UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

NO. 19-2041

_____

**BEATRICE MUNYENYEZI,
PETITIONER-APPELLANT**

**v.**

**UNITED STATES,
RESPONDENT-APPELLEE**

_____

ON APPEAL FROM A JUDGMENT

OF THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

_____

**JOINT APPENDIX**

_____

Richard Guerriero
1st Circuit Bar ID 1164673
NH Bar ID 10530
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com

# TABLE OF CONTENTS

2020-02-01 Docket Sheet 16-cv-402.......................................................................1-6

2020-02-01 Docket Sheet 10-cr-085....................................................................7-49

2010-06-23 Indictment.......................................................................................50-67

2012-03-15 Hung Jury - Mistrial Declared in First Trial..................................68-83

2013-02-05 Motion Hearing............................................................................84-102

2013-02-06 Trial Day 02 am Doc 289 Openings; Zachariah........................103-225

2013-02-06 Trial Day 02 pm Doc 306 Zachariah; Sebaganwa.....................226-297

2013-02-07 Trial Day 03 am Doc 283 Sebaganwa; Nzeyimana...................298-333

2013-02-07 Trial Day 03 pm Doc 290 Nzeyimana; Monica........................334-387

2013-02-08 Trial Day 04 Doc 301 Monica; Nyiraminani............................388-523

2013-02-11 Trial Day 05 am Doc 284 Longman.........................................524-662

2013-02-11 Trial Day 05 pm Doc 291 Longman.........................................663-734

2013-02-12 Trial Day 06 am Doc 307 Rutaganda; Benn.............................735-857

2013-02-12 Trial Day 06 pm Doc 285 Heflin; Kamanzi.............................858-936

2013-02-13 Trial Day 07 am Doc 292 Kamanzi; Violo; Mukeshimana.....937-1053

2013-02-13 Trial Day 07 pm Doc 302 Mukeshimana; Salidzik...............1054-1116

2013-02-14 Trial Day 08 am Doc 296 Sibomana; Andersen....................1117-1232

2013-02-14 Trial Day 08 pm Doc 300 Andersen; Fox.............................1233-1301

2013-02-15 Trial Day 09 am Doc 308 Hitimana; Ahishakiye; Uwiteyakazana

…………………………………………………………...……........1302-1381

2013-02-15 Trial Day 09 pm Doc 286 Uwiteyakazana; Habinshuti;

Nyiramariro...........................................................................1382-1460

2013-02-19 Trial Day 10 am Doc 293 Endless..........................................1461-1614

2013-02-19 Trial Day 10 pm Doc 297 Mukamwiza..................................1615-1660

2013-02-20 Trial Day 11 Doc 309 Closings; Verbal Jury Instructions ....1661-1822

2013-02-20 Trial Written Jury Instructions 2013 and 2012 trials ............1823-1886

2013-02-21 Verdict Form....................................................................1887

2013-02-21 Verdict Transcript Doc 303....................................................1888-1893

2013-02-25 Order Revoking Citizenship...................................................1894-1895

2013-07-15 Sentencing Hearing..............................................................1896-1948

2013-07-17 Judgement Imposing Sentence...............................................1949-1954

2015-03-25 Opinion of First Circuit on Appeal in 13-1950.....................1955-1970

2016-09-06 Munyenyezi Motion Under 28 USC 2255............................1971-1994

2017-03-06 Government Motion to Dismiss 28 USC 2255 Petition…......1995-2017

2017-04-14 Munyenyezi Response to Government Motion to Dismiss

.......................................................................................2018-2027

2017-07-17 Amended 2255 Claim Adding Maslenjak issue.....................2028-2033

2017-08-30 District Court Order Denying Motion to Vacate...................2034-2040

2017-08-31 District Court Judgment Denying Motion to Vacate......................2041

2017-11-06 Munyenyezi Notice of Appeal...............................................2042-2045

2019-02-07 First Circuit Order Remanding re Maslenjak.......................2046-2047

2019-03-29 Government Response to Claim Based on Maslenjak...........2048-2069

2019-07-30 Munyenyezi Memorandum in Support of Maslenjak Claim..2070-2098

2019-10-12 Munyenyezi Notice of Appeal.........................................................2099

ADMIN,APPEAL,CLOSED

# U.S. District Court
## District of New Hampshire (Concord)
## CIVIL DOCKET FOR CASE #: 1:16-cv-00402-SM

Munyenyezi v. USA                                  Date Filed: 09/06/2016
Assigned to: Judge Steven J. McAuliffe            Date Terminated: 10/10/2019
Related Case: 1:10-cr-00085-SM-1                   Jury Demand: None
Case in other court:  CCA, 18-01023               Nature of Suit: 510 Prisoner: Vacate
        Circuit Court of Appeals, 19-02041       Sentence
Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence    Jurisdiction: U.S. Government Defendant

### Petitioner

**Beatrice Munyenyezi**                represented by    **Richard Guerriero**
#11805-049                                             Lothstein Guerriero
Aliceville - FCI                                       39 Central Sq, Ste 202
Federal Correctional Institution                      Keene, NH 03431
PO Box 4000                                           603 352-5000
Aliceville, AL 35442                                  Email: richard@nhdefender.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


V.

### Respondent

**USA**                                represented by    **John A. Capin**
                                                      US Attorney's Office (MA)
                                                      1 Courthouse Way, Ste 9200
                                                      Boston, MA 02210
                                                      617 748-3264
                                                      Email: john.capin@usdoj.gov
                                                      *LEAD ATTORNEY*

                                                      **Mark Quinlivan**
                                                      US Attorney's Office (MA)
                                                      1 Courthouse Way, Ste 9200
                                                      Boston, MA 02210
                                                      617 748-3606
                                                      Email: mark.quinlivan@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Seth R. Aframe**
                                                      US Attorney's Office (NH)
                                                      James C Cleveland Federal Bldg
                                                      53 Pleasant St, 4th Flr
                                                      Concord, NH 03301
                                                      603 230-2532
                                                      Email: seth.aframe@usdoj.gov
                                                      *TERMINATED: 12/01/2016*

Appendix Page 1

| Date Filed | # | Docket Text |
|---|---|---|
| 09/06/2016 | 1 | MOTION to Vacate Sentence under 28 USC 2255 filed by Beatrice Munyenyezi. Notice of Filing to US Attorney with copy of the motion. See also Criminal Case No. 1:10-cr-85-SM-01.(lml) (Entered: 09/08/2016) |
| 09/06/2016 | 2 | MOTION to Proceed In Forma Pauperis filed by Beatrice Munyenyezi.(lml) (Entered: 09/08/2016) |
| 09/06/2016 | 3 | MOTION to Appoint Counsel filed by Beatrice Munyenyezi.(lml) (Entered: 09/08/2016) |
| 09/06/2016 | | Case assigned to Judge Steven J. McAuliffe. The case designation is: 1:16-cv-402-SM. Please show this number with the judge designation on all future pleadings. (lml) (Entered: 09/08/2016) |
| 09/08/2016 | | NOTICE of Filing - Case filed under 28 U.S.C. 2255. A copy of the petition has been electronically sent via ECF to your office. No further action is required by the United States Attorney unless directed by the presiding judge.(lml) (Entered: 09/08/2016) |
| 09/08/2016 | | NOTICE. This case has been designated for Electronic Case Filing. All further submissions shall be filed in compliance with the Administrative Procedures for Electronic Case Filing. Pro se litigants are not required to file electronically and may continue to file documents in paper format. Persons filing electronically are strongly encouraged to complete the interactive training modules available on the courts website. To access these modules, click HERE.(lml) (Entered: 09/08/2016) |
| 09/08/2016 | | **ENDORSED ORDER denying as moot 2 Motion to Proceed in forma pauperis. *Text of Order: There is no filing fee associated with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255. Accordingly, the request to proceed in forma pauperis is denied as moot. So Ordered by Magistrate Judge Andrea K. Johnstone.*(lml)** (Entered: 09/09/2016) |
| 09/09/2016 | 4 | NOTICE of Attorney Appearance by Seth R. Aframe on behalf of USA Attorney Seth R. Aframe added to party USA(pty:res).(Aframe, Seth) (Entered: 09/09/2016) |
| 10/03/2016 | 5 | **ORDER: US Attorney to answer 1 Motion to Vacate Sentence - 2255 on or before November 15, 2016. So Ordered by Judge Steven J. McAuliffe.(jbw)** (Entered: 10/03/2016) |
| 12/01/2016 | 6 | NOTICE of Attorney Appearance by John A. Capin on behalf of USA Attorney John A. Capin added to party USA(pty:res).(Capin, John) (Entered: 12/01/2016) |
| 12/01/2016 | 7 | MOTION to Extend Time to Answer to January 16, 2017 filed by USA. Follow up on Objection on 12/15/2016. The deadline DOES NOT consider the three additional days for mail service that may be applicable to certain parties under Fed. R. Civ. P. 6(d) and Fed. R. Crim. P. 45(c).(Capin, John) (Entered: 12/01/2016) |
| 12/20/2016 | | **ENDORSED ORDER granting 7 Motion to Extend Time to Answer. *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe.(lat)** (Entered: 12/20/2016) |
| 01/16/2017 | 8 | MOTION to Extend Time to February 15, 2017 *to Repsond to Section 2255 Petition* filed by USA. Follow up on Objection on 1/30/2017. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Capin, John) (Entered: 01/16/2017) |
| 01/19/2017 | | **ENDORSED ORDER granting 8 Motion to Extend Time to February 15, 2017, to Respond to Section 2255 Petition. *Text of Order: Granted, until March 3, 2017 (the court will not have an opportunity to consider the response before that date). Petitioner*** |

| | | |
|---|---|---|
| | | *may, of course file an objection if she chooses. As the time for filing has expired at this point, the extension requested is modest, and petitioner did not object to the prior request for extension of time, it seems administratively convenient to grant the request without further delay. An objection, however, if filed, will be considered.* **So Ordered by Judge Steven J. McAuliffe. Answer Follow Up on 3/3/2017.(lat)** (Entered: 01/20/2017) |
| 03/06/2017 | [9](#) | MOTION to Dismiss *28 U.S.C. Section 2255 Petition* filed by Beatrice Munyenyezi. Attorney John A. Capin added to party Beatrice Munyenyezi(pty:pet). Follow up on Objection on 3/20/2017. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Capin, John) (Entered: 03/06/2017) |
| 04/14/2017 | [10](#) | RESPONSE to Motion re [9](#) MOTION to Dismiss *28 U.S.C. Section 2255 Petition* & Conditional Acceptance of Motion to Dismiss Via Proof of Claims: and Writ of Constitutional Challenge Pursuant to Article I, Section 8, Clause 17 filed by Beatrice Munyenyezi. (Attachments: # [1](#) Exhibit 1 - Email dated 10/15/2015, # [2](#) Exhibit A - Federal Legislative Criminal Jurisdiction, # [3](#) Exhibit B - Dunn and Bradstreet Numbers of the US Corporate Government and Most of Its Major Agencies, # [4](#) copy of mailing envelope)(jbw) (Entered: 04/17/2017) |
| 07/17/2017 | [11](#) | MOTION Pursuant to Rule 15, Part 2(d), AMENDED AND SUPPLEMENTAL PLEADINGS filed by Beatrice Munyenyezi. Follow up on Objection on 7/31/2017. (jbw) (Entered: 07/17/2017) |
| 08/09/2017 | | **ENDORSED ORDER granting [11](#) Motion Pursuant to Rule 15, Part 2(d).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe.(lat)** (Entered: 08/09/2017) |
| 08/30/2017 | [12](#) | **/// ORDER denying [1](#) MOTION to Vacate Sentence under 28 USC 2255. The Court declines to issue a certificate of appealability. So Ordered by Judge Steven J. McAuliffe.(jbw)** (Entered: 08/31/2017) |
| 08/30/2017 | | **ENDORSED ORDER granting [9](#) MOTION to Dismiss 28 U.S.C. Section 2255 Petition.** *Text of Order: Granted (see contemporaneous order).* **So Ordered by Judge Steven J. McAuliffe.(jbw)** (Entered: 08/31/2017) |
| 08/31/2017 | | **ENDORSED ORDER denying [3](#) Motion to Appoint Counsel.** *Text of Order: Denied.* **So Ordered by Judge Steven J. McAuliffe.(jbw)** (Entered: 08/31/2017) |
| 08/31/2017 | [13](#) | **JUDGMENT is hereby entered in accordance with Orders by U.S. District Judge Steven J. McAuliffe on August 30, 2017. Signed by Daniel J. Lynch, Clerk of Court.** *(Case Closed)* **(jbw)** (Entered: 08/31/2017) |
| 11/06/2017 | [14](#) | NOTICE OF APPEAL as to [12](#) ORDER denying [1](#) MOTION to Vacate Sentence under 28 USC § 2255 by Beatrice Munyenyezi. File-stamped copy to be sent to parties/USCA by Clerks Office.<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel and pro se parties should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf**(jbw) (Entered: 12/28/2017) |
| 12/20/2017 | [15](#) | USCA JUDGMENT as to [14](#) Notice of Appeal filed by Beatrice Munyenyezi - the notice of appeal to be sent to the district clerk for docketing. A new proceeding will be opened in this court in the ordinary course.(jbw) (Entered: 12/28/2017) |
| 12/28/2017 | [16](#) | Appeal Cover Sheet as to [14](#) Notice of Appeal filed by Beatrice Munyenyezi. (jbw) (Entered: 12/28/2017) |
| 12/28/2017 | [17](#) | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals, documents |

Appendix Page 3

| | | |
|---|---|---|
| | | numbered 12, Endorsed order granting 9 Motion to Dismiss Petition, 13 - 16, re 14 Notice of Appeal. A copy of the Notice of Appeal mailed to all parties this date.(jbw) (Entered: 12/28/2017) |
| 12/28/2017 | 18 | Clerk's AMENDED Certificate transmitting Record on Appeal to US Court of Appeals, documents numbered 11, 12, Endorsed Order granting 9 Motion to Dismiss Petition, 13 - 16, re 14 Notice of Appeal (to add doc. no. 11). A copy of the Notice of Appeal mailed to all parties this date.(jbw) (Entered: 12/28/2017) |
| 01/10/2018 | | Appellate Case Number: CCA 18-1023 re 14 Notice of Appeal filed by Beatrice Munyenyezi.(jbw) (Entered: 01/10/2018) |
| 02/07/2019 | 19 | USCA JUDGMENT as to 14 Notice of Appeal filed by Beatrice Munyenyezi: The judgment of the district court is vacated, only insofar as it denied the Maslenjak claim, and the case is remanded to the district court for further proceedings consistent with this judgment.(lml) (Entered: 02/08/2019) |
| 02/13/2019 | | **ENDORSED ORDER. *Text of Order: Attorney Richard Guerriero is hereby appointed to represent the petitioner in regards to this case until further order of the court.* So Ordered by Judge Steven J. McAuliffe.**(lml) (Entered: 02/14/2019) |
| 02/13/2019 | | **ENDORSED ORDER. *Text of Order: The government shall file a legal memorandum fully addressing petitioner's claim for relief (28 U.S.C. ss 2255) under the Supreme Courts holding in Maslenjak v. United States, 137 S. Ct. 1918 (2017), on or before March 15, 2019. Counsel will be appointed for petitioner with respect to that claim. Counsel shall file a responsive legal memorandum on behalf of petitioner on or before April 13, 2019. Petitioner is free, if she wishes, to file a pro se memorandum in addition to that filed by appointed counsel.* So Ordered by Judge Steven J. McAuliffe. (Respondent's legal memo due 3/15/2019, Petitioner's reply memo due 4/13/2019.)** (lml) (Entered: 02/14/2019) |
| 03/08/2019 | 20 | NOTICE of Attorney Appearance by Mark Quinlivan on behalf of USA Attorney Mark Quinlivan added to party USA(pty:res).(Quinlivan, Mark) (Entered: 03/08/2019) |
| 03/14/2019 | 21 | Assented to MOTION to Extend Time to March 29, 2019 *to file Memorandum Addressing Claim Based on Maslenjak v. United States* filed by USA.(Quinlivan, Mark) (Entered: 03/14/2019) |
| 03/14/2019 | | **ENDORSED ORDER granting 21 Assented to Motion to Extend Time to March 29, 2019 to file Memorandum Addressing Claim Based on Maslenjak v. United States. *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Legal memo due 3/29/2019.** (lml) (Entered: 03/15/2019) |
| 03/29/2019 | 22 | RESPONSE to Motion re 1 Motion to Vacate Sentence - 2255 filed by USA. (Quinlivan, Mark) (Entered: 03/29/2019) |
| 04/03/2019 | 24 | MANDATE of USCA as to 14 Notice of Appeal filed by Beatrice Munyenyezi. (lml) (Entered: 04/04/2019) |
| 04/04/2019 | 23 | Assented to MOTION to Extend Time to File Petitioner's Memorandum Until 4/29/2019 filed by Beatrice Munyenyezi.(Guerriero, Richard) (Entered: 04/04/2019) |
| 04/05/2019 | | **ENDORSED ORDER granting 23 Assented to Motion to Extend Time to File Petitioner's Memorandum. *Text of Order: Granted.* So Ordered by Magistrate Judge Andrea K. Johnstone. Reply Brief due 4/29/2019.**(lml) (Entered: 04/05/2019) |
| 04/22/2019 | 25 | Assented to MOTION to Extend Time to Object/Respond to 07/29/2019 filed by Beatrice Munyenyezi.(Guerriero, Richard) (Entered: 04/22/2019) |

Appendix Page 4

| 04/22/2019 | | **ENDORSED ORDER granting 25 Assented to Motion to Extend Time to Object/Respond. *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Follow up on Reply on 7/29/2019. (lml)** (Entered: 04/22/2019) |
|---|---|---|
| 07/29/2019 | 26 | Assented to MOTION to Extend Time to File Legal Memorandum to 7/30/2019 filed by Beatrice Munyenyezi.(Guerriero, Richard) (Entered: 07/29/2019) |
| 07/29/2019 | | **ENDORSED ORDER granting 26 Assented to Motion to Extend Time to File Legal Memorandum to 7/30/2019. *Text of Order: Granted.* So Ordered by Magistrate Judge Andrea K. Johnstone. Follow up on Reply on 7/30/2019. (lw)** (Entered: 07/29/2019) |
| 07/30/2019 | 27 | BRIEF/MEMORANDUM *in Support of Motion Pursuant to 28 USC 2255* by Beatrice Munyenyezi (Attachments: # 1 Exhibit Letter from Donald Salzman, # 2 Exhibit (Affidavit) Affidavit of David Ruoff, # 3 Exhibit (Affidavit) Affidavit of Mark Howard) (Guerriero, Richard) (Entered: 07/30/2019) |
| 10/10/2019 | 28 | **///ORDER denying 1 Motion to Vacate Sentence - 2255. Petitioner's Motion to Vacate Sentence under 28 U.S.C. § 2255 (document no. 1, as amended by document no. 11) is denied. The Clerk of Court shall enter judgment in accordance with this order and close the case. So Ordered by Judge Steven J. McAuliffe. (lw)** (Entered: 10/10/2019) |
| 10/10/2019 | 29 | **AMENDED JUDGMENT is hereby entered in accordance with 12 Order, Endorsed Order on Motion to Dismiss, 28 Order on Motion to Vacate Sentence under 28 USC 2255. Signed by Daniel J. Lynch, Clerk of Court. *(Case Closed)* (lw)** Modified on 10/10/2019 to add: amended text (lw). (Entered: 10/10/2019) |
| 10/12/2019 | 30 | NOTICE OF APPEAL as to 28 Order on Motion to Vacate Sentence under 28 USC 2255, 29 Judgment, by Beatrice Munyenyezi. (No fee paid, USA or IFP.) [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** (Guerriero, Richard) (Entered: 10/12/2019) |
| 10/16/2019 | 31 | Appeal Cover Sheet as to 30 Notice of Appeal filed by Beatrice Munyenyezi. (lw) (Entered: 10/16/2019) |
| 10/16/2019 | 32 | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals documents numbered 28 - 32, re: 30 Notice of Appeal. A copy of the Notice of Appeal mailed to all parties this date. (lw) (Entered: 10/16/2019) |
| 10/21/2019 | | Appellate Case Number: Circuit Court of Appeals 19-2041 re: 30 Notice of Appeal filed by Beatrice Munyenyezi. (lw) (Entered: 10/21/2019) |
| 11/12/2019 | | CJA 20 Payment Information. Authorization given to pay counsel for representation under the Criminal Justice Act in the following amount. **Richard Guerriero:** $8,374.80. (mp) (Entered: 11/12/2019) |

---

| **PACER Service Center** |
|---|
| **Transaction Receipt** |
| 02/01/2020 09:50:38 |

Appendix Page 5

| PACER Login: | guerrieropacer | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:16-cv-00402-SM |
| Billable Pages: | 5 | Cost: | 0.50 |
| Exempt flag: | Exempt | Exempt reason: | Exempt CJA |

Appendix Page 6

CLOSED,CONFLICT-FD

# U.S. District Court
## District of New Hampshire (Concord)
## CRIMINAL DOCKET FOR CASE #: 1:10-cr-00085-SM-1

Case title: USA v. Munyenyezi

Date Filed: 06/23/2010
Date Terminated: 07/17/2013

---

Assigned to: Judge Steven J. McAuliffe

Appeals court case number: 13-1950 CCA

## Defendant (1)

**Beatrice Munyenyezi**
*TERMINATED: 07/17/2013*

represented by **David W. Ruoff**
Howard & Ruoff PLLC
831 Union St
Manchester, NH 03104
603 625-1254
Fax: 603 203-5268
Email: druoff@howardruoff.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Mark E. Howard**
Howard & Ruoff PLLC
831 Union Street
Manchester, NH 03104
603 625-1254
Fax: 603-625-2504
Email: mhoward@howardruoff.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

## Pending Counts

18 U.S.C. 1425(a) PROCUREMENT OF
CITIZENSHIP OR NATURALIZATION
UNLAWFULLY
(1)

18 U.S.C. 1425(b) PROCUREMENT OF
CITIZENSHIP OR NATURALIZATION
UNLAWFULLY
(2)

## Disposition

Defendant to be imprisoned for a total term
of 120 months on each of Counts One and
Two, both terms to be served concurrently;
Three years supervised release on Counts
One and Two, both terms to run
concurrently, with standard and special
conditions; $200.00 Special Assessment;
Fine waived. Defendant to be remanded to
the custody of the U.S. Marshal.

Defendant to be imprisoned for a total term
of 120 months on each of Counts One and
Two, both terms to be served concurrently;
Three years supervised release on Counts

Appendix Page 7

One and Two, both terms to run concurrently, with standard and special conditions; $200.00 Special Assessment; Fine waived. Defendant to be remanded to the custody of the U.S. Marshal.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                           **Disposition**

None

---

**Plaintiff**

**USA**                                    represented by   **Aloke S. Chakravarty**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
617-748-3658
Email: aloke.chakravarty@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Donald A. Feith**
US Attorney's Office (NH)
James C. Cleveland Federal Building
53 Pleasant St, 4th Flr
Concord, NH 03301-0001
603 225-1552
Email: donald.feith@usdoj.gov
*TERMINATED: 10/17/2011*

**Jeffrey Auerhahn**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 225-1552
Email: jeffrey.auerhahn@usdoj.gov
*TERMINATED: 12/16/2010*

**John A. Capin**
US Attorney's Office (MA)
1 Courthouse Way, Ste 9200

Appendix Page 8

Boston, MA 02210
617 748-3264
Email: john.capin@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/23/2010 | [3](#) | Praecipe for Warrant by USA as to Beatrice Munyenyezi. (jab) (Entered: 06/23/2010) |
| 06/23/2010 | [4](#) | MOTION to Seal Case at Level I until defendant is taken into custody by USA as to Beatrice Munyenyezi. (jab) (Entered: 06/23/2010) |
| 06/23/2010 | | **ENDORSED ORDER granting [3](#) Motion to Seal Case at Level I as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Magistrate Judge Landya B. McCafferty. (jab)** (Entered: 06/23/2010) |
| 06/23/2010 | | Arrest Warrant Issued as to Beatrice Munyenyezi. Original warrant and copies to US Marshal and US Probation. (jab) (Entered: 06/23/2010) |
| 06/23/2010 | [1](#) | INDICTMENT as to Beatrice Munyenyezi (1) count(s) 1-2. *Original document available in clerks office.*(jab) Modified on 6/24/2010 to remove "SEALED" (kad). (Entered: 06/24/2010) |
| 06/24/2010 | | Arrest of Beatrice Munyenyezi. (kad) (Entered: 06/24/2010) |
| 06/24/2010 | | NOTICE to Attorneys of Record: The case has been unsealed. Defendant arrested. All future pleadings shall be filed in accordance with this district's Administrative Procedures for Electronic Case Filing. (kad) (Entered: 06/24/2010) |
| 06/24/2010 | [5](#) | NOTICE OF ATTORNEY APPEARANCE Jeffrey Auerhahn appearing for USA. (Auerhahn, Jeffrey) (Entered: 06/24/2010) |
| 06/24/2010 | [6](#) | Arrest Warrant Returned Executed on 6/24/2010 as to Beatrice Munyenyezi. (jab) (Entered: 06/25/2010) |
| 06/24/2010 | [7](#) | **CJA 20 as to Beatrice Munyenyezi: Appointment of Attorney David W. Ruoff for Beatrice Munyenyezi for criminal case representation. NOTICE: COUNSEL SHALL PRINT AND SUBMIT COMPLETED VOUCHER FOR PAYMENT AT APPROPRIATE TIME. Signed by Clerk James R. Starr. Follow up on submission of CJA Voucher on 12/27/2010. (Attachments: # [1](#) CJA Attorney Fact Sheet)(kad)** (Entered: 06/25/2010) |
| 06/24/2010 | [8](#) | MOTION to Appoint Counsel with Financial Declaration by Beatrice Munyenyezi. *Original document available in clerks office.* (kad) Modified on 6/25/2010 to CORRECT DATE FILED(kad). (Entered: 06/25/2010) |
| 06/24/2010 | | **ENDORSED ORDER approving [8](#) Motion to Appoint Counsel as to Beatrice Munyenyezi (1). *Text of Order: Request approved. Appoint counsel.* So Ordered by Magistrate Judge Daniel J. Lynch. (kad)** (Entered: 06/25/2010) |
| 06/24/2010 | | Minute Entry for proceedings held before Magistrate Judge Daniel J. Lynch: INITIAL APPEARANCE and ARRAIGNMENT as to Beatrice Munyenyezi (1) Count 1,2 held on 6/24/2010. Defendant: sworn, advised of rights & charges, waived reading of indictment, and pled not guilty. Court approves financial affidavit. Trial Date: 8/3/2010, 3-4 weeks, complex case, status conference to be scheduled within 14 days. DETENTION HEARING as to Beatrice Munyenyezi held on 6/24/2010. Defendant detained, order to issue. (Tape #2:13, 2:34) (Govt Atty: Jeffrey Auerhahn) (Defts Atty: David Ruoff) (USP: Jodi Gauvin)(Total Hearing Time: 36)(CLA Time: 51) (kad) (Entered: 06/25/2010) |

| 06/25/2010 | 9 | **ORDER OF DETENTION as to Beatrice Munyenyezi. So Ordered by Magistrate Judge Daniel J. Lynch. (kad)** (Entered: 06/25/2010) |
|---|---|---|
| 06/28/2010 | 10 | Assented to MOTION to Appoint Co-Counsel by Beatrice Munyenyezi. (Howard, Mark) (Entered: 06/28/2010) |
| 06/28/2010 | | **ENDORSED ORDER granting 10 Assented to MOTION to Appoint Co-Counsel as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Chief Judge Steven J. McAuliffe. (jab)** (Entered: 06/29/2010) |
| 06/28/2010 | 11 | **CJA 20 as to Beatrice Munyenyezi: Appointment of Attorney Mark E. Howard as co-counsel for Beatrice Munyenyezi for criminal case representation. NOTICE: COUNSEL SHALL PRINT AND SUBMIT COMPLETED VOUCHER FOR PAYMENT AT APPROPRIATE TIME. Signed by Clerk James R. Starr. Follow up on submission of CJA Voucher on 12/30/2010. (Attachments: # 1 CJA Panel Attorney Fact Sheet)(jab)** (Entered: 06/29/2010) |
| 06/28/2010 | 12 | Arrest Warrant Returned Executed on 6/24/2010 as to Beatrice Munyenyezi. (jab) (Entered: 06/29/2010) |
| 06/29/2010 | | [FILED IN ERROR - Docket Entry filed in wrong criminal case.] RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi: Sentencing rescheduled for 7/16/2010 01:30 PM before Chief Judge Steven J. McAuliffe.*The court has allotted 1 1/2 hours for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* (jab) Modified on 6/29/2010 to add text in brackets. (jab). (Entered: 06/29/2010) |
| 06/29/2010 | | Corrective Entry to Rescheduling Notice of Hearing. Entry corrected by adding the following docket text to the beginning of the docket entry, [FILED IN ERROR - Docket Entry filed in wrong criminal case.] (jab) (Entered: 06/29/2010) |
| 06/30/2010 | | TRIAL NOTICE: Jury Selection/Trial set for two week period beginning 8/3/2010 09:30 AM before Chief Judge Steven J. McAuliffe. Final Pretrial Conference set for 7/23/2010 03:00 PM before Chief Judge Steven J. McAuliffe. (jab) (Entered: 06/30/2010) |
| 06/30/2010 | | NOTICE OF HEARING as to Beatrice Munyenyezi: Status Conference re: Complex Case set for 7/16/2010 11:00 AM before Chief Judge Steven J. McAuliffe. (jab) (Entered: 06/30/2010) |
| 07/16/2010 | | TRIAL NOTICE: Jury Selection/Trial set for two week period beginning 5/17/2011 09:30 AM before Chief Judge Steven J. McAuliffe. Final Pretrial Conference set for 5/6/2011 04:00 PM before Chief Judge Steven J. McAuliffe. (vln) (Entered: 07/16/2010) |
| 07/16/2010 | | Minute Entry for proceedings held before Chief Judge Steven J. McAuliffe: STATUS CONFERENCE as to Beatrice Munyenyezi held on 7/16/2010. Trial scheduled for the May 2011 trial period. (Court Reporter: Diane Churas) (Govt Atty: Jeffrey Auerhaun, Aloke Chakravarty) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 35 minutes)(CJA Time: 40 minutes) (vln) (Entered: 07/16/2010) |
| 08/16/2010 | 13 | **PRETRIAL SCHEDULING ORDER as to Beatrice Munyenyezi: Jury Trial set for 5/17/2011. So Ordered by Chief Judge Steven J. McAuliffe. (jab)** (Entered: 08/16/2010) |
| 08/26/2010 | 14 | MOTION for Discovery by Beatrice Munyenyezi. Follow up on Objection on 9/13/2010. (Howard, Mark) (Entered: 08/26/2010) |
| 09/01/2010 | 15 | SEALED Response to Defendant's motion re: 14 Motion for Discovery at Level I filed by USA. (jab) (Entered: 09/01/2010) |

| | | |
|---|---|---|
| 09/01/2010 | 16 | SEALED MOTION and Memorandum in Support of Protective Order at Level I by USA as to Beatrice Munyenyezi. Served on 8/31/2010. Follow up on Objection on 9/20/2010. (Attachments: # 1 Proposed Protective Order) (jab) (Entered: 09/01/2010) |
| 09/01/2010 | 17 | SEALED MOTION for leave to File 15 Response (and 16 motion for protective order) Under Seal at Level I by USA as to Beatrice Munyenyezi. Served on 8/31/2010. Follow up on Objection on 9/20/2010. (jab) (Entered: 09/01/2010) |
| 09/16/2010 | | NOTICE OF HEARING as to Beatrice Munyenyezi: Telephone Conference set for 9/16/2010 02:30 PM before Magistrate Judge Landya B. McCafferty. The court will initiate the call. (jab) (Entered: 09/16/2010) |
| 09/16/2010 | | RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi: Telephone Conference set for **9/17/2010 at 2:30 PM** before Magistrate Judge Landya B. McCafferty. The court will initiate the call. (mm) (Entered: 09/16/2010) |
| 09/17/2010 | 18 | MOTION for Bail *Review Pursuant to 18 USC 3142(f)(2)(B)* by Beatrice Munyenyezi. Follow up on Objection on 10/4/2010. (Attachments: # 1 Exhibit 1 News Advisory, # 2 Exhibit 2 Doubt Article, # 3 Exhibit 3 Kobagaya Indictment, # 4 Exhibit 4 Kobagaya Bail Order, # 5 Exhibit 5 Kobagaya Conditions of Release, # 6 Exhibit 6 2/24/06 Testimony, # 7 Exhibit 7 2/27/06 Testimony, # 8 Exhibit 8 2/28/06 Testimony, # 9 Exhibit 9 Declaration of Attorney Marquis, # 10 Exhibit Kobygaya Bail Memo, # 11 Exhibit Order of High Court UK) (Ruoff, David) (Entered: 09/17/2010) |
| 09/17/2010 | | Minute Entry for proceedings held before Magistrate Judge Landya B. McCafferty: TELEPHONE CONFERENCE as to Beatrice Munyenyezi held on 9/17/2010. (Govt Atty: Al Chakravarty, Jeff Auerhahn) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 1 hour 10 minutes) (jab) (Entered: 09/17/2010) |
| 09/20/2010 | 19 | **ORDER re: telephone conference: Parties to file a joint proposed protective order on or before September 24, 2010; granting 17 Sealed Motion for Leave to File Response Under Seal as to Beatrice Munyenyezi (1). So Ordered by Magistrate Judge Landya B. McCafferty. [Miscellaneous deadline set for 9/24/2010.] (jab)** (Entered: 09/20/2010) |
| 09/27/2010 | 20 | Joint Submission of Proposed Protective Order by Beatrice Munyenyezi (Attachments: # 1 Proposed Order Protective Order)(Howard, Mark) (Entered: 09/27/2010) |
| 09/28/2010 | | **ENDORSED ORDER as to Beatrice Munyenyezi granting 20 Joint Submission of Proposed Protective Order.** *Text of Order: Granted.* **So Ordered by Magistrate Judge Landya B. McCafferty. (jab)** (Entered: 09/29/2010) |
| 09/28/2010 | 21 | **PROTECTIVE ORDER as to Beatrice Munyenyezi. So Ordered by Magistrate Judge Landya B. McCafferty. (jab)** (Entered: 09/29/2010) |
| 10/01/2010 | 22 | MEMORANDUM in Opposition by USA as to Beatrice Munyenyezi re 18 MOTION for Bail *Review Pursuant to 18 USC 3142(f)(2)(B) (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Auerhahn, Jeffrey) Modified on 10/1/2010 to remove duplicate text (vln). (Entered: 10/01/2010)* |
| 10/01/2010 | | NOTICE of ECF Filing Error re: 22 Memorandum in Opposition to Motion, filed by USA. No description of exhibit or attachment was included. Exhibit or attachment shall be followed by a short description of the document and shall not exceed five words. AP 2.5(a). See How to Properly Attach Exhibits to Pleadings. NO ACTION REQUIRED - FOR INFORMATIONAL PURPOSES ONLY AND MERELY INTENDED TO EDUCATE ALL PARTIES IN THE CASE. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1423. (vln) (Entered: 10/01/2010) |

| 10/01/2010 | 24 | Assented to MOTION to Seal Document *Supplemental Meorandum in Opposition to Motion for Release from Pre-Trial Detention* at Level I *by* USA as to Beatrice Munyenyezi. (Auerhahn, Jeffrey) (Entered: 10/01/2010) |
| 10/05/2010 | 25 | Assented to MOTION for Leave to File Reply to Government's Objection to Bail *Review* by Beatrice Munyenyezi. (Howard, Mark) (Entered: 10/05/2010) |
| 10/06/2010 | | **ENDORSED ORDER granting 25 Assented to MOTION for Leave to File Reply to Government's Objection to Bail *Review* on or before 10/8/2010 as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Magistrate Judge Landya B. McCafferty. (jab)** (Entered: 10/06/2010) |
| 10/08/2010 | 26 | RESPONSE by Beatrice Munyenyezi re 22 Memorandum in Opposition to Motion,. (Howard, Mark) Modified on 10/12/2010 to add link to 18 motion for bail hearing. jab). (Entered: 10/08/2010) |
| 10/13/2010 | | **ENDORSED ORDER mooting 14 Motion for Discovery as to Beatrice Munyenyezi (1).** *Text of Order: Moot in light of the Protective Order (doc. no. 21)* **So Ordered by Magistrate Judge Landya B. McCafferty. (jab)** (Entered: 10/13/2010) |
| 10/22/2010 | | **ENDORSED ORDER granting 24 Motion to Seal 23 Supplemental Memorandum in Opposition to Motion for Release from Pre-Trial Detention at Level I as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Magistrate Judge Landya B. McCafferty. (Sealed Document deadline 10/24/2011.) (jab)** (Entered: 10/22/2010) |
| 11/03/2010 | | **ENDORSED ORDER granting 18 Motion for Bail Review Hearing as to Beatrice Munyenyezi (1).** *Text of Order: Granted with respect to scheduling a hearing on the question of bail.* **So Ordered by Magistrate Judge Landya B. McCafferty. (jab)** (Entered: 11/04/2010) |
| 11/04/2010 | | NOTICE OF HEARING as to Beatrice Munyenyezi: Bail Review Hearing set for 11/15/2010 01:30 PM before Magistrate Judge Landya B. McCafferty. (jab) (Entered: 11/04/2010) |
| 11/05/2010 | | NOTICE OF HEARING as to Beatrice Munyenyezi: Telephone Conference set for 11/10/2010 03:30 PM before Magistrate Judge Landya B. McCafferty. The court will initiate the call. (kad) (Entered: 11/05/2010) |
| 11/10/2010 | | Minute Entry for proceedings held before Magistrate Judge Landya B. McCafferty: TELEPHONE CONFERENCE as to Beatrice Munyenyezi held on 11/10/2010. Parties agree to change the time for the upcoming hearing on 11/15 to 3pm (Govt Atty: Jeffrey Auerhahn) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 08) (mm) (Entered: 11/10/2010) |
| 11/10/2010 | | NOTICE OF HEARING as to Beatrice Munyenyezi: Bail Review Hearing set for 11/15/2010 **03:00** PM before Magistrate Judge Landya B. McCafferty. (mm) (Entered: 11/10/2010) |
| 11/15/2010 | | Minute Entry for proceedings held before Magistrate Judge Landya B. McCafferty: BAIL HEARING as to Beatrice Munyenyezi held on 11/15/2010. Taken Under Advisment. (Court Reporter: S. Bailey) (Govt Atty: Jeffrey Auerhahn) (Defts Atty: David Ruoff, Mark Howard) (USP: Janice Benard)(Total Hearing Time: 1 hr 7 min)(CJA Time: 1 hr 7 min) (amm) (Entered: 11/15/2010) |
| 11/16/2010 | 27 | Letter to Magistrate Judge to correct misstatement during hearing and provide additional information by USA as to Beatrice Munyenyezi (Auerhahn, Jeffrey) (Entered: 11/16/2010) |
| 11/24/2010 | 28 | **ORDER re: Bail Review** ~~Appendix Page 142~~ **Beatrice Munyenyezi. So Ordered by** |

| | | **Magistrate Judge Landya B. McCafferty. (jab)** (Entered: 11/24/2010) |
|---|---|---|
| 12/16/2010 | 29 | NOTICE of Attorney Withdrawal of AUSA Jeffrey Auerhahn filed by Donald A. Feith as to Beatrice Munyenyezi. (Feith, Donald) Modified on 4/13/2011 to add: AUSA Jeffrey Auerhahn as the withdrawing AUSA(js). (Entered: 12/16/2010) |
| 02/09/2011 | | NOTICE OF HEARING as to Beatrice Munyenyezi: Status Conference set for 3/7/2011 10:30 AM before Chief Judge Steven J. McAuliffe. (jab) (Entered: 02/09/2011) |
| 02/14/2011 | 30 | Assented to MOTION to Extend Time dispositive and evidentiary motions for two (2) weeks by Beatrice Munyenyezi. (Howard, Mark) (Entered: 02/14/2011) |
| 02/15/2011 | | **ENDORSED ORDER granting 30 Motion to Extend Time to file dispositive and evidentiary motions to 2/25/2011 as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Chief Judge Steven J. McAuliffe. (jab)** (Entered: 02/15/2011) |
| 02/24/2011 | | RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi: Status Conference rescheduled for 3/8/2011 02:00 PM before Chief Judge Steven J. McAuliffe. (jab) (Entered: 02/24/2011) |
| 02/25/2011 | 31 | MOTION to Suppress Eyewitness Identification by Beatrice Munyenyezi. Follow up on Objection on 3/14/2011. (Ruoff, David) (Entered: 02/25/2011) |
| 03/08/2011 | 34 | MOTION to Continue Trial 80 days (Waiver of Speedy Trial to be filed conventionally) by Beatrice Munyenyezi. Follow up on Objection on 3/25/2011. Miscellaneous Deadline set for 3/18/2011. (Ruoff, David) (Entered: 03/08/2011) |
| 03/08/2011 | | Minute Entry for proceedings held before Chief Judge Steven J. McAuliffe: STATUS CONFERENCE as to Beatrice Munyenyezi held on 3/8/2011. Counsel to file briefs w/i 14 days. (Total Hearing Time: 1 hr 40 minutes)(CJA Time: 1 hr 40 minutes) (jab) (Entered: 03/08/2011) |
| 03/08/2011 | 35 | WAIVER of Speedy Trial by Beatrice Munyenyezi. (jab) (Entered: 03/09/2011) |
| 03/08/2011 | 36 | **ORDER re: Pretrial Status Conference as to Beatrice Munyenyezi. So Ordered by Chief Judge Steven J. McAuliffe. (jab)** (Entered: 03/09/2011) |
| 03/16/2011 | 39 | Assented to MOTION for Leave to File Reply to Government's Objection to Motion to Suppress *on or before March 23, 2011* by Beatrice Munyenyezi. (Ruoff, David) (Entered: 03/16/2011) |
| 03/16/2011 | | **ENDORSED ORDER granting 39 Assented to MOTION for Leave to File Reply to Government's Objection to Motion to Suppress *on or before March 23, 2011* as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Chief Judge Steven J. McAuliffe. (jab)** (Entered: 03/17/2011) |
| 03/22/2011 | 40 | MEMORANDUM in Opposition by USA as to Beatrice Munyenyezi re 34 MOTION to Continue Trial 80 days (Waiver of Speedy Trial to be filed conventionally). (Chakravarty, Aloke) (Entered: 03/22/2011) |
| 03/24/2011 | 43 | MEMORANDUM in Support of 34 MOTION to Continue Trial 80 days (Waiver of Speedy Trial to be filed conventionally) (Ruoff, David) Modified on 3/24/2011 to add the text: in support of. (jab) (Entered: 03/24/2011) |
| 03/30/2011 | 49 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Status Conference held on July 16, 2010. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter |

| | | |
|---|---|---|
| | | will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/25/2011. Redacted Transcript Follow Up 5/5/2011. Release of Transcript Restriction set for 6/30/2011. (jab) (Entered: 04/01/2011) |
| 03/31/2011 | 48 | Motion for Transcript at Government Expense *of Status Conference Hearing held on July 16, 2010* by Beatrice Munyenyezi. Follow up on Objection on 4/18/2011. (Ruoff, David) (Entered: 03/31/2011) |
| 04/06/2011 | 50 | ADDENDUM re: 48 Motion for Transcript at Government Expense *of Status Conference Hearing held on July 16, 2010 (Indicating USA's Assent to Motion)* by Beatrice Munyenyezi. (Ruoff, David) (Entered: 04/06/2011) |
| 04/06/2011 | | **ENDORSED ORDER granting 48 Motion for Transcript at Government Expense as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Chief Judge Steven J. McAuliffe. (jab)** (Entered: 04/07/2011) |
| 04/19/2011 | 53 | Notice to Substitute Attorney. Added attorney John A. Capin. Attorney Jeffrey Auerhahn terminated. (Capin, John) (Entered: 04/19/2011) |
| 04/19/2011 | | NOTICE of ECF Filing Error re: 53 Notice to Substitute Attorney filed by USA. No certificate of service. Filer shall file a certificate of service using the *Certificate of Service* event. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1587. Notice of Compliance Deadline set for 4/29/2011. (jab) (Entered: 04/19/2011) |
| 04/19/2011 | 54 | Certificate of Service by USA as to Beatrice Munyenyezi re 53 Notice to Substitute Attorney (Capin, John) (Entered: 04/19/2011) |
| 04/20/2011 | 55 | **ORDER granting 34 Motion to Continue Trial in the interest of justice as to Beatrice Munyenyezi (1). So Ordered by Chief Judge Steven J. McAuliffe. Final Pretrial Conference reset for 2/10/2012 10:00 AM before Chief Judge Steven J. McAuliffe. Jury Selection/Trial reset for two week period beginning 2/22/2012 09:30 AM before Chief Judge Steven J. McAuliffe. (jab)** (Entered: 04/20/2011) |
| 04/20/2011 | | NOTICE OF HEARING as to Beatrice Munyenyezi: Pretrial Status Conferences set for 8/30/2011 10:00 AM and 10/17/2011 10:00 AM before Chief Judge Steven J. McAuliffe. (jab) (Entered: 04/20/2011) |
| 05/05/2011 | | **CJA 24 as to Beatrice Munyenyezi: Authorization to Pay Diane Churas $23.40 for Transcript of Pretrial Status Conference. So Ordered by Chief Judge Steven J. McAuliffe.** *Original document available in clerks office.* **(jab)** (Entered: 05/05/2011) |
| 06/03/2011 | 57 | NOTICE of Scheduling Development re 55 Order on Motion to Continue Trial, by USA as to Beatrice Munyenyezi. (Chakravarty, Aloke) (Entered: 06/03/2011) |
| 08/29/2011 | 58 | Assented to MOTION to Continue Pre-Trial Status Conference *to August 31, 2011* by Beatrice Munyenyezi. (Howard, Mark) (Entered: 08/29/2011) |
| 08/29/2011 | | **ENDORSED ORDER granting 58 Assented to MOTION to Continue Pre-Trial Status Conference *to August 31, 2011* as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Chief Judge Steven J. McAuliffe. Status Conference set for 8/31/2011 10:30 AM before Chief Judge Steven J. McAuliffe. (vln)** (Entered: 08/30/2011) |

Appendix Page 14

| 08/30/2011 | | RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi. Status Conference set for 9/2/2011 10:00 AM before Chief Judge Steven J. McAuliffe. (vln) (Entered: 08/30/2011) |
|---|---|---|
| 09/02/2011 | | Minute Entry for proceedings held before Chief Judge Steven J. McAuliffe: STATUS CONFERENCE as to Beatrice Munyenyezi held on 9/2/2011. (Govt Atty: Aloke S. Chakravarty) (Defts Atty: Mark E. Howard)(Total Hearing Time: 1 hr 30 min)(CJA Time: 1 hr 30 min) (jab) (Entered: 09/07/2011) |
| 10/07/2011 | | NOTICE OF HEARING ON MOTION as to Beatrice Munyenyezi re: 31 MOTION to Suppress Eyewitness Identification. Motion Hearing set for 11/15/2011 10:00 AM before Chief Judge Steven J. McAuliffe. (jab) (Entered: 10/07/2011) |
| 10/17/2011 | | Minute Entry for proceedings held before Chief Judge Steven J. McAuliffe: STATUS CONFERENCE as to Beatrice Munyenyezi held on 10/17/2011. (Govt Atty: John Capin) (Defts Atty: Mark Howard)(Total Hearing Time: 45 minutes)(CJA Time: 45 minutes) (jab) (Entered: 10/17/2011) |
| 10/17/2011 | | RESCHEDULING NOTICE OF HEARING ON MOTION as to Beatrice Munyenyezi re: 31 MOTION to Suppress Eyewitness Identification. Motion Hearing rescheduled for 11/9/2011 10:00 AM before Chief Judge Steven J. McAuliffe. (jab) (Entered: 10/17/2011) |
| 11/09/2011 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: MOTION HEARING as to Beatrice Munyenyezi held on 11/9/2011 re: 31 MOTION to Suppress Eyewitness Identification. Government presents evidence. Oral argument heard. Court denies without prejudice 31 MOTION to Suppress Eyewitness Identification as to Beatrice Munyenyezi. Parties to file legal memos/proposed jury instruction re: genocide by 1/11/2012. [Witnesses Appearing: Thomas Brian Anderson, Jr.] (Court Reporter: Susan Bateman) (Govt Atty: John Capin) (Defts Atty: David Ruoff, Mark Howard)(Total Hearing Time: 2 hr 40 minutes)(CJA Time: 2 hr 45 minutes) (jab) (Entered: 11/09/2011) |
| 11/09/2011 | 61 | EXHIBIT LIST by USA as to Beatrice Munyenyezi re: Suppression Hearing. (jab) (Entered: 11/09/2011) |
| 11/09/2011 | 62 | EXHIBIT LIST by Beatrice Munyenyezi re: Suppression Hearing. (jab) (Entered: 11/09/2011) |
| 11/28/2011 | 63 | Proposed Voir Dire by USA as to Beatrice Munyenyezi. (Capin, John) (Entered: 11/28/2011) |
| 12/13/2011 | 64 | Assented to Motion for Transcript at Government Expense by Beatrice Munyenyezi. (Ruoff, David) (Entered: 12/13/2011) |
| 12/14/2011 | | **ENDORSED ORDER granting 64 Motion for Transcript at Government Expense as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 12/14/2011) |
| 12/16/2011 | | NOTICE OF HEARING as to Beatrice Munyenyezi. Status Conference set for 1/27/2012 02:00 PM before Judge Steven J. McAuliffe. (jab) (Entered: 12/16/2011) |
| 12/20/2011 | 65 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Suppression Hearing held on November 9, 2011. Court Reporter: Susan Bateman, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day |

| | | |
|---|---|---|
| | | period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 1/13/2012. Redacted Transcript Follow Up 1/23/2012. Release of Transcript Restriction set for 3/19/2012. (jab) (Entered: 12/20/2011) |
| 12/21/2011 | | **ENDORSED CJA 24 as to Beatrice Munyenyezi: Authorization to Pay Susan Bateman $630.50 for Transcript of Suppression Hearing. *Text of Order: Approved for Payment* So Ordered by Judge Steven J. McAuliffe. *Original document available in clerks office.* (jab)** (Entered: 12/22/2011) |
| 01/03/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: TELEPHONE CONFERENCE as to Beatrice Munyenyezi held on 1/3/2012. (Govt Atty: John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 10 minutes) (jab) (Entered: 01/03/2012) |
| 01/19/2012 | | RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi. Status Conference set for 2/2/2012 10:00 AM before Judge Steven J. McAuliffe. (jab) (Entered: 01/19/2012) |
| 01/23/2012 | 71 | **ORDER re: Interpreters as to Beatrice Munyenyezi. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 01/23/2012) |
| 01/25/2012 | 72 | MOTION for Disclosure Foreign Witnesses by USA as to Beatrice Munyenyezi. Follow up on Objection on 2/13/2012. (Attachments: # 1 Certificate of Service) (Chakravarty, Aloke) (Entered: 01/25/2012) |
| 01/27/2012 | 73 | MOTION Limited Attorney-Conducted Voir Dire by Beatrice Munyenyezi. Follow up on Objection on 2/13/2012. (Howard, Mark) (Entered: 01/27/2012) |
| 01/30/2012 | 74 | TRIAL BRIEF by USA as to Beatrice Munyenyezi. (Attachments: # 1 Exhibit Dept. of State Background Note: Rwanda, # 2 Exhibit UN Security Council Resolution 955, # 3 Exhibit Library of Congress, Congressional Research Service Publication, # 4 Exhibit Dept. of State 2010 Human Rights Report)(Capin, John) (Entered: 01/30/2012) |
| 01/30/2012 | 75 | TRIAL BRIEF by Beatrice Munyenyezi as to Beatrice Munyenyezi. (Howard, Mark) (Entered: 01/30/2012) |
| 02/01/2012 | 76 | OBJECTION by Beatrice Munyenyezi re 72 MOTION for Disclosure Foreign Witnesses. (Ruoff, David) (Entered: 02/01/2012) |
| 02/02/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: STATUS CONFERENCE/FINAL PRETRIAL CONFERENCE as to Beatrice Munyenyezi held on 2/2/2012. Final Pretrial Conference scheduled for Friday, February 10, 2012 at 10:00 a.m. is cancelled. (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard) (Total Hearing Time: 2 hr 10 minutes)(CJA Time: 2 hr 20 minutes) (jab) (Entered: 02/02/2012) |
| 02/03/2012 | | **ENDORSED ORDER withdrawing 72 MOTION for Disclosure Foreign Witnesses as to Beatrice Munyenyezi (1). *Text of Order: Withdrawn.* So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/03/2012) |
| 02/03/2012 | | NOTICE OF HEARING as to Beatrice Munyenyezi. Daubert Hearing set for 2/15/2012 10:00 AM before Judge Steven J. McAuliffe. (jab) (Entered: 02/03/2012) |

Appendix Page 16

| | | |
|---|---|---|
| 02/07/2012 | 78 | MOTION to Approve Delayed Dislcosure of Foreign Defense Witnesses by Beatrice Munyenyezi. Follow up on Objection on 2/24/2012. (Ruoff, David) (Entered: 02/07/2012) |
| 02/09/2012 | 79 | RESPONSE to Motion by USA as to Beatrice Munyenyezi re 78 MOTION to Approve Delayed Discosure of Foreign Defense Witnesses. (Attachments: # 1 Certificate of Service)(Chakravarty, Aloke) (Entered: 02/09/2012) |
| 02/09/2012 | 80 | MOTION in Limine re: Testimony Related to Post-Genocide Rwanda and to Conduct Hearing Under Rule 702 (Daubert) by USA as to Beatrice Munyenyezi. Follow up on Objection on 2/27/2012. (Attachments: # 1 Exhibit A - Endless C.V., # 2 Exhibit A - Endless Report, # 3 Exhibit B - Thomson C.V., # 4 Exhibit B - Thomson Report, # 5 Certificate of Service) (Chakravarty, Aloke) (Entered: 02/09/2012) |
| 02/10/2012 | | NOTICE of ECF Filing Error re: 79 Response to Motion filed by USA. Filer used the wrong event. Filer should have used Objection to Motion. NO ACTION REQUIRED - FOR INFORMATIONAL PURPOSES ONLY AND MERELY INTENDED TO EDUCATE ALL PARTIES IN THE CASE. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1587. (jab) (Entered: 02/10/2012) |
| 02/10/2012 | | **ENDORSED ORDER granting in part and denying in part 78 MOTION to Approve Delayed Disclosure of Foreign Defense Witnesses as to Beatrice Munyenyezi (1).** *Text of Order: Granted in part. The identity of defense witnesses travelling from Rwanda shall be disclosed to the prosecution upon the later of: seven days before trial, or within 6 hours after the witness(es) leave Rwanda en route to the United States.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/10/2012) |
| 02/14/2012 | | RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi. Daubert Hearing rescheduled for 2/21/2012 10:00 AM before Judge Steven J. McAuliffe. (jab) (Entered: 02/14/2012) |
| 02/15/2012 | 83 | MEMORANDUM re 74 Trial Brief, 75 Trial Brief *(objecting to Government's Trial Brief request for judicial notice of genocide)* (Ruoff, David) (Entered: 02/15/2012) |
| 02/15/2012 | 84 | Assented to MOTION in Limine re: ICTR Convictions by Beatrice Munyenyezi. (Ruoff, David) (Entered: 02/15/2012) |
| 02/15/2012 | 85 | MOTION in Limine re: Exclude Shalom Nhatobali A-File by Beatrice Munyenyezi. Follow up on Objection on 3/5/2012. (Howard, Mark) (Entered: 02/15/2012) |
| 02/15/2012 | 86 | MOTION in Limine re: Limit Testimony of Professor Timothy Longman by Beatrice Munyenyezi. Follow up on Objection on 3/5/2012. (Howard, Mark) (Entered: 02/15/2012) |
| 02/15/2012 | 87 | EXHIBIT *List of Government* by Aloke S. Chakravarty on behalf of USA. (Chakravarty, Aloke) (Entered: 02/15/2012) |
| 02/15/2012 | 88 | Assented to MOTION to Seal Document *Witness List (Filing Under Seal)* at Level Iby USA as to Beatrice Munyenyezi. (Chakravarty, Aloke) (Entered: 02/15/2012) |
| 02/15/2012 | 89 | FINAL WITNESS LIST by Beatrice Munyenyezi as to Beatrice Munyenyezi. (Ruoff, David) (Entered: 02/15/2012) |
| 02/15/2012 | 90 | TRIAL BRIEF by USA as to Beatrice Munyenyezi. (Attachments: # 1 Exhibit A: Library of Congress Report, # 2 Exhibit C: Kamatali Report and CV, # 3 Exhibit D: Presidential Decree, # 4 Exhibit E: Genocide Convention)(Capin, John) (Additional attachment(s) added on 2/16/2012: # 5 Exhibit B -- Codes and Laws of Rwanda) (jab). (Entered: 02/15/2012) |

Appendix Page 17

| 02/16/2012 | | NOTICE of ECF Filing Error re: 88 Assented to MOTION to Seal Document *Witness List (Filing Under Seal)* at Level I adn 87 Exhibit List filed by USA. No certificate of service. Filer shall file one certificate of service using the *Certificate of Service* event for both documents and link the filing back to the originally filed documents. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1587. Notice of Compliance Deadline set for 2/27/2012. (jab) (Entered: 02/16/2012) |
|---|---|---|
| 02/16/2012 | | NOTICE of ECF Filing Error re: 90 Trial Brief filed by USA. No certificate of service. Filer shall file a certificate of service using the *Certificate of Service* event and link the filing back to the originally filed document. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1587. Notice of Compliance Deadline set for 2/27/2012. (jab) (Entered: 02/16/2012) |
| 02/16/2012 | 91 | Certificate of Service by USA as to Beatrice Munyenyezi re 88 Assented to MOTION to Seal Document *Witness List (Filing Under Seal)* at Level I, 87 Exhibit, ECF - Filing Error - Action Required,, (Chakravarty, Aloke) (Entered: 02/16/2012) |
| 02/16/2012 | | **ENDORSED ORDER granting 84 Assented to MOTION in Limine re: ICTR Convictions as to Beatrice Munyenyezi (1).** *Text of Order: Granted, subject to revisiting the issue if trial circumstances warrant it.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/16/2012) |
| 02/17/2012 | 93 | MEMORANDUM in Opposition by USA as to Beatrice Munyenyezi re 86 MOTION in Limine re: Limit Testimony of Professor Timothy Longman. (Capin, John) (Entered: 02/17/2012) |
| 02/17/2012 | 94 | MEMORANDUM in Opposition by USA as to Beatrice Munyenyezi re 85 MOTION in Limine re: Exclude Shalom Nhatobali A-File. (Capin, John) (Entered: 02/17/2012) |
| 02/17/2012 | | **ENDORSED ORDER granting 88 Motion to Seal Document: Witness List (Filing Under Seal) at Level I as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/20/2012) |
| 02/19/2012 | 95 | OBJECTION by Beatrice Munyenyezi re 80 MOTION in Limine re: Testimony Related to Post-Genocide Rwanda and to Conduct Hearing Under Rule 702 (Daubert) MOTION in Limine re: Testimony Related to Post-Genocide Rwanda and to Conduct Hearing Under Rule 702 (Daubert). (Howard, Mark) (Entered: 02/19/2012) |
| 02/19/2012 | 96 | EXHIBIT *List of Defendant*. (Ruoff, David) (Entered: 02/19/2012) |
| 02/21/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: DAUBERT HEARING as to Beatrice Munyenyezi held on 2/21/2012. Witnesses Appearing: Brian D. Endless, Susan M. Thomson. Court denied without prejudice to interposing appropriate objections in the context of the trial, the Government's 80 MOTION in Limine as to Beatrice Munyenyezi (1). (Court Reporter: Sandra Bailey) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 2 hr 35 minutes)(CJA Time: 2 hr 45 minutes) (jab) Modified on 2/21/2012 to add the word, appropriate. (jab). (Entered: 02/21/2012) |
| 02/21/2012 | 97 | **Final Pretrial Order. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/21/2012) |
| 02/21/2012 | | **ENDORSED ORDER denying 85 MOTION in Limine re: Exclude Shalom Nhatobali A-File as to Beatrice Munyenyezi (1).** *Text of Order: Denied.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/22/2012) |
| 02/21/2012 | | **ENDORSED ORDER denying 86 MOTION in Limine re: Limit Testimony of** |

**Professor Timothy Longman as to Beatrice Munyenyezi (1).** *Text of Order: Denied.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/22/2012)

| 02/22/2012 | 98 | MOTION to Strike *Surplusage in the Indictment or Redact Prior to Presentation to Jury* by Beatrice Munyenyezi. Follow up on Objection on 3/12/2012. (Howard, Mark) (Entered: 02/22/2012) |
|---|---|---|
| 02/22/2012 | 99 | Assented to Motion for Transcript at Government Expense *(Daily Trial Copy)* by Beatrice Munyenyezi. (Howard, Mark) (Entered: 02/22/2012) |
| 02/22/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY SELECTION/TRIAL - Day 1 as to Beatrice Munyenyezi held on 2/22/2012. Jury empaneled; not sworn. (Court Reporter: Susan Bateman) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 2 hr 25 min) (CJA Time: 2 hr 45 minutes) (jab) (Entered: 02/22/2012) |
| 02/23/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 2 as to Beatrice Munyenyezi held on 2/23/2012. Jury sworn. Interpreters sworn. Opening Statements (Atty Capin, Atty Howard). Government's evidence begins. Witnesses Appearing: Esperance Kayange. Interpreter: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya. (Court Reporter: Susan Bateman (a.m. session); Diane Churas (p.m. session)) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr. 35 min)(CJA Time: 5 hr 35 min) (jab) (Entered: 02/24/2012) |
| 02/23/2012 | 101 | **ORDER re: replenishment of jury-related supplies. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/24/2012) |
| 02/24/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 3 as to Beatrice Munyenyezi held on 2/24/2012. Government's evidence continues. Witnesses Appearing: Esperance Kayange, Timothy Longman. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 32 min)(CJA Time: 5 hr 32 min) (jab) (Entered: 02/24/2012) |
| 02/27/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 4 as to Beatrice Munyenyezi held on 2/27/2012. Government's evidence continues. Witnesses Appearing: Timothy Longman, Charles Bugirimfura. Interpreter: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya. (Court Reporter: Susan Bateman - am session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 29 min)(CJA Time: 4 hr 39 min) (jab) Modified on 2/28/2012 to correct spelling of witness's last name. (jab) (Entered: 02/27/2012) |
| 02/28/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 5 as to Beatrice Munyenyezi held on 2/28/2012. Court excuses juror no 13 from jury duty. Government's evidence continues. Witnesses Appearing: Charles Bugirimfura. Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumy. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 43 min)(CJA Time: 5 hr 43 min) (jab) (Entered: 02/28/2012) |
| 02/28/2012 | 102 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Daubert Hearing held on 2/21/2012. Court Reporter: Sandra Bailey, Telephone # 603-225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter |

will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.

**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 3/23/2012. Redacted Transcript Follow Up 4/2/2012. Release of Transcript Restriction set for 5/29/2012. (jab) (Entered: 02/29/2012)

| | |
|---|---|
| 02/29/2012 | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 6 as to Beatrice Munyenyezi held on 2/29/2012. Government's evidence continues. Court orders the Clerk's Office to secure accommodations for those jurors who wish to stay overnight due to the pending snow storm. Witnesses Appearing: Charles Bugirimfuca, Eric Benn Rony Zachariah, Emmanuel Niyitegeka. [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumy.] (Court Reporter: Susan Bateman - am session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 20 min)(CJA Time: 5 hr 35 min) (jab) Modified on 3/22/2012 to correct trial date. (jab). (Entered: 03/01/2012) |
| 03/01/2012 | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 7 as to Beatrice Munyenyezi held on 3/1/2012. Government's evidence continues. Court orders the Clerk's Office to secure accommodations for those jurors who wish to stay overnight due to the snow storm. Witnesses Appearing: Emmanuel Niyitegeka, Dorothy Michaud, Jean-Damascene Nshimiyimana. [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya.] (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 21 min)(CJA Time: 5 hr 21 min) (jab) (Entered: 03/01/2012) |
| 03/02/2012 | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 8 as to Beatrice Munyenyezi held on 3/2/2012. Government's evidence continues. Witnesses Appearing: Jean-Damescene Nshimiyimara, Louise Mukamana, Aleysia Mukankuriza. [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumy.] (Court Reporter: Diane Churas - a.m. Susan Bateman - p.m.) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 18 min)(CJA Time: 5 hr 18 min) (jab) (Entered: 03/05/2012) |
| 03/05/2012 | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 9 as to Beatrice Munyenyezi held on 3/5/2012. Government's evidence continues. Witnesses Appearing: Aleysia Mukankuriza, Jean-Damascene Munyanyeza. Interpreter: [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya.]. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 55 min)(CJA Time: 6 hr) (jab) (Entered: 03/05/2012) |
| 03/06/2012 | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 10 as to Beatrice Munyenyezi held on 3/6/2012. Government's evidence continues. Defendant moves for a mistrial; oral argument heard. Court denies motion for a mistrial. Government rests. Defendant's Rule 29 motion; oral argument heard. Court denies Rule 29 motion. Witnesses Appearing: Jean-Damascene Munyaneza, Agnes Murebwanayo, Thomas B. Andersen, Jr. [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya.]. (Court Reporter: Susan Bateman - am session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David |

| | | Ruoff)(Total Hearing Time: 3 hr 58 min)(CJA Time: 5 hr 30 min) (jab) (Entered: 03/06/2012) |
|---|---|---|
| 03/06/2012 | 107 | ORAL MOTION for a Mistrial by Beatrice Munyenyezi. (jab) (Entered: 03/06/2012) |
| 03/06/2012 | | **ORAL ORDER denying 107 Oral Motion for a Mistrial as to Beatrice Munyenyezi (1). So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 03/06/2012) |
| 03/07/2012 | 108 | OBJECTION by USA as to Beatrice Munyenyezi re 98 MOTION to Strike *Surplusage in the Indictment or Redact Prior to Presentation to Jury*. (jab) (Entered: 03/07/2012) |
| 03/07/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 11 as to Beatrice Munyenyezi held on 3/7/2012. Defendant's evidence begins. Witnesses Appearing: Anastasia M. Mukamwiza, Mukanyiginya Leocadie, Vizimana Sylvere, Hitimana Gilbert. [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya.]. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hr 55 min)(CJA Time: 6 hr 5 min) (jab) (Entered: 03/07/2012) |
| 03/07/2012 | 109 | Assented to ORAL MOTION for Issuance of Additional Subpoenas (in excess of 5) and to have service made by the US Marshal by Beatrice Munyenyezi. Notice to Government Attorney - If this motion requests a subpoena for personal or confidential information about a victim, pursuant to Fed. R. Crim. P. 17(c)(3), the government shall immediately provide the victim with notice of this motion. Ex parte motions are exempt from this requirement. (jab) (Entered: 03/07/2012) |
| 03/07/2012 | | **ORAL ORDER granting 109 Assented to Motion for the Issuance of Additional Subpoenas (in excess of 5) and to have service made by the US Marshal as to Beatrice Munyenyezi (1).** *Granted; subpoenas do not need to be served by US Marshal.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 03/07/2012) |
| 03/07/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: In Chambers Conference as to Beatrice Munyenyezi held on 3/7/2012 : Charging conference held. (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff) (Total Hearing Time: 45 mintues)(CJA Time: 45 minutes) (jab) (Entered: 03/08/2012) |
| 03/08/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 12 as to Beatrice Munyenyezi held on 3/8/2012. Defendant's evidence continues. Defendant moves for a mistrial; government objects. Court denies the defendant's motion for mistrial. Defendant rests. Defendant's Rule 29 Motion; government objects. Court denies Rule 29 Motion. Witnesses Appearing: Nyiramariro Vanatie, Uwiteyakazana Venerande. Interpreter: [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya.]. (Court Reporter: Susan Bateman) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 2 hr 2 min) (CJA Time: 2 hr 30 min) (jab) Modified on 3/9/2012 to correct filing date and trial date in docket text. (jab). (Entered: 03/09/2012) |
| 03/08/2012 | | ORAL MOTION for Mistrial by Beatrice Munyenyezi. (jab) (Entered: 03/09/2012) |
| 03/08/2012 | | **ORAL ORDER denying Oral Motion for Mistrial as to Beatrice Munyenyezi (1). So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 03/09/2012) |
| 03/08/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: In Chambers Conference as to Beatrice Munyenyezi held on 3/8/2012 re: jury instructions. (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 45 minutes)(CJA Time: 45 minutes) (jab) (Entered: 03/09/2012) |
| 03/08/2012 | | **ENDORSED ORDER** as to Beatrice Munyenyezi granting in part, denying in part |

Appendix Page 21

| | | |
|---|---|---|
| | | **98** MOTION to Strike *Surplusage in the Indictment or Redact Prior to Presentation to Jury. Text of Order: Granted in part and denied in part. The indictment will be redacted appropriately for presentation to the jury.* **So Ordered by Judge Steven J. McAuliffe.** (jab) (Entered: 03/12/2012) |
| 03/09/2012 | | **ORAL ORDER granting in part and denying in part** **99** **Motion for Transcript at Government Expense for the reasons as set forth on the record as to Beatrice Munyenyezi (1). So Ordered by Judge Steven J. McAuliffe.** (jab) (Entered: 03/09/2012) |
| 03/09/2012 | | **ORAL ORDER granting in part and denying in part** **98** **Motion to Strike for those reasons as set forth on the record as to Beatrice Munyenyezi (1). So Ordered by Judge Steven J. McAuliffe.** (jab) (Entered: 03/09/2012) |
| 03/09/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 13 as to Beatrice Munyenyezi held on 3/9/2012. Closing Arguments heard. Court charges jury. Court dismisses alternate jurors. CSO sworn. Jury retires to deliberate. Jury deliberations begin. [Interpreters: Zena Ntiranyibagira, Jacqueline Birori Adam, Joseph Rubagumya.] Court Reporter: Sandra Bailey (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 3 hr 35 min)(CJA Time: 4 hr 15 min) (jab) Modified on 3/11/2012 to add interpreters and dismissal of alternate jurors. (jab). (Entered: 03/11/2012) |
| 03/09/2012 | 110 | Court Instructions as to Beatrice Munyenyezi. (jab) (Entered: 03/11/2012) |
| 03/12/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 14 as to Beatrice Munyenyezi held on 3/12/2012. Jury deliberations continue. Jury Question No. 1. Court orders lunch be provided for the jury. Jury deliberations to resume March 13, 2012 at 9:00 a.m. (jab) (Entered: 03/12/2012) |
| 03/12/2012 | 112 | Jury Question No. 1 as to Beatrice Munyenyezi (redacted). (Attachments: # 1 Answer to Jury Question 1) *Original document available in clerks office.*(jab) (Entered: 03/19/2012) |
| 03/13/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 15 as to Beatrice Munyenyezi held on 3/13/2012.. Jury deliberations Continue. Jury Questions 2, 3 and 4. Court responds to Jury Question No. 3 in courtroom with jury present. Court informs jury that there will be no deliberations on 3/14/2012. Deliberations will resume on Thursday, 3/15/2012 at 9:00 a.m. (Court Reporter: Sandra Bailey) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 15 min) (jab) (Entered: 03/14/2012) |
| 03/13/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: In Chambers Conference as to Beatrice Munyenyezi held on 3/14/2012 re: jury question nos 2 and 3. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 1 hr) (jab) (Entered: 03/14/2012) |
| 03/13/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: In Chambers Conference as to Beatrice Munyenyezi held on 3/13/2012 re: jury question no. 4 (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 23 minutes) (jab) (Entered: 03/14/2012) |
| 03/13/2012 | 113 | Jury Question No. 2 as to Beatrice Munyenyezi (Redacted). (Attachments: # 1 Answer to Jury Question No. 2) *Original document available in clerks office.*(jab) (Entered: 03/19/2012) |
| 03/13/2012 | 114 | Jury Question No. 3 as to Beatrice Munyenyezi (Redacted). (Attachments: # 1 Answer to Jury Question No. 3) *Original document available in clerks office.*(jab) (Entered: |

| | | 03/19/2012) |
|---|---|---|
| 03/13/2012 | 115 | Jury Question No. 4 as to Beatrice Munyenyezi (Redacted). (Attachments: # 1 Answer to Jury Question 4) *Original document available in clerks office.*(jab) (Entered: 03/21/2012) |
| 03/15/2012 | 111 | Proposed Modified Allen Charge by Beatrice Munyenyezi (jab) (Entered: 03/15/2012) |
| 03/15/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 16 as to Beatrice Munyenyezi held on 3/15/2012. Jury deliberations continue. Court responds to Jury Question No. 4 in courtroom with jury present. Jury deliberations continue. Jury Question/Note No. 5. Jury brought into the courtroom. Court's colloquy with Jury Foreperson. Court polls jury at the request of the government. Jury unable to reach a unanimous decision as to either count. Court dismisses jury panel. Court declares a mistrial. (Court Reporter: Susan Bateman) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 16 minutes) (jab) Modified on 3/19/2012 to correct filing date. (jab). Modified on 4/4/2012 to add: (jab). (Entered: 03/19/2012) |
| 03/15/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: In Chambers Conference as to Beatrice Munyenyezi held on 3/15/2012 as to Jury Question No. 4. (Court Reporter: Susan Bateman) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 10 minutes)(CJA Time: 10 minutes) (jab) (Entered: 03/19/2012) |
| 03/15/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: In Chambers Conference as to Beatrice Munyenyezi held on 3/15/2012 re: Jury Question/Note No. 5. (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff) (Total Hearing Time: 5 minutes)(CJA Time: 5 minutes) (jab) (Entered: 03/19/2012) |
| 03/15/2012 | 116 | SUPPLEMENTAL ANSWER TO 115 Jury Question No. 4 as to by Beatrice Munyenyezi. (jab) (Entered: 03/21/2012) |
| 03/15/2012 | 117 | Jury Question/Note No. 5 as to Beatrice Munyenyezi (Redacted). *Original document available in clerks office.*(jab) (Entered: 03/21/2012) |
| 03/15/2012 | 118 | EXHIBIT LIST by USA as to Beatrice Munyenyezi. (jab) (Entered: 03/21/2012) |
| 03/15/2012 | 119 | EXHIBIT LIST by Beatrice Munyenyezi. (jab) (Entered: 03/21/2012) |
| 03/20/2012 | 120 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 2 (a.m. session) held on February 23, 2012. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012) |
| 03/20/2012 | 121 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 2 (p.m. session) held on February 23, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise |

Appendix Page 23

reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.

**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012)

| 03/20/2012 | [122](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 3 (a.m. session) held on February 24, 2012. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012) |
| 03/20/2012 | [123](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 3 (p.m. session) held on February 24, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012) |
| 03/20/2012 | [124](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 4 (a.m. session) held on February 27, 2012. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers** |

**and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012)

| 03/20/2012 | 125 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 4 (p.m. session) held on February 27, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012) |
| --- | --- | --- |
| 03/20/2012 | 126 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 5 (a.m. session) held on February 28, 2012. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012) |
| 03/20/2012 | 127 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 7 (a.m. session) held on March 1, 2012. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012) |
| 03/20/2012 | 128 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 8 (p.m. session) held on March 2, 2012. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise |

reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.

**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 4/13/2012. Redacted Transcript Follow Up 4/23/2012. Release of Transcript Restriction set for 6/18/2012. (jab) (Entered: 03/21/2012)

| 03/22/2012 | | TRIAL NOTICE: Final Pretrial Conference set for 5/7/2012 02:00 PM before Judge Steven J. McAuliffe. Jury Selection/Trial set for the trial period beginning 5/15/2012 09:30 AM before Judge Steven J. McAuliffe. (jab) (Entered: 03/22/2012) |
| --- | --- | --- |
| 03/22/2012 | 129 | MOTION for Bail *Review Hearing* by Beatrice Munyenyezi. Follow up on Objection on 4/9/2012. (Attachments: # 1 Exhibit I, # 2 Exhibit II) (Ruoff, David) Modified on 4/6/2012 to add Exhibit descriptions. (jab). (Entered: 03/22/2012) |
| 03/22/2012 | | Receipt of the Exhibits listed on 118 Exhibit List filed by USA are hereby acknowledged. (jab) (Entered: 03/23/2012) |
| 03/26/2012 | 131 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 12 (a.m. session) held on March 8, 2012. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/19/2012. Redacted Transcript Follow Up 4/30/2012. Release of Transcript Restriction set for 6/25/2012. (jab) (Entered: 03/27/2012) |
| 03/26/2012 | 132 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 16 held on March 15, 2012. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/19/2012. Redacted Transcript Follow Up 4/30/2012. Release of Transcript Restriction set for 6/25/2012. (jab) (Entered: 03/27/2012) |
| 03/27/2012 | | NOTICE OF HEARING as to Beatrice Munyenyezi. Status Conference set for 3/30/2012 10:00 AM before Judge Steven J. McAuliffe. (jab) (Entered: 03/27/2012) |

Appendix Page 26

| 03/29/2012 | 133 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 6 (a.m. session) held on February 29, 2012. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/23/2012. Redacted Transcript Follow Up 5/3/2012. Release of Transcript Restriction set for 6/28/2012. (jab) (Entered: 03/30/2012) |
|---|---|---|
| 03/29/2012 | 134 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 10 (a.m. session) held on March 6, 2012. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/23/2012. Redacted Transcript Follow Up 5/3/2012. Release of Transcript Restriction set for 6/28/2012. (jab) (Entered: 03/30/2012) |
| 03/30/2012 | | Receipt of the Exhibits listed on 119 Exhibit List filed by Beatrice Munyenyezi are hereby acknowledged. (jab) (Entered: 03/30/2012) |
| 03/30/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: STATUS CONFERENCE as to Beatrice Munyenyezi held on 3/30/2012. (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: David Ruoff, Mark Howard)(Total Hearing Time: 40 minutes)(CJA Time: 50 minutes) (jab) (Entered: 03/30/2012) |
| 03/30/2012 | 135 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 5 (p.m. session) held on February 28, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/23/2012. Redacted Transcript Follow Up 5/3/2012. Release of Transcript Restriction set for 6/28/2012. (jab) (Entered: 03/30/2012) |

| 03/30/2012 | [136](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 6 (p.m. session) held on February 29, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/23/2012. Redacted Transcript Follow Up 5/3/2012. Release of Transcript Restriction set for 6/28/2012. (jab) (Entered: 03/30/2012) |
| --- | --- | --- |
| 03/30/2012 | [137](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 7 (p.m. session) held on March 1, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/23/2012. Redacted Transcript Follow Up 5/3/2012. Release of Transcript Restriction set for 6/28/2012. (jab) (Entered: 03/30/2012) |
| 04/02/2012 | | NOTICE OF HEARING as to Beatrice Munyenyezi. Bail Hearing set for 4/12/2012 11:00 AM before Magistrate Judge Landya B. McCafferty. (kad) (Entered: 04/02/2012) |
| 04/02/2012 | [138](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 9 (a.m. session) held on March 5, 2012. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/26/2012. Redacted Transcript Follow Up 5/7/2012. Release of Transcript Restriction set for 7/2/2012. (jab) (Entered: 04/03/2012) |
| 04/02/2012 | [139](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 11 (a.m. session) held on March 7, 2012. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from |

| | | the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/26/2012. Redacted Transcript Follow Up 5/7/2012. Release of Transcript Restriction set for 7/2/2012. (jab) (Entered: 04/03/2012) |
|---|---|---|
| 04/02/2012 | [140](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 13 (Closing Argument and Jury Charge) held on March 9, 2012. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/26/2012. Redacted Transcript Follow Up 5/7/2012. Release of Transcript Restriction set for 7/2/2012. (jab) (Entered: 04/03/2012) |
| 04/02/2012 | [141](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Transcript of Jury Questions held on March 13, 2012. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/26/2012. Redacted Transcript Follow Up 5/7/2012. Release of Transcript Restriction set for 7/2/2012. (jab) (Entered: 04/03/2012) |
| 04/02/2012 | [142](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 8 (a.m. session) held on March 2, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** |

Appendix Page 29

| | | |
|---|---|---|
| | | Redaction Request Follow Up 4/26/2012. Redacted Transcript Follow Up 5/7/2012. Release of Transcript Restriction set for 7/2/2012. (jab) (Entered: 04/03/2012) |
| 04/02/2012 | 143 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 9 (p.m. session) held on March 5, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. <br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** <br><br>Redaction Request Follow Up 4/26/2012. Redacted Transcript Follow Up 5/7/2012. Release of Transcript Restriction set for 7/2/2012. (jab) (Entered: 04/03/2012) |
| 04/05/2012 | 144 | OBJECTION by USA as to Beatrice Munyenyezi re 129 MOTION for Bail *Review Hearing*. (Attachments: # 1 Exhibit Exh. A, # 2 Exhibit Exh. B (ICTR testimony), # 3 Exhibit Exh. B (Shalom letter to defendant), # 4 Exhibit Shalom letter to defendant's sister))(Capin, John) (Entered: 04/05/2012) |
| 04/05/2012 | 145 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 10 (p.m. session) held on March 6, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. <br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** <br><br>Redaction Request Follow Up 4/30/2012. Redacted Transcript Follow Up 5/10/2012. Release of Transcript Restriction set for 7/5/2012. (jab) (Entered: 04/09/2012) |
| 04/05/2012 | 146 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial, Day 11 (p.m. session) held on March 7, 2012. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. <br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** <br><br>Redaction Request Follow Up 4/30/2012. Redacted Transcript Follow Up 5/10/2012. Release of Transcript Restriction set for 7/5/2012. (jab) (Entered: 04/09/2012) |
| 04/10/2012 | | NOTICE OF HEARING as to Beatrice Munyenyezi. Status Conference set for 7/11/2012 |

Appendix Page 30

| | | |
|---|---|---|
| | | 11:00 AM before Judge Steven J. McAuliffe. (jab) (Entered: 04/10/2012) |
| 04/12/2012 | | Minute Entry for proceedings held before Magistrate Judge Landya B. McCafferty: BAIL HEARING as to Beatrice Munyenyezi held on 4/12/2012. After a contested hearing, defendant released on conditions. (Govt Atty: John Capin) (Defts Atty: David Ruoff) (USP: Jodi Gauvin)(Total Hearing Time: 1:15)(CJA Time: 1:47) (kad) (Entered: 04/13/2012) |
| 04/12/2012 | 149 | **SEALED ORDER Setting Conditions of Release as to Beatrice Munyenyezi. So Ordered by Magistrate Judge Landya B. McCafferty. (kad)** Modified on 4/13/2012 to add: "SEALED" (kad). (Entered: 04/13/2012) |
| 04/12/2012 | 150 | **ORDER Setting Conditions of Release (REDACTED) as to Beatrice Munyenyezi. So Ordered by Magistrate Judge Landya B. McCafferty. (kad)** (Entered: 04/13/2012) |
| 04/17/2012 | 151 | COLLATERAL RECEIPT no. 342 as to Beatrice Munyenyezi for Childrens' US Passports and Refugee Travel Documents issued to Kristin Cook, US Probation Officer pursuant to Order Setting Conditions of Release. (jab) (Entered: 04/17/2012) |
| 04/19/2012 | 152 | Assented to Motion for Transcript at Government Expense *of Trial Transcript* by Beatrice Munyenyezi. (Ruoff, David) (Entered: 04/19/2012) |
| 04/20/2012 | | **ENDORSED ORDER granting 152 Motion for Transcript at Government Expense of Trial Transcript as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 04/22/2012) |
| 04/27/2012 | 153 | Assented to MOTION to Continue Trial to 09/10/2012 (Waiver of Speedy Trial to be filed conventionally) by Beatrice Munyenyezi. Waiver of Speedy Trial due 5/7/2012. (Ruoff, David) (Entered: 04/27/2012) |
| 04/30/2012 | 154 | **ORDER granting 153 Motion to Continue Trial in the interest of justice as to Beatrice Munyenyezi (1). So Ordered by Judge Steven J. McAuliffe. Waiver of Speedy Trial due 5/7/2012. Final Pretrial Conference reset for 8/30/2012 11:00 AM before Judge Steven J. McAuliffe. Jury Selection/Trial reset for two week period beginning 9/10/2012 09:30 AM before Judge Steven J. McAuliffe. (jab)** (Entered: 04/30/2012) |
| 04/30/2012 | 155 | COLLATERAL RECEIPT no. 344 as to Beatrice Munyenyezi for Child's Refugee Travel Document issued to Kristin Cook, US Probation Officer. (jab) (Entered: 05/01/2012) |
| 05/04/2012 | | **ENDORSED CJA 24 as to Beatrice Munyenyezi: Authorization to Pay Diane Churas $494.10 for copies of Trial Transcripts. *Text of Order: Approved for Payment.* So Ordered by Judge Steven J. McAuliffe. *Original document available in clerks office.* (jab)** (Entered: 05/07/2012) |
| 05/04/2012 | | **ENDORSED CJA 24 as to Beatrice Munyenyezi: Authorization to Pay Susan Bateman $525.60 for copies of Trial Transcripts. *Text of Order: Approved for Payment* So Ordered by Judge Steven J. McAuliffe. *Original document available in clerks office.* (jab)** (Entered: 05/07/2012) |
| 05/07/2012 | 156 | WAIVER of Speedy Trial by Beatrice Munyenyezi. (jab) (Entered: 05/07/2012) |
| 05/08/2012 | | **ENDORSED CJA 24 as to Beatrice Munyenyezi: Authorization to Pay Sandra Bailey $609.30 for copies of Trial Transcripts. *Text of Order: Approved for Payment* So Ordered by Judge Steven J. McAuliffe. *Original document available in clerks office.* (jab)** (Entered: 05/08/2012) |
| 06/05/2012 | 159 | Assented to MOTION to Continue status conference *currently set for 7/11/12 to 8/3/12* by USA as to Beatrice Munyenyezi (Capin, John) (Entered: 06/05/2012) |

| | | |
|---|---|---|
| 06/06/2012 | | **ENDORSED ORDER granting 159 Assented to MOTION to Continue Status Conference currently set for 7/11/12 to 8/3/12 as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. Status Conference reset for 8/3/2012 10:00 AM before Judge Steven J. McAuliffe.** (jab) (Entered: 06/06/2012) |
| 07/05/2012 | 162 | MOTION to Continue Trial for not less than 60 days (Waiver of Speedy Trial to be filed conventionally) by Beatrice Munyenyezi. Follow up on Objection on 7/23/2012. Waiver of Speedy Trial due 7/16/2012. (Howard, Mark) (Entered: 07/05/2012) |
| 07/12/2012 | 165 | OBJECTION by USA as to Beatrice Munyenyezi re 162 MOTION to Continue Trial for not less than 60 days (Waiver of Speedy Trial to be filed conventionally) . (Chakravarty, Aloke) (Entered: 07/12/2012) |
| 07/16/2012 | | **ENDORSED ORDER denying 162 Motion to Continue Trial in the interest of justice as to Beatrice Munyenyezi (1).** *Text of Order: Denied. The government shall identify any new witnesses sufficiently in advance of trial to permit defense counsel to reasonably inquire into previous statements or testimony given by those witnesses.* **So Ordered by Judge Steven J. McAuliffe.** (jab) (Entered: 07/16/2012) |
| 07/17/2012 | 166 | WAIVER of Speedy Trial by Beatrice Munyenyezi. (jab) (Entered: 07/17/2012) |
| 08/03/2012 | 168 | MOTION to Continue Trial six (6) months (Waiver of Speedy Trial to be filed conventionally) by Beatrice Munyenyezi. Follow up on Objection on 8/20/2012. Waiver of Speedy Trial due 8/13/2012. (Howard, Mark) (Entered: 08/03/2012) |
| 08/03/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: STATUS CONFERENCE as to Beatrice Munyenyezi held on 8/3/2012. (Govt Atty: Al Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 2 hrs 10 min)(CJA Time: 2 hrs 30 min.) (jab) (Entered: 08/07/2012) |
| 08/08/2012 | 170 | WAIVER of Speedy Trial by Beatrice Munyenyezi. (jab) (Entered: 08/08/2012) |
| 08/15/2012 | 173 | OBJECTION by USA as to Beatrice Munyenyezi re 168 MOTION to Continue Trial six (6) months (Waiver of Speedy Trial to be filed conventionally) . (Capin, John) (Entered: 08/15/2012) |
| 08/21/2012 | 174 | Notice of Intent to Reply to Objection to *Government's Opposition to Motion To Continue DN173.* (Howard, Mark) (Entered: 08/21/2012) |
| 08/21/2012 | 175 | NOTICE of Withdrawal of Notice of Intent To File Reply Memorandum re 174 Notice of Intent to Reply by Beatrice Munyenyezi. (Howard, Mark) (Entered: 08/21/2012) |
| 08/29/2012 | 176 | **ORDER granting 168 Motion to Continue Trial in the interest of justice as to Beatrice Munyenyezi (1). So Ordered by Judge Steven J. McAuliffe.Final Pretrial Conference set for 1/25/2013 10:00 AM before Judge Steven J. McAuliffe. Exhibit Lists due by 1/25/2013. Witness Lists due by 1/25/2013. JERS Statement due 1/28/2013. Jury Selection/Trial set to begin 2/4/2013 09:30 AM before Judge Steven J. McAuliffe.** (jab) (Additional attachment(s) added on 8/31/2012: # 1 Order with corrected judge's signature block) (jab). (Entered: 08/30/2012) |
| 09/11/2012 | 177 | NOTICE of Change of Address by David W. Ruoff as to Beatrice Munyenyezi to 831 Union Street, Manchester, NH 03104. (Ruoff, David) (Entered: 09/11/2012) |
| 11/02/2012 | | NOTICE OF HEARING as to Beatrice Munyenyezi. Status Conference set for 11/28/2012 10:30 AM before Judge Steven J. McAuliffe. (jab) (Entered: 11/02/2012) |
| 11/28/2012 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: STATUS CONFERENCE as to Beatrice Munyenyezi held on 11/28/2012. Court orders copies of jury questionnaires to be provided to counsel, said copies to be destroyed by counsel. |

| | | Trial schedule will be 9:00 - 3:00 p.m. with 1/2 hour for lunch and two 15-minute breaks. Jury selection set for 2/4/2013 at 9:30 a.m. (Govt Atty: Al. Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 2 hr 15 minutes)(CJA Time: 2 hr 15 minutes) (jab) (Entered: 12/03/2012) |
|---|---|---|
| 12/03/2012 | 181 | **ORDER re: juror Questionnairs as to Beatrice Munyenyezi. Signed by Clerk James R. Starr.(jab)** (Entered: 12/03/2012) |
| 12/20/2012 | 182 | Memorandum to Court Regarding Use of First Trial Evidence by Beatrice Munyenyezi (Ruoff, David) (Entered: 12/20/2012) |
| 12/21/2012 | 183 | MOTION in Limine re: Reference to Prior Trial by USA as to Beatrice Munyenyezi. Follow up on Objection on 1/7/2013. (Capin, John) (Entered: 12/21/2012) |
| 01/04/2013 | 186 | RESPONSE by USA as to Beatrice Munyenyezi re 182 Miscellaneous Filing. (Attachments: # 1 Notice ECF Certificate of Service)(Chakravarty, Aloke) (Entered: 01/04/2013) |
| 01/11/2013 | 192 | Joint Assented to MOTION to Extend Time To File Motions in Limine by USA as to Beatrice Munyenyezi. (Capin, John) (Entered: 01/11/2013) |
| 01/15/2013 | | **ENDORSED ORDER granting 192 Motion to Extend Time to File Motions in Limine to 2/18/2013 as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 01/15/2013) |
| 01/16/2013 | | **ENDORSED ORDER denying without prejudice 183 MOTION in Limine re: Reference to Prior Trial as to Beatrice Munyenyezi (1). *Text of Order: The motion in limine is denied, but without prejudice to interposing an appropriate objection at trial, when the evidentiary context is clear.* So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 01/16/2013) |
| 01/17/2013 | | RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi. Final Pretrial Conference reset for 1/28/2013 02:00 PM before Judge Steven J. McAuliffe. (jab) (Entered: 01/17/2013) |
| 01/18/2013 | 194 | MOTION in Limine re: Exclude Evidence of Convictions of Defendant's Family Members by Beatrice Munyenyezi. Follow up on Objection on 2/4/2013. (Howard, Mark) (Entered: 01/18/2013) |
| 01/18/2013 | 195 | MOTION in Limine re: To Preclude Expert Testimony of Dr. Bessel Van Der Kolk by Beatrice Munyenyezi. Follow up on Objection on 2/4/2013. (Howard, Mark) (Entered: 01/18/2013) |
| 01/18/2013 | 196 | MOTION in Limine re: ICTR Prosecutors as Witnesses by Beatrice Munyenyezi. Follow up on Objection on 2/4/2013. (Ruoff, David) (Entered: 01/18/2013) |
| 01/18/2013 | 197 | MOTION in Limine re: References to Media Concerning Alleged Comments By Rwandan Officials by USA as to Beatrice Munyenyezi. Follow up on Objection on 2/4/2013. (Attachments: # 1 Exhibit New Times Article- 4/23/09, # 2 Exhibit New Times Article- 3/19/12, # 3 Exhibit New Times Article-4/2/12, # 4 Exhibit New Times Article- 3/9/12) (Capin, John) (Entered: 01/18/2013) |
| 01/18/2013 | 198 | MOTION in Limine re: Preclude Reference to Specific Areas of Disputed Admissibility by USA as to Beatrice Munyenyezi. Follow up on Objection on 2/4/2013. (Attachments: # 1 Certificate Service) (Chakravarty, Aloke) (Entered: 01/18/2013) |
| 01/25/2013 | 203 | TRIAL BRIEF by USA as to Beatrice Munyenyezi. (Capin, John) (Entered: 01/25/2013) |
| 01/25/2013 | 204 | OBJECTION by USA as to Beatrice Munyenyezi re 195 MOTION in Limine re: To Preclude Expert Testimony of Dr. Bessel Van Der Kolk . (Capin, John) (Entered: |

| | | 01/25/2013 |
|---|---|---|
| 01/25/2013 | 205 | OBJECTION by USA as to Beatrice Munyenyezi re 194 MOTION in Limine re: Exclude Evidence of Convictions of Defendant's Family Members . (Capin, John) (Entered: 01/25/2013) |
| 01/25/2013 | 206 | OBJECTION by USA as to Beatrice Munyenyezi re 196 MOTION in Limine re: ICTR Prosecutors as Witnesses . (Capin, John) (Entered: 01/25/2013) |
| 01/25/2013 | 207 | EXHIBIT *List by Defendant*. (Ruoff, David) (Entered: 01/25/2013) |
| 01/25/2013 | 208 | EXHIBIT *LIST : PRETRIAL* by Aloke S. Chakravarty on behalf of USA. (Chakravarty, Aloke) (Entered: 01/25/2013) |
| 01/27/2013 | 209 | OBJECTION by Beatrice Munyenyezi re 197 MOTION in Limine re: References to Media Concerning Alleged Comments By Rwandan Officials . (Howard, Mark) (Entered: 01/27/2013) |
| 01/27/2013 | 210 | OBJECTION by Beatrice Munyenyezi re 198 MOTION in Limine re: Preclude Reference to Specific Areas of Disputed Admissibility *(in opening statements)*. (Ruoff, David) (Entered: 01/27/2013) |
| 01/28/2013 | | NOTICE of ECF Filing Error re: 208 Exhibit List - Pretrial filed by USA. No certificate of service. Filer shall file a certificate of service using the *Certificate of Service* event and link the filing back to the originally filed document. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1587. Notice of Compliance Deadline set for 2/7/2013. (jab) (Entered: 01/28/2013) |
| 01/28/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: FINAL PRETRIAL CONFERENCE as to Beatrice Munyenyezi held on 1/28/2013. Order to Issue. (Govt Atty: Al. Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff) (Total Hearing Time: 1 hr 15 minutes)(CJA Time: 1 hr 15 minutes) (jab) (Entered: 01/28/2013) |
| 01/28/2013 | | RESCHEDULING NOTICE OF HEARING as to Beatrice Munyenyezi. Conference set for 2/5/2013 09:00 AM before Judge Steven J. McAuliffe in Courtroom 5 prior to Jury Selection. Jury Selection set for 2/5/2013 09:30 AM before Judge Steven J. McAuliffe in Courtroom 3. Evidence to begin 2/6/2013 09:00 AM before Judge Steven J. McAuliffe in Courtroom 5. (jab) (Entered: 01/28/2013) |
| 01/29/2013 | 214 | FINAL WITNESS LIST by Beatrice Munyenyezi. (Ruoff, David) (Entered: 01/29/2013) |
| 01/30/2013 | 215 | FINAL WITNESS LIST by USA as to Beatrice Munyenyezi. (Chakravarty, Aloke) (Entered: 01/30/2013) |
| 02/01/2013 | 217 | EXHIBIT *List* by Aloke S. Chakravarty on behalf of USA. (Chakravarty, Aloke) (Entered: 02/01/2013) |
| 02/01/2013 | 218 | MEMORANDUM re Final Pretrial Conference, *Submission re: Jury Instructions* (Attachments: # 1 Appendix 2012 Trial Jury Instructions Draft)(Chakravarty, Aloke) (Entered: 02/01/2013) |
| 02/01/2013 | 226 | **Final Pretrial Order. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/21/2013) |
| 02/05/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: MOTION HEARING as to Beatrice Munyenyezi held on 2/5/2013 re Motions in Limine 194 - 199 . (Court Reporter: Susan Bateman) (Govt Atty: John Capin, Aloke Chakravarty) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 0:20)(CJA Time: 0:20) (vln) Modified on 2/5/2013 to add motion number 194 (vln). (Entered: 02/05/2013) |

| | | |
|---|---|---|
| 02/05/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY SELECTION/TRIAL - Day 1 as to Beatrice Munyenyezi held on 2/5/2013. Attorney voir dire conducted. Jury not sworn. Evidence to commence at 9:00 a.m. on February 6, 2013. (Court Reporter: Diane Churas) (Govt Atty: Al. Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 2 hr 39 minutes)(CJA Time: 4 hr 12 min) (jab) (Entered: 02/05/2013) |
| 02/05/2013 | | **ENDORSED ORDER denying without prejudice 195 MOTION in Limine re: To Preclude Expert Testimony of Dr. Bessel Van Der Kolk as to Beatrice Munyenyezi (1).** *Text of Order: Denied without prejudice to interposing an appropriate objection at trial when the evidentiary context is clear.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/12/2013) |
| 02/05/2013 | | **ENDORSED ORDER denying without prejudice 196 MOTION in Limine re: ICTR Prosecutors as Witnesses as to Beatrice Munyenyezi (1).** *Text of Order: Denied without prejudice to interposing an appropriate objection at trial when the evidentiary context is clear.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/12/2013) |
| 02/05/2013 | | **ENDORSED ORDER denying without prejudice 197 MOTION in Limine re: References to Media Concerning Alleged Comments By Rwandan Officials as to Beatrice Munyenyezi (1).** *Text of Order: Denied without prejudice to interposing an appropriate objection at trial when the evidentiary context is clear.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/12/2013) |
| 02/05/2013 | | **ENDORSED ORDER denying without prejudice 198 MOTION in Limine re: Preclude Reference to Specific Areas of Disputed Admissibility as to Beatrice Munyenyezi (1).** *Text of Order: Denied without prejudice to interposing an appropriate objection at trial when the evidentiary context is clear.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/12/2013) |
| 02/05/2013 | | **ENDORSED ORDER granting 194 MOTION in Limine re: Exclude Evidence of Convictions of Defendant's Family Members as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/12/2013) |
| 02/06/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 2 as to Beatrice Munyenyezi held on 2/6/2013. Jury Sworn. Exhibits read into the record. Government's evidence begins. Witnesses Appearing: Rony Zachariah, Thierry Sebaganwa. Interpreters: Sabrina Iyadede, Freddy Munana. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hrs 50 minutes) (CJA Time: 6 hrs 5 minutes) (jab) (Entered: 02/07/2013) |
| 02/07/2013 | 223 | **ORDER re: replenishment of jury-related supplies. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 02/07/2013) |
| 02/07/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 3 as to Beatrice Munyenyezi held on 2/7/2013. Government's evidence continues. Witnesses Appearing: Thierry Sebaganwa, Bruno Nzeyimana, Donald Monica. Interpreter: Sabrina Iyadede, Freddy Munana. (Court Reporter: Susan Bateman- a.m. session; Sandra Bailey - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hrs 43 minutes)(CJA Time: 6 hrs 2 minutes) (jab) (Entered: 02/07/2013) |
| 02/07/2013 | 224 | MOTION in Limine re: Defendant's ICTR statements *pursuant to Rule 404(b)* by Beatrice Munyenyezi filed on 2/25/2013. (Ruoff, David) (Entered: |

| | | |
|---|---|---|
| | | 02/07/2013) |
| 02/08/2013 | | **ORAL ORDER denying 224 MOTION in Limine re: Defendant's ICTR statements** *pursuant to Rule 404(b)* **as to Beatrice Munyenyezi (1). So Ordered by Judge Steven J. McAuliffe.** (jab) (Entered: 02/08/2013) |
| 02/08/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 4 as to Beatrice Munyenyezi held on 2/8/2013. Government's evidence continues. Witnesses Appearing: Donald Monica, Vestine Nyiraminani. Interpreter: Sabrina Iyadede, Freddy Munana. (Court Reporter: Diane Churas) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 3 hrs 28 minutes) (CJA Time: 3 hrs 52 minutes) (jab) [Modified on 2/11/2013 to add: As the jury trial was adjourned early due to the impending blizzard, the judge instructed that any juror, counsel or witness could remain in Concord, NH over night if he or she felt uncomfortable driving home in the storm.] (jab). (Entered: 02/08/2013) |
| 02/11/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 5 as to Beatrice Munyenyezi held on 2/11/2013. Government's evidence continues. Witnesses Appearing: Timothy Longman. (Court Reporter: Susan Bateman- a.m. session; Sandra Bailey - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hrs 22 minutes)(CJA Time: 6 hrs) (jab) (Entered: 02/11/2013) |
| 02/12/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 6 as to Beatrice Munyenyezi held on 2/12/2013. Government's evidence continues. Witnesses Appearing: Jean Paul Rutaganda, Eric Benn, Donald Heflin, Richard Kamanzi. Interpreter: Sabrina Iyadede, Freddy Munana. (Court Reporter: Diane Churas - a.m. session; Susan Bateman - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hrs 58 minutes)(CJA Time: 6 hrs 12 minutes) (jab) (Entered: 02/12/2013) |
| 02/13/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 7 as to Beatrice Munyenyezi held on 2/13/2013. Government's evidence continues. Witnesses Appearing: Richard Kamanzi, Maurice Violo, Consolee Mukeshimana, Christy Salidzik. Interpreter: Sabrina Iyadede, Freddy Munana. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hrs 48 minutes)(CJA Time: 6 hrs 8 minutes) (jab) (Entered: 02/13/2013) |
| 02/14/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 8 as to Beatrice Munyenyezi held on 2/14/2013. Government's evidence continues. Government rests. Defendant's Rule 29 motion. Oral argument heard. Motion denied. Defendant's evidence begins. Witnesses Appearing: Vincent Sibomana, Thomas Brian Anderson, Jason Fox. Interpreter: Sabrina Iyadede, Freddy Munana. (Court Reporter: Diane Churas - a.m. session; Susan Bateman - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hrs 15 minutes)(CJA Time: 5 hrs 15 minutes) (jab) (Entered: 02/15/2013) |
| 02/15/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 9 as to Beatrice Munyenyezi held on 2/15/2013. Defendant's evidence continues. Witnesses Appearing: Gilbert Hitimana, Marie Alice Ahishakiye, Venerande Uwiteyakanza, Venuste Habinshuti, Venantie Myiramariro. Interpreter: Jacqueline Adam, Joseph Rubagumya. (Court Reporter: Diane Churas - a.m. session; Susan Bateman - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 4 hrs 13 minutes)(CJA Time: 6 hrs 15 minutes) (jab) (Entered: 02/17/2013) |

Appendix Page 36

| 02/18/2013 | 225 | MOTION for Mistrial by Beatrice Munyenyezi. Follow up on Objection on 3/7/2013. (Howard, Mark) (Entered: 02/18/2013) |
|---|---|---|
| 02/19/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 10 as to Beatrice Munyenyezi held on 2/19/2013. Court informs jury panel that juror #10 was excused; juror #13 replaces juror #10. Defendant's evidence continues. Defendant rests. Defendant renews Rule 29 Motion - motion denied. Government's Rebuttal witness. Oral argument heard re: Defendant's motion for mistrial. Court denies 225 Motion for Mistrial as to the first part; curative explanation given to the jury by Atty Capin and the Court. Witnesses Appearing: Brian Endless, Anastasia Mukamwiza. Interpreter: Jacqueline Adam, Joseph Rubagumya. (Court Reporter: Sandra Bailey - a.m. session; Diane Churas - p.m. session) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 3 hrs 52 minutes)(CJA Time: 5 hrs 52 minutes) (jab) (Entered: 02/19/2013) |
| 02/19/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: In Chambers Conference as to Beatrice Munyenyezi held on 2/19/2013 re: jury instructions. (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 2 hrs and 50 minutes)(CJA Time: 4 hours) (jab) (Entered: 02/21/2013) |
| 02/20/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 11 as to Beatrice Munyenyezi held on 2/20/2013. Closing arguments. Government's Rebuttal Argument. Court reviews draft jury instructions with counsel. Court charges jury. Court excuses alternate jurors nos. 14, 15 and 16. CSO sworn. Jury retires to deliberate. Interpreter: Jacqueline Adam, Joseph Rubagumya. (Court Reporter: Diane Churas) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff)(Total Hearing Time: 3 hrs and 54 minutes)(CJA Time: 5 hrs and 26 minutes) (jab) (Entered: 02/20/2013) |
| 02/20/2013 | 227 | Court Instructions as to Beatrice Munyenyezi. (jab) (Entered: 02/21/2013) |
| 02/21/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: JURY TRIAL - Day 12 as to Beatrice Munyenyezi held on 2/21/2013. Jury deliberations continue. Jury returns verdict of guilty on Counts One and Two. The Court enters judgment on the verdict. The defendant's U.S. Citizenship is hereby set aside and her Certificate of Naturalization has been cancelled. Defendant is detained pending sentencing. (Court Reporter: Diane Churas) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff) (USP: Kevin Lavigne)(Total Hearing Time: 5 minutes)(CJA Time: 4 hrs 45 minutes) (jab) (Entered: 02/21/2013) |
| 02/21/2013 | 228 | Jury Question No. 1 as to Beatrice Munyenyezi. (Attachments: # 1 Court's Answer) *Original document available in clerks office.*(jab) (Entered: 02/21/2013) |
| 02/21/2013 | 229 | JURY VERDICT as to Beatrice Munyenyezi: Guilty on Counts 1,2. *Original document available in clerks office.*(jab) (Entered: 02/21/2013) |
| 02/21/2013 | 230 | FINAL WITNESS LIST by USA as to Beatrice Munyenyezi. (jab) (Entered: 02/21/2013) |
| 02/21/2013 | 231 | FINAL EXHIBIT LIST by USA as to Beatrice Munyenyezi. (jab) (Entered: 02/21/2013) |
| 02/21/2013 | 232 | FINAL WITNESS LIST by Beatrice Munyenyezi. (jab) (Entered: 02/21/2013) |
| 02/21/2013 | 233 | FINAL EXHIBIT LIST by Beatrice Munyenyezi. (jab) (Entered: 02/21/2013) |
| 02/21/2013 | 234 | COURT EXHIBIT LIST as to Beatrice Munyenyezi. (jab) (Entered: 02/21/2013) |
| 02/25/2013 | 236 | **ORDER as to Beatrice Munyenyezi. The certificate of citizenship, issued to Beatrice Munyenyezi on July 18, 2003, is hereby declared cancelled. So Ordered by Judge Steven J. McAuliffe.** Appendix Page 237 2013) |

| 03/06/2013 | 239 | Assented to MOTION to Extend Time Deadline for Filing Post-verdict Rule 29 Motion by Beatrice Munyenyezi. (Ruoff, David) (Entered: 03/06/2013) |
|---|---|---|
| 03/07/2013 | | **ENDORSED ORDER granting 239 Motion to Extend Deadline for Filing Post-Verdict Rule 29 Motion to March 15, 2013 as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 03/07/2013) |
| 03/07/2013 | 240 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial Testimony of Thierry Sebaganwa held on February 7, 2013. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 4/1/2013. Redacted Transcript Follow Up 4/11/2013. Release of Transcript Restriction set for 6/6/2013. (jab) (Entered: 03/08/2013) |
| 03/15/2013 | 241 | MOTION to Extend Time Rule 29 Motion Deadline by Beatrice Munyenyezi. Follow up on Objection on 4/1/2013. (Ruoff, David) (Entered: 03/15/2013) |
| 03/15/2013 | 242 | ADDENDUM re: 241 MOTION to Extend Time Rule 29 Motion Deadline by Beatrice Munyenyezi. (Ruoff, David) (Entered: 03/15/2013) |
| 03/15/2013 | | **ENDORSED ORDER granting 241 Motion to Extend Time to File Rule 29 Motion to 3/22/2013 as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 03/15/2013) |
| 03/22/2013 | 245 | MOTION for Judgment *of Acquittal* by Beatrice Munyenyezi. Follow up on Objection on 4/8/2013. (Ruoff, David) (Entered: 03/22/2013) |
| 03/25/2013 | | NOTICE OF HEARING as to Beatrice Munyenyezi. Sentencing set for 6/3/2013 09:30 AM before Judge Steven J. McAuliffe.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(jab) (Entered: 03/25/2013)** |
| 03/25/2013 | 246 | Letter to Attorney General from Deputy Clerk re: requirements under Title 8, U.S.C., § 1451(f). (Attachments: # 1 Certified Copy of Judge McAuliffe's Order (doc no. 236).) (jab) (Entered: 03/25/2013) |
| 04/02/2013 | 247 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Excerpt of Testimony of Thierry Sebaganwa held on February 6, 2013. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. |

Appendix Page 38

| | | |
|---|---|---|
| | | **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/26/2013. Redacted Transcript Follow Up 5/6/2013. Release of Transcript Restriction set for 7/1/2013. (jab) (Entered: 04/03/2013) |
| 04/02/2013 | [248](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Excerpt of Testimony of Eric Benn held on February 12, 2013. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 4/26/2013. Redacted Transcript Follow Up 5/6/2013. Release of Transcript Restriction set for 7/1/2013. (jab) (Entered: 04/03/2013) |
| 04/08/2013 | [250](#) | Assented to MOTION to Extend Time to Object/Respond to [245](#) MOTION for Judgment *of Acquittal* to May 10, 2013 by USA as to Beatrice Munyenyezi. (Chakravarty, Aloke) (Entered: 04/08/2013) |
| 04/10/2013 | | **ENDORSED ORDER granting [250](#) Assemted to Motion to Extend Time to Object/Respond to [245](#) Motion for Judgmeent of Acquittal to 5/10/2013 as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Follow up on Objection on 5/10/2013. (jab)** (Entered: 04/11/2013) |
| 05/03/2013 | [253](#) | MOTION to Continue Sentencing and Opposition Deadline by USA as to Beatrice Munyenyezi. Follow up on Objection on 5/20/2013. (Chakravarty, Aloke) (Entered: 05/03/2013) |
| 05/10/2013 | [254](#) | OBJECTION by Beatrice Munyenyezi re [253](#) MOTION to Continue Sentencing and Opposition Deadline *Partial*. (Howard, Mark) (Entered: 05/10/2013) |
| 05/17/2013 | | **ENDORSED ORDER granting [253](#) MOTION to Continue Sentencing and Opposition Deadline as to Beatrice Munyenyezi (1). *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe. Sentencing reset for 7/3/2013 09:30 AM before Judge Steven J. McAuliffe.*The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.(jab)** (Entered: 05/17/2013) |
| 05/24/2013 | [255](#) | MEMORANDUM in Opposition by USA as to Beatrice Munyenyezi re [245](#) MOTION for Judgment *of Acquittal* . (Chakravarty, Aloke) (Entered: 05/24/2013) |
| 06/23/2013 | [260](#) | SENTENCING MEMORANDUM *and Motion for Depature and/or Variance* by USA as to Beatrice Munyenyezi. (Attachments: # [1](#) Exhibit A - Statement of Relevant Conduct, # [2](#) Exhibit B - U.S. v. Jordan Sentencing Transcript)(Chakravarty, Aloke) (Entered: 06/23/2013) |
| 06/27/2013 | [262](#) | Assented to MOTION for Leave to File Defendant's Sentencing Memorandum, instanter, Out of Time by Beatrice Munyenyezi.(Ruoff, David) (Entered: 06/27/2013) |

| 06/27/2013 | 263 | SENTENCING MEMORANDUM by Beatrice Munyenyezi. (Ruoff, David) (Entered: 06/27/2013) |
|---|---|---|
| 06/28/2013 | | **ENDORSED ORDER granting 262 Assented to MOTION for Leave to File Defendant's Sentencing Memorandum, instanter, Out of Time as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 06/30/2013) |
| 07/01/2013 | 264 | RESPONSE by Beatrice Munyenyezi re 260 Sentencing Memorandum. *and Objection to Motion for Upward Departure* (Ruoff, David) (Entered: 07/01/2013) |
| 07/02/2013 | 265 | Assented to MOTION to Continue Sentencing to July 15, 2013 by Beatrice Munyenyezi. (Howard, Mark) (Entered: 07/02/2013) |
| 07/02/2013 | | **ENDORSED ORDER granting 265 Assented to MOTION to Continue Sentencing to July 15, 2013 as to Beatrice Munyenyezi (1).** *Text of Order: Granted; given the government's assent.* **So Ordered by Judge Steven J. McAuliffe. Sentencing set for 7/15/2013 01:30 PM before Judge Steven J. McAuliffe.** *The court has allotted 1 hour for the hearing. Please contact the court immediately if you anticipate the hearing will exceed the allotted time.* **Any motion seeking a departure or variance, as well as any sentencing memorandum, shall be filed 10 days prior to the sentencing date. Any response shall be filed 4 days prior to sentencing date.**(vln) **(Entered: 07/02/2013)** |
| 07/15/2013 | 266 | MOTION for Return Collateral Property by Beatrice Munyenyezi. Served on 7/15/13. (jab) (Entered: 07/15/2013) |
| 07/15/2013 | | Minute Entry for proceedings held before Judge Steven J. McAuliffe: SENTENCING held on 7/15/2013 for Beatrice Munyenyezi (1): Defendant sentenced on Counts 1-2; denying 245 MOTION for Judgment *of Acquittal*. Oral argument heard on 260 government's Motion for Upward Departure and/or variance. Court grants 260 Motion for Upward departure and/or variance for the reasons set forth on the record. Appeal rights to defendant. (Court Reporter: Sandra Bailey) (Govt Atty: Aloke Chakravarty, John Capin) (Defts Atty: Mark Howard, David Ruoff) (USP: Jodi Gauvin)(Total Hearing Time: 1 hr 7 minutes)(CJA Time: 1 hr 12 minutes) (jab) (Entered: 07/15/2013) |
| 07/15/2013 | | **ENDORSED ORDER granting 266 MOTION to Return Collateral Property as to Beatrice Munyenyezi (1).** *Text of Order: Granted.* **So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 07/15/2013) |
| 07/15/2013 | 267 | **ORDER as to Beatrice Munyenyezi re: 266 MOTION to Return Collateral Property. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 07/15/2013) |
| 07/15/2013 | 268 | RECEIPT for Collateral returned as to Beatrice Munyenyezi re: 151 Collateral Receipt. Received by Marie Howard, Paralegal for Howard & Ruoff. (jab) (Entered: 07/15/2013) |
| 07/15/2013 | 269 | RECEIPT for Collateral returned as to Beatrice Munyenyezi re: 155 Collateral Receipt. Received by Marie Howard, Paralegal for Howard & Ruoff. (jab) (Entered: 07/15/2013) |
| 07/17/2013 | 270 | **JUDGMENT as to Beatrice Munyenyezi (1), Counts 1, 2: Defendant to be imprisoned for a total term of 120 months on each of Counts One and Two, both terms to be served concurrently; Three years supervised release on Counts One and Two, both terms to run concurrently, with standard and special conditions; $200.00 Special Assessment; Fine waived. Defendant to be remanded to the custody of the U.S. Marshal. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 07/18/2013) |
| 07/22/2013 | 271 | NOTICE OF APPEAL by Beatrice Munyenyezi re 270 Judgment,. (No fee paid, USA or IFP.). [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at |

| | | www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.] |
| | | **NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/efiling.htm** Designation of Exhibits Deadline set for 8/26/2013. (Howard, Mark) (Entered: 07/22/2013) |
| 07/27/2013 | 272 | Appeal Cover Sheet as to Beatrice Munyenyezi re 271 Notice of Appeal. (jab) (Entered: 07/27/2013) |
| 07/27/2013 | 273 | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals, documents numbered 270 - 273, as to Beatrice Munyenyezi to USCA re 271 Notice of Appeal. Presentence Investigation Report is attached in a sealed envelope. A copy of the Notice of Appeal mailed to all parties this date. (jab) (Entered: 07/27/2013) |
| 07/29/2013 | | Appellate Case Number: CCA 13-1950 for 271 Notice of Appeal filed by Beatrice Munyenyezi. (jab) (Entered: 07/29/2013) |
| 08/01/2013 | 274 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Sentencing Hearing held on July 15, 2013. Court of Appeals Docket Number 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 8/26/2013. Redacted Transcript Follow Up 9/6/2013. Release of Transcript Restriction set for 10/30/2013. (jab) (Entered: 08/01/2013) |
| 08/13/2013 | 275 | Letter to Attorney General from Deputy Clerk re: requirements under Title 8, U.S.C., § 1451(f). (Attachments: # 1 Certified Copy of Judgment (doc no. 270).) (jab) (Entered: 08/13/2013) |
| 08/26/2013 | 277 | DESIGNATION of Exhibits re 271 Notice of Appeal,,, (Ruoff, David) (Entered: 08/26/2013) |
| 08/27/2013 | 278 | (Corrected) DESIGNATION of Exhibits re 271 Notice of Appeal (Ruoff, David) Modified on 8/27/2013 to add "(Corrected)". (jab). (Entered: 08/27/2013) |
| 09/04/2013 | 279 | Clerk's Supplemental Certificate transmitted to US Court of Appeals as to Beatrice Munyenyezi re 271 Notice of Appeal, with document numbered 278 (Corrected) Designation of Exhibits. (jab) (Entered: 09/04/2013) |
| 10/01/2013 | 282 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Motion Hearing held on 2/5/2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. |

| | | |
|---|---|---|
| | | **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 10/25/2013. Redacted Transcript Follow Up 11/4/2013. Release of Transcript Restriction set for 12/30/2013. (jab) (Entered: 10/01/2013) |
| 10/01/2013 | [283](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 3 (a.m. session) held on 2/7/2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 10/25/2013. Redacted Transcript Follow Up 11/4/2013. Release of Transcript Restriction set for 12/30/2013. (jab) (Entered: 10/01/2013) |
| 10/01/2013 | [284](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 5 (a.m. session) held on 2/11/2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 10/25/2013. Redacted Transcript Follow Up 11/4/2013. Release of Transcript Restriction set for 12/30/2013. (jab) (Entered: 10/01/2013) |
| 10/01/2013 | [285](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial- Day 6 (p.m. session) held on 2/12/2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 10/25/2013. Redacted Transcript Follow Up 11/4/2013. Release of Transcript Restriction set for 12/30/2013. (jab) (Entered: 10/01/2013) |
| 10/01/2013 | [286](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 9 (p.m. |

session) held on 2/15/2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.

**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 10/25/2013. Redacted Transcript Follow Up 11/4/2013. Release of Transcript Restriction set for 12/30/2013. (jab) (Entered: 10/01/2013)

| 10/01/2013 | [287](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Recorded Bail Hearing held on 4/12/2012. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 10/25/2013. Redacted Transcript Follow Up 11/4/2013. Release of Transcript Restriction set for 12/30/2013. (jab) (Entered: 10/01/2013) |
| 10/17/2013 | [289](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 2 (a.m. session) held on 2/6/2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/12/2013. Redacted Transcript Follow Up 11/21/2013. Release of Transcript Restriction set for 1/16/2014. (jab) (Entered: 10/17/2013) |
| 10/17/2013 | [290](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 3 (p.m. session) held on February 7, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. |

Appendix Page 43

| | | |
|---|---|---|
| | | **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/12/2013. Redacted Transcript Follow Up 11/21/2013. Release of Transcript Restriction set for 1/16/2014. (jab) (Entered: 10/17/2013) |
| 10/17/2013 | [291](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 5 (a.m. session) held on February 11, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/12/2013. Redacted Transcript Follow Up 11/21/2013. Release of Transcript Restriction set for 1/16/2014. (jab) (Entered: 10/17/2013) |
| 10/17/2013 | [292](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 7 (p.m. session) held on February 13, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/12/2013. Redacted Transcript Follow Up 11/21/2013. Release of Transcript Restriction set for 1/16/2014. (jab) (Entered: 10/17/2013) |
| 10/17/2013 | [293](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 10 (a.m. session) held on February 19, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/12/2013. Redacted Transcript Follow Up 11/21/2013. Release of Transcript Restriction set for 1/16/2014. (jab) (Entered: 10/17/2013) |
| 10/28/2013 | [295](#) | Judgment Returned Executed as to Beatrice Munyenyezi on 10/17/2013.(jab) (Entered: |

Appendix Page 44

| | | |
|---|---|---|
| | | 10/28/2013) |
| 11/04/2013 | [296] | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 8 (a.m. session) held on February 14, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/29/2013. Redacted Transcript Follow Up 12/9/2013. Release of Transcript Restriction set for 2/3/2014. (jab) (Entered: 11/04/2013) |
| 11/04/2013 | [297] | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 10 (p.m. session) held on February 19, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Susan Bateman, Telephone # 603 225-1453. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/29/2013. Redacted Transcript Follow Up 12/9/2013. Release of Transcript Restriction set for 2/3/2014. (jab) (Entered: 11/04/2013) |
| 11/05/2013 | [298] | TRANSCRIPT of FTR Gold Recording as to Beatrice Munyenyezi of Initial Appearance and Arraignment held on June 24, 2010. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/29/2013. Redacted Transcript Follow Up 12/9/2013. Release of Transcript Restriction set for 2/3/2014. (jab) (Entered: 11/05/2013) |
| 11/13/2013 | [299] | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Bail Hearing held on 11/15/2010. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript |

Appendix Page 45

through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.

**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**

Redaction Request Follow Up 12/9/2013. Redacted Transcript Follow Up 12/19/2013. Release of Transcript Restriction set for 2/13/2014. (jab) (Entered: 11/14/2013)

| 11/13/2013 | 300 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 8 (p.m. session) held on 2/14/2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Sandra Bailey, Telephone # 603 225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 12/9/2013. Redacted Transcript Follow Up 12/19/2013. Release of Transcript Restriction set for 2/13/2014. (jab) (Entered: 11/14/2013) |
| 11/13/2013 | 301 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 4 held on February 8, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 12/9/2013. Redacted Transcript Follow Up 12/19/2013. Release of Transcript Restriction set for 2/13/2014. (jab) (Entered: 11/14/2013) |
| 11/13/2013 | 302 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 7 (p.m. session) held on February 13, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** |

Appendix Page 46

| | | |
|---|---|---|
| | | Redaction Request Follow Up 12/9/2013. Redacted Transcript Follow Up 12/19/2013. Release of Transcript Restriction set for 2/13/2014. (jab) (Entered: 11/14/2013) |
| 11/13/2013 | 303 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Verdict held on February 21, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/9/2013. Redacted Transcript Follow Up 12/19/2013. Release of Transcript Restriction set for 2/13/2014. (jab) (Entered: 11/14/2013) |
| 11/14/2013 | 304 | (SEALED) TRANSCRIPT of Proceedings for Jury Selection held on February 5, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. At the discretion of the presiding judge, the transcript of jury selection may not be available for public inspection. Modified on 11/15/2013 add "sealed" (jab). (Entered: 11/14/2013) |
| 11/15/2013 | 305 | **ORDER as to Beatrice Munyenyezi re: 304 Transcript - Jury Selection. The Court Reporter is directed to prepare a redacted transcript in accordance with this order. So Ordered by Judge Steven J. McAuliffe. (jab)** (Entered: 11/18/2013) |
| 11/19/2013 | 306 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 2 (p.m. session) held on February 6, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/13/2013. Redacted Transcript Follow Up 12/23/2013. Release of Transcript Restriction set for 2/18/2014. (jab) (Entered: 11/20/2013) |
| 11/19/2013 | 307 | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 6 (a.m. session) held on February 12, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers** |

| | | |
|---|---|---|
| | | **and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/13/2013. Redacted Transcript Follow Up 12/23/2013. Release of Transcript Restriction set for 2/18/2014. (jab) (Entered: 11/20/2013) |
| 11/19/2013 | [308](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 9 (a.m. session) held on February 15, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/13/2013. Redacted Transcript Follow Up 12/23/2013. Release of Transcript Restriction set for 2/18/2014. (jab) (Entered: 11/20/2013) |
| 11/20/2013 | [309](#) | TRANSCRIPT of Proceedings as to Beatrice Munyenyezi for Jury Trial - Day 11 held on February 20, 2013. Court of Appeals Docket Number CCA 13-1950. Court Reporter: Diane Churas, Telephone # 603 225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 12/16/2013. Redacted Transcript Follow Up 12/26/2013. Release of Transcript Restriction set for 2/21/2014. (jab) (Entered: 11/20/2013) |
| 11/20/2013 | [310](#) | REDACTED TRANSCRIPT of [304](#) Transcript - Jury Selection, Transcript in case as to Beatrice Munyenyezi. This redacted transcript is available at the clerk's office for viewing but may not be copied for 90 days from the date the original transcript was filed. (jab) (Entered: 11/20/2013) |
| 03/25/2015 | [311](#) | ORDER of USCA as to Beatrice Munyenyezi re [271](#) Notice of Appeal. (jbw) (Entered: 03/26/2015) |
| 03/25/2015 | [312](#) | JUDGMENT of USCA as to Beatrice Munyenyezi re [271](#) Notice of Appeal: Affirmed. (jbw) (Entered: 03/26/2015) |
| 04/23/2015 | [313](#) | MANDATE of USCA as to Beatrice Munyenyezi re [312](#) Judgment - Affirmed(Appeal Record follow-up for return of record/exhibits from USCA by 5/28/2015.) (jbw) (Entered: 04/24/2015) |
| 05/04/2015 | [314](#) | Receipt of the Exhibits listed on [61](#) Suppression Hearing Exhibits and [233](#) Final Trial Exhibit List filed by Beatrice Munyenyezi are hereby acknowledged. (jbw) Modified on 5/4/2015 to add suppression hearing exhibits. (jbw). (Entered: 05/04/2015) |
| 01/26/2016 | [315](#) | Receipt of the Exhibits listed on [231](#) Final Exhibit List filed by USA are hereby acknowledged. (jbw) (Entered: 01/26/2016) |

Appendix Page 48

| 09/06/2016 | 316 | Copy of MOTION under 28 U.S.C. 2255 filed by Beatrice Munyenyezi. ( Civil Action 1:16-cv-402-SM). All further docketing will be in the civil case. Copy of the petition has been sent to the AUSA for information only. (lml) (Entered: 09/08/2016) |
| 03/03/2017 | 317 | FILED IN ERROR. Should have been filed in the civil case, Munyenyezi v. U.S.A., 16-cv-402-SM. MOTION to Dismiss *28 U.S.C. Section 2255 Petition* by USA as to Beatrice Munyenyezi. Follow up on Objection on 3/17/2017. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Capin, John) Modified on 3/6/2017 to add filed in error language. (jbw) (Entered: 03/03/2017) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 02/08/2020 10:40:32 | | |
| **PACER Login:** | guerrieropacer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:10-cr-00085-SM |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

Appendix Page 49

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 1:10-cr |
| | ) | UNDER SEAL - LEVEL 1 |
| | ) | |
| | ) | Violation: |
| V. | ) | 18 U.S.C. § 1425(a) and (b) |
| | ) | Procurement of Citizenship |
| | ) | or Naturalization Unlawfully |
| | ) | 8 U.S.C. § 1451(e) |
| BEATRICE MUNYENYEZI | ) | Revocation of Citizenship |

## INDICTMENT

The Grand Jury charges that:

At all times relevant to this Indictment,

**Rwanda and the Rwandan Genocide: April to July 1994**

1.    Rwanda is one of the smallest countries in Central
Africa.  In 1994, the population of Rwanda was between 7 and 8
million people.  The two main ethnic groups in Rwanda were the
Hutu and the Tutsi.  The Hutus accounted for approximately 90
percent of the population.  Just prior to Rwanda's independence
from Belgium in 1962, the Hutu majority gained control of the
government, and after independence, the Hutu majority engaged in
acts, including discrimination and acts of violence, against
Tutsis.  As a result, numerous Tutsis fled Rwanda and some formed
a rebel guerilla army, known as the *Rwandan Patriotic Front*
("*RPF*").

2.    In or about the early 1990s, the *RPF* invaded Rwanda;
thereafter, Rwandan President Juvenal Habyarimana executed
agreements that mandated that the Hutus and Tutsis would share
power.  These agreements, which were negotiated between July 1992

and June 1993, were signed in Arusha, Tanzania, and came to be
known as the *Arusha Accords* (the "*Accords*").  Pursuant to the
*Accords*, Habyarimana's party, the *Mouvement Republicain National
pour le Developpement* ("*MRND*"), agreed to share power with
several other parties, as well as those that represented the *RPF*.

3.    On or about April 6, 1994, the Rwandan president's
plane, which was carrying President Habyarimana and Burundi's
President, was shot down by ground-fired missiles as it
approached Rwanda's airport at Kigali.  This assassination
precipitated a period of violence throughout Rwanda.  Within
hours, Hutu extremists, including those with positions of power
in an interim government formed after President Habyarimana's
assassination, began targeting and killing prominent individuals,
including moderate Hutu politicians and Tutsi leaders.  Included
among those killed were government ministers, including the prime
minister, who were opposed to the extremists.

4.    Working in cooperation with the government and the
military, extremist Hutus, who included members of the
*Interahamwe*, or youth militia of the *MRND*, set up roadblocks
around the country.  Those manning the roadblocks also included
members of the army and Presidential Guard and others, as well as
the *Interahamwe*.  These roadblocks became a principal vehicle for
the government's execution of the genocide of the Tutsis
throughout the country.  The killings spread throughout the

2

countryside as Hutus, armed with machetes, clubs, guns and
grenades, began killing Tutsi civilians, at times targeting
Tutsis based upon identification cards, known as "*cartes
d'identite*," or "identity cards," which included information
about the bearer, including his or her ethnicity.  Hutus, manning
roadblocks at locations in Rwanda, demanded production from
passers-by of identification cards, and killed individuals
identified as Tutsis.  Women who were Tutsis and identified as
such at roadblocks were at times not killed, but were taken into
custody, imprisoned by Hutus and raped.

     5.   The killings in Rwanda ended only after armed Tutsi
rebels of the *RPF*, invading from neighboring countries, managed
to defeat the forces of the interim Hutu government and other
extremists, and halted the genocide in July 1994.  By then, an
estimated 500,000 - 800,000 persons, nearly one tenth of the
population, had been killed.  This period of mass killing is
commonly referred to as the Rwandan genocide.

        **The Defendant BEATRICE MUNYENYEZI**

     6.   The Defendant BEATRICE MUNYENYEZI ("MUNYENYEZI") is
from Byumba, which was a prefecture (or state) in northern
Rwanda.

     7.   MUNYENYEZI is married to Arsene Shalom Ntahobari (or
Ntahobali) of Butare, Rwanda.  Ntahobari and MUNYENYEZI were both

members of and active supporters of the *MRND* Party and leaders of the *Interahamwe* within the area of Butare town.

8.   During the Rwandan genocide, that is, between approximately April and July 1994, MUNYENYEZI lived in Butare at the *Ihuriro Hotel* (the "*Ihuriro*").  The *Ihuriro* was owned by the family of MUNYENYEZI's husband, whose mother was a cabinet minister in the *MRND* government.  During the genocide, there were several roadblocks in the vicinity of the *Ihuriro*, including one that was right out front.  This roadblock was manned by members of the *Interahamwe* and other radical Hutu elements.  The identity cards of those who tried to pass the roadblock were checked by those manning the roadblock.  Those identified as Hutus were allowed to pass.  Those identified as Tutsis were separated and killed.  Some of the Tutsi women and teenage girls were kidnapped and held against their will and raped.  Most of these women and teenage girls were later killed.

9.   During the genocide in Rwanda, the Defendant MUNYENYEZI participated, committed, ordered, oversaw, conspired, and aided and abetted, assisted in and directed the persecution, kidnapping, rape and murder of numerous individuals at the roadblock in front of the *Ihuriro Hotel* in Butare and elsewhere. Most of her victims were Tutsi.  MUNYENYEZI assisted in many ways, including but not limited to, participating in and speaking at meetings and public rallies of the *MRND* and *Interahamwe*,

4

bringing supplies to *Interahamwe* and others who participated in
genocide against Tutsis including those who manned roadblocks in
Butare, identifying and discussing Tutsis to be killed and
encouraging others to rape Tutsi women and kill Tutsis, checking
identity cards and otherwise identifying Tutsis at roadblocks,
and selecting Tutsis to be kidnapped, raped and murdered.
MUNYENYEZI also took and received personal property and
belongings that were taken from victims who were murdered.

10.  In or about July 1994, as the *RPF* advanced on Butare,
the Defendant BEATRICE MUNYENYEZI left Rwanda.  In or about
September 1994, she entered Kenya, and thereafter lived in
Nairobi, Kenya.

**The Refugee Application and related documents**

11.  On or about January 18, 1995, in Nairobi, Kenya, the
Defendant BEATRICE MUNYENYEZI signed and dated a *Form I-590*,
*Registration for Classification as a Refugee*, and on or about
February 16, 1995, in Nairobi, Kenya, in the presence of, and
pursuant to an oath administered by an official of the U.S.
government, the Defendant BEATRICE MUNYENYEZI signed a *Form G-
646, Sworn Statement of Refugee Applying for Entry into the
United States*, and certified the truthfulness of the *Form I-590*
she had previously filed; each document contained false
information, including the following:

5

a.    The *Form I-590* directed MUNYENYEZI to list "Political, professional or social organizations of which I am now or have been a member or with which I am now or have been affiliated since my 16th birthday (If you have never been a member of any organization, state "None.")."  Although the Defendant MUNYENYEZI had been a member of, and affiliated with, the *MRND*, she responded: "None."

b.    The *Form G-646* listed aliens who are not admissible to the United States and asked the applicant if any of the listed classes apply to her.  One of the listed classes of excludable aliens was "Aliens who have committed ... a crime of moral turpitude ...."  Although the Defendant MUNYENYEZI had been involved in genocide, murder, kidnapping, rape, false imprisonment, theft, and conspiracy to commit same, and other crimes of moral turpitude during the genocide in Rwanda in 1994, MUNYENYEZI indicated that none of the excludable classes applied to her.

**The State Department's *Rwandan Questionnaire***

12.  Following the end of the genocidal killings of Tutsis by Hutus, the United States Department of State required Rwandans who were applying to enter the United States, to respond to additional "*Questions for Rwandan Visa Applicants*" ("the *Rwandan Questionnaire*").  The purpose of this questionnaire was to allow the Department of State, in assessing whether to permit entry

into the United States, to determine whether the individual might
have in any way participated or aided in the genocide in Rwanda
and, if so, to deny entry into the United States by such
individual.

13.  On or about November 13, 1995, in Nairobi, Kenya, the
Defendant BEATRICE MUNYENYEZI answered questions on the *Rwandan
Questionnaire*.  One of the questions asked, "Did you have any
involvement in the killing or injury to other persons since
April 1, 1994?  Did you in any way encourage others to
participate in such killing or injury?"  Although the Defendant
had been involved in the killing and injury of Tutsis during the
genocide in Rwanda, and encouraged others to do the same, the
Defendant MUNYENYEZI responded "No."

**Refugee Application granted**

14.  MUNYENYEZI's Refugee Application was granted, and on or
about March 10, 1998, MUNYENYEZI entered the United States at New
York, New York, as a refugee.

**Application for Permanent Residence and to Adjust Status**

15.  On or about July 7, 1999, the Defendant BEATRICE
MUNYENYEZI signed "under penalty of perjury" and submitted to
U.S. immigration officials an *Application to Register Permanent
Residence or Adjust Status, Form I-485*, which contained false,
misleading and fraudulent information and responses to questions,
including the following:

7

a.   On her *Form I-485*, the Defendant MUNYENYEZI indicated "None" in response to a question that directed her to "List your present and past membership or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States, or in any other place since your 16th birthday."  The Defendant BEATRICE MUNYENYEZI failed to disclose information concerning her membership in, and affiliation with, the *MRND* political party and the *Interahamwe*.

b.   On her I-485, the Defendant MUNYENYEZI responded by putting an "X" in the boxes marked "No" in response to the following question: "Have you ever, in or outside the U.S. ... knowingly committed any crime of moral turpitude ... for which you have not been arrested?"  This answer was false because the Defendant MUNYENYEZI participated in and aided, counseled, and assisted in genocide, murder, rape, kidnapping, false imprisonment, theft, and other crimes of moral turpitude during the genocide in Rwanda in 1994.

c.   On her *Form I-485*, the Defendant MUNYENYEZI responded by putting an "X" in the boxes marked "No" in response to the following question: "Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion?"  This answer was false

8

because the Defendant MUNYENYEZI engaged in genocide, and
otherwise ordered, incited, assisted and otherwise participated
in the killing of Tutsis during the genocide in Rwanda in 1994.

d.    The Defendant MUNYENYEZI also responded by putting an
"X" in the box marked "No" in response to the question that
asked, "Have you, by fraud or willful misrepresentation of a
material fact, ever sought to procure, or procured, a visa, other
documentation, entry into the U.S., or any other immigration
benefit?"  The Defendant MUNYENYEZI failed to disclose all the
false information, lies and misrepresentations on the *Form I-590,
Registration for Classification as Refugee*, *Form G-646*, *Sworn
Statement of Refugee Applying for Entry into the United States*,
and *Rwandan Questionnaire*, that she completed and submitted in
order to receive an immigration benefit, and to thereby gain
entry into the United States.

**Application to Adjust Status granted**

16.    The *Application to Adjust Status*, filed by MUNYENYEZI,
was approved on or about January 19, 2001.

**Application for Naturalization**

17.    On or about December 16, 2002, in New Hampshire, the
Defendant BEATRICE MUNYENYEZI, signed and certified "under
penalty of perjury" an *Application for Naturalization*, *Form N-
400,* and mailed said *Application* from Manchester, New Hampshire
to the United States Immigration and Naturalization Service

9

Eastern Service Center in St. Albans, Vermont.  On or about April
29, 2003, in Manchester, New Hampshire, the Defendant BEATRICE
MUNYENYEZI appeared before an officer of the United States
Citizenship and Immigration Services and certified, "under
penalty of perjury," the truthfulness of said *Form N-400*, which
Form contained false, misleading and fraudulent information and
responses to questions, including the following:

      a.   In response to a question on her *Form N-400* that asked,
"Have you **EVER** been a member of or associated with any
organization, association, fund, foundation, party, club,
society, or similar group in the United States or in any other
place?" (emphasis in the original), the Defendant MUNYENYEZI did
not disclose her membership in, and association with, the *MRND*
and *Interahamwe* and responded by putting an "X" in the box marked
"No."

      b.   In response to a question on her N-400 that asked,
"Have you **EVER** persecuted (*either directly or indirectly*) any
person because of race, religion, national origin, membership in
a particular social group, or political opinion?" (emphasis in
the original), the Defendant MUNYENYEZI responded by putting an
"X" in the box marked "No" and failed to disclose her direct and
indirect persecution of Tutsis during the Rwandan genocide.

      c.   In response to a question on her N-400 that asked,
"Have you **EVER** committed a crime or offense for which you were

**NOT** arrested?" (emphasis in the original), the Defendant MUNYENYEZI failed to disclose her participation in genocide, murder, rape, kidnapping, and theft, and responded by putting an "X" in the box marked "No."  In addition, MUNYENYEZI failed to disclose that she had previously violated U.S. criminal laws by providing false information and responses in immigration documents and interviews, including the *Form I-590*, *Form G-646*, the *Rwandan Questionnaire* and *Form I-485.*

     d.  In response to a question on her *Form N-400* that asked, "Have you **EVER** given false or misleading information to any U.S. official while applying for any immigration benefit or to prevent deportation, exclusion or removal?" (emphasis in the original), the Defendant MUNYENYEZI responded by putting an "X" in the box marked "No," thus failing to disclose all the false information she provided in previous immigration documents submitted to receive immigration benefits and to remain in the United States, that is, the *Form I-590*, *Form G-646*, *Rwandan Questionnaire,* and *Form I-485.*

     e.  In response to a question on her N-400 that asked, "Have you **EVER** lied to any U.S. government official to gain entry or admission into the United States?" (emphasis in the original), the Defendant MUNYENYEZI responded by putting an "X" in the box marked "No," thus failing to disclose the false information she provided on the *Form I-590*, *Form G-646* and *Rwandan Questionnaire*.

**Application for Naturalization granted**

18.   On or about April 29, 2003, in Manchester, New Hampshire, the Defendant MUNYENYEZI's *Application for Naturalization* was granted, and on or about July 18, 2003, in Concord, New Hampshire, the Defendant BEATRICE MUNYENYEZI took the applicable oath and became a citizen of the United States.

12

**COUNT ONE**
**(18 U.S.C. § 1425(a) –**
**Procurement of Citizenship or Naturalization Unlawfully)**

Paragraphs 1 through 18 set forth above, are hereby realleged and incorporated as if fully set forth herein.

From on or about December 16, 2002, and continuing thereafter through on or about July 18, 2003, in the District of New Hampshire and elsewhere, the Defendant,

BEATRICE MUNYENYEZI,

did knowingly procure and attempt to procure her own naturalization contrary to law, that is, in violation of Title 18, United States Code, Sections 1001(a)(2) and (3), 1015(a), and 1546(a), by knowingly providing false and fraudulent information as to material facts in her Application for Naturalization, Form N-400, and in violation of the Immigration and Nationality Act.

All in violation of Title 18, United States Code, Section 1425(a).

13

## COUNT TWO
### 18 U.S.C. § 1425(b) - Procurement of Citizenship or Naturalization Unlawfully

Paragraphs 1 through 18 set forth above, are hereby realleged and incorporated as if fully set forth herein.

From on or about December 16, 2002, and continuing thereafter through on or about July 18, 2003, in the District of New Hampshire and elsewhere, the Defendant,

BEATRICE MUNYENYEZI,

did knowingly procure, obtain and apply for, and did attempt to procure and obtain naturalization and citizenship, for herself, to which she was not entitled, in that

a.   the Defendant MUNYENYEZI did provide false and fraudulent information as to material facts in her *Application for Naturalization*, *Form N-400*;

b.   at the time of her application for naturalization, the Defendant MUNYENYEZI was not lawfully admitted to the United States for permanent residence, pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that the Defendant MUNYENYEZI did gain entry to and asylum in the United States by providing false and fraudulent information as to material facts in a *Registration for Classification as a Refugee*, *Form I-590*, *Sworn Statement of Refugee Applying for Entry into the United States*, *Form G-646,* and "Questions for Rwandan Visa Applicants" questionnaire;

14

c.   at the time of her application for naturalization, the Defendant MUNYENYEZI was not lawfully admitted to the United States for permanent residence, pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that the Defendant MUNYENYEZI did apply for and receive status as a *Lawful Permanent Resident* of the United States, by providing false and fraudulent information as to material facts in an *Application to Register Permanent Residence or Adjust Status*, *Form I-485*;

d.   at the time of her application for naturalization, the Defendant MUNYENYEZI was not lawfully admitted to the United States for permanent residence, pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that the Defendant MUNYENYEZI was an inadmissible alien who had engaged in conduct that is defined as "genocide" for the purposes of the International Convention for the Prevention and Punishment of Genocide;

e.   at the time of her application for naturalization, the Defendant MUNYENYEZI could not satisfy the requirements for naturalization, pursuant to Title 8, United States Code, Section 1427, in that she was not a person of "good moral character," in that the Defendant MUNYENYEZI provided false testimony for the purpose of obtaining immigration benefits;

f.   at the time of her application for naturalization, the Defendant MUNYENYEZI could not satisfy the requirements for naturalization, pursuant to Title 8, United States Code, Section 1427, in that she was not a person of "good moral character," in that the Defendant MUNYENYEZI had participated in genocide, and in so doing committed numerous acts of violence, including murder, rape, persecution, and theft; and

g.   at the time of her application for naturalization, the Defendant BEATRICE MUNYENYEZI did not satisfy the requirements for naturalization that are set forth in Title 8, United States Code, Section 1427.

All in violation of Title 18, United States Code, Section 1425(b).

16

## **REVOCATION OF CITIZENSHIP**
### **8 U.S.C. § 1451(e)**

Upon conviction under either of Count One or Count Two above, the Defendant BEATRICE MUNYENYEZI's July 18, 2003 naturalization shall, by Court order, be revoked, set aside, and declared void, and the Defendant BEATRICE MUNYENYEZI's certificate of naturalization shall, by the same order, be canceled.

Pursuant to Title 8, United States Code, Section 1451(e).

17

June 23, 2010

A TRUE BILL

/s/ Foreperson
Grand Jury Foreperson

JOHN P. KACAVAS
United States Attorney

/s/ Jeffrey Auerhahn
Jeffrey Auerhahn
Special Assistant U.S. Attorney

/s/ Aloke S.Chakravarty
Aloke S. Chakravarty
Special Assistant U.S. Attorney

18

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6-25-2012

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-85-01-SM
          v.                    *  March 15, 2012
                                *  9:30 a.m.
  BEATRICE MUNYENYEZI           *  3:35 p.m.
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY SIXTEEN
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:


For the Government:    John A. Capin, SAUSA
                       Aloke S. Chakravarty, SAUSA
                       U.S. Attorney's Office (NH and MA)



For the Defendant:     Mark E. Howard, Esq.
                       David W. Ruoff, Esq.
                       Howard & Ruoff, PLLC
                       1850 Elm Street
                       Manchester, NH 03104



Court Reporter:        Susan M. Bateman, LCR, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH 03301
                       (603) 225-1453

```
 1                  P R O C E E D I N G S
 2           (IN ANTEROOM WITH COUNSEL AND COURT)
 3           THE COURT:  Good morning.  Okay.  Let's
 4  see.  Yeah, you make a good point.  It's always
 5  interesting.  I don't know why these -- you know,
 6  those instructions are always -- somebody does it
 7  and the circuit says it's not so bad to reverse.
 8  They don't really -- it's not really an approval
 9  kind of thing but --
10           MR. HOWARD:  I think it says in the
11  commentary to the model instructions that they're
12  not approved.
13           THE COURT:  Oh, they're not approved, but
14  that notion of half a loaf, as usual, maybe a
15  third.  Oh, I'm sorry.  I should have said we're
16  in chambers with counsel on the record.
17           Do you have this yet?  Did you pass it
18  out, Judy?
19           THE CLERK:  I did, yes.
20           THE COURT:  This is what I propose to do.
21  Why don't you take a minute and read it and see
22  what you think.  Essentially, Mark, what I've done
23  is taken your suggestion of -- I didn't take it
24  out about certainty.  I agree with you, it tends
25  to sound like it's a comment, so I moved it to the
```

3

1  part that discusses what the burden of proof is on

2  the government and I added a little narrative in

3  the front.  Otherwise it's basically the same

4  instruction.

5          I also took out that burden of proof is a

6  legal tool.  I agree, I don't really care for

7  that, and I put your suggestion in that burden of

8  proof is a legal requirement.

9          MR. RUOFF:  It's a triple negative.  I'm

10  just having a tough time wrapping my mind around

11  it, paragraph 2.

12          MR. HOWARD:  That's the language of the

13  model instruction, isn't it?

14          THE LAW CLERK:  It is.  And I have to

15  admit I had a little trouble with it, too, when I

16  read it.

17          MR. RUOFF:  What does that mean, a double

18  negative and another negative?

19          THE COURT:  It's not really.  I like it.

20  On the other hand, jurors favoring conviction have

21  to seriously ask themselves whether they should

22  not distrust the weight or sufficiency of the

23  evidence which fails to dispel reasonable doubt in

24  the minds of their fellow jurors.  It's the

25  emphasis.

4

1          MR. RUOFF:  The emphasis on the right

2  syllable.

3          THE COURT:  It's the best you're going to

4  do.

5          MR. HOWARD:  I have that sense, Judge.

6          THE COURT:  Oh, who knows.  Obviously we

7  don't know how they're split, and we don't have

8  any idea of the degree of conviction on one side

9  or the other.  We just don't know.

10          MR. HOWARD:  Right.

11          THE COURT:  It may be a short day.  It may

12  not be.  Any problems, government?

13          MR. CHAKRAVARTY:  Nothing worth fighting

14  over, your Honor.

15          THE COURT:  Okay.

16          MR. HOWARD:  We can indicate for the

17  record that we don't object to the instruction.

18          THE COURT:  Good point.  Any objections, I

19  should ask?

20          MR. CAPIN:  No, your Honor.

21          MR. CHAKRAVARTY:  No.

22          MR. HOWARD:  No.

23          THE COURT:  Okay.

24          (IN COURT - NO JURY PRESENT)

25          THE CLERK:  Court is in session and has

1  for consideration jury trial, day sixteen, in the

2  matter of United States of America versus Beatrice

3  Munyenyezi, case number 10-CR-85-01-SM.

4        THE COURT:  Oh, I changed the title to

5  supplemental answer since we had already sent a

6  response in.

7        (IN COURT - JURY PRESENT)

8        THE COURT:  Good morning, ladies and

9  gentlemen.  On Tuesday afternoon you asked the

10  following question, "Your Honor, we cannot

11  unanimously agree on Count 1 and we cannot

12  unanimously agree on Count 2.  Please instruct us

13  on filling out the jury verdict sheet".

14        I responded as follows, "Thank you.  As I

15  mentioned, the Court will resume Thursday starting

16  at 9:00 o'clock a.m.  I will discuss your question

17  with counsel for both parties and address it at

18  that time", and I now will address your question.

19        As I have stressed several times, you are

20  the sole and exclusive judges of the facts in this

21  case.  Only you can determine what the truth is

22  and only you can return a verdict in this case.

23        Nothing I have said in the instructions on

24  the law that I have given you or in the responses

25  I have given to your questions, including this

1  response, is meant in any way to suggest what your

2  verdict should be.  That is entirely your

3  responsibility and no one else's.

4          I have reviewed your question with

5  counsel, and I believe I fully understand the

6  points you have raised.  At this point, however, I

7  am going to provide you with brief supplemental

8  instructions.

9          You should consider that you have been

10  selected in the same manner and from the same

11  source as any future jury would be selected.

12  There is no reason to suppose that this case would

13  ever be submitted to twelve men and women more

14  intelligent, more impartial or more competent to

15  decide it than you or that more or clearer

16  evidence would be produced in the future.  Thus,

17  it is your duty to decide the case if you can

18  conscientiously do so without violence to your

19  individual judgment.

20          The verdict to which a juror agrees must,

21  of course, be his or her own verdict, the result

22  of his or her own convictions, and not a mere

23  acquiescence in the conclusion of his or her

24  fellow jurors.

25          Yet in order to bring twelve minds to a

7

1  unanimous result, you must examine the question

2  submitted to you with an open mind and with proper

3  regard for and deference to the opinion of your

4  fellow jurors.  In conferring together, you ought

5  to pay proper respect to each other's opinions and

6  you ought to listen with a mind open to being

7  convinced by each other's arguments.

8         Thus, where there is disagreement jurors

9  favoring acquittal should consider whether a doubt

10  in their own mind is a reasonable one when it

11  makes no impression upon the minds of the other

12  equally honest and intelligent jurors who have

13  heard the same evidence with the same degree of

14  attention and with the same desire, to arrive at

15  the truth under the sanction of the same oath.

16         On the other hand, jurors favoring

17  conviction ought seriously to ask themselves

18  whether they should not distrust the weight or

19  sufficiency of evidence which fails to dispel

20  reasonable doubt in the minds of their fellow

21  jurors.

22         Not only should jurors in the minority

23  reexamine their positions, but jurors in the

24  majority should do so also to see whether they

25  have given careful consideration and sufficient

8

1  weight to the evidence that has favorably

2  impressed the persons in disagreement with them.

3         Burden of proof is a legal requirement

4  against which you must measure the evidence in

5  deciding this case.  In trials absolute certainty

6  can be neither expected nor attained, but the law

7  imposes upon the prosecution a high burden of

8  proof.  The prosecution has the burden to

9  establish with respect to each count each

10  essential element of the offense and to establish

11  that essential element beyond a reasonable doubt.

12  And if with respect to any element of any count

13  you are left in a reasonable doubt, the defendant

14  is entitled to the benefit of such doubt and must

15  be acquitted.

16         It is your duty to decide the case if you

17  can conscientiously do so without violence to your

18  individual judgment.  It is also your duty to

19  return a verdict on any counts as to which all of

20  you agree, even if you cannot agree on all counts.

21  But if you cannot agree, it is, of course, your

22  right to fail to agree.

23         I now instruct you to go back and resume

24  your deliberations with this supplemental

25  instruction in mind.

1           (IN COURT - NO JURY PRESENT)

2           THE COURT:  It just occurs to me, because

3  the answer does include supplemental instructions,

4  are there any objections to the supplemental

5  instructions as given?

6           MR. HOWARD:  No, your Honor.

7           MR. CHAKRAVARTY:  No, your Honor.

8           THE COURT:  All right.  Thank you.

9           (RECESS)

10          (IN COURT - JURY PRESENT)

11          THE COURT:  All right.  Good afternoon,

12  ladies and gentlemen of the jury.

13          The jury foreperson has communicated in a

14  note the following quote, "Your Honor, we cannot

15  unanimously agree on Count 1 and we cannot

16  unanimously agree on Count 2.  We do, however,

17  unanimously agree that the decision of each juror

18  will not change".

19          So, Mr. Foreperson, are you satisfied, and

20  is it your judgment, that the jury is hopelessly

21  deadlocked with respect to the issues that you're

22  deciding?

23          THE FOREPERSON:  I am, your Honor.

24          THE COURT:  And are you of the opinion

25  that further deliberations would prove futile?

1           THE FOREPERSON:  I am, your Honor.

2           THE COURT:  All right.  Ladies and

3   gentlemen of the jury, the jury foreperson is of

4   the view that the jury is hopelessly deadlocked

5   with respect to the issues that you're deciding

6   and is of the opinion that further deliberations

7   would prove futile.

8           I'm going to poll each of you, which means

9   I'm going to ask each of you if you agree or

10  disagree with that assessment.

11          Juror No. 2, do you agree or disagree?

12          THE JUROR:  I agree.

13          THE COURT:  Juror No. 3, do you agree or

14  disagree?

15          THE JUROR:  I agree, your Honor.

16          THE COURT:  Juror No. 4, do you agree or

17  disagree?

18          THE JUROR:  I agree.

19          THE COURT:  Juror No. 5, do you agree or

20  disagree?

21          THE JUROR:  I agree.

22          THE COURT:  Juror No. 6, do you agree or

23  disagree?

24          THE JUROR:  I agree.

25          THE COURT:  Juror No. 7, do you agree or

1   disagree?

2           THE JUROR:  I agree.

3           THE COURT:  Juror No. 8, do you agree or

4   disagree?

5           THE JUROR:  I agree.

6           THE COURT:  Juror No. 9, do you agree or

7   disagree?

8           THE JUROR:  I agree.

9           THE COURT:  Juror No. 10, do you agree or

10  disagree?

11          THE JUROR:  I agree.

12          THE COURT:  Juror No. 11, do you agree or

13  disagree?

14          THE JUROR:  I agree.

15          THE COURT:  And Juror No. 12, do you agree

16  or disagree?

17          THE JUROR:  I agree.

18          THE COURT:  All right.  Ladies and

19  gentlemen, you know, at the outset I think I

20  mentioned to you that the genius of our jury trial

21  system is the reliability of twelve people from

22  different walks of life coming together and

23  bringing together your collective intelligence and

24  your good faith in trying to resolve these

25  difficult issues, and I for one am satisfied, and

1  I know counsel are satisfied, that you've

2  certainly been thoroughly attentive during the

3  course of the trial.  You've demonstrated that you

4  paid attention to the evidence.  It's a

5  complicated case.  It's a difficult case.  And so

6  I want to make the point clear to you that you

7  should not feel that you failed in this case.  You

8  may have failed to unanimously agree upon verdicts

9  on the two counts, but you certainly have not

10  failed in carrying out your duty as jurors in this

11  case.

12          Whatever side of the question each of you

13  came down on, the questions that you were

14  deciding, I know each of you reached that

15  conclusion for yourself, and I know you did it --

16  you reached that conclusion based on a considered

17  respect -- a conscientious consideration of the

18  evidence in the case, you arrived at your position

19  honestly after having considered all of the

20  arguments of counsel and the evidence, and

21  obviously you've all adhered to your particular

22  individual beliefs and conclusions, and that's

23  what's expected of jurors in this case -- in every

24  case.

25          So each of you has certainly upheld the

1   finest traditions of the American jury system by

2   standing firm after having reached a good faith

3   conclusion, and I mean that sincerely.  Sometimes

4   no decision is the right decision, and perhaps

5   that's the answer here.

6           Given the fact that the jury is unable to

7   reach a unanimous decision with respect to a

8   verdict as to Count 1 and with respect to a

9   verdict as to Count 2, I hereby declare a mistrial

10  in this case and I will discharge the jury with

11  the Court's thanks and appreciation, and I mean

12  that sincerely as well.

13          I will just point out to you before you

14  leave that there has been continuing press

15  coverage of the case, and I expect there probably

16  will be continuing press coverage.  Whether you

17  speak publicly about your experiences as a juror

18  in this case is entirely up to you.  You're

19  obviously not required to publicly comment.  It's

20  entirely your decision.  But if you do choose to

21  publicly comment about the case, I hope you will

22  just keep in mind that for now this case is not

23  over.  The case is still continuing.  Just keep

24  that in mind and maybe exercise some discretion if

25  you can.

14

1          Thank you very much.  I appreciate your

2  indulgence.  And yesterday, that was not planned.

3  And again, thanks for your patience and for your

4  effort.  No one can say you didn't thoroughly,

5  thoroughly consider all of the evidence in this

6  case.

7          So, with thanks, you are excused.

8          (IN COURT - NO JURY PRESENT)

9          MR. HOWARD:  Your Honor, may we approach

10  sidebar?

11          THE COURT:  Certainly.

12          (SIDEBAR)

13          MR. HOWARD:  We just are asking if you

14  would be willing to entertain before they leave

15  what their count was and what side they were

16  coming down on.

17          THE COURT:  I generally wouldn't because

18  the case is certainly not over.  I'm not sure you

19  want me to do that anyway because the government's

20  got to make a decision here and they've got to do

21  some analysis and some thinking.

22          MR. HOWARD:  I was trying to help that

23  analysis along.

24          THE COURT:  Well, but it may not help.

25          MR. HOWARD:  That's the risk I take.

1          THE COURT:  Exactly.  So I think -- given

2     where we are in the case, I think that probably

3     would not be a good idea, but thanks for asking.

4     No.

5          MR. HOWARD:  Thank you, Judge.

6          THE COURT:  All right.  Thanks.

7          (CONCLUSION OF SIDEBAR)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate

 6   transcription of the within proceedings, to the best of

 7   my knowledge, skill, ability and belief.

 8

 9

10   Submitted: 3-26-12

11                            SUSAN M. BATEMAN, LCR, RPR, CRR
                              LICENSED COURT REPORTER, NO. 34
12                            STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12-30-2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*  10-CR-85-01-SM
            v.                          \*  February 5, 2013
                                        \*  1:25 p.m.
    BEATRICE MUNYENYEZI                  \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Government:      John A. Capin, SAUSA
                         Aloke S. Chakravarty, SAUSA
                         U.S. Attorney's Office (NH and MA)

For the Defendant:       Mark E. Howard, Esq.
                         David W. Ruoff, Esq.
                         Howard & Ruoff, PLLC

Court Reporter:          Susan M. Bateman, LCR, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

1              P R O C E E D I N G S

2              THE CLERK:  Court is in session and has for

3    consideration a motion hearing in United States of

4    America versus Beatrice Munyenyezi, criminal case

5    No. 10-CR-85-1-SM.

6              THE COURT:  All right.  I just wanted to --

7    as I mentioned at the pretrial conference that was not

8    on the record, I wanted to put these rulings,

9    unhelpful as they may be, on the record with respect

10   to your motions in limine.

11             I think I have a full list, but if I don't

12   just let me know and we'll go through them.  If

13   anybody wants to be heard, I'll be happy to hear you

14   on the record as well so you can make an appropriate

15   proffer as you choose.

16             All right.  Actually I think I'm probably

17   going to have to ask you to just refresh my memory on

18   some of these.  194, defendant's motion I guess to

19   exclude evidence of the prior conviction of the

20   defendant's husband and mother-in-law and sister, it's

21   not your intention, Mr. Chakravarty, to elicit that

22   type of evidence anyway unless some special

23   circumstance arises in which case you will notify me

24   in advance and we'll discuss it.

25             MR. CHAKRAVARTY:  That's correct, your Honor.

1            THE COURT:  Andersen is going to testify?

2            MR. CAPIN:  Yes, your Honor, he is.

3            THE COURT:  He won't make the same mistake.

4            MR. CAPIN:  He's been admonished, your Honor.

5            THE COURT:  All right.  195, defendant's

6    motion to exclude Dr. Vanderculk.  Denied without

7    prejudice to your interposing an appropriate objection

8    at the time the evidence is offered so the evidentiary

9    context is clear and I can make a more informed

10   judgment.  However, don't count on it.  Not you.

11   Defendants count on it.  Government don't count on it.

12            As the record stands now, you haven't

13   persuaded me that his testimony isn't admissible.

14            196, defendant's motion to preclude the ICTR

15   attorneys from testifying as to why they didn't charge

16   the defendant, that motion is -- well, that's denied

17   as well without prejudice to interposing an

18   appropriate objection at the time when the evidentiary

19   context is clear.

20            However, I don't think that's going to

21   happen.  It seems to me it's a collateral matter.

22   It's likely to lead to confusion of the issues and the

23   jury, and I doubt I'm going to allow you to present

24   ICTR attorneys to explain why they didn't do

25   something.  That's even assuming you have evidence

1    they consciously didn't do anything with respect to

2    charging a defendant.

3            197, that's the newspaper article.  Is that

4    what that is?  Nobody is looking at this but me, are

5    they?

6            MR. HOWARD:  I don't think it's our motion.

7    I think it's yours.

8            THE COURT:  Yes, this is the newspaper

9    article.

10            MR. CAPIN:  I think it's a motion to preclude

11    references to the media at a minimum in opening

12    statements, and then later --

13            THE COURT:  All right.  Here's my problem

14    with that, Mr. Howard.  I've given a lot of thought to

15    it, and it's always a hazard for me to speculate as to

16    what your theory exactly is, but I think -- correct me

17    where I'm wrong -- it goes something like this.  This

18    defendant -- or not the defendant.  These witnesses

19    come from a culture or society that encourages them to

20    implicate Hutus when charged and to accuse Hutus with

21    respect to genocide crimes; that somehow they're

22    motivated by that cultural imperative to I guess lie

23    or present false testimony in cases in which Hutus are

24    accused of genocide activity.  So they're motivated to

25    lie and they have a bias emanating from this cultural

1    imperative.

2         I think if you have evidence to that effect,

3    obviously I let you present it last time, and I'll

4    certainly allow you to present it this time, but I

5    think your evidence last time was limited to pretty

6    much Dr. Longman, and I guess you're going to call

7    your own expert.

8         MR. HOWARD:  That's correct.

9         THE COURT:  So you'll have expert testimony

10   opinion evidence that there is such a narrative and

11   there is such a cultural imperative, I assume.  But

12   the newspaper article is something different, unless

13   the expert relied on it.  If he relied on it, he

14   certainly could talk about it, I suppose, as something

15   he relied on in forming his expert opinion.

16        But as I understand it, the way you want to

17   use the newspaper article, or articles, is to

18   cross-examine witnesses to the effect, have you seen

19   this article, is your testimony not consistent with

20   the narrative of the imperative that this article

21   discloses.

22        So far I haven't seen an article that

23   actually discloses that imperative with any kind of

24   reliable detail.  I understand from the government

25   most of the witnesses are going to say I don't speak

1   English, these are in English newspapers and I wasn't

2   exposed to it, and I don't think you can use that kind

3   of an impeachment where it seems that the primary

4   purpose is not so much to impeach the credibility of

5   the witness but to get before the jury some

6   substantive evidence that you think tends to support

7   the notion that there is this narrative that leads to

8   this type of bias.

9           So where am I wrong?

10          MR. HOWARD:  I was going to hesitate to say

11  you're wrong.

12          THE COURT:  Well, what am I missing?

13          MR. HOWARD:  Well, first, it was the

14  government's motion.  They selected some articles that

15  they don't want us to use.  It's not like we have

16  selected articles that we intended to use.

17          With respect to the articles that they think

18  we're going to try to use to prove the official

19  narrative, I said in my pleading, I thought, that they

20  were misguided about the purpose of it.

21          I do think that there is an overlay of the

22  official narrative, because you do have the Rwandan

23  officials very critical of the prior proceeding and so

24  forth.  I don't think we're going to be allowed to get

25  into that.

1        Our use of the media was going to be very

2   simple and it's very common in American courtrooms,

3   and that is for many of these witnesses, the new ones

4   at least, they are brought to the surface in the last

5   summer only after Rwanda media is, for all intents and

6   purposes, inundated with my client's photograph, her

7   name and the story.

8        Whether they serendipitously learned of this

9   case through the media or they were shown those

10  articles or force fed information about my client, her

11  name, her connection to Butare, her husband, and

12  they're parroting it back, that's what we intend to

13  use; that it's the media that gives rise to the

14  information they have for recent fabrication.  That

15  seems to me to be both basic and obvious.

16       They can deny it.  They can say, I never saw

17  those articles, I was never force fed the information.

18  That's for the witness to deny it.  But I have a good

19  faith basis to cross-examine them on that principle.

20       We are not going to stand here and just

21  introduce articles without questioning witnesses and

22  say, see, this is the information that was in Rwanda,

23  this is the official narrative, you can't believe any

24  of these people.  That's not what we're doing.  We're

25  going to cross-examine the witnesses --

1          THE COURT:  Well, let me ask you this.  If

2   you say to a witness, I show you an article, or a

3   series of articles, that appeared in newspapers in

4   Rwanda, did you see those, and the witness says no,

5   your next step is to say what?

6          MR. HOWARD:  I don't know what more I can do,

7   but the jury certainly can assess whether it's

8   credible that they did not have access to that

9   information.

10         THE COURT:  See, that's the problem.  It

11  seems to fall into the classic it looks like

12  impeachment but it's actually substantive evidence to

13  support the notion that there is this cultural

14  imperative, and I can't let you do that.

15         In other words, you've put the cloak of

16  impeachment on the article, but it's really not

17  impeachment at all.  It's get before the jury hearsay

18  evidence so that they will take as a given that there

19  is evidence of a cultural imperative.

20         I thought you were going down a better road

21  when you said, you know, the fact that there was

22  widespread coverage is itself admissible to show the

23  recent fabrication.

24         MR. HOWARD:  That's what I intend to do.

25         THE COURT:  Oh, I thought you said you were

1   going to use it to impeach.

2          MR. HOWARD:  No, but I've got to have -- I

3   think you're going to require me to have at least some

4   attempts to connect the public information to the

5   witness.

6          THE COURT:  I think -- and again, correct me

7   if I'm wrong, but I think the government's concern is

8   I don't want them standing up and telling this jury

9   that there are newspaper articles that they will see

10  that will establish this cultural imperative when the

11  chances of getting the newspaper articles in to

12  establish that is pretty much nil.  In your opening,

13  that's what you're concerned about, right?

14         MR. CAPIN:  That is the primary concern,

15  correct, your Honor.  In the opening.

16         THE COURT:  Maybe we can cut to it this way.

17  Do you intend to make that kind of statement in your

18  opening?

19         MR. RUOFF:  Well, I'm doing the opening.

20         THE COURT:  Okay.  Mr. Ruoff.

21         MR. RUOFF:  All I was going to say is that

22  after the prior proceeding this case was widely

23  publicized in Rwanda.  That's it.

24         MR. CAPIN:  It seems to me that that is --

25         MR. RUOFF:  Which it was.

1          THE COURT:  And the evidence you're going to

2    offer that it was widely publicized in Rwanda

3    subsequently is going to consist of what, and how are

4    you going to get it in?

5          MR. RUOFF:  Well, I can ask the witnesses if

6    any of them saw it.  They may know the answer to this.

7          THE COURT:  All right.  And you anticipate

8    the witnesses will say --

9          MR. RUOFF:  And it may go to -- it may be

10   admissible for other reasons.  Why they're going back

11   there in June and how they -- the provinces of some of

12   these witnesses, how they were found.  They may put up

13   an agent or two that has actual knowledge of the

14   contents of these newspaper articles and the

15   photographs contained in them and, you know, whether

16   or not they asked their witnesses --

17         THE COURT:  You've got the cultural

18   imperative theory, and then you have a different

19   theory that's something like these witnesses are the

20   product of widespread publication.

21         MR. RUOFF:  Yes.  They may have been exposed

22   to it, yes.

23         THE COURT:  Okay.

24         MR. RUOFF:  And I wasn't going to use, in my

25   opening at least, the argument about, you know, the

1   newspaper articles are demonstrative of some type of

2   dominant narrative.

3           THE COURT:  You're not?

4           MR. RUOFF:  No.

5           THE COURT:  Okay.  Does that satisfy you?

6           MR. CAPIN:  No, your Honor, because I think

7   the reference to the newspaper article -- I mean,

8   there's no better good faith reason to suggest to the

9   jury that Rwandan witnesses were poisoned by that than

10  they were by the Concord Monitor.

11          The only articles -- and the articles on the

12  defendant's exhibit list that they've identified are

13  in an English only paper called the Rwanda Times.

14          MR. CHAKRAVARTY:  The New Times.

15          MR. CAPIN:  The New Times.  Thank you.  It

16  has no specific -- to my knowledge -- I haven't looked

17  at the specific things.  I think there's something

18  filed with the Court.  There's nothing more specific

19  than she is charged with immigration fraud because she

20  denied her role in the genocide.  Certainly there's

21  nothing that would provide the potential witness any

22  detailed information about what they're supposed to

23  say and this meshes somehow with the Rwandan narrative

24  thesis.

25          But my fundamental point is until such time

1 that they can establish through a witness that, A,

2 they saw the media, and B, that somehow that material

3 is biased, I don't see how that should be permitted in

4 opening.  And to suggest that an agent might have seen

5 it, that's totally immaterial.

6          THE COURT:  How do you link the publicity to

7 the production of these witnesses?  I mean, I know

8 you're saying that somehow there's a link between

9 publicity and the appearance of these witnesses, but

10 do you have a link actually?  Do you have an

11 evidentiary link?

12          MR. HOWARD:  Well, we don't have access to

13 their witnesses so I don't know what they actually

14 saw, but I certainly, I believe, can do this.

15          There are witnesses who say -- who have never

16 talked about her before.  Then all of a sudden in June

17 not only do they know the story but they know what she

18 looks like, and that's because her picture was in the

19 paper, and they describe certain features about her

20 that are in the photograph that's in those articles.

21          Now, all of a sudden 18 years later you've

22 got these witnesses who are handpicked by the agents

23 on the ground working for the U.S. agents, hand

24 delivered to the U.S. agents, who now all of a sudden

25 know her name and they all of a sudden know what she

1   looks like.  How could that be?

2          Well, one possible source is the media,

3   whether it's serendipitous or handed to them by

4   somebody, either a U.S. agent or somebody working for

5   a U.S. agent.

6          THE COURT:  All right.  Mr. Ruoff, in your

7   opening tell me again what you plan to say.

8          MR. RUOFF:  Just that after the prior

9   proceeding the case was widely publicized in Rwanda.

10  That's it.

11         THE COURT:  I expect the evidence to show

12  that after the prior proceeding the case was widely

13  publicized in Rwanda?

14         MR. RUOFF:  Yes.

15         THE COURT:  Okay.

16         MR. CAPIN:  I don't think there's a basis for

17  even that assertion, that it was widely publicized.

18  There was a couple of --

19         MR. RUOFF:  Well, it's true.

20         THE COURT:  Are you quibbling about widely or

21  publicized?

22         MR. CAPIN:  Yeah, quibbling about widely and

23  quibbling about any good faith reason to believe that

24  these witnesses were exposed to any media.  Moreover,

25  with regard to --

1        THE COURT:  Well, but they're free to deny

2   it.  They're free to deny it.  It's opening.  He

3   anticipates the evidence will be that.  If he doesn't

4   produce the evidence, if it's not admissible,

5   obviously you'll point that out, I assume.

6        MR. CAPIN:  Fair enough.

7        THE COURT:  Okay.  197 is denied without

8   prejudice to interposing an appropriate objection at

9   the time the evidence is offered when the evidentiary

10  context is clear.

11       198, exclude reference to --

12       MR. RUOFF:  I think we just discussed that.

13       THE COURT:  198?  Did we?

14       MR. RUOFF:  Well, they're kind of tied

15  together, your Honor.  One was --

16       THE COURT:  Prior trial outcomes -- yes.

17  Nobody is going to refer to the prior trial outcome,

18  right?

19       MR. RUOFF:  No, they all know about it

20  anyway.

21       THE COURT:  And nobody is -- I assume in your

22  opening you're going to -- I assume you're going to

23  refer to this sort of theme about a cultural

24  imperative narrative?

25       MR. RUOFF:  Yes.

```
 1            THE COURT:  But you're not going to -- you

 2   were concerned about referring to government

 3   influences and that kind of thing.  Do you remember?

 4            MR. CHAKRAVARTY:  Your Honor, there's the

 5   notion that there's this cultural imperative, but then

 6   the fact that the cultural imperative is being driven

 7   by -- the Rwandan government is somehow tainting these

 8   witnesses, for which there was no evidence.

 9            THE COURT:  You don't have any evidence of

10   that, and you're not going to argue that, I assume, in

11   your opening.  You're not going to mention it in your

12   opening anyway.

13            MR. RUOFF:  I'm not -- I want to be careful

14   about --

15            THE COURT:  Sure.  He's just drawing a

16   distinction.  There may be this cultural imperative,

17   but that's different from the government of Rwanda is

18   actually manipulating this prosecution by serving up

19   witnesses or influencing their testimony and so forth,

20   and what Mr. Chakravarty is saying is there's no

21   evidence to that that they're aware of, and if you

22   don't have any you probably ought not to be able to

23   say you think the evidence is going to show that.

24            MR. RUOFF:  I think -- I'm not going to say

25   that there's a specific witness that has been actually
```

1  influenced, but I think I'm allowed to say, consistent

2  with the Court's ruling on our expert's testimony,

3  that there is this cultural phenomenon and this

4  narrative.

5          THE COURT:  That's different from colonel so

6  and so has pulled the lever and produced

7  these witnesses because of a --

8          MR. RUOFF:  No, no, no.  It's not going to be

9  that specific.

10          THE COURT:  Okay.  So you're not going to

11  specifically refer to government directed

12  manipulation.

13          MR. RUOFF:  No.

14          THE COURT:  Okay.

15          MR. CAPIN:  I guess -- just to be clear, I'm

16  just concerned because counsel has referred to somehow

17  witnesses being -- I think the word was fed up or

18  served up, and there's no evidence for that either.

19          I hope that implicit in this discussion is

20  that neither party will suggest that agents in Rwanda

21  provided witnesses to --

22          THE COURT:  I thought that was your point --

23  that is your point.

24          MR. RUOFF:  Yeah.

25          THE COURT:  That is their point.

1          MR. CAPIN:  That agents of the Rwandan

2    government identified --

3          THE COURT:  No, no.  Now you're slipping.

4    Agents you said first.  Agents can be any agency or

5    agent of the investigation.

6          MR. CAPIN:  Well, so I'm distinguishing

7    because --

8          THE COURT:  The tracker in the last case, you

9    know, the implication was somebody called the tracker

10   and said we need people to testify about this and he

11   went out and found them and produced them.

12         MR. CAPIN:  But we've addressed this mutually

13   in our pleadings, and we tried to make it as clear as

14   possible that certainly with regard to any new

15   witnesses the tracker was solely used to locate a

16   person whose name was given to the tracker.

17         THE COURT:  That's your position.

18         MR. RUOFF:  Well, we don't have any discovery

19   on that, Judge.  All we have is a letter saying --

20         THE COURT:  That's their position.  Your

21   position is what, different?

22         MR. RUOFF:  Is that they were given a list of

23   names by other Rwandan witnesses who testified, or may

24   not have testified, I don't know, and that was how

25   these investigators found these witnesses was from

1  other Rwandans, not federal agents, but just from

2  other Rwandans.

3          THE COURT:  All right.  Do you have a problem

4  with that?

5          MR. CAPIN:  I suppose not.

6          THE COURT:  All right.  199, that's -- you're

7  seeking to preclude the defense from impeaching, I

8  guess, Mr. Townsend.

9          MR. CAPIN:  I think that's moot, your Honor.

10         THE COURT:  Okay.  I was going to say I think

11 it is moot.  Well, I don't know if it's moot, but it's

12 likely to become moot if the ICTR witnesses don't

13 testify, correct?

14         MR. CAPIN:  Yes.

15         MR. CHAKRAVARTY:  And even if they do, your

16 Honor, it wouldn't be Mr. Townsend.

17         THE COURT:  Oh.  Okay.  All right.

18         That's all I have.  Are there any other

19 motions anybody is aware of that are not ruled on that

20 you wish to have ruled on now?  No?  Okay.

21         MR. HOWARD:  That's it, your Honor.

22         THE COURT:  All right.  Tomorrow morning at

23 9:00 o'clock.

24         (Conclusion of hearing at 1:50 p.m.)

25

```
 1                  C E R T I F I C A T E

 2

 3

 4          I, Susan M. Bateman, do hereby certify that the

 5     foregoing transcript is a true and accurate

 6     transcription of the within proceedings, to the best of

 7     my knowledge, skill, ability and belief.

 8

 9

10     Submitted: 10-1-13
                              SUSAN M. BATEMAN, LCR, RPR, CRR
11                            LICENSED COURT REPORTER, NO. 34
                              STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/15/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-cr-85-01-SM
            v.                  *  February 6, 2013
                                *  9:15 a.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 2 - MORNING SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE
AND A JURY

Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH)
                      53 Pleasant Street, 4th Floor
                      Concord, NH 03301

For the Defendant:    David W. Ruoff, Esq.
                      Mark E. Howard, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH  03104

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

```
 1                         I N D E X

 2

 3
     Opening statement by Mr. Chakravarty, page 17
 4
     Opening statement by Mr. Ruoff, page 46
 5

 6

 7

 8   Witness              Direct   Cross   Redirect   Recross

 9
     RONY ZACHARIAH
10
     By Mr. Chakravarty     59
11

12

13

14

15

16

17   Exhibits                            Id     Evid.

18   Government's Exhibit No. 29                  72

19

20

21

22

23

24

25
```

3

```
 1                     (JURY DULY SWORN)
 2            THE CLERK:  Court is in session and has for
 3   consideration jury trial day two in the matter of United
 4   States of America versus Beatrice Munyenyezi, Case
 5   Number 10-cr-85-01-SM.
 6            Your Honor, for the record, the government has
 7   premarked exhibits 1 through 29.  All exhibits not
 8   marked for identification are herewith accepted into
 9   evidence, there being no objection by opposing counsel.
10   They are exhibits 1 through 6, 10 through 13, 15 and 16.
11   Those to which objection has been made shall remain
12   marked for ID at this time.  They are exhibits 5, 7, 9,
13   14, 17 through 29.
14            The defendant has premarked exhibits A through
15   F.  Those to which objection has been made shall remain
16   marked for identification at this time.  They are
17   exhibits A through F.
18            THE COURT:  All right, good morning, ladies
19   and gentlemen.  You've now been sworn in as the petit
20   jury in this case which means that you are now judges of
21   the facts, you are judges of this court, you are judges
22   no less than I'm a judge.  In fact, you're the more
23   important judges in this case because only you can
24   determine what the facts are, what the truth is, and
25   only you can return a verdict in the case.  I play no
```

4

1  role in determining what the facts are, and I play no

2  role in returning a verdict in this case.  That's solely

3  and exclusively your responsibility.

4          I'm going to take just a few minutes before we

5  actually begin the trial proper to give you a little bit

6  of a preview or an outline of what you might expect by

7  way of procedure so that you'll have a context for

8  understanding the evidence and the process as it

9  unfolds.

10          As you know, this is a criminal case brought

11  by the United States government.  Sometimes during the

12  course of the trial I'll refer to the government as the

13  prosecution or prosecutors.  The government is

14  represented in this case by Assistant United States

15  Attorneys Capin and Chakravarty who you met yesterday.

16  And the defendant is Beatrice Munyenyezi, and she's

17  represented by her lawyers, Mr. Howard and Mr. Ruoff,

18  who you also met yesterday.

19          The defendant in this case has been charged by

20  the government with violations of federal law.

21  Specifically, she's charged in the indictment in two

22  counts with unlawfully procuring United States

23  citizenship or naturalization in violation of 18 U.S.

24  Code, Sections 1425(a) and (b).  The charges against the

25  defendant, as I mentioned, are contained in the

1   indictment, and as I said yesterday, the indictment is

2   simply a description of the charges made by the

3   government against the defendant.  The indictment is a

4   charging document.  It's not evidence of anything.

5          The defendant has pleaded not guilty to the

6   charges in the indictment and she denies committing the

7   charged offenses; therefore, she is presumed to be

8   innocent and she may not be found guilty by you unless

9   12 of you unanimously find that the government has

10  proved her guilt beyond a reasonable doubt with respect

11  to each and every essential element of the offenses

12  charged against her.

13         Now, I'm going to explain what essential

14  elements mean at the end of the trial, but basically

15  each charge, each statutory charge is like a recipe.

16  There's an element, and there are several elements in

17  each charge, and it's the government's burden to prove

18  each charge beyond a reasonable doubt, which means

19  proving each element, and you will get a complete

20  briefing on what that means at the end of the trial, and

21  during the course of the trial I'm sure you will be told

22  by counsel what they expect to prove with respect to the

23  elements.

24         Now, the trial proper will begin in just a few

25  minutes with what's known as opening statements.

6

1   Counsel for each side has an opportunity to stand before

2   you at the beginning of the trial and speak to you

3   directly and tell you in a narrative form what they

4   anticipate the evidence will be and how that evidence

5   fits with their view, their perspective of what the case

6   is about.  So they'll basically tell you this is what we

7   think the case is about and this is the evidence we

8   anticipate you're going to hear that supports our view

9   of the case.

10          There are a couple things you should keep in

11   mind about opening statements.  First and foremost, they

12   are not evidence.  That the lawyer for one side or

13   another tells you what they expect the evidence will be,

14   that you will hear, doesn't make it evidence, okay.  The

15   evidence comes from the witness stand through the sworn

16   testimony of witnesses or the admission of documents or

17   things into evidence.  You'll see a number of folders

18   sitting up in front of the deputy clerk's bench that

19   contain proposed exhibits and some exhibits that have

20   already been actually entered in this trial.

21          Like any profession, there's a certain amount

22   of jargon that's associated with what we do.  You heard

23   the deputy clerk rattle off a number of numbers and said

24   that certain exhibits, the ID have been stricken by

25   agreement, they are admitted into evidence, and maybe

7

1    you missed some of that as it went by rather quickly.

2    What she was doing was reading into the record exhibits

3    that both the government and the defense have agreed

4    should be presented to you in this case.  So there's no

5    dispute about it, there won't be any argument about it,

6    so there's already evidence in the record.

7              We mark everything.  The lawyers are required

8    to mark all the things that they expect to admit before

9    you as evidence in advance of trial so we can know what

10   they are.  They're given either a number or a letter.

11   Before they are admitted in evidence they are marked

12   with something called ID.  You heard Judy say ID may be

13   stricken on, and then read a number of numbers.  That's

14   our shorthand way of saying what was once a proposed

15   exhibit, proposed evidence, is now actually evidence.

16   So during the course of the trial you will hear counsel,

17   as a shorthand way, may stand up occasionally and say

18   move to strike ID on Exhibit 20.  It's a shorthand way

19   of saying I wish this document that's marked as

20   Exhibit 20 for identification to be admitted as a full

21   exhibit before the jury so that they can consider it.

22   If I say ID may be stricken on 20, now you know that

23   whatever that is marked as 20 is now actually evidence

24   before you that you can consider.

25             Now, once opening statements are concluded the

8

1   government begins the case by calling witnesses.

2   Somebody has to go first, you know, the way time works,

3   we have beginning, we have past, we have present, we

4   have future, somebody has to start.  Because the

5   government bears the burden of proof in the case and

6   always retains the burden of proof in the case, the

7   government goes first.  So, government counsel will call

8   witnesses to the witness stand.  They'll be sworn, put

9   under oath.  The government will engage in what's known

10  as direct questioning, asking questions in a particular

11  manner.  The witnesses will answer the questions.  When

12  the government's through asking all the questions they

13  wish to ask of a particular witness, the roles reverse.

14  Counsel for the defendant has an opportunity to question

15  that witness in a style that's known as cross-

16  examination.  When defense counsel have finished asking

17  all questions of a particular witness on cross that they

18  wish to ask, the government has a brief opportunity to

19  redirect.  And these are very professional lawyers,

20  they're very capable.  My practice is to basically let

21  them go back and forth a few times as necessary to cover

22  new ground.  So direct, cross, redirect, recross.

23  Probably call a stop about there.  But, that's the

24  process.

25          When the witness is finished, counsel have

9

```
1   exhausted all the questions they wish to ask, the
2   witness will be excused.  Government will call another
3   witness, so on and so on, until they've exhausted their
4   list of witnesses.
5            During the course of their examination of
6   witnesses they will be moving to introduce exhibits,
7   documents, things into evidence, and I've just described
8   that process for you.
9            When the government has completed presenting
10  all of its evidence, the defendant has an opportunity to
11  call witnesses and present evidence.  You should
12  understand, however, that the defendant is not required
13  to call any witnesses.  The defendant is not required to
14  present any evidence whatsoever.  The burden is entirely
15  on the government to prove these charges beyond a
16  reasonable doubt.  The defense has no burden whatsoever
17  and no obligation to call witnesses or to present
18  evidence at all.  Now, I anticipate the defense in this
19  case will call some witnesses and will present evidence.
20  So when the government's finished, defense counsel
21  likely will call witnesses, and the roles are reversed.
22  Defense counsel engages in what's known as direct
23  examination, a particular style of questioning, the
24  government will have an opportunity to cross-examine,
25  and similarly we will go through all the defense
```

1   witnesses until they've presented all the evidence they

2   wish to present.

3           When all of the evidence has been presented to

4   you, counsel will once again have an opportunity to

5   stand before you and speak to you directly and make

6   what's known as a closing argument.

7           Like opening statements, closing arguments are

8   not themselves evidence.  You probably realize now on

9   opening statements counsel will tell you what they

10  expect the evidence will be, but it doesn't always work

11  out quite that way.  By the time they make closing

12  arguments you'll know what the evidence is because

13  you'll have received all the evidence.  You'll have

14  heard the witnesses and you'll see the documents and so

15  on, so you'll know what the evidence is.  So, closing

16  arguments, unlike opening statements, is not based on

17  anticipation, it's based on reality, and they will then

18  review the evidence with you as it came in, and they

19  will argue to you as to how they believe that evidence

20  supports their particular positions in the case.  Again,

21  closing arguments are not themselves evidence.

22          What counsel say during the course of the

23  trial is not evidence.  What they, the questions they

24  ask, the questions are not evidence.  So if a counsel

25  asks a question of a witness that assumes a fact,

1    there's no evidence of that fact unless the witness

2    accepts the fact.

3              Once closing arguments are completed, I will

4    then instruct you on the law that you're to apply.  As I

5    started out telling you, you are the judges of the

6    facts.  My role is to be a judge of the law.  Basically

7    it's my obligation to assure that both parties receive a

8    fair trial, a fair opportunity to present evidence, a

9    fair opportunity to present their cases to you, and the

10   way we do that, as you might imagine, there are rules of

11   procedure, there are rules of evidence, there's

12   substantive law, there are a lot of rules that apply.

13   Counsel basically are familiar with those rules.  I'm

14   somewhat familiar with them.  We'll do that in a rather

15   quick fashion usually, and the way we do that is if

16   either counsel thinks that some rule applies that's not

17   being honored or observed, they will make what's known

18   as an objection.  They will stand up and say, you know,

19   I object, and sometimes they will briefly state the

20   grounds.  We're generally familiar with the rules and

21   the way they apply.  I'll rule on it, sustained,

22   overruled, some modification of that, and we'll move on.

23             Please don't hold it against counsel that they

24   stand up and make objections.  It's their obligation and

25   duty to their clients to do so, and it's helpful to the

1    court because it helps me recognize when there is an

2    issue that needs to be resolved so that we can move on

3    properly.

4            Sometimes it's not so clear how the rules

5    apply in a particular factual situation.  Sometimes it's

6    a little more complicated than just ruling on it.  In

7    that event, I don't expect that will happen too often

8    here, but in that event, if I think we can discuss it

9    and resolve it in just a minute or so, couple of

10   minutes, I'll have counsel come to the sidebar just as

11   we did with you when you were going through the jury

12   selection process, they'll come to the sidebar, we'll

13   discuss it quietly, hopefully out of your hearing, and

14   I'll rule on it after I've given counsel an opportunity

15   to weigh in on the respective issues.  If I think it's

16   even more complicated than that and we're going to have

17   to do a little work on it, and again, I don't expect

18   that will happen in this case but if it does, I'll

19   excuse you back to the jury deliberation room, we'll

20   take the matter up in court, take whatever time is

21   necessary to resolve the issue before moving on.

22           Please understand that if that happens, that

23   it's really, it's really not slowing you down.

24   Invariably those sessions accelerate the process of the

25   trial.  So it's an efficient way of doing it.  It may

1   not seem like it to you, because you're sitting back in

2   the jury deliberation room waiting, but trust me, it's

3   an efficient way to move the case along.

4           The schedule we're going to follow is start at

5   9:00, go to about 12:30, short break in between.  Pick

6   up again about one or a little after and go to three

7   with a short break in between.  Again, that may not seem

8   like a long day to you, but trust me, those of you who

9   have not served on juries before, that's a long day for

10  you to sit there and concentrate, and I think you'll

11  find it's an effective schedule, we can move along

12  pretty quickly with that schedule.

13          Because you are judges of the facts, as again

14  I told you yesterday, it's very important that you not

15  only be fair and impartial, that you appear to be fair

16  and impartial, and therefore please do not do any

17  research about any issues or any matters related to this

18  case.  Please do not communicate with spouses, friends,

19  co-workers, relatives, anybody about your role as a

20  juror or your thoughts or what's going on in the case.

21  No Twitter, no Facebook, no whatever other social media

22  there are that you participate in, no communication

23  whatsoever about your thoughts, experiences, feelings,

24  emotions, whatever it is people communicate on those

25  media these days, don't do that.  After the trial is

14

1    over, obviously you're free to communicate however you

2    choose.

3           There's water I think at the end of each side

4    of the jury box.  Feel free to -- any time you need a

5    drink, feel free to get it or ask fellow jurors to pass

6    the drink down to you.  If you ever need a break beyond

7    the schedule I described, just get Judy's attention or

8    get my attention, we'll be happy to accommodate, it's

9    not an issue.

10          Notes.  You've all been provided with

11   notebooks and pen I believe.  Yes.  You're certainly

12   allowed to take notes.  But there are a couple of

13   guidelines that you should probably follow, keep in

14   mind.  Please don't try to be a stenographer.  You can't

15   do it.  The stenographer is taking down everything that

16   people say.  She's very highly trained, computer-

17   assisted.  She can do it, you can't.  And if you try,

18   what will happen is you'll get so lost in trying to take

19   down notes that you'll miss the opportunity to judge the

20   credibility or assess the demeanor and character of

21   witnesses, and that's your primary role, that's very

22   important for you to be able to do.  So take notes but

23   not to the exclusion of hearing the evidence and

24   concentrating on the witnesses.

25          Please use your notes only to refresh your own

1   recollections and your own memories.  Don't, in other

2   words, don't use your notes as some sort of written down

3   capital T platonic truth in discussions with your fellow

4   jurors.  People see things, hear things, perceive things

5   differently.  That's the beauty of the jury system.  It

6   truly is some 12 people in a group.  It's amazing the

7   perceptions that that group together have.  So, one

8   person claiming that their notes should trump everybody

9   else's perception, A, it's fallacious; and B, you

10  shouldn't do it.  So don't do that.

11          You can't take your notes at home -- you can't

12  take your notes home during the course of the trial.

13  You must leave them here.  Judy will collect them,

14  secure them in the clerk's office, and return them to

15  you in the morning.  Nobody will read them.  Judy won't

16  read them.  Nobody will take a look at them.  But at the

17  end of the trial, if you would like to take them home,

18  obviously you're free to do that.

19          All right, I think that pretty much covers --

20  oh, one other thing.  You see these easels here and

21  obviously counsel are going to be using demonstrative

22  exhibits and so forth during the course of their

23  openings probably and certainly during the trial they

24  will, it's kind of hard the way this is structured for

25  everybody to be able to see what they're showing, and

1   I've already instructed counsel that they're to show it

2   to you.  So make sure you can see the exhibits, and if

3   anybody else can't see, that's just the way it goes.

4   But make sure you can -- you the jurors can see the

5   exhibits they're talking about.  Sometimes counsel get

6   excited about what they're doing and they forget and

7   they'll stand in front of the exhibit and some of you

8   can't see it.  If that happens, again, you are judges in

9   this courtroom.  This courtroom is yours more than it's

10   anybody else's.  Be sure to speak up and say I can't see

11   the exhibit or you're standing in the way.

12         Sometimes they'll stand in front of the

13   witness and they'll have a great conversation with the

14   witness between themselves but you can't hear because

15   the lawyer's blocking the witness.  Again, speak up and

16   say you can't see or hear.  Counsel will appreciate

17   that.  They want you to hear the witnesses, they want

18   you to see the exhibits, so they will very much

19   appreciate your assisting them in that regard.

20         All right, I think that completes the preview.

21   We will now begin the trial proper, and as I mentioned,

22   we begin with opening statements.  Please keep in mind

23   that opening statements are designed to assist you in

24   understanding what the case is about, what counsel

25   expects the evidence to be and how much it will fit in

1  the overall framework as they describe it to you so you

2  will have some reference points.  The government begins,

3  and Mr. Chakravarty will be making the opening

4  statements.  Whenever you're ready, Mr. Chakravarty.

5           MR. CHAKRAVARTY:  Thank you, your Honor.  One

6  thing to add to what your Honor said.  If you can't hear

7  me or I'm going so fast you don't understand what I'm

8  saying, and that's also something that all the attorneys

9  would want you to raise your hand.

10           Ladies and gentlemen, as you know, I'm Al

11  Chakravarty, John Capin, we're prosecutors for the

12  government, Assistant U.S. attorneys, our client is the

13  United States of America.

14           The United States of America is the envy of

15  the world.  Immigration, amongst other things, has made

16  this country strong, resilient, constant influx in

17  talent, in skills.  There are two ways to come to this

18  country.  One is legally and one is illegally.

19           One of the illegal ways to come into the

20  United States is to lie in order to get here, in order

21  to stay here, and to lie to get one of the most

22  treasured privileges that we share -- that of U.S.

23  citizenship.  That's what you're going to hear in this

24  courtroom.  That's what the defendant did.

25           It started long ago and it took a long time to

1    find the evidence to demonstrate, took a long time

2    before there was even reason to question.  And question

3    we did.  We gathered the evidence to present to you in

4    order to make a judgment as to whether she lied to come

5    into the country, whether she lied to become a refugee,

6    whether she lied to get a green card, lawful permanent

7    residency, and ultimately ten years ago in this very

8    building, she swore -- she was sworn in as a citizen.

9    That was fraud.

10           Lies matter in the immigration processes

11   especially, because when somebody is coming from a

12   foreign country, what is America going to have to assess

13   whether this person deserves to come here?  There are

14   many ways to come here, but you have to rely on what the

15   person tells you, to know what question to ask.  But you

16   can't go and follow-up on thousands of people who are

17   trying to come to our shores every year.  You can't go

18   back to their countries and start getting corroborating

19   information, you have to rely on the applicant to give

20   you that.  And then if there is something that raises a

21   red flag, you ask follow-up questions.  The entire

22   immigration process is designed to ask those questions

23   that determine whether you're legally eligible to come

24   to the United States or whether you're telling the

25   truth.  The very same things that his Honor told you

1    that you're going to be doing here in this trial,

2    looking at somebody, seeing if what they say makes

3    sense, seeing their demeanor.  It's called assessing

4    credibility.  And that's what the immigration officers

5    in the State Department, when they are looking at

6    somebody's application, you're going to hear that that's

7    what they have to do as well.  Assess the person's

8    credibility.

9         This defendant tried to control the image that

10   she was going to tell America who she was.  She tried to

11   tailor it to something that would be sympathetic to her.

12   And she did that by not allowing the immigration

13   officers and the State Department to use the only tools

14   that they have to be able to try to figure out whether

15   this person is a real refugee or whether she's something

16   else.

17        Those questions on these forms that you're

18   going to hear about on the immigration file that you're

19   going to see, those are questions that are precisely and

20   specifically asked for legal reasons and also because

21   how somebody answers those questions makes a difference

22   as to where that conversation is going, where and how

23   that application is going to get processed.  And if you

24   cover up the lens through which the immigration officer

25   is looking, they don't know what to ask, they don't know

1   that there's reason to start asking you about, as you

2   will find out in this case, about what you were doing

3   during the Rwanda genocide, about what your family was

4   doing, about what your political activities were, about

5   whether you were a part of one of the organizations that

6   orchestrated this.  Those are the questions, which if

7   you could read her forms, because what she answered is

8   false, and she thought no one would ever know.  She

9   thought we would never be in this courtroom, ever,

10  exposing this to the world.  But we are.

11          You're going to hear about something called

12  materiality.  Materiality means, and the judge talked a

13  little bit about it yesterday, lying about any old thing

14  may not really matter, meaning if you live on the second

15  floor or on the third floor of an apartment, that might

16  not be the end of the world.  But you're going to see

17  that every one of the lies that the defendant in this

18  case, that we're going to point out to you, every one of

19  those did matter.  And they did matter because they were

20  precisely the answers to the questions that the

21  Immigration Service was asking in order to determine

22  whether this person is, as when she first came, as a

23  refugee.  Is this person genuinely somebody who is

24  fearful that she will be persecuted if she goes back to

25  her country, or is this somebody that's coming for other

1    reasons.  You will also hear that if somebody is

2    actually a persecutor or lied or assisted in the

3    persecution of another person anywhere in the world,

4    they're not allowed to come here.  And that's the policy

5    of the United States.  We're open to people who are

6    genuine victims from around the world.  If you're not,

7    you're on the other side, if you're on the side of

8    persecution, then you're not allowed to come in.

9              Ladies and gentlemen, let me tell you a little

10   bit about the substance of what she was lying about,

11   this Rwandan genocide that you heard a little bit about

12   yesterday.

13             Rwanda is a country in Africa, one of the

14   smallest countries in Africa, in central east Africa.

15   It's about less than 10 million people.  These are the

16   confines of Rwanda.  Bordered by Congo which back in

17   1994 was called Zaire, Uganda to the north, Burundi to

18   the south.  This is Tanzania over here.  Rwanda in 1994

19   basically had two ethnic groups.  You may have heard

20   something about the Rwandan genocide and you know

21   there's tribes in Africa, and because the popular

22   perception of African people are their tribes, and if

23   that's easier to understand it, then that's fine, but

24   they are ethnic groups.  And I say that because it was a

25   highly organized society, and it was when the colonial

22

1   powers came into play that they decided that everybody

2   needs to define what kind of ethnic group they're a part

3   of, and they issued identity cards.  For example, this

4   is her identity card, and we had it enlarged, and you

5   have to identify whether you're a Hutu or Tutsi, Twa or

6   you were something else.  Twa was a very small minority.

7   The predominant population was Hutus and Tutsis.  Hutus

8   comprised about 84 percent of the population, vast

9   majority were Hutus.  Tutsis about 14 percent.

10          Leading up to the genocide in 1994, you will

11   hear that there was a lot of political scapegoating of

12   the Tutsis.  A lot of the Hutu, the political powers,

13   government itself which was run by kind of a dominating

14   president called Habyarimana, you're going to hear the

15   name, that's why I mention it, you're going to hear that

16   they were blaming the Tutsis and their political

17   background for a lot of the social and economic problems

18   that were visiting the country, and they kept fomenting

19   this fervor over and over.  That was in the years

20   between about 1991 to 1994.

21          At that time you'll hear that where there once

22   had been only one political party allowed in the entire

23   country, a political party which is called the MRND,

24   those are the initials, you're going to hear a lot about

25   that.  Let's turn this around.  These is some of the

1   words you're going to hear, and sometimes it's easier to

2   see them so you will know how to spell them and how

3   we're pronouncing them and how we're mispronouncing

4   them.  The MRND was the political party in power.  Up

5   until 1990 it was the only political party.  Everybody

6   had to be a member of it.  After '91 other parties were

7   allowed, but the MRND political party was still the one

8   in power, the president was still part of the MRND.  And

9   they were part of the organizations that became called

10  Hutu power.  People who were saying, just like you

11  imagine white power, people who were saying Hutus need

12  to stand up for ourselves and we need to blame the

13  Tutsis for a lot of what's happened.

14          There have been some civil war that started

15  around 1990, up in this portion in the north of the

16  country, because there was a rebel Tutsi army that was

17  living in exile in Uganda that would occasionally do

18  cross border conflict, pretty much up here.  But because

19  of that, it gave the MRND a reason to say it's the

20  Tutsis.  The Tutsis are the problem.  And so for three

21  or four years they heard that every day.  They'd have

22  stadiums full of rallies where they give speeches.  They

23  would go down the street and they would do things called

24  manifestation, they were basically parades where they

25  would just say go MRND.  And that was the environment

1   before the genocide.

2           I explain that because you know what happened

3   next.  I'll give some more details.  And during the

4   trial I expect you will hear in very good detail from

5   one of the leading experts on what happened during the

6   genocide, a professor at Boston University, Tim Longman,

7   who is in the audience.  He'll tell you that April 6,

8   1994, it's a date that's etched in every Rwandan's mind,

9   there were some talks in Tanzania which is not far away.

10  The president was flying back to Kigali, the capital of

11  Rwanda, was flying with the president of Burundi, a

12  neighboring country, and it was coming back from the

13  peace talks, his plane was shot down by a missile.  It

14  was destroyed.  That night the genocide began.  That was

15  the trigger, that was the cue that now it's time to take

16  care of business, to do what they call getting the work

17  done.  What that meant was abject slaughter of Tutsis.

18  Killing them.  Often with hand tools.  If you were a

19  moderate Hutu, meaning somebody who was sympathetic to

20  or didn't have a dog in that fight, then you too would

21  be killed.  The prime minister, who was a moderate, she

22  was killed.  It was carnage, the life of which we would

23  never see and it's hard for us to grasp.  But it's

24  important that you know that, so that when you hear the

25  witnesses that are going to be coming on the stand and

1    telling you what they saw the defendant do, you can

2    understand the conflict.  You can understand why what

3    they're saying matters, and why what she lied about

4    matters.  She lied about that.  She took part in the

5    MRND.  What she lied about was that she was part of the

6    machinery.  Here's what I mean.

7            The killing started, it started in Kigali, but

8    it spread, metastasized throughout the whole country.

9    It came to Butare later, and I'll talk to you a little

10   about that.  But one of the institutions of the genocide

11   was something that we call roadblocks.  And basically it

12   was a couple people in the road who were stopping

13   traffic, either foot traffic or cars driving down the

14   road, and what they would do at these roadblocks was

15   they would check the identity of whoever was trying to

16   get through that roadblock.  Remember, Hutus were

17   looking for Tutsis which they thought they were the

18   problem.  They thought they were invading the country

19   and they were trying to defend themselves, so they were

20   checking for Tutsi.  If you were a Tutsi and they found

21   out at that roadblock, if your identity card identified

22   you as a Tutsi, if someone in the neighborhood

23   recognized you as a Tutsi, it's death.  For women it's

24   worse.  Women were raped and sometimes killed, sometimes

25   kept.  Men were killed.  They were either killed right

1   there and taken off to the side out of sight, and the

2   next hundred days was one of the most brutal and

3   efficient killing that had, certainly of the century,

4   but of the million or so Tutsis, 800,000 Tutsis and

5   moderate Hutu were killed in a hundred days.  Most of it

6   happened right at the beginning of the genocide, and by

7   the end of the genocide, there were no Tutsis left to be

8   killed.  People were hiding.  They knew what was going

9   to happen if you went out in the street, including those

10  roadblocks.  Those roadblocks popped up all over the

11  country.  And they weren't just military, they weren't

12  police doing these roadblocks.  It was thugs.  It was

13  MRND that had a youth wing of people who were for four

14  years getting ready to defend their communities.  The

15  youth wing was called the Interahamwe.  You will hear

16  that word a lot.  Interahamwe.  These people often they

17  would wear colors, arm bands.  You know gang colors,

18  they were wearing gang colors.  And they would go around

19  and they would set up these roadblocks.  And they said,

20  we're going to keep, we're going to make sure the Tutsis

21  aren't in our place.

22          Ladies and gentlemen, when I said what else

23  the defendant lied about, the defendant spent the

24  genocide at a hotel.  The Hotel Ihuriro was owned by her

25  family.  Her husband was the leader of the Interahamwe

1    in Butare town.  He and his confederates set up a

2    roadblock just out front of that front door where she

3    spent the genocide.  She never mentioned that.  She

4    never mentioned her husband.  Never mentioned she was a

5    member of the MRND or the Interahamwe.  Never mentions

6    this roadblock.  She went on to say, you will hear, that

7    there was no genocide in Butare.  There was no roadblock

8    out front of the front door.  There was no killing.  And

9    that's why you're going to hear, so many witnesses are

10   going to come on that stand starting today, and they

11   will say of course there was a roadblock there.  Of

12   course they were checking IDs there.  You're going to

13   hear Professor Longman explain to you that that was one

14   of the most notorious roadblocks.  People were killed

15   right there and dumped behind the very house that she

16   lived in for a hundred days and she pretended not to

17   know anything.

18          But there's more.  It wasn't that she just

19   lied about her husband's activities.  The judge and Mr.

20   Howard mentioned to you that guilt by association is not

21   how we a ascribe guilt in this country, and I could not

22   agree more.  You're going to hear about what her husband

23   did, not because she's guilty because he's guilty.

24   You're going to hear because that's evidence that she

25   was lying.  What he was doing and her pretending that

1   nothing was happening, that's a lie.  Why is that a lie?

2   Because you're going to hear the theme to all of her

3   lies starting at the refugee process all the way until

4   she swore allegiance to the United States in this

5   building, was she wanted to distance herself from the

6   Rwandan genocide.  Why?  Because people would start

7   asking questions, the very questions that are probably

8   going through your head right now, why would somebody

9   lie about that.  Well, of course there's reasons why

10  somebody would lie about that, because then you have to

11  explain why you didn't see anything happening out in

12  front of that front door every day.

13          Let's talk a little bit more about the

14  defendant.  She came to Butare town, this is this town

15  right here, shortly before the genocide began.  You will

16  hear she settled in this house right on the main drag of

17  Butare town.  This is the house, you're going to see

18  this a lot, and you're going to see reference to that

19  house a lot.  That house is where she lived with her

20  husband, her mother -- his mother and his father.

21  You're going to hear that his mother was a cabinet

22  minister in the cabinet of the country, presidentially

23  hand picked.  She was a member of the MRND, a leader in

24  that party.  You're going to hear that the father had

25  been a member of parliament.  He also was a member of

29

1    the MRND.  And you're going to hear that he was then

2    presidentially appointed to be the director of the

3    National University which is right down the street.

4              Butare was a progressive town.  The genocide

5    came late to Butare.  You're going to hear it was MRND

6    presence in Butare, which included her family, that led

7    to the genocide finally getting to Butare.  It finally

8    roused the support that they needed to start the

9    genocide.

10             You're going to hear that she got married just

11   before the genocide to her husband.  Her husband's name

12   was Arsene Shalom Ntahobali.  You're going to hear us

13   refer to him as Shalom.  Ironic, he's not a man of

14   peace.  Shalom and she got married in '93, they had a

15   baby that year.  Remember the genocide started in '94.

16   April of '94 you're going to hear that she was pregnant

17   again, couple months, less than a couple months.  And

18   they all lived here.

19             The president's plane shot down on April 6th.

20   The genocide in Butare began about two weeks later.

21   You're going to hear that it started after the

22   president, new president was appointed, also of the

23   MRND.  He said now it's time to get the work done here

24   in Butare.  And you're going to hear that and the

25   Interahamwe going out in the streets and setting up

1    roadblocks.  That's what started the genocide.  And over

2    those next few days you're going to hear from eye

3    witnesses, some of whom are Rwandan, some of whom are

4    not, about the carnage that they saw.

5           What the defendant didn't know when she said

6    there were no roadblocks in front of that hotel, she

7    didn't know when she said that she hadn't seen any

8    evidence of the genocide in Butare, was that a U.S.

9    government Department of Defense satellite had been

10   flying over Rwanda after the genocide began.  This

11   picture is actually from June 1st of 1993.  This picture

12   you're going to hear a lot more detail about.  You're

13   going to hear a DOD analyst come in here and explain to

14   you what it shows.  It shows the building that she lived

15   in.  It shows, these are real people, then going through

16   the roadblock.  Granted, this is June, most of the

17   Tutsis are gone.  People still lined up, cars stopped,

18   logs in the road in a way that they would stop cars from

19   driving by.  So, this is an example of the kind of

20   evidence that's going to corroborate the witnesses in

21   this case.

22          Before I start talking about types of evidence

23   you're going to hear, I just want to go through and

24   explain to you how she actually got here, because that's

25   what this case is about.  It's not about your finding

1   some definitive history of the Rwanda genocide, this is

2   not a war crimes tribunal, this is not an immigration

3   court.  You know, if this were, then maybe we would be

4   going on for months or years if this happened to be a

5   war crimes trial.  This is a case about whether she lied

6   to Immigration and the State Department, whether she

7   laid about material facts, she misled the U.S.

8   government, America, in deciding to give her a benefit.

9   And that path started right after she left Butare.

10          You will hear that in July of 1994 the

11  genocide ended, and the way it ended was that Tutsi

12  rebel group that was coming down from Uganda, well, they

13  came full bore, the whole country was inflamed, and

14  finally by July they got to Butare.  So they got to

15  Butare.  The defendant and her family got out of town.

16  They went to Zaire, they went to Kenya, and from Kenya

17  she went to the U.S. Embassy and said I want to be a

18  refugee.  It's 1995, and you'll see the first step that

19  she did, the first lie that she did to the United States

20  government.  She filled out what's called a refugee

21  application.  This is it.  It's a collage of different

22  courses of the application that I wanted to point to

23  your attention.  She identifies herself.  That's what

24  she looked like then.  And the application form asks not

25  many questions, but one it asks is list your political,

1    professional or social organizations of which I am now

2    or have been a member of -- been a member or with which

3    I am now or have been affiliated since my 16th birthday.

4    If you've never been a member of an organization, you

5    can say none.  And that's what she did, she said none.

6    She was also told that if she had ever committed a crime

7    of moral turpitude, and you're going to hear what that

8    means, serious crime or one involving lying.  Then if

9    you hit yes, then you have to explain.  So of course she

10   hit no.  And then it notifies her that further I have

11   never ordered, assisted or otherwise participated in the

12   persecution of any person because of race, religion or

13   political opinion.

14          So she knew how she had to portray herself in

15   order to become a refugee.  She couldn't tell the truth

16   about what she had been doing during the genocide or

17   what she was involved in, or what activities she was

18   involved in, because she knew she wouldn't be able to

19   come to the United States.  She didn't give that

20   information in '95.

21          She then filled out the State Department

22   questionnaire.  We'll put that in the top so you will

23   recognize what it is.  And this is a list of questions

24   that she was asked by the State Department.  And I'll

25   read it to you because I know some of you can't see it.

1    She was specifically asked, you've been in Rwanda since

2    April '94.  Were you personally affected in any way by

3    the events that took place there?  In particular, were

4    you affected by the atrocities that took place?  Were

5    you a victim?  Were you a witness?  Were you otherwise

6    involved?  And her answer to that was that family

7    members disappeared.  She didn't say anything about

8    roadblocks, she didn't say anything about her house

9    being destroyed, and I'll explain that in a second.  You

10   see, because when that Ugandan Tutsi force came in in

11   July of '94, when they finally got to Butare, one of the

12   first things they did, and you're going to see an image

13   of this, is they destroyed the house, of all the places

14   to destroy in Butare, they destroyed the house that she

15   lived in.  But she didn't mention that a year later when

16   she was applying for refugee status.  She just mentioned

17   family members disappeared.  She didn't say she was a

18   witness to anything.  She didn't say that she was

19   otherwise involved.  Didn't mention the MRND.  Didn't

20   mention the family's connection to MRND.  And then it

21   explicitly asked, did you have any involvement in any

22   killing or injury, and of course she said no to that.

23   Because if she hadn't, you can imagine what questions,

24   follow-up questions would be from the State Department.

25          She also was asked what was your occupation in

1    Rwanda?  And you're going to hear that she was young.

2    She listed that she was a student.  That's funny,

3    another example of how she never thought that this

4    information would come to light.  When this criminal

5    case began, a search warrant was executed in her house,

6    and you'll hear that when they go in her house they find

7    her resume, and on her resume she said that since 1992

8    through the end of the genocide, she was the manager at

9    the Hotel Ihuriro.  The Hotel Ihuriro was that house

10   that we were just looking at that was destroyed after

11   the genocide.  So, when it suited her, you'll hear that

12   she was a manager of this bar.  And when it suited her

13   to get in the country, she was a poor mother student who

14   wanted to come here with her three kids.

15          She did come.  It took about three years going

16   to the embassy over and over again.  That's what she

17   did.  Without the information that would have led to

18   more questions, more probing as to what she was really

19   doing during the genocide, she was able to come.  1998

20   she came to the United States and she made her way

21   actually here, first Plymouth and then Manchester.  She

22   was treated as a refugee because that's what she

23   presented herself.  She was treated as a pious hapless

24   young mother of three, and America opened its doors and

25   gave her a start.

1          A year after she got here she filled out the

2    application for permanent residence.  It's here, green

3    card application.  That means that if you get a green

4    card, you can stay here as long as you want.  You can't

5    vote, you can't sit on a jury, but you can be here.  And

6    on that form what they're checking for, you'll hear, is

7    has anything changed since she applied for refugee

8    status.  And guess what?  Nothing changed.  She didn't

9    change her answers to any questions.  This is a very

10   detailed form.  There are a few of the questions on

11   here.  Obviously whether you were a member or affiliated

12   with a party or political organization, that is

13   specifically one of the questions.  It says with every

14   political organization, any membership or affiliation,

15   whether it's in the United States or in any other place

16   since you were 16 years old, including any foreign

17   military service.  That question is designed to capture

18   exactly what she was, which is somebody who had been

19   affiliated with the MRND party, someone who the

20   immigration officers would be able to ask more

21   questions, they'd be able to do their own research,

22   they'd be able to say what is this MRND?  And when they

23   looked into it they would realize, wait a second, she's

24   not a refugee, she's something else.

25          It asks of course if she had ever participated

1   in the persecution or engaged in genocide or persecuted

2   somebody because of their political opinion or ethnic

3   origin.  Well, that's exactly what the MRND and other

4   Hutus did during the genocide.  That's what her own

5   family did during the genocide.

6           Well, again, with the information, false

7   information that she gave, she got her green card.  And

8   then she waited a few years as required, and then in

9   2002 she fills out her citizenship application.  And the

10  same questions are on the citizenship application,

11  because they matter in citizenship, just as they matter

12  in getting a green card, just as they matter getting

13  into this country as a refugee.  Have you ever been a

14  member or associated with any organization, association,

15  fund, party, club, in United States or any other place?

16  No.  Do you have good moral character?  You will hear

17  from witnesses as to what that means.  It's basically a

18  catchall for a lot of issues that the Immigration

19  Service would ask more questions about.  Have you ever

20  participated in a persecution?  Have you ever committed

21  a crime for which you were not arrested?  That includes

22  not only what she did in Rwanda.  She's not on trial for

23  what she did in Rwanda.  But coming into the United

24  States through a fraudulent refugee status, lying on the

25  application for her green card, lying on the application

1   for refugee, all of those things are technically crimes

2   against the United States.  That's why we're here.  Not

3   to litigate whether she's responsible for the genocide.

4          She was told -- she was asked whether you have

5   ever given false or misleading information to any U.S.

6   government official.  It's the way she got here.  You're

7   going to hear that she was asked whether she ever lied

8   to a U.S. government official.  She lied on the forms.

9   She lied to the consular officer, immigration officer in

10  Kenya.  She lied, you will hear, to a U.S. immigration

11  officer right here in Manchester when she went in to the

12  interview on this citizenship application.  It's one

13  thing to lie on the form, it's another thing to lie to

14  your face, and that's what she did.

15         She got what she wanted a decade ago right

16  here.  She got her citizenship.  Nobody knew any worse.

17  A couple years later she goes on NPR here in New

18  Hampshire.  She talks about how she was a victim of the

19  civil war that happened in Rwanda.  Remember, where she

20  was in Butare there was no civil war.  There was peace,

21  and then there was the genocide, and then she fled.

22  There's no civil war.  You're going to hear some of the

23  that interview.  It starts raising questions.  Started

24  drawing some attention.

25         A year later she goes to Arusha, Tanzania.

1   Arusha is a city in Tanzania.  That's where the UN had

2   set up a war crimes tribunal to look into specific

3   crimes that occurred during the genocide in Rwanda, and

4   you're going to hear that her husband and her -- his

5   mother were on trial there.  She goes there and she

6   testifies for them, for him.  And you're going to hear

7   just as she did with the U.S. government, she lied over

8   and over again.  That's where the UN tribunal, that's

9   where she said, oh, it was pretty boring during the

10  genocide, nothing was going on, I never saw any bodies,

11  there was no roadblock at our hotel, I don't know where

12  people are getting the information.

13          That's what started the U.S. government,

14  Homeland Security finally started to realize wait a

15  second, there's something up here, and they started

16  looking into it.  In 2008 we learn that she lied at the

17  tribunal, and they start gathering information, started

18  talking to experts.  You're going to hear that Dr.

19  Longman worked with another expert who was the

20  predominant expert in what happened during the genocide.

21  They talked to her.  They read a lot of books on the

22  genocide from different perspectives.  They read

23  articles.  They gathered information so that they would

24  be schooled up so they would know whether what she was

25  saying over in Africa was jiving with what we knew now

 1    to be reality.  And they figured, okay, we need to talk

 2    to people who are witnesses for what she was really

 3    doing, not just what she might have been doing, what she

 4    was probably doing, but what she herself was doing.  And

 5    when they did, they did what you would do as common

 6    sense.  How do you investigate somebody who's committed

 7    immigration fraud?  You have to get information from the

 8    country from whence they came.  So they asked Rwandans,

 9    people they new, they asked journalists, they asked

10    non-governmental organizations, they asked anybody who

11    they could talk to who might have some knowledge about

12    what happened in that area of Butare town during the

13    genocide.

14             What you're going to hear is after they found

15    some witnesses, they identify witnesses, they talk to

16    other countries who are investigating people in their

17    country who had came from the Rwanda genocide.  They

18    talked to Rwandans here about who they might know that

19    were in Butare at the time.  With that information they

20    identified a list of people that they needed to talk to

21    that lived in Rwanda.  And you're going to see some of

22    the Homeland Security agents are right back there.  They

23    are going to take the stand and they are going to tell

24    you after they get that information, they went to

25    Rwanda, just as you would in any other crime.  You say,

1    where do I find the witnesses?  Well, if this was the

2    crime scene and it existed over a hundred days, then who

3    would you expect to ask?  You expect to see people who

4    are just passing through there, who live there, who knew

5    about it.  Almost everybody knew Shalom's house, they

6    also called Pauline's house, the Hotel Ihuriro, for the

7    same reasons that if John Sununu lived down the street,

8    you would know who his house is, you would know about

9    it, you would know about his son, for the same reasons

10   everybody knew about this house.  There was also this

11   bar in the house.  Some people would go to the bar.

12   You're going to hear this was the main drag.  If you

13   were from Butare in 1994, you knew the I'huriro

14   roadblock.

15           And so what did the Homeland Security

16   investigators do?  They go over there and they say,

17   well, we've talked to the people who live around there.

18   And you're going to hear they found some neighbors that

19   they talked to, and they will tell you what they said,

20   you're going to see them come in the courtroom.  You're

21   going to hear that this was a school, a secondary school

22   that was part of the Episcopal church, called the EER

23   school.  You're going to hear about it because it's

24   right next door.  You can see everything there.  And in

25   the school during the genocide you're going to hear that

1   a lot of Tutsis sought refuge there.  There was a

2   history in Rwanda that in times of crisis and ethnic

3   conflict and in times of war that people would go to

4   churches for refuge.  And so during the genocide off and

5   on there were a lot of refugees there.  So we found some

6   of the refugees who were there, and they will describe

7   to you what they saw at the roadblock and at the Ihuriro

8   Hotel.

9            And then you're going to hear from people who

10   worked in town.  The main town was over here.  And the

11   people worked in town and then they would go south

12   towards their homes towards Burundi.  So south is

13   Burundi, and to the north it was Kigali, the capital.

14   So most people would come down.  And so when they go

15   home they would have to see the roadblock.  They would

16   have to see I'huriro.  You're going to hear from

17   witnesses, and what they are going to tell you is this

18   was a roadblock, this was one of the roadblocks, part of

19   the genocide, people's identities were checked, people

20   were killed, and she was there.  They saw her.  They

21   didn't just see her sitting around, although that would

22   be something, but that's not what she told the U.S.

23   government.  She was actually one of the people who was

24   checking the identification.  Stands to reason she had

25   been there for a while.  Stands to reason she was the

42

1   wife to the guy who was the head of the Interahamwe.

2   She was in a prominent family.  It's right outside her

3   house.  It was there at least through June when this

4   image was taken.  And when she did that, ladies and

5   gentlemen, she was facilitating the genocide.  And you

6   don't have to find that she's some kind of genocidal

7   maniac.  That's not what you're going to be asked.  The

8   charges are simple.  Did she mislead?  Did she

9   misrepresent?  Did she answer the questions like we

10   would have expected her to?  Or was she hiding

11   something?  Did she intentionally misrepresent herself

12   on the refugee form all the way through to get

13   citizenship.

14        Now, Mr. Ruoff and Mr. Howard are going to do

15   their jobs.  They're defense lawyers.  Their job is to

16   zealously advocate for Beatrice Munyenyezi.  And when

17   they do, they're going to cross-examine these witnesses

18   that I just described.  They are going to cross-examine

19   Dr. Longman.  They're going to cross-examine a doctor

20   who was doing charitable work in Rwanda at the time for

21   the group, Doctors Without Borders, who also saw the

22   roadblock.  They're going to go through the exhibits

23   that Judy mentioned that have not been yet admitted.

24   They might cross-examine or they might use some of

25   those.  They might use some of the exhibits that have

1   already been admitted.  And they are going to go through

2   the immigration file, the alien file which all these

3   immigration documents are in that we're going to present

4   to you, and they're going to try to pick holes, because

5   that's their job.  They may even spin some kind of

6   international conspiracy based on the fact that these

7   Rwandan witnesses are subject to some foreign societal

8   phenomena, and that's not what this case is about.  This

9   case is about these people having seen the defendant

10  doing something, things that weren't even criminal in

11  Rwanda, you know, being at a roadblock?  You're not

12  going to be prosecuted in Rwanda for being at a

13  roadblock.  But it's important here because it shows

14  that she lied on the forms.  Confuse you, distract you

15  with this idea that you can't believe anybody from

16  Rwanda.  You can't believe certainly the witnesses that

17  the government produces.

18          I submit to you this is not what this case is

19  about.  Confusion, distraction is to try to get your

20  eyes off the ball, which is this path, over and over and

21  over again.  She perpetuated one story, one story, she

22  is a victim of the genocide.

23          Ladies and gentlemen, the immigration process

24  matters.  It's the only way that we can filter the

25  deserving, those who are genuine victims of the world

1    we want to open our arms to, from those who are seeking

2    a safe haven.  America's policy is we will not let them

3    seek safety, and we do that in asking these questions.

4    And when you want to answer the questions in a way that

5    suits you, when you want to give the information to

6    America that you choose to give to America and not what

7    America demands of you, then you corrupt that entire

8    process.  The system cannot work that way, especially

9    here, where ten years later we've uncovered the evidence

10   we're going to present to you that she lied egregiously

11   about important things, about important things in the

12   context of humanity that matter.  They matter in this

13   courtroom, they matter outside this courtroom.

14          When that evidence is presented, ladies and

15   gentlemen, there has to be accountability.  I said

16   before it's not a war crimes tribunal.  In this room

17   we're going to ask you to find her accountable for the

18   crime for which she's charged, which is unlawfully

19   procuring U.S. citizenship.  That's what the story is

20   about.  That's the story that we're going to present to

21   you.

22          There's two charges in the indictment.  One is

23   that she unlawfully procured citizenship by lying about

24   her affiliation with the MRND, that political

25   organization, and also lying about the roadblock that

1    was in front of the house, as you can see right there.

2    The second, because lying about that, those are material

3    facts, lying about that along the way, that means that

4    she unlawfully procured U.S. citizenship.

5            The second count is equally simple.  It's

6    because she actually was a member of the MRND, because

7    she actually was at the roadblock and participated in

8    the roadblock, that those facts make her ineligible to

9    be a U.S. citizen.  One is that she lied, which makes

10   her ineligible to be a U.S. citizen, and the other is

11   that the underlying facts that she engaged in make her

12   ineligible for U.S. citizenship.

13           At the end of the trial, Mr. Capin and I will

14   come back to you, we're going to summarize the evidence

15   that you're going to see, just as this is what I expect

16   the evidence will be that you're going to see, respond

17   to anything that the defense does on the

18   cross-examination of our witnesses, and at the end of

19   the trial we're going to ask you to assess that

20   evidence, and we're confident that we'll be able to

21   prove that we have the evidence and we'll present the

22   evidence that she did materially misrepresent herself

23   and she unlawfully procured U.S. citizenship.  We know

24   that now.  We're going to ask you to find those facts

25   and hold her accountable.  That would be a verdict of

1  guilty.

2          THE COURT:  Thank you, Mr. Chakravarty.  If

3  you could take down your posters as well.  And Mr.

4  Ruoff, are you prepared?

5          MR. ROUFF:  Yes, your Honor.

6          THE COURT:  All right, you may proceed.

7          MR. ROUFF:  It's a good thing the federal

8  government doesn't always get it right.  Mr. Chakravarty

9  just suggested to you that I'm going to try to spin some

10  kind of a tale to try to distract and mislead you.  That

11  is not true.  There is so much more going on in this

12  case that you will hear through the course of the next

13  two weeks, so many facts that they don't want you to

14  know about that they didn't even mention them.

15          Would it make any difference to you to know

16  that the current regime in Rwanda is that same ruthless

17  rebel Tutsi force that came in and took over Rwanda in

18  1994, led by a man by the name of Paul Kagame, who was

19  in Boston not too long ago, and that he rules that

20  country with an iron fist?  And the way that he asserts

21  control over that country is through using what they

22  call genocide ideology.

23          In Rwanda, if you were asked about the

24  genocide and you say anything that varies from what they

25  call the dominant narrative, you are a criminal, you

1  will go to jail.  If you say any facts publically that

2  negates anything intended by Paul Kagame's version of

3  the genocide, you are a criminal.  That concept is so

4  foreign to us in the United States.  We have the First

5  Amendment that says we can criticize our government.

6          I bring this out to you because when the

7  witnesses come here from Rwanda, they know they are

8  going back to Rwanda.  They all know that they're

9  testifying against Beatrice Munyenyezi.  They all know

10  that she was married to Shalom.  That she lived with

11  Pauline Nyiramasuhuko who was a cabinet member in the

12  government that was overthrown.  So don't think that I'm

13  the one trying to spin a story here.  To do so is naive.

14          And don't take my word for it.  You will hear

15  the experts testify about this.  About the

16  oppressiveness.  About the authoritative control.  About

17  the machine guns on every corner in Rwanda trying to

18  suppress the citizens.  Do they do it just because

19  they're afraid?  Would they testify a certain way about

20  genocide than those that they are asked about, whether

21  they participated in genocide out of strict fear?  Some,

22  yes.  Well, you will hear that there will be some that

23  actually are elevated to hero status.

24          There are organizations within Rwanda now that

25  try to educate, that try to train witnesses how to

1    testify.  It's called Ibuka and another one called

2    Abasa.  You will hear evidence about those.

3            The government in their opening apparently

4    expects you to just sit here as Americans and assess

5    these witnesses as if they are just going to go back to

6    Massachusetts or go back to Colebrook, New Hampshire, or

7    go to Kansas, and they're just going to resume their

8    normal lives as we do.  But you can't look at this

9    evidence through the lens of just, well, these are just

10   normal people like you and me.  They come from a

11   fundamentally different culture with a fundamental

12   difference in language, a fundamental difference in the

13   way they look at events.

14           There is no doubt that what happened in Rwanda

15   in 1994 was evil, no doubt.  And the depraving that took

16   place in that country, the mass slaughter that took

17   place in that country, not just of the Tutsis by the

18   MRND, but also by the slaughter that took place by Paul

19   Kagame's invading army.  The slaughter of hundreds of

20   thousands of Hutus.  Many of the refugees that left

21   Rwanda were Hutus fleeing from the slaughter of that

22   army.  It wasn't some small rebel ban as Mr. Chakravarty

23   suggests.  It was a very sophisticated killing machine

24   too.

25           That theory, by the way, is called the dual

1    genocide theory.  And if you talk about that in Rwanda,

2    you're a criminal.

3            So this case is not as cut and dry as the

4    government would like to make you believe.  And we are

5    certainly not going to try to spin a tale.

6            If there is a truth in the tale in this case,

7    it's of a strong resilient woman, a mother of three

8    young kids who did come to this country.  Mr.

9    Chakravarty suggested that our country is strong and

10   resilient because of its immigration, that immigrants

11   add a lot to this country, and she is one of those.  She

12   came to this country barely being able to speak a word

13   of English.  She knew a few words here and there.

14   Couldn't read or write English.  So we'll have to

15   speculate who was translating documents for her in Kenya

16   when they were filling out those forms all in English.

17   But the burden is on them to try to convince us that all

18   of that was done reliably.

19           She put herself in school.  She had to take

20   her GED, because when she left Rwanda she hadn't even

21   completed high school.  A mother, a senior in high

22   school, with twins on the way.  She enrolled in the

23   school, they became active in the local refugee

24   community, she went on NPR to talk about her role in

25   trying to help refugees adapt to life in New Hampshire.

1   And at the end of this trial one of the things we will

2   ask you, just like the questions on the questionnaire,

3   is if someone who had committed the atrocities that you

4   will hear about did all that, why in every one of the

5   documents that you'll see is her name, Beatrice

6   Munyenyezi?  Why does she identify Shalom as her

7   husband?  Pauline as her mother-in-law?  Her daughters

8   by their last name, Ntahobali, if she is someone who is

9   here trying to deceive people about that past.  It's the

10  worst deception you've ever seen.  And then she goes

11  back to Rwanda and back to Tanzania to testify.

12          We'll ask you at the end of this trial to

13  determine whether or not those are the acts of someone

14  who has something to hide.  Someone who, as he just

15  said, is hiding from her past and doesn't want the U.S.

16  government to know about it.  Clearly not.

17          Interesting enough the government says that

18  when they learned about this after her testimony in the

19  ICTR, they were a little vague about how they learned

20  about it.  That should cause you some concern.  We'll

21  look for evidence when the agents testify about how they

22  learned about Ms. Munyenyezi.  Who complained.  We still

23  don't know the answer.  The case has been kicking around

24  for almost four years, and we still don't know.  They

25  won't tell us, and they probably won't tell you.

```
 1              Interesting enough that this was not the first
 2    investigation into what happened in Rwanda in 1994.
 3    Now, they're trying to say that this is not an
 4    investigation about the genocide, but it really is.  And
 5    the reason, you know, that they will downplay that is
 6    because there was an intense worldwide investigation
 7    into what happened in Rwanda.  Rwanda is the size of New
 8    Hampshire.  Only back then it had about nine million
 9    people.  That's a very densely populated country.  And
10    the level of atrocity was very high.  Human Rights
11    Watch, other Human Rights Watch groups descended in
12    Rwanda to try to help, to try to heal, to try to figure
13    out what happened so that everybody can move on and that
14    it can be prevented in the future.
15              Books have been written about it.  Books
16    written by people that you'll hear from in a little
17    while.  Mr. Longman sitting in the back of the
18    courtroom, he was involved in the preparation, the
19    actual hands-on investigation and interviewing of dozens
20    and dozens and dozens, perhaps hundreds and hundreds of
21    witnesses in Butare.  Who was doing what, who was
22    responsible for this.  Shalom's name came up.  It's
23    mentioned in the book.  One name that's never mentioned
24    for ten years, Beatrice Munyenyezi.  Never mentioned.
25    That's one investigation that took years.
```

 1          Another one was, Mr. Chakravarty mentioned it,

 2    the International Criminal Tribunal of Rwanda.  That was

 3    the trial of eight different defendants from Butare, and

 4    it involved the trial of my client's husband and her

 5    mother-in-law.  That trial lasted eight years, 250

 6    witnesses, over 500 exhibits entered into evidence, and

 7    many, many more people interviewed, focused on Shalom,

 8    Pauline, the hotel, the EER that you heard about.  That

 9    was the focus of their inquiry.  Not one person, not one

10    person said the name Beatrice Munyenyezi.  Not one

11    person said the wife of Shalom was involved.

12          Where does all this go?  The evidence will

13    show that when U.S. investigators show up, the witnesses

14    there may or may not already know that they're there to

15    be talked about, interviewed about Beatrice Munyenyezi.

16    We don't really know because all these witnesses are set

17    up by other people, trackers that Homeland Security

18    hires.  We don't know.  Trackers aren't going to come in

19    here and testify.  The people that are on the ground

20    that set up these interviews, perhaps Ibuka and Abasa,

21    we don't know, won't come in and testify.  The

22    government is going to try to claim that these witnesses

23    had no idea why we were there or who we were going to

24    ask about.  But they don't know that.  They don't know

25    that at all.  When they fly over to Rwanda to interview

1    witnesses, they are given the list of people to

2    interview.  Interesting thing is, all of the witnesses,

3    except for perhaps three of the Rwandans, there will be

4    about eight that you will hear from, that they say will

5    describe what my client did, and were never described,

6    were never discovered by the government until after a

7    prior proceeding in this case.  There was a proceeding

8    in this case about a year ago after which this case made

9    headline news in Rwanda.  Nationally publicized.  They

10   traveled back there a month later and they uncover eight

11   new perfect witnesses, after five trips to Rwanda.

12          You will hear through the course of the trial

13   that many of these witnesses know each other or that

14   they know other people that were involved in the case.

15   And that's one thing that you should keep in

16   consideration in listening to them.

17          The government suggests that these witnesses

18   are actual eye witnesses of things that they said or

19   things that they saw.  I would suggest to you using the

20   image that my learned colleague suggested here about

21   John Sununu living down the road, that a lot of people

22   probably knew the cabinet minister's house, that they

23   knew Shalom or knew of him.  And it doesn't take much of

24   a logical step to go from there to say, oh, and I knew

25   his wife too.  I saw them all over town.

1          So as you're sitting here listening to the

2     evidence, be critical.  You don't have to take these

3     witnesses at their word.  And given where they're coming

4     from and what they're going back to, you should not.

5          Beatrice was born in the north of Rwanda.

6     That's where she was raised.  The north of Rwanda, if

7     you recall from the map, is up in this area, Nemba,

8     Ruhengeri, on the border of Uganda.  That is an area

9     that has been in the constant state of war for years, or

10    at least as of 1994, between 1990 and 1994.  The war

11    never stopped up here.  It was always the RPF army

12    making incursions into Butare.  The Rwandan army

13    fighting back.  So many of the people that grew up in

14    this area grew up knowing nothing but war.

15          She was not from Butare which is where her

16    husband is from.  She met him in high school and got

17    pregnant.  Before she completed high school, as a

18    Catholic, they went down to Butare and they got married.

19    You will hear evidence that in fact she didn't get along

20    with Shalom's family.  The government thinks that they

21    always lived at the hotel.  But you will hear evidence

22    that's not correct.  They actually owned a couple of

23    houses in town, and it wasn't until just before April of

24    1994 that they moved into the hotel.

25          She was nursing a young child when the

1  genocide began and became pregnant with twins at the

2  time.  And you will hear evidence that it was not an

3  easy pregnancy for her and that it was something that

4  consumed most of her life during April, May and June.

5          Beatrice is a simple woman.  She was a simple

6  woman in 1994.  And when she became a refugee and fled

7  into the Congo and then to Nairobi, she did what she had

8  to do.  She was offered a spot, an anchor if you will,

9  we will explain what an anchor is during the course of

10  the trial, to come to the United States.

11          Her brother was a member of a very progressive

12  political party and he had been evacuated by the UN at

13  the beginning of the genocide, and he was already in the

14  United States, and he was going to serve as her sponsor.

15  He was a professor at UNH at the time.  Now he's

16  currently a professor at Western New England College.

17  So that's why she wanted to come here, because that's

18  where her family was.

19          Curious that throughout the entire course of

20  her application, filling out all the forms that you will

21  see in great detail, that she never tried to conceal the

22  facts of who her husband was.  No.

23          There is a strong temptation in a case like

24  this to let your emotions cloud your judgment.  We're

25  not allowed to do that in this room.  Emotions can be

1   very persuasive.  Trial lawyers are taught to use

2   emotion to try to persuade jurors.  But you can't make

3   your decision based on emotion, based on anger, based on

4   a sense of wanting to punish somebody for some act that

5   you consider so vial, and you'll hear about a lot of

6   vial acts.  You have to be critical.  You wouldn't want

7   no less for yourself if you were sitting in her chair.

8           Some of the witnesses will tell very

9   compelling stories.  Ask yourself whether or not they

10  are rehearsed stories.  One witness in particular who

11  you will hear from very soon is this doctor from

12  Luxembourg.  I've heard his story before.  It's very

13  compelling.  His diction is fantastic.  His word choice,

14  his voice is very sonorous.  His accent is kind of

15  enthralling and he is a fantastic story teller.  He

16  loves his own story.  And as he sits here and tells you

17  his story and you can see him getting into it and

18  getting emotional in telling the story, don't be drawn

19  into the emotional component.  Look at him and say,

20  okay, what does he have to say about that woman.  He's

21  going to describe horrible things that happened in a

22  church that occurred miles and miles away from any place

23  my client has ever been, for which he has nothing to do

24  with.  And they're leading with him because he is a very

25  good storyteller and he does tell a good story, but

1   you've got to keep reminding yourself, I can't let my

2   emotions interfere with whether or not I determine this

3   has anything to do with this case.

4          You will hear other witnesses, some who

5   testified before the ICTR, some who have given prior

6   interviews in the past to Canadian authorities.  None of

7   them ever mentioned our client, ever mentioned her being

8   involved in the MRND.  Nothing.

9          You will hear the investigators try to say

10  that, you know, they did this.  It's like a crime scene.

11  Well, there's not going to be any forensic evidence.  No

12  one ever went around and looked to see if there is

13  anything around here to support anything that the

14  witnesses have said.  You will hear that there was very

15  little done to corroborate what any witness said.  They

16  just kind of took it at face value and said look, oh,

17  okay, this is horrible.  They did what you can't, let

18  their emotions cloud their judgment.

19          Now, at the end of this trial my partner Mark

20  is going to stand before you and he's going to repeat

21  many of the same themes that I have spoken about and

22  that you will hear during the course of the trial, and

23  he's going to ask you to find that our client's not

24  guilty.  One of the greatest protections in our country

25  is that this is not a Rwandan kangaroo court.  The judge

58

1    doesn't get to determine who's guilty or not guilty.

2    Our governor doesn't get to rule with an iron fist.  You

3    are a protector.  You protect us from them, and that's

4    your role in this case.  Please keep that in mind.

5    Thank you.

6          THE COURT:  All right, thank you, Mr. Ruoff.

7    Why don't we go to 11, will that be all right?  All

8    right, ladies and gentlemen, that concludes opening

9    statements.  And let me just remind you once again that

10   opening statements are not themselves evidence.  They

11   are simply designed to help you understand the evidence

12   and provide a fame work or a context in which you can

13   receive and understand the evidence.

14         We will now begin the presentation of

15   evidence.  As I mentioned, the government bears the

16   burden of proof, therefore the government goes first.

17   So the government will begin by calling witnesses and

18   presenting evidence to you.  Mr. Capin?  Mr.

19   Chakravarty?

20         MR. CHAKRAVARTY:  The government calls Dr.

21   Rony Zachariah.

22         THE CLERK:  Please raise your right hand.

23               RONY ZACHARIAH

24      having been duly sworn, testified as follows:

25         THE CLERK:  Please be seated.  For the record,

1   please state your name and spell your last name.

2           THE WITNESS:   My name is Dr. Rony Zachariah,

3   and my last name is spelled Z-A-C-H-A-R-I-A-H.

4           THE COURT:   Whenever you're ready, Mr.

5   Chakravarty.

6           MR. CHAKRAVARTY:   Thank you, your Honor.

7                   DIRECT EXAMINATION

8   BY MR. CHAKRAVARTY:

9       Q.   Good morning, Dr. Zachariah.

10      A.   Good morning.

11      Q.   Would you tell the jury where you're from?

12      A.   I'm coming from Luxembourg and I hold a

13  Luxembourgish nationality.

14      Q.   Can you explain very briefly without getting

15  in to personal details why we asked you to come today,

16  for scheduling purposes why we've asked you to come

17  today to testify.

18      A.   You've asked me to come to testify as a fact

19  witness.

20      Q.   And was there a reason why we had to do it

21  early this week?

22      A.   That's because in fact I have schedules next

23  week, my wife is away, and I have to take care of the

24  kids, so this is the only time that was free for me, and

25  I have a very busy schedule with the work we do now, so

1    thank you for accommodating that.

2        Q.    So what kind of work is that?

3        A.    Well, I work with Medecins Sans Frontieres,

4    otherwise known as Doctors Without Borders, and we do

5    medical charity work around the world.  That in short is

6    a medical humanitarian organization that offers relief

7    work to people affected by man-made or natural

8    disasters, famine.  We work particularly in conflict

9    areas and it's an organization that tries to keep

10   political independence and neutrality and as much as

11   possible independence of action so that we can access

12   populations in need.

13       Q.    And are you a medical doctor by training?

14       A.    Yes, I am.

15       Q.    And when were you trained?

16       A.    Where was I trained or when?

17       Q.    When?

18       A.    I finished my medical education in 1986.

19       Q.    And do you have a particular specialty?

20       A.    Yes.  I did my basic doctor's degree in

21   Nigeria, and then I went on to London to do public

22   health and tropical medicine, in Ireland pediatrics, and

23   I hold a Ph.D. in infectious disease, epidemiology and

24   operations research from the University of Amsterdam.

25       Q.    And when did you first begin working with

1    Medecins Sans Frontieres, Doctors Without Borders?

2         A.   I started working in 1992.

3         Q.   And was that in the field or was that at their

4    headquarters?

5         A.   No, in the field.

6         Q.   Where were you first deployed?

7         A.   Well, I was first deployed -- well, I met them

8    after the Lebanese war.  I worked two years for British

9    charity and with the International Committee of the Red

10   Cross, the Red Crescent Society in Lebanon for two

11   years, and I was fascinated by this and applied to them.

12   In 1992 I was sent to Somalia as my first experience

13   during the war.

14        Q.   And you mentioned that you were in Lebanon.

15   That was during the Lebanese civil war?

16        A.   Yes, 1990 and '92.

17        Q.   And what kind of work were you doing in

18   Lebanon.

19        A.   Well, I was doing basically emergency work,

20   working with refugees, working on the south Lebanese

21   border, and helping mainly with hospitals, medical aid

22   in different parts of the country because it was at that

23   time different groups in Lebanon were fighting each

24   other, especially religious groups broken down on ethnic

25   grounds or religious grounds.

1        Q.    In Somalia what kind of work did you do there?

2        A.    I was heading an emergency hospital for

3   Medecins Sans Frontieres in Kismayo in the south where

4   we had to complete emergency  hospital that used to take

5   care of wounded, that used to offer medical care.

6   Generally what a district hospital would provide.  So

7   obstetrics, pediatrics, medical clinics and surgery.  We

8   had our own full teams.

9        Q.    After Somalia where did you go?

10       A.    After Somalia I went to Afghanistan and to the

11   Tajikistan, mainly for Afghan refugees from the Afghan

12   war.

13       Q.    And after that where did you go?

14       A.    Tajikistan -- I'm trying to remember.  From

15   Tajikistan I went to Rwanda.  I spent some time doing

16   missions in Sri Lanka, in Guinea and then I went to

17   Rwanda.

18       Q.    And when did you arrive in Rwanda?

19       A.    I arrived on the 20th of February, 1994.

20       Q.    What was your mission in Rwanda?

21       A.    I was appointed as the field and general

22   coordinator for the southern area which is Butare in

23   Rwanda where we were taking care of about 80 to a

24   hundred thousand Burundi refugees along the

25   Rwandese-Burundese border, so we were offering relief

1    supplies for -- relief aid for these refugees, and that

2    was one of the leading NGOs taking care of the medical,

3    nutritional and sanitary needs of these refugees.

4         Q.   What was your particular role?

5         A.   I was the general coordinator.

6         Q.   How large was your team?

7         A.   At the time we probably had about 30 to 50

8    expatriates, occupancy of the national staff, so it's a

9    pretty big team.  A hundred thousand people is a lot of

10   people to take care of.  We had doctors, nurses,

11   logisticians, drivers, vehicles, medical supplies,

12   pharmacists, the whole works.

13        Q.   Just to clarify, you said 30 to 50 people who

14   like yourself were not Rwandese?

15        A.   That's right.

16        Q.   And approximately how many Rwandans did you

17   have working with you?

18        A.   Can't remember the exact numbers, but we had

19   Rwandese national staff which took care of a lot of the

20   administration, the support functions such as stores, we

21   also had Rwandese nurses.  We had some Rwandese doctors

22   who worked with us in the refugee camps, and a lot of

23   the support staff, cleaners, nurse aides, logisticians,

24   so on.

25        Q.   And where did you set up your headquarters?

1      A.    It was based in Butare, in Buye area of

2  Butare, Butare town.

3      Q.    So can you explain to the jury about the

4  relationship between Butare town and the province or the

5  state of Butare?

6      A.    Well, Butare is the main center.  It's in fact

7  the hub of Butare prefecture it's called in French, and

8  it's, I think it is the second biggest town in Rwanda

9  during the time after Kigali.  So that's all where the

10  tractions with NGOs, the UN, HCR, the authorities of

11  eastern Butare.  So you of course have the different

12  communes which are the administrative units in the

13  French speaking system, and those have their own mayors

14  or communal leaders, but everyone is responsible finally

15  to the prefect of Butare.

16      Q.    A prefect is the governor of Butare?

17      A.    Yes, yes.

18      Q.    And so your headquarters was in the town of

19  Butare?

20      A.    Yes, that's right.

21      Q.    And where relative to the town were your

22  humanitarian, your refugee missions?

23      A.    Well, they were located around the border with

24  the Rwandese, with Burundi actually, so it's in the

25  border area.  Most of the refugees were in the border

1    area.  So I was particularly involved with communes

2    which is the Kibuye, Kigembe, the Nyakizu and Chile area

3    which is really the border, I think this is the, yeah,

4    it's on the border side.  If you have a map, I could

5    show you.

6         Q.   I will use the projector.  Can you see this in

7    front of you?

8         A.   Yes.

9         Q.   It's Exhibit 2.  Is that a map of Rwanda?

10        A.   Yup.

11        Q.   So can you just mark on the screen, something

12   should come up on the screen and the jury will be able

13   to see where you're indicating.

14        A.   So it would be around here.

15        Q.   And this is Butare town?

16        A.   Butare town, that's right.  So it would be

17   around this area, like this.

18        Q.   So all the way to the south as well as to the

19   east of Butare town?

20        A.   I may not have the geography completely right

21   but this is the border that we were involved with, yeah.

22        Q.   Now, doctor, this isn't the first time that

23   you've testified about your experience during the

24   genocide; is that correct?

25        A.   Yes, that's correct.

66

1        Q.    You testified for the International Tribunal?

2        A.    Yes, I have.

3        Q.    And you testified at a prior proceeding in

4    this case?

5        A.    Yes, last year.

6        Q.    Now, from February when you first arrived in

7    Butare to April 6th of 1994, were you able to perform

8    your functions?

9        A.    To April 6th?

10        Q.    Yes, up to April 6th?

11        A.    Yes.  No problems at all.

12        Q.    And were you able to travel in and out of

13    Butare?

14        A.    No problem at all, yes.

15        Q.    Were there military checkpoints at the entry

16    and exits to Butare town?

17        A.    Yes, there were two at the time.  There was

18    one at the entry and one at the exit like in Kigali.

19        Q.    Can you describe what a military checkpoint is

20    for the jury?

21        A.    Well, there would be -- a military checkpoint

22    would be, well, these were fixed checkpoints, so you had

23    a barrier that was constructed with a pole that goes up

24    and down, and you had two or three or sometimes four

25    soldiers at these checkpoints.  When you would stop,

1   they would come ask you where you're going, look into

2   your car, they let you through.  I must say that we were

3   well-known at the time in Rwanda, and because there were

4   several refugees, this big NGO community, so we were

5   very well respected and we didn't have any problems at

6   all as part of the international delegation.  I must say

7   coming in from outside I felt Rwanda was, I had actually

8   gone there after Somalia and Afghanistan's war I wanted

9   to get to actually a peaceful country where I could do

10  some constructive work, and this was a very calm country

11  at the time of came in.

12       Q.   And there were never issues at any of these

13  checkpoints that you would go there?

14       A.   No.

15       Q.   Was your vehicle marked International

16  Non-Governmental Organization vehicle?

17       A.   Well, generally we used white cars and we have

18  Medecins Sans Frontieres, a Doctors Without Borders

19  sticker on the side, and these cars are very typical of

20  the non-governmental organization relief community, so

21  they are easier to find.

22       Q.   Were you traveling many places throughout

23  Rwanda but mainly from that Burundian border area all

24  the way up to Kigali?

25       A.   Yes, and also to the Burundi border, so all

1    the way to Kigali in Butare and to the south.

2         Q.   Now, I'm going to ask you about April 6, 1994.

3    Can you describe how you first learned that something

4    happened?

5         A.   Well, we have our main base, country base was

6    in Kigali at the time where we had our head of mission,

7    and we keep very close contact, daily contact with

8    radio, HF radio, so I heard on the 7th morning that the

9    plane of President Habyarimana had been shot down and

10   the situation in Kigali was already deteriorating and

11   there was insecurity.  That was the first time I heard

12   about it.

13        Q.   So --

14        A.   So early on the 7th.

15        Q.   Slow you down a little bit.  You said the

16   plane of President Habyarimana, is that correct?

17        A.   Yes.

18        Q.   He was the president of Rwanda?

19        A.   Yes, the president of Rwanda, yeah.

20        Q.   I'm not going to ask you to spell it because I

21   will provide the spelling to the reporter afterward.

22        A.   Yes.

23        Q.   You said that the situation had deteriorated

24   in Kigali.  What do you mean by deteriorate?

25        A.   Well, there was shooting.  There was, I was

1    not in Kigali, but that was information I got from our

2    head of mission and our team that they heard several

3    gunshots throughout the night, during the day on the

4    7th, so the impression that conflict had started in

5    Kigali, some sort of conflict going on.

6        Q.    So based on that information what did you do?

7        A.    Based on that information, well, I was also

8    advised to stop making, the political situation is

9    unclear in Kigali and that there are clear political

10   disturbances and we monitor that quite closely, so I was

11   advised by the head office that we should shift into

12   emergency mode.  And we're an emergency organization so

13   we try to act before things happen.

14            So, on the 7th I called a meeting of all our

15   team and said, well, we have to start preparing Butare

16   University Hospital where we already had links because

17   it was our hospital for severe cases that came from the

18   camps.  Now, in the camps we had our own doctors, we had

19   our own clinic, but if there were more severe cases that

20   we couldn't manage and that needed inpatient specialized

21   care, then we bought them to the Butare University

22   Hospital.  There was pediatric facilities, obstetrics,

23   gynecology, there was surgery and so on so forth, so the

24   idea was immediately to try to set up this hospital as

25   an emergency facility.  By that we mean we brought in

1    emergency kits to take care of the 150, 300 wounded.  We

2    have those prepacked kits, so quite easy.  We brought in

3    independent water supply systems, 15,000 liters that we

4    could run.  I brought in emergency generators,

5    additional fuel so we could run the operating theatre

6    ourselves if needed to provide certainly independence

7    there, and also to have stocks of medical and surgical

8    supplies placed beforehand in the hospital.

9         Q.   To clarify for the jury, you were actually

10   preparing to help the wounded in this conflict; is that

11   fair to say?

12        A.   Yes, yes.

13        Q.   When you say emergency, you're not talking

14   about how you take care of your own people, you're

15   talking about how you would take care of new patients?

16        A.   Yes, exactly.

17        Q.   And how far was the Butare University Hospital

18   from your headquarters?

19        A.   Probably about two kilometers, two and a half,

20   three.

21        Q.   Was that also in Butare town?

22        A.   Yes.  It was in the Buye area, residential

23   areas.  It's really not far.

24        Q.   After you made those arrangements what did you

25   do on April 8th?

```
 1        A.    Well, on April 8th we had, we have weekly

 2   security meetings all the time, and these are meetings

 3   we had with the NGO communities and the authorities in

 4   Butare to plan for the week to look at what are the

 5   refugee needs and then to arrange accordingly and to

 6   report to Kigali.  So when we came to this meeting in

 7   the morning we were told that all NGOs would now need

 8   passes, authorization passes to move around Butare and

 9   elsewhere.  So in fact that pass would only be available

10   through Colonel Tharcisse Muvunyi who was then the

11   brigade commander, military commander for the southern

12   region of Rwanda covering Butare.

13        Q.    So this was a military pass that would allow

14   you to travel?

15        A.    It was what you call a lese passe but it had

16   to be given by the military authorities, and at the time

17   we were told to get this from Colonel Muvunyi who was

18   the then brigade commander for, military brigade

19   commander, call that a military pass, it needed to be

20   stamped by the military.

21        Q.    And did you bring those with you to America?

22        A.    Yes, I did.

23        Q.    And I show you -- may I approach, your Honor?

24              THE COURT:  Is it marked?

25              MR. CHAKRAVARTY:  It's marked.  Exhibit 29 for
```

1    ID.

2            THE COURT:  But is it relevant?

3            MR. CHAKRAVARTY:  What is it called?

4            THE COURT:  No, is it relevant?  Yes, we take

5    it on his word that he had to get a pass.

6            MR. CHAKRAVARTY:  Fair enough.

7        Q.   Dr. Zachariah, would these assist you in

8    explaining your testimony as we approach the April 20th

9    time frame?

10       A.   I think it will because it shows clearly how

11   restrictive the movement became between the 9th and the

12   20th of April, all the three times I met Colonel

13   Muvunyi, and I think the process shows up very clear

14   that restrictions became almost impossible towards the

15   later part of my stay there.

16           THE COURT:  Any objection, Mr. Howard?

17           MR. HOWARD:  I don't have any objection.

18           THE COURT:  ID may stricken on what's the

19   number?

20           MR. CHAKRAVARTY:  29.

21           THE COURT:  29.

22           (Government's Exhibit 29 admitted.)

23       Q.   Now, Doctor, these are in French, I'm not

24   going to ask you to read them aloud, but can you

25   describe what this is?

73

```
1        A.    Okay.  So this is what you call an
2    authorization pass, in French letter lese passe.  And in
3    fact I wrote it myself because we have experience, I was
4    supposed to go and see Colonel Muvunyi, he was brigade
5    commander and in this sort of time he won't have much
6    time to write this, and if you wait for them to write it
7    you'd probably have to hang around a long time or go a
8    number of times, so I actually wrote this up knowing how
9    a pass looks like in the French speaking area and
10    generally having worked in similar circumstances, so we
11    wrote this and I took it up.  I went on the 9th of April
12    to see Colonel Muvunyi at the ESO.  Standing outside I
13    asked the soldiers there I would like to see Colonel
14    Muvunyi, and they said he's very busy, you can't see
15    him.  But I sent in my card and said, well, we're from
16    Medecins Sans Frontiere and he actually came out.  So I
17    gave him this pass and said we, well, we are working, I
18    explained what we were doing and so on and so forth, and
19    he actually said, okay, I'll give you this pass.  And he
20    went in and he's written down, and you notice at the
21    base he said that, you know, the members, 11 members of
22    MSF cited above, and the names you can see them, are
23    authorized to move in the prefectures of Butare and
24    Gikongoro, and it was signed by Colonel Muvunyi with his
25    stamp on it.
```

74

1    Q.   So that was the first time that something

2    about travel had changed?

3    A.   Yes.

4    Q.   And on that date, the 9th, had there been any

5    visible signs that you saw in Butare that the genocide

6    had come to Butare?

7    A.   No.

8    Q.   So what happened three days later on

9    April 11th?

10   A.   On the 11th we were still preparing our

11   hospital.  I was in a routine visit there in the

12   evening, and we were told that a number of dead bodies

13   had been brought to the hospital, to the hospital

14   morgue.  So I go back to the morgue with some of my

15   colleagues and there were actually 11 civilian bodies.

16   They were women, they were all civilian, but their hands

17   were all tied in the back and they were shot.  That was

18   the first time we began to see dead bodies in the

19   hospital.  But at this time these came from a commune

20   outside Butare.  They were not from Butare town itself.

21   That was the first indicator where I had seen dead

22   bodies now of civilians in Butare.

23   Q.   So over the next few days did you actually

24   leave Butare town and go to surrounding areas and

25   villages in the prefecture?

1        A.    No, I didn't, not in Butare.

2        Q.    Did you at some point understand that there

3   was targeted killing of a specific ethnicity?

4        A.    Later, yes, indeed.

5        Q.    So in those first few days that you saw dead

6   bodies you didn't know what the circumstances were?

7        A.    No, I didn't at all.

8        Q.    What happened two days later in Gitarama?

9        A.    So that was the 13th of April.  We received

10  information through a Belgian surgeon who was working in

11  the Gitarama Hospital.  Now Gitarama is one of the main

12  towns between Kigali and Butare and I can show you that

13  here.

14       Q.    On this map is that --

15       A.    That's exactly where it is, yes.  So it's on

16  the main route between Kigali and Butare.  We received

17  information there were several wounded there and they

18  had run out of medical supplies, and they called up our

19  head office and they call us from Brussels.  So I

20  decided to leave with two cars, a colleague of mine,

21  with medical supplies to the hospital to help them out.

22            So we leave and it's about 60 kilometers I

23  believe.  And about 25 kilometers from Gitarama we see

24  hundreds of people, civilians with their belongings

25  walking towards Butare.  So we stop and ask them where

1    are you going and they said, well, it's a long conflict

2    outside Gitarama, we're going towards Butare where we

3    hope we will be safe.  Anyway, we go on and we ask

4    what's happening further up because this is very

5    important because we were trying to get an emergency

6    team out into Kigali and we wanted to know what the

7    route would be like, if we can have access to Kigali.

8    And they said, well, there's lots of road checkpoints, a

9    lot of people being killed, it's very unsafe.

10            Anyway, we managed to get to Gitarama.  And on

11   the outsides of Gitarama, which didn't exist before,

12   there was a very oppressive checkpoint, in fact a

13   barricade mainly with soldiers.  It was a well-armed

14   roadblock.  I could see in the distance on the top a big

15   machine gun, something like a Brown 25.  Now, that's

16   something you can easily take any vehicle off, manned by

17   soldiers.  And it was a checkpoint where you had planks

18   on the floor with nails, drums, so, very unusual, a

19   heavily-armed military.

20            So we arrive, and the usual thing is that the

21   driver negotiates and says who we are, so that was the

22   usual impression I was thinking would happen.  Anyway,

23   we stopped.  The soldier comes next to the car.  Speaks

24   to the driver.  He asks for the ID card.  The soldier

25   looks at the ID card.  Then he suddenly changes.  He

1    becomes very aggressive and he shouts at the driver,

2    Batutsi, Batutsi, three times, which means Tutsi.  And

3    then he opens the car door and slams it twice, and we've

4    never experienced this before.  So I see, and the

5    driver's really scared and frightened, so I tried to

6    intervene and I said, well, I intervene and I tell the

7    soldier we are a medical charity, we're doctors, we've

8    come here to help with medical wounded in the Gitarama

9    Hospital, and he let's us through.  I was very

10   surprised.  As soon as I crossed I asked our driver,

11   well, what happened here, you know, why is the situation

12   like this, why have they dealt with you like this?  And

13   he says I'm Tutsi and I've been accused, in fact he said

14   we are here to help the rebels and we are assisting the

15   rebels.

16          So I arrive anyways, which was a very

17   surprising moment, the first time I see a complete

18   change in their approach to us, anyway, I arrive at the

19   hospital.  There's about 30 to 40 wounded the civilians.

20   I meet the Belgian doctor, I meet the head of the

21   hospital, and yeah, we see about 30 to 40 wounded, maybe

22   even 50, most of these patients all civilians.

23   Children, women, elderly.  And what was quite unusual

24   about the kind of wounds they had, they had wounds of 5

25   centimeters up to 15, lacerations, all in the upper body

1    which is quite unusual.  In a conflict you tend to have

2    a mixture of bullet wounds and so on and more geographic

3    distribution that is even, but it struck me that most of

4    these wounds were in the upper body.

5            So we make a donation of medical supplies and

6    we go back to Butare.

7            MR. CHAKRAVARTY:  Your Honor, this is a good

8    time to break.

9            THE COURT:  All right.  Ladies and gentlemen,

10   we'll take our first break now.  Because it's our first

11   break, please indulge me.  Let me remind you do not

12   discuss the case amongst yourselves or anyone else

13   during the course of the break.  It will be probably

14   about 10 or 15 minutes.

15           (Recess taken.)

16           THE COURT:  Whenever you're ready, Mr.

17   Chakravarty.

18           MR. CHAKRAVARTY:  Thank you, your Honor.

19      Q.   Dr. Zachariah, the next day after your trip to

20   Gitarama, did you have a meeting with your driver?

21      A.   Yes, I did.

22      Q.   Explain what happened.

23      A.   Well, what concerned me of course was the fact

24   that I realized that having Tutsi drivers would be a

25   problem for access for us, and my first reaction was to

1    try to find out and discuss it with them.  So 14th

2    morning I called a meeting of our eight drivers who were

3    there at the time and tried to explain what happened.

4    The driver who accompanied me to Gitarama explained, and

5    I found out actually that seven out of the eight drivers

6    I had were Tutsis.  So we discussed and they said it is

7    probably not advisable, looking at the circumstances,

8    and they were also concerned about their safety, and the

9    mutual decision that we took was that we would withhold

10   the drivers and in fact the expatriates staff start to

11   drive the vehicles themselves.  I did not want to have

12   any problems in terms of compromising our ability to

13   access populations because of the ethnicity of our

14   drivers.  Of course our operations have to take first

15   priority.  So I put off all the eight.  Four of them

16   could not leave back to Kigali, so we gave them one of

17   our houses because by this time most of the

18   non-emergency expatriates staff had been evacuated, and

19   we put them in one of our houses with sufficient stocks

20   afoot so they could stay.

21        Q.   So the next day did you go on another mission,

22   this time you and the other expatriates driving?

23        A.   Yes.  This is the 15th, and as I said, we had

24   several camps on the Burundese border and one of those

25   camps was Nyakizu and we had about 10,000 refugees being

1    taken care of there.  And through the HF radio Zaire

2    staff called us from nutritional center there, because

3    there we had a major nutritional support intervention,

4    saying that there is major unrest here.  The authorities

5    of the commune of Nyakizu have asked that the

6    communities rise up against Tutsis, and that also come

7    and wanted all the refugees to leave Nyakizu.  And in

8    any case, our staff told us that the situation is too

9    dangerous.  They would like to be evacuated to Butare.

10          So I decided to leave in the evening.  There

11   were 11 of them.  So I went to the 13-seater Toyota Land

12   Cruiser, myself and one of my expatriate colleagues, and

13   while we wait in Nyakizu you have to go towards the

14   south from Butare and then you turn right through mud

15   roads.  Well, as we were going through this mud road

16   towards Nyakizu we could see, we went through three

17   roadblocks, in fact, constructed by civilians, these

18   roadblocks being made out of basically cut logs, trees

19   being cut, and they were being constructed as we were

20   going down.  We managed to get through these.  We get to

21   the nutritional center where we asked everyone to meet

22   up.  We collected them and we left back to Butare, by

23   which time there were actually five roadblocks.  And

24   interestingly we were stopped at two of them, and the

25   Africa contingent of those in the car were asked for

1   their ID cards, and they asked clearly are there any

2   Tutsis on board.  Well, we had only Zaire staff, so

3   knowing that they were from Zaire, international staff,

4   we got back to Butare.  And the next day --

5       Q.   Let me just stop you there.  So the people who

6   you were bringing back to Butare were Zaire nationals?

7       A.   Yes, there were no Rwandese nationals that day

8   on this car.

9       Q.   And it was those people that were asked for

10  their identification?

11      A.   Yes.

12      Q.   You explained that you saw roadblocks being

13  constructed on the way out, and when you returned were

14  they being constructed or the five roadblocks were

15  already there?

16      A.   The five were already there, so there were two

17  more.  When I went in, because we got our radio message

18  I guess soon after, maybe an hour, two hours after what

19  had happened there, and while we were going in you could

20  see, I mean these roadblocks, you know, they were trees

21  that were cut and put on the road because that was

22  basically how they were constructed at that time.

23      Q.   Okay, so that trip to Nyakizu was outside the

24  city limit of Butare town?

25      A.   Yes.

1    Q.   So then next day you traveled outside the city

2    of Butare?

3    A.   Yes.

4    Q.   Where'd you go?

5    A.   I went to Kibeho which is in the Gikongoro

6    prefecture, and the reason why I decided to go there is

7    the head of Caritas, this is the Catholic relief

8    services, he came to our house along with I believe

9    pastors from the Goba (ph) parish and they said well,

10   there's about 300 to 400 wounded civilians in the Kibeho

11   church taking refuge there.  And everyone knew now that

12   we had the University Hospital, a major surgical center,

13   an emergency care center for wounded, so they wanted us

14   to evacuate these people to Butare.

15         So I decided to leave with three of my

16   colleagues on three Land Cruisers.  So we take the road

17   to Gikongoro.  And on the way now there's about eight to

18   ten roadblocks.  Some of them are manned by civilians.

19   As we got closer towards Kibeho there were military,

20   there were soldiers.  Anyway, we managed to negotiate

21   our way through this.  And about 500 meters, I would

22   say, more or less from the Kibeho church, we could see

23   the Kibeho church in the distance.  It's a hilly area.

24   You climb up and you negotiate to a small road, and in

25   the distance you could hear sporadic gunfire and you

1    could see a lot of commotion, and suddenly a pickup van

2    overtakes us with horns, you know, it was quite

3    surprising because the road was quite small, and so I

4    moved to the side and the car overtook all the three

5    cars.

6              There were two communal policemen in the back,

7    the car screeches in front of us and they jump out with

8    their guns.  In the passenger seat, a civilian person

9    comes out.  He's wearing a yellow scarf.  It's quite odd

10   at the time and flashy because it was quite warm.

11   Anyway, he comes up and he asks me what are you doing

12   here?  I tell him, well, I'm from a relief organization.

13   We are working in the University Hospital.  I have

14   information from people from the church that there are

15   several wounded here and I'm here to evacuate them to

16   Butare University Hospital.  And before he could say

17   anything I took the pass from Colonel Muvunyi and I gave

18   it to him and I said, well, I have also permission from

19   the brigade commander of Butare to access these

20   populations.

21             So he gets the, he takes the letter passe

22   which you just saw, which also has the authorization for

23   Gikongoro, as I pointed out earlier on.  He looked at it

24   very carefully and then he looks at me and says you have

25   no work in Kibeho.  You have no authorization

1    whatsoever.  And then he turns, he turns back towards

2    the car.  The communal policeman who was just beside him

3    puts his gun up, he takes off the safety catch and I

4    think he's going to shoot at this moment.  And I say

5    stop, stop, stop, we're going to go back.  One of the

6    communal policemen got behind my colleagues, they take

7    off the HF radio, and then the other one actually goes

8    and takes out the European person driving the third car,

9    can I see your passport, are you Belgian.  She gives the

10   passport.  She's from Luxembourg.  And then he decided

11   to keep the passport.  So they sort of antagonized us

12   really, and I now appeal to the man who seems to be an

13   authority wearing this yellow scarf.  I said, well,

14   we're leaving, please give us back our passports.

15   Because if you don't have the passport, you can't move

16   anymore in Butare.  Really, you can't get out.  Then he

17   shows a sign of gesture and, you know, to the two

18   communal policemen, and they give back the passport,

19   they give back the HF radio.  So we manage to turn and

20   we leave back towards Butare.  At that movement you

21   could hear the screams, screams of people, and repeated

22   gunfire all the way until we were completely out of

23   range.

24            So, well, we arrived back in Butare without a

25   problem.  It was always interesting that going back was

1   easier than coming in.  We arrived there and I decide my

2   team, that we will try to renegotiate Kibeho two to

3   three hours after and try to find out what is happening.

4          Q.   When you say renegotiate, you mean try to go

5   back?

6          A.   Yes.  So about two or three hours we decide,

7   okay, maybe things calmed down, maybe we can go back.

8   And now we try to really negotiate the area but now

9   there's a checkpoint, actually there's lots of people,

10   civilians now fleeing that we meet, and several people

11   also from Zaire and elsewhere.  We asked them what's

12   happening, and they say, well, we saw your car, it's

13   almost 2000 people who have been killed there, and

14   there's no way you can get back.  And meanwhile at this

15   time on the 16th, towards the time when we were going

16   back a second time, there is a roadblock on the access

17   roadblock going to Kibeho, so we couldn't go back to

18   Kibeho unfortunately.

19          Q.   So when you say going back, you're talking

20   about going from Butare town where your headquarters

21   was, to Kibeho outside the city?

22          A.   Yes.

23          Q.   And before the 16th were there any roadblocks

24   that you had seen aside from the ones you previously

25   mentioned at the entrance or exit points to Butare town?

1      A.    No.

2      Q.    So on the next day -- sorry, this is about ten

3  days after President Habyarimana's plane was shot down;

4  right?

5      A.    Yes.

6      Q.    So the next day was April 17th.  What did you

7  do after that?

8      A.    So I came back.  I met Daniel and some of the

9  others from the relief community and said, well, we

10 should now, this one weekly security meeting is clearly

11 inadequate, we should have them every day, discussed

12 with the suprefect who we knew well, and therefore we

13 decided, okay, the suprefect arranged that we meet each

14 day.  And the place we would meet is an auditorium close

15 to the Kabutare road opposite the prefecture, more or

16 less, and we were standing outside this auditorium

17 because there was a meeting going on, and I was standing

18 with the suprefect himself, and for the first time there

19 is a roadblock just in front, about 50, 60 meters in

20 front of where we're staying in front of this big hall,

21 and a vehicle, a Nissan, a blue Nissan comes up close to

22 this roadblock and we're watching.  This roadblock is

23 now manned by soldiers, and they ask for the ID card and

24 the ID card is given.  They look at this and then

25 there's a sort of an argument that occurs and some

1    shouting.  And then the soldiers decide to take the

2    person out of the car, and they start hitting him with

3    the gun butt.  First they punched him, then they hit him

4    with the gun butt.  This is a very white T-shirt, white

5    shirt, and they kept hitting him until he fell on the

6    floor.  His head, he started bleeding, blood all over,

7    and they kept hitting him until he moved no more, and

8    then they pulled him to the side of the road.  Now, this

9    is happening in front of a place where the authorities

10   meet.  So I asked the suprefect why this is happening or

11   what is this, you know, and he says, well, they probably

12   suspect him of being Tutsi.

13          Anyway, what was very strange was just after

14   that this pickup, a Mitsubishi pickup truck comes from

15   the Kabutare area which is a cross road coming in, and

16   it was all like jubilation, people on this pickup, they

17   were whistling, they had banana leaves on it, they were

18   stamping the floors, it was like -- and people were

19   chanting -- it was like, you know, like people who just

20   won a football match and are jubilating.  So I asked, in

21   fact, I had no idea, I asked exactly, has there been a

22   football match, you know.  He didn't say anything but

23   this truck came to this checkpoint and it just honked,

24   and the checkpoint opened, and they went through.  And

25   what was amazing for me was that again, what struck me

88

1    was yellow scarves, two or three of them were wearing

2    these yellow scarves.  And of course it struck me

3    because I had seen this the day before and I found it

4    very odd.  And here I was.  I had tried the day before

5    with an authorization pass from the brigade commander.

6    I couldn't have access.  We are asked to provide, you

7    know, you need authorization pass, and here the vehicle

8    that just goes through.  So I ask the suprefect who are

9    these people.  And he tells me these are the

10   Interahamwe.  The first time I actually knew that this

11   is the Interahamwe, whatever that meant.

12        Q.    It's the first time you heard that phrase,

13   Interahamwe?

14        A.    Yes.

15        Q.    And for the record that's

16   I-N-T-E-R-A-H-A-M-W-E phonetically translated into

17   English?

18        A.    Interahamwe, I think that's right.

19        Q.    You mentioned the word suprefect as the person

20   that you were talking to.  Is that a French word that

21   basically means like the vice, mayor or the vice --

22        A.    Yes, yes.

23        Q.    So he was a government official that you were

24   talking to?

25        A.    Yes, yes.  In fact, we have the prefe and you

 1   have the suprefect.  Generally a lot of daily activities

 2   down by the suprefect, so he -- and he was linked to all

 3   our aid activities of the NGO community.

 4        Q.   Now, you just described two roadblocks in

 5   Butare town, the one right in the heart of town that you

 6   had not seen before April 17th.

 7        A.   Yes.

 8        Q.   Aside from those two, at that time were you

 9   aware of any other new roadblocks that were not

10   necessarily military roadblocks?

11        A.   Yes.  At the time there was, from the 17th to

12   say about the 20th there probably was between six to

13   eight roadblocks now by the time.

14        Q.   And aside from what you just described that

15   you saw yourself, were you aware of any other

16   manifestations of the genocide in Butare town on the

17   17th?

18        A.   No.

19        Q.   Now, the next day after seeing what you did,

20   what did you do to insure your safety?

21        A.   Well, there were two things I needed to do on

22   the 18th.  The first was to go and see Colonel Muvunyi

23   again because some of our staff again left and we had

24   new people come in who were more specialized in

25   emergency and conflict management.  So the first thing I

1    went was to see Muvunyi and the second thing I decided

2    to do was go and see the prefe to discuss the

3    deteriorating security situation in Butare.  So I take

4    them one after the other.

5            So I went to see Colonel Muvunyi again, and

6    again he was busy.  So I said, well, I told the person

7    at the ESO front gate, actually Colonel Muvunyi came out

8    and we chatted with him, and I again gave him the pass,

9    a new letter passe which I wrote in myself to the

10   administration for him to sign, and he signs it, but

11   interesting, I was looking to see whether it again gave

12   me authorization to Gikongoro, and I wanted to speak to

13   him about Gikongoro, we didn't have access.  And he

14   signs it, asks his assistant to go and get the stamp.

15   He gets the stamp, stamps it, and he says you're

16   authorized to travel in the Butare prefecture.  And I

17   said, sir, we absolutely need the Gikongoro, it's a

18   major conflict area, I need access.  He says I cannot

19   give you access to Gikongoro, it's insecure, and we do

20   not, there's no way I can let you go to Gikongoro

21   anymore.  And you see on the pass that day there's only

22   Butare prefecture.

23       Q.   Before you describe your meeting with the

24   prefect, this is the pass that you're talking about?

25       A.   Yes.  And you notice here, we were told in the

1    security meeting as well that this time you would need

2    not just the names but you would need the nationalities

3    of individuals, and you see when I arrived there he told

4    me this, and so we had to put it on with our hands and,

5    you know, written in ink and then he signed it.

6         Q.   Okay, and this is what you meant by he just

7    limited it to Butare?

8         A.   Yes.  Which correlates well with our 16th

9    where Gikongoro was completely inaccessible.

10        Q.   Okay.  And then you explained that you met

11   with the prefect?

12        A.   Yes.  So I went to see, now, this is of major

13   concern to us because we have no more access to the

14   populations.  I particularly wanted to discuss the

15   situation in Kibeho, the beating to death of a civilian

16   in front of the authorities on the 16th -- on the 17th,

17   and also the fact that we needed some sort of safe haven

18   for the civilians that were all moving towards Butare at

19   this time, because Butare was known to be safe at the

20   time.  So I went to meet Jean-Baptiste Habyarimana who

21   was then the prefect.

22        Q.   So he had the same last name as the president

23   who --

24        A.   But there's an L in it, I believe.  There's

25   Habyarimana and this one I believe, if I believe right,

1   is Habyalimana (ph).

2        Q.   But different person?

3        A.   Different person, yeah.  So anyway, I get to

4   see him, and I explain to him and he listened to us, but

5   he was very, he was very disturbed, he was nervous, he

6   was hurried, and he was actually opening his drawers,

7   was taking out all his papers.  In fact, he was sorting

8   out his office.  And he said, it's a pity what happened

9   to Butare.  I have no control whatsoever anymore of this

10  place and I've just been relieved of my post as prefect

11  and you need to come back and discuss with the new

12  prefect as soon as you can.  I'm afraid that I can do

13  nothing for you.

14          So we decided okay, well, if that's the case

15  we will come back and discuss with the new prefect.  But

16  on the 18th we didn't get a solution to the situation in

17  Butare.

18       Q.   Did you know the outgoing prefect's ethnicity?

19       A.   At that time I didn't.

20       Q.   And did you know -- did he tell you who his

21  replacement was going to be?

22       A.   He didn't at the time.

23       Q.   So then what happened --

24       A.   He might have, but I probably don't remember.

25       Q.   Fine, you don't remember.  You don't remember

1    now whether Hutu or --

2         A.    I don't, no.

3         Q.    Okay.  So the next day, April 19th.

4         A.    Yes.

5         Q.    1994, describe what happened.

6         A.    So April 19th we decide to take back some of

7    our staff who wanted to leave, and I needed new medical

8    supplies because, and telecommunications systems from

9    the border, so we decided to leave to the Burundese

10   border.  So, amazingly this day there were, it normally

11   takes about an hour and a half to get from Butare to the

12   Burundese border.  It's a widening road, probably about

13   70 kilometers if I remember right, but anywhere an hour

14   and a half.  This day took us six hours.  Twenty-five

15   barricades, I wouldn't even call them checkpoints

16   anymore, barricades on the way.  And at each of these

17   you would be stopped.  Some of them were manned by

18   military people.  You would see dead people on the side,

19   there were people shot, civilians lying on the side of

20   the checkpoint.  Others would be managed by a mix of

21   soldiers and civilians.  We negotiate a number of them.

22   We come to about the fifth roadblock and this one is

23   beside a village and it's really a barricade.  Now, the

24   reason why I say that is you had the roadblocks, you had

25   drums, and then you had planks of wood in which you had

94

1    nails, so there was no way even with our Land Cruisers

2    that have reinforced suspensions you could go through,

3    even if you decided to push through, and in this

4    checkpoint there were again people with yellow scarves

5    which was contrasting, and also military people.  And we

6    were stopped.  The African contingent of our, we had

7    some Africans with us, were asked for their ID cards.

8    And none of the expatriates or Europeans, including

9    myself, light-skinned people were asked for ID cards.

10   Now this is very odd.  Being in several other war

11   situations and everywhere, everyone is asked for ID

12   cards and checked.  None of us were asked and they

13   specifically asked us, are you carrying Tutsis.  And we

14   had luggage in the back.  We had also medical supplies

15   because I thought at the health centers that have

16   wounded we would pop in, give them medical supplies.

17   And they jumped into the back of the vehicles to check

18   if the cases actually had people in it.

19          And the scene was, the scene was one in which

20   you could see the entire landscape becoming dotted with

21   bodies.  And as we went through these villages you could

22   see the grass houses were all set on fire, they were

23   burning, and you would have in between two or three

24   people sitting on the floor and there was somebody with

25   a machete holding, you know, watching over them.  It was

1    very festive.  There were young people.  There were

2    women.  There were, you know, many of them were drunk

3    because they would come and speak to you and you could

4    smell alcohol.  And on the side you would see bodies.

5    And this was the scene all the way through to the

6    Burundese border.

7         When we arrived close to the Burundese border,

8    and here we have mainly military people with heavy guns,

9    including rocket grenades on their side, there again I

10   see this yellow scarf and on civilian, so I now know

11   this is probably Interahamwe.  But anyway, we managed to

12   cross through with the passes.  So about 700 meters from

13   the border, Burundese border, a crowd of people, about

14   70 to 80 of them, they are like cattle in a stampede.

15   They run beside the car from the side and ahead of us,

16   and behind them a group of ten militia running behind

17   them with machetes.  There's an old man on the right

18   side of our car who, you know, is slow and one of

19   militia hits him straight on the side of the neck, and

20   that's a very critical place because once you slash here

21   you cut the carotid artery which goes to the brain and

22   of course you fall down, so this person was hit, he fell

23   over, I swerved the car so I don't run over, and the

24   person just keeps running.

25         This group of people reached the Burundese

1   border, but unfortunately when at the border there was

2   another group of militia who was actually waiting for

3   them.  So out of the 70 there were probably six to ten

4   that managed to cross that border with their wounds.

5   All the rest of them were killed and thrown into the

6   river Akagera.

7           So we got our supplies and decided to leave

8   back.  We evacuated the rest of our staff.

9   Interestingly now we only had expatriate staff and

10  myself, and it took us much less time to get back to

11  Butare.

12          But I think that was, I've seen a lot, if I

13  can describe it, I think when I look back it was hell on

14  earth.

15          Q.   You took photographs that day?

16          A.   Yes.  I took a couple of photographs that day.

17          Q.   Did you take photos of some of the masses of

18  dead bodies?

19          A.   Yes, I did.

20          Q.   Bodies in the river?

21          A.   Yes.

22          Q.   When you returned from this day in hell, what

23  did you do?

24          A.   Well, this was amazing.  This could not have

25  happened without something very important.  And for us

1    it was important to quickly find out what was happening.

2    So of course I discussed with my team, people in the

3    hospital, and they told me that there was, this was now

4    late in the evening, that there was actually a speech by

5    then interim president Theodore Sindikubwabo, who had

6    asked that the population should rise up against the

7    Tutsis who were enemies, and this was probably with

8    that.  Now I of course, this was done in Kinyarwanda, I

9    hadn't listened to it myself, but it sort of gave us the

10   impression or the justification what had happened, but

11   it made it very clear to us that now there was a major

12   change in the situation in terms of ethnic, if you're a

13   Tutsi there was a major problem in terms of relief and

14   need for safe haven from a humanitarian perspective.

15        Q.   Okay, this person, the interim president,

16   Theodore Sindikubwabo, did you know who he was?

17        A.   I knew who he was, yes.

18        Q.   Had you actually seen him before?

19        A.   Yes, I had seen him in Butare at this time.

20   In fact, I must have seen him.  He crossed us sometimes

21   on the main road.  And he was an elderly man and he was

22   very, well, he had lenses, you could see it while he was

23   sitting in the car, but we crossed him several times

24   because he was in Butare at the time.

25        Q.   You say Butare, you talking about Butare town?

98

1        A.    Yes.

2        Q.    Do you know what political party he was a

3   member of?

4        A.    At the time I didn't.

5        Q.    Now, are you familiar with a structure in

6   Butare called the Ihuriro Hotel?

7        A.    Yes, I am.

8        Q.    What did you know that structure to be?

9        A.    Well, it's on the way, I've never been there

10   myself, but it was a structure that lies on the road, if

11   you're coming from the north going to the south, it lies

12   after the road to Kabutare on the left side.

13        Q.    Did you know it by any other names?

14        A.    Well, it was Pauline's house or where she used

15   to live or guest house.

16        Q.    When you say Pauline, who do you mean?

17        A.    She was then the minister for women's welfare,

18   one of the ministers in the then government.

19        Q.    Did you know anything about her politics?

20        A.    No.

21        Q.    Pauline's house or the Ihuriro Hotel, how

22   often would you pass it while you were in Butare, before

23   the 19th?

24        A.    Before the 19th, three or four times.

25        Q.    And describe the road that it was on, it was

99

1    located on?

2         A.    Well, this is on the main road.  It's in the

3    main road that goes through the center of Butare, so

4    it's a main access road.  I mean, it's where most of the

5    hotels were.  The prefecture was just on the side.  It's

6    really centrally positioned.  It lies between the, yeah,

7    it lies just before the hospital, the University

8    Hospital.  I mean, that whole area is about three

9    kilometers I think, two to three kilometers.  It's not a

10   large area.

11        Q.    If you don't mind, I'm going to put up

12   Exhibit 5B -- excuse me, 5A.  Now, doctor, you've seen

13   this photo before?

14        A.    Yes, I have.  I think you showed me.  I was

15   privileged to see the satellite pictures of the area

16   after many years, saw it last time.

17        Q.    And this is a very far out zoomed -- unzoomed

18   shot, correct?  Well, unzoomed relative to the other

19   ones I've shown you.  Why don't I walk you through this.

20        A.    Yes.

21        Q.    You recognize this to be a map of or an

22   overview photograph of Butare?

23        A.    Yup.

24        Q.    And, so zoom in to this area.  Is this a

25   reasonable approximation of what you also saw as

100

1  Exhibit 5B, which is this image?

2      A.  Yeah, I think that's fair, yeah.  That one is

3  clearer than this one.

4      Q.  So 5B looks clearer than the one on the

5  screen?

6      A.  Yes.

7      Q.  The one on the screen is zoomed in.  I'm just

8  trying to establish that it's a zoomed in version of

9  what's on there.

10     A.  Yeah.

11     Q.  And so do you recognize any structures in this

12  photo?

13     A.  Yes.  In fact, I'm just trying to get my --

14  well, this is --

15     Q.  Take your time and get your bearings and then

16  I'll ask you to walk us through.

17     A.  Can you -- the road to Kabutare, is it the one

18  here?  Sorry, shouldn't be touching that.  The road to

19  Kabutare, this is the main access, road access.

20     Q.  This is the road of Kigali to Burundi?

21     A.  Right.  I see.  So we used to be somewhere

22  here.  So the road that I'm speaking about, this is the

23  main road.  Can I touch this?

24     Q.  Yes, you can touch it and it will leave a

25  mark.  If you just want to make an arrow to identify a

1   particular location, you just have to tap it.

2        A.   Okay, here we are.  This is where I had

3   mentioned the auditorium was.  This is the road to

4   Kabutare.  Okay, so this is where the auditorium was.

5   And this is the prefecture here, it's on this side.  And

6   this is the road going to the hospital.  So here is

7   where you had the Ihuriro Hotel.  There's another road

8   going this way and the ESO quarters is here.

9        Q.   What is the ESO?

10       A.   This is Ecole des Sous.  It's the junior

11  training school, and that's where we used to meet the

12  colonel, Muvunyi.

13       Q.   When you say junior training school, you mean

14  it's a military school for non-commissioned officers?

15       A.   Yes, for officers.

16       Q.   For officers, but they are non-commissioned,

17  they're not the generals but the sergeants?

18       A.   Yes, that's right, yeah.  And on this side

19  here, you would have the market area.  The prefecture is

20  over here.  So you could negotiate the main road here or

21  you could go this way through the market and get down to

22  the hospital, two access roads.  But this is the main

23  road that goes between Kigali and Burundi.  I sort of,

24  yeah, I sort of picked this up.

25       Q.   I'm sorry, I didn't understand that.

1      A.    So I think it still looks, it reminds me what

2   I had seen.

3      Q.    And so this is that main road?

4      A.    Yes.

5      Q.    So what was this structure?

6      A.    This is the Ihuriro Hotel.

7      Q.    That was the home you knew of Pauline

8   Nyiramasuhuko?

9      A.    Yes.

10      Q.    Describe what this structure is.

11      A.    That should be the ESO, which is the junior

12   officers and where Colonel Muvunyi, the way to get the

13   passes.

14      Q.    And was there a road?

15      A.    Yes, there is a road.  There is a road that

16   links up there.

17      Q.    In the, this I think you identified as the --

18   this I think you identified as the prefecture?

19      A.    Yes.

20      Q.    Explain to the jury what a prefecture is?

21      A.    That's a governor's office.  It's where the

22   authorities are.  That's where the governor or the

23   prefect, and, you can actually even see the platform in

24   the beginning, it's a small roundabout.

25      Q.    Yes.

1      A.   Just on top here.

2      Q.   The place that you described that blue Nissan,

3  somebody being pulled out of the blue Nissan, is that in

4  this area over here?

5      A.   Yea.  If I --

6      Q.   Go ahead.

7      A.   This is the road.  This is where the bus, the

8  pickup came through, and it goes this way.  And this is

9  where it is, at the junction.  If I could take this off

10  I could put a new -- okay, it should be, the junction

11  should be here.  This is where the auditorium was.

12  That's where we were staying.

13      Q.   And in relation to -- your office was north of

14  where you just made that mark; correct?

15      A.   Yes.

16      Q.   And you described that you had set up

17  emergency facilities at the Butare University Hospital?

18      A.   Yes.

19      Q.   Can you show on the map where that is?

20      A.   So it should be this group of buildings here.

21  On the extreme end of Butare town.

22      Q.   And how would you travel to the University

23  Hospital?

24      A.   Well, there are two ways to travel.  You could

25  go straight this way.  And then the main entrance I

1    think is somewhere here.  Or you could actually go

2    through the back entrance, this way.  So we used to take

3    both, but towards the later part I used to take the back

4    entrance through ESO, after the 20th.

5         Q.    And is ESO the place that -- or was there a

6    roadblock in --

7         A.    Yes, there was a roadblock.

8         Q.    And how frequently did you go through that

9    roadblock?

10         A.    Well, that was the easier one for us to go

11    through because there were soldiers and, well, they knew

12    that I knew Colonel Muvunyi, and it was quite easy for

13    us to go through, close to the hospital and they knew we

14    worked there.  So I used to try to take that as much as

15    I could.

16         Q.    Just a couple of other orientation points.

17    Are you familiar with Huye Stadium, H-U-Y-E Stadium?

18         A.    Yes.

19         Q.    What is Huye stadium?

20         A.    Well, it's a stadium where you have sports and

21    whatever.  That was further up north.  It lie between

22    the road going to Gikongoro close to the airport, in

23    fact on the right side.

24         Q.    So --

25         A.    Further down on this picture.

105

1     Q.    Okay.  Given the current configuration of

2    Exhibit 5A, it would be on the northern -- off of the

3    image on the northern side?

4     A.    It would be, the way it is here now, it would

5    be northwest.

6     Q.    In that direction?

7     A.    Yes.  That should be right if I've got my

8    bearings right.

9     Q.    And would this road, the main road that was

10    going through to the south would be the Burundi border?

11    A.    If it went south, yes.

12    Q.    If you follow that road for another 70

13    kilometers?

14    A.    Yes.  The Huye is northwest because we used to

15    have stores of medical supplies there, so I used to

16    cross that stadium behind.

17    Q.    You mentioned the ESO, that junior officers

18    camp here.  Are you familiar with another military camp

19    called Ngoma camp?

20    A.    Yes.

21    Q.    N-G-O-M-A?

22    A.    Yes.

23    Q.    And where was that?

24    A.    That was also northwest.  It's close to the

25    Huye Stadium.  I had not been there myself because I

106

1    didn't have any reason to be and authorizations were

2    from the ESO camp, so.

3         Q.   So you knew where it was, but you didn't go

4    there?

5         A.   Yeah, it's close to the airport.

6         Q.   Now, prior to the trial yesterday in fact I

7    showed you some videos that are marked Exhibits 9A

8    through B, and some still photos; correct?

9         A.   Yes, yes.

10        Q.   Would those videos assist you in explaining

11   what the roadblocks looked like in Rwanda during the

12   genocide?

13        A.   I could try, yeah.

14        Q.   Okay.  Would you notice some significant

15   differences from what you already described and from

16   what is depicted on videos?

17        A.   Yes.  Do you want me to say what I find

18   differently after we've seen them or straightaway?

19        Q.   Why don't you do so generally now.

20        A.   Yes.  This is with respect to what I saw in

21   the office yesterday.  Well, I think those, the

22   roadblocks that I saw yesterday in the office are really

23   nothing compared to what I saw, say, on the 19th to the

24   24th of April because what you showed me yesterday,

25   honestly, those ones are only more like speed breakers,

1   and if you had a good vehicle, you could actually easily

2   go through these.  At the time I was there that was

3   impossible.  You will notice that the right and the left

4   side of the road was blocked off, so you had logs of

5   wood, big logs of wood, not small ones.  You had planks

6   of wood on the floor with nails as I'd mentioned earlier

7   on.  You had drums.  You had big rocks.  And then you

8   had armed military and sometimes armed civilians, and

9   there were multiple blocks, so, you know, you had to get

10   through one, then you get to the next one, and that was

11   distinctly different from what I saw in the office

12   yesterday.  Some of the characteristics are there.  I

13   mean, you have civilians.  Some of them wear grenades.

14   Some that were half military uniform, so they had a

15   jacket, for instance, that was what we saw, and then

16   lots of people with machetes, but I think I saw very few

17   soldiers yesterday on what you showed me, but I think

18   those, the checkpoints, the roadblocks you showed me

19   yesterday at the time, it was much, much worse than that

20   when we were there.

21       Q.   Do the videos, do they fairly and accurately

22   depict the features, maybe not to scale, with the

23   exception that you just mentioned the scale and the

24   scope and the intensity of the roadblock, do they

25   capture the features of the roadblocks?

1     A.   Yeah, it sort of captures the general sort of,

2    it gives you generally measures of what happened in

3    terms of, you know, people being checked, ID cards and

4    identification.

5          MR. CHAKRAVARTY:  Your Honor, I move to strike

6    the IDs on Exhibit 9A through G and publish A through G.

7          MR. HOWARD:  We have an objection to those.

8          THE COURT:  You have an objection?

9          MR. HOWARD:  We do.

10        THE COURT:  Sustained.

11    Q.   In what ways, Dr. Zachariah, do the videos

12   that we were just talking about --

13       THE COURT:  Well, he can't authenticate the

14   videos.  They don't look like what I saw.  That's not an

15   authentication.

16    Q.   Are there certain features that look like what

17   you saw?

18    A.   Yes, the checking of ID cards.

19       THE COURT:  He can't testify that's a fair and

20   accurate representation of what was there.  He never saw

21   what was there.

22    Q.   You don't recognize the particular roadblocks

23   in the video?

24    A.   No, I don't.

25    Q.   Describe how after April 19th and after your

1    trip back from the border, describe how the roadblocks

2    changed on the next day?

3       A.    On the 20th.  Well, what happened on the 20th

4    is we had a security meeting in that auditorium, and I

5    received information, one of the Belgian pastors, one of

6    the Belgian pastors from the Kabuye commune, if that's

7    how it's spelled, anyway, comes into the meeting room

8    and he calls me out quickly and says it's urgent.

9    There's been major problems in Saga 1 and Saga 2 camps.

10   Tutsis are being selectively taken out and killed and

11   your staff may be in danger.  Now, we used to work

12   closely with the church in these camps.  He says you

13   better get there fast and get your people out.

14          So I decide to leave with two cars to Saga 1

15   and Saga 2.  This is about 20, 25 minutes normally.  But

16   on the way to Saga 1 and Saga 2 there were like 10 to 12

17   roadblocks now.  Some managed by soldiers, others by

18   civilians, again with guns, some with grenades,

19   machetes.  We managed to negotiate our way through until

20   we come to the border of Saga 1 and Saga 2.  I could see

21   the two or three of the houses in the distance.  They

22   were burning.  And we come to this massive barricade

23   into Saga 1 and Saga 2.  It's like again jubilation.

24   There were drums, there were masks, people had spears,

25   they put on banana leaves.  And we stop there and people

1    charged, the civilians charged towards us, there were

2    one or two with military uniform.  Now were they

3    Gendarmes, were they communal leaders.  Anyway, come

4    charging to the car with weapons.  They smash the car.

5    They smash in the headlights of my car as I go down.

6    And then there is somebody who seems like who is in

7    authority comes up to the side of the car and he asks

8    what are you doing here.  And I tell him I'm here to get

9    out my people, 30 to 40 emergency personnel here and I

10   want to take them back to the relative safety of Butare.

11   And he tells me if you're here to take out Tutsis, we

12   will kill them anyway and we will kill you, too, so turn

13   around.  So unfortunately we had to turn around.  And

14   what happened that day in Saga 1, Saga 2, were that all

15   the emergency staff were taken out violently from their

16   house.  We'd asked them to all wear T-shirts which are

17   white with clear identification, everyone during this

18   time.  They were all taken out.  Their ID cards were

19   carefully verified.  The Hutu staff were put on one

20   side, the Tutsi staff were put on the other.  The Zaire

21   staff were asked to watch.  The Hutu staff were then

22   given guns and machetes and they were asked to kill

23   their Tutsi --

24           MR. HOWARD:  If I may, before he continues on

25   with his story.  I couldn't understand whether he

1    actually saw this happening or someone told that it

2    happened.  I just missed that part.  Could you clarify,

3    please?

4         Q.   Doctor, were you present when this was

5    happening?

6         A.   I was present when it was happening.  I went

7    back and Zaire staff --

8         Q.   Strike that.  The part that you have

9    described --

10        A.   Yes.

11        Q.   -- going down to these refugee camps --

12        A.   Yes, I was the one driving the car.

13        Q.   You were the one driving.

14        A.   Yes.  It was my car that was attacked.  I

15   spoke to the person who was in charge.  But I didn't

16   know what was happening to staff, so I had to turn back.

17        Q.   So you were turned around, your staff was

18   separated, and whatever happened after that happened

19   outside of your presence?

20        A.   Yes.  How I got that information was through

21   the Zaire staff who actually came over --

22             MR. HOWARD:  I object that it's hearsay and,

23   your Honor, and ask that you strike.

24             MR. CHAKRAVARTY:  Your Honor, it's not offered

25   for the truth.

112

```
 1              THE COURT:  Objection overruled.

 2         Q.    What happened, what did you do?

 3         A.    I think that was a changing point in our

 4    history I think as an organization, as a person because

 5    it was the first time that members of staff were

 6    actually targeted.  Well, it changed everything for us

 7    from our operations because it clearly meant now that

 8    there was a complete change in the whole experience

 9    we've had until now, that medical staff, aid workers

10    were targeted.

11         Q.    When you say targeted, in the exchange we may

12    have missed what actually happened.

13         A.    Yes, we have never, I might say we have never

14    seen those people anymore.

15         Q.    Let me just clarify.  You said Hutu staff was

16    separated from the Tutsi staff?

17         A.    Yes.

18         Q.    And Hutu staff were given weapons?

19         A.    Yes.

20         Q.    Then what was your understanding of what

21    happened?

22         A.    They were asked to kill their Tutsi

23    colleagues, and those that refused were killed

24    themselves.  We have never seen any of the 40 staff that

25    we had records for, we've never seen any one of them
```

1   after that.

2        Q.   And so --

3        A.   But from an operational perspective, this was

4   very significant for us, because it changed the

5   dimension of what was happening clearly in our minds in

6   Rwanda.

7        Q.   So what steps did you and MSF take after that?

8        A.   Well, I felt the urgency again to go and see

9   Muvunyi and also to meet the new suprefect.  This was

10  top of my agenda.  I went back to Butare.  I saw Colonel

11  Muvunyi again, and I spoke to him about what is

12  happening in Butare.  He said, well, I will do what I

13  can and I'll sign your passes, but this time I was told

14  that it's not enough to have your nationalities, you

15  have to have your nationalities, your name, your

16  nationality, your passport number, your car registration

17  number, and each car has to be allocated to particular

18  people.  So, if you do not have those, because they will

19  crosscheck your passport and the number of car,

20  otherwise you will not get through.  So of course I had

21  to do that.  You see, there was a clear restriction of

22  movement even for the international NGO community.  And

23  this was very important, because without that

24  authorization with the numbers, you would not get fuel

25  in the fuel pumps.

114

1           So, now, if you look at the passes you see

2      that clearly, which I got from Muvunyi on the 20th of

3      April.

4           Q.   All of that data that you just mentioned,

5      that's on the passes?

6           A.   Yes.

7           Q.   So what did, aside from talking to Muvunyi

8      about that new pass, what else did you do?

9           A.   I went to see then the new prefect, Sylvain

10     Ndikumania.

11          Q.   Now, so this is the man who succeeded

12     Habyarimana who was clearing out his office when you

13     went to see him?

14          A.   Yes, exactly.  So I went to see him.  I went

15     to see him actually with the head of the delegation of

16     the International Committee of the Red Cross, and we

17     explained to him what's happening, the need for safe

18     havens, the fact that medical staff have been prevented

19     from performing their functions, and that he has also a

20     responsibility as the head to guarantee the safety or

21     safe haven of civil populations, and also the right for

22     medical care and for relief aid organizations under the

23     Geneva Conventions.  He was very indifferent.  He

24     continued to do what he was doing in the office, and all

25     he asked us was, so tell us what do you intend to do

1    here, and, you know, what is the nature of your work.

2    Then I explained all that and said, well, it's very

3    difficult to do what we're doing now, and he says, well,

4    if that's what you think, so be it.

5           We left very helplessly, actually, we felt so

6    helpless because he was clearly not collaborative at

7    all.

8        Q.    Did you know his political affiliation?

9        A.    At the time, no.

10       Q.    Aside from meeting with Muvunyi and meeting

11   with Ndikumania, did you notice any observation on the

12   20th that also dealt with this?

13       A.    Yes, towards the evening, back to the

14   hospital, and Dr. Jolton, who was then the medical

15   director of the hospital calls me and says, well, Rony,

16   we've just been changed to military hospital, and we

17   will be getting about 30 to 40 wounded soldiers coming

18   in from the frontline, and we might need additional

19   support.  I says no problem at all.  We have all the

20   medical supplies.  If you want, we can bring in

21   additional surgical teams, we'll do what we can and

22   we'll prepare.

23          But I waited with him for the injured to come

24   in.  So it was a helicopter which carries about 30 to 40

25   people landed and these were all soldiers from the

1    Presidential Guard who were shot with thigh wounds, all

2    kinds of surgical injuries.  Of course we went into my

3    work that evening to get them all allocated into the

4    orthopaedics ward.  We allocated nurses and our surgical

5    team of course was taking care of everybody now, the

6    soldiers and the civilians.

7            But, yeah, in some way our hospital, which is

8    the only medical facility in the southern part of Rwanda

9    now that was functional, became also a military support

10   facility.

11       Q.   So, were you aware of military conflict going

12   on at the time?

13       A.   Yes.

14       Q.   Where was that?

15       A.   This was towards Kigali and from Kigali

16   downwards.

17       Q.   So this is the armed forces of Rwanda were in

18   conflict with the --

19       A.   With the FPR.  I was told clearly that it was

20   FPR advances.

21       Q.   FPR --

22       A.   Front Patriotique Rwandais.

23       Q.   The French --

24       A.   Patriotic Front of Rwanda, I think that's what

25   it was called, yeah.

1     Q.   In English to French, RPF was a French acronym

2  for the RPF?

3     A.   Yeah, I think that's right, yeah, the

4  Patriotic Rwandese Front, I think that was what it was

5  called.

6     Q.   Had you been on the frontline of that

7  conflict?

8     A.   No, not at all, because I was in the -- I was

9  north of Gitarama, it was the Kigali side, so, no.

10     Q.   Now, on the 20th were there other changes in

11  Butare that you noticed?

12     A.   On the 20th we began to see many more

13  checkpoints.  I don't know how many now, but between

14  20th, 21st, 22nd we probably had much more.  We probably

15  had 10, 11, depending on whether you looked at the main

16  road or looked at access roads.  The numbers of

17  checkpoints increased, and I think from the 20th, now

18  the 20th, 21st, 22nd, the profile of soldiers at some of

19  the checkpoints also changed.  They had different

20  berets, different kinds of uniforms, and their attitudes

21  changed as well.

22     Q.   How do you mean their attitudes changed?

23     A.   Well, their approach to us clearly was

24  different from the soldiers that were there before.

25     Q.   How was it different?

118

1      A.   Because the soldiers that were there before

2  were more polite.  They would look at your passes.  The

3  ones after the 20th, 21st, 22nd, there was sense of

4  arrogance, indifference, they didn't seem to care, so

5  that's the sort of the perception we had, and they

6  weren't as polite.

7      Q.   On the main road that you described going from

8  the center of town down towards Burundi, did you see

9  roadblocks pop up on that main road?

10      A.   Sorry, can you --

11      Q.   I will.  On the main road between your office

12  and Burundi, you described where the Ihuriro Hotel was.

13  Were there additional roadblocks that popped up on that

14  main road?

15      A.   On the 20th onwards?

16      Q.   Yes.

17      A.   Yes.  On around the 20th, yeah.

18      Q.   And was there a roadblock near the Ihuriro

19  Hotel?

20      A.   Yes, in the vicinity of that hotel.

21      Q.   Did you go through that roadblock?

22      A.   Yes, a number of times.

23      Q.   Were you able to negotiate that?

24      A.   Yes, we were always able to negotiate that,

25  but it was a more difficult checkpoint.  Well, difficult

1    is relative, but, yeah, there was a way we could, if I

2    was to choose would I go through that way directly after

3    the 20th or would I take the ESO road, which is the

4    bypass, I prefer to take the ESO road because there the

5    soldiers at that checkpoint were under the command of

6    Colonel Muvunyi who knew me, so, and they knew us, so it

7    was much easier for me to negotiate my way through that

8    to the hospital, which was the main center of our

9    activity.

10        Q.   So, Doctor, this is 5B, which is on a poster

11   we've shown the jury.  This is a road to the ESO and

12   this is the main road that we're talking about.

13        A.   Yes.

14        Q.   The main paved road.

15        A.   Yes.

16        Q.   Is the Ihuriro Hotel?

17        A.   Yes.

18        Q.   So relative to the hotel, where did you see

19   this roadblock?

20        A.   Now, the, I must say that the roadblocks,

21   except for the first two, the one at the entry and the

22   exit and the one in front of the prefect or the

23   auditorium, the rest of the checkpoints were actually

24   make do checkpoints.  So, I mean, they would be

25   constructed with logs and so on, they were actually

120

```
 1   mobile.  So their position in relation to any landmark

 2   could change.  It's quite interesting how sometimes

 3   these checkpoints varied in position.  So it could have

 4   been here.  It could be further up on this road.  So,

 5   depends on where the other roadblocks were.  If there

 6   was one here or there was one on the other side, then

 7   these positions could change.  But this roadblock was in

 8   this vicinity.  There was one after the 20th.  I'm sure

 9   of after the 20th.

10        Q.   And you describe that there was -- this is a

11   road to the ESO; correct?

12        A.   Yes.

13        Q.   And where was the roadblock on the ESO?  Maybe

14   I should switch to the other --

15        A.   It was directly in front of the ESO.

16        Q.   So again, this is the Ihuriro Hotel.  This is

17   the road to the ESO.

18        A.   Yup.

19        Q.   Where would the roadblock be?

20        A.   So the roadblock would be here, somewhere

21   here.  If I got the geographic -- this is ESO here;  is

22   that right?

23        Q.   Right.

24        A.   Okay, so it would be somewhere here, main

25   entrance, just in front of the main entrance.
```

121

1      Q.   And I say correct, that's where you identified

2   earlier as being the ESO.

3      A.   Okay.

4      Q.   And so how would you go to the hospital by

5   avoiding the roadblock near the I'huriro?

6      A.   Well, you had two options.  You could go --

7   can you just show me where the Kabutare road is.  Well,

8   you would come through this way.  You had a road, this

9   is the Kabutare, so you could come this way or you could

10  take the road further up which comes this way -- whoops,

11  sorry.  You can come this way.

12     Q.   This way you mean?

13     A.   Yeah, you can come this way, which actually

14  was a road that comes from the Hotel Ibis, goes behind,

15  or you could come up this way close by the prefecture

16  and come this way all the way.  So you do need to take

17  this main road.  So there were two other access roads

18  that meets up with this road, and you can go straight on

19  to the hospital.

20     Q.   You said that you did come this way, or north

21  and south, to the I'huriro roadblock on several

22  occasions?

23     A.   A number of occasions, yes.

24     Q.   Describe what that roadblock looked like?

25     A.   Well, there were more civilians there.  There

1   were soldiers.  Unlike say the roadblock in front of the

2   Hotel Faucon, which I haven't told you about yet, but

3   there was only military soldiers on the 22nd, but this

4   one had civilians and soldiers.

5       Q.   And in terms of the structure, in terms of

6   physicality --

7       A.   Same thing.  It was lots of wood.  It was a

8   make do checkpoint at the time.  You had planks of wood,

9   you had drums.

10      Q.   When you say drums, you mean like what

11  Americans would call barrels?

12      A.   Yes.

13           MR. CHAKRAVARTY:  Your Honor, could we break

14  now?

15           THE COURT:  Yes, that will be great, thank

16  you.

17           All right, ladies and gentlemen, we'll take a

18  brief recess for lunch.  Try to do it in 30 minutes.  If

19  that's not enough, 40, we will do 40, but let's see if

20  we can do it in 30.  Please don't discuss the case

21  amongst yourselves or anyone else during the course of

22  the break, and we'll you about 1 o'clock.

23           (Jury exited the courtroom.)

24           (The following hearing is ex parte.)

25

123

```
1                    C E R T I F I C A T E

2

3           I, Sandra L. Bailey, do hereby certify that

4    the foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9    Submitted: 10/17/13

10                          SANDRA L. BAILEY, LCR, CM, CRR

11                          LICENSED COURT REPORTER, NO. 15

12                          STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/17/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-85-SM
            v.                  *  February 6, 2013
                                *  1:15 p.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

Day 2 - Afternoon Session
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. MCAULIFFE
and a jury

Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH and MA)

For the Defendant:    Mark E. Howard, Esq.
                      David W. Ruoff, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH 03104

Interpreters:         Sabrina Iyadede
                      Freddy Munana

Court Reporter:       Diane M. Churas, LCR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1442

```
 1                      I N D E X

 2

 3

 4   WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS

 5

 6
     RONY ZACHARIAH
 7

 8   By Mr. Chakravarty   3               40

 9   By Mr. Howard                 16

10
     THIERRY SEBAGANWA
11

12   By Mr. Capin        44

13

14

15   EXHIBITS:                        ID.   Evid.

16   Government's Exhibit 22                 48

17   Government's Exhibits 25J, 25L, 25N     64

18   Government's Exhibit 26D                66

19   Government's Exhibit 26C                67

20

21

22

23

24

25
```

1                    BEFORE THE JURY

2                    RONY ZACHARIAH

3                    DIRECT EXAMINATION (cont'd)

4    BY MR. CHAKRAVARTY:

5              THE COURT:  Whenever you are ready, Mr.

6    Chakravarty.

7              MR. CHAKRAVARTY:  Thank you.

8         Q.   Doctor, when did you leave Butare for good on

9    that mission?  What date?

10        A.   The 24th of April 1994.

11        Q.   So between April 20th, you've gotten us up to

12   until the 24th.  What was MSF doing and what was your

13   mission at that point?

14        A.   Well, at that time we restricted our mission

15   then to mainly at the University Hospital in Butare

16   because, as I said, access to our camps, Nyakizu, Saga

17   1, Saga 2, all these were no longer possible.  So in a

18   certain way our medical operations were restricted to

19   Butare Town, and my focus at the time was to focus on

20   surgical wounded and the University Hospital and to try

21   as much as possible to use the hospital as a safe haven

22   for civilians that were fleeing from the conflict.

23        Q.   So on the 21st what happened?

24        A.   Well, on the 21st in the morning I arrived in

25   the hospital and I see Dr. Jolton who's the director of

4

 1    the hospital, and I'm told actually that the hospital

 2    crisis management group has decided that there is too

 3    many people in the hospital and there's a hygiene

 4    problem and those patients -- civilian patients who have

 5    been -- whose wounds were taken care of and who did not

 6    have medical reason to be in the hospital should be

 7    shifted to the -- transferred to the prefecture and then

 8    they would be reassigned to different places.

 9            That was all the information that I got.

10    Well, I discussed this with Dr. Jolton saying that this

11    is really not a good idea because one of the ideas of

12    the hospital is also to act as a safe haven, and even if

13    the patients have been cured of their wounds, where

14    would they go to?  I'm happy to put up tents and provide

15    additional accommodation in the hospital, which is what

16    we did by the time.  So that if it's a question of the

17    soldiers needing a place, let them take the room, we'll

18    get the civilians into the tents, which we had and which

19    we put up.

20            In total 40 children were shifted from the

21    hospital to the prefecture, and that position was

22    irreversible.  That position had been taken by high

23    management of course in the hospital.

24            So while I rushed to the prefecture, I looked

25    for those kids and I did not find any of them.  I find

1    six or seven of them.  I could recognize them from their

2    bandages which were -- the type was very specific that

3    only we had at the time.  And they said, well, they have

4    been redistributed to Kabutare Hospital.  I go over to

5    the Kabutare Hospital and I do not find any of them.  So

6    we've never seen what happened to those -- we never saw

7    those patients anymore.

8         Q.   And did you learn their ethnicity, those

9    children that were taken?

10        A.   I don't know what their ethnicity was, but I

11   presume they were Tutsis because the hospital had mainly

12   Tutsi civilians that we were acting as safe havens for.

13        Q.   The next day did you meet with the

14   sous-prefet?

15        A.   The 22nd.

16        Q.   The 22nd.

17        A.   The 22nd -- actually, as I've said, on the

18   20th when I met Muvunyi there was a serious restriction

19   of movement of all cars.  You needed those numbers, you

20   need authorization passes, and Mr. Sufane, who was the

21   sous-prefet, told me that he doesn't have anymore access

22   to fuel and therefore can I pick him up on the 22nd for

23   the security meeting.

24             So I went with a colleague to his house in the

25   morning, which is also in the Buye area of Butare.

6

1      Q.    Just to clarify, that's a residential area?

2      A.    That's a residential area.  It was not far

3   from where we were living.  So I said that's fine, I

4   will come and pick you up in the morning at eight and

5   we'll go and have a security meeting.

6            So when I arrive at his house what meets my

7   eye is about 15 bodies, all of them scattered in the

8   grass in front of his house.  So I stopped the car, come

9   out, and what first strikes me is a mother with a

10  three-month-old baby on the floor, and I believe this

11  baby was still breastfeeding.  There was milk on the

12  breast, but the baby was three months old more or less,

13  but there was a bullet in the back of the head, and

14  everyone else seemed dead actually.

15           There's a young girl, maybe 15, 16, that runs

16  up to the car and she tells me that she's Sylvain's

17  sister-in-law and that last night soldiers attacked the

18  house and they accused the father -- in fact they

19  attacked the house.  They killed every one of the family

20  because apparently he was with the PSD party, which was

21  then in opposition to the then Habyarimana government or

22  the then political power or -- yeah, which was in fact

23  partisan position.

24     Q.    With the PSD party?

25     A.    Yeah.

7

1   Q. Which was in opposition to President

2 Habyarimana; correct?

3   A. That's right.  That's the information I got,

4 and they were attacked, and that's it.

5   Q. Do you know what President Habyarimana's

6 political party was?

7   A. It was the mouvement national.  It was the

8 MRND party.  There were some other groups there which I

9 was not aware of, no.

10   Q. So you were just starting to say the French

11 words that compose the acronym MRND?

12   A. Yes.  For me it was quite surprising because

13 Sylvain was actually Hutu, he was not a Tutsi, which I

14 knew at this time.

15    Anyway, there's this girl that comes up.  She

16 had a bullet wound through her breast.  It was actually

17 split.  I quickly looked at it.  There wasn't much

18 bleeding, because I think she must have been shot at

19 point blank range, and because of the heat of the bullet

20 it cauterizes.  I asked her, get in and we'll take you

21 quickly to the hospital and we'll take care of you.

22    I hear a groan on the right side and there's a

23 young boy about 13 years old, and she sees as well, and

24 I quickly get down, examine him, and his pulse is very

25 weak.  He's actually in shock.  I quickly examine him.

8

 1   He had a bullet through his thigh.  And if you get a

 2   bullet through your thigh, there's a lot of blood, two

 3   or three liters of blood that can't stay in the thigh

 4   and you go into shock, and I believe that's what

 5   happened to him.  They thought he was dead.  So I tried

 6   to take him up with my colleague in the car into the

 7   rear of the Toyota Land Cruiser, and as we try to take

 8   him in, two soldiers come rushing by, and they ask for

 9   their ID cards and say you can't take them in.  I had an

10   exchange with them saying, look, we are taking care of

11   140 soldiers like you and maybe you might be there one

12   of these days.  We will take care of you in the same way

13   as we will take care of these patients.  Please let us

14   go.

15            It sort of worked and he let us go.  So we get

16   these two people to the hospital.  And on the way we see

17   -- in front of the Hotel Faucon, which is before the

18   prefecture, much north, there's a check point manned by

19   military people only, and we see about 30 civilians,

20   adults and there were about 15 children.  They were

21   being beaten actually with batons and also with gun

22   butts and held around the checkpoint.

23            We managed to cross all the same, got to the

24   hospital, and on our way back, actually all those 30

25   were shot.  Their bodies were lying on the side of the

1   checkpoint, including the children.  There was blood all

2   over the roadside beside the checkpoint.

3        Q.   What did you do after your experience on the

4   22nd in terms of MSF regrouping and deciding what you

5   were going to do?

6        A.   We decided at that moment, well, that we

7   restrict our activities mainly to the hospital of course

8   and try to work as much as possible there.

9             The situation was very difficult.  We had very

10  restrictive movement.  We had the prefet who did not

11  collaborate with us or identify with us.  All our

12  refugee camps were basically closed, did not have access

13  to, and there were massive numbers of checkpoints and

14  roadblocks which seriously restricted movement, and by

15  this time Butare was no longer a safe haven.  So my only

16  hope was that the hospital would still be protected, and

17  hope was that the military authorities would at least

18  respect the Geneva Conventions.

19             I think that was the last straw we had.  We

20  had of course our flag up.  We had the flag of the

21  International Committee of Red Cross, and our operations

22  were fully restricted now to the hospital.

23       Q.   So what happened at the hospital on the 22nd

24  and 23rd?

25       A.   Well, on the 23rd morning, we arrive at the

10

1    hospital around 8 o'clock and we have by now a 24-hour

2    team that works in the hospital night and day, and as I

3    arrive some of the staff come up quickly to me and say,

4    well, there's been 40 patients that were taken out last

5    night.  The cards -- the I.D. cards were identified.

6    They were either beaten to death or shot behind the

7    hospital.  And they showed me three tipper trucks that

8    were actually carrying the bodies and these were

9    prisoners wearing pink uniforms.  It was quite classic

10   in Rwanda.  The prisoners wore very special pink colors

11   so you could pick them out.  They were carrying these

12   bodies into the trucks.  So I went and looked at it, and

13   these were all civilian patients, women, children, men,

14   only civilians.  They had either been beaten or shot and

15   they were being taken into the truck.

16          So I quickly tried to find Dr. Jolton and I

17   discussed with him and I say, well, this is unacceptable

18   and we need an urgent meeting with the responsible of

19   the presidential guard.  The soldiers who were there,

20   they had a captain there.  They had a medical team.

21   They had a doctor.  There were a number of captains.  So

22   I said we need to have a quick meeting with this person,

23   and we'll have to decide what to do with the situation.

24          So a meeting was organized between Jolton,

25   myself, and the captain responsible for the welfare of

```
 1   the then presidential guard in the hospital.  I talked
 2   with him of course.  And along with my colleague we
 3   raise on the strongest grounds possible the human
 4   rights, the ethical responsibility and the right for
 5   medical care of all wounded, irrespective of their
 6   ethnicity, and I made it very clear that MSF will stay
 7   in this hospital if we will be allowed to treat Hutus,
 8   Tutsis, and soldiers, and that neutrality is the
 9   condition which we will not compromise to work in the
10   hospital, our team.  I'm not a Tutsi, but everyone has
11   to have access to care.
12           My hope at the time was that this being the
13   only medical facility in the south of Rwanda, also now a
14   military facility in which we were offering surgical
15   care, that I had a bargaining chip to say that there's a
16   win-win situation here.  My team will take care of the
17   soldiers, will operate their soldiers.  We will take
18   care of them.  The return is that civilians stay in this
19   hospital irrespective of whether they are Tutsis or
20   Hutus, and everyone has the right to care.
21           The captain said, well, we'll do what we can.
22           Then we come off -- it's a double-story
23   building.  You come off the steps, come down, and then
24   there's a few other soldiers that come up and they say
25   this in French.  This hospital stinks with Tutsis.  Can
```

1   you clean up?

2           And meanwhile in the compound just beside the

3   place we had a meeting, this area where MSF has put up

4   its tents and where there's a sort of sorting area.  If

5   patients come, they go there.  If they are severe they

6   are put into a ward.  If they could be handled directly

7   for their lacerations, our team takes care of them.

8   There's a patient being sutured, a group of civilian

9   militia and soldiers come.  They take him.  They strip

10  off the sutures, they take him off the IV line, he's

11  taken away.  And along with him, there are five of my

12  nursing staff, there's Sabine, there's Nadine, there's

13  Rose, there's Alexis and Jean-Marie.

14          Now, I knew at this time that all of them were

15  Tutsis except Sabine.  They came to take Alexis --

16  Nadine and Rose.  I tried to intervene, and they said

17  they're on this list.  There's nothing you can do about

18  it.

19          And then they came to take Sabine.  Now,

20  Sabine was a Hutu I knew.  She was seven months

21  pregnant, and in fact I had allocated her to work for

22  the soldiers.  When they came to take Sabine, who was a

23  very good friend of mine, I intervened actually

24  physically between the soldier and Sabine, and I

25  screamed in a certain way, "Sabine is Hutu, leave her

1    alone."  And I looked at the military captain with the

2    hope that he would release Sabine.  So he comes up to

3    me, and meanwhile I'm staying interposed between Sabine

4    and this other soldier trying to take her away, and he

5    opens the rear of his pocket and he takes out a typed

6    piece of paper, in fact there were two or three pages on

7    it with scribbles on the paper, and he looks at it very

8    carefully and then he looks straight at me and he says

9    in French, Doctor -- (reporter not able to interpret).

10   In other words, you are right, Doctor, you are right.

11   Sabine is Hutu.  But this baby she's carrying is going

12   to be Tutsi because her husband is Tutsi.

13          I felt numb.  I felt a bead of sweat behind my

14   neck when I realized for the first time in Rwanda that

15   the baby follows paternal line.

16          So they took Sabine away and at this moment I

17   thought the only way I can probably try to save the

18   situation myself is to try to get to Captain Nizeyimana

19   who was then the military -- and NGO liaison officer

20   appointed by Colonel Tharcisse Muvunyi.

21          So I go to the auditorium where they were

22   having a meeting and I find Captain Nizeyimana and I

23   told Captain Nizeyimana that this is what has happened

24   and we have to absolutely try to do something.

25          All he said was, well, I will try to

1   investigate and I will do what I can.

2           When I went back to the hospital, by this time

3   I was told that Sabine was actually killed and also

4   Nadine, Rose, Alexis and Jean-Marie, and by this time

5   there were patients being taken out, civilians, in

6   groups.  You could hear the screams, and at this moment

7   I decided that there was no more sense of neutrality in

8   this hospital, and in keeping with the word and the

9   position we have as a neutral organization, we decided

10  there was -- on the team, that it was time that we can

11  no longer uphold the principles that we stand by and

12  that we will not continue to work in this hospital.

13          It was already quite late, and remembering the

14  drive on the 19th through the border, the border closes

15  around six, I thought it's better to spend the night in

16  Butare rather than to try to get to the border because

17  we might be in no man's land.  So we spend the night at

18  home, and the next morning I go back to the auditorium

19  where Captain Nizeyimana had said, well, come over the

20  next morning and we will see what we could do.

21          When I come over he actually simply confirmed

22  the killing of civilians, including MSF staff, and says

23  to me that the situation is well beyond his control.  He

24  can do nothing to protect the security of the patients

25  at this hospital.  So that is the day we left.

1        Q.    Where'd you go?

2        A.    Went down to Burundi's border out to

3    Bujumbura.

4        Q.    Capital of Burundi?

5        A.    Yes.  And back to Europe.

6        Q.    The area around the University Hospital, what

7    kind -- can you describe that area around the hospital

8    itself?  Physically, was it a residential area or wooded

9    area?

10        A.    There was no -- it's not a residential area.

11    I mean, it was mainly -- the hospital is big, the

12    University Hospital, and behind it you have the

13    Institute of National Research, which is nationally used

14    for research.  So it's more a university kind of

15    structure with demonstrative, with -- mainly with

16    patient wards and so on.  The campus was actually on the

17    other side of where the hospital was, across the road.

18        Q.    The university campus was somewhere else?

19        A.    Yes, yes.

20        Q.    Did you return to Butare?  Have you returned

21    to Butare since then?

22        A.    No, I haven't.

23              MR. CHAKRAVARTY:  That's all I have, your

24    Honor.

25              THE COURT:  Mr. Howard?

1          MR. HOWARD:  Thank you.  Good afternoon,

2    Doctor.

3          THE WITNESS:  Good afternoon.

4          MR. HOWARD:  I promise to have you back on

5    that plane to Luxembourg very soon.

6                    CROSS-EXAMINATION

7    BY MR. HOWARD:

8      Q.   The first thing I'd like to talk to you about

9    is some of the geography around Butare, which you

10   learned of for the approximately two months that you

11   were there.  We saw -- and we'll put some maps up here

12   in a moment, but we saw that there was the main road in

13   Butare, and then there was a side road where the ESO was

14   located; correct?

15     A.   Yes.

16     Q.   And if you go north of the ESO on that side

17   road, you will come to the prefect.

18     A.   Yes.

19     Q.   And you will also come to I think it's the

20   road to Kabutare.  Is that right?

21     A.   No.  If you went along there, soon you will

22   come into the market area, which leads to the outer

23   limits.

24          Now, the road to Kabutare is on the other side

25   of the ESO.  But through the prefecture if you went

1    straight you would go to Kabutare.

2        Q.   Okay.  I'm going to try to zero in on this.

3    We'll keep it at this elevated view for the moment.  And

4    if we follow this bend in the road here we are going

5    south to north; correct?

6        A.   Yeah.

7        Q.   Where my finger is following is the main road

8    through Butare Town; correct?

9        A.   Yes.

10       Q.   This structure here is the hotel that you

11   talked about?

12       A.   Yes.

13       Q.   And then if I move my finger over this way,

14   we'll see the ESO is up in here; correct?

15       A.   Yes, that's correct.

16       Q.   The University Hospital, if you follow this

17   road down through here; right?  And I will come in on

18   the other side.  You follow this road down into the

19   hospital; correct?

20       A.   Yeah, I think that's correct.

21       Q.   Now, where these roads meet here where the ESO

22   is and the road down to the hospital, we would refer to

23   that as the junction; correct?

24       A.   Okay.

25       Q.   And then if we follow north of this road

1    through these dark clouds here, we saw that the

2    prefecture -- is this the prefecture?

3         A.   Yeah, that's right.

4         Q.   And so this is the Kabutare road.

5         A.   Right, if you went across all the way to the

6    right.

7         Q.   Then if we keep going up this way, where does

8    that go to?

9         A.   That goes to the market, and then it comes

10   back to the main road, and I believe it comes close to

11   the Hotel Ibis.

12        Q.   Now, the place you were living and the

13   headquarters for the MSF, the Doctors Without Borders,

14   was in a section called Buye?

15        A.   Yes.

16        Q.   And Buye is north and to the west of Butare

17   Town; correct?

18        A.   North and it should be east.

19        Q.   So if we go up this road here.

20        A.   It will be on the right side.

21        Q.   And how far do I have to go to get to Buye?

22        A.   Can we go down a bit?

23        Q.   Well, actually we've run out of photograph.

24        A.   I think we needed to go a bit further.  I

25   can't see the structures.  They're difficult.  But you

```
1    need to go way down and it was on the landmark.  It was
2    beside the Hotel Faucon.  There's a road to the right,
3    and if you went further, there was another one to the
4    right and a little bit further one to the right.  So
5    there is three roads you could get to the Buye area.  So
6    further north and then to the right there were roads
7    that you could get to this area.
8         Q.   And so when you would travel every day back
9    and forth from home and the headquarters to the
10   hospital, you would come down this road past the ESO and
11   right into the hospital because that was the easiest and
12   fastest way to go.  Correct?
13        A.   Yes.  Depended on -- yeah, we used both roads.
14        Q.   And what I heard you say to the prosecutor
15   when he was asking you questions, he asked you prior to
16   April 19th how many times you had gone by the hotel.
17   You said probably three or four.  Is that right?
18        A.   Prior to the 19th?
19        Q.   Yes.
20        A.   Yes, three, four.  Could have been more.
21   Depends on what we had to do.
22        Q.   Just a handful of times.
23        A.   That's right.
24        Q.   And that was before there were any roadblocks
25   in Butare Town.  There was a roadblock north that headed
```

1    out toward Kigali, and there was a roadblock in the

2    southern entrance of town.  Those were the regular

3    checkpoints where those arms that swing up and down, the

4    military checkpoints.  Those had always been there;

5    right?

6         A.   Yes.

7         Q.   There was nothing in Butare prior to roughly

8    the 16th to the 19th?

9         A.   Until the 16th.  16th we had the first

10   checkpoint going to the Congo on the access road.

11        Q.   Up to the 19th of April, you had gone the main

12   road past the hotel just a handful of times?

13        A.   Every day.

14        Q.   I meant down here, driving this way.

15        A.   Yes.

16        Q.   Okay.  Now --

17        A.   From the 17th we -- a handful of times, three

18   to four, we could have been six.  It all depends.  On

19   the average you could say about three to five times in

20   the least, in the least.

21        Q.   Sure, I'm fine with that.  I just wanted to

22   get a sense of your usual travel pattern.  That's all I

23   really wanted to do.

24             Now, Doctor, you have testified on a few other

25   occasions in the past in cases involving the genocide in

1  Butare; is that correct?

2      A.   Yes, that's correct.

3      Q.   You testified at the International Tribunal

4  back in 1997?

5      A.   Yes.

6      Q.   That was in a case of a fellow by the name of

7  Akayesu?

8      A.   Yes, that's right.

9      Q.   You testified again in the International

10  Tribunal in 2011 and that concerned this Captain

11  Nizeyimana?

12      A.   Yes.

13      Q.   That's the captain who you had some

14  conversations with in the last day or two that you were

15  in Butare?

16      A.   Yes, that's right, the military and NGO

17  liaison officer.

18      Q.   You provided testimony in this case before;

19  correct?

20      A.   Yes.

21      Q.   And then also one you didn't mention on your

22  direct, you've testified in Canada; right?

23      A.   Yes, I did.

24      Q.   That was for a case against a guy named Desire

25  Munyaneza; correct?

```
1         A.   Yes, that's correct.

2         Q.   That was in 2007 I believe?

3         A.   Yes, I think so.

4         Q.   Now, the Munyaneza case, Desire, he was a

5    person you understood that the authorities in Canada had

6    accused of being essentially involved with Shalom

7    Ntahobali; correctt?

8         A.   Yes.

9         Q.   And in that Munyaneza case you were asked

10   specific questions about the hotel that was owned by

11   Pauline; correct?

12        A.   Yes.

13        Q.   We'll come back to that in just a moment.  In

14   none of those cases, particularly the Munyaneza case,

15   you had no information whatsoever about Beatrice;

16   correct?

17        A.   I did not.

18        Q.   Before your involvement in this case you

19   didn't even know she existed, did you?

20        A.   No, I didn't know.

21        Q.   Everything that you have testified about here

22   -- strike that.  You had obviously some very horrific

23   experiences while you were in Rwanda.  Yes?

24        A.   Yes.

25        Q.   When you went out to the church at Kibeho and
```

```
 1   you saw and heard some horrific things there, that had

 2   nothing to do with Beatrice; correct?

 3        A.   No, sir, I have no idea at all that it did

 4   have anything to do with her.  I wouldn't know.

 5        Q.   When you traveled down to Burundi to the

 6   border, I think you were going to get supplies and maybe

 7   you were going to retrieve some staff, if I recall that

 8   discussion.

 9        A.   Yes.

10        Q.   You saw some horrible things there, too;

11   correct?

12        A.   Yes.

13        Q.   Many checkpoints along the way?

14        A.   Yes, indeed.

15        Q.   Beatrice had nothing to do with that?

16        A.   Yes, not to my knowledge, of course not.

17        Q.   Nothing to do with killing people along the

18   Burundi border; correct?

19        A.   No.

20        Q.   I think one of the first stories you told us

21   was having to travel out to Gitarama, sort of north and

22   east of Butare.

23        A.   Yes.

24        Q.   And there you encountered a fairly aggressive

25   checkpoint and some things happened in that exchange as
```

1   well, in that story; right?

2        A.   Yes, that's correct.

3        Q.   Again, nothing to do with Beatrice?

4        A.   No.  They were soldiers at the time.  There

5   were not civilians there.

6        Q.   You testified on direct that after

7   April 19th -- hold that question for a moment.  I want

8   to start with the morning of April 24th.  That's the

9   morning you left; correct?

10       A.   Yes.

11       Q.   You left your residence, the headquarters, and

12   the first thing you did was went to see the captain to

13   talk about the situation at the hospital?

14       A.   Yes.

15       Q.   Do you have any idea what time you actually

16   left town that morning?

17       A.   Probably around 11 o'clock or so.  I can't

18   really put my thumb on it, but we didn't do anything

19   else, so that's probably right.  Somewhere between -- in

20   the early morning hours I would say.

21       Q.   You met with the captain at the auditorium?

22       A.   Yes, that's right.

23       Q.   And that was up near the Hotel Faucon?

24       A.   I can show you exactly on this map where it

25   is.

1     Q.   That would be terrific.  Could you do that?

2     A.   Yes.

3          MR. HOWARD:  I don't know if you touch the

4  screen if it will give us that little purple mark again.

5     A.   So this is the road going to Kabutare.  So the

6  auditorium is just here.

7     Q.   After meeting with the captain at the

8  auditorium, did you go over to the hospital to retrieve

9  supplies and people who would be evacuating with you?

10    A.   No, I didn't.  Went straight through the main

11 road.

12    Q.   Who is the we?

13    A.   Myself and the rest of the team.

14    Q.   And you went directly south?

15    A.   Yes.

16    Q.   And you had no trouble leaving the town to

17 evacuate?

18    A.   No.

19    Q.   On the 23rd, the day before, it was the day

20 that your staff, the nurses, were taken by the soldiers?

21    A.   Yes.

22    Q.   You had meetings at the prefect and I believe

23 at the auditorium that day?

24    A.   On the 23rd.

25    Q.   Yes.  Is that the day that you picked up

1    Sylvain?  Do you recall?

2        A.    No, it's not Sylvain.  That was the 22nd that

3    I picked up -- not Sylvain at the prefet.  It was

4    Zephanie who was the sous-prefet, who was killed.  In

5    fact, I went to pick him up, but I didn't because

6    everyone in his family was actually killed.

7        Q.    I don't want to talk about the 22nd just yet.

8    On the 23rd, this is in a time in the few days where you

9    said your mission was confined to the hospital.  But you

10   did have meetings off the hospital grounds at least, at

11   the prefect?

12       A.    We did not have any meeting at the prefecture

13   if I remember right.

14       Q.    Okay.  You spent the day at the hospital?

15       A.    Yeah, I believe so.

16       Q.    On the 22nd other than security meetings you

17   spent the day at the hospital?

18       A.    The 22nd?

19       Q.    22nd.  I'm moving backwards in time now.

20       A.    Yes.  On the 22nd I spent time in the

21   hospital, I spent it at home, communications.  I can't

22   remember all the activities I did, but most time mainly

23   in the hospital from then on.

24       Q.    And on the 21st, that was a day also that you

25   spent at the hospital except for going to the prefect

1   and the Kabutare Hospital to look for those children.

2        A.    Yes.

3        Q.    Now I want to talk about the hotel.  You said

4   on direct that there was a roadblock in front of the

5   hotel.

6        A.    In the vicinity of the hotel.

7        Q.    What does that mean, in the vicinity of the

8   hotel?

9        A.    In fact, as I mentioned earlier on, the

10  checkpoints after the 17th were make-do checkpoints, and

11  interestingly the position -- now, I had not been to the

12  I'Huriro Hotel, and how exactly the checkpoints that

13  were there after, say, the 20th related to each

14  structure.  Because these are mobile checkpoints, they

15  varied.  What was that question again?

16       Q.    You have testified --

17       A.    Yes.  So there was a checkpoint in the

18  vicinity of the structure.

19       Q.    And I'm trying to get a sense of what that

20  means, to be in the vicinity of the structure.  Was it

21  south of the hotel?

22       A.    It could be south, it could be north.  I can't

23  remember -- there was a checkpoint after the Kabutare

24  checkpoint on that road which lies in the vicinity of

25  the I'Huriro Hotel and I even think there was a second

 1     one further down as time went by, but which date

 2     exactly, it's after the 20th I would say.

 3          Q.   Okay.  This is the intersection with Kabutare

 4     and the main road; right?

 5          A.   Yes.

 6          Q.   There's a checkpoint there?

 7          A.   There's a checkpoint exactly here, and that's

 8     where I said on the 17th a person was beaten to death.

 9     There was a checkpoint further north.  Now, this is the

10     access route.  Now, the numbers of checkpoints here

11     depends really on -- are we speaking of the main road,

12     access roads, and the point in time because they all

13     changed.  There was one going to Kabutare further down.

14     So the checkpoint here, it was exactly here, the one

15     beside the auditorium.

16          Q.   I'm trying to follow what you said.  If you're

17     at this point in Kabutare at the intersection, if you

18     come down the main road, --

19          A.   Yes.

20          Q.   -- were there additional checkpoints?

21          A.   Yes, there were.

22          Q.   And where were they located?

23          A.   They were located -- so I can tell you where

24     -- there was one somewhere around here.  It could be

25     here or here depending on the position in time,

1   somewhere there.  And then further down after the

2   Kabutare.  And then there was one beside the ESO, which

3   would be here.  Those are the ones I can remember now,

4   and there's one on the access road which unfortunately

5   when I touch I don't get.

6        Q.   That's up there.

7        A.   Okay.

8        Q.   And you're saying that in the vicinity of the

9   hotel sometimes you have them south and sometimes north.

10  Those checkpoints changed every day?

11       A.   They didn't change after the 20th.  Now, the

12  position with respect to the I'Huriro Hotel might have

13  changed.

14       Q.   That's what I'm asking you.  The one that you

15  say was in the vicinity of the hotel, did it change

16  after the 20th or not?

17       A.   When I say it's changed in terms of the hotel,

18  it could be 50 meters up, 50 meters down.  All I can say

19  is there was a checkpoint after the Kabutare one going

20  to the hospital, and there was probably even two at a

21  certain moment in time right before you could get to the

22  University Hospital where there was another one,

23  depending on which part of -- which day it was, on or

24  around the 20th to the 23rd.

25       Q.   This may seem like I'm quibbling, but this is

1    actually very important to me.  You testified in Canada;

2    correct?

3         A.   Yes, I did.

4         Q.   And just so we're clear, that was in a trial;

5    right?

6         A.   Yes.

7         Q.   Your testimony was under oath?

8         A.   Yes.

9         Q.   You were asked a direct question about

10   roadblocks in Butare?

11        A.   Yes.

12        Q.   And you identified eight roadblocks; correct?

13        A.   I said six to eight I believe.

14        Q.   And you told the people in Canada exactly

15   where those roadblocks were?

16        A.   Yes.  The question was not time bound though.

17        Q.   Okay.  You seemed prepared to tell me that the

18   question was not time bound.  Been thinking about it,

19   have you?

20             MR. CHAKRAVARTY:  Objection, your Honor.

21             THE COURT:  Sustained.

22        Q.   The question to you in Canada was in Butare

23   Town when you were present -- and we know that was up

24   until April 24th; correct?

25             (Witness nods head affirmatively.)

1          Q.   Did you hear about a person called Pauline

2     Nyiramasuhuko or her husband Maurice Ntahobali?  Do you

3     remember your answer to that question?

4          A.   Yes.  The answer is yes.

5          Q.   You had said I had heard of Pauline vaguely,

6     but I had never met her.

7          A.   That's completely correct.

8          Q.   And then the question had to do with her

9     physical residence.  Can you visualize where her

10    residence was?  And you said it was not far from the

11    roadway toward the University Hospital.  Correct?

12         A.   Yes, and on the left side.

13         Q.   And then you were asked:  And when you were

14    still in Butare was there a roadblock there.  Correct?

15         A.   Yes, that's correct.

16         Q.   And that's when you went through and you

17    identified some eight roadblocks in Butare?

18         A.   Yes.

19         Q.   And if we could come back to the map here, the

20    first roadblock you identified, there was one coming

21    into Butare from Kigali just after I believe the bridge.

22    That's the roadblock that's always there; right?

23         A.   Yes, that's a fixed one; right.

24         Q.   Then there was one at the junction of the road

25    going towards Rabuya, which is on the left.  That's much

```
 1   further north than what we're talking about in this
 2   picture; right?
 3        A.   That's correct.
 4        Q.   Then you said further down there was one at
 5   the Hotel Faucon?
 6        A.   Yes.
 7        Q.   Still north of what's in the picture here.
 8        A.   Yes, that's completely correct.
 9        Q.   Then you said there was one before this
10   building where we used this hall where we used to have
11   our meetings, and that's when we're getting into this
12   area, right, where the hall was.
13        A.   Yep, yep.
14        Q.   Then you said there was one before the ESO
15   barracks, and that's over here; right?
16        A.   Yes, that's correct.  More or less right
17   there.
18        Q.   And then you said there was one other before
19   the junction going into the University Teaching
20   Hospital, and we talked just a moment ago that that
21   junction is here.  Right?  That's the junction going
22   into the hospital.
23        A.   No, it's further down.  It's not that
24   junction.  It's further down.
25        Q.   Down in this area?
```

1      A.   It's close to the main entrance there was a

2  checkpoint, and there was one going into the hospital on

3  the side road.

4      Q.   So that's in here.  This collection of

5  buildings right here is the hospital campus; right?

6      A.   I can't get my bearings on the main entrance.

7  On this road coming in there was one there, and there

8  was one going into the hospital as well.

9      Q.   Okay.  So the main entrance of the hospital is

10 in the area where you drew the pink line?

11     A.   I think it's somewhere here, if I've got my

12 bearings right.  I'm not 100 percent sure.

13     Q.   Somewhere here, you went down to this area.

14 Is that what you're talking about?

15     A.   I think that's the other access, but I might

16 be mistaken there.  The picture's not really clear.

17     Q.   Then you said there's another one in front of

18 the UNHCR compound which was a bit outside of the

19 university main entrance.

20     A.   Yeah.

21     Q.   Now we're going further south; right?

22     A.   Whether it's south or whether it's before the

23 entrance, I can't remember anymore.

24     Q.   And then you said there was one before the

25 Cyarwa sector, and that's much further south.

1        A.    Yeah.

2        Q.    At no point did you say anything about there

3   being a roadblock in the vicinity of Pauline's house?

4        A.    Yes.  In that testimony I didn't, yes.

5        Q.    In fact what you said was:  Now, how does that

6   relate to Pauline's house?  I don't know.

7        A.    Yes, that's right.  I did not know at the time

8   how it relates, but I did not deny the existence of that

9   checkpoint.

10        Q.    You just had no idea where it was.

11        A.    I must say that I could not relate at the time

12   to it, unlike in this trial where the last testimony

13   when I was here after almost 17 years, I actually had

14   the privilege and luxury of looking at these satellite

15   pictures which of course refreshed my memory.

16        Q.    In fact, when you testified before in this

17   case, not only did you add to your list of roadblocks,

18   one in front of Pauline's house, you described it as the

19   most difficult roadblock in Butare, didn't you?

20        A.    Yes, I did.  Very difficult roadblock, yeah.

21        Q.    So after 17 years of mining your memory, not

22   only do you now add it to the list, it's the worst one

23   in town.

24        A.    It's a difficult one.  Now, the question is --

25   I think it's really relative.  The checkpoint in front

1    of Kabutare where somebody was beaten to death, the

2    checkpoint in front of Hotel Faucon where 30 people --

3    were they difficult or not?  The only reason why I after

4    the 20th stopped using this was the profile of that

5    checkpoint changed in terms -- that checkpoint had more

6    civilians, they had different kinds of military people.

7            Now, how it related to the I'Huriro Hotel and

8    its position in terms of that landmark I honestly could

9    not recollect at that time, and those checkpoints

10   changed in geographic positions, and to me the I'Huriro

11   Hotel per se was not a landmark that I would remember or

12   keep in mind because it's not a place I would go to.

13   The Hotel Faucon, the Hotel Ibis, the Kabutare, these

14   are points that I very closely identified with because I

15   used to go to those places.  So understandably I could

16   not relate it in those testimonies.

17           But here the fact that I've seen satellite

18   images brings back the memories of what it was, and as I

19   said, the question of how many checkpoints in Butare is

20   a time-bound one.  If it's before the 6th, for instance,

21   or the 6th to the 11th, there were only two and

22   occasionally three.  If it was from the 17th, there were

23   probably six or eight.  And from the 20th, there were

24   probably ten, eleven, or even twelve if you consider the

25   access roads.

36

```
 1       Q.   That's the first time you've ever said ten,

 2  eleven, or twelve is when you came here today; right?

 3       A.   Yes.

 4       Q.   You've always described it as six to eight and

 5  you've listed them, none of them including Pauline's

 6  house; right?

 7       A.   Yeah.  But the question is if you look at the

 8  main road or if you look at the access road.  Now, on

 9  the 19th --

10            THE COURT:  I'm sorry, but there's really no

11  question pending.

12            THE WITNESS:  Thank you, sir.

13       Q.   I think just a last question on this point.

14  The last time you testified, and we just talked about it

15  today, you described the roadblock at Pauline's house as

16  the most difficult one.   Right?

17       A.   As a very difficult one.  I don't know if I

18  said it was the most difficult one, but it was surely --

19  fair enough to say it was probably the most difficult

20  one to cross for us.

21       Q.   And when we talked about -- and this roadblock

22  in the vicinity of Pauline's house just came on the 20th

23  of April; correct?

24       A.   On or around the 20th.

25       Q.   So you were in Butare for a total of three and
```

1    a half days --

2         A.    Yes.

3         Q.    -- after this roadblock supposedly came up?

4         A.    Yeah, that should be right, yeah.

5         Q.    When you testified last time -- and, again,

6    you were under oath; right?

7              (Witness nods head affirmatively.)

8         Q.    Mr. Chakravarty asked you on redirect

9    examination:  Is there any doubt in your mind that there

10   was a roadblock in front of Pauline's house?  And you

11   said there isn't.  I would doubt the dates of exactly

12   when it was, but I had been through that road over five

13   times every day.  Right?

14        A.    Yes.

15        Q.    I guess what I have some trouble with is if

16   this roadblock is one of the most difficult ones, prior

17   to the roadblock coming in on the 20th, according to

18   you, you'd only been by that hotel three or four times

19   in two months.  Now it's got the most difficult

20   roadblock and you're going by it five times a day?  Why

21   were you doing that?

22        A.    Well, we went through it probably five times a

23   day initially.

24        Q.    But why?

25        A.    Because we used it for the main -- to go to

38

1  the hospital.  And then I shifted using the ESO road.  I

2  don't know if I've got the question right.

3      Q.   What you had said before under oath when you

4  were testifying in the ICTR, you said you usually took

5  the back road to the hospital, and you told us that here

6  today?

7      A.   Yes.

8      Q.   In fact, you only took the main road three or

9  four times in two months.

10      A.   No, that's not true, sir.

11      Q.   That's what you said.

12      A.   Well, it depends on when in time, sir.

13      Q.   After the roadblock goes in, according to you,

14  instead of taking the back road, which by your testimony

15  is easier, you choose to go through that roadblock five

16  times a day and it's the most difficult one to get

17  through.  My only question is why would you do that?

18      A.   Five times, sir, a handful of times, it might

19  have been three, it might have been two.  We tried to

20  avoid that roadblock.

21      Q.   And you could.  With every trip you took in

22  Butare you could avoid it by going on the road past the

23  ESO which was easier to take.

24      A.   Yes.  But it's sometimes important to know

25  what is happening in a situation such as this.  We try

```
 1    not to avoid, sir, in the work we do as you quite well
 2    have seen from what I said.  We tried to go back, for
 3    instance, to Kibeho.  This is part of our work, and to
 4    know what's happening and which of the access roads,
 5    it's important to sometimes try to go through and see if
 6    you can negotiate and then take your operational
 7    positions.  Part of our job is to try to find out what
 8    is happening so that we can adapt our operational
 9    strategies.  So I might have gone through.  Now, how
10    many times?  Five, four, couple maybe.
11         Q.   Okay.  What we talked about when I first
12    started asking you questions, and you confirmed it with
13    the prosecutor, the 21st, 22nd, and 23rd you confined
14    your mission to the hospital, and I confirmed with you
15    that at least on the 22nd and 23rd, except to go look
16    for those children and except to meet with the captain,
17    you didn't leave the hospital.
18         A.   No, that's not true, sir.  This is the main
19    incident.  We might have gone several times home, and
20    otherwise I can't remember that.
21         Q.   Okay.  Well, if you left several times to go
22    home, you're going to take the back road because that's
23    the easiest way to go?
24         A.   As I said, I might have taken one or the
25    other, sir.  I can't remember now how many times I took
```

1    this road.

2         Q.    Didn't see any killings at the roadblock in

3    the vicinity of Pauline's house; right?

4         A.    No, I did not.

5         Q.    Didn't see a woman working there, did you?

6         A.    I can't recollect, sir.

7         Q.    Just two quick questions.  You testified under

8    oath before you were asked where the EER is, the

9    Episcopal school.  You don't know where that is, do you?

10        A.    No, I don't remember, sir.

11        Q.    And do you know where the research institute

12   is, the IRST?

13        A.    That's behind the hospital, sir.

14             MR. HOWARD:  Thank you, Doctor.  Back to

15   Luxembourg as soon as Mr. Chakravarty is done I suppose.

16             THE COURT:  Any redirect?

17             MR. CHAKRAVARTY:  Just very briefly to

18   clarify.

19                    REDIRECT EXAMINATION

20   BY MR. CHAKRAVARTY:

21        Q.    Mr. Howard asked you if you passed the hotel

22   three or four times a day, more than five times a day

23   after the 20th.  Can you explain in your own words how

24   frequently you passed that hotel?  And you can use the

25   time reference that you find the most useful to explain

1    it to the jury.

2         A.    So probably on the 20th I used that road three

3    or four or five times.

4         Q.    Is that five times a day?

5         A.    Five times a day, sir, yeah.

6         Q.    And so when you said earlier before

7    April 20th, when you said you would pass it three or

8    four times, were you saying three or four times per day

9    or three to four times in two months?

10        A.    Three or four times a day, yeah.  This was the

11   best road and the tarred road going to the hospital.  So

12   you could use that road.  That was the fastest way

13   through and the straightest way.

14        Q.    So you mentioned it's the tarred road going

15   through town.  You mean -- what you mean by that is it's

16   a paved road.

17        A.    Yes, that's right.

18        Q.    The rest of the roads in Butare were dirt

19   roads; right?

20        A.    Part of them are tarred, part of them are

21   dirt.

22        Q.    So that's how important this artery was

23   through Butare that it was paved; is that right?

24        A.    Yes, that's right.

25        Q.    So the fact that you didn't have any business

42

1    at Pauline's house is why you didn't have a specific

2    memory when you testified about other things in other

3    cases about exactly where that roadblock was.

4         A.   Yes, correct.

5         Q.   And the Canadian case involving Mr. Munyaneza,

6    that's not related to this case; correct?

7         A.   I believe not, no.

8         Q.   So it was in this case that we asked you about

9    when that roadblock -- you remember that roadblock with

10   regards to Pauline's house; correct?

11        A.   Yes.  But the defense just asked me -- they

12   did ask me that question, and I said I could not relate

13   to the hotel.

14        Q.   You also said that it was not referenced by

15   time.

16        A.   Yes.

17        Q.   What did you mean by that?

18        A.   Because the numbers of roadblocks in Butare

19   changed over time.  From the 6th to the 11th or the 12th

20   we had two or three checkpoints.  From the 17th we

21   probably had -- 17th or 20th, on or around, we had maybe

22   six or eight.  And after the 20th if you included the

23   access roads, then you probably had over ten or

24   somewhere in the range of ten or eleven possibly.

25        Q.   You've mentioned a lot of roadblocks today

```
 1   that occurred in Butare, but I haven't asked you where

 2   every single one of those was; correct?

 3        A.   Yes, you haven't.  No, I don't remember that.

 4   No, you haven't.

 5        Q.   And so Mr. Howard already iterated this

 6   question, but is there any doubt in your mind based on

 7   your memory of being there as to whether there was a

 8   roadblock in the vicinity of the I'Huriro Hotel?

 9        A.   No, I have no doubt, sir, after the 20th.

10        Q.   And you described -- Mr. Howard asked you what

11   the vicinity means, and you said it could be anywhere

12   from 50 meters up to 50 meters below where the hotel

13   was; correct?

14        A.   Yes.

15        Q.   So that would be in this area; right?

16        A.   Yes.

17             MR. CHAKRAVARTY:  Thank you, your Honor.

18             THE COURT:  All right, thank you.  Thank you,

19   Doctor.  You're free to leave, you're excused as a

20   witness, and thank you.

21             Mr. Capin, you may call your next witness.

22             MR. CAPIN:  Thank you, your Honor.  The

23   government calls Thierry Sebaganwa.  And your Honor, we

24   have an interpreter to be sworn.

25             (Sabrina Iyadede and Freddy Munana duly
```

1   sworn.)

2           THE CLERK:  For the record can you please

3   state your name and spell your last name.

4           MS. IYADEDE:  Sabrina Iyadede, I-Y-A-D-E-D-E.

5           MR. MUNANA:  Freddy Munana, M-U-N-A-N-A.

6           THE CLERK:  Thank you.

7                   THIERRY SEBAGANWA

8       having been duly sworn, testified as follows:

9           THE CLERK:  For the record please state your

10  name.

11          THE WITNESS:  Thierry Sebaganwa,

12  S-E-B-A-G-A-N-W-A.

13          THE COURT:  Can you hear, Mr. Ruoff?

14          MR. RUOFF:  Yes, I can.  Thank you.

15          THE COURT:  Anytime you're ready.

16                  DIRECT EXAMINATION

17  BY MR. CAPIN:

18          MR. CAPIN:  Good afternoon, Mr. Sebaganwa.

19  Could you please pull that microphone closer to your

20  mouth so we can all hear you.

21          THE COURT:  Actually if the interpreter could

22  adjust your microphone and speak up.

23          MR. CAPIN:  Now, I'm going to ask you to keep

24  your voice up so that the members of the jury can hear

25  everything you say.

```
 1              THE COURT:  Again, it's more important that

 2    they hear the translator.

 3              MR. CAPIN:  Madam interpreter, I would also

 4    ask you to speak up as well.

 5              THE INTERPRETER:  I apologize.

 6         Q.   Mr. Sebaganwa, how are you employed?

 7         A.   I work in marketing in a company called SP.

 8         Q.   And what is that company?

 9         A.   We sell oil products in Rwanda.

10         Q.   And have you been working -- how long have you

11    been working in marketing for this petroleum product

12    company?

13         A.   I've been there for one year.

14         Q.   What year were you born, sir?

15         A.   I was born in 1972.

16         Q.   Can you describe your education please for the

17    jury.

18         A.   I studied primary school, secondary school,

19    and I also went to college.

20         Q.   Did you receive a college degree?

21         A.   Yes.

22         Q.   In what field?

23         A.   In engineering and electro-mechanical.

24         Q.   So is your degree in electrical mechanical

25    engineering?
```

46

```
 1        A.    Yes, with the electronic option.

 2        Q.    And where did you go to university or to

 3   college?

 4        A.    I studied in the city of Butare.

 5        Q.    What was the name of the university?

 6        A.    National University of Rwanda.

 7        Q.    Before you went to university, did you finish

 8   secondary school or high school?

 9        A.    Yes.

10        Q.    How many years does one attend secondary

11   school in Rwanda before going to college?

12        A.    Six years.

13        Q.    And before that six years of secondary school,

14   how many years of primary school did you attend?

15        A.    Eight years.

16        Q.    Where did you attend secondary school?

17        A.    I also studied in the city of Butare.

18        Q.    And what was the name of your secondary

19   school?

20        A.    Group of parents.

21        Q.    Groupe Scolaire de Fures, is that a private

22   school sponsored by parents?

23        A.    It's a private school that was created by

24   parents and that's funded by parents.

25        Q.    And is that school in Butare Town?
```

```
 1        A.   Yes.

 2        Q.   Did you grow up in Butare?

 3        A.   It's even there that I was born.

 4        Q.   And what part of Butare did you grow up in?

 5        A.   I would say that I was raised in the district

 6   of Ngoma in the city of Butare.

 7        Q.   Is that near a military establishment called

 8   Ngoma Camp?

 9        A.   Yes.

10        Q.   Is that near the airport?

11        A.   Yes.

12        Q.   So walking from your home to the center of

13   Butare would take how long approximately?

14        A.   I would say about 15 minutes.

15             MR. CAPIN:  May I approach, your Honor?

16             THE COURT:  Anytime, Mr. Capin.

17             MR. CAPIN:  Thank you, your Honor.

18        Q.   I'm going to show you what's been marked for

19   identification as Exhibit 22.  Sir, can you tell me if

20   you recognize that photograph?

21        A.   Yes, I recognize this picture.

22        Q.   Do you recognize all of the people depicted in

23   that photograph?

24        A.   I know all of them.

25             MR. CAPIN:  I offer Exhibit 22 at this time,
```

1   your Honor.

2              THE COURT:   Any objection?

3              MR. RUOFF:   No objection, Judge.

4              THE COURT:   ID may be stricken on Government's

5    22.

6              (Government's Exhibit 22 admitted.)

7              MR. CAPIN:   I'm going to put this on the

8    computer screen.  Do you see the computer monitor to

9    your right?  Now, sir, if you touch the monitor like

10   this -- will the interpreter instruct him to look in my

11   direction.  If you touch the computer monitor with your

12   finger in this fashion, it will make a mark on the

13   screen that we can all see.

14       Q.   So one at a time, would you point to each

15   individual in this photograph and tell us who they are.

16       A.   This is me.

17       Q.   So that's you right there?

18       A.   Yes, this is me.

19       Q.   Approximately how old were you when that

20   photograph was taken?

21       A.   I was about 17 years old.

22       Q.   Tell us who else is in the photograph.

23       A.   This boy's called Habinshuti Venuste.

24              MR. CAPIN:   I'm sorry, I think I inadvertently

25   erased your mark.  I will point to people, you tell me

```
 1   who they are, okay?

 2        Q.    That is you; correct?

 3        A.    Yes.

 4        Q.    Who is that?

 5        A.    This is Venuste.

 6        Q.    Was he a teenage friend of yours?

 7        A.    Yes.

 8        Q.    Who is that?

 9        A.    Her name is Alice.

10        Q.    Also a friend?

11        A.    I just -- I knew her.  She was a friend.

12        Q.    Who is that?

13        A.    This is Shalom.

14        Q.    Was he a friend?

15        A.    Then, yes, he was still my friend.

16        Q.    Who is that?

17        A.    This is Heidi.

18        Q.    Is she a friend?

19        A.    Yes.

20        Q.    How about that?

21        A.    Eugene.

22        Q.    Another friend?

23        A.    We were kind of friends.

24        Q.    Who is this?

25        A.    This white person, I'm not sure I know them,
```

```
 1    but they were tourists.  They were on vacation.

 2        Q.   And who's she with?

 3        A.   This is Eugene.

 4        Q.   I'm going to circle the person you identified

 5    as Shalom.  Did I circle the correct person?

 6        A.   This is Shalom.

 7        Q.   What was Shalom's full name?

 8        A.   It's Ntahobali.

 9        Q.   Now, is it common in Rwanda to have a

10    Christian first name such as yours, Thierry, and an

11    African surname, such as Sebaganwa?

12        A.   Yes.

13        Q.   So the gentleman circled -- the man circled on

14    Exhibit 22, his Christian name was Shalom?

15        A.   That's what I know him by.  That's what I knew

16    him by.

17        Q.   And his African name was Ntahobali?

18        A.   Ntahobali.

19        Q.   I'm not going to try to pronounce that name.

20    I will refer to him as Shalom for today's purposes.

21    Okay?

22        A.   Okay.

23        Q.   When did you meet Shalom?  Or put differently,

24    what grade were you in in school when you met Shalom?

25        A.   We were in primary school.
```

1          Q.    Do you remember approximately what grade you

2    met him in primary school?

3          A.    I was about the fifth year out of six.

4          Q.    And how did you meet Shalom?

5          A.    We see every year Habyarimana Juvenal, the

6    president of Rwanda.  He had a month where he would tour

7    around the country.  Then students of primary schools,

8    they would train us to march -- to march in front of him

9    to welcome him.  So you understand that all the schools

10   would get together.  Most of the time they will pick

11   students that are at least in the fourth year up to the

12   eighth year.  And then we'll go like to the stadium and

13   just march, celebrate him.  And then in those camps,

14   trainings, that's when all the youth will meet.  We'll

15   play soccer against other schools, and so that is where

16   I met Shalom.

17         Q.    And did you see Shalom -- how often did you

18   see Shalom while you were in high school?

19         A.    You see, Shalom's father was rector of the

20   National University of Rwanda where they lived.  It was

21   close to the Groupe Scolaire where I studied.  So we

22   will meet, for example, during lunch break.  He was

23   leaving college and I was also going home and we will

24   say hello to each other many times.  And this picture is

25   proof -- is the best proof that we knew each other.

52

1      Q.    Was Shalom in the same year as you in high

2   school?

3      A.    No, he was above me about two years.

4      Q.    When he graduated from high school do you know

5   where he went?

6      A.    That's when he went to study in the National

7   University of Rwanda.

8      Q.    Did you ever have occasion to see him when he

9   was studying at the university?

10     A.    Twice a week I had like lab work to do at the

11  National University of Rwanda for school.

12     Q.    So as a high school student you would go to

13  the university twice a week?

14     A.    Yes, because my teachers in high school were

15  also sometimes teachers in the university.

16     Q.    How would you get from the Group Scolaire to

17  the university?  Would you walk or would you go in a

18  vehicle?

19     A.    In Butare everything is nearby.  It's a city

20  that's very -- the school and university were nearby.

21  To go from Groupe Scolaire de Fures I would pass by the

22  Ibis and then I will pass by the EER, which is a school.

23  It was a church.

24     Q.    Sir, just so the record is clear, you speak

25  Kinyarwanda; correct?

53

```
 1        A.   Very, very well.

 2        Q.   And you also speak some French?

 3        A.   Yes.

 4        Q.   And I think we're all perceiving you speak

 5   some English also.

 6             MR. CAPIN:  The record will show that the

 7   witness gestured so-so, your Honor, if I may.

 8        Q.   So I'm going to move this along.  Was the

 9   university close enough so that you could walk from the

10   Group Scolaire to the university twice a week to do your

11   lab classes?

12        A.   Yes.

13             MR. CAPIN:  Judy, is 5B in evidence?

14             MR. RUOFF:  Yes, they are all in.

15             THE COURT:  All of five.

16        Q.   Sir, I'm going to put on the monitor to your

17   right a photograph and --

18             THE COURT:  Is this really necessary?  Move it

19   along.  We've established this very well.

20             MR. CAPIN:  It is.  I wouldn't do it if it

21   weren't, your Honor.

22             THE COURT:  Yes, you would.  Let's not spend a

23   lot of time.  It's not a great photograph and it's

24   confusing.

25             MR. CAPIN:  We're not going to.  I will make
```

54

1    it as simple as possible.

2         Q.    Have you seen this photograph previous to

3    testifying this afternoon?

4         A.    Yes, I was shown this picture before.

5         Q.    Do you recognize any of the structures in the

6    picture?

7         A.    I know all of this.

8         Q.    Okay.  Without going into too much detail in

9    the interest of time, would you please circle -- I'll

10   circle something.  Do you recognize this structure?

11        A.    Yes, I know this place.

12        Q.    What is it?

13        A.    It's a primary school that was built by EER --

14   called EER.

15        Q.    Did you say ER or EER?

16        A.    Okay.  So it's a school that was built by the

17   church.

18        Q.    So it's a church school.  Is it a primary

19   school?

20        A.    Yes.

21        Q.    And do you recognize -- is this a road you're

22   familiar with?

23        A.    I know this road.

24        Q.    And is this a road you are familiar with?

25        A.    Yes.  I know it.

55

1      Q.   What does this road lead to in that direction?

2      A.   This road leads to ESO.

3      Q.   Is that a military establishment?

4           THE COURT:  We can assume he's familiar with

5      his town, and the past witness has already gone over

6      this photograph as to what things are.  So let's not

7      establish that he knows where his town is.  Let's get

8      right to the point.

9      Q.   Now, do recognize the building that I just

10     circled, sir?

11     A.   Yes, I know this house very well.

12     Q.   What is that structure?

13     A.   It's a building that was built by a man called

14     Ntahobali Maurice.

15     Q.   Who is Ntahobali Maurice?

16     A.   It's Shalom's father, and he's also the

17     husband of Pauline Nyiramasuhuko.

18     Q.   Do you know if -- was Pauline -- and I'm going

19     to use only first names.  Was Pauline Shalom's mother?

20     A.   Yes.

21     Q.   Do you know if Pauline and Maurice had any

22     other houses in Butare?

23     A.   Yes, I think they had another house in

24     Cyangugu right under -- not far from the university.

25     Q.   So you said that Maurice was the rector of the

56

1    university.  What did Pauline do for a living?

2        A.   She was a minister of MRND in the government.

3        Q.   She was an MRND cabinet minister?

4        A.   She was a minister of MRND in many political

5    parties.

6        Q.   Do you mean during the multi-party period in

7    Rwanda?

8        A.   Yes.

9        Q.   Do you know if -- you said Pauline and Maurice

10   were the parents of Shalom?

11       A.   Yes.

12       Q.   Did Maurice and Pauline have any other kids?

13       A.   I remember Clarisse, and the other ones were

14   really young.

15       Q.   Shalom had a sister named Clarisse; is that

16   correct?

17       A.   Okay.  Clarisse was older than Shalom.

18       Q.   And did he have younger siblings?

19       A.   Well, he had other siblings really young, but

20   I didn't really have any contact with them.  I just saw

21   them from afar.

22       Q.   Were the other siblings brothers or sisters?

23       A.   They were girls, sisters.

24       Q.   So Shalom was the only son of Pauline and

25   Maurice?

```
 1        A.    Yes.

 2        Q.    Do you know if Shalom ever married?

 3        A.    Yeah, he married.

 4        Q.    Do you know approximately when he married?

 5        A.    Around the end of 1993.

 6        Q.    Were Pauline and Maurice well-known in Butare

 7   Town?

 8        A.    Very much.

 9        Q.    Before 1994 was Pauline the only national

10   government cabinet minister living in Butare?

11        A.    Within the MRND, yes.

12        Q.    Were there any other cabinet ministers at all

13   before 1994 living in Butare?

14        A.    I believe that that was the only one.

15        Q.    And you said that Maurice was the rector of

16   the university.  Was that the only university in town?

17        A.    Yes.  That was the only National University in

18   Butare.

19        Q.    And was the president of the university a

20   political appointment?  Was he appointed politically by

21   someone?

22        A.    Yes.  He was selected, you know, in the

23   political context.

24        Q.    Who appointed the rector of the university?

25        A.    It's the president, the president of the
```

58

1    country.

2        Q.    And before April 1994 who was the president of

3    the republic?

4        A.    Habyarimana Juvenal.

5        Q.    So when Shalom married -- do you know the name

6    of the person Shalom married?

7        A.    Her name was Beatrice.

8        Q.    When Shalom married Beatrice, was that big

9    news in Butare?

10        A.    Of course.

11        Q.    Do you know if Shalom and Pauline ever had

12    kids?

13        A.    Yes, they had kids.

14            MR. RUOFF:  I'm sorry, I think the question

15    was did he know whether or not Shalom and Pauline ever

16    had kids.

17            MR. CAPIN:  Thank you, Mr. Ruoff.

18            MR. RUOFF:  And the answer's yes.

19            THE COURT:  That was the question.  Do you

20    want to rephrase it?

21            MR. RUOFF:  I'm concerned about the

22    translation.

23            THE COURT:  Well, the translation could be

24    accurate.  It's perhaps a misunderstanding.

25            MR. CAPIN:  Perhaps I misspoke.

1        Q.    Do you know if Shalom and Beatrice ever had

2   any children?

3        A.    Yes, because when they got married she was

4   pregnant.

5        Q.    So did they have a child in 1993?

6        A.    You know, around end of '93, beginning of '94,

7   yes.

8        Q.    I'm going to ask you some questions about

9   political parties in Rwanda.  Was there a time in Rwanda

10  when there was only one political party?

11       A.    We were born and raised with the mindset that

12  there was only one political party.

13       Q.    And what was the sole political party when you

14  were born?

15       A.    MRND.

16       Q.    Was there a time when other political parties

17  were permitted to form in Rwanda?

18       A.    Yes.

19       Q.    And in what year was that?

20       A.    1992.

21       Q.    After 1992 did you see much political activity

22  in Butare?

23       A.    There were meetings and demonstrations.

24       Q.    And by demonstrations, do you mean kind of

25  like rallies?  What we call rallies in this country?

1        A.    So it was pretty much demonstrations, rallies,

2    youths gathering in the street and chanting and speaking

3    about what they were going to do.

4        Q.    Did you see that type of demonstration by the

5    MRND?

6        A.    Yes.

7        Q.    And you mentioned youth.  Did the MRND have a

8    youth branch?

9        A.    Yes.  Their youth were called Interahamwe.

10       Q.    Did you see the Interahamwe participate in

11   these rallies and manifestations in Butare?

12       A.    Yes.

13       Q.    Do you know what party Shalom belonged to?

14       A.    Pauline, Shalom, Beatrice, Ntahobali Maurice,

15   all of them were in MRND.

16       Q.    So was Shalom a member of the Interahamwe?

17       A.    Very much so, very prominent.

18       Q.    Was Beatrice a member of the Interahamwe?

19       A.    And she knows it.

20       Q.    Well, sir, that was a yes or no question.

21            MR. RUOFF:  We'll accept the answer, Judge.

22            THE COURT:  Well, it's not responsive.

23       A.    Yes.

24       Q.    Did the MRND members -- strike that.  Did any

25   MRND members wear any sort of distinctive clothing

1  during political rallies?

2         MR. RUOFF:  Objection, no foundation, Judge.

3         THE COURT:  That's correct.  Lay a foundation.

4    Q.   When you saw political rallies in Butare, were

5  there ways that you could tell what party was conducting

6  the rally?

7    A.   It will depend on what they are wearing and

8  what they are chanting, and also before that there will

9  be announcement on the radio saying which party is going

10  to have a demonstration, a rally, a meeting.

11    Q.   Were there occasions in Butare when you heard

12  such announcements announcing MRND rallies?

13    A.   Yes.

14    Q.   And when you saw the rallies following such an

15  announcement, did MRND members ever wear distinctive

16  clothing?

17    A.   They were wearing uniforms.

18    Q.   Did all parties have such uniforms?

19    A.   No.  Each party had their own uniform and

20  their own colors.

21    Q.   Can you describe generally the uniform of the

22  MRND?

23    A.   Yes.

24    Q.   Please describe it generally.

25    A.   The colors of MRND, it was black and red and

1    green.  A lot of times they will wear those colors on

2    their hats and they will put a little medallion

3    depicting Habyarimana.

4         Q.   The president?

5         A.   Yes, the president of MRND.  And then they

6    bought a uniform, an African print, and the most primary

7    colors were green and yellow, and there were also four

8    letters, MRND, in a circle, organized in a circle.  Yes.

9         Q.   And did all MRND members participating in

10   rallies wear such clothing?

11        A.   They were wearing those clothes.

12        Q.   My question was were all participants in a

13   rally wearing that clothing or were only certain

14   participants wearing that clothing?

15        A.   The clothes that I explained the first time --

16   the second time were clothes that were worn by important

17   members, the members of -- superior members.

18        Q.   The leaders?

19        A.   The leaders.

20             MR. RUOFF:  Judge, I'm going to object on

21   basis of knowledge and foundation.  I mean it's one

22   thing if he actually notices, but it's unclear --

23             THE COURT:  I thought that's what you were

24   driving at earlier.  The foundation he was looking for

25   was personal knowledge.

63

1           MR. CAPIN:  Okay.

2      Q.   Did you personally see people wearing --

3           THE COURT:  No, no, does he know.

4           MR. CAPIN:  Does he know?

5           THE COURT:  What's the basis of his personal

6  knowledge that MRND wears these colors.  How does he

7  know that.

8      Q.   You described a particular uniform.  How do

9  you know that that uniform was worn by important MRND

10  members?

11     A.   Because it was worn by important people and

12  people in their circle, and it was also worn by

13  Interahamwe.  And then the regular people, the common

14  people who were a member of the MRND, most of the time

15  they will have hats -- most of the time they will have

16  hats with the color black, red, and green and a

17  medallion with Habyarimana on it.

18     Q.   In this country we have political parties and

19  there are certain symbols commonly known associated with

20  those parties.  Was this African print that you

21  described commonly known in Butare to be associated with

22  the MRND?

23     A.   Yes.

24     Q.   Would you please tell this jury if you

25  personally with your own eyes saw people wearing that

64

1    clothing before the genocide in Butare.

2         A.    Yes.

3         Q.    Did you ever see Beatrice wearing that

4    clothing?

5         A.    Yes.

6         Q.    On more than one occasion?

7         A.    I remember twice.

8         Q.    Before you describe those two occasions, I'm

9    going to show you what's been marked for identification.

10               MR. CAPIN:  I'm going to show the witness

11   Exhibits 25L -- I'm sorry, 25J, 25L, and 25N and I would

12   move to strike the ID, your Honor.

13               THE COURT:  Objection?

14               MR. RUOFF:  No objection, your Honor.

15               THE COURT:  ID may be stricken on 25J, L, and

16   N.

17               (Government's Exhibits 25J, 25L, and

18               25N admitted.)

19        Q.    I'm going to show you -- do you see the

20   photograph I put on your screen to your left which is

21   25N?

22        A.    Yes.

23        Q.    And am I correct in noting there are men and

24   women depicted in that photograph?

25        A.    Yes.

65

 1      Q.    Do you recognize the type of clothing the ones

 2  I'm pointing to are wearing?

 3      A.    Yes.

 4      Q.    What do you recognize that to be?

 5      A.    This is Interahamwe clothing.

 6      Q.    Is this the type of African print uniform you

 7  were describing a moment ago?

 8      A.    Yes.

 9      Q.    Is this the type of print that you saw

10  Beatrice wearing?

11      A.    She had this in her dress.

12      Q.    In the form of a dress?

13      A.    Yes, she had this clothing in the form of a

14  dress.

15      Q.    Did you see Shalom wearing this clothing as

16  well?

17      A.    Yes.  He had it in the form of a very wide

18  shirt and shorts.

19      Q.    I'm circling -- I notice that somebody in this

20  photograph is holding up a sign that says MRND Commune

21  Kicukiro?

22      A.    Yes.

23      Q.    Was it common during MRND rallies in Butare

24  for people to hold signs indicating what party they

25  belonged to?

1      A.   Yes.

2      Q.   I'm going to show you another photograph.  I

3  think it's a little -- shows more detail.  Do you

4  recognize what the two men that I'm pointing to here are

5  wearing?

6      A.   Yes.

7      Q.   Is that the same type of MRND uniform you

8  described?

9      A.   Yes.

10      Q.   And similarly -- that is Exhibit 25L.

11  Similarly I'm going to show you 25J.  Is the man on the

12  right wearing the same type of uniform?

13      A.   Yes.

14      Q.   Now, are you able to make out any letters in

15  these photographs, any letters appearing on the uniform?

16      A.   I don't see any.

17          MR. CAPIN:  Move to strike the ID on 26D.

18          THE COURT:  Objection?

19          MR. RUOFF:  No objection.

20          THE COURT:  ID may be stricken on 26D.

21          (Government's Exhibit 26D admitted.)

22          MR. CAPIN:  And also, your Honor, if I may, I

23  believe this is 26C.

24          THE COURT:  It looks like C.

25          THE CLERK:  It's on the top.

67

1          MR. RUOFF:  In any event, no objection, Judge.

2          THE COURT:  No objection, ID may be stricken

3    on 26C.

4          (Government's Exhibit 26C admitted.)

5     Q.   Now, do you recognize this, sir?

6     A.   This is what I was talking about.

7     Q.   Now, to be clear, you've never seen this exact

8    object before, I mean this example of a uniform, have

9    you?

10    A.   I know this clothing.

11    Q.   Do you recognize this to be the MRND clothing

12   you saw Interahamwe wearing in Butare?

13    A.   When I see this, this is what he means.

14    Q.   What I'm asking is this example of the

15   clothing, you don't know who this belongs to.

16    A.   That one, no.

17    Q.   But this example is helpful.  You described

18   letters appearing somewhere in a circular pattern.  Can

19   you make out any letters on this and point to them.

20          MR. CAPIN:  Perhaps you can step down.  May I

21   ask the witness to step down?

22          THE COURT:  Certainly.

23    Q.   Do you see any lettering on this uniform?

24    A.   Yes.

25    Q.   Would you please point to the lettering.

1      A.   MRND.

2      Q.   Do you also see it here?

3      A.   Yes, it's the same thing, MRND.

4      Q.   And that lettering is not visible on the

5  photographs I showed you?

6      A.   They're not clear.

7      Q.   And before you came into this courtroom today,

8  I had never shown you this?

9      A.   No.

10     MR. CAPIN:  Please take the stand, sir.  This

11  may be a good time for a break, your Honor.

12     THE COURT:  Ladies and gentlemen, we'll

13  adjourn for the day and we'll resume tomorrow morning at

14  9 o'clock.  Again, please let me caution you not to

15  discuss the case with anyone.  Also, please again avoid

16  any media.  There may be media coverage, so avoid any

17  possible exposure to media coverage about the trial.

18  We'll see you tomorrow morning at 9 o'clock.

19     (Jury exited courtroom.)

20             BEFORE THE COURT

21     THE COURT:  I don't mean to keep getting in

22  your way, but I feel like you're getting bogged down in

23  this.  I don't want to go through that again, days and

24  days going through the photographs and stuff.  I'm

25  keeping a current list of things we don't need to do

1    much of.  Shalom is the son of Maurice and Pauline.  We

2    don't need to do that with every witness.  Shalom's

3    mother and father own the hotel.  We don't need to do

4    that with every other witness.  Pauline was an MRND

5    minister.  Don't have to do that with every witness.

6    Maurice was the director of the university, done.  Where

7    the camp is, where the university is, where the EER is,

8    where the main road is on the satellite photo, where

9    people move around and what the buildings are, I mean, a

10   little more, but not a lot of that because it's so

11   boring and it's so confusing and it's so repetitive and

12   it takes so much time.

13            MR. RUOFF:  We have no objection with boring

14   and repetitive.

15            THE COURT:  I know.  But it really takes so

16   much time.  We're losing the jury.

17            MR. CAPIN:  And your Honor, frankly, I think

18   for both, we are grateful for the guidance.  We don't

19   want to bore you or the jury.

20            THE COURT:  It's not guidance.  A map would be

21   a lot better.  Nobody can look at that and figure out

22   where the road is.

23            MR. CAPIN:  The issue of course with regard to

24   certain things is to the extent that there is --

25            THE COURT:  Sure.  I'm just saying you don't

1  need to put witnesses on and say, now, can you show us

2  where the main road is.  Please.  The jury knows where

3  the main road is.  At least they know where that thing

4  on the map that you say is the main road is the main

5  road.

6         MR. CHAKRAVARTY:  Your Honor, it's early.

7  It's different now than it may be later, but it wouldn't

8  be to explain to the jury where those places are.  It

9  would be because we fully expect Mr. Howard and Mr.

10  Ruoff will attack the witnesses for their credibility

11  and whether they have the ability to perceive or whether

12  they are telling some kind of narrative as a part of

13  being in Butare.  So the fact that they knew who these

14  people were before is important.  That's the reason why.

15  I agree that we needn't dwell on that.  As you pointed

16  out, establishing the town Butare may be sufficient, but

17  that's the reason in exploring those types of questions.

18         MR. CAPIN:  If I can just dovetail.

19         THE COURT:  I take your point, but a quick do

20  you know who Pauline is?  Yes, I do.  Who is she?  She's

21  the mother of Shalom.  Good.  Move on.  If you're trying

22  to just show this witness knows who those people are,

23  fine, but it sounds like you're trying to establish in

24  fact that's who it is.

25         MR. CAPIN:  I think the point Mr. Chakravarty

1    made as well is the challenge is going to be suggesting

2    to the jury this witness doesn't really know what he

3    said.

4              THE COURT:  If they do that I will allow you

5    to redirect on that point.  So instead of preventively

6    doing that with every witness, if that's their

7    cross-examination challenge, I will allow you to

8    redirect on that.  And similarly --

9              MR. CAPIN:  Fair enough.  We'll keep it very

10   narrow.  For example, if -- aside from knowing what the

11   defense may characterize it, what everybody knows, if

12   for example the witness knows the names of all four

13   daughters, that's probative and it's something the jury

14   on direct should be able to hear because it helps them

15   assess the basis of knowledge and credibility.  It's one

16   question, and the point is well taken and we won't dwell

17   on certain things, but I think the government should be

18   entitled to establish a solid foundation.

19             THE COURT:  You know, I will give you all the

20   latitude you want as long as it's efficient, effective,

21   and brief.  Have a good evening.

22             (Adjourned at 3:00 p.m.)

23

24

25

72

```
1

2                    C E R T I F I C A T E

3

4              I, Diane M. Churas, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 11/19/13

11                                 DIANE M. CHURAS, LCR, RPR, CRR
                                   LICENSED COURT REPORTER, NO. 16
12                                 STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12-30-2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-01-SM
           v.                   *  February 7, 2013
                                *  9:00 a.m.
   BEATRICE MUNYENYEZI          *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY THREE - MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Government:     John A. Capin, SAUSA
                        Aloke S. Chakravarty, SAUSA
                        U.S. Attorney's Office (NH and MA)

For the Defendant:      Mark E. Howard, Esq.
                        David W. Ruoff, Esq.
                        Howard & Ruoff, PLLC

Interpreters:           Freddy Munana
                        Sabrina Iyadede

Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

I N D E X

WITNESS:              Direct   Cross   Redirect   Recross

THIERRY SEBAGANWA:


(Transcribed under separate cover)


BRUNO NZEYIMANA:

By Mr. Chakravarty  13

 1                P R O C E E D I N G S

 2          (IN COURT - NO JURY PRESENT)

 3          THE COURT:  The snow -- I'm not a canceler,

 4   I'm really not, but I'm trying to be more sensitive.

 5          Judy says the jury seems happy with the

 6   notion that maybe we'll come in at 9:00 and maybe call

 7   it at 1:00 o'clock.  Break halfway between.

 8          The only concern I have is I don't want a lot

 9   of people sitting here looking out the window and

10   worrying about when they're getting out of here and

11   what the snow is doing, but Judy doesn't feel that the

12   jury feels quite that way about it.

13          So before we decide, what do you think?  Mr.

14   Capin, you're at the podium.

15          MR. CAPIN:  That sounds reasonable to me.

16          THE COURT:  Cancel or --

17          MR. CAPIN:  I would say go till 1:00.

18          THE COURT:  Does that make sense to you, Mr.

19   Ruoff?  Is that all right?

20          MR. RUOFF:  It does.  But if we get here in

21   the morning and there's five inches of snow outside,

22   that might be a problem because then the jurors may

23   change their mind and be worried about driving home at

24   1:00.

25          MR. CAPIN:  Is there a call-in option for the

1  jurors?

2         THE COURT:  Yes.

3         MR. CAPIN:  They could be instructed to call

4  in before they head out if it looks horrific.

5         THE COURT:  I don't think anybody thinks it's

6  going to be a problem in the morning, right?  An inch

7  or two maybe, a dusting?

8         MR. RUOFF:  I haven't read the news, Judge,

9  so I don't know.

10         MR. HOWARD:  I don't have it in my head how

11  far away some of these jurors have to drive.

12         THE COURT:  There are some 90-mile trips, an

13  hour and a half to Swansea.

14         MR. HOWARD:  I'm just going to express the

15  concern from what I understand the prediction to be

16  that the storm is starting tonight but picking up a

17  good head of steam by tomorrow morning and into the

18  afternoon where we will get two to three inches an

19  hour.

20         THE COURT:  That's right.  In the afternoon.

21         MR. HOWARD:  Right.  So if we're sending

22  people home --

23         THE COURT:  Well, again, let me say,

24  yesterday my feeling was we'll go till 1:00 o'clock.

25         This morning I was more concerned that I

1   didn't want jurors sitting there looking out the

2   window worrying about it.  Judy tells me the jurors

3   are generally of a view that this is New Hampshire.

4   We drive in snow.

5           MR. HOWARD:  It is that.  Right.

6           THE COURT:  Which pleasantly surprised me.

7   However, I'm not sure that really allays all the

8   concerns.

9           MR. HOWARD:  Right.  Obviously we have a

10  concern about distractions.

11          THE COURT:  The government is saying 1:00

12  o'clock sounds fine.  What do you say?

13          MR. HOWARD:  I'm okay with that.  I'm okay I

14  think with the possibility that if they're distracted

15  come noontime and that this is worse --

16          THE COURT:  Sure.  Okay.  Sure.  If it's

17  worse than we anticipate, then we'll call it a day

18  whenever we --

19          MR. HOWARD:  What should be our principal

20  concern is is it safe to send them home at 1:00

21  o'clock in a driving snowstorm.  We don't want to be

22  responsible for that either.

23          THE COURT:  Well, we do have to be

24  responsible for things, Mr. Howard.  It's part of

25  life.

1          They're all entitled to stay at a local hotel

2   if they feel uncomfortable driving, so that's not an

3   issue either.

4          All right.  Judy, what do you think?

5          THE CLERK:  Let's ask the jury.

6          THE COURT:  Great idea.  Perfect.

7          THE CLERK:  Let's poll them and see how they

8   feel.

9          THE COURT:  All right.  I'll just randomly

10  poll -- I'll just generally poll them and see what

11  they think.

12          (IN COURT - JURY PRESENT)

13          THE CLERK:  Court is in session and has for

14  consideration jury trial day three in the matter of

15  United States of America versus Beatrice Munyenyezi,

16  case No. 10-CR-85-01-SM.

17          THE COURT:  All right.  Good morning, ladies

18  and gentlemen.

19          Now before we start, counsel and I have been

20  discussing the snow tomorrow.  Yesterday my feeling

21  was we probably should come in and start at 9:00 and

22  maybe leave at 1:00 and take an abbreviated break, and

23  then this morning I thought maybe I was being

24  insensitive and perhaps we should cancel tomorrow.

25          Judy reports that she senses the jury is of

1    the view that this is New Hampshire and we drive in

2    the snow, no problem.  That's generally the way I look

3    at it.  Of course I only live a mile away.

4           So we thought -- I talked with counsel.

5    Everybody is ambivalent about it, and basically Judy

6    suggested we ask you since you're the ones we're

7    worried about.

8           I'm going to ask you just a series of --

9    don't vote early.  You might want to vote late.  Do

10   you want to cancel tomorrow?  Do you want to go till

11   1:00 with the understanding that if anybody is

12   uncomfortable because it gets real bad before 1:00 you

13   certainly can stay locally at a hotel and the

14   government will reimburse you, or do you want a normal

15   day?  I don't think anybody wants that.

16          How many would prefer to just cancel

17   tomorrow, call it a day, and then try to keep the pace

18   up next week?  Anybody?  One.

19          Okay.  How many want to go till 1:00 o'clock

20   and take a break halfway between 9:00 and 1:00 and

21   call it a day at 1:00?

22          We have a consensus.  Okay.  We'll do that.

23   We'll do that with the proviso, obviously, that if at

24   11:00 o'clock it looks crazy then we'll stop.  We'll

25   stop whenever it starts to look really bad.

1        All right.  Great.  Thank you very much.  I

2   appreciate your help.

3        We're continuing obviously this morning with

4   the government's presentation of evidence.

5        Mr. Capin, whenever you're ready.

6        (Testimony of Thierry Sebaganwa was

7   transcribed previously under separate cover)

8        THE COURT:  Ladies and gentlemen, why don't

9   we take a short break, ten or fifteen minutes.

10       (RECESS)

11       (IN COURT - NO JURY PRESENT)

12       MR. RUOFF:  I think we have an issue we need

13   to discuss before we bring the jury in.

14       THE COURT:  All right.  You may be seated.

15   What is it?

16       MR. RUOFF:  The report of interview we have

17   of this gentleman contains what we believe is a

18   hearsay statement, and I think we've learned that they

19   have new information about what he may say that is

20   inconsistent with this that was just disclosed to us

21   like 30 seconds ago.

22       The statement is about our client and that he

23   says he saw someone, a woman at the roadblock, and

24   that others called her Beatrice.  And we believe that,

25   you know, when he says that other people called her

1   Beatrice, that that statement is offered for the truth

2   of the matter that she is Beatrice and that it's

3   hearsay and violates my client's rights to confront

4   the actual accusers who say she is Beatrice.

5           Furthermore, the government just informed us

6   that in an interview session apparently with this

7   witness he said that they called her Beatrice and she

8   responded to that.  So therefore it's an adoptive

9   admission.

10          Unfortunately, we believe that that is a

11  Brady violation because they never disclosed that this

12  witness has given additional information that's

13  inconsistent with what's in the report.

14          So I just figured that would be an issue we

15  would bring to the Judge's attention.

16          THE COURT:  It's not inconsistent.  It's not

17  Brady.  But anyway, Mr. Chakravarty.

18          MR. CHAKRAVARTY:  Your Honor, it's routine

19  that before a witness testifies you ask him specific

20  details.

21          THE COURT:  What about the hearsay issue?

22          MR. CHAKRAVARTY:  So it is an adoptive

23  admission, your Honor.  The witness in the witness's

24  presence --

25          THE COURT:  It's an adoptive admission?  Who

1  adopted it?

2          MR. CHAKRAVARTY:  The defendant.  It's an

3  admission by the defendant, your Honor.

4          The defendant was addressed as Beatrice in

5  the witness's presence.  The witness heard it, saw it,

6  and then she responds.  There's a greeting.  She

7  responds to the greeting appropriately.

8          THE COURT:  That sounds right, doesn't it?

9  He can certainly testify to what he personally

10 observed.  Someone called you John and you turned

11 around and said what, right?  Is there an issue?

12         MR. RUOFF:  Well, I'm just -- I guess I'm

13 just annoyed that there's additional material

14 information.  I just assumed they wouldn't be able to

15 get that in because it's hearsay, and now all of the

16 sudden they have the foundation, you know, to lay it

17 for a hearsay exception that they haven't disclosed,

18 your Honor.

19         I don't know how many times they've prepped

20 this witness or when they learned this information.

21 We should be getting e-mails at night when they get

22 different --

23         THE COURT:  You never get them in a criminal

24 case, and they're not obligated to give you their

25 research files and they're not obligated to provide

1    that information, so I'm missing the point.  There's

2    no Brady issue as far as I can tell.

3            They've given you the witness's prior

4    statements, right, before the witness testifies?

5            MR. RUOFF:  They've given us one prior

6    statement.  Well, actually, under the rule it's not a

7    statement of this witness.  It's a statement of the

8    agent that did the interview, but nothing about --

9    from their witness prep sessions with this witness.

10           In the past we've received e-mails where

11   other witnesses have said things that are either in

12   addition to or different from the ICE report, and we

13   haven't received that.  We received none of it with

14   respect to the prior witness.

15           THE COURT:  I hear you.  But again, you have

16   to go back to basics, don't you?  Have they made their

17   Rule 16 disclosures?  Yes, they have.  Have they made

18   Brady disclosures?  They say they have.  Giglio

19   problem?  Not that I see.  I'm unhappy that they

20   haven't fully disclosed what they know about what the

21   witness may testify when called to trial.  Well,

22   they're not required to give you that unless it falls

23   within Rule 16 or Brady or Giglio, so I'm not sure

24   what your problem is.

25           MR. RUOFF:  Our characterization, I guess, is

1    that it would be Giglio material because it goes to

2    the witness's -- whether or not the witness said that

3    to the ICE agents.

4              Certainly we can cross-examine him on it, but

5    it's still a disclosure issue as far as I understand

6    Giglio to apply to inconsistent statements or --

7              THE COURT:  I'm not sure why it's

8    inconsistent.

9              MR. RUOFF:  I'll just rest, your Honor.

10             THE COURT:  Inconsistent would be I said it

11   happened and then I said it didn't.

12             Okay.  To the extent there's an objection,

13   it's overruled, and you can bring in the jury.

14             (IN COURT - JURY PRESENT)

15             (Deputy clerk swears in the witness)

16             THE CLERK:  He said thank you.

17             THE COURT:  He has to respond that he will or

18   he will not.

19             THE WITNESS:  I will tell the truth.

20             THE CLERK:  Thank you.  Please be seated.

21                      BRUNO NZEYIMANA

22             having been duly sworn, testified as follows:

23             THE CLERK:  For the record, please state your

24   name and spell your last name.

25             THE WITNESS:  My name is Nzeyimana.

<pre>
 1                    DIRECT EXAMINATION

 2  BY MR. CHAKRAVARTY:

 3       Q.  For the record, that's spelled

 4  N-Z-E-Y-I-M-A-N-A?

 5       A.  Those are the letters that show my name.

 6       Q.  Mr. Nzeyimana, is your first name Bruno?

 7       A.  No.  That is a Christian name.

 8       Q.  A Christian name.  In Rwanda is it common

 9  that you would be referred to as Nzeyimana Bruno?

10       A.  The family name is Nzeyimana and the

11  Christian name is Bruno.

12       Q.  Mr. Nzeyimana, if you could make sure that

13  the microphone is close to your mouth.  Even though we

14  do not understand Kinyarwandan, it's important that we

15  hear how you respond.

16          Mr. Nzeyimana, where are you from?

17       A.  I am Rwandan and I'm from Southern Province.

18       Q.  Is Southern Province the province that -- the

19  prefecture that used to be called Butare Prefecture?

20       A.  Butare is among areas that were put together

21  to form Southern Province.

22       Q.  How old are you?

23       A.  I'm 51 years old.

24       Q.  Back in April of 1994 what did you do for

25  your occupation?
</pre>

1       A.  I was in the military.

2       Q.  And in 1994 how long had you been in the

3  military?

4       A.  Twelve years and a few months.

5       Q.  Is that the Rwandan military?

6       A.  Yes.

7       Q.  Are you familiar with the term XFAR?

8       A.  I do.

9       Q.  And can you explain what XFAR means?

10      A.  I will explain.  Usually we used to be called

11  FAR, but then we were still running soldiers.  In 1994

12  when we got defeated they added X.  Then it became

13  XFAR.

14      Q.  And is FAR, F-A-R, the French acronym for the

15  Armed Forces of Rwanda?

16      A.  Uh-huh.

17      Q.  What was your rank in 1994 in the Rwandan

18  Army?

19      A.  I was corporal.

20          MR. CHAKRAVARTY:  It's corporal, Mr.

21  Translator?  Did I hear that correctly?

22          THE INTERPRETER:  Yes.  Corporal.

23      Q.  And where were you posted in April of 1994?

24      A.  I was a soldier in Camp Ngoma.

25      Q.  Camp Ngoma, is that spelled N-G-O-M-A?

1     A.  Yes.

2     Q.  And was that just outside the city limits or

3  was it in Butare Town?

4     A.  It's in the outskirts of Butare Town nearby

5  the Butare airport.

6     Q.  In April of 1994 what type of soldiers were

7  posted at Ngoma Camp?

8     A.  I didn't get that well.

9     Q.  All right.  Was Ngoma Camp -- did it have a

10  specific purpose?

11     A.  There were wounded soldiers that were wounded

12  during the war.

13     Q.  When you say wounded during the war, do you

14  mean the war between the Armed Forces of Rwanda and

15  the Rwandan Patriotic Front?

16     A.  Would you please repeat?  I didn't get the

17  question very well.

18     Q.  You said soldiers were injured during the

19  war, and I asked you to explain what war.  Who were

20  the warring factions?

21     A.  Between the Rwandan soldiers and the

22  Inkotanyi soldiers.

23     Q.  You used the word Inkotanyi; is that right?

24     A.  Yes.  That's right.

25     Q.  Is that I-N-K-O-T-A-N-Y-I?

```
 1      A.  Yes.

 2      Q.  Is that the name that the army gave to the

 3 soldiers of the Rwandan Patriotic Front?

 4      A.  That was the name that was known back then.

 5 You can call your opponent the way you like.

 6          MR. RUOFF:  I'm sorry, Judge.  I didn't

 7 understand the English translation.  You can call your

 8 what?

 9          MR. CHAKRAVARTY:  You can call your opponent

10 the way you like.

11          THE INTERPRETER:  Your opponent.

12          MR. RUOFF:  Thank you.

13      Q.  And prior to April of 1994 was there fighting

14 going on in the north of the country near the Ugandan

15 border?

16      A.  Yes, there was fighting going on.  That's

17 where it actually started.

18      Q.  And that fighting was between two military

19 forces, correct?

20      A.  The fighting was between the soldiers that

21 were in Rwanda and others that were outside the

22 country.

23      Q.  And you were protecting the borders of

24 Rwanda?

25      A.  Yes.
```

1       Q.  In April of 1994 was there any fighting near

2   Butare?

3       A.  No.

4       Q.  You had been posted to Ngoma Camp yourself,

5   correct?

6       A.  I don't understand the question well.

7       Q.  I'll ask you directly what I want to ask you.

8   Why were you shifted to Ngoma Camp?

9       A.  I was wounded during the fight.

10      Q.  Where on your body were you wounded?

11      A.  I was wounded right here on my shoulder on

12  this side and up to here.

13      Q.  Was it a bullet wound?

14      A.  It was bullets.

15      Q.  And where in Rwanda had you been in combat?

16      A.  I was fighting in Mutara in a sector called

17  Shonga nearby Uganda.

18      Q.  Now, can you explain what the ethnic

19  composition or the ethnic makeup was of the Armed

20  Forces of Rwanda?

21          MR. RUOFF:  Objection.  Foundation.

22          THE COURT:  Overruled.

23      A.  The ethnic composition of the Rwandan Armed

24  Forces was mainly Hutu and a few Tutsis.

25      Q.  And do you know the ethnic composition of the

```
 1  Inkotanyi?

 2       A.  It was mainly Tutsis and a few Hutus.

 3       Q.  When you were shifted to Ngoma Camp what was

 4  your assignment?

 5       A.  When I was shifted to the camp I was in

 6  charge of hygiene and logistics, including providing

 7  foods to soldiers and also married soldiers.

 8            MR. RUOFF:  I'm sorry, Judge.  I didn't get

 9  the last phrase.

10            THE COURT:  Married soldiers.

11            THE INTERPRETER:  Married soldiers.

12       Q.  Okay.  So when you say you were in charge of

13  providing food to married soldiers, can you explain

14  what that entailed?

15            THE COURT:  This is relevant, right?

16            MR. CHAKRAVARTY:  Marginally, your Honor.

17            THE COURT:  Well, let's keep it actually

18  relevant.

19            MR. CHAKRAVARTY:  It's nothing that --

20            THE COURT:  Really?

21       Q.  Did you have to go out of Ngoma Camp to

22  achieve your duties?

23       A.  Before genocide or during genocide?

24       Q.  Before the genocide.

25       A.  Yes, I will go out after work as requested
```

1   and I will go outside.

2       Q.  And how would you get around Butare?

3       A.  I would walk.  I would use vehicle.  I would

4   use motorcycle or bicycle.

5       Q.  So prior to the genocide were you familiar

6   with any checkpoints on the roads -- on the main roads

7   in Butare?

8       A.  There were none in Butare except for some

9   gendarmes that would stop people, asking for their

10  identification.  Other than that there were no

11  roadblocks.

12      Q.  And the gendarmes, was that like the civil

13  police monitoring the exit -- the southern exit to

14  Butare?

15      A.  No.  They would focus more on the vehicle

16  circulation and people that are driving them.

17      Q.  So they're the automobile police?

18      A.  Yes.

19      Q.  And heading north from Butare to Kigali was

20  there a military checkpoint?

21      A.  Two words.  Kigali, Nyanza.  There was a

22  roadblock of military that would stop vehicles and ask

23  people to get out.  And a place called giti cy'inyoni

24  by Nyabarongo there was a roadblock.  There were

25  soldiers too on that roadblock.

1      Q.  So those are military roadblocks outside of

2  the city of Butare?

3      A.  Yes.

4      Q.  How did you learn about the fact that the

5  genocide began in Rwanda?  I'll rephrase.  How did you

6  learn that the president's plane was shot down in

7  Rwanda?

8      A.  As you understand, I was a soldier.  So there

9  was a military message that came in announcing to us

10  that the president's plane had been shot down.

11         So the next morning it had already been

12  broadcasted through Radio Rwanda and RTLM mentioned

13  that as well.

14         MR. CHAKRAVARTY:  And that last phrase, Mr.

15  Translator, RTLM?

16         THE INTERPRETER:  RTLM mentioned that as

17  well.

18      Q.  Those are radio stations?

19      A.  Yes, those were radio stations in Rwanda at

20  that time.

21      Q.  And was that April 6, 1994?

22      A.  Yes.

23      Q.  Now, after you had that information, or it

24  reached Ngoma Camp, did you stay at Ngoma Camp?

25      A.  That's where I stayed.

1       Q.  At some point did killing begin near Butare?

2       A.  There was time, so I don't know if I should

3  go on.

4       Q.  All right.  The question was at some point

5  did that happen?

6       A.  Yes.

7       Q.  So how long approximately after the

8  president's plane was shot down did violence begin in

9  Butare?

10      A.  You see, it's been a long time, but I think

11  it was between April 15th and 20th.  The president

12  back then, whose named was Theodore, held a meeting in

13  city hall -- in Butare city hall.

14      Q.  When you say Theodore, is that Theodore

15  Sindikubwabo?

16      A.  Sindikubwabo, yes.

17      Q.  Was that meeting broadcast on the radio?

18      A.  Yes, it was broadcast on the radio, but it

19  was mainly attended by government officials, commune

20  leaders and some other institutional officials, and

21  also military high-ranking officials were present.

22      Q.  You were not present, correct?  Were you

23  present?

24      A.  No.

25      Q.  Did you hear the speech?

1      A.  I heard it.

2      Q.  After the speech what happened in Butare?

3      A.  Roadblocks were created right away.

4      Q.  So you say roadblocks.  How did these

5 roadblocks differ from what you described on the road

6 to Kigali?

7      A.  The difference between the two is right after

8 President Sindikubwabo held the speech he had come

9 with Interahamwe.

10          MR. RUOFF:  Objection, your Honor.

11 Objection.  Foundation.  It's not clear whether or not

12 he actually saw any of this.

13          THE COURT:  Overruled.

14          MR. RUOFF:  Your Honor, may I make a record?

15          THE COURT:  Yes.

16          (SIDEBAR)

17          MR. RUOFF:  Thank you, your Honor.  My intent

18 is not to delay things, but I do have to make a

19 record.

20          I'm objecting because it's unclear from this

21 witness whether he is testifying from direct knowledge

22 of how roadblocks were erected when they went up.

23          THE COURT:  He hasn't testified about that.

24          MR. RUOFF:  Well, he's about to.  How they

25 were different from ones that he saw.

```
 1            THE COURT:  We'll see.  When there's an

 2    objection to a question, interpose an objection.  He's

 3    laid a foundation.  He's established that he was

 4    there.  He was in the military.  He came outside

 5    occasionally.  He was familiar with the roadblock

 6    situation before.  He's now describing that there was

 7    a difference afterwards.  It's clearly based upon

 8    personal knowledge.  I'm not sure what your objection

 9    is.

10            MR. RUOFF:  My objection is foundation.  He's

11    maybe testifying about what other people said.

12            THE COURT:  Objection overruled.

13            (CONCLUSION OF SIDEBAR)

14            MR. CHAKRAVARTY:  Translator, he was starting

15    to say something.  You might remind the witness of the

16    question.

17            THE INTERPRETER:  I'm sorry, your Honor.  He

18    was saying that and their leader was present as well.

19        Q.  Okay.  So let me -- I'll ask the question

20    again, not knowing whether he had finished.  What was

21    different between the checkpoints you've already

22    described and the roadblocks --

23            THE COURT:  Why don't you ask him the

24    difference between the checkpoints he saw previously

25    and the checkpoints he saw thereafter.
```

1          MR. CHAKRAVARTY:  Thank you.

2          (Interpreter poses question to witness)

3     A.  The difference is that ever since the

4  president held the speech at the convention center in

5  Butare they started close-by roadblocks.

6     Q.  I'm sorry.  I didn't understand.  They

7  started --

8          THE INTERPRETER:  Close-by roadblocks.

9  Roadblocks that are close to each other.

10    Q.  Who started roadblocks that were close to

11  each other?

12    A.  As far as I'm concerned, I think it's the

13  president because he mentioned something saying that

14  people from Butare had been pretending to be less

15  concerned because other prefectures had started

16  killing but Butare hadn't started yet.

17    Q.  Okay.  It's my fault for asking a very

18  general question.  Who were the people that you saw

19  that had actually created the roadblocks close by to

20  each other?

21    A.  Interahamwe started them.

22    Q.  In April of 1994 did you know what the

23  Interahamwe was?

24    A.  I knew them.

25    Q.  What was the Interahamwe?

1      A.   Interahamwe, it was a branch with military

2  affiliation that was connected to MRND.

3      Q.   Now, during the genocide after it reached

4  Butare did you continue to leave Ngoma Camp from time

5  to time?

6           THE INTERPRETER:   Could you repeat?

7           MR. CHAKRAVARTY:   Sure.

8      Q.   After the genocide left Butare, did you

9  continue to leave Ngoma Camp from time to time?

10     A.   No.   Only once in a while.

11     Q.   When you did leave did you have to get a

12  pass?

13     A.   I would have to write requesting for a pass,

14  they would sign it, and then I would leave.

15     Q.   And where did you go when you received such a

16  pass?

17     A.   The pass will be signed by the commander, and

18  the purpose was to go see my family.   You wouldn't get

19  any other pass other than going to see your family.

20     Q.   Where was your family relative to Ngoma Camp?

21     A.   Camp Ngoma is towards north.   So I would go

22  towards the south right next -- actually, near

23  Burundi.

24     Q.   Just to situate the jury generally, Mr.

25  Nzeyimana, was the Ngoma Camp in this direction and

 1  was your home in this direction towards Burundi?

 2      A.  This map is not clear, but it's obvious that

 3  the arrow that shows north, that's where I was, and

 4  the lower arrow, if that's showing south, that's

 5  showing where my house was -- my family was located.

 6      Q.  Okay.  I'm just showing this to give the jury

 7  an idea that Butare Town was between Ngoma Camp and

 8  your home, correct?

 9      A.  Yes.

10      Q.  And prior to the genocide had you traveled on

11  the main road, the paved road that goes from north to

12  south?

13      A.  I would go to my house back and forth every

14  week before the genocide.

15      Q.  So you were very familiar with the path back

16  and forth?

17      A.  Yes.

18      Q.  Before the genocide were you familiar with

19  the I'Huriro Hotel?

20      A.  I knew it.  Even during the construction I

21  knew it.

22      Q.  Okay.  How did you know the I'Huriro Hotel?

23      A.  There was a bar.  We would have drinks

24  sometimes over there.  And there was a path I would

25  use back and forth most of the time.  All those

1  buildings, I was familiar with them.

2      Q.  Did you know who owned that hotel?

3      A.  I knew that person.

4      Q.  What did you know about who owned the hotel?

5      A.  Before the genocide?

6      Q.  Yes, before the genocide.

7      A.  The owner had previously been a member of

8  parliament and he was the leader of -- rector of the

9  university.

10      Q.  Do you remember his name?

11      A.  Yes.

12      Q.  What was his name?

13      A.  Ntahobali, Maurice.

14      Q.  Do you know who Maurice was married to?

15      A.  I knew that person.

16      Q.  And what did you know her name to be?

17      A.  Her name was Nyiramasuhuko, Minister of

18  Family.  She was a member of cabinet -- one cabinet

19  member.  She was a member of Rwandan cabinet.

20      Q.  Do you know what political party they

21  belonged to?

22      A.  It was MRND.

23      Q.  Now, during the genocide did you see the

24  I'Huriro?

25      A.  Yes.  Yes, I passed by.

1      Q.  Again, was that the main path to get to your

2  home from Ngoma Camp?

3      A.  Yes.  Yes, it was the path I would use back

4  and forth.  It was the main road.

5      Q.  Describe the circumstances in which you saw

6  the I'Huriro during the genocide.

7      A.  In details?

8      Q.  If you want to start with general, then I'll

9  ask you a further detailed question.

10     A.  I would ask for a pass in Camp Ngoma to go

11  see my family, my wife and kids in Yaroingari, and

12  then they will grant me that and I would take a bike.

13  And when I would get to Faucon there was a roadblock,

14  and when I would reach the point where there's Butare

15  cathedral there was another roadblock.  And when I

16  would reach I'Huriro there was another roadblock.  And

17  when I would reach the university there was another

18  roadblock.  And at Mukoni on the way towards Tumba

19  there was another roadblock.

20     Q.  So when you were --

21     A.  And then I would continue.  But at some point

22  there was another roadblock at a place called Rango,

23  and then I would continue to carry on towards my

24  house.

25     Q.  So there are several roadblocks between Ngoma

1    Camp and your house?

2         A.  Yes.

3         Q.  You said there was one at the I'Huriro?

4         A.  Yes.

5         Q.  Can you describe that roadblock?

6         A.  From Butare towards the rector's office you

7    would use the main tarmac road towards EER, which

8    belongs to protestants, towards the main road, and

9    after that point there was a roadblock right on the

10   street.

11        Q.  I want to break that down a little bit.  You

12   said that as you're proceeding toward the -- past the

13   I think you said EER, the Protestant church?

14            MR. RUOFF:  Judge, that's an awfully long

15   translation.

16            MR. CHAKRAVARTY:  He wasn't translating.  It

17   was actually just his answer.

18            THE COURT:  Yes, it is.

19            MR. RUOFF:  I just don't want to lose

20   anything in the translation because it's a long

21   narrative.

22            THE COURT:  Yes, it is.  Can you translate

23   that?  Can you?

24            THE INTERPRETER:  Yes.

25            THE COURT:  Okay.

1        A.  From the point where the Butare cathedral

2    roadblock was located towards the rector's office,

3    which was connected to EER location, there was around

4    ten meters from that point towards another roadblock

5    that was right before Hotel I'Huriro.

6        Q.  Okay.  So describe what that area looked like

7    to the jury who has never been there.

8        A.  I'm about to describe how the roadblock

9    looked.  It wasn't an actual roadblock that blocked

10   the road, just like this table looks.  It was a bunch

11   of big tree pieces that were put on top of each other

12   that you would circle around.  Whether you would be in

13   a vehicle or a bicycle, you would have to go around,

14   around before you got to a point where I'Huriro was.

15       Q.  Continue.

16       A.  So right where the I'Huriro is located there

17   was a one-way street that came from the opposite

18   direction where there was metal nail tire popper, and

19   the way you could see that tire popper was when you

20   would come from Kanyaru area -- to where Kanyaru area

21   is located, on the other side.

22       Q.  You mean from the southern side of the

23   I'Huriro you would see something across the road that

24   you described as a tire popper?

25       A.  Yes.  That's what you would come towards

```
 1   first from that direction, but from the opposite
 2   direction it was the last thing I would be able to
 3   see.
 4        Q.  So you would go through -- swerve through
 5   some logs until you got to the tire popper?
 6        A.  Yes.
 7        Q.  Were there people -- I'm sorry.  You're not
 8   done.  Continue.
 9        A.  So that was for vehicles and people.  But on
10   the sidewalk there were Interahamwe that had on
11   uniforms but also people with regular clothes that had
12   on top of them, of those clothes, military jackets.
13        Q.  So, first, just to clarify, you said on the
14   sidewalk.  Do you mean by the side of the road, or was
15   there actually a paved sidewalk?
16        A.  No, it was grass on the side of the road.  So
17   what I meant to say was that on the side of the tarmac
18   towards the side -- towards the south, that's where
19   all those people were located.
20        Q.  And you described that they were wearing you
21   said Interahamwe clothes and then also clothes with
22   military jackets?  Were the people who you saw, were
23   they military people?
24        A.  They were not military people because a
25   soldier normally has a jacket and pants that are
```

1   identical to the jacket and a hat that has military

2   insignia and it's basically for combat and also

3   including boots, and because it was during the war he

4   also had to have a gun.

5        Q.  And what you describe as the proper military

6   uniform, is that what you were wearing during this

7   time?

8        A.  Me?

9        Q.  Yes.  Yourself.

10       A.  I had full combat uniform from shoes -- from

11  bottom to top, because if you didn't have military

12  clothes you wouldn't be able to get out.

13       Q.  When military went through these roadblocks

14  were they able to go through without a hassle?

15       A.  They would ask for identification just like

16  anybody else.

17       Q.  The Interahamwe and the people wearing the

18  military jackets at the roadblock, were they carrying

19  any weapons?

20       A.  Yes.  They had guns, AK-47, but they didn't

21  have -- they didn't all of them possess those weapons.

22       Q.  Were there other types of weapons that were

23  not firearms?

24       A.  They had clubs.  That's what I saw mostly.

25       Q.  Now, did you view some videos that I showed

1  you in my office upstairs?

2      A.  I think I did.

3      Q.  And were those videos depicting a roadblock?

4      A.  Yes, I did see those as well.

5      Q.  Were those videos representative of what you

6  just described as a roadblock during the genocide?

7      A.  Yes.

8      Q.  And just to clarify, those are the

9  non-military roadblocks?

10     A.  I didn't get the question very well.

11     Q.  Okay.  I want to make sure that you're

12  distinguishing that the videos depict a roadblock

13  unlike the one between Butare and Kigali.

14     A.  It's different because military roadblocks

15  had big trunk blocking the street.  As for other

16  military during the genocide, different roadblocks

17  during the genocide, you had to zigzag around to go

18  through them.

19     Q.  And that's what's depicted on these videos,

20  correct?

21     A.  Yes.

22     Q.  Would the videos be helpful to explain to the

23  jury what a roadblock looked like during the genocide?

24     A.  You mean the roadblocks?

25     Q.  Just generally.  Not a specific roadblock,

1    but generally the Interahamwe manned roadblocks.

2        A.  Yes.

3            MR. CHAKRAVARTY:  Your Honor, I would move to

4    strike the ID on Exhibit 9, and perhaps we could

5    publish it after the break?

6            THE COURT:  Any objection?

7            MR. RUOFF:  May I have a second to confer

8    with counsel?

9            THE COURT:  Ladies and gentlemen, why don't

10   we break now for lunch.  Yesterday a half hour didn't

11   seem to work out that well so 45 minutes, is that

12   acceptable?  How many members of the jury want to

13   stick with a half hour?  All right.  45 minutes it is.

14           (IN COURT - NO JURY PRESENT)

15           THE COURT:  More than 45 minutes to get to, I

16   saw the roadblock, this is what it looked like.  We've

17   got to do better than that.  Foundation is important,

18   I know, but it's not that important.

19           So we've got to lay a foundation -- take

20   fifteen minutes and do your best.  Lay the best

21   foundation you can and then get to the important

22   evidence or I'm going to start saying you've got

23   fifteen minutes to lay a foundation.  After that no

24   more foundation questions.

25           Yes, what's your objection?  Do you have an

1  objection?

2          MR. RUOFF:  Can we take it up after?  I need

3  to discuss -- review the --

4          THE COURT:  It's evidentiary.  It's a pretty

5  common standard.  They move to admit the videotape.

6  Do you have an objection?

7          MR. RUOFF:  At this point we do.

8          THE COURT:  Sustained.  No foundation.

9  Inadequate foundation.

10         (RECESS)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4         I, Susan M. Bateman, do hereby certify that the

 5    foregoing transcript is a true and accurate

 6    transcription of the within proceedings, to the best of

 7    my knowledge, skill, ability and belief.

 8

 9

10    Submitted: 10-1-13
                                SUSAN M. BATEMAN, LCR, RPR, CRR
11                              LICENSED COURT REPORTER, NO. 34
                                STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/15/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-cr-85-01-SM
            v.                  *  February 7, 2013
                                *  1:20 p.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *

DAY 3 - AFTERNOON SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE
AND A JURY

Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH)
                      53 Pleasant Street, 4th Floor
                      Concord, NH 03301

For the Defendant:    David W. Ruoff, Esq.
                      Mark E. Howard, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH  03104

Interpreters:         Freddy Munana
                      Sabrina Iyadede

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

```
 1                      I N D E X

 2

 3
       Witness              Direct   Cross   Redirect   Recross
 4

 5     BRUNO NZEYIMANA

 6     By Chakravarty        13               30 and 34
       By Mr. Ruoff                   21                    32
 7

 8     DONALD MONICA

 9     By Mr. Capin          35

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    BEFORE THE COURT

 2              THE COURT:  I was thinking about your

 3  objection and those evidentiary questions are always

 4  interesting.  It's not an adopted admission unless the

 5  defendant adopted it.  So, what's the evidence that the

 6  defendant adopted it?  Someone said Beatrice, someone, a

 7  woman I assume he can't identify responded yes, how is

 8  it that the defendant adopted it?

 9              MR. CHAKRAVARTY:  It's a mutual greeting, your

10  Honor.

11              THE COURT:  Between whom?

12              MR. CHAKRAVARTY:  Between his companion and

13  the defendant.

14              THE COURT:  How do you know it's the

15  defendant?

16              MR. CHAKRAVARTY:  He responded -- the person

17  who responded to Beatrice.

18              THE COURT:  Yes, which could have been

19  Beatrice number 17 as opposed to Beatrice number 12 as

20  opposed to the defendant.

21              MR. CHAKRAVARTY:  Could be, but --

22              THE COURT:  So, it's not adoption, then. It's

23  only adopted if the defendant adopts it.

24              MR. CHAKRAVARTY:  At the location where the

25  defendant resided during the genocide, there's abundant
```

4

1   evidence of a person who is identified wearing clothes

2   that other witnesses have identified that person

3   wearing, who responds to the name Beatrice, it seems to

4   be a reasonable inference for the jury to be able to

5   infer that, beyond a reasonable doubt, that person is

6   Beatrice the defendant.

7              THE COURT:  I don't think they can infer a

8   necessary predicate to an adopted admission.  Now you're

9   even more beyond.  You're saying, first infer that the

10  person who said yes was this defendant.  Then it's an

11  adopted admission because she would have adopted being

12  called Beatrice.  She would have admitted that her name

13  was Beatrice.

14             MR. CHAKRAVARTY:  Your Honor, that is the

15  first step.  If somebody responds to their name, I think

16  the case law is clear, somebody responds to their name

17  appropriately, that means that they are expressing that

18  that is my name.

19             THE COURT:  Correct.

20             MR. CHAKRAVARTY:  Whether you call that an

21  adopted admission or present sense impression of what

22  this person --

23             THE COURT:  That's what I was going to raise

24  with you.  I don't think it helps you tremendously, but

25  it might be a present sense impression, hearsay

5

1    exception.  In other words, I saw someone who had a

2    present sense impression that there was a woman named

3    Beatrice.  He called her Beatrice and the woman

4    responded.  What's that evidence of?  Really nothing

5    more than someone at the scene thought there was someone

6    there named Beatrice who apparently thought her name was

7    Beatrice as well.  Right?  All right, I'm not sure it

8    goes anywhere, but the analysis I think is a little more

9    subtle than adoptive admission.

10            Any problem?

11            MR. HOWARD:  Do you mind if I speak, judge?

12            THE COURT:  Sure.

13            MR. HOWARD:  We still think there's a first

14   hearsay problem of somebody else says Beatrice.  That's

15   clearly hearsay because it's offered to prove the truth

16   of the matter asserted.  Are you saying that then the

17   next question --

18            THE COURT:  Then is there an exception.  And

19   the answer is, well, yes.  And the government says, yes,

20   adoptive admission.  The more I thought about it that,

21   the more I have a problem with that.  It's really not an

22   adopted admission unless you can show this defendant

23   adopted it, in my view.  That somebody adopted it

24   doesn't get you anywhere.

25            So, then, is there any other exception?  Well,

6

```
 1    maybe present sense impression.
 2              MR. HOWARD:  Well, the present sense
 3    impression is a statement describing or explaining an
 4    event or condition.  I don't think that's either one of
 5    these.  They are not describing an event or condition.
 6    He's simply -- the witness would be participating --
 7              THE COURT:  My impression is that your name is
 8    Beatrice.
 9              MR. HOWARD:  That's not a condition or an
10    event.  That's a statement of my potential name.
11              THE COURT:  And this witness is not going to
12    say he knows the defendant or recognizes --
13              MR. CHAKRAVARTY:  No, he's not.  What he's
14    going to say is that she responds appropriately.  She
15    returns the greeting of his companion.
16              THE COURT:  Well, when you say she, you're
17    talking about some person.
18              MR. CHAKRAVARTY:  The person.  Just as they
19    pass the roadblock, the evidence will be, he then learns
20    from the person, his companion who had greeted Beatrice,
21    who was that, and then the person says that's Pauline's
22    daughter.
23              THE COURT:  Certainly can't testify to that.
24              MR. CHAKRAVARTY:  Can't testify, I understand
25    that that would be hearsay for purposes of the jury.
```

7

1    For the legal determination as to whether it's an

2    adopted admission or present sense impression for your

3    Honor, you can consider that with regards to admitting

4    the evidence, not that you need to based on what the

5    government says, but if you're concerned, that certainly

6    does go to --

7              MR. HOWARD:  I'm sorry, did the prosecutor

8    just say that the witness is also going to say it's

9    Pauline's daughter?

10             THE COURT:  No, no, he agrees that would be

11   inadmissible.

12             MR. HOWARD:  Okay.

13             THE COURT:  Are you about to do that?

14             MR. CHAKRAVARTY:  Yes, within the next 5,

15   10 minutes.

16             THE COURT:  Okay.

17             MR. CHAKRAVARTY:  Incidentally, and I can

18   forego the, I do agree that I'm not going to elicit the

19   after-the-fact statement, however, there is a hearsay

20   exception for historical kind of family awareness of

21   family information, someone is married to somebody, and

22   the only way they know that is through hearsay.  He's

23   married to her, then it's the hearsay exception.

24             THE COURT:  This witness is going to testify

25   that he heard someone greet a woman at the barricade or

8

1    the roadblock by the name Beatrice.

2              MR. CHAKRAVARTY:  Correct.  And then --

3              THE COURT:  Okay.  And you're offering that

4    just to show that someone at the barricade was named

5    Beatrice?

6              MR. CHAKRAVARTY:  Named Beatrice.

7              THE COURT:  Or someone, anyone.

8              MR. CHAKRAVARTY:  We will later use that as an

9    evidence point to argue that that --

10             THE COURT:  Sure, right.  But this witness is

11   just establishing, based on my knowledge, someone, I

12   heard it, I observed him call someone Beatrice and they

13   responded.  Okay.  Objection overruled.

14             Did you have another issue?

15             MR. CHAKRAVARTY:  On another issue unrelated

16   to this witness, but scheduling, I don't know when we're

17   going to have a chance to talk outside the presence of

18   the jury.  Tomorrow we anticipate calling Dr. Longman,

19   and as we did last year, we discussed the defendant's

20   testimony before the ICTR which is an admission of the

21   defendant.  This year, in addition to the other forms of

22   authentication we have a certificate of authenticity

23   from the ICTR authenticating the testimony.  We think

24   it's self-authenticating.  Unlike last year, we did not

25   come to an agreement in terms of striking the ID on

9

1    exhibits, so the government would move those transcripts

2    into the record.  They are all admissions of the

3    defendant.

4              THE COURT:  Well, is it all relevant?

5              MR. CHAKRAVARTY:  We think it's relevant.  And

6    we've culled it out, so it's relevant in what we think

7    is the complete portions of each passage that relates to

8    what we think are further lies that she made about what

9    she was observing at the I'Huriro.

10             THE COURT:  What's the number?

11             MR. CHAKRAVARTY:  So the certificates of

12   authenticity are --

13             THE COURT:  Just give me the number.

14             MR. CHAKRAVARTY:  27 and B are the

15   certificates of authenticity, and 16 I believe is the --

16   I'm sorry, 18.

17             THE COURT:  18.  And what's your objection,

18   Mr. Howard?

19             MR. HOWARD:  Well, are they being offered now

20   without any foundation being laid for them?

21             THE COURT:  No, no.  Well, at some point he's

22   going to stand up and say I'd like to strike the ID.

23   These are admissions by the defendant.  That they are

24   statements by the defendant under oath makes them

25   admission -- I don't think we call them admissions,

1   that's a misleading term.  What do they call them?  The

2   rules have changed.

3            MR. CHAKRAVARTY:  Statements.

4            THE COURT:  Statements by party opponent.  Is

5   it?  Is that what they call it?  What used to be

6   admissions are now something else, but the theory is the

7   same.  So anyway, that they want to introduce them, that

8   they're from the party opponent makes them admissible,

9   Mr. Chakravarty seems to think you have some sort of

10  authentication objection.  There's no substantive

11  objection, right?

12           MR. HOWARD:  Well, I think the substantive

13  objection is probably two-fold.  One, what is the

14  relevance of the statements she --

15           THE COURT:  There is no relevance requirement.

16  If she made them, they are statements by party opponent,

17  they are admissible, period.  That the prosecutor wants

18  to admit them is enough.

19           MR. HOWARD:  No, I respectfully disagree.

20  That makes them not hearsay.  It doesn't make them

21  relevant.

22           THE COURT:  Oh, you mean general relevance?

23           MR. HOWARD:  There's general relevance to what

24  she said and compare that to first their relevance,

25  their probative value to an issue in this case, and

1    404(b).  They're trying to admit them as prior bad acts

2    of the defendant.  And we've got that objection as well.

3    But we've got to cross all those.

4              THE COURT:  I've honestly forgot why they came

5    in last year.

6              MR. CHAKRAVARTY:  They are evidence that the

7    defendant had perpetuated lies about the existence of

8    the roadblock, her association with MRND, activities

9    that she saw Shalom doing during the genocide.

10   Activities that she herself --

11             THE COURT:  You mean she made prior consistent

12   statements with what she said on the document --

13             MR. CHAKRAVARTY:  Some of them were

14   consistent.  The government argues they were consistent

15   lies.

16             THE COURT:  That's your theory.

17             MR. CHAKRAVARTY:  They all occurred after the

18   defendant obtained citizenship.  So they can't be prior

19   acts.  These are acts consistent with the motive as to

20   why she had, you know, lied to U.S. Immigration, because

21   she had a story that she continued to maintain.

22             THE COURT:  Okay.  That probably meets the

23   relevance threshold.  What other problem do you have,

24   Mr. Howard?

25             MR. HOWARD:  Well, uncharged misconduct that

12

1   they are simply trying to argue --

2            THE COURT:  What's the misconduct?

3            MR. HOWARD:  They are arguing them as perjury

4   in the ICTR.  That these are additional lies for which

5   she's not charged with in this case.  So what do they

6   get to do?  Walk in character evidence after character

7   evidence that she lied --

8            THE COURT:  No, but they do get to -- well,

9   I'll think about it.  Do you have an authentication

10  objection as well?

11           MR. HOWARD:  Well, authentication in the sense

12  of is it her transcript, no, I don't.

13           THE COURT:  Okay, so the certificates are

14  acceptable?

15           MR. HOWARD:  Yes.

16           MR. CHAKRAVARTY:  Your Honor, just a final

17  point on authentication.  We also, when we retooled for

18  this case, we got audio/video of portions of that

19  testimony that has her actual voice that goes along with

20  the transcript and we would want to play portions of the

21  audio at the same time so the jury would be able to

22  follow along the transcript.  So there is another

23  exhibit that would be involved as well.

24           THE COURT:  When do you plan on it?

25           MR. CHAKRAVARTY:  Probably do that with a

13

1    separate witness, not with --

2              THE COURT:  Next week?

3              MR. CHAKRAVARTY:  Next week.

4              THE COURT:  All right.  All set?

5                        BEFORE THE JURY

6              THE COURT:  Mr. Chakravarty, whenever you're

7    ready.

8              MR. CHAKRAVARTY:  Thank you, your Honor.

9         CONTINUED DIRECT EXAMINATION OF BRUNO NZEYIMANA

10                     THROUGH AN INTERPRETER

11        Q.   BY MR. CHAKRAVARTY:  Mr. Nzeyimana, we were

12   talking about your observations of roadblocks.  I'm

13   going to ask you now specifically about the I'Huriro

14   roadblock.

15        A.   I will answer.

16        Q.   Approximately how many times did you pass the

17   roadblock at the I'Huriro?

18        A.   About three times I pass by.

19        Q.   And when you passed, approximately how many

20   people were, appeared to be working the roadblock?

21        A.   Approximately on that roadblock there were

22   people working there, about eight to ten people.

23        Q.   And what were the different things that those

24   people were doing?

25        A.   Some would ask for identification.  They would

1    hand it to other people and those people would read it.

2    As far as I'm concerned, that's what I noted.

3         Q.   Where were the other people to whom they would

4    hand the ID, where were they situated?

5         A.   On the way from Gnoma to Nyaruhengeri there

6    was -- they would be situated on the left side because I

7    will go down towards the south.

8         Q.   So when you're heading south those people were

9    on the left side of the road?

10        A.   On the left.  On the side of the road.

11        Q.   Is that the same side of the road as the

12   I'Huriro?

13        A.   Yes, it's on the same side, that's true.

14        Q.   Were those people seated or standing?

15        A.   Some will be seated but most of the time

16   people that would ask for identification would be

17   standing.

18        Q.   Approximately how many people were asking for

19   identification?

20        A.   There were two, and those two would hand it to

21   others.

22        Q.   Aside from the people involved with the

23   checking of the identity, what were the other people

24   doing?

25        A.   I don't understand the question.

1    Q.   You described the eight to ten people who were

2  there, about four or so or more were doing the checking

3  of the identity.  What were the other half of the people

4  doing?

5    A.   As you understand, the two people would hand

6  the identification to others and those other people

7  would read it.  If you were Hutu, you will be able to

8  proceed.  And if you were not, you would go on the side.

9    Q.   Would other, would the other people who were

10  at the roadblock be involved in that process?

11    A.   Yes, they were all involved.

12    Q.   So when you said if you were not Hutu you

13  would go to the side, explain what you mean?

14    A.   It means that those roadblocks were looking

15  for Tutsis, and it was shown in the identification card.

16  It was obvious, you could see -- if you have it, it will

17  be obvious that you are a Tutsi.

18    Q.   And so where were the Tutsis seated?

19    A.   As you can see, out of the team of eight to

20  ten people, when two of them would ask for ID they would

21  hand it to the rest of the team, and if you were not

22  Hutu you will be put on the side.  And out of that

23  group, there were people that would look after you to

24  the point where you wouldn't be able to move.

25    Q.   And you were able to pass through this

16

```
 1   roadblock; correct?

 2        A.   That's correct.

 3        Q.   What is your ethnicity?

 4        A.   I'm a Hutu.

 5        Q.   When you passed through you described that you

 6   were in full uniform.  Did you have a firearm?

 7        A.   Yes.  I had on a military uniform and I had a

 8   gun.

 9        Q.   When you arrived at the roadblock were you

10   searched?

11        A.   Yes.

12        Q.   Did you have an identification?

13        A.   Yes.

14        Q.   Did they look at your identification?

15        A.   And what I had in the bag.

16        Q.   Did you see any woman at the roadblock?

17        A.   I saw her.  It wasn't many of them.

18        Q.   So you saw one woman?

19        A.   Yes.

20        Q.   Before you went through the roadblock did you

21   know who that person was?

22        A.   No.

23        Q.   Can you describe what she was wearing?

24        A.   She was wearing clothes on which was written

25   MRND.
```

1     Q.   Can you describe the clothes?

2     A.   It was clothes that were made of matching

3  pants and shirt.  It was made of green and -- green

4  colors.  Also letters that read MRND.

5     Q.   Holding up 26C and D, do these look familiar

6  to you?

7     A.   Even though it's been a long time since I've

8  seen those colors, it looks the same.  What I can

9  remember, even though it's been a long time, there was

10  also a hand looked like this.

11     Q.   The clothes that I just held up, are those

12  similar to what you saw this woman wearing at the

13  I'Huriro roadblock?

14     A.   Yes.

15     Q.   Approximately how many occasions did you see

16  that woman at the roadblock?

17     A.   Approximately three times because I went to my

18  house four times, but it's three times, that's how much

19  I saw her on the roadblock.

20     Q.   On one occasion did you go through the

21  roadblock with a friend named Pascal?  On one occasion

22  did you go through the roadblock with a friend named

23  Pascal?

24     A.   Yes.

25     Q.   And what was Pascal's ethnicity?

18

1       A.   He was Hutu.

2       Q.   Just like you?

3       A.   Yes.

4       Q.   Describe what happened when you got to the

5    roadblock?

6       A.   We left our area near Nyaruhengeri because we

7    were neighbors, but he was university employee, and when

8    we get to that roadblock where the tire popper was, they

9    stopped me, asked me for my identification, and I

10   provided it.  Then Pascal at some point greeted a woman

11   and say how are you Beatrice.  She say how are you.  He

12   didn't show identification.  I went up zigzagging,

13   swerving around the roadblock --

14       Q.   Let me stop you there.  You were allowed to

15   pass through after your ID was checked?

16       A.   Yes.

17       Q.   And did you and Pascal leave the roadblock at

18   the same time?

19       A.   We left and went up the same time.

20       Q.   So when Pascal and you first came to where the

21   tire popper was, you described that he greeted somebody

22   as Beatrice.  What did that person do?

23       A.   She also replied how are you.

24       Q.   Now, what was she doing at the roadblock on

25   the day that you went through with Pascal?

1       A.    She was standing.  She also took my

2  identification and read it.

3       Q.    Mr. Nzeyimana, at some point last year were

4  you contacted by American investigators?

5       A.    I did talk to them.

6       Q.    And did you go to the Hotel Faucon in Butare?

7       A.    Yes, that's where we interacted.

8       Q.    Did you meet with the American investigators

9  there?

10      A.    I don't understand investigators, what it

11  means.

12      Q.    I'm sorry.  You met with the Americans at the

13  Hotel Faucon in Butare?

14      A.    Yes, there were Americans.  I wasn't getting

15  exactly the nature of the question.

16      Q.    Yes, my apologies.  Investigator means many

17  different things and you're not in law enforcement so

18  that makes sense.

19            Were there any officials of the Rwandan

20  government present at the meeting?  Were there any

21  officials of the Rwandan government present at the

22  meeting?

23      A.    No.

24      Q.    Did you know before the meeting why the

25  Americans wanted to talk with you?

20

1        A.    No.

2        Q.    What did you think they wanted to talk to you

3   about?

4        A.    Since I'm a farmer, I thought they were also

5   farmers from ministry who wanted to talk to me.

6        Q.    Farmers from?

7        A.    Ministry.

8        Q.    What is ministry?

9        A.    Ministry of agriculture and husbandry in

10  Rwanda.  Since I'm a farmer, I thought that's what they

11  wanted to talk to me about.

12       Q.    Did anyone tell you what you should say to the

13  American investigators -- excuse me, the Americans?  Did

14  anyone ever tell you what you should say to the

15  Americans?

16       A.    No.

17       Q.    Prior to that day were you asked about what

18  you had seen at the I'Huriro?

19       A.    Nothing, no.

20       Q.    Now, you have previously testified in a case

21  at Arusha, the United Nations tribunal; is that correct?

22       A.    That's right.

23       Q.    Did that case have anything to do with the

24  I'Huriro?

25       A.    No.

1       Q.   In July of 1994, the end of the genocide, did

2   you flee Rwanda?

3       A.   I fled just like any other Rwandans, soldiers,

4   with whom I was.

5       Q.   Because you were a member of the army, many

6   members of the army fled and they were called the

7   ex-FAR; correct?

8       A.   Yes.

9       Q.   And the military force against whom you had

10   been fighting had now taken over Rwanda; correct?

11       A.   Yes.

12       Q.   And which country did you go to?

13       A.   Congo, Zaire.

14       Q.   How long were you in Zaire?

15       A.   I left in 1996.

16       Q.   Did you return to Rwanda then?

17       A.   I came back to Rwanda.

18       Q.   Did the government ask you to do anything

19   after you came back?

20       A.   Nothing.

21            MR. CHAKRAVARTY:  Thank you.

22            THE COURT:  Mr. Ruoff.

23            MR. ROUFF:  Thank you, your Honor.

24                     CROSS-EXAMINATION

25   BY MR. ROUFF:

22

1          Q.   Did you have to let the Rwandan government

2     know you with returning to Rwanda?

3          A.   (No response.)

4          Q.   I'm sorry, I didn't hear the answer.

5          A.   I don't understand that question.

6          Q.   When you returned to Rwanda, did you have to

7     let the Rwandan government know that you had returned?

8          A.   When we came back they did census of the

9     number of refugees that were returning to the country,

10    and I was one of them.

11         Q.   Did you let them know that you were ex-FAR?

12         A.   Yes.

13         Q.   And you became a farmer after you returned to

14    Rwanda; right?

15         A.   Yes.

16         Q.   You did not go back into the military with the

17    RPF when you returned; right?

18         A.   That's right, I didn't return to the military.

19         Q.   Now, you grew up in that area south of Butare;

20    correct?

21         A.   Ever since I was a child.

22         Q.   And you left Butare in approximately 1982 when

23    you enrolled in the army?

24         A.   That's right.

25         Q.   And until 1993 you were assigned to a combat

1   unit in the north of Rwanda; correct?

2       A.   Please repeat again.  I don't understand well.

3       Q.   I'll move on, your Honor.  You returned to

4   Rwanda in 1993 when you were assigned to Gnoma camp;

5   correct?  You returned to Butare, sorry, in 1993 when

6   you were assigned to Gnoma camp?

7       A.   Correct.

8       Q.   And prior to that time you had not been

9   assigned to live and work in Butare because your unit

10  was up north?

11      A.   Correct.  I was in a place called Gitarama,

12  then I will go on a combat in the north.

13      Q.   Now, you gave some testimony earlier

14  describing a roadblock in the vicinity of the Hotel

15  Ihuriro; correct?

16      A.   I did, that's correct.

17      Q.   Okay.  You described it as an area where there

18  were trees that you kind of had to weave in and out of,

19  right, on the ground?

20      A.   That's not correct.  The way it looked, it was

21  roadblock formed by logs that described as I mentioned

22  earlier.

23      Q.   Okay, there were logs in the road?

24      A.   And beer cases and the tire popper and the

25  bricks, and bricks, but the form was the way I mentioned

1    earlier, that's how the roadblock was.

2         Q.   Okay.  Now that kind of roadblock you had

3    probably seen before in your military experience; right?

4         A.   I don't understand that.

5         Q.   Well, it's the kind of roadblock that you

6    would have to kind of drive through in a swerving path;

7    right?

8         A.   As far as that roadblock is concerned, that's

9    exactly how I described it.  It was different from the

10   actual roadblock that blocks the road using a piece of

11   tree blocking the street.

12        Q.   I believe you said earlier that you went

13   through the roadblock by the Ihuriro Hotel three times;

14   correct?

15        A.   It's four.  It's four.

16        Q.   Four times?

17        A.   It's more than three.  It's four.

18        Q.   Now, if -- you were going through that

19   roadblock to go home; right?

20        A.   Correct.

21        Q.   Now, between the camp in Gnoma and your home

22   during the genocide there were many roadblocks; correct?

23   I don't want you to name them all.  Just that there were

24   many of them?

25        A.   Yes, there were a lot of them.

25

1     Q.   And you had to show your ID at all of them;

2  correct?

3     A.   Correct.

4     Q.   Is it fair to say that there were close to 15

5  to 20 roadblocks between Gnoma camp and where you live

6  in Nyaruhengeri?

7     A.   No, that wouldn't be correct.

8     Q.   How many?

9     A.   I mentioned that five were in the city area.

10  Others were for civilians.  You will find one roadblock

11  and trouble a few kilometers before you find another and

12  so on.

13     Q.   So how many were there?

14     A.   Countryside roadblocks were a lot of them.  I

15  was talking about, I talked to you about roadblocks from

16  the city area.  As far as countryside roadblocks, I

17  wouldn't exactly count all of them and come out with a

18  number.

19     Q.   Were there too many to remember?

20     A.   I would remember them.  Since you just asked

21  me to, let me think about it.  I will pass through about

22  six sectors.  I think every sector had one roadblock

23  each.

24     Q.   And many of the roadblocks had a lot of people

25  around the roadblock; correct?

26

```
 1        A.    I don't understand whether it's roadblocks in

 2   the city area or country --

 3        Q.    In the city area.

 4        A.    In the city area on the roadblock that I was

 5   able to go through, it wouldn't be more than ten people,

 6   but excluding people whom they found out not having

 7   identification.

 8        Q.    Did you ever see hundreds of people delayed at

 9   the roadblock?

10        A.    It wasn't hundreds of people but it was a

11   number of people.  Sometimes it would be two people or

12   four people or 12 people that were put on the side, one

13   person on the side.

14        Q.    Now, Butare in 1994 was the second largest

15   city in Rwanda; correct?

16        A.    Yes.

17        Q.    And the Butare population, only if you know,

18   was about 2 million people; is that accurate?

19        A.    Due to the fact that I was in the military I

20   wouldn't exactly tell the number of people in Butare.

21        Q.    Is that because you spent most of your time in

22   camp Gnoma?

23        A.    That's correct, too.

24        Q.    Now, the first time anyone came to talk to you

25   about this case was in June of 2012; correct?
```

27

 1      A.   That's correct, it was in June, yes.

 2      Q.   And that was the first time that anybody asked

 3  you questions concerning roadblocks in Butare; correct?

 4      A.   Correct.

 5      Q.   Now, how did you first learn that Americans

 6  wanted to talk to you in 2012?

 7      A.   I don't understand the question.

 8      Q.   How did you learn that people from America

 9  wanted to talk to you in June?

10      A.   There was a man called me at Hotel Faucon and

11  told me that there were white people that were looking

12  for me.

13      Q.   Okay.  Was the man that called you from Hotel

14  Faucon someone that he knew?

15           THE INTERPRETER:  Would you repeat?

16      Q.   That he knew.

17           THE INTERPRETER:  Okay.

18      Q.   Not you, Freddy, him.

19      A.   I didn't know him.

20      Q.   Did he tell you his name?

21      A.   He did because I wouldn't have left

22  Nyaruhengeri without knowing who was calling me.

23      Q.   And what was his name?

24      A.   His name was Pierre.

25      Q.   What was his family name?

28

```
 1        A.    I didn't ask him.

 2        Q.    You only got his first name, his Christian

 3   name?

 4        A.    Yes.

 5        Q.    Was he speaking in Kinyarwandan?

 6        A.    Yes.

 7        Q.    Was his Kinyarwandan very good?

 8        A.    It was good.

 9        Q.    Was it your understanding that he was Rwandan?

10        A.    He was Rwandan.

11        Q.    Did he tell you where he was from?

12        A.    I didn't ask him where he was from because I

13   could tell he was Rwandan like me.

14        Q.    Could you tell by his accent that he was

15   actually from the south of Rwanda?

16        A.    I didn't speculate on that due to the number

17   of people I meet or I interact with.  I didn't speculate

18   on that.

19        Q.    Did he tell you that he was working for the

20   U.S. government?

21        A.    No.

22        Q.    Now, you said before that when you went to the

23   interview you assumed that the people that wanted to

24   talk to you were from the ministry of agriculture;

25   correct?
```

1       A.   Correct.

2       Q.   So you must have assumed that the person that

3  was calling you was trying to set up an interview with

4  you and the Rwandan government; correct?

5       A.   That's correct, because there were a lot of

6  associations, agriculture associations for whom I was a

7  leader.

8       Q.   Did Pierre mention the word agriculture when

9  he talked to you?

10      A.   No.

11      Q.   So you must have been completely surprised

12  when the Americans didn't ask you questions about

13  agriculture; correct?

14      A.   Correct.

15      Q.   Now, when you met with the American

16  investigators, you didn't tell them the little story

17  about your friend Pascal, did you?

18      A.   I don't understand the question.

19      Q.   When you met with the American investigators,

20  you didn't tell them that you had gone through the

21  roadblock with your friend Pascal, did you?

22      A.   I think the question is complicated.

23      Q.   Well, on direct examination the prosecutor

24  asked you about a trip to the roadblock and you said you

25  were going with a friend of yours named Pascal; correct?

1        A.   I said that.

2        Q.   Yes, you did.  But you never told U.S.

3   investigators in June about this person Pascal; correct?

4        A.   I said that.

5        Q.   You did tell investigators about Pascal, is

6   that what you're saying?

7        A.   (No response.)

8             THE INTERPRETER:  Continue?

9        Q.   I asked him a question.

10        A.   I didn't understand your question.

11        Q.   When you spoke to the U.S., Americans, in

12   Hotel Faucon, did the word or name Pascal come out of

13   your mouth?

14        A.   I said that.

15             MR. ROUFF:  Can I have just a second, judge.

16             THE COURT:  You may.

17             (Pause.)

18             MR. ROUFF:  Thank you, sir.  Enjoy your first

19   nor'easter.

20             THE COURT:  Any redirect?

21             MR. CHAKRAVARTY:  Just briefly, your Honor.

22                     REDIRECT EXAMINATION

23   BY MR. CHAKRAVARTY:

24        Q.   When you met with the Americans in Butare, did

25   they ask you all of the questions that I told you that I

1    would be asking you?

2         A.   No.

3         Q.   Did they ask you with all the detail with

4    which I explored with you what happened?

5         A.   I don't understand that.

6         Q.   We went through a long session today and I

7    asked you many, many questions about small steps during

8    the genocide.  When the Americans met with you in

9    Butare, did they do that kind of a meeting with you or

10   was it more general?

11        A.   We talked at first in general.

12        Q.   And then you told them about the I'Huriro?

13        A.   I told them about that after they found out

14   that I was in the military, but I didn't mention that

15   the same day.

16        Q.   So by the end of your time talking to the

17   Americans, did you tell them that you saw someone

18   responding to Beatrice at the roadblock?

19        A.   I told them that.

20        Q.   With regards to this person that asked you to

21   go to the Hotel Faucon where you met with the Americans,

22   was he the one asking you questions at the hotel?

23        A.   No.

24        Q.   Did the Americans bring their own translator?

25        A.   (No response.)

32

```
1       Q.   I'll ask another question.  Was there a
2   translator with the Americans who helped you communicate
3   with the Americans?
4       A.   Yes, yes, there was.
5       Q.   And that person was not the Pierre that asked
6   you to go to the hotel?
7       A.   It wasn't Pierre.
8            MR. CHAKRAVARTY:  That's all I have.
9            MR. ROUFF:  One quick question.
10           THE COURT:  You may.
11           MR. ROUFF:  Because he just said something
12  that I need to ask about, and maybe it's an
13  interpretation issue.
14                        RECROSS-EXAMINATION
15  BY MR. RUOFF:
16      Q.   I believe, sir, that you said that it was only
17  after they found that you were in the military that you
18  told them about the roadblocks and that you didn't tell
19  them that same day.  Did you meet with the investigators
20  on more than one day?
21           THE INTERPRETER:  Would you repeat that,
22  please?
23      Q.   Just ask him the question, did you meet with
24  the investigators on more than one day?
25      A.   You mean here or in Rwanda?
```

1      Q.   In Rwanda.

2      A.   I didn't see them.  I don't understand the

3  question.

4      Q.   Did you meet with the federal agents on more

5  than one day in Rwanda?  I'm sorry, let me ask a better

6  question.  I think I know why he's confused.  Did you

7  meet with the Americans on more than one day in Butare?

8      A.   We met more than once.

9      Q.   Okay.  How many times did you meet with the

10  federal agents in Butare?

11      A.   About three times.

12      Q.   Was it always the same three, the same agents

13  that you met with?

14      A.   That was the case.  Those were people that

15  were with me all the time.

16      Q.   And on each one of those interviews was the

17  interview set up, was the interview set up by this

18  gentleman Pierre?

19      A.   No.  Pierre only called me once, the first

20  time.

21      Q.   How were the other meetings set up?

22      A.   Let me explain it.  Pierre called me the first

23  time and he mentioned that there were white people that

24  were looking for me.  And when I got there I asked them

25  what they needed me for.  Then they told me they needed

34

1    me, then I eventually went back home and they called me

2    back later.  And I eventually told them that I was in

3    the military.

4        Q.   Okay.

5        A.   And they asked me questions and I gave

6    details.

7        Q.   Did you ever talk to any other Rwandan other

8    than Pierre on behalf of the agents?

9        A.   Other than the translator?

10       Q.   Other than the translator.

11       A.   No one.

12            MR. ROUFF:  I'm all set.  Thank you very much.

13            MR. CHAKRAVARTY:  Can I just clarify.

14                 REDIRECT EXAMINATION

15   BY MR. CHAKRAVARTY:

16       Q.   So did you tell them about the I'Huriro and

17   Beatrice in Rwanda?

18       A.   They found out that I was from Nyaruhengeri,

19   and as far as Gnoma is concerned that I was there, and I

20   explained how I would go through all those roadblocks.

21       Q.   And that's when you told them about Beatrice?

22       A.   They asked me about that after I explained, I

23   described the roadblock.  I didn't know Beatrice.  I

24   didn't know her.

25       Q.   I'm just asking you about the name Beatrice.

1    Did you say it to the Americans at that time?

2         A.   At that time I did.

3              MR. ROUFF:  Nothing further.

4              THE COURT:  Okay, thank you, sir, you may step

5    down and you're excused.  Appreciate it.

6              And Mr. Capin, you may call your next witness.

7              MR. CAPIN:  The government calls Donald

8    Monica, your Honor.

9              THE CLERK:  Please raise your right hand.

10                        DONALD MONICA

11       having been duly sworn, testified as follows:

12             THE CLERK:  Please be seated.  For the record,

13   state your full name and spell your last name.

14             THE WITNESS:  My name is Donald James Monica.

15   M-O-N-I-C-A.

16                     DIRECT EXAMINATION

17   BY MR. CAPIN:

18        Q.   Mr. Monica, good afternoon.

19        A.   Good afternoon.

20        Q.   Please tell the jury what you do for a living?

21        A.   I'm with U.S. Citizenship and Immigration

22   Services.  I'm associate director in their headquarters.

23        Q.   What is U.S. Citizenship and Immigration

24   Service?

25        A.   It's a government agency responsible for

1    immigration benefits to the United States.  Green cards,

2    citizenship, that sort of thing.

3         Q.   And how long have you -- we'll refer for

4    today's purposes, to save syllables, as USCIS?

5         A.   Correct.

6         Q.   How long have you been with USCIS?

7         A.   Since it was founded in March 2003, and I was

8    with its predecessor agency, Immigration and

9    Naturalization Service, INS, since May of 1980.

10        Q.   As the associate director of field operations,

11   generally what are your duties?

12        A.   I oversee all of USCIS offices, domestic

13   offices except a few small ones that do specialized

14   things like asylum and employment-based immigration and

15   such.

16        Q.   And how long have you been the associate

17   director of field operations?

18        A.   Either permanent or acting since August of --

19   I'm sorry, October of 2010.

20        Q.   Before that where were you assigned?

21        A.   Before that I was the regional director for

22   the southeast region with USCIS.

23        Q.   You were employed, then, prior to March of '03

24   with what we used to call INS?

25        A.   Correct.

```
 1        Q.   As an INS employee, were you ever posted or

 2   assigned to a job outside the country?

 3        A.    Four different occasions.  I did a couple

 4   years in Toronto, Canada; couple years in Montreal,

 5   Canada; five years in Nairobi, Kenya; and about a year

 6   and a half, two years in Moscow, Russia.

 7        Q.   What were the five years you spent in Nairobi,

 8   Kenya?

 9        A.    1991 to '96.

10        Q.   What was your job in Nairobi?

11        A.    For the first year, 13 months, I was the

12   assistant officer in charge, and for the rest of the

13   time I was the officer in charge.

14        Q.   What were your duties when you were assigned

15   to the Kenya office?

16        A.    A number of things related to INS activities.

17   About 80, 85 percent of it was the refugee resettlement

18   program, and the rest would be foreign orphans for

19   adoption in the United States, certain marriage

20   petitions, that sort of thing.

21        Q.   Were you handling applications by refugees

22   seeking to come to the U.S.?

23        A.    Correct.

24        Q.   Were those refugees during your five years in

25   Nairobi -- am I correct, Nairobi is the capital of
```

38

1    Kenya?

2         A.    Correct.

3         Q.    During your five years in Nairobi, were you

4    working only with refugees who were living at that time

5    in Nairobi?

6         A.    No.  In fact very few were in Nairobi.  The

7    INS office in Nairobi at the time was the only one in

8    Africa.  We had responsibility for all INS

9    responsibilities in Sub-Saharan Africa.

10        Q.    As part of your job responsibility, would you

11   travel to locations where refugees were living while

12   seeking refugee status?

13        A.    Yes.

14        Q.    In other countries?

15        A.    Yes.

16        Q.    Could you ballpark -- how many countries did

17   you go to during your five years in Nairobi, Kenya?

18        A.    Twenty-one African countries.  I'd have to

19   think and count to say how many were refugee processing,

20   but probably two-thirds or more.

21        Q.    During your five years in Nairobi, again, just

22   count just generally, how much of your time did you

23   spend traveling other parts of Kenya or other parts of

24   Sub-Saharan Africa to refugee camps?

25        A.    It varied from year-to-year but generally

1    somewhere between 25 percent and a third of the year

2    outside of Kenya.  There were a number of refugee camps

3    in Kenya that we would spend time at outside of Nairobi.

4         Q.    You said that you started as the assistant

5    officer in charge and then became the officer in charge;

6    is that correct?

7         A.    Correct.

8         Q.    When did you become the officer in charge?

9         A.    December 1992.

10         Q.    I want to direct your attention, then, to

11    February 1995.  Were you the officer in charge at that

12    point?

13         A.    Yes.

14         Q.    Where was your work station, where were you

15    assigned?

16         A.    In Nairobi.  The INCS office was at the

17    American embassy in Nairobi.

18         Q.    I'm going to show you what is in evidence as

19    Exhibit 6, and I'm going to show you the package that

20    you brought with you and just ask you to glance at the

21    two for a moment.  First of all, I'm handing you the

22    package you walked into the courtroom with this

23    afternoon.  What is that package?

24         A.    It's an Alien File.  Short name is A-File.

25    It's --

1    Q.   I'll show you.  You brought two files?

2    A.   Correct.

3    Q.   I show you just one file you brought.

4    A.   Ah-hum, it's --

5    Q.   First of all, what is an A-File?

6    A.   It's a record of immigration activities

7    usually for foreigners who are rarely U.S. citizens

8    unless they've naturalized, but it's basically the

9    immigration history of an individual.

10   Q.   Does USCIS and it's predecessor INS document

11   every stage of the immigrant process for an immigrant to

12   come to this country?

13   A.   Yes -- well, yes.

14   Q.   Including immigrants who come as refugees?

15   A.   Correct.

16   Q.   And so that Alien File or A-File, does that

17   correspond to a particular immigrant?

18   A.   Yes.

19   Q.   To whom?

20   A.   It is the Alien File of Beatrice Munyenyezi.

21   Q.   So, and I believe in front of you, is there a

22   document, Exhibit 7?

23   A.   Six.

24   Q.   Six.  And take a look at that and tell me if

25   that is also Beatrice Munyenyezi's A-File, or a copy

1   thereof?

2        A.   It appears to be a copy, yes.

3        Q.   Describe generally what types -- strike that.

4   Have you reviewed Ms. Munyenyezi's A-File in its

5   entirety?

6        A.   Yes.

7        Q.   And have you spent particular attention

8   reviewing the portion that relates to her application to

9   become a refugee in this country?

10        A.   Yes.

11        Q.   I'm going to display certain documents on the

12   screen in front of you, sir.  And just to be clear,

13   Exhibit 6, take a moment and look through it and tell me

14   if it appears to be the same as the original you brought

15   with you.  And I'm not asking you to do it page by page.

16   The parties have agreed that's her A-File.

17        A.   Yes, it appears to be.  It's just assembled

18   differently.  This is in two sides of the file.  That's

19   a single file.

20        Q.   So I'm going to show you not the entirety of

21   this two-inch stack, maybe about 10 or 15 pages of it.

22   I'm going to start with --

23             MR. CAPIN:  May I have a moment, your Honor,

24   with Mr. Howard?

25             THE COURT:  Yes.

42

1          (Pause.)

2          MR. CAPIN:  For the record, your Honor, I'm

3    going to be --

4          Q.   Do you recognize the page that I'm displaying

5    on the overhead, sir, or on the screen?

6          A.   I do.

7          Q.   And what is that document?

8          A.   It's a 49590 which is the standard form for

9    refugee application.

10         Q.   And the applicant is, I know it's hard to read

11   on the screen, but is that Beatrice Munyenyezi?

12         A.   Appears to be, yes.

13         MR. CAPIN:  For the record, your Honor, the

14   parties have agreed that certain information in the

15   interest of privacy of the defendant's children has been

16   redacted or erased from this file, for example, dates of

17   birth, but I'm going to show the witness an unredacted

18   version of only this page.

19         Q.   Is this the same page I just showed you, sir,

20   the first page of her, Ms. Munyenyezi's registration for

21   classification as a refugee?

22         A.   Yes.

23         Q.   And in fact is her name displayed on line one

24   as the name of the applicant?

25         A.   Yes.

1      Q.    And under the reasons for -- what is that

2   reason section in Box 5 intended to capture?

3      A.    In order to qualify for refugee status in the

4   United States there are several things an individual has

5   to do.  One of them relates to a well-founded fear of

6   persecution for certain specified reasons, and that's a,

7   even though it says state in detail, it tends just to be

8   a summary of the reasons.

9      Q.    Before we dwell on this document, can you

10   explain to the jury what the process is for a person

11   seeking to become a refugee and come to this country?

12      A.    There are several steps to the process.  Most

13   of it is handled by the Department of State, or agents

14   acting on behalf of the Department of State.  One part

15   of it was the then INS now USCIS piece, there's some

16   preprocessing, the actual interview with INS, the

17   decision by INS, and if the case is approved, there's

18   post-adjudication processing that assist with departure.

19      Q.    So describe what a person seeking refugee

20   status in Nairobi, Kenya, in 1995 would do to start the

21   process?

22      A.    The -- this would be broader than just

23   Nairobi, but it would be true of all refugee applicants

24   in Africa at that time.  There's a variety of priorities

25   in terms of who can get in the line and who cannot get

44

1    in the line.  Those priorities included family

2    relationships, certain conditions in the country, and

3    first asylum.  If an individual fell into one of those

4    priorities, he or she would be registered with an entity

5    acting on behalf of the State Department known as Joint

6    Voluntary Agency or JVA.  JVA would assist the person in

7    completing the forms.  Schedule the person for an

8    interview with INS.  After the interview, if the case

9    was approved, JVA would coordinate the medical exam

10   departure processing, sponsorships in the U.S.

11        Q.   Is it fair to say that there are, in any given

12   year, a thousand or more people seeking refugee status

13   than there are spots for them in this country?

14        A.   Yes.

15        Q.   Now, with regard to JVA, what was JVA's role

16   on the ground in Nairobi in 1995 when you were the

17   officer in charge?

18        A.   Primarily determining whether somebody

19   actually fell within one of the designated priorities,

20   consequently could even get into the program queue, into

21   the line to begin with, complete forms, that sort of

22   thing, schedule, and then when we were finished with it,

23   the departure, processing medical exams, et cetera.

24        Q.   And did you have extensive experience in

25   Nairobi with JVA?

45

1        A.    Yes, almost daily.

2        Q.    Was JVA working under a contract with the U.S.

3    Department of State?

4        A.    Yes.   The contract was with their parent

5    entity Church World Service, but it was under a contract

6    with the Department of State.

7        Q.    And as a part of that contract, was JVA

8    required to use qualifying competent interpreters as

9    necessary to communicate --

10        A.    Yes.

11        Q.    -- with refugee applicants?

12        A.    Yes.

13        Q.    In your five years stationed in Nairobi did

14    you have occasion to communicate with the refugee

15    applicants with the use of JVA approved interpreters?

16        A.    More often than not, yes.

17        Q.    In your experience were they incompetent?

18        A.    Yes.

19        Q.    Did you ever have occasion to ask for a new

20    interpreter because the one who was doing the

21    interpretation was in your estimation not competent?

22        A.    Not with the JVA in Nairobi, but earlier on

23    there was an equivalent entity in West Africa primarily

24    dealing with Liberian refugees, I did have problems with

25    their translators a few times and traded them out, and

46

1  perhaps once or twice in Sudan which was a different

2  entity from the JVA.

3      Q.    And to be clear, the JVA, then, was

4  translating from whatever the refugee's language was in

5  to English to communicate with you?

6      A.    The JVA translator was, yes.

7      Q.    And among the educated people in Nairobi at

8  the time, English was commonly spoken; correct?

9      A.    Yes.

10      Q.    Turning, then, to this refugee application.

11  Did you review this -- well, strike that.  At some point

12  did you adjudicate the refugee application submitted by

13  Beatrice Munyenyezi?

14      A.    Yes.

15      Q.    And explain to the jury what you mean by

16  adjudicate?

17      A.    The, essentially the process, whether in

18  Nairobi or in the refugee camp is the same.  The JVA

19  would set up an interview schedule, INS would provide an

20  officer, sometimes me, often someone else, who would go

21  to the particular interview site to get the file the JVA

22  had prepared, review the file, interview the applicant

23  looking for whether they qualified as a refugee, and if

24  they did seem to qualify, whether they met the

25  admissibility requirements to the United States which

47

1    are separate and apart from the refugee qualification.

2         Q.   Okay.  We'll turn to those as well in a

3    moment, but am I correct, then, in understanding before

4    you met in Nairobi with a refugee applicant, that

5    Nairobi already had had a meeting with JVA?

6         A.   Several.

7         Q.   Several.  And JVA would assist that person in

8    completing, that's a -- in completing the refugee

9    application?

10        A.   Correct.

11        Q.   Did you review -- can you tell by reference to

12   the A-File whether you reviewed the refugee application

13   on the screen in front of us before adjudicating

14   Beatrice Munyenyezi's application for refugee status?

15        A.   I can tell from having reviewed the A-File in

16   this particular form, the evidence of that would be on

17   the back of the form.

18        Q.   Okay, fair enough.  But is the answer, then,

19   yes, you did review this?

20        A.   Yes.

21        Q.   Now, going back to the question I asked a

22   couple minutes ago, what is the purpose of the

23   information in Box 5 where it says reasons, state in

24   detail?

25        A.   It's the applicant's initial statement of why

48

1    he or she believes they have a well-founded fear of

2    persecution if they were to return to their home

3    country.

4         Q.   And a well-founded fear of persecution, is

5    that a term with specific meaning in immigration law for

6    INS purposes?

7         A.   Yes.

8         Q.   What does it mean?

9         A.   It's a fairly low standard but it means, it's

10   basically based on your account of events.  Is it

11   plausible that if you were to return to your home

12   country you would be persecuted because of one of five

13   enumerated grounds.

14        Q.   And is that -- is that the basic eligibility

15   requirement?

16        A.   Yes.

17        Q.   What other eligibility requirements are there

18   to be eligible as a refugee to come to this country?

19        A.   Under the definition of refugee you've got the

20   well-founded fear for one of the five enumerated

21   grounds.  There's in that same definition a clause

22   relating to certain people who can be processed in their

23   country of nationality that did not apply anywhere in

24   Africa.  There were a couple countries around the world

25   but not in Africa where that applied.  Then there was

1    also a statement that if you had engaged in persecution,

2    there's a number of words used, encourage, induce, a

3    variety of phrases, I don't recall them all right now,

4    that the refugee definition did not apply to you.

5        Q.   So, is that commonly referred to in your line

6    of work as the persecutor bar?

7        A.   Yes.

8        Q.   So that means that somebody who has engaged in

9    persecution by directly or indirectly persecuting

10   others, that person cannot become, by definition cannot

11   become a refugee?

12       A.   Correct.

13       Q.   Okay.  So the statement in Section 5 is of the

14   applicant, in this case Munyenyezi's statement of why

15   she has a well-founded fear of returning to her home

16   country; is that correct?

17       A.   Yes.

18       Q.   I'm going to read it to you, sir.  Tell me if

19   I read correctly, please.  In July 1994 there was a

20   violent change of the government in Rwanda.  Given the

21   extent of the killing that took place before and after

22   the takeover, many people fled the country and are --

23   can you read that next word, sir?  Oh, up to date

24   unwilling to go back so long as the security situation

25   does not improve.  I happen to be among those people.

50

1    Did I read that correctly?

2         A.    Yes.

3         Q.    And am I correct in noting that there are

4    three children listed on the application as well?

5         A.    Correct.

6         Q.    And without focusing on the names, typically

7    the dates of birth, is the first child born on

8    November 20, 1993?

9         A.    Yes.

10        Q.    And that's expressed as 20, as in 20th of

11   November, 1993?

12        A.    Correct.

13        Q.    September, Mr. Chakravarty is correcting me,

14   September of 1993.  And the, then there are twins

15   apparently born on the 20th of November 1994; is that

16   correct?

17        A.    Yes.

18             MR. CAPIN:  Your Honor, I wish I could say I

19   could send Mr. Monica home now, but this may be the time

20   for a break.

21             THE COURT:  It's going to take you a while?

22             MR. CAPIN:  Not that long but another half an

23   hour.

24             THE COURT:  You expect to cross?

25             MR. HOWARD:  Yes.

1          THE COURT:  All right.  Ladies and gentlemen,

2     we'll adjourn for the evening.  Let me just check one

3     thing.  The deputy clerk was going to follow the weather

4     and give me a report.

5          So we will plan on resuming again tomorrow

6     morning at 9:00.  We will plan on adjourning at

7     1 o'clock.  If the snow proves to be heavier earlier

8     than we anticipate, we're obviously flexible enough to

9     adjourn earlier than that.

10         Please don't discuss the case during the

11    course of the adjournment and we'll see you tomorrow

12    morning at 9:00.

13              (Jury exited the courtroom.)

14         THE COURT:  I'm not even sure that's present

15    sense impression as I think about it.  I don't think it

16    was.

17         MR. HOWARD:  Isn't there an expression that

18    ship has sailed?

19         THE COURT:  Yes, yes, but just of academic

20    interest it seems to me, don't you agree, the way it

21    came in it, the way it came in it was simply testimony

22    of what he actually perceived.  The witness simply

23    reported what he observed.

24         MR. HOWARD:  Then he said somebody else

25    identified her by name.

52

```
 1              THE COURT:  I don't think he did.

 2              MR. HOWARD:  He did.  The friend Pascal.

 3              THE COURT:  You never got to that.

 4              MR. CHAKRAVARTY:  He did.  He said in one

 5   swoop that she addressed him.  Said hello, Beatrice, and

 6   she said how are you --

 7              THE COURT:  How are you, what he observed.

 8              MR. CHAKRAVARTY:  And then --

 9              THE COURT:  He never said Pascal later -- I

10   later said to Pascal who was that and he said Beatrice.

11              MR. CHAKRAVARTY:  No, right, I expressly did

12   not elicit that based on the conversation.

13              MR. HOWARD:  But the statement of Pascal,

14   hello Beatrice, is a hearsay statement being offered to

15   prove for the truth of the matter asserted that the

16   person he's talking to is Beatrice.

17              THE COURT:  Oh, I disagree.  But if that's the

18   case it's the present sense.  Have a good evening.

19              MR. HOWARD:  I told you that ship sailed.

20              (Adjourned at 3:00 p.m.)

21

22

23

24

25
```

53

```
 1

 2                    C E R T I F I C A T E

 3

 4          I, Sandra L. Bailey, do hereby certify that

 5     the foregoing transcript is a true and accurate

 6     transcription of the within proceedings, to the best of

 7     my knowledge, skill, ability and belief.

 8

 9

10     Submitted: <

11                            SANDRA L. BAILEY, LCR, CM, CRR

12                            LICENSED COURT REPORTER, NO. 15

13                            STATE OF NEW HAMPSHIRE

14

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO
2/11/2014

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                       \*
UNITED STATES OF AMERICA               \*
                                       \*  10-CR-85-SM
                v.                     \*  February 8, 2013
                                       \*  9:10 a.m.
BEATRICE MUNYENYEZI                     \*
                                       \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*




Day 4
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. MCAULIFFE
and a jury


Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH and MA)

For the Defendant:    Mark E. Howard, Esq.
                      David W. Ruoff, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH 03104


Interpreters:         Freddy Munana
                      Sabrina Iyadede


Court Reporter:       Diane M. Churas, CSR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1442

1                          I N D E X

2

3
    WITNESS:          DIRECT    CROSS    REDIRECT      RECROSS
4

5   DONALD MONICA

6   By Mr. Capin      10                    84

7   By Mr. Howard               42                        93

8
    VESTINE NYIRAMINANI
9
    By Mr. Capin      94                    128
10
    By Mr. Howard               115
11

12

13  EXHIBITS:                            ID.    Evid.

14  Government's Exhibit 7                      55

15

16

17

18

19

20

21

22

23

24

25

```
 1                     BEFORE THE COURT

 2          THE COURT:  Weather?  It is what it is.

 3          MR. CHAKRAVARTY:  It is what it is.  Obviously

 4   Mr. Capin and I are more than willing --

 5          THE COURT:  Are you staying over?

 6          MR. CHAKRAVARTY:  We're not staying over.  We

 7   also have a real sense of responsibility to our team,

 8   many of whom live right in --

 9          THE COURT:  It's a little late for this

10   speech.

11          MR. CHAKRAVARTY:  Fair enough.  They have

12   advanced the estimates in terms of the beginning time of

13   the snowfall.

14          THE COURT:  Who's they?

15          MR. CHAKRAVARTY:  The Weather Service.

16          THE COURT:  Not what I'm seeing.  Late

17   afternoon, evening.

18          MR. CAPIN:  They're saying whiteout at two

19   p.m. in Boston.  And Professor Longman, for example, is

20   driving into that, as are obviously members of our team.

21          THE COURT:  Are you going to get to Professor

22   Longman today?

23          MR. CAPIN:  He's here.

24          MR. CHAKRAVARTY:  He's on his way here.  He

25   might be out there.  If we can send him back, I'd like
```

1    to be able to do that.

2              We have another witness after this one, but it

3    may not take us to one p.m.  The governor in

4    Massachusetts has said get off the road --

5              THE COURT:  I know.

6              MR. CAPIN:  Get off the roads at 12.  A lot of

7    other -- the court's closing at 12 down there.  Again,

8    it's not because we're Massachusetts wimps.

9              THE COURT:  Really defending yourself against

10   some evidence of it perhaps.

11             MR. CHAKRAVARTY:  As you pointed out, your

12   Honor, it's not about counsel.  It's about the rest of

13   the team.

14             THE COURT:  Oh, if it's not about counsel,

15   then no problem.  We'll see how it goes, but we're not

16   advised that there's any acceleration in the weather.  I

17   thought you were staying over honestly.  Maybe we should

18   think about it.  Dr. Longman, I mean, I hate -- that

19   speech was for yesterday, not today.  We already brought

20   the jury in.  They've counted on a day till one.  If

21   your team is really in that dire straits, I suggest you

22   get hotel rooms in Concord.  Easy enough to do.

23             MR. CAPIN:  I guess maybe even a minor

24   accommodation, like 11:30 or noon.

25             THE COURT:  Sure, we'll see where we are.  I

1   don't want to bring the jury all the way in here -- some

2   people are coming for an hour and a half -- and then

3   tell them that the government's team needs to be

4   accommodated and therefore we're going to cut the time

5   in half.  Can't do that.  You've got to adapt I think.

6   You've got to tough it out.

7            So we'll see how we go, but certainly -- you

8   know, if we get to noon-ish that's probably okay.  I

9   don't want to cut it much.

10            MR. CHAKRAVARTY:  We understand.  I don't know

11   if your Honor wants to take this up now, but the defense

12   filed an objection to the ICTR transcripts.

13            THE COURT:  You're bringing Dr. Longman up,

14   you're going to put on another witness, you're going to

15   do another 40 minutes of how do you know the streets of

16   Rowanda and Butare.

17            MR. CHAKRAVARTY:  I'll try not to do that.

18            THE COURT:  You're not going to get to Dr.

19   Longman if you do that.

20            MR. CAPIN:  We're going to take the Court's

21   advice and try to do that direct in 30 or 40 minutes.

22            THE COURT:  Fifteen is what I said.

23            MR. CAPIN:  Fifteen, the entire exam, your

24   Honor, with the interpretation?

25            THE COURT:  No, no.  My problem yesterday --

1    again, I will try to stay out of your way a little bit

2    as long as we're moving along.  45 minutes, are you sure

3    you know the streets of Butare?  What did he add?  I saw

4    the roadblock three or four times.  A friend of mine

5    called a woman who I saw at the roadblock Beatrice.

6    Really?  An hour and a half for that?

7              MR. CAPIN:  Well, your Honor, today we'll be

8    more brief, although obviously every witness has a

9    unique basis of knowledge.

10             THE COURT:  Yes, and that's what I'm trying to

11   get to you, is losing yourself in excruciating detail

12   about what store is on the corner of East Second Street

13   and North Third Street, that means nothing to the jury,

14   and continuously showing a black and white fuzzy,

15   grainy, poor excuse for a map and debating about what

16   intersection is really the main intersection means

17   nothing to this jury.

18             MR. CAPIN:  We appreciate the guidance and

19   suggestion.  The next Rowandan witness will be much

20   more --

21             THE COURT:  Okay.  Your case, within reason.

22   I mean, my management.  Your case.

23             MR. CAPIN:  We get all the signals.

24             MR. CHAKRAVARTY: The issue is do you want to

25   take up the ICTR issue now.

```
 1              THE COURT:  Sure.  There's not much to it.
 2   What's your position?  We say she's told the truth all
 3   along.  Her prior consistent statements show that she's
 4   told the truth, but actually the government says she was
 5   lying and therefore it's a 404(b) evidence?  Seriously?
 6              MR. HOWARD:  Yes, very seriously, Judge.  They
 7   are charging her with lying on immigration forms.  We
 8   say she's not lying on the immigration forms.
 9              THE COURT:  You're denying it.  You're saying
10   not so.
11              MR. HOWARD:  Right.  So in an uncharged,
12   totally unrelated proceeding, they want to introduce
13   evidence of lying about other things.
14              THE COURT:  The lies consisting of prior
15   consistent statements from your point of view.  I did
16   not participate in the genocide, my husband did not
17   participate in the genocide.  How is that 404(b)?
18              MR. HOWARD:  Because they're introducing it as
19   prior or uncharged misconduct for which she had a
20   propensity to lie.  That's what they're offering it for.
21              MR. CHAKRAVARTY:  That's not accurate.  I
22   characterize it as her lies, but it's her statements to
23   anybody who would come in if it's about the subject
24   matter we're proving.
25              MR. HOWARD:  They can't argue that they're
```

8

1   lies because then they're using it to show that it's

2   uncharged misconduct that's propensity.

3           THE COURT:  Well, they're using it to show a

4   consistent presentation of a certain set of facts that

5   they claim are false.  It would come in under 404(b)

6   anyway because it has special relevance.  It shows her

7   knowledge.  It shows her absence of mistake.  It shows

8   this isn't a translation issue.  This isn't some

9   translator that misconstrued what she said and put it

10  down on the form.  She's consistently said the same

11  things previously.  Lack of accident, mistake.

12          MR. HOWARD:  I'm not aware, Judge, that the

13  statements from the ICTR are the same statements that

14  they say are same lies on her visa application.

15          THE COURT:  They don't have to be identical.

16  The general nature of the statements.  Aren't they lack

17  of participation?  Is that what it is?

18          MR. CAPIN:  Most of them are lack of

19  participation.  Some of them are other statements about

20  what was happening around the I'Huriro, the fact that

21  she was with her husband all the time.  Her husband

22  didn't do anything.  They were staying at the house,

23  that kind of stuff.

24          MR. HOWARD:  Which there's no lie on the visa

25  application, no statement in the application about it.

1          THE COURT:  Okay.  I've read your pleading.

2    Appreciate your argument.  Objection sustained.  Motion

3    in limine denied.

4          MR. CHAKRAVARTY:  Your Honor, then the

5    government would move to strike the ID on three of the

6    four ICTR transcripts.  The fourth one, which we'll take

7    up at a later time, is a statement about the defendant's

8    medical condition before the ICTR which we would only

9    introduce if the door is opened.  We think the door may

10   have become open, but it's not necessarily ripe to bring

11   that up.

12         THE COURT:  All right.  Bring in the jury.

13                   BEFORE THE JURY

14         THE CLERK:  Court is in session and has for

15   consideration jury trial day four in the matter of

16   United States of America versus Beatrice Munyenyezi,

17   Case No. 10-cr-85-01-SM.

18         THE COURT:  Good morning, ladies and

19   gentlemen.  We're going to try to move along a little

20   quickly.  Counsel seem concerned that the weather might

21   be accelerating at least heading south.  We'll see how

22   we go.  If it looks like it's accelerating around

23   noon-ish or so, maybe we'll break even earlier than one.

24         All right.  Mr. Capin, whenever you're ready.

25

```
 1                    DONALD MONICA

 2              DIRECT EXAMINATION (cont'd)

 3   BY MR. CAPIN:

 4         MR. CAPIN:  Mr. Monica, good morning.

 5         MR. MONICA:  Good morning.

 6    Q.   Are you traveling back to D.C. after your

 7   testimony today?

 8    A.   I had planned to, but I'm actually only trying

 9   to get to Boston today and I'm booked out of Boston

10   Sunday.

11    Q.   You work out of D.C. headquarters?

12    A.   Correct.

13    Q.   How many people are in your supervisory chain

14   of command?  How many people report to you?

15    A.   Directly or indirectly, about 5,000.

16    Q.   And when you were the officer in charge in

17   Nairobi, Kenya, in 1995, approximately how many African

18   refugees were living either in refugee camps or

19   elsewhere?

20    A.   Throughout the continent the estimates that I

21   saw were in the vicinity of about a million people.

22    Q.   Was there any kind of ceiling on how many

23   refugees this country would take in?

24    A.   Yes.  The President in consultation with the

25   Congress sets an annual ceiling for the world and then
```

1    by particular regions.  Africa is one of those regions.

2        Q.   What was the ceiling in 1995 for how many of

3    those million people could possibly get into this

4    country?

5        A.   I don't remember exactly, but it was probably

6    in the range of about 4,500 to 5,500.

7        Q.   And of the million or so refugees living in

8    Africa, were most of them in big cities like Nairobi or

9    most of them refugees?

10       A.   In the areas I was familiar with, mostly in

11   refugee camps.

12       Q.   Was there anything different about the profile

13   of people who tended to live in cities like Nairobi as

14   opposed to refugee camps?

15       A.   I can speak only to Nairobi.  It was unusual

16   for refugees to live in Nairobi.  Most of them were in

17   the camps by 1995.  The Kenyan government was

18   discouraging refugees from being in the city, and the UN

19   provided more ration and assistance to those living in

20   the city than they did to those in the camps.  It was an

21   expensive city.  It required some independent means to

22   live there.

23       Q.   Turning back to this particular refugee

24   application for Beatrice Munyenyezi, where was she

25   living when she applied to become a refugee and come to

1   this country?

2       A.    Postal box on the form shows Nairobi.   There

3   was no home delivery of mail.   It was all postal box in

4   the country.   So I'm not sure where she would have

5   lived, but presumably in the Nairobi area.

6       Q.    Sir, we reviewed this page yesterday stating

7   the reasons that Ms. Munyenyezi stated for wanting to

8   become a refugee.   I'm displaying now on the screen the

9   second page of this document.   Do you see that?

10      A.    Yes.

11      Q.    The first question on that page, and it

12  states:   Political, professional, or social

13  organizations of which I am now or have been a member or

14  with which I am now or have been affiliated since my

15  16th birthday.   And then in parentheses asks if you have

16  never been a member of any organization, state none.

17  Did I read that correctly?

18      A.    Yes.

19      Q.    And that's the question right here by the red

20  flag?

21      A.    Yes.

22      Q.    And am I correct in noting that the answer to

23  the question written by the applicant or by somebody at

24  the JVA was none?

25      A.    Yes.

1      Q.   Now, did you review -- strike that.  Yesterday
2  you explained that there was an adjudication process for
3  refugee applications?
4      A.   Correct.
5      Q.   Were you the adjudicator for this one?
6      A.   Yes.
7      Q.   So in essence were you deciding whether this
8  applicant would be granted refugee status?
9      A.   Yes.
10      Q.   At some point in this process did you
11  interview Ms. Munyenyezi?
12      A.   Yes.
13      Q.   Before interviewing her what, if anything, did
14  you do with the form that we are looking at now?
15      A.   Before doing any refugee interview I reviewed
16  the file for several minutes, went over it, and then
17  began the interview.
18      Q.   So you would have read this entire form and
19  other documents in the file before interviewing the
20  applicant?
21      A.   Correct.
22      Q.   What difference, if any, would it have made
23  if, for example, Ms. Munyenyezi had written in Box 14 --
24  as opposed to none and written MRND or the name of a
25  political party in Rwanda?

1        A.   I would have asked -- I would have asked

2   additional questions related to that, but irrespective

3   of what the answer is, I would have asked about -- I

4   would have repeated the question and reaffirmed the

5   answer that's on the form, the routine practice.

6        Q.   So there are two steps there.  One is in

7   interviewing her you reviewed Question 14, and the file

8   indicates she reaffirmed that she had belonged to no

9   organizations.  Is that correct?

10        A.   Correct.

11        Q.   And in addition, if she had written a specific

12   organization or political party, you would have asked

13   follow-up questions?

14        A.   Correct.

15        Q.   And why is that?

16        A.   Two reasons.  Depending on the nature of the

17   association, it could go to the likelihood of being

18   persecuted because of membership of that organization,

19   and less often but in some cases it could go to one of

20   the admissibilities for any status in the United States.

21        Q.   When you say one of the admissibilities, are

22   you talking about things like we talked about yesterday,

23   persecuted by you referred to yesterday?

24        A.   That's one thing that could preclude it.

25        Q.   Did you have occasion during the time as the

1    officer in charge in Nairobi to deny an application

2    because you deemed somebody to be a persecutor or likely

3    to be a persecutor?

4         A.   Several, yes.

5         Q.   I note that at the bottom of this document it

6    indicates -- do you see the box I'm pointing to now on

7    the screen?

8         A.   Yes.

9         Q.   What does that box indicate?

10        A.   That's just a record of the date of interview.

11        Q.   And is the date that I'm circling here the

12   date it was submitted, January 18, 1995?

13        A.   That would have been the day that it was

14   completed by JVA and the applicant.

15        Q.   I see.  So submitted on January 18, 1995.  The

16   interview actually took place a few weeks later on

17   February 16, 1995?

18        A.   Correct.

19        Q.   I see that it's approved.  Can you describe

20   the box I'm circling now.

21        A.   If the case is approved, it's stamped

22   approved.  If it's not approved it's simply handwritten

23   denial.

24        Q.   And I see there's a date in March of 1995.  Is

25   that when it's approved?

1      A.    Yes.

2      Q.    And I see there is a signature that I'm

3  pointing to, which is illegible.  Whose signature is

4  that?

5      A.    It's actually my initials.

6      Q.    Thank you.  When this is approved does this

7  mean that Ms. Munyenyezi was now admissible and --

8  eligible and admissible to travel to the U.S.?

9      A.    Conditionally.  There's additional steps that

10  INS at the time was not involved with.  The JVA and

11  state department followed up, background checks, medical

12  exams, departure processing, the various sorts.

13      Q.    So she was accepted conditionally, and one of

14  the conditions was additional information gathered by

15  the State Department; is that correct?

16      A.    Correct.

17      Q.    I show you the next page on this form.  Is

18  this the next page -- well, actually does this document

19  relate to the refugee application we just looked at?

20      A.    Yes.

21      Q.    I see that it's called a sworn statement.  I'm

22  not going to do that again.  I'm pointing to the name of

23  the document.  "Sworn Statement of Refugee Applying For

24  Entry Into the U.S."  And this again was submitted by

25  Ms. Munyenyezi; correct?

1      A.    Yes.

2      Q.    And what is the purpose of this sworn

3  statement?

4      A.    It's an opportunity for the interviewing

5  officer to go over the grounds of inadmissibility to the

6  United States.  Applied both to refugees and to other

7  visa categories for the most part.

8      Q.    So before interviewing Ms. Munyenyezi, did you

9  review this form?

10      A.    Yes.

11      Q.    And am I correct in noting that the name on

12  the form is in fact Beatrice Munyenyezi?

13      A.    Yes.

14      Q.    It bears a signature at the bottom which

15  purports to be a signature of the applicant; correct?

16      A.    Yes.

17      Q.    Now, would you also use this form in any way

18  during your interview of Ms. Munyenyezi?

19      A.    I would hold the answers in mind, but I would

20  never refer back to the form.

21      Q.    And hold the answers in mind when formulating

22  questions asked her?

23      A.    If any of the questions were answered in the

24  affirmative, yes.

25      Q.    So I note that at the top of this page it

1    says:  Applicants must establish -- I will point to it

2    right here -- must establish that they're admissible to

3    the United States except as otherwise provided by law.

4    Aliens with any of the following classes are not

5    admissible to the United States.

6            Did I read that correctly?

7        A.   Yes.

8        Q.   And I'm certainly not going to read all of the

9    entire document.  The jury will have it in evidence.

10   But I will point to the first basis for inadmissibility.

11   Does number one mean aliens who have committed or have

12   been convicted of a crime involving moral turpitude, and

13   then it says in parentheses, does not include minor

14   traffic violations.  Did I read that correctly?

15       A.   Yes.

16       Q.   Am I correct in noting that at the bottom of

17   this the applicant checked no?

18       A.   Actually I checked that based on her response.

19       Q.   I see.  You checked that out during the

20   interview process.

21       A.   Correct.

22       Q.   Now, if instead of saying no the applicant had

23   said yes, would that have had any effect on your

24   adjudication of this application?

25       A.   Follow-up questions, and if I found there was

1  a ground of inadmissibility, then the case would not be

2  approved.

3      Q.   So if, for example, the applicant had said I

4  assisted others in kidnapping people back in Rwanda,

5  would that have mattered in terms of how you adjudicate

6  this application?

7      A.   Yes.

8      Q.   How would it matter?

9      A.   If I found the statement credible, she would

10  not have qualified as a refugee probably under the

11  persecution bar in the refugee definition less so than

12  the information on this particular form.

13      Q.   So she would have been deemed inadmissible as

14  a persecutor.

15      A.   Probably, yes.

16      Q.   And I'm going to point to another point on

17  this form.  Do you see where it says:  Further, I have

18  never ordered, assisted, or otherwise participated in

19  the persecution of any person because of race, religion,

20  or political opinion.  And then it states under that:  I

21  understand all the foregoing statements having asked for

22  and obtained a translation or explanation of every point

23  which was not understood or clear to me.  Did I read

24  that correctly?

25      A.   Yes.

1       Q.   Under that attestation am I correct in noting

2   that Ms. Munyenyezi signed the document?

3       A.   Yes.

4       Q.   And if in fact she had not signed that

5   attestation, that sworn statement, would that have

6   affected your adjudication?

7       A.   Probably, but I never saw anybody not sign it.

8   Yes.

9       Q.   If she had not signed it, you would have asked

10   her why she hadn't signed it?

11       A.   Yes.

12       Q.   That would have led to a whole new line of

13   inquiry.

14       A.   Yes.

15       Q.   And then finally, at the bottom of the page

16   I'm noting there's a signature of interpreter and name

17   of interpreter.  Was that standard on this form?

18       A.   Yes.

19       Q.   And would that interpreter have been one of

20   these JVA -- I'm sorry, what was JVA again?

21       A.   Joint Voluntary Agency.

22       Q.   And that was the organization that had a

23   contract with the Department of State to do a number of

24   things, including provide competent translators?

25       A.   Yes.

1      Q.   Would this have been a JVA-appointed

2  translator?

3      A.   Probably.

4      Q.   I will move on.  I'm going to move on more

5  quickly through the rest of the next dozen or so pages

6  and then I think I will be done with you, sir, with

7  questions for you.  This is a biographic information

8  page; correct?

9      A.   Yes.

10     Q.   Part of the same application?

11     A.   Yes.

12     Q.   And I see the applicant again is Beatrice

13 Munyenyezi; correct?

14     A.   Yes.

15     Q.   And I see that it says husband or wife, Shalom

16 Arsene Ntahobali.  Did I read that correctly?

17     A.   Yes.

18     Q.   Now, is this the only place that Shalom

19 Ntahobali's name appears in this file?

20     A.   I don't recall, but probably not.  There is

21 probably other references.

22     Q.   What role, if any, did Shalom Ntahobali have

23 in Ms. Munyenyezi's application for refugee?

24     A.   Based on the processing priorities at the

25 time, she would have qualified for an interview based on

1   a U.S.-based relative, and her spouse and children under

2   21, unmarried, could qualify as derivatives on the case.

3   So they would have usually no role in the refugee case

4   itself.  They would simply be accompanying her.

5        Q.   So Ms. Munyenyezi was in a category that

6   received priority because she had a brother who had been

7   accepted as a refugee.  Is that correct?

8        A.   Yes.

9        Q.   And are you familiar with the term "primary

10   applicant"?

11        A.   Yes.

12        Q.   What does that mean?

13        A.   The primary applicant is the one in a refugee

14   case upon whom the case -- the success or lack of

15   success of the case depends.  It's the individual who

16   has the qualifying relationship that gets him or her

17   into the priority category.

18        Q.   And the term "derivative applicant"?

19        A.   Would be the spouse or minor children.

20        Q.   Was Shalom Ntahobali at this stage a

21   derivative applicant for refugee status?

22        A.   Yes.

23        Q.   So at this stage -- in your review of the file

24   can you tell whether during your interview of Ms.

25   Munyenyezi her husband was present as well?

 1        A.    Yes.  It's indicated on the form that he was

 2    interviewed the same day.

 3        Q.    So they were both applying as refugees.

 4        A.    Yes.

 5        Q.    Am I also correct in noting on Ms.

 6    Munyenyezi's biographical information that asks for her

 7    work history, she says never worked?

 8        A.    Correct.

 9        Q.    And is it standard to have a photograph of the

10    applicant in the file?

11        A.    Yes.

12        Q.    And is this a photograph of Ms. Munyenyezi in

13    1995?

14        A.    Yes.

15        Q.    In fact, on the reverse of the photograph,

16    whoever assembled the file had written her name,

17    Munyenyezi Beatrice, and some numbers.

18        A.    Yes.

19        Q.    What are those numbers?

20        A.    JVA kept their own case numbers.  That's a JVA

21    case number.

22        Q.    In reviewing the file, did you see this?  It

23    appears to be a fax from Kathleen?

24        A.    Looks like Kathleen Baisden.

25        Q.    To Virginia Manyeki?

24

1        A.   Yes.

2        Q.   Do you know who Virginia Manyeki was?

3        A.   Yes, I knew Virginia Manyeki.

4        Q.   Who was she?

5        A.   She was a Kenyan clerical worker with the JVA.

6        Q.   Am I correct in reading this document as

7   saying:  Neither the RDC nor the USCC has any record of

8   updated bio you say was sent to us on November 5th,

9   1997.  However, as it is mentioned in your fax of 2/5/98

10  we will delete Ntahobali Shalom Arsene from the above

11  case as amended assurance has been requested from USCC.

12  Is that a correct reading?

13       A.   Yes.

14       Q.   Is that a request by Ms. Munyenyezi that her

15  husband be taken off the application?

16       A.   It appears to be, but that would not have

17  involved the INS.  It was the JVA and the State

18  Department and U.S.-based entity activity.

19       Q.   Fair enough.  Did you review this letter which

20  is directed to the INS officer and JVA and at the bottom

21  bears the name M. Beatrice.  Did you review this letter?

22       A.   I reviewed it in reviewing the file the other

23  day.  I don't recall if I would have seen it at the

24  time.

25       Q.   Well, I'm going to read it --

1          MR. CAPIN:  And, your Honor, this is the only

2    document I will read of any length over the final half a

3    dozen or eight documents.

4          Q.   Tell me if I read this correctly.  As per your

5    instruction, this is to confirm that I have decided to

6    remove my husband from my file being handled by your

7    office.  Indeed, after our second interview in

8    March 1998 the caseworker told us that he was not in a

9    position to tell when our case was likely to be sorted

10   out and advised us to wait until our names were pinned

11   on the board.  Given that we were running short of money

12   for our upkeep in Nairobi, we went back to Zaire somehow

13   uncertain of the fate of our case because normally your

14   office gives the answer immediately after the interview.

15   Did I read that correctly?

16         A.   You read March 1998.  I believe the date is

17   March 1995.

18         Q.   Thank you for the correction.  Yes, I did make

19   that mistake.  Continuing here.  When my husband was

20   offered sponsorship to continue his BA program, he

21   cannot afford to miss the chance and he thereby changed

22   his mind about going to the USA.  However, at the end of

23   his course he is eligible to immigration in the USA, he

24   could join me there with my children.  While apologizing

25   for any inconvenience caused, please accept my sincere

26

1   graditure.  M. Beatrice.

2             Did I read that correctly?

3        A.   Yes.

4        Q.   And this is a document on American Embassy

5   letterhead; correct?

6        A.   Yes.

7        Q.   From the INS?

8        A.   Yes.

9        Q.   And it's dated October 27, 1997?

10       A.   Correct.

11       Q.   Does this indicate that -- what does this

12   indicate?

13       A.   The applicant needed a waiver of grounds of

14   inadmissibility.  Form I-602 is the waiver request, and

15   this indicates that INS approved the waiver, and it

16   included her three children.

17       Q.   And again, is this fax -- again we see that

18   name Kathy Baisden.  Fax is dated February 15, 1996?

19       A.   Correct.

20       Q.   Does this refer to the applicant's husband

21   Shalom Ntahobali, Shalom Arsene?

22       A.   Yes.

23       Q.   Does it say that he was offered a scholarship

24   to study in Zaire.  If he is accepted, he is unable to

25   return to Kenya at the moment to continue with the

1    process and his case therefore be closed.  PA would like

2    to proceed without him.  What is PA?

3         A.   Principal applicant.

4         Q.   So that would be Ms. Munyenyezi?

5         A.   Correct.

6         Q.   And then is this a standard JVA form that I

7    put on the screen?

8         A.   Yes.

9         Q.   And what is it?

10        A.   It's an appointment notice.  It's usually

11   given to or mailed to refugee applicants for some sort

12   of JVA appointment.  There were several different

13   reasons they used it.

14        Q.   Can you tell by looking at this form what the

15   reason was she was being asked to come in for an

16   appointment?

17        A.   To fill out a Rwandese questionnaire.

18        Q.   Is there a Rwandese questionnaire in this

19   file?

20        A.   Yes.

21        Q.   And was that a State Department document?

22        A.   It was a series of questions that Statement

23   Department wanted answered before they would give a

24   Security Advisory Opinion on Rwandese refugee

25   applicants.

```
 1        Q.   I'm going to ask you to briefly explain in a

 2   moment what a Security Advisory Opinion is.  I think

 3   another witness today will testify to that.  But just to

 4   be able to put it in context, is this the Rwandese

 5   questionnaire?

 6        A.   Yes.

 7        Q.   And it has at the top, it says:  Questions for

 8   Rwandan visa applicants; correct?

 9        A.   Yes.

10        Q.   And the first question is:  Have you been in

11   Rwanda since April 1, 1994.  Correct?

12        A.   Yes.

13        Q.   And Ms. Munyenyezi wrote yes?

14        A.   Correct.

15        Q.   And I'm not going to read every question, but

16   I will read just a couple.  Question B states as

17   follows:  Tell me if I read this correctly.  If so, were

18   you in any way personally affected by the events that

19   took place there?  In particular were you in any way

20   personally affected by the atrocities that took place?

21   Were you a victim?  A witness?  Were you otherwise

22   involved?  Did I read that correctly?

23        A.   Yes.

24        Q.   And do I correctly note that Ms. Munyenyezi

25   wrote:  Family members disappeared?
```

1      A.    Yes.

2      Q.    And do I correctly note that under her

3   occupation in Rwanda, she wrote student refugee?

4      A.    Correct.

5      Q.    And then this question goes on, a number of

6   questions lettered, and they're lettered A through L on

7   this page; correct?

8      A.    Yes.

9      Q.    And I'm going to show you another document

10  now.  I'm going to ask you what this is.

11     A.    It's a cable from the U.S. Embassy in Nairobi

12  going out -- drafted it says by me, but it's clerical

13  drafting, requesting advisory opinion.  Visa donkey is

14  the State Department phrase for various kinds of

15  advisory opinions.

16     Q.    Does the State Department use animal names to

17  refer to a certain document, like donkey, hawk, eagle?

18     A.    Yes.

19     Q.    Now, your name appears on here.  That's your

20  name I circled, D.J. Monica?

21     A.    Yes.

22     Q.    Can you tell the jury -- a cable is basically

23  a fax type communication?

24     A.    No.  It's done electronically.  The State

25  Department has a means.  I'm not sure how it works.  You

1   give them a disk with all this application on.  They

2   would do one of these on every applicant irrespective of

3   nationality, and somehow they transmit that

4   electronically to us.

5        Q.   Can you tell by looking at this document where

6   it was sent from and where it was sent to?

7        A.   It was sent from the American Embassy in

8   Nairobi to the American Embassy in Kigali.

9        Q.   So the jury can follow along, am I pointing at

10  the from, A. Embassy, Nairobi?

11       A.   American Embassy; right.

12       Q.   To A. Embassy, Kigali.

13       A.   Correct.

14       Q.   There's also it says here Dept. State, Wash,

15  D.C?

16       A.   Right.  The Department of State in Washington

17  and to the FBI.

18       Q.   And to the FBI.  And again, the principal

19  applicant that this cable refers to is Munyenyezi

20  Beatrice; correct?

21       A.   Yes.

22       Q.   Am I correct in noting that in this

23  information being transmitted from Nairobi to the

24  embassy in Kigali, Rwanda, and to Washington, are all

25  the answers to the Rwandan questionnaire we just looked

1    at?

2         A.   Yes.

3         Q.   So for example, I pointed out -- you noted

4    that the Rwandan questionnaire had questions numbered A

5    through L.  I'm putting two pages on the screen.  Are

6    these the answers right here, A, B, C through L?

7         A.   Yes.

8         Q.   And is this cable verbatim word for word, send

9    to the embassy in Kigali and to Washington, D.C.,

10   exactly the answers that Ms. Munyenyezi put on her

11   Rwandan questionnaire?

12        A.   Yes.

13        Q.   So for example, if you read Question B it says

14   exactly:  Family members disappeared.  Correct?

15        A.   Yes.

16        Q.   And then after this -- you referred to a

17   Security Advisory Position.

18        A.   Opinion.

19        Q.   Opinion, thank you.  Was a Security Advisory

20   Opinion generated by the Department of State after

21   receiving such a cable?

22        A.   Yes.  The refugee could not travel until the

23   Security Advisory Opinion was received.

24        Q.   Explain to the jury what the Security Advisory

25   Opinion was and how that process worked.

1          A.    Essentially as I understood it at the time, it

2    was -- the three entities that received it, the American

3    Embassy in Kigali, the State Department, and the FBI,

4    would check their databases for any derogatory

5    information on the individual.  If they had derogatory

6    information, that would be transmitted to us.

7          Q.    I'm putting on the screen now another document

8    in Ms. Munyenyezi's A-File.  Do you recognize that?

9          A.    Yes.

10         Q.    Whose handwriting is that?

11         A.    From where it says INS officer on down, it's

12    mine, and from there on up it's a JVA caseworker.

13         Q.    So the JVA caseworker -- just so it's clear,

14    is the top inch or so of this cut off?

15         A.    Yes.  The original form would have the

16    individual's name, date of birth if I recall correctly,

17    and their refugee priority under that priority system I

18    described before.

19         Q.    You're saying everything from here up is

20    filled out by JVA?

21         A.    Right.

22         Q.    And then is that your handwriting, D. Monica?

23         A.    Yes.

24         Q.    So everything from here down, is that your

25    handwriting?

1          A.    Correct.

2          Q.    Why don't you explain to the jury what this

3     document is and how if in any way it relates to Ms.

4     Munyenyezi's refugee application.

5          A.    It's actually a two-page form.  We used it in

6     those forms -- I'm sorry, in the applications.

7     Primarily -- at the time there were only two of us in

8     Africa that did all of these interviews based in Africa.

9     Everyone else that did them were usually U.S.-based

10    officers that came on temporary assignments, many of

11    whom had not done any or many refugee applications.

12    This was a control sheet so I could review their work

13    afterwards.  It was to make sure that they touched on

14    every point that needs to be considered in a refugee

15    application.

16         Q.    So it's a two-page form.  Just so the jury can

17    understand what the whole form looks like, is this the

18    first page that I'm showing you now?

19         A.    It's either the first or second.  I'd have to

20    see that one to recall.  Yes, what you showed me was the

21    first page.

22         Q.    And that contains your interview notes;

23    correct?

24         A.    Correct.

25         Q.    And these are the notes you took during an

1    interview of Ms. Munyenyezi?

2        A.    Correct.

3        Q.    And tell us what the second page is.

4        A.    The second page are the relevant factors to

5    determine whether somebody qualifies as a refugee or

6    not, and normally everybody would fill them out.  I

7    sometimes did or did not myself.  I reviewed their work

8    and that's what I used to make sure they touched all of

9    the points.

10       Q.    So was one of the primary purposes of this

11   form to allow you to do quality control over other

12   employees?

13       A.    Yes.

14       Q.    Because you were the officer in charge and you

15   were responsible for the quality of all this work?

16       A.    Yes.

17       Q.    Now, I note -- so this goes through some of

18   the things you told us about.  It goes through grounds

19   for persecution; correct?

20       A.    Yes.

21       Q.    It goes to the conclusion of whether there was

22   past persecution?

23       A.    Yes.

24       Q.    Whether there's a credible basis for concern

25   about the possibility of persecution?

1    A.    Yes.

2    Q.    It also asks is the applicant credible.   Were

3  you assessing the credibility of every applicant who

4  you've interviewed for refugee status?

5    A.    Yes.

6    Q.    Describe what you mean by assessing

7  credibility and what role that played in the process.

8    A.    Essentially is the individual telling the

9  truth or not, and that was done primarily on observing

10  their demeanor, consistencies in the account that they

11  were giving, relationship of the account to known

12  country conditions, that sort of thing.

13    Q.    And you are making this assessment during the

14  interview process?

15    A.    Correct.

16    Q.    How long did your average interview of a

17  refugee application actually last?

18    A.    Typically about 30 minutes.   The first five,

19  seven were completing some of the forms, getting

20  signatures, asking those various questions, and the last

21  20, 25 minutes was usually the actual interview to

22  determine eligibility for refugee status.

23    Q.    So during that first five or seven minutes

24  when you say reviewing the forms, were you reviewing

25  that first document we looked at in the presence of the

1    applicant and with the applicant?  I'm talking about of

2    course this document, the application itself.

3         A.   Yes.

4         Q.   So would you have gone through every one of

5    those items and asked the applicant to confirm it or

6    affirm it?

7         A.   Not every one.  I tended to focus on the ones

8    that seemed to be relevant.  Education, for instance, I

9    wasn't overly concerned with.  It very rarely had

10   bearing on eligibility.

11        Q.   But you would have focused certainly -- am I

12   correct that you would have focused on the reasons

13   stated for wanting to be a refugee; correct?

14        A.   Yes.

15        Q.   Would you have also focused on the question

16   concerning political affiliation?

17        A.   Yes.

18        Q.   So is it your standard practice to ask the

19   applicant to confirm or affirm the answer to this

20   particular question?

21        A.   Yes, both political affiliation and any other

22   affiliation.

23        Q.   Thank you.  So with regard to this question

24   here, whether the applicant is credible, did INS ever

25   deem an applicant not eligible based on your

1   assessment -- you being INS's assessment -- that an

2   applicant was not credible?

3       A.   Yes.

4       Q.   During your time in Nairobi can you give us an

5   estimate of what percentage of applicants would have

6   been deemed --

7       A.   It varied from time to time, but probably in

8   the range of 10 to 15 percent.

9       Q.   So 10 to 15 percent of applicants would have

10  been denied based on an assessment by somebody in your

11  position that the applicant wasn't credible.

12      A.   Correct.

13      Q.   And here it says:  Well-founded fear due to

14  ethnicity, unstable political/social environment?  Did I

15  read that correctly?

16      A.   Yes.

17      Q.   Is that your handwriting?

18      A.   Yes.

19      Q.   Is that essentially your conclusion after

20  interviewing Ms. Munyenyezi?

21      A.   Yes.  It's a summary.

22      Q.   So let's walk through, if we could, your

23  actual notes.  Since it's your handwriting, I will ask

24  you to read it.  Starting with what appears to state:

25  Prior to war.

38

1          A.    Prior to the war the PA, principal applicant,

2     and spouse lived in Butare.  PA was a secondary student,

3     spouse was a university student, electronics, science,

4     small one under that.  PA's family were farmers,

5     spouse's family were civil servants.  Father at National

6     University.  Mother appointed cabinet minister.  Prior

7     to April 1994 neither PA, spouse, nor family were

8     politically active or had any problems with the

9     government.  When fighting reached Butare in 6/94, PA

10    fled to Zaire border, Cyungo, stayed there two weeks and

11    then crossed into Bukavu.  After one month went to

12    Tanzania.  Says they left due to poor conditions in

13    Bukavu.  Also wanted to join brother in U.S.  The

14    brother hadn't gone yet but had been accepted, in

15    reference to the refugee program.

16          After a few weeks went to Nairobi.  Fears to

17    return to Rwanda because situation hasn't normalized.

18    Said they would face arrest simply because they are

19    Hutu.  Says they heard of relatives returning 6/94 who

20    disappeared.

21          Q.    Now, I note that between -- there seem to be

22    sort of chapter headings or lines between different

23    topics?

24          A.    Correct.

25          Q.    Was that your standard practice?

1          A.    Yes.

2          Q.    Can you explain to the jury just what your

3    standard practice was with regard to how you conducted

4    an interview, how you determined what to write down and

5    the like.

6          A.    Right.  I more often than not interviewed with

7    a translator, and during the time that the translator

8    was translating or the applicant was answering

9    questions, I would watch the demeanor of the applicant

10   to the extent I could try to be attentive to interaction

11   between the translator and the individual.  And then

12   when the translator provided me the answer, I often had

13   follow-up questions, and I would then think through in

14   various blocks and I would just summarize the blocks of

15   activity.

16              The first one, for instance, was just setting

17   the personal situation, the second one would have been

18   the family situation, and then the individual's

19   political/social situation before the war, and then I

20   would get into the account of why the individual left

21   his or her country of nationality.

22         Q.    So I note that you wrote PA, as primary

23   applicant?

24         A.    Yes.

25         Q.    Because at this point the derivative applicant

40

1    was the husband.

2         A.    Correct.

3         Q.    PA's family social group were farmers,

4    spouse's family civil servants.  You then wrote a

5    description of what the father and mother of the spouse

6    did.  Father, National University; mother, appointed

7    cabinet minister or ministry.

8              Do those notes reflect further questioning

9    about the nature of the civil service as reported by the

10   applicant of her husband, mom and dad?

11        A.    Probably.  This is, as I said -- those notes

12   are just summaries of about 20 minutes of a typical

13   interview and I would have followed up on questions like

14   that.

15        Q.    If the applicant had said anything that sent

16   up a red flag about political activity by the husband's

17   family would you have noted that in this application?

18        A.    Yes.

19        Q.    And am I noting correctly that one of the

20   following documents notes that the following applicant,

21   including the applicant herself and her children, were

22   accepted for resettlement under the auspices -- under

23   whose auspices?  It says under our auspices, but the

24   letterhead is cut off.

25        A.    There were several organizations in the U.S.

1    that did this under contract with the State Department,

2    and I'm not sure which one that is.  It could be U.S.

3    Catholic Migration Refugee Services or U.S. Lutheran

4    Refugee Services.  Two that come to mind, but there were

5    several that did this.  We, INS, were not directly

6    involved in this part of the process.  It was JVA, State

7    Department, and the resettlement agency.

8         Q.   And then is this a picture I'm seeing in the

9    lower left-hand corner of the applicant?

10        A.   Yes.

11        Q.   And this other picture is of the applicant's

12   husband.

13        A.   I believe so.

14        Q.   Mr. Chakravarty pointed out something I would

15   like to ask you about.  I'm circling "affiliate."  Can

16   you read that to me?

17        A.   Affiliate, and then it has an individual's

18   name, Lan Truohg.  Looks like it was a coordinator in

19   the Office of Refugee Resettlement at an address in

20   Manchester.

21        Q.   So is the resettlement agency that

22   participated in Ms. Munyenyezi's settling in this

23   country as a refugee located in Manchester, New

24   Hampshire?

25        A.   The agency would have been a national agency.

1    That appears to be a local affiliate or a local

2    representative.

3             MR. CAPIN:  I have nothing further, your

4    Honor.  Thank you.

5             THE COURT:  Thank you.  Mr. Howard?

6             MR. HOWARD:  Thank you, your Honor.

7                      CROSS-EXAMINATION

8    BY MR. HOWARD:

9             MR. HOWARD:  Good morning, Mr. Monica.

10            THE WITNESS:  Good morning.

11            MR. HOWARD:  We met just before court today.

12   My name is Mark Howard.  I represent Beatrice

13   Munyenyezi.

14       Q.   A few preliminary questions for you.  You were

15   talking about that there was an approximate cap on the

16   number of refugees from the entire continent of Africa

17   that could come into the United States.

18       A.   Correct.

19       Q.   Is that in any given year?

20       A.   It's set annually by fiscal year, by U.S.

21   fiscal year.

22       Q.   And it was estimated in, what, 1995 there were

23   about a million refugees in Africa?

24       A.   Those were the figures I heard from the UN.

25       Q.   And the cap was somewhere between 4,500 and

1    5,500 people who could actually come?

2         A.    Approximately, yes.

3         Q.    By anyone's account, a pretty exclusive club.

4         A.    Yes.

5         Q.    Do you have any idea of those million how many

6    were Rwandans?

7         A.    I do not.

8         Q.    Do you have any idea how many Rwandan

9    applications there were in 1995?

10        A.    For the U.S. refugee program?

11        Q.    Yes.

12        A.    I don't, but it was a small number.

13        Q.    What's a small number?  Can you approximate

14   for me?

15        A.    I would guess a hundred or two.  One to 200.

16        Q.    One to 200 people applied in 1995 from Rwanda?

17        A.    To the best of my recollection, yes.

18        Q.    And you understood in early 1995 when you were

19   assigned to the Beatrice Munyenyezi file that the

20   Rwandan refugees were coming out of I think what you

21   described as a war or civil conflict in Rwanda.

22        A.    Correct.

23        Q.    Can you think back to that time in late 1994,

24   early 1995 when you started to see Rwandan applications

25   what you knew about that war or civil conflict?  Maybe

44

1    what advisories you had been given by the State

2    Department or the Defense Department or Immigration?

3        A.    Three primary sources.  It was told in the

4    U.S. it was front page news in East African newspapers.

5    I had access to and was regularly copied on country

6    condition cables from the State Department as well as

7    reports that are routinely generated by various

8    agencies.

9        Q.    Can you be any more specific about what you

10   knew about country conditions by the time you sat down

11   with Ms. Munyenyezi in early 1995?  What had happened in

12   Rwanda in that post-April time frame of 1994?

13       A.    To the best of my recollection -- and it's

14   been a long time since I read or thought about it, but

15   it was -- when the previous government was disrupted,

16   their ethnic clashes broke out between the two primary

17   groups, the Hutus and the Tutsis.  The Hutus engaged in

18   large scale killings.  That unrest lasted for several

19   months, I forget exactly how long, until a military

20   force that had been based in Uganda, made up primarily

21   of previously exiled Tutsis, came in and eventually

22   became the government that I believe is still there

23   today.  Certainly the government that was there in the

24   mid-nineties.

25       Q.    And you understood in early 1995 or at least

45

1    your information was that Hutus had perpetrated large

2    scale killings against Tutsis?

3         A.   Yes.

4         Q.   So can I assume from that that a Rwandan

5    refugee coming to you and identifies herself as a Hutu

6    is immediately suspicious to you.

7         A.   No.

8         Q.   No?

9         A.   No.

10        Q.   Being of the Hutu clan or Hutu ethnicity

11   doesn't give you a red flag that maybe I ought to look

12   into this because as I understand it Hutus were killing

13   Tutsis in this conflict.

14        A.   Given -- it would be something I would ask

15   about.  Most of the decision whether the persecutor bar

16   would apply I would rely on the Security Advisory

17   Opinion for it.  My focus would have been more so on the

18   qualifying for refugee status apart from the persecutor

19   bar.

20        Q.   So the persecutor bar as you described it and

21   as Attorney Capin was asking you about, that's really

22   the business of the State Department.  They'll let you

23   know if this person should be disqualified because of

24   persecution.  It's not your decision.

25        A.   No, it is my decision.  I ask questions about

1    it, but I generally assume credibility unless I have

2    reason not to.  I did have occasion to disqualify people

3    that I felt the persecutor bar applied to independent of

4    a State Department Security Advisory Opinion, but it was

5    based primarily on their responses to me as to their

6    activities.

7         Q.   Okay.  We're going to take a little digression

8    and talk about this credibility assessment that you do.

9    You just mentioned you have disqualified -- or did in

10   that time frame disqualified people because they gave

11   you answers on their forms, you interviewed them and you

12   made the assessment that they were not credible.

13        A.   Correct.

14        Q.   Did you also disqualify people who gave you

15   answers on the form that said yes, I have killed, raped,

16   and kidnapped people in Rwanda?

17        A.   I don't believe I ever had a form that said

18   that.

19        Q.   Did you disqualify somebody just because they

20   said they were a member of the MRND in Rwanda?

21        A.   I don't believe that I ever had an applicant

22   admit to being a member.

23        Q.   Okay.  So if you didn't have an applicant who

24   admitted to being an MRND member, did you then -- do you

25   have a recollection of talking to somebody who didn't

1    admit to being MRND, you talked to them, didn't believe

2    their denial, and disqualified them?

3         A.    I have no specific recollection.

4         Q.    Did you know in 1995 what the MRND was?

5         A.    Yes.

6         Q.    What was your understanding in 1995, trying

7    not to think about the last 18 years of knowledge that

8    you might have?

9         A.    At the time I associated it with the remnants

10   of the previous government.

11        Q.    The ruling government?

12        A.    Correct.

13        Q.    The one that was overthrown by the RPF?

14        A.    Correct.

15        Q.    So hold that thought.  By the way, just so

16   we're clear, do you have a specific recollection of

17   interviewing my client?

18        A.    I do not.

19        Q.    So everything you talked about this morning is

20   based on what your usual protocol would be.  You don't

21   actually remember talking to her.

22        A.    Correct, I have no direct recollection.

23        Q.    So if I were to ask you any specific questions

24   about things she may have said, unless it's in your

25   notes you wouldn't be able to answer it?

1    A.    Correct.

2    Q.    Do you have a specific recollection of her

3  English abilities at the time?

4    A.    No.

5    Q.    There was an interpreter there; right?

6    A.    Yes.

7    Q.    By all appearances neither she nor her husband

8  spoke any English?

9    A.    I don't recall.

10    Q.    And her husband was there also; correct?

11    A.    Based on my review of the file, yes.

12    Q.    And when I say was there, what I was referring

13  to was the February 16, 1995, interview.

14    A.    Correct.

15    Q.    So it could be that the things you wrote in

16  your notes were things that her husband said through the

17  interpreter.  May not have even been her statements?

18    A.    No.  I would not have interviewed the husband

19  with regard to the persecution story, only regards to

20  his particular form.

21    Q.    So the two of them are sitting in front of you

22  and you have a clear recollection that when you directed

23  questions to her, she answered to the interpreter who

24  then answered to you?

25    A.    I have a clear recollection that that is my

```
1    standard practice.  As a principal applicant, the
2    success of the refugee case rests on her well-founded
3    fear of persecution, not his well-founded persecution.
4         Q.    Which you found to be the case; right?
5         A.    Correct.
6         Q.    She had a well-founded fear of persecution?
7         A.    Correct.
8         Q.    And you did not find her to be not credible?
9         A.    Correct.
10        Q.    You found her to be credible?
11        A.    Correct.
12        Q.    Do you have a recollection, just to go back to
13   a few statistics for a moment, how many officials like
14   yourself in Nairobi were handling Rwandan applications?
15        A.    On a regular basis only two, myself and one
16   other.  We were the only two posted in Nairobi.  Anybody
17   else who did it would have been on a temporary duty
18   assignment.
19        Q.    Do you recall your volume of Rwandan refugee
20   cases in 1995?
21        A.    Not specifically in 1995.  Just probably the
22   total from '94 to '96 when I left was probably fewer
23   than a hundred.
24        Q.    That you handled?
25        A.    Correct.
```

1      Q.   Over approximately a two-year period?

2      A.   Correct.

3      Q.   Maybe 50 cases a year on average?

4      A.   On average, yes.

5      Q.   And since hers was in early 1995, her

6   application date is late 1994, can I assume that she's

7   one of the first ones, in your case files?

8      A.   Yeah.  Probably not.  The vast majority of the

9   ones that we processed while I was there were people

10  that had been evacuated by the UN in April and May of

11  '94.  There was the first wave of folks who had been

12  brought out specifically by the UN and other agencies,

13  and after that we interviewed many fewer Rwandans.

14     Q.   So of the hundred over the two-year period,

15  the vast majority came in the first couple of months and

16  they were the UN evacuees?

17     A.   UN and other agencies.

18     Q.   And other agencies.  Did you know that her

19  brother Higaru Jean-Marie, he sat here for the last few

20  days, he was one of the UN evacuees.  Did you know that?

21     A.   I did not.

22     Q.   In your review of the file you did learn

23  though that her brother Higaru was her anchor here in

24  the U.S.?

25     A.   Correct.

1        Q.    He's the one that's essentially going to

2    sponsor her, is going to take responsibility of her when

3    she comes in?

4        A.    Correct.

5        Q.    So now let's create another class of cases.

6    We've got the UN and other agencies' evacuees, and then

7    we've got the refugees who perhaps left Rwanda on their

8    own, maybe walked from Butare or drove from Butare to

9    this town near the Congo called Cyangugu.  You made

10   reference to that a moment ago; right?

11       A.    Correct.

12       Q.    Of the hundred how many of those are there?

13   The refugees who fled on their own without the

14   assistance of an agency?

15       A.    I don't recall.

16       Q.    Can you give me an approximation?

17       A.    I cannot.

18       Q.    I'm trying to get a sense of in your caseload

19   how many are in Beatrice's group.

20       A.    To my recollection very, very few, but I

21   couldn't hazard a guess at this point.

22       Q.    In order to get this process rolling, a

23   refugee has to fill out the Application For Refugee

24   Status?

25       A.    Correct, Form I-590.

52

1      Q.   Form I-590.  Little bit fuzzy, but this is the

2   Registration For Classification of the Refugee; correct?

3      A.   Correct.

4      Q.   And down at the bottom if we zoom in and I put

5   my finger here, that's the Form I-590.

6      A.   Correct.

7      Q.   Now, in this form -- first of all, do you have

8   any idea who actually prepared the form, I mean put the

9   writing on the document?

10      A.   Probably a JVA caseworker.

11      Q.   You're not sure about that?

12      A.   No.

13      Q.   You assume it's somebody else?

14      A.   Right.  And that would be the standard

15   practice.

16      Q.   Just while we are on it, up top it indicates a

17   present address and gives a P.O. box in Nairobi?

18      A.   Correct.

19      Q.   And this was according to the document --

20      A.   January 18, 1995.

21      Q.   January 18, 1995.  Have any idea who she was

22   living with in Nairobi?

23      A.   It indicates care of JW Njoroge, but whether

24   or not she was living there or not, I don't know.  It

25   could have just been a mail address.

53

1     Q.   Would it surprise you at all that's the

2  landlord and she was living with her sister?

3     A.   No.

4     Q.   Now, on this form she is what's known as the

5  primary applicant; right?

6     A.   Principal applicant, yes.

7     Q.   Principal, sorry.  And on it it lists that she

8  has three children?

9     A.   Correct.

10     Q.   And were you also aware at the time that she

11  filed this application, her spouse, Shalom Arsene

12  Ntahobali, also filed an application?

13     A.   Yes.

14     Q.   Is he required -- if she's the principal

15  applicant and he's an adult, does he have to file his

16  own application or can he just ride along with hers?

17     A.   In the U.S. program at that time, he would

18  have to fill out his own form, but he could only ride

19  along with her if he would not have his own independent

20  access to the program unless he also fell into one of

21  the priorities.

22     Q.   I meant to ask you about that.  What

23  constitutes a priority?

24     A.   It varies from year to year, as does the

25  ceiling, and -- the number varied from year to year, one

54

1    to four, one to six.  The first priority was always --

2    wasn't always, but at that time it would have been

3    either a UN or State Department referral based on an

4    individual who was in danger in their country of first

5    asylum, meaning somebody left their home country,

6    wherever they first got to and are still in danger, the

7    UN or the State Department could refer them to a refugee

8    program.  They did not need a U.S.-based relative.

9            The other priorities after that, usually two

10   through four, two through six, related to individuals

11   who had a relative in the United States, and the

12   priority based on the closeness or the nature of the

13   relationship.

14       Q.   So because Beatrice has her brother Higaru

15   here in the U.S., that gives her some priority?

16       A.   Correct.

17       Q.   Could Shalom independently use Higaru as his

18   brother-in-law?

19       A.   No.

20       Q.   So he's got to tagalong with hers, but he also

21   has to file an application?

22       A.   Correct.

23       Q.   And wouldn't it also be the case that his

24   so-called A-File would be attached to hers?

25       A.   Correct.

1       Q.   And you would have that information available

2  to you when you're reviewing her application?

3       A.   Correct.

4       Q.   In fact he's sitting right in front of you

5  during the interview, so you've got his application

6  also.

7       A.   Correct.

8            MR. HOWARD:  Your Honor, I'm going to try to

9  identify the Shalom Ntahobali A-File by exhibit number.

10  The parties agree it can be moved in as a full exhibit.

11  For the record, that's Exhibit 7.

12           THE COURT:  No objection?

13           MR. CAPIN:  No objection.

14           THE COURT:  ID may be stricken on

15  Government 7.

16           (Government's Exhibit 7 admitted.)

17      Q.   So at the same time that Beatrice files her

18  application -- which is received on January 18th of

19  1995; is that correct?

20      A.   Correct.

21      Q.   Her husband Shalom files his application.  I'm

22  going to just show you the second page first.  It says

23  Shalom Ntahobali Arsene, January 18th, 1995.

24      A.   That's actually not the second page.  It's a

25  biographical form.

1       Q.   You're right about that, my apologies.  Here's

2   the first page and maybe I didn't grab the second page.

3   What you were just saying is a biographical form, so

4   this is an entirely different form?

5       A.   If you could slide it up, maybe I could see

6   the bottom.

7       Q.   The bottom?

8       A.   Correct.  That is not part of the refugee

9   application form.  It's not part of the I-590.  It's a

10   required form, but it's not the back page of the I-590.

11       MR. HOWARD:  What I'm going to do is work off

12   this first page, and perhaps when we take a break I'm

13   going to try to find the second page.

14       (Pause.)

15       Q.   I have seen this before.  Now I have the

16   second page.  This is a two-sided form; correct?

17       A.   Yes.

18       Q.   So if we look now, we can see, if I point

19   here, that it was submitted the same day as Beatrice's?

20       A.   Correct.

21       Q.   Thank you.  Both are required to submit family

22   information; right?

23       A.   Correct.

24       Q.   Meaning their children and who they're married

25   to?

1      A.   Correct.

2      Q.   As part of the application are they also

3   required to identify their family relationships?

4      A.   The principal needs to identify certain family

5   relationships.  Yes.  I hadn't thought about it in

6   awhile, but now that I recall, yes.

7      Q.   I'm going to place a page from Shalom

8   Ntahobali's file on the screen here, and we can see at

9   the top that it says family relationship?

10     A.   Yes.

11     Q.   Up in the far left-hand corner the name Shalom

12   Arsene Ntahobali?

13     A.   Correct.

14     Q.   And if I slide down, you can see that it's

15   date-stamped January 18, 1995?

16     A.   Correct.

17     Q.   Can we assume from that that this was

18   submitted at the same time as his application?

19     A.   Yes.

20     Q.   And Shalom identifies his parents here;

21   correct?

22     A.   Yes.

23     Q.   He identifies them by name, Maurice Ntahobali

24   and Pauline Nyiramasuhuko; right?

25     A.   Yes.

1      Q.   You also can see that he identifies some

2   siblings?

3      A.   Yes.

4      Q.   And the first three are females; are they not?

5      A.   They appear to be.

6      Q.   Clarisse, Denise, and Bridget; right?

7      A.   Yes.

8      Q.   And it appears Clarisse and Denise according

9   to this document were in Zaire?

10     A.   Yes.

11     Q.   And are of the age at the time 25 and 23

12  respectively.

13     A.   Yes.

14     Q.   Just about the same age as Beatrice.  She was

15  born in 1970; correct?

16     A.   Yes.

17     Q.   We may come back to that document in a moment.

18  So you know when you first pick up the file to review

19  it, you're looking at Beatrice's A-File, you're looking

20  at Shalom's A-File, you're looking at their

21  relationships, right, that they have, who their families

22  are.

23     A.   Yes, but not very closely.  The form that you

24  just referenced is not an INS form.

25     Q.   But it may not be an INS form, but it's a form

1    that the INS has in its possession information provided

2    to it by the applicants?

3         A.   Correct.

4         Q.   And presumably a form that you're going to

5    rely on?

6         A.   Generally, no.  That particular form was

7    used -- if the case was approved and the individual

8    eventually went to the U.S., that was the form that

9    served as the basis for any qualifying relative in the

10   future to establish a relationship, and it is primarily

11   used by the State Department and JVA.

12        Q.   So once these forms are received by your

13   office on January 18, 1995, the case is assigned and in

14   this case the case was assigned to you; correct?

15        A.   Yes.

16        Q.   You then schedule an interview?

17        A.   No.  JVA schedules the interviews.  I tell

18   them when we're available and they schedule accordingly,

19   based on the order they're received usually.

20        Q.   It looks like you were available for an

21   interview within a month's time?

22        A.   Correct.

23        Q.   And the JVA sets up the interview.  Did you

24   usually go over to the JVA office?

25        A.   If we interviewed in Nairobi it was always at

1    the JVA office, yes.

2         Q.    So those interviews did not take place at the

3    embassy.

4         A.    Correct.  We never interviewed at the embassy.

5         Q.    And at the JVA offices, I believe you

6    testified that usually or probably JVA would provide an

7    interpreter that has been vetted by the JVA?

8         A.    Correct.

9         Q.    That wasn't always the case, was it?

10        A.    Correct.

11        Q.    There were instances where the applicant

12   themselves were required to find their own interpreter

13   and bring them to the office; right?

14        A.    Not that I recall.  I was thinking more of

15   there were a number of people that spoke English well

16   enough when you'd use an interpreter.

17        Q.    Let me clarify.  For those who needed an

18   interpreter, there were occasions that the applicant was

19   required to find their own interpreter and bring the

20   interpreter to the interview.

21        A.    I don't recall it being a requirement.  I

22   recall it having happened on occasion as an option but

23   never as a requirement.  If the individual needed an

24   interpreter, JVA was required under their contract to

25   find one and supply it.

61

1      Q.   But if JVA didn't supply one, then the

2  applicant would have to bring one in order to

3  communicate.

4      A.   Yes, but they weren't actually required.  No

5  applicant was required to actually supply a translator.

6      Q.   I understand that.  You and I are probably

7  starting to quibble over what the word "required" means.

8  I don't want to do that.  All I'm saying is if JVA

9  didn't provide one and the applicant wants to

10 communicate, then the applicant really needs to bring an

11 interpreter along; right?

12     A.   Correct, or reschedule the interview for a JVA

13 interpreter.

14     Q.   And this fellow who is on the documents from

15 February 16, 1995, as the interpreter, his name is

16 Joseph Bukeye?  Do you remember that name being shown to

17 you on direct?

18     A.   Yes.

19     Q.   You were asked if he was one of those JVA

20 interpreters and you said probably.

21     A.   Correct.

22     Q.   You don't know if he was or not.

23     A.   Correct.

24     Q.   You don't know if it's somebody who Beatrice

25 had to bring on her own.

```
 1        A.    Correct.

 2        Q.    Do you have any knowledge of his

 3   qualifications?

 4        A.    No.

 5        Q.    Do you speak any Kinyarwandan on your own?

 6        A.    No.

 7        Q.    You're not alone.  So you don't have any idea

 8   what he is saying to Beatrice and Shalom in that

 9   interview as you're asking questions.

10        A.    Very little idea, but depending on the

11   question there might be certain words that --

12        Q.    That don't translate?

13        A.    Yeah.

14        Q.    That don't translate well.

15        A.    That don't translate well that either would

16   have been done in English or -- it wasn't uncommon in

17   East African languages to have what would have been an

18   English word with local language ending on it and you'd

19   pick up some of those now and then.

20        Q.    Any idea of that instance occurring in

21   Beatrice's interview?

22        A.    I have no recollection of Beatrice's

23   interviews at all.

24        Q.    Right.  So when you're doing this interview on

25   February 16th, you're talking to this Joseph Bukeye and
```

1   he's talking to Shalom and Beatrice.

2        A.   Correct.

3        Q.   And then Bukeye gives back to you what his

4   interpretation is, assuming that he's being honest about

5   what Beatrice and Shalom are saying.

6        A.   Correct.

7        Q.   And you write down what Joseph Bukeye is

8   saying.  Right?

9        A.   Eventually, yes.  Not contemporaneously.

10       Q.   Right, I understand that.  I'm going to get

11   away from that interview for a moment and turn to --

12            MR. HOWARD:  Before we do that, this is

13   actually a good time -- Judge, can I just ask what your

14   anticipated break is given the schedule?

15            THE COURT:  If you're ready we can do it now.

16   I thought we should go to 11 and check the weather.

17            MR. HOWARD:  I'm happy to do it.  I didn't

18   want to get in anybody's way about what your plan was.

19            THE COURT:  Is it convenient now?

20            MR. HOWARD:  It's convenient, Judge, because I

21   don't want to fumble around with papers I have to find.

22            THE COURT:  Ladies and gentlemen, why don't we

23   take a short break now and we'll come back and go on.

24            (Recess taken.)

25            THE COURT:  Still looks the same, 6:00 for

64

1    blizzard warnings, heavy snow around 3, so we'll press

2    on if that's all right.  If anybody has any strong

3    objection, let me know.

4              MR. HOWARD:  Thank you, your Honor.

5         Q.   Mr. Monica, before we took the break I was

6    about to move on to another subject area.  With respect

7    to Beatrice's A-File, isn't it also true that her

8    brother's application, Jean-Marie Higaru's application

9    is part of her A-File because he's the anchor?

10        A.   I don't recall.  It would vary from time to

11   time.  There would be something in the file confirming

12   the relationship, but in this specific case I don't

13   recall whether it's in there or not.

14        Q.   Prior to the February 16th, 1995, interview do

15   you recall reviewing Higaru's application?

16        A.   No.

17        Q.   In your preparation for your testimony here, I

18   assume you looked at the entire A-File.

19        A.   Yes.

20        Q.   I'm going to put on the screen, we can't see

21   the very top of what it says the document is, but if you

22   look down at the bottom you can see that it says I-590?

23        A.   Correct.

24        Q.   And for Jean-Marie Vianney Higaru.  Do you see

25   that?

```
 1          A.   Yes.

 2          Q.   Now that you are looking at this document,

 3     does it refresh your memory that you have seen it?

 4          A.   No.  I may have seen it and not paid close

 5     attention to it.  I only reviewed the A-file yesterday.

 6          Q.   If I then show you the signature page saying

 7     it was received on May 11th, and maybe the interview by

 8     the looks occurred on May 19th, 1994, does that refresh

 9     your memory?

10          A.   No.

11          Q.   I'm not going to ask you about things you just

12     don't know about.  Going back to Beatrice's application,

13     one of the things you talked about with Mr. Capin was

14     this Question 14 at the top of the page.  Let me just

15     briefly read it into the record.  The applicant is

16     asked:  Political, professional, or social organizations

17     of which I am now or have been a member, or with which I

18     am now or have been affiliated since my 16th birthday.

19     And then in parentheses it says:  If you have never been

20     a member of any organization, state none.  Correct?

21          A.   Yes.

22          Q.   And the form indicates that Ms. Munyenyezi

23     said none.

24          A.   Correct.

25          Q.   The first question I have for you is in
```

```
 1    Question 14 it asks you to identify either membership or

 2    affiliation; correct?

 3         A.    Correct.

 4         Q.    From the point of view of your immigration

 5    service, what's the difference between membership and

 6    affiliation?

 7         A.    I don't believe there's an intent to really

 8    differentiate them.  It's to make the question broad

 9    enough that the person would respond identifying any

10    organization regardless of whether -- of how you frame

11    the question.

12         Q.    Well, would you agree with me that there is a

13    distinction between membership in a group and perhaps

14    affiliation with a group?

15         A.    Probably, yes.

16         Q.    Does the government have a view of what the

17    difference is?

18         A.    Not that I'm aware of.  It's mostly in the

19    nature of the activity.

20         Q.    You see in the parenthetical where it says:

21    If you've never been a member of an organization state

22    none?

23         A.    Yes.

24         Q.    Let's take out of the equation for now that

25    you only speak Kinyarwandan and we know that the English
```

1    language doesn't translate all that well sometimes.  If

2    you were asked to identify either a membership or an

3    affiliation, but then you were told you can say none if

4    you're not a member, would you agree with me then that

5    you're only not telling the truth if you're not a

6    member?

7              MR. CAPIN:  Objection.

8              THE COURT:  Overruled.

9         A.   Can you repeat the question.

10        Q.   We're trying to figure out here if that answer

11   none is a lie to that question.  The government asks the

12   applicant to identify whether you are a member or you

13   are affiliated, but then the government tells the

14   applicant you can say none if you're not a member.

15   Right?

16             MR. CAPIN:  Your Honor, this is pure

17   hypothetical.

18             THE COURT:  It's important to know what his

19   view of it is because he's the man in charge of

20   administering it and it's like most government forms.

21   What does it mean?

22        A.   You know -- and this is one of the questions I

23   used as I mentioned before.  I didn't always focus on

24   any questions.  Education, for instance, was often not

25   focused on.  On this question here I actually routinely

1    would ask it in terms of association.  Have you ever

2    been associated with, and let that be translated, and

3    then based on the response to that, either live with the

4    "none" or I would amend it if the person indicated an

5    association.

6         Q.   So the question asks membership or

7    affiliation, but in your usual practice when you're

8    doing the interview, you change it and you say in

9    association with.

10        A.   Correct.

11        Q.   Okay.  But the form itself -- which is filled

12   out before they even get to the interview; right?

13        A.   Correct.

14        Q.   Only says that if you're not a member of any

15   organization, you can say none?

16        A.   Correct.

17        Q.   Okay.  So if somebody went to a political

18   rally but is not a member of whatever party is throwing

19   that political rally, they may have some association

20   with the rally because they're there, but they're not a

21   member of the party.  Right?

22        A.   Yes.

23        Q.   And that form doesn't require them to say I

24   went to political rallies and I have some association

25   with that party because I went there, but I'm not a

1  member.  Right?

2       A.    Correct.

3       Q.    They don't have to divulge that to you.

4       A.    Correct.

5       Q.    Do you have any idea based on your knowledge

6  of handling Rwandan refugee applications what it took to

7  be a member of the controlling party, the MRND?

8       A.    No.

9       Q.    All right.  Let's move on.  Just a couple of

10  quick questions about the interview you did on the 16th.

11  The interview you did on the 16th, I'm putting it back

12  on the screen here.  I just want to make sure that I

13  understood your testimony.  The handwriting that's in

14  the text here, that's yours?

15       A.    Correct.  Everything from INS officer on down

16  is mine.

17       Q.    The first thing you write in the interview

18  notes is prior to war.

19       A.    Correct.

20       Q.    Nowhere in here does it say genocide, does it?

21       A.    No.

22       Q.    The next thing I want to point out is when you

23  were talking to the two of them -- and presumably it's

24  Shalom who answers this question.

25            MR. CAPIN:  Objection.

1              MR. HOWARD:  I'll rephrase the question.

2              THE COURT:  All right.

3         Q.   When you're talking to the two of them you're

4    asking about their families and political activities;

5    right?

6         A.   Correct.

7         Q.   It's identified expressly in your notes there

8    that Shalom's family has a history of civil service to

9    the controlling government; right?

10        A.   Correct.

11        Q.   He says that his father was at the National

12   University; correct?

13        A.   I believe she said it.  I would not have

14   interviewed him with regard to this.

15        Q.   So she's telling him.

16        A.   Correct.

17        Q.   Do you recall if she was more specific, that

18   he in fact was -- I believe the title was rector.  He's

19   the head of the National University?

20        A.   No, I have no recollection of the interview at

21   all.

22        Q.   Any either indication in your notes or as I

23   asked the question, a refreshed recollection, that she

24   said that the head of the National University is a

25   politically appointed position?

```
 1        A.    No.

 2        Q.    Then she -- because we can understand even

 3   though you don't recall it.  This is her answering the

 4   question; right?

 5        A.    Correct.

 6        Q.    She says to you that her mother-in-law,

 7   Shalom's mother is Pauline Nyiramasuhuko.  You knew that

 8   going into the interview; right?

 9        A.    Correct.

10        Q.    Is a cabinet minister; right?

11        A.    Yes.

12        Q.    That would be a cabinet minister of the then

13   controlling government, the one that was deposed?

14        A.    Correct.

15        Q.    Sending any red flags up that maybe you ought

16   to look into who these two people are?

17        A.    It would have led to follow-up questions, but

18   again, I would have relied on the Security Advisory

19   Opinion if I found no additional red flags during the

20   interview.

21        Q.    So at the time that you did this interview,

22   apparently the name Pauline Nyiramasuhuko being a

23   cabinet minister with the MRND-controlled government

24   meant nothing?

25        A.    Correct.
```

1        Q.    And so later on in this process you send a

2   communique -- I think it's called the visa donkey or

3   something like that?

4        A.    Correct.

5        Q.    -- off to the State Department; right?

6        A.    Correct.

7        Q.    You're looking to the State Department to get

8   some clearance here because they're the ones who are

9   going to really know who the people are you have to pay

10  attention to; right?

11       A.    Correct.

12       Q.    And do you remember when you sent that visa

13  donkey?  Do you remember what year you sent it?

14       A.    No.  The date is on the cable.

15       Q.    Okay.  I think it was in 1996.  I'll dig it

16  out in a minute.  We'll confirm the date in a moment.

17  Does Immigration disclose to the State Department not

18  just it's Beatrice, not just that it's Shalom and their

19  three daughters, but that, hey, State Department, we're

20  being told here that her mother-in-law is Pauline

21  Nyiramasuhuko, cabinet minister in the MRND government.

22  Can you tell us anything about that?

23       A.    No, that would not be part of the SAO request,

24  the visa donkey.

25       Q.    Do you mind if I ask why not?

1     A.   At the time the name meant nothing to me, and

2     there would be no reason to put it in.  We did not put

3     family histories into the advisory requests.

4     Q.   So even though she discloses to you

5     mother-in-law's a cabinet minister -- I understand that

6     doesn't mean anything to you, but you don't even share

7     that with the State Department.

8     A.   Correct.

9     Q.   Do you have any reason to doubt that her

10    mother-in-law was in fact Pauline Nyiramasuhuko, cabinet

11    member of the MRND led government?

12    A.   No.

13    Q.   She's being honest about that as far as you

14    know; right?

15    A.   Correct.

16    Q.   I believe you showed us this before.  You

17    actually in your word or your parlance, you've

18    adjudicated her application two weeks later on

19    March 2nd; right?

20    A.   Correct.

21    Q.   That means you approved her for refugee

22    status; right?

23    A.   Correct.

24    Q.   And that would set in motion that she would

25    then have to do a couple of things, get a medical exam,

1   have a background check, and assuming she passed all

2   those things, she would be admissible into the U.S.;

3   correct?

4        A.   Correct.

5        Q.   To anybody who's a refugee in Africa, if they

6   get that letter from you that says congratulations, you

7   are eligible, schedule your appointment for a medical

8   exam, that is great news; right?

9        A.   Yes.

10       Q.   And you sent that letter presumably to the

11  post office box that she put on her application.  Would

12  that be fair enough to say?

13       A.   Not necessarily.  That part -- the only time I

14  would have seen the file or the applicant was at the

15  time of the interview, that February 16th date.  JVA

16  handled all the pre-processing and post-processing, and

17  usually for cases in Nairobi they had a bulletin board

18  and they posted on the bulletin board names and advised

19  the individual to report to them.  They would then

20  physically hand them the various letters.

21       Q.   So what the JVA was doing, understanding that

22  it might not be that reliable to just mail the

23  congratulations letter to Beatrice, they also say, we

24  have a bulletin board, so come check in our office every

25  so often to see if you are on the board; right?

1      A.    Correct.

2      Q.    Do you recall reviewing the file that on

3  October 23rd, some seven months later, JVA still hadn't

4  heard from Beatrice?

5      A.    I saw that reviewing the file, yes.

6      Q.    This best news that she would have gotten, she

7  didn't even know about it for seven months; right?

8      A.    Apparently, yes.

9      Q.    In fact, what the JVA did was they sent a

10 letter to the United States and said could you go find

11 her anchor, her brother Higaru, and let her know that we

12 gave her -- that she's eligible?  We approved her

13 application seven months ago?

14     A.    Correct.

15     Q.    You saw that letter; right?

16     A.    When I reviewed the file yesterday, yes.

17     Q.    Do you have any idea where Beatrice was in

18 those seven months?

19     A.    Only from having reviewed the file yesterday,

20 and it appears she was in Zaire.

21     Q.    She went back to Zaire for a period of time;

22 right?

23     A.    It appears so, yes.

24     Q.    Does that strike you as consistent with the

25 actions of someone who was aggressively trying to get

1    into the U.S.?

2            MR. CAPIN:  Objection.

3            THE COURT:  I'm not sure it's relevant.

4    Sustained.

5        Q.    Then from your review of the file, you do know

6    that she came to the JVA on November 13th of 1995;

7    right?

8        A.    I don't recall the specific date, but I do

9    know that she eventually got the necessary letter.

10       Q.    Well, I'm going to put this chronology -- is

11   this kept by your office?

12       A.    No, it's JVA chronology.

13       Q.    This is JVA.  But it is something you

14   reviewed?

15       A.    Yes, I did, yes.

16       Q.    She came into the office on November 13th,

17   1995, to remove her husband because he has a scholarship

18   in Zaire.  Do you see that?

19       A.    Yes.

20       Q.    There's no discussion in this November 13th,

21   1995, appearance that says, hey, congratulations, you're

22   eligible.  Did you know that, Beatrice?  There's no

23   discussion there; right?

24       A.    Correct.

25       Q.    In fact it's another two months, January 16,

1    1996, that she, the PA, that's Beatrice, came in to

2    check on her case.  She'd never been informed or

3    understand that she had been approved; right?

4        A.   Correct.

5        Q.   So we are talking a good ten months after her

6    eligibility before she realizes that she was eligible

7    and she needed to come in.  Right?

8        A.   It appears so, yes.

9        Q.   Yes.  When she was in the office on

10   November 13th of 1995, the JVA required her to fill out

11   the Rwandese -- the questionnaire for Rwandese visa

12   applicants; right?

13       A.   Correct.

14       Q.   So after she's already been deemed eligible,

15   now she's got to fill out another form; right?

16       A.   Correct.

17       Q.   That form did not exist back in March of 1995,

18   did it?

19       A.   I don't recall when it came into existence.

20       Q.   Well, if it was in existence at the time she

21   applied, you would have had her do it; right?

22       A.   No.  JVA had her complete the form, and it

23   would then become part of that visa donkey cable you saw

24   earlier, but as I mentioned it's not an INS form.

25       Q.   Is this a U.S. Government required form?

1        A.    U.S. Government required information.   It

2   wasn't a formal format.   It was typed up.   There was no

3   standard form for that.   It was just a list of

4   questions.

5        Q.    So the JVA is this non-governmental

6   organization that has a contract with the government;

7   right?

8        A.    Correct.

9        Q.    The government had said to the JVA we would

10   like you to get some information from Rwandans who are

11   trying to come into the U.S.

12        A.    Correct.

13        Q.    But this form itself is a JVA form.   It's not

14   a U.S. Government form.

15        A.    Which form are you referring to?

16        Q.    The Rwandese application, the questionnaire?

17        A.    Correct.

18        Q.    All right.   So she fills out the Rwandese

19   form, the application -- strike that, questions for

20   Rwandan applicants.   The first question is have you been

21   in Rwanda since April of 1994.   Right?

22        A.    Correct.

23        Q.    Wouldn't you agree with me that if you're

24   somebody who doesn't want the government to know they

25   were in Rwanda during the period of the war or the

1    genocide answering yes is not a good idea?

2              MR. CAPIN:  Objection.

3              THE COURT:  Overruled.

4         Q.   You should probably lie about that; right?

5         A.   Not necessarily.  I don't think I would draw

6    that conclusion.  There are all sorts of refugees on all

7    sides of the conflict that were in and left.

8         Q.   But if you're trying to hide because you are a

9    persecutor, telling the JVA that you were in Rwanda is

10   not a very good idea, is it?  You'd be better to lie,

11   wouldn't you?

12        A.   I don't think I would go that far.  I can

13   think of reasons why it would be advantageous to be

14   truthful on that.  You may have had a passport issue

15   subsequent to that date.  If you had that passport and

16   then tried to say you weren't there, create more

17   problems for you, for instance.

18        Q.   Just to scoot down with Question F, what

19   occupation did you have in Rwanda prior to April '94,

20   she put student; right?

21        A.   Correct.

22        Q.   And then occupation since that time, refugee.

23        A.   Correct.

24        Q.   No reason to think that's false; right?

25        A.   Correct.

1      Q.   Then right after it it says:  Did you suffer

2  any financial losses during the civil conflict in

3  Rwanda.  Do you see that question?  There's an answer

4  that says house?

5      A.   Yes.

6      Q.   Were you aware that the house she was living

7  in was blown up by the RPF?

8      A.   No.

9      Q.   And just out of curiosity, this form is being

10  used in late 1995.  Do you know who chose the term

11  "civil conflict" for what was going on in Rwanda on this

12  form?

13      A.   It would be the applicant's response to the

14  JVA at the time they filled it out.

15      Q.   The JVA creates this form and called what was

16  going on a civil conflict.

17      A.   Based on the answer to the question, yes.

18      Q.   Now, after the Rwanda questionnaire was

19  completed and she came back in in January, she was

20  approved again; right?  Meaning she was found eligible

21  again.  Or did she even have to be?

22      A.   No.  And the Rwanda questionnaire is used to

23  respond to questions on that Security Advisory Opinion

24  request, the visa donkey, but the JVA doesn't make

25  determinations as to eligibility.  They simply collect

81

1    that information and forward it.  But there is no

2    re-approval or reaffirmation, nor can the JVA find

3    somebody ineligible or take them off the case.

4         Q.   This was a very poorly phrased question.  My

5    apologies for that.  The information is submitted to the

6    State Department, because she's already been deemed

7    eligible.  Now we are doing the background check.  About

8    a year later we're doing the background check.

9         A.   Correct.

10        Q.   Background check is fine; right?

11        A.   Correct.

12        Q.   She runs into a bit of a problem with a

13   medical issue where the government then says, okay, now

14   you are excludable because of a medical issue.  Right?

15        A.   Correct.

16        Q.   She applies for a waiver of the medical issue

17   and that's granted; correct?

18        A.   Correct.

19        Q.   In the meantime that's when her husband

20   withdraws his application; correct?

21        A.   I don't recall.

22        Q.   Do you recall that that was sometime in early

23   1996?

24        A.   It occurred at some point.  I don't remember

25   specifically.

1    Q.   And that had to do with studying in Zaire

2   according to those notes?

3    A.   Correct.

4    Q.   She doesn't actually get to the United States

5   until 1998; correct?

6    A.   Correct.

7    Q.   And from roughly early 1996 all the way to

8   1998, that has to do with the medical issue that she has

9   to get the waiver for; right?

10    A.   I'd have to review the file again to say for

11   sure, but probably.

12    Q.   Once that waiver is granted, then she's

13   allowed to come.

14    A.   Correct.

15    Q.   In that period of time, from 1995 when she

16   first applied and told you who her husband was, told you

17   who her mother-in-law was, and told you who her

18   father-in-law was, and told you that her mother-in-law

19   was a cabinet minister in the controlling government,

20   did the United States Government ever do any

21   investigation to either verify that information or

22   determine its significance?

23    A.   I believe not.  It just was not a routine part

24   of our process.

25         MR. HOWARD:  I think this is my last series of

1    questions.  And I believe I can find this document

2    relatively quickly.

3         Q.   Mr. Capin put on the screen and read out loud

4    this handwritten letter.  Do you recall him doing that?

5         A.   Yes.

6         Q.   First of all, do you know when this letter was

7    written?

8         A.   No.

9         Q.   Doesn't appear to be dated, does it?

10        A.   Correct, it appears not to be dated.

11        Q.   But it does talk about her husband having

12   sponsorship for a program in Zaire; right?

13        A.   Correct.

14        Q.   And then at the bottom her name appears;

15   right?  M. Beatrice?

16        A.   Correct.

17        Q.   You actually have witnessed her sign documents

18   before; right?

19        A.   Correct.

20        Q.   That is not the signature you're familiar

21   with, is it?

22        A.   I don't recall, but it doesn't appear to be.

23        Q.   You have no idea who actually put pen to paper

24   on this letter, do you?

25        A.   No.

1          MR. HOWARD:  Okay.  Since Mr. Capin just asked

2    me to leave it here, I assume he's got questions about

3    it and I will defer to him.

4          MR. CAPIN:  May I, your Honor?

5          THE COURT:  Are you finished?

6          MR. HOWARD:  I am finished, your Honor.

7          THE COURT:  Mr. Capin, redirect?

8                    REDIRECT EXAMINATION

9    BY MR. CAPIN:

10     Q.   Just starting where Mr. Howard left off, am I

11   correct in understanding that JVA was involved with this

12   applicant's application from the beginning to the end?

13     A.   Correct.

14     Q.   And Mr. Howard asked you a number of questions

15   about whether you knew with regard to this specific

16   applicant based on your memory that it was a JVA

17   interpreter who interpreted between you and her.  Do you

18   remember those questions?

19     A.   Yes.

20     Q.   In the normal course somebody who is involved

21   with JVA from the very beginning throughout the process

22   would have been interviewed by you in the presence of a

23   JVA-approved interpreter.  Isn't that right?

24     A.   Yes.

25     Q.   And there were Kinyarwanda interpreters

1  available to you in Nairobi, Kenya, through JVA, weren't

2  there?

3      A.   Yes.

4      Q.   Now, just so the jury understands, is the

5  process that you were going through in trying to help

6  refugees come to this country, is that an adversarial

7  process?

8      A.   No.  It's explicitly in our training materials

9  not an adversarial process.

10      Q.   So you're not trying to prevent the refugees

11  from coming.

12      A.   Correct.

13      Q.   It's not part of your routine practice to seek

14  to find them not credible.

15      A.   Correct.

16      Q.   In fact, I believe you said in response to Mr.

17  Howard's questions that you assume the credibility of

18  the answers unless something the applicant says to you

19  doesn't jive with that.

20      A.   Correct.  And it's not just my personal

21  practice.  That's the way the program is designed.

22      Q.   So when Mr. Howard said you found her to be

23  credible, that was based on what she said to you during

24  the half an hour or so meeting with her, and in fact it

25  was consistent with what she had put on her application.

1          A.    Correct.

2          Q.    Now, with regard to -- just before I move on

3    from the whole English language issue, if you had had

4    any doubt that the applicant was -- that the interpreter

5    was interpreting correctly for you, what would you have

6    done?

7          A.    Stopped the interview and gotten a new

8    translator.

9          Q.    And is one of the things you would use to

10   figure out if the interpretation was correct whether the

11   answers she's giving you are responsive to your

12   questions?

13         A.    Yes, that and other factors.

14         Q.    Other factors like your experience on how

15   fluidly the translation is going through the

16   interpreter?

17         A.    Are there pauses, does there seem to be

18   confusion, that sort of thing.

19         Q.    Now, on your handwritten notes -- I'm putting

20   up my version of it just in the interest of time.  It

21   has some highlighting.  Now, how do you reconcile on

22   this statement the statement here:  Prior to 4/94

23   neither PA, spouse, or family were politically active or

24   had any involvement with government, with the statement

25   over here that the civil servants in her husband's

1   family were at the university and were a cabinet

2   minister?

3       A.   I don't recall this specific response, but I

4   would have done follow-up questions routinely.  But

5   based on -- I had experience with other cabinet level

6   applicants for refugee status, etc., and being a cabinet

7   minister would not always make you politically active in

8   the sense that it would be a concern to us.  You're

9   obviously politically active in the sense that you are

10  involved in politics, but then the follow-up is

11  specifically for eligibility for refugee status.  Does

12  that political activity bear on your likelihood of

13  persecution or less likely or less often the possibility

14  that you engage in persecution, and whatever follow-up

15  apparently didn't raise such red flags.

16      Q.   In the sense a red flag had been raised, you

17  would have made a note of it in your notes?

18      A.   Yes.

19      Q.   To be clear, Mr. Howard kept asking you

20  questions about Ms. Munyenyezi's A-File indicating that

21  her mother-in-law was a member of the MRND government.

22  There's no reference to the MRND at all in her A-File,

23  is there?

24      A.   Not that I recall.

25      Q.   Mr. Howard asked you to infer that because the

1    government in power was MRND that the mother-in-law was

2    a member of the MRND.  Correct?

3         A.   Yes.

4         Q.   So were you aware that the prime minister at

5    the time the genocide started was actually a member of

6    another party?

7         A.   Not specifically, but I may have known that.

8    I knew more then than I know now.

9         Q.   Many years have passed.  Were you aware that

10   the prime minister, who was not MRND, was one of the

11   first people murdered by the MRND when the genocide

12   started?

13        A.   Now that you mention it, I recall something

14   along the lines, but it's fuzzy.

15        Q.   So I believe the reference that Mr. Howard was

16   showing you to, Shalom Ntahobali's mother being Pauline

17   Nyiramasuhuko, that was in Shalom Ntahobali's

18   biographical data, in his A-File; correct?

19        A.   Correct.

20        Q.   That biographical data may also be in her

21   A-File?

22        A.   Correct, yes.

23        Q.   But who was the focus of your interview when

24   you met with this husband and wife in 1995?

25        A.   The principal applicant.

89

1      Q.   And why is that?

2      A.   The success or failure of the refugee

3   application hinges on her.

4      Q.   Hinges on her eligibility of not being a

5   persecutor, etc.

6      A.   Correct.

7      Q.   So the standard procedure then would have been

8   to ask all of your questions to her directly through the

9   interpreter; correct?

10     A.   Once we got through the basic biographical

11  questions, everybody would have to affirm what's already

12  on the application form they filled out.  That was the

13  first few minutes of the application.  Subsequent to

14  that point the actual eligibility determination would

15  just be an interview of the principal applicant.

16     Q.   And you wouldn't have any cause to delve into

17  the husband or derivative applicant's political activity

18  or background?

19     A.   Usually, no.

20     Q.   Now, Mr. Howard asked you some questions about

21  the Rwanda questionnaire.  I think you referred to the

22  Rwandese questionnaire.  Now, do you know who generated

23  the questions that went onto this form?

24     A.   The State Department requested that those

25  questions be asked and included in the security advisory

1    request.

2        Q.    So regardless of who actually typed the form,

3    these are questions that the State Department is

4    instructing JVA to get from applicants.

5        A.    Correct.

6        Q.    And Mr. Howard -- I just want to clarify

7    because I'm not sure if I understand the question or the

8    answer with regard to this.  He asked you would she have

9    been a better liar if she had said no to have you been

10   in Rwanda since April of 1994.  Do you remember that

11   question?

12       A.    Yes.

13       Q.    Isn't it true that if she said that she wasn't

14   in Rwanda, she wouldn't have been eligible to be a

15   refugee because the basis of her application was I was

16   in Rwanda and there was a war?

17       A.    No.  The basis -- it's a well-founded fear of

18   returning to Rwanda at the time of the application,

19   application irrespective of where she would have been

20   before that.

21       Q.    But in her reason for seeking resettlement --

22   and this is a terrible copy.  Have you reviewed -- so

23   the refugee application, the first question you reviewed

24   is the reason why you are seeking refugee status; right?

25       A.    Correct.

1      Q.   And I'm not going to do it verbatim, but Ms.

2  Munyenyezi said in essence:  There was a war in Rwanda

3  after April 1994 and that's what caused me to flee.

4  Correct?

5      A.   Correct.

6      Q.   So if she said in her Rwanda questionnaire, I

7  wasn't in Rwanda after April '94, that would have been

8  inconsistent with the reason she was asking for asylum?

9      A.   Correct.

10      Q.   And I don't have the copy of her form, but did

11  you have occasion in preparing to also review Shalom

12  Ntahobali's A-File?

13      A.   Yes.

14      Q.   And did you compare what he said on his form

15  for the reason he was seeking refugee status for the

16  reason that appeared on the form submitted by the

17  primary applicant, Ms. Munyenyezi?

18      A.   Yes.

19      Q.   I'm going to put -- do you recognize what's on

20  the screen now?  This is Mr. Ntahobali's reason;

21  correct?

22      A.   Correct.

23      Q.   I'm going to read it and tell me if there is

24  any similarities between his and Ms. Munyenyezi's reason

25  for saying she wanted to be a refugee.

1        A.    I believe it's identical.

2        Q.    It's identical; right?

3        A.    Correct.

4        Q.    In July 1994 there was a violent change in

5   government in Rwanda.  Given the extent of the killings

6   that took place before and after the takeover, many

7   people fled the country and are up to date unwilling to

8   go back so long as the security situation does not

9   improve.  I happen to be among those people.

10          That was the basis that Shalom Ntahobali gave

11   for being a refugee as well; correct?

12        A.    Yes.

13        Q.    And finally, Mr. Howard asked you some

14   questions about -- I think the term he used was the

15   anchor for this defendant's --

16        A.    Correct.

17        Q.    -- refugee.  And that was her brother; right?

18        A.    Right.

19        Q.    And he showed you the brother's Form 590?

20        A.    590; correct.

21        Q.    And you can see the top is cut off.  This is

22   his reason for coming; right?

23        A.    Right.

24        Q.    That's not verbatim the same, is it?

25        A.    Doesn't appear to be.

1       Q.    So the jury will have that.  They can compare

2   it if they'd like.  But when he was asking for his

3   political affiliation, am I correct in noting he states

4   MDR, in parentheses, the Democratic Republican Movement,

5   1991 until present, and then says it had been fragmented

6   recently.

7       A.    Correct.

8       Q.    So this is an example of a refugee applicant

9   who disclosed his political party back in Rwanda.

10  Correct?

11      A.    Yes.

12      Q.    And he got status?

13      A.    Correct.

14            MR. CAPIN:  I have nothing further, your

15  Honor.

16            THE COURT:  Thank you.  Any redirect?

17            MR. HOWARD:  Just a couple questions, your

18  Honor.

19                      RECROSS-EXAMINATION

20  BY MR. HOWARD:

21      Q.    So Higaru puts that he was a member of the

22  party; right?  The party, a party, the MDR party.

23  Right?  On his application that you just looked at?

24      A.    Correct.

25      Q.    She wasn't a member of any party; right?

94

1      A.    Correct.

2      Q.    Saying no is okay if you're not a member of a

3 party; right?

4      A.    Correct.

5            MR. HOWARD:  Thank you.

6            THE COURT:  All right.  Thank you, Mr. Monica.

7 You may step down and you're excused.  Appreciate your

8 testimony.  And you may call your next witness, Mr.

9 Capin.

10           MR. CAPIN:  Thank you, your Honor.  Next

11 witness is Vestine Nyiraminani.  If I may, your Honor,

12 may I spell it into the record now?

13           THE COURT:  Yes.

14           MR. CAPIN:  Vestine is V-E-S-T-I-N-E, and the

15 surname is N-Y-I-R-A-M-I-N-A-N-I.

16                       VESTINE NYIRAMINANI

17      having been duly sworn, testified as follows:

18           THE CLERK:  Please state your name.

19           THE WITNESS:  Nyiraminani Vestine.

20                       DIRECT EXAMINATION

21 BY MR. CAPIN:

22      Q.    Good morning, Ms. Nyiraminani.

23      A.    Good morning.

24      Q.    Everything you say is being interpreted

25 through this young lady for this jury.

1      A.   Yes.

2      Q.   So if there's anything in my questioning that

3  you don't understand, please let me know.

4      A.   Yes.

5      Q.   And if necessary, I will ask the question

6  differently.

7      A.   Yes.

8      Q.   Tell the jury please where you were born.

9      A.   Tumba.  I was born in Tumba

10      Q.   Is Tumba in Rwanda?

11      A.   In Rwanda in the city of Butare.

12      Q.   And what year were you born?

13      A.   I was born in 1963.

14      Q.   Can you tell the jury how far you went in

15  school?

16           THE INTERPRETER:  I'm sorry, I didn't hear the

17  last part.

18      Q.   Can you tell the jury please how far you went

19  in school?

20      A.   I did six years of primary and then three

21  years of high school.

22      Q.   And where did you go to primary and high

23  school?

24      A.   In Butare.

25      Q.   When you were a young woman did you have a

1    national identity card?

2         A.    When I reached 16.

3         Q.    And did your national identity card indicate

4    what your ethnicity was?

5         A.    Yes.

6         Q.    What did it indicate?

7         A.    Tutsi.

8         Q.    Are you married?

9         A.    Yes.

10        Q.    Do you have any kids?

11        A.    Yes.

12        Q.    How many kids?

13        A.    I have six kids.

14        Q.    I'm going to direct your attention to the

15   beginning of 1994.

16        A.    Yes.

17        Q.    Were you working at that time?

18        A.    Yes.

19        Q.    What were you doing for work?

20             MR. RUOFF:  Just for the record, I'd ask that

21   the interpreter would just make it clear what she's

22   asking for clarification.

23             THE INTERPRETER:  Thank you.  I just need to

24   clarify what she's trying to say.

25        A.    So I did home housecleaning at a place called

    1    Itaba.

    2        Q.    Is Itaba a neighborhood in Butare Town?

    3        A.    Yes.

    4        Q.    Was it housecleaning for a family that lived

    5    in that neighborhood?

    6        A.    Yes.

    7        Q.    Did anybody else work as a housecleaner for

    8    that family along with you?

    9        A.    My elder sister.

   10        Q.    How many days a week did you work for that

   11    family doing housecleaning?

   12        A.    Six days a week.

   13        Q.    Which day did you have off?

   14        A.    On Sundays.

   15        Q.    What time would your workday start?

   16        A.    At 8 o'clock.

   17        Q.    And what time would it end?

   18        A.    At 5:30.

   19        Q.    How would you get from Tumba to the

   20    neighborhood of Itaba where you worked?

   21              THE INTERPRETER:  How did you get from --

   22        Q.    I will ask two different questions.  The

   23    neighborhood you worked in was Itaba?

   24        A.    Yes.

   25        Q.    And you were living in Tumba?

```
 1        A.    Yes.

 2        Q.    How did you get from Tumba to Itaba every day?

 3        A.    I would walk.

 4        Q.    Would you walk with your sister?

 5        A.    Yes.

 6        Q.    And would you walk back from Itaba to Tumba at

 7   the end of the workday?

 8        A.    Yes.

 9        Q.    Would you walk along the main paved road that

10   led north from Burundi to Kigali?

11        A.    Yes.  Itaba, yes.

12        Q.    I will show you a photograph.  On your screen

13   to your right there's a photograph there?

14        A.    Yes.

15        Q.    Did I show you this photograph when we met

16   yesterday?  Have I shown you this photograph before?

17        A.    Yes.

18        Q.    Maybe it's easier.  Take a look at the paper

19   version of it.  Have I shown you that photograph before?

20        A.    Yes.

21        Q.    And I'm going to ask you just two or three

22   questions about this photo.  Do you recognize any of the

23   structures shown in this photograph?

24        A.    Yes.

25        Q.    Tell the jury one of the structures you
```

1   recognize.

2        A.   Yes.

3        Q.   Which building do you recognize?

4        A.   I recognize the EER school.

5        Q.   And that's the school that you touched?

6        A.   Yes.

7        Q.   And when I showed you this photograph, did I

8   explain that you would see it on a computer screen

9   today?

10       A.   I saw it on my own.

11       Q.   Fair enough.  I'm circling the building next

12   to the EER school.  Do you recognize that building?

13       A.   Yes.

14       Q.   And what is that building?  Or back in 19 --

15   was that building there in 1994?

16       A.   Yes.

17       Q.   And in 1994 what was that building?

18       A.   It was a hotel.

19       Q.   Did the hotel have a name?

20       A.   I'Huriro.

21       Q.   So am I correct that in order to walk to

22   Tumba, you would have to walk along the main road in the

23   direction I've just indicated?

24       A.   Yes.

25       Q.   And am I correct that in order to walk to

1    Itaba where you worked you would have to walk along the

2    main road in the direction I've now indicated?

3        A.    Yes.

4        Q.    Was the Hotel I'Huriro built before the

5    genocide?

6        A.    Yes.

7        Q.    Was it built about two years before the

8    genocide?

9        A.    Yes.

10       Q.    Do you know who lived -- did anybody live in

11   the I'Huriro at the beginning of 1994?

12       A.    Yes.

13       Q.    Please tell this jury who lived in that

14   building.

15       A.    Yes.

16       Q.    Tell them the names now.

17       A.    Maurice, Pauline, and their kids.

18       Q.    Do you know the names of their kids?

19       A.    Yes.

20       Q.    Please tell the jurors the names of the kids.

21       A.    Shalom.

22       Q.    Was he a son?

23       A.    Yes.

24       Q.    Did Pauline and Maurice have any other sons?

25       A.    I know Shalom only.

1       Q.   Did Shalom have any brothers?

2       A.   He had sisters.

3       Q.   How many sisters did he have?

4       A.   I remember three.

5       Q.   Do you remember their names?

6       A.   I remember the names of two sisters.

7       Q.   Which two names do you remember?

8       A.   Bridget and Denise.

9       Q.   Do you know if Shalom was married?

10      A.   Yes.

11      Q.   Do you know if he was married before the

12   genocide?

13      A.   Yes.

14      Q.   Did you ever see Shalom in Butare Town with

15   his wife before the genocide?

16      A.   Yes.

17      Q.   Did you know -- at that time did you know the

18   wife's name?

19      A.   Yes.

20      Q.   What name did you know her by at that time?

21      A.   I knew Beatrice.

22      Q.   Do you know what Shalom's father did for work?

23      A.   Not really.  I know that he worked at the

24   university.

25      Q.   So you don't know what job he had at the

```
 1    university?

 2         A.    No.

 3         Q.    Do you know what Shalom's mother did for work?

 4         A.    Yes.

 5         Q.    What did she do for work?

 6         A.    She was a minister in the Rwandan government.

 7         Q.    Do you know where Pauline, Maurice, and their

 8    kids lived before the I'Huriro was built?

 9         A.    Yes.

10         Q.    Please tell the jury where they lived before

11    the Hotel I'Huriro?

12         A.    They once lived in Cyarwa under hill of

13    Tumba.

14         Q.    Is Cyarwa another neighborhood of Butare?

15         A.    Yes.

16         Q.    And are you telling the jury it's close to

17    Tumba?

18         A.    Yes.

19         Q.    Did you ever see -- do you know what the MRND

20    was in 1994?

21         A.    Yes.

22         Q.    What was the MRND?

23         A.    It was a party, a political party.

24         Q.    A political party?

25         A.    Yes.
```

1    Q.   Did you ever see MRND rallies or meetings in

2    Butare?

3    A.   Yes.

4    Q.   Did the MRND have a youth branch?

5    A.   Yes.

6    Q.   Do you know what it was called?

7    A.   Yes.

8    Q.   Please tell the jury what it was called.

9    A.   Interahamwe.

10   Q.   Did the Interahamwe have any particular

11   clothing that their leaders wore?

12   A.   Yes.

13   Q.   Please describe for the jury what the clothing

14   looked like.

15   A.   Yes.

16   Q.   Tell the jury what the clothing looked like.

17   A.   It was a clothing with many colors.  Us in

18   Rwanda, we call it Ibitenge.

19        MR. RUOFF:  I'm sorry, Judge, can I get a

20   spelling on that word?

21        THE INTERPRETER:  I-B-I-T-E-N-G-E.

22        MR. RUOFF:  Thank you.

23   Q.   And what were the predominant colors in that

24   clothing?

25   A.   There is black and red.

| 1 | Q. | Anything else? |

1    Q.   Anything else?

2    A.   There's also like another clothing where you

3  could see the face of the President Habyarimana.

4    Q.   Were there different types of clothing that

5  the Interahamwe wore?

6    A.   Yes.

7    Q.   Can you describe any others?

8    A.   That is what I remember.

9    Q.   I'm going to show you what is Exhibit 25.  Do

10  you recognize what the two men in the foot of that

11  picture are wearing?

12    A.   Yes.

13    Q.   What do you recognize it to be?

14    A.   That is the Interahamwe uniform.

15    Q.   If you look at your screen, is it the two men

16  I'm circling now?

17    A.   Yes.

18    Q.   Did you ever see Beatrice wearing this kind of

19  uniform?

20    A.   No.

21    Q.   I'm going to direct your attention to

22  April 1994.  Were you still working for that same family

23  in Itaba?

24    A.   Yes.

25    Q.   Did you stop working for that family at some

1    point?

2        A.    Yes.

3        Q.    Do you remember the date on -- the last date

4    that you worked for that family?

5        A.    Yes.

6        Q.    What was that date?

7        A.    April 20, 1994.

8        Q.    And on that day did you walk to work as you

9    typically did?

10       A.    Yes.

11       Q.    Did you work all day that day?

12       A.    Yes.

13       Q.    At the end of your workday what did you do?

14       A.    I went back home.

15       Q.    Were you able to get back home?

16       A.    I encountered some troubles along the way.

17       Q.    Tell the jury what troubles you encountered on

18   the way.

19       A.    I was stopped at the roadblock at I'Huriro.

20            MR. CAPIN:   I will interrupt you for one

21   second.   Tell the witness I interrupted you for one

22   second.

23       Q.    Was there a roadblock at the I'Huriro when you

24   walked to work that morning?

25       A.    No.

1       Q.   So am I correct in understanding that while

2  you were at work that day, a roadblock was set up at the

3  I'Huriro?

4       A.   In the evening.

5       Q.   And what happened?  Were you walking home that

6  day with your sister?

7       A.   Yes.

8       Q.   Now, you told the jury you encountered some

9  trouble that day?

10      A.   Yes.

11      Q.   Is the trouble you encountered at that

12  roadblock?

13      A.   Yes.

14      Q.   Please describe for the jury what happened

15  when you got to the I'Huriro roadblock.

16      A.   When I was on my way home at 5:30, I was with

17  my sister and other people who were coming from the

18  market and from their own jobs, I encountered a

19  roadblock, and there were -- at that roadblock there

20  were soldiers and Interahamwe.  They asked to see my

21  identity card.

22      Q.   Is that the identity card that you referenced

23  earlier that said you were a Tutsi?

24      A.   Yes.

25      Q.   Who asked for your identity card?

```
 1        A.    It's an Interahamwe named Beatrice.

 2        Q.    Is that the same Beatrice you said was

 3   Shalom's wife?

 4        A.    Yes.

 5        Q.    Had you seen that woman before that day?

 6        A.    I hadn't seen her that morning.

 7        Q.    No, but before April 20th had you ever seen

 8   that woman?

 9        A.    Yes.

10        Q.    More than once?

11        A.    Many times I would see her in the city.

12        Q.    Have you ever been inside the Hotel I'Huriro?

13        A.    No.

14        Q.    Do you know one way or the other whether that

15   woman you knew as Beatrice worked inside the Hotel

16   I'Huriro?

17        A.    I knew that she lived there.

18        Q.    My question is did you know whether she worked

19   there?

20        A.    No.

21        Q.    Had you ever seen the reception desk at the

22   Hotel I'Huriro?

23        A.    I would never go in, but I just knew the place

24   from the street.

25        Q.    So you'd never had occasion to see the front
```

1    desk.  You never had the opportunity to see the

2    reception desk.

3         A.   No.

4         Q.   So when you gave your ID to Beatrice, what

5    happened next?

6         A.   She looked at it.

7         Q.   And then what happened?

8         A.   And then she said, "Have a seat over there."

9         Q.   Did she indicate where you should have a seat?

10        A.   A little on the side away from the roadblock.

11        Q.   Were you the only person sitting there?

12        A.   No.

13        Q.   Who else was sitting there?

14        A.   My sister and other people that were on their

15   way home from work with me.

16        Q.   Did you recognize any of those other people?

17        A.   Some of them were my neighbors.

18        Q.   Your neighbors from Tumba?

19        A.   Yes.

20        Q.   Did you know the ethnicity of the people

21   sitting by that roadblock with you?

22        A.   Yes.

23        Q.   What was their ethnicity?

24        A.   Tutsi.

25        Q.   Were there any Hutus sitting there with you?

```
 1       A.   No.

 2       Q.   Is that because there were no Hutu walking by

 3  the roadblock that day?

 4       A.   No, there were Hutus passing by.

 5       Q.   Then why were the Hutu not sitting down next

 6  to you?

 7       A.   Well, Hutus will show their ID card, but then

 8  they were told to keep going.

 9       Q.   How long did you sit by that roadblock?

10       A.   About 30 minutes.

11       Q.   Was Beatrice the only person checking IDs at

12  that roadblock?

13       A.   Well, she's the one that asked me for my ID.

14       Q.   Were there other people checking IDs at that

15  roadblock?

16       A.   Yes.

17       Q.   Were there other women checking IDs?

18       A.   I didn't see any.  She's the one I saw.

19       Q.   So were the other people checking IDs all men?

20       A.   Yes.

21       Q.   Did any of those men have weapons?

22       A.   Yes.

23       Q.   Did they have machetes?

24       A.   They also had knives.

25       Q.   Did they have any firearms?
```

1        A.    Yes.

2        Q.    How long did you stay by that roadblock?

3              MR. HOWARD:   Object, asked and answered.

4              THE COURT:   Overruled.

5        Q.    How long did you stay by that roadblock?

6        A.    30 minutes.

7        Q.    What happened after 30 minutes?

8        A.    Yes.

9        Q.    Tell the jury what happened after you sat

10   there for 30 minutes.

11       A.    Six soldiers asked us to get up and they made

12   us walk.

13       Q.    In which direction did you walk?

14       A.    Towards the forest near the IRST.

15       Q.    Is the IRST a building south of the I'Huriro?

16       A.    Yes.

17       Q.    Did all of the Tutsi sitting by the side of

18   the road walk toward the IRST or did some of them walk

19   somewhere else?

20       A.    No.

21       Q.    I'm going to ask the question differently.

22   Did you walk with a group of Tutsi toward the IRST

23   forest?

24       A.    Yes.

25       Q.    Were other Tutsis taken somewhere else?

1        A.    Yes.

2        Q.    Where were the other Tutsi taken?

3        A.    They led them towards away in between EER and

4    IRST.

5        Q.    Describe the area between the EER --

6              MR. CAPIN:  I'm sorry, did she say IRST or

7    I'Huriro?

8              THE INTERPRETER:  I apologize.

9        A.    In between EER and I'Huriro there was a way

10   and that's where they were left.

11       Q.    Describe the way between the EER and the

12   I'Huriro.

13       A.    There's a small narrow way going down, and

14   some of them were led towards that way.

15       Q.    When you say "way," do you mean path?

16       A.    It's a path.

17       Q.    Did you see what happened to the people that

18   were taken down that path?

19       A.    No.

20       Q.    You say you were taken to the IRST woods?

21       A.    Myself and the people with me, we were led

22   towards the IRST.

23       Q.    How far is the IRST woods from the I'Huriro?

24             MR. CAPIN:  Madam witness, I'm going to ask a

25   different question.

1      Q.    How long did it take to walk from the I'Huriro

2      to the IRST woods?

3      A.    About ten minutes.

4      Q.    Is the IRST woods close to the University

5      Hospital?

6      A.    Yes.

7      Q.    Please tell the jury what happened when you

8      got to the IRST woods.

9      A.    Yes.

10      Q.    Tell the jury now, please.

11      A.    When we got there a soldier stabbed my sister

12      in the head with a knife.  I felt very frightened.  I

13      started backing off with another girl called Nyiramana.

14      We were lucky they didn't see us.  And we took a small

15      path that's in between the lab and the IRST, and then we

16      went up towards home where we lived because there, there

17      was nothing happening yet.

18      Q.    When you said "we," who was with you?

19      A.    Myself and Nyiramana.

20      Q.    Did any of the other Tutsis led into the woods

21      that day escape with you?

22      A.    There is one more.  Her name is Francine.  So

23      we were three.

24      Q.    Are the three of you the only ones that

25      escaped the woods that day?

```
 1        A.   Yes.

 2        Q.   Did you ever see your sister again?

 3        A.   No.

 4        Q.   After you escaped the IRST woods that day,

 5   where did you go?

 6        A.   I went home.  My parents were still there.

 7        Q.   Did you stay there for the rest of the

 8   genocide?

 9        A.   Yes.

10             MR. CAPIN:  Would you like a glass of water?

11             THE INTERPRETER:  No.  She's fine.

12        Q.   Did you stay with your parents for the rest of

13   the genocide?

14        A.   No.

15        Q.   Why not?

16        A.   They killed them.

17        Q.   Who killed them?

18        A.   The Interahamwe.

19             MR. CAPIN:  I only have a few more questions.

20        Q.   Ms. Nyiraminani, would you like to take a

21   one-minute break and catch your breath?

22        A.   It's okay.  It's going to pass.

23        Q.   Did you have any brothers and sisters living

24   with you in Tumba when the genocide started?

25        A.   Yes.
```

1       Q.    How many?

2       A.    I was the eighth.

3       Q.    You were the eighth?

4       A.    Yes.

5       Q.    How many of your brothers and sisters survived

6  the genocide?

7       A.    Myself only.

8       Q.    Did you meet with American investigators?  Did

9  you meet with Americans in Rwanda at some point?

10      A.    Yes.

11      Q.    When did you meet with them?

12      A.    Last year in June.

13      Q.    Where did you meet with them?

14      A.    At the Faucon Hotel.

15      Q.    Is that near the center of Butare Town?

16      A.    Yes.

17      Q.    Before you met with those Americans, did you

18  know what they wanted to talk to you about?

19      A.    No.

20      Q.    What did you think they wanted to talk to you

21  about?

22      A.    I was curious to find out.

23      Q.    How did you get to that meeting?

24      A.    A man called me on the phone.

25      Q.    Somebody you know?

1        A.   No.

2        Q.   Do you know the man's name?

3        A.   Yes.

4        Q.   What was his name?

5        A.   Jean Pierre.

6        Q.   And did Jean Pierre help you get to the Hotel

7    Faucon that day?

8        A.   Yes.

9        Q.   How did he help you?

10       A.   He had a car.

11       Q.   Did you talk to Jean Pierre about what the

12   Americans wanted to talk to you about?

13       A.   No.

14            MR. CAPIN:  Nothing further, your Honor.

15            THE COURT:  Mr. Ruoff?

16            MR. HOWARD:  It will be me this time, Judge.

17            THE COURT:  I'm sorry.

18            MR. MUNANA:  Excuse me, your Honor, may I ask

19   to excuse myself?  (Interpreter.)

20            THE COURT:  Oh, sure.

21                     CROSS-EXAMINATION

22   BY MR. HOWARD:

23       Q.   Good afternoon.  May I call you Vestine?

24       A.   Yes.

25       Q.   Vestine, what do you do for work now?

```
1         A.    I work for myself.

2         Q.    What do you do for work?

3         A.    I work at home.

4         Q.    Can you tell me what you do for work?

5         A.    To raise my children.

6         Q.    And where do you live now?

7         A.    In Tumba.

8         Q.    Back in April of 1994 you lived in Tumba?

9         A.    Yes.

10        Q.    And you worked in Taba?

11        A.    In Taba, yes.

12        Q.    Where is I Taba?

13        A.    In the city of Butare.

14        Q.    What does it mean?

15        A.    Can you repeat?

16        Q.    Are there any buildings or landmarks that we

17   can use to know where I Taba is in Butare?

18        A.    Yes.

19        Q.    Can you name a landmark for me?

20        A.    Yes.

21        Q.    Please do so.

22        A.    You pass by Hotel Faucon and then you keep

23   going down to another place called Hotel Ineza.  That's

24   where.

25        Q.    So in April of 1994 when you would walk to
```

117

1    work, you would pass the university.  Is that true?

2         A.    Yes.

3         Q.    You would pass the EER.

4         A.    Yes.

5         Q.    You would continue north past the Hotel

6    Faucon?

7         A.    Yes.

8         Q.    Before you got to the Hotel Faucon, you passed

9    the Hotel Ibis?

10        A.    Yes.

11        Q.    Continuing north after you pass Faucon, what

12   is the next thing you come to?

13        A.    Going to I Taba?

14        Q.    Yes.  After Faucon how far is it to Itaba?

15        A.    It's really close.

16        Q.    How long would it take you to walk to work

17   from Tumba to I Taba using the main road?

18        A.    30 minutes, 35 minutes.

19        Q.    You have lived in Tumba your entire life?

20        A.    Yes.

21        Q.    And anybody who was living in or around Butare

22   in April of 1994 would know the Hotel I'Huriro; right?

23        A.    Yes.

24        Q.    And everybody there knows where the EER is;

25   correct?

1      A.   Yes.

2      Q.   And even today there is a building where the

3  I'Huriro used to be; right?

4      A.   Yes.

5      Q.   And even today there is a path that goes

6  between the EER and the hotel?

7      A.   Yes.

8      Q.   Everybody who was in Butare in late April

9  knows that there were roadblocks all over the city;

10  correct?

11      A.   Yes.

12      Q.   And everybody who was in Butare knows where

13  the IRST is; correct?

14      A.   Yes.

15      Q.   Ma'am, have you ever been interviewed by

16  investigators concerning the genocide before the

17  Americans came?

18      A.   Only Gacaca from home.

19      Q.   Have you testified in Gacaca court before?

20      A.   Yes.

21      Q.   How many times?

22      A.   Many times.

23      Q.   In what town were the Gacacas?

24      A.   In Butare and also in the sector where I live

25  in Tumba.

```
 1        Q.   Did you ever testify against anybody who you

 2   say was at the roadblock near the I'Huriro hotel?

 3        A.   No.

 4        Q.   Did you ever testify against anybody at any of

 5   the -- who worked at any of the roadblocks?

 6             MR. CAPIN:  Objection.  She's only testified

 7   to knowledge of one roadblock.

 8             THE COURT:  No, she just said everybody in

 9   town at the time would know there were roadblocks all

10   over town.  Overruled.

11             THE INTERPRETER:  Can you please repeat the

12   question.

13        Q.   Have you ever testified in Gacaca against

14   anybody who worked at any of the roadblocks in Butare?

15        A.   Yes.

16        Q.   What roadblocks?

17        A.   The roadblocks from my town in Tumba.

18        Q.   In Tumba.

19        A.   Yes.

20        Q.   You told us you went through the roadblock

21   near the I'Huriro Hotel on April 20th; correct?

22        A.   Yes.

23        Q.   When did you pass through roadblocks in Tumba?

24        A.   Can you repeat?

25        Q.   Let me try this.  What date did you pass
```

120

```
 1   through roadblocks in Tumba?

 2       A.   Yes.

 3       Q.   What dates?

 4       A.   In Tumba on the 21st of April.  That's when

 5   the genocide had started in Tumba, around 11 a.m.

 6       Q.   So after you escaped from the forest at the

 7   IRST, you went back to Tumba that night?

 8       A.   Yes.

 9       Q.   And the next morning you saw roadblocks in

10   Tumba?

11       A.   Yes.

12       Q.   And you tried to walk through them?

13       A.   Yes.

14       Q.   So you knew in Butare near the I'Huriro that

15   soldiers were taking Tutsis from the roadblock, but you

16   still went through another roadblock the next day.

17       A.   Yes.

18       Q.   Did you ever go through any more roadblocks?

19       A.   No.

20       Q.   That was it, just on April 21st.

21       A.   Yes.

22       Q.   On April 20th when you walked to work that

23   morning, did you pass a roadblock at the I'Huriro or the

24   EER in the morning?

25       A.   No.
```

121

1       Q.    Did you pass any roadblocks near the Hotel

2    Ibis?

3       A.    No.

4       Q.    Did you pass a roadblock near the Hotel Faucon

5    on the morning of April 20th?

6       A.    No.

7       Q.    Did you pass any roadblocks walking to work in

8    the morning of April 20th?

9       A.    No.

10      Q.    On the way home after work on April 20th, did

11   you pass any roadblocks before you got to the Hotel

12   I'Huriro?

13      A.    No.

14      Q.    There were no other roadblocks on your walk

15   home on April 20th; is that correct?

16      A.    Yes.

17      Q.    Thank you.  When you met with the Americans in

18   June of last year, did they tell you what they wanted to

19   talk to you about?

20      A.    No.

21      Q.    What questions did they ask you?

22      A.    Well, at the beginning they questioned me

23   about my experience of the genocide.

24      Q.    Did they ever mention the name Beatrice to you

25   in that interview?

1       A.    No.

2       Q.    You just came out with the name Beatrice all

3   by yourself; right?

4       A.    Well, in the context of my testimony regarding

5   what I went through during the genocide and at that

6   roadblock I pronounce her name, yes.

7       Q.    You started talking about the roadblock in

8   front of the hotel when you talked to the agents; right?

9             THE INTERPRETER:  I'm sorry, can you repeat

10  that?

11      Q.    You talked about the roadblock in front of the

12  hotel when you spoke to the agents?

13      A.    Yes.

14      Q.    And you told the agents that you would see

15  Beatrice around town before the genocide; right?

16      A.    Yes.

17      Q.    How did you know that they wanted to hear

18  about Beatrice?

19      A.    It was my testimony about how I lived in 1994.

20      Q.    No, I know.  But the first thing you told them

21  was I've seen Beatrice around town.  I'm asking you how

22  did you know that they wanted to hear about Beatrice?

23            MR. CAPIN:  Objection, compound question,

24  assuming facts that she has not testified to.

25            THE COURT:  Overruled.

         1        Q.   You told the agents that you saw Beatrice

         2   around town.

         3        A.   Yes.

         4        Q.   How did you know that they wanted to hear

         5   about Beatrice?

         6        A.   Well, I didn't know if they wanted to hear

         7   about Beatrice or not, but I wanted to tell them about

         8   the terrible difficulties I encountered at a roadblock.

         9        Q.   And the only person you mentioned was

        10   Beatrice; right?

        11        A.   No.

        12        Q.   You told them about other people?

        13        A.   Yes.

        14        Q.   Who else did you tell them about?

        15        A.   All the other Interahamwes that I've seen that

        16   I didn't see anymore, I gave testimony on them.

        17        Q.   You told the American agents the names of

        18   other Interahamwe soldiers?

        19        A.   Yes.

        20             MR. CAPIN:  Objection.  I would ask that he

        21   orient the witness by time because it's not clear to me

        22   which interview, if it's in Rwanda or here.  I'm asking

        23   if he would orient by time.

        24             THE COURT:  Could you?

        25             MR. HOWARD:  Sure.

124

```
 1        Q.    When you met with the American agents in
 2   June of 2012, did you give them the names of other
 3   Interahamwe?
 4        A.    Well, I was asked to talk about my experience,
 5   so I was giving them my experience of the genocide and
 6   the people who did me wrong.
 7        Q.    Right.  I understand.  Now, tell me the names
 8   of the people that you gave to the American agents.
 9        A.    There is Dr. Sostene, Strato.
10        Q.    Any others?
11        A.    Ruganza, and many others.
12        Q.    And many others?
13        A.    Yes.
14        Q.    By name.
15        A.    That's what I said.
16        Q.    Okay.  When you spoke to the agents in June of
17   2012, did you tell them that both you and your sister
18   were taken from this roadblock on April 20th?
19        A.    Yes.
20        Q.    What was your sister's name?
21        A.    Kagaju Christianne.
22        Q.    You told us that there were six Interahamwe
23   soldiers who took you, your sister, and others to the
24   IRST forest; correct?
25        A.    Yes.
```

1        Q.    How many others were there that were taken to

2   the forest?

3        A.    I'd say about 25.

4        Q.    So there were six soldiers that took about 25

5   people to the forest.

6        A.    Yes.

7        Q.    You said that this man Jean Pierre called you

8   on the phone to tell you that American agents wanted to

9   talk to you?

10        A.    Yes.

11        Q.    And you do not know who he is?

12        A.    No.

13        Q.    Did you ask him how he got your name?

14        A.    No.

15        Q.    Did you ask the American agents how they got

16   your name?

17        A.    No.

18        Q.    Do you have any idea how it is that they

19   called you for an interview?

20        A.    No.

21        Q.    Ma'am, do you read the newspaper in town?

22        A.    No.

23        Q.    Never watch the news?

24        A.    I don't own a television.

25        Q.    Ever listen to the radio?

1       A.    Sometimes.

2       Q.    Before the agents talked to you, had you ever

3  heard on the radio that Beatrice was here in the United

4  States having a trial?

5       A.    No.

6       Q.    No one around Butare talked about the fact

7  that Beatrice, wife of Shalom, was on trial in the U.S.?

8             MR. CAPIN:  Objection.

9             THE COURT:  Overruled.

10      Q.    As far as you know.

11            THE INTERPRETER:  Can you repeat, please.

12            MR. HOWARD:  As far as she knows did anyone

13  around Butare talk about the fact that Beatrice, wife of

14  Shalom, was having a trial in the United States.

15      A.    No.

16      Q.    So when you spoke to the American agents in

17  June of 2012, that's the first time you ever got any

18  indication at all that the Americans wanted to talk to

19  you and it was about Beatrice.

20      A.    Yes.

21      Q.    When was the last time you testified in a

22  Gacaca court?

23      A.    I don't remember the year.

24      Q.    Do you have any idea how many years ago it

25  was?

```
 1         A.   I don't really remember.  I give many

 2    testimonies in Gacaca.

 3         Q.   Was it ten years ago?

 4         A.   More than ten.

 5         Q.   You said that you saw Beatrice walking around

 6    town and you knew she was the wife of Shalom.  How did

 7    you know that?

 8         A.   I was born in Butare, so I've known them for a

 9    long time.

10         Q.   Before the genocide, April of 1994, how long

11    had you known Beatrice?

12         A.   Two.

13         Q.   Two years?

14         A.   From 1993 to 1994.

15         Q.   And when in 1993 did you first meet Beatrice?

16         A.   In the city of Butare.

17         Q.   When in 1993?

18         A.   I don't know the date.

19         Q.   How many children did Beatrice have when you

20    knew her?

21         A.   I don't know them.

22         Q.   Ever see her pregnant?

23         A.   No.

24              MR. HOWARD:  Thank you, ma'am.

25              THE COURT:  Any redirect?
```

128

```
 1              MR. CAPIN:  Few questions, your Honor.

 2                     REDIRECT EXAMINATION

 3   BY MR. CAPIN:

 4       Q.   When Mr. Howard asked you -- do you remember

 5   he did ask you when you first met Beatrice?  Did you

 6   ever go into Beatrice's house?

 7       A.   No.

 8       Q.   Did you ever shake Beatrice's hand?

 9       A.   No.

10       Q.   Did you ever have a conversation with

11   Beatrice?

12       A.   No.

13       Q.   So when you say you knew Beatrice, do you mean

14   you knew of her because she was part of this well-known

15   family?

16       A.   They were very important people.  They were

17   well-known, and the average commoner would want to know

18   about them.

19       Q.   But did you ever meet her personally, as in

20   talked to her, become her friend, go to her house?

21       A.   I just knew her in town in the city of Butare,

22   but I've never went to visit her or talk to her.

23       Q.   When you say you knew her, you knew of her as

24   a well-known person in town.

25       A.   Very -- very important.
```

1        Q.   Mr. Howard asked you some questions about the

2    day that you and your sister went to the roadblock at

3    the I'Huriro.

4        A.   Yes.

5        Q.   Was that the very first roadblock that you

6    ever saw during the genocide?

7        A.   That's the one I saw because it was just

8    beginning.

9        Q.   So my question is, is that the very first one

10   that you saw?

11       A.   That's when it started in town, yes.

12       Q.   And you had never seen a roadblock before the

13   I'Huriro roadblock; is that correct?

14       A.   No.

15       Q.   And do you see the map -- the photograph on

16   the screen to your right?  After -- you went in this

17   direction toward the IRST woods; is that correct?

18       A.   Yes.

19       Q.   Did you ever go back into Butare Town past the

20   I'Huriro during the genocide?  Actually let me ask a

21   different question.  Did you remain in Tumba after the

22   20th for the rest of the genocide?

23       A.   Yes.

24       Q.   Did you ever go back to the family you worked

25   for in I Taba during the genocide?

1       A.   No.

2       Q.   Did you ever go back to Butare Town during the

3  genocide?

4       A.   No.

5       Q.   Now, you mentioned to Mr. Howard three names

6  of other Interahamwe who you've told Americans about.

7            MR. HOWARD:  Objection, your Honor.  That was

8  not the question.  It was that she told the American

9  agents in June of 2012.

10            THE COURT:  Correct.

11       Q.   You told Mr. Howard about three Interahamwe

12  that you told the Americans about in June of last year.

13       A.   Yes.

14       Q.   And you mentioned the names Sostene, Strato,

15  and Ruganza?

16       A.   Yes.

17       Q.   Who's the first person you told about Sostene,

18  Strato, and Ruganza?  Who was the first American?

19            I will ask a different question.  Am I the

20  first American you told about Sostene, Strato, and

21  Ruganza?

22            MR. HOWARD:  Objection, leading.

23            THE COURT:  No, overruled.

24       Q.   Am I the first American to whom you said the

25  names Strato, Sostene, and Ruganza?

```
 1        A.    Yes.

 2        Q.    Did you meet me before last week?

 3        A.    Yes.

 4        Q.    Where did you meet me for the first time?

 5        A.    Here in the United States.

 6        Q.    So the first time you met me was here in the

 7   United States.

 8        A.    Yes.

 9        Q.    Did you ever travel to the United States

10   before coming here to testify to this jury?

11        A.    No.

12        Q.    So the first time you mentioned Strato,

13   Ruganza, and Sostene was when you arrived here and told

14   me about them?

15        A.    No.

16        Q.    When you told me about Strato, Sostene, and

17   Ruganza, were you talking about Interahamwe who you knew

18   in Tumba?

19              THE INTERPRETER:  I'm sorry, repeat.

20        Q.    I'll choose one name.  When you told me about

21   Strato, were you talking about Interahamwe you knew in

22   Tumba?

23        A.    Yes.

24        Q.    Have you ever seen Strato since the genocide

25   was over?
```

132

```
 1        A.    No.

 2        Q.    Did you ever tell American investigators about

 3   Strato?  Strike that.  Did you ever tell any

 4   investigator about Strato before telling me?

 5        A.    No.

 6        Q.    Why not?

 7        A.    Nobody asked me.

 8        Q.    And is part of the reason because you never

 9   saw him again after the genocide?

10             MR. HOWARD:  Objection, your Honor.  She said

11   because nobody asked that.

12             THE COURT:  What are we doing?

13        Q.    Why did you not seek out an investigator and

14   talk about Strato?

15             THE COURT:  I may be mistaken, but I thought

16   she testified she told the American investigators about

17   that.

18             MR. CAPIN:  She's clarified, your Honor, that

19   she told me for the first time in this country.

20             THE COURT:  Oh, you're impeaching her.

21             MR. CAPIN:  I'm clarifying.

22             THE COURT:  Clarifying.  I didn't have any

23   idea what you were talking about.  It's not relevant

24   really what she told you when, is it?

25             MR. CAPIN:  Well, to the extent the defense is
```

133

1   going to argue something contrary to the jury, I just

2   want to make sure it's clear.

3            THE COURT:  Well, her testimony is relevant as

4   to what she told the American investigators, but it's

5   not relevant what she told you unless you're

6   clarifying --

7            MR. CAPIN:  The first time she said it was in

8   this country.  I'll move on.

9       Q.   Mr. Howard asked you questions about the

10  events in Tumba on April 21st.

11      A.   Yes.

12      Q.   Tell the jury what happened in Tumba on

13  April 21st.

14      A.   Around 11 a.m., that's when the genocide

15  started in my hometown of Tumba.  They were killing

16  people, destroying properties and houses, and stealing

17  whatever was inside.

18      Q.   How long did the violence in Tumba last?

19      A.   Three months.

20      Q.   How did you survive those three months in

21  Tumba?

22      A.   There is an Interahamwe who took me in his

23  house.

24      Q.   Is it somebody that you knew before the

25  genocide?

```
 1        A.    Yes.

 2        Q.    Was he a friend of yours?

 3        A.    No.

 4        Q.    Did he offer you protection during the

 5   genocide?

 6              THE INTERPRETER:  I'm sorry, I need to consult

 7   with my partner.

 8              THE COURT:  Certainly.

 9              THE INTERPRETER:  Thank you.

10              (Pause.)

11              THE INTERPRETER:  I'm ready.

12              MR. CAPIN:  I think the question was -- could

13   I be reminded of the question.

14              (Pending question read.)

15        Q.    Did he offer you protection during the

16   genocide?

17        A.    I wouldn't call it protection.

18        Q.    What would you call it?

19        A.    I would say that with the power that he had

20   during the genocide, he had every right on me -- over

21   me.  He could make me do whatever he wanted.

22        Q.    Did he make you do anything?

23        A.    Yes.

24        Q.    What did he make you do?

25        A.    Forced rape.
```

1               MR. CAPIN:  I'm sorry.  I have nothing

2    further, your Honor.

3               THE COURT:  Any redirect?

4               MR. HOWARD:  No.

5               THE COURT:  Thank you, ma'am.  You may step

6    down.  I appreciate your testimony.  You're excused.

7               All right.  Ladies and gentlemen, we'll

8    adjourn for the weekend.  Please don't discuss the case

9    amongst yourselves or anyone else.  Please avoid any

10   type of media coverage about the case, and we'll see you

11   Monday morning.  Please try to get home by four o'clock

12   and you'll be fine.  Thank you very much for your time

13   today.

14               (Adjourned at 12:50 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3              I, Diane M. Churas, do hereby certify that the

4    foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9                              _Diane M. Churas_

                               DIANE M. CHURAS, LCR, RPR, CRR
10   Submitted: 11/13/2013     LICENSED COURT REPORTER, NO. 16
                               STATE OF NEW HAMPSHIRE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12-30-2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
           \*
UNITED STATES OF AMERICA   \*
           \*  10-CR-85-01-SM
    v.      \*  February 11, 2013
           \*  9:10 a.m.
 BEATRICE MUNYENYEZI   \*
           \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF JURY TRIAL
DAY FIVE - MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE


APPEARANCES:


For the Government:   John A. Capin, SAUSA
           Aloke S. Chakravarty, SAUSA
           U.S. Attorney's Office (NH and MA)


For the Defendant:   Mark E. Howard, Esq.
           David W. Ruoff, Esq.
           Howard & Ruoff, PLLC


Interpreters:     Freddy Munana
           Sabrina Iyadede


Court Reporter:    Susan M. Bateman, LCR, RPR, CRR
           Official Court Reporter
           United States District Court
           55 Pleasant Street
           Concord, NH 03301
           (603) 225-1453

I N D E X

WITNESSES:          Direct  Cross    Redirect  Recross

TIMOTHY LONGMAN:

By Mr. Chakravarty   4




EXHIBITS:                                IN EVD

26(A), 26(B), 26(E), 26(F) and 26(G).      56

18(A), (B) and (C).                       130

19(A) through (L).                        131

27(A), (B).                               131

1                P R O C E E D I N G S

2          THE CLERK:  Court is in session and has for

3   consideration jury trial day five in the matter of

4   United States of America versus Beatrice Munyenyezi,

5   case No. 10-CR-85-01-SM.

6          THE COURT:  Good morning, ladies and

7   gentlemen.  We're going to obviously continue with the

8   government's case this morning.  Go ahead.

9                     TIMOTHY LONGMAN

10         having been duly sworn, testified as follows:

11         THE CLERK:  For the record, please state your

12  name and spell your last name.

13         THE WITNESS:  Sure.  Timothy Longman,

14  L-O-N-G-M-A-N.

15         THE COURT:  As you will soon hear, Dr.

16  Longman is here to offer expert opinion evidence.

17  Most witnesses are required to testify about what

18  they've seen, what they've heard, what they know from

19  personal experience to be so.

20         Dr. Longman is an expert witness.  He differs

21  from an ordinary witness in that he's entitled to give

22  opinion evidence based upon his expertise.  So when

23  somebody has expertise in a field, or discipline that

24  the jury may not be quite familiar with, the parties

25  are allowed to call expert witnesses to help you

1   understand the field and so forth to the extent that

2   it's important with respect to the issues you're

3   deciding.

4           So Dr. Longman is entitled to give opinions

5   about matters, and I believe he's going to give you a

6   brief historical review of the state of Rwanda during

7   the period in question in this case.

8           All right.  Mr. Chakravarty.

9           MR. CHAKRAVARTY:  Thank you, your Honor.

10                      DIRECT EXAMINATION

11   BY MR. CHAKRAVARTY:

12      Q.  Doctor, I would just ask you to keep your

13   voice up, I know you're getting over a cold, and also

14   to speak as slowly as you can.

15      A.  All right.

16      Q.  Would you please tell the jury where you

17   work?

18      A.  I work at Boston University.  I'm the

19   Director of the African Study Center there and teach

20   political science.

21      Q.  And can you describe what your education is?

22      A.  I did my Ph.D. at the University of Wisconsin

23   in political science with a minor in African studies.

24      Q.  Did you focus on any particular subject for

25   your dissertation?

1        A.  I wrote my dissertation on Rwanda, looking

2    specifically at religion and politics as my main

3    focus.

4        Q.  And approximately when did you get your

5    Ph.D.?

6        A.  I earned my Ph.D. in 1995.  I did my

7    fieldwork in Rwanda in 1992 and 1993, and then spent a

8    couple years finishing up writing up the dissertation.

9        Q.  What are your responsibilities as the

10   Director of the African Study Center?

11       A.  As Director of African Study Center I

12   organize about a hundred faculty who have

13   specializations in Africa.  We teach African language

14   courses.  We have lecture series.  I also teach

15   courses on human rights and on religion and politics

16   in Africa.

17       Q.  Before you became a professor at BU, where

18   did you work?

19       A.  I was a professor for over a decade at Vassar

20   College in Poughkeepsie, New York, and prior to that I

21   worked for Human Rights Watch in Rwanda.

22       Q.  All right.  What types of courses do you

23   teach at BU?

24       A.  Political science courses.  I teach courses

25   on generally African politics, on justice issues,

1    human rights, religion and politics.

2        Q.  And at Vassar what did you teach?

3        A.  A similar list of classes.  I also taught

4    African American politics there.

5        Q.  You mentioned before you were on the faculty

6    of Vassar you were on Human Rights Watch?

7        A.  That's correct.

8        Q.  Can you tell the jury what Human Rights Watch

9    is?

10        A.  Human Rights Watch is a New York based

11    non-governmental organization that does human rights

12    research and advocacy.  They do investigations in

13    various countries and then try to publicize instances

14    of human rights abuses, and they try to get the

15    governments of the United States and the European

16    Union and the United Nations, as well as the countries

17    that they're studying, to improve their human rights

18    records.

19        Q.  And what types of activities does Human

20    Rights Watch do?

21        A.  It does investigations in the field quite a

22    bit.  It sends people to do studies of human rights

23    abuses, reported abuses, and then we would write

24    reports on those and do some advocacy work based on

25    those reports.

1    Q.  When you worked for Human Rights Watch did

2  you participate in such a mission with regard to

3  Rwanda?

4    A.  I did.  In Rwanda Human Rights Watch actually

5  had a permanent office and I was the head of that

6  office for a year, from 1995 to 1996.

7        The primary work that we did in that office

8  was to do a major investigation into the 1994 genocide

9  in Rwanda.

10        We did a number of interviews and we also

11  went into government archives to gather documents in

12  order to try to write an extensive account of how the

13  genocide was possible from the national to the local

14  level.

15    Q.  And how did you go about conducting that

16  investigation?

17    A.  Well, there was a team of -- over a couple of

18  year period there was about nine people that came and

19  went.  At any given time there were usually two

20  researchers who were based there, plus a couple of

21  researchers who were based in the U.S. who would come

22  periodically.

23        A lot of our research was interviews with

24  people.  We interviewed people who were targets of the

25  genocide and survived.  We also interviewed people who

 1   were accused of having participated in the genocide,

 2   conducting interviews for people in prison, and then

 3   anyone else that we could get who would be willing to

 4   talk about the genocide and what they saw.

 5           Then the other thing we did through research

 6   was to go into government offices and try to look for

 7   any kind of documentary records that there were.  So

 8   minutes from government meetings, letters that

 9   government officials had sent back and forth,

10   sometimes letters from the population appealing to the

11   government for help or things of that sort.  So any

12   kind of documentary evidence that we could get that

13   might shed some light on what happened.

14       Q.  And how long did the project last?

15       A.  On the ground -- it started in early 1995,

16   and the research on the ground continued really till

17   sometime in 1997.  So it was about three years of

18   research, and then the book that was published on it

19   came out in 1999.  So it took a couple of additional

20   years to write up the research.

21       Q.  Now, the book that came out of it, what was

22   the name of that book?

23       A.  It's called Leave None to Tell the Story.

24       Q.  Can you describe generally what the book is?

25       A.  The book is long, first of all.  It's about

1   900 pages.  It is an extensive study of the genocide

2   that tries to really understand how it could be

3   possible.

4           The first half of the book focuses on the

5   national level and really looks at the government that

6   was in place and how it moved towards genocide, what

7   were the steps that led towards genocide.

8           And then the second half of the book is a

9   study of three local communities where we did in-depth

10  research in some local communities to try to

11  understand how the genocide was actually carried out

12  at the grassroots level.

13      Q.  Did the book attempt to catalog genocidaires?

14      A.  No.  The book is attempting to give an

15  overall image of how the genocide was possible.

16  Because it's for Human Rights Watch, which is an

17  advocacy group, there was an interest in encouraging

18  prosecutions.

19          One of the goals of this was to say it is

20  possible to investigate the genocide and find out what

21  happened and also to argue that the people who were

22  the chief organizers of it, the people who were giving

23  the orders and were at the top, should be held

24  accountable.

25          So it does discuss some of the people who are

1   involved in the genocide, but there's certainly no

2   attempt to list every person who was involved.

3       Q.  Specifically with regard to Butare, the

4   southern prefecture in Rwanda, was there discussion in

5   the book about Shalom Ntahobali and Pauline

6   Nyiramasuhuko?

7       A.  Yes, they were discussed.

8       Q.  You participated along with the rest of the

9   team.  Who was the leader of the team that ultimately

10  published the book?

11      A.  Well, the leader of the research team and the

12  lead author was Alison Des Forges, who was a Yale

13  University Ph.D. who taught at University of Buffalo

14  and had become over time sort of most prominent expert

15  on Rwanda.

16          She did historical studies initially, but

17  then approached this project as a historian trying to

18  document what happened and became very well-known in

19  fact for her work on Rwanda.

20      Q.  And how was the book received?

21      A.  It was an award-winning book.  It won the

22  Rafael Lemkin prize for the top book in human rights

23  for the year.  Alison Des Forges herself won a

24  MacArthur Genius Grant for her work on the project.

25  It was lauded by many people, very well reviewed, and

1  seen as kind of the definitive account of the

2  genocide.  It still more than a decade later is seen

3  as sort of the best explanation of what happened.

4      Q.  In terms of -- you said definitive account.

5  What do you mean by definitive account?

6      A.  It's the most respected explanation of how

7  the genocide was possible.

8      Q.  You said the book doesn't contain a

9  comprehensive list of genocidaires.  Are you aware of

10  anything that does?

11      A.  I'm not.

12      Q.  Are you familiar with the International

13  Criminal Tribunal for Rwanda?

14      A.  I am.

15      Q.  And can you just explain what that was to the

16  jury?

17      A.  Well, shortly after the genocide there was a

18  feeling that the people who had organized the genocide

19  needed to be held accountable.  In particular, the

20  national leaders.

21          Most of them were outside of Rwanda at the

22  time, so it wasn't possible for the Rwandan government

23  to actually do anything about it because they had fled

24  as the war was coming to an end and the genocide was

25  being closed.  And so the Rwandan government went to

1    the United Nations and asked them to create a criminal

2    tribunal that could hold people internationally

3    accountable.

4           So in late 1994 it was decided that they

5    would set up an expanded branch that was already a

6    tribunal for the former Yugoslavia, dealing with

7    Bosnia and Croatia, set up a new branch of that that

8    would be based in Arusha, Tanzania, and that would

9    focus on holding the chief organizers of the 1994

10   Rwandan genocide accountable.

11        Q.  Did they come up with a comprehensive list of

12   genocidaires?

13        A.  Their list is very small, indeed.  They

14   actually focused just on less than a hundred

15   individuals that they saw as the chief organizers and

16   as people who were sort of exemplars of the types of

17   people involved in the genocide.  So they were often

18   using cases to make a point about various categories

19   of people, like military leaders, government

20   ministers, local government officials, so that they

21   could show that we're holding the sort of people who

22   were the most responsible accountable.

23        Q.  You said that you interviewed -- you and your

24   team interviewed a lot of people in Rwanda when

25   researching for the book.  Approximately how many

1   people do you think your team interviewed?

2       A.  Probably a couple of hundred.  Alison Des

3   Forges conducted a number of interviews with people

4   outside Rwanda as well.  So she talked to a number of

5   people who are in exile, a lot of officials, Catholic

6   priests who had been based in Rwanda and were now back

7   in Europe, those kind of people.  She may have

8   interviewed another 100, but the approximate number

9   probably interviewed, about 200, I would guess.

10      Q.  Now, when you went and headed up the research

11  team for the Human Rights Watch project, was that your

12  first time in Rwanda?

13      A.  It was not.

14      Q.  When had you been there before?

15      A.  I had been in Rwanda just before the

16  genocide, 1992 to '93, when I was doing my

17  dissertation and research.

18      Q.  Can you explain what you did then?

19      A.  At that time I was doing research on religion

20  and politics.  So I was -- it was the period of course

21  before the genocide, so the focus was mostly on the

22  democracy movement and political changes that were

23  taking place in Rwanda and the role that churches were

24  playing in that.

25          Rwanda is a heavily Christian country, it's

1  over 90 percent Christian, and I was looking at the

2  influence that churches had.

3          So for that I focused on six local parishes

4  and interviewed people in those parishes, attended

5  church services, went to prayer services, a variety of

6  different things that churches were doing to try to

7  see what kind of social influence they had.

8          Q.  And where did you live while you were there?

9          A.  I lived mostly in Butare.

10         Q.  Where in Butare?

11         A.  I was in the center of the city in a

12  neighborhood called Buye.  Three of the parishes that

13  I studied were in the Butare area.  Two were in the

14  city of Butare and one was on the next hill over just

15  across the valley.

16         Q.  In addition to the Human Rights Watch and

17  your dissertation research, have you returned to

18  Butare in the last 15 years for other research?

19         A.  I took a leave from Vassar College for two

20  years to go to the Human Rights Center at the

21  University of California, Berkeley.  They had a

22  MacArthur Foundation grant to do research on the

23  genocides in Rwanda and the former Yugoslavia, and

24  particularly looking at the ways in which those

25  societies were rebuilding.

1          So I headed up the Rwanda half of that

2     research.  It ended up being for a five-year period,

3     although I was based in Berkeley for only two years.

4          When I was based in Berkeley I was going back

5     and forth to Rwanda quite a lot, four times a year

6     usually, and during that research one of the cities

7     that we focused on looking at how it was

8     reconstructing was Butare.  So I spent a lot of time

9     there.

10          I also during that period taught courses at

11     the National University of Rwanda.  So I spent three

12     months based in Butare teaching that class but went

13     back to Butare probably a dozen times over a five-year

14     period.

15     Q.  And the National University of Rwanda is

16     based in Butare?

17     A.  That's correct.

18     Q.  In addition to the Leave None to Tell the

19     Story book, were there any other major works that were

20     published that related to the genocide, particularly

21     in Butare?

22     A.  Well, my own book has some discussion of

23     Butare.  I published a book on the churches and the

24     genocide.  But there is another major study that

25     focuses just on Butare and how the genocide took place

1   there by a European scholar named Andre Guichaoua.

2        Q.  And you studied that as well?

3        A.  I have.

4        Q.  I didn't mean to give your own book short

5   shrift.  Can you explain what that book was about?

6        A.  Sure.  It was basically -- I had done my

7   dissertation research before the genocide on the

8   churches and what was happening in the country.

9             When I was back with Human Rights Watch, and

10  in my research with Berkeley, I was able to follow up

11  on places that I had studied and do more research.  So

12  the book is a study of the churches in the genocide,

13  looking at the ways in which Christian churches got

14  involved in both opposing and unfortunately supporting

15  the genocide.

16       Q.  In addition to the book, have you published

17  other things about the genocide?

18       A.  I've published numerous journal articles and

19  book chapters and -- yeah.  So many, many

20  publications.

21       Q.  Are you currently working on a book?

22       A.  I'm finishing a book based on the research I

23  did for the Human Rights Center at Berkeley on

24  post-genocide Rwanda, looking at memory and justice

25  specifically.

1       Q.  What's your thesis for that book?

2       A.  Well, I'm still finishing it so it may change

3   somewhat, but what I'm looking at in the book is ways

4   in which the society is rebuilding and looking a lot

5   at the government's attempts to shape how people see

6   the past and in particular shape how people think

7   about the genocide and the ways in which they've used

8   courts and other tools to do that.

9           But then I'm also focusing on the ways in

10  which the population is reacting to that and the ways

11  in which people find ways to interpret things in their

12  own ways and to tell their own stories and to rebuild

13  their own lives in unique ways.

14          So it's the study sort of -- attempts by the

15  government to influence people and the ways in which

16  people resist that influence.

17      Q.  When you conducted field research in Rwanda,

18  how did you ensure reliability of information?

19      A.  As with any research project, you have to

20  spend a lot of time and talk to a lot of people.  One

21  of the reasons that we did both documentary research

22  and interview research was to try to balance those

23  against one another.  So that sometimes things that

24  people had mentioned in their interviews would show up

25  in a document somewhere, in minutes from a meeting or

1   in a letter.

2           But one of the key things that my research is

3   always focused on is just interviewing individuals.

4   You try to interview as many people as you can, and in

5   particular to get a selection of people from different

6   perspectives.  People who might be from different

7   ethnic groups or different socioeconomic classes might

8   give you different interpretations.

9           And in conducting interviews you also have to

10  focus really on pushing beyond just easy answers.  I

11  have studied Kinyarwanda.  I'm not fluent, but I'm

12  comfortable enough in the language to be able to greet

13  people and put them at ease and to follow my

14  interpreters, and so for my own research I found that

15  very helpful.  But I also will push in interviews

16  quite a bit to focus on what is it that people

17  themselves have seen.

18          For something as momentous as the genocide,

19  everybody knows what happened in their communities and

20  they've talked about it and there are stories that

21  people will tend to tell.  But to get at what actually

22  really happened you have to ask, well, what did you

23  see?  Were you there?  Where were you during this

24  time?  How much information did you -- and you ask for

25  details as well.  So usually through that you can get

1    beyond the sort of superficial things and try to get

2    multiple eye witnesses to any event who see things

3    from different perspectives is something that's often

4    very helpful.

5            So you ask individuals what did you see

6    personally and ask them for details and you find that

7    each person sees things somewhat differently, but

8    that's actually something that confirms what's

9    happened because the basic details that they give are

10   accurate.

11      Q.  Is there anything about Rwandan social norms

12   that you found when conducting these interviews?

13      A.  Well, Rwanda is a society that's been very

14   hierarchical and has had a history of authoritarian

15   rule.  In that kind of society people have to be

16   careful what they say, so they tend to protect

17   themselves, and often people's first reaction is to

18   play very close to their chest.

19           You're coming in as a stranger doing

20   interviews, they don't know much about you, and

21   they're worried about what can happen to them if they

22   say certain things.  So people will sometimes be a

23   little reserved initially.  It's not that hard to get

24   beyond that because you can ask people multiple

25   questions, ask what they've actually seen themselves.

1  You take some time with the interview.  Sometimes you

2  interview people more than once.

3          But one of the things I found as well is that

4  over time people in Rwanda have gotten more used to

5  talking.  When I was first there in '92 and '93, after

6  a long history of authoritarian rule, the country was

7  kind of closed down in some ways.  They were building

8  towards the genocide so there was a lot of fear, and

9  at that time, you know, I really had to live in the

10  community for a long time to get at the truth.

11          Since the genocide there have been a lot of

12  legal actions that have been taken, there have been a

13  number of efforts to get people to talk about the

14  past, and in a lot of ways people talk more freely

15  than they did initially.

16          When I was first doing the research for the

17  Human Rights Watch book for example just after the

18  genocide, it was hard to get perpetrators to talk

19  about what they had done.  But when I went back in the

20  2001 to 2005 period a lot of people were actually

21  talking about, yes, I was involved in the genocide in

22  this way, I'm ashamed of what I did, and would give

23  details.

24          But the culture in some ways has changed, so

25  people are much more willing to talk about their own

1  lives and things they've done and things they've seen.

2      Q.  Your field research in Rwanda, has that been

3  important to your own development of expertise in what

4  happened during the genocide?

5      A.  Oh, absolutely.  In total I spent probably

6  about three years in Rwanda.  I've traveled there

7  dozens of times and have developed a lot of

8  relationships with Rwandans that I know well,

9  friendships, people who I can rely on for information.

10         But also I think I've come to know the

11  society fairly well and have gathered just a lot of

12  data, frankly.  I've studied the genocide in a number

13  of different communities and looked at how it's

14  happened.  I've written a lot about those different

15  communities so I feel that I've developed a pretty

16  good understanding of what happened in Rwanda both

17  before the genocide and after.

18      Q.  Is there a circle of scholars that studied

19  the genocide?

20      A.  There are a lot of people who work on Rwanda.

21  It has become an interesting topic.  A lot of

22  Americans have heard about the Rwandan genocide, so

23  there are a number of scholars who worked on Rwanda

24  before, but then there are a lot of others who have

25  come in since.  There are a lot of graduate students

1   in recent years who focused on Rwanda.  A lot of

2   people have done extensive fieldwork in the country

3   and are writing about it.  So there are several dozen

4   people in the world I would say who are Rwanda

5   scholars who tend to be in communication with one

6   another.

7        Q.  Do you collaborate with them?

8        A.  I do.  Extensively.  There's a lot of

9   academic conferences, the African Studies Association

10  meeting, and also specialized conferences on Rwanda or

11  on ethnic violence that I often participate in.

12       Q.  Have you been consulted by universities,

13  media or others to talk about Rwanda?

14       A.  Yes.  I have given lectures on Rwanda at many

15  places:  Yale, Harvard, Columbia, Dartmouth.  I was

16  the keynote speaker at a conference in July at Keene

17  State, which was a conference focused on Rwanda.  So I

18  do a lot of public lecturing on Rwanda.  Sometimes on

19  the genocide.  Sometimes on what's happened

20  afterwards.  Sometimes on religion and politics.  A

21  variety of different topics.

22            I've also been a consultant with the U.S.

23  Government for USAID, the U.S. Agency for

24  International Development, in helping them to set

25  their strategies for development in Rwanda and --

1  yeah, I get consulted by the media quite a bit as

2  well.

3       Q.  Are you familiar with the name of Brian

4  Endless?

5       A.  I am.

6       Q.  What do you know about him?

7       A.  Not very much.  I believe he works for the

8  Paul Rusesabagina Foundation.  Paul Rusesabagina was

9  the man the movie Hotel Rwanda was about who now lives

10 in the United States and has set up a foundation.

11      Q.  Is Mr. Endless part of the circle of scholars

12 that you were talking about?

13      A.  I've never met him.

14      Q.  The articles that you've published, have some

15 of those been in peer-reviewed journals?

16      A.  Yes, many have.  The Journal of the American

17 Medical Association, Comparative Education Review, the

18 African Studies Review, the Journal of Religion in

19 Africa.

20      Q.  You mentioned that you worked with USAID and

21 also Human Rights Watch.  Are there any other

22 non-governmental organizations that you've worked

23 with?

24      A.  I've worked for the International Center for

25 Transitional Justice.  There may be others as well,

1   but those are the main ones.

2        Q.  And have you testified before about Rwanda?

3        A.  I have.

4        Q.  Have you testified in many different

5   countries?

6        A.  I've testified at the International Criminal

7   Tribunal for Rwanda in Arusha.  I've testified in

8   Finland.  I've testified in Canada.

9        Q.  You've testified here?

10       A.  And I've testified in a couple of cases in

11  the U.S., yes.

12       Q.  Please describe geographically Rwanda.

13       A.  Sure.  Rwanda is a tiny country.  It's about

14  the size of Vermont.  That's what they often say.  It

15  is a landlocked country situated in East Africa.  It's

16  in the Great Rift Valley so it's an area of sort of

17  very high altitude so it's actually very pleasant.  A

18  cool country that's very fertile.  It never gets too

19  hot and never gets too cold.  It's a very mountainous

20  country but quite small and quite densely populated.

21  It's the second most densely populated country in the

22  world.

23            At the time of the genocide there were about

24  8 million people in the territory.  Today it's

25  estimated there's more than ten million.

1      Q.   Describe the demographics of Rwanda.

2      A.   Sure.  So Rwanda is a -- it's a little

3  different than some other African countries in that it

4  had a history.  Prior to colonialism it existed as a

5  kingdom with more or less similar borders to what it

6  has today, and so there's only one language that's

7  spoken in the country, Kinyarwanda, one native

8  language.

9           Kinyarwanda is a language that's shared by

10  the various different ethnic groups.  In many African

11  countries you have different ethnic groups in

12  different parts of the country, but in Rwanda there

13  are ethnic groups that live interspersed with one

14  another.

15          The history of the groups is a little

16  different than it is in many places in that we don't

17  really think that they are groups that resulted from

18  immigration or from being in a distinct territory but

19  were social categories that developed over time within

20  Rwanda.

21          At any rate the main groups, the Hutu, are

22  the majority group.  They make up -- at the time of

23  the genocide they made up either 85 to 90 percent of

24  the population, somewhere in there.

25          The Tutsi were a minority group that made up

1  10 to 12 percent of the population at the time of the

2  genocide.

3        There's a small pygmy group called the Twa

4  that are less than one percent of the population as

5  well.  You don't hear too much about them because

6  they're a fairly small group in terms of population

7  and also are not terribly politically influential.

8  They don't have a lot of power.

9        So Rwandan politics has been dominated by the

10  Hutu and Tutsi groups, the two largest groups in the

11  country.

12     Q.  Are these different groups integrated in

13  Rwandan society?

14     A.  They are.  So when you look at the history of

15  these groups there's debate among scholars about how

16  Hutu and Tutsi came about.

17        The majority of scholars believe that these

18  were status differences that emerged within the

19  country; that the people who were the more powerful,

20  the people who dominated the society who had cattle

21  and controlled most of the political realm came to be

22  known as the Tutsi over time.  They were the chiefs.

23  They were the people who had the greatest influence.

24  They had people in their communities who were clients.

25        And so it's believed that the term Tutsi

1   originally meant elite or it meant sort of high

2   status; whereas Hutu meant commoner.  The Hutu were

3   the people who were the farmers and the workers.  They

4   were the sort of average people living in the

5   communities.

6          But because of that arrangement it means that

7   Hutu and Tutsi were living in integrated communities.

8   So that in any community you would have a Tutsi -- a

9   group of Tutsis who were the elite of the community

10  who tended to organize the community, and then the

11  Hutu were the workers in that community for them.

12      Q.  And you mentioned earlier that Rwanda had

13  been a colonial colony.  Describe that, sir.

14      A.  Sure.  It was colonized officially in 1895 by

15  the Germans initially.  The Germans didn't have a very

16  large presence in Rwanda.  And during World War I the

17  Belgians came in and took over Rwanda.

18          So from 1916 on it was a Rwandan colony -- I

19  mean a Belgian colony, Rwanda was a Belgian colony,

20  and the Belgians took a much more active interest in

21  Rwanda.  So we usually talk mostly about Belgian

22  colonialism as a focus.

23      Q.  What are the natural resources in Rwanda?

24      A.  Rwanda has people and land, and that's about

25  it.  The main products sold from Rwanda are coffee and

 1   tea.  There is no gold.  Well, trace amounts of gold,

 2   trace amounts of tin, but unfortunately Rwanda doesn't

 3   have diamonds or copper or any of the major natural

 4   resources that its neighbors have.

 5       Q.  And is it a landlocked country?

 6       A.  It's a small landlocked country, yes.

 7       Q.  So what was the impact of the colonial

 8   period?

 9       A.  Well, the colonial rulers reshaped the

10   society in many ways so that -- Hutu and Tutsi had

11   been status divisions that were already there, but the

12   colonizers came in with ideas that were current at

13   that time about race.

14          In the 1800s there was a big focus on racial

15   difference between people, and it was true in the

16   United States, it was true in Europe, but it was truly

17   internationally as well.

18          There was a real emphasis on some groups

19   being better than other groups and an idea that was

20   very popular, that if you could understand the racial

21   nature of people you could rule them more effectively

22   and society should be organized along racial lines.

23          So those ideas were brought to Europe --

24   brought by Europe to Africa during the period of

25   colonization.

1          The Belgians, in particular, came to Rwanda

2   and they saw the Hutu, Tutsi and Twa and thought of

3   them as three fundamentally different races.  They

4   found in Rwanda a society that was complex, that was

5   well organized, that had a highly developed

6   civilization.  And so they theorized that the Tutsi

7   must be a completely separate race that's more closely

8   related to Europeans, because that's the only way you

9   could explain the level of development in Rwanda.

10          So they argued that the Tutsi were a race

11   that maybe was a lost tribe of Israel that had

12   wandered down into Africa.

13          The Hutu, they said, were a Bantu group; that

14   is, a group that was from that region that was mostly

15   farmers and hard workers but not so smart, was their

16   theory.  And they said that the Twa were a pygmy

17   group, which is a less developed group that you can't

18   trust and a lot of negative stereotypes.  Kind of the

19   stereotypes they had against gypsies in Europe at the

20   time, and because they saw these groups as

21   fundamentally different races, they used that as a

22   basis for their policy.

23          The Tutsi already were the dominant group but

24   they -- in their policy the Belgians made sure that

25   the Tutsi controlled everything.  Because they said,

1   well, the Tutsi are the natural rulers, they therefore

2   eliminated all political power for Hutu.  So all of

3   the chiefs became Tutsi and they gave the Tutsi

4   leaders much greater power than they had before.

5   Economic opportunities were all reserved for the Tutsi

6   as well.  Education was reserved for the Tutsi as

7   well.

8           So during the colonial period the difference

9   between Hutu, Tutsi and Twa became sharper and it

10  became more important as well, because if you were

11  born a Hutu it meant that you couldn't go to school

12  for the most part, you couldn't aspire to political

13  power, you couldn't have employment with the colonial

14  state or many other jobs; whereas if you were Tutsi

15  you were in a much better position socially and could

16  get education, you could have more political power,

17  there were taxes you didn't have to pay because the

18  colonial states set up taxes that were especially for

19  the Hutu population.

20          So in practice they took these divisions and

21  made them into ethnic divisions so that they became

22  sharp and important.

23      Q.  Did they formalize them?

24      A.  They did.  In the 1930s, because they had

25  this system where they said we're going to rule

 1   through the Tutsi and leave them in power, we need to

 2   know who is Tutsi and who is Hutu and who is Twa.  So

 3   they went through the country and issued identity

 4   cards, and all of the identity cards listed people's

 5   ethnicity so that it became something in public record

 6   that if you were a Tutsi, then your children would be

 7   Tutsi and their children would be Tutsi because it's

 8   registered in government offices, and you had to carry

 9   a card with you that said what your ethnic identity

10   was.

11        Q.  And before the institution of those cards

12   were people able in certain circumstances to

13   transition from being Tutsi to Hutu or vice versa?

14        A.  There was some flexibility to the identities

15   historically.  Because they were not thought of as

16   racial identities in Rwanda, but status identities, if

17   you increased your status -- if you were a Hutu who

18   became wealthy, if you were a Hutu who gathered a lot

19   of cattle and people were beholden to you, over time

20   people would think of your family as a Tutsi family.

21            But once colonialism came in that was no

22   longer possible, and once you wrote these things down

23   and codified it you couldn't change it, unless you

24   paid a bribe or did something illegal to get your

25   identity changed.  It was something that was fixed.

1    It was codified in the government record.

2              The reality was that there had been

3    intermarriage sometimes.  Hutu and Tutsi would

4    sometimes marry one another, and so they had to have a

5    rule that if your father -- you took whatever

6    ethnicity your father was.  That became a fixed rule

7    as well.  So if your father was Tutsi, you would be

8    Tutsi.  If your father was Hutu, you would be Hutu.

9    And your mother's identity ultimately wouldn't matter.

10        Q.  Were there certain physical attributes that

11   became stereotypical for Hutu and Tutsi?

12        A.  Well, because the Europeans thought of these

13   as racial differences they imputed -- they put upon

14   the populations racial ideas.  So they developed an

15   idea that the Tutsi were a tall group with narrow

16   features, with long fingers and long noses, and that

17   the Hutu were a stocky, shorter group because they

18   were farmers.

19              So there developed a very sort of strong

20   stereotype about what these groups were.  They

21   actually developed a theory that the Tutsi were a

22   neolotic group, a group from the Nile valley that had

23   migrated into Rwanda with their cattle, and some of

24   those groups are very tall in other places and so they

25   developed that stereotype.

 1          The reality is there were some dietary

 2    differences in Rwanda.  The Tutsi lived on a diet that

 3    had much more dairy in it.  They lived not exclusively

 4    from dairy but heavily from dairy.  There was a sort

 5    of yogurt drink that was the staple of the diet;

 6    whereas the Hutu lived on mostly starches and beans.

 7          So it's not surprising, actually, because of

 8    the dietary differences that Tutsi did tend to be a

 9    little taller and Hutu tended to be a little stockier

10    because they ate different things, frankly.  But the

11    colonial power said that that was a racial difference,

12    and it's really not borne out by science.

13    Q.  Can you describe the social administrative

14    constructure of society during the colonial period?

15    A.  Well, the Belgians practiced what was called

16    indirect rule, which is a system where they said the

17    easiest way to rule a country is not to come in and

18    fire all of the people who are in charge and put new

19    people in but to govern through the existing

20    authorities.

21          So they set up a system in which the colonial

22    power was on top but the population wouldn't feel it

23    quite as much because they left the Rwandan king in

24    place and they left chiefs in place, and so they ruled

25    through this hierarchical structure.

1          The reality is, though, the Belgians did what

2     all colonial powers did, and they reshaped things to

3     serve their own liking.  So the political system in

4     Rwanda had been very complex before with overlapping

5     authorities and a variety of different types of chiefs

6     and decentralized power.

7          The colonial state created a very centralized

8     state.  So that they concentrated power in the hands

9     of the monarch and ultimately in their hands.  They

10    simplified the political system so that the flow of

11    authority was much more clear, and they set up a

12    stronger bureaucracy to help make that possible.

13         So you developed a very centralized system

14    with a strong bureaucracy in which power flowed

15    clearly from the colonial state down to the people.

16    Q.   And were there -- and administrative managers

17    that were part of that bureaucracy, were they Rwandan

18    or colonial?

19    A.   They were mostly Rwandan, Tutsi chiefs.

20    There were of course colonial administrators who were

21    at the top who were in various places, but the main

22    people who dealt with the day-to-day political life

23    were Rwandans themselves.  Mostly the local chiefs and

24    sub-chiefs.

25    Q.   With regards to institutions that existed

1    during the colonial period, I'm thinking the schools,

2    can you describe how schooling education occurred

3    during the colonial period?

4        A.  Yeah.  Rwanda was a place where the Catholic

5    church in particular was very active.  And the

6    Catholic church, as well as the Protestants when they

7    came, became very active in setting up schools.  But

8    most of the schools were also associated with the

9    colonial state in some ways.

10           The purpose of schools at that time was not

11   so much to uplift the population as to train

12   administrators and to train priests and pastors.  And

13   so they set up a few schools, not many, that focused

14   on training mostly the elite, and those were people

15   who were trained mostly to do either government

16   employment or to work for the church.

17       Q.  What languages were spoken in Rwanda during

18   the colonial period?

19       A.  Well, Kinyarwanda is the language that

20   everybody speaks, but the language of colonial

21   administration was French.  And so anyone who went to

22   school would have gone to school in French.

23       Q.  Now, when you were living in Rwanda were you

24   aware of what languages they taught in school?

25       A.  Yes.

1        Q.  And what language did they teach?

2        A.  Well, French remains the dominant language,

3   but anyone who went to high school certainly would

4   have had to study Swahili and English as well.

5        Q.  Where do they speak Swahili?

6        A.  They speak Swahili throughout much of East

7   Africa, particularly in Kenya and Tanzania.

8        Q.  Do you know the predominant language of

9   business in Kenya and Tanzania?

10       A.  It's English and Swahili, but particularly in

11  Kenya English is spoken very widely.

12       Q.  So when did the colonial period end?

13       A.  There was a sort of slow end to colonialism

14  in Rwanda.  There was an uprising in 1959 in which the

15  Hutu, who were increasingly frustrated at the

16  inequality in their society, attacked some of the

17  Tutsi chiefs.  And over the next three years there was

18  a shift that took place so that the leadership of the

19  country was -- all the Tutsi were driven out and Hutu

20  took on the positions as chiefs.

21            Rwanda gained its independence in 1962 with a

22  Hutu president and a government that was almost

23  entirely Hutu, and the Tutsi who had been the leaders

24  became sort of a persecuted minority.

25       Q.  And how long did the Hutu remain in power?

1    A.  Until 1994.  Until the end of the genocide

2  when a rebel army that was predominantly Tutsi came

3  and took power.

4    Q.  So after the Belgians were kicked out were

5  there ethnic conflicts in Rwanda during that

6  intervening 30 some-odd years?

7    A.  Yes.  In 1959 you had this uprising in which

8  some of the chiefs were targeted.  There wasn't that

9  much violence at that time, but over the next several

10  years there were waves of ethnic violence against the

11  Tutsi and that drove tens of thousands of Tutsi into

12  exile, particularly the elite Tutsi who felt

13  themselves the most threatened.  But there were some

14  attacks by Tutsi rebel groups back into Rwanda and

15  that led to reprisals.

16    So from 1959 to 1965 there were various waves

17  of violence in which several thousand Tutsi inside of

18  Rwanda were killed and many more Tutsi fled.

19    There was a period of relative calm for

20  almost a decade, and then in 1973 as the president was

21  beginning to feel himself unpopular and was worried

22  that he was going to lose power, one of the things he

23  did was to stir up ethnic sentiments again.  And so

24  there was a wave of ethnic violence in 1973.

25    That was so destabilizing that a coup took

1   place, and the military stepped into power and a new

2   president, President Habyarimana, stepped into office.

3   And he basically said, okay, we're going to put an end

4   to ethnic conflict.

5          So for over a decade there was a period in

6   which there wasn't a lot of ethnic conflict in Rwanda,

7   but as Habyarimana began to lose his popularity he

8   once again started to turn to ethnic sentiments

9   stirring up ethnic divisions in order to try to win

10  over the population again and to divert the

11  population, frankly, from his own inadequacies.

12      Q.  Is that President Habyarimana, is that

13  Juvenal Habyarimana?

14      A.  That's correct.

15      Q.  Was that the president who was in the

16  airplane that had been shot down in 1994?

17      A.  That's right.  He died on April 6th in a

18  plane crash.

19      Q.  You mentioned that when the Tutsis were being

20  persecuted during that time period that some went into

21  exile.  Where did they go?

22      A.  The majority went to Congo, which was called

23  Zaire at the time, and to Uganda.

24      Q.  Did they stay together in terms of as Tutsi

25  exiles, or did they integrate into those places?

1     A.   In some places they integrated.   In Uganda

2  there were large refugee camps in which many of the

3  Tutsi were forced to live.

4     Q.   Jumping ahead, are you familiar with what is

5  called the Rwandan Patriotic Front?

6     A.   I am.

7     Q.   What was that?

8     A.   The Rwandan Patriotic Front was a rebel army

9  that was made up mostly of Tutsi refugees from earlier

10  violence.   Some of them were people who had fled

11  Rwanda when they were young.   Many of them were people

12  that had actually been born in exile.

13          It was based in Uganda, and most of its

14  leadership was Rwandans who had grown up in Uganda.

15  It included some Tutsi and some others who joined from

16  other countries, from Congo and elsewhere, but the

17  majority of people, particularly in the leadership,

18  were Tutsi refugees in Uganda.

19     Q.   Back to President Habyarimana's rule.   You

20  mentioned when things got bad after the tensions

21  increased.   Can you explain that?

22     A.   Sure.   Well, Rwanda's economy began to

23  collapse in the late 1990s.   Habyarimana had been in

24  power for over a decade, and people were increasingly

25  tired and frustrated because the price of coffee

1    collapsed and so there was less money coming into the

2    country.  And that began to manifest itself in

3    opposition to the president.  In particular, one of

4    the things that people complained about was that

5    Habyarimana was from the north of the country and he

6    favored people from his home region in the north.  So

7    a lot of Hutu who lived in the south of the country

8    were resentful.

9           In 1990 there was a wave of democracy that

10   swept across a lot of Africa, the time of the fall of

11   the Berlin wall and the breakdown of communism in

12   Europe, and that inspired a lot of countries in Africa

13   to have their own democracy movements.  Rwanda was one

14   of those.

15          So a lot of people who had been complaining

16   and unhappy in early 1990 began to organize opposition

17   demanding the right to form political parties,

18   demanding the right to print what they wanted and to

19   have opposition newspapers.  There were protests that

20   took place and a lot of pressure that was put on the

21   regime that ultimately forced the government to accept

22   some reforms, to legalize opposition parties, and to

23   change the political system a little bit.

24          At the same time there was another factor

25   that began in October of 1990 which destabilized the

1   country further, and that was that the RPF, the

2   Rwandan Patriot Front, launched an invasion on Rwanda.

3           The invasion was not very successful.  As a

4   matter of fact, the first attack was completely driven

5   out.  But the fact that you had a Tutsi rebel army

6   that was attacking a country, and that over time

7   became better organized and more effective at its

8   attacks, helped to create a situation of sort of fear

9   and instability within the country.

10          So one of the things that happened was the

11  government was being criticized for not being more

12  democratic, for being too authoritarian, for having

13  been in office for too long.  And when you had an

14  invasion from outside they were then able to rally a

15  lot of people back behind them.  So they were forced

16  to make some reforms, but they were able to say, hey,

17  the real problem isn't our bad rule, it's this Tutsi

18  army that's attacking from outside.

19          So even though you had legitimate complaints

20  against the government, the government was able over

21  time to turn a lot of people back behind them by

22  claiming that they were going to defend the interests

23  of Hutu against these invading Tutsi.

24          They developed a lot of ideology that talked

25  about the Tutsi threat.  Remember what things were

 1   like during colonialism when the Tutsi oppressed us.

 2   They're invading to try to take over the country again

 3   and oppress us once more.  And so they had a very

 4   strong anti-Tutsi rhetoric that developed over time.

 5       Q.  Now, you mentioned that the president was

 6   from the north of the country.  Are you familiar with

 7   Byumba?

 8       A.  Yes.

 9       Q.  Where is that?

10       A.  Byumba is in the north of the country.

11           MR. CHAKRAVARTY:  Just for the record, that's

12   B-Y-U-M-B-A.

13       Q.  When the RPF attacked Rwanda in 1990, where

14   did they attack?

15       A.  The first attack was in Byumba.

16       Q.  What was the ostensible purpose of the RPF's

17   invasion?

18       A.  The RPF claimed to have several goals.  One

19   is that they were fighting for the right of refugees

20   to return to the country.  You had these Tutsi

21   refugees that had been living abroad for 30 years.

22   The Habyarimana government did not allow them to come

23   back to Rwanda.  They faced some persecution in Uganda

24   in the 1980s, and many tried to come back to the

25   country at that time to protect themselves but they

1   weren't allowed to, so their number one claim was to

2   want to bring refugees back.

3          But their other claim was they also wanted to

4   bring democracy to Rwanda.  They saw the opposition

5   parties organizing and thought that they might be able

6   to support that movement.

7      Q.  Now, immediately after the invasion by the

8   RPF what changes happened in Rwanda?

9      A.  Well, the Rwandan Patriot Front, as I said,

10  was a mostly Tutsi movement, but they established a

11  coalition government that included many Hutu.  The

12  president was a Hutu.  The prime minister was a Hutu.

13  And there were a number of other political parties

14  that were included.  The RPF established its control

15  over the country, and the former government for the

16  most part fled into Zaire, into Congo.

17     Q.  I'm sorry.  I jumped ahead.  I meant when

18  they -- I think you were talking about when the RPF

19  took over the country.

20     A.  Yes.

21     Q.  And that's in 1994?

22     A.  That's correct.

23     Q.  At the end of the genocide.

24     A.  That's correct.

25     Q.  So back to 1990.

1        A.  Oh, sure.  Sorry.

2        Q.  You described some of the sentiment in

3   Rwanda.

4        A.  Right.

5        Q.  I think you said it increased tensions, but

6   was there any other kind of social changes?

7        A.  Yeah.  So in 1990 you had this democracy

8   movement that was destabilizing the government and

9   then an invasion.  The government responded by

10  scapegoating Tutsi in a lot of ways.  They claimed

11  that all the Tutsi who were living in Rwanda were

12  allies of the RPF and they couldn't be trusted, that

13  they were secret agents.  This ideology sort of

14  developed over time, but there were several things the

15  government did to try to encourage it.

16        Immediately after the October invasion they

17  arrested a lot of Tutsi leaders throughout the

18  country, and many of those Tutsi leaders remained in

19  jail for three months or six months or longer before

20  they were released.

21        There also were a number of ethnic massacres

22  that took place.  They were small scale.  300 or 400

23  Tutsi were killed in one community or another.  They

24  took place every couple of months.  But they helped to

25  increase the tensions between Tutsi and Hutu, and they

1   also in many ways sort of rehearsed what ultimately

2   became the genocide; that is, they organized local

3   communities to get involved in the killing.  They had

4   local militias that were sometimes implicated, often

5   with support from a military backing.

6          When I was living in Rwanda in 1992 and '93,

7   it was a period in which there were massacres going

8   on, and I had a number of Tutsi friends who came to me

9   and asked whether they should flee the country.  They

10  were afraid of what was happening.  They saw things

11  going in a bad direction and felt increasingly

12  insecure.

13         I'm still getting over the flu so my voice is

14  kind of going.

15         So people would come to me and say that, you

16  know, they were afraid and wondered if they should

17  leave the country.  It's an indication of the level of

18  fear between the ethnic groups that was ongoing.

19         But even so, in most communities Hutu and

20  Tutsi were still living together at peace.  It's just

21  that there was tension and there was suspicion between

22  the groups.

23     Q.  During the period after 1990, after the

24  invasion, was there a reconciliation or a peace

25  process that was implemented between the RPF and the

1  then government of Habyarimana?

2      A.  Uh-huh.  There were a variety of agents in

3  the international community that pushed the RPF and

4  the Habyarimana government to negotiate.  Ultimately

5  that culminated in August 1993 in an agreement that

6  was signed in Arusha, Tanzania, called the Arusha

7  Accords.

8          The Arusha Accords included a ceasefire and

9  an agreement for how the RPF would be integrated into

10  the Rwandan government.

11          There was a plan for bringing the refugees

12  back and a plan for establishing a multiparty -- a

13  multiethnic government that would ultimately hold

14  elections.

15      Q.  All right.  So Habyarimana took power in

16  1973; is that right?

17      A.  That's correct.

18      Q.  So from 1973 to 1991 can you describe the

19  political landscape in Rwanda?

20      A.  Well, Habyarimana took over this centralized

21  bureaucratic state that had been established during

22  the colonial period.  It was a state in which you had

23  government offices from the top to the bottom that

24  tried to control the population fairly effectively.

25          Habyarimana also set up a single political

1   party that was the only legal political party that was

2   allowed and everyone in the country was required to be

3   a member of that party and ruled not -- you know, was

4   not the most brutal dictator, but he was a dictator

5   nonetheless.  He had extensive authority and used his

6   power to maintain himself in office, and people in the

7   country basically followed his rule.

8       Q.  What was the political party?

9       A.  The MRND.

10      Q.  Do you know what the acronym stands for?

11      A.  Let's see.  MRND is the French acronym, so

12  it's sort of the reverse of what it would be in

13  English.  So it's the Democratic National Movement for

14  the Revolution, I believe.

15      Q.  And in that climate of increasing pressure on

16  Habyarimana that you were describing in that '90s

17  timeframe, was there a move to open the country up to

18  more political parties?

19      A.  Yes.  There was a demand by the democracy

20  movement to allow other political parties.  And so in

21  1991 they did allow the formation of other political

22  parties, so the MRND became just one of several

23  parties that were present in the country that people

24  had the option of being part of.

25      Q.  And were those other political parties again

1  opposition parties?

2       A.  Most of them were.  There were several

3  parties that were very critical of the MRND.  There

4  were parties that represented Hutu from the south.

5  There were parties that were multiethnic and opposed

6  the increasing ethnic nationalism of the MRND.  There

7  was one party that was largely Tutsi.  And so they

8  were very critical of the regime and fairly strong

9  opponents.

10      Q.  Who maintained the -- or who was in power of

11 the government from that period between this

12 multiparty period and when the genocide began?

13      A.  Well, about a year after political parties

14 were legalized there was a multiparty government that

15 was put into place and a prime minister who actually

16 came from one of the opposition parties.  Some

17 opposition ministers were put into government as well,

18 and so it was technically a coalition government.

19         But the MRND and President Habyarimana really

20 held onto power fairly strongly.  They did name

21 ministers.  They allowed ministers to come from other

22 parties but didn't give them real power.  They made

23 sure that the MRND had most of the control.  They also

24 worked then to try to divide those parties and to

25 co-opt them.

1           So one of the things that happened,

2    particularly from 1993 on, was a move to really split

3    each of the opposition parties and to co-opt

4    particularly pro-Hutu elements of those parties and to

5    bring them into a grand coalition behind President

6    Habyarimana.

7           Q.  Was there a name given to that coalition?

8           A.  It was called Hutu Power.

9           Q.  What was the relationship between Habyarimana

10   himself and the MRND?

11          A.  Habyarimana was the leader of the MRND, but

12   there were other powerful figures around him as well.

13   His wife was a major political figure.  There were a

14   number of her relatives who were in powerful positions

15   that waged power, some of the military personnel, so

16   there was sort of a group of people.  Habyarimana was

17   at the center but was not the sole power.

18          Q.  When we talk of political parties in Rwanda,

19   can you explain how they're similar or different from

20   what we think of political parties in the United

21   States?

22          A.  The political parties in Rwanda for the most

23   part tended to have less of a political agenda.  They

24   tended to be more identity based.  So that the MRND

25   was a party that was associated more with the

1    interests of Hutu from the north of the country.  The

2    liberal party was the party that was mostly associated

3    with interests of Tutsi, for example.  There were a

4    couple of parties that appealed to Hutu from the south

5    of the country.

6             They were similar to our parties in that

7    their goal was to get people into public office.  They

8    were hoping that there would be elections and that

9    they would get people elected, and the level of

10   competition between them was often very intense.

11            We think of our country as being polarized,

12   but I don't think we're on the verge of a civil war.

13   And in Rwanda they were in the midst of a civil war,

14   and so the competition between political parties was

15   often quite heated, occasionally violent, but it was a

16   period of real political tumult where you had parties

17   arguing over who they should represent.

18            They also had some difference in vision.  So

19   that there were some parties that were interested in

20   an integrated country, in a country that would welcome

21   Tutsi and Hutu and Twa, and there were other parties

22   that much more strictly were just fighting for the

23   interests of Hutu against the supposed Tutsi enemies

24   that they saw.

25        Q.  During this period was the power in the

1   government really being shared amongst the parties?

2       A.  Not the primary power.  I mean, you did have

3   a prime minister from a moderate party.  You had some

4   other ministers, even some Tutsi ministers, but the

5   main power was still in the hands of the MRND and

6   President Habyarimana.

7       Q.  Were there ministers who were not MRND?

8       A.  There were ministers who were not MRND.

9   About half -- actually less than -- well, it was about

10  half the government that was MRND or allied parties.

11      Q.  And the prime minister?

12      A.  The prime minister was from a party called

13  the MDR.

14      Q.  What kind of party was the MDR?

15      A.  The MDR was a party that was affiliated with

16  the first president of the country.  That was a party

17  that represented Hutu mostly from the center of the

18  country.  It was not overtly an ethic party.  There

19  were a number of people in that party who believed

20  that they should represent development for the entire

21  country, but there were some elements of it who took

22  on the mantle of the former president, the first

23  president, who had been very anti-Tutsi.  So it was a

24  party that was already somewhat divided between those

25  who were sort of moderates and those who were more

1   Hutu ethnic nationalists.

2       Q.  In terms of MRND, the people who associated

3   with MRND, you mentioned that they were from the north

4   of the country.  Was there a profile in terms of what

5   kind of person was a member of that party?

6       A.  Well, not everyone was from the north of the

7   country.  It hadn't been the ruling party.  There were

8   some people throughout the country who were in

9   powerful positions who felt they owed their power to

10  the MRND, so even when the other parties emerged they

11  remained loyal to the MRND.

12          The MRND also was a party that sold itself as

13  the party that was going to protect the Hutu against

14  the Tutsi.  It was the party that really promoted this

15  ideology of protecting Hutu interests and demonizing

16  the Tutsi.  So the MRND -- when people were members of

17  the MRND, you assumed that they shared that sentiment.

18      Q.  Was there a master membership list of the

19  MRND?

20      A.  There was not.

21      Q.  How would one identify with the MRND

22  counterpart?

23      A.  You would register with a political party.

24  Each of the parties kept some register at the local

25  level of who their memberships were.

1      Q.  Were there any insignia or other

2  manifestations of political party affiliation?

3      A.  In this period when I was living in Rwanda

4  before the genocide, when there was a lot of party

5  competition, people were very active in trying to show

6  what party they were a part of.

7          Each party had colors that were associated

8  with it and each party had some clothes in those

9  colors that people would wear.

10          In particular, one of the things that was

11  very popular was to wear a hat from your party.  So

12  young men, in particular, would all be wearing a hat

13  for one party or another.

14          Bars in towns had flags from each of the

15  parties.  So you kind of knew that this was a pro

16  government bar or this was an opposition bar based on

17  the flag that it was flying outside.  It didn't mean

18  that people couldn't go into it if they were from

19  another group, but there was a real active attempt to

20  sort of show your political affiliation through what

21  you wore and through the flags that you flew.

22      Q.  Are you familiar with political party

23  rallies?

24      A.  Yes.

25      Q.  With regards to MRND rallies, can you explain

1   to the jury what those were?

2       A.  Well, as I said, each of the parties was --

3   you know, it was a very polarized time and each of the

4   parties was trying to whip up support for its party.

5           When I was in Rwanda I was living in Butare

6   for most of the time, and there were times when I was

7   planning to go to Kigali and people would say don't go

8   there because there's going to be a rally today.

9           The parties would bring together people and

10  have chants and songs and speeches to try to whip up

11  support for the party, and sometimes opposition party

12  groups, particularly youth groups, would organize and

13  protest against it and there would sometimes be

14  fighting in the streets between the groups.

15          So the rallies were a time in which the

16  parties really promoted their ideas and tried to get

17  people whipped up into a frenzy in support for the

18  party, and sometimes it was too exuberant actually

19  because it led to protests and conflict.

20      Q.  You mentioned that sometimes they would get

21  violent.

22      A.  That's correct.

23      Q.  How do you mean that the rallies would get

24  violent?

25      A.  Well, in particular, a couple of things could

1    happen.  Sometimes you would have opposition, youth

2    groups that would be outside sort of protesting, a

3    counterprotest, and there might be fighting between

4    those, you know, gang violence in a sense where they

5    might have fist fights or throw rocks at each other.

6           But sometimes after rallies there would also

7    be reprisals that would happen.  Youth would go out

8    from the rallies and -- say if it was an MRND rally

9    there might be an attack on Tutsi shops, or sometimes

10   the contrary would happen.  With the opposition

11   parties that -- one of the communities I did a lot of

12   work in they went out and forced local -- the local

13   mayor to wear a cap from the opposition party even

14   though he was MRND, and they marched him through the

15   town wearing a cap he didn't believe in, which sounds

16   a little silly, but it was a way of sort of showing

17   the power of their party within the community.

18        Q.  Would people in town know when there was a

19   political party rally?

20        A.  Oh, absolutely.  It would be publicized.  It

21   would be on the radio.  Organizers would go out and

22   tell everyone to come to the rally and urge people to

23   join.  That's how I knew to avoid Kigali on certain

24   days, because there were going to be big rallies.

25        Q.  You said that they would go around and

1   announce it.  How would they announce it, on the

2   streets?

3        A.  Well, each of the parties had an organization

4   within the community so, you know, just spread it

5   through word of mouth but also then through the radio.

6        Q.  Dr. Longman, I'm handing you a box, Exhibit

7   26.  Some of these are marked for ID.  Some of them

8   the ID is stricken.

9            Just take a moment and flip through those and

10  see if you recognize those.

11           (Witness looks through Exhibit 26)

12       A.  Yeah.

13       Q.  What do you recognize those to be?

14       A.  These are some of the clothes I was

15  describing, the clothes that people wore to show their

16  affiliation with a particular party.

17           MR. CHAKRAVARTY:  Your Honor, I would move to

18  strike the ID on the remainder of Exhibit 26.

19           MR. HOWARD:  There's no objection.

20           THE COURT:  ID may be stricken on Exhibit 26.

21           THE CLERK:  For the record, it would be

22  Exhibit 26(A), 26(B), 26(E), 26(F) and 26(G).

23           (Government's Exhibit 26(A), 26(B), 26(E),

24  26(F) and 26(G) Admitted)

25       Q.  Doctor, specifically with regard to the

1   clothes in that box, is there an example of a hat that

2   you described earlier?

3          A.  Yeah.  I'll just set the box down here.  This

4   would be an MRND hat.

5          Q.  And how would you know that it was MRND?

6          A.  By the colors.  In this case the green,

7   black, yellow and red, and also by this symbol here.

8          Q.  Can you describe that?

9          A.  It's a hoe and a machete used to cut bananas.

10         Q.  The other garments in there, what are they

11  indicative of?

12         A.  This particular fabric, this style, was for

13  the MRND.  As you can see, it has most of the colors I

14  just mentioned, as well as blue.  It became ultimately

15  also associated with the Hutu Power movement.  When

16  Hutu Power emerged people would wear these outfits to

17  show their affiliation with it.

18         Q.  There are a couple of other garments in

19  there.

20         A.  There's a scarf here, which I believe is an

21  MRND scarf, actually.  It doesn't have the yellow that

22  you would usually have but -- another shirt.  It's an

23  MRND shirt.

24         Q.  At least the shirt specifically says MRND on

25  it?

1      A.  It does, yeah.  It's a MRND 1975 to 1985

2  tenth anniversary shirt.  This obviously precedes the

3  period we're talking about, but it's a demonstration

4  of the kind of clothes people would wear.  And there's

5  a shirt with President Habyarimana's photograph on it.

6      Q.  The appearance of the president's face on a

7  garment, what would that indicate?

8      A.  If you're going to wear it, you're showing

9  your loyalty to him.

10      Q.  Was that exclusively for MRND members, or

11  would other Rwandans who were members of other

12  political parties wear the picture?

13      A.  It would be, I would assume, primarily MRND

14  members.  I've never heard of Hutu Power members who

15  were not MRND members wearing the president's face.

16      Q.  And then finally in the envelope there's a

17  pin.

18      A.  Oh, yeah.

19      Q.  What is that?

20      A.  So again, it's a pin of President Habyarimana

21  with the colors.

22      Q.  All right.  If I may just grab that.

23      A.  Sure.  I have to say these clothes smell kind

24  of old and musty.

25      Q.  I can assure you they've been washed.  That's

1   all I can assure you.  All right.  Is this an example

2   of that pin?

3       A.  Yes.

4       Q.  And that's the president in his younger

5   years?

6       A.  Yes.

7       Q.  26(G).

8       A.  He's looking quite a bit thinner than he did

9   later in life.

10      Q.  So what types of activities would occur at an

11  MRND rally?

12      A.  There would of course be political speeches.

13  You would have leaders of the party trying to whip up

14  support, but then there were a lot of other things to

15  try to get people excited.  So there would be dancing

16  and singing and chants.  There were particular songs

17  in chants that would be associated with the various

18  political parties.

19          The youth militia usually played a -- the

20  youth groups of the parties usually played an

21  important role in the rallies.  They would be the ones

22  who would be organizing the dance and getting people

23  to come and trying to whip up frenzy, getting people

24  to cheer and clap and those sort of things.

25          So it was an event that would really be

1   trying to sort of get people riled up politically.

2       Q.  So did most of these political parties have a

3   youth wing?

4       A.  All the political parties had some type of

5   youth wing, yes.

6       Q.  Okay.  So with regard to the MRND, did they

7   have a youth wing?

8       A.  They did.

9       Q.  What was that?

10      A.  It was called the Interahamwe.

11      Q.  Can you spell that?

12      A.  I can try.  I'm terrible at spelling aloud,

13  but I-N-T-E-R-A-H-A-M-W-E.

14      Q.  And what was the objective of the youth

15  wings?

16      A.  Well, they started out merely as party youth

17  wings.  We have the young Democrats and the young

18  Republicans in the United States, and they started out

19  not so dissimilar from that but in a much more heated

20  political atmosphere.  So they were the groups that

21  were trying to, you know, get people pumped up and get

22  support for the party and get them when they're young

23  and pull them in.

24          Over time as the country became more

25  polarized, and in particular after Hutu Power emerged

1  in 1993, the youth wings in several of the parties

2  became much closer to being militias.

3        As a matter of fact, at a certain point in

4  1993 they started to be trained as malitia on how to

5  carry arms and how to protect your village and how to

6  supposedly provide security.

7     Q.  Specifically with the Interahamwe training,

8  why did they need to learn this?

9     A.  Well, the Interahamwe were motivated by an

10 ideology that really focused on the Tutsi threat.  And

11 you did have the RPF invading the country in the

12 north.

13       So it was a palpable threat that many people

14 felt.  You had a civil war that was going on in part

15 of the country.  There was tension between Hutu and

16 Tutsi.  They were being taught that all the Tutsi in

17 their community, even though they may have been far

18 from the battlefront, that all those Tutsi were

19 traitors who couldn't be trusted.

20       So the emphasis for the Interahamwe was to

21 protect yourselves against an RPF threat; that the RPF

22 may come, and you need to be prepared in your

23 community to protect yourself against that.

24       Ultimately we know that some people already

25 had in mind a genocide; that some of the people who

1   were organizing this training had an idea that they

2   could use it to create basically troops -- civilian

3   troops who would be there to attack Tutsi and try to

4   wipe out the Tutsi population.  The training was

5   actually very important in many communities to

6   preparing for that.

7        Q.  When you lived in Rwanda in 1993, can you

8   describe the atmosphere with regards to ethnic

9   tension?

10       A.  It was obviously very tense.  I worked some

11  in the north of the country in a community where there

12  had actually been some ethnic massacres.  There

13  weren't very many Tutsis who were left there.  Many of

14  them had fled to various places.

15           In Butare where I spent most of my time the

16  situation was a little different.  Butare had a

17  reputation of being a very moderate community.  It was

18  the intellectual center of the country.  The National

19  University was based there, the best high schools in

20  the country were based there, and it had a very large

21  Tutsi population.  Over 25 percent of the city of

22  Butare was Tutsi.

23           It was a community that prided itself on

24  political moderation, on being ethnically tolerant,

25  and it was a city that had a lot of intermarriage

1  between Hutu and Tutsi.

2          That said, because you had a civil war that

3  was ongoing and because you had massacres that were

4  taking place -- in other parts of the country, I

5  should say, the massacres were mostly in the north of

6  the country -- there was a growing tension.  A lot of

7  the Tutsi were afraid of what was going to happen,

8  were uncertain.  A lot of the Hutu were afraid that

9  this regime was going to force ethnic violence on

10  them.

11          There was not very much support for the MRND

12  or for Hutu Power or for Habyarimana in Butare.  It

13  was a region where the opposition was much more

14  strongly embraced, and in particular the ideology of

15  the opposition.  One that talked about -- ethnic

16  harmony and unity within the country was one that was

17  very widely accepted within Butare, but people saw

18  what was happening in the rest of the country and were

19  frightened.

20          In Butare, as well, it's in the south of the

21  country, and there were Hutu there who were very

22  resentful that the MRND regime had not allowed people

23  from the south to have much power.  So there were a

24  lot of southern Hutu who were resentful of the

25  northern Hutu who dominated the political system, and

 1  so there was a lot of opposition but also a lot of

 2  tension.

 3      Q.  A few more questions about the civil war, and

 4  then we'll get to the genocide.

 5          The civil war that you described began in

 6  1990 -- October 1990 with the RPF invasion; is that

 7  right?

 8      A.  That's correct.  October 1st.

 9      Q.  And you mentioned earlier the Arusha Accords

10  occurred in August of '93?

11      A.  That's correct.

12      Q.  So during that time was there actual military

13  conflict between the Armed Forces of Rwanda and the

14  RPF?

15      A.  There was.  As I said, the first RPF attack

16  on the country was not very successful.  It was

17  rebuffed fairly quickly.  There were some foreign

18  troops that came in and helped the Rwandan army, but

19  the RPF then regrouped and got more recruits and

20  trained them more effectively, and they then began to

21  attack the country on another side of the north.

22          So they went from Byumba to Ruhengeri, which

23  was another province over, and were much more

24  successful.  They were able to occupy some more land,

25  and over time their invasions became more and more

1  successful.  So they gradually did make progress on

2  the battlefield.

3          It was a conventional war in that there were

4  battles between the Rwandan army and the RPF on the

5  front.  So it's not kind of a real action as we think

6  of many wars in Africa being.

7      Q.  What was the ethnic composition of the Armed

8  Forces of Rwanda?

9      A.  The Armed Forces of Rwanda were almost

10 exclusively Hutu.

11     Q.  And you've already described the RPF.  Where

12 did they get their weapons and their arms in order to

13 fight?

14     A.  The RPF was -- the leaders of the RPF had

15 been strong supporters of the president of Uganda in a

16 rebel movement that brought him to power.

17         In a period after Idi Amin was deposed there

18 was another government that was unpopular and a rebel

19 movement emerged that brought ultimately a new

20 president to Uganda.  Several of his most important

21 military leaders were Rwandan refugees based in

22 Rwanda.  Rwandan refugees had been targeted for ethnic

23 violence in Uganda, and so they ended up supporting

24 this rebel movement.  So there was a very close

25 relationship between Uganda and the RPF.

1    Q.  So the civil war that you described between

2  these two sides, did that fighting reach Butare?

3    A.  No.  It was quite far from Butare.  Butare is

4  in the far south of the country.  The fighting was

5  exclusively in the north of the country.

6    Q.  All right.  So amidst this environment after

7  August of --

8         THE COURT:  Are you going to move on to a new

9  subject?

10        MR. CHAKRAVARTY:  Yes.

11        THE COURT:  Why don't we take our break now.

12        Ladies and gentlemen, we'll take our

13  midmorning break now.

14        (RECESS)

15        THE COURT:  Mr. Chakravarty.

16    Q.  Dr. Longman, we just got to the time of the

17  genocide in Rwanda.  What is a genocide?

18    A.  A genocide is a form of killing that's

19  directed at people based upon their identity.  There's

20  a genocide treaty in the international law that

21  defines genocide as targeted killing of people based

22  on their ethnicity, race, religion or nationality, and

23  that's targeting with a specific intent of wiping out

24  the group in whole or in part.

25    Q.  Did a genocide occur in Rwanda in 1994?

1        A.  Yes.

2        Q.  When did it take place?

3        A.  It began April 7, 1994, and lasted for about

4    a hundred days, until mid-July.

5        Q.  What group was targeted by the genocide?

6        A.  The genocide targeted overwhelmingly the

7    Tutsi group.  There were also moderate Hutu who were

8    supportive of the Tutsi who were killed, but when we

9    speak of genocide we're generally speaking about the

10   Tutsi who were killed.

11       Q.  What was the international response of the

12   genocide as it was occurring?

13       A.  The initial response of the international

14   community was to misunderstand and mischaracterize

15   what was happening.  Initially there was reluctance to

16   talk about it as genocide.  There's an impression that

17   African countries are naturally violent, that they're

18   always fighting, and that's just the way African

19   countries are.

20            Unfortunately, that's the way a lot of the

21   international community reacted to what happened in

22   Rwanda.  Governments were very slow to actively

23   condemn what was happening.  When they did talk about

24   it, they portrayed it as civil war.  But there's a big

25   difference between civil war and genocide.

1          What was happening in Rwanda, you were

2   targeting mostly people who were unarmed, and the vast

3   majority in fact of those who were killed were women

4   and children and the elderly, people who were not a

5   threat in any way from a military sense, and the

6   killing was very much one-sided; that is, the

7   population that was being targeted was overwhelmingly

8   the Tutsi, and they were being targeted because they

9   were members of the Tutsi ethnic group, not because

10  they posed any real political threat or military

11  threat.

12          The international community unfortunately

13  didn't recognize that initially and just called on all

14  sides to stop fighting as though the Tutsi who were

15  being killed were fighting back, which for the most

16  part they weren't.

17          Eventually, towards the end of the violence,

18  countries like the United States and Belgium and

19  others began to talk about it as genocide and called

20  for intervention, but by then it was actually too late

21  and hundreds of thousands of people had been killed.

22      Q.   What triggered the genocide?

23      A.   Well, the genocide was, as we know now from

24  our research, something that was planned in advance.

25  There were people sometime in 1993, probably, who

1    developed the idea of consolidating the rule of the

2    Hutu regime by targeting all the Tutsi that threatened

3    them and also targeting moderate Hutu.  You could use

4    the cover of genocide to kill off Hutu opponents as

5    well.

6              There was a plan for genocide that was

7    developed by some of the people at the top of the

8    military, leaders of the Hutu Power movement, people

9    closely associated with the president, but it wasn't

10   put into place until President Habyarimana was killed,

11   and when he was killed the plan was immediately put

12   into action.

13             There were already lists of people to be

14   killed that were in place.  Within hours after the

15   president's death the Presidential Guard and some

16   elite military troops went out into the capital and

17   started hunting down prominent Tutsi as well as

18   moderate Hutu politicians and Hutu who were leaders in

19   the opposition parties and in civil society.  So there

20   was a systematic attempt really as soon as the

21   president was killed to carry out this killing.

22        Q.   What were the objectives of the genocide?

23        A.   The objective was to basically wipe out the

24   Tutsi population and to rally the Hutu population, and

25   in so doing to secure the power of the government in

1   place.  It was an attempt by the Hutu Power movement

2   to really wipe out anyone who was not part of their

3   movement, but particularly to wipe out the Tutsi who

4   they saw as a perpetual problem within Rwanda.

5        Q.  How successful was it?

6        A.  It was not entirely successful in terms of

7   wiping out all Tutsi, but it was pretty successful.

8   We estimate about 80 percent of the Tutsi population

9   was killed in just three months; that is, the Tutsi

10  population that was in Rwanda at the time.

11          From a political perspective it was a

12  failure, though, because it so destabilized the

13  country that it made it difficult for the government

14  to actually maintain its power.

15          When the genocide started, the RPF relaunched

16  the civil war, relaunched its attack on Rwanda in

17  order to take over the country and stop the genocide.

18  And so in July of 1994 the RPF successfully took

19  control of the country and drove the regime -- the

20  Hutu Power regime into exile.

21          So the killing of Tutsi was very successful,

22  but the political strategy of trying to maintain power

23  was a failure.

24       Q.  They killed about some 800,000 people.  How

25  many people are estimated to be perpetrators?

1    A.  It's difficult to say.  There were fairly

2  small groups of killers who were the main instruments

3  of the genocide at the beginning.  There were the

4  Interahamwe militia, there were soldiers and

5  Presidential Guard, a fairly small group of people who

6  were involved in very targeted killings.

7         A lot of people were killed initially in

8  large scale massacres.  The Tutsi population was

9  gathered into churches and schools and other public

10  buildings with promises of sanctuary, and those were

11  actually cynical ploys to get people together so that

12  they would be easier to eliminate.  So small groups of

13  killers were responsible in many cases for killing ten

14  or 20,000 in a single place over a course of several

15  days.

16         Over the weeks following that the violence

17  was expanded as they tried to hunt down survivors,

18  people who had fled from these killings who had never

19  come to the central locations, and so there were more

20  people who got involved in patrols that went to search

21  for survivors or in roadblocks where they checked

22  people's IDs to make sure they weren't Tutsi trying to

23  slip through.

24         Then there were people who were involved in

25  peripheral ways, people who provided support to the

1  barricades or the patrols, people who looted property

2  after the killing, people who provided other types of

3  material support.  Maybe several hundred thousand

4  people were involved at some level, maybe a little

5  more.  So it's a large number of people.  A smaller

6  number of people who were really the dedicated killers

7  and the main organizers of it, but the overall number

8  of people who were involved in some ways is really

9  quite large.

10      Q.  You mentioned that the violence erupting in

11  Kigali after the president -- actually, why don't we

12  step back a moment.

13          Why don't you explain actually how the

14  president was killed.

15      A.  The president was flying in a plane back from

16  a meeting that had been held in Tanzania.  The meeting

17  had focused on how to implement the Arusha Accords.

18  The integration of the RPF into the government had not

19  yet taken place, and there was pressure on the regime

20  to go ahead and implement the peace deal and create a

21  multiparty, multiethnic government.  They were

22  dragging their feet.  So this meeting that had been

23  held was how to push that process forward.

24          The president was flying back from that

25  meeting when his plane was shot down by a missile.  We

1   don't know for sure who shot that plane down.  There's

2   a lot of debate actually among forensics experts and

3   others about who shot the missile, but whoever did,

4   whether it was Habyarimana's own people who wanted to

5   use his death as an excuse for launching the genocide,

6   or whether it was the RPF, as some evidence suggests,

7   that was viewing Habyarimana as an obstacle to moving

8   forward with the peace deal, it became the excuse for

9   starting the genocide.

10      Q.  And after his death how did the government of

11  Rwanda reform?

12      A.  Well, as I said, immediately after his death

13  the elite leaders of Hutu Power, the Presidential

14  Guard and others, went out and targeted people they

15  saw as their chief political opponents.  That included

16  prominent Tutsi, but it also included prominent

17  moderate Hutu.

18         The prime minister was a woman from Butare

19  who was killed along with ten Belgian peacekeepers who

20  were there to protect her.

21         There were a number of ministers, some who

22  were Tutsi, some who were moderate Hutus, who were

23  killed, and so the government had to reformulate.  And

24  so what they did was to build a new government that

25  was entirely Hutu Power.  They still had people from

1  opposition parties, but they in particular brought

2  people who they felt were loyal to the Hutu Power and

3  would be strongly anti-Tutsi and would help to

4  implement the policy of wiping out the Tutsi.

5       Q.  And so was there a new president appointed?

6       A.  There was a new president, a man named

7  Sindikubwabo, S-I-N-D-I-K-U-B-W-A-B-O, who had been

8  the leader of parliament.  He was a man also from

9  Butare, but he was a member of the president's

10 political party, the MRND.

11      Q.  Were there any other Butare political figures

12 who joined the new government?

13      A.  There were actually a lot of people from the

14 south, including Butare, put into this new government.

15           As I mentioned before, Habyarimana's regime

16 had based most of its power on the north, and as Hutu

17 Power developed there was a lot of strong support for

18 the president in northern parts of the country.  But

19 because they had a program to carry out the genocide

20 and to establish their power throughout the entire

21 country they really needed to appeal to the south.

22           And so the new government that was set up

23 actually had a lot of politicians from the south.  So

24 not only the president was from Butare but the prime

25 minister who was named was a Hutu from Butare, and

1   there were several other ministers and various other

2   positions who came from Butare or from surrounding

3   provinces.  The idea was to create a government that

4   might be more capable of winning over southerners to

5   the cause.

6        Q.  So in addition to Sindikubwabo, was the prime

7   minister Kambanda?

8        A.  That's correct.

9        Q.  And was there a Pauline Nyiramasuhuko?

10       A.  Pauline Nyiramasuhuko had been part of the

11  government at the time of Habyarimana's death, and she

12  maintained her position within the government.

13       Q.  What was her role in the cabinet?

14       A.  She was the Minister of Women's Affairs.

15       Q.  So back to how the genocide played out.

16  Before and after this new interim government set up,

17  what kind of government involvement was there in the

18  actual change?

19       A.  One of the things that the international

20  community got wrong when they first started reporting

21  on what was happening in Rwanda was to treat it as

22  though it was spontaneous violence, as though people

23  were upset over the president being killed and they

24  just rose up and killed their neighbors.

25            One of the things that was very clear when I

 1    was doing my research, particularly in '95 and '96, in

 2    looking at how the genocide happened was how well

 3    organized it was from above.  They had for many months

 4    in advance been planning something.  They had trained

 5    militias and they had established agents throughout

 6    the country to help carry it out.

 7           When killings happened it's true that they

 8    used a lot of civilians, but there were almost always

 9    police and military who were there participating in

10    the killings.  Orders came from on high.  The

11    government organized -- named particular people to

12    take responsibility for different parts of the country

13    to make sure that the genocide was carried out.

14           As an example of something I encountered in a

15    number of the communities that I studied, initially

16    Hutu men who were married to Tutsi women were able to

17    save their wives and smaller children often weren't

18    targeted initially.  But in May an order went out from

19    the government that they had to finish the work that

20    they had started, the euphemisms that they used, and

21    so government officials went throughout the country to

22    make sure that everyone knew that you were supposed to

23    kill all Tutsi, including Tutsi women married to Hutu

24    and small Tutsi children.  And so at that time there

25    was another wave of killing of people who had survived

1   up to that point.

2          So one of the things we found is this was not

3   spontaneous violence in any way.  It was very well

4   organized.  It came from on high and orders were given

5   down through the hierarchy to the local level.

6          Q.  You described that there were some mass

7   killings, massacres.  How widespread was that?

8          A.  In most of the country the first step that

9   was taken in the genocide was to gather the Tutsi

10  together into a central location.  Churches were the

11  number one killing fields.  The country was very

12  religious, and in ethnic violence in the past people

13  had been able to go to the local Catholic or

14  Protestant church and had been saved because in a

15  strongly Christian country people didn't want to

16  disturb the sanctity of their religious centers.

17         But that idea was actually exploited

18  actively, the idea you could get sanctuary.  So people

19  were called into churches and into schools and then

20  they were targeted there quite intentionally.

21  Massacres happened in churches and schools really

22  throughout the country in most places.

23         Where the genocide happened later, that was

24  less common a tactic because people had already

25  learned it was dangerous to go to these places because

1  you weren't actually going to be protected, but I

2  would say a majority of the Tutsi who were killed were

3  killed in these massacres.  They took place really in

4  just the first couple of weeks of the genocide, and by

5  that time a huge portion of the Tutsi had already been

6  slaughtered.

7       Q.  I ask you to describe how -- after that

8  slaughter you described that there were mechanisms for

9  the genocide to be expanded, so I'm going to ask you

10  to explore that and just speak a little slower.

11      A.  I can.  I can try.  My apologies.  I get

12  excited about these things, and I'm used to lecturing

13  to classes.  I'll try to slow down.

14          So the large scale massacres were sort of the

15  first step in the genocide, and after that the

16  government really built on that strategy to try to

17  weed out anyone who might have survived.

18          Because the killing took place over several

19  days in most cases, people would sneak away at night

20  or they would be able to break through and get away.

21  Some people never came to the large scale massacre

22  sites.  And so there were a couple of mechanisms that

23  were set up to try to make sure that they could find

24  all the Tutsi.

25          One was nightly patrols in which they would

1    go and travel around through their neighbors.  Each

2    community was supposed to develop its own patrol that

3    would look for Tutsi survivors.  If they found someone

4    in the night, they would ask them for their ID, and if

5    they were Tutsi they would kill them.

6             They would search houses of people that they

7    believed had Tutsi hiding in them.  So they searched

8    the neighbors and walked around just making sure there

9    weren't any Tutsi trying to sneak away in the darkness

10   of night.

11            And then roadblocks were an important tool

12   that was used as well.  There were roadblocks set up

13   on most intersections, and those roadblocks were used

14   really to make sure that Tutsi couldn't pass.

15            One of the things to realize about the

16   geography of Rwanda is it's very hilly and it's also

17   very densely populated.  So there are very few sort of

18   open spaces.  Almost all the land is cultivated and

19   people have farms where they've put up hedges and

20   fences, and it's not easy to pass through places

21   without going on the roads.

22            So by setting up roadblocks on each of the

23   major intersections there was a thought that they

24   could sort of capture any of the Tutsi who were trying

25   to escape, who were trying to get away to a new hiding

1    space or trying to escape the country.

2        Q.  So focusing on the roadblocks, describe what

3    the roadblocks were like during the genocide.

4        A.  Well, there were a couple of kinds of

5    roadblocks.  When I was living in Rwanda there were

6    already a couple of roadblocks in Butare because they

7    were set up by the military because of the civil war.

8    So there were a few military roadblocks that were

9    fairly formal at the entrance and exit to town

10   where -- then during the genocide there were also

11   roadblocks that were set up by militia groups and by

12   neighborhood security committees.

13           In all of these roadblocks basically

14   something was put into the road to keep cars from

15   easily driving through.  It might be some tires or a

16   piece of wood or something that -- if you really

17   wanted to drive through it, it wouldn't have been that

18   difficult to plow through.  But the idea was sort of

19   symbolically to make a barricade.

20           So all of the cars and bicycles and

21   pedestrians who came through had to stop at the

22   roadblock and have their identity papers searched.

23   They also would sometimes have their body searched.

24   If they had bags, the bags would be searched to look

25   for weapons.  The point of them was to try to find,

1  you know, enemy agents, as they portrayed them, but

2  during the genocide what that really meant was to look

3  for Tutsi.

4          So identity cards were checked, and if people

5  had a Tutsi identity card they might be killed on the

6  spot or more likely they would be taken to the side

7  somewhere and killed.  If people had no identity card,

8  there was an assumption they were probably a Tutsi who

9  had thrown away their identity card so they might be

10 killed as well.

11         But also there was a realization that you

12 could be a Tutsi who had stolen a Hutu identification

13 card.  So sometimes they would look at people and say,

14 is this person too tall.  They might ask, do you know

15 this person, you know, is this somebody from our

16 neighborhood, do we know this person to be a Tutsi.

17 So there was an attempt to find anyone who was Tutsi

18 because they were deemed to be agents of the RPF and

19 they had to be eliminated.

20     Q.  Did the RPF have a name that people in Rwanda

21 used generally to describe them?

22     A.  They were called the Inkotanyi.

23     Q.  And was there also a pejorative name for

24 Tutsi during the genocide?

25     A.  The term Inyenzi, which means cockroaches.

1  It was actually a term that in the 1960s some of the

2  Tutsi rebels had applied to themselves, because they

3  would come in the night and attack and flee, kind of

4  the way cockroaches do when you turn on the light.

5  But over the years the term cockroaches, Inyenzi, had

6  come to be a term that was used to negatively talk

7  about Tutsi in general, but specifically RPF.

8      Q.  Now, you mentioned that people's identity

9  papers were checked.  Can you describe what the

10 identity papers were?

11     A.  There was a green card that was folded in

12 half, a sort of small thing that would be just the

13 size to fit in your pocket, and that card on the

14 second page has a list of ethnicities.  Your ethnicity

15 would be left uncrossed off, as opposed to being

16 circled as we would do.  For some reason an identity

17 card would -- if you were Tutsi they would cross off

18 Hutu and Twa and foreigner.  If you were Hutu they

19 would -- yes, so something like that.

20     Q.  I just put up Exhibit 11 on the projector.

21 Is this an example of an identity card?

22     A.  Yes, it is.

23     Q.  You were just talking about crossing off

24 different --

25     A.  Right.  So this would be an identity card for

1   a Hutu from Gaseke (look at exhibit??)commune.

2        Q.  And on the back of the card, what kind of

3   information is listed here?

4        A.  It asks where you're from, what your commune

5   is, what your sector is, your name.  It's got,

6   obviously, sex and your parents' names.

7        Q.  And here the name is Munyenyezi, Beatrice?

8        A.  That's correct.

9        Q.  And the prefecture is Byumba, correct?

10       A.  That's right.

11       Q.  And that's that northern province that you

12  described earlier where the RPF invaded?

13       A.  It is.

14       Q.  So who would man the roadblocks that popped

15  up during the genocide?

16       A.  Each roadblock tended to have a sponsor, some

17  group that was basically in charge of it.  As I said,

18  there were some military roadblocks, and the military

19  continued to be the primary people running those

20  roadblocks.  But the various militia groups and some

21  of the sort of neighborhood security groups that came

22  together as basically militia would have their own

23  roadblocks which they would run.

24            The roadblocks usually had a core of people

25  who were in charge, and then other people from the

1  community were encouraged to participate in the

2  roadblocks as well and to come and to man them.

3        But generally it was the militia members who

4  were there, and sometimes military would come and join

5  them and help out.  Sometimes other people who

6  supported the purposes would come and join in.

7      Q.  How frequently were the roadblocks manned?

8      A.  They were supposed to be manned 24 hours.

9  They were, as I say, just kind of a couple of things

10  thrown into the road.  So it wasn't that hard to take

11  one down and put it up, but most of the time once they

12  were put up they stayed there for the entire period of

13  the genocide.

14        And there was usually somebody there all of

15  the time, because the daytime was the time when most

16  people would be out moving and that's when they would

17  search the ID cards and search through bags, but

18  nighttime was when Tutsis who might be trying to flee

19  would pass through.  So it was important that you had

20  some people at the roadblock at night to make sure

21  that no one is sneaking by.

22      Q.  How mobile were the roadblocks?

23      A.  They tended to be relatively mobile.  As I

24  said, there might be a few tires and some sticks and

25  that sort of thing.  But they would tend to be

1   situated in strategic places, so that the roadblock

2   would be at an intersection -- usually at an

3   intersection or an entrance to a town or an entrance

4   to a neighborhood, and so it would be in that same

5   place pretty much every time.

6       Q.  What would happen if you were identified as a

7   Tutsi at a roadblock?

8       A.  If you were identified as a Tutsi, in most

9   cases people were either killed on the spot or more

10  often they were taken to the side and killed.  Usually

11  people didn't want to do it kind of in full view of

12  everyone, but they would take someone back into a

13  grove of trees or behind a building.  There were

14  certain places near roadblocks that became notorious,

15  places where people were killed.

16      Q.  For Tutsi women, what would happen to them?

17      A.  Tutsi women often were raped before being

18  killed.  In some cases if a Tutsi woman was viewed as

19  being particularly beautiful or if she was young and

20  attractive, she might be taken forcibly by some of the

21  militia members and kept as a kept woman.  Sometimes

22  people took a Tutsi woman as sort of their concubine

23  during the period of the genocide.  In other cases

24  women were taken to a commonplace that the militia

25  controlled and kept basically as sex slaves during the

1   period of the genocide and raped repeatedly.

2       Q.  Can you explain to the jury how efficient the

3   violence was during the genocide?

4       A.  Yeah, I mean it was amazingly efficient.  As

5   I say, we estimate that something like 80 percent of

6   the Tutsi population was killed.  A large portion was

7   killed in these large scale massacres, but the

8   mechanisms that were set up to try to find anyone who

9   had survived were really pretty effective.  Over a two

10  or more month period they really were able to hunt

11  down most Tutsi who had survived the initial killings.

12  So a large portion of people were killed.

13          There were some people who were kept by their

14  Hutu neighbors and hid in places that were never

15  found.  There were some Tutsi who lived near the

16  border who managed to escape before the violence

17  became too bad, but the majority of Tutsi, a large

18  majority, was killed.

19      Q.  How were most people killed?

20      A.  The killing did involve guns and firearms in

21  some cases, particularly in large scale massacres

22  people were sometimes shot, but the majority of

23  militia members didn't have guns.  They had machetes

24  and clubs with nails in them and other weapons that

25  were sort of low grade weapons that were used.  So the

1    majority of people were killed in that fashion.

2          This killing was very hard work actually,

3    which is why the killing took place many times over

4    days when the massacres were taking place.  They had

5    to go in and -- chopping people to death with a

6    machete is not easy to do.  I apologize.  It's sort of

7    a gruesome thing to talk about, but that was the

8    nature of the killing in Rwanda.  The killing was

9    gruesome and often took place over a very long period

10   of time.

11        Q.  What was the role of drugs and alcohol?

12        A.  The killing was made easier by various things

13   that the militia members did to sort of hide their

14   identities.  That included wearing banana leaves in a

15   skirt and putting clay or charcoal on their faces

16   sometimes to kind of hide their identity, but also

17   getting the militia, particularly the youth militia,

18   hopped up on drugs and alcohol was one of the ways to

19   sort of make it easier for them to kill.

20        Q.  Was there a government mandate to

21   participate?

22        A.  The government -- as the genocide went on,

23   after the first massacres took place -- set up a

24   system that they called civil self-defense.  They used

25   a lot of euphemisms to justify their killing.  If you

1  just went to people and said, kill your Tutsi

2  neighbors, people wouldn't do it.  So you had to use

3  coded language to get them to act.

4         The genocide was always portrayed as

5  something that was defensive, and the government set

6  up civil self-defense committees in every

7  neighborhood, in every city, in every province, and

8  they then sent out orders a little later that required

9  all adult men to support the defense efforts in some

10  way.  So men were required to go to the barricades or

11  to go on the patrols.

12         People would try to find ways to get out of

13  it if they didn't support the mechanisms.  Sometimes

14  there were Hutu who were hiding Tutsi in their homes

15  who would go just to show up at the barricade just to

16  show they were there and then go back home but not

17  really participate, but there was a requirement for

18  men to participate.

19      Q.  You described it as hard work.  I don't mean

20  to belabor this, but the killings would last over a

21  periods of days?

22      A.  That's right.  Well, particularly the large

23  scale massacres usually took two or three or four

24  days.

25      Q.  Is that because the killers needed rest?

1     A.  It's because there were so many people

2   gathered and the killing was, yeah, hard work.  It

3   was -- one of the euphemisms that was used to talk

4   about this was to do your work.  There had been under

5   Habyarimana's regime a required public labor that

6   everyone had to do, and they used the language of that

7   public labor to get people to kill.  They said people

8   needed to go out and do their public work, and so it

9   was treated in some cases like a 9:00 to 5:00 job.

10          They would go out in the morning, the militia

11   groups, and start killing and go back home at 5:00 for

12   dinner and then gather again the next morning for

13   killing again.

14     Q.  Were lists made of Tutsis?

15     A.  In each community there were in some cases

16   lists drawn up before the genocide, but there were

17   lists that were made of Tutsis in various forms.  When

18   the Tutsi gathered in the churches or school buildings

19   government officials usually came in and said, well,

20   we need a list of all the people who are here so that

21   we can know how much food to provide and how much

22   assistance to provide to you.  Those lists were then

23   used to make sure that everybody on that list was

24   killed so that they could go after the killing and

25   check off the names of all of the people in the

1  community who had been killed and know how many people

2  were there.

3         In communities -- as the civil self-defense

4  security efforts went on as well, lists were drawn up

5  of RPF agents, as they called it, which were really

6  lists of Tutsis, and those lists tried to list all the

7  Tutsis that were known in the community so they could

8  make sure that nobody was missed.

9         Those lists tended to be lists of anyone who

10  was known to be a Tutsi who had not yet been killed.

11  So in a community the security committee would list

12  all the Tutsi they knew who had somehow escaped, no

13  one had seen their body yet, no one in the patrols or

14  the barricades had killed them yet, so they would have

15  a list of these are the people we need to find.

16      Q.  Did everyone voluntarily participate in the

17  genocide?

18      A.  Not everyone voluntarily participated, no.

19  There were people who were coerced into participating.

20  The government encouraged people to participate.

21  People worried that there might be consequences if

22  they didn't.  So there were some people who were

23  coerced into participating and there were people who

24  were trying to protect Tutsi family members or Tutsi

25  friends that they had in hiding, so they sometimes

1   participated as a way of protecting their own Tutsi.

2   But the core of people who participated, the militia

3   members and the organizers of it, generally

4   participated voluntarily.

5        Q.  Why didn't the Tutsis fight back during the

6   genocide?

7        A.  They did fight back, but not very

8   effectively.  It was not just young men of military

9   age who were being targeted.  It was all Tutsi.  And

10  in the churches and elsewhere where people gathered

11  you had the majority of the population that was

12  elderly, women and children.  They were not armed.

13       As they were brought into the places of

14  supposed sanctuary, those who had arms had their arms

15  taken away.  The government claimed, well, you can't

16  bring a gun into a place of refuge, so they disarmed

17  those who had arms.

18       But where they could the Tutsi did fight

19  back.  They would take what was there, usually stones,

20  and in some cases they were able to rebuff the

21  militias for a few days by throwing stones.

22       But the militia groups then went out and

23  recruited other members and brought in the police and

24  the military, and the police and the military would

25  open fire and shoot the people who were throwing

1  stones or throw grenades into the crowd, and then it

2  was easier for the militia groups to come in.

3     Q.  Describe how local militias participated in

4  the killing.

5     A.  The local militias did the majority of the

6  killing outside of Kigali.  In most places these

7  militia groups were young often unemployed youths who

8  were able to sort of empower themselves through this

9  kind of action.

10        They acted under the direction of government

11 officials and other leaders of the genocide, but the

12 militia groups were the main killers.  They were the

13 ones who often manned the barricades.  They were the

14 ones who attacked the places of refuge.

15    Q.  And the Interahamwe was one of these

16 militias?

17    A.  The Interahamwe -- the term Interahamwe

18 originally referred to just the MRND.  Over time that

19 term got used to talk about militias in general, so

20 sometimes people throw the term out, but the

21 Interahamwe generally refers to the youth militia of

22 the MRND specifically.

23    Q.  What was the role of the elite during the

24 genocide?  Was there a distinction between elite and

25 the commoner?

1       A.   Yeah.   The elite in most cases were involved

2   in -- those elites who were sympathetic to Hutu Power

3   were involved in organizing and encouraging the

4   genocide.   For the most part the elite didn't actually

5   do the killing themselves.   They gave the orders to

6   the youth militia.   The elite were the ones who tried

7   to stir up the population and make sure that everyone

8   knew genocide was official policy and that you should

9   go along with the genocide or face the consequences.

10      Q.   All right.   I'm going to bring you to Butare

11  specifically.   You explained that you had lived in

12  Butare before and after the genocide and you took many

13  trips there and you conducted research there; is that

14  right?

15      A.   That's correct.

16      Q.   So in your understanding about the genocide

17  as it unfolded in Butare, what is your basis of

18  knowledge for that?

19      A.   Well, I lived there during the period that

20  was leading up to the genocide.   I was not there

21  during the genocide itself, but when I went back I did

22  some research myself on the genocide in Butare city

23  itself.   I did more research in some of the

24  neighboring communities in the same province, and I

25  also have read pretty much everything that's been

1  written about the genocide.

2          So it's based on my own interviews, some

3  documents that I've reviewed, as well as reading a lot

4  of secondary sources.

5      Q.  And you explained generally how you conducted

6  research in Rwanda.  Specifically in terms of

7  interviews about the genocide in Butare, how did you

8  ensure the reliability of the information?

9      A.  Well, we tried to identify people who had

10  some experience with the genocide.  A lot initially

11  were genocide survivors themselves, Tutsi, and we

12  asked them what they had seen themselves.

13          The major emphasis was really on eyewitness

14  reports.  What we were really interested in was not

15  what you had heard about the genocide but what you

16  yourself had seen and experienced.

17          Some people couldn't tell us much because

18  they were in hiding the whole time and didn't really

19  see that much.  But other people had gone from one

20  hiding place to another or had been targeted

21  themselves or had been stopped at a roadblock and

22  saved in some way or another and so actually had very

23  rich detail.

24          We also talked to other people as well.  We

25  talked to some people who had been involved in the

1    killing, and then we talked to other people who were

2    eye witnesses, and tried to gather as much information

3    as we could.

4          What was important was to try to get as many

5    corroborating witnesses as we could, so people who had

6    seen one event from different perspectives.

7          Anything that went into Leave None to Tell

8    the Story was based on multiple witnesses.  We tried

9    never to include something that was just a single

10   person's account that wasn't corroborated either by

11   documentary evidence or by other witnesses.

12   Q.  In your research experience in Butare at that

13   time did you get false accusations from people that

14   you were interviewing?

15   A.  Not often.  There were a couple of -- not

16   from people we interviewed.  I was going to say there

17   were a couple of times where a police officer might

18   say, oh, you should interview this person because they

19   know about the genocide, and then I would interview

20   them and realize that actually this is not somebody

21   who was involved, there had been some false

22   accusations.

23         So I ran into false accusations I would say

24   in that context, but the people I spoke with the

25   problem was more an unwillingness to speak.  People

1   who were involved in the genocide did not want to

2   implicate themselves and so wouldn't talk very much,

3   but certainly the survivors were willing to talk a

4   lot.

5          One of the things that's interesting is that

6   over time people became even more open to talking.

7   When I went back to Rwanda in the 2001 to 2005

8   research project, I found a much greater willingness

9   for people to talk about even what they themselves had

10  done in the genocide.  So it's become more common to

11  talk about the genocide and to be open about what

12  actually happened.

13         But for the research we did for Leave None to

14  Tell the Story it took a lot of digging and a lot of

15  pushing and asking for multiple individuals and also

16  looking for some documents that would corroborate what

17  was said.

18    Q.  Now specifically with regard to how the

19  genocide manifested in Butare, when did the genocide

20  begin in Butare?

21    A.  Well, as I mentioned before, Butare was the

22  intellectual center of Rwanda and had a history of

23  being a more moderate place.  The political party that

24  was most popular in Butare was a party that was very

25  openly multiethnic and tried to really represent a

1    more progressive political position.

2            And so Butare was reluctant to get involved

3    in the genocide.  As a matter of fact, as the genocide

4    was occurring in some neighboring areas the province

5    of Butare set itself up to try to prevent it.

6            Butare had a Tutsi prefect, their governor,

7    basically, was a Tutsi, and a lot of moderate

8    political leaders.

9            So Butare was a place that had the genocide

10   occur fairly late.  It was almost two weeks into the

11   genocide that it took place, and it actually took a

12   lot of effort on the part of the new Hutu Power

13   government to make sure that the genocide took place

14   in Butare.

15       Q.  Will you explain what happened?

16       A.  Sure.  Well, over time the genocide was

17   spreading into the area around Butare.  In some of the

18   neighboring provinces the killings had begun.  There

19   were a couple of places in Butare where there were

20   strong supporters of the regime and strong supporters

21   of Hutu Power who started the killing, but officials

22   in Butare tried to stop that and tried to keep a cap

23   on it.

24           Eventually the national government realized

25   they had to come and actively intervene.  So on April

1   19th they organized a meeting that all of the

2   government officials in Butare were required to

3   attend.  All of the mayors and all of the provincial

4   officials were required to come.

5           The president and the prime minister spoke at

6   this meeting and several other ministers, and they

7   made it very clear that they were displeased with the

8   leaders of Butare for getting in the way of their

9   national security efforts.  Again, they used coded

10  language, but everyone knew what they meant.

11          They talked about the leaders of Butare who

12  were supporting the RPF and not supporting the

13  government, and they sent a message that was very

14  clear that if you did not support the genocide you

15  would be removed and maybe suffer a worse fate.

16          At that meeting the governor, the prefect,

17  was publicly dismissed and forced to leave the meeting

18  in a sort of humiliating fashion.  He was a Tutsi, as

19  I said, and ultimately was killed a little while

20  later.

21          The message was then sent, you know, to

22  anyone else who is here, if you're a moderate Hutu and

23  you don't support our effort, you will suffer the

24  consequences.  You, too, may be dismissed.  You may be

25  targeted.  Your family may be targeted.  They didn't

1  say that in so many words, but that was the

2  implication of everyone who -- people who attended

3  that meeting said that they knew was clear.  So that

4  meeting made it clear that people needed to

5  participate.

6          Shortly after that meeting a busload of

7  Presidential Guards came into Butare, and they began

8  targeted killings of leaders in Butare.  Roadblocks

9  were put up immediately after that meeting.

10          That's really when the genocide began.  Over

11  the next several days there was a systematic attempt

12  neighborhood by neighborhood to find the Tutsi who

13  were there.

14          But Butare was a little different than most

15  cases because it happened so late.  They did not

16  gather the Tutsi in central locations for the most

17  part; that is, you had small gatherings of Tutsi at a

18  few places, like the Prefecture, at some of the

19  churches, at some of the schools, but there were

20  several hundred or a couple of thousand Tutsi as

21  opposed to 10, 20, 30,000 that you got in some of the

22  other communities.

23          So in Butare there were a few massacres in

24  central locations, but the killing in Butare was much

25  more dependent upon the patrols and the roadblocks to

1  find the Tutsi.  And so there was a systematic effort

2  that began really just after that meeting on the 19th

3  to find the Tutsi and hunt them down.

4       Q.  Was that meeting on the 19th broadcast?

5       A.  It was.

6       Q.  And did President Sindikubwabo, who you

7  mentioned earlier, did he give a speech along the

8  lines that you just mentioned?

9       A.  He did.

10      Q.  So specifically with regard to Butare, who

11  comprised Hutu Power in Butare where MRND was not the

12  government of Butare?

13      A.  Because Butare had been this moderate place

14  that associated with the opposition, the general

15  public was widely supportive of the opposition and

16  most of the politicians ended up being as well.  There

17  were several of the mayors who had switched political

18  parties in 1992 or '93 and become members of

19  opposition parties.

20          But there were some politicians who had

21  remained loyal.  Sindikubwabo had been the

22  pediatrician to President Habyarimana, so he had a

23  close relationship with the Habyarimana family.  So he

24  remained active in the MRND, and there were a few

25  other figures from the MRND.

 1          There were a few people from opposition

 2   parties.  Some of them, like Kambanda, the prime

 3   minister, had been frustrated in their attempts to get

 4   power before.  So Hutu Power used them and drew them

 5   into Hutu Power as a way of winning them over.  So

 6   there were sort of a handful of these southern

 7   politicians who supported the Hutu Power movement.

 8   Very few who were MRND, but there were a few who were

 9   MRND.

10       Q.  Who were the MRND leaders -- some of the MRND

11   leaders?

12       A.  The most prominent was Pauline Nyiramasuhuko,

13   who was an MRND minister.  She was someone who was a

14   friend of Habyarimana's wife, they had gone to school

15   together, and she had remained loyal to the MRND and

16   loyal to the Habyarimana family, because as a

17   southerner she was able to get a powerful position in

18   the regime by maintaining her affiliation with the

19   MRND by being one of the few southerners who was

20   willing to do that.

21       Q.  What role did her son have?

22       A.  Well, her son was young at the time.  He had

23   been a university student at the local university.

24   Apparently not a terribly successful university

25   student.  And he became a youth leader in the

1    community in some ways.

2         Apparently at the university he had helped to

3    organize some anti-Tutsi protests at an earlier time.

4    He was someone who also identified with the MRND.  He

5    was a leader of Interahamwe.  Interahamwe was not very

6    big in Butare because it was the MRND militia, but

7    there were some local youth that were willing to be in

8    the MRND, and then there were also some northern

9    students at the university who were willing to be part

10   of the MRND.

11        And Shalom, using his connection to his

12   mother, and also his father who was the head of the

13   university, the rector of the university, he was able

14   to become a leader of the Interahamwe.

15        Q.  Just to clarify, Pauline's son is named

16   Shalom?

17        A.  That's correct.

18        Q.  Is that Shalom Ntahobali?

19        A.  Yes.

20        Q.  You said his father was the rector of the

21   university.  Do you remember his name?

22        A.  Maurice.

23        Q.  And was he politically involved?

24        A.  He was.  He had been the Speaker of the

25   National Assembly, and then I believe it was 1989 he

 1   was appointed the rector of the university.  It's a

 2   national university, so this is a position that's

 3   appointed by the president and it's a position that

 4   is -- because the university is seen as influential,

 5   the president tends to pick somebody that he feels he

 6   can trust that is an ally.

 7        Q.  Now, you mentioned that the Interahamwe was

 8   not very big in Butare.  What was it comprised of?

 9        A.  Well, most youth in the region were from

10   opposition parties.  So if they were part of a youth

11   wing at all, they were part of youth wings from other

12   parties.

13          The Interahamwe was the one associated with

14   the MRND.  So it was a sort of very small group with

15   Shalom at its head.  People who -- in some cases

16   university students who were from the north who were

17   strong supporters of Hutu Power.  Sometimes unemployed

18   youths and others in the community who saw this

19   association as something they could use to improve

20   their position.  It gave them some power.

21          You have to think about Rwanda is a society

22   where there tends to be respect for elders and there

23   is some respect for hierarchy, and in the midst of the

24   genocide being part of one of these youth militias was

25   a way to really empower yourself.  It was a way for

1   people who would not otherwise have much respect to

2   frighten people into respecting them.  So the

3   Interahamwe was really at the heart of that.

4        Q.  That family, the Ntahobali family, what kind

5   of social status did it have?

6        A.  It was one of the more prominent families in

7   Butare.  Obviously if you have the head of the

8   university and his wife who is a minister in the

9   government and they're known to be closely associated

10  with the president and his family, you know, that's

11  one of the most powerful families in the community.

12          The university was the number one employer in

13  Butare and, you know, as the head of the most

14  prominent employer in the community Maurice is

15  somebody who was quite important, and then his wife

16  because of her political connections ended up being

17  very important as well.

18       Q.  So during the genocide what role did the

19  Interahamwe have in the activity?

20       A.  Well, the Interahamwe group was just one of a

21  number of militias.  There were Hutu Power militias

22  that did emerge later.  But the Interahamwe group,

23  because it was already identified with opposition to

24  the Tutsi, was one of the first to act.

25          One of the things they did was to set up a

1   roadblock that frankly was a quite notorious roadblock

2   when I was in Rwanda in '95 and '96, and even when

3   I've been back since, people talk about this roadblock

4   as being the one they were frightened to go through,

5   where it was particularly brutal, where people were

6   degraded and humiliated trying to get through.

7          But they also were involved, particularly

8   early on, in trying to search for Tutsi who were

9   surviving.  Well, not surviving.  It was actually when

10  the killing was just beginning they were going out

11  looking for Tutsi in the community who were involved

12  in some of the killings.

13         I spoke with several people in Butare who

14  were survivors who said that they had known Shalom

15  personally, they had gone to school with him or they

16  knew him from just living in the community, and they

17  had known that he was looking for them.  People had

18  given them word that Shalom was out to find them, that

19  he had sort of a list of people that he knew that he

20  wanted to eliminate.

21     Q.  Based on your research, what did Shalom do

22  during the genocide?

23     A.  Well, he was one of the sort of organizers of

24  the foot soldiers.  He was not himself a prominent

25  individual in the sense that he was very young and his

1  power came mostly from being the head of a militia

2  group, but his militia group was one of the more

3  important ones in the community.

4          So he was one of the people who really tried

5  to represent the Hutu Power aesthetic of trying to get

6  people to support the killing and support the

7  government and be loyal to the Hutu cause.

8          Frankly, he's quite notorious in Butare as

9  being one of the real -- the bloodiest of the killers.

10  He's not seen as being politically one of the more

11  powerful people in the community, but he's seen as

12  being the person that people were most afraid of in a

13  sense because he was such a vicious leader of the

14  killing crews.

15      Q.  That notorious roadblock that you mentioned a

16  little while ago, where was it?

17      A.  It was on the main road in Butare, not far

18  from the university.  It was at a junction where -- if

19  you came from the main road, you could take the

20  junction up to the University Hospital and up to the

21  market.  It was in front of the Hotel I'Huriro.

22      Q.  What was the Hotel I'Huriro?

23      A.  The Hotel I'Huriro was a place that was

24  relatively recently built.  It was actually built

25  after I had left Rwanda in 1993, but it was a hotel

1   that was owned by Pauline and Maurice.

2         I should mention that a hotel in Rwanda, it's

3   a place where people stay, but it's also an important

4   gathering place.  Hotels usually have restaurants or

5   bars where people from the community will come for

6   meals.  Most of the hotels in a place like Butare make

7   more of their money probably from the sale of food and

8   liquor than from renting rooms to people.  But this

9   was one of those hotels, the new one that was set up,

10  closer to the university than other hotels.  I think

11  there was a hope that it might appeal to the

12  university crowd.

13        Q.  I think I will put up the aerial photo.  If

14  this is the main road from Kigali to Bujumbura, is

15  this the I'Huriro Hotel?

16        A.  Yes.  So the I'Huriro is right there.

17        Q.  And is this that road that you mentioned

18  going towards the ESO, the junior officers school,

19  and then the hospital?

20        A.  You've got the hospital on one side, the

21  junior officers school on the other, and then if you

22  continue up the road it takes you to the market.

23        Q.  Who lived at the I'Huriro Hotel?

24        A.  My understanding is that Shalom was the

25  manager of it; that he and his family were living

1   there.  There also -- Pauline, because she was a

2   minister in the government, was not spending most of

3   her time in Butare.  But people said that when she was

4   in Butare she often stayed in the hotel rather than in

5   her own home.

6          THE COURT:  This is really outside his

7   expertise and we've covered this.

8          MR. CHAKRAVARTY:  I'll move on.

9          THE COURT:  He has no personal knowledge.

10         MR. CHAKRAVARTY:  No.  It's based on the

11  research is what I'm asking.

12     Q.  Based on your research, Dr. Longman, were

13  there mass graves in Butare?

14     A.  There were mass graves in Butare, yes.

15     Q.  Were there any mass graves in the vicinity of

16  the I'Huriro?

17     A.  Butare is built on a ridge along a hill that

18  had some valleys beneath, and several of those valleys

19  had mass graves in them.  The arboretum, which was a

20  large place that the university ran, was a place where

21  there were mass graves.  And there was a mass grave in

22  the valley below the I'Huriro, which is a valley sort

23  of adjacent to the university, as well.

24     Q.  What kind of vegetation or topography is

25  there around there?

1      A.  Part of the land was cultivated because it
2  was a place where they grew food for the university
3  students, but there were also little grove trees.
4      Q.  Aside from that roadblock at I'Huriro, did
5  other roadblocks pop up in Butare?
6      A.  There were many roadblocks.  As I said, there
7  were some roadblocks that had been there since 1990 at
8  the entrances of the town, and then there were
9  roadblocks that were set up at some of the smaller
10  entrances where people came mostly by foot and at
11  several of the major intersections of the town as
12  well.
13      Q.  Are you familiar with the EER and the EER
14  school?
15      A.  I am.
16      Q.  What were those?
17      A.  The EER is the Episcopal church in Rwanda.
18  The Episcopal church had a diocese that was based in
19  Butare, and their cathedral was actually right near
20  the I'Huriro Hotel.  They also had a small school
21  complex and a few other buildings that were part of
22  the cathedral grounds.
23      Q.  How do you know the Tutsis were targeted in
24  Butare?
25      A.  Through the various -- certainly through

1  testimony that --

2         THE COURT:  You spent the last hour going

3  over that.

4         MR. CHAKRAVARTY:  Yeah, I understand that.

5  I'll ask him my next question.

6      Q.  In addition to the research and your

7  description of how the genocide spread throughout the

8  country, did you personally go back to Butare after

9  the genocide?

10     A.  I did.  In '95 and '96 I was the head of the

11  Human Rights Watch Office, which was based in Butare.

12  We interviewed people there.  I also had a lot of

13  friends in Butare who lived through the genocide, both

14  Hutu and Tutsi, and who told their stories to me.

15     Q.  And so did you notice any difference in the

16  number of Tutsi friends that were still living in

17  Butare?

18     A.  I know a lot of people who were killed, yes.

19  There are a lot of Tutsi who came back to Rwanda from

20  Uganda and Congo, so there still are a number of Tutsi

21  in Rwanda.  But of the Tutsi population that was there

22  before, there were many, many who were killed.

23     Q.  How long did the killing go on in Butare?

24     A.  In Butare it went on in sort of a more

25  extended fashion than in many other places because you

1   didn't have massacres.  So hunting people down really

2   took place all of the way into July.  It ended finally

3   when the RPF arrived in early July.

4        Q.  How visible was the killing?

5        A.  Rwanda was -- Butare was 25 percent Tutsi.

6   So if you're talking about -- it's a huge, huge number

7   of people who were killed.  They were killed at the

8   barricades.  They were killed in their homes.  They

9   were hunted down.  It would have been impossible to be

10  in Butare at that time and not be aware of what was

11  going on.

12            People were killed on the road.  Bodies were

13  dumped in all sorts of graves.  When you walked

14  through Butare people point out mass graves all over,

15  and pretty much every neighborhood had mass graves in

16  it and bodies were frankly present in a lot of places

17  a lot of the time.

18       Q.  Approximately how populated was Butare?

19       A.  Butare was about 30,000 people.  So it's a

20  small city.

21       Q.  I'm going to ask you a little bit about

22  cultural norms in Rwanda.

23       A.  Sure.

24       Q.  Specifically the Rwandan family.  Can you

25  describe the significance of marriage to social

1   status, relationships?

2       A.  Family is very important in Rwanda.  Having

3   children is very important.  Children were really seen

4   as a sign of wealth in the society, and so families

5   tend to be very large.  People often have eight to ten

6   children.  And the family structure is very important.

7           Rwanda is overwhelmingly rural, and in rural

8   areas families live in communities together where a

9   family will share land.  The sons will build their

10  houses near their parents' compound.

11          The family is also what gives a lot of

12  authority.  The family that you're part of can be very

13  important for your status in society.  So if you go

14  back to that tradition that Tutsi meant being high

15  status, traditionally that was -- the family you were

16  a part of that gave you your status.

17          Even though it was no longer the Tutsi that

18  were high status after the revolution in '59, there

19  was still an importance of family.  So that if you

20  were part of a prominent family, it helped to raise

21  your profile.

22      Q.  And what was the significance of marrying in

23  Rwanda?

24      A.  People of Rwanda certainly married for love,

25  but there also were important considerations of

1   families.  People would use marriage to help them

2   improve their social status sometimes.

3       Q.  What was the status of women politically when

4   the genocide began?

5       A.  There were a small number of women who were

6   in important political positions.  Most notably, the

7   prime minister was a woman.

8           But in general women were underrepresented

9   and had few legal rights.  Women didn't have the right

10   to own property or to inherit.  Women were seen as

11   minors in most cases and subservient to their husbands

12   or their fathers or their brothers depending on their

13   social relations.

14       Q.  Did the MRND have any impact on women in

15   Rwanda?

16       A.  It created a Ministry of Women, but it didn't

17   do too much to promote women's rights.

18       Q.  Were there women who participated in the

19   genocide?

20       A.  There were a small number of women who

21   participated actively in killing.  Women's role in the

22   genocide tended to be a more supportive role, but

23   there were some women who killed.  But most women

24   participated in providing support to the roadblocks or

25   pointing out where people were to be killed, providing

1   information, various sorts of material support.  Women

2   were often involved in pillaging.  They played a role

3   in the genocide, but given Rwandan cultural norms

4   women generally weren't involved in combat.  They

5   didn't get involved in killing.

6       Q.  How did the self-defense narrative you

7   described earlier relate to a woman's role in

8   providing the support of this?

9       A.  Well, one of the ways in which the anti-Tutsi

10  ideas were put forward was one that really talked

11  about the need to protect women.

12          Tutsi women were treated as vixens who were

13  trying to seduce Hutu men, and then Hutu men were

14  called upon to show their manhood and protect their

15  women from the Tutsi invaders.

16          So there was a language that did talk about

17  gender and talked about women being as being -- either

18  as Tutsi women being evil seductresses or as Hutu

19  women being vulnerable women who needed to be

20  protected.

21      Q.  I asked earlier about the elite versus the

22  commoner.  How wealthy is the average Rwandan -- or

23  was the average Rwandan at the time?

24      A.  Rwanda is an extremely poor country and was

25  very poor at that time, and so people would make -- I

1   think it was something like $300 a year was the

2   average income in the country.  Most people are very,

3   very poor.

4        Q.  Were there many cars?

5        A.  There were not very many cars, no.  Certainly

6   there were roads and the elite did have cars, but in

7   say some of the rural communities where I did research

8   there might have been ten cars for a community of five

9   or 10,000.

10        Q.  And to own your own home or your own

11   structure, did everybody -- how did most people live?

12   Did they own their own homes?

13        A.  No, most people owned their own homes.  Most

14   people lived in very modest housing on land that they

15   owned, and Rwandan people tend to own small parcels of

16   land.  When you had multiple children, you would

17   divide it up and the parcels would get smaller and

18   smaller and smaller, and each son would have to build

19   his own home on a limited income.

20            Most homes were made out of mud bricks and

21   sometimes thatched roofs.  People would save up money

22   to buy some kind of tiling that they could put on the

23   roof, but most people lived quite modestly.

24        Q.  So how did the genocide end?

25        A.  The genocide ended when the RPF arrived.

1   When the Rwandan Patriot Front army came in and took

2   control of territories.

3       Q.  In Butare when did that happen?

4       A.  In Butare it happened the first week of July.

5   I believe it was July 3rd that the RPF marched in and

6   fought its way through the city and took control

7   within a day.

8       Q.  When the RPF came into the country what

9   happened to the people who had been participating in

10  the killing?

11      A.  Well, a couple of things happened.  In some

12  communities the RPF did open fire on populations that

13  it found.  They had seen the remnants of the genocide

14  and they often viewed the general population as

15  supporters of the genocide and supporters of the

16  regime, so there certainly are places where RPF

17  soldiers carried out their own massacres.

18          And then after they took control of places

19  they sometimes also tried to have summary justice;

20  that is, in some communities they would ask people who

21  was responsible for the genocide here, and if people

22  got pointed out they just took the young men and older

23  men aside and shot them there.

24          So there were -- the RPF, while it stopped

25  the genocide, was not completely without its own

1    faults.

2         Q.  And they killed many people during that time.

3         A.  They did.  But we're talking tens of

4    thousands as opposed to 800,000.

5         Q.  Have you heard of something called the dual

6    genocide theory?

7         A.  I have.

8         Q.  Can you explain what that is?

9         A.  There's an argument that some people have

10   made that -- at one level it starts with an argument

11   that this wasn't a genocide at all, it was really a

12   civil war, because people were being killed on both

13   sides.

14         There's an argument that the RPF was

15   systematically killing a lot of people.  The idea of

16   genocide is that it's not just people being killed in

17   the context of war, it's people being targeted for

18   their identity.  And there are some people who have

19   argued that Hutu have been targeted because they were

20   Hutu by the RPF and that the RPF came in and just shot

21   all the Hutu that it found.

22         There was one -- a couple that tried to

23   publish unsuccessfully a paper that made the argument

24   that in fact more Hutu were killed during the genocide

25   than Tutsi.

1          More reputable scholars have completely

2    debunked this.  They have argued that, yes, there were

3    some Hutu that were killed, but the numbers that were

4    killed were much lower, number one; and number two,

5    the way that they were killed was not systematic; that

6    is, if you want to call it genocide you have to say

7    people are killed because of who they are.

8          If the RPF was killing people because they

9    suspected them of having supported the genocide,

10   that's not in and of itself genocide.  It's a human

11   rights violation, and summary justice which we oppose

12   because those people didn't get fair trials, but it's

13   something different than genocide.

14       Q.  In addition to killing people suspected of

15   being involved in the genocide, did the RPF destroy

16   buildings?

17       A.  They did some.  During the genocide one of

18   the things that was done to try to wipe out even the

19   memory of the Tutsi was that the militias would

20   sometimes destroy the homes or other buildings that

21   were Tutsis.  So in some communities you would see

22   rubble because a Tutsi home had been -- they killed

23   the people in the home and then just tore the home

24   down as though they're saying these people never

25   existed.

1          In response to that, when the RPF took power

2    they tore down a few buildings mostly of leaders of

3    the genocide.  So in some of the communities they came

4    to, in Butare for example, they tore down buildings

5    that were associated with a couple of the main

6    perpetrators of the genocide.

7          Q.  Where did the Hutu majority -- or where did a

8    lot of Hutus go when the RPF came into power?

9          A.  The Hutu generally fled as the RPF came.  Not

10   everyone.  There were many moderate Hutu who had

11   opposed the genocide who didn't feel they had anything

12   to fear.  Plus many of the Hutu, as the RPF was

13   coming, fled mostly towards Congo once they got to

14   Butare.

15         Some of the people stopped within Rwanda.

16   There was an area of Rwanda that the French army came

17   to and established control over.  So some people

18   stopped in camps within that French controlled

19   territory but many pushed on into the Congo, and there

20   were something like a million refugees in Congo

21   immediately after the genocide.  Most of those were

22   Hutu who had fled as the RPF came.

23         Q.  And within the refugee camps in Congo how did

24   social structures develop?

25         A.  People generally fled as a community, and so

1  the same social structures that were present before

2  the genocide in the communities were kept in the

3  camps.  So that the people who had been mayors sort of

4  kept their position of leadership, and in the camps

5  generally the militias that had been terrorizing the

6  populations back home continued to have a lot of power

7  in the camps.

8       Q.  What type of people would make it to Kenya?

9       A.  Well, Kenya is quite a distance from Congo,

10 so it certainly would take resources to get there.

11 People that I know who were refugees of Congo who were

12 poorer, either they came back into Rwanda in 1996 or

13 if they continued to flee into Rwanda they generally

14 walked through the rain forest for years.

15           In order to get to Kenya you usually would

16 have to fly because you couldn't really drive because

17 the main road would be going through Rwanda which you

18 wouldn't go back into.

19      Q.  So after the genocide did the Rwandan

20 government set up like a truth and reconciliation

21 process?

22      A.  They set up something called the Gacaca,

23 which was a grassroots effort to deal with how the

24 genocide took place in all the communities.  Basically

25 they were putting people on trial in courts and

1   realized there were so many people who were accused

2   that they would never be able to get everybody through

3   the court system, so they would set up a local system

4   that would have committees of well-respected

5   individuals in each community that would sit and

6   gather information about what happened during the

7   genocide and sit in judgment of people who had

8   participated.

9           So communities were ordered to come together

10  and to discuss all of the crimes that were supposedly

11  committed in the genocide and to talk about who

12  committed those crimes and then to sit in judgment of

13  them.

14      Q.  Was there a comprehensive list coming out of

15  Gacaca hearings as to all people who participated in

16  the genocide?

17      A.  There was an attempt, but the Gacaca was not

18  professionals, it was average people, and many of them

19  actually were not literate.

20          So while there was an attempt to really talk

21  about everything that happened in Rwanda, the Gacaca

22  process was fairly deeply flawed.

23      Q.  When did the Gacaca process begin and end?

24      A.  The Gacaca was rolled out over several years.

25  The elections were first held in 2001 for Gacaca

1   judges, and then they slowly implemented it in a few

2   communities.  It was rolled out at a national level in

3   2005, and the last Gacaca hearings officially ended I

4   believe in 2010.  Most communities did Gacaca from

5   about 2005 through 2008.

6       Q.  Military who had been part of the former

7   Rwandan military, where did they go?

8       A.  You mean the ones who were part of the

9   military during the genocide?

10      Q.  Yeah, the Armed Forces of Rwanda.

11      A.  Most of them fled into Congo.  As the RPF was

12  approaching, it drove the military sort of further and

13  further into Rwanda and then eventually they crossed

14  into Congo.

15          The government of Congo at the time was

16  sympathetic to the Hutu Power government, and so they

17  gave safe refuge to the military.  Many of them

18  crossed into Congo with their arms and sometimes

19  stayed in refugee camps actually with their arms,

20  which is against international law.

21      Q.  And you mentioned earlier that the ICTR, the

22  abbreviation for the UN international tribunal, when

23  did that get rolling in terms of remaining cases?

24      A.  The International Criminal Tribunal for

25  Rwanda brought its first cases in 1997.  It was set up

1   in 1994, but it took quite a while to get it up and

2   running.  It didn't really get into sort of a pattern

3   of working well until about 2000.

4        Q.  All right.  With regards to the ICTR, you've

5   testified there before?

6        A.  I have.

7           MR. CHAKRAVARTY:  And I'm going to ask your

8   Honor -- at this point I would move to strike the ID

9   on 18(A) through C and Exhibit 19.

10          MR. HOWARD:  Your Honor, I don't have in

11  front of me what those are.

12          THE COURT:  Transcripts of ICTR testimony.

13          MR. HOWARD:  So subject to the objection I

14  had made before, which I think you overruled if I'm

15  not mistaken.

16          THE COURT:  Well, I don't think this witness

17  can establish a foundation or authenticate them or

18  anything.

19          MR. CHAKRAVARTY:  Your Honor, we're going to

20  just read a couple of them that relate back to his

21  knowledge of Butare.

22          THE COURT:  Do you have an objection?

23          MR. HOWARD:  I do.

24          THE COURT:  Sustained.

25          MR. CHAKRAVARTY:  Your Honor --

1             THE COURT:  What is it?  What's the

2    authentication?  How do I know?  What's the

3    foundation?

4             MR. CHAKRAVARTY:  I thought we already did

5    that.

6             THE COURT:  No, we didn't already do that.

7    This is the trial.

8             MR. CHAKRAVARTY:  No, I understand.  I

9    thought we did that out of the presence of the jury.

10            THE COURT:  We had a motion in limine we

11   heard.

12            MR. CHAKRAVARTY:  No, I thought that on

13   Friday, but I would be happy to go through it.

14            THE COURT:  Well, you might be right, but I

15   don't have a memory of it.  He can't authenticate it,

16   can he?

17            MR. CHAKRAVARTY:  No, they're

18   self-authenticating.

19            THE COURT:  Well, so you say.  I haven't seen

20   it.  Come up to sidebar.

21            MR. CHAKRAVARTY:  Fair enough.

22            (SIDEBAR)

23            THE COURT:  Let me see them.

24            MR. CHAKRAVARTY:  These are transcripts of

25   the defendant's testimony before the ICTR, speaking of

1   authenticity, saying what they are.  The facesheet

2   says what they are as well.

3            THE COURT:  Have you seen these, Mr. Howard?

4            MR. HOWARD:  Yes, I have.

5            THE COURT:  I think I do recall, you had no

6   objection to the authenticity.

7            MR. HOWARD:  Right.  Given the certificate, I

8   couldn't question that they're authentic.

9            THE COURT:  Now, you've gone through all of

10  this?

11           MR. HOWARD:  Yes.

12           THE COURT:  Do you have any specific

13  objections to any of this?  It's all her testimony.

14           MR. HOWARD:  It is her testimony.  We did

15  levy the objection last week, and we filed a motion in

16  limine that all that they're really trying to do here

17  is attempt to establish that she lied at the ICTR, and

18  they're going to use this expert to say, this is what

19  she said, is that true based on your expert knowledge.

20           THE COURT:  Oh, that was your 404(b)

21  objection.

22           MR. HOWARD:  It is.

23           THE COURT:  All right.

24           MR. HOWARD:  I have an additional objection

25  that now they're just pitting one witness against my

1    client to try to prove that she lied.  They're going

2    to rely on his expert.  He can't opine on whether

3    she's being truthful or not, just like no other

4    witness can opine on the truthfulness of another.

5            THE COURT:  You're not going to do that.

6            MR. CHAKRAVARTY:  I'm not going to do that.

7            MR. HOWARD:  That's what they did in the last

8    trial, so I assumed that's what they're going to do

9    this time.

10            THE COURT:  You're offering these as

11    admissions by a party opponent, I assume.

12            MR. CHAKRAVARTY:  Yes.

13            THE COURT:  I understand Mr. Howard's

14    characterization, but now that I think about it I

15    don't recall you ever saying -- it's not your goal,

16    it's not your goal.

17            MR. CHAKRAVARTY:  It's not.  It's not.  It's

18    the persuasive argumentative goal, but not through

19    this witness, to say this statement is a lie.  If she

20    says something about how many -- the visibility of

21    killings in Butare, and the witness has just testified

22    that --

23            THE COURT:  I assume -- I thought -- I think

24    my memory is coming back now.  I thought the point was

25    she's told a consistent story that you say is

1   consistent with what she put on her forms that amounts

2   to a material misstatement.  That's what I thought you

3   said.

4           MR. CHAKRAVARTY:  On the forms, yes.  This

5   also is her testimony about what happened during the

6   genocide in Butare.  So it's a fact about an admission

7   by the defendant about the issue to be resolved.

8           THE COURT:  These are her prior statements

9   under oath in a prior proceeding at which she had

10  cross-examination.  There was a cross-examination

11  opportunity, and you're offering them as admissions by

12  a party opponent, the defendant.

13          MR. CHAKRAVARTY:  Right.

14          MR. HOWARD:  What does that have to do with

15  this witness, is my question.

16          THE COURT:  Probably nothing.

17          MR. CHAKRAVARTY:  I'm not going to have a leg

18  over this witness.

19          MR. HOWARD:  Maybe I could ask for an offer

20  of proof.

21          THE COURT:  That's why I started with the

22  problem, because what's it got to do with him.

23          MR. HOWARD:  Right.  And maybe I could ask

24  for an offer of proof as to what he's going to ask the

25  witness, because I just don't see what this witness

1  can offer that's either relevant or --

2          THE COURT:  You're surely not going to ask

3  this witness instances whether it's truthful or not.

4          MR. CHAKRAVARTY:  No.  He's going to publish

5  some of these exhibits.  I have the ability to

6  emphasize the probative value of what's in the

7  exhibit.

8          THE COURT:  Why with him?

9          MR. CHAKRAVARTY:  Because he just testified

10 to some of the underlying facts which we argue

11 demonstrate that --

12         MR. CAPIN:  I think the key point here, if I

13 may, is it's merely a matter of publishing this to the

14 jury without any argument and without asking --

15         THE COURT:  Yes.  Normally that's done by

16 handing the jury the transcript.  Sometimes it's done

17 by putting an associate on the stand and somebody

18 asking the questions and somebody else responding, but

19 I don't know what this expert has to do with it.

20 You're not going to have him pretend he's the

21 defendant and read her answers, I assume.

22         MR. CHAKRAVARTY:  He did last time, your

23 Honor.  Like three clips out of all of this.  It took

24 like five minutes, and it just allows us to highlight

25 further our theory of the case.

```
 1            THE COURT:  Yeah, but Mr. Howard is going to
 2   -- you're going to say, look, this transcript says she
 3   was asked the following question and gave the
 4   following answer.  What do you think about that, Dr.
 5   Longman?
 6            MR. CHAKRAVARTY:  No, I'm not even going to
 7   say that.
 8            THE COURT:  Okay.  So why do we need to do it
 9   at all?
10            MR. CHAKRAVARTY:  Because it's a reader.
11   Instead of you doing a reader all at once at the end
12   of the trial with an agent or something.  It's
13   particular probative things that are fresh in the
14   jurors' minds about things that the witness has just
15   testified to.
16            MR. HOWARD:  So they brought a Ph.D. from
17   Boston University to read --
18            MR. CHAKRAVARTY:  How else do I publish it?
19   If it's not this witness, then it could be another
20   witness.
21            THE COURT:  Somebody that I can control, like
22   Mr. Capin or somebody.  I don't want him up there.
23   It's the inflexion and drama and all of that we need
24   to control.
25            MR. CAPIN:  I think Mr. Chakravarty can read
```

1   the questions and say to the jury, did I read that

2   correctly.  It's merely a matter of publishing it.

3          THE COURT:  All right.  That's a more

4   efficient way of doing it, I suppose, but I don't want

5   him commenting on her testimony.

6          MR. CHAKRAVARTY:  I won't ask any questions

7   about her testimony.

8          THE COURT:  Okay.  The other way to do it is

9   to have somebody read the whole thing.  Unless you

10   want that.

11          MR. HOWARD:  No.

12          THE COURT:  Okay.

13          (CONCLUSION OF SIDEBAR)

14          THE COURT:  (A) through (D) 18?

15          MR. CHAKRAVARTY:  (A) through (C).

16          THE COURT:  Okay.  The ID may be stricken on

17   18(A), (B) and (C).

18          (Government's Exhibit 18(A), 18(B) and 18(C)

19   Admitted)

20          MR. CHAKRAVARTY:  Your Honor, Exhibit 19(A)

21   through (L) is the audio/video which overlaps with

22   18(A) through (C).  I would move to strike the ID on

23   that as well; as well as the certificates of

24   authenticity, 27(A) and 27(B).

25          MR. HOWARD:  Please note my objection, your

1  Honor.

2          THE COURT:  You don't have an authenticity

3  objection.

4          MR. HOWARD:  I do not.

5          THE COURT:  ID may be stricken on

6  Government's 19(A), (B) and (C).

7          MR. CHAKRAVARTY:  Your Honor, I think that's

8  18(A), (B) and (C).

9          THE COURT:  We did 18(A), (B) and (C).  You

10  just asked for 19.

11          MR. CHAKRAVARTY:  Yes.  19(A) through (L).

12          THE COURT:  ID may be stricken on

13  Government's Exhibits 19(A) through (L).  And what do

14  you want, 27(A) and (B)?

15          (Government's Exhibit 19(A), 19(B), 19(C),

16  19(D), 19(E), 19(F), 19(G), 19(H), 19(I), 19(J), 19(K)

17  and 19(L) Admitted)

18          MR. CHAKRAVARTY:  27(A) and (B).

19          THE COURT:  I assume there's no objection to

20  27(A) and (B).

21          MR. HOWARD:  No, your Honor.

22          THE COURT:  ID may be stricken on 27(A) and

23  (B) as well.

24          (Government's Exhibits 27(A) and 27(B)

25  Admitted)

1      Q.  Dr. Longman, I'm not going to ask you any

2   questions about these, but I'm going to read some

3   passages and ask you if I'm reading it correctly.

4          You did testify at one point in the

5   International Tribunal in Arusha, Tanzania?

6      A.  I did, yes.

7          THE COURT:  Does he have copies?

8          MR. CHAKRAVARTY:  No, he doesn't.

9          THE COURT:  Let's move this along.  You're

10  going to hand him a transcript.  He's going to read it

11  along with you and then say, yes, you read it

12  correctly.

13         MR. CHAKRAVARTY:  I'm going to put it up on

14  the screen, your Honor.

15         THE COURT:  Okay.

16     Q.  Is this the format of the transcripts that

17  are generated --

18         THE COURT:  I think you're being asked to

19  confirm that he's reading this correctly.

20         THE WITNESS:  All right.

21     A.  Yes.  In doing my research I have

22  consulted -- these are publicly available documents

23  for the most part, this type of thing that I've seen.

24     Q.  And it lists the case and the different

25  individuals who are accused in the case?

```
 1      A.  Correct.

 2      Q.  And the date of the testimony of the

 3 transcript?

 4      A.  Yes.

 5      Q.  And then it lists the person who is

 6 testifying, correct?

 7      A.  Yes.

 8      Q.  So in this case it's Beatrice Munyenyezi?

 9      A.  Yes.

10      Q.  Now, in your experience has testimony in the

11 ICTR been under oath?

12      A.  Yes, it is.

13      Q.  Is it similar to the oath -- the one you took

14 today?

15      A.  It is.

16      Q.  I'm just going to ask you -- read this and

17 ask you if I read it correctly.

18          "Madam, prior to the 6th of April 1994, had

19 you, with your own eyes, seen the people who were

20 called Interahamwe?"  And the answer is, "No, not to

21 my knowledge."  Is that correct?

22      A.  Correct.

23      Q.  Up here does it say -- is the question,

24 "Madam, can you tell us how things were at the time at

25 Hotel I'Huriro, how was life there?"  And the answer,
```

1    "Life was boring.  People couldn't get out.  And the

2    fact that there were so many people and without moving

3    around and nothing to entertain them it was a very --

4    we were also scared actually.  I think that is what I

5    can say."  Did I read that correctly?

6         A.  Yes.

7         Q.  And this appears to be testimony on February

8    27, 2005?

9         A.  Yes.

10        Q.  And right here the question, "And I would

11   like to suggest to you that the roadblock was much

12   closer to the I'Huriro Hotel.  Don't you seem to say

13   that the roadblock was located near the gutter just

14   below the M.S.N. garage?"  Answer, "That's not true,

15   ma'am, because I was there.  I passed through that

16   roadblock.  What you're saying is not true."  Did I

17   read that correctly?

18        A.  Yes.

19        Q.  Question, "So, Madam witness, the question

20   that followed that question was, the EER school or

21   compound is quite close to the I'Huriro, isn't it?"

22   And the answer, "I am not sure how close you referred

23   to it, but it was not close.  It was probably ten

24   minutes from hotel.  It depends how you could walk."

25   Did I read that correctly?

1      A.  Yes.

2      Q.  Question, "In your evidence you've also

3  testified that you attended rallies.  Do you remember

4  that?"  Answer, "Yes, ma'am."  Question, "Were these

5  MRND related rallies?"  Answer, "Yes, ma'am."

6  Question, "You also mentioned that you followed a

7  movement, didn't you?"  Answer, "I did not say that.

8  Question, "During these MRND rallies can you tell us

9  what was said?"  Answer, "I don't remember.  That was

10  probably between '91 or '92.  I don't remember."  Did

11  I read that correctly?

12      A.  Yes.

13      Q.  Question and answer.  Question, "So according

14  to your evidence there was no violence.  There was no

15  strife in Butare in May when you went out for a little

16  walk about?"  Answer, "I did not say that there

17  were -- there was no violence.  You asked me if there

18  was a lot of violence.  That's what you asked me.

19  There may have been a lot of violence, people probably

20  killing each other, people trying to take people's

21  belongings, so it is so and so, but I didn't see any

22  such violence of I reckon shooting each other with

23  guns or whatever, I did not see that."  Did I read

24  that correctly?

25      A.  Yes.

1      Q.  This is on February 28, 2006; is that

2  correct?

3      A.  Yes.

4      Q.  This is the question, "Shall I take it from

5  your answer that you have renounced Rwandan

6  citizenship?"  Answer, "That is your opinion, Madam."

7  And then the witness continues, "Your Honor, I am

8  right now a United States citizen, but if I ever

9  wanted to give it up and go back to my country I am

10  free to do so, although probably Rwanda may not

11  recognize me as Rwandese and so I don't know any other

12  answer that I can give."  Did I read that correctly?

13      A.  Yes.

14      Q.  Dr. Longman, in that testimony there was some

15  discussion of MRND rallies.  We talked about that

16  earlier.  Did you have an opportunity to review

17  Exhibit 25, some videos of MRND rallies?

18      A.  I did.

19      Q.  And are those fair and accurate depictions of

20  MRND rallies as you knew them?

21      A.  I believe they are.

22          MR. CHAKRAVARTY:  Your Honor, I would move to

23  strike ID on 25 and publish that, just a few minutes

24  of video.

25          MR. HOWARD:  Well, if we could just get some

1    further foundation if he's ever actually been to one

2    and seen one.

3             THE COURT:  Sustained.

4         Q.  You described earlier that you had seen

5    people going to rallies.  What is your basis of

6    knowledge with regard to MRND rallies?

7         A.  I talked to people about them.  I've never

8    attended one myself, but certainly --

9             THE COURT:  Have you ever seen one?

10            THE WITNESS:  I've never seen one other than

11   videos, photographs and that sort of thing.

12        Q.  Have you seen people marching in the streets

13   as part of the political process?

14        A.  I have.

15        Q.  And have you heard any recordings of rallies?

16        A.  I have.

17        Q.  You said earlier that you saw the clothing

18   and the indicia of the different political parties.

19        A.  I have.

20        Q.  Did you see press reporting about what

21   happened at rallies?

22        A.  I did.  And also it was on the radio when I

23   was staying in Rwanda.

24        Q.  Based on that, would playing these videos be

25   helpful to describe the atmosphere at a political

1  rally?

2       A.  They certainly seem to reflect everything

3  that I've heard about the MRND rallies, yes.

4            MR. CHAKRAVARTY:  Your Honor, this is the

5  foundation.  I move to strike.

6            MR. HOWARD:  Same objection.

7            THE COURT:  Same ruling.  Sustained.

8            Ladies and gentlemen, why don't we take our

9  lunch break now.  Again, we'll try for 45 minutes.

10           (IN COURT - NO JURY PRESENT)

11           THE COURT:  If I had ever seen what those

12  videos might look like, what I imagine it would be

13  like -- you've got to authenticate it I think a little

14  more strongly than that.

15           (RECESS)

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 10-1-13          _Susan M. Bateman_
                                **SUSAN M. BATEMAN, LCR, RPR, CRR**
11                              LICENSED COURT REPORTER, NO. 34
                                STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/15/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-cr-85-01-SM
            v.                  *  February 11, 2013
                                *  1:15 p.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 5 - AFTERNOON SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE
AND A JURY

Appearances:

For the Government:    Aloke S. Chakravarty, SAUSA
                       John A. Capin, SAUSA
                       U.S. Attorney's Office (NH)
                       53 Pleasant Street, 4th Floor
                       Concord, NH 03301

For the Defendant:     David W. Ruoff, Esq.
                       Mark E. Howard, Esq.
                       Howard & Ruoff, PLLC
                       831 Union Street
                       Manchester, NH  03104

Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

2

1                        I N D E X

2

3    Witness              Direct    Cross    Redirect    Recross

4
     TIMOTHY LONGMAN
5
     By Mr. Chakravarty     3                  63
6    By Mr. Howard                    9                      70

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                         BEFORE THE JURY

 2              THE COURT:  All right, Mr. Chakravarty,

 3    whenever you're ready.

 4                         TIMOTHY LONGMAN

 5       having previously been sworn, testified as follows:

 6                    DIRECT EXAMINATION cont'd

 7    BY MR. CHAKRAVARTY:

 8         Q.   Dr. Longman, just a few more questions and

 9    I'll turn you over to my colleagues.

10              Dr. Longman, you were here for the opening

11    statement in this case; is that right?

12         A.   I was.

13         Q.   Both of us identified you and now the jury is

14    seeing you.

15              Defense characterized Rwandan society as

16    making it difficult --

17              MR. HOWARD:  Objection, your Honor.

18              THE COURT:  Overruled.

19         Q.   To believe what -- what was your reaction to

20    defense counsel's characterization of Rwandan society?

21         A.   I thought it was a mischaracterization.  I

22    frankly found it a little offensive, that idea that

23    Rwandans are fundamentally different from us, which is

24    not something that I find to be true.  I've got a lot of

25    research in Rwanda.  I've had people tell me a lot of
```

4

1   things and I've been able to corroborate them fairly

2   substantially.  The idea that they're all somewhat liars

3   to me is an offensive comment.

4          MR. HOWARD:  Well, I'll object.  There was no

5   comments that the defense characterized Rwandans as all

6   liars.

7          THE COURT:  Ladies and gentlemen, you take

8   your own memory of opening statements.  But let me take

9   this opportunity again to remind you, that's one of the

10   reasons I stress opening statements are not evidence.

11   They're not evidence and they can't be considered by you

12   as evidence.

13      Q.   One of the images that was raised was machine

14   guns being on every corner.  Are you familiar with

15   machine guns or rifles being on every corner?

16      A.   Rwanda is not really a democracy.  It is an

17   authoritarian state.  But it's not one where you see a

18   huge police presence actually.  There are no roadblocks

19   now.  You're free to travel.  And it is a country that

20   you have to be somewhat careful because it is a

21   government that's authoritarian, but that's not

22   something that I have seen certainly.

23      Q.   Is genocide denial a crime in Rwanda?

24      A.   It is.

25      Q.   Are there other countries that have genocide

5

1    denial as a crime?

2         A.    There are.

3         Q.    Can you give an example of one?

4         A.    Germany, for example, and several countries in

5    Europe in which it is criminal to deny the holocaust.

6         Q.    There's a suggestion that the witnesses who

7    testify here have to go back to Rwanda.  Are you aware

8    of reprisals against witnesses who testified in

9    international proceedings when they return to Rwanda?

10        A.    There have been -- no, I'm not, actually, no.

11        Q.    A group called Ibuka was mentioned.  Are you

12   familiar with what Ibuka is?

13        A.    I am.

14        Q.    What is that?

15        A.    It's a national organization that coordinates

16   survivors groups in Rwanda.  There are hundreds of

17   groups that genocide survivors have set up since the

18   genocide, and Ibuka is a national organization that's an

19   umbrella group for them.  So it's a national

20   spokesperson as it were, a spokes group for genocide

21   survivor groups.

22        Q.    And is this a legitimate organization?

23        A.    It is.

24        Q.    What functions does it serve?

25        A.    It helps to in particular speak out on behalf

6

1    of genocide survivors.  It's the best known genocide

2    survivor group.  And it lobbies the government for more

3    benefits for genocide survivors and protection of their

4    interests.

5         Q.   Is this survivor group associated with the

6    government?

7         A.   Well, it has at times been very critical of

8    the government, and since this is an authoritarian state

9    at times the government has tried to rein it in.  In

10   1999 they actually drove out the leader of Ibuka and

11   brought in a more, pushed to adopt a more sympathetic

12   leader.  So the government has some influence over it.

13   But it is an independent organization and it does

14   periodically criticize the government for not providing

15   enough support for genocide survivors.

16        Q.   Now, you've been critical of the government?

17        A.   I have.

18        Q.   Is the present government the legacy of the

19   RPF?

20        A.   The government today is led by Paul Kagame who

21   was the military leader of the RPF.  He's a Tutsi who

22   grew up in Uganda who basically led the movement that

23   fought their way to control of Rwanda.  He didn't start

24   out as president.  He was vice president and secretary

25   of defense, minister of defense, but he became president

7

1    in 2000 and has been president since.

2         Q.    And are there genuine opposition in groups?

3         A.    Opposition is pretty limited.  There are some

4    political parties that are slightly independent of the

5    RPF, but Kagame and the Rwanda Patriotic Front dominate

6    the political scene.

7         Q.    Are you aware of reprisals against witnesses

8    who appear in international proceedings?

9         A.    In international proceedings, no.  But there

10   have been reprisals against in particular some Tutsi

11   genocide survivors who have appeared in court cases.

12   There's fear sometimes of people speaking out to accuse

13   people because of the reprisals against them.  There

14   have been a few human rights reports that have

15   documented even some killings of Tutsi genocide

16   survivors because of the testimony that they were

17   giving.  I don't believe that any of those were actually

18   international cases though.

19        Q.    Are you aware of coaching of witnesses for

20   international cases?

21        A.    I'm not.

22        Q.    Are you aware of any incentive that results in

23   false accusations related to the genocide in Rwanda?

24        A.    I'm not.

25        Q.    Is there any Rwandan cultural phenomenon that

1    expect people to testify falsely against others?

2        A.    No.

3        Q.    Are you aware of some kind of, quote, dominant

4    narrative that exists in Rwanda that puts pressure on

5    people to say a specific story as to what happened

6    during the genocide?

7        A.    One of the things I've been writing about is

8    the way in which the government has been trying to

9    interpret Rwanda's past, including the genocide in a

10   very specific way.  They do have a story that they tell

11   about what happened.  It's one that emphasizes the evils

12   of the genocide and completely ignores their own human

13   rights abuses.  It's one that paints them as heros and

14   as people who should be ruling the country.  And that's

15   a fairly common process in Rwanda right now, that people

16   know that story, they know what the government's line

17   is.

18       Q.    And that's the big picture as to legitimacy of

19   their power?

20       A.    It is, yes.

21       Q.    Are you aware of any kind of microscopic

22   suggestion of what a particular witness should say in an

23   international proceeding?

24       A.    I'm not.

25            MR. CHAKRAVARTY:  That's all I have, your

1    Honor.

2              THE COURT:  Thank you, Mr. Chakravarty.  Mr.

3    Ruoff?  Mr. Howard?

4              MR. HOWARD:  Yes.  Thank you, judge.

5                        CROSS-EXAMINATION

6    BY MR. HOWARD:

7         Q.   Good afternoon, Dr. Longman.

8         A.   Good afternoon.

9         Q.   We've met before; right?

10        A.   Yes.

11        Q.   You sat in that chair just about a year ago

12   and you and I talked for about an hour and a half;

13   right?

14        A.   We have.

15        Q.   On behalf of Mr. Ruoff let me first apologize

16   for offending your sensibilities for anything we may

17   have said in our opening statement.  But let's explore

18   just how offensive it really was; okay?

19        A.   Sure.

20        Q.   Just a second ago you said you're not aware of

21   anything in Rwanda that encourages somebody to accuse

22   another of genocide falsely; right?

23        A.   I don't believe that was exactly the question.

24        Q.   Mr. Chakravarty was very careful to phrase it

25   quite precisely, wasn't he?

```
 1        A.   I believe he was, yes.

 2        Q.   Because in fact there are incentives in Rwanda

 3   for people to testify or to falsely accuse others of

 4   genocide, aren't there?

 5        A.   I don't think there are incentives, but there

 6   have been false accusations in Rwanda.

 7        Q.   Well, let's start first with the court system

 8   has set up first money award processes for those who

 9   claim to have been victims of the genocide; right?

10        A.   No.  In general, there's a survivors fund

11   which puts scholarships for children to go to school.

12   I'm not aware of any payments to people.

13        Q.   Okay.  You're not aware of a situation that

14   came up in a prior proceeding in this case involving a

15   person in Rwanda named Joseph Mazimpaka?  Did the

16   government share that little story with you?

17        A.   Could you just tell me a little more about it.

18        Q.   Joseph Mazimpaka was a person in Rwanda who

19   was not involved in the genocide in any way.

20             MR. CHAKRAVARTY:  Objection, relevance, your

21   Honor.

22             THE COURT:  Sustained.  You're not testifying.

23             MR. HOWARD:  I was going to ask him the

24   hypothetical question.

25             THE COURT:  He didn't hear it.
```

1          MR. HOWARD:  All right.  Thank you.

2     Q.   We talked last time about prisoners in Rwanda;

3  right?

4     A.   Yes.

5     Q.   And prisoners who were scooped up by the

6  government right after the genocide, put in prison

7  without formal charges; right?

8     A.   In some cases, yes.

9     Q.   Okay.  Held for years without trial; right?

10     A.   In some cases.

11     Q.   And then they were offered an opportunity to,

12  if they confessed their involvement in the genocide,

13  they could get out; right?

14     A.   That's correct.

15     Q.   And then the Rwandan government led by Paul

16  Kagame said, well, wait a minute.  What we find here is

17  these prisoners are coming in and they're confessing to

18  their own involvement.  We are requiring them to name

19  others who are involved with them.  Right?

20     A.   It didn't happen quite that way but the law

21  that was written that set up the Gacaca process was one

22  that said if you confessed your crime and implicated

23  others, that you could have a reduced sentence.  I

24  should say that many of the people that you mentioned

25  initially who had no charges against them, people who

1    were falsely accused, there was an earlier process that

2    released most of those from prison.

3         Q.   People who were falsely accused?

4         A.   People who were falsely accused, that's

5    correct.

6         Q.   Then in this process for the prisoners, what

7    ended up happening was they would come into the courts,

8    they would confess their crime, they would identify or

9    implicate others, but it turned out they would be

10   implicating people either who were dead or who had

11   already confessed; right?

12        A.   In many cases, yes.

13        Q.   And that was very dissatisfying to the leading

14   regime, wasn't it?

15        A.   It was considered disingenuous on their part.

16        Q.   It was dissatisfying, wasn't it?

17        A.   Dissatisfying?  I'm not sure what you mean by

18   that.

19        Q.   Because they wanted new people named; right?

20        A.   They were running a judicial process and were

21   certainly trying to identify people who were involved in

22   the genocide.

23        Q.   Right.  So, what we found, then, were people

24   coming in saying, okay, you need a new name, I'll give

25   you a new name.  And in many instances those were false

1   accusations, weren't they?

2       A.    In some instances, you know, I haven't looked

3   at that many of those cases specifically.  My

4   understanding is the fact it implicated many people who

5   were also guilty.  There may have been some false names.

6   I'm not actually aware, you know, I haven't done

7   research specifically on the naming and whether they're

8   accurate or not.

9       Q.    Well, you gave a speech at Tulane University

10  just a few years ago; right?

11      A.    Ah-hum.

12      Q.    And that was one of the very points you were

13  making about how the current regime forces this official

14  or dominant narrative that you just told Mr. Chakravarty

15  only sort of exists?

16      A.    No, there is a dominant narrative.  I

17  certainly didn't deny that.

18      Q.    It's very real, isn't it?

19      A.    There is an effort by the government to talk

20  about the outlines of the genocide and to tell a

21  particular story, yeah.

22      Q.    And it's a very important tool that the

23  government uses to maintain its power; right?

24      A.    I would agree, yes.

25      Q.    It is a very important tool that it uses

1   almost as a cultural matter, this politics of genocide.

2   You either agree with what we say about it or we arrest

3   you; correct?

4        A.   I can't respond to a partial question, sir,

5   so.

6        Q.   Okay.

7        A.   So, if you'd put it fully, I would be happy to

8   respond.

9        Q.   So at Tulane University when you were talking

10  about how the government forces the narrative on its

11  people, one of the things you said was, you talked about

12  this situation with the prisoners; right?

13       A.   I've given many, many, many speeches, sir,

14  so --

15       Q.   And you were presumably talking with academic

16  integrity; right?

17       A.   Absolutely.  I try to speak the truth and

18  based on what I know, so.

19       Q.   And what you said was, that system set up by

20  the government incentivized prisoners to falsely accuse

21  others because they had to come up with a new name?

22       A.   Yes, I believe that is true.

23       Q.   And that's how they got out of prison; right?

24       A.   They don't get out of prison necessarily but

25  they get a reduced sentence, yes, in that sense when you

1   put it that way, yes, there actually is an incentive to

2   accuse people.  It's not an incentive necessarily to

3   accuse people falsely, but certainly in that context

4   because they're naming other people, they might accuse

5   some falsely.  Just to clarify, the incentive is to

6   accuse other people, and particularly to accuse other

7   people who can be arrested, and so definitely there is

8   that kind of incentive.  To say that that's an incentive

9   to accuse falsely, to me that's not necessarily the

10  case.

11       Q.   Well, when you said at Tulane that that

12  provides an incentive to accuse falsely, you meant it,

13  with a professor of academic integrity; right?

14       A.   Sure.  Again, I've given many speeches.  I

15  don't remember the exact wording that I used in that

16  speech, but yes, there is clearly an incentive to make

17  accusations, and within that process it does open a door

18  to false accusations.

19       Q.   Okay.  All right, let's just back up a moment

20  here.  We're going to come back to this concept of

21  official narrative in a moment.

22            Your opinions that you've expressed here today

23  about the goings on in Butare are not based on your

24  personal observations; right?

25       A.   Some of them are based on my personal

16

1    observations.

2         Q.   Well, the goings -- when I asked about the

3    goings on in Butare, I meant, and I apologize for not

4    being more clear, the activities of the genocide between

5    April 7th, starting with the shooting down of the

6    president's plane on April 6th through early July, you

7    were not there.

8         A.   I was not in Rwanda at the time.

9         Q.   All of the stuff that you told us, for

10   example, about roadblocks, you never actually saw them

11   in Butare during the genocide?

12        A.   I did not see roadblocks in Butare during the

13   genocide.

14        Q.   Everything that you've told us is based on

15   interviews that either you've done or people in your

16   investigative team for the Human Rights Watch, the

17   interviews they do; correct?

18        A.   Also there are some other secondary sources

19   like Andre Guichauoua.  There are other people who've

20   written on the area as well.  So, some of it is

21   secondary sources, some of it is interviews I've done,

22   some of it is also the documentary evidence.

23        Q.   So, the things you testified to here, for

24   example, about the location or the structure of

25   roadblocks is not from your personal knowledge but from

1   what others have told you or you've read it?

2        A.   That's correct.

3        Q.   Okay.  So they're not fact.  They're your

4   opinions; right?

5        A.   I wouldn't characterize them as my opinions.

6   I would say that I'm an expert.  I've studied Rwanda a

7   lot.  I've lived in this area.  And in many cases some

8   of the things I've heard are not even in formal

9   interview, but are just from talking with friends, you

10  know, I've lived in Butare extensively and had many

11  conversations about what happened in 1994.

12       Q.   Right.  So, you talked about Pauline

13  Nyiramasuhuko?

14       A.   Correct.

15       Q.   And Shalom Ntahobali?

16       A.   Correct.

17       Q.   And you have talked about Maurice Ntahobali,

18  Shalom's farther, Pauline's husband?

19       A.   Correct.

20       Q.   This is a very prominent family in Butare?

21       A.   It is.

22       Q.   Very well-known?

23       A.   Very well-known.

24       Q.   Did you know of them when you were in Butare?

25       A.   I knew, at that time I knew of Maurice.  I

18

1    didn't know of the others.

2         Q.    And the story of Shalom and Pauline and

3    Maurice has been told and retold countless times in the

4    last 18 years, hasn't it?

5         A.    I don't know.

6         Q.    Well --

7         A.    I've seen it written in several sources and

8    certainly people that I knew well have told me about

9    them.

10        Q.    Exactly.  When you talked to people in the

11   early 2000s when you went back to Butare, it was still a

12   topic of discussion what happened there and Pauline's

13   role and Shalom's role; correct?

14        A.    It was a more pointed discussion in '95 and

15   '96 when I was there, but yes, people certainly still

16   talk about it in 2000.

17        Q.    And it wouldn't surprise you at all being a

18   professor of political science that the people in the

19   community over the last 18 years have told and retold

20   that story to themselves hundreds of times; correct?

21        A.    I would totally agree with that, yes.

22        Q.    And one of the concepts that you know of in

23   Rwanda is that as a cultural matter, how they tend to

24   view these stories, and the cultural matter, the

25   cultural issue, is sometimes they take these stories and

19

1    assume, once they hear it, that they were the witness to

2    what happened; right?

3        A.   I would not agree with that, no.

4        Q.   You've heard of the -- well, strike that.   You

5    do not agree, I just want to make sure I understand, you

6    do not agree that Rwandans often will retell stories

7    that they've heard, not that they've personally

8    witnessed, but they will retell stories that they've

9    heard as if they were in the first person, that they saw

10   it themselves?

11       A.   No.

12       Q.   Not familiar with that concept?

13       A.   No.

14       Q.   Okay.   So going back to Pauline and Shalom,

15   they were a very prominent family.   You agree with that?

16       A.   Very much so.

17       Q.   In fact, I think you had some pretty

18   remarkable terms for Shalom that he was among the most

19   heinous or horrific offenders?

20       A.   Certainly notorious.

21       Q.   Notorious was your word I believe.

22       A.   Yeah.

23       Q.   And many people who you talked to knew of his

24   activities or spoke of his activities; correct?

25       A.   Yes.

1       Q.    I think, if I remember your testimony from a

2  year ago, you said that you yourself in that 1995 to '96

3  period conducted about 25 interviews of people in

4  Butare?

5       A.    Formal interviews, yes.

6       Q.    Is that 25 different people or does that

7  include the multiple times that you might talk to one

8  person?

9       A.    Twenty-five different people I believe.

10      Q.    And you had other investigators who were

11 working with you who were talking to other people;

12 correct?

13      A.    There were.

14      Q.    And all told, there were a couple of hundred

15 at least interviews that were done just about the

16 activities in Butare town?

17      A.    I think there were probably about a hundred in

18 Butare town.

19      Q.    And it was based on those interviews that you

20 drew your conclusions about Shalom; right?

21      A.    Not exclusively, no.

22      Q.    But other sources?

23      A.    So, just to clarify, the only interviews for

24 Butare town that I saw were the interviews that I

25 conducted.  So there were other researchers on Butare.

1    I did not write the chapters in the book on Butare.

2    Alison Des Forges wrote them.  So Alison was the person

3    who saw all of the research that was there.  I did not

4    see most of the documents for Butare either.  Alison was

5    the person who looked through them.  A lot of people

6    that I know just from casual conversation would talk

7    about Shalom.  When I say he's notorious, what I mean is

8    it's not just something that was mentioned in

9    interviews, but people would talk about Shalom.  As you

10   walked down the street with someone they would say, oh,

11   and this is where the Hotel Ihuriro was.  This was

12   terrible during the genocide.  I had to pass through

13   here and it was very dangerous, that sort of thing.

14        Q.   And you relied on that kind of casual

15   interview to draw your conclusions in the book?

16        A.   No.  I didn't write that book.  I wrote a

17   couple chapters that are separate.  So for me that was

18   one of the things that corroborated for me the

19   interviews that I was doing that were more formal.  The

20   fact that people I knew well and trusted would tell me

21   things that were similar to what I was hearing in formal

22   interviews that I was conducting were something that

23   made me feel more comfortable that certainly what I was

24   getting was accurate.

25             But again, I didn't write the section of Leave

22

1    None to Tell the Story on Butare.

2         Q.    Let me ask you this.  From your speaking with

3    the other investigators from your own interviews and

4    from all of the casual conversations you've had, both in

5    1995 and '96 and in your return trip in 2001 or so, did

6    the name Beatrice Munyenyezi ever get mentioned?

7         A.    Not that I recall.

8         Q.    Did you even know that Shalom was married?

9         A.    I believe I had heard that he was married.  I

10   didn't know the details, but it was not something people

11   told me about, no.

12        Q.    Earlier in your testimony here you were

13   talking about how you understood that Shalom and his

14   family lived in the hotel; right?

15        A.    That's correct.

16        Q.    When you testified about that very point a

17   year ago, you said Shalom and his wife lived in that

18   hotel.  Do you recall that?

19        A.    Not exactly, but that seems similar, yes.

20        Q.    And you recall me getting up, don't you, and

21   saying how did you know he was even married?

22        A.    I don't recall that, but I'll take your word.

23        Q.    And you didn't even know he was married, did

24   you?

25        A.    I don't have an exact memory of all the

1    details of Shalom.  My general impression is there were

2    people talked about their family, my recollection is

3    that people talked about his wife, but I don't remember

4    much detail, I've never heard her name.

5         Q.   Well, can I assume, then, that for all these

6    conversations and interviews that you had where maybe,

7    maybe somebody mentioned that Shalom had a wife, no one

8    ever said to you that she worked at a roadblock?

9         A.   No.

10        Q.   No one ever said to you that she in any way

11   participated in the genocide at all; correct?

12        A.   No.

13        Q.   And that includes being in Butare from 1995 to

14   '96.  It wasn't mentioned to you even once?

15        A.   No, not once.

16        Q.   When were you hired as an expert to work with

17   the government in this case?

18        A.   I don't remember exactly.  Maybe a year and a

19   half ago, two years ago perhaps.

20        Q.   Okay.  And from the time that you were hired,

21   were you provided with any list of names of people who

22   were going to potentially be witnesses in this case from

23   Rwanda?

24        A.   I don't believe I was, no.

25        Q.   Have you ever been given any of those names?

24

1      A.    No.

2      Q.    So is it fair to say that you've never vetted

3   any of those names against any of the people that were

4   interviewed for the Human Rights Watch?

5      A.    Not in this context, no.  There was a

6   proceeding in Finland in which I was shown a list of

7   people that they were interviewing, and at that time I

8   was asked to see if any of those people had been also

9   witnesses for Human Rights Watch, and I think there was

10   maybe one, maybe two that had been.  That was in a trial

11   dealing with another area in Butare.  A place called

12   Nyakizu.

13      Q.    That's a little bit further south?

14      A.    It's a little bit further south, but it's

15   still in the same prefecture.

16      Q.    It's in the same Butare prefecture, but Butare

17   town is kind of up here and Nyakizu is down here?

18      A.    That's correct.

19      Q.    So the people who have been identified as

20   witnesses here you did not vet against any of your Human

21   Rights Watch that you worked with?

22      A.    I did not, no.

23      Q.    Have you ever been shown the names of any of

24   the people who were identified as witnesses or even

25   interviewed?

    1        A.    I have not.  And I have not sat in on any of
    2    their testimonies either.
    3        Q.    Now, and just so we can be clear, I think this
    4    was brought up by the government.   In the book Leave
    5    None to Tell the Story, although you talked, although
    6    the books describes in Butare town in some detail
    7    Pauline and Shalom, not only is Beatrice Munyenyezi not
    8    mentioned, the fact that Shalom is married wasn't even
    9    mentioned?
   10        A.    That's correct, it's not.
   11        Q.    I want to talk to you for a little bit about
   12    the MRND and the party structure in Butare leading up to
   13    the genocide.
   14        A.    Sure.
   15        Q.    We know that there's a long history and you
   16    spent a long time this morning bringing us over
   17    centuries of Rwanda history.   In 1990 President
   18    Habyarimana instituted what was known as multi-parties?
   19        A.    1991.
   20        Q.    1991.  He allowed -- the MRND no longer had
   21    exclusive presence in Rwanda.  He allowed other parties
   22    to be formed?
   23        A.    That's correct.
   24        Q.    Some of those parties, most of them became
   25    opposition parties; right?

1     A.    Correct.

2     Q.    And one of the things that we know is that

3     Rwanda perhaps from prior to colonialism or perhaps

4     because of colonialism was a very well organized

5     society; right?

6     A.    Yes.

7     Q.    It was, I guess I'll put it this way,

8     bureaucratically or administratively inclined; was it?

9     A.    It was a severe bureaucratic society and

10    hierarchical society.

11    Q.    And one of the things that they do there, much

12    like we do here in the United States, is they keep very

13    good records of stuff, right?  Their government records

14    are very good?

15    A.    Generally they've had fairly good records.

16    Q.    And you even talked about one of the things

17    that you wanted to do in researching in Butare in 1995

18    and '96 was go into the local government offices and

19    look for documentation of the activities of the

20    government during the genocide period; right?

21    A.    There were people in our team who did go into

22    the government offices for the prefecture, for the

23    province, and found documents.  They weren't actually in

24    the offices.  They were piled up in a storage room and

25    they dug through the pile of papers to try to find what

27

1    they could.

2        Q.    And the same is true for the party structures

3    in Rwanda, too, wasn't it?  The parties kept very good

4    records of what they did?

5        A.    I've never actually assessed the party

6    records.  I'm certain that they did keep some lists of

7    members.  Generally people paid membership and they

8    would have kept a record of membership dues.

9        Q.    Isn't it true that for the MRND, after multi-

10   parties started in 1991, the only way you could be a

11   member was actually to sign up and to pay dues?

12       A.    To be considered a full and active member you

13   would generally have to pay dues and be a formal member,

14   yeah.

15       Q.    If one were to assert membership in the MRND,

16   they have to have signed up and they have to have paid

17   dues; right?

18       A.    To a certain membership?  No.  I don't mean to

19   parse words but for the MRND to continue -- consider you

20   a full member you would have to have paid the dues.  For

21   an individual to claim membership, that's, you know, I

22   don't -- they can do that without having paid dues.  But

23   for the party itself to have considered you a member,

24   you would have needed to pay dues.

25       Q.    Yeah.  You did not, did you, review any --

1   well, strike that.  In your research in Butare did you

2   come across any document that Beatrice Munyenyezi was in

3   fact a member of a political party?

4        A.   I didn't see any lists of party membership.

5        Q.   And would you assume from your knowledge of

6   the MRND that they at least had member rolls at the

7   communal level?

8        A.   Just to be clear, it's a political party, and

9   even though it was the dominant political party, by that

10  time it was a private organization.  So those rolls

11  would never have been in government offices.  I would

12  guess that at the local level officials would have kept

13  lists of who their paid members were.  But those would

14  not never have been deposited in a government archive.

15  So where I look in -- well, I didn't look in Butare but

16  in some of the other communities where I looked I never

17  saw party member rolls of any kind for any of the

18  parties.

19       Q.   You talked some about these what you

20  understood to be MRND rallies.  You've never been to

21  one?

22       A.   I have never been to one.  I've been in Kigali

23  when one was going on and could hear it and stayed in my

24  residence with the door tightly closed.

25       Q.   What year was that?

29

1          A.   That would have been 1993.

2          Q.   You were in Kigali in 1993?

3          A.   I was based in Butare.  I was staying at the

4    Baptist guesthouse in Kigali.

5          Q.   Just out of curiosity, when did you leave

6    Butare in 1993?

7          A.   I believe I left in June of '93.

8          Q.   And you went back in November of 1995?

9          A.   That's correct.

10         Q.   And just to get to a point of something that

11   is your personal knowledge, isn't it true that by the

12   time you left Butare in June of 1993, this building

13   known as the Ihuriro Hotel did not exist?

14         A.   It had not been built, yes, that's correct.

15         Q.   So that there was no structure there when you

16   left in June of '93?

17         A.   That's correct.  And by the time I got back it

18   had been destroyed.

19         Q.   Since you started your work in this case,

20   you've talked about a group of intellectuals who studied

21   this stuff, I think you said maybe a dozen or so.  Have

22   you discussed Beatrice Munyenyezi with those folks?

23         A.   I think over dinner one time with a couple of

24   people, some of whom were consulting with you actually,

25   there was discussion of the case and the relative --

1        Q.   Susan Thompson?

2        A.   That would be correct.

3        Q.   All right.  Okay.  And is it fair to say that

4   those people you had the discussion with, none of them

5   said, oh yes, we know that Beatrice was there working

6   with Shalom?

7        A.   None of them said yes, we know that she was

8   there working with Shalom.

9        Q.   None of them said that; right?  In fact, they

10  expressed the same thing that you did, which was I never

11  even heard this name before?

12            MR. CHAKRAVARTY:  Objection, your Honor.

13  They're free to call a witness and testify to this

14  instead of trying to get it in through this witness.

15            THE COURT:  Overruled.  It's not being offered

16  for the truth of the matter.  Well, there are two

17  complications.  One, there's an old saying about absence

18  of evidence is not evidence of absence which means that

19  someone doesn't know about something doesn't mean it's

20  evidence that didn't happen.  The other problem is, this

21  isn't being offered so that Susan Thompson, whatever she

22  might have said or not said, is somehow evidence to

23  support some fact, it's not.  This is being offered I

24  assume just for the absence of any mention.

25            MR. HOWARD:  That's correct.

```
 1              THE COURT:  So, that someone else said

 2   something is not before you to prove the truth of what

 3   they said.

 4              MR. HOWARD:  Thank you, judge.

 5        Q.   BY MR. HOWARD:  Nobody said they never heard

 6   --

 7              THE COURT:  That he's an expert and never ran

 8   across, I'm sure they will argue at some point, it's up

 9   to you.

10        A.   I've never had a conversation about whether

11   people had heard of the charges against her or not.  Our

12   conversation was rather about the trial moving forward.

13        Q.   And while we're on the subject of academics

14   and folks that you have talked to and met, the

15   prosecutor brought up the name Brian Endless.

16        A.   Yes.

17        Q.   You understand that Professor Endless is

18   somebody we potentially listed as an expert in the case?

19        A.   I believe that's why he brought it up, yes.

20        Q.   And you mentioned that you knew him as a

21   member of the Paul Rusesabagina Foundation?

22        A.   That's my impression.  I could be wrong on

23   that.  I don't actually known him.  But I don't believe

24   I've ever met him.

25        Q.   In fact, the two of you have been identified
```

32

1   as experts in common cases before; right?

2        A.   I do not know that.

3        Q.   There's this one; right?

4        A.   Oh, there is one other case, in the Canadian

5   case, I believe, yes.

6        Q.   Just last year; right?

7        A.   Yes.  Generally as an expert witness you're

8   involved with your part of the trial and you don't

9   follow the rest of the trial, but I was told that

10  Endless had testified in the case in Canada, yes.

11       Q.   And there was a case in Kansas in which he

12  testified.  You were also an expert in that case, but

13  you didn't testify; correct?

14       A.   I'm not aware that he testified, but yes.

15       Q.   Speaking of the case in Kansas just for a

16  moment, you wrote an expert report in that case; right?

17       A.   I did.

18       Q.   And you did not write a report in this case?

19       A.   I did not.

20       Q.   So everything that you told the jury this

21  morning and this afternoon was not something that you

22  had provided in a report, you just testified to it?

23       A.   That's correct.

24       Q.   What you gave us in this case was the report

25  that you wrote in Kansas, and it was about an entirely

1    different area; right?

2          A.   The report I give in this case was based on my

3    report in Kansas?

4          Q.   Yes.

5          A.   No, that's inaccurate.

6          Q.   Oh.  Okay.  Are you aware of what the

7    government gave us for your expert disclosure?

8          A.   I'm not.

9          Q.   It was your Nyakizu report?

10         A.   Nyakizu.

11         Q.   Doesn't have anything to do with Butare, does

12   it?

13         A.   It does have something to do with Butare.

14   It's related --

15              MR. CHAKRAVARTY:  Objection to this line.

16              THE COURT:  What's the relevance?

17              MR. HOWARD:  That the opinions that he's

18   espoused this morning were not previously provided to

19   us.

20              MR. CHAKRAVARTY:  This witness is not capable

21   of, first of all, and second --

22              THE COURT:  There's no motion regarding that

23   and he was disclosed as an expert.  His expertise isn't

24   that particular case or this particular case, it's

25   Rwanda and the history, cultural makeup, political

1    nature.

2            MR. HOWARD:  Thank you.  I'll move on, judge.

3        Q.   All right, Dr. Longman, let's return now to

4    the idea of the official narrative; okay?

5        A.   Sure.

6        Q.   First of all, I want to establish a couple of

7    points.  You very much ascribe to the idea that there is

8    an official narrative about the genocide imposed by the

9    Kagame regime in Rwanda; correct?

10       A.   If I can just parse that a little bit.  The

11   Kagame regime has attempted to impose a particular

12   interpretation of events.  They have a way that they

13   talk about things and they want people to embrace that.

14   My research has found that in fact many people go

15   against that and find their own ways to, have their own

16   narratives, but certainly the government has a project

17   to try to convince people to talk in a particular way

18   and think in a particular way.

19       Q.   And by the word convince, sometimes that's

20   through education; right?

21       A.   Yes.

22       Q.   Sometimes it's through forcing them; right?

23       A.   Yes.

24       Q.   So let's talk first about the official

25   narrative.  What is it exactly?

1          A.     The government has a few things that it

2     argues.  One is to argue that ethnicity was invented by

3     Europeans, that it was completely invented by the

4     colonialists, it had no meaning before which, as I had

5     described it this morning, I don't think is fully

6     accurate.  Tutsi and Hutu did exist before.  Weren't

7     completely invented.  The government also tries to

8     emphasize its heroic role in stopping the genocide.

9     They don't want people to talk about their own war

10    crimes or human rights abuses.  And they try to

11    emphasize in the narrative the idea that the genocide

12    was very popular, a variety of things that they put out

13    in terms of how the genocide happened.  They argue that

14    it was driven by an idealogy of hatred of the Tutsi and

15    a variety of things of that sort.  But the main things

16    that I find problematic in particular is the idea that

17    the RPF itself did no wrong and that they were the heros

18    who stopped the genocide.

19         Q.     All right, we'll talk about that problematic

20    aspect in just a moment.

21              Isn't there another aspect to it, and that is

22    maybe it's a subset of what you just said, that with the

23    idea that the Tutsis were targeted, what the corollary

24    to that is, that the Hutus are the ones who did it;

25    right?

36

1          A.    Yes.

2          Q.    And it's imposing this notion that Hutus,

3     which are 85 percent of the population, are the guilty

4     ones; right?

5          A.    They are suggesting that the genocide was

6     carried out by Hutu against Tutsi which seems

7     self-evident to me, but yes, that's part of the way they

8     talk of the genocide.

9          Q.    Well, yes, it's self-evident to you.  But when

10    you're trying to run a country and keep power in that

11    country, one very effective way to do it is, and you're

12    the minority in that country, 85 percent of you are

13    guilty of trying to kill and exterminate us, the

14    15 percent, who are in power; right?

15         A.    What's the question?

16         Q.    Well, that's one way that you maintain

17    control, is this politics of guilt over 85 percent of

18    your population.  They're not allowed to do anything.

19    They have to think about the genocide in a certain way

20    because they're the ones who did it 18 years ago?

21         A.    I think clearly the government is saying that

22    the genocide was carried out by Hutu, yes.

23         Q.    But you say that like it's such a simple

24    proposition.  They're using it as a tool to force

25    compliance with what they view is what happened and to

1   keep themselves in power; right?

2        A.   They're using the narrative or they are using

3   this claim of Hutu -- because there are Hutu in the

4   government.  There are Hutu in some positions of

5   authority.  It's a regime that's dominated by Tutsis

6   certainly, and the regime does emphasize that it was a

7   genocide carried out by Hutu.  If you're trying to get

8   at the idea that they are tainting Hutu by association

9   with the genocide, that's probably accurate, yes, that's

10  one of the ways to say that Hutu, you know, are

11  involved.  However, they do also emphasize some heros

12  who protect the Tutsi, and there's not a suggestion that

13  all Hutu necessarily are genocidaire, but there is an

14  emphasis at some level on, you know, the Hutu was the

15  group that carried out this genocide and, so.

16       Q.   Right.  Okay.  And one of the tools that I

17  mentioned a moment ago was the tool of education; right?

18       A.   Correct.

19       Q.   And one of the things we know about this

20  process of educating the populace on the genocide is,

21  first of all, history is not taught in the schools in

22  Rwanda, is it?

23       A.   I believe it's recently restarted, but for

24  over a decade there was not formal history teaching,

25  yes.

1       Q.    Correct.  So that was one of the things they

2   did, was you couldn't teach it in the schools to the

3   general populace through school teachers; correct?

4       A.    Not in a formal history curriculum.  They did

5   teach history in a course called political education,

6   civics class, but the formal instruction of history with

7   history textbooks was removed because the history

8   textbooks included the attacks on Tutsi, and they

9   thought until we get new textbooks, we can't teach the

10  history.

11      Q.    Okay.  Where it was taught, however, the

12  history of the genocide, was in the re-education camps;

13  right?

14      A.    It was taught in re-education camps and

15  basically the same curriculum was taught in schools in

16  political education.

17      Q.    So, a re-education camp.  That is something

18  that the government set up for people who, if they fled

19  Rwanda and they're coming back into the country, they

20  had to go through these camps to be indoctrinated in,

21  among other things, Rwandan history including the

22  government's view of the genocide; right?

23      A.    They set up a re-education program, camps

24  called ingando that were for all entering university

25  students.  So anyone who was going to the university was

1   expected to go through a class on civil self-defense but

2   also on Rwandan history.  It included people who were

3   elected to government office, were to participate in

4   these, as well as -- not all returning refugees, but

5   specifically former combatants, particularly former

6   members of the militia and former members of the armed

7   forces, and also prisoners who were released from prison

8   went through the re-education camps.

9        Q.   Maybe a soldier who used to be FAR now known

10   as an ex-FAR soldier would have to go through one of

11   these re-education camps?

12        A.   Most of them probably would, yes.

13        Q.   And yesterday you talked about the university

14   prisoners who were being released.  One of the things

15   they had to do was go through the re-education camp;

16   right?

17        A.   Correct.

18        Q.   And it was the process of this re-education

19   camp concept --

20        A.   Ingando.

21        Q.   -- where the official narrative is imposed by

22   the government; right?

23        A.   It's one of the ways where they -- the method

24   that they teach they say is a Socratic method where they

25   have discussions and debate, but honestly, they are

1    leading the debate in a particular direction to suggest

2    that the genocide was a bad thing, that the RPF stopped

3    the genocide, we should be critical of the Europeans for

4    causing these problems.  There's certainly ideas that

5    they are trying to get everyone to agree with.

6         Q.   Another very important tool, you would agree

7    with me, wouldn't you, that the government used was this

8    very process of the Gacaca courts?

9         A.   Absolutely.

10        Q.   This goes back to the speech you gave at

11   Tulane University just a few years ago; right?

12        A.   I gave a lecture on Gacaca courts.  I've given

13   a lot of lectures on Gacaca courts.

14        Q.   Sure.  But you and I had a discussion as you

15   were sitting in that chair just a year ago about this

16   Tulane speech; right?

17        A.   Yes.

18        Q.   Don't remember it?

19        A.   No, I remember that we had a conversation --

20        Q.   It was one of the most remarkable moments in

21   my life --

22        A.   Well, sorry, sorry.  To be honest, I publish

23   quite a bit, as I'm afraid you're aware, because it's a

24   lot.  And the things that I publish are the things I

25   spend a lot of time working on.  I give a lot of

1    lectures.  And remembering exactly what I said in one

2    lecture or another, it's sometimes a little difficult.

3    But yes, I certainly gave a lecture at Tulane on Gacaca.

4         Q.   The thrust of the lecture at Tulane with

5    respect to Gacaca was teaching your audience at Tulane

6    how Gacaca has been used as a tool of the current regime

7    to force the official narrative; right?

8         A.   I published that in a couple places as well,

9    yes.

10         Q.   And one of the things you pointed out in that

11    speech was the atrocities committed by the RPF cannot be

12    brought up in Gacaca; right?

13         A.   That's right.

14         Q.   And it's not just because Gacaca was designed

15    for the genocide, it's because the government expressly

16    forbids those courts to deal with RPF atrocities; right?

17         A.   That's correct.  The government has said the

18    Gacaca is for the genocide.  If you have complaints

19    against the RPF, bring them up in regular courts.

20         Q.   And that just doesn't happen very often, does

21    it?

22         A.   Does not happen very often, no.

23         Q.   Despite the hundreds of thousands of Hutus who

24    were killed by the RPF, it's just not talked about, is

25    it?

42

```
 1        A.    It is talked about but --

 2        Q.    Not by them.

 3        A.    Not very much publicly.

 4        Q.    Right.  The other thing you did in the Tulane

 5   speech was walk your audience through statistically what

 6   the Gacaca courts were designed to do, right?  And what

 7   you pointed out then was just how oppressive this court

 8   system was going to be against the Hutu population;

 9   right?

10        A.    Ah-hum.

11        Q.    Let's walk through the statistics just a

12   little bit.

13        A.    Sure.

14        Q.    You've said here this morning that there was

15   roughly eight million people in Rwanda at the time;

16   right?

17        A.    Seven-point-seven million, so, yup.

18        Q.    Seven-point-seven.  And actually these are the

19   stats from Tulane, 7.7?

20        A.    Yeah.

21        Q.    And you were thinking about 700,000 people

22   were killed during the genocide; right?

23        A.    Correct.

24        Q.    Most of them Tutsi?

25        A.    Overwhelmingly, yes.
```

1      Q.   Overwhelmingly Tutsi, some Hutu.  If the

2  courts are set up to prosecute the people who

3  perpetrated that, one of the first things you -- and

4  another thing you told us today was there's about a

5  hundred thousand people involved in the killing, about a

6  total of 200,000 who actually supported the killings;

7  correct?

8      A.   Ah-hum.

9      Q.   So we're looking at prosecuting about a couple

10  hundred thousand people; correct?

11      A.   Yes.

12      Q.   So if we start with the population of

13  7.7 million, the first thing we get to do is cut that

14  population in half, right, because they were under age

15  15 at the time of the genocide and therefore they

16  weren't going to be prosecuted?

17      A.   Correct.

18      Q.   So I think we're down to 3.75 million?

19      A.   Three-point-five, because you've already taken

20  700,000 out.

21      Q.   Good point.  So of the 3.5, we're going to cut

22  that number in half because half of that population is

23  women; right?

24      A.   Correct.

25      Q.   And what you said to your audience at Tulane

1  was women weren't involved in the genocide?

2      A.   Maybe 2 to 3 percent of cases have been

3  against women, but the overwhelming majority of women

4  were not implicated in Gacaca cases.

5      Q.   The involvement of women is so insignificant,

6  you went and said at Tulane they just weren't even

7  involved?

8      A.   Yeah.   In general it was very low levels of

9  involvement.

10     Q.   So, just take a quick diversion from the

11 statistics for a moment.   The involvement of a woman,

12 first of all, would get somebody's attention because it

13 was so rare; right?

14     A.   Depends on the nature of involvement.   As I

15 said, pillaging by women was actually pretty common, and

16 if you take that it may be a much larger number, but.

17     Q.   So significant involvement by a woman such as

18 ordering Interahamwe soldiers what to do with Tutsis

19 they had captured; right?

20     A.   What's the question?

21     Q.   That would be noted, wouldn't it, that's

22 exceptional?

23     A.   It was not terribly common but there certainly

24 were a number of cases.

25     Q.   A woman who ran a roadblock was exceptional;

1   right?

2        A.    A woman who ran a roadblock, who is in charge

3   of a roadblock?

4        Q.    Who's in charge of the roadblock.

5        A.    That would be fairly exceptional, yes.

6        Q.    A woman who is at the roadblock taking IDs and

7   ordering Tutsis off and then ordering soldiers to do

8   things with them, that's exceptional?

9        A.    Probably not.  That's the more common sort of

10   supportive task, particularly if you're talking about

11   someone who is literate and can read the ID cards

12   easily, that sort of thing, it wouldn't be exceptional.

13        Q.    So of the couple thousand people that we're

14   looking to put through the Gacaca court system, maybe 2

15   or 3 percent were women.  If I am not mistaken, that's

16   probably going to bring us down to --

17        A.    Two to 3 percent of the cases that were

18   brought up were women.

19        Q.    Okay.

20        A.    So.

21        Q.    All right.

22        A.    It doesn't actually suggest much about their

23   actual involvement, but in the nature of the cases that

24   Gacaca was targeting, it basically took women out.

25        Q.    All right.  So, now let's get back to our

1   statistics for a moment.  We've cut the remainder of the

2   population in half because they are women and they are

3   statistically insignificant.  So we're down to about

4   1.75 million Hutu men?

5        A.   That's right.

6        Q.   Who the government is going to target for

7   prosecution in the Gacaca courts; right?

8        A.   Yes.

9        Q.   And in fact, they ended up prosecuting a

10  million to a million-two; right?

11       A.   About a million is estimated.

12       Q.   So we're looking for 200,000 participants, and

13  we prosecuted 1.2 million people in the population?

14       A.   Problems with the way they define guilt in the

15  courts actually.

16       Q.   Well --

17       A.   Anybody who was present --

18       Q.   One of the first ways the RPF defined guilt

19  was you're a Hutu male; right?

20       A.   I wouldn't say one of the first ways.  There

21  is an implication of collective guilt.  There is an

22  implication.  They are suggesting here that you have to

23  be suspect of Hutu.  There's certainly something in

24  that.  But generally -- well, go ahead, sorry.

25       Q.   Even you would agree with me that the Gacaca

1    courts were an oppressive tool to impose guilt upon the

2    Hutus to help impose this official narrative; right?

3         A.   Even I would agree because I'm a fairly strong

4    critique of the regime actually, yes, so, and I

5    criticize Gacaca fairly extensively.

6         Q.   That spares me having to pull out this other

7    article where you concluded just what I said.  We're

8    going to spare everybody.

9         A.   I don't believe Gacaca was an honest system.

10   It was purported to be a court system but unfortunately

11   it had no judges.  It had no lawyers involved.  It was

12   an amateur program that the government manipulated

13   extensively.  So, it's not legally sound and I think it

14   was a fairly oppressive tool that was used, yes.  I'm

15   not a fan of the Gacaca.  The idea was interesting but

16   the practice failed.

17        Q.   And where that leads us is, wouldn't you agree

18   that this extensive concentrated effort by the

19   government puts people in the position, for example, if

20   you're Hutu and you are asked by someone in a position

21   of authority to talk about something that happened in

22   Butare, you are inclined to tell that person in position

23   of authority what they want to hear; right?

24        A.   I guess.  Can you ask that again?  Certainly

25   if it's an authoritarian society, it's one in which the

48

1    government has a lot of control and people will

2    certainly not want to offend government officials in a

3    context like that.  So the idea that if a government

4    official talks to you about something, you're going to

5    try to please them, absolutely, certainly.

6        Q.   Right.  So if agents show up with badges and

7    they want to talk about Beatrice Munyenyezi and you

8    happen to be, for example, an ex-FAR soldier who has

9    been through the re-education camp, your first

10   inclination is to tell them what they want to hear?

11       A.   First inclination for anyone in that kind of

12   context is try to please the government authorities.  If

13   you're talking about Rwandan authorities coming to them,

14   certainly.

15       Q.   And you would also agree with me that they

16   will try to say what they're supposed to say in order to

17   get by?

18       A.   In the society historically I think it's true.

19   I think it's less true today.  One thing that did happen

20   in the Gacaca process was communities came together and

21   talked about things, and overall I didn't think Gacaca

22   was a very good process because I think it got exploited

23   by the government, but it did involve communities coming

24   together and talking and in the process I think the

25   society talks a lot more than it used to.  People are

49

1    much more willing to speak.  When I was there in '92 and

2    '93 it was much harder to get information out of people

3    than it has become.

4        Q.    And one of the other things that you

5    experienced, not only do people say what they have to

6    say to get by, they say what they have to say to protect

7    themselves; right?

8        A.    Yes.  People are going to certainly have their

9    own interests in mind as in any authoritarian society.

10   People are going to, as I said before, play things close

11   to the chest and try to protect their interests.

12   Certainly people aren't going to foolishly make things

13   up in order to, you know, that might get them in

14   trouble.  So, I would think people are going to say as

15   little as they can and try to keep things as quiet as

16   they can and just survive that way.

17       Q.    One thing that you have to be careful of is

18   that if, for example, you're a Hutu, maybe an ex-FAR,

19   that you have to be careful when you're being asked

20   certain questions not to make it appear like you're a

21   genocide denier.  You're actually among the guilty ones.

22   So you have to be careful not to make it look like you

23   don't know anything; right?

24       A.    Not to make it look like you don't know

25   anything about the genocide?  Um, I suppose.

50

1          Q.   Well, you can't just say to them, I don't know

2     that person, I don't know what happened there.  Your

3     instinct --

4          A.   You could certainly say that.

5          Q.   All right.  Okay.

6          A.   But you couldn't say I don't believe there was

7     a genocide in this context in Rwanda.  Genocide denial

8     is a crime in the country.

9               MR. HOWARD:  Excuse me, judge, I lost my place

10     for just a moment.  I promise I won't be long.

11               (Pause.)

12          Q.   Toward the end of your testimony the

13     government was asking you questions.  You read from some

14     of the testimony that Ms. Munyenyezi gave at the ICTR

15     seven years ago now.

16          A.   Yeah.

17          Q.   Do you recall that?

18          A.   I do.

19          Q.   Prior to reading those statements you had made

20     a few comments about the conditions in Butare; right?

21     Do you recall that?

22          A.   Yes.

23          Q.   Now, one of the things you said was that the

24     violence in Butare was quite rampart.  That anybody who

25     was there would have known that there was a lot of

1   killing going on; right?

2        A.   Yes.

3        Q.   Now, isn't it true that what happened in

4   Butare, yes, a lot of people were killed, they were

5   throughout Rwanda in that period, but in Butare it

6   didn't happen in the streets and out in public places;

7   right?

8        A.   No, sometimes it did happen in the streets and

9   in public places.

10       Q.   But the predominance of the violence was that

11  people were taken away?

12       A.   The difference in Butare is that it didn't

13  happen in massacre sites.  It was over a much more

14  extended period of time in which people were found and

15  killed.  There were particular sites a little, you know,

16  a little off to the side of the road where people were

17  killed.  That's not unique to Butare.  It was often the

18  case in the roadblocks, that you didn't kill people

19  right at the roadblock, although that did happen in

20  Butare as well.

21       Q.   But it didn't happen very often; right?

22       A.   It was more common that people were taken to

23  the side to be killed.

24       Q.   And also what you know about the conditions in

25  Butare were that most of the violence occurred early on

1    when it started in Butare after the 19th?

2        A.    Actually one of the things that's interesting

3    about Butare compared to the other places, is that the

4    violence was much more extended.  There was a lot of

5    targeted killing very much in the beginning, but

6    violence did continue through Butare for really up until

7    the end.  There were still people who were being found

8    -- Tutsi who were in hiding.  Even towards the end of

9    June there were some moderate Hutu who had been

10   protecting Tutsi who were killed.  So, the violence was

11   more concentrated toward the beginning, but it was much

12   more extended in Butare than it was in most places.

13       Q.    Right.  It was concentrated at the beginning.

14   So once we move into mid and late May and into June,

15   there was much less of it.  It went on for a longer

16   period of time, but there was much less of it?

17       A.    There were still killings every day, but there

18   might have been dozens of people killed a day as opposed

19   to hundreds.  You have to remember that the population

20   was 25 percent Tutsi.  So there was a very large

21   population of people to be killed, plus there were a lot

22   of Tutsi who had come to seek refuge in Butare because

23   of its moderate reputation, so a very large population

24   to be killed.  So yes, there was a most concentrated

25   killing at the beginning but the killing went on

53

1    throughout the entire period.

2         Q.   And you read a statement, a portion of my

3    client's testimony where she had made reference to

4    having gone out and gone for a short walk in mid to late

5    May or so of 1994 and not witnessing the violence;

6    right?

7         A.   I noticed in her words was that she said she

8    hadn't seen anyone shooting anyone.  Something of that

9    sort.

10        Q.   Or killing anyone?

11        A.   Or killing anyone.  It's possible that you, if

12   you could take a walk without actively seeing someone

13   killing right at that moment, sure.  It's hard to

14   imagine somebody who could live in Butare and not

15   actually see any violence because it was pretty

16   widespread.  The bodies --

17        Q.   But that wasn't what she said at the ICTR

18   either, is it?  During that walk she didn't see it;

19   right?

20        A.   She said that during that walk she didn't see

21   anyone being killed or shot.  Something of that sort.

22        Q.   No reason to think that was a lie?

23        A.   That could certainly be accurate.

24        Q.   And not seeing any dead bodies, in late May

25   you may not have.  If you've gone on a short walk along

1   the main road, you probably wouldn't have; right?

2        A.   I wouldn't say probably.  In fact, there were

3   several mass graves right on either side and the bodies

4   were piled up.  Is it possible?  Certainly it's

5   possible.

6        Q.   Okay.  So let's talk about the mass graves

7   then.  You have an understanding that there were mass

8   graves right along the main road on the sides of the

9   roads?

10       A.   There were several just off the side of the

11   road, yes.  So, in particular there's one, if you just

12   go down in the valley of the IRST which is a research

13   institute just a little ways up across from the

14   university, that was a place that was kind of notorious

15   where a lot of people were taken to be killed and they

16   were buried there.

17       Q.   Is that the arboretum?

18       A.   That's not the arboretum.  It's on the

19   opposite side of the road of the arboretum.  The

20   arboretum is a little further back.  The arboretum is

21   actually behind the university, so that's a little

22   further back.

23       Q.   So is the IRST over by the hopital?

24       A.   That's correct.

25       Q.   Okay.  Which is not along the main road?

1      A.    So the area where the killing was was actually

2  in a grove between the main road and the IRST.

3      Q.    Just walking along up by the ESO and maybe

4  down past by the EER, you didn't see that mass grave

5  because you didn't walk by it?

6      A.    Well, that one is further over on another

7  side.  So if you're just going up to the ESO and back

8  around the EER you wouldn't have passed that particular

9  mass grave.

10      Q.    You and I had this exact discussion last year,

11  didn't we?

12      A.    I don't recall.  It's possible.

13      Q.    Didn't you say to me last year, yeah, it's

14  very possible that if she went on a short walk in that

15  area of Butare she wouldn't have seen any violence and

16  wouldn't have seen any dead bodies because the violence

17  had subsided by that time in May and the killings didn't

18  happen in the streets anyway; right?

19      A.    Killings generally happened on the side of the

20  road.  There were some killings in the street.  It's

21  certainly possible.  I'm not denying it.  You asked me

22  several times.  But yes, it's possible you could take a

23  walk and not see killings.

24      Q.    Just to finish up our discussion about the

25  mass grave.  I may have missed it, but I thought you

1   said that you know that there was a mass grave down

2   behind the hotel in the little valley?

3       A.   I've heard about it.  I couldn't tell you

4   exactly where I've read about it or heard about it, but

5   it's not one that -- I don't believe the Human Rights

6   Watch identifies this in our book.  I don't believe that

7   it's on our map.  In Leave None to Tell the Story

8   there's a map of the mass graves.

9       Q.   There is.

10      A.   But that's only a partial map.  I have to say

11  in my own research I found mass graves, not the one that

12  you're talking about, but there are many mass graves in

13  Butare.

14      Q.   I'd like you to identify for us because it's

15  the first time I've ever heard, identify for us the

16  source of your information that there was a mass grave

17  behind the hotel, in an open field behind the hotel?

18      A.   I honestly don't remember.

19      Q.   Okay.  So you're testifying under oath that

20  there was one, but you don't know the source of that

21  information?

22      A.   I do not remember the source of that

23  information.

24      Q.   What did it look like?

25      A.   I do not know.

1       Q.    I'm sorry?

2       A.    I do not know.

3       Q.    Was it an open pit?

4       A.    I don't know, sir.

5       Q.    Was the land in that area scarred from

6  bulldozing or digging?

7       A.    I don't know, sir.

8       Q.    Where exactly behind the hotel was it located?

9       A.    I believe there -- if you look at the

10  topography of the area, the ESO and the hospital are on

11  a higher plane and then you come down a little ways to

12  the road there's a hotel and then there's a valley

13  there.  My assumption is that there would be a mass

14  grave there.  It's a logical kind of place.  Most other

15  valleys had mass graves frankly.

16      Q.    Are you assuming there was one or are you --

17  it is your opinion there was one?

18      A.    I have heard that there was one there.  I am

19  not raising it as the most important mass grave in the

20  city.  Again, it's not one that was listed in our Human

21  Rights Watch book.  So, I've heard that there was a mass

22  grave there.  I can't tell you, sir, where I heard that.

23      Q.    If you don't mind us returning to our

24  discussion about the manner or -- strike that.  The

25  concerns you had in conducting your investigation when

58

1   you were talking to the Rwandan witnesses back in 1995

2   and '96.

3      A.   Sure.

4      Q.   We did talk for a moment about one of the

5   things you had to be careful of is that Rwandans tend to

6   want to tell you things to please you, tell you what you

7   want to hear; right?

8      A.   That wasn't my main concern in that research.

9      Q.   Understood, but that was one of the concerns

10   that you had?

11      A.   Not in that context.

12      Q.   The other thing that you had to be careful of

13   when investigating the genocide was being told stories

14   that were essentially stock stories, right, stock

15   answers?

16      A.   Not in '95 and '96.

17      Q.   Okay.  In 2001?

18      A.   It was more common.  By then stories had been

19   told.  People tended to know what happened in their

20   communities by then.  So it was more common then that

21   there would be a general story and so you'd have to say,

22   well, what did you personally view, what did you see

23   with your own eyes.

24      Q.   And when you talk about there's a general

25   story, everybody knows that there were roadblocks around

59

1    Butare; right?

2        A.    Correct.  And most people could tell you where

3    they were.

4        Q.    Whether they actually saw them or not, they've

5    been told where they were, and so they might just repeat

6    it, right, that was one of the things you had to be

7    careful of?

8        A.    Sure.  People could tell you that there were

9    roadblocks in places and you'd have to say did you

10   actually go through that roadblock, did you actually see

11   it.

12       Q.    But that's not actually good enough, is it,

13   because all they have to do there is say yes?

14       A.    Right, well, obviously you don't ask yes or no

15   questions.  You would ask can you tell me about it.  Who

16   was there.  When did you go through.  You ask for

17   details and that's the way you can test people.

18       Q.    Because you want to avoid just being given a

19   stock answer when this person really doesn't know what

20   they are talking about; right?

21       A.    Sure.

22       Q.    The existence of roadblocks, how the IDs -- or

23   strike that.  The checking of IDs at roadblocks, that

24   was a very common part of the stock story?

25       A.    Done at pretty much every roadblock, yes.

1    Q.    And people being taken off to certain areas to

2    be killed, such as the arboretum that you mentioned;

3    right?

4    A.    Yes.

5    Q.    The IRST, the research institute; right?

6    A.    Most people in Butare could tell you where

7    mass graves were and where the main killing sites were.

8    Q.    Group Scolaire, for example, there was a

9    massacre there; right?

10    A.    Yes.

11    Q.    And the story of the massacre at Group

12    Scolaire was a popular one.  It's one that many people

13    could tell you having been told that many times; right?

14    A.    That is certainly part of the lore of the

15    genocide.

16    Q.    Tutsi refugees gathering at the EER, whether

17    it's Tutsi refugees that was actually there or not, you

18    have to be careful what you're being told because it was

19    very common knowledge that Tutsis gathered first at the

20    EER?

21    A.    I don't believe they gathered first at the EER

22    but it was a place of refuge at one point.

23    Q.    We did have this debate before, too.  They

24    were first at the prefecture?

25    A.    They were first at the prefecture.  There were

1   some already at the EER.  And at a certain point the

2   government moved all the people from the prefecture to

3   the EER.

4        Q.   And everybody in Butare knew then and

5   everybody in Butare knows now that Pauline and Shalom

6   lived at the hotel?

7        A.   Yes, nearly everybody.  Maybe some people

8   don't know that, but I would guess the majority of

9   people would know, yes.

10            MR. HOWARD:  Your Honor, were we going to be

11   taking, I don't know what our practice was, were we

12   breaking before 3:00 for a few minutes?  I notice we're

13   getting to about 2:30 here.  So I was thinking that if I

14   could collect my thoughts I'd probably be done in ten

15   minutes.

16            THE COURT:  You can certainly take a short

17   break to collect your thoughts.  I normally would kind

18   of run from 1:15 to 3, but that's fine.

19            MR. HOWARD:  Would it inconvenience anybody?

20   If I can have five minutes, I can shorten this.

21            THE COURT:  Appreciate it.  Ladies and

22   gentlemen, we will take a short ten-minute break.

23            (Recess taken.)

24            THE COURT:  Mr. Howard.

25            MR. HOWARD:  Yes, your Honor, I will be fewer

1   than ten minutes, I promised the jury that.

2       Q.   BY MR. HOWARD:  We had a quick conversation

3   about Dr. Endless, and I didn't finish my questioning of

4   you.  You know of him to be a professor of African

5   studies in Loyola University in Chicago?

6       A.   I know very little about him.  I'd have to say

7   I believe, yes.  I knew he was a professor.  I couldn't

8   have told you what university.

9       Q.   Are you aware that you share one common

10  membership with him?

11      A.   I'm not.

12      Q.   Have you ever heard of the Friends of Evil

13  list?

14      A.   No.

15      Q.   You've never heard of that?

16      A.   I don't think I have actually.

17      Q.   Are you aware that you are on the Friends of

18  Evil list that is propagated by the state-run media out

19  of Rwanda?

20      A.   I don't think I knew that, no.

21      Q.   And they are extremely critical of your

22  views --

23           MR. CHAKRAVARTY:  Objection.

24           THE COURT:  Sustained.  You're not testifying,

25  Mr. Howard.  Questions can be asked, but the questions

63

```
 1    are not themselves evidence.  And facts assumed in the

 2    question is not evidence.  So there's no evidence of

 3    such a thing.  The witness hasn't heard of it.

 4              MR. HOWARD:  And that's what I was asking,

 5    judge.

 6              THE COURT:  He said he didn't.

 7        Q.   BY MR. HOWARD:  You have not in any way

 8    followed a blog in which you are being criticized by the

 9    current government?

10        A.   I have been criticized in a blog by the

11    government.  When I was criticized it was not called the

12    Friends of Evil.

13        Q.   All right.  And unfortunately that distracted

14    my thinking, so I think that we are going to be

15    finished.  If I can just check with Mr. Ruoff.

16              (Pause.)

17              MR. HOWARD:  Dr. Longman, thank you.  It's

18    been a pleasure.  Appreciate it.

19              THE WITNESS:  Thank you, sir.

20              THE COURT:  Mr. Chakravarty, any redirect?

21              MR. CHAKRAVARTY:  Just briefly, a few things.

22                    REDIRECT EXAMINATION

23    BY MR. CHAKRAVARTY:

24        Q.   Doctor, you were here cross-examined by Mr.

25    Howard a year ago; is that fair to say?
```

64

1          A.   That's correct.

2          Q.   It was about events that you testified today?

3          A.   That's correct.

4          Q.   And in fact, at one point Mr. Howard asked you

5     to identify mass graves on a poster.  I believe the

6     poster was 5B.  On this poster.  Do you remember that?

7          A.   Yes, I think so.

8          Q.   And you remember Mr. Howard just asked you if

9     this is the first time that you've ever identified mass

10    graves around the Ihuriro Hotel?

11         A.   Yes.

12         Q.   In fact last year you actually circled on that

13    poster where there were mass killings?

14              THE COURT:  Well, did you?

15         Q.   I'm sorry, did you?

16              THE COURT:  Again, counsel are testifying.

17    You're not allowed to.  What he just said in his

18    question assumes a fact.  There's no evidence of it.  So

19    please keep that in mind as counsel are going forward

20    because it's starting to become a common practice.  The

21    questions are not evidence.  Facts assumed in the

22    questions are not evidence until there is some evidence

23    of that fact.

24         Q.   I'll rephrase, your Honor.  Did you in fact

25    circle an area down the hill that you described on cross

65

1    as to where the mass grave was?

2        A.    To be honest I don't remember that I did.

3        Q.    May I approach, your Honor?

4              THE COURT:  Any time.

5        Q.    Just read this to yourself and I'll ask you a

6    question.

7              (Pause.)

8              MR. HOWARD:  May I just have a page number

9    he's being asked to review?

10             THE WITNESS:  Page 28 on February 27,

11   afternoon session.

12             (Pause.)

13             THE WITNESS:  Yes.

14       Q.    So you did in fact circle --

15       A.    I circled that as an area where a lot of

16   people were killed.  And my testimony at that time was

17   that I knew this to be an area where a lot of people

18   were killed but that I did not know for sure that it was

19   a mass grave at that time.

20       Q.    You talked about Leave None to Tell the Story

21   and whether you had heard Beatrice Munyenyezi's name

22   when you and Alison Des Forges and others had worked on

23   that; correct?

24       A.    Correct.

25       Q.    And is it surprising to you that you did not

1   hear her name?

2       A.   Well, first of all, I only did a handful of

3   interviews, 20 or so interviews on Butare specifically,

4   so it doesn't surprise me in that context.  And I don't

5   know whether other people heard her name, frankly.  Her

6   name definitely does not appear in Leave None to Tell

7   the Story, but the point of that book was to focus on

8   the main organizers of the genocide.  Each community we

9   might identify five or ten people who were the people we

10  saw as really responsible for the genocide.  There was

11  no attempt to list every single person involved because

12  of course there were hundreds, even thousands in any

13  community.

14      Q.   You were asked some questions about the

15  inclination for Hutus to please authority figures when

16  asked about the genocide?

17      A.   It's not just Hutus, I mean, there is some

18  tendency for people in Rwanda historically to want to

19  please authorities.

20      Q.   So, that cultural phenomenon, does that extend

21  to falsifying testimony about people who don't live in

22  that community?

23      A.   The tendency is to speak in generalities.  As

24  I said, there is this narrative.  The government has

25  interpreted things in a particular way.  And so what

67

1    ideally happens is that people will try to tell you

2    something that fits that narrative in some way.  But

3    certainly the details of any specific events wouldn't be

4    part of that.

5        Q.    And Mr. Howard asked you if you could say, a

6    Rwandan could say that they didn't know someone and what

7    they did.  Could they, could a Rwandan say that they

8    didn't know someone and what they did during the

9    genocide?

10       A.    Absolutely.  In court hearings, in Gacaca

11   hearings, there's not an expectation that everyone

12   implicates everyone else.

13       Q.    With regards to Tutsi genocide survivors, is

14   there a pattern or practice of influencing their

15   testimony with regards to falsely accusing individuals?

16       A.    Not that I'm aware of, no.

17       Q.    When you were in Rwanda conducting your Human

18   Rights Watch research, was that done in concert with the

19   Rwandan government?

20       A.    Oh no.  We had strict rules working for Human

21   Rights Watch.  You never conduct interviews with a

22   government official present.  You never would conduct an

23   interview with anyone who is armed police or military.

24   We weren't allowed to carry anyone with arms in our

25   vehicles.  And we also, in identifying people, worked

68

1    through a variety of means to try to find people who

2    could provide testimony.  There were certainly times

3    when we might go to a political official in a town and

4    say can you identify some of the them who are most

5    informed about what happened in the genocide.  But often

6    we would also go to survivors and ask them and see if

7    they knew of other people.  And sometimes, frankly, we

8    would just drive into a community and park our car and

9    walk a couple of miles up the road and find people to

10   talk to.  We tried to use as many methods as we could to

11   identify people to interview.  Sometimes people in the

12   community would say, oh, one of the people who was

13   really involved is in the prison in Butare, you should

14   go speak with him.  And so we would follow-up on that

15   kind of lead.  But most of your identification of

16   interview subjects was through word-of-mouth and just

17   going out and knocking on doors.

18        Q.    And did the Rwandan government know that you

19   were doing those kinds of things?

20        A.    They did.  We had to have permission to work

21   in Rwanda.  We weren't registered with government

22   because we wanted to retain our independence, but we

23   certainly informed the government that we were there and

24   we had permission from the ministry of justice to do

25   research on the genocide as well as on ongoing human

1    rights issues.

2         Q.    Were you able to get accurate reliable

3    information with regards to what happened during the

4    genocide?

5         A.    I believe we were.  I think there's a reason

6    that Leave None to Tell the Story is so widely

7    respected.

8         Q.    Can you just tell us what gives you that

9    assurance, comfort level in relying --

10        A.    I've been working in Rwanda for 20 years.  I

11   know people there very well.  I have friends who were

12   killed in the genocide.  I know of some people that I

13   know were perpetrators during the genocide.  And over

14   the years I've talked to a lot of people and I've read

15   almost everything that's published on Rwanda, and all of

16   that, to me, paints a fairly consistent picture.  There

17   are debates among scholars over certain issues, but

18   whether or not this is genocide is not really a

19   scholarly debate.  And among virtually everyone I

20   respect, Leave None to Tell the Story is accepted as the

21   best history on the genocide.

22        Q.    Doctor, this was the smaller version of

23   exhibit, this is actually 5A.  When Mr. Howard was

24   asking you about those killing fields, the killing field

25   near the Ihuriro, are you able to generally, based on

1    what your memory is today, describe or just point or

2    identify where you believe that area to be?

3        A.    Yeah, I can certainly talk about, if you talk

4    about there being a place where a lot of people were

5    killed, what people told me was that this sort of area

6    down here, that's a little wooded area, this is the

7    fields for the university, the university is over this

8    way, but this area here, I was told by many people that

9    that's where they took people to kill them.

10       Q.    And again, did I just circle the Ihuriro?

11       A.    Yup.

12       Q.    And what is this building?

13       A.    That's a school complex that's part of the

14   Episcopal Church compound.

15       Q.    Is that right next to the Ihuriro?

16       A.    It is.

17            MR. CHAKRAVARTY:  That's all I have, your

18   Honor.

19            THE COURT:  All right.  Any recross?

20            MR. HOWARD:  Very briefly, judge.

21                      RECROSS-EXAMINATION

22   BY MR. HOWARD:

23       Q.    This area -- here we go.  That area here,

24   that's a wooded area behind the EER; right?

25       A.    That's correct.

71

1    Q.   And just quickly about the work of the Human

2    Rights Watch.  I know that you tried to maintain your

3    independence.  When you were doing your investigation,

4    was the information you were gathering shared with other

5    governmental agencies?

6    A.   We did have some cooperation with the

7    International Criminal Tribunal for Rwanda.  They were

8    doing exclusively interviews.  We were also gathering

9    documents.  And one of the things we did was to share

10   all the documents that we gathered with the ICTR.

11   Q.   Do you know when Shalom Ntahobali was arrested

12   by the ICTR?

13   A.   I don't offhand, sorry.

14   Q.   Is it a date that you otherwise would have in

15   your memory if it was refreshed?

16   A.   I know something about the trial since I've

17   done work on Butare.  I'm not an expert on the Butare

18   trial in the ICTR, but I have looked at it, so I might,

19   yes.

20   Q.   I'm not assuming this is fact.  I'm only

21   asking if it refreshes your memory thatin July of 1997

22   in Kenya?

23   A.   If you would ask me, I would guess it was

24   later than that, but.

25   Q.   Okay.

72

1       A.    I did know he was arrested in Kenya, though,

2   that much I know.

3             MR. HOWARD:  Thank you very much, judge.

4             THE COURT:  All right, thank you, Dr. Longman.

5   Appreciate it.

6             THE WITNESS:  Thank you, your Honor.

7             THE COURT:  Ladies and gentlemen, we will

8   adjourn now for the day.  We will resume again tomorrow

9   morning for 9:00.

10            (Adjourned at 2:55 p.m.)

11                  C E R T I F I C A T E

12

13            I, Sandra L. Bailey, do hereby certify that

14   the foregoing transcript is a true and accurate

15   transcription of the within proceedings, to the best of

16   my knowledge, skill, ability and belief.

17

18

19   Submitted: 10/17/13        **SANDRA L. BAILEY, LCR, CM, CRR**

20                              LICENSED COURT REPORTER, NO. 15

21                              STATE OF NEW HAMPSHIRE

22

23

24

25

Appendix Page 734

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/17/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                       \*
UNITED STATES OF AMERICA       \*
                                      \*  10-CR-85-SM
              v.                 \*  February 12, 2013
                                       \*  9:05 a.m.
BEATRICE MUNYENYEZI          \*
                                       \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*




Day 6 - Morning Session
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. MCAULIFFE
and a jury


Appearances:

For the Government:  Aloke S. Chakravarty, SAUSA
                       John A. Capin, SAUSA
                       U.S. Attorney's Office (NH and MA)

For the Defendant:   Mark E. Howard, Esq.
                       David W. Ruoff, Esq.
                       Howard & Ruoff, PLLC
                       831 Union Street
                       Manchester, NH 03104

Interpreters:        Sabrina Iyadede
                       Freddy Munana

Court Reporter:       Diane M. Churas, CSR, CRR
                       Official Court Reporter
                       U.S. District Court
                       55 Pleasant Street
                       Concord, NH   03301
                       (603) 225-1442

1                        I N D E X

2


3
    WITNESS:          DIRECT    CROSS    REDIRECT     RECROSS
4
    JEAN PAUL RUTAGANDA
5
    By Mr. Capin        3                   38
6


7
    ERIC BENN
8
    By Mr. Capin      45                  101
9                                         108
    By Mr. Ruoff               79                        106
10


11


12
    EXHIBITS:                          ID.   Evid.
13


14   Defendant's Exhibits C1 through C6          81

15

16

17

18

19

20

21

22

23

24

25

1                      BEFORE THE JURY

2              THE CLERK:  Court is in session and has for

3    consideration jury trial day six in the matter of United

4    States of America versus Beatrice Munyenyezi, Case No.

5    10-cr-85-01-SM.

6              THE COURT:  Good morning, ladies and

7    gentlemen.  We're continuing of course with the

8    government's presentation of evidence.  Mr. Capin?

9              MR. CAPIN:  Good morning, thank you.  Good

10   morning, ladies and gentlemen.  The government calls

11   Jean Paul Rutaganda.

12                      JEAN PAUL RUTAGANDA

13       having been duly sworn, testified as follows:

14             THE CLERK:  For the record, please state your

15   name and spell your last name.

16             (Through interpreter.)

17             THE WITNESS:  Rutaganda Jean Paul.

18             MR. CAPIN:  And for the record Rutaganda is

19   spelled R-U-T-A-G-A-N-D-A.

20                      DIRECT EXAMINATION

21   BY MR. CAPIN:

22        Q.   Good morning, Mr. Rutaganda.

23        A.   Good morning.

24        Q.   Please tell this jury where you live.

25        A.   I was born in Tumba in Butare prefecture.

```
 1        Q.   Is Tumba close to Butare Town?

 2        A.   Yes.

 3        Q.   How are you employed?

 4        A.   I work in restaurant services.

 5        Q.   Are you a waiter?

 6        A.   Yes.

 7        Q.   Where were you born?

 8        A.   I was born in Tumba, Butare prefecture.

 9        Q.   What year were you born?

10        A.   1979.

11        Q.   Were you approximately 15 at the time of the

12   genocide?

13        A.   Yes.

14        Q.   Did you go to school, sir?

15        A.   I studied up to primary six.

16        Q.   That's the sixth grade of primary school,

17   sixth year of primary school?

18        A.   Yes.

19        Q.   How old were you when you finished the sixth

20   grade?

21        A.   I was 13.

22        Q.   Where did you start your primary school?

23        A.   I was seven when I started primary school.

24        Q.   And where did you start your primary school?

25        A.   Tumba Catholic.
```

1      Q.   Tumba Catholic school?

2      A.   Yes.

3      Q.   Did you transfer from Tumba Catholic school to

4   another school at some point?

5      A.   Yes.

6      Q.   In what grade did you transfer?

7      A.   In third grade, primary school.

8      Q.   And what school did you transfer to?

9      A.   Butare Catholic in town.

10      Q.   When you say in town, do you mean in Butare

11   Town?

12      A.   Yes.

13      Q.   Did you attend Butare Catholic school in

14   Butare Town from grade three until you finished in grade

15   six?

16      A.   Yes.

17      Q.   Where were you living when you were in sixth

18   grade?

19      A.   In Butare Town.

20      Q.   Who were you living with?

21      A.   A lady who was living in town whose name was

22   Sarafina.

23      Q.   And who is Sarafina?

24      A.   A lady who lived in Butare Town.

25      Q.   Did anybody else live with Sarafina?

```
 1        A.    Her kids and her servants.

 2        Q.    How many kids did Sarafina have?

 3        A.    She had three sons and two daughters.

 4        Q.    How old were her sons?

 5        A.    Twenty years old and up.

 6        Q.    After you finished elementary school what did

 7   you do?

 8        A.    I worked as a house servant.

 9        Q.    Where did you work as a house servant?

10        A.    At that lady's house whose name was Sarafina.

11        Q.    When you finished primary school, was that

12   approximately 1992?

13        A.    Yes.

14        Q.    How long did you work at Sarafina's house as a

15   house servant?

16        A.    I worked there up to genocide period, even

17   after that.

18        Q.    Do you know what ethnicity Sarafina and her

19   children were?

20        A.    Yes.

21        Q.    What ethnicity?

22        A.    They were Tutsi.

23        Q.    Did Sarafina survive the genocide?

24        A.    Yes.

25        Q.    Did all of her children survive the genocide?
```

7

1          A.    Some died.

2          Q.    I direct your attention to April of 1994.

3          A.    Yes.

4          Q.    Were you living with Sarafina at that time?

5          A.    Yes.

6          Q.    Do you see the computer screen to your right,

7    sir?  First I'm going to show you a photograph and ask

8    you to look at that carefully.

9                (Pause.)

10         A.    Yes, I saw it.

11         Q.    Did you first see that photograph yesterday?

12         A.    Yes.

13         Q.    Do you recognize anybody in that photograph?

14         A.    Yes, I can.

15         Q.    Who do you recognize?

16         A.    I recognize two young men.

17         Q.    Which two young men do you recognize?

18         A.    I recognize the one holding the glass and the

19   one with sunglasses with long hair.

20         Q.    I'm going to put this on the screen and

21   perhaps you can tell me who you recognize.  Now, sir, if

22   you touch this screen, if you tap the screen with your

23   finger it will make a mark.

24         A.    Yes.

25         Q.    Can you please touch each of the two people

8

1    you say you recognize?

2         A.    Yes.

3         Q.    Please do that.

4         A.    This young man with the glass, his name is

5    Eugene.

6         Q.    And who else do you recognize?

7         A.    This one with sunglasses touching this girl's

8    hair.  His name is Shalom.

9         Q.    When did you know those two people, Eugene and

10   Shalom?

11        A.    Ever since I got in town because the lady

12   whose home I lived with was Eugene's neighbor --

13             THE INTERPRETER:  I'm sorry, clarification.

14             MR. CAPIN:  Please.

15        A.    And Shalom as well lived in the neighborhood

16   where we lived.

17        Q.    Where was Shalom living in April of 1994?

18        A.    He lived in Ntahobali Maurice's house who was

19   his father.

20             MR. RUOFF:  Your Honor, may we approach.

21             THE COURT:  Sure.

22                        AT SIDEBAR

23             MR. HOWARD:  We have had very few translation

24   issues and we've never really complained about it.  In

25   this instance the question was who he lived near and the

1    witness said --

2              THE COURT:  In whose house.

3              MR. HOWARD:  Just a few moments ago, how he

4    knew these people and the witness -- in the photograph,

5    and the witness said that he lived near this kid Eugene

6    I think his name is.  He did not say Shalom.  The

7    interpreter then said can I get a clarification and

8    asked him about Shalom as well, and the witness added

9    Shalom.  So we're concerned that --

10             THE COURT:  What's your solution?  Suggestion?

11             MR. HOWARD:  Well, I think --

12             THE COURT:  Concern noted.  What else would

13   you like?

14             MR. HOWARD:  Well, I guess it raises a few

15   issues.

16             THE COURT:  I don't speak Kinyarwandan.

17             MR. HOWARD:  Neither do we.  My client does

18   and she said that's not what the witness said.

19             THE COURT:  What does she claim the witness

20   said?

21             MR. HOWARD:  When asked the question who he

22   lived next to, he only said the young man and --

23             THE COURT:  Once again -- I mean, it's your

24   case, but seriously if you're going to take an hour for

25   this kid to add testimony to the effect of I was at the

1    roadblock and I saw the roadblock, let's take 15 minutes

2    and do that.  This business about where'd you go to

3    grammar school, I mean, seriously.

4           MR. CAPIN:  Establishing that he was in Butare

5    at all relevant times.

6           THE COURT:  There are three questions you

7    should ask.  Did you grow up in Butare, familiar with

8    the town?  Did you go to school there?  Know anybody

9    there?  Yeah.  What do you know?

10          MR. CAPIN:  If there was no cross-examination,

11   that would be fair.

12          THE COURT:  Nobody's cross-examining about

13   where the streets intersect and where the hospital is.

14          MR. CAPIN:  With regard to this last issue the

15   interpreter asked for leave to ask for a clarification.

16   I didn't hear an objection.

17          MR. HOWARD:  How am I supposed to object?

18          THE COURT:  He's got a concern.

19          MR. HOWARD:  If we could maybe just --

20          THE COURT:  Cover it on cross.

21          MR. HOWARD:  We will, but I wonder if we could

22   just ask the interpreter to say only what the witness

23   says and we'll be more mindful --

24          THE COURT:  No, I'm not going to tell the

25   interpreter they can't seek clarification.  It's not a

1  difficult translation.  No, it's not a game.  It's a

2  search for the truth.

3          MR. HOWARD:  I'm not trying to play a game,

4  Judge, at all.

5          THE COURT:  It's a search for the truth.  If

6  he needs to clarify something, he'll clarify it.  And if

7  your client thinks the translation was incorrect, make

8  an objection and we'll deal with it, or cover it on

9  cross.

10          MR. HOWARD:  That's what I'm doing.

11          THE COURT:  What's your solution?  You don't

12  have one.  So my solution is cover it on cross.

13          MR. HOWARD:  What I'm asking for a solution is

14  that the translator be asked -- if they want to clarify

15  something --

16          THE COURT:  No.  The translator -- there's no

17  indication he's adding testimony.  He's absolutely

18  entitled to seek clarification.  It's a difficult

19  translation and he will be allowed to seek

20  clarification.  Now, speed it up, seriously.

21                  IN OPEN COURT

22     Q.  BY MR. HOWARD:  When you say that Shalom lived

23  with Ntahobali Maurice, do you know where exactly they

24  lived?

25     A.  Yes.

1  Q. Where did they live?

2  A. They lived right below EER.

3  Q. Can you look at that computer screen again,

4 sir?

5  A. Yes.

6  Q. Do you see any structures in this photograph

7 that you recognize?

8  A. Yes.

9  Q. What do you recognize?

10  A. This is EER school.

11  Q. Um-hum.

12  A. And this road from Kigali towards Burundi.

13  Q. Is that Burundi?

14  A. Yes.  And this one went straight leading to

15 military school ESO, and this is I'Huriro Hotel.

16  Q. Do you know who else lived at the I'Huriro

17 Hotel?

18  A. His mother.

19  Q. What was his mother's name?

20  A. Nyiramasuhuko.

21  Q. How far was the I'Huriro Hotel where you were

22 living with Sarafina?

23  A. About one kilometer.

24  Q. Do you know what Maurice did for a living?

25  A. He was the rector of the university.

    1        Q.    How about Pauline?

    2        A.    During the genocide she was the minister of

    3   the country.

    4        Q.    Do you know what party she belonged to?

    5        A.    Yes.

    6        Q.    What party?

    7        A.    MRND.

    8        Q.    Do you know what party Maurice belonged to?

    9        A.    No.

   10        Q.    Did Maurice and Pauline have children?

   11        A.    Yes.

   12        Q.    Other than Shalom did she have other children?

   13        A.    Shalom is the one I would see around, but

   14   there were others.

   15        Q.    How did you know Shalom?

   16        A.    The household where I lived, those young men

   17   from the household I lived in, they were his friends.

   18   They would hang out.

   19        Q.    Did you see Shalom more than once?

   20        A.    Yes.

   21        Q.    Did you ever learn that Shalom got married?

   22        A.    I knew it during the genocide.

   23        Q.    Did you know his wife's name during the

   24   genocide?

   25        A.    Yes.

1      Q.   What was his wife's name?

2      A.   Munyenyezi.

3      Q.   I'm going to direct your attention to April of

4   1994.  Were you still living at Sarafina's house at the

5   beginning of that month?

6      A.   Yes.

7      Q.   Did there come a time when you left Sarafina's

8   house?

9      A.   Yes.

10      Q.   Approximately when did you leave Sarafina's

11   house?

12      A.   I left the house around 21st through 25th.

13      Q.   So you're saying at some point in that period

14   of time?  You don't know exactly when?

15      A.   Yes.

16      Q.   Why did you leave Sarafina's house?

17      A.   There was no safety.

18      Q.   Explain to this jury what you mean when you

19   say there was no safety.

20      A.   Killers were intending to come and kill her

21   and then they will beat us up.

22      Q.   And where did you go when you left Sarafina's

23   house?

24      A.   At EER.

25      Q.   When you say EER, do you mean the school that

```
 1    you pointed to on that picture in front of you?

 2         A.    Yes.

 3         Q.    Why did you go to the EER?

 4         A.    That's where Tutsis fled to during the

 5    genocide.

 6         Q.    When you got to the EER were there other Tutsi

 7    there?

 8         A.    Yes.

 9         Q.    Did you have an identity card during the

10    genocide?

11         A.    No.

12         Q.    What is your ethnicity?

13         A.    Tutsi.

14         Q.    Why did you not have an identity card?

15         A.    I wasn't the age.

16         Q.    You were too young to have one?

17         A.    Yes.

18         Q.    When you got to the EER in late April 1994,

19    were there many Tutsi there?

20              THE INTERPRETER:  Clarification.  Would you

21    repeat that question?

22              MR. CAPIN:  I will break it into two parts.

23         Q.    I want to direct your attention to when you

24    went to the EER in late April 1994.  Were there many

25    Tutsi there?
```

1      A.   There were.

2      Q.   Were there Tutsis living and sleeping there?

3      A.   Yes.

4      Q.   Did you sleep there?

5      A.   Yes.

6      Q.   How many days?

7      A.   Three.

8      Q.   While you were at the EER, did you see

9   anything unusual on that road in front of the EER and

10   the I'Huriro?

11      A.   Yes.

12      Q.   Please tell the jury what you saw.

13      A.   I saw a roadblock and Interahamwe.

14      Q.   And where was the roadblock?

15      A.   There were stones on the road and also chairs

16   and benches in front of the Hotel I'Huriro.

17      Q.   Did you say you saw Interahamwe at that

18   roadblock?  Did you say you saw Interahamwe at that

19   roadblock?

20      A.   Yes.

21      Q.   Can you describe what the Interahamwe were

22   wearing?

23      A.   Yes.

24      Q.   Please describe that for the jury.

25      A.   Interahamwe had on MRND clothing and some had

1    on military uniform but they were civilians.

2         Q.   When you say they had on MRND clothing, can

3    you describe what you mean, please?

4         A.   Yes.

5         Q.   Please describe that for the jury.

6         A.   Interahamwe clothing had on a picture of

7    Habyarimana.  And there were also some other in town

8    clothes that had on a machete and an ax that were

9    located on the seal of the party.

10        Q.   Were the machetes and the ax crossed in this

11   fashion that I'm indicating?

12        A.   Yes.

13        Q.   Did the Interahamwe roadblock have any

14   weapons?

15        A.   Yes.

16        Q.   Can you please tell this jury what weapons you

17   saw.

18        A.   They had machetes, hammers, swords, and guns.

19        Q.   Did you stay in Butare Town during -- strike

20   that.  Was that the only roadblock you saw in Butare

21   Town during the genocide?

22        A.   No, there were others.

23        Q.   Can you list a few of the other roadblocks you

24   saw for this jury?

25        A.   Yes.

1      Q.    Please list them.

2      A.    The first roadblock I saw was located near

3   Venant right across the prefecture.   Another one was

4   located at the Hotel Faucon.   Another one was located at

5   the one-way street at the Buhira's.   Another one was

6   located at the I'Huriro.   Another one was located at the

7   university and at Mukoni.

8      Q.    Do you know which of those roadblocks appeared

9   first?

10      A.    No.

11      Q.    Now, you said that from the EER you could see

12   Interahamwe at the I'Hriro roadblock; is that correct?

13      A.    Yes.

14      Q.    Did you recognize any of the Interahamwe that

15   you saw?

16      A.    Yes.

17      Q.    Could you recognize more than one of the

18   Interahamwe that you saw?

19      A.    Yes.

20      Q.    Are these people who you knew by name from

21   your time in Butare?

22      A.    Yes.

23      Q.    Can you please list a few examples for the

24   jury.

25      A.    Yes.

1        Q.    Please do.  List a few examples of Interahamwe

2   you saw for the jury.

3        A.    There was Interahamwe whose name was Desire,

4   Claire Mutaganda, Shalom, Twahirwa, Alphonse, Kzungu,

5   Jean Bosco, Jean Pierre.

6        Q.    Okay.  You don't need to list any more.  Were

7   there any women among the Interahamwe?

8        A.    Yes.

9        Q.    Do you know the name of any of the women

10  there?

11       A.    Yes.

12       Q.    What names do you know?

13       A.    Munyenyezi.

14       Q.    Did you see any other women at that roadblock?

15       A.    There was no one else at that roadblock.

16       Q.    Could you see what Munyenyezi was doing at

17  that roadblock?

18       A.    Yes.

19       Q.    Please tell the jury what you could see

20  Munyenyezi doing at that roadblock.

21       A.    She had a notebook and a pen counting.

22       Q.    What else could you see her doing?

23       A.    She also had on Interahamwe uniform.

24       Q.    Was she doing anything while she was at the

25  roadblock?

1      A.    Yes.

2      Q.    What was she doing?

3      A.    She was counting, registering dead Tutsis and

4    others who were not yet dead.

5      Q.    Do you know based on -- how do you know she

6    was doing that?

7      A.    Tutsis who would die at that time had been

8    already registered and counted.

9      Q.    Now, you could not see what she was writing,

10   could you?

11          MR. RUOFF:  Objection, leading.  I think he

12   testified he saw her writing in a book.

13          THE COURT:  Sustained.

14     Q.    Could you see the words that she was writing?

15     A.    I couldn't see the words, but you could see

16   exactly what the actions she was doing -- what she will

17   be doing.

18     Q.    And when you say the actions, do you mean

19   writing in a book?

20     A.    Yes.

21     Q.    Were there people passing on the road by that

22   roadblock?

23     A.    Yes.

24     Q.    Were they walking through that roadblock

25   without stopping?

1          A.    They will stop.

2          Q.    Describe what you would see when they would

3     stop.

4          A.    What I could see, Hutus could proceed without

5     stopping.  They were free, but Tutsis will be stopped.

6          Q.    When you say Tutsis would be stopped, explain

7     to the jury what you mean by that.

8          A.    There was Tutsi genocide.  Hutus will proceed.

9     Tutsis will be stopped.  They will be stopped.  They

10    will take their identification.  They will be beaten up

11    and they will be killed -- and they will be killed.

12         Q.    I'm asking you what you saw at that roadblock.

13         A.    They will stop Tutsis, beat them up, and they

14    will take others -- they will take others to kill them

15    in a forest right below EER.

16         Q.    How would one reach that forest from where the

17    roadblock was located?

18         A.    I wouldn't go there, but we could hear noises

19    of people that will be taken from that roadblock to

20    there.

21         Q.    When you say to there, do you mean to that

22    forest?

23         A.    Yes.

24         Q.    Could you see what was happening to people who

25    were taken into that forest with your own eyes?

```
 1        A.    No.

 2        Q.    Could you hear noises coming from that forest?

 3        A.    Yes.

 4        Q.    What kind of noises could you hear?

 5        A.    Some were screaming, some were crying and

 6   mourning.

 7        Q.    Did you hear those sorts of noises more than

 8   once?

 9        A.    Yes.

10        Q.    During your three days there, did you hear it

11   every day?

12        A.    They were killed day and night.

13        Q.    I'm asking about the noises you could hear --

14   strike that.  You tell this jury you could hear noises

15   coming from the woods behind the EER; is that correct?

16        A.    Yes.

17        Q.    And by noises I mean the screaming and crying

18   you described.

19        A.    Yes.

20        Q.    Did you hear those specific noises every day

21   you were there?

22        A.    Yes.

23        Q.    Did you hear them only once every day?

24        A.    Yes.

25        Q.    Could you hear them from the building that --
```

1  the EER building shown in that photograph?  I may have

2  asked that question wrong.  Do you see the -- am I

3  circling the EER on that picture, Mr. Rutaganda?

4      A.  Yes.

5      Q.  Do you see what I'm circling now?

6      A.  Yes.

7      Q.  What do you understand that to be?

8      A.  That location is where there will be -- they

9  will kill people, and I could hear the noise being at

10  EER right in that corner right there.

11      Q.  I'm sorry, where could you hear it from?

12  Would you touch the screen and tell us where you could

13  hear it from.

14      A.  Most of the time I was located at that corner

15  right there or sometimes I will be sitting at the patio

16  right there.

17      Q.  Was it difficult to hear that screaming and

18  crying from where you were at the EER?

19      A.  We will be scared, feeling like at any moment

20  that what could happen to us.

21      Q.  I have another question though, sir.  Could

22  you hear the screaming and crying that you described

23  from where you were at the EER?

24      A.  Yes.

25      Q.  And was it difficult to hear?

1     A.   At that time you will feel like -- you will

2   feel like you are about to die as well.

3     Q.   Was the screaming and crying you heard very

4   loud?

5     A.   They will scream a lot.  You could hear it.

6     Q.   You say you stayed at the EER for three days?

7     A.   Yes.

8     Q.   Where did you go after three days?

9     A.   I went back to the house, at Sarafina's house.

10     Q.   Why did you leave the EER?

11     A.   I thought it was safer, but I realized that it

12   was actually worse.

13     Q.   When you say it was actually worse, you mean

14   the EER was worse?

15     A.   Yes.

16     Q.   Why was the EER worse?

17     A.   Killers will come there day and night.

18     Q.   When you say come there, what do you mean

19   there?

20     A.   At EER.

21     Q.   And what would the killers do when they came

22   to the EER?

23          MR. RUOFF:  Objection, foundation.

24          THE COURT:  Overruled.

25          MR. RUOFF:  Your Honor, may I?  Basis of

1   knowledge, if he actually sees them.

2          THE COURT:  He was there.  It's been

3   established.  He was there.

4          MR. CAPIN:  I will ask a new question.  It

5   will be a repeat.

6       Q.   Did you see killers come to the EER while you

7   were there for three days?

8       A.   Yes.

9       Q.   What did you see the killers do?

10      A.   They will beat up people and kill them.

11      Q.   When you went back -- after three days you

12   went back to Sarafina's house?

13      A.   Yes.

14      Q.   Did you remain in Butare Town for the rest of

15   the genocide?

16      A.   Yes.

17      Q.   Where was your family at that time?

18      A.   They were in Tumba.

19      Q.   And when I say your family, did you have

20   brothers and sisters?

21      A.   Yes.

22      Q.   And were both of your parents living before

23   the genocide?

24      A.   Yes.

25      Q.   How many of your family members survived the

26

1   genocide?

2       A.   My older brother.

3       Q.   So aside from you is the only survivor in your

4   family one brother?

5       A.   Yes.

6       Q.   Were you contacted by U.S. agents while you

7   were living in Rwanda?

8       A.   Yes.

9       Q.   And did you meet with American agents?

10      A.   Yes.

11      Q.   Where did you meet with them?

12      A.   At Hotel Faucon.

13      Q.   Is the Hotel Faucon close to where you work as

14  a waiter?

15      A.   Yes.

16      Q.   Approximately when was this meeting?

17      A.   It was in June.

18      Q.   Were there any officials of the Rwandan

19  government at that meeting?

20      A.   No.

21      Q.   Did any official of the Rwandan government

22  contact you to talk about what the Americans wanted?

23      A.   No.

24      Q.   How did you learn the Americans wanted to meet

25  with you?

```
 1      A.   It's a man whose name is Jean Pierre, he's a

 2 driver, he came to see me.

 3      Q.   And did Jean Pierre tell you the Americans

 4 wanted to talk to you?

 5      A.   Yes.

 6      Q.   What did you think the Americans wanted to

 7 talk about?

 8      A.   I thought that it was about information and

 9 testimony on what happened in Butare during the

10 genocide.

11           MR. CAPIN:  May I have a moment, your Honor.

12           THE COURT:  Certainly.

13      Q.   I have a few more questions about what you saw

14 Interahamwe doing at the I'Huriro roadblock.

15      A.   Yes.

16      Q.   Were the Interahamwe taking anything from the

17 people passing through the roadblock?

18      A.   Yes.

19      Q.   Could you see what they were taking?

20      A.   Yes.

21      Q.   Please tell the jury what they were taking.

22      A.   If it was a Tutsi, they will check that person

23 and take away the belongings.

24      Q.   Could you see -- do you know how they could

25 tell if a person was Tutsi or Hutu?
```

1      A.   The first thing they will ask for

2   identification.

3      Q.   Did you see any Interahamwe in particular

4   asking for identification?

5      A.   Yes.

6      Q.   Which Interahamwe did you see asking for

7   identification?

8      A.   Most of the time I saw Shalom, Munyenyezi, and

9   Desire, and Nyiramasuhuko.

10           MR. CAPIN: I have nothing further, your Honor.

11           THE COURT:  Thank you.  Mr. Ruoff?

12                    CROSS-EXAMINATION

13   BY MR. RUOFF:

14      Q.   Good morning, sir.

15      A.   Good morning.

16      Q.   Earlier when Mr. Capin was asking you to name

17   the women at the roadblock, I believe the only woman you

18   named was Munyenyezi; correct?

19      A.   Yes.

20      Q.   And I think you just testified that Pauline

21   Nyiramasuhuko was also at the roadblock; correct?

22      A.   Yes.

23      Q.   One of the questions that Mr. Capin asked you

24   concerned what -- your thinking American investigators

25   wanted to talk to you about at Hotel Faucon.  Do you

1    remember that question, sir?

2         A.    Yes.

3         Q.    And I believe your answer was that you thought

4    they wanted to talk to you about information and

5    testimony about the genocide; correct?

6         A.    Yes.

7         Q.    And that's because you've talked to other

8    people about what happened at the genocide; correct?

9         A.    Yes.

10        Q.    You've talked to a number of Canadians about

11   what happened during the genocide; correct?

12        A.    Yes.

13        Q.    You talked to them in 2001; correct?

14        A.    Yes.

15        Q.    And then you talked to them again in 2005;

16   right, sir?

17        A.    I talked to them once.

18        Q.    Do you remember talking to Canadian

19   investigators in March of 2005?

20        A.    Yes.

21        Q.    Do you remember talking to a gentleman by the

22   name of David Laurent in 2001?  His translator was

23   Georgette Buwate (ph).  And that was at the Hotel Ibis.

24        A.    Yes.

25        Q.    So there were two times that you talked to

1    Canadians; correct?

2         A.   It's once.  I remember only once.

3         Q.   We'll get back to the interviews.  One thing I

4    want to go over with you is what is your specific date

5    of birth?

6         A.   1979.

7         Q.   Sir, do you know the month and the day you

8    were born?

9         A.   No.

10        Q.   Now, you testified earlier that you were

11   13 years old when you graduated primary school; correct?

12        A.   Yes.

13        Q.   Isn't it true that you were still attending

14   primary school when the genocide began?

15        A.   I had already finished.

16        Q.   When you met with American investigators in

17   June, didn't you tell them that you were still attending

18   primary school when the genocide began?

19        A.   I told them that I had finished and living at

20   Sarafina's house.

21        Q.   Now, you testified earlier about your family

22   in Tumba.

23        A.   Yes.

24        Q.   Isn't it true you told American investigators

25   in June that you were living at Sarafina's because you

1   did not have a family of your own?

2       A.   I was an orphan and poor.  I didn't have my

3   mother.

4       Q.   Didn't you tell them that Sarafina took care

5   of you because you did not have a family of your own?

6       A.   She took care of me because I was poor.

7       Q.   Now, the prosecutor asked you a number of

8   questions about Shalom Ntahobali.

9       A.   Yes.

10      Q.   And he asked you about Maurice and Pauline;

11  correct?

12      A.   Yes.

13      Q.   Had you personally known Maurice Ntahobali or

14  Pauline Nyiramasuhuko?

15      A.   We didn't personally know each other, but it

16  was a prominent important family and it was -- it was

17  families.

18      Q.   Now, you testified that you were aware that

19  Shalom was married.  Is that something that you know

20  only because it's generally known in the Butare

21  community?

22      A.   Yes.

23      Q.   You didn't go to the wedding; right?

24      A.   Yes, I didn't go there.

25      Q.   You said that you knew Shalom because he was

```
 1   friends with one of the sons of Sarafina?

 2        A.   Yes.

 3        Q.   Now, at that time he must have been much older

 4   than you; correct?

 5        A.   Yes.

 6        Q.   Because you were a 14-year-old boy?

 7        A.   Yes.

 8        Q.   And he would have been a 24-year-old man?

 9             THE INTERPRETER:  Would you repeat that?

10             MR. RUOFF:  He would have been a 24-year old

11   man.

12        A.   Yes.

13        Q.   Now, you know Shalom had sisters; right?

14        A.   Yes.

15        Q.   Do you know their names?

16        A.   No.

17        Q.   Did you ever see his sisters around Butare?

18        A.   I wouldn't see them.

19        Q.   Now, you said that the place where you lived

20   with Sarafina was about a kilometer from where Maurice

21   Ntahobali and his family lived; right?

22             THE INTERPRETER:  Did you say Maurice or

23   Shalom?

24             MR. RUOFF:  I said Maurice Ntahobali.

25        A.   Yes.
```

1        Q.   And isn't that because it was actually in the

2   same neighborhood as Sarafina's in Huye?

3        A.   Yes, it was same neighborhood.

4        Q.   Not at the I'Huriro down by the ESO; correct?

5   Not at the I'Huriro down by the ESO; correct?

6        A.   I didn't understand that.

7        Q.   He had a house he lived in that was not a

8   hotel; correct?

9        A.   I don't know.

10        Q.   Do you know whether or not they had a house in

11   Cyarwa?

12        A.   Yes.

13        Q.   That's down by Mukoni; correct?

14        A.   Yes.

15        Q.   And that's generally known around the

16   community as well; right?

17        A.   Yes.

18        Q.   Now, isn't it true you only moved into Butare

19   in 1993?

20        A.   '91, '92, something like that.

21        Q.   Is it true that you were actually born in

22   Burundi?

23        A.   No.

24        Q.   I'm going to show you a couple of things on

25   the monitor here.  The prosecutor pointed out this area

1    here.  This is the area where you stayed at the EER;

2    correct?

3         A.   Yes.

4         Q.   And you were there for three days; right?

5         A.   Yes.

6         Q.   Now, you said that you were afraid during that

7    time; right?

8         A.   Yes.

9         Q.   So you were hiding in these buildings down

10   here; right?

11        A.   Yes.

12        Q.   Now, you said that you saw what was going on

13   at the roadblock up here in front of the hotel; right?

14        A.   Yes.

15        Q.   You said that you could see from where you

16   were here that up here people were checking IDs; right?

17        A.   Yes.

18        Q.   You said you saw someone named Munyenyezi

19   writing in a book up here?

20        A.   Yes.

21        Q.   And you could tell that someone up here was

22   writing down names of Tutsi in a book; right?

23        A.   Yes.

24             MR. RUOFF:  Just a second, your Honor.

25             (Pause.)

1       Q.   Lastly, with respect to the photograph, you

2   said that from where you were down here you could see

3   the people up at the roadblock were wearing MRND

4   uniform?

5       A.   Yes.

6       Q.   And that you saw people wearing buttons with

7   the picture of the president on it; right?

8            MR. CAPIN:  Objection.  He didn't say buttons,

9   your Honor.

10           THE COURT:  True, he didn't say buttons.

11  Clothing.

12      Q.   Clothing with pictures of the president on it?

13      A.   Yes.

14      Q.   Now, when you talked to the agents in

15  June 2010, isn't it true that you told him that you saw

16  her wearing buttons with the picture of the president on

17  it?

18           THE INTERPRETER:  Clarification, did you say

19  2010?

20      Q.   I'm sorry, last June, 2012.

21           THE INTERPRETER:  Would you interpret that

22  question.

23      Q.   In June 2012 didn't you tell American agents

24  that you could see from the EER Munyenyezi wearing a

25  button with the picture of the president on it while she

1    was at the roadblock.  My question is only whether or

2    not you said that to the agents.

3        A.   Yes, I did.

4        Q.   Now, prior to June of 2010 -- 2012, sorry,

5    prior to June 2012 you had never told anybody about

6    Munyenyezi; correct?

7        A.   No one.

8        Q.   Yet in 2001 when you met with Canadian

9    investigators at the Ibis Hotel, you talked about Shalom

10   and Pauline; correct?

11       A.   Yes.

12       Q.   You described to them that Shalom was a devil;

13   right?

14       A.   Yes.

15       Q.   That his mother was evil?

16       A.   Yes.

17       Q.   You described how Pauline was dressed?

18       A.   She will be dressed in military uniform.

19       Q.   My question is whether or not you described

20   how she was dressed to the Canadians in 2001.

21       A.   Yes.

22       Q.   And during that interview you never mentioned

23   Beatrice Munyenyezi, the wife of Shalom; correct?

24       A.   Yes.

25       Q.   And in 2005 you met with Canadian

1 investigators again; correct?

2  A. I don't understand that.

3  Q. Okay.  Do you remember when you met with

4 Canadian investigators and they showed you a number of

5 pictures and they were asking questions about Desire?

6  A. Yes.

7  Q. You remember that now.

8  A. Yes.

9  Q. Okay.  And that was the time when you told

10 them again about Shalom and Pauline; correct?

11  A. Yes.

12  Q. And you explained in detail how Shalom tried

13 to kill you three times; right?

14  A. Yes.

15  Q. And you described seeing Shalom travel around

16 with a group of men.

17  A. Yes.

18  Q. And you described how you escaped.

19  A. Shalom had a white pickup.  That car will come

20 and gather Tutsis.  The first group, I was part of it,

21 and when we got to Buhira's, somebody kicked me with an

22 elbow -- the car slowed down and somebody kicked me with

23 an elbow and with a gun butt, and I got out of the car

24 and fell and the car kept driving.

25  Q. My question was when you met with Canadian

1   investigators, you told them the story of how you fled

2   from Shalom.  Just what you told the Canadian

3   investigators.

4        A.   I told them that Shalom was -- would kill

5   people.  He was like a devil, and he will take people

6   and go and kill them on a daily basis.

7        Q.   So you talked a lot about Shalom with the

8   Canadians, right, even though they were there to talk

9   about someone named Desire.

10            MR. CAPIN:  Objection to the compound

11   question, your Honor.

12            THE COURT:  Overruled.

13        A.   Yes.

14        Q.   And you did not mention Munyenyezi?

15        A.   Yes.

16            MR. RUOFF:  Just a second, your Honor.

17            (Pause.)

18            MR. RUOFF:  Thank you, sir.  No more

19   questions.

20            THE COURT:  Any redirect?

21            MR. CAPIN:  It will be brief, your Honor.

22                      REDIRECT EXAMINATION

23   BY MR. CAPIN:

24        Q.   Can you please look at the picture of the EER,

25   sir?

1     A.    Yes.

2     Q.    Was there enough space inside the buildings

3   for all the Tutsi refugees to fit?

4     A.    Yes.

5     Q.    Did the Tutsi refugee also move throughout the

6   area behind and surrounding the EER?

7     A.    Yes.

8     Q.    Mr. Ruoff pointed to this location here where

9   you said you spent most of your time.  Do you see that?

10    A.    Yes.

11    Q.    Did you also in the three days you were at the

12  EER move around the entire area?

13    A.    Yes.

14    Q.    Did you move to places on the EER property

15  much closer to the roadblock?

16    A.    Yes.

17    Q.    Did you move to places where you could easily

18  see the roadblock?

19    A.    Yes.

20    Q.    Now, Mr. Ruoff asked you questions about you

21  telling Canadians that Shalom tried to kill you three

22  times.

23    A.    Yes.

24    Q.    Did Munyenyezi ever try to kill you?

25    A.    No.

1      Q.   Mr. Ruoff asked you questions about other

2   Interahamwe that you mentioned to the Canadians.

3      A.   Yes.

4           MR. CAPIN:  Can I have a moment, your Honor.

5           THE COURT:  Certainly.

6           (Pause.)

7      Q.   When you spoke to the Canadians, did you

8   mention Desire?

9      A.   Yes, I did.

10     Q.   Did you mention a man named Clement?

11     A.   Yes.

12     Q.   Is Clement related Desire?

13     A.   His older brother.

14     Q.   Did you mention a man named Jean Pierre?

15     A.   Yes.

16     Q.   Is Jean Pierre related Desire?

17     A.   Yes.

18     Q.   How is he related Desire?

19     A.   His cousin.

20     Q.   So when you talked to the Canadians you

21   mentioned Desire, his brother, his cousin, Shalom, and

22   Pauline.  Is that correct?

23          THE INTERPRETER:  Clarification.

24     Q.   I'm going to list the people that you

25   mentioned to the Canadians.  Please tell me if I leave

41

1    anybody out.  Desire, his brother Clement; correct?

2         A.    Yes.

3         Q.    His cousin Jean Pierre?

4         A.    Yes.

5         Q.    Shalom and Pauline?

6         A.    Yes.

7         Q.    And those are the only people you mentioned to

8    the Canadians?

9         A.    Yes.

10        Q.    When you spoke to the Canadians did you have

11   an understanding about where Desire was living?

12        A.    Yes.

13        Q.    Where did you understand him to be living?

14        A.    In Canada.

15        Q.    Now, you mentioned when I asked you questions

16   about Interahamwe at the roadblock -- I'll break it

17   down.  I asked you questions about Interahamwe who you

18   saw at the roadblock.

19        A.    Yes.

20        Q.    And you mentioned six or eight people?

21        A.    Yes.

22        Q.    You mentioned Alphonse?

23             MR. RUOFF:  Objection.  This is all leading

24   now, Judge.

25             THE COURT:  Well, overruled.  Briefly.

42

1             MR. CAPIN:  I'm about one minute from the end,

2    your Honor.

3        Q.   You mentioned Alphonse; correct?

4        A.   Yes.

5        Q.   Was Alphonse one of the killers who took

6    Tutsis down to the woods?

7        A.   Yes.

8        Q.   Why didn't you tell the Canadians about

9    Alphonse?

10            THE INTERPRETER:  Excuse me?

11        Q.   Why did you not tell the Canadians about

12    Alphonse?

13        A.   I didn't remember that.

14        Q.   Did the Canadians ask you about Alphonse?

15        A.   No.

16        Q.   You mentioned that Twahirwa was another man

17    working at the I'Huriro roadblock.

18        A.   Yes.

19        Q.   Why did you not -- did you tell the Canadians

20    about Twahirwa?

21        A.   No.

22        Q.   Did they ask you about Twahirwa?

23        A.   No.

24        Q.   You mentioned Kzungu.  Did you tell the

25    Canadians about Kzungu?

```
 1        A.    No.

 2        Q.    Did they ask you about Kzungu?

 3        A.    No.

 4        Q.    You mentioned Jean Bosco.

 5        A.    Yes.

 6        Q.    Did you tell the Canadians about Jean Bosco?

 7        A.    No.

 8        Q.    Did the Canadians ask you about Jean Bosco?

 9        A.    No.

10        Q.    Was Shalom the only Interahamwe you saw at the

11   I'Huriro roadblock?

12        A.    There were many Interahamwe.

13        Q.    Is he the only one from the I'Huriro roadblock

14   that you mentioned to the Canadians?

15        A.    I told them more.

16        Q.    Did you tell them about Desire?

17        A.    Yes.

18        Q.    And did you tell the Canadians about Shalom

19   and Desire together because they did a lot of things

20   together?

21              MR. RUOFF:  Objection.  It's getting way far

22   afield.

23              THE COURT:  It's getting way far afield.  It's

24   way beyond a few minutes of a few questions.

25              MR. CAPIN:  Fair enough.  I have nothing
```

1    further.

2              THE COURT:  Two.

3                    RECROSS-EXAMINATION

4    BY MR. RUOFF:

5         Q.    Pauline Nyiramasuhuko didn't try to kill you;

6    right?

7         A.    Yes.

8         Q.    She did try to kill you?

9         A.    No.

10        Q.    But you told the Canadians about her?

11        A.    Yes.

12        Q.    And the American investigators asked you

13   specific questions about Munyenyezi; right?

14        A.    Yes.

15             MR. RUOFF:  No further questions.  Thank you.

16             THE COURT:  Thank you, sir, you may step down

17   and you're excused.  Do you want to take a break now?

18             MR. CAPIN:  It may be a good time.

19             THE COURT:  Why don't we take our midmorning

20   break now, ladies and gentlemen.

21             (Recess taken.)

22                        ERIC BENN

23        having been duly sworn, testified as follows:

24             THE CLERK:  For the record, please state your

25   name and spell your last name.

45

```
 1              THE WITNESS:  Good morning.  My name is Eric
 2   Benn.  Last name is spelled B-E-N-N.
 3                     DIRECT EXAMINATION
 4   BY MR. CAPIN:
 5        Q.   Mr. Benn, please tell the jury what you do for
 6   a living.
 7        A.   My position, I'm an employee of the federal
 8   government.  I work in the Department of Defense.  My
 9   position and title is senior GEOINT advisor, and I work
10   for the National Geospatial Intelligence Agency.
11        Q.   What is the National Geospatial Intelligence
12   Agency?
13        A.   National Geospatial Intelligence Agency is a
14   part of the Department of Defense.  It is also a part of
15   the intelligence community.  This is the community of
16   agencies in the federal government that conduct
17   intelligence, foreign intelligence, for our national
18   security interests.  We are both a part of DOD, the
19   Department of Defense, supporting the war fighter
20   requirements, but also supporting the other things that
21   the intell community supports, which is senior decision
22   making, warning, help to policy makers and diplomats to
23   protect our interests.
24        Q.   You said you were a GEOINT analyst.  What does
25   GEOINT refer to?
```

46

```
 1          A.    GEOINT, classic government speak.  We have
 2    acronyms and shorthand for things.  GEOINT is one of the
 3    disciplines of the intelligence business.  It's focused
 4    on the inputs or the sources we work with.  Probably the
 5    pieces of the intell community you're more familiar with
 6    or are more well-known, HUMINT, human intelligence.
 7    That's predominantly done by the Central Intelligence
 8    Agency, CIA, which goes out and tries to recruit human
 9    agents to divulge things that are of interest to our
10    nation.  SIGINT is signal intelligence.  That's done by
11    our sister organization, the National Security Agency,
12    and they try to intercept communications or signals, and
13    those might be the kinds of signals that a terrorist
14    might be using on his cellphone or it might be the kind
15    of thing that a foreign military is communicating with
16    its deployed forces.  HUMINT, SIGINT, GEOINT, geospatial
17    intelligence.  That has to do with imagery, imagery
18    intelligence and geospatial information.  Geospatial
19    information is the traditional mapping, charting,
20    geography, the kind of information in maps or charts or
21    the kinds of data that missiles need to use to fly their
22    trajectories, the maps that soldiers use to calculate
23    artillery fires or sailors use to navigate the seas
24    safely.  Imagery and imagery intelligence is imagery --
25    it used to be called photography.  It's now imagery,
```

47

1    which we collect with cameras or camera-like devices,

2    and they can be anything from a handheld photo that an

3    attache might collect or that we might even get on the

4    open press to now the unmanned aerial vehicles, Predator

5    and the comparable of surveillance platforms that the

6    military flies, to airplanes with pilots in them, such

7    as the U2 or other manned reconnaissance aircraft to now

8    satellites.  And there are both satellites that are

9    flown by civil entities, like the U.S. Geologic Survey

10   or NASA.  There are private satellites, such as GeoEye

11   and DigitalGlobe, which you can see on Google Earth or

12   Google Maps, and then the government has its own

13   classified satellites that are flown for intelligence

14   purposes.  We do the intelligence, we do the analysis of

15   the data from those various imagery sources to answer

16   the policy questions, the planning questions, the

17   information needs related to our national security.

18        Q.   So would I be correct in understanding that as

19   a geospatial intelligence analyst what you essentially

20   do is you analyze images collected from a variety of

21   sources, including satellites and the like.

22        A.   That is exactly what we do.  We try to answer

23   information needs or provide the information that our

24   national security interests demand of us.

25        Q.   And how long have you been engaged in that

1  line of work?

2      A.    I started in this line of work when I joined

3  the U.S. Army.  I joined the Army right out of college

4  in the late seventies.  I was trained in the Army as an

5  imagery interpreter at Fort Huachuca, which is where the

6  intell school was.  That was in 1978.  And I've

7  essentially been involved in this business since that

8  time, since the late seventies.

9      Q.    Are you currently employed by the military?

10     A.    I'm currently employed by the Department of

11 Defense.  The Department of Defense has many civilian

12 employees as well as active duty military employees.

13         I did three years as an intelligence analyst,

14 a non-commissioned intelligence analyst in the Army, but

15 completed my military service and have done the civilian

16 equivalent since the early eighties.

17     Q.    Can you in a sentence or two just review

18 chronologically your experience as a civilian employee

19 with the Department of Defense since the eighties.

20     A.    Sure.  I joined as an imagery analyst with an

21 organization called the Defense Intelligence Agency,

22 DIA.  DIA does the intelligence analysis but also

23 exploitation and processing to support the military's

24 requirements, to support the DOD, the Department of

25 Defense, combatant commands, the planners, the policy

1    makers, and the Pentagon, the Secretary of Defense,

2    people like that.

3            A new agency was established in 1996 called

4    the National Imagery and Mapping Agency, NIMA -- we

5    always have our shorthand -- and that's the predecessor

6    organization to NGA, the agency I'm with now.  We

7    brought in in 1996 the imagery assets from CIA, from

8    DIA, my organization, and other organizations, the

9    mapping agency, defense mapping agency, and combined

10   that all into a single organization.

11           When I started I was a line analyst and I

12   worked a number of analytic accounts.  I did a brief

13   period looking at North Korean military forces.  I spent

14   almost five years looking at the Soviet intervention in

15   Afghanistan.

16           I then was promoted to senior analyst and was

17   working a myriad of Soviet military issues, branch

18   senior analyst and then division senior analyst.  I was

19   involved in arms control, the Cold War threat, those

20   various high priority topics.

21           In the late nineties I was the office senior

22   analyst, and at the establishment of the new agency, I

23   was the research director, essentially looking at all of

24   our analytic portfolios and helping to prioritize and

25   make sure that the focus of all of our analysts was on

1   the most important issues and directing and that kind of

2   analysis.

3         Q.    You say you were promoted to senior analyst.

4   Are you in fact the most senior analyst currently at the

5   Department of Defense?

6         A.    Yes, that is correct.  I'm the most senior

7   geospatial analyst, or GEOINT analyst, in the Department

8   of Defense but also in the intelligence community and by

9   implication in the government.

10        Q.    Does the civilian service at the Department of

11  Defense have an equivalent of what we might understand

12  to be a military title?  What would your equivalent be

13  on the military side?

14        A.    I'm a member of the senior executive service,

15  I'm actually a senior level, which is what we have for

16  senior technical experts.  The equivalent which we have

17  for protocol purposes when we go to conferences or

18  meetings or when they have to understand for processing

19  these kinds of things, we at my level have the

20  equivalence of a two or three-star general officer or a

21  rear admiral in the Navy, so the equivalent of a general

22  or an admiral.

23        Q.    And approximately how many images have you

24  analyzed in your 35 or so years?

25              THE COURT:  Do you challenge his

1    qualifications to testify as an expert?

2          MR. RUOFF:  Not at all, your Honor.

3          THE COURT:  Okay.  He's qualified as an

4    expert.  He can give expert opinion testimony.

5          MR. CAPIN:  One more question and then I will

6    move on.

7          THE COURT:  One more, that's it.

8    Q.    Have you received any awards for your service

9    as a GEOINT analyst?

10    A.    Yes.  I recently last spring was very pleased

11    and honored to receive the -- had been selected as a

12    presidential rank award recipient.  There are a couple

13    dozen senior executives in the federal government who

14    receive such an award, and I was called out for a career

15    of distinguished service and received this

16    acknowledgement.  Included in the citations for that

17    were references to contributions I made to the Bin Laden

18    pursuit, not as an analyst directly involved in that

19    analysis, but rather as someone who was supervising and

20    validating the analysis, the reporting, the techniques

21    that we were using in the hunt for Bin Laden and

22    ultimately his pursuit and what we all know to be the

23    disposition of his circumstances.

24    Q.    Thank you, sir.  As you can see there's no

25    dispute that you're an expert.  Can you please tell the

1    jury what you did with regard to this case?

2         A.    With regards to this case, I was asked to

3    review a number of images that had been prepared.  These

4    are what we call imagery-derived products, IDP, and

5    these are images that were required by the U.S.

6    government for official purposes back in 1994.  The

7    array of images that were potentially available were

8    examined, and these are images that pertain to the area

9    of interest that was asked for in this case.  I have

10   reviewed those images and done -- or these image

11   products and have done analysis of what can be observed

12   on the image data itself.

13        Q.    Can you tell the jury just in a nutshell

14   what's involved in analyzing an image.

15        A.    In analyzing an image you invariably want to

16   have some understanding of what the information need

17   that you're supporting is.  So you want to understand

18   the location, why the location was collected on this

19   imaging platform or, in this case, a satellite,

20   something about the location.  You want to take prior

21   knowledge of exploiting images and what that kind of

22   part of the world will be like and the kind of features

23   you are used to seeing or likely to see there and then

24   go after kind of the information needs that the

25   requester brought to you, and then think about going in

1    and looking at the imagery, and first you look at kind

2    of the quality of the image, the overview of what it

3    looks like, and then you start zooming or changing the

4    magnification or the contrast or the technical

5    attributes of optimizing what you can see to resolve

6    features or objects or activities that will be of

7    significance to the person that asked you to review the

8    imagery.

9         Q.   I will hand you what's in evidence as Exhibits

10   5A through F.  Would you tell me if you recognize those,

11   please?

12        A.   I do recognize these exhibits.

13        Q.   And what are they?

14        A.   These are image-derived products.  In this

15   case -- all image-derived products are going to have a

16   name and a date on them and a unique identification

17   number on them.  These image-derived products also have

18   certain annotations which I and my colleagues who were

19   involved in the preparation of these materials have

20   annotated and essentially burned into these image

21   graphics.

22        Q.   Is the equipment that collects images such as

23   the ones you're holding, Exhibits 5A through F, does

24   that equipment correctly annotate the date of the image

25   on the image itself?

54

1          A.    Yes, it does.  These satellites have

2    extraordinary accuracy and precision.  The date, the

3    time, the location, the geometry is all critical to the

4    operation of the satellite, one, to make sure that we

5    image the right part of the ground, but then for the

6    derived processes and products that we are going to

7    derive from this, we in many instances need

8    extraordinary detail because in some instances we are

9    actually deriving precision coordinates that the

10   military will use to aim weapons.  So if we are going to

11   give them coordinates that are derived from a different

12   piece of satellite imagery, obviously there's a

13   requirement that we have extraordinary accuracy and

14   precision and understanding of the imagery.  So yes,

15   those dates are very well precise.

16         Q.    And what are the dates on the images in front

17   of you, Exhibits 5A through F?

18         A.    The dates of the various images, 1 June 1994,

19   5 June 1994, 18 July 1994.

20         Q.    I'd like to ask you to explain to the jury

21   what you did, what your analysis involved with regard to

22   each of those images.

23               MR. CAPIN:  And your Honor, I think it may be

24   easier for Mr. Benn if he were permitted to use the

25   computer.

1          THE COURT:  Certainly.  If you'd like to step

2     down, Mr. Benn, that would be great.

3          Q.   In the interest of efficiency, Mr. Benn, I've

4     gone and put up Exhibit 5A.  Feel free to be seated or

5     whatever is most comfortable.  Please tell the jury what

6     they are looking at on their screens.  Start by

7     orienting us by where in the world this is and what

8     we're looking at.

9          A.   Yes.  This is a black and white image,

10     panchromatic.  It's acquired, collected by an imaging

11     satellite that's several hundred miles up in space and

12     it's looking down at the ground.  Now, in this instance

13     -- whereas usually when you see maps or products like

14     that, north is up because that's kind of the convention.

15     In this case the satellite isn't looking straight down.

16     It's looking off to the side at a certain obliquity, and

17     as we zoom in on some of the subsequent images, you will

18     see why we've turned the image sideways.

19          So north is to the left and you see the north

20     up in the corner of the image.  I will direct your

21     attention with the cursor here.  So north is to the

22     left, and that's kind of made for viewing convenience

23     and logic.  As I zoom in you can actually see buildings.

24     We don't want to have buildings lying on their side or

25     looking like they are turned sideways.  So we do that

1    for this purpose.  This is so far up in the air -- up in

2    space, that's a cloud.  There are other clouds that are

3    over in the corners of the images.  Here is actually a

4    shadow of a cloud up in the corner of this image.

5              This is an area in Rwanda that the satellite's

6    focused in on and collected a set of image data.  This

7    is in the Butare province, and this is actually a

8    section of the town of Butare.  We can go in and zoom in

9    and out of the original data set, and then essentially

10   grab a portion of that and we turn that into the derived

11   products.  This is exactly the kind of product that we

12   produce every day for policy makers, for military

13   planners.

14             No doubt people have heard the North Koreans

15   conducted a nuclear test overnight last night.  There

16   were image products that were produced this morning of

17   the North Korean nuclear test sites that would be very

18   comparable to this that have been delivered to

19   policymakers throughout Washington, D.C., the military

20   commands, those kinds of things.

21             This is the kind of graphic that we'll

22   routinely produce.  What you're seeing here is a part of

23   the town of Butare.  What I will draw your attention to

24   with the mouse is a line that's kind of running across

25   the image from right to left.  That's the Kigali Road.

 1    That's the main highway through this district.  It's the

 2    main road that runs through Butare.

 3              Off to the right, off the edge of the image,

 4    is the highway that goes south to the Burundian border,

 5    and running through town it runs off and it's actually

 6    under the cloud or right on the edge of the cloud, but

 7    the road is running north to the capital Kigali, which

 8    is why the road is named Kigali Road.

 9              Other features that you see kind of in the

10    vicinity here, you see a number of buildings kind of in

11    a nice clean row up in the upper right portion, other

12    buildings up in this area.  That's the university.  You

13    can see kind of from the layout, it's a large

14    structured, organized complex.  There's a large medical

15    center that's on the opposite side of the road just to

16    the south.  That's a large health complex and medical

17    institution, I think, associated with the university.

18    There are other buildings and areas of developments over

19    on the left side and along the road.  Kind of in the

20    center of the image you're seeing an area that doesn't

21    have any structures, doesn't appear to have any roads

22    through it.  In fact, it's kind of hard to see on this

23    image, but that's kind of a large valley or a gully or a

24    cut-out, a basinal kind of a formation that slopes down

25    off of the road, and you can see a forest out here, and

1    running off to the top of the image to the east it

2    actually adjoins a large -- I think it's a national

3    forest or a state forest, kind of a large natural area.

4          So that's kind of the overview that we're

5    seeing.  The next image and the next couple images we'll

6    be zooming in on this overview to look more closely at

7    areas that are down at this portion of the road in the

8    lower center, kind of where the road turns an arc and

9    then swings back off to the left of this image, which is

10   to the north.

11   Q.   Before you move on to the next image, can you

12   explain what factors affect your ability to make out

13   things on the ground in images like these?

14   A.   Various factors.  Well, obviously there's the

15   circumstances of the image itself.  This is a nice clean

16   image.  There are some clouds present.  More presence of

17   clouds means there's more areas that are obscured.  If

18   the thing you are looking for is directly under a cloud,

19   that means it's impossible to see.  Sometimes you get

20   haze or atmospheric conditions, mist in the air or steam

21   rising up off the hot pavement or a very moist day.  You

22   may have a shimmer of kind of the haze in the area that

23   reduces the quality of the image.

24          And then the other thing that you look for is

25   the contrast of the features, the ability to resolve and

1    see the features that you're looking for.  In this case

2    as we look through, more zoom, more magnification, you

3    will see that features are -- some of them in different

4    images will be somewhat fuzzy, and that's the attributes

5    of the resolution of the image.  The better the

6    resolution, the more fine or discreet features you can

7    see.

8            Analysts look for things like the size of the

9    objects, the shape of the objects, their surroundings,

10   the texture.  Are they clean in a simple or uniform

11   reflectance or appearance or do they have a pattern

12   about them.  Those kinds of features are the things

13   that -- the techniques that the analytical signatures

14   are methods that we use as we exploit these kinds of

15   data.

16       Q.   What's the date of the image on file on 5A?

17       A.   This image was acquired on 1 June 1994.

18       Q.   Am I correct that 5B is a zoomed in image of a

19   portion of that same image on June 1, '94?

20       A.   5B, up in the upper left corner, is that the

21   exhibit number?  Yes, that is the same image and it has

22   been zoomed in to show just a portion of the road.

23       Q.   And is the portion shown on that just north of

24   the university?

25       A.   It is not.  Well, it is well to the north.  It

60

1   is perhaps a half a kilometer to the north and across

2   the image.

3       Q.   We're not up on distances.  Half kilometer is

4   like five or 600 yards?

5       A.   Thank you.  Between a quarter and a half a

6   mile.

7           And I can jump back, I think.  Here's the

8   university.  Here's that kind of valley or low area

9   that's draining off to the top of the image, and we're

10   looking now at this area right in here.  There's a

11   prominent building there, and there's a series of

12   buildings here that we will look at, and there's a road

13   intersection right there that will be I think centered

14   in the next image that we look at.

15       Q.   Could you move on to the next image and

16   explain again what you're able to observe based on your

17   expertise?

18       A.   So this was the large building that I was

19   siting.  This is the road intersection.  And

20   unfortunately you're not seeing much of that road.

21   That's called I think the CHUB Road.  It runs off, and I

22   think the military cantonment that's just off of this

23   image is called the CHUB Garrison or something along

24   those lines.  And then this is that set of features that

25   I think I understand to be a school or a secondary

1   school.  Not from my analysis of the imagery but from

2   other sources and just having looked at Google maps and

3   those kind of things.

4           Again, this is the Kigali Road or the Kigali

5   Way and that's essentially bisecting the image top and

6   bottom.  North is again generally to the left of the

7   image.  And so you're seeing the road, features on the

8   road, and then structures, buildings, that are adjacent

9   to the road.

10      Q.  Can you tell me something about the topography

11   of this area moving from the road in that direction?

12   First, just so we all understand, I'm using the right

13   term, what do you understand topography to mean?

14      A.  Topography would be the terrain or the relief

15   or the shape of the earth.  And essentially the road is

16   on a relatively flat and high ground, and moving off to

17   the upper right corner of the image, off in this general

18   direction, you're going down slope.  So it's relatively

19   flat.  It appears to be relatively flat out, for

20   instance, in the backyard of this complex and relatively

21   flat out through this yard or this area, but I can even

22   make out what are probably drainage ditches or gullies

23   or things like that, and others are running off down

24   towards the east.  And as you go back on the prior image

25   you could see the various drainage ways forming as it

1    went down slope into that relief.

2            So this is probably not steep, but this is

3    very much a sloped surface back in the top portion of

4    the image.  This is woods up here and this is lower cut

5    scrub or small trees.  In some instances these are lines

6    made by people who are carving out either fields or

7    areas that they are fencing off, essentially to graze

8    livestock or there may be ownership issues, those kinds

9    of things related to seeing those kinds of boundaries.

10       Q.    Can you tell if there's any agricultural

11   activity in that corner?

12       A.    In this instance up here these are forests.

13   You can see the very irregular pattern and it's

14   speckled.  That's what the tops of trees routinely look

15   like.  It's not organized.  This is not an orchard or a

16   grove that has been planted.

17            In this instance this right kind of below

18   where the slope begins, you can see these are dots that

19   are in rows and they very much are out in an organized

20   fashion.  I would interpret this to be an orchard or an

21   organized large vegetable garden where the plants grow

22   for years and years and endure.  I'm not seeing other

23   areas that are comparably cultivated or organized or

24   systematic in the way they are laid out.  But some of

25   these others could be plotted fields or fields where

1    people are maintaining livestock or those kinds of

2    things.

3         Q.   Can you tell me the distance between this

4    building and these series of buildings?  Basically from

5    here to here.  Have you taken any steps to ascertain

6    possibly how far that distance is?

7         A.   I have.  I haven't taken the precise kinds of

8    steps that we would use if someone was going to do

9    military planning.  If someone is going to jump out of

10   an assault aircraft and you want to know exactly how

11   long it will take before they get to the gate, I would

12   use very different techniques.  But what we call a

13   course estimation, rough estimates, the size of vehicles

14   are known and the numbers of vehicle lengths can then be

15   calculated in a very straightforward fashion.  That's

16   roughly 200 feet.

17        Q.   So can you give us something just in our

18   current environment of 200 feet just so we have a sense

19   of how far it is between those two buildings?

20        A.   Sure.  In preparing to come in before you

21   today, I was waiting out front.  In fact, the front of

22   this courtroom, all three courtrooms, from one side to

23   the other, is almost exactly 200 feet as I pace it off,

24   and assuming my pace is about three feet.

25             So the width of this courthouse is about the

64

1    same distance as from the large building that's over

2    here to the edge of -- the corner of this complex or

3    this facility, which I think I understand to be a middle

4    school.

5         Q.    So if I were to walk out this door behind you,

6    sir, and walk the full length of this hallway here,

7    that's about 200 feet?

8         A.    That's my estimation, yes.

9         Q.    Describe what activity you can see on the

10   roadway.

11        A.    As I say, this is the main highway.  This is

12   the Kigali Road, and there are various features that can

13   be seen at this level of magnification, and we'll zoom

14   in even further on a subsequent image.  But I see

15   vehicles.  There's a car.  There's another car.  This is

16   a vehicle, I think it's probably a light pickup truck.

17   This is a large cargo truck that's over out immediately

18   adjacent to this complex.  It's actually parked on the

19   shoulder.  So the white area that you see on the right

20   side of the image is the cab and the hood.  The dark

21   area is the bed of the truck.  So it's parked on the

22   shoulder facing the wrong direction into traffic.

23             There are other vehicles, some vehicles in

24   this parking area inside the complex here.  There are

25   other vehicles parked inside this compound.  It's over

1   on the right.  I don't see other vehicles going up the

2   road past this white one.  What I do see though is other

3   activity on the road.  This I believe is an asphalt

4   road, and usually asphalt surfaces, unless they are

5   really badly deteriorated, where you've got muddy holes

6   and ruts and those kinds of things, that is not what I

7   believe I see here.  I believe this to be human

8   activity, people in fact congregating out on the road

9   surface, and this is relatively large numbers of people

10   that are actually out on the road.  I see the mottled

11   pattern, diverse colors, light, dark, tan, and in

12   between.  It's not the clean, consistent pattern.  If it

13   was a flock of sheep, they would all have the same

14   color.  A flock of livestock would probably be clustered

15   together.  This is kind of scattered out as people who

16   are walking in a loose aggregate might formulate.  This

17   is not a marching band.  This is not a military

18   formation.  This is not people lined up in neat rows.

19   This is clusters or numbers of people.

20          It's most congregated up in this general

21   region, but there are still numbers of people that I see

22   even well back, almost all the way to the edge of the

23   image.

24      Q.   What, if anything, do you infer from the

25   pattern of the people along the roadway and the pattern

1    of the automobiles that you pointed out with regard to

2    what other elements may be in that roadway?

3         A.   As I can see in this image, and if we go to

4    the next exhibit or in a subsequent image where we've

5    zoomed in even further, you can see in even more detail.

6    These vehicles -- and I described the one that's kind of

7    in the lead of the three.  The cab is the white area.

8    The bed of the truck is in the back.  That vehicle is

9    not driving on the wrong side of the road.  He's headed

10   south and yet he's crossed over.  It appears that he or

11   she has crossed over and is in the opposing lane of the

12   road.

13        The vehicle behind it appears to be following

14   in its track and is also driving across into that

15   oncoming lane.  The white vehicle isn't potentially --

16   it hasn't crossed over but isn't exactly up against the

17   curb in his or her lane either.

18        Similarly I also infer that more of the people

19   along the road are on the right side or the lower side

20   of the image.  So I get the impression that they are on

21   the southbound side.  My intuition would be that they

22   are also traveling in the south -- southerly direction

23   in the direction that these vehicles have been driving.

24   Why the vehicles are outside of their lane of traffic, I

25   interpolate less from this image, but the zoomed in

1   images, there are obstacles in the road and they are

2   driving around those obstacles so as to proceed to the

3   south.

4        Q.   When you say driving around those obstacles,

5   your hands are defining a zigzag sort of.

6        A.   Yes, a zigzag.  We call it a serpentine

7   fashion.  "Serpent" is the root word of "serpentine."

8        Q.   Snake like?

9        A.   It's snake like.

10       Q.   We're going to move on to 5C, but before we do

11   that, you just said it appears to you that the human and

12   vehicle traffic is moving from north to south.  Does the

13   fact that there appears to be nothing in this vicinity

14   here in any way relate to that conclusion?

15       A.   The absence of traffic, the absence of vehicle

16   traffic or people traffic implies that to the right

17   beyond the area that the prosecutor has just asked about

18   is open or is not obstructed and to the left is

19   obstructed.  And in fact the obstructions that I see on

20   the road essentially begin at exactly that area and a

21   number of them are in the area to the north on the road

22   or into the obstructed area, and there are no

23   obstructions that I observe on this or other images to

24   the south as though this is the point at which the

25   obstructions begin, if that answers the question.

1      Q.   It does, thank you.  Why don't we move on to

2    5C if we could.  And before you start on this one, I

3    notice there are the words "people," "vehicles," and

4    "obstructions" written on this.  I also note that this

5    is dated in the upper right-hand corner June 1, 1994.

6      A.   That's correct.

7      Q.   Is this from the same image?

8      A.   This is exactly the same image and has been

9    zoomed in.

10     Q.   Do you know how the words "people,"

11   "vehicles," and "obstructions" came to appear on this

12   image?

13     A.   This is the standard analytic process where in

14   response to the information needs that have been brought

15   to myself and my colleagues, we annotate the things we

16   observe with the levels of confidence we have onto those

17   graphics to illustrate the findings -- the significant

18   findings that we have drawn from the image data.

19     Q.   So if you would please explain what you're

20   able to see now with this additional level of zoom.

21     A.   So I'm able to characterize in greater detail

22   and hence with more confidence the activities of those

23   vehicles.  Here you can see the white sedan.  You can

24   actually see the hood of the vehicle and the windshield

25   and the roof of the passenger compartment and the trunk

1   to give me very strong confidence that he or she is

2   traveling to the south.  Again, that kind of detail in

3   the small utility vehicle, probably a pickup truck or

4   perhaps a utility van with the light-toned cab.  There's

5   that large cargo truck, and again, it is substantially

6   larger than the passenger vehicles.

7           So that's kind of the orientation, the comfort

8   that I as an analyst have in understanding and --

9   understanding, being confident, that I am seeing what I

10  think I'm seeing.

11          Clearly I infer that these vehicles are

12  driving to the south, are driving from left to right on

13  the image, and there are features that are obstructing

14  the road.  In this case it's a small darkened area on

15  the road.  In this case there's another darkened feature

16  there.  There's a feature up here that isn't annotated.

17  There's another feature here that isn't annotated that I

18  also assessed to be obstructions.

19          So in fact I get the impression that this

20  white vehicle is about ready to veer off into the other

21  lane to avoid, to go around an obstruction that's right

22  here.

23          Looking at the people annotation, you can see

24  on the portion of the road there -- let me grab this and

25  just zoom it a little bit.  The image starts to get

1    blocky, but you can see what I described before the

2    mottled effect, the different colors, the variations.

3    Some are dark, some are light.  In some instances what

4    you're seeing is not the individual, the person, but the

5    shadow path from the person, and that's a standard part

6    of our analytic technique is to see both the feature and

7    the shadow that it has.  The taller the object, the

8    longer the shadow it's going to cast will be.

9              So you can see that there are large numbers of

10   areas and features that are out obstructing the road.

11   Fewer down here, whereas here they span almost the full

12   width of the road.  Well, forward there are fewer of

13   them and they don't span the full width of the road.

14   Let's see if I can -- if I slide over -- I'm not sure I

15   can slide over to the left.  No, I've gone too far in

16   the zoom.

17             There's less concentration of people on the

18   road even back here as we get past this initial cluster

19   or this most dense area of what we've annotated, those

20   people.

21        Q.   You describe shadows and the like that help

22   you see the location of obstacles in the road.  Do they

23   help you establish approximately how big those obstacles

24   are?

25        A.   They do.  The larger the mass of the feature

1    that the light is hitting, the larger the shadow that

2    it's going to cast will be.  So this is the time of day

3    when the sun is nearly directly overhead.  We're not

4    seeing long shadows cast from buildings.  That's either

5    a two or three-story building and it's not casting a

6    long shadow.  So the shadows cast by individuals will be

7    cast almost straight down on the ground adjacent to

8    them, but the features that you're seeing, some of these

9    light-toned features, you get almost the feel of a dark

10   halo next to them which is the shadow being cast by the

11   individual or pair of individuals walking close

12   together.

13       Q.   How about the obstacles, what's labeled

14   "obstructions," can you tell approximately how big they

15   are?

16       A.   Using the relative size of the vehicles -- and

17   these are individual sedans or vehicles -- they aren't

18   the size of a Jersey barrier or the kinds of things that

19   the highway department puts out on a construction site.

20   They aren't the size of this podium.  They are more the

21   size of the trunk of an individual or perhaps the side

22   of someone's leg.  They are big enough that very clearly

23   they are casting a visual feature that can be recognized

24   on the imagery data.  They are also big enough in some

25   instances to be casting a shadow.  So I assess -- I

1    would judge that they are perhaps a four-by-four or a

2    six-by-six size timber or a log or a pipe that's that

3    size.  They could even be substantially larger than

4    that.  But they aren't two or three or five feet apart.

5        Q.   Substantial but of a size that a couple of

6    strong men could move.

7        A.   I would very much assess, yes.

8        Q.   Are you able to tell us more information in

9    the next image?  I believe -- we're now looking at

10    Exhibit 5D for the record.

11        A.   Yes.

12        Q.   Does this have any additional information or

13    by zooming it more, have you discussed this to the

14    extent that you can?

15        A.   I think we've talked generally about the

16    features that can be observed.  Actually this is

17    generally the same area.  Again, you do see the mottling

18    and the shape and distribution or dispersement of

19    individuals there as they move along the road.  Again,

20    this gives evidence that there are fewer on the

21    northbound side of the road and more on the southbound

22    side of the road in this particular area.  I think the

23    greatest concentration is still off to the left, but

24    again, this informs my judgment that they probably are

25    moving in the same direction as these vehicles that are

1    in the traffic.

2              Here's one of those obstructions that I

3    believe the white sedan is about to drive around.   I

4    think there's another one over here.   He's going to

5    drive out into that lane and then swing right back to

6    then fall in behind this vehicle.   And both of these two

7    vehicles are driving around this obstruction and will

8    then have to go in that lane all the way past these two

9    obstructions before they could proceed south.

10        Q.   The last obstruction you see is just a few

11   feet from the corner of that large two or three-story

12   building on the right?

13        A.   It is, right at the CHUB Road and right in

14   front of this large complex or compound that's over on

15   the other side.

16        Q.   Why don't we move on to the next image, which

17   is Exhibit 5E.   I know there are red arrows at various

18   spots on this image.   Do you know how those came to be

19   there?

20        A.   Those are just different annotations that our

21   analysts or my colleagues inserted in this particular

22   graphic.   Those were again features that we recognized

23   that we adjudged to be of interest, and those are in

24   fact the obstructions or objects that we feel we see

25   that are out on the course of the highway.

1      Q.    And is the location of those obstacles in that

2   roadblock, are they in the same -- are the locations

3   consistent with what we saw four days earlier on June 1?

4      A.    They are fairly consistent.  In some instances

5   I adjudge that they may have been moved between those

6   dates.  One or two of them may have been moved between

7   those dates, but they are generally the same number and

8   configuration, driving one through that same zigzagging

9   pattern.

10      Q.    I want to draw your attention -- maybe if I

11   put the cursor so the jury knows what we're talking

12   about -- to the back of that school before the slope

13   into the valley.

14      A.    Right there.  This is the level backyard, yes.

15      Q.    Backyard of that school.  Is there any

16   difference between what you see in that image and what

17   was observable on June 1st?

18      A.    In this instance, one, I see essentially no

19   traffic on the highway, which is in contrast to

20   June 1st.  I don't see any activity in the backyard of

21   the school complex or what's reported to be a school.  I

22   don't see any objects or features or evidence of human

23   activity out there.  I see open area.  There is a

24   feature running to the east west here, and in looking at

25   it on this image, I almost get the shape of a slightly,

1    kind of a tent shape, a gentle slope.  Kind of the peak

2    of the tent is running up this way, so that's one slope,

3    and the other is running off to the other area.  I don't

4    know what that feature is.

5         Q.   Can you go back to June 1st and look at that

6    area and tell us if you see any differences?

7         A.   That area is not on this image.  It's just

8    under the annotations and slightly off.  So I'm going to

9    go up one more.  Here's that area that we were looking

10   at.  That's the long feature that I was just siting that

11   may be a slightly sloped, kind of a tent-shaped mound of

12   dirt or earth, something like that.  I see features back

13   up in that yard, one, two, three, four, five, six,

14   seven, eight, nine -- roughly 20 features up there that

15   were not present on the prior image and are clearly

16   present here and are casting very observable patterns.

17   Some of them are light.  I can zoom in on that area.  It

18   starts to get blocky.  Some of them are light, a

19   couple -- three, four of them are lighter in color.

20   Many are quite dark.  In this case the shadows are on

21   the topside, top and right side.  So I almost get the

22   inference that there may be a little bit of a shadow on

23   some of these larger features.  Some of them are almost

24   too big to be individuals.  If they are people, there

25   could be pairs of people or multiples of people.  They

1    could also be features casting a dark impression on the

2    ground.  So I can't precisely characterize what they

3    are.  But very clearly there are patterns.  There are

4    close to two dozen objects, between 20 and two dozen

5    objects or features or activities that are observed on

6    the image.

7         Q.   Are any of those features the size of human

8    beings?

9         A.   Yes, some of them are.  This one probably is.

10   This could easily be a pair.  That may be an individual

11   there.  I'm having a hard time breaking these out, but

12   some of those might be individuals.  This one probably

13   is.

14        Q.   Moving on then to Exhibit 5F, which is the

15   last in the series, what's the date on this image?

16        A.   This date was 18 July of 1994.

17        Q.   Can you tell us what differences you see

18   between what's shown on this image and what we saw on

19   June 1st and June 5th?

20        A.   On this image, first, since we've just been

21   speaking of it, draw attention to that back courtyard or

22   back area behind the school.  I again see no activity

23   out there.  I do see that sloping ground kind of along

24   that centerline.  I see relatively little activity.

25   There's a vehicle on the highway I believe, but no other

1    vehicles or traffic on the highway.  The obstructions

2    are no longer observable on this image.  As annotated,

3    the large building that was a prominent white roof on

4    some of those prior images that was in the corner of

5    this fenced off complex, that building is no longer two

6    or three stories tall.  Most of it is completely gone,

7    has been reduced to a destroyed status.  It looks to be

8    rubble.  It looks to have been crushed, crumbled,

9    dismantled.

10        Q.   On this image are you able to tell us

11   approximately how big the trees are in that wooded area

12   behind the school to the upper right hand of the image?

13        A.   Sure.  This is probably a two-story building.

14   So these trees are three times as tall as a two-story

15   building.  So they are probably 60, 80 feet tall.  They

16   are substantial-sized trees.  Some at the edges are

17   smaller.  They might be 25 or 30 feet tall.  But these

18   are substantial -- that's full up woods.

19        Q.   Would you be able to see human beings inside

20   that wooded area from an image such as this?

21        A.   I would not.  It's completely obscured.

22        Q.   Finally, just going back for a minute, if you

23   wouldn't mind toggling back to 5B.  The compound -- the

24   building that you said was two or three stories high in

25   the lower right-hand corner, can you tell the jury what

1    you were able to observe about the compound surrounding

2    that building?

3         A.    In fact, this is a better image, if I may, 5C.

4         Q.    Please.

5         A.    This is the two or three-story building.  It

6    is part of I would call it a compound or a complex.  It

7    has a wall around it.  The wall is at least as tall as

8    that heavy cargo truck.  The wall -- I'm going to zoom

9    in a little bit and then drag us over there.  That's a

10   large entrance to a paved driveway going in, probably

11   two doors that swing open to allow vehicles in and out.

12   It looks to be a small passenger -- or a personal gate

13   in the back for people to traffic through but not

14   vehicles.  There's also a feature over here that

15   probably is related to people passing in and out of the

16   complex.  There's a tree back here.  That's a vehicle

17   that's parked in the open area adjacent to -- here's a

18   couple vehicles here, probably more vehicles backed up

19   against the building.  I assess this building to be

20   either two or three stories tall.  There's an awning in

21   front of it that extends out and over the fence or the

22   wall out to the highway.  So that probably is where

23   there is a formal entrance, a passenger or a public

24   entrance into whatever that structure is.  There's a

25   light tone structure in the back.  This is probably a

1    tin roof or a light-tone roof of a storage garage, of a

2    utility shed like function.

3            There is an area here that's casting a

4    different shadow.  It's an extra story taller on the

5    back of the building.  That could be a stairwell.  It

6    could be -- if it was a western country or commercial

7    facility, that could be where the elevator shaft is or

8    some other utility function like that, but it's an extra

9    story tall.  Back just in the edge of the building, it

10   appears to be a flat roof building with a small lip on

11   it.  And this is not an industrial complex.  It doesn't

12   have smoke stacks.  It doesn't have heavy equipment or

13   cranes or the kinds of things you might see with

14   manufacturing.  It appears to be related to residential

15   or human endeavors, office or living or those kinds of

16   activities.

17       Q.   How many cars do you see in the compound?

18       A.   The two dark-toned ones, the light-toned one

19   here, and two, possibly three others.

20            MR. CAPIN:  Thank you, sir.  Your Honor, I

21   don't have anything further.

22            THE COURT:  Mr. Ruoff?  Do you want Mr. Benn

23   to stay there?

24            MR. RUOFF:  Yeah, sure.  That will be fine.

25                    CROSS-EXAMINATION

1   BY MR. RUOFF:

2      Q.   All right.  Mr. Benn, how are you, good to see

3   you again.  Do you remember me?

4      A.   Yes, I do, sure.

5      Q.   From last year.  Okay.  Mr. Capin just had you

6   take a look at a number of photographs and I'm going to

7   show you a few more.  Specifically, Government's

8   Exhibit 5C and 5B appear to be from June and July of

9   1994?

10      A.   June and July, yes.  1 June, 5 June, and 18

11   July I believe are the dates.

12      Q.   Okay.  Now, I'm going to have -- I don't think

13   the clarity will be too bad.

14           THE COURT:  I have to switch it to the ELMO I

15   think.

16           (Pause.)

17      Q.   For the record, this is Defendant's C2 for ID.

18   Actually why don't you have a seat.  I can do this from

19   here.  Thank you.

20           Okay.  Defense C2 for ID is up on the screen

21   here.  Do you recognize this photograph?

22      A.   I do recognize this photograph, yes.

23      Q.   Do you recognize that photograph?

24           MR. CAPIN:  We have no objection to its

25   admission.

```
 1        A.   I recognize it, yes.

 2             MR. RUOFF:  Can I strike the ID on all of

 3   them?

 4             MR. CAPIN: Yes.

 5             THE COURT:  ID may be stricken on Defense

 6   Exhibits C1 through 6.

 7             (Defendant's Exhibits C1 through C6 admitted.)

 8        Q.   Okay.  Now, this is a closer up picture of the

 9   same compound that we saw on the prior government's

10   exhibit from June and July; correct?

11        A.   That is correct, yes.

12        Q.   So this would be the structure that you talked

13   about with the thing on the back and then what you

14   believe to be a school over there; right?

15        A.   Yes.

16        Q.   Okay.  Now, on this picture, safe to say it's

17   actually of Butare on May 23rd, 1994?

18        A.   Yes, it is.

19        Q.   Do you see any of the structures in the

20   roadway like you did on the later pictures?

21        A.   Analysts, we train them not to make analytic

22   calls off of prints, and so it's very difficult with

23   confidence to want to do exactly this kind of thing.

24   That said, we make the calls that we have to when we

25   can.
```

1      Q.   Let me ask you a different question.  You

2   prepared this photograph; right?

3      A.   Correct.

4      Q.   You're the one that put the date May 23rd,

5   1994, on it; right?

6      A.   We did, yes.

7      Q.   And you labeled the compound Butare, Rwanda;

8   right?

9      A.   Yes.

10      Q.   And put the north sticker on there; right?

11      A.   Correct.

12      Q.   You didn't annotate this picture with anything

13   that reflects a structure or obstruction in the roadway;

14   correct?

15      A.   That's correct.  I would be more confident

16   looking directly at the image rather than the screen if

17   I were to try to make judgments as to whether or not I

18   can observe obstructions on the roadway.

19           THE COURT:  I'm curious.  This is your image.

20           THE WITNESS:  It is.

21           THE COURT:  But you didn't analyze this the

22   way you did the other ones.

23           THE WITNESS:  Did analyze it, but we didn't

24   see features that directly were relevant to the

25   questions we had been asked.

1     Q.    BY MR. RUOFF:  That's my next question.  What

2  questions had you been asked to identify?

3     A.    And along that line, I would just cite that in

4  the 1 June series, on some images we annotated the

5  obstructions, in others we did not.

6     Q.    My question was, sir, what questions had you

7  been asked to answer when annotating different

8  photographs?

9     A.    Look for indications of obstructions to the

10  free movement of people and/or people obstructed in

11  their movement along the road.

12     Q.    Okay.  You were not told to look for an

13  absence of roadblock; correct?  Were you told to look

14  for photographs where there was no roadblock at all?

15     A.    No.  I'm sorry, ask the question again,

16  please.

17     Q.    Were you told to look for photographs where

18  there was no roadblock at all in this area?

19     A.    We were told -- we were asked to look for

20  photographs in the time frame of the several weeks and

21  look for the activity that could be observed, roadblocks

22  or absence of roadblocks, and then be prepared to

23  prepare imagery-derived products of those photographs.

24     Q.    How many photographs did you review

25  personally?

1          A.    The six or eight that have been introduced.

2          Q.    How many of those were under your supervision

3     review?

4          A.    I do not have insight into that.  They

5     reviewed all of the images and all of those that had any

6     information relevant to what we were looking for were

7     prepared.

8          Q.    Relevant to what you were asked to look for;

9     right?

10         A.    Correct.

11         Q.    Do you have other photographs other than the

12    ones that you have reviewed prior to trial here today?

13         A.    This one you have just introduced.  There are

14    other photographs, yes, of other areas in Butare that I

15    had reviewed.

16         Q.    How about pictures prior to May 23rd, 1994?

17         A.    I believe that there's an image that we have

18    prepared in either the March or April time frame.  I

19    don't recall off the top of my head the date of that.

20         Q.    Did you take a look at photographs from the

21    March and April time frame?

22         A.    We did.

23         Q.    Is it fair to say that the satellite that

24    captured these pictures was taking pictures of Butare

25    the entire time between March, April, May, June, and

1    July then?

2         A.    The entire time is a term that I can't

3    precisely respond to.  We were periodically collecting

4    images throughout that general time frame, yes.

5         Q.    Okay.  How many images do you think that you

6    collected for the time period between March, April, May,

7    June, and July of 1994?

8         A.    I can't begin to speculate, and it would be

9    imprudent for me to try to infer the exact numbers

10   because that starts to reveal our capacity, our

11   capabilities.

12        Q.    Did you review photographs from April of 1994?

13        A.    Yes.

14        Q.    Did you see any --

15        A.    I don't recall the exact date, but I believe

16   it to be an April image.

17        Q.    Did you see any evidence of any type of

18   trafficking or roadblocks in those photographs?

19        A.    No.

20              MR. RUOFF:  Judge, can we take a break?

21              THE COURT:  How long?

22              MR. RUOFF:  Just to talk to you at sidebar.

23                        AT SIDE BAR

24              MR. RUOFF:  Here we are.

25              THE COURT:  Where are they?

86

1            MR. CAPIN:  They have them all, your Honor.

2            MR. RUOFF:  We don't have any from April.

3            MR. HOWARD:  We were told in a letter from the

4    United States Attorney that there were no --

5            THE COURT:  Keep your voice down, no smiling.

6    You're editorializing with your facial expressions

7    continuously.  Please stop, particularly now because

8    you're facing the jury.  Quiet.  You gave all the images

9    you have to the defense?

10           MR. CAPIN:  Yes, your Honor.

11           MR. RUOFF:  We don't have any images for

12   March, April -- this is the first photograph we have is

13   May 23rd.  He just said that he saw photographs --

14           THE COURT:  Why don't you take all the images

15   you have and show it to the witness and say are these

16   all the images.

17           MR. CAPIN:  That, your Honor, is the

18   appropriate procedure.

19           THE COURT:  Thank you.

20           MR. RUOFF:  I'm asking if there are some that

21   I don't have and apparently there are.

22           THE COURT:  No, no, you're accepting as fact

23   that there are images that you don't have which may not

24   be fact.  So take all the images you've been given, show

25   them to the witness, and ask him if those are all the

```
 1    images.  Then you'll know.

 2            MR. RUOFF:  But then he doesn't -- he may say

 3    he doesn't remember all the images.

 4            THE COURT:  He could be wrong.  He could be

 5    completely, utterly wrong.  Try that.  It's the only way

 6    to do it really.

 7                        IN OPEN COURT

 8            THE COURT:  Still doing it, Mr. Capin.

 9            MR. RUOFF:  Okay.  I'm going to hand you all

10    the defendant's exhibits here, Exhibit C.

11            THE WITNESS:  Thank you.

12            MR. RUOFF:  Take your time and look at all the

13    dates on all those pictures.

14            (Pause.)

15            MR. RUOFF:  Let me know when you're done.

16            THE WITNESS:  I'm done.

17      Q.    Okay.  Now, you've just testified that you saw

18    photographs from April of 1994.

19      A.    I did believe I had recalled having seen them

20    of that time frame.

21      Q.    And they're not in that collection of

22    photographs that I gave you; correct?

23      A.    That is correct.

24            MR. RUOFF:  Can I have them back.

25            THE WITNESS:  Yes.
```

88

1      Q.   So this is not a complete set of the

2  photographs that you reviewed; right?

3      A.   I would correct my testimony and assert that

4  the earliest date that I saw was in fact that May date.

5  I was recalling that it was sometime before the 28th of

6  May and 1 June images, but I did not recall the exact

7  time frame.  I knew it was sometime earlier in the

8  spring.  So I would now correct myself to reflect that

9  this is the earliest date that I recall having done

10  analysis.

11      Q.   So earlier when you testified that you

12  reviewed photographs from April of 1994, that was just a

13  mistake?

14      A.   That was a mistake.

15      Q.   Who defined the time frame for photographs

16  that you were looking for?

17      A.   The investigators who came to talk to our

18  organization representing the government looking for our

19  analysts to look at potentially whether or not we had

20  data relevant to the case that's now before us.

21      Q.   Okay.  What was the time frame they asked you

22  to look for?

23      A.   The time frame?

24      Q.   Yes.

25      A.   When the activity was going on?

1      Q.    No, just the time frame that they asked you to

2    cover.

3      A.    I don't know the specific dates.  I would

4    believe it to be the May and June and July time frame.

5      Q.    They didn't ask you to look for photographs

6    from the April time frame?

7      A.    I do not know that one way or the other.

8      Q.    Who would know the answer to that question,

9    sir?

10     A.    I would infer that the officers who came and

11   inquired with us representing the government.

12     Q.    Okay.  Who is "us"?  Who is the person that we

13   would call to say did they ask for photos from April of

14   1994?

15     A.    The government's team can describe what

16   questions they posed to my colleagues.

17     Q.    Which of your colleagues would we need to ask?

18     A.    Could answer that question?

19     Q.    Say that again?

20     A.    Which of my colleagues could answer the time

21   frame that we received the inquiries about?

22     Q.    Yes.

23     A.    These are officers who are in our analytic

24   work force.

25     Q.    Okay.  Now, is it possible that your team or

1    your officers reviewed photographs from April of 1994

2    and did not turn them over to the immigration code

3    enforcement officers?

4         A.   It is possible that they would have reviewed

5    images and seen nothing that pertained to the questions

6    that were posed and hence have not turned them over,

7    yes.

8         Q.   So if there were pictures from 1994 of April

9    that showed nothing, they wouldn't get turned over to

10   the government; right?

11        A.   Correct.

12        Q.   Even though it's the government that's asking.

13        A.   Correct.

14        Q.   So it's possible that somewhere in DOD files

15   there are photographs of Butare from 1994 taken by a

16   satellite?

17        A.   That's correct.

18             THE COURT:  In April.

19        Q.   In April of 1994.

20        A.   Correct.

21        Q.   And they were not turned over?

22        A.   Correct.

23             MR. RUOFF:  Can we approach again, Judge?

24             THE COURT:  I don't think you need to

25   approach.

1          Can you go back and determine whether there

2    are such photos?

3          THE WITNESS:  Yes, we can determine whether or

4    not such photos exist.

5          THE COURT:  And if they exist can you turn

6    them over to the government?

7          THE WITNESS:  We will have potentially images

8    going back to the seventies of Butare.

9          THE COURT:  No, April of 1994.

10         THE WITNESS:  I can investigate whether or not

11   those images from that specific time frame exist.

12         THE COURT:  Presumably somebody's already done

13   that.

14         MR. CAPIN:  Your Honor, if I may, this has

15   been done.  Inquiry has been made of this agency, and

16   the result of the inquiry was communicated to the

17   defense.

18         MR. RUOFF:  And the result was none exist.

19         MR. CAPIN:  He said it's possible there could

20   be other images.  It's not a memory test for this

21   witness, your Honor.

22         THE COURT:  No.  But we have to find out,

23   don't we.

24         MR. CAPIN:  And my point is inquiry has been

25   made and the answer --

92

1          THE COURT:  Well, that's your point.  Are

2     there such images, do you know, April of '94?

3          THE WITNESS:  I would speculate images very

4     likely do exist.

5          THE COURT:  Okay.  Would it be an

6     insurmountable problem for you to find them and deliver

7     them to the government?

8          THE WITNESS:  There is a process by which

9     imagery-derived products are produced.  The government

10    reflects through the inter-agency process the potential

11    risks to national security in the preparation of these

12    kinds of products and it's a deliberate process.  We

13    have already revealed handfuls of images.  As long as

14    the intell community judges that such additional

15    products are in our interest, yes, they can be produced.

16         THE COURT:  Okay.  And you can make that

17    request if you haven't already.

18         MR. CAPIN:  We have.  You have multiple times.

19    We've given them the answer.  There were no other

20    images, your Honor.

21         MR. CHAKRAVARTY:  The images we got were for

22    the entire genocide and we provided them to the defense.

23         THE COURT:  Did you request images that might

24    exist from April of '94 without regard to what they

25    might show?

```
 1              MR. CAPIN:  Yes, your Honor.

 2              MR. CHAKRAVARTY:  Yes.  That's why these

 3    images --

 4              THE COURT:  You can take turns, but don't talk

 5    over each other.

 6              MR. CAPIN:  The image Mr. Ruoff is showing the

 7    witness is an image that I think shows no roadblock and

 8    that's the point of it.  It wasn't that we culled them

 9    only to show the roadblock.  Everything we have,

10    roadblock or not --

11              THE COURT:  I hear you, but the witness seems

12    to be testifying differently, hence the problem.

13              MR. CAPIN:  I think the witness may have it --

14              THE COURT:  Yes, he could be right, he could

15    be wrong, who knows?  But it's different.

16              MR. CAPIN:  I think Mr. Benn may have

17    something to add to this.

18              THE COURT:  He may, but he's not being asked a

19    question.  The question is to you.  Have you attempted

20    to obtain all images from April of 1994 that might

21    exist?

22              MR. CAPIN:  Yes, your Honor.

23              THE COURT:  And you asked for those.

24              MR. CAPIN:  Correct.

25              THE COURT:  And without regard to whether they
```

1    showed roadblocks or didn't show roadblocks.

2              MR. CAPIN:  Correct.

3              THE COURT:  And all the images you've received

4    you've turned over to the defense.

5              MR. CAPIN:  Yes.

6              THE COURT:  Okay.  Do you know anything

7    different, Mr. Benn?

8              THE WITNESS:  I do not.

9         Q.   BY MR. RUOFF:  But you still stand by your

10   testimony that you would speculate that those images do

11   exist; right?

12        A.   Images could have been collected of this area

13   if there was national security interest in this area at

14   the time.  I'm not an expert in the events that were

15   occurring in Rwanda.  It may be the case, and this is

16   just a scenario on my part, that in other parts of

17   Rwanda there were more complicated or contentious or

18   controversial issues and we were focusing the satellite

19   there and that in fact Butare only became a priority

20   later in this time frame, and this, the 21st of May, was

21   the first of the series of images that we focused on

22   Butare.  I don't have that insight to know one way or

23   the other when our attention was shifted to here when we

24   started collecting multiple images of this portion of

25   Rwanda.  It will not be the case that we're collecting

95

1    the whole country on a continuous daily, weekly basis.

2    We have to select the things against the most important

3    priorities at which we allocate this kind of a

4    capability.

5         Q.   But if I understand what you said before,

6    there was some kind of vetting done by the intelligence

7    community to decide what photographs to release to the

8    government.  Right?

9         A.   Correct.

10        Q.   So if there was some photograph of Butare

11   prior to May 23rd, 1994, that the Department of Defense

12   saw fit not to disclose, it wouldn't have done so;

13   correct?

14        A.   If it had a substantial case that there would

15   have been risks to our national security interests, that

16   could have been the case, yes.  I would infer from the

17   fact that we did release multiples of images, some as

18   close as three days apart, that there was relatively

19   little sensitivity that was inferred associated with

20   this topic, and hence, I would judge that there are not

21   images that were restricted for national security

22   reasons.

23        Q.   The image that we have up on the screen here

24   now from May 23rd, 1994?

25        A.   Yes.

1      Q.   That's a zoomed-in image, isn't it?

2      A.   It is relatively zoomed in, yes.

3      Q.   In the collection of photographs I gave you,

4   did you see that same image on May 23rd, 1994, that was

5   panned out?

6      A.   I think I did, but I don't recall specifically

7   of the individual dates of each of those images.

8      Q.   Here we go.

9      A.   I do not see a zoomed-out image of the 23rd of

10   May.

11      Q.   Not there; correct?

12      A.   Correct.

13      Q.   And just so we are all clear, this is just a

14   copy of the panned-out image from June 1st; right?

15      A.   Yes, that's correct.

16      Q.   And all the rest of the government exhibits

17   that you've been talking about were zoomed-in images of

18   this; correct?

19      A.   All of the 1 June images were zoomed in, yes,

20   from that image; correct.

21      Q.   So somewhere in Department of Defense files is

22   a panned-out copy of what would contain this image;

23   right?

24      A.   Correct.

25      Q.   Do you have any idea why that image was not

1    turned over?

2        A.    There was no particular information that could

3    be gleaned from that image that was judged to be useful

4    to the questions we had been asked.

5        Q.    Okay.  No other information pertaining to

6    other roadblocks in the rest of Butare?

7        A.    Correct, no other information along those

8    lines.

9            MR. RUOFF:  Can we switch back over to the

10   video ELMO.

11       Q.    Okay.  Going back to the image that we have up

12   on the screen here, Mr. Benn, June 1st I believe.

13   Correct?

14       A.    Yes.

15       Q.    Now, the obstructions that you have marked on

16   here appear in the roadway?

17       A.    Correct.

18       Q.    Okay.  You didn't testify or you didn't see

19   anything in the roadway in this direction; correct?

20       A.    That's correct as well.

21       Q.    No obstructions there.  And you testified that

22   it appeared that these cars are kind of working their

23   way in serpentine manner, appear to be following one

24   another in fact; right?

25       A.    That is correct.

1    Q.    And since there's no obstructions further

2    south, once they clear this last obstruction, they are

3    free to continue on until wherever they stopped;

4    correct?

5    A.    No physical obstructions that I can observe

6    that would impede them, yes.

7    Q.    And the people that are all queued up up here,

8    the bulk of them are in the area right here in front of

9    this school; correct?

10    A.    That's correct, yes.

11    Q.    So it appears from this photograph, if we are

12    kind of reading this correctly, that there's a queue-up

13    of people and then these cars are allowed to pass

14    through this serpentine roadblock and go on their way;

15    correct?

16    A.    That's the appearance.

17    Q.    Doesn't appear that's there's any type of

18    checking or queuing or searching going on right directly

19    in front of the hotel; right?

20    A.    Nothing that can be observed from the

21    overhead, yes.

22    Q.    The only thing that can be observed from the

23    overhead is there's something causing congestion a few

24    hundred meters north -- maybe 200 meters north of the

25    hotel; right?

1      A.    Well, it's half the distance of the 200 yards,

2    yes.

3      Q.    Okay.  Let me ask you -- I will show you the

4    May 23rd photograph again.  Now, the topography in this

5    area you said was generally uphill this way and downhill

6    this way; correct?

7      A.    Yes, that's correct.

8      Q.    Can you see anything in the features of the

9    terrain here that can tell you how deep the terrain is,

10   how steep the terrain is?

11     A.    Looking on a single image, it's relatively

12   difficult to judge that with any detailed

13   characterization.  It's probably sloping somewhat off of

14   the road down towards the structures but not steeply.

15     Q.    What do you mean by steeply?  Can you give us

16   a sense of what the slope would be?  For every five feet

17   you walk, you drop two feet?  Is that what you mean?

18     A.    The approach to the buildings, between the

19   road and the buildings, is relatively flat.  It's

20   potentially very gently sloped.  The buildings and the

21   yard behind them look to be somewhat sloped, but not

22   steep, not something you'd huff and puff or you'd have a

23   hard time with your lawn mower cutting the grass if it

24   was a lawn.

25            Once you get beyond the edge of that area

1   behind the school, you see the paths converging.  You

2   get to what looks more like an orchard-like organization

3   of features.  That looks like it's more steep.  That is

4   a more sloped -- steeply sloped area going down to the

5   corner of the image, if that's helpful.

6        Q.   Okay.  Showing you what's been marked for ID

7   D4 -- and don't show it to the jurors, please.  If I

8   were just to represent to you that those are the

9   buildings in the photograph, is that the kind of slope

10  that you would see in the image?

11       A.   That's very consistent.  My backyard is fairly

12  steeply sloped and there are areas of it where the lawn

13  mower is kind of at the edge of, and if it gets any

14  steeper you have to go straight up and down and not

15  sideways across it.  So that yard behind the school is

16  sloped but not steeply sloped.

17       Q.   Would you be able to see the roadway from

18  where this photograph was taken?

19       A.   Not the road surface.

20       Q.   Why not?

21       A.   Because it's too far uphill.  I would

22  speculate you may be able to see vehicles, tall

23  vehicles.  But I can't know with certainty without kind

24  of studying the layout and the various features.  But

25  no, you cannot see the road surface.

```
 1                MR. RUOFF:  Your Honor, I move to strike the

 2   ID on Defense Exhibit D4.

 3                THE COURT:  Any objection?

 4                MR. CAPIN:  Objection.  There's no foundation.

 5   I'm not sure what that is.

 6                MR. RUOFF:  Well, it's representative of the

 7   slope that is behind the building that he just

 8   identified.

 9                MR. CAPIN:  May I see it?

10                THE COURT:  Yes.

11                MR. CAPIN:  There's no foundation.

12                THE COURT:  Sustained.

13                (Pause.)

14                MR. RUOFF:  Do you have a question, because

15   I'm all done.  Thank you.

16                THE WITNESS:  If I could, I cannot corroborate

17   that the image you just showed me did correspond to that

18   location.  With more time and analysis I could

19   potentially correlate that I was looking at exactly the

20   place you were asserting it was.

21                MR. RUOFF:  You can do that with someone else.

22   I'm all done.

23                THE COURT:  Hence the ruling.

24                        REDIRECT EXAMINATION

25   BY MR. CAPIN:
```

1    Q.    Just so the record is clear, the photo that

2  Mr. Ruoff showed you, I think you said you couldn't

3  see -- from the perspective that the shooter of that

4  picture took, you couldn't see the surface of the road;

5  is that correct?

6    A.    Assuming that there is a road on the other

7  side of this structure, I have not established what this

8  structure is.  One could not necessarily see the road

9  surface.

10    Q.    Might someone be able to see a human being

11  standing at the edge of the road?

12    A.    I just can't know that without knowing the

13  distance of whatever the terrain I'm seeing on the back

14  of the building is and its distance to the road.

15    Q.    Can you tell if the person who shot the

16  picture was standing up, lying down?  Can you tell

17  anything from this picture about how it was taken?

18          THE COURT:  I think you're arguing about a

19  picture that's not in evidence.

20          MR. CAPIN:  Correct.  I'm just establishing

21  what can be discerned from this from Mr. Benn's

22  perspective.

23          THE COURT:  Did you analyze this photograph?

24          THE WITNESS:  I have not analyzed this

25  photograph, never seen it before.

1              THE COURT:  Thank you.

2              MR. CAPIN:  I'll move on.  And I just have

3     maybe three or four questions.  I shouldn't promise.  I

4     have just a couple of minutes.

5         Q.   The image on the screen now, Mr. Ruoff made

6     reference to, I think he said, something causing

7     congestion up in this area.  Do you remember those

8     questions?

9         A.   My recollection is he inferred that that was

10    where the greatest concentration of people was.

11        Q.   That's where the greatest concentration of

12    people is.  But the obstacles causing the congestion

13    throughout this area here begin here; do they not?

14        A.   Correct.  Again, the most southward of them or

15    the first of them observed when moving from south to

16    north is there, yes.

17        Q.   And Mr. Ruoff showed you -- is this the one

18    you showed him?

19             MR. RUOFF:  I showed him all of them.

20             MR. CAPIN:  Which one did you publish?

21             MR. RUOFF:  May 23rd.

22        Q.   Showed you this printed out version of an IDP.

23    I'm sorry, what does IDP stand for?

24        A.   Imagery-derived product.

25        Q.   And you generally produce those to the parties

1    in the action electronically; correct?

2         A.    That is correct.

3         Q.    So if Mr. Ruoff in the electronic probably

4    printed out this picture and showed it to you, would you

5    be able to zoom in and out as you did with the others

6    that Mr. Ruoff has shown to you electronically as

7    opposed to this single photo printout?

8         A.    The digital version would allow one to zoom in

9    and out, yes.

10        Q.    And even without zooming it in or out, am I

11   correct noting that -- what do you see with regard to

12   human activity in this photo?

13        A.    I see glare on the screen first, which

14   qualifies my confidence in what I observe.  I do see

15   vehicles moving at various areas on the road, some at

16   the lower corner, some in the lower center.  I think I

17   see one kind of in the center of the road there.  No,

18   that's not a vehicle.  That's in fact a feature that is

19   routinely present.  Yes, you just zoomed in and there's

20   probably a small truck that's transiting north on the

21   road.

22        Q.    Right here?

23        A.    Correct.

24        Q.    Can you see anything that indicates one way or

25   the other on this picture, if the quality permits it,

1    regarding the obstacles you pointed out on other images

2    in this area here?

3         A.   It is possible that there is one present.   In

4    fact, just adjacent to the cloud, kind of in the center

5    of the image where the first of the obstacles was on the

6    prior.

7         Q.   Here approximately?

8         A.   Just slightly to the left.  You see the bright

9    white spot there, that's a cloud.

10        Q.   That there?

11        A.   Yes, just right next to that.  No, on the

12   other side of the road.

13        Q.   There?

14        A.   Correct.

15        Q.   What can you tell the jury about that?

16   Understanding again the quality of the image isn't

17   great.

18        A.   I'm seeing a feature that's perpendicular to

19   the road, and whereas you are seeing kind of the center

20   lane of the road.  It's a dark stripe.  The feature runs

21   out to that.  You see almost a light feature at the end

22   of the obstruction or what the potential obstruction

23   over top of that line, that center lane line, and in

24   fact where it crosses there's almost a dark splotch,

25   which could be the shadow of whatever is holding the

1   obstruction up.

2         Q.    Right.  Are we talking right there?

3         A.    Yep.

4         Q.    Anything else you can tell from this image?

5         A.    It is possible there's a portion of another

6   obstruction up adjacent to one of the trees on the

7   opposite side of the road, but I'm not certain of that.

8   The third of the large trees on the northbound side,

9   there's a lighter feature that's out in the road.

10        Q.    Are we talking over here?

11        A.    Correct.

12        Q.    I see.

13        A.    Exactly.

14              MR. CAPIN:  I have nothing further.  Thank

15   you, your Honor.

16              THE COURT:  Mr. Ruoff, anything else?

17                    RECROSS-EXAMINATION

18   BY MR. RUOFF:

19        Q.    Can you see to any degree of scientific

20   certainty that those are in fact obstructions?

21        A.    I cannot.

22        Q.    So you're saying possible; right?

23        A.    I'm saying possible.

24              MR. CAPIN:  Objection.

25              THE COURT:  It sounds to me like you said

1    possible, not even probable.

2            THE WITNESS:  Correct.

3            MR. CAPIN:  On this image?  I just want to

4    clarify the question.  On this image?

5            THE WITNESS:  This glary image that I'm

6    observing on a screen, which is not as good as the

7    quality even as the digital features that we were seeing

8    before.

9            MR. CAPIN:  Can I ask one follow-up question?

10           MR. RUOFF:  My turn.

11           THE COURT:  Mr. Ruoff's turn.

12      Q.   BY MR. RUOFF:  And you actually gave all these

13   images to the government digital; right?

14      A.   I did.

15      Q.   And the government didn't show you this image

16   and ask you for analysis; right?

17      A.   They did ask us for analysis, and we produced

18   that product.

19      Q.   Without any type of indication on it showing

20   obstructions; right?

21      A.   That is correct.

22      Q.   So to the extent that the jury has actually

23   seen this photograph, it's not because the government

24   has shown it to them; right?

25      A.   That is correct.

1          MR. RUOFF:  Thank you.  No more questions.

2                    REDIRECT EXAMINATION

3    BY MR. CAPIN:

4      Q.   How would you compare your degree of certainty

5    that there's a roadblock in the images 5A through F as

6    compared to the lower quality that Mr. Ruoff showed you?

7      A.   I'm more confident in the digital images that

8    we examined that were displayed on the computer.

9    Substantially more confident.

10     Q.   And how about -- even putting aside the -- if

11   I were to show you just a printout of the obstructions

12   annotated on Exhibit 5D, for example, how is your degree

13   of confidence in the existence of a roadblock compared

14   to the degree of confidence you have in seeing

15   obstructions on the defense exhibit?

16     A.   I'm very much more confident on this image.

17   The quality of this image is greater.  You don't have

18   the haze and the shadows and the clouds on the image

19   that we were just looking at.  These features are much

20   more distinct and clear-cut and they extend very clearly

21   over the surface of the road.  I'm not kind of intuiting

22   small features that I'm calling possibles.  So I'm much

23   more confident with these.

24          MR. CAPIN:  Thank you, your Honor.

25          THE COURT:  All set, Mr. Ruoff?

```
 1            MR. RUOFF:  Yeah, we're all set, Judge.  Thank

 2   you very much.

 3            THE COURT:  Thank you, Mr. Benn, appreciate

 4   it.  You're excused.

 5            MR. RUOFF:  Your Honor, may this witness not

 6   be excused so we can address an issue with you before or

 7   after lunch?

 8            THE COURT:  Yes.  Sidebar?  Thank you.  Have a

 9   seat.

10                      AT SIDEBAR

11            MR. RUOFF:  Your Honor, I'm making this

12   request pursuant to my client's constitutional right for

13   all proofs favorable and for the production of all

14   exculpatory evidence in this case.  Quite frankly, we're

15   just not satisfied that there are no photographs.  The

16   government asked this witness to look for activity.

17            THE COURT:  That's why I asked the question

18   the way I asked it.  The government as I understand it

19   is saying they have made a request for all images from

20   April onward of Butare.  They got those images and they

21   have disclosed them all to you.  So if you're claiming a

22   Brady violation of some kind, you've got to tell me what

23   it is you think they have, it's got to be material, and

24   it's got to be exculpatory.

25            MR. RUOFF:  I understand that, your Honor.
```

1          THE COURT:  I'm not even sure if it would be

2    exculpatory because -- which raises another interesting

3    question, which is be careful what you wish for.  I

4    would have frankly lived with his answer that there were

5    photographs in April and they didn't show anything.  But

6    anyway, I'm not sure we've actually tied down very

7    carefully who saw roadblocks when.

8          MR. CAPIN:  Correct.  But there's no evidence

9    that there was any roadblock before April 20th.  That's

10   the closest we have gotten.  So the question about April

11   is frankly --

12         THE COURT:  But I understand your motion.

13         MR. RUOFF:  May I flesh it a little bit more

14   just for the record?

15         THE COURT:  Well, sure.

16         MR. RUOFF:  I believe the witness -- that they

17   were approached by the investigators and told to look

18   for a certain time frame for certain characteristics.  I

19   believe they were looking for people on the roadway with

20   roadblocks, and if the witness looked at photographs

21   that did not reveal those characteristics, they did not

22   get disclosed to the U.S. Attorney's Office.  I'm

23   confident we have everything they have.  I'm less

24   confident that we have everything that DOD has, and if

25   there are photographs, if there are, you know, any

1   photographs that show there's nothing going on in front

2   of the hotel --

3          THE COURT:  Here's the point.  You're really

4   talking about, I think, a prosecutor's obligation under

5   Brady to disclose everything within their control

6   whether they know about it or not that could be

7   exculpatory.  They say they have.

8          MR. RUOFF:  Well, I think it's everything in

9   the possession of the government, not within their

10  control.  I mean, the government is the government, and

11  I think if this witness has agreed to go look and see if

12  there are any and report back to the court, I'm asking

13  that you have him do that.

14         MR. CAPIN:  Your Honor, he's looked twice, and

15  what Mr. Ruoff is ignoring is the answer to the question

16  what were you asked.  When it was fleshed out, we were

17  asked for the presence or none of elements in the road

18  that might be obstructions to human or other traffic.

19  It's not look for a roadblock.  It's look for a

20  roadblock or any other element that may not be there.

21  So that was his answer.  His answer wasn't we were told

22  only to look only for roadblocks and ignore the absence

23  of roadblocks.

24         THE COURT:  I thought you represented to me

25  that you asked for all images of Butare from April

1    onward and that's what you got.

2              MR. CAPIN:  That's correct.

3              THE COURT:  As far as you know.

4              MR. CAPIN:  Yes.

5              THE COURT:  And so then all of those images

6    were turned over.

7              MR. CAPIN:  Yes.

8              THE COURT:  And this witness -- I'm happy to

9    ask him about it or you can ask him about it, but I

10   thought he said basically, you know, I'm very important

11   and people do this for me and I don't know what they

12   were asked.

13             MR. RUOFF:  Right.  That's kind of my point.

14   He doesn't know and we don't have a letter asking him

15   for anything.

16             THE COURT:  But the government is making a

17   representation to you that that's what they asked for,

18   all images, and everything they got.  They can't do it

19   over.  That's what I'm hearing.

20             MR. RUOFF:  He didn't say that they were asked

21   to look at all images.

22             MR. CAPIN:  He doesn't know.  That's

23   attributed to the whole agency.  That's why this has

24   been fleshed out before.

25             MR. RUOFF:  That's what discovery is about.

1            THE COURT:  No, no, no.  It's not discovery.

2    It's you have an affirmative obligation to turn over

3    exculpatory evidence and that would be exculpatory.

4            MR. CAPIN:  Absolutely.  When I was using

5    discovery, I was including our Brady and Giglio

6    obligations.  We understand with Brady that this is a

7    continuing obligation.

8            THE COURT:  Not discovery.

9            MR. RUOFF:  So if we get photographs from

10   April three months from now --

11           THE COURT:  You will file a 2255 and I will

12   seriously entertain it.

13           MR. RUOFF:  I'd rather have them before a jury

14   comes back.

15           THE COURT:  Again, when you say I'd rather

16   have them, you assume that they exist.

17           MR. RUOFF:  I think I have a good faith basis

18   to believe that they exist.

19           THE COURT:  You can believe whatever you

20   choose to believe, but there's no evidence.

21           MR. HOWARD:  I'd like to just supplement the

22   record.  We did write a letter to the government on

23   August 1st of 2012.  Based on this witness's prior

24   testimony in the previous proceeding, he said that there

25   were additional sets of photographs, and that's what I

1    wrote the letter based on, that we wanted those.  I got

2    a response saying that I fundamentally misunderstood his

3    testimony, that I had everything that he looked at.

4    He's repeated the testimony again today that he has

5    additional images.

6         THE COURT:  He hasn't said that.  He said I

7    would speculate, I would infer there might be images in

8    April.  That's what he said.

9         MR. HOWARD:  Actually, Judge, he first said he

10   did look at images in April, and then Mr. Capin was good

11   enough to provide evidence to the jury that he didn't

12   look at images in April and he changed his testimony

13   consistent with what Mr. Capin had to say about it.  So

14   I appreciate that Mr. Capin is the one who's looking at

15   these images for the DOD, but he's not.

16        We got a response from the government a few

17   days later that said we fundamentally misunderstood and

18   that they have produced everything that was either

19   inculpatory or exculpatory.  They did not say that you

20   have every image that the DOD has or that the witness

21   looked at.  They said we had every image -- they

22   produced to us every image that they had.

23        THE COURT:  Sure.  But it's only a problem if

24   it's exculpatory and they haven't produced it and it's

25   material.

1          MR. HOWARD:  But I can't say if it's

2    exculpatory.  I can't look at the photograph, and he's

3    saying they exist.

4          THE COURT:  I don't know what you want me to

5    do.  The best I can do for you is let you examine him

6    and ask if there are other images, I guess.

7          MR. HOWARD:  We've done that and he said there

8    is, and he said there is in May also.

9          THE COURT:  All right.  I won't argue with

10   you.  I disagree with you.  That's not my understanding

11   of his testimony, but I will ask him just to make sure.

12   I'll clean it up for you.

13          MR. HOWARD:  And if I may, when Mr. Ruoff

14   asked about May 23rd, we had that one close-up, he said

15   there's a panned-out image.  We don't have a panned-out

16   image for May 23rd.  They provide us an image that's

17   zoomed in on the hotel.

18          THE COURT:  Stay right here.  Let me see what

19   I can do.

20                    IN OPEN COURT

21          THE COURT:  I'm sorry, ladies and gentlemen.

22   Normally I would let you go back because this is taking

23   a little longer.  I might be able to clear this up.

24          Are there images to your knowledge from

25   April of 1994 that have not been produced to the

116

```
 1   government of this area of Butare?

 2              THE WITNESS:  I'm not aware of any images.

 3              THE COURT:  Okay.  With respect to the image

 4   that you said, yes, that's a zoomed-in image of a

 5   panned-out -- there's a panned-out image of which this

 6   is a zoomed-in copy, where is it?

 7              THE WITNESS:  A panned-out image could be

 8   created.

 9              THE COURT:  No, no.  I thought you testified

10   that this is a zoomed-in image that came from what would

11   be a panned-out image, and the question is where is that

12   panned-out image.

13              THE WITNESS:  The panned-out image is the

14   original data set, the full image that's in the DOD

15   archives or image libraries as we call them.

16              THE COURT:  You mean it could cover a huge

17   area.

18              THE WITNESS:  Correct.  The original area that

19   the satellite collected, an image-derived product, a

20   tailored product for this use to my knowledge was not

21   created, what we call an overview of Butare.  We just

22   created the zoomed-in product.

23              THE COURT:  Got it.  Any questions based on

24   mine?

25              MR. RUOFF:  I don't have any.
```

 1            THE COURT:  All right.  Stay right there.

 2    Ladies and gentlemen, why don't we take our lunch break

 3    now.  We'll resume again at ten after one.

 4            (Jury exited courtroom.)

 5                      BEFORE THE COURT

 6            THE COURT:  One more time.  Just so we are

 7    very clear about this, as I understand what you're

 8    saying is the satellite takes gross pictures of a large

 9    area and then you create products.  You can reduce and

10    focus and then you create that particular image of

11    interest.

12            THE WITNESS:  That's correct.

13            THE COURT:  So to your knowledge are all those

14    products that you've created, have they all been handed

15    over to the government?

16            THE WITNESS:  Yes.

17            THE COURT:  Okay.  Any questions based on

18    mine?

19            MR. HOWARD:  The images from which you created

20    those products, the panoramic view I'll call it, the

21    10,000-foot view.

22            THE WITNESS:  Yes.

23            MR. HOWARD:  For example, there was a

24    photograph that was dated May 23rd of 1994.  Are there

25    higher view images that would show more of Butare other

1   than just that isolated view of May 23rd that you

2   generated?

3            THE COURT:  Well, I think that's a confusing

4   question, because what you're saying is I could make

5   them; right?  I could make one, but it doesn't exist.

6            THE WITNESS:  One could be made.  The original

7   satellite image does exist.  Products of those, or

8   review, have not been created, do not exist.

9            MR. HOWARD:  So there's an original satellite

10  image from May 23rd, and what the Department of Defense

11  did was provided one photograph of the hotel from that

12  satellite image.

13           THE WITNESS:  Correct.

14           MR. HOWARD:  And who determined that that was

15  the photograph you were going to produce for May 23rd,

16  1994?

17           THE WITNESS:  The analysts working with the

18  requester who were asking for detailed evidence of

19  events that might be of significance.

20           MR. HOWARD:  And to your knowledge are there

21  any satellite images, satellite data sets, for any date

22  in Butare before May 23rd of 1994 and after April 6th of

23  1994?

24           THE WITNESS:  To my explicit knowledge, I'm

25  aware of none.  As an intelligence officer, I know that

1   we routinely collect area coverage of essentially the

2   inhabitable parts of the earth once every year, once

3   every five years, just so that if something comes along,

4   we can go back and research when it was first there.  So

5   data exists.  It may be from the early nineties, it

6   might be from the late eighties.  So the answer to your

7   question is yes.  Is it in any way germane?  I think

8   not.

9           THE COURT:  Do you know what the request was

10  for images?

11          THE WITNESS:  I haven't literally seen the

12  words, but I can infer that the request was go in and

13  look for images of this area that potentially reveal

14  evidence related to the kinds of features we have been

15  discussing, and the analysts, were there images of April

16  or March or February, would have looked at them and

17  would have potentially prepared materials from them had

18  there been anything germane.

19          THE COURT:  Here's the basic.  The basic

20  problem is the defense wants to know, are there images

21  of these roads in April and May that show no

22  obstructions?

23          THE WITNESS:  I'm not aware of that.

24          THE COURT:  The way you're describing the

25  mission, it sounds like our mission wasn't to find non-

1   obstructions.  Our mission was to find obstructions.

2           THE WITNESS:  And that's generally the way it

3   works.  We aim the satellites where we know events to be

4   occurring that are of interest, and so it would have

5   been when there were open stories and press reports of

6   events going on in this part of the country that we

7   would have shifted our attention.  We don't collect

8   things to go find the absence of things of interest.  So

9   you end up in a funny circumstance where I can't negate

10  that something wasn't going on because we weren't

11  looking.

12          THE COURT:  Defense counsel's concern is this.

13  There are images that some analysts looked at that

14  concern April and May of 1994 that show nothing, and the

15  analyst might say that shows nothing, nothing of

16  interest, off to the side.  They would like to see those

17  images.

18          THE WITNESS:  I do understand that.

19          THE COURT:  And the question is, is that so or

20  is that not so?  The government says that's not so.  We

21  asked for everything.  And you seem to be contradicting

22  that.

23          THE WITNESS:  They know better than I.  I

24  personally have not gone in and reviewed all the images

25  that were acquired of all those locations so as not to

1   divulge.  Okay?  We were imaging every two days, because

2   some people might like to know how often we look, and I

3   don't want to have to discuss those kinds of precise

4   capabilities.  So I haven't in fact done that negation

5   of what the universe of data was.  If the government has

6   inquired of the experts on this region, then I would

7   assert that in all likelihood we have done due

8   diligence, have answered responsibly, and it's my own

9   absence of insight.

10          THE COURT:  You're not familiar with the

11   request specifically.

12          THE WITNESS:  In detail; correct.

13          THE COURT:  And you are familiar with the

14   request.

15          MR. CAPIN:  And counsel for NGIA is present

16   and he's familiar with the request.

17          THE COURT:  You're familiar with it.

18          MR. CAPIN:  Yes.

19          THE COURT:  And as I hear it, you're

20   representing to me that you made a request for all

21   images of that area that the government had.  Right?

22          MR. CAPIN:  That is correct.

23          MR. CHAKRAVARTY:  Yes, your Honor, and

24   including absence thereof, absence of the roadblock, and

25   we expressly made sure -- we expressly asked for all

1    images of the absence of the roadblock to be created in

2    IDPs, and that's what yielded the May 23rd and the other

3    exhibits which haven't been published to the jury but

4    which demonstrate that they don't have the roadblock.

5              THE COURT:  And step two is everything you got

6    you handed over.

7              MR. CHAKRAVARTY:  Exactly.

8              THE COURT:  Okay.

9              MR. HOWARD:  Can I just ask if the government

10   can produce any written requests that they made so we

11   can actually see the language?  They obviously made an

12   inter-agency request.  I'm going to assume it was in

13   writing because agencies don't usually do it without it.

14             THE COURT:  I assume it's in writing.

15             MR. CHAKRAVARTY:  We can look for it.

16             THE COURT:  Can you do that?  All right.  Why

17   don't we adjourn for lunch.  Resume again at 1:10.

18             (Luncheon recess taken at 12:35 p.m.)

19

20

21

22

23

24

25

123

1

2                    C E R T I F I C A T E

3

4            I, Diane M. Churas, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9                                    _____
     Submitted: 11/19/13
10                                   DIANE M. CHURAS, LCR, RPR, CRR
                                     LICENSED COURT REPORTER, NO. 16
11                                   STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12-30-2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-85-01-SM
         v.                     *  February 12, 2013
                                *  1:00 p.m.
    BEATRICE MUNYENYEZI         *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY SIX - AFTERNOON SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:


For the Government:      John A. Capin, SAUSA
                        Aloke S. Chakravarty, SAUSA
                        U.S. Attorney's Office (NH and MA)


For the Defendant:      Mark E. Howard, Esq.
                        David W. Ruoff, Esq.
                        Howard & Ruoff, PLLC



Interpreters:           Freddy Munana
                        Sabrina Iyadede



Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

2

I N D E X

WITNESS:            Direct    Cross     Redirect    Recross

DONALD HEFLIN:

By Mr. Chakravarty  3                   43

By Mr. Ruoff                  32


RICHARD KAMANZI:

By Mr. Chakravarty  47

```
1                  P R O C E E D I N G S

2              (IN COURT - NO JURY PRESENT)

3         THE COURT:  You know, I'm not sure I formally

4  excused Mr. Benn.  Mr. Benn is excused.

5         MR. CAPIN:  Thank you.  Does the Court have

6  objection to my typing quietly during the testimony?

7         THE COURT:  Can you hear it?

8         MR. RUOFF:  I can hear it.

9         MR. CAPIN:  I won't do it.

10        THE COURT:  That's fine.  Is it extensively?

11        MR. CAPIN:  No.

12        THE COURT:  Yeah, that's fine.  Are you

13 taking notes or something?

14        MR. CAPIN:  Yes.

15             (IN COURT - JURY PRESENT)

16                      DONALD HEFLIN

17        having been duly sworn, testified as follows:

18        THE CLERK:  For the record, please state your

19 name and spell your last name.

20        THE WITNESS:  My name is Donald L. Heflin,

21 H-E-F-L-I-N.

22                   DIRECT EXAMINATION

23 BY MR. CHAKRAVARTY:

24     Q.  Good afternoon, Mr. Heflin.  Keep your voice

25 up.  I normally ask witnesses to talk slower, but I
```

1    don't think I'll have to do that with you.

2         A.  No.

3         Q.  Mr. Heflin, where do you work?

4         A.  I'm the managing director of the Visa Office

5    at the U.S. State Department.

6         Q.  And what is the managing director of the U.S.

7    Visa Office?

8         A.  I supervise about 900 State Department

9    employees who work in the area of visas and making

10   sure that people who might be threats to the U.S.

11   don't come here, including about 400 people at the

12   National Visa Center in Portsmouth, New Hampshire.

13        Q.  Where is that accent from?

14        A.  Alabama.

15        Q.  And how long have you been with the

16   Department of State?

17        A.  25 and a half years now.

18        Q.  And that's who runs the National Visa Center?

19        A.  Yes.

20        Q.  Can you describe some of the postings you've

21   had with the department?

22        A.  I've served in Lima, Peru; Madras, India,

23   Lusaka, Zambia; twice in Mexico; once in England and

24   two or three stints in Washington.

25        Q.  Back in 1995 what was your assignment?

```
 1        A.   I was the desk officer for Rwanda in the
 2   Bureau of African Affairs.
 3        Q.   Have you had other jobs in Washington as
 4   well?
 5        A.   Yes.   After that I went to the Office of
 6   Legal Coordination in the visa office.   And in between
 7   England and Mexico I was in the Bureau of African
 8   Affairs again.   First in Regional Affairs and then in
 9   African Affairs.
10        Q.   I'm going to ask you several questions about
11   the refugee process.   Can you explain to the jury what
12   the relationship is between the Department of State
13   and what was then the INS, or Immigration and
14   Nationalization Service, back in 1995 through 1997
15   when you were on the Rwanda desk?
16        A.   Right.   Every year somewhere in the world
17   there will be a war or disaster break out and refugees
18   put into the countries around it and we ask those
19   countries to house and feed the refugees, and we along
20   with our European and Canadian friends and the United
21   Nations give them money to do so.   It can be a lot of
22   people.
23             In Rwanda, for instance, in the '94 to '96
24   time frame there were about two million Rwandans
25   living in the surrounding countries.
```

1          So we like to put our money where our mouth

2     is and accept some refugees to live here in the United

3     States, and typically we take in about 60, 70,000 a

4     year at an expense of 300, $350 million a year to the

5     U.S. Government.

6          And the USCIS, or back in the mid '90s the

7     old USINS, actually handles the processing of the

8     refugees.  It usually starts when -- a technical term,

9     JVA, joint voluntary agency.  I think of it as a

10    charity.  A charity will identify someone in the

11    refugee community who they think the best answer for

12    is -- they're a good candidate for resettlement in the

13    U.S.

14         They're also doing the same thing for the

15    western European countries and the Scandinavian

16    countries and Canada, and they'll refer this person to

17    the embassy.

18         From there USCIS, formally INS, takes it up

19    and processes the paperwork to its conclusion, and if

20    the refugee meets all the tests and all the

21    regulations, it gets them on a plane to the U.S.

22         In the middle of that, among other things,

23    they send in and check out the person's name at the

24    very least against their databases in Washington.  And

25    in the case of some countries they also have to gather

1   more information and send it to the State Department

2   for us to make sure that they don't have

3   ineligibilities under the visa law or the Refugee Act.

4        Q.  So for Rwanda after the genocide was there

5   such a process?

6        A.  There was.  In the immediate aftermath of the

7   genocide, which began in April of '94, it took us a

8   while to figure it out, but we and the European

9   countries were -- we had a bit of a naive approach.

10  We figured if you were in the refugee camp you must be

11  a good guy, and it turned out that that wasn't quite

12  true.  In the refugee camps there were people who had

13  fled because their families had been victims of the

14  genocide, but there were also people who had

15  perpetrated the genocide.  And there were a lot of

16  people in the middle, people who had left because

17  their village elders told them it was best to get out

18  of the way of the fighting.  And because of that we

19  were concerned that we might be letting into the

20  country people that were actually ineligible to come

21  here because their participation in the genocide

22  violated several areas of our law.

23          So we required that Rwandan applicants for

24  visas or for refugee processing be asked certain

25  questions, those answers be turned into a cable and

1  sent in to Washington, and then they couldn't go

2  forward with the visa or the refugee processing till

3  they got an answer back from Washington.

4       Q.  I'm just going to put up on the screen a page

5  from Exhibit 6.  Do you recognize these questions?

6       A.  Yes.  This is the questionnaire we were using

7  on both visa applicants and refugees in the fall of

8  1995.

9       Q.  Were these State Department questions?

10      A.  Yes.  They were drafted by -- I believe by

11  Kevin Aiston who had a very similar career path to me.

12  He had been the Rwandan desk officer during the

13  genocide, I took his place, and then he moved over to

14  the legal office of the visa office.

15      Q.  And these questions -- the answers to these

16  questions, what would happen to those?

17      A.  They would be turned into a cable that we at

18  the time called a Visas Donkey cable and sent to the

19  State Department.  It would go to several offices, but

20  the action office was the -- the legal coordination

21  staff of the visa office.  The office still exists, I

22  supervise it now, and its main concentration is making

23  sure people suspected of being terrorists don't come

24  to the U.S., but they also look at human rights

25  abusers and other people who have ineligibilities

1    under our law.

2         Q.  So back in 1995 and 1996, in addition to the

3    name check that you mentioned earlier would the data

4    that this form is asking for, would that also be

5    checked by the Department of State?

6         A.  Yes.

7         Q.  Were those questions important?

8         A.  They're very important.  Frankly, our

9    database back in those days in general wasn't as good

10   as it is now.  Post 9/11 we've really stepped up our

11   game in terms of both the size of the database and our

12   computerization not only in the area of terrorists but

13   in other areas, such as human rights abusers.

14             But also everybody involved with Rwanda in

15   1995 and '96 were really concerned with things like

16   making sure people were fed and had medicine and had

17   sanitation both inside Rwanda and in the big refugee

18   camps, and the Rwandan government was also concerned

19   with security.  Raids were being launched into Rwandan

20   territory from places like Zaire all the time.

21             So although making a comprehensive list of

22   genocide leaders and participants was important, it

23   wasn't the number one priority.  Just pure survival of

24   the folks in and around Rwanda was the number one

25   priority.

1          So we didn't have a great database to check

2    things against at that time.  So the questions to the

3    answers become important.

4          We don't really expect someone to be dumb

5    enough to say, yes, I participated in the genocide and

6    I think you should let me travel to the U.S. anyhow.

7    So a lot of the questions attempt to get at that by

8    asking other things.

9          Q.  And what kind of other information was the

10   State Department looking at?

11         A.  Well, for instance, question B.

12         Q.  I'll zoom in.

13         A.  "How was your family affected?"  You could

14   see several different responses to that.  Someone

15   might say, well, my family was affected.  People were

16   killed in the genocide in my immediate family, and I

17   almost was and I fled and I don't ever want to go back

18   there again.  That would be the classic refugee.  That

19   would be the kind of person that we were looking for

20   refugee resettlement.

21         Someone else might say, well, no one in my

22   family died and I didn't feel under any threat, but it

23   was going on all around me and then the war came to my

24   town and it was terrible when I left and I'm afraid to

25   go back.  They're not quite as strong a case for

1  refugee resettlement, but they're not a bad guy.

2  Someone else might say, well, I lost my government job

3  and I left Rwanda because I was afraid I would be

4  prosecuted.  That would be a red flag for us.  In that

5  case we would want to dig a little deeper and see what

6  else we could find out about this person and their

7  activities during the three months of the genocide.

8       Q.  All right.  So can you explain how this

9  information would get to Washington where you were and

10  to the other components at the State Department that

11  actually reviewed the answers?

12       A.  It actually came in in a cable called a Visas

13  Donkey which was a -- it followed a format.  It would

14  have the full name, date and place of birth of the

15  applicant for a visa or for refugee travel documents.

16  And then under that it would just simply list out the

17  answers to these questions.  Usually it wouldn't list

18  the questions themselves because the analysts who

19  worked with Rwanda cases were so used to seeing them

20  they didn't need that.  They knew that it was a

21  standard questionnaire.

22           Question B asked how your family was

23  affected.  Question E asked if you were living in

24  Rwanda now.  Question G asked if you had funds in any

25  foreign bank account, things like that, and they would

1  look at the answers and see if there was a yellow flag

2  or a red flag coming out of those.

3      Q.  Who else would look at that information?

4      A.  It was the legal coordination staff of the

5  visa office.  I believe it also went to our Democracy

6  Rights and Labor Office, basically the human rights

7  people.  It went to the lawyer's office for the State

8  Department, an attorney named Crystal Nix, and

9  courtesy copies came to me and to the embassy in

10 Rwanda.

11     Q.  What was the purpose of that?

12     A.  It was basically to give us the

13 opportunity -- we tried not to interfere in these

14 cases on a political basis.  You know, that's not what

15 the refugee process is about.

16         But it gave us the opportunity if we saw, for

17 instance, the name of somebody really famous, like

18 someone who had been a cabinet member or a general in

19 the army, to raise our hands and say wait, wait, wait,

20 there's something going on here.

21         Also listed in the cable would be the names

22 of family members traveling with the person.  And

23 sometimes the principal applicant might not raise a

24 yellow or red flag, but you look down at who their

25 spouse is and you think, oh, this could be a real

1   problem.  It gave us the opportunity to raise our

2   hand.  But most of the work concentrated in the

3   analysts' and the visa office.

4         Q.  If a response to the questions on that form

5   prompted a yellow or red flag, as you described it,

6   what would the State Department do?

7         A.  We would go back out and ask that more

8   questions be asked, and in some cases we just simply

9   wouldn't be able to issue the visa or the refugee

10  travel documents.

11            The burden is really on the applicant for a

12  visa or refugee status in these cases.  We have plenty

13  of people who want to come to the U.S.  We can just

14  skip over people that have these kind of problems and

15  take the next person in line.

16        Q.  So looking back at question B one of the

17  questions is, "Were you in any way personally affected

18  by the events?"  What's the purpose of that question?

19        A.  Well, we would like to see how people express

20  themselves.  I mean, the thing that you're really

21  looking for in a refugee case from that time is,

22  people in my family were killed, I was almost killed,

23  I was lucky to escape with my life, I was hunted down.

24            But at the other extreme people might say,

25  well, I had a great government job, or my father or my

 1   spouse had a great government job and we had to resign

 2   that and flee the country in advance of the army of

 3   the new government, we were in fear of prosecution.

 4   That would be a sign that perhaps they had

 5   participated in the genocide or at least there was

 6   some reason to think they had.

 7        Q.   And so what would the State Department do in

 8   that circumstance?

 9        A.   In that circumstance we might well find --

10   participation in genocide brings in several areas of

11   our law.  The Immigration and Nationality Act says you

12   can't come to the U.S. if you've committed a crime of

13   moral turpitude, section 212(a)(2).  Crimes of moral

14   turpitude include murder or aiding and abetting in

15   murder.  Section 212(a)(3)(E) of the Immigration Act

16   says you can't ever have participated in genocide, and

17   participation is defined pretty broadly.  It includes

18   assisting, encouraging, complicity.

19            And then the Refugee Act of 1980, which would

20   apply to people trying to come here as refugees but

21   not on a visa, also has a persecutor part.  Even if

22   you have a well-founded fear of persecution, if you

23   engage in persecution of other people you can't come

24   to the U.S. as a refugee.

25            And then, more than that, if somebody was

1   dishonest on this questionnaire and cut off our

2   ability to investigate yellow or red flags, that may

3   well lead to a finding that they were ineligible to

4   come to the U.S. under 212(a)(6)(C) of the Immigration

5   Act, commonly called visa fraud.

6       Q.  And that's because they're incredible, they

7   did not tell you the truth?

8       A.  They have not told us the truth and they cut

9   off a line of inquiry on something that was material

10  to their coming to the U.S.  It's no big deal if we

11  ask somebody what their favorite color is and they

12  tell us blue when it's really red.  But when they give

13  dishonest answers on a questionnaire like this,

14  they're going right at the heart of several visa

15  ineligibilities I've just listed.

16      Q.  The next question sounds like it's just

17  another way to ask this question, "Were you personally

18  affected by the atrocities?"  Is that similar to

19  personally affected by the events that took place in

20  Rwanda, the preceding question?

21      A.  Yes.  And again, we're looking to elicit a

22  response and see what the people's first reaction is

23  to that.

24      Q.  One of the questions on part B is, "Were you

25  a victim?"  Explain why you ask that.

1     A.  Frankly, most of the victims died.  There

2  were some who were wounded and got away.  There were

3  others who were victims in the broader sense, that

4  close family members died and sometimes they witnessed

5  it.

6     Q.  And then you ask -- you, meaning the State

7  Department, asks, "Were you a witness?"  Why do you

8  ask that question?

9     A.  Because there were very few witnesses from

10 the groups that were targets of the genocide that

11 survived.  There were some.  A lot of the witnesses --

12 this, and the next part of the question, "Were you a

13 witness or were you otherwise involved", was trying to

14 get at whether people -- not everybody involved in the

15 genocide wielded a machete.  There were people going

16 on the radio and encouraging people to come to certain

17 places at certain times to do the killing.  There were

18 people organizing the killing fields.  There were

19 people basically ratting out their neighbors as to

20 which ethnic group they belonged to or whether they

21 were moderate Hutu or not, so that would be otherwise

22 involved.

23    Q.  So that's the type of information you were

24 looking to capture in this question.

25          The next question seems self-explanatory,

1    "Did you encourage others to participate in such

2    killing or injury?"  Does that go to whether somebody

3    is eligible to come to the United States?

4         A.  Absolutely.  Both under the persecution bar

5    and 212(a)(e)(E) of the Immigration Act.

6    Encouragement itself could lead to ineligibility.  You

7    don't have to actually pull the trigger.

8         Q.  I take it that's the same explanation for D

9    as well?

10        A.  That's correct.

11        Q.  Let's go to question F.  It asks what your

12   occupation was in Rwanda prior to April 1, 1994, and

13   what has your occupation been since that time.  Why

14   does that matter to the State Department?

15        A.  Given the nature of the government that

16   existed prior to the summer of 1994, particularly we

17   were looking for people who had government posts.  The

18   government was -- a lot of people in the government

19   and the ruined party were called up in the

20   organization or execution of the genocide.  We had

21   people who on this form would basically try to cover

22   up the fact that they had been a local mayor or an

23   official of the national government.

24        Q.  Okay.  Question F asks, "Did you suffer any

25   financial losses during the civil conflict in Rwanda?"

1  Why do you ask that question?

2      A.  This is similar to trying to elicit from

3  someone whether they had lost their government job or

4  similar.  The folks who lost funds were the folks who

5  fled and aren't going to go back possibly because they

6  fear persecution.  For instance, on this questionnaire

7  a person says they lost their house.  Okay.  Well, why

8  was that?  This is the kind of thing we would want to

9  look at a little further.

10     Q.  And would you ask further questions of the

11 applicant?

12     A.  It's a picture -- you kind of look at the

13 totality of all the answers.  You know, in this case

14 so many of the answers were innocent.  The one that is

15 a little intriguing is house.  I might have gone back

16 and asked a follow-up question about that one.

17     Q.  Now I'm showing you this cable.  Do you

18 recognize this?

19     A.  Yes.  Now, this is a standard Visas Donkey

20 cable for Rwanda from that period.  In question 1 it

21 explains what the applicant is trying to do.  In this

22 case -- paragraph one.  In this case it's someone who

23 is coming for refugee resettlement.

24         And question 2 it lists the full name, date

25 and place of birth of the person, and that enables us

1   to check our databases.  And then you can see below

2   that it lists, beginning with the letter A, the

3   questions from the questionnaire that we just looked

4   at.

5       Q.  Okay.  You've reviewed this and the answers

6   match up to the questionnaire we just looked at?

7       A.  Yes.

8       Q.  In addition to the principal applicant,

9   Munyenyezi, Beatrice, are there applicants of other

10  individuals that appear to be two children -- three

11  children, excuse me?

12      A.  Yes.  According to this cable, she was going

13  to be accompanied by three children.  One of them was

14  actually quite young, and the other two were twins,

15  and they were all going to travel with their mother.

16      Q.  The routing information, if you could

17  decipher some of this for us.  When was this cable

18  sent?

19      A.  This cable was sent on the 8th of February,

20  1996, from our embassy in Nairobi, which is where the

21  refugee processing was done, to two places, the

22  embassy in Kigali and the Secretary of State in

23  Washington, which is really the place that had the

24  action, and with an info copy to the FBI.

25          And then if you go down a little bit below

1    that, within the State Department it went to the

2    Office of Legal Coordination, which is where the main

3    analysis would have been, to the Democracy Rights and

4    Labor's Central African Office and to the legal

5    office.

6          Q.  And that's the process you described a little

7    while ago?

8          A.  Yes.

9          Q.  Now, you explained a little bit about what

10   the U.S. Government's refugee policy was.

11   Specifically during the period that you were on the

12   desk, what were the issues that were occupying Rwanda

13   in the United States?

14         A.  There were two or three big ones.  The first

15   one was, as I mentioned earlier, everybody involved in

16   Rwanda, both Rwandans and other governments, were just

17   trying to deal with survival.  The country had been

18   torn up in '94 really badly.  It had two million of

19   its citizens living overseas in refugee camps.  It had

20   to worry about the food supply.  It had to worry about

21   medicine.  It had to worry about sanitation both

22   inside and outside the country.

23             A preoccupation of the Rwandans was that they

24   were suffering raids being launched into the country

25   from outside all the time by kind of holdouts from the

1    former government.

2         And also Rwanda's jails were filling up.

3    Given that almost a million people died in the

4    genocide, there were a lot of accusations against

5    people in addition to just the regular criminals that

6    they had in their justice system.  And we were

7    pressuring them to do something about it, which they

8    eventually did.  They eventually set up a community

9    court system and had a lot of people go through local

10   justice where their neighbors accused them of what

11   happened in the spring of '94, and they either pled

12   guilty or there was a trial and then at the end

13   sentence was imposed.  Very typically it was community

14   service.

15        Q.  And so in terms of the refugee process, what

16   type of applicant was the United States looking for as

17   a Rwandan refugee?

18        A.  The classic case would have been someone who

19   had people in their family die, ordinarily escaped

20   dying themselves, and they were targeted for the

21   genocide because they were a particular ethnic group,

22   in this case the Tutsi, or they were a moderate Hutu.

23   A moderate Hutu could be defined as a member of the

24   MRD political party, or frankly the moderate Hutu was

25   often defined as someone who didn't believe in

1   exterminating all the other ethnic groups.  The group

2   that ran the genocide hated the Tutsis, but they also

3   hated the moderate Hutus.  They saw them as sellouts

4   of their own ethnic group.

5         Q.  You just mentioned the MRND political party.

6         A.  I'm sorry.  The MDR.

7         Q.  I just wanted to clarify.  You said that

8   there was a moderate political party that was the MDR?

9         A.  It was the MDR, and then there was the MRND,

10  which was the party of the then president, but also an

11  awful lot of extremists, including the people who

12  planned the genocide.

13        Q.  I'll touch on that in a second.  Is there a

14  legal standard that a refugee applicant has to satisfy

15  before becoming a refugee?

16        A.  Yes.  A refugee has to have suffered

17  persecution or have a well-founded fear of persecution

18  if they return to their country.  And their fear of

19  persecution has to be on one of five grounds:  Ethnic

20  group, nationality, religion, social affiliation or

21  political opinions.

22        Q.  And whose burden is it to satisfy those

23  criteria?

24        A.  The applicant's.

25        Q.  You mentioned earlier the questionnaire and

1    the cable which I think is called a Donkey cable.

2         A.  Yes.

3         Q.  Is that part of a security advisory opinion

4    process?

5         A.  That's exactly right.

6         Q.  And can you explain what a security advisory

7    opinion process is?

8         A.  A security advisory opinion has changed over

9    the years, particularly after 9-11, but it basically

10   consists of two parts.

11         First, an applicant for any type of travel

12   document to come to the U.S., whether it's a visa, an

13   immigrant visa or refugee travel document, has their

14   name checked against a database to make sure we're not

15   letting someone in where there's already been some

16   evidence that they're a bad guy.

17         Then in the case of certain countries we're

18   looking at other things.  In the case of Rwanda we

19   were looking in particular at is it possible you

20   participated in the genocide.

21         Q.  Now, based on your review of these documents

22   relative to this case, based on the responses to the

23   questions, did the State Department respond to the

24   query from Nairobi with regard to whether this

25   applicant had satisfied the security advisory opinion

1  process?

2      A.  Yes, they did.  In another formatted cable

3  called Visa 6.

4      Q.  Is that this document?

5      A.  Yes.  This is it.

6      Q.  Okay.  And can you tell us the date that the

7  clearance was passed back to Nairobi?

8      A.  14 February '96.

9      Q.  And again, this was for Beatrice Munyenyezi

10  and the three children that she had identified; is

11  that right?

12      A.  That's correct.

13      Q.  Now, in your review of the documents in this

14  case did you look at the refugee form -- application

15  form?

16      A.  I did.

17      Q.  Now, is this -- who would review this

18  document in the refugee process?

19      A.  This would have been the officer from the

20  USCIS who did the interview out of Nairobi, and then

21  this form would have been part of the packet that

22  traveled with the applicant as they came to the United

23  States and became part of their permanent file which

24  the Immigration people call an A file, because it has

25  a distinctive number that begins with the letter A.

1      Q.  And that's exactly where this document is

2   from.  On the second page does it list whether she has

3   any relatives in the United States?

4      A.  Yes, it does.  It says she has a brother.

5   The joint voluntary agencies and the charities that

6   try and identify people who would be good candidates

7   for resettlement have various factors they look at.

8   This may well have been one, the fact she had a close

9   relative in the U.S. who would be an anchor relative

10   for her who could sponsor her.

11      Q.  Now, in order to have an anchor relative, are

12   the anchor relative's refugee documents and bio data,

13   is that included in that alien file that you just

14   mentioned?

15      A.  Yes, I believe it would be.

16      Q.  So the name of the brother appears to be

17   Higiro, Jean-Marie Vianney?

18      A.  Yes.

19      Q.  Is this an I-590, or a refugee application,

20   of Jean-Marie Vianney Higiro?

21      A.  Yes.

22      Q.  And do you recognize this to be a list of

23   family members of Jean-Marie Vianney Higiro?

24      A.  Yes.  And this is fairly typical.  When

25   people are being admitted as refugees, or for that

1    matter as immigrants for immigrant visa, they tend to

2    list all their relatives in case they're going to send

3    for them later to come to the U.S.  They can always

4    point back and say, look, I didn't make this up.  When

5    I first came into the U.S. I listed this person.

6         Q.  Is there a process for having someone follow

7    a relative who has come to the United States as a

8    refugee?

9         A.  It works two ways.  In most cases they're

10   followed and joined.  It has to be a very close

11   relative, like your spouse or your father or mother

12   that you're following.  In some cases that can be

13   expanded out.

14             And what that does is it basically gets the

15   applicant out of having to prove that they have a

16   well-founded fear of persecution.  The reason they're

17   traveling to the U.S. is to join their refugee

18   relative.

19             They have to meet all of the other criteria.

20   They have to clear a medical check.  They have to have

21   an SAO sent in.  They have to fill out all of the

22   paperwork.  But they don't have to have a well-founded

23   fear of persecution.  Only the principal applicant who

24   went before them did.

25             In the cases of people who are not in that

1    immediate family circle, like usually a brother,

2    sister, niece or nephew, they still have to show the

3    well-founded fear of persecution.  But the fact that

4    they've got an anchor relative in the U.S. who will

5    receive them and help them out is a big factor.

6         Q.  So Mr. Higiro listed Beatrice Munyenyezi as a

7    sister; is that right?

8         A.  That's correct.

9         Q.  Now, Mr. Higiro listed on the association's

10   question on the I-590 that he was a member of the MDR.

11   Is this the organization you mentioned a little while

12   ago?

13        A.  Yes.  The MDR was a moderate Hutu party

14   before the genocide, and actually after the dust

15   settled and the new government took power it

16   cooperated with the Rwandan Patriotic Front and a

17   coalition government.

18        Q.  So was that supportive of this well-founded

19   fear of persecution?

20        A.  Yes, it would have been.

21        Q.  If that had said MRND would it have been?

22        A.  The fact that someone was a member of the

23   MRND would raise at least a yellow flag, perhaps a red

24   flag for us, because the MRND was a political party.

25   It had elected the president who died in the plane

1    crash in April of '94 who at times had been very hard

2    against the Tutsis but was showing towards the end of

3    his life some inclination to open up and negotiate and

4    deal with them.  But it also contained a lot of people

5    who were involved in the organization planning the

6    execution of the genocide.

7        Q.  If on the questionnaire an applicant listed

8    that they were a member of the MRND, what would the

9    response be by the Department of Safety?

10       A.  I doubt seriously they would have received a

11   Visa 6 response.  At the very least we would have

12   asked this applicant a lot more questions, and it may

13   well be that they never would have been admitted as a

14   refugee or as a visa applicant.

15       Q.  If an applicant listed that she had been a

16   witness to events during the genocide, what would have

17   been the response?

18       A.  We would have gone back and asked more

19   questions:  You were a witness.  How did that come to

20   be?  What did you see?  Have you talked to the

21   authorities?

22       Q.  If an applicant had indicated that she had

23   checked identification cards at roadblocks during the

24   genocide, what would have been the response?

25       A.  If someone admitted they had checked

1    identification cards during the genocide to help

2    identify people to be executed, that would have made

3    them ineligible under the crime of moral turpitude

4    provisions and the genocide provisions of the

5    Immigration and Nationality Act, and in the case of a

6    refugee applicant, the persecutor bar of the 1980 Act,

7    and their names would have gone into the computer

8    system database to make sure that they never came to

9    the U.S.

10        Q.  Now, at the time I think you mentioned that

11   that database was not very well populated.

12        A.  No, it was not.

13        Q.  Approximately how many people do you think

14   were on that database?

15        A.  I'm going to estimate at the time, we're

16   talking about fall of '95, spring of '96, between 100

17   and 200 people.

18        Q.  Approximately how many perpetrators would the

19   United States think were involved in the genocide?

20        A.  This has been the matter of some debate.

21   There were over a million people killed in just a

22   little over two months, but they were killed for the

23   most part without gunfire.  They were killed with

24   machetes.  So it took an awful lot of people to do

25   that.  Thousands.  How many thousands?  It's hard to

1  say.

2      Q.  Now, if the applicants had listed that they

3  had spent the genocide with their husband and their

4  husband had been the leader of the local militia, the

5  Interahamwe militia, would that have had an effect on

6  how the State Department would process the

7  application?

8      A.  That would have been a red flag.  While I'm

9  sure the MRND had some people in it that never

10 participated in the genocide, the Interahamwe were

11 leaders in the genocide and then when they stepped out

12 of the country were launching armed attacks back into

13 Rwanda.

14     Q.  You say red flag.  Does that mean -- what

15 would the State Department actually have done?

16     A.  We might have gone back and asked more

17 questions, but we might have just said that we weren't

18 able to approve this refugee processing and moved on

19 to the next person.  Like I say, we have plenty of

20 people trying to come here who don't have these kind

21 of problems.

22     Q.  Now, just to refresh my recollection, when

23 Ms. Munyenyezi was given her Visa 6, which I think is

24 the State Department term for her clearance?

25     A.  Yes.

1     Q.  Visa 6.  What was the date?

2     A.  14 February 1996.

3     Q.  Did you notice when her husband, Shalom

4  Ntahobali, submitted his Rwandan questionnaire?

5     A.  I believe it was after.

6     Q.  I'm putting on a page from Exhibit 7.  Do you

7  recognize this?

8     A.  Yes.

9     Q.  What is that?

10     A.  This was the Visas Donkey that was sent on

11  from him a bit after his wife.

12     Q.  Okay.  It looks like basically the very next

13  week.

14     A.  The 23rd of February 1996.

15     Q.  Nine days later.  So after the clearance

16  that's when the husband's was submitted; is that

17  right?

18     A.  Correct.

19     Q.  Mr. Heflin, is credibility important to the

20  refugee process?

21     A.  Credibility is key.  It's actually one of the

22  main reasons that people are turned down for refugee

23  processing.  Sometimes their story just doesn't add

24  up.

25          But it's also -- there's an awful lot of

1   times in refugee processing -- just like in visa

2   applications, we ask people to fill out forms.  We ask

3   them to come to an interview.  We ask them a lot of

4   questions.  The system is really built around the

5   answers to those questions being honest.

6           MR. CHAKRAVARTY:  That's all I have.

7           THE COURT:  Mr. Ruoff.

8                   CROSS-EXAMINATION

9   BY MR. RUOFF:

10      Q.  Good afternoon, Mr. Heflin.  I'm Dave Ruoff.

11      A.  Good afternoon.

12      Q.  I'm going to just go over a couple questions

13   that the prosecutor asked you about earlier with

14   respect to the Visa 6 granting, okay?

15          Now, that Visa 6 would be returned after the

16   Donkey cable had been sent to Washington and they

17   reviewed the responses and then issued the Visa 6

18   back, right?

19      A.  That's correct.

20      Q.  Okay.  And you said that there were a number

21   of questions on the form, the Rwandan questionnaire,

22   that if answered a certain way would have prompted a

23   response on the Visa 6 that would have asked for

24   additional information, right?

25      A.  Correct.

1    Q.  Okay.  Now, if that had happened I'm guessing

2    the mechanism would have been a cable back to the

3    person that took the refugee application indicating

4    that you needed additional answers; is that right?

5    A.  That's correct.

6    Q.  And then that agent would sit down with the

7    applicant and ask the questions that Washington D.C.

8    wanted answered, right?

9    A.  That's right.

10   Q.  And one of the questions that I believe you

11   told Mr. Chakravarty would have triggered a response

12   was whether or not someone had seen something or been

13   a witness to the genocide in 1994, right?

14   A.  Yes.

15   Q.  Because you would have wanted to know what

16   they were doing and what was their perspective, right?

17   A.  Correct.

18   Q.  And from those answers you would have been

19   able to ascertain whether or not they would be

20   acceptable as a refugee?

21   A.  That's right.

22   Q.  Okay.  So on the application in this case one

23   of the answers that went back to the Visa Donkey is on

24   question B, which you read in detail, right?

25   A.  Yes.

 1        Q.  Was "Family members disappear", correct?

 2        A.  Yes.  That's correct.

 3        Q.  Okay.  So that answer informed D.C. that

 4   perhaps the person who filled out this form had been

 5   in a position to witness violence or someone

 6   disappearing, right?

 7        A.  Yes.  It implies that they or their family

 8   members were a victim of the genocide.

 9        Q.  Okay.  Did you send back -- do you know

10   whether or not there was any request for additional

11   information from D.C. about that response?

12        A.  In this case there was not.

13        Q.  Do you have any inclination as to why there

14   was no additional request for information based on

15   that response?

16        A.  Looking just at the answer to question B,

17   "Family members disappear," that could be consistent

18   with someone whose family had been a victim of the

19   genocide.

20        Q.  Okay.  Well, let's look at this document,

21   which is the page just preceding it in the A file.  Do

22   you recognize that?

23        A.  I'm not sure I've seen this document, but

24   what it looks like would have been a questionnaire

25   from fairly early on in the refugee process.

1       Q.   Okay.  Well, the date stamped on this one is
2  13 November '95, right?
3       A.   Yes.
4       Q.   The date stamped on this one is what?
5       A.   Also 13 November.
6       Q.   Okay.  So what do you deduce from that, that
7  they're filled out on the same day?
8       A.   It appears to be.
9       Q.   Okay.  Now, the top of this is cut off, but
10  do you see the words appear "Administrated through
11  Church World Services"?
12       A.   Yes.  That would have been a joint voluntary
13  agency.
14       Q.   And this would have been a second page, I
15  guess.  I don't know.
16       A.   The second page bears the hallmarks of being
17  from USCIS.
18       Q.   Okay.  There's nothing on the document itself
19  that says that this is an official government form,
20  right?
21       A.   No.
22       Q.   Many government forms actually have something
23  down at the bottom that give it a form number and a
24  form name, right?
25       A.   Could be.  If you're asking me to

1  speculate --

2      Q.  No.  I'm just saying there's nothing on the

3  form to indicate that this is an official government

4  form, correct?

5      A.  That is correct.

6      Q.  Now, I think you said that there was a JVA

7  that was responsible for compiling this information,

8  correct?

9      A.  Right.

10     Q.  And the JVA is not a government organization,

11 correct?

12     A.  That's correct.

13     Q.  So a lot of time the JVAs would review the

14 information with the applicant, write it down, and

15 then submit it to the federal government?

16     A.  Yes.

17     Q.  Do you know anything about Kinyarwandan?

18     A.  The language?

19     Q.  Yes.

20     A.  A little bit.  I don't speak any.

21     Q.  Do you know anything about its syntax or how

22 easily it translates to Romance language in English?

23     A.  It at times is a difficult translation.

24     Q.  Okay.  So it's not uncommon for these forms

25 to be filled out by a translator, correct?

1      A.   That's correct.   Now, many people in Rwanda

2  at that time also spoke French.

3      Q.   Okay.   Well, this is not in French, right?

4      A.   Pardon?   I mean, in other words the

5  translation might be from French, not from

6  Kinyarwanda.

7      Q.   Okay.   So you don't really -- I guess you

8  don't know who actually wrote the words down on this

9  form, I guess that's my point, right?

10      A.   My guess would be the USCIS officer, but it

11  could have been someone from JVA.

12      Q.   Okay.   There's no place on here for a

13  signature or anything like that?

14      A.   No, there is not.

15      Q.   The only thing that identifies who is

16  associated with this form is on this page that you

17  don't recognize, right?

18      A.   Correct.

19      Q.   Now, I have a question for you on question B.

20  It says -- well, look at question A:   Have you been in

21  Rwanda since April 1, 1994?   If so, were you in any

22  way personally affected by the events that took place

23  there?

24           The State Department decided not to use the

25  word genocide, correct?

1       A.  Not in this question.

2       Q.  Well, does the word genocide appear anywhere

3  on this form?

4       A.  No, it does not.

5       Q.  Okay.  So when they're asking the question,

6  were you personally affected by events that took place

7  there, how does that translate into Kinyarwandan?

8       A.  Oh, I wouldn't know.

9            MR. CHAKRAVARTY:  Objection, your Honor.  The

10  witness doesn't know Kinyarwandan.

11           THE COURT:  I think that's the point.

12           MR. RUOFF:  That's the point.

13           THE COURT:  Overruled.

14      Q.  In particular, were you in any way personally

15  affected by the atrocities that took place, right,

16  that's the next part?

17      A.  Correct.

18      Q.  There's nowhere in here that defines what

19  atrocities you're specifically asking about, right?

20      A.  Correct.

21      Q.  Okay.  I think it's just implied, that is?

22      A.  I think it was fairly common knowledge in

23  Rwanda, especially among the refugee community.

24      Q.  Were you a victim, right?

25      A.  Yes.

1      Q.   How would you define victim then?

2      A.   Part of the reason for this question written

3  the way it was --

4      Q.   I'm curious to know how you --

5      A.   -- was to see how the applicant defined

6  victim.

7      Q.   And then there's a question about being a

8  witness?

9      A.   Correct.

10     Q.   Now, I notice when Mr. Chakravarty was asking

11 you questions about Rwanda you knew the names of the

12 main political parties, like the MDR and the MRND,

13 right, and you talked about some red flags, and I

14 think you specifically used the phrase cabinet member,

15 right?

16     A.   Correct.

17     Q.   So if someone were identified in an

18 application as either being a cabinet member, or being

19 associated with a cabinet member, that would certainly

20 cause some red flags, right?

21     A.   Yes, sir.

22     Q.   Because someone who admits to being, you

23 know, associated with someone that's a cabinet member

24 might be inviting additional questions, correct?

25     A.   Right.

1        Q.  So generally, if someone was trying to get

2    into the United States they wouldn't admit to

3    affiliations like that.  Is that true?

4        A.  They wouldn't, but covering that up if they

5    were asked directly --

6        Q.  Correct.

7        A.  -- would in itself give rise to an

8    ineligibility under the law.

9        Q.  Were you aware that the applicant in this

10   file actually identified the mother-in-law -- the

11   mother of her husband as being a cabinet minister,

12   correct -- a cabinet minister?

13       A.  Could I see that?

14       Q.  It's right on the screen.

15           THE COURT:  Have you seen this before?

16           THE WITNESS:  I believe I might have.  Let's

17   see.

18           THE COURT:  Maybe you could point it out to

19   him.

20       A.  Is it over here on the right?

21       Q.  It's right here.  Look at the screen.

22       A.  Yeah, I've got it.  Well, mother-in-law -- I

23   mean, what you're really looking for is -- you know,

24   the example I gave when I talked about the cable going

25   to Embassy Rwanda was if someone was identified as

1  being a cabinet member or a general in the Army.

2          Now, your mother-in-law being a cabinet

3  member is a bit of a different kettle of fish.

4          For instance, in this case we know from the

5  documents that have been shown by the two attorneys

6  during this court session that this applicant had a

7  mother-in-law who was a cabinet minister in the old

8  government but a brother who was a member of the

9  moderate political party that many people in that old

10  government were trying to wipe out.

11     Q.  Okay.  So what's your point?

12     A.  Well, my point is that being the

13  daughter-in-law of a cabinet member of the old

14  government wouldn't necessarily raise a red flag.  It

15  might raise a yellow flag.

16     Q.  And that's because her brother was actually

17  someone who was a member of a political party that was

18  not involved in the genocide; is that right?

19     A.  Well, I was saying that, you know, in the

20  elite class in Rwanda this story of someone having a

21  mother-in-law who was at one extreme of the Hutu

22  political parties and then a brother who was at the

23  other extreme is not that unusual.

24     Q.  But the brother who is in the MDR was willing

25  to serve as an anchor for her when she arrived in the

1  United States, right?

2       A.  Well, sure.  He's her brother.

3       Q.  This particular portion of the questionnaire

4  also identifies her -- the rest of the family, the

5  spouse's family, as civil servants, right?

6       A.  Yes.

7       Q.  And one of the things that your form is

8  supposed to be vigilant for is whether or not people

9  lost their government jobs under the old regime,

10 correct?

11      A.  That would be one thing, like a particularly

12 high-ranking government job.

13      Q.  Like a cabinet minister or a mayor or

14 something like that?

15      A.  A mayor, a member of parliament.

16      Q.  Now, you said initially that the Visa 6 would

17 check names against the database.  I think you

18 estimated the number in the database to be 100 to 200

19 people.

20      A.  At that time probably so.

21      Q.  Now, was that a database that was specific to

22 people known in Rwanda, or was it an INTERPOL

23 database?

24      A.  It was culled from various sources, some from

25 the Rwandan government itself, some from probably

1   press reporting, frankly, others' accusations that

2   came in.  They were basically the names of people who

3   unquestionably had been leaders of the genocide and

4   were still at large.

5        Q.  So they were Rwandan names?

6        A.  Yes.

7        Q.  From various intelligence sources that the

8   U.S. Government had compiled through open sources,

9   right?

10       A.  Using the word intelligence, probably, yes.

11           MR. RUOFF:  Could I have a second, Judge?

12           THE COURT:  Certainly.

13           MR. RUOFF:  Thank you, sir.  I have no more

14   questions.

15           THE COURT:  Any redirect, Mr. Chakravarty?

16           MR. CHAKRAVARTY:  I have a few things.

17                     REDIRECT EXAMINATION

18   BY MR. CHAKRAVARTY:

19       Q.  On this form you were asked about -- these

20   are obviously someone's notes, somebody's interview

21   notes?

22       A.  Yes.

23       Q.  Does it make sense that this might be the

24   notes of the CIS officer who interviewed the

25   applicant?

1       A.  Yes.

2       Q.  So you were asked about whether a cabinet

3   minister being a mother-in-law would be significant.

4   I ask you whether this portion of the interview in

5   which the applicant is recorded to have said, prior to

6   April of '94 neither PA, principal applicant, spouse

7   or families were politically active or had any

8   problems with government, is that consistent with this

9   being another kettle of fish?

10      A.  The problem with that answer is -- okay,

11  let's break that answer down into a couple of parts.

12          Prior to April of '94 none of them had any

13  problems with the government.  All right.  Fine.  None

14  of them were politically active.  That, if not true,

15  would have been a material misrepresentation.

16      Q.  Are you done?  Sorry.

17      A.  Yes.

18      Q.  Why would that be?

19      A.  Well, okay.  So we've got somebody that prior

20  to April of '94 -- in other words, from the old regime

21  which turned into the genocide's regime was in

22  power -- didn't have any problems with them, but they

23  claim not to have been politically active.

24          That they were actually activists say in the

25  MRND party or in the Interahamwe or in high-ranking

1   government posts, that would have been a yellow or a

2   red flag that they might have been involved in

3   organizing the genocide.

4       Q.  Okay.  And this interview was conducted by a

5   CIS officer using the same legal standards that you

6   described?

7       A.  Yes.  He would have been very familiar with

8   the Immigration Nationality Act and the Refugee Act.

9       Q.  Okay.  You were asked about questions on --

10  whether the form on which the questions were printed,

11  whether this was a government form.  Are these State

12  Department questions?

13      A.  They're State Department questions, and

14  actually the typeface is one that we used on a lot of

15  our documents at the time.  So my guess would be that

16  this was a form that was used by the USCIS and the

17  shorter form that we saw before was used by the JVA.

18      Q.  This one?

19      A.  Yes.

20      Q.  Regardless, the information is provided by

21  the applicant that's being submitted to the State

22  Department, correct?

23      A.  Correct.

24      Q.  And then, finally, you were asked about the

25  JVA not being a governmental agency.  Was the JVA --

1   were they actually under contract with the State

2   Department?

3       A.  They were.  There's a handful of JVAs that we

4   work with in various areas of the world.  They're very

5   well trained.  They're very good at what they do.  We

6   give them money.  Although in the case of a charity,

7   such as Church World Services, they also work with

8   donations from private donors.

9           MR. CHAKRAVARTY:  That's all I have.

10          THE COURT:  Recross?

11          MR. RUOFF:  No, your Honor.  I'm all set.

12  Thank you.

13          THE COURT:  All right.  Thank you, Mr.

14  Heflin.  You may step down.  You're excused.  We

15  appreciate it.

16          You may call your next witness.

17          MR. CHAKRAVARTY:  Richard Kamanzi.

18                  RICHARD KAMANZI

19          having been duly sworn, testified as follows:

20          THE CLERK:  Thank you.  Please be seated.

21  For the record, please state your name and spell your

22  last name.

23          THE WITNESS:  Richard Kamanzi.  Last name,

24  K-A-M-A-N-Z-I.

25          THE CLERK:  Thank you.

```
 1              (Witness using Interpreter)

 2                   DIRECT EXAMINATION

 3  BY MR. CHAKRAVARTY:

 4       Q.  Good afternoon.

 5       A.  Good afternoon.

 6       Q.  Mr. Kamanzi, where are you from?

 7       A.  I'm from Butare in Rwanda.

 8       Q.  And were you born and raised there?

 9       A.  Yes.

10       Q.  Did you live in Butare Town itself?

11       A.  Yes.

12       Q.  How old are you?

13            THE INTERPRETER:  How old are you or how old

14  were you?

15       Q.  How old are you now?

16       A.  32.

17       Q.  Approximately how old were you during the

18  time of the genocide?

19       A.  15.

20       Q.  Where did you live just before the genocide

21  began?

22       A.  I was -- I lived near the university.

23       Q.  Did you live right off the main road from

24  Kigali to Bujumbura?

25       A.  Near the mosque, yes.
```

1       Q.  And how many years had you lived there at the

2  time the genocide began?

3       A.  We moved there in '89.

4       Q.  What type of a home did you live in?

5       A.  It was a building that had stores underneath,

6  and we lived on the third floor -- second floor.

7       Q.  And were there other structures in the same

8  compound as your home?

9       A.  In the backyard we housed -- the building

10  housed children from the university, and they would

11  even bake bread there.

12       Q.  Okay.  So behind your home there were some

13  boarding rooms and also a bakery?

14       A.  Yes.

15       Q.  So there were several people living on your

16  property; is that fair to say?

17       A.  Yes.  Many people.

18       Q.  It sounds like your family was relatively

19  well off?

20       A.  They tried.

21       Q.  Where did you attend school at the time of

22  the genocide?

23       A.  I studied at EAVK in Butare.

24       Q.  Is that a secondary school?

25       A.  Yes.

1      Q.  And is that north of the road that goes to

2   the ESO?

3      A.  It's near Groupe Scolaire.

4      Q.  So that's north of the city; is that correct?

5      A.  Yes.

6      Q.  So did you pass the I'Huriro Hotel on your

7   way to school?

8      A.  Yes.

9      Q.  Do you know who owned the I'Huriro?

10     A.  Yes.

11     Q.  What did you know about them?

12     A.  They were neighbors, and they were also

13   well-known people.

14     Q.  Who are they?

15     A.  Ntahobali, Maurice.

16     Q.  Is he the eldest male in the family?

17         THE INTERPRETER:  I'm sorry, can you --

18     Q.  I asked about the family, and you mentioned

19   one person.  Is he the eldest male?  Is that why you

20   mentioned him?

21     A.  Yes, he was the eldest in that family.

22     Q.  Did you know who he was married to?

23     A.  Yes.

24     Q.  Who was she?

25     A.  Nyiramasuhuko.

```
1       Q.  Did you know her first name?

2       A.  Pauline.

3       Q.  Did you know if they had children?

4       A.  I knew one.

5       Q.  Did you know their son?

6       A.  Yes.

7       Q.  What was his name?

8       A.  Shalom.

9       Q.  Did you know whether he was married?

10      A.  Yes.

11      Q.  Did you know who he was married to?

12      A.  Beatrice Munyenyezi.

13      Q.  Had you seen Shalom and Beatrice in Butare

14  while you lived there?

15      A.  A little bit.

16      Q.  And at what point were you -- do you remember

17  when you first learned who Beatrice and Shalom were --

18  or who Beatrice was?

19      A.  Yes.

20      Q.  Can you tell us where you were?

21          THE INTERPRETER:  Where you were?

22          MR. CHAKRAVARTY:  Yes, where you were.

23      A.  In Groupe Scolaire.

24      Q.  Had you seen Shalom and Beatrice at a trade

25  show?
```

1            THE INTERPRETER:  Can I consult with

2   my partner?

3            MR. CHAKRAVARTY:  Sure.

4            THE INTERPRETER:  Thank you.

5            (Interpreters consult)

6       A.  Yes.

7       Q.  Approximately when was that?

8       A.  End of '93.

9       Q.  I just want to clarify.  The end of '93, is

10  that the first time you actually had close contact

11  with Shalom and Beatrice?

12           MR. RUOFF:  Objection.  That assumes a fact

13  not in evidence, close contact.

14           MR. CHAKRAVARTY:  I'll rephrase it.

15           THE COURT:  Thank you.

16      Q.  Can you explain what happened in the end of

17  '93 between you and Beatrice and Shalom?

18      A.  So during the holidays at Groupe Scolaire

19  there used to be trade shows organized.

20      Q.  Please continue.

21      A.  I was with my cousins who lived in Ngoma --

22  so I was with my cousins who lived in Ngoma.  Some of

23  them are no longer, but one of them pointed towards

24  them saying that is Shalom's fiancee.

25      Q.  And where were you?

1      A.  Okay.  We were at the stand of the (??)Relais

2  de la Soif.

3          MR. RUOFF:  I'm sorry.  I didn't get the

4  translation.

5          THE COURT:  It's French.

6          MR. RUOFF:  I don't think the translator got

7  that.

8          THE INTERPRETER:  Can I just ask, just to

9  clarify?

10          THE COURT:  Sure.

11      A.  So it was a place in the trade show, a little

12  booth where they sold Fanta, Coca-Cola, and it was

13  called Relais de la Soif, which means the street --

14  road of thirst.  Road of the thirst.

15      Q.  So that store, Relais de la Soif, that was a

16  store that had business in Butare, right?

17      A.  It was a trade show.  There were many stands,

18  and I was sitting by a stand that sold refreshments.

19      Q.  And so did you have personal interaction with

20  Beatrice and Shalom?

21      A.  No.

22      Q.  But you knew who they were?

23      A.  So someone pointed at them showing, oh, this

24  is them, but I didn't speak with them.

25      Q.  So before the genocide how many times do you

1    think you had seen Beatrice around town?

2         A.   After that I saw her once more.

3         Q.   After that.  So before that approximately how

4    many times do you think you saw her?

5         A.   Twice.

6         Q.   How many times had you seen Shalom in town?

7         A.   I saw him quite often because we also had a

8    restaurant and he used to come to the restaurant.  He

9    wouldn't come to eat.  He would come to visit other,

10   you know, college students staying in the backyard,

11   and also we will meet around town.

12        Q.   When you say we will meet, you mean that you

13   saw him but did not actually interact with him?

14        A.   Oh, I only saw him.  I would never interact

15   with him.

16        Q.   So when a Rwandan says meet someone, it means

17   something less than actually introducing yourselves?

18        A.   Yes.

19        Q.   From your home could you see the I'Huriro?

20        A.   Yes, you could see I'Huriro.

21             MR. CHAKRAVARTY:  Go to the map.

22        Q.   So this is Exhibit 5(A).  Mr. Kamanzi, are

23   there any structures here that you can recognize -- I

24   can zoom out for you for a second -- if I told you

25   that this was the main road from Kigali to Bujumbura?

```
1      A.  Yes.

2      Q.  Do you recognize what that is?

3      A.  Yes, I know.

4      Q.  What is that?

5      A.  That is the Hotel I'Huriro.

6      Q.  And do you recognize that?

7      A.  It's a school.

8      Q.  How long would it take you to walk from the

9  I'Huriro to the school?

10     A.  Not even one minute.

11     Q.  Is your home depicted on this exhibit?

12     A.  Yes, I see it.

13     Q.  Could you just touch the screen in the

14  vicinity of where your home was?

15     A.  Around here.

16     Q.  So you're saying it was right next to the

17  I'Huriro or it was further down?

18         MR. RUOFF:  Objection.  He's leading.  He's

19  identified where he says it is.

20         THE COURT:  It's not leading, but go ahead.

21     Q.  About how far walking was your home to the

22  I'Huriro?

23         MR. RUOFF:  Objection.  Asked and answered.

24  He said about.

25         THE COURT:  Overruled.
```

1          MR. CHAKRAVARTY:  No, it was a different

2    question, different answer.

3          THE COURT:  Overruled.

4          MR. RUOFF:  I'm sorry.

5     Q.  How far was your home to the I'Huriro?

6     A.  A little less than four minutes.

7     Q.  Okay.  You said earlier that your home was

8    near a mosque; is that correct?

9     A.  Yes.

10     Q.  And so between the mosque, which is in this

11   direction --

12          MR. RUOFF:  Objection.

13          THE COURT:  Sustained.

14          MR. RUOFF:  Objection.  Ask that he remove

15   that mark from the photograph.

16          THE COURT:  He did.

17     Q.  On this image could you identify where the

18   mosque is?

19     A.  Yes.

20     Q.  Okay.  And I can zoom in for you.  I

21   apologize for the resolution.

22          Again, using your finger to touch the screen,

23   can you just describe the general vicinity?  And I

24   understand that you're not an analyst of these photos

25   but just generally in the vicinity of where your home

1   was -- the mosque was, excuse me.

2           (Witness does so)

3           MR. RUOFF:  Your Honor, I would like the

4   record to identify he's identified a place about 50

5   meters south of the I'Huriro Hotel.

6           THE COURT:  Well, the mark is on the screen.

7   The jury can see it.  I'm not sure about the meters or

8   your estimation of that.

9       Q.  Okay.  So next to the I'Huriro was there a

10  structure?

11      A.  Besides the mosque, there was no other.

12      Q.  Between the I'Huriro and your home were there

13  any structures?

14      A.  There was a mosque.  The other structures

15  were on the other side of the road.

16      Q.  Okay.  So there was only the mosque.  The

17  building that you just identified, if that is the

18  mosque then your home would be the next adjacent to

19  the I'Huriro?

20      A.  Nearby.

21      Q.  So if that is the mosque where I have the

22  cursor --

23          MR. RUOFF:  Objection.  Assumes a fact not in

24  evidence.

25          THE COURT:  No.  If it is doesn't assume that

1  it is.

2      Q.  So then the nearest next structure is here;

3  is that fair?

4      A.  I don't understand the question.

5      Q.  So --

6          THE COURT:  Maybe we could move on.

7          MR. CHAKRAVARTY:  We do need to kind of know

8  where it is.

9          THE COURT:  Well, you've taken eight shots at

10  it.  Let's move on.

11      Q.  What was this area here?

12      A.  Okay.  I'm thinking that actually this is

13  where actually we lived because the picture was zoomed

14  out a lot.

15      Q.  I'm sorry.  I was just trying to clarify.

16  Why do you think that this was the area that you

17  lived?

18      A.  Because that's where I recognize the mosque.

19      Q.  And approximately where on the screen is the

20  mosque?

21      A.  Here.

22      Q.  Okay.  And so your home is right next to the

23  mosque?

24      A.  Yes, the next building.

25      Q.  Okay.  So from your home can you describe

1   what the view was of the I'Huriro?

2        A.  It depends.  If you are in the backyard where

3   they bake the bread, you could see the building of the

4   I'Huriro, the front and the back.  If you are on the

5   first floor, you could see the front of the building

6   I'Huriro.

7        Q.  Could you see the area behind the I'Huriro,

8   down the hill?

9        A.  If you were upstairs or in the backyard, you

10  could see the back of the I'Huriro.

11       Q.  Did you ever see Shalom driving a vehicle?

12       A.  Most of the time he would be driving.

13       Q.  Do you remember anything about the vehicle?

14            THE INTERPRETER:  I'm sorry.  I need to

15  clarify.  Your Honor, can I?

16            (Interpreter clarifies with witness)

17       A.  So the last time I saw him was during the

18  time when there was a lot of political parties, so I

19  could see that there was a microphone on the car and

20  there were some cloth, print fabric, on the car in the

21  front.

22       Q.  What were -- the cloth print fabrics, what

23  did they depict?

24       A.  The colors of the --

25            THE INTERPRETER:  I'm sorry.  Can I clarify?

1          THE COURT:  Certainly.

2          (Interpreter clarifies with witness)

3     A.  So you could see the party seal.

4     Q.  Okay.  Do you remember what party it was?

5     A.  Yes.

6     Q.  What was it?

7     A.  MRND.

8     Q.  I'm asking you if you recognize this picture,

9  25(H) for ID.

10     A.  Yes.

11     Q.  Does that picture depict something similar to

12  what you saw Shalom driving?

13     A.  The colors.

14     Q.  When you say the colors, what do you mean by

15  the colors?

16     A.  This is the same kind of things that were on

17  the car.

18     Q.  Do you also see microphones on this car?

19     A.  Yes, I see.

20     Q.  And is that similar to what you saw on the

21  car that Shalom was driving?

22     A.  Yes.

23          MR. CHAKRAVARTY:  Your Honor, I would move to

24  strike the ID, 25(D).

25          MR. RUOFF:  Objection as to relevance and

1  foundation.

2          THE COURT:  Sustained.

3      Q.  Where did you see Shalom driving this

4  vehicle?

5          MR. RUOFF:  Objection.

6          THE COURT:  Well, see, you should really be a

7  little more relevant and focused.  Sustained.

8      Q.  Did you pass by the I'Huriro on foot prior to

9  the genocide?

10     A.  Yes.

11     Q.  How frequently would you walk by the

12 I'Huriro?

13     A.  I would pass by many times going to and

14 coming back from school.

15     Q.  Now, on one occasion did you see a group of

16 people coming to the I'Huriro?  On one occasion did

17 you see people coming together to the I'Huriro?

18     A.  One day when I was going home in, you know,

19 the afternoon, around 3:00, that's when I would see a

20 group of people going into the I'Huriro looking like

21 they were coming from the Burundi side.

22     Q.  They were coming from the south?

23     A.  Yes.

24     Q.  When you say Burundi side, you mean south of

25 Rwanda, correct?

 1      A.  Yes.

 2      Q.  And amongst these people were there people

 3 that you recognized?

 4      A.  I recognized some of them.

 5      Q.  Approximately when did you see these people

 6 coming to the I'Huriro?

 7      A.  I don't remember the date exactly, but I

 8 recall that it's in March 1994.

 9      Q.  So just before the genocide?

10      A.  Yes.

11      Q.  Where were you situated vis-a-vis the

12 I'Huriro?

13      A.  I was on my way home.  On the main road going

14 home.

15      Q.  And were these people wearing any distinctive

16 clothing?

17      A.  They were wearing the party clothes.

18      Q.  What party clothes?

19      A.  MRND.

20      Q.  And what were they doing?

21      A.  They appeared to be dancing.

22      Q.  Did they come in vehicles or come on foot?

23      A.  They were in cars, and then some of them

24 after they finished their dance they walked inside.

25      Q.  Where did they get out of the cars and do

 1  their dance?

 2      A.  They parked in front of the I'Huriro, and

 3  some of them were also in the middle of the street

 4  because it was a bit of a mess.

 5      Q.  When you say a bit of a mess, what do you

 6  mean by that?

 7      A.  You could see that there were people who were

 8  entertaining, animated and dancing.

 9      Q.  Did you recognize some of those people?

10      A.  I recognized a few of them.

11      Q.  About how many were there?

12      A.  You mean altogether or the ones that I

13  recognized?

14      Q.  Altogether.

15      A.  About 45.

16      Q.  And how many people did you recognize?  Well,

17  strike that.  I'll ask you more specifically.

18          Can you name the people who you recognized?

19      A.  I recognized Beatrice, her husband,

20  Kanyabashi, Seraphin and Shalom's mother and Shalom.

21      Q.  You said Beatrice and her husband.

22      A.  Yes.

23      Q.  When you say her husband, did you mean

24  Shalom?

25      A.  Yes.

1       Q.  Did those people go into the home through the

2  front door or did they go into the compound?

3            THE INTERPRETER:   Through the compound?

4            MR. CHAKRAVARTY:   Into the compound.

5            THE INTERPRETER:   Did they go through the

6  front door?

7            MR. CHAKRAVARTY:   Did they go through the

8  front door or did they drive in?

9       A.  Everybody, or the ones that I named?

10       Q.  Just the people that you named.

11       A.  The ones that I named went in through the

12  compound.

13       Q.  And how far away from them were you when they

14  went in?

15       A.  I was on the main road going home.

16            MR. CHAKRAVARTY:   Excuse me one moment.

17            (Attorney Chakravarty confers with Attorney

18  Capin)

19            MR. CHAKRAVARTY:   I'm sorry.  There was an

20  exhibit I was searching for that Mr. Capin is helping

21  me out on, and I missed that answer.

22            Madam Interpreter, do you recall the answer

23  or can you repeat the answer?

24            THE INTERPRETER:   He said, I was on the main

25  road going home.

1        Q.  I understand.  How far away, distance-wise?

2   Were you closer than I am to you?

3        A.  A little closer.  He was about here.

4        Q.  So from that distance could you see what

5   Beatrice was wearing?

6        A.  I could see it.

7        Q.  Can you describe it?

8        A.  She was wearing MRND clothes but slightly

9   different than what the others were wearing.  There

10  were some pink colors in it.

11       Q.  Were the letters MRND written on it?

12       A.  Yes, it was written on it.

13       Q.  Do you remember how it was written?

14          THE INTERPRETER:  I'm sorry?

15       Q.  Do you remember how it was written?

16       A.  I don't remember completely, but it was

17  black.  There was black.

18       Q.  I give you 25 -- 26(E), excuse me.  Does that

19  look similar to what you saw Beatrice wearing?

20       A.  It's this one.

21       Q.  You mentioned that it was different than what

22  the other people were wearing.  What were the people

23  who were with Beatrice wearing?

24       A.  The others who were dressed differently are

25  the ones who were dancing in the streets.  The ones

1   who got into the compound were dressed like this.

2          Q.   So did that include this person named

3   Kanyabashi?

4          A.   I told you, yes, he was included.

5          Q.   What is Kanyabashi's Christian name?

6          A.   Joseph.

7          Q.   Were you related to him?

8          A.   His wife.

9          Q.   His wife is related to you?

10         A.   His wife is my mom's sister.

11         Q.   Did Mr. Kanyabashi have a role in the

12  government?

13         A.   Yes.

14         Q.   What was that?

15         A.   Mayor.

16         Q.   He was the mayor, is that -- in Rwanda is

17  that also known as the burgomaster?

18         A.   Burgomaster.

19         Q.   Burgomaster is the word for mayor?

20         A.   Yes.

21         Q.   Was he the mayor of Butare?

22         A.   From Ngoma.

23         Q.   Ngoma commune, does that include Butare Town?

24         A.   It's the city, Ngoma.

25         Q.   And what was his ethnicity?

```
 1       A.  He was Hutu.

 2       Q.  And did he have a political party

 3  affiliation?

 4       A.  Well, according to what he was wearing he

 5  was.

 6       Q.  Did you know before this event what his

 7  political party affiliation was?

 8       A.  I knew.

 9       Q.  And what was it?

10       A.  MRND.

11       Q.  I'll come back to him in a little while.  The

12  genocide -- when the genocide began in April of '94,

13  how did you first learn about it?

14       A.  I knew it on the 6th of April at night.

15       Q.  How did you learn?

16       A.  My cousin who lived in Brussels called us and

17  she told us that she saw on the news that the plane

18  has burned, crashed.

19       Q.  After you got that call, what did your family

20  do?

21       A.  We stayed there and we waited until the

22  morning.

23       Q.  Did your family take any precautions?

24       A.  We got separated at that time.

25       Q.  You say you got separated.  Did you split up?
```

 1        A.  Yes.

 2        Q.  Eventually, did you reconvene?  Did you come

 3  back together at your family home?

 4        A.  I had left with my mother, and then we came

 5  back on the 10th passing under the cathedral -- near

 6  the cathedral.

 7        Q.  When the genocide reached Butare, where were

 8  you?

 9        A.  I had come back home, but we weren't on the

10  second floor.  We were in the backyard.

11        Q.  So you were back at the family home that you

12  pointed out earlier?

13        A.  Yes.

14        Q.  And is your family Tutsi?

15        A.  Yes.

16        Q.  So it was mentioned that you were not in the

17  main home, you were in one of the buildings in the

18  backyard; is that what I understood?

19        A.  We were where the students stayed.

20        Q.  And why did you do that?

21        A.  That's where we were hiding, because we knew

22  that a student had left on holiday so it was empty.

23        Q.  How did you first learn that the genocide had

24  reached Butare?

25        A.  I heard helicopter flying.  The helicopter

1   landed near the airport in Ngoma.  And we also heard a

2   speech of the president -- the person who was

3   president then, and he said he was tired of people

4   that he called unconcerned, unbothered.

5       Q.  That was a little confusing.  So when you say

6   that you heard a helicopter and you heard a speech by

7   the president, are you talking about the speech of the

8   interim president, Sindikubwabo?

9       A.  Yes, I heard the speech of Sindikubwabo who

10  was president.

11      Q.  And then what you said, that people were not

12  concerned, is that the substance of the speech that

13  you were relaying?

14          THE COURT:  Haven't we covered this over and

15  over and over?

16          MR. CHAKRAVARTY:  We did, your Honor.  It was

17  just confusing.  It wasn't clear.

18          THE COURT:  But we've had discussions about

19  laying foundations for such a long period about

20  matters that have already -- evidence that's been

21  presented.  It's becoming cumulative.

22          MR. CHAKRAVARTY:  I'll move on, your Honor.

23      Q.  Do you remember approximately when that

24  occurred?

25      A.  I think it was on the 19th.

```
 1      Q.  Could you see the I'Huriro when those events

 2 occurred?

 3      A.  Yes, I could see it from the backyard where

 4 they bake bread.

 5          MR. RUOFF:  I'm sorry.  I didn't catch the

 6 last --

 7          THE INTERPRETER:  Where bread is baked in the

 8 backyard.

 9          MR. RUOFF:  Okay.

10      Q.  And could you see anything occurring?

11      A.  Even before that date I could see what was

12 going on there at the I'Huriro.  I wouldn't see what

13 was happening in the hotel, but by the road where the

14 building ended I could see what was going on there.

15      Q.  And what could you see?

16      A.  I could see people coming down the road and

17 going there -- in the grove that was there behind.

18          MR. CHAKRAVARTY:  Your Honor, I don't know

19 how much more you want me to go on for.

20          THE COURT:  Well, it's after 3:00.  Your

21 timing is not that good, but there's going to be

22 cross-examination obviously, right?

23          MR. RUOFF:  Oh, yes.

24          MR. CHAKRAVARTY:  I still have about ten more

25 minutes.
```

1          THE COURT:  Oh, I'm sure you do, but it's the

2    end of the day.

3          Ladies and gentlemen, we'll adjourn for the

4    day.  We'll resume again tomorrow morning at 9:00

5    o'clock.

6          (IN COURT - NO JURY PRESENT)

7          MR. CHAKRAVARTY:  Your Honor, one issue in

8    terms of the next witness --

9          THE COURT:  Bad timing.  I mean, really, 40

10   minutes of where do you live?  Really?  Where's the

11   mosque?  Really?  Is it really there, or is it

12   somewhere else?  Is it down the road so many meters?

13   Seriously?  And then you get to the actual evidence

14   and you're out of time.

15         MR. CHAKRAVARTY:  I recognize that.  I didn't

16   expect him to misidentify, your Honor.  That's clearly

17   what the problem is, and it took some time to fix it.

18         THE COURT:  Well, let me try it one more

19   time.  The jury has heard this over and over and over

20   and over.  Do you live in Butare?  How old were you?

21   Are you familiar with the town you grew up in?  Yes.

22   Do you know where the I'Huriro Hotel is?  Yeah, I do.

23   Great.  Tell us about it.

24         You don't need to spend 35 minutes on do you

25   walk it every day or just every other day or sometimes

1   during the day.  You really don't have to do that.

2              MR. CHAKRAVARTY:  Your Honor, I recognize

3   that.  In this case it was the misidentification and

4   the anticipated cross is why --

5              THE COURT:  You get into those kinds of

6   problems when you do that.

7              MR. CHAKRAVARTY:  Fair enough.

8              THE COURT:  That's not my concern.  My

9   concern is it's becoming really cumulative, and the

10  jury is giving me the looks like can't you stop this.

11  I can stop it.  I'm going to have to.

12             Shalom is not on trial here, okay?

13             MR. CHAKRAVARTY:  We recognize that.

14             THE COURT:  Well, you don't seem to recognize

15  it.  Your opening statement was all about, this is not

16  about genocide, it's about lying on the forms, and yet

17  all your questions are about the mother-in-law, the

18  father, the brother, the husband.

19             I mean, sure, do you know them?  I do.  Okay.

20  Great.  Move on.

21             MR. CHAKRAVARTY:  But that's why he knows

22  them, your Honor.

23             THE COURT:  Yes, but it doesn't take 30

24  minutes.  It truly doesn't.

25             MR. CHAKRAVARTY:  Fair enough.  I recognize

1  that it took longer than anticipated.  It's not much

2  longer.

3          THE COURT:  Each witness is 45 minutes of,

4  are you sure you know the town you grew up in, and

5  five or ten minutes of what useful evidence they might

6  have to offer.  It's unbalanced and -- okay, try it

7  however you like to try it within reason, but it's

8  becoming cumulative and it's starting to waste time.

9          I'm going to have to put you on the clock and

10  say you've got ten minutes, use it however you like

11  for foundation, and then get to the evidence.

12          MR. CHAKRAVARTY:  We'll be snappier, your

13  Honor.

14          The issue for scheduling tomorrow is -- the

15  government intends to call a witness from -- who had

16  previously worked at the ICTR.  The defense had moved

17  in limine to prevent us from calling such a witness.

18  Your Honor withheld judgment, denied it without

19  prejudice, but expressed a strong preference not to

20  call such a witness largely because this case is not

21  about the ICTR.

22          THE COURT:  Well, make a proffer.  What's he

23  going to say and why is it relevant?

24          MR. CHAKRAVARTY:  In the defendant's opening

25  they mentioned two things.  One, the Leave None to

1  Tell the Story, the Human Rights Watch book, has no

2  mention of her name, and second that --

3         THE COURT:  Well, you know, there's a

4  footnote to that which is, of course, like in

5  immigration cases, if one expects to find a record and

6  doesn't find a record, then that's evidence that no

7  application was filed.

8         MR. CHAKRAVARTY:  Fair enough.  And

9  regardless, that's the book part.

10        The other evidence of absence argument that

11 the defense made -- or the point that the defense made

12 in their opening was that the ICTR has been looking at

13 the events that occurred in Butare for a long time and

14 they haven't indicted the defendant.

15        THE COURT:  Cumulative.  You already elicited

16 that from Dr. Longman.

17        MR. CHAKRAVARTY:  Well, respectfully, Dr.

18 Longman basically said they only charged a very few

19 people.

20        THE COURT:  No, I think he went beyond that.

21 I think he testified as to why, what their focus was,

22 they were looking for leaders and representative

23 people and that sort of thing.

24        MR. CHAKRAVARTY:  Well, I think that he can

25 speculate as to that.  He wasn't part of the process.

1          THE COURT:  No, no.  You called him and

2    offered him to the jury as an expert on Rwanda and the

3    genocide, and he testified in that capacity as an

4    expert.  He wasn't speculating.  He was giving his

5    expert opinion.

6          MR. CHAKRAVARTY:  But there's a difference

7    between saying after the fact, these are the people

8    who they ultimately charged, versus when they're there

9    actually conducting investigations, these are the

10   people that --

11         THE COURT:  I assume this witness is not

12   prepared to get on the witness stand and say, I know

13   Beatrice Munyenyezi, the defendant in this case, and

14   let me tell you why I didn't charge her.

15         MR. CHAKRAVARTY:  Absolutely not.  What he

16   would do is say, at the time that we were

17   investigating these cases, particularly in the Butare

18   case, and I don't know personally whether Beatrice

19   Munyenyezi appears in any of the government files, but

20   we were only looking at a very small subset and we

21   wouldn't be asking questions about Beatrice Munyenyezi

22   or anybody else aside from the people that we were

23   focused on.  That is not something that Dr. Longman

24   said.

25         He would be a very brief witness.  He would

1   be very overview.  The witness happens to be an

2   important muckety-muck now, for lack of a better

3   phrase.  He's ambassador-at-large.  He works for the

4   State Department now.  But his window of being able to

5   be here is very narrow.  It's tomorrow.

6          We think it is helpful evidence both for the

7   jury as well as to have a response to -- it's the only

8   way we can have equality of arms in terms of having a

9   response to something we would have no other way to

10  prove about what happened at the ICTR.

11         Dr. Longman, from what he said, can't tell

12  what the ICTR was thinking when they were doing it and

13  whether there would be records or whether they would

14  be investigating somebody who wasn't an organizer.

15         There were some smaller bit players who were

16  charged before the ICTR.  Although, as the witness

17  would say, that wasn't part of our prosecution

18  strategy.  In limited circumstances, we would charge

19  them.  For example, if they were ICTR subcontractors

20  or employees.

21         THE COURT:  Mr. Ruoff.

22         MR. RUOFF:  Yes.  We litigated this in our

23  objection, Judge.  My cross-examination would be

24  lengthy, because if he's going to get up there and say

25  we had no resources and we weren't looking for and

1    asking questions about anybody that might otherwise be

2    involved, I have dozens and dozens of reports where

3    the investigators are asking about Pauline and Shalom

4    and there are other witnesses that are brought in.

5    And I also have more than one ICTR file at my disposal

6    where that's done, some that are -- you know, ICTR

7    prosecutions from Colonel Mulvani and from the

8    hospital.

9            So if they're going to put up this witness to

10   say, oh, we had restricted resources and weren't

11   interested in these other people, then I think I have

12   to get into the grist of what the investigations were

13   and how other people were mentioned.  That's our

14   point.  It's not that they just decided not to

15   prosecute her.

16           THE COURT:  You know, I think I'm going to

17   stand by my initial inclination on that motion in

18   limine, which is -- I understand the argument and I

19   understand that you would like to go on at length on

20   every minor point.  I can't let you do it.

21           There's evidence from which you certainly can

22   argue and is certainly self-evident, but Dr. Longman

23   made it very clear.  This was an International

24   Criminal Tribunal.  They weren't attempting to try

25   everybody that was involved, however comparatively

1  minor or modest or way.  They were only looking at the

2  major architects and the major players and the

3  representative leaders.  That's already in evidence.

4  We don't need to pound it and pound it and pound it.

5  We just don't.

6          I don't want to get into a sidetrack of, what

7  was the ICTR doing, what was their policy, were they

8  efficient, were they effective, did they really mean

9  it.  We don't want to get into that.  I don't want to

10  get into that, and I don't think you need to and I

11  don't think it's critical.  It's not critical to any

12  issue here.

13          To the extent that what you really want to

14  say is, I need some evidence from which I can argue

15  that there's a reason the ICTR didn't charge or

16  prosecute this particular person, Dr. Longman gave you

17  that, and that's all you could ever have is a policy

18  reason.  It was not their policy to prosecute people

19  below the architectural, organizational or

20  particularly heinous level.

21          You already have that, so piling on and

22  putting on more cumulative evidence doesn't justify

23  the time and it risks a collateral proceeding in which

24  we get into the ICTR and its processes and how valid

25  and expeditious they were.

1          So I guess the answer is no.  Okay.  Have a

2    good evening.

3          (Conclusion of hearing at 3:10 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4         I, Susan M. Bateman, do hereby certify that the

 5    foregoing transcript is a true and accurate

 6    transcription of the within proceedings, to the best of

 7    my knowledge, skill, ability and belief.

 8

 9

10    Submitted: 10-1-13
```

**SUSAN M. BATEMAN, LCR, RPR, CRR**

```
11
```
LICENSED COURT REPORTER, NO. 34

STATE OF NEW HAMPSHIRE

```
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/15/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-cr-85-01-SM
          v.                    *  February 13, 2013
                                *  9:10 a.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 7 - MORNING SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE
AND A JURY

Appearances:

For the Government:    Aloke S. Chakravarty, SAUSA
                       John A. Capin, SAUSA
                       U.S. Attorney's Office (NH)
                       53 Pleasant Street, 4th Floor
                       Concord, NH 03301

For the Defendant:     David W. Ruoff, Esq.
                       Mark E. Howard, Esq.
                       Howard & Ruoff, PLLC
                       831 Union Street
                       Manchester, NH  03104

Interpreters:          Freddy Munana
                       Sabrina Iyadede

Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

2

1                     I N D E X

2
     Witness              Direct    Cross    Redirect    Recross
3

4    RICHARD KAMANZI

5    By Mr. Chakravarty   18                    40
     By Mr. Ruoff                    29
6

7    MAURICE VIOLO

8    By Mr. Capin         43                    94
     By Mr. Howard                   67
9

10   CONSOLEE MUKESHIMANA

11   By Mr. Capin         99

12

13

14

15

16

17
     Exhibits                              ID          Evid.
18
     Government's Exhibit No. 24A & 24G                27
19

20

21

22

23

24

25

3

1                       BEFORE THE COURT

2            THE COURT:  Blasting.  I don't think most

3    newspaper reporters know what blasting looks like.  We

4    certainly haven't gotten close to that.  It's more

5    helpful guiding.  But, if you continue to draw out the

6    foundation, I'm going to take that as an invitation to

7    participate and assist you, which you're probably not

8    going to like.

9            MR. CHAKRAVARTY:  Well, your Honor, you

10   raised -- first, we are mindful of --

11           THE COURT:  What do you know?  What did you

12   see?  What do you know from your own personal knowledge?

13   What did you see?  What did you hear?  That's evidence,

14   okay.  The rest of it, I understand you've got to do a

15   little bit of it, but not, not to the extent we've been

16   doing it.  I know you can do it.  I've seen you do it.

17   So I know you can do it.

18           MR. CHAKRAVARTY:  The message has come across

19   obviously.  We have tried to get as much as we can

20   within those confines.  To the extent that we crossed

21   the line, we will try to pare that down even more.  We

22   are on schedule.  We're moving along.  We had almost

23   four witnesses yesterday.

24           THE COURT:  Yes.  But I'm not sure you're

25   focusing on the jury.  They're in pain.  That's what I'm

4

1  seeing.

2           MR. CHAKRAVARTY:  Well, I obviously hope not

3  to belabor that.

4           THE COURT:  They are.  They are.

5           MR. CHAKRAVARTY:  I heard about this media

6  reporting and haven't seen it, but if it is as

7  inflammatory --

8           THE COURT:  Well, I just didn't want you to be

9  offended by it.  I apologize for the paper because they

10  said that you were blasted.  You of course were not

11  blasted.

12           MR. CHAKRAVARTY:  My concern --

13           THE COURT:  Well, not in the context -- maybe

14  in the context of the outside world of course, but not

15  in the context of our profession.  But anyway, go ahead.

16           MR. CHAKRAVARTY:  Thank you, your Honor.  With

17  regard to the jury potentially reading that paper, they

18  may perceive that we actually have done something wrong

19  in a sense, and perhaps a cautionary instruction just to

20  say, you know, as I've reminded you before, what you

21  read in the paper --

22           THE COURT:  No one is supposed to be reading

23  anything.

24           MR. CHAKRAVARTY:  Well, exactly.  So, perhaps

25  that might be appropriate, your Honor, given --

5

        1                THE COURT:  I will inquire to make sure they
        2    haven't, they stuck to that rule and haven't.
        3                MR. CHAKRAVARTY:  Thank you.  Your Honor,
        4    also just to report back to the court, I did a quick
        5    search just to put the Eric Benn issue to bed.  I went
        6    back through correspondence to see if there was any
        7    written correspondence.  Given the classified nature of
        8    the business that they are in, everything is classified.
        9    So we did not send a written correspondence.  It was a
       10    phone call and then it was face-to-face conversations
       11    with people who were clear.  So I don't have a written
       12    documentation of that.
       13                I do, however, have written documentation
       14    related to the, the defense made a discovery request
       15    last year asking for just to kind of recheck, so we did
       16    do that.  After the response was the same that, you
       17    know, we don't have any, you know, what you have is what
       18    we have, the defendant's husband who is in the ICTR, his
       19    attorney asked us the same questions, asked the U.S.
       20    government for the same photos.  We want all the photos
       21    between April and July of 1994.  And the U.S.
       22    government, State Department, inncluding contacting our
       23    office and Eric Benn's office to the NGA, they then
       24    formulated a response, and they responded very
       25    definitively, there is nothing beyond what has been

6

1   produced in discovery in the District of New Hampshire

2   case.  And they specifically mentioned the dates of the

3   photos that were listed.

4           It just so happens that within the last few

5   days Shalom's attorney has again asked for a renewal of

6   that request.  So, I don't know if it's coordinated, I'm

7   not suggesting it is, but the issue was created by a

8   confusion as to the difference between the exhibits that

9   were introduced and all of the photos that were produced

10  in discovery and that has kind of snowballed into this

11  speculation --

12          THE COURT:  No, no.  The problem was that the

13  witness said in his expert assessment he would infer and

14  guess and assume that there were photographs taken in

15  April.  That's what he said.

16          MR. CHAKRAVARTY:  That's right.  That's

17  speculation, your Honor, but there is no evidence of

18  that, your Honor, and from everything the NGA has told

19  us and what the U.S. government has told to the UN

20  tribunal, that's not the case.

21          THE COURT:  Well, as I understand it, and you

22  correct me if I'm wrong, Mr. Howard, the issue was

23  raised by the defendant as a Brady issue.  The issue is

24  raised as a Brady issue.  And so, again, correct me if

25  I'm wrong, my understanding is the prosecutors are

1   telling me on the record we have -- we asked for all

2   photographs from April on of this Butare area.  Yes?

3               MR. CHAKRAVARTY:  Yes, your Honor.

4               THE COURT:  And what we received, all of it,

5   we have turned over to the defense.

6               MR. CHAKRAVARTY:  Yes, your Honor.

7               THE COURT:  Okay.  So, there may still be a

8   Brady issue, but as far as I'm concerned you are

9   representing there is no Brady issue because you asked

10  for everything and you turned everything over.

11              MR. CHAKRAVARTY:  That's right.

12              THE COURT:  Okay.  So I'm not sure what else

13  you can do, Mr. Howard.

14              MR. HOWARD:  I'm not sure what else there is I

15  can do.  I just want to continue to make the record that

16  what the prosecutors are saying is not what their expert

17  said.  Not only did he say that there would have been

18  photographs in April --

19              THE COURT:  I can't remember his exact words

20  and maybe you have a better memory, but it wasn't

21  definitive.  It was I would expect there would be

22  certain photographs in April, but that's all it was.

23              MR. HOWARD:  His first incarnation, his first

24  answer to the question was yes, there were, and I looked

25  at them in April.

8

```
 1              THE COURT:  Okay, I don't recall that.

 2              MR. HOWARD:  Then when Mr. Capin educated the

 3    witness and the jury and you that there were no such

 4    paragraphs, he then changed his testimony that he was

 5    only speculating that there would have been.  They would

 6    have been done by his underlings.  He could not have run

 7    away from his earlier testimony fast enough, and he did.

 8    So I think the record is confused for sure, but that's

 9    because the witness was educated on what to say.

10              Secondly, he clearly said we only produce

11    photographs of what we were asked to produce.  And he

12    clearly said we were asked to look at photographs that

13    had indications of obstructions in the road, physical

14    objects, or indications of populations or vehicles being

15    obstructed.  We don't look for nothing, he told us, we

16    look for something.  So we only gave those photographs

17    where we have found something.

18              That clearly implies, and he said it when we

19    did the colloquy after the jury left, that of course

20    there would be other images, other, I forget what he

21    called them, daily databases.  He didn't want to tell us

22    when they were or how often they were because that would

23    divulge secrets that he doesn't want to give up, but he

24    clearly said, well, yes, there would be other days.

25    So --
```

 1            THE COURT:  Well, of course, later he said it
 2    depends on what you're focusing the satellite on, and
 3    early in April they focused the satellite more towards
 4    Kigali, I assume, and then later down towards Butare.
 5            MR. HOWARD:  Correct.  And I understand that.
 6    But the witness's testimony was what we were asked to
 7    produce were images that showed something.  We made a
 8    request of images that showed obstructions to put it in
 9    a shorthand way.  Now, the prosecutor is saying there
10    was no written request.  There was only a conversation.
11    And that's not what we said.  We said give us
12    everything.  So now there's this conflict.
13            THE COURT:  But it's a Brady issue, don't you
14    agree?
15            MR. HOWARD:  Oh, I agree, because --
16            THE COURT:  Okay.  So it's a Brady issue.  The
17    prosecutors have an affirmative duty to turn over
18    anything that's exculpatory.  Presumably they've done
19    that because they're saying they've done that.
20    Obviously if they have doubts about it, they are
21    obligated to go and make an affirmative effort to
22    determine whether they do have anything else.
23    Presumably they will do that.
24            MR. HOWARD:  Right.  I think their witness has
25    contradicted them but that's -- I can't do anything

1    about that, judge.  I am more helpless than you are when

2    it comes to the Department of Defense.

3              THE COURT:  But I can't find a Brady violation

4    based on nothing.

5              MR. HOWARD:  But we're not -- I know you can't

6    find a Brady violation on this record.

7              THE COURT:  Okay.

8              MR. HOWARD:  But, sure, when this trial is

9    over, we're going to have to do FOIA requests, we're

10   going to have to do everything, and then if we find

11   something, obviously we will be back.  I'm not

12   comfortable, to be perfectly honest with you, that the

13   prosecution is simply saying, yeah, we asked them, they

14   didn't have anything.  I don't think there has been

15   sufficient due diligence.  I don't think these

16   prosecutors, knowing what their own witnesses said, that

17   they've been in the room and looked at the databases and

18   said okay, pull up everything that could have happened

19   between April 6th and July 18th, because if what they've

20   produced is true, what they're saying is May 23rd, 28th,

21   30th, June 1, June 5 and July 18, six days over a

22   hundred days, that's all that the Department of Defense

23   ever did?  It just can't be true.

24             THE COURT:  Okay.

25             MR. CAPIN:  Just a couple of points, your

1   Honor.  First of all, as the court correctly pointed

2   out, that may not be true, but Mr. Benn explained, first

3   of all, that the satellite focus was changed during the

4   course, it changes during the course of events.  He

5   inferred and the court correctly remembered, he inferred

6   that it changed likely because the events elsewhere in

7   Rwanda were of more significance earlier in the genocide

8   as we heard from every witness, including Professor

9   Longman.  It wasn't until late in the genocide, at least

10  several weeks, and then it came to Butare, so it

11  shouldn't be surprising to anybody that that was the

12  change in focus later on.  But with regard to the record

13  here, the one thing Mr. Benn made clear was that at

14  every juncture he was conjecturing that there may be

15  other images, wouldn't be unusual to have other images,

16  I would guess there are other images.  And he also made

17  clear that the request was not made to him.  And Mr.

18  Patrick Kim, counsel for NGA, was in the courtroom and I

19  invited counsel to make the record by inviting Mr. Kim

20  to, in the court's presence, I pointed out Mr. Kim, this

21  is a person who knows what the request was.  So to have

22  now the following day some suggestion that anything --

23  that the government is saying anything short of what was

24  actually done is unfortunate at best.  We asked, and we

25  made this clear, and I'll say it again, we asked for

1   every image of the area in Butare in question during the

2   --

3          THE COURT:  Here's the problem you're facing,

4   and I'm sure you appreciate it.  That's your perception

5   but, you know, there are always thousands of perceptions

6   depending who's involved.  That may be Mr. Kim's

7   perception, but maybe when it was transferred, that

8   request was translated to the people that actually do

9   the hunting and the looking, maybe it got muddled.  But

10  whatever, in the end you're on the hook for it.

11         MR. CAPIN:  Understood.

12         THE COURT:  Okay.  So it might be prudent and

13  wise to go back to the agency and say, look, if you have

14  anything, you give it to me.  Because if you don't, this

15  case is in jeopardy.

16         MR. CAPIN:  And what I think Mr. Chakravarty

17  --

18         THE COURT:  And if they say take a hike, then

19  all right.

20         MR. CAPIN:  And I'll say what Mr. Chakravarty

21  said.  We've asked them more than once for everything

22  during the genocide.  Norman Marquis --

23         THE COURT:  But now it's a potential 2255

24  issue.  That's what you're looking at.

25         MR. CAPIN:  We understood that if we are wrong

1    and if we have been, despite repeated requests for

2    everything during the genocide, we have not been given

3    everything NGI has, owns, then we understand the

4    government is the government and we will proceed

5    accordingly if something turns up.  But having asked

6    more than once for everything during the genocide, both

7    in connection with this case and in connection with

8    Shalom's case --

9              THE COURT:  I've been in government.  I know

10   how it works.  You ask clearly.  He asks less clearly.

11   They transmit even less clearly.  And pretty soon you

12   get back something like the witness suggested, we don't

13   look for non-issues, we look for issues.  Well, that's a

14   red flag to use an overused term in this case.

15             MR. CAPIN:  But with respect, your Honor --

16             THE COURT:  If I were a prosecutor I would go

17   back and say, look, it's go time.  You go back and look

18   at what you have and you tell me.

19             MR. CAPIN:  We appreciate the guidance, your

20   Honor, but what Mr. Benn said is that I as an analyst

21   look for something.  That's a totally different between

22   from a what NGIA --

23             THE COURT:  No question about it, no question

24   about it.  He was talking beyond his knowledge it

25   sounded to me like.

14

1          MR. CAPIN:  That's exactly right.  That's our
2     point.
3          THE COURT:  But that begs the question.  That
4     isn't the issue.  The issue is, does the government have
5     any exculpatory evidence that was asked for or that you
6     have an affirmative duty to produce that you haven't
7     produced.  And your saying I'm not aware of it, as you
8     know, is not a defense later.
9          MR. CAPIN:  Well, I mean, I can only say I'm
10    not aware of it unless I personally walk --
11         THE COURT:  That you are in truth unaware of
12    it is not a defense later.
13         MR. CAPIN:  No -- oh, I understand that.  But
14    again, this has been raised in this case.  It's been
15    raised more than once by Norman Marquis, counsel for
16    Shalom Ntahobali, and at every juncture we've gone back
17    and confirmed this is the whole universe.
18         THE COURT:  Oh, you have.  Okay.
19         MR. CAPIN:  And as Mr. Chakravarty points out,
20    it was also further inquired of in connection with the
21    defendant's sister, Prudence Kantengwa, who was
22    prosecuted in Boston last year.
23         So, on every occasion in connection with every
24    prosecution we have confirmed, often at the request of
25    counsel, that NGI has no further information than what

15

1    they have told us.  Here's the whole universe of

2    pictures.

3                THE COURT:  They have no further images?

4                MR. CAPIN:  Than the ones they provided.

5                THE COURT:  Than the ones they provided.  And

6    those are the dates.

7                MR. CAPIN:  Correct.  The whole genocide.  We

8    had no interest in asking for anything short of the

9    whole genocide.

10               THE COURT:  Sure.

11               MR. HOWARD:  Whether this is ironic or

12   shocking, I'm not sure, judge.  Now we're saying at the

13   first trial in this case Mr. Benn did the same thing.

14   We didn't have this kind of extended discussion, but he

15   gave the same muddled responses as to whether there's

16   more or not.  He indicated in the first trial that there

17   was.  That's why we made our discovery request after the

18   first trial.  And we were told we misunderstood the

19   issue, we're stupid, and there isn't anything more.

20   Then -- so Norman Marquis has asked, apparently counsel

21   for Prudence Kantengwa has asked for the same thing, and

22   they are getting the same answer from the prosecution

23   and apparently from the Department of Defense.  How can

24   it be that this two to three star general can come in

25   here after all of that history and say there are more

16

 1    photographs, and I don't have the first idea whether

 2    there are more photographs.  How can he not be prepared

 3    for that question?  And how can we be where we are today

 4    after all of that?  There's clearly more photographs.

 5    Whether they know it or not, there're clearly more

 6    images.  They just don't want to look.

 7            THE COURT:  I can't share your certitude

 8    because there's no evidence of that.  But anyway, I

 9    appreciate it.

10            By the way, in terms of last year.  Prior

11    proceeding was the directive, and everybody's nibbling

12    around the edges with you sat in that chair last year,

13    didn't you, sir.  No more of that.  No more of that.  I

14    know it's clever, but I don't want that.  Prior

15    proceeding, that's it.  Okay.

16                    BEFORE THE JURY

17            THE CLERK:  Court is in session and has for

18    consideration jury trial day seven in the matter of

19    United States of America versus Beatrice Munyenyezi,

20    Case Number 10-cr-85-01-SM.

21            THE COURT:  Good morning, ladies and

22    gentlemen.  The delay this morning, we had to take up a

23    couple of issues with counsel.  But I think in the end

24    it's going to help us move along.  I want you to know

25    I'm actively engaged with counsel about picking up the

1   pace here, so I think we will be picking up the pace

2   with the witnesses.

3           Third thing.  I wanted to remind you that of

4   course you really have to take steps and be cautious

5   about not exposing yourself to any media coverage about

6   the case at all.  This case has to be decided based upon

7   the evidence presented before you in this courtroom,

8   only the evidence presented before you in this

9   courtroom, and in the argument of counsel.  Not the

10  opinions and not the commentary of the press or the

11  media or anybody outside that has not, like you, sat

12  throughout the whole trial and heard all the evidence.

13          So, I did at the beginning I think ask you to,

14  if you're accidentally exposed or whatever, exposed to

15  any media coverage, to let the deputy clerk know so that

16  we can take it up with counsel.  And I just want to

17  assure myself this morning.  Have any of you been

18  exposed to any media coverage whatsoever about this

19  case?  Okay.  It's really important that you have

20  somebody sanitize the newspapers that you read and not

21  be exposed to it.  And in the end you'll be much more

22  comfortable about whatever verdict you return knowing

23  that you strictly adhered to that rule and you decided

24  the case based only on the evidence here.  There has

25  been some media coverage and I'm just getting concerned

1   that some of it might, if you were exposed to it, might

2   be a problem.  So please, thank you for taking those

3   steps.  Appreciate it.

4          All right, and we are going to move along

5   today.

6          MR. CHAKRAVARTY:  We are, your Honor.

7          THE COURT:  Mr. Chakravarty, whenever you're

8   ready.

9          MR. CHAKRAVARTY:  Thank you.

10          CONTINUED DIRECT EXAMINATION OF

11          RICHARD KAMANZI THROUGH AN INTERPRETER

12     Q.   BY MR. CHAKRAVARTY:  Mr. Kamanzi, we were

13   talking about when the genocide arrived at Butare.  From

14   the bakery at the time, around that time, could you see

15   activity in the Hotel Ihuriro?

16     A.   I couldn't see what was happening inside, but

17   I could see what was happening in front of the Ihuriro.

18     Q.   Describe to the jury what you saw happening at

19   the Ihuriro?

20     A.   What I saw happening at the Ihuriro where the

21   building starts, I could see someone going up, and I

22   could also see someone passing by all the way where the

23   Ihuriro ends.  Sometimes I will see people going up and

24   I will see people passing by, and some would stay there

25   longer, and it means that people that would stop there

1  longer, it means that they had been stopped.

2      Q.   Let me stop you here because there may be

3  confusion in the imagery.  When you say coming up to the

4  Ihuriro, do you mean approaching the Ihuriro from the

5  north?

6      A.   From south to toward north.

7      Q.   So people were coming from the south going

8  towards Kigali?

9      A.   Both sides.  Some would come from south and

10  others would come from north.

11     Q.   And where did you see these people stop?

12     A.   I couldn't see exactly the roadblock being

13  from the bakery, but obviously the roadblock where it

14  was I couldn't see it, but there was obvious something

15  that made them stop.

16     Q.   And then on the other side of the building you

17  saw people continuing on?

18     A.   Some would continue but others would be taken

19  down, right below the roadblock, and I could see it from

20  where I was.

21     Q.   When you say taken down below the roadblock,

22  what do you mean?

23     A.   There was a forest.  People that had been

24  stopped and arrested, they would be taken down towards

25  the forest screaming.

1          Q.    And is that on the side of the Ihuriro towards

2     the valley?

3          A.    Between the school and Ihuriro.

4          Q.    And over how many days did you see this type

5     of activity?

6          A.    Two days before the 19th.  And two more days

7     after the 19th towards the 22nd.

8          Q.    And you remember the 19th because of what you

9     testified to yesterday?

10         A.    Yes.

11         Q.    When you saw the activity of people taken down

12    towards the forest, could you hear anything?

13         A.    I could hear screaming.

14         Q.    Could you see who was taking these people

15    down?

16         A.    Yes.

17         Q.    What did you see?

18         A.    I noticed people that had uniform, military

19    uniform, and there were regular people, civilians.

20         Q.    Did you see if they had weapons?

21         A.    Yes.

22         Q.    What could you make out?

23         A.    Soldiers had guns.

24         Q.    Were there any other weapons?

25         A.    And civilians had sticks.

1          Q.    How long did you remain at the bakery behind

2    your home?

3          A.    I stayed there from the 10th to the 22nd.

4          Q.    On that day did you go to the University

5    Hospital?

6          A.    I went there the next day in the morning on

7    the 23rd.

8          Q.    Why did you go there?

9          A.    On the 22nn we had been attacked.   Interahamwe

10   came to our house.

11         Q.    How long were you at the University Hospital?

12         A.    Half of a day because I left there in the

13   evening.

14         Q.    And where did you go when you left there?

15         A.    When I left I went to Taba.

16         Q.    And is that to the north of where you were?

17         A.    Yes, I went uphill towards the north.

18         Q.    How did you travel?

19         A.    There's a man that came that picked me up in

20   the car.

21         Q.    Did you know the man?

22         A.    I did.

23         Q.    And what did you believe -- where did you

24   believe you were going?

25         A.    The person that came to pick me from our

22

1    house, he was a doctor.  He's the one that made me --

2    that took me to the other doctor who was actually also

3    his friend.

4        Q.   So you were going to a doctor's house?

5        A.   No.

6        Q.   Where were you going?

7        A.   Back to Kanyabashi.

8        Q.   Did your aunt send somebody to pick you up?

9        A.   No.

10       Q.   So how did they know to come get you?

11       A.   The person whose name is Amumbwe (ph) who is a

12   doctor is the one that called Surill.

13       Q.   And that's a friend of yours, Amumbwe (ph)?

14       A.   No, he was living in one of the rooms.  He was

15   still in school.  He had not finished school yet.

16       Q.   So he was living behind your home in one of

17   the boarding houses?

18       A.   Yes.  And the rooms are reserved for students.

19       Q.   And did you go to Kanyabashi's house?

20       A.   Yes.  I arrived there in the evening around

21   4 p.m.

22       Q.   And Kanyabashi was the mayor of Ngoma; right?

23       A.   Yes.

24       Q.   When you went to Kanyabashi's house did you

25   pass the Ihuriro?

23

1        A.    Yes.

2        Q.    What did you see there?

3        A.    When I went down by ESO, and I went down

4    further because I was curious to see where people would

5    stop.

6        Q.    And what did you see?

7        A.    I saw three civilian men who were standing

8    there, and logs that were on the side, not on the

9    street, and about four cans.

10            THE INTERPRETER:  Clarification.

11            (Interpreter consulting witness.)

12        A.    And those men had big sticks.

13        Q.    Clarify.  You said cans.  Do you mean like

14    drums?

15        Q.    Barrels might be another --

16        A.    No.

17        Q.    Describe -- I'm sorry.  What was the answer?

18        A.    No.

19        Q.    What do you mean when you say can?

20        A.    There were -- it looked like empty barrels.

21        Q.    You described there were logs off to the side

22    of the road.  Was there anything preventing traffic?

23        A.    When I got there they were on the side, they

24    were not blocking the street.

25        Q.    Those three individuals you saw carrying

1    sticks, did they stop the vehicle?

2        A.    They didn't stop it because it was being

3    driven by soldiers, they didn't stop it.

4        Q.    Did Dr. Surill come with soldiers?

5             THE INTERPRETER:  Clarification.

6             (Interpreter consulting witness.)

7        A.    Dr. Surill  was in the vehicle.

8        Q.    And I was asking whether the soldiers you

9    mentioned were also in the vehicle, did they arrive with

10   Dr. Surill?

11       A.    Yes.  They were in that vehicle and it was

12   being driven by a soldier.

13       Q.    I'm putting up Exhibit C2.  It came up

14   yesterday.  Do you recognize this structure?

15       A.    Yes.

16       Q.    What is that?

17       A.    It's the Ihuriro.

18       Q.    And is the road from the ESO this road that I

19   just drew?

20       A.    That's where I actually came from, going all

21   the way down.

22       Q.    So what I just drew on the screen, is that

23   essentially the path that you took past the Ihuriro?

24       A.    Yes.

25       Q.    Last year do you remember meeting with

1    American investigators in Butare?

2         A.   I do.

3         Q.   Where did you meet?

4         A.   At Faucon.

5         Q.   Were there any members of the Rwandan

6    government there with you?

7         A.   No, and you were with a Rwandan woman.

8         Q.   And were they translating?

9         A.   Yes.

10        Q.   Did you know why you were being asked to talk

11   to them?

12        A.   I didn't.

13        Q.   What did you think that you were going to be

14   asked?

15        A.   I didn't know.

16        Q.   Did you tell them about your experience during

17   the genocide?  Did you tell them about your experience

18   during the genocide?

19        A.   I was called by a man whose name is Jean

20   Pierre.  I told him that I was not going to be

21   available.  I came on the third day.  That's when they

22   asked me to give my testimony.

23        Q.   My question was, did they ask you about the

24   genocide?

25        A.   Yes, that's what I meant.

26

1       Q.   And at some point did you tell them about

2  Beatrice?

3       A.   A little bit later towards the middle of the

4  meeting, that's when they asked me about it.

5       Q.   And had anyone asked you about Beatrice

6  before?

7       A.   No one.

8       Q.   Now, when you met with investigators, did you

9  show them -- excuse me, when you met with the Americans,

10  did you show them where your house was?

11       A.   The next day, that's when I met one of them, I

12  don't remember exactly who he was, but I took him to

13  show him my house.

14       Q.   And did you point out your home?

15       A.   I showed -- I only showed him, I don't know,

16  he took pictures.

17       Q.   I'm showing you 24G and 24A for ID.  Do you

18  recognize these photos?

19       A.   Yes.

20       Q.   What are those?

21       A.   Right below my house.

22       Q.   Is that an image of your home?

23       A.   Yes.

24       Q.   When you say right below my house, did you

25  mean the photos appear to be taken right below your

1    house?

2         A.   Yes.

3         Q.   Is there a path there that leads behind the

4    Ihuriro?

5         A.   Yes.  There's an unpaved road right below.

6              MR. CHAKRAVARTY:  Move to strike the ID.

7              MR. RUOFF:  No objection.

8              THE COURT:  I'm sorry, what's the number?

9              MR. CHAKRAVARTY:  24A and 24G.

10             THE COURT:  ID may be stricken on 24A and 24G.

11             (Government's Exhibits 24A and 24G

12             admitted.)

13        Q.   BY MR. CHAKRAVARTY:  The image that I just put

14   up on the screen, Mr. Kamanzi, is this your home?

15        A.   That's it.

16        Q.   I should add, do you live there now?

17        A.   No.

18        Q.   But this is the home you were talking about

19   that you lived in during the genocide?

20        A.   That's where I lived but there's some

21   structure they added after.

22        Q.   Okay.  So what structures that appear on this

23   photo did not exist in 1994 during the genocide?  And

24   you can touch the screen.

25        A.   (Witness doing so.)

28

```
 1        Q.   So what you circled, those structures did not
 2   exist during the genocide?
 3        A.   Yes, all along this wall.
 4        Q.   And then have there been other structures
 5   built that don't appear on this image between where your
 6   home was and the Ihuriro?  Have there been other
 7   structures built since the genocide that appear between
 8   your home and the Ihuriro?
 9        A.   A lot.
10        Q.   You mentioned yesterday there was a Mosque.
11   Do you see the Mosque in this picture?
12        A.   The green one.
13        Q.   The structure that I'm circling?
14        A.   Yes.
15        Q.   And that's the Mosque that you said that you
16   lived next to; correct?
17        A.   Yes, that's the structure next to my house.
18        Q.   Yesterday you mentioned that you were at an
19   expo and you were at a booth by I think it was Relais de
20   la Soif?
21        A.   Yes.
22        Q.   And I was confused as to what Relais de la
23   Soif is.  Is that the name of a company or a business?
24        A.   It's, it belonged to Kigozi (ph) who also sold
25   alcohol.  He also had storage.
```

1            MR. CHAKRAVARTY:  That's all, your Honor.

2            THE COURT:  Mr. Ruoff.

3            MR. RUOFF:  Thank you.

4                    CROSS-EXAMINATION

5    BY MR. RUOFF:

6        Q.    Good morning, sir.

7        A.    Good morning.

8        Q.    Now, I believe Mr. Chakravarty just asked you

9    some questions about your travel to Kanyabashi's house;

10   right?

11       A.    Yes.

12       Q.    And you explained that you were taken there by

13   a doctor with two soldiers; correct?

14       A.    Yes.

15       Q.    And that on your way to Kanyabashi's house you

16   went by the front of the Ihuriro where you saw a

17   roadblock; right?

18       A.    Yes, but it was on the side.

19       Q.    Okay.  Now, prior to you testifying here today

20   you met with the prosecutors to go over your testimony;

21   correct?

22       A.    I met with Brian in Butare.

23       Q.    Well, I meant at the hotel about two nights

24   ago, didn't you meet with Mr. Chakravarty?

25       A.    We did see each other, but we didn't see each

1   other at the hotel.

2        Q.   Okay.  Well, you met with Mr. Chakravarty and

3   went over your testimony; correct?

4        A.   As far as I'm concerned, I told Brian.

5        Q.   Was Brian there with Mr. Chakravarty?

6        A.   No, in Butare I talked to Brian only.

7        Q.   I'm talking about any meeting that you had

8   with Mr. Chakravarty in the last week.

9        A.   Yes.

10       Q.   Okay.  And when you met with Mr. Chakravarty

11  in the last week, you went over your story from the

12  genocide; right?

13       A.   I told him about my story.

14       Q.   Okay.  And isn't it true that when you talked

15  to Mr. Chakravarty, you told him that you never saw the

16  roadblock itself; correct?

17       A.   I told him that the roadblock was on the side.

18       Q.   You told him that you only saw vestiges of the

19  roadblock but not the roadblock itself; correct?

20            THE INTERPRETER:  Clarification.  You saw

21  what?

22       Q.   The remains.

23       A.   That's what I'm talking about.

24       Q.   Now, when Mr. Chakravarty asked you questions

25  about the expo -- I'm sorry, about whether or not you

1   know Shalom's wife, you told him you knew her a little

2   bit; correct?

3       A.   As little as possible.

4       Q.   In fact, you said you had only seen her three

5   times before the genocide; right?

6       A.   Yes.

7       Q.   And the time that you saw her at the expo was

8   the third time that you saw her?

9       A.   That's where I knew her, in the expo.

10      Q.   That was the time when someone pointed to her

11  and said that is the fiancee of Shalom?

12      A.   Yes.

13      Q.   And that was in around the holidays, 1993?

14      A.   Yes.

15      Q.   Now, the holidays in Rwanda, that's in what

16  month?

17      A.   In July.

18      Q.   And prior to that time you didn't know at all

19  who she was; correct?

20           THE INTERPRETER:  Excuse me?

21      Q.   Prior to that time you didn't know her name?

22      A.   I didn't know her name.

23      Q.   And I think you said that after you saw her at

24  the expo, you only saw her one other time; correct?

25      A.   Yes, in March 1994.

1       Q.   And I think that's the time you said you saw

2   her dancing in the street; correct?

3       A.   She herself wasn't dancing, but people with

4   whom she was, were dancing.

5            MR. RUOFF:  I seem to be missing an exhibit.

6   We will make due with this one.

7       Q.   I'm showing you Government's Exhibit 5A.  Now,

8   you testified on direct about a number of things that

9   you saw while you were hiding in the bakery portion of

10  your house; correct?

11           THE INTERPRETER:  Would you repeat that?

12      Q.   When you were hiding in the bakery portion of

13  your house.

14      A.   Yes.

15      Q.   Okay.  And I think you said that you witnessed

16  things for the two days before and the two days after

17  April 19th?

18      A.   Yes.

19      Q.   You said that you saw from the bakery portion

20  of the house, you could see across the valley to the

21  hotel; right?

22      A.   Can I show it?

23      Q.   Well, I'll show you.  Your house is here;

24  correct?

25      A.   Yes.

1  Q. And that's the Mosque; right?

2  A. Yes.

3  Q. And this is the front to the hotel?

4  A. Not really --

5  Q. Oh, I'm sorry, you're right, you're right.

6 Here?

7  A. Yes.

8  Q. So everything that you saw was witnessed by

9 looking across this distance; correct?

10  A. You could see someone passing by that first

11 area and see the same person going towards that other

12 area passing in front of the house.

13  Q. And I think you said that the two days before

14 the 19th you saw people stopped along this area of the

15 road in front of the hotel; right?

16  A. Yes.

17  Q. So that would have been two days before

18 April 19th; right?

19  A. Yes, 19th.

20  Q. That would be two days before Sindikubwabo

21 gave his speech; right?

22  A. Yes, because this area was full of military,

23 all this area.

24  Q. Now, the topography in this area, it is

25 downhill as you head south toward your house; right?  As

34

1    you head from here south, that is downhill; right?

2         A.    Yes.

3         Q.    So as you're looking from your backyard up to

4    the hotel, you're looking uphill; right?

5         A.    Yes, you can see uphill.

6         Q.    And this hotel is surrounded by a stone fence;

7    right?

8         A.    Yes, there was, and it was kind of going

9    downhill.

10        Q.    And the stone fence was about this tall in

11   1993 -- 1994; right?

12        A.    Yes, but it was going downhill like this.

13        Q.    I'm just asking about how tall the stonewall

14   was around.

15        A.    It wasn't very tall because you could see the

16   backyard.

17        Q.    You mentioned on direct examination that you

18   saw Shalom driving around prior to the genocide in a car

19   with a speaker on it?

20        A.    Yes, before the genocide.

21        Q.    And you actually, when you met with the agents

22   in June -- actually, when you met with Brian in June in

23   Butare, you talked about what you saw Shalom do; right?

24             THE INTERPRETER:  Excuse me, would you repeat

25   the question, please?

1    Q.    Sure.  When you talked to Brian in Butare in

2    June, you told him what you saw Shalom do; correct?

3    A.    Yes, I did.  I told him many things because he

4    also came to my house and I didn't think that's what you

5    were asking me about.

6    Q.    You never mentioned to Brian the fact that you

7    saw Shalom driving around in a car with a speaker;

8    right?

9    A.    Yes.

10    Q.    You did tell him or did not tell him?

11    A.    I didn't because we didn't go in details

12    because he was asking me a few things.

13    Q.    Well, you talked to him about seeing a car

14    driving around with a speaker on it; right?

15    A.    I only told him that I saw Shalom driving a

16    car many times, but we didn't go in detail.

17    Q.    Okay.  I'm showing you Government's

18    Exhibit 22.  Mr. Chakravarty showed you that picture as

19    well.  Remember?

20    A.    No.

21    Q.    He did not?

22    A.    No.

23    Q.    Do you recognize anybody in this picture?

24    A.    Four.

25    Q.    Do you recognize this gentleman here?

```
 1        A.    Thierry.

 2        Q.    Okay.  Thierry is staying at the hotel with

 3   you down the street; right?

 4        A.    Yes.

 5        Q.    And do you know any of the other people that

 6   you're staying with at the hotel down the street?

 7              MR. CHAKRAVARTY:  Objection, your Honor.

 8   Self-evident he's staying with them now, so maybe that

 9   can be tied up.

10              THE COURT:  Maybe you can clarify.  You mean

11   back then?

12              MR. RUOFF:  Well, that was going to be the

13   next question, yes.

14              THE INTERPRETER:  Can you repeat the question.

15        Q.    Do you know the other Rwandans that you're

16   staying with at the hotel, did you know them back in

17   1993 or '94?

18        A.    About two or three.

19        Q.    Which two or three did you know back in 1993?

20        A.    Venantie.  No one else.

21        Q.    You did not know Thierry?

22        A.    People I know before the genocide is two

23   people, Thierry and Venantie.

24        Q.    Okay.  Did you meet with any of those people

25   you're staying with at the hotel after the genocide?
```

1        A.    Only one lady who works at the hospital.

2   That's who I saw around.  But we didn't really get to

3   know each other.

4        Q.    What's her name?

5        A.    Consolee.

6        Q.    Have all you Rwandans talked about your

7   genocide stories together at the hotel?

8        A.    No one knows my story.

9        Q.    Now, have you ever been interviewed before

10  Brian came to interview you in June 2012?

11       A.    No, except that a long time ago right after

12  the genocide some white people came to ask me a few

13  questions, but I don't know exactly who they were.

14       Q.    Okay.  When those white people interviewed

15  you, did you tell them everything you knew?

16       A.    I only told my story.

17       Q.    What's your date of birth, sir?

18       A.    October 23rd, '79.

19       Q.    So at the time of the genocide you were 14 or

20  15 years old?

21       A.    Around there.

22       Q.    You were between 14 and 15 years old?

23       A.    Yes.

24       Q.    Just a few last questions, sir.  Do you know

25  the name of Shalom's younger sisters?

38

1    A.    No.

2    Q.    You did not know the family all that well,

3  then?

4    A.    I wasn't acquainted to the family, but I saw

5  Shalom around because he would come around to see people

6  in the house that are located in the compound.

7    Q.    Do you know whether or not Beatrice ever had

8  any children?

9    A.    When I last saw her she hadn't had a kid yet.

10    Q.    And the last time you saw her was March 1994?

11    A.    Yes.

12    Q.    Okay.  So you never saw her carrying around an

13  infant child with her in March?

14    A.    No.

15    Q.    Now, in Rwanda isn't it very common for women

16  to carry and nurse their infant children?

17    A.    You only see that a few times.

18    Q.    But it's not uncommon to see people on the

19  road carrying an infant wrapped in cloth?

20         THE INTERPRETER:  Would you repeat that?  He

21  was saying something.

22    Q.    What was he saying?

23    A.    Only people from the countryside carried

24  babies on the back.

25    Q.    Do they carry them on the front too?  On the

Appendix Page 975

1   front?

2        A.   Only a few modernized people, but as far as

3   that is concerned, I didn't see that.

4        Q.   Do you recall what Beatrice looked like back

5   in 1993?

6             THE INTERPRETER:  Did you say in 1993?

7        Q.   In 1993.

8        A.   Yes, she was dark and big.

9        Q.   Okay.  Do you remember anything particular

10  about her hairstyle?

11       A.   I didn't really focus on that.

12       Q.   Now, when this gentleman Jean Pierre contacted

13  you to talk to the Americans last June, did he explain

14  to you how he got your name?

15       A.   (No response.)

16       Q.   Did he explain to you how he got your name?

17       A.   No, he didn't tell me anything.  He only said

18  that there were people that wanted to see me.

19       Q.   Did he say that they were from the United

20  States?

21       A.   No.  He only said that I should come and talk

22  to some man, but he didn't say who they were, I only saw

23  them when I got there.

24       Q.   Did you know that they were mzungu?

25       A.   No, I only saw them when I got there.

40

1       Q.   Okay.  And Mr. Interpreter, can you interpret
2  for the jury what mzungu is?
3              THE INTERPRETER:  Mzungu means a white person.
4              MR. RUOFF:  Thank you, sir.  No more
5  questions.
6              THE COURT:  Any redirect?
7                      REDIRECT EXAMINATION
8  BY MR. CHAKRAVARTY:
9       Q.   Am I a mzungu?
10      A.   If you look at someone looks like you, you
11  kind of look mzungu -- you kind of look white.
12      Q.   But I'm not Rwandan; right?
13      A.   Yes.
14      Q.   Richard, you were shown this photo.  Before
15  Mr. Ruoff put this up here had you seen this before?
16      A.   No, this is my first time to see it.
17      Q.   You said that you recognized a few people in
18  that photo?
19      A.   Yes.
20      Q.   Can you tap on the screen the individuals that
21  you recognize and say who they are?
22      A.   I know this one here.
23      Q.   Who is he?
24      A.   His name is Muza (ph).
25      Q.   How did you know him?

```
 1        A.   We went to school together.

 2        Q.   Did he live in Butare town?

 3        A.   Yes, that's where he still lives.

 4        Q.   Who else do you recognize?

 5        A.   Thierry.

 6        Q.   You explained Thierry.  Was he also from

 7   Butare town?

 8        A.   Yes.

 9        Q.   Who else do you recognize?

10        A.   This one's name is Mayanga.

11        Q.   Did he also live in Butare town?

12        A.   Yes, but he just got out of prison.

13        Q.   Okay.  Do you recognize anyone else?

14        A.   The one with sunglasses.

15        Q.   And who is he?

16        A.   Shalom.

17        Q.   And is this how he appeared roughly back in

18   the time before the genocide?

19        A.   He was a little bit bigger.

20        Q.   You were asked about whether your house was

21   uphill or downhill by Mr. Ruoff?

22        A.   Yes.

23        Q.   Between your home and the Ihuriro, can you

24   describe whether that was uphill or downhill?

25        A.   From my house towards that place, that's
```

42

1    actually down in the valley.

2         Q.    So was there anything impeding your vision to

3    the area back here?

4         A.    Nothing was an obstacle because there was

5    nothing in there.

6         Q.    So when you saw the people being taken down to

7    the wooded area, can you draw on this map the direction

8    that you saw them coming?

9         A.    They were taking them towards that direction.

10        Q.    Finally you were asked about whether you had

11   ever been asked by an outsider about your experience

12   during the genocide before?

13        A.    Yes, a little bit.

14        Q.    And did you tell them about your observations

15   of Kanyabashi?

16        A.    They were asking me if I was hiding at his

17   house.

18        Q.    They asked you if you were hiding at

19   Kanyabashi's house?

20        A.    Yes.  That's only what they were asking me,

21   nothing else.

22             MR. CHAKRAVARTY:  That's all I have.

23             MR. RUOFF:  Nothing, your Honor.  Thank you.

24             THE COURT:  Thank you, sir, you may step down

25   and you're excused.

43

     1            THE WITNESS:  Thank you.

     2            THE COURT:  And you may call your next

     3    witness.

     4            MR. CAPIN:  Thank you, your Honor.  The

     5    government calls Maurice Violo, V-I-O-L-O.

     6            THE CLERK:  Please raise your right hand.

     7                       MAURICE VIOLO

     8        having been duly sworn, testified as follows:

     9            THE CLERK:  Please be seated.  For the record,

    10    please state your name and spell your last name.

    11            THE WITNESS:  Maurice Violo, V-I-O-L-O.

    12                    DIRECT EXAMINATION

    13    BY MR. CAPIN:

    14        Q.   Good morning, sir.

    15        A.   Good morning.

    16        Q.   Please tell the jury what you do for a living?

    17        A.   I'm an Immigration Service officer.

    18        Q.   Are you employed by USCIS?

    19        A.   Yes, I am.

    20        Q.   How long have you been an Immigration Service

    21    officer?

    22        A.   I've been with the service since 1987 which in

    23    the beginning was INS, Immigration and Naturalization

    24    Service, then it changed over to CIS in 2003.

    25        Q.   You were with the service in 2003?

44

1      A.    I've been with the Immigration since 1987.

2      Q.    What was your title in 2003?

3      A.    2003, I was a Citizenship and Immigration

4   Services officer.

5      Q.    Can you explain to the jury what that

6   involves?

7      A.    It involves conducting interviews on numerous

8   applications for citizenship, permanent residence,

9   adoptions and other applications to determine and make a

10  final decision whether to adjudicate it, which means to

11  approve it, or to deny the application.

12     Q.    Before becoming an Immigration Service

13  officer, did you receive training on how to conduct --

14  how to do that job?

15     A.    Yes.  I received training in the Boston

16  district office.

17     Q.    When was that?

18     A.    That was back in '97 -- '97, '98.

19     Q.    And in your current capacity and going back

20  over your career, did you receive any continuing

21  education or ongoing training?

22     A.    Yes.  We receive training every month when the

23  time allows.

24     Q.    And did your duties in 2003 include

25  adjudicating applications for naturalization?

1          A.    Yes, they did.

2          Q.    And do you understand naturalization to be in

3    essence the same as citizenship?

4          A.    Yes, it is.

5          Q.    How does a person apply to become a citizen?

6          A.    First off they have to be a permanent

7    resident.  And secondly, they just have to file the

8    Application for Naturalization.

9          Q.    And do you have a standard practice or

10   procedure that you follow when you're assigned an

11   Application for Naturalization to adjudicate?

12         A.    Yes.  When we receive a file, before we do

13   anything, we review the file to make sure everything is

14   in the file that needs to be addressed prior to the

15   interview.

16         Q.    When you say you review the file, what file

17   are you talking about?

18         A.    The file is complete.  It encompasses all the

19   applications that that person has submitted to

20   Immigration.  The 485, the permanent resident

21   application, the naturalization application, and in

22   cases asylum applications, and cases, refugee

23   applications.  Everything is in that A-File.

24         Q.    Now, do you review the entire A-File before

25   you look at an applicant's application for citizenship

46

1    or naturalization?

2         A.    I review the whole application.

3         Q.    And if everything appears to be in order, what

4    do you do next?

5         A.    If the application is in order, then I call

6    the applicant into the office to conduct the interview.

7         Q.    Now, do you do the interview in person in your

8    office?

9         A.    Yes.  It's a one-on-one interview.

10         Q.    Do you do anything to insure that the

11   applicant speaks English well enough to understand what

12   you're talking about?

13         A.    Yes.  We put the applicant under oath and then

14   we go through the application, and then we administer

15   English reading, writing tests and a government civics

16   test.

17         Q.    And if you had any question based on

18   administering the English writing test and the reading

19   test and the civics test, that a person spoke English

20   well enough to understand, what would you do, if you had

21   any doubt?

22         A.    If the person did not understand?

23         Q.    Yes.

24         A.    Then we would -- I would stop the interview

25   and reschedule for a re-exam.

1      Q.    At which an interpreter would be provided?

2      A.    No, an interpreter is not provided unless the

3  applicant establishes that they are eligible for a

4  waiver entitling them to an interpreter.

5      Q.    Who gets a waiver?

6      A.    A waiver is someone who's a permanent

7  resident, who has been a permanent resident for -- whose

8  age is 50 years and been a resident for 20 years, or

9  55 years and been a resident for 15 years, or 65 and

10  been a resident for 20 years.  They're eligible to have

11  an interpreter present and to conduct the interview in

12  their own language.  Also if they have a medical waiver

13  saying that the person is not able to learn, read, write

14  or understand English or conduct the civics test because

15  of a medical condition such as stroke or some mental

16  incapacity.  Other than that, everyone is required to do

17  the exam.

18      Q.    I'm going to show you a portion of Exhibit 6,

19  is that correct, Al, 6?

20            MR. CHAKRAVARTY:  Yes.

21      Q.    Look through each page of that document and

22  tell me if you recognize what I've handed you.

23      A.    Yes, this is the standard N-400 application.

24      Q.    And at the end of the N-400 is there a civics

25  test or a document showing the civics test was given and

48

1    a reading test, as you've described?

2         A.   Yes, there is.  There's a civics test right

3    over here, there's the reading sample and there's the

4    writing sample.

5         Q.   And do you know who adjudicated this

6    particular application for citizenship?

7         A.   That would be myself, sir.

8         Q.   And am I correct in noting that on page one --

9    so this is the title of the document?

10        A.   Application for Naturalization, yes, sir.

11        Q.   Am I correct that in noting on page one the

12   applicant here is Beatrice Munyenyezi?

13        A.   Correct.

14        Q.   And toggle to the end just to wrap up the

15   questions about the applicant's language ability.  Tell

16   the jury what we're looking at right now on the screen?

17        A.   That is the civics and history test.  We are

18   required to ask the questions in order, and the

19   applicant is required to answer the questions.  If the

20   question is not answered correctly, we move on to the

21   next question.  The applicant has to answer at least six

22   of the ten questions on the form.  Anything less than

23   six the applicant fails.

24        Q.   So I notice here that there are six

25   checkmarks.  One, two, three, four -- I can't count

1   there.  Which questions did you ask this particular

2   applicant?

3       A.   The first six questions.  The first one being

4   what is the name of the president's official home.  How

5   many voting members are there in the House of

6   Representatives?  Who elects Congress?  What is the

7   capital of your state?  Why did the Pilgrims come to

8   America?  And what is the basic belief of the

9   Declaration of Independence?  Those were the first six

10  questions and they were all answered correctly, so the

11  exam ended right there.

12      Q.   So if the applicant had answered any of those

13  questions incorrectly --

14      A.   We would move on to the next four until six

15  were answered correctly.

16      Q.   And is this the --

17      A.   That's a reading sample.

18      Q.   Do you have a standard practice with regard to

19  how you administer --

20      A.   I present the document to the applicant and

21  ask can you please read that sentence out loud.  And the

22  applicant reads it out loud.  If she reads it correctly,

23  we move on to the next stage.

24      Q.   During your time as an Immigration Service

25  officer, can you tell me approximately how many

1    applications for citizenship you've adjudicated?

2         A.    It's hard to say.  It's been in the hundreds

3    if not over a thousand plus.

4         Q.    Do you remember this particular applicant,

5    Beatrice Munyenyezi?

6         A.    No, I can't say that I do.

7         Q.    And tell me what you're looking at now?

8         A.    That is the writing sample.

9         Q.    And how do you administer that?

10        A.    I ask her to -- we fold the paper over because

11   as you see on the top it says you cook very well, so we

12   fold the paper in half so she doesn't see the sentence

13   and ask her to write on the bottom, you cook very well.

14   And as you can see right over her name, she wrote the

15   sentence correctly.

16        Q.    And I see here that there's an oath of

17   allegiance?

18        A.    Correct.

19        Q.    And is that signed in your presence?

20        A.    Yes, everything is signed in my presence.

21        Q.    I want to walk through, if we could now, the

22   actual application for citizenship.  Now, is it your

23   standard practice to review every question on this form

24   with the applicant during your interview process?

25        A.    Every question has to be asked according to

1   the regulations except for a couple which includes

2   whether you've ever been a member of the Nazi party or

3   whether you ever served in the military.  If I'm

4   interviewing a female, I do not ask the military

5   question because they're not required to register for

6   selective service.  As far as the Nazi party is

7   concerned I don't ask that because it's not relevant to

8   the application.

9        Q.   How consistently do you follow that practice

10   of asking every question except for the two --

11        A.   Every applicant.

12        Q.   Okay.  So we're going to walk through this

13   application briefly.  Page two indicates some

14   information about the applicant; correct?

15        A.   Right.

16        Q.   Including where she's from?

17        A.   Where she's from and where she resides, and

18   also her Social Security, her date of birth, the date

19   that she became a permanent resident.

20        Q.   Is this number up here in the right-hand

21   corner, is that your A-File?

22        A.   That's what we refer to as an A-File, yes.

23        Q.   I notice that there are red checkmarks at

24   different spots of this page.  Do you know who put those

25   on there?

1       A.   I put those checkmarks there myself.

2       Q.   I notice that somebody wrote in -- can you

3 read that to me?

4       A.   That's Hillsborough County.  That was left

5 blank, so I filled it in because I know that Manchester

6 is in Hillsborough County.

7       Q.   And what are we looking at now?

8       A.   That's the biographics if you want to say,

9 female, height, weight, race, color of hair, color of

10 eyes, residence, place of employment.

11      Q.   Now, we notice that part of the residence has

12 been redacted for these purposes.  Would this have been

13 filled in with the full street address?

14      A.   Yes, it would have.

15      Q.   Now, I notice there's no checkmark there.

16 What, if anything, do you make of that?

17      A.   The checkmark is checked on part B.  Part six,

18 I didn't check it for whatever reason.

19      Q.   By part six you're talking about this section

20 right here?

21      A.   Right, where the past residence is.

22      Q.   Is it your routine practice to ask that

23 question of every applicant?

24      A.   I ask what is your current residence.  And if

25 it's different from what the application says, then I

1   would write the new address on the application.

2        Q.   So is that true with regard to every question

3   that you ask the applicant; that is, if he or she gives

4   you have a different answer, you make a record of it on

5   the application?

6        A.   We have to make a notation on the -- that's

7   why we mark everything.  We write with numbers.  How

8   many annotations have you made on the application.  So

9   if I make one, two, three, four on the last page of the

10  application, I write how many annotations have been made

11  or any supplemental pages that have been added to the

12  application.

13       Q.   Now, I notice here there's information about

14  travel out of the country?

15       A.   Correct.

16       Q.   Can you tell the jury why those questions are

17  asked?

18       A.   Well, they have to establish physical presence

19  in the United States, and in this case she's only

20  showing two trips outside the United States for a total

21  of 22 days.  If a person -- one of the requirements of

22  citizenship is to have at least half your residence in

23  the United States.  So for her in her situation or his

24  situation, to be eligible you have to be a resident for

25  five years.  Thirty of those months have to have been

54

1   physically present in the United States.  And in this

2   case obviously it doesn't affect the eligibility for

3   citizenship.

4        Q.   I notice at the bottom there's information

5   about the defendant's spouse?

6        A.   Ah-hum.

7        Q.   It says Ntahobali Shalom Arsene, do you see

8   that?

9        A.   Yes, I do.

10        Q.   Here it says home address and the -- does the

11   applicant fill this out?

12        A.   Yes, the applicant fills out the complete

13   application unless they have someone prepare the

14   application for them.

15        Q.   So the applicant here wrote NA.  Is that

16   unusual in your experience with regards to an applicant

17   describing where --

18        A.   No, it's not unusual, you know, at times the

19   applicant's no longer married to the subject and is not

20   aware of where the applicant is residing at the time.

21   What we look for is how many times you've been married,

22   and if it's been more than once, we require divorce

23   decrees, and if remarried, marriage certificates.  But

24   if the person has no contact, they've been separated or

25   whatever, they're not going to actually know where that

55

 1   person is residing at that time.

 2        Q.   The next page there are more questions about

 3   the marital history; correct?

 4        A.   Yes.  That all pertains to the spouse.

 5        Q.   Now, I notice here that it's asked for the

 6   spouse's A number.  And again, the applicant here wrote

 7   NA.  Do you see?

 8        A.   Correct.

 9        Q.   Now, do you review the A-File to determine

10   whether in fact the spouse has an A number?

11        A.   No.  In this case no, unless the couples are

12   married and they both file an application for

13   citizenship, then each spouse would put down their A

14   numbers.  This is the applicant's application.  It's not

15   the spouse's application.  So the spouse is not really

16   an issue on this particular application.

17        Q.   The next -- do you review these questions with

18   the applicant?

19        A.   Every question is reviewed except the ones

20   that I noted.

21        Q.   And right here, explain what wrote you?

22        A.   Again, I asked how many children do you have.

23   The answer evidently was three.  So I put no other

24   children.  And the annotation again, when I write

25   something, I put the number.

1     Q.   This is part ten.  Starts or continues, starts

2    with affiliations.  Is it your routine practice to

3    review this question with every applicant?

4     A.   Again, those questions are all reviewed.

5     Q.   And I notice the applicant here responds to

6    the question -- the question here, have you ever been a

7    member of or associated with any organization,

8    association, fund, foundation, party, club, society, or

9    similar group in the U.S. or in any other place.  Am I

10   correct in noting the applicant wrote no?

11    A.   Correct.

12    Q.   Do you have a standard practice with regard to

13   what you do if, when reviewing that question, the

14   applicant says, well, in fact I belong to X organization

15   and identifies an organization?

16    A.   If the applicant states during the interview

17   that they belong to an organization, group or club or

18   what have you, I would write the name of that

19   organization in that section.  And then I would ask the

20   applicant what that organization is if I wasn't aware or

21   never heard of that organization.  And I would also

22   write her answer to that question.

23    Q.   So, for example, the applicant said I was a

24   Girl Scout, you would write that down but wouldn't

25   follow-up?

57

```
 1        A.    No, I wouldn't follow-up because it's evident

 2   to what the Girl Scouts are.

 3        Q.    What if the applicant wrote the name of a

 4   political party you have never heard of?

 5        A.    Then I write the name of the political party.

 6   I would ask what the political party consisted of.  And

 7   then I would continue, or I would continue with further

 8   investigation to confirm what that applicant told me is

 9   exactly what that political party is.

10        Q.    To what extent do you rely on the applicant to

11   be truthful during this process?

12        A.    We rely almost a hundred percent on the

13   applicant to tell us the truth during the interview.

14        Q.    Why is that?

15        A.    Because that's all we have to go by is what

16   the applicant says unless we have something on the

17   application itself, some information that tells us

18   otherwise, information that doesn't jive with what the

19   applicant has stated on the application.

20        Q.    So, just to make sure I understand your

21   standard practice with regard to these questions.  If

22   the applicant in this box had written MRND or some

23   political party that had the initials MRND, what would

24   you have done?

25        A.    Again, like I said, I would write what she
```

1   stated and I would ask her what that party consisted of

2   and what her involvement in that party was.  And then

3   after the interview, I would investigate further to

4   confirm whether or not the answer to that question was

5   answered truthfully and correctly.

6        Q.   So if the applicant identified the party and

7   you inquired, if it wasn't a party you had heard of, a

8   political party you heard of, the application would be

9   on hold for some period?

10       A.   Right.  We would continue with interviewing

11  until its finality, but no final decision would be made

12  on the application until we have confirmed all the

13  information on that application.

14       Q.   Now, below the affiliations question there are

15  a series of other questions about more specific

16  affiliations; is that correct?

17       A.   Yes, there are.

18       Q.   Do you ask each of those questions?

19       A.   I ask, yes, the Communist party, Totalitarian

20  party, terrorist organization.  Everything is asked

21  except for that section there, question 12, which refers

22  to the Nazi party.

23       Q.   And that's this one right here; correct?

24       A.   Correct, which is not applicable in this

25  situation.

1      Q.    Because you wouldn't have any cause to ask a

2    25 or 30-year-old if she were a Nazi?

3      A.    No, no, I think it's obvious.

4      Q.    So, with regards to question 11, though, do

5    you specifically review that question which reads --

6      A.    Yup, yup, and thoroughly.  Have you ever

7    persecuted anyone because of their race, religion,

8    national origin, membership in any particular social

9    group or political opinion, that question is answered,

10   it's asked in totality, as well as the questions

11   continuous residence after the Nazi party questions.

12     Q.    Whose obligation is it to correctly fill out

13   this form?

14     A.    It's the applicant's responsibility to answer

15   the questions truthfully and correctly.

16     Q.    And who has the burden of showing that she's

17   eligible, that the applicant is eligible to become a

18   citizen?

19     A.    The burden is on the applicant on that

20   naturalization.

21     Q.    Now, is this an adversarial process that

22   you --

23     A.    No, no, it's one-on-one.  It's not adversarial

24   whatsoever.  We try to make it as easy and comfortable

25   for the applicant as possible because I know they're

60

1    under stress, pressure, and what have you.

2          Q.    In terms of the next page, this is a section

3    in part ten, Section D -- your Honor, I'm not going to

4    be much longer, but this may be the time for the break.

5          THE COURT:  All right.  Ladies and gentlemen,

6    why don't we take our mid-morning break now.

7          (Recess taken.)

8          THE COURT:  Whenever you're ready.

9          MR. CAPIN:  Thank you, your Honor.

10         Q.    BY MR. CAPIN:  Mr. Violo, just a few more

11   questions about the N-400.  The N-400, that's the

12   standard term for the naturalization application?

13         A.    Correct.

14         Q.    So we had gotten to the questions about, in

15   part 10, of good moral character.  And again, is it your

16   practice to ask each applicant each of the questions on

17   this page?

18         A.    Yes, it is.

19         Q.    And how consistently do you follow that

20   practice?

21         A.    With every applicant.

22         Q.    So do you ask every applicant question 15,

23   have you ever committed a crime or offense for which you

24   were not arrested?

25         A.    Yes, I do.

1       Q.    Would you make a notation on the application

2   if the applicant gave an answer different from the one

3   she gave in writing?

4       A.    Yes, I would.

5       Q.    So, for example, here if the applicant said

6   that she had helped others participate in kidnapping,

7   would you have made a note of that?

8       A.    Yes, I would write it in the spaces down

9   below.

10      Q.    Would that have been disqualifying?

11      A.    Depends if she was convicted of the crime.

12      Q.    Would you inquire further?

13      A.    Of course.  We would ask for the certified

14  court records.

15      Q.    What if she admitted to crimes for which she

16  had not been convicted, would you ask further questions

17  about those crimes?

18      A.    Yes, we would.

19      Q.    Why would you ask further questions?

20      A.    To determine the eligibility of citizenship.

21      Q.    Under what circumstances might affirmative

22  answers, yes answers, affect her eligibility?

23      A.    Well, if the person admits committing a crime,

24  we need to know what the crime was, when the crime was

25  comitted, what the sentence was, whether the person was

1  convicted, and we would need the certified court records

2  to ascertain all that information.

3      Q.   What if upon inquiry there were no certified

4  court records, what if there had been no arrest or

5  conviction?

6      A.   They would still have to go to the court and

7  get a certified copy saying that there's no records on

8  file for that particular person.

9      Q.   What if the person admitted to committing a

10  crime in a foreign country?

11      A.   They would still be required to get those

12  documents from that particular country.

13      Q.   Is it up to the applicant to decide whether or

14  not to disclose prior criminal activity?

15      A.   It is mandatory that the applicant disclose

16  any and all criminal activity in the past, whether

17  convicted or not convicted, of those activities.

18      Q.   Same series of questions with regard to the

19  last two questions, questions 23 and 24 at the bottom of

20  this page.

21      A.   Ah-hum.

22      Q.   Twenty-three reads have you ever, and ever for

23  the record is in all caps and bolded, given false or

24  misleading information to any U.S. government official

25  while applying for any immigration benefit or to prevent

1   deportation, exclusion or removal.  Did I read that

2   correctly?

3        A.   Yes, sir.

4        Q.   Is it your standard practice and was it your

5   standard practice back in '03 to ask every applicant

6   that question?

7        A.   It was and it still is.

8        Q.   And if the applicant revealed that she had

9   made a misrepresentation, for example, at the refugee

10  stage, would that have mattered to you?

11       A.   Yes, we would have to inquire what kind of

12  misrepresentation was made at that time.

13       Q.   And would that have been your standard

14  practice, to ask a series of questions if she said yes,

15  in fact, I lied at an earlier stage?

16       A.   Yes.  Any time the applicant answers yes to a

17  question, it leads to further questioning to determine

18  what that situation was all about.

19       Q.   You mentioned a couple of questions on this

20  form that you routinely don't ask.  What were they?

21       A.   The part of affiliation to the Nazi

22  organization, and if it's a female applicant I don't ask

23  about the military, that they were registered with the

24  military, because they are not subject to selective

25  service as men are.

64

1        Q.    And you've also indicated that you don't probe

2   on information such as address or A-File number for the

3   applicant's spouse?

4        A.    No.  Again, this is the applicant's

5   application, not the spouse or anyone else, this is just

6   on the applicant.

7        Q.    Aside from those questions that we just

8   reviewed, do all the other questions on this form matter

9   to the USCIS?

10        A.    Yes, it does, that's why they're on the

11   application.

12        Q.    The last question you review is have you ever

13   lied to any U.S. government official to gain entry or

14   admission into the U.S.  Is that a different way of

15   capturing the same information asked about in question

16   23?

17        A.    Well, question 23 addresses any misleading

18   information given to a government official.  Twenty-four

19   is specifically stating misrepresent yourself at the

20   time of entry to get into the United States.

21        Q.    And if the applicant had said yes, for

22   example, in the refugee context I lied about prior

23   affiliations, would that have mattered to you?

24        A.    Yes, it would have.

25        Q.    Would you have made a note of it?

65

1      A.   Yes, I certainly would have.

2      Q.   Would you have asked further questions about

3 it?

4      A.   Of course.  Like I said, a yes response

5 requires further insight into the question.

6      Q.   The final page we'll look at very briefly, we

7 looked at in the beginning.  This is the page containing

8 the applicant's signature?

9      A.   Correct.

10      Q.   And we noted earlier there's an oath of

11 allegiance on this page?

12      A.   Yes, there is.

13      Q.   There's also a signature under oath, part 13;

14 correct?

15      A.   Correct.

16      Q.   And it states, I swear, affirm, and certify

17 under penalty of perjury under the laws of the U.S. of

18 America that I know the contents of this application --

19 I'm sorry, that the contents of this Application for

20 Naturalization subscribed by me, including corrections

21 numbered one through three, and evidence submitted to me

22 numbered pages one through -- it says zero there, did

23 you mean to write ten?

24      A.   No, that's zero.  That's the other documents

25 they submitted besides the N-400 application.  Like if

1   there was a criminal record and there was certified

2   court documents, those would be numbered one, two,

3   three, however the number would be.  Whether she

4   submitted a divorce decree, that would be additional

5   documentation that would be noted on that question there

6   as numbered pages one through zero.

7          Q.   So what does one through zero mean on this

8   application?

9          A.   That nothing was submitted outside the N-400

10  application.

11         Q.   I see.  And then she attests that these are

12  all true and accurate to the best of my knowledge and

13  belief?

14         A.   Right.  And it's signed in front of me, and

15  then I sign and date it, and then she reads the oath and

16  signs underneath the oath.

17         Q.   Is she asked -- before being sworn in as a

18  citizen is she asked again to affirm the accuracy of

19  everything she told you?

20         A.   Yes.  She's asked is everything correct and

21  true to the best of your knowledge.

22              MR. CAPIN:  That's all, your Honor.  Thank

23  you.

24              THE COURT:  Thank you.  Mr. Howard.

25              MR. HOWARD:  Thank you, your Honor.

1                    CROSS-EXAMINATION

2    BY MR. HOWARD:

3         Q.   Good morning, Mr. Violo.

4         A.   Good morning, sir.

5         Q.   I just want to make sure I understand your

6    position.  You, at least with respect to this case, your

7    role was to adjudicate Ms. Munyenyezi's naturalization

8    application?

9         A.   Not only adjudicate but conducted the

10   interview also.

11        Q.   And adjudication means to approve it?

12        A.   Or deny it.

13        Q.   Or deny it?

14        A.   Or hold it pending further review.

15        Q.   So you had that option available to you as

16   well?

17        A.   Correct.  If I couldn't make a decision at the

18   end of the interview, the application would be held

19   until all the questions were accounted for.

20        Q.   And if you had information available to you in

21   the A-File that caused you any concern whatsoever, you

22   could have held the file and investigated?

23        A.   That's true.

24        Q.   We're not just limited to the citizenship

25   application, it's not just the answers on there, but

68

1    anything in the file you've got available to you to say,

2    ah, that just doesn't quite look right to me?

3         A.    That's correct.

4         Q.    In 2003 you had been in your position for

5    16 years?

6         A.    1997 is when I became an adjudications

7    officer.  So it's been from 1997 to present that I've

8    been an adjudications officer.

9         Q.    So in 2003 you were an adjudications officer

10   for six years; correct?

11        A.    From '97 to 2003, correct.

12        Q.    And your experience went from 1987 up to 2003?

13        A.    Right, '87 I was an immigration inspector, not

14   an adjudicator.

15        Q.    Do you mind telling me what an inspector does?

16        A.    What an inspector does is I worked at JFK

17   International Airport and inspected people coming in to

18   this country and determine whether they are admissible

19   or not admissible to the United States.

20        Q.    And did that position include reviewing

21   documentary evidence that the person might present to

22   you at the airport?

23        A.    As an inspector they present documents to me

24   to determine whether they are eligible to enter the

25   United States, and that would be a valid passport and a

1   valid nonimmigrant or immigrant visa that enables them

2   to come into the United States.

3        Q.   So when you transitioned into the next phase

4   of your career in 1997, that's as an adjudicator, and

5   you receive training on that?

6        A.   Yes, I did, in Boston.  We went for training

7   in Boston.

8        Q.   And I thought I heard you say that as time

9   permitted, you are updated in your training virtually

10  every month?

11       A.   Right.  Every month we have scheduled training

12  segments, a number of people come and give us training.

13       Q.   So let's talk a little bit about what some of

14  those trainings are like.  Since they're every month, I

15  assume it's not the same topic every month?

16       A.   No, it's not the same topic and it's not the

17  same people that give the training.  We have office of

18  chief counsel who comes to our office once a week, and

19  he's available to us if we have any questions about

20  whatever the situation may be.  And he enables us to

21  make a decision on that particular application.  He

22  gives training on segments of the law, whether what's an

23  aggravated felon, what's a crime involving moral

24  turpitude, any new changes that have been instituted in

25  immigration that we need to be aware of.  We have

1  national security training.  Any current trends that are

2  out there that we need to be aware of and to look out

3  for.

4      Q.   And let's talk about those current trends.

5  When you're adjudicating citizenship applications, for

6  example, one of the things you might want to look for is

7  what country are they coming from.  What were the

8  country conditions when they left that country.

9      A.   Correct.

10     Q.   And with respect to Rwandan applications, you

11 started seeing those probably somewhere between 2000 and

12 2003, application for citizenship; right?

13     A.   I would imagine.  I can't be exact on the

14 years.

15     Q.   Well, one thing we know is before you can

16 apply for citizenship you actually have to be in this

17 country as a resident legal alien for at least five

18 years?

19     A.   Correct, in this particular situation, yes.

20     Q.   So somebody who came in 1998, they can't even

21 apply until 2003; right?

22     A.   Right, that's five years.  They are allowed to

23 file 90 days prior to their permanent resident date.

24     Q.   So if somebody fled from Rwanda in 1994 from

25 the genocide, if they were lucky enough to get here by

71

1    the end of 1994, the first day they could apply for

2    citizenship would be 1999?

3        A.   Correct.

4        Q.   So that's why I was saying, you probably

5    started seeing applications around 2000 and 2003 because

6    it's just not possible before that?

7        A.   Right, but once the application for refugee

8    status had been approved, that date is retroactive to

9    that date of the approval.  It's not the date that the

10   interview was conducted and approved on.  It goes

11   retroactive to the approval date.  So even though they

12   came in, let's say they were approved in, they were

13   admitted in 1996 as a refugee and they were interviewed

14   in 2000 or 2003, the date on their permanent residence

15   is the date that they were admitted as a refugee.  It

16   goes backs to that date.

17       Q.   And I just, this is a point that's probably

18   not even relevant, but I just want to make sure I

19   understood it.  Ms. Munyenyezi, according to the file

20   you reviewed, entered this country in March of 1998?

21       A.   I don't have it in front of me so I don't

22   know.

23       Q.   Are you saying that her physical arrival in

24   the country isn't the trigger date for the five years,

25   it goes back to when she was approved?

72

1     A.    It goes back to the date of the approval of

2    the refugee application.  The date she was admitted as a

3    refugee.

4     Q.    So it's not her physical presence here?

5     A.    No.

6     Q.    Okay.  So, thinking back to the early 2000s,

7    do you have any recollection of how many cases you

8    handled that were Rwandan refugees from the genocide

9    seeking to live here in New Hampshire?

10     A.    No, I can't give you a number on that, sir.

11     Q.    No idea?

12     A.    No.  I'm not going to commit to any numbers.

13    I don't know.  I'm not going to guess.

14     Q.    Over the course of your career as an

15    adjudicator you said you've done maybe a thousand cases

16    of people seeking citizenship?

17     A.    Right.

18     Q.    That's from 1997 to the present?

19     A.    Right.

20     Q.    That's 16 years; right?

21     A.    '97 when I became an adjudicator, right.

22     Q.    So it's no more than 75 cases a year

23    throughout your career for people who want to become

24    citizens who are coming into New Hampshire; correct?

25     A.    I'm not sure what you're saying there.

1        Q.   Well, if I take a thousand cases and divide it

2    by 16, I wanted to say that's a hundred, but I know

3    that's not right.

4        A.   But we conduct interviews every day, and those

5    interviews can consist of 12, 13, 14, 15 interviews a

6    day five days a week.  We naturalize between 80 and a

7    hundred applicants a month here in district court.  So

8    that alone is over a thousand applicants a year that are

9    naturalized who come through our office, and I'm

10   responsible for at least half of those numbers.

11       Q.   Okay, I guess I must have missed your

12   testimony.  I thought you said about a thousand over the

13   course of your career.

14       A.   A thousand, you know, hundreds, over a

15   thousand.

16       Q.   Okay.  Before you began adjudicating Rwandan

17   refugees who were coming from the genocide, I'm assuming

18   you received training in country conditions?

19       A.   We're aware of what the situations in those

20   countries are.

21       Q.   Do you have a recollection of thinking back to

22   2003 what you knew about the genocide in 1994 as cues

23   that you would look for in dealing with someone like Ms.

24   Munyenyezi?

25       A.   You have to understand that when a person is

74

1    admitted as a refugee, that's been approved outside the

2    United States in whatever camp that person was staying

3    at until the application was adjudicated.  So that

4    person was vetted prior to the approval of the

5    application.  So all the checks were conducted,

6    everything was signed, sealed and delivered before that

7    person came into the United States.  So, for my purpose,

8    that was done over there.  What I'm concerned about is

9    her eligibility for citizenship.  She's already admitted

10   as a refugee and there's already been a process to the

11   permanent resident.  So now it's my responsibility to

12   determine whether she's eligible for citizenship.

13        Q.    Right, and her eligibility for citizenship

14   depends upon all those other things she said in the

15   other applications; right?

16        A.    Right, right.

17        Q.    Which you reviewed before you adjudicate?

18        A.    Right, to make sure everything is consistent

19   from step one to the final step.

20        Q.    But you're not suggesting that your role is

21   just, okay, I've looked at the paperwork, it's all

22   filled out, boom, you're a citizen?

23        A.    Of course not.  We're not -- we don't rubber

24   stamp.

25        Q.    Understood.  We're going to have some level of

75

1    critical inquiry, aren't we?

2         A.    Definitely, depending on the answers that are

3    provided to us during the time of the interview and the

4    information we have in the A-File during the time of the

5    interview.

6         Q.    One of the pieces of information you had in

7    her citizenship application was that her husband was

8    Shalom Ntahobali; correct?

9         A.    Correct.

10        Q.    And did you have any information at your

11   disposal in 2003 as to who he was?

12        A.    No, I did not.

13        Q.    You had no --

14        A.    His name was listed on the refugee documents.

15   His name was listed on the permanent resident document.

16   His name was listed on the N-400 application.  Again, as

17   I stated before, the N-400 is her application, it's not

18   the husband's application.

19        Q.    And she told you exactly who he was; right?

20        A.    That it was her husband.

21        Q.    There's no dispute that they were married?

22        A.    No reason to dispute it.  It's all in the

23   file.

24        Q.    Right.  She told you that he was in Arusha,

25   Tanzania, he's not here; right?

76

1      A.    Correct, according to the file.

2      Q.    You knew at the time that the International

3  Criminal Tribunal for Rwanda was in Arusha, Tanzania?

4      A.    Did I know that?  No.  I can't say that I did

5  know that.

6      Q.    The ICTR had been in existence for six years,

7  you knew that?

8      A.    I knew that there was trials going on in

9  Tanzania about the genocide that transpired in Rwanda.

10     Q.    But one of the things we heard from an expert

11  just a couple days ago was that the ICTR only did an

12  exclusive club of defendants.  There were maybe 80 of

13  them.  Were you aware of that?

14     A.    No, I was not aware of that.

15     Q.    So it wouldn't have been that difficult for

16  the government to populate the database of at least

17  those people who were charged in the ICTR, would it?

18          MR. CAPIN:  Objection, your Honor.

19     A.    Again, that's --

20          THE COURT:  Overruled.

21     A.    That was all addressed during the refugee

22  process, not during the naturalization process.  All

23  that should have been addressed at the refugee process

24  stage.

25     Q.    So you're not even going to go back and look?

1          A.    Look at what?

2          Q.    Who he is.

3          A.    It's her application.  It's not his

4     application.

5          Q.    And she's telling you who he is.  I'm just

6     asking if you're going to go back and --

7          A.    She's telling me it's her husband.  If she

8     would have told me, well, my husband belongs to such and

9     such an organization.  Well, what kind of organization

10    is it?  My husband is in jail.  Well, what was he

11    arrested for?  Were you involved in that?

12         Q.    Hold that thought.  There's another thing she

13    told you when she walked into your office -- strike

14    that.  When she came for the citizenship ceremony on

15    July 18, one of the questions she's asked is have you

16    traveled outside the United States since we last

17    interviewed you; right?

18         A.    Yes, that's at the time of naturalization.

19         Q.    You interviewed her in April of 2003 and then

20    she came to this courthouse to do the naturalization in

21    July of 2003; right?

22         A.    If that's what the record shows.

23         Q.    Well, they're your records.

24         A.    Well, I don't have them in front of me.

25         Q.    Your office sends her a letter that tells her,

78

1   among other things, to fill out this form the day she's

2   supposed to come; right?

3        A.   Correct.

4        Q.   And it asks her to answer these questions

5   based on information that may have changed from the time

6   we interviewed in April until the time you come to

7   Concord in July; right?

8        A.   Right.   Any changes since the final interview

9   have to be noted on that application, on that form,

10   rather.

11        Q.   And the second question was, have you traveled

12   outside the United States.   Do you see that?

13        A.   Right.

14        Q.   She answered yes.   Right?

15        A.   And it's crossed out and checked no.

16        Q.   In red?

17        A.   In red.

18        Q.   That's you; isn't it?

19        A.   I'm not sure that's me because -- just because

20   I did the interview doesn't necessarily mean that I was

21   here for the naturalization.

22        Q.   Well, these other changes on the citizenship

23   application, the N-400, they were all done in red pen?

24        A.   All the officers do it in red pen.

25        Q.   So, when it said she said yes, she was

1   actually trying to tell you folks I have traveled

2   outside the United States at this point?

3       A.   That's not necessarily so because a lot of

4   people misread this form.  A lot of people think that it

5   means ever travel, not after the final interview.  A lot

6   of people check have you ever been married, divorced or

7   separated after the, but they've been married for five

8   years prior to the interview, but they still check yes.

9   So that's why we make the corrections.  It's after your

10  final interview, any changes after the final interview.

11      Q.   Many people who come here with these

12  questions, they find them confusing and they mis --

13      A.   And that's why we go over them during the

14  interview and during the naturalization process.

15      Q.   So what clearly happened here was she had said

16  yes, I've traveled outside.  That was not right because

17  it wasn't within that narrow window, so the proper

18  answer was no?

19      A.   After the final interview, correct.

20      Q.   Okay.  And you don't remember that it was

21  actually you she spoke to?

22      A.   At that time?

23      Q.   Yeah.

24      A.   No, I don't remember.

25      Q.   Right.  Do you have any recollection, Mr.

80

```
 1    Violo, of actually asking her, well, where did you
 2    travel?
 3         A.   If she traveled outside the time that, from
 4    the final interview, I ask where have you traveled and I
 5    write it.  Where did you go?  Canada.  How long were you
 6    there?  Five days, a weekend.  I would make that
 7    notation there.
 8         Q.   And isn't it true, Mr. Violo, that she said to
 9    you I went to Arusha to visit my husband?
10              MR. CAPIN:  Objection, your Honor.
11         Q.   I'm asking him if he knows.
12         A.   No, sir, I don't know.
13              THE COURT:  Overruled.
14         Q.   And when you --
15         A.   And if she did tell me that, I would have
16    wrote it down.  Why would I not write it down?
17         Q.   I don't know why you wouldn't write it down.
18         A.   I wrote everything else down.
19         Q.   And when you looked at her application when
20    you did the interview and it said my husband -- and it
21    said my husband, Shalom Arsene Ntahobali, is in Arusha,
22    Tanzania, this was at the April interview; right?
23         A.   Correct.
24         Q.   And you asked her, what's he doing there,
25    didn't you?
```

1       A.    I don't recall if I asked her that or not.

2       Q.    And, sir, do you recall her saying to you he's

3  being prosecuted at the ICTR?

4       A.    Never.  Never said that.  Never.

5       Q.    That didn't happen --

6       A.    That would have triggered something in me if

7  she would have said he's being prosecuted over there for

8  whatever reason.

9       Q.    And your answer to her, wasn't it, Mr. Violo,

10  your husband's being prosecuted and you're applying for

11  citizenship?

12       A.    No.  Nope.  Nope.  Nope.

13       Q.    So you have a specific -- or you have no

14  recollection of either meeting with her, but you have a

15  specific recollection that that conversation never

16  happened?

17       A.    That would stand out.  Meeting a person that,

18  people I meet, dozens of people a day, hundreds of

19  people a week, remembering all, no.  A statement like

20  that, that would definitely stick out.

21       Q.    So you deny that that conversation even

22  happened?

23       A.    I have no recollection of that conversation

24  whatsoever.  If that occurred, there would have been

25  notations all over the place.  That application would

1   not have been approved that day.

2        Q.   Or what you've explained to this jury before,

3   well, she's been fully vetted by all the other agencies,

4   she must be fine?

5        A.   That's not -- that might be true at the time

6   she was vetted, but if new information came up at the

7   time of the naturalization application, that would open

8   up the door to the beginning of the process.

9        Q.   Okay.  So you know that her husband is Shalom

10  Arsene Ntahobali and he's in Arusha, Tanzania, when you

11  are considering her application; correct?

12       A.   That's correct.  That's what was stated on the

13  form.

14       Q.   And you reviewed the rest of the A-File;

15  correct?

16       A.   Correct.

17       Q.   And in your review of the A-File you found the

18  interview notes that were done back over in Kenya by a

19  Donald Monica, didn't you?

20       A.   What I reviewed on that refugee application is

21  that it was adjudicated at that particular time and when

22  it was approved on that application.  I don't review

23  every single question on that form.  I look at, you

24  know, children, any children, any family members notated

25  on that application, any organizations or affiliations,

1   work, past work employment on that application, but I

2   don't review the whole refugee process.  You have to

3   remember, these interviews are time sensitive.  I don't

4   have two, three hours to adjudicate an application.  So

5   I look at the important documents in that form which is

6   the approval of the refugee document itself, the date

7   she was admitted to the United States or he was admitted

8   to the United States, the 485 application for the green

9   card that says the refugee document corresponds with the

10  485, the 485 corresponds with what the N-400 says.  But

11  as far as the whole detail of the refugee process, no,

12  that was done over there.  That was adjudicated over

13  there.  That was taken care of over there.

14       Q.   Okay.  So when the prosecutor was asking you

15  about your review of the A-File, your answer was I

16  reviewed the file for everything that needs to be

17  addressed?

18       A.   Right.  And that was, was the refugee document

19  adjudicated, was it approved, and what date was she

20  admitted to the United States.  Like I said, that

21  determines the date that she becomes a permanent

22  resident.

23       Q.   So you don't go back and actually look at the

24  information that's in those papers to see if there's

25  consistency between what she said then and what she's

84

1   saying now; right?

2        A.   You look at certain things.  You can't look at

3   every single page.  You look at documents that are

4   relevant to the application at the time.

5        Q.   The A-File is, I forget what exhibit number it

6   is.

7             MR. CAPIN:  6.

8        Q.   Exhibit 6, less than an inch thick.  You can't

9   look at every paper?

10       A.   We don't look at every --

11       Q.   I didn't ask you whether you did, I asked

12   whether you --

13       A.   There are medical documents in there also.  I

14   don't look at the medical documents.

15       Q.   Why not?

16       A.   What's relevant to that being her citizenship,

17   it's not relevant.

18       Q.   Okay.

19       A.   Whether she's been inoculated or had all her

20   immunization shots.

21       Q.   So you could look at the whole file, you just

22   didn't; right?

23       A.   We could look at everything.  But then again,

24   we have 14, 15 interviews a day.  If I spent every day

25   looking at every single page in the file, I would never

1   be able to get through my interviews.

2        Q.   Basic review of the file you would have

3   learned she was a Hutu from Rwanda; right?

4        A.   It's all on the application, yes.

5        Q.   Basic review of the file was that the

6   mother-in-law was a cabinet minister in the then ruling

7   government; right?

8        A.   If I had gone through that.

9        Q.   Basic review of the file would have shown you

10  that her father-in-law was the rector of the university

11  appointed by the president; right?

12       A.   Again, that N-400 application is her

13  application, it's not her family's application.

14       Q.   That's what was in her application.   Strike

15  that.   In her A-File?

16       A.   I'm looking at her Application for

17  Naturalization.

18       Q.   Okay.   Well, there are no questions on the

19  application about who your relatives are and what they

20  did in your country of origin; right?

21       A.   It says who your husband is on the Application

22  for Naturalization.   It says it on the 485 --

23       Q.   And she told you?

24       A.   Who your family members are, whether you have

25  children or not.

1      Q.   And she told you?

2      A.   Yeah, she told me.

3      Q.   And you didn't cross-reference any of that

4   information with the stuff that was previously in the

5   file; right?

6      A.   Again, it's her application.

7      Q.   I know it's her application.  She gave you the

8   information.  All you had to do was read the

9   information --

10     A.   She --

11     Q.   Let me finish the question.

12     A.   Okay.

13     Q.   All you had to do was look at the information

14  in her citizenship application and compare it to what

15  else was known in the file; right?

16     A.   Again, all those questions that you're raising

17  right now should have been addressed during the refugee

18  process.  And if those issues arose, it should have been

19  caught at that level.

20     Q.   Okay.  So, what if information changes in the

21  five years after she's actually been admitted, then what

22  --

23     A.   That's something else.  But the information is

24  not going to change from what was established on the

25  refugee process.  That was then.  What's going to change

87

 1   once she's here is her permanent residence.

 2        Q.    Would it raise a red flag with you if you had

 3   actually done the research, run a database to see if

 4   Shalom Ntahobali was of any concern?

 5        A.    What would have raised a red flag for me is if

 6   she would have admitted to being a member of that

 7   organization at the time of the interview.

 8        Q.    How do you know she was a member?

 9        A.    I'm not saying.  I'm just saying, the question

10   is asked do you belong to any group, clubs, organization

11   or whatever, oh yes, I was part of this, then it would

12   lead to further questioning.  What is this organization?

13   What was your involvement with this organization?  She

14   answered no.  What am I going to do?  What am I going to

15   do?

16        Q.    And if no is a truthful answer, then we're

17   good to go; right?

18        A.    If the answer is no, it ends a line of

19   questioning.  You move on to the next question.

20        Q.    Do you make any credibility assessment?  Geez,

21   she's saying no, but looked a little squirrelly in that

22   chair.  I'm not sure.

23        A.    Well, yeah, you look at the person, how they

24   react, how they answer, whether they're looking at you

25   directly, whether they're looking down at the floor,

88

1    whether their eyes are in the sky.

2         Q.    Sure.

3         A.    Whether they hesitate on the answer.

4         Q.    Right.  As you said before, this isn't an

5    adversarial process, you're trying to make it as easy as

6    possible, but it's a little adversarial?

7         A.    It only becomes -- it doesn't become

8    adversarial if the person answers the questions

9    truthfully and correctly.  If we come across an answer

10   that was not truthful, then the process raises to

11   another level.  Well, you stated you were not arrested.

12   But we have a rap sheet here that says you were.

13        Q.    Okay.

14        A.    So then it becomes a little bit more

15   confrontational.

16        Q.    Did you have any rap sheet that she was ever

17   arrested?

18        A.    Now, as I said, you are processing or

19   reviewing the applications to make sure that all of the

20   security checks, background checks have been completed

21   and come back clear.

22        Q.    So when she -- she wrote down in the

23   application that she was not a member of or associated

24   with any political parties, you went over that question

25   in person with her; right?

89

```
 1      A.   Yes.
 2      Q.   And from your observation of her as you were
 3 asking her that question, there was no reason to doubt
 4 what she was saying?
 5      A.   At that time, no.  I found no reason to doubt
 6 it.
 7      Q.   All right.  And obviously, since you've just
 8 mentioned it yourself and you talked about it with Mr.
 9 Capin, had she written MRND, she would have been
10 excluded?
11      A.   She would -- no.
12      Q.   Okay.
13      A.   Not at that time.  We would investigate
14 exactly what that was and what her involvement in that
15 organization was.  That would have been the case that
16 would have been continued.  No final decision would have
17 been made at that time.
18      Q.   As of 2003 what did you know the MRND was?
19      A.   I had no idea what it was.  That's why if she
20 would have mentioned it, I would have wrote it down,
21 wrote down her response to it and looked into it
22 further.
23      Q.   And the only obligation she has to say yes or
24 to write down MRND is if she's actually a member or if
25 she's actually associated with that organization?
```

90

1      A.  Anyone who is associated with any group, club,

2  organization has to note that, it's their responsibility

3  to note that on the application.  That's why that

4  question is there.

5      Q.  And if the answer is no?

6      A.  If the answer is no --

7      Q.  You write no; right?

8      A.  If the answer is no, we move on.  Where am I

9  going to go if the answer is no?  Have you ever been

10  arrested?  No.  What am I going to do?

11      Q.  And if no is a truthful answer, there's no

12  problem?

13      A.  If no is a truthful answer, no, it's not a

14  problem.

15      Q.  When she wrote down in the application that

16  her husband was in Arusha, Tanzania, and under his home

17  address she put NA, did that cause you to ask her any

18  questions?

19      A.  No, it did not.  Again, this is her

20  application, it's not her husband's application.

21  Doesn't matter to me where he's living.  I'm not going

22  to go check up on him.

23      Q.  And do you at least ask, excuse me, Beatrice,

24  for being so nosy, but how come you don't know your

25  husband's address?

1          A.    No.

2          Q.    How come you're saying it's not applicable

3     what his address is?

4          A.    It's her application.

5          Q.    I understand that.  She wrote and answered it.

6     All I'm asking you is, did you ask any questions --

7          A.    No, I did not.  I was satisfied with what she

8     wrote down.  I don't know.  Okay.  So you don't know.

9          Q.    Do you have any idea how many Rwandan refugees

10    from the genocide were admitted in New Hampshire as

11    citizens in 2003?

12         A.    No.

13         Q.    When she put on her N-400 that you are

14    reviewing that she had -- you asked her to list all the

15    trips that she had taken --

16         A.    Ah-hum.

17         Q.    Since becoming a lawful permanent resident --

18         A.    Permanent resident, correct.

19         Q.    And she listed in 2002 having gone to Kenya

20    and Tanzania for a total of 20 days.  You see that?

21         A.    Yes, I do.

22         Q.    Did you ask her where she went?

23         A.    She went to Kenya and Tanzania.

24         Q.    Did you ask her why?

25         A.    No, I didn't ask her why.  People go visit

92

1    their home countries.  People go visit relatives.

2         Q.    You know that's not her home country; right?

3         A.    Well, I'm just saying in general.  People

4    travel.  She couldn't go to her home country as she was

5    a refugee from that country and going back to that

6    country would have maybe posed a few difficulties.

7         Q.    Well-founded fear of persecution; right?  That

8    is what you found in the file?

9         A.    A fear of --

10              MR. CAPIN:  Objection.

11              THE COURT:  I don't think -- he didn't review

12   that part I thought he said.

13        Q.    I'll skip it.  With respect to you were asked

14   some questions about her English skills, and you

15   explained to us that somebody who is applying for

16   citizenship, unless they get some waiver for a legal

17   reason or a medical reason, you have to be able to speak

18   English when you apply?

19        A.    You have to be able to speak and write and

20   converse in ordinary usage of the English language.

21        Q.    Somebody who comes to this country from a

22   foreign country, doesn't speak any English when they get

23   here, by the time they apply for citizenship they have

24   to be fairly fluent, don't they?

25        A.    I wouldn't say fluent.  They have to be

1   understanding the ordinary usage.  There's a big

2   difference between fluent and being able to understand

3   the basic usage of the English language.

4        Q.   I agree and I apologize for overstating.  We

5   require it here in the United States as a civic

6   responsibility to have a functional knowledge of the

7   English language before we allow you to become a

8   citizen; right?

9        A.   That's correct unless you fall under one of

10   the waiver categories.

11        Q.   So somebody who comes in here and works like

12   crazy for five years to try to learn as much of the

13   English language as possible, that's expected of them;

14   right?

15        A.   If they want to become a U.S. citizen, that's

16   a requirement, yes.

17        Q.   Doesn't mean that they can speak English when

18   they first got here; right?

19        A.   A lot of people don't.  I didn't.

20        Q.   Where'd you come from?

21        A.   I came from Italy.

22        Q.   And you spoke not a word of English?

23        A.   No, sir.  Came here when I was three and a

24   half years old.

25        Q.   My mother would say neither did I speak

94

1    English at that age.  She'd possibly still say it.  Did

2    your parents speak English when they brought you --

3         A.   No, they did not, sir.

4         Q.   And did they get a waiver or did they have to

5    learn to speak?

6              MR. CAPIN:  Objection.

7              THE COURT:  I think it's getting a little far

8    afield, isn't it?

9              MR. HOWARD:  Mr. Violo, thank you very much

10   for your time.

11             THE WITNESS:  Thank you, sir.

12             THE COURT:  Any redirect, Mr. Capin?

13             MR. CAPIN:  Very briefly, your Honor.

14                    REDIRECT EXAMINATION

15   BY MR. CAPIN:

16        Q.   Mr. Howard spent some time reviewing this

17   particular portion of the citizenship application.

18        A.   Ah-hum.

19        Q.   Now, am I correct in understanding that you

20   did not look thoroughly so as to re-adjudicate the

21   refugee application and the green card application?

22        A.   And the 485 application, green card, yes.

23        Q.   You reviewed them for the limited purpose of

24   comparing them to see if the answers were consistent?

25        A.   Right.

95

1      Q.   But were you aware in that review that in fact

2  when Ms. Munyenyezi came to this country she had been a

3  refugee in Kenya?

4      A.   That's usually one of the countries that

5  refugees are confined to while their application is

6  being processed.

7      Q.   So would it be unusual in your experience for

8  a refugee from Kenya, for example, who was living in

9  Kenya while awaiting entry into this country, would go

10  back and visit that country?

11      A.   No, not at all.  She might have other family

12  members or aunts, uncles or cousins awaiting refugee

13  status there also.

14      Q.   And you're aware that Kenya is a largely

15  English speaking country?

16      A.   Yes, it is.

17      Q.   As is Canada?

18      A.   Oh, yes, it is.

19      Q.   And Mr. Howard asked you some questions about

20  the absence of information on this form with regard to

21  where the husband was living.  If the defendant had said

22  my husband is on trial for genocide, would you have

23  asked any follow-up questions?

24      A.   Well, like I said, that opens up a whole new

25  window to further questioning.

96

1          Q.    And then I'm not going to review the -- each

2     step of the defendant's path to citizenship, but you

3     said that you're not going to go through the whole file

4     and re-adjudicate everything.  I just want to ask you a

5     couple questions about certain of the key documents at

6     the various stages, and I will start with the refugee

7     stage and ask you, do you recognize this to be the last

8     page of the refugee application?

9          A.    Yeah, that's the final page where it was

10    adjudicated, approved, and then to the right of the

11    approval is the date she was admitted to the United

12    States.

13         Q.    Okay.  And on this page, in your normal

14    routine practice, do you review the answer to question

15    14 which reads, asks the applicant to list political,

16    professional or social organizations of which I am now

17    or have been a member or which I am now or have been

18    affiliated since my 16th birthday.  Do you review that?

19         A.    Yes, I do.  It's all on the same page and you

20    just normally go up to the top and work your way down.

21         Q.    And if that answer was inconsistent with what

22    the applicant wrote on her citizenship application, what

23    would you do?

24         A.    I would confront the applicant.  On this

25    application for refugee status you stated that you were

97

1    not a member of any political group, organization or

2    association or whatever, but on your N-400 application

3    you noted that you belonged to this particular group,

4    why the discrepancy?

5        Q.   Now, Mr. Howard asked you about certain things

6    that appeared in the file relating to the refugee

7    application.  Did you review these notes by Donald

8    Monica who adjudicated the refugee application?

9        A.   No, I did not.

10       Q.   So when Mr. Howard asked you if you were aware

11   that the application reflected that the defendant's

12   father was -- father-in-law worked at the university in

13   Rwanda, you weren't aware of that?

14       A.   No, I was not.

15       Q.   Likewise you were not aware that the defendant

16   told Mr. Monica that prior to April 1994, neither she,

17   her spouse or her family were politically active?

18       A.   Nope, I did not.  As I said, that all should

19   have been vetted at that time or she shouldn't have

20   gotten her refugee status.

21       Q.   The last couple questions, Mr. Violo, if I can

22   make this focus.  Do you recognize this to be one of the

23   pages of the green card application?

24       A.   Yes, that's the 485 application.

25       Q.   And the 485 application --

98

```
 1        A.    Is for permanent residence.

 2        Q.    Which is often called a green card?

 3        A.    Green card, right.

 4        Q.    And again, do you see the question at the

 5   bottom of this page which asks the applicant to list,

 6   and I'll read this question here, your present and past

 7   membership in or affiliation with every political

 8   organization, association, fund, et cetera, since your

 9   16th birthday.  And you note, you see the applicant

10   wrote --

11        A.    None.

12        Q.    None, correct?

13        A.    Correct.

14        Q.    If that answer -- and that answer was

15   consistent with what this applicant, Beatrice

16   Munyenyezi, wrote on the application for citizenship?

17        A.    Right.  And on the refugee application.

18        Q.    If that answer had been inconsistent, if there

19   she had written, for example, MRND, what would you have

20   done?

21        A.    Again, I would have noted it down on the

22   application.  I would have her asked what that

23   organization consisted of and what her involvement was,

24   and then I would have gone back after the interview to

25   research that organization and see exactly what it was
```

1   and make sure that it corresponded what she had told me

2   under oath.

3           MR. CAPIN:  Nothing further, your Honor.

4   Thank you.

5           MR. HOWARD:  No.  Thank you, judge.

6           THE COURT:  Thank you, Mr. Violo, you may step

7   down, you're excused.

8           And you may call your next witness.

9           MR. CAPIN:  The government calls Consolee

10  Mukeshimana.  M-U-K-E-S-H-I-M-A-N-A.

11          THE CLERK:  Please raise your right hand.

12                  CONSOLEE MUKESHIMANA

13          having been duly sworn, testified through

14          an interpreter as follows:

15          THE CLERK:  For the record, please state your

16  name.

17          THE WITNESS:  My name is Consolee Mukeshimana,

18  M-U-K-E-S-H-I-M-A-N-A.

19                  DIRECT EXAMINATION

20  BY MR. CAPIN:

21      Q.   Ms. Mukeshimana, good afternoon.

22      A.   Good afternoon.

23      Q.   Would you please tell this jury where you're

24  employed?

25      A.   I work at the University Hospital in Butare.

100

```
 1        Q.   How are you employed?

 2        A.   I am a nurse.

 3        Q.   How long have you been a nurse?

 4        A.   Since 1999 -- 1989.

 5        Q.   What year were you born?

 6        A.   In '64.

 7        Q.   Where were you born?

 8        A.   I'm born in a place called Nyakesha (ph) in

 9   Butare.

10        Q.   Is that near Butare town?

11        A.   Yes, it's near.

12        Q.   Would you please describe your education?

13        A.   I studied six years of high school.

14        Q.   Did you receive training in high school as a

15   nurse?

16        A.   Yes.

17        Q.   I direct your attention to early 1994.

18        A.   Yes.

19        Q.   Were you about 30 years old at that time?

20        A.   Yes.

21        Q.   Where were you living?

22        A.   I lived in a place called Sovu.

23        Q.   Is Sovu a neighborhood this Butare?

24        A.   Yes.

25        Q.   Where were you working at the time?
```

1       A.    At the health center of Sovu.

2       Q.    Was that near your residence?

3             INTERPRETER:  I'm sorry?

4       Q.    Was that near where you were living?

5       A.    Yes, I lived right near.

6       Q.    And were you working as a nurse at that time?

7       A.    Yes.

8       Q.    In early 1994 did you see any political

9  rallies in Butare?

10      A.    Yes, I saw some.

11      Q.    Did you see any MRND rallies?

12      A.    Yes, I saw some.

13      Q.    How did you know that a particular rally was

14  an MRND rally?

15      A.    They had clothes that they wore that would

16  tell which party they were affiliated to.

17      Q.    Can you please describe to this jury the

18  clothes worn by MRND members?

19      A.    It was clothes that had a lot of colors with

20  long sleeves and some of them are also in the form of

21  muumuu.

22      Q.    Did you say muumuu?

23      A.    Yeah, muumuu, a long dress.  There was also a

24  circle appearing and in the circle there was the

25  portrait of Habyarimana.  And there were also a machete

102

1    and an axe crossing this way.

2         Q.    To be clear are you identifying -- sorry.

3         A.    And there are also the letter, there was also

4    the letter R.

5         Q.    When you say that there was multi-colored

6    clothing and clothing with Habyarimana's face on it and

7    clothing with crossed weapons, are you describing

8    different articles of clothing?

9         A.    All of that would be on one clothing item.

10        Q.    Now, I'm going to show you what is in evidence

11   as Exhibit 5B.  Do you recognize any of the structures

12   in this photograph?

13        A.    Yes, I recognize them.

14        Q.    You can touch the computer screen and it will

15   show us which one you're pointing at.  Please tell the

16   jury what you recognize.

17        A.    These are EER schools.

18        Q.    Can you please circle the EER, put a circle

19   around the EER.

20        A.    This is a small street that leads to ESO.

21        Q.    Okay.

22        A.    And this is the hotel called Ihuriro, and the

23   schools go all the way, everything she drew.  And this

24   road keeps going towards the university.

25        Q.    Okay.  I'm going to ask you what have I just

1   circled, what is that structure?  And before you answer

2   let me show you this, the photograph, so you can look at

3   the hard copy.

4        A.   Here below these are schools of the EER.  This

5   is a hotel.

6        Q.   Thank you.  So again, show the jury, if you

7   would, now that you looked at the hard copy, where is

8   the hotel?

9        THE COURT:  The record should the reflect

10  since the jury can see that she basically pointed out

11  the same structure she pointed out earlier.

12       MR. CAPIN:  Thank you, your Honor.  Let the

13  record reflect, your Honor, that the witness identified

14  the building in the upper left-hand corner of the

15  structure, lighter in color than most other structures

16  as the Hotel Ihuriro.

17       THE COURT:  Yes.

18       Q.   BY MR. CAPIN:  Do you know who was living in

19  the Hotel Ihuriro in early 1994?

20       A.   That is not where I lived.

21       Q.   Okay.  Do you know if anybody lived there?

22       A.   Yes.

23       Q.   Who lived there?

24       A.   Now, Ntahobali Maurice lived there.

25  Nyiramasuhuko Pauline lived there.  Their kids lived

104

1    there.  Shalom lived there.  Clarisse lived there.

2    Denise lived there.  Brigite lived there.

3         Q.   Did you know this family personally?

4         A.   I knew them.

5         Q.   Do you know where they lived before they lived

6    in the Ihuriro?

7         A.   They lived in a place called Ikibabara.

8         Q.   Do you know if they owned a home there?

9         A.   It was there.

10        Q.   I didn't catch the name of the place.

11        A.   Ikibabara.

12        Q.   Is that the same name it had during the

13   genocide?

14        A.   Yes, it was called Ikibabara and this is what

15   it's called today as well.

16        Q.   Do you know if the family owned a house

17   anywhere else?

18        A.   Only the hotel I mentioned.

19        Q.   Do you know if they owned a home in Cyagwa?

20        A.   Well, I wasn't sure about their place in

21   Cyagwa.  I heard people saying that they did have, they

22   lived in Cyagwa as well, but I'm not sure if they owned

23   the house or if they rented it.

24             MR. CAPIN:  And for the record, Ms.

25   Interpreter, am I spelling Cyagwa correctly,

1    C-I-A-R-G-W-A?

2            THE INTERPRETER:  C-Y-A-G-W-A.

3        Q.   Did you ever visit Maurice and Pauline where

4    they lived?

5        A.   Yes, I visited them.

6        Q.   And where were they living when you visited

7    them?

8        A.   In Ikibabara.

9        Q.   Was anybody in your family related to Maurice?

10       A.   Yes, there is one.

11       Q.   Who is related to Maurice?

12       A.   The husband of my sister.

13       Q.   Your sister's husband was related to Maurice

14   how exactly?

15       A.   It was their uncle.

16       Q.   Maurice was your sister's husband's uncle?

17   Maurice was the uncle of your sister's husband?

18       A.   Yes.

19       Q.   Did you ever visit the Ihuriro?

20       A.   Yes, I visited the place.

21       Q.   More than once?

22       A.   Two times.

23       Q.   Can you tell the jury what was on the ground

24   level of the Ihuriro?

25       A.   There was a place where they greeted people.

1   There was a reception desk.  And then when you pass by

2   the reception you reach a place where they sold alcohol

3   and things like that.

4          Q.   A bar basically?

5          A.   Yes, it's a bar.  And above there were rooms.

6          Q.   Your sister who, I have a question about your

7   sister who was married to Maurice's nephew.  Where did

8   she live been the genocide?

9          A.   She lived in a place called Nyanza.

10         Q.   Is Nyanza a neighborhood of Butare town?

11         A.   Yes.

12         Q.   Did you ever visit, did you visit your sister

13  often in Nyanza?

14         A.   Yes.

15         Q.   Did you ever see Shalom -- I'm sorry, did you

16  ever see Pauline, Maurice and their kids at Nyanza?

17         A.   I saw them.

18         Q.   Do you know what political party Pauline

19  belonged to?

20         A.   Yes, I knew it.

21         Q.   Before I ask you that I have a couple of other

22  questions.  You mentioned all of Pauline's and Maurice's

23  children.  Do you know if Shalom was married before the

24  genocide?

25         A.   Yes, he was married.

1    Q.   Do you know the name of his wife?

2    A.   Her name is Beatrice.

3    Q.   So getting back to political parties.  Do you

4    know what political party Pauline belonged to?

5    A.   I know it.

6    Q.   What party?

7    A.   MRND.

8    Q.   How about Maurice?  Do you know -- can you

9    tell the jury what party he belonged to?

10   A.   He was also in MRND.

11   Q.   Do you know what party Beatrice belonged to?

12        MR. HOWARD:  Objection, your Honor,

13   foundation.

14        THE COURT:  Sustained.  Foundation.

15   Q.   Did you ever see Beatrice do anything that

16   gave you information about what party she belonged to?

17   A.   I didn't know exactly what party she belonged

18   to.

19   Q.   So you had no idea what party she belonged to?

20   A.   Her, I didn't know which party she belonged

21   to.

22   Q.   Let me direct your attention to April of 1994.

23   Do you remember when the president's plane was shot

24   down?

25   A.   Yes.

108

1      Q.   And did the genocide start in Butare later

2   that month?

3      A.   Yes.

4      Q.   Do you remember who became the president after

5   Habyarimana's plane was shot down?

6      A.   Yes.

7      Q.   Who become president?

8      A.   Sindikubwabo.

9      Q.   Were you living at your home in Sovu, that

10   neighborhood in Butare in late April?

11      A.   I lived there.

12      Q.   Did you hear Sindikubwabo give a speech?

13      A.   I heard the speech.

14      Q.   How did you hear the speech?

15      A.   On the radio.

16      Q.   Can you tell the jury what you remember about

17   that speech?

18      A.   It was April 19, 1994, so they were having a

19   meeting in a meeting hall called Ingoraruma (ph).

20      Q.   Does that translate into English?

21      A.   MRND conventional center.  And then he was

22   saying that people from the town of Butare were un-

23   bothered, unconcerned.

24      Q.   Are you describing what Sindikubwabo, the

25   president, said?

109

1        A.    Yes.

2        Q.    What else did he say?

3        A.    He said whenever you need to burn weeds, you

4    must bring them together.  And you must hunt the enemy

5    wherever he is, and there's no other enemy but the

6    Tutsi.

7        Q.    Did the genocide come to Sovu shortly after

8    that speech?

9        A.    Yes.

10        Q.    Describe what happened in Sovu?

11        A.    In Sovu the killings started on April 22nd,

12    1994.  People came.  There were Hutu and Interahamwe.

13    And they had various weapons.  Meaning axes, spears

14    clubs, machetes and axes, guns and grenades.

15        Q.    And what did those people do?

16        A.    So they came to see groups of Tutsis who had

17    gathered at the health center.  They came blowing

18    whistles and then they started attacking and killing.

19        Q.    How did you survive that attack?

20        A.    I was amongst the dead bodies.

21        Q.    Are you saying you hid amongst the dead

22    bodies?

23        A.    Yes.

24        Q.    Did you go somewhere afterwards?  Did you go

25    somewhere else after those attacks?

110

1        A.    I left that place and I went to another place.

2        Q.    Then where did you go?

3        A.    I went back to my sister's home.

4        Q.    Is that the home you told us about in, was it

5   Nyanza?

6        A.    Yes.

7        Q.    Did you have children at the time?

8        A.    A friend of mine had taken my children for me,

9   but I was pregnant and my pregnancy was advanced.

10        Q.    When you got to your sister's house did you

11   stay there?

12        A.    Yes, I stayed there.  I ended up leaving there

13   towards the end of the fighting, but I did stay there

14   for a long time.

15        Q.    While you were there did you ever have

16   occasion to see Pauline, Maurice and their kids come

17   visit your sister's house?

18        A.    They came when she lost one of her kids.

19        Q.    Who lost a kid?

20        A.    My sister.

21        Q.    When you say lost, you mean one of your

22   sister's kids passed away?

23        A.    Yes, he got sick and died.

24        Q.    Is that why Pauline, Maurice and their family

25   came to visit?

111

1      A.    Yes, they came to the funeral.

2      Q.    Did you see Pauline and Maurice when they

3  arrived at the house?

4      A.    I saw them.

5      Q.    Did you greet them?

6      A.    No.

7      Q.    Why not?

8      A.    Because I thought they were coming to kill me.

9      Q.    Were you hiding at your sister's house?

10      A.    In the kitchen at my sister's house.

11      Q.    Is the kitchen a different structure from the

12  rest of the house?

13      A.    In front of the living room.

14      Q.    Is it a separate structure?

15      A.    It faces the house but it's a separate

16  structure.

17      Q.    Who came with Pauline and Maurice when they

18  came to mourn with your sister?

19      A.    They came with their daughter-in-law Beatrice

20  and Shalom and Clarisse, Denise and Brigite.

21      Q.    Do you know how these people were dressed?

22      A.    Pauline was wearing a military uniform.

23  Beatrice also was wearing a military uniform.  Maurice

24  was wearing an MRND shirt.  Shalom was also dressed in a

25  military uniform.  And the kids were wearing regular

1   clothes.

2       Q.    When you say the kids, are you talking about

3   Shalom's three sisters?  When you say the kids, are you

4   talking about Shalom's three sisters?

5       A.    Yes.

6       Q.    Could you see and hear -- could you see the

7   people you just described while they were visiting your

8   sister's house?

9       A.    I saw them.

10      Q.    Could you see them from where you were hiding

11  in the kitchen?

12      A.    I could see them.  There were little holes

13  that I could peek into.

14      Q.    Were you able to hear what they were saying?

15      A.    I heard it.

16      Q.    Did you hear Pauline say anything in

17  particular?  Strike that.  Did you see Pauline give

18  anything to anybody?

19      A.    I saw her.

20      Q.    What did you see her give somebody?

21      A.    She give money to a man called Simubara.

22      Q.    Did she give him any instructions?

23      A.    She said they should go buy liquor and drink,

24  and they should also bring some liquor to the people at

25  the barrier.

113

1      Q.    By barrier do you mean roadblock?

2      A.    Yes, the roadblock on the main street.

3      Q.    Now, on this occasion when you saw Maurice,

4   Pauline and their family mourning with your sister, was

5   that the first time you had ever seen Beatrice?

6      A.    Yes, it was the first time.

7      Q.    Had you ever see her before?

8            MR. HOWARD:  Objection, your Honor, she just

9   said it was first time.

10           THE COURT:  I will allow it.  Go ahead.

11     Q.    Had you ever seen her before?

12     A.    I had seen her.

13     Q.    Where had you seen her before?

14     A.    At the roadblock at the Ihuriro.

15     Q.    When you say the roadblock at Ihuriro,

16   describe for the jury what you mean?

17     A.    My brother-in-law told me that I should go

18   with him there because they can help.  And we went and

19   we met them at the roadblock, that is at the Ihuriro,

20   that's where we found them.

21     Q.    Is your brother-in-law, this is the man

22   married to the sister you were staying with?

23     A.    Yes, he's my brother-in-law, my sister's

24   husband.

25     Q.    Was he -- do you know if he was Tutsi or Hutu?

114

1       A.    He was a Hutu and he was also an Interahamwe,

2    he's responsible.

3       Q.    Was your sister Hutu or Tutsi?

4       A.    She's Tutsi.

5       Q.    Was it unusual for Tutsi women to be married

6    to Hutu men?

7       A.    It was common.

8       Q.    So when you got to the roadblock at the

9    Ihuriro, who was there?

10       A.    I saw there were the Interahamwe who had put

11   that roadblock.

12       Q.    Did you know the names of any of those

13   Interahamwe?

14       A.    I recognized some of them.

15       Q.    Can you tell us some of the people you

16   recognized?

17       A.    I recognized Nyiramasuhuko Pauline, Shalom.

18   Beatrice, and another that they called Kazungu, and

19   other military from the ESO camp and other people.

20       Q.    So the four people you mentioned, Pauline,

21   Shalom, Beatrice and Kazungu, were they all Interahamwe?

22       A.    They were Interahamwe.

23       Q.    Why did you go to the roadblock that day?

24       A.    Because my brother-in-law had advised that we

25   should go and seek help so that I can go and escape to

1    Burundi.  So he was seeking help into his family and

2    that's where we found them.

3         Q.   And were you able to get through that

4    roadblock and proceed to Burundi?

5         A.   No.

6         Q.   Why not?

7         A.   He told Nyiramasuhuko.  He asked her if she

8    can put me in a car and drive me past a place called

9    Kanyaru, but she replied that she will only bring me

10   there if it is to drown me there.

11        Q.   To drown you there?

12        A.   To drown me.

13        Q.   Is there a river at the border of Burundi?

14        A.   Yes.

15        Q.   Now, you say you saw Beatrice at the

16   roadblock.  What was she doing?

17        A.   She was dressed in military clothes.  So the

18   Interahamwe would stop people and she would look into

19   their identity cards.  The Hutus would be allowed to

20   keep going and the Tutsis would be stopped there and

21   they would be brought somewhere to be killed.

22             MR. CAPIN:  Your Honor, I have maybe ten more

23   minutes.  This may be a good time.

24             THE COURT:  There will be cross, so why don't

25   we take our lunch break now.  Ladies and gentlemen, we

116

1    will resume again say at 1:10 or 1:15.

2              (Luncheon recess.)

3

4

5                    C E R T I F I C A T E

6

7              I, Sandra L. Bailey, do hereby certify that

8    the foregoing transcript is a true and accurate

9    transcription of the within proceedings, to the best of

10   my knowledge, skill, ability and belief.

11

12

13   Submitted: 10/17/13

14                    **SANDRA L. BAILEY, LCR, CM, CRR**

15                    LICENSED COURT REPORTER, NO. 15

16                    STATE OF NEW HAMPSHIRE

17

18

19

20

21

22

23

24

25

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO
2/11/2014

1

```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE


        * * * * * * * * * * * * * * * * *
                                        *
        UNITED STATES OF AMERICA        *
                                        *  10-CR-85-SM
                    v.                  *  February 13, 2013
                                        *  1:20 p.m.
        BEATRICE MUNYENYEZI             *
                                        *
        * * * * * * * * * * * * * * * * *




                      Day 7 - Afternoon Session
                       TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE STEVEN J. MCAULIFFE
                           and a jury


        Appearances:

        For the Government:  Aloke S. Chakravarty, SAUSA
                             John A. Capin, SAUSA
                             U.S. Attorney's Office (NH and MA)

        For the Defendant:   Mark E. Howard, Esq.
                             David W. Ruoff, Esq.
                             Howard & Ruoff, PLLC
                             831 Union Street
                             Manchester, NH 03104

        Interpreters:        Sabrina Iyadede
                             Freddy Munana

        Court Reporter:      Diane M. Churas, CSR, CRR
                             Official Court Reporter
                             U.S. District Court
                             55 Pleasant Street
                             Concord, NH   03301
                             (603) 225-1442
```

1                            I N D E X

2

3
     WITNESS:              DIRECT    CROSS    REDIRECT   RECROSS
4

5    CONSOLEE MYKESHIMANA

6    By Mr. Capin          3                   34

7    By Mr. Howard                    7                    39

8
     CHRISTINA SALIDZIK
9
     By Mr. Chakravarty  40
10
     By Mr. Ruoff                  60
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    BEFORE THE JURY

2          (Direct examination continued of Consolee

3    Mukeshimana by Mr. Capin.)

4          THE COURT:  Whenever you are ready, Mr. Capin.

5          MR. CAPIN:  Thank you.

6     Q.   Ms. Mukeshimana, before the break I was asking

7    you questions about what the Interahamwe were doing at

8    the roadblock.

9     A.   Yes.

10    Q.   Please tell us what they were doing at the

11   roadblock.

12    A.   At that roadblock Beatrice would ask people

13   passing by for their IDs.  People of the ethnic of Hutus

14   would be allowed to continue, and people from the ethnic

15   of Tutsi would be gathered on one side, and they would

16   lead them towards -- behind the hotel going to kill

17   them.  But girls and women would first be brought to a

18   house that was next to the hotel in the basement and

19   from there you could hear them screaming.

20    Q.   You could hear screaming from where you were

21   at the roadblock?

22    A.   Yes, they were screaming.

23    Q.   Could you see Tutsi being led down the path

24   next to the hotel?

25    A.   Yes, I saw them.

4

1    Q.    Please describe what obstacles made up the

2    roadblock.

3    A.    There were logs.  There were buckets of --

4    empty buckets of Fanta soda or Primus.

5    Q.    What is Primus?

6    A.    So there are cases that are used to put

7    bottles in beer called Primus.

8    Q.    Was Beatrice herself checking IDs of

9    passersby?

10    A.    Yes, she would check the IDs of the people

11    passing, and those who were Tutsis she would leave them

12    to the group of Interahamwe would then take them and

13    bring them to be killed.

14    Q.    How long did you spend at that roadblock?

15    A.    I stayed there about two hours.

16    Q.    Was anybody at that roadblock injured in your

17    presence at the roadblock?

18    A.    There are three mens who were killed there.

19    Q.    Did you see them killed with your own eyes?

20    A.    I saw them.

21    Q.    Can you please describe what you saw.

22    A.    They were -- first those mens were arrested

23    and then they wanted to fight with them.

24    Q.    You're saying the men fought back?

25    A.    Yes, those three mens attempted to fight back

1    refusing to go down that path.

2         Q.   And what happened to those three men?

3         A.   They were caught and they were hit with clubs

4    in the head.  They died instantly.

5         Q.   How far from you did these three men die?

6         A.   It was right at the roadblock.  It was right

7    next to it and they died being dragged towards the place

8    on the path, on that small path.

9         Q.   Where was Beatrice when these three men were

10   being killed?

11        A.   Well, she was there, too, because in order for

12   them to be killed, she had to first ask for the ID and

13   then show the Interahamwe -- led them to the Interahamwe

14   so they could get killed.

15        Q.   After you left that roadblock that day, where

16   did you go?

17        A.   So my brother-in-law came and took me and he

18   told the Interahamwe that, you know, he was going to

19   kill me himself, because he also had a club, and then he

20   just led me towards that small path and then we ended up

21   going back to his place.

22        Q.   So you went down the path behind the EER?

23        A.   Yes.  We went, we took that small path and

24   walked behind EER, and there was also a mass grave where

25   they were throwing people.

6

```
1         Q.   Could you see that grave with your own eyes?

2         A.   Yes.

3         Q.   Was that grave in a wooded area?

4         A.   It was around the wooded area, yes.

5         Q.   After that day did you ever see the I'Huriro

6    roadblock again?

7         A.   No, I went back to Nyanza.

8         Q.   Is that where your sister lived?

9         A.   Yes.

10        Q.   So did you go back to your sister's house?

11        A.   Yes.

12        Q.   Did you meet with American investigators last

13   year?

14        A.   We met.

15        Q.   Where did you meet?

16        A.   At Faucon.

17        Q.   Is that the hotel in Butare?

18        A.   Yes.

19        Q.   Is that close to where you work at the

20   University Hospital?

21        A.   It's near.

22        Q.   Was there any official of the Rwandan

23   government at that meeting?

24        A.   No.

25        Q.   Did you ever speak to any official of the
```

7

```
 1    Rwandan government about what you told the Americans?

 2        A.   No.

 3        Q.   How did you learn that Americans wanted to

 4    talk to you?

 5        A.   A man called me to let me know that there were

 6    people at Faucon who needed me, who were looking for me.

 7        Q.   Do you know that man's name?

 8        A.   I don't remember.

 9        Q.   Before you met with the Americans what did you

10    think they wanted to talk to you about?

11        A.   Well, when he called me I assumed that it was

12    regarding my activities in women's group.

13        Q.   What was women's group?

14        A.   Oh, so we get together as a solidarity group

15    and, for example, we gather money and give it to one of

16    us so she can do something for herself.

17        Q.   So some type of charitable organization?

18        A.   Yes.

19             MR. CAPIN:  Nothing further, your Honor.

20             THE COURT:  Mr. Howard?

21             MR. HOWARD:  Thank you.

22                       CROSS-EXAMINATION

23    BY MR. HOWARD:

24        Q.   Good afternoon.

25        A.   Good afternoon.
```

8

```
 1        Q.    The dress you're wearing, are those

 2   traditional African colors?

 3        A.    No.

 4        Q.    No?

 5        A.    No.

 6        Q.    Ma'am, I want to talk about your family

 7   relationship to Maurice and Pauline.

 8        A.    Well, my sister has some ties with them.

 9        Q.    Your sister's husband's name is Enoch; right?

10        A.    Yes.

11        Q.    Enoch is Maurice Ntahobali's nephew.

12        A.    He's related to Ntahobali.

13        Q.    And you have been to Ntahobali's house for

14   family events, haven't you?

15        A.    Yes.

16        Q.    So you know the family very well; correct?

17        A.    Yes.

18        Q.    You know Shalom and his sisters?

19        A.    Yes.

20        Q.    And you've been to family events at the hotel;

21   correct?

22        A.    I went.

23        Q.    And how many family events have you been to at

24   the hotel?

25        A.    About twice.
```

9

 1      Q.   And what were those events?

 2      A.   Well, I would, for example, go along with my

 3 sister when she was going there with the kids, to show

 4 the kids.

 5      Q.   And can you tell us when you went to the first

 6 event at the hotel?

 7      A.   We went before the war.

 8      Q.   Before the war?

 9      A.   Yes.

10      Q.   What year did you first go to the hotel?

11      A.   It's around '93.

12      Q.   And was it before or after Shalom was married?

13      A.   Well, the first time was before Shalom got

14 married, but around that time we went back a second

15 time.  So I went twice.

16      Q.   And was Beatrice there either of the times

17 that you went to the hotel?

18      A.   No.  The first time I saw Beatrice was at the

19 roadblock.  That day when I went to visit she was not

20 there.

21      Q.   The first time you've ever seen Beatrice is at

22 the roadblock; right?

23      A.   At the roadblock.

24      Q.   Do you know when Shalom was married?

25      A.   Before the war.

10

1      Q.   Do you know what month and year he was

2   married?

3      A.   I would believe that it was in '93, but I

4   don't remember the month.

5      Q.   And I'm sorry, did you tell us when was the

6   second time you went to the hotel for a family event?

7      A.   The second time was around the same period.

8   My sister had a child who was sick at the hospital, so

9   we went to the hotel on our way.

10      Q.   Thank you.  You understood that Pauline was a

11   cabinet minister in the government?

12      A.   Yes.

13      Q.   And Maurice was the head of the university?

14      A.   Yes.

15      Q.   They were very prominent people in Butare;

16   correct?

17      A.   Yes.

18      Q.   Ma'am, just before the genocide began, you

19   were living in Sovu; correct?

20      A.   That is where I lived.

21      Q.   And Sovu is not in Butare Town, is it?

22      A.   It's next to Butare.

23      Q.   This is a map of the prefecture of Butare, the

24   whole map is the prefecture, okay?

25      A.   Yes.

 1          Q.   And Butare Town is here?

 2          A.   No.

 3          Q.   No?

 4          A.   Yes.

 5          Q.   Yes.  Butare Town is here where the star is;

 6     correct?

 7          A.   Here.

 8               MR. CAPIN:  Your Honor, I would object.  It's

 9     not clear foundationally whether she's reading the word

10     or if she knows -- can read the map.

11               THE COURT:  Well, the map's not the greatest.

12     She's marked where it says Butare.

13               MR. HOWARD:  Sure, that's fine.

14          Q.   And ma'am, Sovu is right here.  Correct?

15          A.   Here.

16          Q.   And Nyanza where your sister lives is right

17     here; correct?

18               (Witness indicating.)

19          Q.   Thank you.  Now, if I look at the next exhibit

20     which is Defendant's Exhibit A.

21               MR. CAPIN:  For ID, Mr. Howard.

22               MR. HOWARD:  Oh, I thought it was already in.

23     I apologize.

24               MR. CAPIN:  I do object unless this witness

25     can read a map.  Objection, your Honor.

```
 1              MR. HOWARD:  All right.  That's fine.  I won't
 2   even try.
 3      Q.   How far of a walk is it from Sovu to the
 4   hotel?  How long does it take?
 5      A.   Thirty.
 6      Q.   Thirty, is that 30 minutes?
 7      A.   Yes.
 8      Q.   Now, let's talk for a moment about your
 9   brother-in-law Enoch.  He was a Hutu?
10      A.   Can you explain?
11      Q.   Enoch, he was Hutu; correct?
12      A.   Yes.
13      Q.   And he was Interahamwe; correct?
14      A.   Yes.
15      Q.   And you know that he killed Tutsis; correct?
16      A.   Yes.
17      Q.   Now, ma'am, have you ever told this story
18   about Pauline and Beatrice at the roadblock to anyone?
19      A.   No one else.
20      Q.   No one's ever heard this story before, have
21   they?
22              MR. CAPIN:  Objection.
23              THE COURT:  Overruled.
24      Q.   Ma'am, this happened 18 years ago and you've
25   never told this story before, have you?
```

1        A.    Well, besides the investigators from America

2    who asked me about my story.

3        Q.    When the investigators came to Butare in 2012,

4    that was the first time you've ever told this story

5    about Pauline and Beatrice, isn't it?

6        A.    Yes.

7        Q.    You said a man called you to tell you that

8    there were people who wanted to talk to you at the Hotel

9    Faucon?

10        A.    He told me that there were people looking for

11    me.  I didn't know what they were looking for.

12        Q.    Who was this man?

13        A.    I don't know his name.

14        Q.    Where were you when he called you?

15        A.    I was home.

16        Q.    Where were you living at the time?

17        A.    In Tumba.

18        Q.    How did you get from Tumba up to the Hotel

19    Faucon?

20        A.    I took a cab.  It's very near.  It's not far.

21        Q.    Did you ask this man his name?

22        A.    Well, I'm not sure.  I don't remember his

23    name.  He told me people were looking for me.

24        Q.    Did he tell you who the people were who were

25    looking for you?

1      A.   Well, he didn't tell me who he was.  He told

2   me that there were people looking for me and I went

3   there unafraid and comfortable because we have peace.

4      Q.   Did he tell you what these people wanted to

5   talk about?

6      A.   No.

7      Q.   Of all the tens of thousands of people who

8   live in and around Butare and Tumba, do you know how it

9   was you got a phone call?

10          MR. CAPIN:  Objection to tens of thousands of

11   people.

12          MR. HOWARD:  There's already been testimony

13   that 30,000 people live in Butare.

14          MR. CAPIN:  In the prefecture, your Honor.

15          MR. HOWARD:  No, the expert said in Butare

16   Town.

17          MR. CAPIN:  Fair enough.  Withdrawn, your

18   Honor.

19          THE COURT:  Overruled.

20          THE INTERPRETER:  Could you please repeat the

21   question.

22      Q.   Of all of the tens of thousands of people who

23   lived in and around Butare Town, do you know how this

24   man knew to call you?

25      A.   I don't know how he got my name.

```
 1        Q.    You work at the University Hospital; right?

 2        A.    Yes.

 3        Q.    And you work there with other nurses; right?

 4        A.    Yes.

 5        Q.    And didn't they tell you that the Americans

 6   want to talk to you?

 7        A.    Well, they didn't know because if they had

 8   known, they would have told me.

 9        Q.    So no nurses at the hospital told you that the

10   Americans are coming to talk to you, did they?

11        A.    No.

12        Q.    Did you ask this man how he got your name?

13        A.    I didn't ask him.

14        Q.    Did you ask the Americans where they got your

15   name?

16        A.    No, I didn't ask them.

17        Q.    And you sat down with the Americans and they

18   told you they wanted to talk to you about the genocide?

19        A.    Yes.

20        Q.    And one of the first things you told them was

21   about Pauline and Maurice; right?

22        A.    No.

23        Q.    Okay.  Did they mention the name Beatrice to

24   you when they were talking to you?

25        A.    No.
```

```
 1       Q.   Ma'am, you have told a story about the
 2   genocide before, haven't you?
 3       A.   Yes.
 4       Q.   You were interviewed for a book back in 1995,
 5   weren't you?
 6       A.   I think that maybe I was interviewed.
 7       Q.   In fact you told a very long story about your
 8   experience in Sovu; correct?
 9       A.   Yes.
10       Q.   And you told these people who interviewed you
11   about this book, about the nuns at the health center
12   where you worked; right?
13       A.   Yes.
14       Q.   And you told them about the people who were
15   killed at the health center; right?
16       A.   Yes.
17       Q.   And you told them about hiding out with your
18   sister; correct?
19       A.   Well, yes, I did tell him a lot, a long story,
20   but it's never ending because there's a lot to talk
21   about.
22       Q.   You also told the people who wrote your story
23   in the book that your brother Enoch wanted to kill you;
24   right?  Brother-in-law, I'm sorry, brother-in-law.
25       A.   Well, if they wrote a book or not I don't
```

1  know, but the fact that he tried to kill me, yes, he

2  did.

3      Q.   While you were at your sister and

4  brother-in-law's house he came home one night and he

5  screamed there are inyenzi in this house.  Didn't he?

6      A.   Yes.

7      Q.   And this was in late April of 1994, wasn't it?

8      A.   No.

9      Q.   Was it in early May of 1994?

10     A.   It was towards the end of June.

11     Q.   Toward the end of June?

12     A.   Yes.

13     Q.   All right.  You went to the Sovu Health Center

14  on April 22nd; right?

15          THE INTERPRETER:  Can you repeat the date?

16     Q.   You went to the Sovu Health Center on

17  April 22nd.

18     A.   Yes.

19     Q.   And by April 25th you were hiding out with

20  your sister; correct?

21     A.   No.

22     Q.   That is not correct?

23     A.   No.

24     Q.   And the night that Enoch came home and he

25  screamed inyenzi in the house, your husband fled, didn't

```
 1   he?

 2        A.    No.

 3        Q.    No, that did not happen either.

 4        A.    It's not true.

 5        Q.    And the next day Enoch came home and he was

 6   wearing your husband's clothes and he had a club in his

 7   hand; right?

 8        A.    Well, if you want me to explain, I can tell

 9   you when that happened.

10        Q.    And after you saw Enoch wearing your husband's

11   clothes and carrying that club, your sister decided to

12   hide you in different places in her neighborhood from

13   her husband; right?

14        A.    Do you want me to explain?

15        Q.    Sure, why don't you explain.

16        A.    I was at my sister's house and then somebody

17   came and said today this house is going to be searched.

18   And then he said bring her and I will go hide her if

19   she's here.  Give her to me, I will go hide her.  And

20   then we went, I spent a night, and I had left my husband

21   -- the husband at my sister's.  And then at that home,

22   that home was attacked in the morning.  I was in a

23   house, inside the gates of that house, and in the house

24   where I was there was also pigs, and then when they hit

25   on the door, the pigs started screaming.  They went
```

1  away.

2          And then I left that place at night and I went

3  back to my sister's place, and when I got at my sister's

4  place my husband wasn't there.  So I asked my sister

5  what happened.  She said that people came and then he

6  ran away and he hasn't come back.  And then shortly

7  after the husband came back and he was wearing a jacket

8  and shoes, and he also had a club filled with blood,

9  dirty with blood.  Up to this day I have asked my sister

10  what happened and up to this day she still hasn't told

11  me what happened.

12      Q.   And the jacket and shoes that Enoch was

13  wearing belonged to your husband; right?

14      A.   Yes.

15      Q.   Now, this man Enoch is the same one who you

16  said took you down to Butare Town and was going to try

17  to get you to Burundi?

18      A.   Yes.

19      Q.   Ma'am, what you told the people who were

20  writing this book was that your sister hid you from

21  Enoch so that he wouldn't kill you; correct?

22      A.   Hiding me where?

23      Q.   In houses all in her neighborhood so that

24  Enoch would not find you.

25      A.   No.  They wrote what they wanted.

1          Q.    Oh, they wrote what they wanted?

2          A.    Yes.

3          Q.    Ma'am, can you read Kinyarwandan?

4          A.    Yes.

5          Q.    Did you read the book?

6          A.    No.

7          Q.    Did you read what you said in the book?

8          A.    I didn't have access to it.

9          Q.    So if the book quoted you as saying --

10              MR. CAPIN:  Objection, your Honor.  If the

11    book quoted you as saying?

12              THE COURT:  Sustained.  You can refresh her

13    recollection if you like.

14              MR. CAPIN:  I don't think she says she

15    forgets, your Honor.  She has not seen the book.

16              THE COURT:  That's true.

17              MR. CAPIN:  She hasn't denied the statement.

18         Q.    Ma'am, do you deny or agree with the following

19    statement:  My older sister agreed to hide me in

20    different places with her neighbors without her

21    husband's knowledge.

22         A.    No.

23         Q.    And do you agree with this statement:  That

24    she hid you until the RPF arrived.

25         A.    I deny.

1       Q.   Ma'am, you also interviewed with the

2   prosecutor from Butare in 1998, didn't you?

3       A.   I'm not sure.  What's his name?

4       Q.   You met with a prosecutor on June 11th of 1998

5   in the office of public ministry, a person by the name

6   of Corenzi.

7       A.   I'm sorry, could you repeat the name.

8       Q.   Corenzi?

9       A.   I don't know that.

10       Q.   Do you remember meeting with officials from

11   the prosecutor's office in Butare in June of 1998?

12       A.   I don't remember.

13       Q.   And do you remember meeting with officials

14   from the prosecutor's office in Butare in May of 1998?

15       A.   I don't know what you're asking me.

16       Q.   You have no recollection of being interviewed

17   by investigators in Rwanda in 1998 about your experience

18   in the genocide?

19       A.   I don't know the year.

20       Q.   Do you at least remember meeting with Rwandan

21   investigators about the genocide years ago?

22       A.   Only in Gacaca.

23       Q.   Do you remember what year that was?

24       A.   I think it's been about two years, two years

25   ago.

22

```
 1       Q.   Just two years ago?

 2       A.   Yes, I think it's two.

 3       Q.   Ma'am, I'm just going to show you, it's a

 4  document in Kinyarwandan, and ask you if it refreshes

 5  your memory about meeting with investigators in 1998.

 6            MR. HOWARD:  Madam interpreter, can you ask

 7  her if reading the first page refreshes her memory about

 8  meeting with these folks.

 9       A.   It's difficult to recall dates sometimes.

10       Q.   I don't want you to think about the date.  Do

11  you remember meeting with prosecutors about 15 years ago

12  in Butare?

13       A.   Well, it wouldn't be impossible that I would

14  have met because right after the genocide they will ask

15  people a lot of questions regarding what happened during

16  the genocide, but it's very difficult to say what date

17  and what year.

18       Q.   Will you agree with me that when you met with

19  prosecutors in 1998, you said nothing about Pauline or

20  Maurice or the roadblock at the hotel.

21       A.   Well, they did not ask me a question first,

22  and second, you speak about what you were asked about,

23  and the Interahamwe who were in Rwanda are very many.

24  So talking about them all is -- would take a long time.

25       Q.   Even if one of them is Shalom Ntahobali, you
```

1    don't talk about him unless somebody asks you about him;

2    is that correct?

3         A.   Yes.  For example, here, I spoke about just a

4    few of them.

5         Q.   Okay.  Now, ma'am, I want to turn to -- I want

6    to talk about your testimony that you walked to this

7    roadblock in front of the hotel, okay?

8         A.   Okay.

9         Q.   Can you tell me what day it was that you left

10   your sister's house with Enoch?

11        A.   In that period nobody cared about days and

12   months.

13        Q.   Do you know how many days or weeks it was

14   after the thing happened at the health center?

15             THE INTERPRETER:  Can you clarify "the thing."

16             MR. HOWARD:  How many days or weeks it was she

17   went to the roadblock after the events at the health

18   center in Sovu.

19        A.   First, I went to Gihindamuyaga in Mbazi.  And

20   then I went back.  That's when I went to Nyanza and it

21   had been about a week.

22        Q.   So when you left Nyanza with Enoch to walk to

23   Burundi, how long had you been at your sister's house at

24   that point?

25        A.   Well, I told you that the way we were living

1    at that time, it was difficult to care about days, how

2    many days.

3         Q.   Did you tell the American investigators that

4    you had been at your sister's house about three weeks?

5         A.   No.

6         Q.   And you said that Enoch was going to take you

7    to the hotel to try to get Pauline's help; is that

8    correct?

9         A.   This is true.

10        Q.   So your objective, your purpose, in leaving

11   your sister's house was to go to Pauline and get her

12   help.

13        A.   Yes.

14        Q.   Did you tell the American investigators that

15   the purpose in going on your walk with Enoch was to get

16   Pauline's help?

17        A.   My brother-in-law was driving me there to ask

18   her if she can help.

19        Q.   You drove?

20        A.   No.

21        Q.   Enoch drove?

22        A.   No.

23        Q.   Okay.  You said your brother-in-law was

24   driving you there.  Was that in a car?

25        A.   I didn't say that.

1       Q.   Were you walking?

2       A.   Yes.

3       Q.   So when you left Nyanza you were walking

4    toward Butare Town; correct?

5       A.   Yes.

6       Q.   How many roadblocks did you have to walk

7    through before you got to the hotel?

8       A.   I passed by three roadblocks.

9       Q.   Please tell us where they were.

10       A.   In Mugahenerezo in Nyanza.

11       Q.   That was one roadblock?

12       A.   In front of Faucon.

13       Q.   In front of the Hotel Faucon.  That was two.

14       A.   The third one on a small path leading to the

15    Groupe.

16       Q.   Leading to the group?

17       A.   Groupe Scolaire.

18       Q.   The Groupe Scolaire?  So you went through

19    three roadblocks before you got to the hotel?

20       A.   Yes.

21       Q.   The people in Nyanza, they know that you're

22    Tutsi, don't they?

23       A.   I don't know if they knew.  I don't know.

24       Q.   You went through that first roadblock okay.

25       A.   The first roadblock, we went around it.

1      Q.   And you got to Faucon and you got through that

2    roadblock okay?

3      A.   We stopped -- we were stopped there.

4      Q.   You got through it.  You weren't hurt.

5      A.   No.

6      Q.   And you got through the roadblock near the

7    Groupe Scolaire.  You were not hurt.

8      A.   We were stopped and my brother-in-law said

9    this is my wife, I'm bringing her to the hospital.

10     Q.   And then when you got to the hotel, as you

11    were walking up to that roadblock, when did you first

12    see Pauline?

13     A.   Well, we got at the roadblock and they were

14    standing there.

15     Q.   When you say they were standing there, Pauline

16    was standing there?

17     A.   There were a lot of Interahamwes and they were

18    also there.

19     Q.   Pauline was there standing outside; correct?

20     A.   Shalom and Beatrice.

21     Q.   Shalom was standing outside and Beatrice was

22    standing outside.

23     A.   And some military men from the ESO and other

24    people who were Interahamwes.

25     Q.   And when you got there, Mr. Capin asked you

1    questions about describing the roadblock.

2          A.    At that roadblock there were Interahamwe.

3    They had various weapons.  Pauline was dressed in a

4    military outfit.  Beatrice was dressed in a military

5    outfit.  She was also checking ID cards.  People from

6    the ethnic group Tutsi would be brought to be killed,

7    and the Hutus would be free to keep going.

8          Q.    Now, what you saw in the road were some logs?

9          A.    Logs and empty cases that used to have bottles

10   of beer or Fanta in them.

11         Q.    Like maybe buckets or barrels?

12         A.    Well, I saw empty cases of beer and logs,

13   trees that have been brought together so that nobody

14   could go over.

15         Q.    I'm sorry, did you just say chains had been

16   brought together?  I missed what you said.

17               THE INTERPRETER:  No, I said logs and cases.

18               MR. HOWARD:  I obviously misheard a word and I

19   apologize.

20         Q.    Did the Interahamwe put anything else in the

21   road to block traffic and to block people?

22         A.    Well, it was just those logs and those empty

23   cases, and on top of that they were also standing there

24   heavily armed and dressed in military outfits.

25         Q.    Didn't you tell the American agents last

1    summer that the Interahamwe had also arranged bodies --

2    dead bodies in the road?

3         A.    In front of Faucon.

4         Q.    You didn't say that that happened at the

5    I'Huriro?

6         A.    No.  At I'Huriro people were killed there.

7         Q.    So in front of the Hotel Faucon what you told

8    the American agents was you walked through a roadblock

9    where the Interahamwe had arranged dead bodies in the

10   road to stop people from going through.

11        A.    It's one man.  He was also a university

12   teacher and his name is Krenzi and I knew him.

13        Q.    Okay.  So at the roadblock at the hotel, you

14   said that women and children were being taken to a house

15   near the hotel?

16        A.    Yes, somewhere in a basement.

17        Q.    Okay.  I'm going to put back on the screen the

18   picture of the hotel and I will try to zoom.  Where is

19   the house where people were taking -- or somebody was

20   taking women and children?  Can you point on the screen?

21        A.    Honestly it's not that clear on the screen,

22   but it's right behind.  Behind the hotel there is a

23   small path that leads towards a small forest behind it.

24        Q.    And that's where women and children were being

25   taken by somebody and brought into a basement somewhere?

1        A.    Yes.

2        Q.    And you don't know who was taking those women

3    and children?

4        A.    Well, it was the people who were at the

5    barrier, they would just lead the way, and Shalom was

6    also among them.

7        Q.    When you were walking back with -- well, first

8    of all, you were not hurt at the roadblock; is that

9    right?

10        A.    No.

11        Q.    Pauline said she would take you to the Burundi

12    border, but she would take you there to drown you in the

13    river.  Correct?

14        A.    Yes.

15        Q.    And did you tell the American agents that

16    Pauline said she would drown you in the river?

17        A.    I said it.

18        Q.    You said that to the American agents last June

19    in Butare?

20        A.    Yes.

21        Q.    You've already told us the story about three

22    men who were killed.  How many other dead bodies did you

23    see at the roadblock?

24        A.    Yes, three men were hit at that barrier and

25    they were dragged down the road.

30

1          Q.     How many other dead bodies did you see there

2     at the roadblock?

3          A.     Those are the three men that I saw being

4     killed there, but every other people were led towards

5     the small grove behind.

6                 MR. CAPIN:  I'm sorry, my apologies, I didn't

7     hear that.  The small what behind?

8                 THE INTERPRETER:  Grove.

9                 THE COURT:  Grove.

10         Q.     And that small grove is -- those buildings --

11    remember you were shown a picture, the buildings of the

12    EER?  The grove is behind those buildings?

13         A.     It's below the EER schools.

14         Q.     So when you and Enoch left the roadblock, you

15    went down to that grove?

16         A.     Yes.  I told you that we took that small path

17    that's next to I'Huriro going down leading to the small

18    grove, and then we turned and went towards home.

19         Q.     Now, that's the same path where those women

20    and children were being taken by the Interahamwe;

21    correct?

22         A.     The women and the young girls would be taken

23    down past a turn towards the basement, but yes, the men

24    would lead them towards the grove.

25         Q.     Down that same path that you and your

1    brother-in-law walked down to leave to go home; right?

2         A.   Yes.

3         Q.   And it's the same path that you say those

4    three men were killed and dragged down; correct?

5         A.   Yes.  There was even a hole, a mass grave.

6         Q.   And we'll talk about that in a second then.

7    And there were other Tutsis brought down that path to be

8    killed, weren't there?

9         A.   Yes.

10        Q.   And that's the path that you and your

11   brother-in-law Enoch chose to walk home on; right?

12        A.   Well, he led me -- he grabbed me and he led me

13   down that path after telling the others that he was

14   going to kill me himself, and he also had a club, and

15   then when we got further, we just turned and went.

16        Q.   So you didn't just go home.  What you're

17   saying now is Enoch told everybody he would kill you and

18   he was going to take you down the path; right?

19        A.   Yes.

20        Q.   And then when you were walking along this

21   path, a moment ago you said there was a mass grave.

22        A.   Yes.

23        Q.   And isn't it true that you saw Interahamwe

24   along that path?

25        A.   They had walked back up.

32

1      Q.   Did you hear those Interahamwe say anything?

2      A.   Well, they were -- they were busy at stopping

3 people so they could see how they could kill them.

4      Q.   Did you tell the American agents that when you

5 were walking past the EER, that the piles of bodies were

6 so big the Interahamwe were saying we need to get a

7 Caterpillar to bulldoze them away?

8      A.   It was in that mass grave.

9      Q.   And that's what -- you heard the Interahamwe

10 say that; right?  We have to get a Caterpillar.

11      A.   I didn't hear about a bulldozer.

12      Q.   You didn't hear that?

13      A.   No.

14      Q.   So you did not say that to the American

15 agents, did you?

16      A.   The ones I told that story are the ones from

17 home, from my country, the ones that you asked me about

18 earlier.

19      Q.   So you did not tell the American agents about

20 the Caterpillar; correct?

21      A.   No.

22      Q.   Finally, you told us about how when you were

23 at your sister's house in June, she lost a child.

24      A.   Yes.

25      Q.   And Pauline and Maurice came to mourn the

```
 1   death of the child?

 2        A.   Yes.

 3        Q.   Shalom was there?

 4        A.   Yes, he was there.

 5        Q.   You say Beatrice was there?

 6        A.   She came, too.

 7        Q.   And Shalom's three sisters were there; right?

 8        A.   They came.

 9        Q.   Denise?

10        A.   Denise, Clarisse, Bridgette.

11        Q.   Do me a favor.  How old is Bridgette?

12        A.   I don't know.

13        Q.   What does Bridgette look like?

14             THE INTERPRETER:  I'm sorry?

15        Q.   What does Bridgette look like?

16        A.   She's light-skinned.

17        Q.   Is she tall?

18        A.   Yes.

19        Q.   Is she taller than you?

20        A.   Well, it's very difficult for me to reply like

21   this because it's been 19 years since I've seen her.

22        Q.   Do you remember what Bridgette was wearing

23   that day?

24             MR. CAPIN:  Objection to that day, your Honor,

25   just clarification.
```

34

```
 1       Q.   The day they came to mourn.

 2       A.   They were wearing regular clothes.

 3       Q.   Was it a dress?

 4       A.   It was a dress.

 5       Q.   Was it kind of like your dress, sort of an

 6  African dress?

 7       A.   No.

 8       Q.   Did you hear Bridgette talk to anybody?

 9       A.   No.

10       Q.   Did you see Bridgette and her sisters Denise

11  and Clarisse sort of hanging out together at your

12  sister's house?

13            THE INTERPRETER:  Can you repeat the names?

14       Q.   Did you see Bridgette hanging out at the house

15  standing around with Denise and Clarisse?

16       A.   I saw them.

17       Q.   And, ma'am, were you aware that prior to the

18  genocide Bridgette went to Germany to study and she

19  never returned to Rwanda?

20       A.   I don't know.

21            MR. HOWARD:  Thank you.

22            THE COURT:  Redirect?

23            MR. CAPIN:  Yes, your Honor.

24                      REDIRECT EXAMINATION

25  BY MR. CAPIN:
```

1      Q.   Ms. Mukeshimana, Mr. Howard asked you went

2   after -- the words he used were after "that thing" at

3   Sovu.

4      A.   Yes.

5      Q.   I want the jury to understand what that thing

6   in Sovu was.  Was that thing at Sovu a massacre?

7      A.   Yes, it was a terrible massacre.

8      Q.   And when you were asked questions for a book,

9   were they mostly about the massacre at Sovu?

10      A.   I was asked what happened in Sovu.

11      Q.   Were you mostly asked about the role of nuns

12   at that time in Sovu?

13      A.   Yes.

14      Q.   Mr. Howard also asked you about the time when

15   Enoch, your brother-in-law, came back wearing your

16   husband's jacket.

17      A.   Yes.

18      Q.   And Mr. Howard described Enoch as carrying a

19   bloody stick.

20      A.   Yes.

21      Q.   Is it your understanding that Enoch killed

22   your husband?

23      A.   Well, because he came back wearing his shoes

24   and his jacket, I assumed that either Enoch killed him

25   or he killed him with other people because up to this

1    day he went away and I have no idea what happened.

2         Q.   Is your understanding that Beatrice had

3    anything to do with your husband's death?

4              THE INTERPRETER:  Can you clarify?

5         Q.   Was it your understanding that Beatrice had

6    anything to do with your husband's death?

7         A.   In the death of my husband?

8         Q.   Yes.

9         A.   She doesn't have a role.

10        Q.   So your husband's death has nothing to do with

11   Beatrice?

12        A.   It has nothing to do with Beatrice.  Beatrice

13   has her own story from the Hotel I'Huriro.  My husband

14   was in Nyanza.

15        Q.   Now, when you were asked questions about

16   events in the genocide back ten or more years ago, were

17   those questions also about Sovu?

18        A.   I was asked about Sovu.

19        Q.   Mr. Howard asked you about having to go

20   through three other roadblocks before you got to the

21   I'Huriro roadblock on the day you described.

22        A.   Yes.

23        Q.   Were you able to get through those roadblocks

24   because your brother-in-law Enoch was Interahamwe?

25        A.   Yes, he was Interahamwe, yes.

1     Q.   If he was Interahamwe, why were you not able

2 to get through the I'Huriro roadblock?

3     A.   Well, he didn't have enough power because it's

4 also far to go to reach Kanyaru.

5     Q.   Did he have the authority to tell Pauline to

6 get out of the way?

7     A.   He was looking for a car.

8     Q.   Now, you described Enoch -- I think Mr. Howard

9 asked you if you chose to go back to your sister's house

10 by walking down that path behind the hotel.  Do you

11 remember those questions?

12     A.   Yes.

13     Q.   Was it your choice to go down that path?

14     A.   No, it's my brother-in-law who took me by the

15 arm like this and he led me down.

16     Q.   And am I correct that the path by the hotel

17 goes down a hill toward the area behind the hotel?

18     A.   Yes.

19     Q.   And then if you go left you go behind the EER?

20     A.   Yes.

21     Q.   Where was the wooded area where you saw people

22 being killed relative to the EER?

23     A.   It's very near, right below the school next to

24 the Hotel I'Huriro.

25     Q.   So immediately behind the school and next to

38

 1    the hotel there's a grove.  Is that what you're saying?

 2         A.    Below the school.

 3         Q.    And is there a path that leads along from

 4    behind the I'Huriro and behind the EER and continues

 5    toward -- generally in the direction of the prefecture?

 6         A.    Yes, there is a clear path there.

 7         Q.    And is that the path that you took, the one

 8    that went behind the EER?

 9         A.    Yes.  We went down the small path next to the

10    Hotel I'Huriro and then that path kind of turns going

11    behind the EER.

12         Q.    And it was when you were walking along that

13    path behind the EER that you saw what you called a mass

14    grave?

15         A.    Yes.

16         Q.    Tell this jury what you mean by mass grave.

17         A.    It's a hole that was dug and they would just

18    kill people there and then throw them in the hole.

19         Q.    Do you remember who you were talking to when

20    you used the word Caterpillar?

21         A.    Well, I believe it's people who were asking me

22    about things related to Sovu because that is where they

23    had to bring the Caterpillar -- a bulldozer to cover

24    people with dirt.

25         Q.    Do you remember if you used the word

39

1   "Caterpillar" when you spoke to Americans in Butare last

2   year?

3            MR. HOWARD:  Your Honor, I object.  She

4   testified that she didn't.

5            THE COURT:  Well, I will allow redirect.

6            MR. CAPIN:  This is the last question, your

7   Honor.

8       Q.   The question is do you remember one way or the

9   other whether you used the word "Caterpillar" when you

10  spoke to the Americans.

11      A.   No.

12           MR. CAPIN:  I have nothing further, your

13  Honor.

14           THE COURT:  All right.  Any recross?

15           MR. HOWARD:  If I can just ask one question,

16  Judge.

17                    RECROSS-EXAMINATION

18  BY MR. HOWARD:

19      Q.   The path that goes by the hotel, that's still

20  there; right?

21      A.   Yes.

22      Q.   And the footpath behind the EER, that's still

23  there.

24      A.   Yes.

25      Q.   And the wooded grove that you say you walked

1   by, that's still there.

2        A.   Yes.

3        Q.   The EER buildings are still there.

4        A.   Yes.

5        Q.   And they have been there for the last

6   18 years.

7        A.   Yes.

8        Q.   And you work just across the road at the

9   hospital; correct?

10       A.   Yes.

11            THE COURT:  One question.

12            MR. HOWARD:  Thank you.

13            THE COURT:  Thank you, ma'am.  You may step

14   down and you're excused.  And you may call your next

15   witness.

16            MR. CHAKRAVARTY:  Government calls Christy

17   Salidzik.

18                 CHRISTINA SALIDZIK

19       having been duly sworn, testified as follows:

20            THE CLERK:  For the record, please state your

21   name and spell your last name.

22            THE WITNESS:  Christina Salidzik,

23   S-A-L-I-D-Z-I-K.

24                 DIRECT EXAMINATION

25   BY MR. CHAKRAVARTY:

41

1      Q.   And where do you work?

2      A.   I work for United States Citizenship and

3  Immigration Services.

4      Q.   And the jury has heard from a couple of your

5  colleagues, so I'm not going to belabor what they've

6  told us, but can you explain what USCIS used to be

7  before 2003.

8      A.   Prior to 2003 USCIS used to be part of the

9  Immigration and Naturalization Services.  When the

10  Department of Homeland Security was formulated in 2003,

11  the various functions of Immigration and Naturalization

12  Services was divided up into agencies, multiple

13  agencies.  With the main processing -- with the main

14  functions for adjudicating applications, those would be

15  assigned to the United States Citizenship and

16  Immigration Services.  The admissions and the

17  inspections portion would go to Customs and Border

18  Protection, and the enforcement division would go to

19  Immigration and Customs Enforcement.

20      Q.   So USCIS -- and I will call it the Immigration

21  Service to avoid discrepancy between the INS and USCIS.

22  So the Immigration Service now, is that purely a

23  benefits agency?

24      A.   Yes, it is.

25      Q.   So it doesn't conduct investigations?

1        A.    No, it does not.

2        Q.    How long have you been with the Immigration

3    Service?

4        A.    About seven and a half years now.

5        Q.    And what is your title?

6        A.    I'm a senior Immigration Services officer.

7        Q.    What does that entail?

8        A.    What I do is I adjudicate a variety of

9    applications.  I conduct interviews on a variety of

10   applications for individuals seeking immigration

11   benefits.  These include applications for status,

12   commonly referred to as obtaining your green card,

13   naturalization applications, derivative citizenship

14   applications, as well as a variety of waiver

15   applications.

16       Q.    Did you go to college?

17       A.    Yes, I did.  I went to the University of Maine

18   in Orono.

19       Q.    And when did you start with Immigration

20   Service?

21       A.    In December of 2005.

22       Q.    And where were you assigned?

23       A.    I was previously assigned to the USCIS office

24   in Manchester, New Hampshire, and then when I became a

25   senior Immigration Services officer in June of 2011, I

1    started working with the Boston field office.

2         Q.    And did you have training in adjudications?

3         A.    Yes, I do.

4         Q.    Have you had experience adjudicating

5    applications?

6         A.    Yes, I do.

7         Q.    Approximately how many applications of the

8    different sorts that come to Immigration Service have

9    you adjudicated?

10        A.    The various types of forms you mean?

11        Q.    Yes.

12        A.    I have dealt with --

13        Q.    Is it fair to say in the hundreds?

14        A.    Yes.

15        Q.    And are you familiar with the rules and

16   policies of the Immigration Services in terms of

17   adjudicating?

18        A.    Yes, I am.

19        Q.    What is an A-File?

20        A.    An A-File --

21             THE COURT:  We've covered all this.  We really

22   don't have to rehash it.

23        Q.    What types of documents go into the A-File?

24             THE COURT:  We've covered that.

25             MR. CHAKRAVARTY:  Your Honor --

44

1          THE COURT:  No, it's cumulative, seriously.

2     We're not going to do it again.

3          Q.   With regards to Immigration Services'

4     assessment of an applicant for naturalization, what is

5     the relationship between the naturalization application

6     and the applications that precede it?

7          A.   Each application builds upon the previous

8     application.  For instance, one of the major functions

9     that you need to establish in eligibility for

10    naturalization is that you've been lawfully admitted for

11    permanent residence.  So we would need to see the

12    connection with the underlying permanent residence

13    status application, and in this particular instance this

14    was based on a refugee application.  So in order to

15    obtain your green card, you would need to have a

16    validly-obtained refugee application.

17         Q.   So that's what I want to talk to you about

18    that your colleagues haven't, the defendant's path to

19    naturalization.  Have you had a chance to review the

20    A-File?

21         A.   Yes, I have.

22         Q.   So can you explain to the jury the first step

23    of the applicant's process to be naturalized.

24         A.   In this particular case the first step was

25    when the applicant submitted her refugee classification

1    application.

2              THE COURT:  I'm sorry to interrupt you.  We've

3    covered this.

4              MR. CHAKRAVARTY:  Your Honor, I'm not going to

5    go into the details.

6              THE COURT:  No, we're not.  We've done that.

7              MR. CHAKRAVARTY:  It's purely a timeline.

8    What we have gotten is several different witnesses

9    talking about different aspects of it.

10             THE COURT:  Get to the aspects that this

11   witness is going to testify about, but we're not going

12   to start all over again with refugee applications and

13   processing and all that.  We've done it.  We're not

14   going to do it again.

15             MR. CHAKRAVARTY:  We're not rehashing it, your

16   Honor.

17             THE COURT:  So in my perception we are and I'm

18   not going to permit it.

19        Q.   So when the -- did this applicant come in as a

20   refugee?

21        A.   Yes.

22        Q.   When did that happen?

23        A.   That occurred on March 10th of 1998.

24        Q.   And after the person came in as a refugee,

25   what were they required to do in order to remain in the

1   country?

2       A.   In order to remain in the country as a

3   refugee, federal laws require that an individual

4   reapplies for admission to the United States by

5   presenting themselves to the Department of Homeland

6   Security after being physically present in our country

7   for one year.  So in this particular instance that would

8   require her to submit an application for permanent

9   residence, and which she did in July of 1999.

10       Q.   And what's the process to apply for permanent

11   residency?

12       A.   The process to apply for permanent residence

13   is we look at whether or not the refugee status has been

14   previously terminated for any reason, and if they're

15   still in fact admissible into the United States.

16       Q.   What does being admissible into the United

17   States mean?

18       A.   Well, like the refugee application, there were

19   various factors that they had to consider regarding the

20   immigration laws to determine whether or not they're

21   permitted to be admitted into the country.  These

22   include evaluating the individual to see if they're

23   involved with any crimes involving moral turpitude, if

24   they have been involved with any criminal offenses, if

25   they had any other type of admissibility such as that.

1          Q.    Is there a presumption of admissibility?

2                THE COURT:  Sidebar.

3                          AT SIDEBAR

4                THE COURT:  Make a proffer.  Why is she here?

5     What relevant evidence is she going to offer?  We've

6     already covered presumptions.

7                MR. CHAKRAVARTY:  The legal standards that

8     apply to the green card -- first, the green card hasn't

9     been talked about at all.

10               THE COURT:  Presumptions.  We know there's no

11    presumption.  So what's she here for?

12               MR. CHAKRAVARTY:  She's here to explain the

13    green card process and the legal standards --

14               THE COURT:  No, that's not relevant.  That's

15    immaterial.  We've already covered that.

16               MR. CHAKRAVARTY:  We haven't covered the green

17    card and the naturalization form.

18               THE COURT:  Why is she here?  To say the

19    questions on the green card application are material?

20    Is that why she's here?  Why is she here?

21               MR. CHAKRAVARTY:  The adjudication of a

22    citizenship application requires the assessment of

23    whether -- the previous witness who testified, the

24    responses on the green card application and the

25    refugee's application.  Nobody's talked about the green

48

1     cards.

2             THE COURT:  We're not going through

3     presumptions and the process and all that over again.

4     We've already done that with two witnesses.  We're not

5     going to do it again.  If she's here to say I reviewed

6     it, I made judgments and these are material, ask her

7     those questions, but get to it.

8             MR. CHAKRAVARTY:  Mr. Capin was careful not to

9     go over this with the prior witness who just talked

10    about his experience with the applicant was this was the

11    legal framework that we used to assess whether these

12    things are material or not.  It is to talk about

13    materiality, but in talking about the citizenship

14    application, whether somebody is lawfully admitted to

15    the United States is what goes back to the green card

16    application.

17            THE COURT:  Did she work on this file?

18            MR. CHAKRAVARTY:  She reviewed the file.

19            THE COURT:  Okay.  Ask her what she reviewed,

20    ask her whether it was in order, ask her if the

21    questions are material, but let's not rehash and

22    reinvent the process.  We can't do that.

23            MR. CHAKRAVARTY:  It's not my intent --

24            THE COURT:  You're doing it.  Whatever she's

25    here for, materiality or I reviewed it or whatever, get

1   to it.

2           MR. CHAKRAVARTY:  All right.

3                   IN OPEN COURT

4       Q.   Ms. Salidzik, I will abbreviate this even

5   further.  You reviewed the file, and were you asked to

6   make assessments about the materiality of various

7   responses on the naturalization form and how they affect

8   how the Immigration Service would process t?

9       A.   Yes, I did.

10      Q.   Specifically with regards to information that

11  was given by the applicant on the green card

12  application, for example, could that have an effect

13  on -- a material effect on how the naturalization

14  application was adjudicated?

15      A.   Yes, it could.

16      Q.   How so?

17      A.   In this particular case the information was

18  consistent in both applications.  However, had it been

19  disclosed that an individual was a member of an

20  organization, for example, in the naturalization

21  application and this was not disclosed in the permanent

22  residence status application, we would have to go into a

23  further line of inquiry as to when this particular

24  membership occurred, what the involvement was, and this

25  is very important because it does help us to establish

1    whether or not an individual is eligible for all of the

2    benefits that they're seeking at any point in time.

3          Q.    And specifically with regards to assessing an

4    applicant for naturalization, is there a legal framework

5    that you have to assess whether somebody is eligible for

6    naturalization?

7          A.    Yes, there is.

8          Q.    What is that?

9          A.    The individual needs to establish that they're

10   at least 18 years of age, that they have been lawfully

11   admitted for permanent residence, that they are a person

12   of good moral character, that they have an attachment to

13   the Constitution of the United States, that they have

14   physically resided in the United States as a permanent

15   resident for at least five years, and they meet general

16   literacy and civics requirements.

17         Q.    So to determine lawful permanent residence,

18   what is material to that assessment?

19         A.    Well, we need to establish whether or not the

20   permanent resident status for which they were applying

21   for they were entitled to.  For instance, if we discover

22   that there was any type of derogatory information which

23   would have rendered the applicant inadmissible at the

24   time or ineligible for the benefit that they were

25   seeking and this information was not available at the

1    time that the permanent resident status application was

2    approved, we would have to address this prior to --

3    during the naturalization application processing time.

4         Q.   How far back in somebody's immigration history

5    are you allowed to go in order to ask them questions

6    about whether they were lawfully present in the United

7    States?

8         A.   From the very beginning.

9         Q.   You mentioned that there was -- there's an

10   element called good moral character.

11        A.   That is correct.

12        Q.   What's that?

13        A.   Good moral character is one of the

14   requirements for naturalization, and basically it

15   compares the norms of society against the individual

16   that is applying for the benefit that they're seeking.

17   The Immigration and Nationality Act, which is our

18   statutes that we refer to for immigration laws, this

19   contains the list of general characteristics and bars

20   which would preclude somebody from being determined to

21   have established good moral character.  These include

22   offenses such as committing murder to being involved

23   with various criminal offenses to providing false or

24   misleading testimony to an Immigration official while

25   applying for an immigration benefit.

1      Q.   So let's start with that.  If someone does

2  provide false testimony to an Immigration officer or in

3  an application, how does that affect the analysis of

4  whether they have the requisite good moral character?

5      A.   If we have established that they have provided

6  false testimony to us while applying for an immigration

7  benefit, that could lead to the denial of their

8  application.

9      Q.   And what steps would the Immigration Service

10  do before doing it?

11      A.   Well, all applicants for naturalization are

12  interviewed.  So as part of our interview process we

13  would go into a series of questions with the applicant

14  to establish what the false testimony is, whether or not

15  they admit to ever providing us with the false

16  testimony; when they gave us the false testimony, what

17  was the outcome of that false testimony.

18      Q.   Is there any independent evidence that you

19  consider?

20      A.   Yes.  We would also -- as part of the

21  naturalization process, we do perform a variety of

22  security background checks, and if derogatory

23  information was found through those security checks, we

24  would confront the interviewer during the interview

25  process to have them provide an explanation.

53

1      Q.    When you say variety of background checks,

2   what does that entail?

3      A.    This can include checks with the Federal

4   Bureau of Investigations regarding their fingerprints to

5   see if there is a criminal record, to run their name

6   against a variety of systems that the FBI has based on

7   their name and their date of birth, and systems such as

8   that.

9      Q.    Now, on the N-400 application form, are there

10   several sections of that form that ask questions related

11   to good moral character?

12      A.    Yes, there is.

13      Q.    And there's one question that asks, that the

14   jury has seen, about affiliations that an applicant may

15   have.  Have you ever been a member of or associated with

16   any organization, association, fund, foundation, party,

17   club, society or similar group in the United States or

18   any other place.  Is that right?

19      A.    That is correct.

20      Q.    Is that substantially the same question that

21   appears on the I-45 in the refugee form?

22      A.    Yes, it is.

23      Q.    How does that answer affect someone's good

24   moral character?

25      A.    Well, it's the applicant's responsibility to

54

1   disclose each and every single membership regardless of

2   whether or not they feel it pertains to the benefits

3   that they are seeking.  We need to evaluate each and

4   every membership independently to determine whether or

5   not it would affect the eligibility negatively and

6   whether or not it would render the applicant

7   inadmissible to the United States or deportable from the

8   United States.

9       Q.   Whose responsibility is it to disclose any

10   organization that might fit in those categories?

11       A.   It is the applicant's responsibility to

12   disclose every single membership regardless of where

13   that membership occurred and when it occurred.

14       Q.   Does that also include any associations or

15   organization?

16       A.   Yes, it does.

17       Q.   Whose responsibility is it to determine

18   whether that association or organization bears on good

19   moral character?

20       A.   It is the job of the office of USCIS

21   adjudications officers.

22       Q.   In this case if there were organizations that

23   should have been listed here, how is that material to

24   Immigration Services?

25       A.   Well, by not disclosing any information in

55

1   this section, it precludes us from asking a further line

2   of questioning for us to determine whether or not an

3   organization would have a negative factor on their

4   eligibility.

5        Q.   Same page, it asks -- are persecutors allowed

6   to become citizens?

7        A.   No, they're not.

8        Q.   Why is that?

9        A.   Because it fails to establish that they meet

10  their good moral character requirements.

11       Q.   Mr. Capin reminded me -- I asked you a second

12  ago about the background check.  Is there an

13  international background check that you're aware of?

14       A.   I believe there is.

15       Q.   What does that entail?

16       A.   This would be through the Department of State.

17  I know during the refugee processing they do a variety

18  of background checks during the refugee processing.

19       Q.   Is that checking for criminal records?

20       A.   I believe that it does.

21       Q.   And in the N-400 form there are several

22  questions related to -- the good moral character related

23  to criminal offenses.  Is that right?

24       A.   That is correct.

25       Q.   How do those questions affect the materials --

1  how are those questions material to the determination of

2  eligibility for citizenship?

3      A.   They're material to determine eligibility for

4  naturalization.

5      Q.   Explain how --

6          THE COURT:  I thought we were focusing on the

7  permanent resident steps.  We've done naturalization

8  with Mr. Violo.  We did refugee with Mr. Monica.  We

9  don't need to do it again.

10     Q.   I will ask the question the judge posed.  How

11 does the information that appears on the N-400 form

12 relate back to the permanent resident application for

13 purposes of the determination of materiality?

14     A.   Again, the information that is disclosed in

15 this could have an effect on whether or not the

16 individual was lawfully admitted as a permanent

17 resident, because if they had disclosed an offense for

18 which they were involved with on a naturalization stage

19 that occurred prior to their permanent resident status

20 and this information was not disclosed to us at the

21 permanent resident phase, they would not have been --

22 it's a potential that they would not have been eligible

23 for that permanent resident status.

24         MR. CHAKRAVARTY:  Your Honor, I recognize the

25 time.  I'm not much longer with her.

```
 1              THE COURT:  Can't imagine that you have more
 2    than two or three minutes.
 3              MR. CHAKRAVARTY:  Probably less than five.
 4              THE COURT:  All right.  Why don't you finish.
 5              MR. CHAKRAVARTY:  Thank you.
 6        Q.   This is the 485 form, the Application for
 7    Lawful Permanent Residence?
 8        A.   Yes.
 9        Q.   And is this the question that asked in
10    substance the same as the one on the N-400 form?
11        A.   That is correct.
12        Q.   And this form also asks many of the questions
13    here about whether you've committed a crime or engaged
14    in other activities, such as engaged in genocide, that
15    might render somebody ineligible for lawful permanent
16    residence.  Is that right?
17        A.   That is correct.
18        Q.   Is there a good moral character provision for
19    lawful permanent residence?
20        A.   There isn't a good moral character provision
21    per se.  For permanent residence the applicant has to
22    establish whether or not they are admissible to the
23    United States.  So we would look at the various forms of
24    admissibility to determine whether or not they are
25    eligible for the benefit.
```

58

1      Q.    And as with all the applications, if somebody

2   knowingly falsifies information on an application, how

3   does that affect CIS?

4      A.    If they knowingly falsify the information,

5   that would render them ineligible for the benefit if it

6   was determined -- or if we were to find out about this

7   information.

8      Q.    And with regards to the 485 form, is that

9   signed under penalties of perjury?

10     A.    Yes, it is.

11     Q.    And in this case was there a preparer?

12     A.    Yes, there was.

13     Q.    The fact that there was a preparer, does that

14   relieve responsibility for the applicant to swear to the

15   accuracy of the information?

16     A.    No.   It is still the applicant's

17   responsibility that all pieces of information on that

18   form are true and correct.

19     Q.    You mentioned earlier the term crime of moral

20   turpitude.

21     A.    Yes.

22     Q.    What is that?

23     A.    That is a legal phrase for a group of

24   particularly serious criminal offenses.   These include

25   things such as murder, rape, aggravated assault,

1    kidnapping.

2         Q.   And you mentioned the term earlier, we heard

3    before, hasn't been defined, what does persecution mean

4    for immigration purposes?

5         A.   Persecution is when an individual or a group

6    of people cause -- inflict pain or suffering onto an

7    affected party based on account of the affected party's

8    race, religion, nationality, membership in a particular

9    social organization, or their political opinion.  Now,

10   those could range anywhere from harassment up to and

11   including genocide.

12        Q.   In your review of this case, if the

13   applicant -- you later learned that the applicant was a

14   member of an organization called the MRND or associated

15   with that organization, would that have a material

16   effect on her eligibility for naturalization?

17        A.   Yes, it does have the possibility, because we

18   would have to go into a line of inquiry about her

19   particular involvement with that organization.

20        Q.   It would cause the service to take additional

21   action?

22        A.   Exactly.

23        Q.   If the service learned that she had actually

24   participated in roadblocks during the Rwanda genocide,

25   would that have a bearing upon materiality?

60

 1        A.   Yes, it would.

 2             MR. CHAKRAVARTY:  That's all I have, your

 3   Honor.

 4             THE COURT:  Cross in the morning?  Or do you

 5   have much?  It's after time.

 6             MR. RUOFF:  I can do it in like five minutes.

 7             THE COURT:  Ladies and gentlemen, would you

 8   like to stay?  The jury would like to stay and get it

 9   done.

10                    CROSS-EXAMINATION

11   BY MR. RUOFF:

12        Q.   Ma'am, you've been here all day; right?

13        A.   Yes, I have.

14        Q.   I just have a couple questions for you.  Is

15   this your first time testifying in federal court?

16        A.   Yes, it is.

17        Q.   Welcome to federal court.

18        A.   Thank you.

19        Q.   Now, you didn't have any direct involvement in

20   this file; right?

21        A.   No, I did not.

22        Q.   I'm just going to ask you a few questions

23   about the I-85 form that you just reviewed.  I think

24   actually before the form is that document in the file;

25   right?

1          A.    Yes.   That would be the cover letter to the

2     application.

3          Q.    Okay.   Now, this is actually prepared by the

4     same person that signed the I-8500 form, right, this guy

5     Tim Kelly?

6          A.    She signed it as a preparer, not the

7     applicant.

8          Q.    I'm assuming that it's pretty common then for

9     organizations like New Hampshire Catholic Charities to

10    actually prepare all the paperwork for the applicant;

11    right?

12         A.    They would prepare it, but yet it's still the

13    applicant's responsibility for the contents of the

14    information that was submitted.

15         Q.    And that explains why this portion of the

16    A-File is all typed and legible and pretty well

17    formatted; correct?

18         A.    I don't know if that would explain it, but

19    this would be a general factor for -- a general format

20    for attorney cover letters.

21         Q.    And the attorney would prepare everything and

22    then the client would just come in and sign whatever

23    documents had to be signed before being submitted;

24    correct?

25         A.    Well, the information would have to come

62

1    directly from the applicant.  The preparer is not

2    allowed to answer the questions on the applicant's

3    behalf.  The preparer would only serve as checking the

4    boxes yes or no to the application.

5         Q.    And that might be based on other information

6    contained in the A-File; correct?

7         A.    They would not have the A-File to fill out the

8    application.

9         Q.    Unless the client had a copy of their original

10   application materials; correct?

11        A.    Well, they would still have to answer the

12   questions.  They're still responsible for the contents

13   of the application and they're still required to go

14   through and answer the questions one by one.

15             MR. RUOFF:  Thank you for coming.

16             THE WITNESS:  Thank you.

17             THE COURT:  Any redirect?

18             MR. CHAKRAVARTY:  No.  Thank you.

19             THE COURT:  Thank you, ma'am, you're excused.

20   And ladies and gentlemen, we'll adjourn now until

21   tomorrow morning at 9 o'clock.  Again, let me just

22   remind you to please make sure you do take efforts --

23   take steps or make efforts to avoid any media exposure

24   about the case.

25             (Adjourned at 3:10 p.m.)

```
1                    C E R T I F I C A T E

2

3              I, Diane M. Churas, do hereby certify that the

4       foregoing transcript is a true and accurate

5       transcription of the within proceedings, to the best of

6       my knowledge, skill, ability and belief.

7

8

9

10

11

12

13      Submitted: 11/13/2013    DIANE M. CHURAS, LCR, RPR, CRR
                                 LICENSED COURT REPORTER, NO. 16
14                               STATE OF NEW HAMPSHIRE

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2-3-2014

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-85-01-SM
          v.                    *  February 14, 2013
                                *  9:10 a.m.
   BEATRICE MUNYENYEZI          *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY EIGHT - MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:


For the Government:      John A. Capin, SAUSA
                        Aloke S. Chakravarty, SAUSA
                        U.S. Attorney's Office (NH and MA)


For the Defendant:      Mark E. Howard, Esq.
                        David W. Ruoff, Esq.
                        Howard & Ruoff, PLLC


Interpreters:           Freddy Munana
                        Sabrina Iyadede


Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

I N D E X

WITNESSES:        Direct   Cross  Redirect  Recross


VINCENT SIBOMANA:

By Mr. Capin      7                 47

By Mr. Howard               28


BRIAN ANDERSEN:

By Mr. Capin      50

By Mr. Ruoff                98




EXHIBITS:                        FOR ID IN EVD

GOVERNMENT'S:

24(P), 24(Q).                        18
24(S).                               26
14(A), 14(B).                        71
28.                                  73
24(N).                               77


DEFENDANT'S:

I.                                   30
H.                                   31
K.                                   31
J.                                   32
L.                              114

1                    P R O C E E D I N G S

2             (IN COURT - NO JURY PRESENT)

3             MR. CHAKRAVARTY:  Your Honor, before the jury

4    comes out, just to let your Honor know about kind of

5    scheduling and where we see things playing out today,

6    it's possible the government may rest today.

7             We anticipate calling at least two witnesses,

8    Vincent Sibomana and Agent Andersen, and we may or may

9    not call --

10            THE COURT:  By my count you have 1, 2, 3, 4,

11   5, 6 Rwandans?

12            MR. CHAKRAVARTY:  Right.  This will be 7.  We

13   may call an eighth.  We may not.

14            THE COURT:  Oh, I have remaining people.

15            MR. CHAKRAVARTY:  And we're not going to call

16   them.

17            THE COURT:  Oh, you're not.  Okay.  You're

18   not going to call them?

19            MR. CHAKRAVARTY:  Right.  We've taken your

20   Honor's queue on the cumulativeness.

21            THE COURT:  No, no.  Don't get me wrong,

22   cumulative on laying foundations for how do you know

23   what you know, what did you see, what did you hear,

24   not substantive.

25            MR. CHAKRAVARTY:  Fair enough.  Given how the

1  trial has played out, we think that we don't need to

2  call all the rest of the witnesses.

3          THE COURT:  Okay.

4          MR. CHAKRAVARTY:  If that's the case, then

5  it's possible, as I suggested, that we will rest.  And

6  depending -- it's not clear what time.  That may be

7  before the lunch break.  If that's the case, then it

8  may -- in conversation with counsel, it may pose some

9  logistic issues for counsel.

10          THE COURT:  I'm sure not, because we're all

11  ready to go, right?

12          MR. HOWARD:  I know that we can put two of

13  the agent witnesses on this afternoon.  That may or

14  may not get us to 3:00 o'clock.

15          THE COURT:  Oh, that's right.

16          MR. HOWARD:  And then what we're anticipating

17  is, we've got several Rwandan witnesses here in the

18  city and we will put them on tomorrow.  The only -- I

19  think then the holdup, if there's a holdup -- I'm not

20  sure there will be -- is our expert is coming from

21  Chicago.  I got on the phone with him last night, and

22  we're playing out all these different variables on how

23  things might work.  I'm just planning on him being

24  here Tuesday with one other overseas witness on

25  Tuesday and we're done.

1            THE COURT:  What are you going to do Monday?

2            THE CLERK:  It's a holiday.

3            THE COURT:  It is?  Oh, of course.  I didn't

4   figure that in.  So that's one less day we have.

5            MR. HOWARD:  So you are loathe to send the

6   jury home early, as am I.  I'm just not sure I can

7   fill up the time with the logistical issues we have

8   with the expert and the other overseas witness.

9            THE COURT:  How long do you anticipate going

10  total?

11           MR. HOWARD:  Two days.  It will be Friday and

12  Tuesday.

13           THE COURT:  Friday and Tuesday.  Okay.

14           MR. HOWARD:  And then close on Wednesday, and

15  we're on that two-week schedule by a half a day.

16           THE COURT:  Perfect.

17           MR. HOWARD:  How's that?

18           THE COURT:  That's good.  That's great.

19           MR. HOWARD:  Good.  Thank you.

20           THE COURT:  So you're talking about one more

21  witness from Rwanda and one agent?

22           MR. CHAKRAVARTY:  Right.  The lead agent and

23  then potentially another Rwandan witness.

24           THE COURT:  Okay.  All right.

25           MR. HOWARD:  If that other Rwandan witness

6

1   comes, I think all the logistical issues are solved

2   because that will be the day today.

3          THE COURT:  I'm trying to think how to bring

4   this up without going back in chambers.  You're all

5   set with your subpoenas and all of that?  That's all

6   done?

7          MR. HOWARD:  Yes.  We are all set.

8          THE COURT:  Okay.  All right.  I can be nice

9   today then.

10         MR. HOWARD:  Just like every other day.

11         THE COURT:  Almost every other day.

12         (IN COURT - JURY PRESENT)

13         THE CLERK:  Court is in session and has for

14  consideration jury trial day eight in the matter of

15  United States of America versus Beatrice Munyenyezi,

16  case No. 10-CR-85-01-SM.

17                     VINCENT SIBOMANA

18         having been duly sworn, testified as follows:

19         THE CLERK:  For the record, please state your

20  name and spell your last name.

21         THE WITNESS:  Sibomana, Vincent.

22  S-I-B-O-M-A-N-A.  Vincent.

23         THE COURT:  Good morning, ladies and

24  gentlemen.  Obviously we're continuing with the

25  government's case.

```
 1            Whenever you're ready, Mr. Capin.

 2            MR. CAPIN:  Thank you, your Honor.

 3                      DIRECT EXAMINATION

 4  BY MR. CAPIN:

 5      Q.  Good morning, Mr. Sibomana.

 6      A.  Good morning.

 7      Q.  Would you please tell the members of this

 8  jury where you live?

 9      A.  Yes.

10      Q.  Tell them.

11      A.  I live in Gisagara.

12      Q.  Is Gisagara part of Butare Prefecture?

13      A.  Yes.

14      Q.  Did it have a different name during the

15  genocide?

16      A.  Yes.

17      Q.  What was it called during the genocide?

18      A.  Nyaruhengeri.

19            MR. CAPIN:  Perhaps, Mr. Interpreter, you

20  could spell that for the court reporter.

21            THE INTERPRETER:  Yes.

22  N-Y-A-R-U-H-E-N-G-E-R-I.

23      Q.  Was Nyaruhengeri south of Butare Town?

24      A.  Yes.

25      Q.  What do you do for work now?
```

```
 1       A.  I'm a farmer and I deal with livestock.

 2       Q.  Where do you farm?

 3       A.  Where I come from in Nyaruhengeri.  Currently

 4  in Gisagara.

 5       Q.  What kinds of things do you grow?

 6       A.  I farm different things, such as cassava,

 7  beans, banana and banana plantation.

 8       Q.  What year were you born, sir?

 9       A.  1980.

10       Q.  So were you about 14 at the time of the

11  genocide?

12            THE INTERPRETER:  Could you repeat that?

13       Q.  So were you about 14 at the time of the

14  genocide?

15       A.  Yes.

16       Q.  Did you go to elementary school in

17  Nyaruhengeri?

18       A.  I went there for two years -- two first

19  years.

20       Q.  After those two years did you go to school

21  somewhere else?

22       A.  Yes.

23       Q.  Where did you go to school after those two

24  years?

25       A.  At EER Butare Primary.
```

1        Q.  And EER -- the EER school near the center of

2   Butare Town?

3        A.  It's in Butare Town.

4        Q.  Who were you living with when you went to the

5   EER school?

6        A.  I lived with my aunt.

7        Q.  And how far did you go at the EER school --

8   how far in school?

9        A.  Primary six.

10       Q.  So after sixth grade at some point did you

11  get a job?

12       A.  Yes.

13       Q.  Where did you work?

14       A.  The Relais de la Soif.

15       Q.  What is Relais de la Soif?

16       A.  It's a name that was named after a drink such

17  as beer and soda, Fanta.

18       Q.  Was it a store that sold beer and soda?

19       A.  Yes, it was a store.

20       Q.  And does Relais de la Soif -- are those

21  French words?

22       A.  I don't know.  I don't know what it means,

23  but that was the name.

24            MR. CAPIN:  Mr. Interpreter, do you know what

25  Relais de la Soif means?

 1          THE INTERPRETER:  Relais de la Soif usually

 2    means where you stop to relieve your thirst.

 3          MR. CAPIN:  So a thirst stop?

 4          THE INTERPRETER:  Yes.

 5      Q.  So after sixth grade you went to work for

 6    Relais de la Soif?

 7      A.  Yes.

 8      Q.  Was Relais de la Soif located right across

 9    the street from the EER school?

10      A.  Yes.

11      Q.  And while you were working right across from

12    the EER school at Relais de la Soif, where were you

13    living?

14      A.  I lived at Relais de la Soif.

15      Q.  Is that where your aunt lived?

16      A.  Yes.

17      Q.  Who owned Relais de la Soif, the business?

18      A.  It belonged to a lady who had a white

19    husband.

20      Q.  Was Relais de la Soif close to the Hotel

21    I'Huriro?

22      A.  Yes.

23      Q.  Did you ever see political rallies in the

24    area of the Relais de la Soif before the genocide?

25      A.  Yes.

 1      Q.  Could you tell by what you saw with your own

 2  eyes which party was rallying?

 3      A.  Yes.

 4      Q.  How could you tell which party was rallying?

 5      A.  Every party had their own clothing.

 6      Q.  So what parties did you see rallying in the

 7  time before the genocide?

 8      A.  MRND, PSD, MDR and PL.

 9      Q.  Did the MRND have particular clothing its

10  members wore?

11      A.  Yes.

12      Q.  Can you describe the clothing you saw the

13  MRND members wear?

14      A.  Yes.

15      Q.  Please describe it.

16      A.  MRND clothing had seals of MRND -- of

17  Habyarimana pictures and acronyms of MRND.

18      Q.  Was there also MRND clothing that had many

19  colors in it?

20      A.  Yes.

21      Q.  So was the I'Huriro Hotel there when you were

22  working at Relais de la Soif?

23      A.  Yes.

24      Q.  Did you start working at Relais de la Soif in

25  approximately 1993?

1      A.  Yes.

2      Q.  Can you tell this jury if you know who lived

3  at the I'Huriro?

4      A.  Yes.

5      Q.  Please tell the jury.

6      A.  The owner who lived there, Maurice Ntahobali,

7  Pauline Nyiramasuhuko, Shalom, Beatrice.

8      Q.  Was Shalom the son of Maurice and Pauline?

9      A.  Yes.

10      Q.  Do you know if Shalom had any siblings?

11      A.  Yes.

12      Q.  Did he have brothers or sisters, or do you

13  know?

14      A.  Yes.  I could see his sisters.

15      Q.  Did anybody from the I'Huriro ever buy beer

16  or soda at the Relais de la Soif?

17      A.  Yes.

18      Q.  Who bought -- who came to Relais de la Soif

19  to buy beer and Fanta?

20      A.  Beatrice, their workers, their employees, and

21  Shalom.

22      Q.  Did Beatrice ever come into the store?

23      A.  Yes.

24      Q.  What did she do when she came into the store?

25      A.  She paid money for the drinks -- for alcohol

1  and soda that they had come to buy.  Buying drinks and

2  alcohol to take to their hotel.

3      Q.  Did you also see Beatrice on any occasion

4  walking around Butare?

5      A.  Yes.

6      Q.  Did you ever pass close by her on the street?

7      A.  Yes.

8      Q.  Did you ever notice whether she was

9  wearing -- strike that.  Did you ever see her wearing

10  MRND clothing?

11      A.  Yes.

12      Q.  What did you see her wearing?

13      A.  She had on an MRND shirt and also a medallion

14  that they used to wear on the shirt.

15          MR. HOWARD:  Your Honor, just before the next

16  question is asked, if we could ask the witness to

17  speak up.  We can't hear him.

18      Q.  Mr. Sibomana, it's important that you speak

19  up so that I can hear you and everybody at this table

20  here can hear you.

21          You say a medallion.  What appeared on the

22  surface of that medallion?  Was there an image?

23      A.  There was a picture of Habyarimana.

24      Q.  Now, how many days a week did you work at

25  Relais de la Soif?

     1        A.  Monday through Saturday.

     2        Q.  And what time of day did you start working

     3   usually?

     4        A.  At 7:00 in the morning.

     5        Q.  Did you open up the store?

     6        A.  No.

     7        Q.  Who opened the store?

     8        A.  There was a cashier who would open it.

     9        Q.  And you were about 14 at the time?

    10        A.  Yes.

    11        Q.  So 7:00 in the morning you started.  How late

    12   did you work every day?

    13        A.  We would close at 6:00 p.m.

    14        Q.  Do you remember learning that the president's

    15   plane had been shot down in April of 1994?

    16        A.  Yes.

    17        Q.  How did you learn about that?

    18        A.  I heard about it on the radio.

    19        Q.  Now, did violence start in Butare about two

    20   weeks after that?

    21        A.  Yes.

    22        Q.  Did you see any roadblocks set up in Butare

    23   at that time?

    24        A.  Yes.

    25        Q.  Which is the first roadblock you saw?

1        A.  At the I'Huriro.

2        Q.  Did you see other roadblocks at other times

3   during the genocide?

4        A.  Yes.

5        Q.  Where else did you see roadblocks?

6        A.  In Butare Town, Behera, Faucon and

7   Nyamasheke.

8        Q.  And do you know based on what you saw with

9   your own eyes which roadblock was established first?

10       A.  The one I saw was at the I'Huriro because

11  that's the one I was close to.

12       Q.  Do you know one way or the other whether the

13  Faucon, for example, was set up earlier or later?

14       A.  No.

15       Q.  Now, when you say you saw a roadblock at the

16  I'Huriro, could you please describe for this jury what

17  you saw?

18       A.  As far as the I'Huriro roadblock, what I saw,

19  since I lived near where it was, there were

20  Interahamwe and Beatrice asking for identification to

21  Tutsis.

22       Q.  What were the barriers that made up the

23  roadblock?

24       A.  It was logs and stones.

25       Q.  Were they all in -- strike that.  Are there

1  Interahamwe who you knew by name who you saw working

2  at that roadblock?

3      A.  Yes.

4      Q.  Please list some of the Interahamwe who you

5  knew by name for this jury.

6      A.  Beatrice, Kazungu, Lambert, Deo, Samuel,

7  Jean-Pierre, Shalom.

8      Q.  I'm not going to ask you to list them all.

9  Are there others who you knew?

10     A.  Yes.  Many.

11     Q.  Did you meet with American investigators last

12  year?

13     A.  Yes.

14     Q.  Where did you meet with them?

15     A.  In Butare.

16     Q.  And how did you learn that American

17  investigators -- where did you meet with them?

18     A.  At Hotel Faucon.

19     Q.  And is that near where you farm?

20     A.  No.

21     Q.  How did you get from where you farm to the

22  Hotel Faucon?

23     A.  It's a driver whose name is Jean-Pierre who

24  came and picked me up.

25     Q.  And did Jean-Pierre take you to Hotel Faucon?

```
 1      A.  Yes.

 2      Q.  Did you know what the Americans wanted to

 3 talk to you about before you got to the Hotel Faucon?

 4      A.  No.

 5      Q.  Now, did you meet me at some point in Rwanda?

 6      A.  Yes.

 7      Q.  Where did you meet me?

 8      A.  In Kigali.

 9      Q.  Was that after you had already met earlier

10 with the American investigators in Butare?

11      A.  Yes.

12      Q.  And after you met with me did you meet again

13 with American investigators in Butare?

14      A.  Yes.

15      Q.  And do you know the name of the head

16 investigator who you met with?  That was a complicated

17 question.  Mr. Sibomana, I'm going to ask you a

18 different question.

19          Who is the American who you first met with at

20 the Hotel Faucon in Butare?

21      A.  Brian.

22      Q.  Is Brian the same person you met with again

23 after meeting me in Kigali?

24      A.  Yes.

25      Q.  Now, when you met with Brian the second time
```

 1  after meeting with me, did you take him to certain

 2  locations in Butare?

 3       A.  Yes.

 4       Q.  Did you point out certain things to him?

 5       A.  Yes.

 6       Q.  For example, did you point out where Relais

 7  de la Soif was located during the genocide?

 8       A.  Yes.

 9       Q.  Did you point out the location where

10  Interahamwe were checking IDs in front of the

11  I'Huriro?

12       A.  Yes.

13       Q.  Did you point out the location where you saw

14  the first barrier that made up that roadblock leading

15  to the I'Huriro?

16       A.  Yes.

17       Q.  Okay.

18          MR. CAPIN:  Move to strike the ID on 24(P)

19  and (Q).

20          THE COURT:  Any objection?

21          MR. HOWARD:  No, your Honor.

22          THE COURT:  ID may be stricken on

23  Government's 24(P) and (Q).

24          (Government's Exhibits 24(P) and 24(Q)

25  Admitted)

1        MR. CAPIN:  Thank you, your Honor.

2        Q.  Mr. Sibomana, if you look to the right of

3  you, do you see the screen with a picture of my hand

4  on it?  I'm going to put a photograph on that screen.

5  Have you seen this photograph before?

6        A.  Yes.

7        Q.  Do you see yourself in this photograph?

8        A.  Yes.

9        Q.  Would you please touch the screen with your

10  finger showing the jury where you're standing in this

11  photograph?

12        A.  I'm here.

13        Q.  Okay.  So you're the person I just circled?

14        A.  Yes.

15        MR. CAPIN:  Would the record reflect, your

16  Honor, that it's the person in the center of the

17  photograph with his right hand extended forward?

18        THE COURT:  It may.

19        Q.  What are you pointing at in that photograph?

20        A.  I'm showing where the roadblock was.

21        Q.  Now when you say where the roadblock was, do

22  you mean that's where Interahamwe were checking IDs?

23        A.  Yes.

24        Q.  Do you see this road right here?

25        A.  Yes.

1      Q.   Is that the road that leads up to the ESO?

2      A.   Yes.

3      Q.   If I were to go this way on the road, would I

4  be going south toward Burundi?

5      A.   Yes.

6      Q.   Let me show you another photograph.

7           MR. CAPIN:  For the record, this is 24(Q).

8  The earlier exhibit was 24(P).

9      Q.   I'm going to show you another photograph, Mr.

10  Sibomana.  Do you see yourself in this photograph?

11      A.   Yes.

12      Q.   And could you please touch or circle where

13  you're standing?

14      A.   It's here.

15      Q.   So is it the person I circled?

16      A.   Yes.

17           MR. CAPIN:  May the record reflect, your

18  Honor, it's the person left of center in the middle of

19  the photograph with his left hand extended?

20           THE COURT:  It may.

21      Q.   Would you please tell the jury what you're

22  pointing at in that picture?

23      A.   Yes.

24      Q.   Tell the jury.

25      A.   I'm showing here where the obstacles started

1 stopping people before you got to the actual place I

2 was showing earlier.

3        Q.  So is the place you're showing in the

4 photograph on the screen now, 24(Q), is that where the

5 first obstacle of that roadblock appeared?

6        A.  Yes.

7        Q.  And the photograph that is 24(P), is the

8 location you're standing here basically very near to

9 where the Hotel I'Huriro was during the genocide?

10        A.  Yes.

11        Q.  When you were living and working across the

12 street from the EER -- maybe I'll break this out so

13 it's easy.

14            When you were living and working across the

15 street from the EER, did you see people coming and

16 going from the I'Huriro?

17        A.  Yes.

18        Q.  Did you see people coming and going wearing

19 particular political clothing?

20        A.  Yes.

21        Q.  What party's clothing did you see most

22 frequently coming and going from the I'Huriro?

23        A.  MRND.

24        Q.  Now, did you ever pass through that

25 roadblock -- did you ever go to that roadblock

1   yourself?

2        A.  Yes.

3        Q.  Tell the jury what happened when you -- first

4   of all, why did you go to that roadblock?

5        A.  I was trying to leave Butare Town going to a

6   place where I come from in Nyaruhengeri.

7        Q.  That's where you currently are a farmer?

8        A.  Yes.

9        Q.  Why were you trying to go to Nyaruhengeri?

10       A.  That's where my family, my parents lived.

11       Q.  Why were you trying to leave Butare Town?

12       A.  Because people were being killed.

13       Q.  And on that particular trip did you make it

14   to Nyaruhengeri?

15       A.  No.

16       Q.  Why not?

17       A.  Because when I got to the roadblock I was

18   stopped and I was not able to proceed.

19       Q.  You mean the roadblock at the I'Huriro?

20       A.  Yes.

21       Q.  Describe for the jury, please, what happened

22   to you at that roadblock.

23       A.  When I got there -- what happened is when I

24   got there Beatrice asked me for my identification.

25       Q.  Did you have an identification?

```
 1      A.  I didn't.

 2      Q.  Why not?

 3      A.  I was not the age of having one yet.

 4      Q.  As a 14-year-old you were too young?

 5      A.  Yes.

 6      Q.  What is your ethnicity, sir?

 7      A.  Tutsi.

 8      Q.  So what happened after Beatrice asked you for

 9 an ID?

10      A.  They asked me for that, and then Interahamwe

11 took me on the side.

12      Q.  Who took you?

13      A.  Interahamwe called Kazungu.

14      Q.  And what, if anything, did Kazungu do to you?

15      A.  Yes.

16      Q.  Did Kazungu do something to you?

17      A.  Yes.

18      Q.  Please tell us what he did to you.

19      A.  He hit me.

20      Q.  What did he hit you with?

21      A.  He hit me with a gun butt, and I fell in the

22 ditch right across from the roadblock.

23      Q.  What happened next?

24      A.  What happened -- because there were people --

25 there were more people there.  We left there after
```

1  Beatrice said that they should take us to go get

2  killed, and when they took us I managed to run away.

3      Q.  When you say us, who do you mean by us?

4      A.  Because I was with other people that had been

5  asked to sit by the roadblock.

6      Q.  Do you know what ethnicity those other people

7  belonged to?

8      A.  Yes.

9      Q.  What ethnicity were they?

10     A.  Tutsis.

11     Q.  So you managed to escape that day?

12     A.  Yes.

13     Q.  At any point during the genocide did you seek

14  refuge at the EER school?

15     A.  Yes.  Right close by.  I managed to find it.

16     Q.  Why did you seek refuge at the EER school?

17     A.  That's where I found a bush where I could

18  hide.

19         MR. CAPIN:  I'm sorry.  My apologies.  I was

20  asking Mr. Chakravarty a question.

21         Mr. Interpreter, could you repeat the answer,

22  please?

23         THE INTERPRETER:  That's where I found a bush

24  where I could hide.

25     Q.  Okay.  Were there other refugees hiding at

    1  the EER school?

    2        A.  Yes.

    3        Q.  Did you stay there for a few days?

    4        A.  Yes.

    5        Q.  Is there a wooded area or a grove behind the

    6  EER school?

    7        A.  Yes.

    8        Q.  While you were at the EER school were you

    9  able to see -- were you able to see what was happening

   10  near that wooded area or grove?

   11        A.  Yes.

   12        Q.  Tell the jury what you could see.

   13        A.  I saw Interahamwe killing Tutsis.

   14        Q.  Now, when you met with Brian the second time

   15  in Butare, did you take him to the location where you

   16  saw Interahamwe killing Tutsis?

   17        A.  Yes.

   18        Q.  And did you point for Brian to where you had

   19  seen Interahamwe killing Tutsis?

   20        A.  Yes.

   21            MR. CAPIN:  Move to strike the ID on 24(S),

   22  your Honor.

   23            THE COURT:  Any objection?

   24            MR. HOWARD:  No objection.

   25            THE COURT:  ID may be stricken on 24(S).

1          (Government's Exhibit 24(S) Admitted)

2          MR. CAPIN:   24(S) is on the screen, and for

3     the record it shows a single person in a white T-shirt

4     pointing with his left hand.

5          Q.   Mr. Sibomana, do you see the picture on the

6     screen in front of you?

7          A.   Yes.

8          Q.   Do you recognize the person in that picture?

9          A.   Yes.

10         Q.   Is it you?

11         A.   Yes.

12         Q.   And where are you pointing?

13         A.   I'm pointing at where Tutsis were killed.

14         Q.   Could you hear noises coming from the area

15    where Tutsi were killed while you were at the EER?

16         A.   Yes.

17         Q.   What could you hear?

18         A.   Being killed, being cut by machetes and being

19    beaten by clubs.

20         Q.   Could you hear human voices?

21         A.   Yes.

22         Q.   What did the human voices sound like?

23         A.   They were screaming, and it sounded very sad.

24         Q.   Was the screaming very loud?

25         A.   Yes.

1      Q.  Could you hear the screaming from a long

2  distance away?

3      A.  Yes.

4      Q.  Was that wooded area where Tutsi were being

5  killed right below a path that goes behind the

6  I'Huriro and the EER?

7      A.  Yes, there is.

8      Q.  While you were at the EER were you ever close

9  enough to that path to see what was happening at the

10  path and below it?

11      A.  Yes.

12      Q.  While you were at the EER did you move to

13  different places all around the different buildings at

14  the EER?

15      A.  Yes.

16      Q.  At some times at the EER were you very close

17  to where Interahamwe were checking ID in front of the

18  I'Huriro?

19      A.  Yes.

20          MR. CAPIN:  I've got nothing further, your

21  Honor.

22          THE COURT:  Mr. Howard.

23          MR. HOWARD:  Thank you, your Honor.

24

25

1                    CROSS-EXAMINATION

2   BY MR. HOWARD:

3        Q.  Good morning, sir.

4        A.  Good morning.

5        Q.  You were living in Butare Town across the

6   street from the EER in April of 1994?

7        A.  Yes.

8        Q.  And the EER is the same place where you went

9   to primary school?

10       A.  Yes.

11       Q.  And do you still go up into Butare Town once

12  in a while?

13       A.  Yes.

14       Q.  And you were there with the Americans just

15  last summer, right?

16       A.  Yes.

17       Q.  I'm going to show you a photograph that's

18  marked H for ID.

19            MR. HOWARD:  And these are going to be H

20  through K.

21       Q.  Sir, I would ask you to look at this

22  photograph and tell me -- actually, let's do this one

23  first.  I'm going to do I for identification first.

24            Is that a photograph of the intersection near

25  the ESO and where the hotel used to be?

1       A.  No.

2       Q.  No?

3           THE INTERPRETER:  No.

4       Q.  Do you recognize the routes of these

5   buildings as the routes of the EER?

6       A.  Yes.

7       Q.  So was that the main road right in front of

8   the EER?

9       A.  Yes.

10      Q.  Sir, still looking at that photograph, but

11  then also take a look at this one where you're

12  standing.  If you look over at the computer screen,

13  sir.  See, this is the main road right here, correct?

14      A.  Yes.

15      Q.  And this is the intersection that goes up to

16  the ESO, correct?

17      A.  Yes.

18      Q.  And the EER buildings would be over to this

19  side, they're not in the picture, correct?

20      A.  Yes.

21      Q.  Okay.  Now, if you can look back at this

22  photograph, would this be the road that goes up to the

23  ESO and this is the main road?

24      A.  Yes.

25      Q.  And the buildings that have the red roofs,

1    that's the EER, right?

2         A.  Yes.  At the school.

3         Q.  Okay.

4              MR. HOWARD:  With that, your Honor, I would

5    move the admission of Exhibit I, and I'll show it to

6    Mr. Capin.

7              MR. CAPIN:  No objection.

8              THE COURT:  ID may be stricken on Defendant's

9    I.

10             (Defendant's Exhibit I Admitted)

11        Q.  Now, sir, these photographs are in the same

12   area.  But if you recognize, this is just a little bit

13   of a different angle, and that's Exhibit H for

14   identification.  Does that look familiar?

15        A.  Yes.

16        Q.  And are those red roofs the EER buildings?

17        A.  Yes.

18             MR. HOWARD:  I would move to strike the ID on

19   H.

20             MR. CAPIN:  May I see it?

21             THE COURT:  Objection?

22             MR. CAPIN:  No objection.

23             THE COURT:  ID may be stricken on Defendant's

24   H.

25             MR. HOWARD:  It's this one.

1          MR. CAPIN:  This one?

2          MR. HOWARD:  Yes.

3          (Defendant's Exhibit H Admitted)

4      Q.  And then looking at Exhibit K, this is from a

5  little ways up the road looking back at where the

6  hotel used to be.  Do you recognize this building

7  right here?

8      A.  This is a plot of where the I'Huriro used to

9  be.

10     Q.  And that's a new building now where the

11 I'Huriro used to be, right?

12     A.  Yes.

13         MR. HOWARD:  So I move to strike the ID on K.

14         THE COURT:  Any objection?

15         MR. CAPIN:  No objection.

16         THE COURT:  ID may be stricken on Defendant's

17 K.

18         (Defendant's Exhibit K Admitted)

19     Q.  May I take this back?  Thank you.  And just

20 one more photograph.  This is from the main road.

21 This is Exhibit J.  Are those the red roofs of the

22 EER?

23     A.  Yes.

24         MR. HOWARD:  I move to strike on J.

25         MR. CAPIN:  No objection.

1              THE COURT:  ID may be stricken on Defendant's

2  J.

3              (Defendant's Exhibit J Admitted)

4              MR. HOWARD:  Thank you, your Honor.  Just for

5  the moment I'm only going to publish I -- Exhibit I.

6         Q.  Mr. Sibomana, this was a photograph of the

7  main road with the intersection of the ESO, correct?

8         A.  Yes.

9         Q.  And these red roofs here are the roofs of the

10 EER school where you went to primary school, correct?

11        A.  Yes.

12        Q.  And then I'll put Exhibit K on the screen.

13 This building here is a new building where the

14 I'Huriro Hotel used to be, correct?

15        A.  Yes.

16        Q.  And these trucks and tractor that are parked

17 here on the slope, that's a path that goes down past

18 the hotel, correct?

19        A.  Yes.

20        Q.  And then on Exhibit H where this lady is

21 standing, that's the entrance to the path that goes

22 down by the hotel, correct?

23        A.  Correct.

24        Q.  Thank you, sir.  Mr. Sibomana, have you ever

25 told this story that you told us this morning to

1  anybody before you spoke to the agents in Butare last

2  year?

3      A.  No one.

4      Q.  And this happened now almost 19 years ago,

5  correct?

6      A.  Yes.

7      Q.  And in the last 19 years you have heard lots

8  of stories about what happened in Butare, haven't you?

9      A.  Correct.

10     Q.  People around Butare for the last 19 years

11  have talked a lot about Shalom, haven't they?

12     A.  I don't know.

13     Q.  People around Butare have talked a lot about

14  the hotel and the roadblock that was there, haven't

15  they?

16     A.  I don't know about that.  I'm saying what I

17  know.  I'm telling my own story.  Whether they said it

18  or not, I don't know.

19     Q.  Okay.  Mr. Sibomana, you said that a man

20  named Jean-Pierre called you to come to the Hotel

21  Faucon?

22     A.  Yes.

23     Q.  Do you have a cell phone?

24     A.  Yes.

25     Q.  And he called you on your cell phone?

1      A.  Yes.

2      Q.  Do you know how he got your phone number?

3      A.  I don't know.

4      Q.  Do you know how he got your name?

5      A.  I don't know.

6      Q.  Did you ask him how it was or why it was he

7   was calling you?

8      A.  Yes.

9      Q.  And what did he say?

10      A.  He called me and told me that there were

11   American researchers that wanted to talk to me about

12   what happened during the genocide.

13      Q.  Okay.  And did you then ask him, well, how

14   come they want to talk to me?

15      A.  I didn't ask him.

16      Q.  Had you ever met this man before?

17      A.  No.

18      Q.  When you came to America a couple weeks ago,

19   you met with Mr. Capin and Mr. Chakravarty, correct?

20      A.  Yes.

21      Q.  And they talked to you about your story,

22   right?

23      A.  Yes.

24      Q.  And while they were talking to you they

25   showed you a statement that was made to authorities in

 1  Canada, right?

 2           THE INTERPRETER:  Could you repeat that?

 3      Q.  They showed you a written statement, a typed

 4  statement, that was made to authorities in Canada?

 5           THE INTERPRETER:  That was made to --

 6           MR. HOWARD:  That was given to authorities in

 7  Canada.

 8      A.  They didn't show me that.

 9      Q.  Did you talk to them about this person named

10  Vincent Sibomana who gave a statement to Canadian

11  authorities?

12           MR. CAPIN:  Objection, your Honor.  Counsel

13  knows it's a different Vincent Sibomana.

14           MR. HOWARD:  Excuse me.  Judge, he doesn't

15  get to testify.

16           THE COURT:  I agree.

17           MR. CAPIN:  Objection, your Honor.

18           THE COURT:  Do you have a good faith basis?

19           MR. HOWARD:  Of course I do.

20           THE COURT:  All right.

21           MR. HOWARD:  I never asserted for a moment it

22  was his statement, nor do I intend to.

23           (SIDEBAR)

24           THE COURT:  What's the objection?

25           MR. CAPIN:  The objection is that we put

1   counsel on notice that a statement we provided from

2   Canada was of a Vincent Sibomana who upon inquiry and

3   looking at -- it's on the face of the statement, a

4   different age, from a different place.  He's -- I

5   think he -- I forget the details, but he had kids

6   during the genocide.  This guy is 13 in the genocide.

7   It's a different person.  It's a common name.

8         MR. HOWARD:  I'm aware of all of that, Judge.

9         THE COURT:  Okay.

10        MR. HOWARD:  I'm not even going to ask him if

11  it's his statement.

12        MR. CAPIN:  Then the objection is relevance,

13  your Honor.

14        THE COURT:  What's it to show?

15        MR. HOWARD:  To show this, Judge.  The --

16        THE COURT:  Do you have a reason to think

17  that the government showed him that statement?

18        MR. HOWARD:  Yes, because they wrote to me

19  and said it's not his statement.  He says it's not his

20  statement.  I don't have any reason to dispute that.

21  What I'm getting at is they have Canadian trackers who

22  are going to find witnesses.

23        There's a different Vincent Sibomana who gave

24  a statement to Canadians.  They go into Butare to find

25  Vincent Sibomana.  They find this guy and he's got a

1   story to tell.

2           THE COURT:  That doesn't seem to help you.

3           MR. HOWARD:  I think it does.

4           MR. CAPIN:  I think Agent Andersen may be the

5   person to ask these questions of.

6           There's no good faith basis to believe that

7   this person was shown the statement.  He says he

8   wasn't shown it.

9           MR. HOWARD:  How did you know it wasn't him?

10          MR. CAPIN:  Because the guy on the report is

11  like twice his age.

12          THE COURT:  Did you show it to him?

13          MR. CAPIN:  No.  It's not him.

14          MR. HOWARD:  You're telling me that when you

15  sat down with this guy you did not go over that

16  statement with him?

17          MR. CAPIN:  Correct.

18          MR. HOWARD:  But you drew the conclusion it

19  was not the same guy?

20          MR. CAPIN:  Based on his age, correct.

21          MR. HOWARD:  Did you even ask him if it was

22  his statement?

23          MR. CAPIN:  No.

24          MR. HOWARD:  But you made a representation to

25  me that I had no good faith basis --

1          THE COURT:  There's no need to argue.  Okay.

2   Thank you.

3          (CONCLUSION OF SIDEBAR)

4       Q.  Sir, you didn't give a statement to Canadian

5   authorities, right?

6       A.  No.

7       Q.  So if some guy named Vincent Sibomana did,

8   it's not you?

9       A.  No.

10       Q.  And you do not have any idea how the

11   Americans got your name, right?

12       A.  No.

13       Q.  By the way, when you met with the agents in

14   June last year did you ask them how did you get my

15   name?

16       A.  I didn't ask that.

17       Q.  Were you curious how it is that Americans

18   came to Butare and they knew to call you?

19       A.  Yes.

20       Q.  But you didn't ask?

21       A.  No.

22       Q.  All right.  Okay.  Mr. Sibomana, you worked

23   at the Relais de la Soif prior to the genocide?

24       A.  Yes.

25       Q.  And you had been working there for about a

 1  year; is that right?

 2       A.  Yes.

 3       Q.  Did you start working there after you

 4  finished school at the EER?

 5       A.  Yes.

 6       Q.  What month did you finish school at the EER

 7  in 1993?

 8       A.  I don't remember that.

 9       Q.  What month does school usually end in Rwanda?

10       A.  Usually school in Rwanda started in

11  September.

12       Q.  So did it end the previous year in May or

13  June?

14            THE INTERPRETER:  Repeat that.

15       Q.  The previous school year, does it end in May

16  or June?

17            THE INTERPRETER:  The previous year?

18            MR. HOWARD:  We know -- he said that school

19  starts in September.  I want to know when the school

20  year ends.

21       Q.  What month does it end in?

22       A.  We used to start in September back then, but

23  that's not the case now.

24       Q.  Okay.  I'm only going to try one more time.

25  We know that it starts in September.  What month does

1  the school year end?

2      A.  The school year had three trimesters, so I

3  don't know how to explain exactly what month school

4  ended.

5      Q.  Okay.  Very good.  Do you -- I'll just try it

6  this way.  Do you know what month you started working

7  at the Relais de la Soif?

8      A.  I don't remember because that's where

9  actually I also lived.  So I started working there

10 after primary school.

11     Q.  Okay.  So while you were in school at the EER

12 and living at the Relais de la Soif, how many times

13 did you see this woman you're calling Beatrice?

14     A.  I saw her once.

15     Q.  One time?

16     A.  I saw her once when she came to Relais de la

17 Soif.

18     Q.  And do you have any idea when it was she came

19 there?

20     A.  No.

21     Q.  How many times did you see her walking around

22 Butare?

23     A.  It's about twice.

24     Q.  And when you saw her walking around Butare,

25 you knew who she was?

1       A.  Yes.

2       Q.  Do you know if Beatrice and Shalom were

3   married?

4       A.  Yes.

5       Q.  When were they married?

6       A.  They got married in 1993.  That's when I got

7   to know them.

8       Q.  Okay.  And did you meet Beatrice before they

9   were married or after?

10      A.  I saw her after.

11      Q.  Can you describe her for me the first time

12  you saw her?

13      A.  I don't understand what you mean by that.

14      Q.  Was she tall or was she short?

15      A.  She was average.  She wasn't very short.

16      Q.  Was she big or was she thin?

17      A.  She was average.  She wasn't very big.

18      Q.  Not very big?

19      A.  Yes.

20      Q.  Did you ever see her carrying a baby in her

21  arms?

22      A.  No.

23      Q.  You said she lived at the hotel, correct?

24      A.  That's where I would see her.

25      Q.  Had you known her to be living at the hotel

1   the entire time that you knew her?

2       A.  Yes.

3       Q.  How long did you -- after the president's

4   plane was shot down how long did you stay at the

5   Relais de la Soif where you were living?

6       A.  After the plane was shot down war start right

7   away.

8       Q.  And where did you live?  Did you continue to

9   live there?

10      A.  Yes.

11      Q.  And how long did you continue to live there

12  after the president's plane was shot down?

13      A.  I stayed there two weeks.

14      Q.  And after the two weeks where did you move

15  to?

16      A.  I moved to EER where other refugees were.

17      Q.  And the EER was right across the street,

18  correct?

19      A.  Yes.

20      Q.  And you told Mr. Capin you stayed at the EER

21  for three days?

22      A.  Yes.

23      Q.  And where did you go from there?

24      A.  I kept hiding in many places in Butare Town.

25      Q.  And did you ever leave Butare Town before the

 1   genocide was over?

 2        A.  No.

 3        Q.  How many times did you actually see the

 4   roadblock in front of the EER and the hotel?

 5        A.  Many times while I was there.  I would see

 6   all the time.

 7        Q.  And when you spoke to the agents in June of

 8   2012, the American agents, you didn't tell them that

 9   you saw anybody being killed at the roadblock, did

10   you?

11        A.  I did.

12        Q.  You did?

13        A.  I told them that people would be asked to sit

14   there and taken afterwards to be killed.

15        Q.  But you didn't see anybody killed at the

16   roadblock, did you?

17        A.  No.

18        Q.  And you did not see any dead bodies at the

19   roadblock, did you?

20        A.  No.

21        Q.  The roadblock wasn't made out of dead bodies,

22   was it?

23        A.  No.

24        Q.  And you told Mr. Capin that when you were

25   pulled aside and this guy named Kazungu came over to

1  you he hit you with the butt of a rifle, right?

2        A.  Yes.

3        Q.  And then you said he threatened to take you

4  away and kill you?

5        A.  Would you repeat the question?

6        Q.  That Kazungu threatened to take you away from

7  the roadblock and kill you.  Is that what you said

8  earlier today?

9        A.  He pulled me and beated me up at the same

10 time, so you couldn't threaten anyone -- a person any

11 more than that.

12       Q.  I thought I heard you say this morning that

13 he was going to take you away to kill you.  Did you

14 say that this morning?

15       A.  No.

16       Q.  Okay.  Now, when you met with -- strike that.

17 You said when you went over to the EER you found a

18 bush to hide behind, right?

19       A.  Yes.

20       Q.  And where was that bush located at the EER

21 that you were hiding behind?

22       A.  It was located on the side where there are

23 rooms behind the EER, close to the growth, not on the

24 side of I'Huriro.

25       Q.  And did you stay hidden for the three days

1   that you were there?

2       A.  Yes.

3       Q.  You described this morning that you saw

4   Beatrice wearing the clothing of the MRND.  Do you

5   remember that?

6       A.  Yes.

7       Q.  When you were around Butare did you see the

8   clothing of any of the other parties?

9       A.  Yes.

10      Q.  What did their clothing look like?  What did

11  the other parties' clothing look like?

12      A.  They were made by other seals and colors

13  different to MRND.

14      Q.  What were the colors of the MDR?

15      A.  Black and red.

16      Q.  What were the colors of the PL?

17      A.  It was green color with three stars in it.

18      Q.  And what were the colors of the PSD?

19      A.  I remember only a few as far as the PSD, but

20  I could recognize it if I saw it.

21      Q.  I'm going to show you what's been marked as

22  Government's Exhibit 26(F).  Is this an MRND shirt?

23      A.  Yes.

24      Q.  Did you see Beatrice wearing a shirt that

25  looked exactly like this?

1      A.  Yes.

2      Q.  Showing you what's been marked as

3  Government's Exhibit 26(E), is this an MRND shirt?

4      A.  Yes.

5      Q.  And that's got President Habyarimana's

6  picture all over it, right?

7      A.  Yes.

8      Q.  Did you see Beatrice wearing a shirt like

9  this one?

10     A.  Yes.

11     Q.  Did you ever see Beatrice wearing a hat that

12  looks like this one?  This is 26(A).

13     A.  I didn't see that.

14     Q.  And this is Exhibit 26(G).  This is like a

15  big shirt or a dress, right?

16     A.  Correct.

17     Q.  Is this MRND also?

18     A.  No.

19     Q.  No?  Can you see on the back the letters in a

20  circle say MRND?

21     A.  I can see them.

22     Q.  But this is not an MRND shirt?

23     A.  What I saw is the one that has Habyarimana's

24  picture.  That's what I saw.  If that's for MRND, I

25  didn't see that.

1      Q.  You saw these two shirts?

2      A.  Yes.

3      Q.  Beatrice was wearing these two, right?

4      A.  Yes.

5      Q.  How many times did you see her wearing that

6  clothing, by the way?

7      A.  I saw her once.

8          MR. HOWARD:  Your Honor, thank you very much.

9  I appreciate it.

10         THE COURT:  Redirect?

11         MR. CAPIN:  Just maybe two minutes, your

12  Honor.

13                  REDIRECT EXAMINATION

14  BY MR. CAPIN:

15     Q.  Is the last time you saw Beatrice wearing

16  MRND clothing when you were 14?

17     A.  I was 13.

18     Q.  The last time you saw Beatrice wearing MRND

19  clothing was when you were 13?

20     A.  Yes.

21     Q.  Based on what you knew to be MRND clothing,

22  are you certain that what Beatrice was wearing was in

23  fact MRND clothing?

24     A.  Yes.

25     Q.  Now, you said that when the American -- when

1   the driver told you that American researchers wanted

2   to talk to you he first called you on your cell phone.

3        A.  Yes.

4        Q.  Does almost everybody in Rwanda have a cell

5   phone?

6        A.  Yes.

7        Q.  And, in fact, are cell phone cards, calling

8   cards, sold throughout towns in Butare in Rwanda?

9        A.  Yes.

10        Q.  Is that the kind of phone you have, the kind

11   that requires -- you have to buy a prepaid card to use

12   it?

13        A.  Yes.

14        Q.  And you say that Beatrice came into the

15   Relais de la Soif once herself to buy beer and soda,

16   correct?

17        A.  Yes.

18        Q.  And Shalom -- did Shalom come in sometimes?

19        A.  Yes.

20        Q.  Did sometimes other employees from the

21   I'Huriro come in to buy beer and soda?

22        A.  Yes.

23        Q.  And in addition to seeing Beatrice come into

24   the Relais de la Soif, did you also see her in the

25   area around the I'Huriro before the genocide?

1       A.  Yes.

2       Q.  More than once?

3       A.  Yes.

4       Q.  As you sit here now, do you remember how many

5  times as a 13-year-old you saw Beatrice before the

6  genocide?

7       A.  I saw her three times.

8       Q.  Do you have any doubt in your mind that the

9  woman checking IDs at the roadblock at the I'Huriro

10  was Beatrice?

11          I'm going to ask a different question of you

12  because the translation is so much longer than my

13  question.

14          Are you certain that the woman you saw at the

15  roadblock was Beatrice?

16      A.  Yes.

17          MR. CAPIN:  No further questions, your Honor.

18          THE COURT:  All right.  All set?

19          MR. HOWARD:  No questions.  Thank you, Mr.

20  Sibomana.

21          THE COURT:  All right.  Thank you, sir.  You

22  may step down.  You're excused.

23          Why don't we take our mid morning break now.

24          (RECESS)

25                          BRIAN ANDERSEN

 1          having been duly sworn, testified as follows:

 2          THE CLERK:  For the record, please state your

 3  name and spell your last name.

 4          THE WITNESS:  Sure.  Thomas Brian Andersen,

 5  Jr.  The last name is spelled A-N-D-E-R-S-E-N.

 6                    DIRECT EXAMINATION

 7  BY MR. CAPIN:

 8      Q.  Special Agent Andersen, please tell the jury

 9  what you do.

10      A.  I'm a special agent for the Department of

11  Homeland Security.  I work for Homeland Security

12  Investigations.

13      Q.  And how long have you been with the

14  Department of Homeland Security?

15      A.  Since February of 2006.

16      Q.  And what is your current assignment?

17      A.  As I said, I'm a special agent.  I'm

18  currently assigned to the National Security

19  Investigations Division in Boston.

20      Q.  And what type of cases does that division

21  work?

22      A.  Primarily we work two types of

23  investigations.  We investigate people who may be

24  threats to national security.  We also investigate

25  people who are human rights violators, people who have

 1  engaged in genocide, war crimes or torture.

 2      Q.  Are you the lead investigator for the case

 3  involving Beatrice Munyenyezi?

 4      A.  Yes, I am.

 5      Q.  In the course of your investigation did you

 6  have occasion to review the defendant's A file, which

 7  is Exhibit 6 to this trial?

 8      A.  Yes, I did.

 9      Q.  And in reviewing that file, did you see

10  photographs of the defendant in that file?

11      A.  Yes.

12      Q.  Do you see the defendant in the courtroom

13  today?

14      A.  Yes, I do.

15      Q.  Would you please identify her for the jury?

16      A.  The defendant is seated next to her attorneys

17  at the defense table wearing a bluish purple sweater.

18          MR. CAPIN:  Could the record reflect the

19  agent identified the defendant, your Honor?

20          MR. RUOFF:  No objection.

21          THE COURT:  It may.

22      Q.  Before 2006 when you went to work for

23  Homeland Security, what did you do for work?

24      A.  For the two years prior to having this job I

25  was a detective assigned to the Southern Vermont Task

 1  Force.

 2        Q.  How long were you a detective with the

 3  Southern Vermont Task Force?

 4        A.  Two years.

 5        Q.  Before that, what did you do?

 6        A.  I was a detective and patrol officer for the

 7  Bellows Falls, Vermont, Police Department.

 8        Q.  How long were you with the Bellows Falls

 9  Police Department?

10        A.  Since January of 2000.

11        Q.  And before January of 2000, how were you

12  employed?

13        A.  I was a high school social studies teacher.

14        Q.  For how long?

15        A.  Five years.

16        Q.  Special Agent Andersen, have you conducted

17  investigations that required gathering evidence and

18  identifying witnesses abroad; that is, out of the

19  country?

20        A.  Yes.

21        Q.  What countries were involved?

22        A.  Rwanda, obviously.  Liberia, El Salvador, the

23  United Kingdom, Peru, Cape Berea.

24        Q.  In the normal course of traveling to a

25  foreign country to conduct investigative activities,

1    are there requirements by our government that you

2    notify the government of the host country?

3        A.   Yes.

4        Q.   How do you satisfy those requirements?

5        A.   Primarily, agents seeking to travel abroad to

6    conduct investigations in other countries work through

7    an office at our headquarters who then work with the

8    State Department, and ultimately a request is sent to

9    the embassy or consulate -- American embassy or

10   consulate in the country that we seek to investigate

11   in.

12           The request is handled at the embassy and

13   often needs to be approved by some local officials.

14   So they would go to the appropriate local official and

15   then approval would come back through that same chain.

16       Q.   Now, does that requirement apply -- for

17   example, you mentioned that you investigated in

18   Liberia.  Does that apply in Liberia?

19       A.   Yes.

20       Q.   Does that apply in the United Kingdom?

21       A.   It did.

22       Q.   So if you were to travel to London to

23   interview witnesses, for example, is our government --

24   are you required, or is somebody at Homeland Security

25   required to notify authorities in the UK?

1    A.  Well, as I said, we don't notify them

2    directly.  We notify the State Department, and the

3    embassy or consulate in that country will notify those

4    personnel in the home country.

5        Q.  With regard to your investigative activities

6    in Rwanda, have you personally traveled to Rwanda to

7    oversee investigative activities?

8        A.  Yes.

9        Q.  How many times?

10       A.  I believe eight.

11       Q.  Was the first time in August 2008?

12       A.  Yes.

13       Q.  And who was the subject of -- what subject or

14   subjects were you investigating when you went on your

15   first trip to Rwanda?

16       A.  We traveled to Rwanda in August of '08 to

17   investigate three subjects.  The defendant, her sister

18   Prudence Kantengwa, and then a third unrelated

19   subject.

20       Q.  Did you travel to Rwanda again in March and

21   April of 2009?

22       A.  Yes.

23       Q.  And who were the subjects of your

24   investigative activities that time?

25       A.  Again, the defendant and her sister,

1  Kantengwa.

2       Q.  Did you travel to Rwanda again in February of

3  2010?

4       A.  Yes.

5       Q.  Was that to conduct investigations unrelated

6  to this defendant?

7       A.  Yes.

8       Q.  Did you travel to Rwanda again in October and

9  November of 2010?

10      A.  Yes.

11      Q.  And again, was that to conduct investigative

12  activities unrelated to this defendant?

13      A.  Yes, they were unrelated.

14      Q.  Unrelated.  Did you travel to Rwanda again in

15  February of 2011?

16      A.  Yes.

17      Q.  Who were you investigating on that trip?

18      A.  Again, the defendant and her sister, Prudence

19  Kantengwa.

20      Q.  Was your next trip in August and November --

21  I'm sorry -- August and September of 2011?

22      A.  Yes.

23      Q.  And was that trip unrelated to the defendant

24  and her sister?

25      A.  Yes, it was.

1      Q.  Did you travel again to Rwanda in June of

2  last year -- I'm sorry -- in February of last year,

3  2012?

4      A.  Yes.

5      Q.  And what subjects were you investigating on

6  that trip?

7      A.  Again, the defendant and her sister.

8      Q.  And finally, did you travel to Rwanda in June

9  of last year?

10      A.  Yes.

11      Q.  And who was the subject or subjects in your

12  investigation on that occasion?

13      A.  This defendant and then other unrelated

14  subjects.

15      Q.  Now, were you present in the courtroom during

16  opening statements?

17      A.  Yes, I was.

18      Q.  Did you hear Mr. Ruoff's opening statements?

19      A.  I did.

20      Q.  Did you hear Mr. Ruoff say the witnesses you

21  interviewed may or may not have known what you were

22  there to talk about and that the Department of

23  Homeland Security uses people in Rwanda to locate

24  witnesses?

25      A.  I did hear that.

1        Q.  When you travel to foreign countries to

2   conduct investigative activities, do you hire people

3   from those countries for any purpose?

4        A.  Yes, we often do.

5        Q.  For what purposes?

6        A.  The primary purposes are to serve as drivers,

7   interpreters, and often those who serve as

8   interpreters make phone calls on our behalf.

9        Q.  With regard to interpreters and people making

10  phone calls, is that especially the case in a country

11  where you don't speak the language?

12       A.  Yes.

13       Q.  Do you continue to need the use of

14  interpreters when you bring witnesses to this country

15  to participate in some proceedings?

16       A.  We do.

17       Q.  Have you seen the interpreters who

18  interpreted for the jury during the course of this

19  trial?

20       A.  Yes, I did.

21       Q.  Are they these two people sitting right here?

22       A.  Yes.

23       Q.  Were they hired by Homeland Security?

24       A.  No, they were not.

25       Q.  Are there currently several interpreters in

1  town working for Homeland Security helping you and

2  attorneys in this case communicate with witnesses?

3      A.  Yes.

4      Q.  With regard to witnesses from Rwanda who have

5  testified before this jury, did you use drivers and

6  interpreters in Rwanda in any way to communicate with

7  those witnesses?

8      A.  Yes, we did.

9      Q.  How did you use them?

10     A.  Well, we used embassy vehicles to get us from

11 Kigali to Butare.  Once we were in Butare, we had

12 hired a driver who we directed to go out and pick up

13 witnesses who we had previously identified and

14 transport those witnesses to our location in Butare.

15     Q.  Now, the interpreters that traveled with

16 you -- they're currently here assisting -- were those

17 interpreters present for the witness interviews?

18     A.  Yes.

19     Q.  Was the driver that you described who you

20 used to fetch the witnesses, was he present -- was he

21 or she present for any witness interview?

22     A.  No.

23     Q.  As pertained to the witnesses who have

24 testified to this jury, what role would the driver

25 play?

1       A.  The role I've already described.  Well, the

2  first role that he had was to make phone calls on your

3  behalf to people who we had already identified and

4  schedule appointments for us to interview those

5  people.  If it was necessary, if they needed a ride,

6  then the driver would go to wherever they were and

7  then bring them back to us in Butare.

8       Q.  And I take it the driver spoke Kinyarwanda,

9  the primary language of Rwanda?

10      A.  He did.

11      Q.  And you do not?

12      A.  No, I don't.

13      Q.  Did you hear Mr. Ruoff say in his opening

14  that when special agents of the Homeland Security flew

15  over to Rwanda you were given the list of people to

16  interview?

17      A.  I did hear that.

18      Q.  Did anybody in Rwanda give you any such list?

19      A.  No.

20      Q.  With regard to the person who you used to

21  contact witnesses and then if necessary drive them to

22  the interviews with people, what, if anything, did you

23  tell him about the nature of your investigation?

24      A.  The only thing that we told the driver about

25  our investigation was that quite obviously we were

1   from the United States, that the subject of our

2   inquiry was in the United States, and that we were

3   seeking to find out information about events that

4   occurred in Butare during the genocide.

5        Q.  Did you instruct him to bring specific people

6   that you identified to meet with you?

7        A.  Yes.

8        Q.  Did he ever bring to a meeting any person who

9   you had not identified for him?

10       A.  No, he did not.

11       Q.  Did you give him instructions about what to

12  tell or what not to tell the witnesses who were being

13  brought to you?

14       A.  We didn't give him much information because

15  we didn't tell him what it was that we wanted to talk

16  to the witnesses about.  What we instructed him was if

17  a witness was inquiring, who are you bringing me to

18  see, what do they want to talk to me about, we told

19  the driver you can tell them that there are some

20  Americans here who would like to talk to you, and

21  that's it, you won't tell them anything other than

22  that.

23       Q.  Now, with regard to the witnesses that have

24  testified at this trial, did you interview each of

25  these witnesses while they were in Rwanda?  What I

 1  should say is, did you or a member of your

 2  investigative team interview each of these witnesses

 3  while you were in Rwanda?

 4       A.  Yes.

 5       Q.  Was there a particular way in which you

 6  started each interview?

 7       A.  Yes.

 8       Q.  Were you consistent in the manner that you

 9  started each interview?

10       A.  In the manner in which we started it?  Yes,

11  we were.

12       Q.  Why don't you walk the jury through your

13  standard procedure for interviewing witnesses in

14  Rwanda.

15       A.  Sure.  As I said before, witnesses didn't

16  know why they were coming to speak with us.  So the

17  first thing that we did when witnesses arrived was we

18  introduced ourselves.  Typically, I would just

19  introduce myself by my first name and I would tell

20  them that I was an investigator from the United

21  States.

22            I would introduce the other members.

23  Sometimes other agents were present.  Sometimes,

24  because of the volume of work that we were doing at a

25  given time, there was only one agent, and then either

1  one or two interpreters.  So I would introduce

2  everybody to that witness and then I would say, it's

3  my understanding that you were in Butare.  I would

4  like to talk to you about events that occurred during

5  the genocide.  Is that okay?  For some people it was

6  not okay.  For others it was.

7       Q.  And if you knew that they were in Butare

8  during the genocide, how would you proceed?

9       A.  If we learned that they were in Butare during

10  the genocide, that would lead us to other questions,

11  general questions, like, where were you during the

12  genocide, are you from Butare.  If they were from

13  Butare, where in Butare.  Were you from town?  Were

14  you from outside of town?  What was your family

15  situation?

16            We would talk generally about their

17  experience during the genocide, not the substantial

18  details that would later come, but things like what

19  was their ethnicity, what was the ethnicity of their

20  parents.  Generally speaking, what happened to your

21  family, things of that nature, to get a sense of what

22  this person's experience was, and the answers to those

23  questions would help us develop additional questions.

24       Q.  So would it be common that in the course of

25  your interview of witnesses who you established had

1   personal knowledge of events in Butare during the

2   genocide, would it happen that these witnesses would

3   mention specific geographic locations or landmarks?

4          A.  Yes.  That happened often.

5          Q.  Were there recurring landmarks or geographic

6   locations you heard about?

7          A.  Yes, there were.

8          Q.  Give us a few examples.

9          A.  The prefecture, or I think what we would call

10  the state house.  You know, if we look at Butare it's

11  kind of a state, and we would think about the

12  prefecture as kind of the capitol building.  That was

13  a common landmark that would come up.

14             A couple of the schools.  Groupe Scolaire

15  occasionally would come up.  The EER school would come

16  up.  Sometimes it would be the church on the EER

17  property.  Obviously, the I'Huriro Hotel would come up

18  consistently, the ESO, the Ngoma Camp, military base,

19  the hospital, the university, occasionally the mosque.

20         Q.  The ESO, that's the noncommissioned officers'

21  barracks?

22         A.  Yes.  Sorry.

23         Q.  During the course of your establishing what

24  the witnesses knew about events in Butare during the

25  genocide, was it common for you to discuss political

1   activity?

2        A.  It was common if witnesses had given an

3   indication that they would know about that.  So, as I

4   said earlier, the questions about background, where

5   they were from, where they lived, how long they had

6   been there, that would drive us to questions about

7   were you in Butare when Rwanda was a single party

8   state, were you in Butare when the period of

9   multiparties came, so 1991, 1992.  So that's what

10  would drive that question.

11        If they hadn't been in Butare during that

12  time, I don't think we would normally ask it.  Asking

13  them about political activity would bring us to yet

14  other questions.

15        Q.  For example, it would lead to questions about

16  whether they were aware of MRND activities in Butare?

17        A.  Yes.  That is a question that we would ask.

18        Q.  If you learned that they were aware of such

19  activities, did you ask them whether they were aware

20  of prominent members of the MRND party who resided in

21  Butare during the genocide?

22        A.  Sure.

23        Q.  What names would occur?

24        A.  The most dominant names were the family of

25  Maurice Ntahobali, his wife Pauline, their son Shalom.

1   Sometimes Sindikubwabo, the interim president, his

2   name would come up.

3        Q.  And when you learned about Maurice and

4   Pauline, did you ask follow-up questions about other

5   members of that family?

6        A.  Yes.

7        Q.  Were other names provided?

8        A.  Yes.

9        Q.  Was the defendant identified by certain

10  witnesses?

11       A.  Yes, she was.

12       Q.  Did you ever identify the defendant by name

13  to any witness before the witness had told you that he

14  knew her -- before the witness told you he knew her

15  name?

16       A.  No.

17       Q.  Did you ask witnesses about how they knew

18  what political party somebody belonged to?

19       A.  Sure.

20       Q.  Describe how you would sort of probe that

21  area of inquiry.

22       A.  If a witness identified having been present

23  in Butare during the time of multiparties and they

24  talked about specific personalities, the follow-up

25  question was, how did you know, what did you see

1  yourself, and often answers would describe rallies --

2  I think what we would call like a parade, a political

3  rally that moves through the street.  People would

4  describe meetings taking place.  There weren't just

5  meetings of the MRND.  There were other political

6  parties who were holding meetings as well.  If they

7  were able to describe those kinds of events we would

8  say, well, how did you know it was MRND as opposed to

9  something else, PL, a different political party, and

10 witnesses would describe, well, the MRND meeting or

11 rally had been announced on the radio, vehicles were

12 driving through the street with megaphones, there were

13 fliers being distributed, people who were representing

14 the MRND party wore particular clothing that other

15 party members did not wear -- or members of other

16 parties did not wear, and then we would ask them to

17 describe that kind of clothing.

18      Q.  With regard to the activities by the

19 defendant during the genocide -- what kind of

20 information did you ask witnesses about or were you

21 interested in learning about the defendant's

22 activities in Butare?

23      A.  Once witnesses had given us a good faith

24 basis to believe that they in fact knew the defendant,

25 we would ask things like, how did you know her, did

 1    you know whether or not she was politically active, if

 2    at all.  And so in response to that question it would

 3    often be, how do you know, and then, well, I saw her

 4    at a rally, I saw her wearing particular clothing and

 5    things of that nature.  They would also describe the

 6    family in greater detail.

 7            We also would ask witnesses whether or not

 8    they had any experiences -- whether or not they had

 9    gone to school with the defendant, whether or not they

10    went to school with her husband.

11            We wanted to know whether or not anybody had

12    interacted with her, for example, at the I'Huriro, at

13    the bar.  Those were, generally speaking, some of the

14    things that we were seeking to find.

15        Q.  With regard to the follow-up question with

16    regard to the bar -- I'm going to show you Exhibit 28

17    and ask if you recognize it.

18        A.  I do.

19        Q.  What do you recognize that to be?

20        A.  A redacted copy of a resume that was found

21    during a lawful search of the defendant's residence.

22        Q.  When you say redacted, was it redacted to

23    omit certain personal identifiers of the defendant?

24        A.  That's correct.

25        Q.  Such as address and phone number?

1      A.  That's right.  I think the address and phone

2  number are not listed here.

3      Q.  When was that obtained by the Department of

4  Homeland Security?

5      A.  In June of 2010.

6          MR. CAPIN:  Move to strike the ID.

7          THE COURT:  Any objection?

8          MR. RUOFF:  Yes, Judge.  May we approach?

9          THE COURT:  Yes.

10         (SIDEBAR)

11         THE COURT:  It was a lawful search.

12         MR. RUOFF:  It was a lawful search.  We don't

13  contest the authenticity, but we object on the basis

14  that the document is hearsay.

15         MR. CAPIN:  It's not being offered for the

16  truth of the matter asserted.  Moreover, if it's what

17  it purports to be, it's her resume, and therefore it's

18  an admission by the party.

19         MR. RUOFF:  Only if it's written by her,

20  Judge.  It has to be her statement.  A resume can be

21  written by anybody unless there's --

22         THE COURT:  What's it being offered for?

23         MR. CAPIN:  It's being offered to show that

24  she identifies activity at the bar of the I'Huriro

25  during the genocide.  She worked there.

1          MR. RUOFF:  That's for the truth of the

2    matter.  Also, in opening statements counsel

3    specifically argued the time frame that she said she

4    put in that resume establishes when she worked there,

5    and it's being offered for the truth of the matter.

6          MR. CAPIN:  It's an admission.  I think the

7    Court can find on a preponderance standard that it's

8    more likely than not that she drafted the resume that

9    was found in her residence at the time of a lawful

10   search.

11         MR. RUOFF:  There were a lot of documents

12   drafted by other people found in her residence at the

13   time of the search.  Unless they have a witness that

14   can say, yes, this was her resume and she submitted it

15   to me for employment --

16         MR. CAPIN:  The standard for admissibility is

17   preponderance.  It's more likely than not that she

18   wrote it.  It goes to weight.  It's more likely than

19   not that she was aware of the contents.

20         THE COURT:  There was a warrant that

21   authorized the search.  This document was found among

22   her papers in her home?

23         MR. CAPIN:  Correct.  I can lay a foundation

24   if you want.

25         THE COURT:  Okay.  Lay a foundation.

1          MR. CAPIN:  I'll go through the issuance of

2  the warrant.

3          THE COURT:  It comes in as an admission, I

4  think.

5          MR. RUOFF:  Only if it's her statement.

6  That's the problem.

7          THE COURT:  Yes.  Then the question is, is it

8  or isn't it, and if the foundation is it was found in

9  her home among her papers pursuant to a search --

10         MR. CAPIN:  I'll make it easy, because I'll

11  also offer at the same time her journal entry which

12  bears her signature.

13         MR. RUOFF:  This document is not signed.

14         MR. CAPIN:  It was found in the same search,

15  so it makes it more likely that it is in fact

16  her admission -- or her statement.

17         THE COURT:  Lay a foundation.

18         MR. CAPIN:  Thank you.

19         (CONCLUSION OF SIDEBAR)

20     Q.  Special Agent Andersen, let me show you --

21         MR. RUOFF:  Those are the two journal

22  entries?

23         MR. CAPIN:  Yes.  The government moves to

24  strike the identification on 14(A) and (B), your

25  Honor.

1          THE COURT:  No objection?

2          MR. RUOFF:  No objection.

3          THE COURT:  Identification may be stricken on

4    14(A) and 14(B).

5          (Government's Exhibits 14(A) and 14(B)

6    Admitted)

7      Q.  This document on the screen in front of you,

8    do you recognize that?

9      A.  Yes.

10     Q.  Was that in fact taken during the same lawful

11   search in which DHS obtained the exhibit in front of

12   you which bears which exhibit, sir, the resume?

13     A.  Yes.

14     Q.  What exhibit number is that?

15     A.  Sorry.  Exhibit No. 28.

16     Q.  So was 14(A) obtained in the same lawful

17   search as Exhibit No. 28?

18     A.  Yes, it was.

19     Q.  You say it was a lawful search.  Do you know

20   who issued the search warrant?

21     A.  I don't recall the judge's name off the top

22   of my head.  It was a magistrate judge in this

23   courthouse.

24     Q.  Were you the person -- the affiant on the

25   search warrant?

1     A.  Yes, I was.

2     Q.  And did you provide the magistrate before you

3 got the warrant details about your investigation?

4     A.  Yes, I did.

5     Q.  And based on providing the --

6     MR. RUOFF:  Objection.  I know where this is

7 going with respect to the presentation to the

8 magistrate.  We're not conducting the lawfulness of

9 the search, Judge.

10     THE COURT:  Okay.

11     Q.  After you obtained the warrant, did you and

12 other agents travel to the residence of the defendant?

13     A.  Yes, we did.

14     Q.  And were you present while the residence was

15 searched?

16     A.  Yes, I was.

17     Q.  And were certain papers taken pursuant to

18 that lawful search warrant during that search?

19     A.  Yes.

20     Q.  Was Exhibit 28 one of them?

21     A.  Yes.

22     Q.  Was Exhibit 14(A) one of them?

23     A.  Yes.

24     Q.  Am I correct in noting that 14(A) is dated

25 September 22, 1999?

 1      A.  Yes.

 2      Q.  And the first several sentences reads as

 3  follows:  How do you feel when you write in English?

 4  I feel good -- I'll zoom this for the jury.  I feel

 5  good when I write in English, especially when I write

 6  a correct sentence.  Even if I make some mistakes, I

 7  don't blame myself or get discouraged because English

 8  is a second language for me.  My mother tongue is

 9  French.  Whenever I'm wrong, I like to keep trying

10  until I get the correct answer.

11          Did I read that correctly?

12      A.  Yes, you did.

13      Q.  Am I correct in noting that it bears the name

14  "By Beatrice Munyenyezi" on the bottom?

15      A.  Yes.

16          MR. CAPIN:  Move to strike the ID on 28, your

17  Honor.

18          THE COURT:  The resume?

19          MR. RUOFF:  Yes.  I continue with my

20  objection.

21          THE COURT:  All right.  Objection overruled.

22  ID may be stricken on Government's 28.

23          (Government's Exhibit No. 28 Admitted)

24      Q.  Now 28 -- am I correct in noting that it

25  appears to be a standard resume with the name Beatrice

1  Munyenyezi across the top?

2      A.  It is.

3      Q.  Am I correct in noting that under work

4  experience --

5          MR. RUOFF:  Your Honor, I'm sorry to

6  interrupt, but at this point since it's a non-truth

7  offering of this document, I'm asking you -- not for

8  the truth of the matter a limiting --

9          THE COURT:  It's admitted as an admission by

10  a party opponent -- or a statement by a party

11  opponent.

12          MR. CAPIN:  A statement by a party opponent.

13  Thank you, your Honor.

14      Q.  Am I correct in noting, as with a standard

15  American resume, that the work experience is laid out

16  in reverse chronological order starting with 2008 at

17  the top and going back to 1992 to 1994 at the bottom?

18      A.  Yes.

19      Q.  Am I correct in noting that for the period of

20  July 1992 through July of 1994 the defendant indicates

21  on her resume that she was the manager at the I'Huriro

22  Hotel, restaurant and boutique, Rwanda?

23      A.  Yes.  That's correct.

24      Q.  Am I also correct in noting that above that

25  the next job this resume states she held was as a

1 caseworker, U.N. high commissioned, for the refugee

2 camps, Kenya and Congo?

3      A.  It does reflect that.

4      Q.  And it claims that she had that job from July

5 1994 until February 1998?

6      A.  Yes.  That's what it says.

7      Q.  And you know, sir, that the defendant

8 traveled to this country as a refugee in March of

9 1998, correct?

10      A.  Yes.

11      Q.  And then under highlights and qualifications

12 at the top of the document, am I correct in noting

13 that she includes two years using customer service and

14 management skills during running a hotel, restaurant

15 and boutique in Rwanda?

16      A.  She does.

17      Q.  Am I also correct in noting, sir, that one of

18 the bullet points under highlights and qualifications

19 reads, "Fluent in English, French, Swahili,

20 Kinyarwanda, Kirundi and Luhya"?

21      A.  Yes, it does say that.

22      Q.  And you know that Swahili, Kinyarwanda

23 Kirundi and Luhya are all African languages?

24      A.  Yes.

25      Q.  I show you several exhibits marked 26(A)

1  through (E) or so.  Take a look at the clothing in

2  this box and tell me if you recognize it.

3      A.  Yes, I do.

4      Q.  Do you know who the original owners of that

5  clothing were?

6      A.  No, I don't.

7      Q.  Do you know who obtained this clothing for

8  its transportation to the U.S.?

9      A.  I did.

10     Q.  You did?

11     A.  Yes.

12     Q.  Where did you get it?

13     A.  At a store in Kigali.

14     Q.  What kind of store?

15     A.  A boutique.  Used clothes.

16     Q.  So somebody who sells authentic clothing from

17  the period of the genocide?

18     A.  Yes.

19         MR. RUOFF:  Well, objection.  That was

20  leading.

21         THE COURT:  Sustained.

22     Q.  What did the store that you bought this

23  clothing at specialize -- did the store you bought

24  this clothing at specialize in selling a particular

25  kind of clothing?

1      A.  The store did not specialize in that, but the

2  owner of that store told me that he had authentic

3  clothing articles from the period before the genocide.

4      Q.  I'm going to show you --

5          MR. CAPIN:  Move to strike the ID on -- well,

6  if I can confer with Mr. Ruoff, it might make this

7  more efficient.

8          (Attorney Capin confers with Attorney Ruoff)

9          MR. RUOFF:  We don't object.

10         MR. CAPIN:  Just to make the record clear,

11  I'm going to show the witness the following exhibits

12  which may already be in evidence:  24(G), 24(N),

13  24(P), 24(Q), and 24(S).

14         THE COURT:  ID may be stricken on 24(N).

15         THE CLERK:  Correct.  The other ones are

16  already admitted.

17         (Government's Exhibit 24(N) Admitted)

18     Q.  Sir, on the screen I have placed Exhibit

19  24(G).  Do you recognize that?

20     A.  Yes, I do.

21     Q.  And the colorful building at the right here

22  that I pointed to on the screen, do you recognize

23  that?

24     A.  I do.

25     Q.  What is that?

1       A.  That is a mosque that is located just south

2  of the site of the former I'Huriro Hotel in Butare.

3       Q.  Is that the mosque that was next-door to

4  Richard Kamanzi's house?

5       A.  Yes.

6       Q.  Do you know who took the photograph?

7       A.  I did.

8       Q.  You took the photograph?

9       A.  Yes, I did.

10      Q.  Where were you standing when you took that

11  photograph?

12      A.  I was standing on a footpath that rings that

13  valley -- the intersection of the path that comes down

14  from the main road beside the building that used to be

15  the I'Huriro Hotel.  The intersection of those two

16  paths.

17      Q.  Let me just show you 5(B).  The photo, for

18  the record, the building right at the center of the

19  part that I zoomed in is the I'Huriro Hotel.

20      A.  Yes.

21      Q.  Can you tell the jury where you were standing

22  when you took the photograph?  Does this show where

23  you were standing?

24      A.  Sure.

25      Q.  Should I zoom in on it a little more?  Is

1   that more helpful?

2          A.   It's fine the way it is.

3          Q.   And does photograph 24(G) accurately depict

4   the view of the mosque and the adjacent houses from

5   the path behind the I'Huriro?

6          A.   It's a little zoomed in, but it does reflect

7   those buildings accurately.

8          Q.   Okay.  So this is zoomed in?

9          A.   It is.

10          Q.   Okay.  Thank you.  I'm going to show you

11   Exhibit 24(N).  Before I show it to you, did you

12   interview a Vincent Sibomana when you went to Rwanda?

13          A.   Yes.

14          Q.   And did Mr. Sibomana take you to where he

15   worked during the genocide?

16          A.   Yes, he did.

17          Q.   Did you take a picture from that location?

18          A.   I took several pictures from that location.

19          Q.   Thanks for the clarification.  I'm showing

20   you 24(N) and ask you if you recognize that.

21          A.   Yes, I do.

22          Q.   Who took this photograph?

23          A.   I did.

24          Q.   What's depicted in the photograph?

25          A.   What's depicted is vehicular traffic on this

1   main road, the Kigali/Bujumbura road.  The bus in the

2   photograph is traveling south on that road headed

3   towards the university.

4        Q.  This bus right here?

5        A.  Yes.

6        Q.  Uh-huh.

7        A.  The road to the right of the bus is the road

8   that leads to the ESO, and also you can get to the

9   hospital that way.

10       Q.  Where were you standing when you took this

11  photograph?

12       A.  I was standing in front of the former Relais

13  de la Soif.

14       Q.  I can't tell looking at this photograph.  Can

15  you tell whether this is zoomed?

16       A.  I think it's slightly zoomed, yes.

17       Q.  I'm going to show you -- and does this image

18  accurately depict what the intersection of the ESO

19  road, I'll call it, which is the road, for the record,

20  which leads -- in the middle of the photograph leads

21  to the right off of the main road.  Does it correctly

22  depict the area where the main road meets the ESO

23  road?

24       A.  Yes, I believe it does.

25       Q.  I show you Exhibit 24(P) and ask you if you

1   recognize that.

2          A.   I do.

3          Q.   And what is that?

4          A.   That is a photograph of one of the witnesses,

5   Vincent Sibomana.

6          Q.   Could you indicate where Mr. Sibomana is

7   standing in the photograph?

8          A.   Sure.  He is standing --

9          Q.   You can touch the screen.

10         A.   Okay.  Sorry.  So he is -- the witness is

11  walking the line that I've indicated on the screen.

12  After I had spoken with Vincent and he had described

13  to me the location of the roadblock in proximity to

14  the I'Huriro Hotel, the place where people's IDs were

15  being checked, where traffic was being stopped.

16              So I was standing at the Relais de la Soif.

17  I asked him to walk to the area where what we would

18  refer to as the main roadblock area was and then to

19  walk across the street indicating -- that's why he's

20  waving his arm -- approximately where that roadblock

21  had been placed.

22              MR. CAPIN:  Your Honor, may the record

23  reflect that Special Agent Andersen has underlined a

24  man in the middle of the photograph with his right arm

25  extended?

1          THE COURT:  It may.

2      Q.  I show you Exhibit 24(Q) and ask if you

3  recognize that.

4      A.  I do.

5      Q.  And what is that?

6      A.  Also on the Kigali road.  I am now

7  standing -- when I took this picture, I was standing

8  at the intersection of the road and the footpath that

9  runs from the main road down to that other path in the

10  valley that I indicated on the more grainy photo.

11     Q.  So you're standing at the top of the path

12  leading up to the main road?

13     A.  Yes.

14     Q.  And you're taking a picture in the direction

15  of the Relais de la Soif?

16     A.  Yes, I am.

17     Q.  Do you see Mr. Sibomana in this photograph?

18     A.  I do.

19     Q.  Could you circle him, please?  That's good.

20  Thank you.

21         MR. CAPIN:  May the record reflect that

22  Special Agent Andersen has circled a person extending

23  his left arm in the middle of the photograph?

24         THE COURT:  It may.

25     Q.  Had you given Mr. Sibomana instructions on

1   where to stand?

2        A.  Yes.

3        Q.  What did you tell him?

4        A.  He had previously described items that had

5   been placed in the road, logs, branches, things of

6   that nature, and I asked him to go to the place where

7   he recalled the first obstruction had been placed in

8   the road.

9        Q.  So was he indicating with his left arm there

10  where the first in the series of obstacles that

11  comprised the roadblock was located based on his

12  experience during the genocide?

13       A.  Yes.

14       Q.  Before we move on from the subject of

15  photographs, I'm going to put Exhibit No. 22 on the

16  screen.  Have you seen this photograph before?

17       A.  Yes, I have.

18       Q.  When did you first see this photograph?

19       A.  I saw this photograph for the first time in

20  Kigali, Rwanda, during the second interview of Thierry

21  Sebaganwa.

22       Q.  Is Thierry Sebaganwa the person in the

23  foreground wearing what appears to be an L.A. Lakers

24  T-shirt?

25       A.  Yes.

 1      Q.  And you say Mr. Sebaganwa brought that to the

 2  second interview with you in Kigali; is that correct?

 3      A.  Yes.

 4      Q.  You had met with him previously?

 5      A.  Yes.

 6      Q.  Did he bring anything to that meeting?

 7      A.  To the first one?

 8      Q.  Yes.

 9      A.  No.

10      Q.  To your knowledge, had he been told anything

11  about the subject of your first meeting before he got

12  to the meeting?

13      A.  No, he did not.

14      Q.  Now, do you recall that Mr. Ruoff during

15  opening said that the prosecution has been vague about

16  how law enforcement agents learned about the

17  defendant's testimony at the ICTR and specifically

18  said, "We still don't know the answer --"

19          MR. RUOFF:  I'll object based on relevance,

20  Judge.

21          THE COURT:  Overruled.

22      Q.  "We still don't know the answer.  They won't

23  tell us.  They probably won't tell you."  Do you

24  remember Mr. Ruoff saying those words?

25      A.  I do.

1      Q.  Please tell this jury how you learned of the

2  defendant's testimony at the ICTR?

3      A.  Okay.  A colleague of mine, a fellow agent

4  working in the same unit that I'm assigned to now, had

5  opened a perjury investigation on the defendant's

6  sister, Kantengwa.

7      Q.  Is that Prudence Kantengwa?

8      A.  Yes, it is.

9      Q.  Continue.

10      A.  The agent who originally was assigned to that

11  investigation was subsequently transferred to another

12  unit, and then that investigation was assigned to me.

13          In connection with that investigation, I

14  contacted Alison Des Forges.  Alison Des Forges at the

15  time was the most prominent preeminent historian on

16  the Rwandan genocide.

17      Q.  Is Alison Des Forges the person who was the

18  principal author on the book Leave None to Tell the

19  Story?

20      A.  Yes.

21      Q.  That's the book that Professor Longman

22  participated in writing?

23      A.  Yes.

24      Q.  Do you know where Alison Des Forges is now?

25      A.  I do.  Alison Des Forges was killed in a

1  plane crash outside of Buffalo in February of 2009.

2      Q.  So after you met with Alison Des Forges --

3  first, tell us what you learned in meeting with Alison

4  Des Forges.

5          MR. RUOFF:  Objection.  Hearsay.

6          THE COURT:  Sustained.

7      Q.  The information you received in meeting with

8  Alison Des Forges, did that information lead -- was

9  that part of the process that led you to inquire into

10  the defendant's testimony at the ICTR?

11     A.  It is.

12     Q.  Okay.  Would you please explain how what Ms.

13  Des Forges told you related to the process of seeking

14  out the defendant's testimony at the ICTR?

15     A.  I learned that Prudence Kantengwa had spent

16  half of -- roughly half of the genocide period

17  living --

18          MR. RUOFF:  Objection.  I believe this is all

19  hearsay.  I don't think he has personal knowledge of

20  any of this.

21          MR. CAPIN:  It's not for the truth, your

22  Honor.  It's to explain -- to respond to Mr. Ruoff's

23  statement of --

24          MR. RUOFF:  Well, that's not evidence, Judge.

25          THE COURT:  Yes, I agree.  Sustained.

 1          He certainly can explain what prompted him to

 2   look into that matter, but we don't need to get into

 3   what he was told.

 4          Q.  Okay.  What prompted you to look into the

 5   matter of the defendant's testimony at the ICTR?

 6          Well, let me ask a different question.  Did

 7   you receive information that prompted you to inquire

 8   into the defendant's testimony at the ICTR?

 9          A.  I did.

10          Q.  What information?

11          A.  I learned that Kantengwa had --

12          MR. RUOFF:  Objection.

13          THE COURT:  Sustained.  It's really not

14   important what he learned.  What's important is what's

15   the source of the information.  It's not really what

16   it was.

17          Q.  Okay.  Based on information that Alison Des

18   Forges, the preeminent Rwandan scholar, provided you?

19          MR. RUOFF:  Objection.

20          THE COURT:  To what?

21          MR. RUOFF:  Just to the editorializing.

22   That's all.

23          THE COURT:  She is a preeminent scholar.  Go

24   ahead.

25          Q.  Based on what Alison Des Forges told you, did

1    you look into Prudence Kantengwa's background?

2         A.  Yes, I did.

3         Q.  Did that lead you to learn that she had a

4    sister named Beatrice Munyenyezi?

5         A.  Yes, it did.

6         Q.  Did Ms. Des Forges tell you that there was a

7    notorious roadblock in front of the I'Huriro during

8    the genocide?

9         A.  Yes, she did.

10        Q.  Did she tell you Prudence Kantengwa had told

11   her --

12             MR. RUOFF:  Objection.

13             THE COURT:  Sustained.  Alison Des Forges is

14   not here to testify.

15             MR. CAPIN:  Fair enough.

16        Q.  After learning what you learned from Alison

17   Des Forges, what if anything did you do next?

18        A.  I spoke with DHS counsel who was handling in

19   part some of the proceedings that Kantengwa was

20   involved with, and I learned that the defendant was

21   actually a naturalized United States citizen.

22        Q.  And what next did you do?

23        A.  I ordered the defendant's A file.

24        Q.  When you got her A file, what did you do?

25        A.  I reviewed the A file and saw how it was that

1   she became a United States citizen.

2       Q.  And what information -- was there information

3   in the A file that led you to inquire about her

4   testimony at the ICTR?

5       A.  Yes.

6       Q.  Explain that, please.

7           MR. CAPIN:  The A file is in evidence as

8   Exhibit 6, your Honor.

9       A.  Okay.  Within the A file were documents

10  indicating the defendant's husband, Shalom Ntahobali.

11  I did some research on Shalom Ntahobali.  I went to

12  the ICTR website.  I found the indictment for Shalom

13  Ntahobali and his mother, Pauline Nyiramasuhuko.  I

14  reviewed that indictment.

15          I then found transcripts of the defendant's

16  testimony in that proceeding in Arusha, Tanzania,

17  reviewed those transcripts, and having already

18  reviewed the defendant's A file, found a number of

19  things within her testimony at the ICTR that I found

20  suspect.

21      Q.  I'm going to ask you about what you found

22  suspect, but first, did you learn after your research

23  into the defendant's background that Shalom Ntahobali

24  had been arrested by the ICTR?

25      A.  Yes, I did.

1      Q.   When was he arrested?

2      A.   He was arrested in 1997 in Nairobi, Kenya.

3      Q.   Was there a particular fact that sort of

4   leapt out at you in reviewing the ICTR transcript that

5   caused you concern about -- or caused you further

6   interest in the defendant?

7      A.   Yes.

8      Q.   Tell us about that.

9      A.   In reviewing the defendant's alien file, A

10   file, I saw that she had a particular medical

11   condition and that the medical condition that she has

12   required a waiver to get into the United States.

13          She was asked questions during the

14   proceedings in Arusha about that very specific medical

15   condition that she got the waiver for to get into the

16   United States, and her responses to those questions

17   posed by the attorneys at the ICTR were not consistent

18   with the medical condition that she had.

19      Q.   I'm publishing a portion of Exhibit 18(A).

20   Is this an excerpt from one of the ICTR transcripts

21   that you reviewed in conducting research into the

22   background of the defendant?

23      A.   Yes.

24      Q.   I direct your attention to line 24:  Madam,

25   as far as you know, was Shalom ever a member of a

1  youth wing of any political party?  Answer:  No.

2         Did I read that correctly?

3     A.  Yes, you did.

4     Q.  Putting on page 39 of this same exhibit,

5  starting with line 30.  Question:  Madam, you were not

6  necessarily familiar with Butare even though you had

7  been there since your wedding at least.  Can you tell

8  us if you had heard it being said that there were

9  Interahamwe or that there were Interahamwe in Butare

10 before the 6th of April 1994?  Answer:  I never heard

11 any such thing like that, and I have never seen people

12 called the Interahamwe.

13        Did I read that correctly?

14    A.  Yes, you did.

15    Q.  Next question:  Did you know, however, Madam,

16 if these notorious Interahamwe had a specific manner,

17 a particular manner in which they dressed themselves

18 in order to distinguish themselves?  I'm still

19 referring to the period before 6th April 1994.

20        Did I read the question correctly?

21    A.  Yes.

22    Q.  And does the answer read:  I didn't see them,

23 but from what I saw back in school they wore uniforms.

24 But in Butare I didn't see any Interahamwe with those

25 kind of uniforms.

1          Did I read that correctly?

2     A.  Yes.

3          MR. CAPIN:  I just have two or three more

4     excerpts, your Honor.

5     Q.  Special Agent Andersen, have you listened to

6     audiotape -- I'm sorry -- to video and audio of the

7     defendant's testimony at the ICTR?

8     A.  Yes.

9     Q.  And were the questions asked in French?  Do

10    you remember?

11    A.  I recall that at least the prosecution asked

12    her the questions in English.  I don't remember how

13    Mr. Marquee asked the questions.

14    Q.  Okay.  Did the defendant respond in English?

15    A.  Yes.

16    Q.  I'm going to play, and we'll follow along,

17    just one clip that is in evidence as 19(D) for the

18    jury, and we will follow along.

19         THE COURT:  19(D) is marked for ID.

20         MR. CAPIN:  I move to strike the ID.

21         MR. CHAKRAVARTY:  I thought we moved to

22    strike the ID, your Honor.

23         THE CLERK:  ID was stricken on February 11th.

24         THE COURT:  It is.  It is stricken, Mr.

25    Capin.

1          MR. CAPIN:  Thank you, your Honor.  I'm just

2  going to confer with Mr. Chakravarty for a moment.

3          (Attorney Capin confers with Attorney

4  Chakravarty)

5          MR. CAPIN:  Can you play it for us, please?

6      Q.  We're going to listen along, Special Agent

7  Andersen.

8          MR. CAPIN:  Can I have the ELMO, please?  Is

9  it possible to have the ELMO and the computer at the

10  same time?

11          THE CLERK:  No.

12          MR. CAPIN:  Well, why don't we play the

13  audio.

14      Q.  Tell me if you recognize this to be the audio

15  you heard when you listened to the audiotape of the

16  defendant's testimony at the ICTR.

17          MR. CAPIN:  May the record reflect that the

18  first part of the audio is a question that appears to

19  be in French, there's a pause for interpretation, and

20  then the defendant answers in English.

21          I think we're now waiting for the

22  interpretation.

23          (Video clip played)

24          MR. CAPIN:  Can the members of the jury hear

25  the English?

1           (Jurors indicate they are having trouble

2  hearing)

3           MR. CAPIN:  Is there any way to increase the

4  volume?

5           THE COURT:  You didn't try it earlier,

6  obviously.

7           THE CLERK:  No.

8           MR. CAPIN:  Sorry, your Honor.  We played it

9  on video earlier.  We didn't try the audio.  Why don't

10  we go through the system at maximum volume.

11          (Video clip played)

12          MR. CAPIN:  I think we'll move on.  May I

13  have the overhead?

14      Q.  Just because the audio was less than

15  perfectly clear to all of us, I'm going to read for

16  you, Special Agent Andersen, simply the portion from

17  line 3 through line 16 on the screen.

18          Question:  And yet, Madam, you probably are

19  aware that people have come here to state that Shalom

20  allegedly erected a roadblock in front of the I'Huriro

21  Hotel and that he allegedly was seen carrying weapons,

22  in particular, firearms and grenades, and that he

23  allegedly killed hundreds of people as early as 20th

24  April.  What would your position be in respect of the

25  evidence of such witnesses, Madam?

1          Answer:  I have heard these allegations and,

2     your Honors, these things have been following me and

3     following my kids.  Obviously, my husband has been

4     sitting there for the last eight or nine years.  I

5     want to make this clear that these things are nothing

6     other than naked lies.  I can explain that.

7          First of all, Shalom's father owned the

8     hotel.  He did not own a road in Butare.  He did not

9     own a street in Butare.  And what kind -- who was

10    Shalom and what kind of power did Shalom possess to

11    install or establish a roadblock in the street?  There

12    was no roadblock in front of the hotel except the

13    roadblock that I saw when I came from Cyangugu, and

14    that was way after April.

15         And back to the killings.  Shalom has been

16    accused of killing people, Tutsi people.  Shalom has

17    done nothing to these people and nothing other than

18    giving them love, opening his gate of life to these

19    people, and he has protected them over a long period

20    of time in our house.  He has never killed anybody.

21         Did I read that correctly?

22    A.  Yes, you did.

23    Q.  The next clip I'll draw your attention to is

24    on the following page, starting with, Question:

25    Madam, you say that you did not believe that those

1  things happened to your knowledge.  Would it have been

2  possible that Shalom confined and raped the young

3  women at the I'Huriro Hotel around the 20th of

4  April -- 20th or 21st of April 1994?

5          Answer:  Where was I?  I was at home.  Shalom

6  never left me.  Shalom did not leave the house after

7  the curfew.  He was always there.  I was living at the

8  hotel with everyone else, and when did those things

9  happen that I didn't leave the hotel without Shalom?

10  When did he do that?  Did I read that correctly?

11      A.  Yes.

12      Q.  Page 50, line 15:  So, Madam witness, the

13  question that followed that question was:  The EER

14  school or compound is quite close to the I'Huriro

15  Hotel, isn't it?

16          Answer:  I am not sure how close you referred

17  to, but it was not close.  It was probably ten minutes

18  from the hotel.  It depends on how you could walk.

19          Did I read that correctly?

20      A.  Yes, you did.

21      Q.  Now, you've been to the location of the

22  former I'Huriro, correct?

23      A.  Yes.

24      Q.  And the EER school is right next-door,

25  correct?

1      A.  Yes.

2      Q.  About how far from the EER school is the

3  I'Huriro -- or was the I'Huriro?

4      A.  No more than 200 feet.

5      Q.  Exhibit 18(B), page 75, and I'm going to

6  simply read the lines highlighted in red.

7          Question:  So, apart from the violence that

8  is related to looting, you've never seen any dead

9  bodies?

10         Answer:  No, I never saw dead bodies.  I saw

11  dead bodies in 1990 where I came from, but I didn't

12  see dead bodies in Butare.

13         Did I read that correctly?

14     A.  Yes, you did.

15         MR. CAPIN:  Could I have a moment, your

16  Honor?

17         THE COURT:  You may.

18     Q.  Exhibit 18(C), page 26, the highlighted

19  portion.

20         Question:  Shall I take it from your answer

21  that you have renounced Rwandan citizenship, that is?

22         Answer:  That is your opinion, Madam.

23         Follow-up question:  Yes, would that be the

24  position?  Is it yes?  Have you renounced or not?

25         Answer:  Your Honor, I am right now a United

1    States citizen, but if I ever wanted to give it up and

2    go back to my country I am free to do so, although

3    probably Rwanda would not recognize me as Rwandese,

4    and so I don't know any other answer that I can give.

5            Did I read that correctly?

6        A.  Yes.

7            MR. CAPIN:  I have nothing further, your

8    Honor.

9            THE COURT:  All right.  Mr. Ruoff.

10                    CROSS-EXAMINATION

11   BY MR. RUOFF:

12       Q.  Good afternoon, Agent Andersen.

13       A.  Good afternoon, Mr. Ruoff.

14       Q.  We've met before, right?

15       A.  Plenty of times.

16       Q.  Now, one of the things that you talked about

17   early on with Mr. Capin when he was asking you

18   questions concerned how you located witnesses in

19   Rwanda, right?

20       A.  Yes.

21       Q.  And I think you said you've been there eight

22   years now since -- I mean eight times now since you

23   started working on this case?

24       A.  That's correct.

25       Q.  Not all of them were for this particular --

1  this case, right?  There were a few travels there that

2  were unrelated?

3      A.  That's also correct.

4      Q.  You said that you would use a driver to try

5  to speak to the people that you wanted to talk to and

6  that that driver would go out and locate folks for

7  you, correct?

8      A.  That's correct.

9      Q.  After you had given him the names?

10      A.  That's also correct.

11      Q.  And you described that you had interpreters

12  that helped you with the presentation -- or

13  investigation of the case, correct?

14      A.  Yes.

15      Q.  You identified some interpreters that were

16  with you in Rwanda and were in court here today,

17  correct?

18      A.  No, I didn't.  There were no interpreters

19  that had been with me in Rwanda in the courtroom

20  today.

21      Q.  Okay.  I must have misunderstood.  I thought

22  there were a couple of Rwandan interpreters that were

23  present in your interviews that were here in court

24  today.

25      A.  Those are the court interpreters.

1       Q.  Okay.  But you also used people called

2  trackers, right?

3       A.  In other trips, yes.

4       Q.  In other trips?

5       A.  Yes.

6       Q.  Okay.  And in the course of investigating

7  this case -- and that's your term, right?  You had

8  hired this gentleman called a tracker?

9       A.  It was actually a term that I got from a

10  Canadian investigator.

11      Q.  We'll get to that.  Trackers are people that

12  you can hire locally in Rwanda to go and actually

13  track people down, correct?

14      A.  Yes.

15      Q.  Hence the name, right?

16      A.  Yeah, I think so.

17      Q.  You give them a list of people that you need

18  to find, and they go out and try to find them with

19  whatever means they have at their disposal.  Is that

20  true?

21      A.  Yeah, I think that's true.

22      Q.  Now, one of the trackers you used in this

23  case was a gentleman by the name of Oliver Mazimpaka?

24      A.  Yes.

25      Q.  Okay.  He was a tracker that also worked on

1   the case up in Canada, right?

2             MR. CAPIN:  Objection.  Relevance, your

3   Honor.

4             THE COURT:  Overruled.

5        A.  Yes, I did.  I got that name from the

6   Canadians.

7        Q.  Okay.  And that's not uncommon to do in the

8   law enforcement circle, which is to talk to other

9   people that have handled similar cases, correct?

10       A.  Yes.

11       Q.  For ideas on how to develop witness leads,

12   things like that?

13       A.  Yes.

14       Q.  And the Canadian authorities gave you the

15   contact information for this person Joseph Mazimpaka,

16   correct?

17       A.  It was not Joseph Mazimpaka.  It was Olivier.

18       Q.  I'm sorry.  Oliver Mazimpaka.

19       A.  That's correct.

20       Q.  Now, how often did you use Mr. Mazimpaka?

21             MR. CAPIN:  Objection.  At least to be time

22   bound somehow, your Honor.

23             MR. RUOFF:  I'll ask a better question.

24             THE COURT:  Okay.  Thank you.

25       Q.  So when you first contacted Mr. Mazimpaka to

1  help you with this case you knew that he already had

2  assisted Canadian authorities?

3      A.  I did.

4      Q.  So you knew that he had potentially a list of

5  witnesses that he had already found for Canadian

6  authorities, right?

7      A.  I hadn't thought about it that way, but

8  that's probably true.

9      Q.  And that's kind of a resource that you would

10  probably be able to use, right?

11     A.  Yes.

12     Q.  Because you're looking for witnesses, right?

13     A.  We would have to be looking for the same

14  thing, but yes, I am looking for witnesses.

15     Q.  Okay.  You're looking for witnesses' names

16  and the content of what they might say to you,

17  correct?

18     A.  I wasn't looking for the content of what they

19  might say to me.  I was looking for people who had

20  specific information about events that occurred in a

21  certain area of Butare.

22     Q.  And he might be in a position when you were

23  talking to him to tell you that he knew of certain

24  people in Butare that had witnessed certain events,

25  right?

1       A.  For Mr. Mazimpaka, that is correct.

2       Q.  Right.  Because he had already done that work

3  for the Canadian authorities, right?

4       A.  Yes.

5       Q.  Now, the Canadian case, by the way, involved

6  someone from Butare, right?

7       A.  There are several cases that the Canadians

8  were working on.  One of them that I'm aware of

9  involved a subject from Butare.

10      Q.  His name was Desire?

11      A.  Desire.

12      Q.  Desire?

13      A.  Yes.

14      Q.  So when you went to Butare a number of times

15  did you continue to use the services of a tracker to

16  help locate witness contact information?

17      A.  I think this is the question that you were

18  asking earlier.  I think I used Mazimpaka twice.

19      Q.  Okay.  Did you use any other trackers?

20      A.  Not in the same capacity that I used Mr.

21  Mazimpaka, no.

22      Q.  Okay.  Well, what other capacity did you use

23  them with respect to this case?

24      A.  Sure.  Well, as I described, after having Mr.

25  Mazimpaka I made some adjustments to the type of

1   information that I shared with him.  That's why I

2   referred to him as a driver, because other than phone

3   calls and driving that's what he did, and so I used a

4   different individual in June of 2012.

5       Q.  So was it for the June trip that you stopped

6   using Mr. Mazimpaka?

7       A.  We had stopped using him before that.  There

8   are other trips that I had gone on that I did use him

9   for.

10      Q.  What did you know about Mr. Mazimpaka?

11          MR. CAPIN:  Objection.  Relevancy, your

12  Honor.  He didn't use him.

13          THE COURT:  Sustained.

14      Q.  Well, when you were using him, what did you

15  know about his background?

16          MR. CAPIN:  Same objection.

17          THE COURT:  Sustained.

18      Q.  Did you know anything about his background?

19          MR. CAPIN:  Objection, your Honor.

20          THE COURT:  Come to sidebar.

21          (SIDEBAR)

22          THE COURT:  Why is this relevant?

23          MR. RUOFF:  Because I'm trying to establish

24  what he knows about this person who is out trying to

25  track down and contact witnesses for him, whether or

1   not he has any type of government affiliation, whether

2   or not he's read up on the case, whether or not he's

3   talking to other people about the case, that type of

4   thing.

5        THE COURT:  And this goes to your theory that

6   the government of Rwanda supplied these witnesses?

7        MR. RUOFF:  Or that the investigation wasn't

8   as pristine as they're laying it out to be in the

9   direct examination.

10        THE COURT:  We're not going to try the

11   investigation.  If it goes to bias that these are

12   procured witnesses or something, fine, but you've got

13   to ask him.  You can't just say what do you know about

14   him.  We're not going to try Mazimpaka, right?

15        MR. RUOFF:  No, no, no.  Just what he knows

16   or doesn't know about him.

17        THE COURT:  Well, no.  You can ask him

18   certainly questions if you've got this theory that he

19   somehow supplied these witnesses, you've got to ask

20   him that, but we're not going to go into a long

21   digression about Mazimpaka.

22        You have to have some evidence.  You really

23   do.  You can't just raise the spectrum based on rank

24   speculation that somehow Mazimpaka was a Rwandan

25   government agent, if that's what you're trying to do.

1          MR. RUOFF:  I'm just asking the question.

2          THE COURT:  Of course you were just asking

3    the question, but then that gives rise to the question

4    why are you asking that question and the government

5    says it's not relevant, and it doesn't seem to be.

6          MR. CAPIN:  If I may, the foundational basis

7    that's lacking here is -- if the question is, did

8    Joseph Mazimpaka in any way assist you in finding any

9    witnesses that this jury has heard from, if the answer

10   is no, the questions should stop there.

11         MR. RUOFF:  Well, he's talked about all of

12   his trips and all the types of interviews that he

13   would do generally.  I should be able to cross-examine

14   that.

15         MR. CAPIN:  I only asked about interviews in

16   June about this case.  All the rest was background.

17         THE COURT:  Yes.  If your point is, I propose

18   that Mazimpaka found and produced these witnesses and

19   served them up, limit it to that.  We're not going to

20   try who Mazimpaka is and leave this general, vague

21   impression that maybe he's a government agent of some

22   secret nature.  Right?  We can't do that.

23         If that's what you're going for, ask him.

24   Did he produce these witnesses?  Ask it any other way

25   you like, but if that's the goal you've got to focus

1   on that.

2         (CONCLUSION OF SIDEBAR)

3      Q.  Agent Andersen, one of the things that I

4   think you commented on just a second ago was that you

5   started calling this person that assisted you with the

6   location of witnesses in this case as a driver and not

7   a tracker, right?

8      A.  Yes.

9      Q.  And I think you said that you did that

10  because you adjusted the kind of information you gave

11  the driver, right?

12     A.  Yes.  Well, I adjusted the information that I

13  gave him and the expectations of what he was going to

14  do for us.

15     Q.  And that is because, with respect to Mr.

16  Mazimpaka, you gave him more information about the

17  case than you did the driver that you used for your

18  trip in June, correct?

19     A.  Yeah, that's true.

20     Q.  Now, with respect to the location of the

21  witnesses that the jury heard in this case, okay, I

22  noticed on direct that you didn't discuss how you

23  learned the identity of those witnesses.

24     A.  I wasn't asked those questions.

25     Q.  Did you learn those -- the identity of the

1  witnesses that you testified -- or that you

2  interviewed in June from other witnesses that you had

3  investigated in the course of this case?

4      A.  Let me think about that for a moment.  Not

5  all of them, but I think that applies to one or two of

6  them.

7      Q.  Okay.  Let me be a bit more concrete.  Can

8  you tell us how you learned about Vincent Sibomana, if

9  I said his name correctly?

10     A.  I did not learn of him from another witness

11 that I had already interviewed in this investigation.

12     Q.  You learned about him from the folks in

13 Canada, right?

14     A.  No, I did not.

15         MR. RUOFF:  Okay.  Judge, can we approach?

16         THE COURT:  Yes.

17         MR. RUOFF:  I'm sorry to delay things.

18         (SIDEBAR)

19         MR. RUOFF:  I know this is unintentional, and

20 I don't think you meant to do it, John, but the last

21 two questions you were nodding responses.  I don't

22 think it was intentional.

23         THE COURT:  Mr. Capin?

24         MR. CAPIN:  Yeah, I have a bad neck.  I might

25 have been stretching.  I just found out I have

1  arthritis right here.

2        THE COURT:  I've been pretty tough on you,

3  Mr. Capin, about editorializing.

4        MR. CAPIN:  And I think I've been better.

5        THE COURT:  Much better.  And I haven't been

6  very tough on you at all, but you do the same thing,

7  Mr. Ruoff.

8        MR. RUOFF:  I know.  That's why I don't think

9  it was intentional.

10        THE COURT:  You tend to smile and comment

11  with facial expressions, which is really a hot button

12  for me, so stop, all of you.  What's the problem?

13        MR. RUOFF:  I just wanted to make us all

14  aware of it.

15        MR. CAPIN:  I don't think it was intentional.

16        THE COURT:  Everybody be cautious about not

17  doing it.  Thank you.

18        (CONCLUSION OF SIDEBAR)

19    Q.  I'm sorry, Agent Andersen.  I didn't catch

20  your answer.

21    A.  My answer was, no, I didn't learn about him

22  from the Canadians.  I know that I later gave his name

23  to the Canadians seeking -- trying to determine

24  whether or not he was someone they interviewed.  We

25  did that with all of our witnesses.

1    Q.  You sort of cross-referenced with Canada to

2  see if they had any other statements?

3    A.  That we could share with you.

4    Q.  Okay.  So how did you learn about Mr.

5  Sibomana?  Who gave you his name?

6    A.  I don't recall exactly right now off the top

7  of my head.  I know that I learned his name from

8  another witness that I was investigating in June of

9  2012 and it wasn't from someone who I had previously

10  interviewed, but it was somebody on that trip, as we

11  commonly did.  When we talked to witnesses, we would

12  ask, the things that we've been talking about, are

13  there other people who might be able to help us with

14  this investigation, and that's how I learned his name.

15    Q.  So with respect to the witnesses that

16  testified in this trial, is it fair to say that

17  there's some threat of commonality through all of

18  them?

19    A.  Well, what's the threat?

20    Q.  Well, that one witness led you to another?

21    A.  I think that is true of some of them, yes.

22    Q.  Okay.  Were there any witnesses that you

23  learned of independent of other witnesses?

24    A.  Sure.

25    Q.  Did you take a look at ICTR records, for

1  example?

2        A.  Not to determine witnesses.  Most ICTR

3  records are actually categorized under pseudonyms.

4  Many people who testified at the ICTR did so under a

5  protected identity.

6        Q.  Which witnesses that the jury has heard from

7  did you learn by completely independent means?

8        A.  Thierry Sebaganwa is a good example.  I got

9  his name from the Canadians.

10       Q.  Was Mazimpaka involved in locating that

11 witness?

12       A.  I wouldn't have any way of knowing that.

13       Q.  Before you formulated your June 2012 trip

14 back to Rwanda, did you already have a complete list

15 of everybody that you wanted to talk to?

16       A.  No.  That's not a fair characterization.  I

17 had a list of the people that I knew I wanted to talk

18 to.  It was certainly not complete.  I mean, that

19 list --

20       Q.  Okay.  How did you get that list?

21       A.  By talking to Canadian investigators.  By

22 talking to Finnish investigators.

23       Q.  Which names did the Finnish investigators --

24           MR. CAPIN:  Your Honor, I think he's not done

25 with the answer.

1        THE COURT:  You may finish.

2        A.  None of the witnesses who testified here came

3   from recommendation from the Fins.  They gave us names

4   of other people who we spoke with and didn't yield any

5   results that would help this investigation.

6        Q.  What do you mean by results that wouldn't

7   help this investigation?  Didn't they say that they

8   were in Butare and didn't see Beatrice Munyenyezi?

9        A.  No.  Nobody said that.  There were people who

10  simply hadn't been in Butare during the genocide.

11  There were other witnesses who weren't familiar with

12  the area.  There are a variety of ways that they

13  wouldn't have been able to shed any light for this

14  jury to make a determination about the evidence being

15  presented.

16        Q.  I'm going to switch gears a little bit and

17  ask you to take a look at -- I believe this is Exhibit

18  18(H).  This is something that you just read to the

19  jurors, and this is with respect to the question

20  concerning the location of the EER school or compound

21  with respect to the hotel; is that right?

22        A.  Yes.

23        Q.  Okay.  It says right here, EER school or

24  compound, right?

25        A.  Yes.

1       Q.  Now, the EER school, which is 5(B), is here,

2  correct?

3       A.  It's not just those buildings.

4       Q.  All these?  And then this is the EER church,

5  correct?

6       A.  No.  I don't think that's the church.  I

7  think that's -- I don't know if you would call it the

8  rectory.

9            That building that you just pointed to has

10  like studio apartments and things like that.  I think

11  the cathedral itself is a little bit farther north.

12       Q.  But it's all part of the EER compound,

13  correct?

14       A.  I agree with that.

15       Q.  Okay.  So to walk from the hotel to the

16  farthest part of the compound where the cathedral may

17  be, the rectory, it might take a little bit longer

18  than it would to walk to these dormitories here,

19  correct?

20       A.  Of course.

21       Q.  And the question that you just read and the

22  answer didn't really specify what part of the EER

23  compound that they were talking about, right?

24       A.  The first part of the question asks school

25  and then and/or compound.

     1      Q.  Right.

     2      A.  Correct.

     3      Q.  Now, talking about the clips from Ms.

     4  Munyenyezi's testimony before the ICTR, you had the

     5  opportunity to read through the entire transcript of

     6  Ms. Munyenyezi's testimony, right?

     7      A.  Yes.

     8      Q.  You know that when she testified in 2006 she

     9  testified over a course of a number of days, right?

    10      A.  Yeah.  Three or four.  I forget exactly.

    11      Q.  Three or four days.  And that was

    12  all-day-long testimony, correct?

    13      A.  I don't remember the timestamps.  It

    14  certainly was substantial testimony.

    15      Q.  And it was a hundred pages of questions and

    16  answers, right?

    17      A.  I don't know how many pages it was.

    18      Q.  Well, more than a hundred, right?

    19      A.  If that's the stack, that's a big stack of

    20  testimony.

    21          MR. RUOFF:  I'm just going to mark this for

    22  ID.  We can mark it later, I suppose.  I think it's

    23  Defendant's L.

    24          (Defendant's Exhibit L marked for

    25  identification)

1       Q.   I'm handing you what's Defendant's L for ID.

2       A.   Got it.

3       Q.   Just take a look at that.  I've shown that to

4   you before, right?

5       A.   Yeah.  At another proceeding?

6       Q.   Yes.

7       A.   Yes.  Yeah, I've seen it before.

8       Q.   That seems to be a copy of the transcript

9   from her complete testimony?

10      A.   Yeah, I think so.

11      Q.   Significantly more than the excerpts that you

12  read into the evidence, correct?

13      A.   Mr. Capin read them in the form of a

14  question, I think, but it is in fact more, yes.

15           THE COURT:  Is this a good time to break, Mr.

16  Ruoff?

17           MR. RUOFF:  Yes, your Honor.

18           THE COURT:  Ladies and gentlemen, we'll break

19  for lunch.  Please don't discuss the case during the

20  course of the break, and we'll resume again at ten

21  after 1:00.

22           (RECESS)

23

24

25

```
1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 11-4-13
```

**SUSAN M. BATEMAN, LCR, RPR, CRR**
LICENSED COURT REPORTER, NO. 34
STATE OF NEW HAMPSHIRE

```
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/11/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *   10-cr-85-SM
                                *   February 14, 2013
          v.                    *   1:15 p.m.
                                *
BEATRICE MUNYENYEZI             *
                                *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 8 - AFTERNOON SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE
AND A JURY

Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH)
                      53 Pleasant Street, 4th Floor
                      Concord, NH 03301

For the Defendant:    David W. Ruoff, Esq.
                      Mark E. Howard, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH  03104

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                          I N D E X

2

3   Witness                Direct   Cross   Redirect   Recross

4

    THOMAS ANDERSEN
5
    By Mr. Capin                             26
6   By Mr. Ruoff                    3                    36

7

8   JASON FOX

9   By Mr. Howard          51               66
    By Mr. Chakravarty              58
10

11

12

13  MOTIONS, page 40

14

15

16

17

18  Exhibits                         ID        Evid.

19  Government's Exhibit No. 24R               31
    Defendant's Exhibit D4                      6
20

21

22

23

24

25

3

```
 1                        BEFORE THE JURY

 2            THE COURT:  Mr. Ruoff, you may continue when

 3    you're ready.

 4            MR. ROUFF:  Thank you, your Honor.

 5                        THOMAS ANDERSEN

 6     having previously been sworn, testified as follows:

 7                    CROSS-EXAMINATION cont'd

 8    BY MR. RUOFF:

 9       Q.   I'm just going to cover a couple points here

10    to make sure I understand the origin of the case, Agent

11    Andersen.

12            I believe you testified that you opened the

13    case in February of 2008; is that true?

14       A.   I think that's correct, yes.

15       Q.   Is that what's reflected in one of your

16    reports, where it says date signed, February 8, 2008?

17       A.   My memory is that the case was opened in

18    February of 2008.

19       Q.   If I showed you the report, would that help

20    you?

21       A.   Sure.

22            (Witness looking at report.)

23       A.   Yes.

24       Q.   Because you had started at the service in

25    2006; right?
```

4

```
 1        A.    That's correct.

 2        Q.    Was this your first Rwandan case?

 3        A.    Well, technically speaking the Kantengwa case

 4   was assigned to me before this one was opened, so the

 5   Kantengwa, although pretty close in time to this one,

 6   was my first.

 7        Q.    Okay.  So, after you were assigned this case

 8   is when you requested the A-File; right?

 9        A.    Yeah -- I'm not sure when I got the A-File in

10   relation to when the case was opened.  I think my

11   recollection is that I reviewed the A-File before the

12   case was opened.

13        Q.    Okay.  Now, preparing to start the

14   investigation in this case you did some research about

15   the ICTR and about Beatrice; right?

16        A.    In reviewing ICTR transcripts I found

17   Beatrice.  I reviewed her A-File.  So, if that's the

18   research that you're talking about, and to Beatrice,

19   yes, that's correct.

20        Q.    Okay.  You reviewed her A-File.  Did you do

21   any Google search to see if she had done anything or any

22   news accounts of her testimony or activities in the

23   community after you opened the case?

24        A.    I know that I did do some searches of her.  I

25   don't remember the order in which I did them.
```

5

```
 1        Q.    Okay.  But, and you learned that she had been

 2   active in the community and given addresses to NPR and

 3   that sort of thing?

 4        A.    I did learn that, yes.

 5        Q.    And you listened to the NPR interviews?

 6        A.    Right.

 7        Q.    Saw newspaper clippings about her activities

 8   in the community; right?

 9        A.    Yes.

10        Q.    You said that you had learned that her husband

11   had been arrested and was charged in the ICTR?

12        A.    I did learn that.

13        Q.    I think you said his arrest was in July 1997;

14   right?

15        A.    I'm not sure if I testified to the month.  I

16   know that it was in 1997.

17        Q.    You don't remember the month?

18        A.    As I sit here now, no.

19        Q.    Skipping ahead to a couple of photographs.

20   I'm showing what's been premarked for ID as defense

21   exhibit D4.  You recognize that, don't you?

22        A.    I do.

23        Q.    You've actually probably been standing in that

24   spot many times; right?

25        A.    I don't know if this exact spot, but I'm very
```

1    familiar with where it is, yeah.

2         Q.    And that picture depicts what you would see if

3    you stood behind the EER and looked up towards the

4    roadway; correct?

5         A.    One of the many places that you could be

6    standing behind the EER, this is one of the them.

7         Q.    Right.

8         A.    Sure.

9         Q.    All right.

10             MR. RUOFF:  Move to strike the ID.

11             THE COURT:  I think it already has been.  D4?

12   I have it marked as stricken.

13             MR. CAPIN:  In any event, no objection.

14             THE COURT:  All right, ID may be stricken in

15   D4 if it hasn't already.

16             (Defendant's Exhibit D4 admitted.)

17             MR. RUOFF:  I'll publish this to the jury.

18        Q.    And as you've already said, that's one of many

19   spots you could walk along the path behind the EER and

20   look up and see it; right?

21        A.    Yes.

22        Q.    The EER school that is?

23        A.    Yeah, I was going to say, look up and see

24   what, yes, from that spot you can see the EER school,

25   it's the brick buildings on the left side and center of

7

1    the photograph.

2         Q.   And this part right here, which I'm pointing

3    to that flat spot, that would be the main road?  Does

4    that look like the main road?

5         A.   I think it's a little hard to tell from there.

6    I don't know if that's the main road or not.

7         Q.   I want to ask you about another photograph.

8    We're talking about pictures here.  Government's

9    Exhibit 22.  This is the picture I believe you said that

10   Thierry gave you?

11        A.   I'm not sure he actually gave it to me, but --

12        Q.   That's my question, okay.  He showed it to you

13   when you were in meeting with him in Kigali on the

14   second time you met with him?

15        A.   That's correct.

16        Q.   Was that still in June 2012?

17        A.   Yes.

18        Q.   I'm guessing it kind of went like this.  You

19   interviewed him, told you he had a photo, left, and he

20   brought it back for a second interview?

21        A.   If you're implying that it was on the same

22   day, it was not the same day, it was several days later.

23        Q.   Okay.  And when you saw this picture, you let

24   him leave with the picture; right?

25        A.   On the second occasion?

8

1       Q.   Yes, you didn't take it?

2       A.   We did not take it.  It was his picture.

3       Q.   Did you take any pictures of the picture?

4       A.   No.  We had determined that he was going to be

5   a witness in this case.  We asked to make sure that he

6   brought it.

7       Q.   Okay.  So he traveled back across the Atlantic

8   with this picture and showed it to you and brought it

9   here to this courtroom; right?

10       A.   It is true that he traveled from Rwanda to

11   here and he brought the picture with him.

12       Q.   All right.  Now, you said you did a search of

13   my client's house; correct?

14       A.   Yes.

15       Q.   Now, you didn't find anything like this in her

16   house; right?

17       A.   No, we did not.

18       Q.   Nothing with the MRND insignia or anything

19   like that?

20       A.   Nope.

21       Q.   And you recovered, we saw some documents that

22   you got from her house, but that's only a small fraction

23   of the number of documents you seized; right?

24       A.   Yes.

25       Q.   You got hundreds and hundreds of documents;

1   right?

2        A.   Yeah, I think that's fair to say.

3        Q.   Some were in French?

4        A.   Yes.

5        Q.   Some were in Kinyarwanda?

6        A.   Yes.

7        Q.   You didn't seize anything that demonstrated

8   that she was ever a member of the MRND; right?

9        A.   We did not.

10        Q.   Now, these clothes, you said you got these

11   from a shop in Kigali; right?

12        A.   That's correct.

13        Q.   Where they on display in the front window?

14        A.   They were not.

15        Q.   They wouldn't display this kind of thing in

16   the front window in Kigali; right?

17        A.   I don't think so.

18        Q.   The person doing that would be taking some

19   risks; right?

20        A.   I don't know if he would be taking any risks,

21   but you wouldn't expect to see that kind of material on

22   display in Kigali.

23        Q.   Okay.  So a shopkeeper came and told you that

24   he could get you some authentic MRND garb and you paid

25   for this; right?

10

1       A.   That's correct.  The shopkeeper didn't come to

2   me, I went to him, found out that he had some, and then

3   we discussed whether or not he would be willing to sell

4   me it.

5       Q.   Okay.  Did he take you in a back room to do

6   the deal?

7       A.   He did not.

8       Q.   Did you have any discussion with him about the

9   statement on this yellow piece of garment which is

10  Government's Exhibit 26F that says, looks like tenth

11  anniversary MRND 1975 to 1985.  Did he explain where he

12  actually got this?

13      A.   I didn't ask him where he had gotten the

14  things.

15      Q.   Okay.

16      A.   So we did not discuss where they came from.

17      Q.   And with respect to the Government's

18  Exhibit 26 -- is that an O?

19           MR. CAPIN:  Yes.

20      Q.   Okay.  26-O, it has dates on the back of this.

21           MR. CAPIN:  Mr. Ruoff, it's a C, I apologize.

22      Q.   Okay, 26C.  It says 15, I believe that's

23  French word for year, 1975 to 1990.  Did he explain what

24  those numbers and dates meant?

25      A.   As I said, I didn't talk to him about what was

1   on there.

2        Q.   Did you consult with anybody about what the

3   dates meant?

4        A.   No, I didn't.

5        Q.   Okay.  So it's possible that this garment

6   represents a tunic that was sold at a very unique event

7   in 1990?

8        A.   I'm not sure that I would agree with that.

9        Q.   You have no basis to disagree with it, though;

10  right?

11            MR. CAPIN:  Objection.

12            THE COURT:  Sustained.

13       Q.   Were you involved in the interviews of

14  Consolee Mukeshimana, were you present for that

15  interview?

16       A.   I believe I was.

17       Q.   You believe or were you there?

18       A.   If you have -- I believe I was.  These

19  witnesses underwent several interviews, so it's possible

20  that I was there for some and not for others, so.

21       Q.   How about the June 7, 2012, interview in

22  Butare?

23       A.   If you have a report that reflects that, if I

24  could take a look at it, it might refresh whether or not

25  I was there.

1       Q.   Well, I'll show you a copy of the report that

2   I have.  And on the front here it says it was Jason Fox

3   and then approved.  It has your name down here.  But if

4   you can take a look at it and tell me if there's

5   anything in it that tells you were actually there.

6       A.   It doesn't say that I was there.  I approved

7   it because at the time this report was uploaded into our

8   data system I was the acting supervisor of the group and

9   that's the person who approves reports.

10      Q.   So as you sit here today you can't say for

11  sure you were actually present for this interview?

12      A.   I'm telling you that my memory is that I was

13  present for an interview of Consolee Mukeshimana.  I

14  don't recall if it was that date, the date of that

15  interview.

16      Q.   So the person who we know would have been

17  present for that date would be the person whose name

18  appears here, Jason Fox?

19      A.   Yes, that's correct.

20      Q.   I think he's in the courtroom, back of the

21  courtroom?

22      A.   Yes.  I think he's on your witness list.

23      Q.   Okay.  Were you present for the June 2nd,

24  2012, interview of Thierry Sebaganwa?

25      A.   Yes.

1       Q.    And Geoffrey Howes was present for that

2    interview as well; right?

3       A.    That's correct.

4       Q.    Now, a report was generated as a result of

5    that interview; correct?

6       A.    Yes.

7       Q.    And the person that actually wrote the report

8    was Geoff Howes; right?

9       A.    That's correct.

10       Q.    And you reviewed and approved the report;

11    right?

12       A.    Also correct.

13       Q.    And when you reviewed and approved the report,

14    it was to make sure that I guess there are no

15    grammatical or spelling mistakes.  That's one thing;

16    right?

17       A.    That's one thing.

18       Q.    Make sure the report reads well; right?

19       A.    Content wise or that it doesn't have

20    grammatical mistakes.

21       Q.    Okay, because these reports are given to

22    prosecutors; right?

23       A.    Yes.

24       Q.    Defense attorneys; correct?

25       A.    Also correct.

1     Q.    Perhaps your supervisor will review these

2  reports as well?

3     A.    I was the supervisor at the time.  My

4  supervisor would not have reviewed those reports.

5     Q.    Okay.  So it's important that these reports

6  fairly depict what was said during the interview

7  process; correct?

8     A.    I do agree with that.

9     Q.    And I think the way these reports generate is

10  you would take notes during the interview process?

11     A.    Correct.

12     Q.    And then apparently Mr. Howes typed this

13  report in and you reviewed it and it was consistent with

14  what you remembered the witness saying as well; right?

15  There's a lot to that question.  Let me break it down.

16     A.    Thank you.

17     Q.    That -- well, were one or both of you taking

18  notes during the interview with Thierry?

19     A.    Only one agent was taking notes.

20     Q.    Okay.  In this case that would have been Agent

21  Howes; correct?

22     A.    That's correct.

23     Q.    And then he took his notes and typed up the

24  report which you reviewed; correct?

25     A.    I agree.

1    Q.   Okay.  And you didn't see anything in the

2    report that you approved that was inaccurate; correct?

3    A.   No, I did not.

4    Q.   Now, you said on direct examination that when

5    you approached the interview of these witnesses, your

6    objective was to give them really no leading questions

7    to suggest answers; right?

8    A.   We asked general questions that would not

9    predetermine a response.

10   Q.   Because you know it's important not to give

11   witnesses information about a case while you're

12   interviewing them in order to test legitimacy of what

13   they're telling you; right?

14   A.   Yes, I would agree with that.

15   Q.   Okay.  So you didn't walk in there and say

16   we're here to talk about Beatrice Munyenyezi at the

17   roadblock in 1994, have a seat?

18   A.   Of course not.

19   Q.   You were trying to use this format of going

20   from general down to specific to determine if the

21   witness actually knew anything that's helpful to you;

22   right?

23   A.   That's correct.

24   Q.   Okay.  And when you write your reports, you're

25   also very careful not to write the reports in the way

1   that would suggest that you gave the witness any

2   information; right?

3        A.   I'm not sure how you write a report that

4   reflects that when the interview itself didn't do that.

5   You ask general questions.  You ask witnesses about

6   their experiences.  You're taking notes, all right.  So

7   you don't capture every single word that a witness says,

8   but you certainly try to capture the important details

9   that, as you said, lend legitimacy to what the witness

10  is telling you.

11       Q.   Okay.  And one of the important details in

12  this case is whether witnesses can remember certain

13  names; correct?

14       A.   Sure.

15       Q.   And whether witnesses can remember certain

16  events in Butare; correct?

17       A.   Whether or not they remember the event is

18  predicated upon were they in proximity to the event when

19  I understand that it occurred, you know, how I form the

20  question.  If they weren't there, you wouldn't expect

21  them to recall that.

22       Q.   But if they mention a specific name or a

23  specific event that was important to your investigation,

24  you would write it down in your report; correct?

25       A.   I think that's fair to say.

17

1      Q.   Okay.  Now, when you met with Mr. Sebaganwa,

2  you met with him in Kigali; correct?

3      A.   Correct.

4      Q.   And you approached him the same way you

5  approached all the other witnesses in this case, which

6  was, you know, with a very general format; correct?

7      A.   Yes.

8      Q.   And when it came time to -- when he was

9  telling you what he remembered from Butare, you didn't

10  suggest any answers to him; right?

11      A.   No, I don't think we did.

12      Q.   And when it came time to talk about Shalom, he

13  actually brought up the name Shalom; correct?

14      A.   That's my memory.

15      Q.   And then he went on to tell you that he would

16  recognize Shalom's wife by her face but he didn't know

17  her name; right?

18      A.   That's my memory.

19      Q.   Okay.  So, in your interview with him in June

20  Mr. Thierry actually didn't know the name Beatrice

21  Munyenyezi; right?

22      A.   Yes.

23      Q.   He didn't tell you that he knew the name

24  Beatrice Munyenyezi?

25      A.   That's right.  My recollection is that he

1    didn't recall it.  It was clear that he knew the wife of

2    Shalom.

3         Q.   But he didn't know her name; right?

4         A.   That's correct, he could not -- he did not

5    give us --

6         Q.   He didn't say I know Beatrice; right?

7         A.   He said I know the wife of Shalom.

8         Q.   Okay.  Well, he said he recognized Shalom's

9    wife by her face but didn't know her name?

10        A.   That's correct.  That's what the report says.

11        Q.   And then you go on to -- he went on to answer

12   more questions but never identifies her by name;

13   correct?

14        A.   You're asking me questions about Mr. Howes'

15   report.

16        Q.   Well, that you read and approved; right?

17        A.   I did, but I certainly don't remember

18   everything that is in his report.

19        Q.   Well, we will go through this.  Just take a

20   second.  You agree that I've read that part correctly

21   about him saying that he didn't know her name, right,

22   that's underlined right there?

23        A.   Yes, that's correct.

24        Q.   Okay.  And look down through here

25   continuously.  Isn't it true that it just refers to the

1    wife of Shalom?

2        A.    Yes.

3        Q.    Okay.  Doesn't say the name Beatrice

4    Munyenyezi anywhere in Agent Howes' report?

5        A.    No, I don't believe it does.

6        Q.    And if he had referred to her as Beatrice,

7    that probably would have been included in Agent Howes'

8    report because that would have been an important detail;

9    right?

10       A.    Certainly.

11       Q.    So as of June 2012 when he met with you, Mr.

12   Thierry didn't know her name?

13       A.    Well, that assumes that he never knew it, and

14   I don't think that that's correct, since he quite

15   clearly knew.

16       Q.    Well, he didn't tell you that her name was

17   Beatrice; right?

18       A.    It doesn't mean that he didn't forget it.

19       Q.    I see.  One last thing, Agent Andersen, and

20   then I'm done.  Showing you what -- Vinny, can I get

21   this premarked?  I thought I premarked this.  This will

22   probably be M, defense M?

23             THE CLERK:  Yes.

24             MR. ROUFF:  For ID.

25       Q.    One of the things that, one of the exhibits

20

1    that the government showed you on direct examination was

2    a copy of a resume that you found at the residence;

3    correct?

4         A.   That was found at the residence.  I didn't

5    actually do the search myself, but I was present.

6         Q.   And we already discussed that you found many

7    documents at the residence?

8         A.   Correct.

9         Q.   Okay.  You actually seized computers and hard

10   drives and stuff like that; right?

11        A.   Yes.

12        Q.   Copied all that?

13        A.   Yes.

14        Q.   Okay.  I'm showing you what's been premarked

15   for ID, this is Bates stamp 472, okay -- I'm sorry, 672.

16   Okay, does that document look similar to the resume that

17   Attorney Capin showed you?

18        A.   Yes.

19        Q.   Is that a different version of the resume?

20        A.   Is it a different version?  It doesn't look

21   like the same font, but maybe it is.  I'm not a font

22   expert, I guess.  There are some differences.

23        Q.   How many resumes for Beatrice Munyenyezi did

24   you find at the residence?

25        A.   I think there were two.

1      Q.   The one that Mr. Capin showed you and the one

2   that you have in your hand?

3      A.   Yeah, I think so.

4      Q.   Okay.

5           MR. RUOFF:   I move to strike the ID, judge.

6           MR. CAPIN:   Objection, hearsay.

7           THE COURT:   Sustained.   Is it being offered

8   for some other purpose, truth of its content?

9           MR. ROUFF:   Well, actually it's just to

10   impeach the other resume.

11           THE COURT:   Sustained.

12      Q.   Well, with respect to the Defendant's M, is

13   there any reference on there to her working as a bar

14   manager?

15           MR. CAPIN:   Objection.

16           THE COURT:   Sustained.

17           MR. ROUFF:   Can I have a second, judge.

18           (Pause.)

19           MR. ROUFF:   Judge, can we just approach

20   sidebar?

21           THE COURT:   Sure.

22                        AT SIDEBAR

23           MR. ROUFF:   I just want to refine my -- we're

24   not offering it for the truth of the matter asserted.

25   It's really, said it was to impeach the other admission

1   that was admitted simply to show that --

2           THE COURT:  The other document comes in as a

3   statement by a party opponent, but the party can't

4   introduce their own statements under that rule.

5           MR. ROUFF:  No, I understand that, but I think

6   we can introduce it to show that, you know, it's not

7   being offered for the truth, we're not offering it to

8   show the truth of any --

9           THE COURT:  It's a document.

10          MR. ROUFF:  Right.

11          THE COURT:  It's hearsay.

12          MR. ROUFF:  Not necessarily.  It's non-hearsay

13  because we're not going to bring it for the truth of any

14  statement.

15          THE COURT:  Then what is it for?

16          MR. RUOFF:  For the absence of any reference

17  to the work at the hotel which is what the government's

18  exhibit talks about.  So that's why it's a non-truth

19  purpose.  We're not offering it to show that she

20  actually worked at the family hotel or anything like

21  that.

22          THE COURT:  You're offering to show that she

23  didn't --

24          MR. HOWARD:  There's no statement, that's all.

25  We're not offering to show that she didn't work there.

1     We're offering it to show that there's no statement on

2     there.

3                 THE COURT:  Which is not relevant to whether

4     she worked there or not.

5                 MR. HOWARD:  We're not trying to prove whether

6     she worked there or not.

7                 THE COURT:  That's not relevant to anything.

8                 MR. HOWARD:  Then the original exhibit isn't

9     relevant.

10                THE COURT:  That's a statement, that's a

11    statement against and doesn't have to be inculpatory,

12    that's just a statement by the party.

13                MR. HOWARD:  It has to be relevant to come in,

14    and it's not relevant according to their own theory

15    objecting to this one.

16                THE COURT:  No, no.  They are saying, A, it's

17    relevant if it's a statement by the party opponent and

18    they want to introduce it, that's it.

19                MR. HOWARD:  But that doesn't make it

20    relevant.

21                THE COURT:  Well, that makes it relevant

22    because it's a statement by a party opponent, but if you

23    need more relevance, it's relevant because it tends to

24    show that she worked in the Ihuriro Hotel.

25                MR. HOWARD:  Okay, that's what they are

24

1    offering it for.  We're offering a document that

2    purports to be a resume of the defendant.  We are not

3    offering it for the truth of anything that's on it,

4    therefore it's not hearsay.  We're not offering our

5    client's statement.  We are offering it only to show

6    that on this particular document there was an absence,

7    we're not going to argue and we're not trying to prove

8    that she didn't work there.

9              THE COURT:  My client also made a statement in

10   which she gave her resume history and didn't say she

11   worked there, yeah, that's a statement.

12             MR. HOWARD:  No, no, no, no.  It's not the

13   statement.

14             THE COURT:  It's a non-statement.  It's a

15   non-statement of work at the hotel.

16             MR. HOWARD:  But we're not offering it to

17   argue that she didn't work there.

18             THE COURT:  Why are you offering it?

19             MR. HOWARD:  That it's not on here.

20             THE COURT:  Yes, which is relevant for what?

21   Tends to prove what fact?  That it's meaningful and

22   determine the issues before the jury what?

23             MR. HOWARD:  If we can get an agreement from

24   the government that they are not going to argue that

25   that other statement is substantive --

1          MR. CAPIN:  Your Honor, we offered that as an

2     admission.

3          THE COURT:  Okay, objection sustained.

4                    BEFORE THE JURY

5     Q.   BY MR. RUOFF:  Now, Agent Andersen, earlier

6     before the lunch break we covered some ground about the

7     witnesses that you interviewed in the June trip to

8     Rwanda, June of 2012.  Do you remember those questions?

9     A.   I remember that there were some questions

10    about that, yes.

11    Q.   Okay.  And all the witnesses that we heard

12    from in this trial came from that June 2012 trip to

13    Rwanda; correct?

14    A.   Yes.

15    Q.   You didn't know or hadn't interviewed them

16    prior to that time; correct?

17    A.   The witnesses who we heard from in this trial,

18    no, I had not.

19    Q.   Correct.  Even though you had been

20    investigating the case since 2008; right?

21    A.   That's correct.

22    Q.   And previously had made at least five trips to

23    Rwanda for this case alone; correct?

24    A.   I never made a trip to Rwanda for this case

25    alone.

26

| | | |
|---|---|---|
| 1 | Q. | Well, for this case among other cases? |
| 2 | A. | That's correct. |

3          MR. ROUFF:  Thank you, agent.

4          THE WITNESS:  Thank you, Mr. Ruoff.

5          THE COURT:  Any redirect?

6          MR. CAPIN:  Just a few questions.

7                    REDIRECT EXAMINATION

8     BY MR. CAPIN:

9          Q.   I just have maybe two minutes.  On this last

10    couple of questions by Mr. Ruoff, on the June trip, am I

11    correct in understanding on the June trip to Rwanda you

12    were investigating this defendant and conducting other

13    investigations unrelated to this defendant?

14         A.   That's correct.

15         Q.   With regard to this defendant, approximately

16    how many witnesses or potential witnesses did you

17    interview in June of 2012?  And when I say you, I don't

18    mean you personally, I mean you and the agents in the

19    reports?

20         A.   Sure, related to this defendant?

21         Q.   Yes.

22         A.   Approximately 40.

23         Q.   Now, Mr. Ruoff said that in the search of the

24    defendant's residence in which her resume was seized,

25    there were lots of other documents.  Remember those

1   questions?

2         A.   I do.

3         Q.   Did those include voluminous records from the

4   ICTR?

5         A.   Yes.

6         Q.   Including transcripts from the ICTR?

7         A.   Yes.

8         Q.   Including transcripts from what are called

9   closed sessions of the ICTR?

10         A.   Yes.

11         Q.   What's a closed session?

12         A.   Closed session is a, what amounts to a private

13   session of the court, and the testimony that is taken

14   during a closed session is not public.  In fact, the

15   transcripts of those closed sessions are not supposed to

16   be available to other witnesses or to the public at

17   large.  So earlier, as I explained, about having gone to

18   the ICTR website and found transcripts, much but not all

19   of what the defendant testified to was publically

20   available.  The closed session transcripts would not be

21   available on the website.  And in my early, my earliest

22   review of her testimony, I didn't have access to the

23   closed session materials because I couldn't get them.

24         Q.   Mr. Howard asked you some questions about one

25   of the ICTR transcripts that we looked at.  Do you see

1    the passage in front of you?

2         A.    The highlighted one, yes.

3         Q.    Whoops.  I think I'm on the wrong page.  And

4    he pointed out, am I correct in noting that he pointed

5    out the passage you and I read together:  So madam

6    witness, the question that followed that question was,

7    the EER school or compound is quite close to the Hotel

8    Ihuriro, isn't it?  And she responded:  I'm not sure how

9    close you refer to, but it's not close.  It was probably

10   ten minutes from the hotel.  Depends on how you could

11   walk.

12              Do you remember that question of Mr. Howard?

13              (Jury can't see the screen.)

14        Q.    I won't read it again, but Mr. Howard pointed

15   out in saying that it was ten minutes to the EER.  The

16   question had been, the EER school or compound.  Do you

17   remember this question?

18        A.    Yes, I do.

19        Q.    Now, I'm going to read to you the preceding

20   question, the immediately preceding question.  And that

21   is:  The EER school is quite close to the Hotel Ihuriro,

22   isn't it?  Answer:  No.

23              Did I read that correctly?

24        A.    Yes, you did.

25        Q.    In fact, on that side of the main road, is

1   there anything closer to where the Ihuriro was than the

2   EER school?

3       A.   No.

4       Q.   Just a couple more questions.  I don't have

5   the benefit of photographs, so I'll simply -- could I

6   have a moment, your Honor, just to gather a couple of

7   photographs.

8            (Pause.)

9       Q.   Let me show you, Special Agent Andersen --

10  actually, I move to strike the ID on 24R.  Maybe you

11  could help us.  Could you educate us.  Do you recognize

12  what's depicted in 24R for ID?

13      A.   I do.

14      Q.   What's depicted there?

15      A.   This is a photo that I took.  The building to

16  the left side of the frame of the photo is one of the

17  buildings of the EER school.  A grassy area.  A little

18  bit of slope.  And you can barely make out the area that

19  is the footpath that is the same location of the photo

20  that Mr. Ruoff showed me earlier.

21      Q.   Before I offer that, can you indicate for us

22  with Exhibit 5B on the screen?

23            THE COURT:  You can put it on, Vinny.

24            MR. CAPIN:  So there's nothing there?

25            THE COURT:  Now there is.

1      Q.   Can you show us on 5B where you were standing

2   when you took that photograph?

3      A.   Sure.

4      Q.   And I mean approximately.

5      A.   (Witness marking screen.)

6      Q.   And can you point an arrow showing which way

7   the photo is being shot.  Okay.  Does that photograph,

8   then, correctly and accurately depict the perspective

9   from where you indicated which, for the record, your

10   Honor, is on the northbound side of the main highway in

11   front of the EER school down east, heading east as

12   heading down the slope toward the grove?

13      A.   Yes, that's correct.

14      Q.   It does?

15      A.   Yeah.

16      Q.   Okay.

17           MR. CAPIN:  Move to strike the ID.

18           THE COURT:  24?

19           MR. CAPIN:  24R, your Honor.

20           MR. ROUFF:  Can I see it?

21           THE COURT:  Any objection?

22      Q.   Do you know if this is zoomed?

23      A.   It might be slightly.  I was standing on the

24   side of the road, so I'd say that's got some zoom to it,

25   yeah.

1        Q.    But putting the zoom aside, does it correctly

2    show the line of sight from the road down to the path?

3        A.    Yes, I believe it does.

4              MR. ROUFF:  We have no objection to striking

5    it.

6              THE COURT:  ID may be stricken on 24R.

7              (Government's Exhibit 24R admitted.)

8        Q.    So, am I correct in understanding that this is

9    the correct -- this is what one would see if one were

10   standing on the edge of the road, on the edge of the

11   road, on the northbound side, facing the EER, and

12   looking downward toward that grove in sort of the valley

13   that Dr. Longman, that other witnesses have described?

14       A.    Yes, that's correct.

15       Q.    Now, similarly, if one were standing here, for

16   example, here, and looking down this way, would one have

17   a similarly unobstructed view of this area here -- well,

18   I should say of this area here?

19             MR. ROUFF:  I'll object under relevance.  It's

20   beyond the scope.  Mainly because it's not 1994.  If he

21   can testify 1994.

22             MR. CAPIN:  Fair enough.

23             THE COURT:  Well, and if he was there and if

24   he saw it, and the photographs are before the jury and

25   they can certainly make their own deductions.

1            MR. CAPIN:  I'll lay the relevance foundation,

2    your Honor.

3        Q.   Mr. Ruoff asked you some questions about

4    Vincent Sibomana?

5        A.   He did.

6        Q.   Correct?

7        A.   Yes.

8        Q.   Is that the kid that worked at the Relais de

9    la Soif?

10       A.   Yes.

11       Q.   You showed us where he stood at different

12   points in time to show you where the roadblock was?

13       A.   That's correct.

14       Q.   Show us with your finger where he stood

15   showing us where the roadblock was where they were

16   checking IDs close to the hotel and where it was where

17   the first obstacle was on the main road?

18            MR. ROUFF:  Objection.  This is way beyond

19   cross of this witness, your Honor.

20            MR. CAPIN:  He was asking about Sibomana

21   and --

22            THE COURT:  Overruled.

23       Q.   Please show us where the roadblock was?

24       A.   So the picture that I took of Sibomana when he

25   indicated the area of the roadblock, he was standing

1   approximately in that location.

2           MR. CAPIN:  May the record reflect, your

3   Honor, that the witness has drawn a line through the

4   main road just on the northwest corner of the

5   intersection of what we're calling the ESO road and the

6   main road.

7           THE COURT:  It may.

8       A.   And you asked me the location of the first

9   barrier?

10      Q.   I think the other one was -- he asked you

11  where the first barrier was if you were coming from this

12  direction, where you would encounter the first part of

13  that roadblock.

14      A.   Sure.  I believe that he was standing in this

15  area when we flipped around and I was standing closer to

16  the site of the former Ihuriro and he was north of me,

17  the location of the first barrier.

18          MR. CAPIN:  And may the record reflect, your

19  Honor, that the witness has drawn a line across the main

20  road approximately between the southern most part

21  building of the EER school and the second building over.

22          THE COURT:  It may.

23      Q.   And just so we're perfectly clear, you

24  indicated that the roadblock is from here to here.

25  Where was Relais de la Soif according to where Mr.

1  Sibomana stood?

2       A.   My understanding -- you want me to circle it?

3       Q.   Please.

4       A.   My understanding, the location of the Relais

5  de la Soif, is that it was there.

6       Q.   And I'm going to ask you kind of an obvious

7  question, but -- well, maybe it's not obvious.  Have you

8  stood at the location where I'm putting my finger now?

9       A.   Yes.

10      Q.   And have you walked down this path?

11      A.   Yes.

12      Q.   Have you stood down here?

13      A.   Yes.

14      Q.   Have you walked the entirety of this path?

15      A.   Yes.

16      Q.   In fact, if you walk this path in this

17  direction, do you get to the mosque a little farther

18  going south?

19      A.   I think you can get all the way to the

20  university on that, but you get to the, mosque before

21  you get to the university.

22      Q.   And the mosque is right next to Richard

23  Kamanzi's house?

24      A.   Correct.

25      Q.   The obvious question.  You told us there was

1    unobstructed view from here down to here.  If you're

2    standing down here and looking up to where Mr. Sibomana

3    indicated the main part of the roadblock was, and again,

4    you weren't there in 1994, but based on your having been

5    at this location, could you see where Mr. Sibomana

6    showed you the main part of the roadblock was?

7        A.   Yes, you could.  And to be clear, you couldn't

8    see the surface of the road, but you could certainly see

9    anything that was on the road, whether it was people or

10   vehicles, you could see that today.

11       Q.   And I think the last question I have for you

12   is Mr. Ruoff asked you a number of questions about

13   whether Thierry Sebaganwa, the first witness who

14   testified to this jury, remembered Beatrice's name at

15   the initial interview.  Remember those questions?

16       A.   Yes.

17       Q.   Based on your work throughout this

18   investigation, is there any question that --

19            MR. RUOFF:  Objection.  Finish the question.

20   Sorry.

21       Q.   Did Shalom Ntahobali have more than one wife?

22       A.   No, I'm not aware that he did.

23            MR. CAPIN:  Nothing further, your Honor.

24            THE COURT:  Any recross?

25            MR. ROUFF:  Yes.

36

1                    RECROSS-EXAMINATION

2   BY MR. ROUFF:

3       Q.    You testified about seeing a number of ICTR

4   documents at my client's house when you executed the

5   search warrant; correct?

6       A.    Yes.

7       Q.    Just because they were at her house doesn't

8   necessarily mean that they're her documents; right?

9       A.    I mean, I think that's a fair assertion.  She

10  was the resident and as far as I know the only people

11  who were living there at the time were the defendant and

12  her daughters.

13      Q.    Well, you know that her sister Prudence

14  Kantengwa lived with her from time to time; correct?

15      A.    I didn't know it was from time to time.  I am

16  aware at some point she had lived with her.

17      Q.    Okay.  And are you aware that she kept some of

18  her belongings at that residence?

19      A.    I don't ever remember hearing that.

20      Q.    Did you look at the documents that you seized?

21      A.    Yes.

22      Q.    In fact, the ICTR documents were found in a

23  black bag that said WESTLAW on it; right?

24      A.    I don't remember exactly what they were found

25  in.

1      Q.   Do you know what WESTLAW is?

2           MR. CAPIN:  Objection.  Relevancy.

3           THE COURT:  Sustained.

4      Q.   Well, you know Prudence Kantengwa is a lawyer;

5   right?

6      A.   I know that she attended law school.

7      Q.   And along with those documents there were also

8   court briefs found with those documents, the ICTR

9   documents; correct?

10     A.   I don't recall as I sit here now every

11  document that was found with the ICTR documents.

12     Q.   Okay.  Well, I'll show you a document that

13  appears to be a Homeland Security document.  That's I

14  guess the equivalent of a possessed property report;

15  right?

16     A.   No, it's not.

17     Q.   Well, it's showing what was found and where;

18  right?

19     A.   This is a photo of the evidence bag that the

20  evidence was placed into after it was seized.

21     Q.   Okay.  And in there are ICTR documents seized

22  by ICE; correct?  Go ahead, look through.

23     A.   Okay.

24     Q.   Here, I'll facilitate this.

25     A.   All right.

38

```
 1       Q.   That's one of the transcripts that you were

 2  talking about; correct?

 3       A.   Yes.

 4       Q.   Okay.  And I'm assuming that ICE copied these

 5  all in the order that they were found?  That they found

 6  a pile of documents, they would have copied them in the

 7  same order that they found them?

 8       A.   Sure.  They were copied at the U.S. Attorney's

 9  Office.  This is why the Bates stamp is on there.

10       Q.   Of course I just lost my -- okay.  What's that

11  document?  We're talking about Bates stamp 1412,

12  counselor.  That's an e-mail to Prudence Kantengwa;

13  correct?

14       A.   Yes.

15       Q.   And it's pertaining to her ICTR testimony;

16  correct?

17            MR. CAPIN:  Objection, your Honor.  Hearsay,

18  relevancy.

19            THE COURT:  Sustained.

20       Q.   Did you ever read that document?

21       A.   I'm sure I did at some time.

22       Q.   Okay.  Obviously you weren't in Butare in

23  1994; right?

24       A.   No, I was not.

25       Q.   So when the prosecutor was showing you these
```

1   zoomed photographs, you have no idea what the vegetation

2   was like in 1994; right?

3       A.   I think that you can certainly get a sense for

4   whether there were large vegetative growth, you know,

5   trees and something like that because you can see that

6   on the IDPs, but if things were smaller, no, I don't

7   think that you can see that as well.

8       Q.   You're talking about these large vegetative

9   things here?

10      A.   Sure.  Yes.

11      Q.   So that there's no way for you in 2012 to know

12  how big these objects were back then of course; right?

13      A.   No, I don't.

14      Q.   And I notice that when you're standing here

15  and taking the picture down here, you zoomed past this

16  line of trees, correct, to take that photograph?

17      A.   Yeah, I think I was standing between those

18  trees as a matter of fact.

19          MR. ROUFF:  No more questions, judge, thank

20  you.

21          MR. CAPIN:  Nothing further, your Honor.

22          THE COURT:  All right.  Thank you, Agent

23  Andersen, you may step down.  You're excused.  Call your

24  next witness.

25          MR. CHAKRAVARTY:  Your Honor, there are no

1   more witnesses for the government.  The government is

2   submitting its case to the jury with the witnesses and

3   the evidence that --

4           THE COURT:  You're resting?

5           MR. CHAKRAVARTY:  The government rests.

6           THE COURT:  All right.  Ladies and gentlemen,

7   the government has rested.  Why don't we take just a

8   short ten-minute break and then we will resume.

9           (Jury exited the courtroom.)

10          THE COURT:  Any motions?

11          MR. HOWARD:  Yes, your Honor.  As to both

12  counts in the indictment the defense would move at this

13  point for first a global Rule 29.  Obviously taking the

14  evidence in a light most favorable to the government, as

15  you must, we still believe that on this evidence there

16  is insufficient evidence to prove that the defendant

17  made a false or misleading statement, material and

18  knowingly, on the, what can only be the government

19  forms.  More specifically and to reduce that motion down

20  to some of the nitty-gritty, we do believe that the

21  court should do a selective Rule 29 on certain aspects

22  of the indictment.

23          There are at least two alleged prior false

24  statements that cannot form the basis for a conviction

25  here and have to be redacted out.  One of those is on

1    the initial refugee application.  The question was are

2    you a member of or have you ever been affiliated with a

3    political party or some other organization prior to your

4    16th birthday.  And then in parenthesis it says if you

5    were not a member, you can answer none.

6            Our motion is based on two theories.  One,

7    that question is hopelessly confusing and as a matter of

8    matter of law cannot form the basis for a conviction

9    because it first asks for memberships and affiliations

10   and then limits the questions to memberships.  Even a

11   completely English-speaking well-conversed lawyer

12   wouldn't know how to answer that question.  But more

13   importantly, there's no indication -- or strike that.

14   The evidence is insufficient that with the subset of

15   that --

16           THE COURT:  Why wouldn't you answer yes if you

17   were a member and no if you were not?

18           MR. HOWARD:  That's what I'm getting to,

19   judge.

20           THE COURT:  But you said no one could answer

21   that question.  But one could answer the question.  If

22   I'm a member, I could say no.  And if I'm not a member,

23   I -- if I'm a member, I say yes.  If I'm not a member, I

24   say no.

25           MR. HOWARD:  Because the general question is

1   member or affiliation.

2          THE COURT:  But the direction says if you're

3   not a member, say no.

4          MR. HOWARD:  But now I don't know what I'm

5   supposed to answer.

6          THE COURT:  No if you're not a member.

7          MR. HOWARD:  All right.  And so what do I do

8   about affiliations?

9          THE COURT:  You ignore it.

10          MR. HOWARD:  I can't ignore it, because if I

11   ignore it I'm going to get prosecuted.

12          THE COURT:  No.  If you're not a member it

13   says no, and as I think the witness said rather clearly,

14   no is an acceptable answer if you're not a member.  But

15   that only applies to one document.

16          MR. HOWARD:  Right, but that particular

17   question forms the basis for the charge in the

18   indictment that she lied on that question.

19          THE COURT:  But the jury has to decide that.

20          MR. HOWARD:  My point is this, judge.  If the

21   person reading the question says I'm not a member but I

22   am affiliated, so she answers no, all right, what the

23   government's doing here, though, is saying that's a

24   false answer.

25          THE COURT:  Oh no, quite wrong.

1          MR. HOWARD:  Well, both --

2          THE COURT:  Because it was absolutely clear

3    that on that document if you were not a member, no was

4    an acceptable and truthful answer.

5          MR. HOWARD:  So, then, perhaps it's going to

6    be a matter of jury instructions.  The government cannot

7    argue that if they haven't proved membership but they

8    have proved some affiliation, she can't be convicted on

9    that basis.

10          THE COURT:  That sounds like a plausible

11    point.

12          MR. HOWARD:  Okay.  So, in any event, I would

13    ask for a Rule 29 on that portion of the indictment that

14    relies on that statement both because it's hopelessly

15    vague and that the government can't -- then secondly has

16    to prove membership.

17          The second point that I'd like to raise is

18    with respect to the Rwanda questionnaire that was

19    required of my client to fill out on November 13th of

20    1995.

21          The testimony of Mr. Monica was that document

22    is not a government document.  It's a JVA document.  His

23    testimony was he frankly didn't know who prepared it but

24    he was clear that it was not a government document.  I

25    think it was Mr. Heflin who said he wasn't sure who

1   prepared it but they are State Department questions, but

2   the JVA prepares them.  It is information provided to

3   the JVA.  The JVA then relays that information to the

4   State Department.  But it is not a questionnaire of the

5   United States government.  It's a JVA questionnaire.

6   And on that basis, even if, and any of the information

7   is knowingly and materially false on that statement, it

8   is not a knowing material false statement to the United

9   States government, and that questionnaire cannot form

10   the basis for a conviction.  Thank you, judge.

11          THE COURT:  Mr. Chakravarty.

12          MR. CHAKRAVARTY:  Your Honor, the government

13   has presented evidence of each and every element.  I'll

14   focus, I think the Rwandan witnesses establish the facts

15   that underlie the statements, I'm not going to belabor

16   that.  There will be time for a jury charge conference

17   at which time if there are certain areas that we should

18   not be able to argue we can discuss it then.  This is

19   not necessarily the time.

20          There was evidence throughout the trial that

21   the associate, the membership and affiliation, both

22   through Mr. Monica at the time of the Rwanda

23   questionnaire as well as Violo and Salidzik in that one

24   of the few things that we heard from her yesterday was

25   substantively it's the same question going back.  And

45

1   Mr. Monica had testified that --

2            THE COURT:  It's not, though.  I've looked at

3   it rather carefully.  It's not.

4            MR. CHAKRAVARTY:  Well --

5            THE COURT:  One question includes a direction

6   as to how to answer and the others don't.

7            MR. CHAKRAVARTY:  And there are -- well, in

8   terms of what the, literally the words in the question,

9   I would agree with you, they are worded differently,

10  which is one of the reasons why the witness yesterday

11  testified to the fact that substantively what they are

12  looking for is the same.

13           THE COURT:  That may be but you can't tell

14  somebody you can answer no and then say but you really

15  can't because we're looking for something different.

16           MR. CHAKRAVARTY:  Well, fair enough.  That's

17  not what the question says, even in the most strained

18  reading.

19           THE COURT:  No, it does.  It clearly does.

20  And your witness made it even, if there was any doubt

21  about it, made it even clearer that no was an acceptable

22  truthful answer if you were not a member.  Affiliation

23  and association were irrelevant.

24           MR. CHAKRAVARTY:  I'm not disputing that

25  evidence, your Honor.  What I'm disputing is, first,

1    it's not a basis for a Rule 29.  It's for the jury to

2    decide.

3           THE COURT:  Well, I've been thinking about

4    that rule, too.  I think you're probably right, but I'm

5    not sure why.  The way you've charged it is somewhat odd

6    because you charged the general violation and then

7    you've broken out sort of theories of liabilities in

8    subparagraphs.

9           MR. CHAKRAVARTY:  Which are surpluses.  Those

10   are not elements.  Those are the theories of the case

11   that have been advanced.  But ultimately it's a 1425,

12   your Honor, did she unlawfully obtain --

13          THE COURT:  So you have this odd situation of

14   I can see where the defense is standing and saying,

15   well, it almost looks like you've charged four different

16   violations of the statute accomplished by different

17   means, and so I want Rule 29, judge, acquittal on that

18   variation, sub D or whatever it is.

19          MR. CHAKRAVARTY:  I understand.

20          THE COURT:  I tend to think more about the way

21   you think about it which is, no, it's one charge, and

22   it's unfortunate that it's pled that way, but it's more

23   like an overact in a conspiracy or something and we just

24   excise it.

25          MR. CHAKRAVARTY:  If it comes to that, and

47

1    that's why --

2              THE COURT:  I just won't struck them, or I

3    will instruct, maybe I will have to instruct that you

4    should have made it part of the case, that that's not

5    before them anymore or something.

6              MR. CHAKRAVARTY:  I don't know that we can

7    consider it's not before them, but the other point, your

8    Honor --

9              THE COURT:  You're right.  It's before them

10   because if she was a member she should have said yes.

11             MR. CHAKRAVARTY:  She should have said yes,

12   exactly.  But the other point, if it's

13   unconstitutionally vague as Mr. Howard just argued --

14             THE COURT:  It isn't.

15             MR. CHAKRAVARTY:  So, exactly, so what he's

16   arguing is that this defendant did not understand the

17   question.  That is a factual issue that the jury can

18   decide, your Honor, the plain language of the question,

19   whether she knew whether to do no or if I'm an affiliate

20   or I'm not a member, I don't know what to write.  That's

21   a factual question for the jury, so, on that point.

22             The other issue is the Rwanda questionnaire.

23   I think two witnesses testified this was both a

24   government form as well as the questions were required

25   by state.  What Mr. Monica said is the person who

48

1    created the form may have been a JVA, joint voluntary

2    agency, which other evidence indicates it contracted by

3    the government, but there is no question, the government

4    would argue, that there's evidence that the questions

5    that were asked to the defendant and the information the

6    defendant was providing was being provided to the

7    government for purposes of her security check, for

8    purposes of the --

9            THE COURT:  Correct me if I'm wrong, but my

10   understanding was that form was submitted to the

11   government in support of the application for a refugee

12   status.

13           MR. CHAKRAVARTY:  It was.  It's in the A-File

14   which by definition --

15           MR. HOWARD:  No, the form was not submitted to

16   the government.

17           THE COURT:  I understood it was.

18           MR. HOWARD:  The JVA pulled the information

19   off the form and sent the visa donkey off to the State

20   Department just --

21           THE COURT:  Oh, I don't think the JVA sends

22   visa donkeys.

23           MR. CHAKRAVARTY:  I think that's right, they

24   don't.  In fact, Mr. Monica's initials were on it, he

25   personally sent it.  That's what he testified to.

1          THE COURT:  Yes, I think that is -- my memory

2    is that form was submitted in support of the application

3    for refugee status.  You think that's not the case, Mr.

4    Howard?

5          MR. HOWARD:  No, I think she sits with the JVA

6    and fills out that form.  The JVA gives it to --

7          THE COURT:  Well, she gives it.  I mean, to

8    the extent that you say the JVA gave it to separate the

9    defendant from it, they are the agent at work.

10         MR. HOWARD:  I wasn't trying to separate her

11   from it.

12         THE COURT:  So it's a submission by the

13   defendant to the government in support of her

14   application, therefore it has to be accurate.

15         MR. HOWARD:  But that part we probably have

16   some disagreement about because I think --

17         THE COURT:  Which part?

18         MR. HOWARD:  -- Mr. Monica said this

19   questionnaire is not a government document, and that's a

20   quote.

21         THE COURT:  Let's assume it isn't.  You still

22   can't send a letter to the government and make material

23   misrepresentations about a matter within the

24   jurisdiction of the agency.

25         MR. HOWARD:  But if I'm sitting with a non-

1   government agent, an NGO, and they ask me a question and

2   I answer the question, the NGO then takes what I answer

3   and sends it off, that's not me giving an answer to the

4   U.S. government.

5          THE COURT:  Only if they are doing it on your

6   behalf and you understand they're doing it on your

7   behalf and it's in support of application for benefits

8   that you were making, then you do.  And I think that's

9   correct.

10          All right.  Thank you.  Your motion is denied.

11   And do you intend to call witnesses, Mr. Howard?

12          MR. HOWARD:  We do, judge.  And I guess we

13   have -- we could probably do one of their agents.  He's

14   not going to be very long.  And then we will bring over

15   our witnesses tomorrow morning if that's acceptable.

16          THE COURT:  All right.  That's fine.  Okay.

17   All set?

18          MR. HOWARD:  It's going to be Jason Fox.

19                    BEFORE THE JURY

20          THE COURT:  Ladies and gentlemen, the

21   government has concluded its presentation of evidence.

22   And let me remind you, the defendant is not required to

23   present any evidence whatsoever.  The defendant bears no

24   burden of proof whatsoever in the case.  But now the

25   defendant chooses to present now witnesses in evidence.

1    She has the opportunity, and Mr. Howard advises me that

2    he is going to call witnesses.  So now we're in that

3    stage of the trial where the defense calls witnesses and

4    conducts direct examination, the prosecution has an

5    opportunity to cross-examine, and we will continue until

6    the defense has presented all the witnesses they choose

7    to present.

8             All right, Mr. Howard.

9             MR. HOWARD:  Thank you, your Honor.

10            THE CLERK:  Would you please stand and raise

11   your right hand.

12                     JASON FOX

13      having been duly sworn, testified as follows:

14            THE COURT:  Before you begin, let me just

15   advise you that because of the scheduling, what we're

16   going to do is this is probably going to be a relatively

17   short witness, then we will conclude with this witness

18   and then we won't start up again until tomorrow morning,

19   but we are on schedule, so.

20            THE CLERK:  Please state your name and spell

21   your last name.

22            THE WITNESS:  Jason Fox, F-O-X.

23            THE CLERK:  Thank you.

24                 DIRECT EXAMINATION

25   BY MR. HOWARD:

52

```
 1        Q.    Good afternoon.   Could you please tell the
 2   jury what you do for a living?
 3        A.    Good afternoon.   I'm a special agent with the
 4   Department of Homeland Security, Homeland Security
 5   investigations.
 6        Q.    And how long have you been with the Department
 7   of Homeland Security?
 8        A.    Since August of 2008.
 9        Q.    And did there come a point in time where you
10   were assigned to work on the case that involves my
11   client, Ms. Munyenyezi?
12        A.    Yes.
13        Q.    And as part of your work in the matter, did
14   you travel to Butare in June of 2012?
15        A.    Yes, I did.
16        Q.    And were you involved in the interview on
17   June 7th of 2012, with a Consolee Mukeshimana?
18        A.    Yes, I was.
19        Q.    And sir, can you tell us how it was that
20   agents had the name Consolee Mukeshimana as someone that
21   they were interested in?
22        A.    I don't recall how we got her name.
23        Q.    Do you know how she was contacted that day?
24        A.    I believe we would have used our driver.
25        Q.    And do you know how your driver contacted her
```

1    that day?

2         A.    We would have given him her number.

3         Q.    Do you know how you got Consolee Mukeshimana's

4    phone number?

5         A.    No, I don't recall.

6         Q.    And you recall -- strike that.  Was there any

7    other witness that you were either involved with

8    interviewing or heard about that identified Consolee

9    Mukeshimana?

10        A.    I don't recall.  We interviewed many people.

11        Q.    Now, when you spoke to Ms. Mukeshimana,

12   afterwards you prepared a report; correct?

13        A.    That's correct.

14        Q.    And although I can show you the report if it

15   refreshes your memory, the interview was on June 7th.

16   You wrote the report on July 30th?

17        A.    I would have to see the report to be sure.

18        Q.    Just briefly showing you the report of

19   Consolee Mukeshimana.  And it should be up in the

20   left-hand corner of the report dated July 30th of the

21   first page.

22        A.    Yeah, the report date is July 30th, but we

23   interviewed on June 7th.

24        Q.    So approximately six or seven weeks later you

25   write the report, and I assume that you wrote that

1   report from your notes?

2        A.   That's correct.

3        Q.   Were these interviews recorded by a tape

4   recorder?

5        A.   No.

6        Q.   And the way these interviews work, you had

7   interpreters in the room?

8        A.   Yes, we did.

9        Q.   Did you have more than one?

10       A.   I believe we probably had one interpreter at

11  the time.

12       Q.   And where exactly did this interview take

13  place?

14       A.   I believe in the Hotel Faucon.

15       Q.   And that's right on the main road in Butare

16  town?

17       A.   That's correct.

18       Q.   But the interview was not recorded?

19       A.   No.

20       Q.   And the way the process worked, agents would

21  ask a question, the interpreter would interpret the

22  question to Ms. Mukeshimana; is that right?

23       A.   Yes.

24       Q.   And Ms. Mukeshimana would give a response in

25  Kinyarwandan?

1      A.    Yes.

2      Q.    And then the interpreter would then interpret

3  back to you, translate back to you in English what the

4  interpreter believes that she said?

5      A.    That's correct.

6      Q.    And then what you're writing the report on is

7  based on what the interpreter's telling you; right?

8      A.    Yes.

9      Q.    Okay.  Now, in the interview of Ms.

10  Mukeshimana did she describe for you coming upon the

11  Ihuriro roadblock?

12      A.    I would be more comfortable if I saw the

13  report.

14      Q.    What I'm going to get to is, first I'll direct

15  your attention to the bottom of page three of the

16  report.  It's the very last paragraph.  If you want to

17  just read that paragraph going on to the next page, it's

18  quite brief, just to refresh your memory about that --

19      A.    Out loud?

20      Q.    No, no, no.  Just to refresh your memory about

21  the question.

22          (Pause.)

23      Q.    And sir, you would agree with me that she was

24  describing what the roadblock looked like in front of

25  the hotel?

```
 1        A.    That was my understanding.

 2        Q.    And isn't it true that she said to you in that

 3   interview that the roadblock had trees, branches and

 4   dead bodies in the road in order to force any traffic to

 5   stop?

 6        A.    That was my understanding.

 7        Q.    Did you ask her to describe what she meant by

 8   dead bodies in the road forcing traffic to stop, by the

 9   way?

10        A.    I don't remember if I asked that.  If I was

11   the writer of that report, I was not asking the

12   questions.

13        Q.    And then from your recollection of the

14   interview, did she at any point tell you that Pauline

15   Nyiramasuhuko had threatened to take her to the Burundi

16   border and drown her in the river?

17        A.    I don't recall.

18        Q.    I'm going to -- let me just make sure I'm

19   clear about your answer.  You don't recall whether she

20   said that or you don't recall her ever saying that?

21        A.    I'll look at the report.

22        Q.    All right.  I'm not even sure there was a

23   difference there, so.  If I could direct your attention

24   to approximately the third line down, second full

25   paragraph on page four.
```

57

1           (Pause.)

2       Q.   And isn't it true that in there she describes

3   some fellow named, being called named

4   Kazungu who was supposed to come over to her but he

5   didn't come over?

6       A.   That's what I wrote.

7       Q.   Nowhere in there does it say that Pauline had

8   threatened to take her to the river down by Burundi and

9   drown her; right?

10      A.   No, it does not.

11      Q.   And then finally, do you recall her saying to

12  you that while she was there at that roadblock she had

13  overheard Interahamwe say that they should get a

14  Caterpillar tractor to move the bodies because the piles

15  were so big?

16      A.   I believe I wrote that, yes.

17      Q.   And you wrote that because that's what she

18  said in that interview?

19      A.   That was my understanding.

20           MR. HOWARD:  Agent Fox, I appreciate your

21  time.  Thank you.

22           THE COURT:  Any cross?

23           MR. CHAKRAVARTY:  Yes.  Just briefly, your

24  Honor.

25

1                    CROSS-EXAMINATION

2    BY MR. CHAKRAVARTY:

3         Q.   Agent Fox, you were one of the agents who

4    assisted in this case; correct?

5         A.   Yes.

6         Q.   Approximately when did you come on to the

7    case?

8         A.   It was June 2010, approximately.

9         Q.   And how long have you been working for ICE?

10        A.   Since August of 2008.

11        Q.   What did you do before that?

12        A.   I was a federal air marshal in 2002 to 2008.

13        Q.   Did you have law enforcement experience before

14   that?

15        A.   I was United States Border Patrol from 2000 to

16   2002.

17        Q.   And when you became an HSI, Homeland Security

18   investigator, did you receive training doing

19   international investigations?

20        A.   Yes.

21        Q.   And had you been to other countries to do

22   investigations?

23        A.   I have.

24        Q.   Is that part of your role as an international

25   security group of the Homeland Security investigation?

1    A.   Yes.

2    Q.   Where did you go?

3    A.   Liberia.

4    Q.   And did you interview witnesses in Liberia?

5    A.   Yes.

6    Q.   Did you get permission from the country?

7    A.   We did.

8    Q.   When you met with Ms. Mukeshimana, did Ms.

9  Mukeshimana, was she told why she was coming to meet

10  you?

11   A.   No.

12   Q.   And the driver who went and fetched her, was

13  he told what you were going to ask Ms. Mukeshimana?

14   A.   No.

15   Q.   When she arrived, was it at the Hotel Faucon

16  in Butare?

17   A.   Yes.

18   Q.   And was there a conference room there?

19   A.   Yes.

20   Q.   You described I think there was only one

21  interpreter; is that right?

22   A.   I believe so.

23   Q.   So, how many people were in the room?

24   A.   Including Ms. Mukeshimana, it would have been

25  four.

1    Q.   Yourself.  Was it Agent Andersen?

2    A.   I believe it's Agent Andersen, yes.

3    Q.   How many agents went on this mission?

4    A.   There was three of us.

5    Q.   Who was the other agent?

6    A.   Special Agent Howes.

7    Q.   Is that Agent Geoff Howes?

8    A.   Geoff Howes, yes.

9    Q.   Is he a former diplomatic security agent?

10   A.   Yes, he is.

11   Q.   The translator who was working, do you

12   remember who that was?

13   A.   I don't recall.

14   Q.   And did you have a pool of two or three

15   translators that you had contracted with?

16   A.   Yes.

17   Q.   And had you used them before?

18   A.   Several times.

19   Q.   Did you find them reliable?

20   A.   Very.

21   Q.   If you had a problem with communicating, were

22   you able to discuss with them and ask a different

23   question to the witness?

24   A.   Yes.

25   Q.   So, when you conducted an interview, did each

1    of the agents who were present have a different role?

2         A.    Yes.

3         Q.    Okay.  Can you describe what those roles were?

4         A.    One agent would be taking the notes.  Another

5    agent would be asking the questions.  Of course there's

6    room for, you know, clarification between each one if we

7    had any other questions.  And Special Agent Andersen was

8    nearby.  We could also confer with him.

9         Q.    So you collaborated, the three of you?

10        A.    Yes.

11        Q.    When you were asking Ms. Mukeshimana

12   questions, how did you frame the interview?

13        A.    I'm sorry.  Say that again.

14        Q.    When you were asking Mukeshimana, when your

15   team was asking Mukeshimana questions, how did you frame

16   the interview?

17        A.    We would start off very general.  We'd ask

18   her, you know, her name, date of birth, where she was

19   born, where she was raised, where she was during the

20   time of the genocide.  From there we could ask several

21   other questions about her knowledge of the area during

22   that time.

23        Q.    And did you have a specific role in this,

24   conducting this interview?

25        A.    This particular interview I was taking notes.

62

```
 1        Q.    So does that mean you weren't asking

 2   questions?

 3        A.    For the most part, no, I wasn't asking

 4   questions.

 5        Q.    Were you suggesting questions to be asked?

 6        A.    I may have, but for the most part I would ask

 7   for clarifications, or if I had a question I thought

 8   might be relevant, I would ask.

 9        Q.    What was the purpose of the report that you

10   were writing?

11        A.    To accurately reflect the interview.

12        Q.    Was it supposed to be verbatim?

13        A.    No.

14        Q.    And in fact, was there any kind of a

15   stenography or anything else done aside from this report

16   memorializing what happened?

17        A.    No.

18        Q.    So it's basically your memory of what

19   happened?

20        A.    Yes.

21        Q.    When the questions were being asked to

22   Mukeshimana, Ms. Mukeshimana, when the general question

23   was asked, was Ms. Mukeshimana allowed to answer for as

24   long as it took for her to answer the question?

25        A.    Yeah, they were open-ended questions which
```

1    tend to convey like a narrative answer.

2        Q.   Some of the points that Mr. Howard raised

3    about things that Ms. Mukeshimana said to you that she

4    didn't say in court and vice versa, how did she, when

5    she said the things to you that you had listed in the

6    report, can you describe how she was answering those

7    questions?

8        A.   She was telling a story of her -- well, she

9    was telling a story and, you know, each step of the way,

10   you know, was kind of carrying on.  We don't stop them

11   when they're talking.  We like to hear the entire story.

12   If we have any more specific questions about something

13   they told us, then we would ask that during the natural

14   pause in the story.

15       Q.   So is it customary to potentially write down

16   things that you think were important that may not be

17   important to the witness?

18       A.   Yes.

19       Q.   And vice versa?

20       A.   Yes.

21       Q.   Is it unusual in your experience as an

22   investigator that a witness would further clarify things

23   after an interview?

24       A.   No.

25       Q.   Is it customary in your experience that when a

1   witness meets with prosecutors, that even further

2   detailed questions were asked?

3       A.   Yeah, they tend to remember more the more they

4   talk about it.

5       Q.   And are more specific questions asked when

6   they meet with prosecutors?

7       A.   Yes.

8       Q.   In preparing a witness for trial, are

9   witnesses often asked the questions that they would be

10  asked in a courtroom?

11      A.   Yes.

12      Q.   Is that how you conducted the interview of

13  Mukeshimana?

14      A.   No.

15      Q.   So when Mr. Howard says did she say that there

16  were dead bodies in the roadblock, is it possible that

17  you misunderstood which roadblock she was talking about?

18      A.   Yes.

19      Q.   With regard to the reference to Caterpillars,

20  is it possible that you misunderstood where and when she

21  said -- what she meant by where and when a Caterpillar

22  was sought?

23      A.   Yeah, it's possible.

24      Q.   Now, you were also asked when you wrote the

25  report that you were asked about, when you --

1    approximately when did you return from Rwanda on your

2    2012 trip?

3         A.   It was the second week of June?  Maybe the

4    second or third week of June, I don't remember exactly.

5         Q.   Approximately how long later did you actually

6    write the report?

7         A.   It was about three weeks, I believe, three

8    weeks to a month.

9         Q.   So you were refreshing your memory from your

10   notes to try to create the gist of what happened at the

11   interview?

12        A.   Yes.

13             MR. CHAKRAVARTY:  One moment, your Honor.

14             (Pause.)

15        Q.   You were asked about whether Ms. Mukeshimana

16   said anything about something that Pauline Nyiramasuhuko

17   said with regards to Kazungu.  Do you remember that?

18        A.   Yes.

19        Q.   Were you investigating Pauline Nyiramasuhuko?

20        A.   No, we were not.

21             MR. CHAKRAVARTY:  That's all I have, your

22   Honor.

23             THE COURT:  Anything else?

24             MR. HOWARD:  May I, judge?

25             THE COURT:  Certainly.

```
 1                   REDIRECT EXAMINATION

 2   BY MR. HOWARD:

 3        Q.   So when Consolee Mukeshimana comes in here and

 4   says that there were dead bodies, she meant dead bodies

 5   up by the Hotel Faucon, not at the Ihuriro, that's just

 6   your mistake in the report?

 7             MR. CHAKRAVARTY:  Objection, your Honor.

 8             THE COURT:  Overruled.

 9        A.   It's my recollection is how it's reflected in

10   the report.

11        Q.   Because she said there were dead bodies

12   obstructing the road set there in front of the Hotel

13   Ihuriro; right?

14        A.   She mentioned dead bodies at the roadblock.

15        Q.   The dead bodies were being used as the

16   roadblock.  That's the way you wrote it; right?

17        A.   I would have to read it again, but that sounds

18   right.

19        Q.   Well, read it again.

20             (Pause.)

21        A.   Yes, that's accurate.

22        Q.   And the way this works, because this

23   translation is going on, the interpreter is translating

24   the question to her; right?

25        A.   Ah-hum.
```

1        Q.    She's giving information to the translator;

2    right?

3        A.    Yes.

4        Q.    And then the translator explains it out to

5    you?

6        A.    Yes.

7        Q.    There's plenty of time to write it down and to

8    get it correct, right?  We're not in a rush here?

9        A.    It depends on how the interview is going.

10   Sometimes there's, you know, the witness is still

11   speaking as the interpreter is speaking.  So I'm not

12   saying it was a hundred percent that -- excuse me.  What

13   I wrote is what was reflected by what she told me.  So

14   this is accurate from what I heard.  This is what I

15   understood.

16       Q.    Right.  Exactly.  So -- strike that.  And as

17   far as this bulldozer or Caterpillar pushing dead

18   bodies, Consolee Mukeshimana said that, she said that

19   about what happened up in Sovu at the health center.

20   Were you in court for that testimony?

21       A.    I was in and out.  I don't recall.

22       Q.    She wasn't talking about Sovu when she was

23   talking about the Caterpillar, was she?

24             MR. CHAKRAVARTY:  Objection, your Honor.

25             THE COURT:  Did you hear her testimony?

68

1                THE WITNESS:  I don't recall that part.

2                THE COURT:  Sustained.

3        Q.    In your interview with her, she was not

4    speaking about being up at Sovu when she mentioned this

5    Caterpillar.  She was speaking about being at the

6    Ihuriro; right?

7        A.    I believe that's what's reflected in the

8    report.

9        Q.    Okay.  Thank you.

10               MR. HOWARD:  No more questions, your Honor.

11               THE COURT:  Anything else?

12               MR. CHAKRAVARTY:  No.

13               THE COURT:  All right, thank you, agent.

14   You're excused.

15               And ladies and gentlemen, so we will adjourn

16   now and resume again tomorrow morning at 9:00.  Please

17   don't discuss the case during the adjournment.

18               (Jury exited the courtroom.)

19               THE COURT:  I'll try to get you a draft charge

20   tomorrow.  Maybe we can go over it tomorrow afternoon.

21   You've got last year's charge.  Just treat that as a

22   draft with respect to the issues that are raised about

23   how we're going to deal with the subcategories.

24               (Adjourned at 2:35 p.m.)

25

69

```
 1

 2                        C E R T I F I C A T E

 3

 4            I, Sandra L. Bailey, do hereby certify that

 5     the foregoing transcript is a true and accurate

 6     transcription of the within proceedings, to the best of

 7     my knowledge, skill, ability and belief.

 8

 9

10     Submitted: 11/13/13      SANDRA L. BAILEY, LCR, CM, CRR

11                              LICENSED COURT REPORTER, NO. 15

12                              STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/17/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                              *
UNITED STATES OF AMERICA       *
                              *  10-CR-85-SM
            v.                 *  February 15, 2013
                              *  9:10 a.m.
BEATRICE MUNYENYEZI            *
                              *
* * * * * * * * * * * * * * * * *
```


Day 9 - Morning Session
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. MCAULIFFE
and a jury


Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH and MA)

For the Defendant:    Mark E. Howard, Esq.
                      David W. Ruoff, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH 03104

Interpreters:         Jacqueline Birori Adam
                      Joseph Rubagumya

Court Reporter:       Diane M. Churas, CSR, CRR
                      Official Court Reporter
                      U.S. District Court
                      55 Pleasant Street
                      Concord, NH   03301
                      (603) 225-1442

2

```
1                        I N D E X

2

3
         WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS
4

5    GILBERT HITIMANA

6    By Mr. Ruoff          3                    30

7    By Mr. Chakravarty              14                      31

8
     MARIE ALICE AHISHAKIYE
9
     By Mr. Ruoff      32
10
     By Mr. Capin                43
11

12   VENERANDE UWITEYAKAZANA

13   By Mr. Howard      70

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        BEFORE THE JURY

 2               THE CLERK:  Court is in session and has for

 3    consideration jury trial day nine in the matter of

 4    United States of America versus Beatrice Munyenyezi,

 5    Case No. 10-cr-85-01-SM.

 6               Will the interpreters please rise and raise

 7    your right hands.

 8               (Interpreters duly sworn.)

 9               THE CLERK:  For the record, please state your

10    names and spell your last names.

11               THE INTERPRETER:  Joseph Rubagunya,

12    R-U-B-A-G-U-N-Y-A.

13               THE INTERPRETER:  Jacqueline Adam, A-D-A-M.

14               THE COURT:  All right, ladies and gentlemen,

15    we're continuing with the defense presentation of

16    evidence.

17               Mr. Ruoff, you may call your next witness.

18               MR. RUOFF:  Thank you, your Honor.  The

19    defendants call Gilbert Hitimana.

20                         GILBERT HITIMANA

21        having been duly sworn, testified as follows:

22               THE CLERK:  For the record, please state your

23    name and spell your last name.

24               THE WITNESS:  The last name, Hitimana,

25    H-I-T-I-M-A-N-A, Gilbert.
```

4

```
 1                      DIRECT EXAMINATION

 2   BY MR. RUOFF:

 3               MR. RUOFF:  May I proceed, your Honor?

 4               THE COURT:  Please, when you're ready, Mr.

 5   Ruoff.

 6        Q.   Good morning, Gilbert.

 7        A.   Good morning.

 8        Q.   Where were you born, sir?

 9        A.   In Rwanda.

10        Q.   What part of Rwanda are you from?

11        A.   In the Save, Save, Butare.

12        Q.   How far is that from Butare Town in Rwanda?

13        A.   From Butare Town to Save is around two to

14   three kilometers.

15        Q.   How far did you go in school?

16        A.   I did five -- four years of elementary school.

17        Q.   What do you currently do for work?

18        A.   Generally I do farming, but -- I went for

19   construction, but I couldn't finish my school for

20   construction.

21        Q.   Do you still live in Save?

22        A.   Yes, that's where I reside.

23        Q.   Do you still live in the house where you grew

24   up?

25        A.   No, now I have my own home.  I no longer stay
```

```
 1    with my parents.

 2         Q.    Are you married?

 3         A.    Yes.

 4         Q.    Do you have any children?

 5         A.    Yes.

 6         Q.    How many?

 7         A.    Two.

 8         Q.    Sir, what's your ethnicity?

 9         A.    I'm a Tutsi.

10         Q.    I'm going to ask you some questions about

11    1994, okay?

12         A.    Okay, I understand.

13         Q.    Were you living in Save in 1994?

14         A.    Yes, that's where I was.

15         Q.    Was one of your relatives Maurice Ntahobali?

16         A.    No, we're not related, but he was related to

17    my mother.

18         Q.    Can you explain how Maurice Ntahobali was

19    related to your mother?

20         A.    It means that my father -- my grandparents was

21    related to Maurice's father.

22               THE INTERPRETER:  Let me clarify.

23         A.    It means that their parents are related.

24         Q.    What's your mother's name?

25         A.    Mokenicia Nocadia (ph).
```

1          Q.    Now, in 1994 before the genocide did you have

2     any brothers or sisters?

3          A.    Yes.

4          Q.    Were any of them killed during the genocide?

5          A.    Yes, some of them were killed.

6          Q.    And did you see them killed?

7                THE INTERPRETER:  Your Honor, I'm going to ask

8     the witness to break up his answers.

9                THE COURT:  All right.

10         A.    The Interahamwe came, they came to my place.

11    They took two of my sisters and one brother.  They tied

12    them together.  It was during the night.  They took them

13    nearby the well, called Cyadisha.

14               THE INTERPRETER:  Let me clarify.

15         A.    They were hitting them with the clubs and they

16    banged everywhere.  Then they could dump them in the

17    well.  They could get another one and dump them in the

18    well, and another one.  Because girls and boys, they're

19    not able to defend themselves equally because the boy

20    could swim in the well.  They said he's getting out,

21    he's getting away, this can't be.  They grabbed a stone

22    -- they throw a stone and they hit him in the eye.  He's

23    here, you will be seeing him.  But he was able to swim

24    along the river -- the well and he was able to escape

25    from the other end.  But the girls stayed there and they

7

1   died.

2       Q.   Now, when you say the word "well," do you mean

3   a reservoir where people go to get water?

4       A.   It was a well, a big well called Cyadisha.

5       Q.   How old were you when the genocide arrived in

6   your hometown?

7       A.   I was born in 1979.  I think I was

8   approximately 15 years.

9       Q.   Do you remember what month it was in when you

10  saw what happened to your relatives that you just

11  described?

12      A.   It was 1994, but I can't remember the exact

13  month.

14      Q.   Do you remember hearing news that the

15  president of Rwanda's plane had been shot down?

16      A.   I could hear it on the radio, but that's when

17  Interahamwe say that the only way we have is Tutsis --

18  that's when the killing, killing the Tutsis started, and

19  that's when it really -- it was strengthened, started on

20  a huge mess.

21      Q.   After that started did you flee from Save?

22      A.   After that happened I escaped and went to a

23  nearby hill.  That's where I went to seek refugee (sic),

24  a neighbor of one of the Cordelia (ph) Raphile.

25      Q.   At some point did you travel to the Hotel

```
 1    I'Huriro owned by Maurice?

 2        A.   Yes, I went there.

 3        Q.   Can you explain to the jury how you arrived at

 4    the hotel.

 5        A.   Yes, I can tell them that.

 6        Q.   Okay.  Please do so.

 7        A.   Let me go a little back.  When they took my

 8    siblings to the well, I was able to escape and my dad --

 9    my dad and my mother, they went during the night and

10    they went trying to escape, and they were able to make

11    it to Butare, to Ntahobali Maurice's place.  And when

12    they went there to Ntahobali Maurice's place they

13    pleaded to him, my dad and my mother, that my children

14    were killed last night and they were dumped in the well,

15    but I knew that there are some who had escaped, and you

16    will really help me and be able to pick them up to put

17    them into safety.

18        Q.   Did they send a car to come pick up you and

19    your other relatives?

20        A.   Yes.

21        Q.   When the car arrived to get you, were you

22    hiding?

23        A.   Yes, I was hiding.

24        Q.   Where were you hiding?

25        A.   The other hill next to ours, called Raphael.
```

9

```
1        Q.   Raphael?

2        A.   Yes.

3        Q.   Did you get in the car?

4        A.   Yes.

5        Q.   Who else was in the car?

6        A.   That car came with my mother, but my dad

7   stayed at Ntahobali's place.

8        Q.   Did the car take you directly to Ntahobali's

9   place?

10       A.   Yes.  They picked me up where I was hiding and

11  they took me directly to Butare.

12       Q.   Were any brothers or sisters with you in the

13  car?

14       A.   The first time they took me and two of my

15  siblings and my young sister who had been -- who was

16  able to escape.

17       Q.   Now, on the ride to the hotel did you hide in

18  the car?

19       A.   Because of fear I was hiding in the car

20  because I didn't want anyone to see me so that they can

21  kill me.

22       Q.   How long did it take to drive to the hotel?

23       A.   They came to pick me up and we were able to go

24  see others who had survived, then were able to go on the

25  road with the soldiers driving that car.  Then they took
```

1   me to the top.

2       Q.   Did the car take you into the compound around

3   the hotel?

4       A.   Yes.

5       Q.   Had you ever been to the hotel before, sir?

6       A.   No.  It was only my dad and my mother.  Me, I

7   had not ever stepped into the hotel.

8       Q.   Now, prior to going to the hotel, did you know

9   Beatrice?

10      A.   Yes.

11      Q.   How many times before going to the hotel had

12  you seen Beatrice?

13      A.   You mean before I went there?

14      Q.   Yes.

15      A.   Before that I had seen her once.  That was at

16  Save.  We had some festivals.  But then she came with

17  her husband.  They came to visit us at Save.

18      Q.   Do you know her husband's name?

19      A.   He was called Shalom.

20      Q.   At the time they came to see you, do you know

21  whether or not they had any children?

22      A.   By then she had not had kids yet.

23      Q.   Did you see Beatrice when you got to the

24  hotel?

25      A.   Yes, I saw her.

1       Q.   How long did you stay at the hotel?

2       A.   We stayed there approximately one month.

3       Q.   Did you leave when everyone else left?

4       A.   We got out of there when we were escaping when

5  the Interahamwe had started shooting into the city.

6       Q.   Now, for the month that you were at the hotel,

7  how many people were living at the hotel?

8       A.   There were many people.

9       Q.   Did you see any soldiers living at the hotel?

10       A.   No.  But from the soldiers that were going

11  with -- escorting Pauline Nyiramasuhuko.

12       Q.   Where did you live in the hotel?

13       A.   I was staying in the basement, downstairs.

14       Q.   Were there bedrooms in the basement?

15       A.   Yes, there was beds there.

16       Q.   How many other people were living in the

17  basement with you?

18       A.   I didn't know many of them.  The few I knew

19  was Kazehe Marius.  And also another person called

20  Venuste, Alice, and Venaucie.

21       Q.   Did they all live in the basement portion of

22  the hotel with you?

23       A.   Yes.

24       Q.   Do you know who lived on the floor above the

25  basement floor?

1       A.     Upstairs there were Beatrice and her husband

2    and the other group of men called Tadeo.

3              MR. RUOFF:  Would you spell that, please?  You

4    said a group of men called Tadeo.

5              THE INTERPRETER:  T-A-D-E-O.

6       Q.     Is that a gentleman's name?

7       A.     Yes, it's a man's name.

8       Q.     So was it Tadeo with his family?

9       A.     Yes.  He came with his wife and kids.

10      Q.     Now, from the basement could you go out into

11   the compound behind the hotel?

12      A.     That's where we were staying and also playing

13   with other kids.

14      Q.     How many other kids do you think were there?

15      A.     There's one who was called Ephrem, and also

16   Marius, and also there's another kid who was called

17   Vicky.

18      Q.     When you say kid, were these young boys,

19   younger than you?

20      A.     There are some that I was older, about a year,

21   was older than them, and others were older approximately

22   two years, and also my young brothers who were there

23   playing in the backyard.

24      Q.     Do you know who cooked all the food for you at

25   the hotel?

```
 1        A.   Yes, I do know.

 2        Q.   Who was it?

 3        A.   He was called Venuste.

 4        Q.   Do you know if there were any hotel employees

 5   that were also living there other than Venuste?

 6        A.   Yes, there was one called Alice.  They were

 7   cooking together.

 8        Q.   Now, in the month that you were at the hotel

 9   during the genocide, how often did you see Beatrice?

10        A.   Every day, every day I was seeing her.

11        Q.   Do you remember whether or not she had a baby

12   at that time?

13        A.   Yes.

14        Q.   Did she have a baby?

15        A.   She had a little baby and also she was

16   pregnant.

17        Q.   Did you ever leave the hotel compound for the

18   month that you were at the hotel?

19        A.   No.  I was inside the backyard of the hotel.

20   I never went outside because I was afraid some people

21   could be coming from Save and they could hurt me.

22        Q.   Do you know what an MRND uniform looks like?

23        A.   I know they had the colors, long shirts.  It

24   had colors.  I don't remember if it was green and

25   another one yellow.
```

1        Q.    Did you ever see Beatrice wearing an MRND

2    uniform?

3        A.    No, I never saw her.

4        Q.    Did you ever see Beatrice wearing a military

5    uniform?

6        A.    No, I never.

7        Q.    When you left the hotel and fled, did you

8    travel with Beatrice?

9        A.    Yes, we went together.

10       Q.    To a city called Cyangugu?

11       A.    After coming out of the hotel, we went to the

12   palace place, similar place called Nyakibanda.  Then

13   after that we spent a night there, and because we saw

14   there was no Interahamwe there, then we went to

15   Gikongoro road.  That's the road that took us to

16   Cyangugu.  We were together.

17            MR. RUOFF:  Thank you, sir.  I have no more

18   questions, your Honor.

19            THE COURT:  All right.  Mr. Chakravarty?

20            MR. CHAKRAVARTY:  Thank you, your Honor.

21                     CROSS-EXAMINATION

22   BY MR. CHAKRAVARTY:

23       Q.    Good morning, Mr. Hitimana.

24       A.    Good morning.

25       Q.    Now, you lived in a town called Nsave; right?

15

1       A.   Yes, I stayed in Save, but it was in a

2  village.

3       Q.   It's a small village well outside of Butare

4  Town; correct?

5       A.   Yes, because Butare is the city.

6       Q.   And as a child you did not go to Butare Town

7  very frequently, did you?

8            THE COURT:  Very often.

9            THE INTERPRETER:  Can you repeat that

10  question?

11      Q.   As a child you did not go to Butare Town very

12  often, did you?

13      A.   No, I was too young, so I couldn't go there

14  often.

15      Q.   Because it was very far away; right?

16      A.   Yes, it's very, very far away from our place.

17      Q.   And when the genocide arrived in your village,

18  your family was targeted; right?

19      A.   We were still with my family who survived.

20      Q.   And your family was being hunted by the

21  Interahamwe; correct?

22      A.   Yes.

23      Q.   And the Interahamwe were wearing clothes that

24  indicated that they were the Interahamwe?

25      A.   Yes.

1      Q.   And they were very -- they had some banana

2  leaves and there were green clothing?

3      A.   Yes, they had banana leaves, firearms.  And

4  also they had small clubs, small hose, and small axes.

5      Q.   And you saw them in your village?

6      A.   And also pangas, machetes.  Yes, in our

7  village.

8      Q.   You heard that the president's plane was shot

9  down; right?

10     A.   Yes, I heard that.

11     Q.   Approximately how long after you heard the

12  president's plane being shot down did you see the

13  Interahamwe?

14     A.   Approximately after the presidential plane was

15  shot down, it was in probably a week that things

16  intensified.

17     Q.   And then you fled and you were taken by a car

18  into Butare Town?

19     A.   During that time when they took my siblings to

20  dump them in Cyadisha well during that period, I was

21  able to escape and I went to the next village called

22  Shyanda.

23     Q.   And you were in Shyanda for a couple of weeks?

24     A.   No, it was a few days because my parents went

25  to seek refugee in Butare Town to even ask for us to be

1   in security.

2       Q.    So a few days after your family was attacked,

3   you came back to your village.

4       A.    You mean after we were being attacked?

5       Q.    You went to Shyanda and then you came back to

6   your village; correct?

7       A.    No.  The soldiers came to pick me up at

8   Nshyanda, then they took me to Butare.

9       Q.    So then maybe less than two weeks after the

10  president's jet was shot down, you went to Butare Town?

11      A.    Maybe one week and three days.

12      Q.    So when you went to Butare Town there were no

13  roadblocks preventing you from getting into Butare;

14  right?

15      A.    The only roadblock I saw, I saw it at Shyanda

16  where I was hiding.  That's where I saw the Interahamwe

17  with clubs, with banana leaves, with machetes.  Since

18  then I was hiding underneath the car -- in the car.

19  That's when the soldiers came to pick me up and took me

20  to Butare.

21      Q.    So on the way from Shyanda to Butare Town you

22  did not pass any roadblocks; is that correct?

23      A.    No, I didn't see any roadblock because I was

24  hiding in the car.

25      Q.    You were hiding because if the Interahamwe saw

1   you, then you would be in trouble.  Correct?

2        A.   Yes, I was so afraid because they could kill

3   me immediately.

4        Q.   And so the family that you described in the

5   car was accompanied by how many soldiers?

6        A.   Maybe three.  The one who was driving and

7   other two.

8        Q.   And were they in military uniform?

9        A.   Yes.

10        Q.   Did they tell you who had sent them?

11        A.   Yes, they told me.

12        Q.   Who did they tell you?

13        A.   They told me it was Ntahobali Maurice.

14        Q.   And did they tell you where you were going?

15        A.   They told me because they were with my mother

16   when they came to pick me up where I was hiding from.

17        Q.   And where did they tell you they were taking

18   you?

19        A.   They told me that we are going to seek refugee

20   to my uncle's.

21        Q.   And is that Maurice Ntahobali?

22        A.   Yes.

23        Q.   Did you know that Maurice Ntahobali was a very

24   important person in Butare Town?

25        A.   Yes, I knew.

1     Q.   And you knew his wife Pauline Nyiramasuhuko

2     was a very important person?

3     A.   Yes, I knew she was an administrator,

4     politician.

5     Q.   Did you know Maurice himself had been a member

6     of the parliament?

7     A.   I didn't know that, but I knew that his wife

8     was a minister and also Maurice was university director

9     of the Butare University.

10    Q.   And you had never been to their home before;

11    is that correct?

12    A.   No, I've never been.  Only my parents could go

13    there.

14    Q.   Now, when you arrived at the hotel, did anyone

15    check your identification?

16    A.   By that time I had not acquired any ID.

17    Q.   You were too young for an ID card; correct?

18    A.   Yes.

19    Q.   And in fact you didn't consider yourself Hutu

20    or Tutsi; is that right?

21    A.   I realized about the differences -- racial

22    differences during the war when they were separating the

23    Tutsi and the Hutu.

24    Q.   And you saw that back in your hometown of

25    Save?

1        A.    Yes.   That's when they came to our place

2    saying that Save place is Tutsi and the other group is

3    Hutu.   That's when they came to attack us.

4        Q.    And after you left there you had -- you were

5    hiding, so you couldn't even see what was happening

6    outside; correct?

7        A.    When I left Butare I never went out because I

8    was always within the backyard.

9        Q.    So you didn't look out of the car that you

10   were in that took you to Butare Town; right?

11       A.    When they came to rescue me the place where I

12   was hiding in Shyanda, that's the only -- when I saw

13   people wearing banana leaves with machetes, with the

14   clubs, and when I came in the car, I was hiding inside

15   the car.   So I didn't -- until we get to Butare Town.

16       Q.    So when you left Shyanda, that was the last

17   time you saw any Interahamwe?

18       A.    That's only in Shyanda, yes.

19       Q.    And that's the last time you saw any violence;

20   correct?

21       A.    Yes.   That's the only place I saw people

22   confronting each other in Butare town.

23       Q.    So for your entire time in Butare Town you

24   never saw any genocide?

25       A.    No, I never saw anything.

1          Q.    You never heard any screaming?

2          A.    I never saw anything because I was playing

3    with other kids.  When it was lunchtime they would bring

4    us food and eat.  So I never saw anything.  I was inside

5    the backyard.

6          Q.    You spent the entire genocide except for the

7    first week and three days in the basement of the

8    I'Huriro Hotel.

9          A.    No, I never saw anything.  Only there's some

10   people, one was called Venaucie.  She was telling my

11   mother where she was living in Kigali, there was a war

12   before they came to Ntahobali's place.  And others who

13   had fled from Tumba, including Alphonsine who we stayed

14   together in the backyard so they could tell my parents

15   about the confronting -- the shooting between RPF and

16   Interahamwe army in Tumba, and that's the only thing I

17   heard about confrontations.

18         Q.    So the only way that you know there was a

19   genocide throughout Rwanda is from what people told you

20   when you were arriving at the I'Huriro; correct?

21         A.    Yes, that's the only way.

22         Q.    Because you stayed in the basement and then

23   you went into the backyard of the I'Huriro.

24         A.    I never went beyond a gate.  I was inside the

25   backyard.

1        Q.    And there's a wall, so you couldn't see

2    anything; right?

3        A.    It was like a tall building, a tall fence with

4    bricks.

5        Q.    Do you remember that the I'Huriro was on a

6    hill?

7        A.    Yeah, it was a little bit of kind of slope on

8    the road, on the main road.

9        Q.    And you could see down into the coffee field

10    and into the woods and the trees that were behind there?

11        A.    No, it was a long fence.  I couldn't see

12    there.

13        Q.    You couldn't see anything behind the I'Huriro?

14        A.    No, I couldn't see there.

15        Q.    Could you see the mosque that was down the

16    street at a little bit higher elevation?

17        A.    You mean the mosque?  No, I couldn't.

18        Q.    Could you see the road to the ESO, the junior

19    officer school that was up the hill?

20        A.    Because it was always locked, you couldn't see

21    that place.

22        Q.    And you couldn't hear a lot of activity

23    outside of the gate either, could you?

24        A.    No, I couldn't.

25        Q.    Could you hear chanting and partying by the

1    Interahamwe?

2        A.    No, I never heard anything.

3        Q.    You didn't see or hear any roadblock in front

4    of the I'Huriro Hotel?

5        A.    No, I never.

6        Q.    You didn't hear any gunshots your entire time

7    you were there.

8        A.    We heard gunshots.  That's when we escaped.

9    That's when we were free.

10       Q.    So the only time you heard gunshots was when

11   you left Butare and you went to Cyangugu and then to the

12   Congo; right?

13       A.    Yes.

14       Q.    And that's when the RPF came to Butare in

15   about July of 1994; right?

16       A.    Yes.  That's when I heard gunshots when they

17   were shooting in the city, Butare city.

18       Q.    Before that you never saw nor heard any

19   violence against anyone in Butare; correct?

20       A.    No, because I was indoors whenever I was

21   playing inside and whenever I'm tired I could go back to

22   sleep and then we were going back and forth.

23       Q.    And you knew Beatrice from before the

24   genocide; right?

25       A.    Yes, I knew her.

1    Q.   And she's part of your extended family;

2  correct?

3    A.   Yes, because her husband was my uncle -- my

4  cousin.

5    Q.   I think you mentioned earlier that some of

6  your other family members are here?

7    A.   Yes.

8    Q.   In fact this is not your first time to the

9  United States; right?

10    A.   No, it's not my first time.

11    Q.   In fact you came last year as well; right?

12    A.   Yes, I was here.

13    Q.   You came to testify on behalf of Beatrice's

14  sister Prudence Kantangwa; correct?

15    A.   Yes, I came.

16    Q.   And that was in Boston; right?

17    A.   Yes.

18    Q.   You didn't mention her earlier, but Prudence

19  was also staying at the I'Huriro Hotel, wasn't she?

20    A.   Yes, she was there, she was staying there.

21    Q.   And her husband was also there?

22    A.   Yes, he was staying there.

23    Q.   And her husband was actually head of the

24  secret police of the MRND government; right?

25    A.   I didn't know that because I never asked him.

 1    We met during the war.

 2         Q.    And you went back to Rwanda and you didn't

 3    have any difficulties back in Rwanda; correct?

 4         A.    No, I never had any difficulty when I returned

 5    from the Congo.

 6         Q.    Did you have any difficulties when you

 7    returned from coming to the United States?

 8         A.    No, I didn't have any issues, any difficulty.

 9         Q.    And so when you saw Beatrice during the

10    genocide is when she came down into the basement or she

11    went outside to see you in the compound; correct?

12         A.    I saw her when I was in the gate, in the

13    backyard.

14         Q.    In the backyard.  And you were playing in the

15    backyard and were you catching the sun?

16         A.    Yeah, because we were staying in the basement

17    and she was staying upstairs, every morning she could

18    come with her kid, holding her baby, to say hello, to

19    say how's everything going.

20         Q.    Did she bring you anything when she came down?

21         A.    Sometimes she could bring us porridge.

22         Q.    And what did you do with her outside in the

23    compound?

24              THE INTERPRETER:  Could you repeat?

25         Q.    What did you do with her outside in the

1    compound?

2         A.    She could come just to talk to us, catching

3    some sun, and then she could go back when she was tired

4    to sleep.

5         Q.    So she wouldn't stay with you very long when

6    she came to visit?

7         A.    Most of the time she was staying with us

8    downstairs, talking to our mother, and midday she could

9    go back upstairs to sleep.  Then in the afternoon she

10   could come back downstairs.  She was conversing with my

11   parents and she could tell them to be strong because

12   they're -- one of the deceased -- one of my sisters,

13   they were close friends.  Then she could get strength

14   from them.

15        Q.    And you never left the compound because you

16   were scared you would be hunted by the Interahamwe?

17        A.    Yes.

18        Q.    But you had not heard of any Interahamwe being

19   in Butare Town; correct?

20        A.    You mean in Butare Town?

21        Q.    Yes.

22        A.    I never heard of that.

23        Q.    Yet you still -- you and everyone else who was

24   staying with you never left the I'Huriro compound;

25   correct?

1       A.   No, because we were afraid.  We stayed inside

2   the backyard because we were afraid to go out because

3   there were some people coming for medical treatment in

4   nearby hospital, so we were afraid they could be seeing

5   us.

6       Q.   But Beatrice could leave the I'Huriro; right?

7   She lived there.

8       A.   No, because she was in her late stages of

9   pregnancy and she had a little kid who was mothering

10  her.  By that time she didn't even have a maid.

11      Q.   She didn't have someone to take care of the

12  baby?

13      A.   By then she didn't have someone to help her,

14  so that's why she was staying with us in the backyard.

15      Q.   Even though all your family was down in the

16  basement with you, nobody was there to help her with the

17  baby?

18      A.   No, because her young kid was so -- she could

19  always cry.  Whenever she was not with her she could

20  make some noise.

21      Q.   And you said she was in the late stages of

22  pregnancy?

23          MR. RUOFF:  Objection.  I don't think that's

24  what he said.

25          THE COURT:  Jury will take its own

1    recollection.

2             THE INTERPRETER:  I'm sorry.  Could you

3    repeat?

4         Q.   You said she was in the late stages of

5    pregnancy?

6         A.   Yes.  You could see she was -- she was in her

7    late stages.

8         Q.   She was very big?

9         A.   She was big, visible, very big.

10        Q.   So if Beatrice went to the market, she never

11   came back and told you how things were out in Butare

12   Town?

13        A.   No.  She was not the one doing groceries.  She

14   had a sister-in-law called Clarisse.  She could go and

15   get some groceries, like oranges for the kids.  She was

16   the only one doing groceries.  Beatrice never left --

17   Beatrice never left the backyard.

18        Q.   She never left to just go for a walk with her

19   husband and her sister?

20        A.   No, they never -- they never went for a walk.

21        Q.   She never went to Cyangugu for a week or so?

22        A.   I don't remember.  I never saw her leaving the

23   hotel, the place.

24        Q.   You said you saw Pauline with some military

25   escorts; is that right?

1          A.    Yes, Pauline had escorts, military escorts.

2          Q.    Did they come into the backyard in the

3     compound?

4          A.    Yes.  When they were coming from Kigali, they

5     could come in the backyard.

6          Q.    And would she address you?

7          A.    No, she never addressed us.

8          Q.    So she came into the compound and just went

9     into the home?

10         A.    It means that whenever she could come, she

11    would come downstairs in the backyard, then go upstairs

12    on the upper floor.  Then after the following morning

13    she could come and pick them up and go back to Kigali

14    where she was walking from.

15         Q.    You understood that was happening, but you did

16    not see that yourself; correct?

17               THE INTERPRETER:  Could you repeat?

18         Q.    You understood that she was going to the top

19    floor, but you did not see that yourself; correct?

20         A.    I knew but I never went upstairs.

21         Q.    And you've come here to testify for your

22    family member Beatrice; correct?

23         A.    No, I'm just related to her husband.

24         Q.    And you're just here to say what you saw and

25    experienced during the genocide; right?

```
 1        A.    Yes.

 2        Q.    And in Butare Town that was nothing; correct?

 3        A.    When I was in Butare nothing happened to me.

 4              MR. CHAKRAVARTY:  Thank you.

 5              THE COURT:  Redirect?

 6              MR. RUOFF:  Yes, your Honor.

 7                        REDIRECT EXAMINATION

 8   BY MR. RUOFF:

 9        Q.    Mr. Hitimana, you mentioned on

10   cross-examination a few minutes ago that a woman named

11   Clarisse would go to the market and do shopping.  Do you

12   remember that question?

13        A.    Yes, I remember that.

14        Q.    And Clarisse was Shalom's sister; right?

15        A.    Yes.

16        Q.    Did you know all of Shalom's sisters?

17              THE INTERPRETER:  I'm sorry.

18        Q.    Did you know Shalom's other sisters?

19        A.    Yes, I knew them.

20        Q.    Denise?

21        A.    Yes.

22        Q.    And Brigette?

23        A.    And Brigette.  Denise, Clarisse, and Brigette.

24              MR. RUOFF:  Thank you, sir.  I have no more

25   questions for you.
```

```
 1                MR. CHAKRAVARTY:  Your Honor, just on that

 2     last point.

 3                     RECROSS-EXAMINATION

 4     BY MR. CHAKRAVARTY:

 5          Q.   Were the sisters all at the hotel?

 6          A.   There were only two.  Brigette had left to go

 7     for studies in foreign countries.

 8          Q.   And you're as certain of that as you are of

 9     what happened in the genocide in Butare Town; right?

10          A.   What I told you is nothing happened to me.  I

11     don't know if --

12                THE INTERPRETER:  Can I clarify?

13          A.   Personally after arriving in Butare nothing

14     happened, but if there's something else that happened

15     prior to that, I don't know.

16          Q.   And my point is you're certain of your

17     observations during the genocide in Butare Town.

18          A.   I'm just saying what I saw.

19                MR. CHAKRAVARTY:  Thank you.

20          A.   The only thing I can add is that the one when

21     we were staying together in the backyard who was

22     pregnant who could not go outside the backyard when I

23     arrived in Butare.  That's how I saw her.  She could not

24     go outside the gate.  That's the only thing I will have

25     to say.
```

1          THE COURT:  Any further questions?  Thank you,

2   sir, you may step down.  You're excused.  You may call

3   your next witness.

4          MR. RUOFF:  Defense called Marie Alice

5   Ahishakiye.

6                   MARIE ALICE AHISHAKIYE

7      having been duly sworn, testified as follows:

8          THE CLERK:  For the record, please state your

9   name.

10         THE WITNESS:  Ahishakiye Marie Alice.

11         THE CLERK:  And spell your last name.

12         THE WITNESS:  I-Y-I-S-A-K-I-Y-E (sic).

13                   DIRECT EXAMINATION

14   BY MR. RUOFF:

15     Q.   May I call you Alice?

16     A.   Yes.

17     Q.   Good morning.

18     A.   Good morning.

19     Q.   Let me ask you first, are you in a little pain

20   today?

21     A.   Yes, I am not feeling well.

22     Q.   Is your back hurting you, too?

23     A.   Because of sitting a long time my back is

24   aching.

25     Q.   Alice, I'm going to ask you to speak into the

```
 1    microphone so that everybody can hear your voice.

 2         A.    Yes.

 3         Q.    Alice, how old are you?

 4         A.    Me?

 5         Q.    Yes, you.

 6         A.    I was born in 1967.

 7         Q.    Did you ever go to school?

 8         A.    No.

 9         Q.    Can you read or write, Alice?

10         A.    Write and read?  No, I am not able.

11         Q.    Did you grow up in a very poor household?

12         A.    Yes.

13         Q.    Were your parents farmers?

14         A.    Yes.

15         Q.    What do you do for work when you're back in

16    Rwanda?

17         A.    I am a farmer.

18         Q.    Do you own your own land or do you work for

19    somebody else?

20         A.    I do farm my own land, and also if I'm able to

21    find work outside, I also can work for others.

22         Q.    What kind of crops do you grow?

23         A.    What crops you're asking that we grow?

24         Q.    Yes.

25         A.    Beans, sweet potatoes, cassava, sorghum,
```

1   cassava, beans.

2        Q.   Is sorghum a kind of a wheat?

3        A.   Yes.

4        Q.   Where are you from in Rwanda?

5        A.   I come from the southern area.

6        Q.   Are you a little nervous in court today?

7        A.   Yes.

8        Q.   Have you ever had this many mzungu staring at

9   you?

10        A.   It's my first time.

11        Q.   Where did you live in 1994, Alice?

12        A.   I lived in Butare.

13        Q.   Now, at some point did you get the job as a

14   cook?

15        A.   Yes.

16        Q.   And you worked as a cook for Pauline

17   Nyiramasuhuko; correct?

18        A.   Yes.

19        Q.   Okay.  Where did you cook for Pauline

20   Nyiramasuhuko?

21        A.   I cooked for her when we lived in Kigali.

22        Q.   Okay.  How did you get the job as a cook for

23   Pauline Nyiramasuhuko?

24        A.   She was my godmother.

25        Q.   Were you working and living in Kigali with

```
 1   Pauline Nyiramasuhuko or were you in Butare?

 2        A.   When I worked for her we were in Kigali.

 3        Q.   Now, at some point did you get sent to cook

 4   for Maurice Ntahobali?

 5        A.   Yes, it happened.

 6        Q.   How long before the president's plane was shot

 7   down in 1994 did you go to cook for Maurice Ntahobali?

 8        A.   A month and a half.

 9        Q.   Where was Maurice living when you went to cook

10   for him?

11        A.   Maurice?

12        Q.   Maurice, where was he living?

13        A.   He lived in Butare.

14        Q.   Okay.  Was there a specific portion of Butare

15   -- did he live in Taba or did he live in Butare Town?

16        A.   He lived in Taba.

17        Q.   Did he live in a house in Taba?

18        A.   Yes.

19        Q.   How far is Taba from Butare Town?

20        A.   It's very close.  It's not that far.

21        Q.   And the house that you went to cook for

22   Maurice was not a hotel; correct?

23        A.   The one in Taba?

24        Q.   Correct.

25        A.   The house in Taba, it was just a normal house.
```

1    It wasn't a storage house.

2         Q.    Okay.  At the time that you were working for

3    Maurice, were you married?

4         A.    No.

5         Q.    Did you have any children?

6         A.    Me?

7         Q.    Yes, you.

8         A.    No.

9         Q.    Now, at some point did you leave the house in

10   Taba and go to work at the hotel owned by Maurice

11   Ntahobali?

12        A.    Yes.

13        Q.    Do you remember, was that before or after the

14   president's plane was shot down?

15        A.    It was just a little bit before, a little bit

16   before.

17        Q.    Okay.  Alice, can you tell us why you went

18   from the house in Taba to the hotel to cook?

19        A.    The old man became sick and then he left and

20   went to the hotel, and then when he got to the hotel he

21   called me.  He said whatever you're preparing, I'm not

22   going to be there.  I am at the hotel.

23        Q.    The old man, was that Maurice?

24        A.    Yes, it was Maurice.

25        Q.    Was it your understanding that Maurice had

1  moved to the hotel?

2      A.    We did not discuss about it.  He went because

3  he was sick.

4      Q.    Okay.  And is that why you went from the house

5  in Taba to the hotel?

6      A.    It is possible.  I don't know the reason.

7      Q.    No, the reason why you went from the house to

8  the hotel.

9      A.    Myself?

10     Q.    Yes.

11     A.    For me, my cooking at the house, it was over,

12  so that's why I moved to the hotel.

13     Q.    Did you go to the hotel to cook for Maurice

14  while he was at the hotel?

15     A.    When I got there, there was no other workers

16  and so they asked me to cook.

17     Q.    Okay.  When you got there, do you remember if

18  that was before or after the president's plane was shot

19  down?

20     A.    I am not remembering very well.

21     Q.    Okay.  Do you know who else was living at the

22  hotel when you went there to work?

23     A.    Those who lived there?

24     Q.    Yes.

25     A.    Beatrice and Shalom also lived there.

```
 1          Q.    Did any of Shalom's other relatives live

 2    there?

 3          A.    Children?

 4          Q.    Yes.

 5          A.    Shalom's children?

 6          Q.    Yes.

 7          A.    Shalom did not have any other children.  He

 8    had one child.

 9          Q.    That was with Beatrice; correct?

10          A.    Yes.

11          Q.    That was a baby?

12          A.    It was a small child and she wasn't nursing

13    anymore.

14          Q.    Do you know if it was a boy or girl child?

15          A.    It was a girl.

16          Q.    Now, prior to your going to the hotel had you

17    met Beatrice before?

18          A.    Yes, I had seen her before.

19          Q.    How many times before had you met her?

20          A.    I would meet her at the hotel whenever I would

21    go to pick up something.

22          Q.    Where did you live when you moved to the

23    hotel?

24          A.    I beg your pardon?

25          Q.    What room did you stay in when you lived at
```

1    the hotel?

2         A.    We lived underneath the house below.

3         Q.    What do you mean by the house below?  You mean

4    the basement?

5         A.    Yes, in the basement.

6         Q.    Okay.  So just so we are clear, there is

7    really only one building at the hotel where people

8    sleep; right?

9         A.    Of people you mean?

10        Q.    I will ask a different question.  Who lived in

11   the basement with you?

12        A.    Those people who are with me are the ones that

13   lived there, and even those who have not been found.

14        Q.    Where was the kitchen located?

15        A.    The kitchen you mean?

16        Q.    Yeah, where was the kitchen?

17        A.    It was on the left-hand side.

18        Q.    In the basement?

19        A.    It was on the side.  It was not at the same

20   house, but it's on the side.

21        Q.    Was it out -- did you have to walk outside of

22   the building to go to the kitchen?

23        A.    It was very close, close to each other.

24        Q.    It had a roof over it; correct?

25        A.    In that house, in the kitchen.

1           MR. RUOFF:  I'm sorry, madam, I didn't

2   understand.  Can you repeat what you just said to me?

3           THE INTERPRETER:  I'm interpreting what she's

4   saying.  Your Honor, may I clarify.  Thank you.

5           (Pause.)

6       A.   Yes, it had a roof.

7       Q.   Is it common in Rwanda for kitchens to be

8   outside?

9       A.   Yes.

10      Q.   Were there any other cooks that worked at the

11  hotel with you?

12      A.   Yes, and my co-worker Venuste.

13      Q.   Do you remember when the genocide started?

14      A.   I do not recall very well.

15      Q.   Now, when you were staying at the hotel, did

16  you ever leave the hotel?

17      A.   No, I never went out because of the duties

18  that I was responsible of.

19      Q.   Who was responsible for getting all the food

20  that was cooked at the hotel?

21      A.   I would not lie because I did not see anybody

22  going for groceries.

23      Q.   Do you know where the food was kept?

24      A.   Yes.

25      Q.   Was it kept down in the basement where you

41

1    lived?

2         A.    Yes.

3         Q.    Now, when you left the hotel for good, was

4    that when everybody else left at the same time?

5         A.    Yes.

6         Q.    And that's when everyone fled because the RPF

7    was coming?

8         A.    Yes.

9         Q.    So from the time that you went to cook at the

10   hotel to the time you fled, how often did you see

11   Beatrice?

12        A.    Many a time she would be there.

13        Q.    Would she come down into the basement and

14   cook?

15        A.    No, she would be on the second floor.

16        Q.    When would you see her on the second floor?

17        A.    Beatrice you mean?

18        Q.    Yes.

19        A.    She would be -- many times she would be on the

20   porch, and then the maid or the girl who was helping her

21   would be like carrying the baby and also washing the

22   clothes.

23        Q.    Did you ever go upstairs to where she lived?

24        A.    Yes.

25        Q.    Do you know who else lived upstairs with

1    Beatrice?

2        A.    The other people who lived there, I do not

3    remember of them.

4        Q.    How about the people in the basement?

5        A.    Yes, those who stayed with me, I do remember

6    of them.

7        Q.    Do you remember if there were any people that

8    were staying in the basement that were hiding?

9        A.    Yes, I do know them.

10        Q.    Did you ever see Beatrice wearing any kind of

11    military uniform?

12        A.    No, it's a lie.

13        Q.    Did you ever see her wearing any kind of

14    uniform at all?

15        A.    No.  She only had her skirt and a top.

16        Q.    Do you know what her health was like when you

17    saw her for that time frame you lived in the hotel?

18        A.    Because she was pregnant, so she looked like

19    somebody who was pregnant.

20        Q.    Do you remember what kind of clothes she would

21    wear?

22        A.    She would wear a skirt or something that will

23    not -- something loose that will not -- something not

24    tight.

25        Q.    Is it fair to say that you saw her every day?

```
 1              THE INTERPRETER:  May I clarify?

 2              THE COURT:  Yes.

 3       A.    I can't say that I saw her many times because

 4  of so much that had to do, so I won't say that I saw her

 5  very often.

 6              MR. RUOFF:  Thank you.

 7              THE COURT:  All right.  Ladies and gentlemen,

 8  why don't we take our midmorning break now.

 9              (Recess taken.)

10              THE COURT:  Mr. Capin?

11              MR. CAPIN:  Your Honor, thank you.

12                       CROSS-EXAMINATION

13  BY MR. CAPIN:

14       Q.    Good afternoon, ma'am.

15       A.    Good afternoon.

16       Q.    I understand that you're nervous.  Witnesses

17  are often nervous, especially when the travel is from

18  far away to testify there.  So you were working at the

19  I'Huriro for how long?  How long did you work at the

20  I'Huriro?

21       A.    What do you mean, for how long we worked?

22       Q.    That is the question.

23       A.    For how long have we worked at the I'Huriro?

24       Q.    For how many months did you work at the Hotel

25  I'Huriro?
```

```
 1        A.    Like two and a half months.

 2        Q.    During the genocide?

 3        A.    Yes.

 4        Q.    And did you ever walk around the neighborhood

 5   during the genocide?

 6        A.    No, I never left.  I never went anywhere.

 7        Q.    Did you ever see anything outside of the walls

 8   of the I'Huriro during the genocide?

 9        A.    Would you please repeat the question?

10        Q.    Did you ever see anything outside the walls of

11   the I'Huriro during the genocide?

12        A.    No, I didn't see anything.

13        Q.    Did you ever see the EER school?

14        A.    School?

15        Q.    School.

16        A.    School?

17        Q.    School.

18        A.    No.

19        Q.    Did you ever see a shop called Relais de la

20   Soif where they sold beer?

21        A.    Snake?

22        Q.    Did you ever go shopping in Butare Town?

23        A.    No, I never went anywhere.

24        Q.    Did you ever see the wooded area in the valley

25   behind the I'Huriro?
```

1          A.    It was on the other side.

2          Q.    On which side?

3          A.    Towards the university.

4          Q.    Did you ever see the path that led from the

5    main road down toward that valley?

6          A.    No, I never went there to see it.

7          Q.    Did you ever see the mosque that was visible

8    from behind the I'Huriro?

9          A.    I don't recall.

10          Q.    Does it help you remember if I tell you it was

11    a very colorful building with bright green?

12          A.    Do you mean that place -- that building where

13    they pray?

14          Q.    Yes, the mosque.

15          A.    No, I never saw that.

16          Q.    When the president's plane was shot down, the

17    prime minister of Rwanda was murdered almost

18    immediately.  Do you remember that?

19          A.    Please repeat the question.

20          Q.    The day after the president's plane was shot

21    down, the moderate prime minister of Rwanda was murdered

22    by the MRND government.  Do you remember that?

23          A.    No, I do not recall.

24          Q.    Do you recall when a man named Kambanda became

25    the prime minister?

1        A.   I do not know.

2        Q.   You don't remember Mr. Kambanda, the prime

3   minister of the genocide government, came to visit the

4   I'Huriro while you were working there?

5             MR. RUOFF:  Objection.  That assumes a fact

6   not in evidence, Judge.

7             MR. CAPIN:  I will put in evidence, your

8   Honor.

9             THE COURT:  Overruled.

10       Q.   I'm going to ask that question in smaller

11  pieces.  Do you remember living at the I'Huriro during

12  the genocide?

13       A.   Yes, I do remember.

14       Q.   Do you remember the prime minister of the

15  genocide government came to visit while you were living

16  there?

17       A.   Yes, I do remember.

18       Q.   And the prime minister who came to visit, his

19  name was Kambanda?

20       A.   Yes, I do remember.

21       Q.   And he was a member of the MRND?

22            THE COURT:  You're testifying.  Why don't you

23  ask questions.

24            MR. CAPIN:  I'm leading, your Honor.

25            THE COURT:  No, you're not leading, you're

```
 1    stating.

 2         Q.    And was he not a member of the MRND?

 3         A.    I don't know which party he belonged to.

 4         Q.    You don't know what party the prime minister

 5    of the genocide government belonged to?

 6         A.    No, I do not know anything about that.

 7         Q.    You of course know that Pauline Nyiramasuhuko

 8    was an MRND member?

 9         A.    I do not know if she was a part of the MRND.

10         Q.    Now, you've testified previously -- strike

11    that.  You've traveled to this country previously to

12    offer your testimony as a witness, have you not?

13         A.    Yes.

14         Q.    In fact, you came to Boston just last year?

15         A.    Yes.

16         Q.    You came to Boston with several family members

17    who are now in Concord; correct?

18         A.    Yes.

19         Q.    And you came to Boston because you were going

20    to testify on behalf of the defendant's sister, Prudence

21    Kantengwa; isn't that correct?

22         A.    Please do repeat.

23         Q.    Do you know the defendant's sister Prudence

24    Kantengwa?  Kantengwa Prudence.

25         A.    Beatrice you mean?
```

1      Q.    No, I mean Kantengwa Prudence.

2      A.    No, I do not know of her.

3      Q.    You've never heard of Prudence Kantengwa?

4      A.    Even if I meet her somewhere, I would not know

5  of her, so I do not know of her.

6      Q.    Do you know a man named Munyemana Athanase?

7      A.    I do not know of him as well.

8      Q.    You've never heard that name?

9      A.    It's the first time I'm hearing of that name.

10     Q.    So if somebody showed you a photograph and

11 asked you to identify Munyemana Athanase would you be

12 able to?

13           MR. RUOFF:  Objection.

14           THE COURT:  That's a different question.

15     Q.    If somebody showed you a photograph and asked

16 you can please identify Munyemana Athanase, what would

17 you say?

18     A.    That will help me better.

19     Q.    Is that because you have in fact seen the man

20 named Munyemana Athanase?

21     A.    It would help me.

22     Q.    Would it help you because you in fact --

23           THE COURT:  I think you're going in circles

24 here obviously.  I don't know him as John Smith.  I know

25 him as Bill Williams.  Oh, that's Bill Williams?  That's

```
 1   also John Smith.  Oh.  If you've got a picture, show it.

 2        Q.   I will move on.  After traveling to Boston,

 3   did you go back to Rwanda?

 4        A.   From where?

 5        Q.   Did you travel to Boston last year?

 6        A.   Yes, we did.

 7        Q.   How long were you in Boston?

 8        A.   Two weeks.

 9        Q.   And you were there for a proceeding involving

10   Prudence Kantengwa; were you not?

11        A.   I don't think I know of Kantengwa.

12        Q.   What did you go to Boston to testify about?

13        A.   Please would you repeat?

14        Q.   What did you go to Boston to testify about?

15        A.   For Beatrice.

16        Q.   So you believe there was a proceeding

17   involving Beatrice in Boston last year?

18        A.   Yes, we came for Beatrice.

19        Q.   And that was last April or May?

20        A.   Yes.

21        Q.   And you stayed at a hotel in Boston?

22        A.   Yes.

23        Q.   And you went to a courthouse in Boston?

24        A.   Yes.

25        Q.   And after you stayed in Boston for about two
```

1    weeks, you went back to Rwanda; isn't that correct?

2        A.   Yes.

3        Q.   And when you went back, nobody from the

4    Rwandan government talked to you about why you'd been in

5    America?

6        A.   No.

7        Q.   Nobody threatened you?

8        A.   Nobody.

9        Q.   Nobody told you you should not testify on

10   behalf of a Hutu in America?

11       A.   No.

12       Q.   Nobody told you what you should say when you

13   came to America?

14       A.   I'm not understanding.

15       Q.   Did anybody tell you what to say when you were

16   traveling to Boston last year?

17       A.   No.

18       Q.   Now, you mentioned that you worked in the

19   kitchen at the I'Huriro; is that correct?

20       A.   Yes.

21       Q.   How many people were you cooking for every

22   day?

23       A.   People that we are together, people who came

24   with me here.

25       Q.   No, I'm asking how many people -- I will ask a

1    different question.

2            MR. CAPIN:  Tell the witness I will ask a

3    different question.

4        Q.    How many people were living at the I'Huriro

5    while you were working as a cook?

6        A.    You mean people who camped there?

7        Q.    While you were working as a cook at the

8    I'Huriro, were there people living there?

9        A.    People who had fled there or who had come to

10   seek refuge there.

11           THE COURT:  I think there is probably a

12   distinction between people who lived there as in have

13   ownership interest and lived there and people who are

14   staying there and people who are visiting and people who

15   are allowed to stay there, so I think maybe you could --

16       Q.    Did you see people inside the I'Huriro while

17   you were working as a cook?

18       A.    People who had sought refuge there?

19       Q.    No.  Did you see people, human beings, inside

20   the hotel while you were working there as a cook?

21       A.    People who lived there?

22       Q.    Yes.

23       A.    Beatrice and Shalom lived there.

24       Q.    Did anybody else sleep there?

25       A.    You mean who lived there?

1      Q.   No, I mean sleep there.

2      A.   People who slept there?

3      Q.   Yes.

4           THE COURT:  Why don't you ask her how many

5    people were inside the wall.

6      A.   I don't recall.

7      Q.   How many people did you see inside the walls

8    of the hotel while you were working at the I'Huriro?

9      A.   There were people who were living there,

10   people who had been found, and those who had not been

11   found.

12     Q.   Were you cooking for some of those people?

13     A.   We cooked altogether -- for altogether.

14     Q.   When you say we cooked, who else cooked?

15     A.   My helper was Habinshuti Vanuste.

16     Q.   And did you and Vanuste cook for everyone

17   eating in that house?

18     A.   Yes.

19     Q.   Who was cooking for the restaurant?

20     A.   When we went there, there was no restaurant.

21     Q.   There was no restaurant in the I'Huriro.

22     A.   When we went there, there was no restaurant.

23     Q.   And there was no bar?

24     A.   No, I did not see that.

25     Q.   Who bought food for you to cook?

53

1      A.    I do not know of any, so I wouldn't mention

2   any because I did not know of any.

3      Q.    When you ran out of porridge, who would you

4   get porridge from?

5      A.    I do not recall of how it went, how it worked.

6      Q.    So as a cook you didn't know how the food was

7   coming to the kitchen to be cooked?

8      A.    Because I had so much to do and so many works,

9   I did not pay attention to whom was going -- or was

10  bringing the food or was going for grocery shopping.

11      Q.    How many times did you go grocery shopping

12  during the genocide?

13      A.    During the genocide?

14      Q.    During the genocide.

15      A.    I do not know.

16      Q.    More than once?

17      A.    You mean we cooked?

18      Q.    No, I'm asking -- I will ask a different

19  question.  Did you ever go shopping to the market during

20  the genocide?

21      A.    No, I did not.  Myself I did not go.

22      Q.    Did you ever leave the compound of the

23  I'Huriro during the genocide?

24      A.    No, I did not go out.

25      Q.    So during the entire genocide you saw nothing

```
 1   outside the walls of that building.

 2        A.   Because we were in the basement and also

 3   because the house was tall and the walls were tall, we

 4   could not see beyond the walls.

 5        Q.   Did you ever spend time in the backyard?

 6        A.   We cooked there in that area in the basement

 7   and it was adjacent, the building were adjacent.  So we

 8   would just cook and bring the food to the other side,

 9   but we could not see beyond the walls because the walls

10   were tall.

11        Q.   Did you ever hear human voices coming over the

12   walls?

13        A.   Because I have problems of hearing, so I

14   wasn't really able to hear.

15        Q.   I see.  So if there was screaming coming over

16   the walls, you wouldn't hear that?

17        A.   And if screams come from afar, I wouldn't be

18   able to hear.  Even -- very often voices that are near

19   to me, I can't be able to hear.

20        Q.   Did you see Beatrice every day?

21        A.   Yes, I did.

22        Q.   How much time every day?

23        A.   Many a time in the morning, like nine in the

24   morning, midday, like three in the afternoon, and she

25   always carried her baby.
```

1    Q.   You never saw her without the baby.

2    A.   I beg your pardon?

3    Q.   You never saw her without the baby.

4    A.   Her baby no longer nursed and she loved so

5  much her baby that she will go around with her baby, and

6  also because of her pregnancy, she was weak, so she will

7  just be with her baby all the time.

8    Q.   And would it be fair to say --

9    MR. CAPIN:  And madam interpreter, I will

10  break this down so it will be easier.

11   Q.   Would it be fair to say that every day there

12  were hours that passed when you did not see Beatrice?

13   A.   No.

14   Q.   Was she in your sight -- could you see her

15  with your own eyes every minute of every day?

16   A.   Yes, we could see her.

17   Q.   So everywhere she went you went?

18   A.   We were in the basement -- we would be in the

19  basement and she would be on the second floor and she

20  was supervising what we would be doing.

21   Q.   And you saw her every minute of every day?

22   A.   Unless she was tired and she would go to make

23  the baby sleep or even herself go to rest.

24   Q.   And that was upstairs?

25   A.   She stayed on the second floor.

1      Q.   And there was a door that led to the street on

2    the first floor?

3      A.   You mean there was a door on the second floor

4    leading to the street?

5      Q.   No, I mean was there a door at the Hotel

6    I'Huriro that you could walk through to get to the

7    street?

8      A.   The door wasn't far from us and we could see

9    her at all times, and actually she would sit there and

10   we felt that she was supervising everything that we were

11   doing from up there.

12     Q.   She would sit by the front door of the hotel?

13     A.   You mean where she sat?

14     Q.   Did you say she would sit there and supervise

15   the hotel staff?

16     A.   Yes, that's how it works.

17     Q.   So she was in essence the hotel supervisor.

18   She was the hotel supervisor.

19          THE INTERPRETER:  Your Honor, may I please ask

20   her to repeat.

21          THE COURT:  Certainly.

22          (Pause.)

23     A.   She would sit there.  There was nothing else

24   that she could do.

25     Q.   When you say she would sit there, what do you

1    mean by there?  Describe what you are talking about.

2         A.    You mean why she sat there?

3         Q.    Where did she sit?

4         A.    On the porch on the second floor.

5         Q.    Was the porch -- did the porch face outdoors?

6         A.    No.  It wasn't facing the street, but it was

7    facing on the other side in the rear.

8         Q.    Did you ever stand or sit on that porch?

9         A.    Because of so much work we had there was no

10   time to go and sit or stand there.

11        Q.    So how do you know she was on that porch if

12   you had no time to go there?

13        A.    It was face to face as we are here face to

14   face.

15        Q.    The porch was high up facing the backyard of

16   the hotel; is that right?

17        A.    Yes.

18        Q.    And the porch was higher than that wall you

19   described?

20        A.    I do not recall of that very well.

21        Q.    So it's possible the wall was so high that it

22   obstructed the view from the second floor porch?

23        A.    I do not know of it.

24        Q.    So you can't tell this jury one way or the

25   other whether a person on that porch could see the

1    street beyond?

2         A.    I beg your pardon?

3         Q.    I'm asking if you can tell this jury whether a

4    person on that porch could see beyond the wall of the

5    compound.

6         A.    I don't think I recall of that very well.

7         Q.    And you personally saw nothing outside --

8    beyond the walls of that compound?

9         A.    We were very much below that.  We could not

10   see beyond the walls.

11        Q.    And you heard nothing outside of the walls of

12   the compound?

13        A.    Because I have problems of hearing, I couldn't

14   hear anything outside the walls.

15        Q.    Were there automobiles parked in the backyard

16   of the compound?

17        A.    Yes, there were vehicles.

18        Q.    There were several vehicles in the backyard of

19   that compound.

20        A.    I don't know how many there were.

21        Q.    More than one?

22        A.    Yes.

23        Q.    More than two?

24        A.    I do not remember of the number.

25        Q.    And there was in fact a gate that opened up to

1      let vehicles drive in and out of that compound; correct?

2           A.   I don't remember of that.

3           Q.   Well, isn't it true, though, that you once saw

4      that gate open and you saw Prime Minister Kambanda come

5      through that gate?

6           A.   I did not see him when he was coming in.

7           Q.   Okay.  Did you see him when he was going out

8      that gate?

9           A.   I did not see him coming in nor coming out.

10          Q.   But you do remember Prime Minister Kambanda

11     coming to the I'Huriro; correct?

12          A.   Yes, I do remember.

13          Q.   But you don't remember whether you saw him

14     going out the gate.

15          A.   I did not see him coming in nor coming out.

16          Q.   Do you remember ever seeing the gate open?

17          A.   Where we were we couldn't see where the gate

18     was.

19          Q.   How do you know there was a gate there?

20          A.   If there was a gate at that front door, I

21     don't remember, at the gates.

22          Q.   I'm going to try to help refresh your

23     recollection.  Okay?

24          A.   Yes.

25          Q.   Do you remember talking to American agents in

1    Butare in 2008?

2         A.   No, I don't remember.

3         Q.   You don't remember.  You don't remember

4    talking to a big white man named Brian Anderson?

5         A.   I don't remember.

6         Q.   Would it help you remember if you saw Brian

7    Anderson?

8         A.   Yes.

9              MR. CAPIN:  Special Agent Anderson, please

10   stand up.

11        Q.   Does that help you remember if you've met

12   Agent Anderson?

13        A.   It's my -- I think it's my first time to see

14   that man.

15        Q.   Ma'am, isn't it true that you met with

16   American investigators in 2008 and told them about your

17   experience in the I'Huriro?

18        A.   Yes, I do remember.

19        Q.   And in fact does that help you remember

20   whether they showed you a picture of Prudence

21   Kantengwa's husband Athanse Munyemana and asked you to

22   point him out?

23        A.   Yes, now I do remember.

24        Q.   And you pointed to the photograph of Prudence

25   Kantengwa's husband and said it's the tall man in the

 1  picture.

 2       A.    Yes.

 3       Q.    And you knew that he was the director of the

 4  secret police for the MRND government.

 5             MR. RUOFF:  Objection.  May we approach.

 6             THE COURT:  Yes.

 7                         AT SIDEBAR

 8             MR. RUOFF:  My objection is to relevance first

 9  of all.

10             THE COURT:  Well, it's beyond the scope a

11  little bit.

12             MR. RUOFF:  It's way beyond the scope of my

13  direct, and it's not impeaching this witness.  It's

14  injecting inflammatory evidence into the trial.  May I

15  make my record, please.  I'm objecting -- with respect

16  to relevance, I'm objecting based on beyond the scope of

17  my direct examination; and furthermore, Judge, Rule 403

18  I believe that injecting evidence about some other

19  person being a minister of some type of defense who's

20  now deceased substantially -- the probative value is

21  substantially outweighed by the danger of unfair

22  prejudice.  I mean, this woman is an ignorant,

23  uneducated farmer, and now they're just trying to tell

24  her what he wants.  She has no basis of knowledge about

25  who the ministers are, who the cabinet members were, who

1    the directors of ministry were.

2              MR. CAPIN:  May I make my record?

3              THE COURT:  Yes.

4              MR. CAPIN:  As an offer of proof, I would say

5    that if -- first of all, she's already impeached herself

6    because first she didn't know him, then she did.  So it

7    goes to her credibility.  Moreover, I'm going to assist

8    the witness through refreshing her recollection that she

9    in fact saw the roadblock and she knew that Beatrice

10   Munyenyezi was a member of the MRND.

11             THE COURT:  That's fine.  It sounds like what

12   you are trying to do -- I don't know what your basis for

13   it is.  You are trying to -- seem to be injecting

14   through this witness some secret police, no good members

15   were somehow in the house and that's a bad thing.

16   That's what it sounds like.

17             MR. CAPIN:  No, your Honor.  The probative

18   value is that the house was full of MRND members and

19   she knew it.  She knew there were monitors there.

20             THE COURT:  The way you're doing it it's

21   starting to trouble me.  There is obviously a

22   translation issue here.  You're putting words in her

23   mouth that are English words.  Nobody has any idea how

24   those English words are being translated into this

25   language and given to her and you are making it sound

63

 1   like because use of basement and she said yard, that

 2   somehow she's misstating.  That probably is not the

 3   case, and the words don't translate that well, and

 4   injecting his role in the government, she says she

 5   doesn't know and you start belaboring the point.  I

 6   agree.  It's way far afield.  It's beyond the scope.

 7   Don't mention him again.

 8           MR. CAPIN:  I take it, your Honor, I am

 9   permitted to go through the other issues.

10           THE COURT:  Yes, but really stop testifying

11   and asking her if she agrees.  Ask her questions.  You

12   can lead her.  You're getting close and you're probably

13   way too close and prudence would dictate that you not

14   push it to the line you're pushing it at.  You're not

15   allowed to testify based upon your questions and facts

16   assumed in your questions and not care what the answer

17   is and that's what I'm starting to get the feeling that

18   you're doing.  If you keep it up, I will just stop you.

19   You'll be done.

20           MR. CAPIN:  We do intend to call Agent

21   Anderson in rebuttal if she denies the roadblock.

22           THE COURT:  Whatever, your call.

23           MR. RUOFF:  Judge, if that's the case we never

24   received a report of this interview, so we'd like a copy

25   of his ROI with respect to his interview of this

64

1    witness.

2              MR. CAPIN:  Your Honor, she was never

3    envisioned as a witness.  Her evidence given was purely

4    inculpatory.  I'm not aware there is an ROI.  I will

5    inquire.

6              THE COURT:  You called her.

7              MR. RUOFF:  I know, but I mean, with respect

8    to Agent Anderson.  He's going to testify about an

9    interview he did.  I'm just asking for the ROI.

10             MR. CAPIN:  I'm not aware it exists, but if it

11   does exist if we call him, we'll produce it.

12             THE COURT:  He's probably not going to testify

13   anyway.

14             MR. RUOFF:  Thank you.

15                        IN OPEN COURT

16        Q.   BY MR. CAPIN:  Ma'am, I have a few more

17   questions about your meeting with the American

18   investigator who you now remember meeting with in

19   Rwanda.  Okay?

20        A.   I'm not hearing, so I guess I'm the one that's

21   going to speak that.

22        Q.   Thank you.  Do you remember the American

23   investigator asking you what party Beatrice Munyenyezi

24   belonged to?

25        A.   I do not recall of those.

1      Q.   Would it refresh your recollection if I

2  suggested --

3           MR. RUOFF:  Objection.

4           THE COURT:  Sustained.

5      Q.   Do you remember telling the American agents

6  that Beatrice Munyenyezi was a member of the MRND?

7      A.   I don't remember.

8      Q.   Do you remember if Beatrice Munyenyezi was a

9  member of the MRND?

10      A.   I do not recall at all.

11      Q.   Was your memory of whether she was a member of

12  the MRND fresher back in 2008 when you spoke with the

13  American investigators?

14      A.   I do not remember anything of that.

15      Q.   My question though, ma'am, is did you have a

16  better memory in 2008 than you do now about whether

17  Beatrice Munyenyezi was a member of the MRND?

18      A.   I do not remember.  I don't even think about

19  it.

20      Q.   I'm asking you to think about it now, please.

21  Can you please tell this jury if you remember whether

22  Beatrice Munyenyezi was a member of the MRND?

23      A.   I did not see her going -- joining the MRND

24  party.

25      Q.   Are you aware -- do you know who the party in

66

1   power was during the genocide?  Do you know who the

2   party in power was during the genocide?

3       A.   I do not recall anything.

4       Q.   You have no memory of who the party in power

5   in Rwanda was during the hundred days when nearly a

6   million people were killed.

7            MR. RUOFF:  Objection, Judge.  Form of the

8   question.

9            THE COURT:  Overruled.

10      Q.   I will repeat it.  I will break it down to

11  make it easier.  You have no memory of which party was

12  in power during the hundred days when nearly a million

13  people were murdered?

14      A.   At that time myself, the work I was doing, it

15  was nothing to do with what was happening.

16      Q.   So you saw and heard nothing?

17      A.   Surely saying (sic).  Hearing, I could not

18  hear.

19      Q.   Well, you could see though; correct?

20      A.   The only thing I could see is what I was

21  doing, and that's the work that I was doing and that's

22  what I had acquired for.

23      Q.   Do you remember seeing a roadblock on the main

24  road in front of the hotel?

25      A.   I saw the roadblock when we were fleeing.

1      Q.    And the roadblock was right in front of the

2   hotel; correct?

3      A.    When I was fleeing I saw on the left-hand side

4   the roadblock, but while we were in the hotel, I could

5   not see beyond the walls and it was not possible with

6   all the work that we had to see where the roadblock was.

7      Q.    I understand that, ma'am, that no human being

8   can see through a wall and I'm not suggesting we should

9   be able to see through a wall.  But when you left the

10  hotel to flee Rwanda, you did leave the hotel; isn't

11  that correct?

12     A.    Yes.

13     Q.    And when you left the hotel did you see the

14  roadblock immediately in front of the hotel?

15     A.    When we left the hotel we did not go through

16  -- we did not go by the roadblock where by the roadblock

17  was.

18     Q.    And where was the roadblock?

19     A.    When we left we went to Nyakibanda and we did

20  not go towards where the roadblock was.

21     Q.    Where was the roadblock?

22          THE INTERPRETER:  I beg your pardon.  Your

23  Honor, may I ask the witness to clarify?

24          THE COURT:  You may.

25          (Pause.)

```
 1        A.   The roadblock was on the left-hand side and we
 2   went up, and when we were going to Nyakibanda we went on
 3   the right-hand side.
 4        Q.   How many meters from the front of the hotel
 5   was the roadblock?  Maybe I can ask a different
 6   question.  Was the roadblock -- when you left the hotel
 7   was the roadblock farther away from you than I am now or
 8   was it closer?
 9        A.   It was farther.
10        Q.   Was it this far?
11        A.   If you go even farther.
12        Q.   Was it this far?
13        A.   When we came out, we went this way and the
14   roadblock was this way.
15        Q.   I understand.  My question, though, is was the
16   roadblock about this far from you -- about as far from
17   you as I am now?
18        A.   Beside the hotel?
19             MR. CAPIN:  I'm sorry, madam interpreter,
20   would you repeat that, please?
21        A.   Beside the hotel?
22        Q.   Yes.
23        A.   It was closer to the hotel, but the yard of
24   the hotel was on the other side.
25        Q.   I'm asking you, can you imagine you're
```

1    standing at the front door of the hotel, please.  And

2    you're facing that main highway that leads to Kigali and

3    to Burundi.  If you were standing at the front door of

4    the hotel, was the roadblock closer than I am from you

5    or farther?

6         A.   The roadblock was here and then we also passed

7    where you're standing.

8         Q.   My question, though, is did the roadblock

9    consist of obstacles like pieces of wood?

10        A.   When I saw it they took the log off and we

11   passed by.

12        Q.   Now, that log they took off, how far was that

13   log -- strike that.  The log that you saw them move, was

14   that log farther from the front door of the hotel than I

15   am from you?

16        A.   It was like from here to where you are.

17             MR. CAPIN:  Just a moment, your Honor.

18             THE COURT:  Yes.

19             MR. CAPIN:  Nothing further.

20             THE COURT:  Any redirect?

21             MR. RUOFF:  I just need to talk to my

22   investigator for two seconds, Judge.

23             (Pause.)

24             MR. RUOFF:  I'm all set, your Honor, thank

25   you.  Thank you, Alice.

```
 1              THE COURT:  Thank you, ma'am, you may step
 2     down and you're excused.  You may call your next
 3     witness.
 4              MR. HOWARD:  Thank you, your Honor.  Your
 5     Honor, the defense would call Venerande  Uwiteyakazana.
 6                       VENERANDE UWITEYAKAZANA
 7          having been duly sworn, testified as follows:
 8              THE CLERK:  Thank you.  For the record, please
 9     state your name and spell your last name.
10          A.   My last name is Uwiteyakazana and my first
11     name is Venerande.
12                       DIRECT EXAMINATION
13     BY MR. HOWARD:
14          Q.   Good afternoon, ma'am.
15          A.   Good afternoon.
16          Q.   May I call you Venerande?
17          A.   Yes.
18          Q.   And we've met before, haven't we?
19          A.   It's the first time, but this is the second
20     time I'm here.
21              MR. HOWARD:  You can tell her she doesn't have
22     to hold on to that.  (Microphone)
23          Q.   Ma'am, where do you live right now?
24          A.   I live in Gatumba in Wasilla.
25          Q.   Is that near Butare?
```

71

```
 1        A.    To be able to get there I have to pay 500.

 2        Q.    So you have to take some kind of motorcycle

 3   taxi?

 4        A.    No, a vehicle.

 5        Q.    A vehicle.

 6        A.    But sometime also you can take a motorcycle.

 7        Q.    Ma'am, where were you living in April of 1994?

 8        A.    I lived there in Gafumba.

 9        Q.    And did you have a child at that time, a young

10   boy?

11        A.    Yes, I did have a boy that I bore over there.

12        Q.    And what's his name?

13        A.    His name is Muhayimana Victor.

14        Q.    Venerande, are you Hutu or Tutsi?

15        A.    I am a Hutu.

16        Q.    And is Victor Hutu or Tutsi?

17        A.    The young one?

18        Q.    Yes, Victor.

19        A.    The young child you mean?

20        Q.    Yes.

21        A.    He's a Tutsi.

22        Q.    And are you related to Maurice Ntahobali?

23        A.    Yes.  I am his auntie, I am the sister of his

24   father.

25        Q.    And how old are you, ma'am?
```

72

1       A.   I don't remember.  Unless I give you my ID

2   card and then you will be able to tell my age.

3       Q.   Are you more than 70 years old?

4       A.   Do you want me to give it to you?

5       Q.   No, she doesn't have to give us her card.  Is

6   she more than 70?

7       A.   I think they say I am 76 years old.

8       Q.   In April of 1994 after the genocide started --

9       A.   Yes.

10      Q.   -- did there come a time that you went to

11  Maurice's hotel in Butare?

12      A.   Yes, I went there in May 1994 and I was taking

13  my son for safety because they wanted to kill him.

14      Q.   Where you lived people were wanting to kill

15  Victor?

16      A.   Yes.

17      Q.   How did you get from where you lived to the

18  hotel?

19      A.   His older brothers, my older sons, when they

20  realized Victor was in danger, was going to be killed,

21  they told me to take him and to flee with him.

22      Q.   And did you do that?

23      A.   Yes, I immediately followed their

24  instructions, and as I was going away I met a Red Cross

25  vehicle that was carrying the food.

1        Q.    And did that Red Cross vehicle give you a ride

2   to Butare?

3        A.    Yes, it took us, me and that young child.

4        Q.    Do you remember how old Victor was at the

5   time?

6        A.    He was ten years old and he was in fourth

7   grade, elementary fourth grade.

8        Q.    And is Victor right now back in Rwanda?

9        A.    Yes, we are together.  We are together.

10        Q.    And when you were taken by that Red Cross

11   vehicle, did you make your way to the hotel?

12        A.    Yes.  We reached there safely and even that's

13   where the food was -- was taken to.

14        Q.    And ma'am, when you got to the hotel, did you

15   meet Maurice?

16        A.    I found him.  He was seated like there at the

17   door.

18        Q.    Did you speak to him?

19        A.    And then he asked me why did you come in a

20   hurry or did you not even have time to wash?

21        Q.    And what did you say to him?

22        A.    And I told him that the Inkotanyi or the RPF

23   had taken over, and also there were other people who

24   were trying to kill my child and that's why I chose to

25   bring him here.

1      Q.   And did Maurice allow you to stay at the hotel

2   with Victor?

3      A.   He told me to go down there at the hotel and

4   he told me there were other people who had arrived

5   earlier.  So go there and then we will wait to see

6   what's going to happen.

7      Q.   And did you go into the basement of the hotel?

8      A.   Yes, we went to -- we went to like the back of

9   the house and on the ground floor.

10      Q.   And did you see other people there who you

11   were related to?

12      A.   Yes.

13      Q.   Do you know Maurice's children?

14      A.   To know them?  Yes, I know them.

15      Q.   Were they at the hotel?

16      A.   Denise was there and Clarisse.

17      Q.   Were any of his other children there?

18      A.   There was one who had gone abroad in Belgium

19   for studies.  So he wasn't there -- or she wasn't there.

20      Q.   What was that woman's name?

21      A.   Brigette.

22      Q.   Was Shalom at the hotel?

23      A.   Yes, together with his wife.

24      Q.   And who's his wife?

25      A.   Beatrice.

1          Q.    At the time that you were at the hotel did you

2    see Beatrice often?

3          A.    Yes.  She would come to talk to us and then

4    she will go back upstairs.

5          Q.    The times that you saw Beatrice, did you ever

6    see her wearing a military uniform?

7          A.    God be my witness, I never saw her wearing any

8    military clothes.

9          Q.    The times that you saw Beatrice at the

10   hotel -- and for the record I have Government

11   Exhibit 26C, did you ever see her wearing clothing like

12   this of the MRND?

13         A.    I never saw her wearing those clothes.  I've

14   never seen her wearing those.  Unless those who came

15   there earlier, maybe they saw her.  But I never saw her

16   wearing such clothes.  She would wear skirts, dresses,

17   but those clothes, I didn't see her wearing those.

18         Q.    And I'm holding up 26F.  It's a shirt of the

19   MRND.  Did you ever see Beatrice wearing a shirt like

20   this?

21         A.    I swear in the name of Jesus Christ of

22   Nazareth that I never saw her wearing such clothing.

23         Q.    Venerande, did you ever go outside the hotel

24   compound?

25         A.    No, never.  The man had given us instruction

76

```
 1   not to go, that we should sit there at peace and we will
 2   wait for the final results.
 3        Q.   And was that man Maurice?
 4        A.   Yes, it was Maurice.
 5        Q.   And you were inside the hotel waiting for
 6   peace?
 7        A.   We were waiting there.  We were waiting for
 8   peace to be established, but instead it intensified and
 9   intensified.
10        Q.   Did you ever see with your own eyes violence
11   in Butare?
12        A.   No, I've never seen.  Only saw where I was
13   living until I fled there and went to town.
14        Q.   Did you ever hear violence in Butare?
15        A.   I didn't hear of it because when I got there
16   it had lessened.  Only the refugees that will flee in
17   all sides going here and there.
18        Q.   When you were at the hotel did you see any
19   roadblocks out on the main road?
20        A.   I never saw any roadblock in front of the
21   hotel, and this is the second time they're asking me and
22   I have sworn that I've never seen a roadblock at the
23   hotel.
24        Q.   And did Beatrice have a baby when you were at
25   the hotel?
```

```
 1        A.   Yes, she had a young child who no longer

 2   nursed because she was pregnant.

 3        Q.   So she had a young baby?

 4        A.   Yes.

 5        Q.   And Beatrice was also pregnant again?

 6        A.   Yes, she was pregnant.

 7        Q.   And she was pregnant again?

 8        A.   She was pregnant and she had the young child

 9   whom she will bring so that we would play or stay with

10   the young child.

11        Q.   And when you were at the hotel in May and June

12   could you tell that Beatrice was pregnant?

13        A.   Yes, I could see it and she was pregnant.

14   Unless anybody didn't see, but I did witness that she

15   was pregnant.

16        Q.   Did you at some point go with the others to

17   the Congo?

18        A.   A time came when the Inkotanyi, the RPF, took

19   over Butare, and Maurice, that man, told us to pack our

20   things and that we should go and we will see where God

21   is going to lead us.

22        Q.   And did you end up in the Congo as a refugee?

23        A.   Yes, we went there as refugees, and we left

24   together with Beatrice in the same car.

25        Q.   When you were at the Congo was there a time
```

1   when Beatrice came back to the refugee camp and brought

2   her twin daughters for you to see?

3        A.   After a few days I think maybe she went to

4   Kenya -- I don't know, I don't remember how many days,

5   but I think she had gone to --

6             THE INTERPRETER:  Your Honor, I'm sorry.

7             (Pause.)

8        A.   She came from Kenya and she brought those

9   children and she brought some clothing to some children

10  that were -- that had sought refuge in Rwanda, and she

11  brought clothes even for my own children.

12            MR. HOWARD:  Venerande, there's no question.

13  Sorry.  I don't have anymore questions for you and I'm

14  sure one of these gentlemen has questions for you, okay?

15            MR. RUOFF:  About ten minutes.

16            THE COURT:  We'll break for lunch now, but

17  before we break just because a lot of this is going on I

18  think it's probably a good opportunity to take some

19  time.  I just want to explain something to you.  I will

20  be giving you instructions on this subject later when I

21  instruct you on the law that you're to apply in

22  resolving this case.  But you've probably noticed over

23  the last couple days, and particularly today it's been

24  happening, to my impression anyway it's been happening,

25  lawyers will sometimes ask a question of a witness like:

79

1    Now, you said you were at your sister's house on

2    Tuesday.  Do you recall John the plumber coming to your

3    sister's house on Tuesday and fixing a leaky pipe?  And

4    the witness says no, I don't recall that.  The lawyers

5    then sometimes act with surprise or disbelief or some

6    sort of facial expression that comments upon the answer.

7    Is there any evidence that there's a plumber named John

8    before you?  No.  Any evidence that the plumber named

9    John went to the house with the sister?  No.

10            So the point being illustrated is facts --

11   questions by counsel are not evidence.  The evidence

12   comes from the testimony of witnesses.  So when counsel

13   asks a question like that and assumes a whole bunch of

14   facts and the answer is no, there is no evidence before

15   you of those facts because counsel's questions are not

16   evidence.

17            It's been happening a lot lately and I'm

18   getting concerned about it.  So be aware of that and be

19   focused on that, and if that happens make sure you

20   recognize that there is no evidence of the assumed fact

21   just because the lawyer assumed it in the question.

22   Okay?

23            All right.  We'll break for lunch.

24            (Luncheon recess at 12:30 p.m.)

25

80

```
 1                    C E R T I F I C A T E

 2

 3             I, Diane M. Churas, do hereby certify that the

 4      foregoing transcript is a true and accurate

 5      transcription of the within proceedings, to the best of

 6      my knowledge, skill, ability and belief.

 7

 8

 9      Submitted: 11/19/13          Diane M. Churas
                                   DIANE M. CHURAS, LCR, RPR, CRR
10                                 LICENSED COURT REPORTER, NO. 16
                                   STATE OF NEW HAMPSHIRE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appendix Page 1381

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12-30-2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-85-01-SM
          v.                    *  February 15, 2013
                                *  1:10 p.m.
    BEATRICE MUNYENYEZI         *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY NINE - AFTERNOON SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Government:     John A. Capin, SAUSA
                        Aloke S. Chakravarty, SAUSA
                        U.S. Attorney's Office (NH and MA)

For the Defendant:      Mark E. Howard, Esq.
                        David W. Ruoff, Esq.
                        Howard & Ruoff, PLLC

Interpreters:           Jacqueline Adam
                        Joseph Rubagumya

Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

I N D E X

WITNESSES:          Direct    Cross    Redirect    Recross


VENERANDE UWITEYAKAZANA


By Mr. Chakravarty            3                        10

By Mr. Howard                          10


VENUSTE HABINSHUTI


By Mr. Ruoff                 11

By Mr. Capin                           20


VENANTIE NYIRAMARIRO


By Mr. Howard                31

By Mr. Chakravarty                     38

```
 1                P R O C E E D I N G S

 2           THE COURT:  Mr. Chakravarty, whenever you're

 3  ready.

 4           MR. CHAKRAVARTY:  Thank you, your Honor.

 5       CROSS-EXAMINATION OF VENERANDE UWITEYAKAZANA

 6  BY MR. CHAKRAVARTY:

 7       Q.  Good afternoon, ma'am.

 8       A.  Good afternoon.

 9       Q.  Madam, you have been to the United States

10  before and you returned to Rwanda, correct?

11       A.  Like this, that we have travel?

12       Q.  Yes, you've traveled to the United States

13  before I think you said on direct exam.

14       A.  Yes.  This is the second time.

15       Q.  And when you returned the first time you

16  didn't have any difficulty when you returned, correct?

17       A.  No.  We didn't have any.

18       Q.  Ma'am, you lived during the genocide -- I'm

19  sorry.  Prior to the genocide you lived far outside of

20  Butare Town, correct?

21       A.  Yes.  Even that's where I live currently.

22  For me to go to Butare I have to pay 500.

23       Q.  So during the genocide you were taken to the

24  I'Huriro Hotel; is that correct?

25       A.  Yes.  During the war.
```

 1      Q.  And that was almost -- you went to the

 2   I'Huriro Hotel for only a few weeks before the end of

 3   the war -- the end of the genocide, correct?

 4      A.  It was at least a month before the war was

 5   over because I was there in May and the war ended in

 6   June.

 7      Q.  Do you remember previously saying that you

 8   stayed -- you think you stayed at the hotel for only

 9   about a couple, two weeks?

10      A.  I arrived there at the end of May, and we

11   left there in June.

12      Q.  You left the I'Huriro in June?

13      A.  Yes.

14      Q.  So it was --

15      A.  When the Inkotanyi or the RPF took over,

16   that's when we left.

17      Q.  So your memory is that the RPF came into

18   Butare Town in June?

19          THE INTERPRETER:  I beg your pardon?

20      Q.  Your memory is that the RPF came into Butare

21   Town in June?

22      A.  It was towards the end of June.

23      Q.  So it's fair to say that you don't know what

24   happened at the I'Huriro before you arrived?

25      A.  Yes.  I could swear and raise my hand and say

1    that I didn't see anything wrong over there.

2         Q.  When you did arrive at the I'Huriro, you were

3    taken in a vehicle, correct?

4         A.  Yes.  I was second in a car that was taking

5    food to the refugees in that place.  I was taken.

6         Q.  And that vehicle did not enter the compound

7    at the I'Huriro, correct?

8         A.  It did enter.

9         Q.  Did you look outside of the I'Huriro before

10   the car went into the compound?

11        A.  They took me out before the car went to where

12   it was supposed to be, and I was taken where that man

13   was seated so that I can talk to him.

14        Q.  The man you're talking about is Maurice, who

15   is in your family, correct?

16        A.  Yes.  It's Maurice Ntahobali and is the owner

17   of the house.

18        Q.  And he's related to you?

19        A.  He is my nephew.  I am his dad's sister.

20        Q.  And did you meet him in front of the hotel

21   before you went in?

22        A.  He was seated at the door, like, for example,

23   where those cups are, that's where he was seated.

24   That's where I found him and he was watching like --

25   he was watching like a video.

1      Q.  So you could see the street in front of the

2  I'Huriro, correct?

3      A.  Yes.  It was close by.

4      Q.  And did you see anything on the street?

5      A.  In the name of God, I didn't see anything.

6  He told me to join others, and after that I didn't see

7  anything else on the street.

8      Q.  Did you see any people gathering on the

9  street?

10      A.  After I was taken out from the car I left to

11  the place where I was instructed to go to, and the

12  refugees from all over the place were fleeing, going

13  towards Mubumbano.

14      Q.  Ma'am, when you went to where you were

15  instructed to go, you never left the I'Huriro from

16  that time on until you left Rwanda, correct?

17      A.  We only sat in one place.  We never left the

18  place.  Only the children that will go up to join

19  Beatrice where they would go to drink porridge, but

20  otherwise we never left where we were seated.

21      Q.  And when you saw Beatrice it's because she

22  came down to visit you?

23      A.  Yes.  When she would come, and then we would

24  just talk for a little bit, and then she would go back

25  to her home.

```
 1       Q.  And she was very pregnant?

 2       A.  It was not very advanced, but yes, she was

 3  pregnant.

 4       Q.  Isn't it true that you've previously said

 5  that she was very pregnant?

 6       A.  You could see that she was pregnant.  I

 7  didn't know how many months she was pregnant, but yes,

 8  you could see that she was pregnant.

 9       Q.  And she would have her baby with her as well?

10       A.  Yes.  She had her young child who did not

11  nurse any longer.

12       Q.  And you saw her every day?

13       A.  Beatrice?

14       Q.  Beatrice, yes.

15       A.  Yes.  And every morning she would come to say

16  hello.

17       Q.  And you never saw her do anything?

18       A.  God be my witness, I never saw her doing

19  anything wrong.

20       Q.  And you never heard anything outside that was

21  violence?

22       A.  No, I didn't hear of anything.

23       Q.  And you never saw anything beyond the walls

24  of the I'Huriro?

25       A.  I didn't see anything, and I got there after
```

1  everybody else had arrived.

2        Q.  And you never went upstairs to see who else

3  was even in the home?

4        A.  Only the young children and the youth will go

5  upstairs.  But us, the elderly people, stayed in the

6  basement.

7        Q.  Ma'am, you had two sons; is that correct?

8        A.  Myself?

9        Q.  Yes.  Did you, yourself, have two sons?

10        A.  Do you mean all the children that I bore or

11  that I gave birth to?

12        Q.  You were asked about your sons on -- at least

13  a son, I think, on direct.  I'm trying to clarify.

14  How many sons did you have?

15        A.  I have the son that I mentioned, Victor, and

16  at the moment I don't have any children because many

17  of them left.

18        Q.  Okay.  You had a son named Vincent, didn't

19  you?

20        A.  Yes.  Vincent Munyaneza.

21        Q.  And he was Interahamwe, wasn't he?

22        A.  Yes.

23        Q.  In fact, you testified against him, didn't

24  you?

25        A.  Yes, I did testify against him because I

1    classify people the same way.  If I would have seen

2    also her doing anything wrong, I would have testified

3    against her as well.

4         Q.  But you didn't see anything happen in Butare,

5    right?

6         A.  Maybe with my firstborn I would testify that

7    I didn't see anything.  Only the traffic of refugees

8    that were coming from all over the place.

9         Q.  When you say the traffic of refugees, are you

10   talking about the traffic into the I'Huriro?

11        A.  No.  They would go on and going towards

12   Mubumbano.  That's where all the refugees would be

13   gathering.

14        Q.  Okay.  And you could see that from the --

15        A.  And many actually were being shot over there.

16        Q.  So you could see the refugees from where you

17   were inside the I'Huriro?

18        A.  Before I left, when I was coming into the

19   car, I saw them, and then after I was taken into the

20   backyard and the house.

21        Q.  I see.  So before you actually went inside

22   the I'Huriro, when you got out of the car that's when

23   you saw the refugees?

24        A.  Yes.  We all came at the same time.  And

25   also, yes, they were going towards all directions and

1   the same happened.  They were going in all directions

2   when we were fleeing into Zaire.

3           MR. CHAKRAVARTY:  Thank you, ma'am.

4           THE COURT:  Redirect.

5           MR. HOWARD:  A couple questions.

6                   REDIRECT-EXAMINATION

7   BY MR. HOWARD:

8       Q.  Venerande, your older son, Vincent, he did

9   bad things during the genocide, didn't he?

10      A.  Yes.  He would go in the mob.  He would go in

11  the mob that attacked, and also they actually

12  discovered a body on my land, and I testified against

13  him during the Gacaca proceedings.

14      Q.  And when you testified against him you told

15  the truth, didn't you?

16      A.  Yes.

17      Q.  And you told the truth because it was the

18  right thing to do, correct?

19      A.  Yes, because all people are equal.  Even

20  those who are being hunted were also human beings.

21          MR. HOWARD:  Thank you, ma'am.

22          THE COURT:  Questions?

23                  RECROSS-EXAMINATION

24  BY MR. CHAKRAVARTY:

25      Q.  You saw no violence in Butare, right?

1     A.  It might have happened, and maybe it did

2  happen, but I did not witness with my own eyes.  But

3  yes, it might have happened.

4          MR. CHAKRAVARTY:  Thank you.

5          THE COURT:  All right.  Thank you, ma'am.

6  You may step down, and you're excused.

7          You may call your next witness.

8          MR. RUOFF:  The defense calls Venuste

9  Habinshuti.

10                  VENUSTE HABINSHUTI

11          having been duly sworn, testified as follows:

12          THE CLERK:  For the record, please state your

13  name and spell your last name.

14          THE WITNESS:  Called Habinshuti, Venuste.

15          THE INTERPRETER:  For the record,

16  H-A-B-I-N-S-H-U-T-I.  Venuste, V-E-N-U-S-T-E.

17                  DIRECT EXAMINATION

18  BY MR. RUOFF:

19     Q.  Good afternoon, Venuste.

20     A.  Good afternoon.

21     Q.  I'm just going to ask you when you answer

22  questions to speak into the microphone.

23     A.  Yes.

24     Q.  How old are you, Venuste?

25     A.  39.

```
 1        Q.  Are you married?

 2        A.  Yes.

 3        Q.  Do you have any children?

 4        A.  Yes.

 5        Q.  How many?

 6        A.  Three of them.

 7        Q.  How far did you go in school, Venuste?

 8        A.  Sixth.  Primary school.

 9        Q.  How many years of school is that?

10        A.  Six.  From one to sixth grade.

11        Q.  Okay.  Can you read and write?

12        A.  Yes, I can read and write Kinyarwanda.

13        Q.  Is Kinyarwanda the only language you speak?

14        A.  Yes.

15        Q.  What do you do for work?

16        A.  I'm a farmer.

17        Q.  Where are you a farmer?

18        A.  In my village.  In my sector.

19        Q.  Okay.  How far is your village from Butare

20   Town?

21        A.  About ten kilometers.

22        Q.  Now, in 1994 did you work for Pauline

23   Nyiramasuhuko?

24        A.  Yes.

25        Q.  Where did you work for her?
```

```
 1        A.  In Kigali.

 2        Q.  What did you do for her?

 3        A.  I was a cook.

 4        Q.  How long did you work for her in Kigali?

 5        A.  About one year.

 6        Q.  Now, do you remember when the president's

 7  plane was shot down?

 8        A.  Yes, I remember.

 9        Q.  You were living in Kigali at that time?

10        A.  Yes.

11        Q.  Can you explain what happened after the plane

12  was shot down?

13        A.  After we learned what had happened we grieved

14  a little bit.  We grieved nearby a military camp.

15        Q.  At some point did you go to the French

16  Embassy?

17        A.  Yes.  We left that military camp and went to

18  the French Embassy.

19        Q.  From there did you go south to Gitarama?

20        A.  Not me.  I left the embassy and went to my

21  home place, Butare.

22        Q.  Okay.  What was the name of the village that

23  you went to in Butare?

24        A.  I went to my birthplace in Huye.

25        Q.  Who was living in Huye when you went there?
```

 1   Let me ask you a better question.  Did you go to your

 2   family's house in Huye?

 3        A.  Yes.

 4        Q.  Were they farmers?

 5        A.  Yes.

 6        Q.  How did you get from Kigali to Huye?

 7        A.  Pauline got me a car that moved me from

 8   Kigali to Butare, my home place.

 9        Q.  Now, how long after the president's plane was

10   shot down did you arrive in your home village?

11        A.  It was about four, five days.  It wasn't a

12   week yet by then.

13        Q.  Okay.  Now, at some point did you travel to

14   the I'Huriro Hotel in Butare Town?

15        A.  Yes.  I went there.

16        Q.  Okay.  Was that in late May of 1994?

17        A.  I can't remember -- I can't recall well the

18   date, but it was in May.

19        Q.  Okay.  Why did you go to the hotel?

20        A.  I went there because many people, many

21   refugees were in the hotel and they wanted some help,

22   initial help.  So I went there because they wanted

23   some additional help.

24        Q.  Some help doing what?

25        A.  I went there to help to cook.

1      Q.   Okay.   How did you learn that they needed

2   help at the hotel?

3      A.   There's a man who was supplying the milk, so

4   they sent him to pick me up and he took me there.

5      Q.   Okay.   When you got to the hotel, do you

6   remember how many people were there?

7      A.   There are some I knew and there were others I

8   did not because there were many people.

9      Q.   Now, prior to going to the hotel did you know

10   who Beatrice was?

11      A.   Yes.

12      Q.   How many times had you seen Beatrice prior to

13   going to the hotel?

14      A.   During her wedding I knew her.   During

15   courtship.   During -- I knew her with her fiance.

16      Q.   Okay.   How many times had you seen her?

17      A.   Because I was living in Kigali, I think I saw

18   her about twice.   Two times.

19      Q.   Okay.   Now, you said that you knew some of

20   the people at the hotel when you arrived.   Who were

21   they?   What were their names?

22      A.   There were -- some people were being hunted

23   and others not.   I don't know if I'm supposed to list

24   every one of them.

25      Q.   Okay.   Well, did you know Alice?

1      A.  Yes.

2      Q.  Had you worked with Alice in Kigali?

3      A.  Yes.  She came and wanted me present because

4  I was going for vacation, and she came to Kigali

5  because I was going for vacation.

6      Q.  By the time you got to the hotel, Alice was

7  already there?

8      A.  Yes, she was there.

9      Q.  Now from the time you arrived at the hotel --

10         MR. RUOFF:  Well, strike that, your Honor.

11     Q.  When you left the hotel, was that when

12  everybody else was fleeing from the hotel?

13     A.  Yes.  We fled together as a group.

14     Q.  Now from the time you arrived at the hotel

15  till the time that you left, did you stay in the hotel

16  compound?

17     A.  Yes.

18     Q.  Where did you live in the hotel compound?

19     A.  You see, I was cooking together with Alice.

20  We were staying there.  There was nowhere else.  We

21  were staying there.

22     Q.  Where did you live inside the compound?  I'm

23  sorry.  Let me ask you a better question.  Where was

24  your room?

25         A.  You see, the way the structure was, there was

1   a basement, there was upstairs, the first floor and

2   the second floor.  You could take the stairs to go in

3   my room on the first floor.

4        Q.  Okay.  Your room was on the first floor, I

5   think.  Is that what you said?

6        A.  Yes.

7        Q.  Okay.  Now if you were in the basement, was

8   there a door leading to the outside in the basement?

9        A.  Unless you could take stairs and go out the

10  front gate.  Also, you could take stairs to go on the

11  first floor to go out.

12       Q.  Was there a set of stairs at the back of the

13  hotel?

14       A.  No, no.  You could just take stairs, go

15  upstairs to get out, or you can go -- because there

16  was a corridor, you could go to each room you wanted

17  to.

18       Q.  Did you ever leave the compound from the time

19  that you arrived there in late May until the time you

20  all fled?

21       A.  No.  I never went out because no one was

22  allowed to go out.  You see, it was during the war.

23       Q.  Do you know who went out to get food?

24       A.  Yes, I know.

25       Q.  Who was it that went to get food for you to

 1  cook?

 2       A.  She was called Clarice.

 3       Q.  When you were at the hotel from late May to

 4  the time you fled, how often did you see Beatrice?

 5       A.  We were staying together.

 6       Q.  Did you see her every day?

 7       A.  Yes.

 8       Q.  Did you see her at every meal?

 9       A.  If you say like every minute, every hour,

10  almost we was together, always together.

11       Q.  Okay.  Did you ever see her wearing any kind

12  of military uniform?

13       A.  No.

14       Q.  Did you ever see her wearing any MRND

15  clothing?

16       A.  No.  Not.

17       Q.  Did you ever see any soldiers in the hotel?

18       A.  You see, I think now it's still the common

19  practice.  Every partisan has soldiers, so

20  Nyiramasuhuko had some.

21       Q.  Were they bodyguards?

22       A.  Yes, those would have bodyguards.

23       Q.  With red berets?

24       A.  Yes, yes.  They had red hats, and they were

25  called gendarme.

1        Q.  When you were living in the hotel, did you

2   notice anything about Beatrice's health?

3        A.  I wouldn't say that she was sick, like being

4   sick from malaria, but she was pregnant.

5        Q.  Did you know that she had a child?

6        A.  Yes, I know that.

7        Q.  Did you see her with that child?

8        A.  Yes.  She had a little baby that was no

9   longer nursed.

10        Q.  I'm sorry?  I didn't hear what you said.

11            THE COURT:  No longer nursed.

12            MR. RUOFF:  Okay.  Thank you.

13        Q.  Now, whenever you saw Beatrice did she always

14   have the child that she was carrying?

15        A.  When she was not asleep, they were together.

16        Q.  What kind of clothes would you see Beatrice

17   wearing when you saw her?

18        A.  She was wearing I think something called

19   maternity, the one that is worn by pregnant women.

20        Q.  Now, you said that you all left the hotel

21   together.  Where did you go after you all fled the

22   hotel?

23        A.  You see, we went to a place called Nyakibanda

24   because there were some people whom we left with who

25   were still being hunted.

1       Q.  Did you wind up in a refugee camp in another

2  country?

3       A.  We left Nyakibanda and went towards Gishamvu.

4       Q.  After Gishamvu did you flee into the Congo?

5       A.  We went to Kibabara, Cyangungu, and close to

6  Congo.

7       Q.  How long were you in the Congo?

8       A.  Let me see.  We came back in 1997, so it was

9  about three years.

10       Q.  Thank you, sir.

11            THE COURT:  Mr. Capin.

12                  CROSS-EXAMINATION

13  BY MR. CAPIN:

14       Q.  Sir, did you come to this country last year

15  for the purpose of offering testimony?

16       A.  Yes, I came.

17       Q.  On behalf of Beatrice?

18       A.  Yes.

19       Q.  Did you go back to Rwanda afterward?

20       A.  Yes.

21       Q.  Did you have any fear of returning to Rwanda?

22       A.  No, I didn't.

23       Q.  Did anybody from the government talk to you

24  about the fact that you had testified on behalf of a

25  Hutu?

```
 1       A.  No.

 2       Q.  You traveled -- what day did the president's

 3  plane go down in 1994?

 4       A.  Yes, I remember it was on the 6th.

 5       Q.  And you traveled to Butare about a week after

 6  that?

 7       A.  Yes.

 8       Q.  And you got to Butare before the genocide had

 9  started there?

10       A.  Yes.  By then it wasn't.

11       Q.  And after you arrived in Butare you entered

12  the Hotel I'Huriro?

13       A.  I went to my birthplace.  I didn't go to the

14  hotel.

15       Q.  Thank you.  On what date did you go to the

16  hotel?

17       A.  I don't remember well, but it was between May

18  20th to May 25th.  It was in the beginning of May.

19       Q.  So you have no information for this jury

20  about what was happening in Butare between April 6th

21  and the middle of May; is that correct?

22       A.  Well, I didn't see anyone being killed, but

23  what you would see is people's homes being burned and

24  also you could see refugees, people trying to flee.

25       Q.  In Butare?
```

1     A.  Yes.

2     Q.  When did you first see that?

3         THE INTERPRETER:  I'm sorry?

4     Q.  When did you first see that?

5     A.  I can't recall well the exact day, but it was

6  during April, towards the beginning of May.

7     Q.  And from the time you arrived at the hotel

8  you never left until the end of the genocide; is that

9  correct?

10    A.  You see, there were many refugees.  There

11  were children there.  No one was allowed to get out to

12  go outside the gate.

13    Q.  Sir, I am going to ask you a yes or no

14  question.  Did you leave the hotel compound at any

15  point from the time you arrived until the end of the

16  genocide?

17    A.  No, I never went out.

18    Q.  And you were with Beatrice Munyenyezi every

19  day you were there?

20    A.  Yes, we were together.

21    Q.  All the time; is that correct?

22    A.  Every day from the time I arrived there until

23  the time we got out of there.

24    Q.  And you had all of your meals with her?

25    A.  No, we were not having meals together.  She

1  had her own home, but we would stay outside together

2  in the compound.

3      Q.  So were there times of the day when you

4  wouldn't see her for many hours?

5      A.  You see, when she was coming out to get some

6  sun, catching some sun.  When she felt tired, she

7  could go upstairs to sleep.

8      Q.  So she would come outside to get some sun

9  with a little baby who was no longer nursing; is that

10  correct?

11      A.  Yes.  Yes, she had -- she was carrying the

12  baby with her.

13      Q.  So she always had that little baby -- the

14  little baby who was no longer nursing, right?

15      A.  Yes.  And when that child was not asleep, she

16  would carry her.

17      Q.  Okay.  And you saw Beatrice every day that

18  you lived at the I'Huriro until the genocide was over;

19  is that correct?

20      A.  Yes.  We were together.

21      Q.  And so if she had left the I'Huriro one day,

22  you would know that, right?

23      A.  Unless she could have used the front gate.

24  But if she was passing by the backyard where I was, I

25  would have seen her.

 1     Q.  But she easily could have left the front gate

 2 on any given day without your knowing it, correct?

 3     A.  I can't testify about it because I didn't see

 4 it.  I don't know anything about it.

 5     Q.  And she also could have left the hotel for

 6 several days without returning and you wouldn't know

 7 that?

 8     A.  No, not possible.  No, it couldn't take one

 9 hour.  We were using some stairs, so there's no way I

10 wouldn't have seen her.

11     Q.  Did you say it couldn't take one hour?

12     A.  Without seeing her?

13     Q.  Yes.

14     A.  Not even ten minutes.

15     Q.  So every day you saw her at least every ten

16 minutes; is that right?

17     A.  You see, every hour we were together, every

18 hour.

19     Q.  So if she had left for several days, you

20 would know that, right?

21     A.  Yes.

22     Q.  And you are certain that did not happen?

23     A.  Unless she went before I arrived to that

24 place, but when I arrived -- I wouldn't have realized

25 it because I wasn't there.

```
 1        Q.  Okay.  And when in May did you arrive?

 2            THE INTERPRETER:  I'm sorry?

 3        Q.  When in May did you arrive?

 4        A.  I can't remember the exact date, but it was

 5   towards the end of May between -- 20th plus.

 6        Q.  So you had no idea what was happening at the

 7   I'Huriro or in the surrounding area before the end of

 8   May?

 9        A.  No.

10        Q.  And were there refugees at the I'Huriro?

11        A.  Yes, they were there.

12        Q.  Were these relatives of Pauline and Maurice?

13        A.  Some were relatives.  Others were neighbors.

14        Q.  And Pauline and Maurice were protecting them?

15        A.  Because he was the head of household, it's

16   understandable that whoever comes into your house you

17   have to protect them.

18        Q.  So they were protecting you also, correct?

19        A.  Yes.

20        Q.  And you mentioned that Beatrice was very

21   pregnant; is that correct?

22        A.  That's true, because after we flee a few --

23   in those months she gave birth.

24        Q.  And you said she was not sick?

25        A.  No.  She wasn't sick, but she was weak.
```

1       Q.  You specifically said she did not have

2   malaria.

3       A.  You see, the weakness I'm talking about is

4   because she was weak because she was in later stages

5   of pregnancy.

6       Q.  But she did not have malaria?

7       A.  No, she didn't have malaria.

8       Q.  Did her husband Shalom have malaria?

9       A.  No, he didn't.

10      Q.  Did you see -- and you saw no violence

11  whatsoever at any point in time while you were at the

12  I'Huriro?

13      A.  No.

14      Q.  Did you offer testimony at the ICTR in

15  Arusha, Tanzania?

16      A.  No.

17      Q.  Did investigators from Arusha come talk to

18  you?

19      A.  No.

20      Q.  Did investigators from anywhere else come

21  talk to you?

22      A.  Unless those who came investigating on

23  Beatrice's case.

24      Q.  You mean the attorneys who are representing

25  her in this court in this trial?

1      A.  Yes.

2      Q.  Just a couple of final questions.  Am I

3  correct in understanding that in the 19 years since

4  the genocide no investigators asked you about what

5  happened at the I'Huriro until Beatrice's lawyers

6  asked you?

7      A.  No.  There are other colleagues -- their

8  colleagues who came to our home to look for us.

9      Q.  But no one from the ICTR?

10     A.  No.

11     Q.  Nobody from Canada?

12     A.  No.

13     Q.  Nobody from Finland?

14     A.  No.  Unless those representing Beatrice are

15 from Finland, but there's no one else I had ever seen.

16     Q.  So you were living in the home of Pauline

17 Nyiramasuhuko and Maurice Ntahobali during most of the

18 genocide; is that correct?

19     A.  You see, I was living with Pauline in Kigali,

20 and I went to Maurice's place towards the end of May.

21     Q.  Right.  In fact, you got to Maurice's place

22 in a car provided by Pauline.

23     A.  Yes.

24     Q.  And that provided your safe travel out of

25 Kigali?

1      A.  Yes.

2      Q.  And then in May and June you spent most of

3  your -- you spent your entire -- strike that.

4          From the middle of May until the end of the

5  genocide you were in the I'Huriro and never left?

6      A.  Ever since I arrived at Maurice's place I

7  just left when we were fleeing.

8      Q.  When you were fleeing at the end of the

9  genocide?

10     A.  Yes, because the RPF were taking over nearby

11  Butare.

12     Q.  And at that point you left the country?

13     A.  Yes.  We flee all together and we went

14  outside.

15     Q.  And when did you return to Rwanda?

16     A.  I came back in 1997.  That's when I returned.

17     Q.  Okay.  Do you know that's the same year that

18  Shalom was arrested by the ICTR?

19     A.  I was still a refugee so we didn't have all

20  the news, but I came to know about it when I came back

21  to Rwanda.

22     Q.  When you came to know about it, did

23  investigators come and say to you, please tell us what

24  happened at the I'Huriro during the genocide?

25     A.  No.

1       Q.  In 19 years nobody asked you to tell them

2   what Shalom did during the genocide?

3       A.  The only people I saw are those representing

4   Beatrice.  No one else.

5       Q.  And that was the first time anybody asked you

6   about Beatrice.  You shared a residence with Beatrice

7   for part of the genocide.

8           THE COURT:  Is this relevant?

9           MR. CAPIN:  It is, your Honor.  Two more

10  questions, your Honor, and I'll stop.

11      Q.  You shared a residence with Beatrice for part

12  of the genocide; is that correct?

13          MR. RUOFF:  Objection.  Asked and answered,

14  Judge.

15          MR. CAPIN:  Your Honor, I'll let it be.

16  Nothing further.

17          THE COURT:  Maybe this is another teaching

18  point moment.  There were a number of questions in

19  which counsel assumed that the ICTR investigators came

20  and asked -- or inquired of this witness.  He said,

21  no, it didn't happen.

22          There's no evidence that it did happen

23  because the question is not evidence, okay, and the

24  answer was no.  And counsel's reaction, in 19 years no

25  one has come and asked you about this, and the answer

1   was no.  There's no evidence that within 19 years

2   somebody came and asked him about it other than his

3   answer, okay, so be aware of this.  Questions are not

4   evidence.

5           MR. CAPIN:  Your Honor, with respect, I

6   believe my first question to the witness was, has

7   anybody from the ICTR ever asked you about Shalom.

8           THE COURT:  You asked about four times.

9           MR. CAPIN:  Correct.  Thank you.

10          THE COURT:  And each time you got the same

11  answer.  I want the jury to understand that what you

12  assume in your question is not evidence.  Got it?

13          MR. CAPIN:  I understand.  I wasn't trying

14  to.  I wasn't assuming anything.

15          THE COURT:  I know.  It's second nature to

16  us.  It's not second nature to you.  But it's a very

17  important rule.  Counsel are not permitted to testify.

18  And facts that they assume in their questions is not

19  evidence of those facts.  Evidence comes from the

20  sworn testimony of witnesses and documents and things

21  that are admitted into evidence.  So please keep that

22  in mind.  Okay.

23          MR. CAPIN:  Thank you, your Honor.

24          THE COURT:  Any redirect?

25          MR. RUOFF:  No, your Honor.

1          THE COURT:  Thank you, sir.  You may step

2  down and you're excused.  You may call your next

3  witness.

4          MR. HOWARD:  The next witness will be

5  Venantie Nyiramariro.

6                    VENANTIE NYIRAMARIRO

7          having been duly sworn, testified as follows:

8          THE WITNESS:  What I'm going to say, I am

9  going to say the truth and I'm going to testify what

10  I've seen.

11          THE CLERK:  For the record, please state your

12  name and spell your last name.

13          THE WITNESS:  Venantie Nyiramariro.

14  N-Y-I-R-A-M-A-R-I-R-O, Venantie.

15                    DIRECT EXAMINATION

16  BY MR. HOWARD:

17      Q.  Good afternoon, Venantie.

18      A.  Good afternoon.

19      Q.  Can you tell the jury where you live?

20      A.  I live in Kibabara.

21          THE INTERPRETER:  For the record, Kibabara,

22  that is K-I-B-A-B-A-R-A.

23      Q.  How many kilometers is Kibabara from Butare

24  Town?

25      A.  It's about fifteen kilometers.

1          Q.   Were you living there in April of 1994?

2          A.   No, I did not live in Butare at that time,

3    but I lived in Kigali province.

4          Q.   You were near Kigali in 1994?

5          A.   Yes.

6          Q.   And are you related to Maurice Ntahobali?

7          A.   Yes.  He is my brother.

8          Q.   In April of 1994 did there come a time when

9    you learned that the president of Rwanda's plane had

10   been shot down?

11         A.   Yes.  We seen it.  We seen it.

12         Q.   And at that time did you have a child named

13   Marius?

14         A.   Yes, I did.

15         Q.   Is Marius still alive?

16         A.   Yes, he is alive.  But at that time he did

17   not live with me.  He lived in Butare at that time.

18         Q.   Why was Marius in Butare in April of 1994?

19         A.   Because it was our country.  And when the

20   time came for vacation, that's where he would be taken

21   to.

22         Q.   Was that Easter holiday vacation from school?

23         A.   It was vacation from school.

24         Q.   And where did Marius stay when he went to

25   Butare?

1        A.   He stayed at relative.

2        Q.   Did he stay at the hotel?

3        A.   Yes.

4        Q.   And did there come a time when you traveled

5    to the hotel in Butare in 1994?

6        A.   I did arrive there in the month of May.

7        Q.   How long did it take you to get from Kigali

8    to Butare?

9        A.   Because we walked there, so it took us a

10   month.

11       Q.   Did you walk with other people who were

12   refugees from the Kigali area?

13       A.   Yes.

14       Q.   And did you walk every day, or did you stop

15   in some places to live for a few days?

16       A.   We -- at a certain time we arrived where the

17   other refugees were being gathered, resting, and we

18   would rest, and the next day we would continue.

19       Q.   And after about a month, in the month of May,

20   you arrived at the hotel, correct?

21       A.   Yes.

22       Q.   When you were walking into Butare Town, did

23   you have to go through some roadblocks before you got

24   to the hotel?

25       A.   Yes, they were there.

1      Q.   Was there a roadblock in the month of May

2  near the I'Huriro Hotel?

3      A.   Yes.  It was there above the hotel.

4      Q.   Above the hotel?

5      A.   Yes.

6      Q.   When you say above, do you mean it was up the

7  street a little ways, up the road?

8      A.   Yes.

9      Q.   When you arrived at the hotel, was your

10  brother Maurice there?

11      A.   Yes, he was there.

12      Q.   And was his wife, Pauline, there as well?

13      A.   I did not know where she had gone, but she

14  wasn't there.

15      Q.   Did you see Pauline once every so often at

16  the hotel?

17      A.   We would see her once in a while.  At least

18  like once a week.

19      Q.   Did Maurice and Pauline have children?

20      A.   Yes, they have children.

21      Q.   And did you know their son Shalom?

22      A.   Yes, he was there.

23      Q.   And was Shalom married when you were -- when

24  you arrived at the hotel, had he already married

25  someone?

1       A.  Yes, he was married.

2       Q.  And who did he marry?

3       A.  Beatrice Munyenyezi.

4       Q.  And did you go to the wedding?

5       A.  Yes, we did attend the wedding.

6       Q.  And was that the year before?

7       A.  Yes.  It was the year before the one the

8  genocide happened.

9       Q.  And was Beatrice at the hotel when you got

10 there?

11      A.  Yes, she was there.

12      Q.  If you look around this room, do you see

13 Beatrice here?

14      A.  She's over there.

15      Q.  And after the genocide -- did you flee to the

16 Congo at the end of the genocide?

17      A.  Yes, we fled, and we went there.

18      Q.  And was Beatrice with you when you went to

19 the Congo?

20      A.  Yes.  We left together.

21      Q.  Once you were in the Congo, did Beatrice

22 leave for Kenya?

23      A.  Yes.  There came a time when she left for

24 Kenya.

25      Q.  Has it been a lot of years since you've seen

    1  Beatrice?

    2       A.  We only saw her yesterday.

    3       Q.  Did Pauline and Maurice have daughters?

    4       A.  Yes.  They were there.

    5       Q.  Who were they?

    6       A.  One is Clarice, the other one is Denise, and

    7  the other one is Brigitte.

    8       Q.  Were all three of those daughters at the

    9  hotel when you got there during the genocide?

   10       A.  There were only two.  The third one was

   11  attending school abroad.

   12       Q.  And who was that who was attending school

   13  abroad?

   14       A.  It was Brigitte.

   15       Q.  And do you remember when the next time was

   16  you saw Brigitte?

   17       A.  Yes.  She joined us where we had fled.  We

   18  had fled to a neighboring country -- in a foreign

   19  country.

   20       Q.  Were you in a refugee camp when you next saw

   21  Brigitte?

   22       A.  Yes.  We were in Gashusha at the refugee camp

   23  in Zaire, which is the Congo.

   24       Q.  When you were at Maurice's hotel, how often

   25  would you see Beatrice?

1       A.   Sometimes we would see her once or twice and

2   she lived above us.

3       Q.   Would you see her every day?

4       A.   We did not see her every day.   Sometimes she

5   would just stay upstairs.

6       Q.   You said you went to Shalom and Beatrice's

7   wedding the year before, correct?

8       A.   Yes.

9       Q.   Was Beatrice pregnant at the wedding?

10      A.   Yes, she was pregnant.

11      Q.   And was that her first child?

12      A.   Yes, it was her first child.

13      Q.   Was that child an infant when you came to the

14  hotel in 1994 in the spring?

15      A.   Yes, it was a young child.

16      Q.   Do you know whether Beatrice was pregnant

17  again when you showed up at the hotel?

18      A.   Yes, she was expecting.

19      Q.   Venantie, did you ever see Beatrice wearing

20  military clothing when you were at the hotel?

21      A.   She never wore those clothes.

22      Q.   Did you ever see her wearing clothing of the

23  MRND political party?

24      A.   No, she never wore those.

25      Q.   Did you ever see her working at a roadblock?

1       A.  No, she didn't work at the roadblock.

2       Q.  Venantie, you've told us that Maurice was

3   your brother.  Did you have a nephew named Enock?

4           THE INTERPRETER:  I beg your pardon?  Your

5   Honor, may I ask the counsel to repeat his question?

6           THE COURT:  Yes.  Certainly.

7           THE INTERPRETER:  Would you please repeat

8   your question?

9       Q.  Did you have a nephew named Enock?

10      A.  He was my uncle from my other uncle, but he

11  wasn't my nephew.

12      Q.  Venantie, thank you for your time.  Have a

13  safe trip back home to Rwanda.

14          THE COURT:  Mr. Chakravarty.

15          MR. CHAKRAVARTY:  Thank you, your Honor.

16                  CROSS-EXAMINATION

17  BY MR. CHAKRAVARTY:

18      Q.  Ma'am, just a few more questions.  Have you

19  come to America before and returned to Rwanda?

20      A.  Yes.  We came in March.

21      Q.  When you returned to Rwanda, did you have any

22  difficulties back in Rwanda?

23      A.  No, we did not encounter any problem.

24      Q.  Even though you came here to testify in

25  America?

1        A.   Yes, we had come to testify.

2        Q.   And you're the sister of Maurice Ntahobali?

3        A.   Yes, I am his sister.

4        Q.   And no one from the Rwandan government has

5   ever put any pressure on you?

6        A.   There isn't any.

7        Q.   Back when you were at the I'Huriro Hotel did

8   you see Pauline wearing MRND clothes?

9        A.   No, she did not wear any clothes of MRND.

10       Q.   Did you see Maurice ever wearing any MRND

11   clothes?

12       A.   He did not wear those MRND clothes.

13       Q.   Did you see Shalom wearing any Interahamwe

14   clothing?

15       A.   No, he didn't.

16       Q.   In fact, when you were at the I'Huriro did

17   you see any signs of violence anywhere?

18       A.   When I got there the war had lessened, so I

19   did not witness any.

20       Q.   And you got there sometime in May of 1994; is

21   that correct?

22       A.   Yes.

23       Q.   So you don't know what happened in Butare

24   Town before that, correct?

25       A.   No, I do not.

1      Q.  Did you see a roadblock outside the I'Huriro?

2      A.  It was a little up.

3      Q.  Was it about 40 seconds away from the

4   I'Huriro?

5      A.  Maybe 50.

6      Q.  Maybe 50 seconds?

7      A.  Yes.

8      Q.  Do you remember last time being asked whether

9   it was 30 seconds away and you saying that it was 40

10  seconds?

11     A.  Maybe I might have mentioned.

12     Q.  Nevertheless, it wasn't far, correct?

13     A.  No, it wasn't that far.

14     Q.  And people were checking identifications at

15  the roadblock?

16     A.  Yes, they did check the IDs.

17     Q.  While you were watching the roadblock, did

18  you see anybody who was asked to sit beside the road?

19     A.  No, I did not see any.

20     Q.  Was this roadblock manned by Interahamwe, by

21  military, or by someone else?

22     A.  It was the military.  I saw the military

23  there.  I don't know because I wasn't living there.

24     Q.  You saw them wearing military clothing?

25     A.  When I found them there, they didn't wear any

1    military clothing.

2         Q.   So they were not wearing military clothing?

3         A.   No, they did not.

4              MR. CHAKRAVARTY:   Thank you.

5              THE COURT:   Any redirect?

6              MR. HOWARD:   No, thank you, Judge.

7              THE COURT:   Thank you, ma'am.   You may step

8    down and you're excused.

9              MR. HOWARD:   Your Honor, that exhausts our

10   list of witnesses for the day.

11             THE COURT:   All right.   That exhausts their

12   list of witnesses, so we're going to adjourn.

13             I'm just thinking.   Counsel, I think

14   yesterday at least we were of the opinion that you

15   would probably have the case Wednesday, maybe Thursday

16   now, but we can probably plan on Thursday you'll

17   probably have the case.

18             For your scheduling purposes, we'll probably

19   have evidence on Tuesday.   Monday is a holiday, so

20   we're not here Monday.   Close up maybe Wednesday and

21   probably do final arguments either Wednesday or

22   Thursday.   At least that's currently the scheduled

23   plan.

24             Because this is a long weekend, please

25   indulge me and let me remind you once again, try to

 1  have all your media checked before you look at it,

 2  newspapers and so forth.  Let the deputy clerk know if

 3  you are inadvertently exposed to any media coverage,

 4  but please make efforts not to be exposed to it.

 5  Don't discuss the case with spouses or anyone else,

 6  and don't do any research whatsoever or communicate

 7  about the case with anyone in any way.

 8           See you Tuesday morning at 9:00 o'clock.

 9  Thank you very much.

10           (IN COURT - NO JURY PRESENT)

11           MR. CAPIN:  The defense opened on how can it

12  be that the ICTR, after years of testimony and

13  hundreds of witnesses, didn't talk to the government's

14  witnesses.

15           We have an employee living with Maurice and

16  Shalom and Beatrice for the whole genocide.  They

17  never talked to him?  Your Honor, respectfully --

18           THE COURT:  He said no.

19           MR. CAPIN:  And that is the point, is that

20  it's probative of the fact that the scope of the ICTR

21  is not as portrayed by the Feds and that's what we'll

22  argue at closing, and you said no.

23           THE COURT:  No.  You were implying -- I think

24  you were implying that the ICTR did talk to him.

25           MR. CAPIN:  No, your Honor.

1          THE COURT:  That the Finish talked to him.

2          MR. CAPIN:  No, your Honor.

3          THE COURT:  That the Canadians talked to him.

4   Respectfully, you were implying that somebody must

5   have talked to him in 19 years.

6          MR. CAPIN:  No.  Respectfully --

7          THE COURT:  And I think you would agree

8   that's not proper impeachment unless you've got some

9   statement.

10         The implication was, sir, in the last 19

11  years somebody has talked to you, and your secondary

12  implication is maybe inconsistent statements were

13  made.

14         MR. CAPIN:  Respectfully, your Honor, I think

15  the implication was exactly the contrary.

16         You're saying, sir, that you haven't talked

17  to the Finish, the Canadians, the ICTR, or Americans,

18  and the answer is no because the scope of those

19  investigation didn't talk to everybody in Butare, it

20  didn't talk to the --

21         THE COURT:  Maybe you weren't aware of your

22  own inflection, but your questions were posed in an

23  incredulous tone.  Are you telling me in 19 years the

24  ICTR hasn't talked to you?  The implication being --

25  yeah, maybe they have, but the implication being that

1    you have a statement or something that you've given to

2    somebody.  The implication being that that statement

3    is inconsistent with what he's testifying to here.

4    You don't want to keep going up to that road.

5            MR. CAPIN:  We're done with that, but

6    respectfully --

7            THE COURT:  I know we're done with it, but

8    I'm concerned about the future.

9            MR. CAPIN:  Well, I was simply -- no other

10   witness will have this issue.  But I was simply trying

11   to echo what I viewed as the incredulousness of the

12   defense counsel of government witnesses on the same

13   issue.

14           THE COURT:  I'm missing it completely.

15           MR. CAPIN:  So you're saying that nobody

16   looked at ICTR databases, nobody looked for this

17   person, she wasn't on a list.  I mean, it's part of

18   the theme that --

19           THE COURT:  No.  That's entirely different in

20   my view.  There was an effort to prosecute and

21   identify people that were involved.  Her name never

22   came up.

23           Okay.  Is it strong?  No.  But is it

24   relevant?  I suppose.  One might expect her name to

25   come up.  To the extent it didn't, the jury can take

1   that into account.

2            But asking a witness, nobody came to talk to

3   you about this, and he says no.  And then you say the

4   Canadians didn't come?  Are you sure?  The ICTR didn't

5   come?  Are you sure?  The Fins didn't ask you?  Are

6   you sure?

7            The implication is they did, and the

8   secondary implication is you gave them a statement.

9   And the tertiary implication I suppose is that

10  statement was kind of inconsistent with what you're

11  saying here.  If you've got inconsistent statements,

12  by all means use them.  But you can't imply there are

13  inconsistent statements when there aren't any.

14           MR. CAPIN:  I take issue with the Court's

15  interpretation of the inflection.  I'll be much more

16  cautious.

17           THE COURT:  Then tell me how it was relevant.

18           MR. CAPIN:  It was relevant because --

19           THE COURT:  I don't find it credible when you

20  say as a witness that the ICTR did not come and talk

21  to you.

22           MR. CAPIN:  No.  On the contrary, I find it

23  very credible.  The Finish didn't talk to you.  The

24  ICTR didn't talk to you.  The Americans didn't talk to

25  you.  The Canadians didn't talk to you.  That's the

 1  same reason that --

 2          THE COURT:  You think you were confirming and

 3  supporting his denial?

 4          MR. CAPIN:  I do, your Honor.

 5          THE COURT:  You do?

 6          MR. CAPIN:  Respectfully, I do.

 7          THE COURT:  Wow.

 8          MR. CHAKRAVARTY:  Your Honor, it is -- I just

 9  rise to say it's a perception issue.  I understand --

10  from a non-questioner, I understand your impression

11  because of the tone in which Mr. Capin was asking

12  questions.

13          THE COURT:  Let me say for the record, there

14  is no question whatsoever in my mind, as a person who

15  was listening to that examination, that the tone of

16  incredulousness in your voice when he said, no, nobody

17  had talked to him was, yes, indeed, of course somebody

18  came to talk to you from Finland or Canada or the

19  ICTR, and what you're saying is not so, and the

20  implication to me was that you had some kind of

21  inconsistent statement.  When I asked you how is this

22  relevant, you assured me it was relevant.

23          Honestly, I expected in the next series of

24  questions you were going to pull out some statement

25  that he had given to the ICTR, to Finland, or to

 1  Canada.

 2          MR. CAPIN:  And perhaps the incredulousness

 3  you heard, your Honor -- and I defer to the Court's

 4  view of it, was --

 5          THE COURT:  Don't defer to it if it's wrong.

 6          MR. CAPIN:  Well, I think it is wrong.

 7          THE COURT:  Then don't defer to it.

 8          MR. CAPIN:  It was a spillover.  It was a

 9  spillover from the incredulousness which I genuinely

10  felt with regard to every other aspect of the witness

11  testimony.  Each of these witnesses basically says --

12          THE COURT:  You're making me concerned.  I

13  don't know who's being called in the future, but we're

14  going to have to be tougher about limiting

15  cross-examination to the scope of direct.  More

16  strictly than I've been doing.

17          MR. CAPIN:  Well, I have one --

18          THE COURT:  You know, you're very fortunate

19  that that witness acknowledged that the prime minister

20  visited the home, because if she had said no we would

21  have an issue.  Now not a critical issue, perhaps, but

22  a real issue.

23          MR. CAPIN:  But, your Honor, frankly, if she

24  had said no I think the government would be entitled

25  to call Special Agent Andersen to say I talked to her

1   in 2008.  She told me, A, the prime minister came; B,

2   when he left, I saw the roadblock through the open

3   gate; and C, the defendant is MRND.

4          THE COURT:  Again, I hate to be an evidence

5   wonk here, but you might be able to do that, maybe, if

6   he could testify based upon personal knowledge that

7   she in fact said "something inconsistent," but that

8   wouldn't be evidence that the guy came.  That's only

9   admissible for impeachment purposes only.

10         MR. CAPIN:  I understand.

11         THE COURT:  The jury cannot consider that as

12   evidence that the guy came.

13         MR. CAPIN:  I understand that.

14         THE COURT:  Well, the fact that the guy came

15   is a problem.  I would at least have to instruct the

16   jury, do not take that as evidence that this man

17   visited this hotel.  And I assume the purpose you're

18   trying to get that before the jury is some sort of

19   association with the MRND.

20         MR. CAPIN:  No, your Honor.  When the gate

21   opened, she saw the roadblock.  Agent Andersen would

22   say that she said when the gate opened I saw the

23   roadblock.  She admitted she saw the roadblock.

24         THE COURT:  Do you not agree that it's

25   significant if -- from your point of view it's

1  significant if the prime minister visited the home?

2          MR. CAPIN:  She admitted he did.  Yes, it is

3  significant.

4          THE COURT:  No.  You're not listening.  Do

5  you not agree that it would be significant from your

6  case's point of view that the prime minister visited

7  the home?

8          MR. CAPIN:  I would agree.

9          THE COURT:  Okay.  That significance weighs

10 pretty heavily against there was a gate and she saw it

11 was open.

12         MR. CAPIN:  But her report to the agent is my

13 memory of the prime minister's visit is when he left,

14 I saw him leave through an open gate.  At that moment

15 I saw the roadblock.  It's the heart of the

16 government's case.

17         THE COURT:  Well, of course, once again, the

18 report is a statement by the agent about what the

19 agent thinks was said.  It's not her statement.  The

20 agent has to say, I was there, she said to me X, not

21 it's in some report.  I was there.  She said to me X.

22 Right?

23         MR. CAPIN:  The agent has a specific memory.

24 I asked him before the line of cross-examination.

25         THE COURT:  Good.  Then he gets to say that.

1    And then what is that?  Is that evidence that the gate

2    opened and she saw the roadblock?  No, it's not.  It's

3    impeachment evidence.

4            MR. CAPIN:  Exactly.

5            THE COURT:  That can only be considered on

6    impeachment.  It's not evidence that the gate opened

7    and she saw the roadblock.

8            MR. CAPIN:  I understand.  And just so the

9    record is -- just so I don't have a different

10   interpretation of the record from your Honor's, I

11   agree that if she had denied it I could have called

12   Agent Andersen.  He would have said I remember clearly

13   she said the gate opened and I saw the roadblock.

14           As it turns out, it can be argued to the

15   jury --

16           THE COURT:  Then I would instruct the jury,

17   don't consider that as evidence that the roadblock

18   opened and she saw that.

19           MR. CAPIN:  I understand.

20           THE COURT:  Consider it only to the extent it

21   applies to determining credibility.

22           MR. CAPIN:  But at the end of the day she did

23   say that when he left she saw the roadblock, and that

24   was an affirmative statement by the witness.

25           She also said, yes, now that you say that I

1  do remember I saw Kambanda there.  So that's not

2  impeachment there.  She admitted she saw Kambanda.

3          THE COURT:  I started out by saying you were

4  very fortunate that she admitted that she saw him

5  coming.

6          MR. CAPIN:  And I appreciate I was.

7          THE COURT:  But I'm getting concerned about

8  this impeachment.  It doesn't seem to be questions

9  asked for purposes of impeaching.  They seem to be

10  questions being asked for purposes of putting before

11  the jury facts not otherwise in evidence under the

12  guise of impeachment, and there's a line out there.

13  There's a line out there.

14          MR. CAPIN:  I'm not sure what the line is.

15  If I have a good faith reason to believe -- and I have

16  more than that because I have it in writing -- that

17  this witness will say -- if she testifies consistently

18  with what she said five years ago, will say I saw the

19  roadblock, then it's my duty to try to elicit that

20  testimony from her.

21          THE COURT:  Yes.

22          MR. CAPIN:  And it's my duty if she says I

23  saw the prime minister come visit, and he's among the

24  MRND, including Pauline and the defendant who I knew

25  to be MRND at the time of the genocide, I have a duty

1   to elicit that testimony from this witness.  And she

2   said to the agent --

3            THE COURT:  Well, you have an opportunity to

4   elicit it.  Not a duty.  You have an opportunity if

5   it's within the scope of direct.

6            You're cross-examining.  If you want to put

7   somebody on to say this guy came to visit the house,

8   put somebody on to say this guy came to visit the

9   house.

10           If she doesn't testify -- the only reason I

11  even let you ask the question is because there were

12  some questions about who was in the house and who was

13  there.  That's the only reason I let you ask it.

14           MR. CAPIN:  I didn't understand -- I think

15  I'm cross-examining the only other Rwandan witness,

16  and I will --

17           THE COURT:  I'm concerned about a couple of

18  things.  Now I'm concerned that you are going to try

19  to elicit substantive evidence that should have been

20  put on direct but you're going to do it on cross.  Are

21  there any more witnesses where you're going to do

22  that?

23           MR. CAPIN:  Well, there's one more witness

24  who testified last year.  We have a transcript of her

25  testimony.  I would expect that if she says anything

1   inconsistent I will impeach her with it.

2          THE COURT:  That's different.  That's a prior

3   inconsistent statement in a prior proceeding under

4   oath.  That's admissible evidence.  That's different.

5          MR. CAPIN:  For this witness I had no

6   transcript, but I knew exactly what she would say if

7   she testified consistently with what she did five

8   years ago.

9          So on that basis it wasn't the most elegant

10  examination, because the witness was hard of hearing

11  and otherwise having difficulty with questions on

12  cross-examination, but I do not expect this issue to

13  recur on Monday.  I think the only other two witnesses

14  are a woman named Anastasia something or other and the

15  expert.

16         THE COURT:  Who else are you calling?

17         MR. HOWARD:  There's one more person from the

18  UK.  She testified last year.  Her name is Anastasia

19  and I always forget the last name.  Her nickname is

20  Kiki.  She's a cousin, I believe.

21         THE COURT:  Who else?

22         MR. HOWARD:  And then our expert Professor

23  Endless from Chicago.

24         THE COURT:  You're right.  There's no more

25  risk.  What's done is done.

1          MR. HOWARD:  Judge, I do believe that we're

2   going to finish Tuesday.  I don't have a sense of the

3   cross of Professor Endless.  I don't think the direct

4   is more than an hour and a half, if that, as I want to

5   streamline I think as best as I can.  So I think we're

6   going to finish our evidence on Tuesday -- if I say

7   noon, I'll probably be held to that.

8          THE COURT:  No, you won't.

9          MR. HOWARD:  I'll say early afternoon we're

10  done.

11         THE COURT:  Any rebuttal?

12         MR. CHAKRAVARTY:  Based on those responses, I

13  don't think so.

14         One question on Dr. Endless, the scope of his

15  testimony.  Given what the Court's pretrial

16  inclinations were, we're hoping for some more

17  clarification that might help Mr. Howard as well.

18         In his expert report Dr. Endless talks about

19  the Rwandan government's influence on witnesses.

20         My understanding of the record thus far is

21  there is no such evidence.  To allow Dr. Endless to

22  opine that the jurors should speculate that people are

23  testifying because of such influence when there has

24  been no evidence presented thereof seems to me to be

25  testifying about a non-relevant --

1          THE COURT:  Well, I haven't seen his report.

2    I assume you have.

3          MR. CHAKRAVARTY:  I have.

4          THE COURT:  What does he say?

5          Mr. Howard, what do you expect?  Make a

6    proffer.  What's he going to say?

7          MR. HOWARD:  It wasn't my intention to elicit

8    testimony that they are testifying because of some

9    direct immediate influence from a Rwandan official.

10   The testimony -- the expert opinion is focused on the

11   official narrative similar to what Dr. Longman talked

12   about.  I think our expert articulates it differently.

13         And quite frankly, Judge, last year Dr.

14   Longman's cross was much more favorable for us.  We

15   didn't call Dr. Endless last year because of that.

16         This year I think he fought me on every

17   question, so I need to have that issue discussed more

18   cogently.

19         THE COURT:  But what's he going to say?

20         MR. HOWARD:  That the Rwandan government --

21         THE COURT:  The cultural narrative, as I hear

22   it honestly, doesn't focus on witness testimony.  I

23   don't deny the genocide, and what else?

24         MR. HOWARD:  Well, and the tools.

25         THE COURT:  The Tutsis didn't engage in

 1   misconduct.  Hutus did.  How is it relevant here?
 2   Here the only relevance of that kind of expert opinion
 3   evidence, like we discussed earlier, is if you can
 4   show that somebody is a member of a group that has
 5   defined cultural biases or attitudes or membership
 6   requirements or approaches to things, such as members
 7   of the Aryan Nation in that case out of California
 8   tend to say X, Y and Z about certain issues.  That's
 9   okay.
10          But what the government is saying is there is
11   no evidence of that.  There's no evidence that members
12   of the Rwandan culture will testify about a particular
13   thing in a certain way.  And you seem to be saying,
14   well, that's not really what he's going to say, but he
15   might.
16          MR. HOWARD:  Well, your Honor, I think there
17   is evidence of that, and I think Dr. Longman said that
18   there was evidence of that; that when you speak to a
19   Rwandan, particularly about the genocide and
20   particularly if you're in a position of authority,
21   they are going to tell you what they think you want
22   them to hear.  And what they think you want them to
23   hear is what's consistent with the Rwandan
24   government's official narrative; that things happened
25   in a certain way; that there are certain stock answers

1   that they're supposed to give and they give them.

2          THE COURT:  And so what's he going to say

3   specifically?

4          MR. HOWARD:  Just that.

5          THE COURT:  He's not going to, I assume, or

6   is he going to -- do you expect he's going to go down

7   a litany that you've been ticking off, there's a

8   roadblock, there are ID checks?

9          MR. HOWARD:  Yes.  He will certainly

10  articulate what the stock answers involved, yes,

11  because that's part of our defense argument on the

12  credibility of the government's witnesses; that all

13  that they've really done is give a stock story that

14  they are taught to give.  And it's not taught that

15  gave them the sense of, come sit with me for a moment,

16  I'm from the Rwandan government, I will tell you what

17  to say in the case of Beatrice Munyenyezi.  It's this:

18  The government through its reintegration camps, et

19  cetera, through the Gacaca courts, reinforces that

20  things happened in a certain way and they only

21  happened in a certain way.  And if you are asked about

22  them, whether you were present or not -- and that's

23  also something Dr. Endless will say; that from a

24  cultural standpoint they tend to talk about things

25  that they've heard about as if it's first person, and

1    they then tell the story.  Yes, of course I've been in

2    Butare forever and all that's ever been talked about

3    is the I'Huriro Hotel, and it's very easy to say there

4    was a roadblock there.  Pick a person and put them at

5    the roadblock.  Then people were taken down below the

6    EER, and then there was the mass grave.

7              There's no -- what we're saying is those are

8    all stock stories and there's no corroboration or

9    anything particular about these witnesses that takes

10   them out of the stock story.  So that's very much part

11   of what Dr. Endless will say.

12             THE COURT:  Except they're individual

13   experiences.

14             MR. HOWARD:  So they say.  And our story --

15   the witnesses articulate them as individual

16   experiences.

17             THE COURT:  They're telling a stock story,

18   but the stock story differentiates witness by witness

19   based upon different personal experiences.

20             MR. HOWARD:  Well, that's what they say they

21   do, but we're saying --

22             THE COURT:  But if there is a roadblock and

23   people are checking IDs and people are segregated and

24   people are taken down and being killed, that you were

25   one of those thousand people, those elements of the

1    story of course are going to be the same.  The other

2    elements will be different.

3           MR. HOWARD:  And even Dr. Longman would say

4    that you can't take it at face value when they tell

5    stories about the genocide.  Even when they appear at

6    face value to be individual stories, you have to dig

7    deeper.  You have to corroborate.  Meaning, for

8    example, having a different person witnessing the same

9    event, not a different event on a different day but

10   the same event, and corroborate their stories before

11   you can actually believe it because of these two

12   concepts of, one, from a cultural standpoint -- and

13   I'm not being disparaging.  It just happens to be the

14   way Rwandans think about things.  One is, they will

15   repeat stories they've been told as if it's their own;

16   and, two, the Rwandan government reinforces a way to

17   tell the genocide story.

18          You put those two things together and, yes,

19   you're going to get people saying, I walked by the EER

20   and this is what happened to me.  Okay.  Did anybody

21   else see that?  Because let's talk to them.  Is there

22   any physical evidence or any other corroborating

23   evidence of what you're telling me, because if there

24   isn't even Dr. Longman would say on the surface I

25   don't trust it, and Professor Endless is coming in to

1    reinforce those notions.

2              MR. CHAKRAVARTY:  So then there's this

3    problem.  The only purpose of Dr. Endless's testimony

4    is to impeach witnesses.  And the way he's going to do

5    it is to cite to a phenomenon which none of the

6    witnesses have demonstrated any evidence of succumbing

7    to.  None of them have indicated in any way that they

8    were either influenced because of some cultural

9    phenomenon, that they were recanting the story that

10   somebody else had told them and had adopted it as

11   their own, and the third point --

12             THE COURT:  Well, they wouldn't say that.  I

13   mean, they wouldn't know that probably.

14             Their point is this is the cultural milieu in

15   which they live and come from, and that has the

16   following effect on some people.

17             MR. CHAKRAVARTY:  In order to suggest that

18   they're being either biased or mistaken in their

19   testimony, then they must be impeached on -- they must

20   have the opportunity to deny under 613(b), and this

21   would be classic extrinsic evidence that they were.

22   So it would be contrary to it.  So, first, that would

23   be violative of 703 because the expert --

24             THE COURT:  I've forgotten the name of the

25   case.  What's the case?

1           MR. CHAKRAVARTY:  Able was the case, your

2    Honor.

3           THE COURT:  Able.  Why doesn't it fall

4    squarely within Able?

5           MR. CHAKRAVARTY:  What category is it except

6    for Rwandans?

7           THE COURT:  Rwandans.

8           MR. CHAKRAVARTY:  All Rwandans are to succumb

9    to some --

10          THE COURT:  Well, no.  I would say Rwandans

11   of the genocide era -- the post-genocide era.

12          MR. CHAKRAVARTY:  Your Honor, that's a far

13   cry from Able where someone has adopted a set of

14   beliefs that's common to a specific -- in that case a

15   specific organization that they have affirmatively

16   adopted.

17          Here, simply by a lot in life, Dr. Endless

18   can come in and say this person is a liar.

19          THE COURT:  No, he's not going to be allowed

20   to say that, obviously.

21          MR. CHAKRAVARTY:  This person is probably

22   lying.  You should think very carefully as to whether

23   they might be --

24          THE COURT:  He's not going to be allowed to

25   say that either.

1           MR. HOWARD:  And I'm not doing that, Judge.

2           THE COURT:  Yeah, he's not going to be

3    allowed to say that.

4           MR. CHAKRAVARTY:  So that there is a cultural

5    phenomenon that this person may or may not subscribe

6    to which --

7           THE COURT:  It's not a matter of subscribing

8    to.  It's subjected to.

9           MR. CHAKRAVARTY:  Subjected to.  So then

10   we're back to the Rwandan government is imposing a

11   dominant era or some kind of story that they have to

12   say and the way -- and his basis for that conclusion

13   is -- incidentally, this is from a professor, which

14   you may remember from the Daubert hearing, who has

15   never been to Rwanda, never conducted any field

16   research.  What he knows about Butare at all is based

17   on the Human Rights Watch book that Dr. Longman and

18   Ms. Des Forges worked on.  He has zero knowledge to be

19   able to make those conclusions.  Instead, he's very

20   much an advocate.  And his position is going to be you

21   can't trust them -- because they're testifying against

22   the Hutu, this is somebody you can't trust and the

23   Rwandan -- because that's what the Rwandan government

24   wants them to do.

25           When every witness who has taken the stand,

1   including the defense witnesses, has said there is no

2   such pressure, there has been no such suggestion, and

3   what he's going to say is you shouldn't believe them

4   because I'm a Ph.D., I've done a lot of research which

5   I have no methodology for but, you know, there's only

6   so much of that I can get from --

7            THE COURT:  He's not going to be allowed to

8   say that either.

9            MR. CAPIN:  Judge, if I may interject

10  something.  I think that the Court perhaps doesn't

11  remember the holding in Able or analysis.

12           THE COURT:  I do.

13           MR. CAPIN:  Well, Able then says -- the

14  Supreme Court says you can confront a witness with his

15  or her bias based on his or her membership.  In that

16  case, the Aryan Nation.

17           So here the witnesses were not confronted

18  with their bias based on their being Rwandans.  That

19  was purposely left alone.  So now something

20  extrinsically is coming in.  It's fundamentally --

21  Able is really uncontroversial.  If I belong to the

22  Nazi Youth, you can ask me, don't you hate Jews.

23           THE COURT:  It's highly controversial.  It

24  went over to the Supreme Court.

25           MR. CAPIN:  But since it was decided we all

1    understand that if a witness is on the stand who

2    belongs to, for example, the Aryan Brotherhood, I can

3    say -- and they're accused of a hate crime, I can --

4              THE COURT:  Well, no.  Maybe you should look

5    at Able again.  It was an expert witness testifying

6    about the nature of the membership in the group and

7    what that meant so the jury could take that into

8    account when a member of the group testified.  That's

9    what it was about.  Can the expert get up there on a

10   witness stand and tell a jury, let me tell you about

11   this membership that this defendant has -- I think it

12   was a witness.  Let me tell you about this club.  I

13   know about it.  I'm an expert.  This is what this club

14   entails.  This is what people in this club say, will

15   say, because of the nature of the club.

16             So how is this different?  An expert gets on

17   the stand and says, just so you can understand, these

18   witnesses are members of this group.  This group is

19   subject to a certain cultural dominant narrative.  Buy

20   it or don't buy it.  I mean, I'm an expert.  I'm

21   telling you that you don't have to believe it, but

22   that's my story.  Maybe it will help you, maybe it

23   won't, in judging the credibility of these witnesses.

24             I mean, he's not going to comment on the

25   credibility of any particular witness certainly.

1  Certainly not.  Why is that different from Able?

2          MR. CAPIN:  Well, I think there's a much more

3  particularized analysis.  In that case it was a

4  specific witness testifying about a specific --

5          THE COURT:  The club is smaller, but the

6  principle is the same, isn't it?

7          MR. CAPIN:  The point may be well taken.

8          MR. CHAKRAVARTY:  Your Honor, I think there

9  is another difference.  When somebody is voluntarily

10 joining an organization that has a set of beliefs and

11 an expert, or anyone else, is simply explaining to the

12 jury what that set of beliefs is that the witness has

13 subscribed to, that is a much different analysis than

14 I was born Rwandan before 1994, and that's the

15 proposition.

16         THE COURT:  I'm trying to think of another

17 example, and all I can -- it's probably not a good

18 one.  All I can come up with is North Korea.

19         If a North Korean witness were to come in

20 here wearing a little North Korean uniform and started

21 testifying about something that -- would you object to

22 an expert saying, listen, just so you understand, this

23 person comes from a highly autocratic society, very

24 closely monitored, everybody is checked and watched

25 and minders follow everybody around, what this person

1   says is absolutely scoped for political correctness

2   and sanctions await those who deviate, would you have

3   any problem with that witness testifying?

4            MR. CHAKRAVARTY:  Your Honor, first, the

5   evidence here is to the contrary.

6            THE COURT:  It's different.  It's not a

7   debating point.  Wouldn't you believe that would be

8   appropriate?

9            MR. CHAKRAVARTY:  The fact that a North

10  Korean --

11           THE COURT:  You do.  I thought you would.

12           MR. CHAKRAVARTY:  Your Honor, they're in a

13  uniform.  They're in a uniform that suggests that I am

14  adopting the values set --

15           THE COURT:  No.  They're not adopting a

16  thing.  It's imposed upon them.  It's not the same

17  thing.  It's not an election.

18           MR. CHAKRAVARTY:  They're representing that.

19  These witnesses are representing themselves and that's

20  all.

21           THE COURT:  That's your position.  But you

22  wouldn't make that argument if it was as I described.

23  I don't think you would.  I think you would say, well,

24  sure, that's legitimate.

25           MR. CHAKRAVARTY:  But not because they're

1  North Korean, your Honor.  Not just because they're

2  North Korean.  A North Korean dissident who is living

3  somewhere else may be in a different situation.

4         THE COURT:  Sure.  But we don't have that

5  here.

6         MR. CHAKRAVARTY:  Well, we don't.  But we

7  also don't have people saying that I am coming here on

8  behalf of the North Korean government.

9         THE COURT:  Nor would -- the witness that I

10 posed wouldn't say that either.  They wouldn't say,

11 hey, I'm here representing the North Korean government

12 and my testimony is all rehearsed.  They wouldn't say

13 that.

14        MR. CHAKRAVARTY:  We're changing the name of

15 the company in your scenario, your Honor, but --

16        THE COURT:  Well, I tried to pick one where I

17 didn't think there would be much argument about a

18 cultural narrative and an expert witness to say let me

19 tell you about this culture so you can judge the

20 credibility.

21        MR. CHAKRAVARTY:  I'm loathe to cast such a

22 broad net on any culture to say they're all liars

23 because they're --

24        THE COURT:  Well, again, nobody is saying

25 they're all liars.  They're saying are they subjected

1  to a cultural narrative that the jury should be aware

2  of so that you can properly determine their

3  credibility on an individual basis.  Should you know

4  the persons in the Aryan Brotherhood and should you

5  know what that entails so that you can properly judge

6  the credibility of that Aryan Brotherhood witness?

7  The U.S. Supreme Court said absolutely you should know

8  that.  No problem.

9            MR. CHAKRAVARTY:  The problem is that there's

10  no evidence that they've either been subjected to that

11  narrative --

12            THE COURT:  Well, Dr. Longman said they're

13  subjected to a narrative.

14            MR. CHAKRAVARTY:  Dr. Longman said that

15  they're -- not that they're necessarily subjected to a

16  narrative; that the Rwandan government has certain

17  things that they don't acknowledge, which are that

18  they're --

19            THE COURT:  Again, my take on his testimony

20  was, yes, there's a dominant narrative.  The elements

21  are pretty well understood.  Yes, there's a reward and

22  sanction system.  Yes, there is.

23            MR. CHAKRAVARTY:  My understanding of it was

24  -- this use of the word narrative is a carryover

25  certainly from the last proceeding, but I think that

1   Dr. Longman made a distinction that this is not

2   something that everyone has to subscribe to.

3          THE COURT:  Of course.

4          MR. CHAKRAVARTY:  In fact, his current work

5   suggests that there are people who can get out from

6   underneath that.

7          Dr. Longman is saying that.  Somebody who has

8   been on the ground and has personally observed things

9   is different than a Ph.D. who's going to say my review

10  of Rwandan politics is that there is a Rwandan

11  narrative.

12         THE COURT:  Well, I'm at a disadvantage

13  because I don't know exactly what he's going to say.

14  He didn't testify last time.

15         MR. CHAKRAVARTY:  Your Honor, in his report

16  on page 30 he says, "Those witnesses who have been

17  produced" -- and he's talking about the ICTR

18  "-- are always vetted by the Rwandan government before

19  they arrive in Arusha where the court is located to

20  testify, and it's clear that the only testimony

21  allowed is that which backs the Rwandan government's

22  side of the story.  In addition, it's well-documented

23  that the Rwandan government typically pays witnesses

24  for their time spent on a case usually at a wage" --

25         COURT REPORTER:  Please slow down.

1          MR. CHAKRAVARTY:  All right.  I'm sorry.

2          Just to complete this -- this is obviously

3    not the whole report, but it's the type of testimony

4    which he's not necessarily qualified to do but which

5    will severely impact the jury's assessment of what is

6    evidence versus what is rank speculation.

7          "In addition, it is well-documented that the

8    Rwandan government typically pays witnesses for their

9    time spent on a case, usually at a wage that is

10   enormously higher than anything a typical Rwandan

11   could earn.  Finally, it is common for Rwandan

12   governments to coerce testimony.  This might be done

13   by allowing a prisoner to go free if they testify in

14   the "correct" way through promises of future benefits

15   or through a threat of force if the "wrong" testimony

16   is given.  As in most areas, the Rwandan government

17   appears to be only interested in the public relations

18   potential of the ICTR with little apparent desire to

19   seek justice."

20          There's more.  But the point is that there's

21   no evidence of any of that, and yet he's going to be

22   using those abstract facts to imply that those are the

23   dynamics at play on all of these witnesses.

24          THE COURT:  All right.  Is he?

25          MR. HOWARD:  Those that he just quoted?  No.

1          THE COURT:  No?  Okay.  Can you give me some

2     better focused idea about what his expert opinion is

3     going to be?  I'm an expert.  Here's my opinion.  What

4     is it?

5          MR. HOWARD:  I don't have any of my stuff in

6     front of me.  I wasn't anticipating having this

7     hearing.

8          THE COURT:  Give me a rough understanding

9     what you have from preparing this case twice.

10         MR. HOWARD:  It goes something like this --

11    and I will start with, on their direct of Dr. Longman

12    they went right down this path anticipating that I

13    would cross him on the official narrative.  They

14    elicited that testimony.  They elicited the things

15    that the Rwandan government does.  They were very

16    defensive about the issue.  They start bringing it up

17    in anticipation, as the Court ruled before the last

18    trial, that we would be able to get into that issue.

19         I then crossed Dr. Longman, anticipating that

20    he would testify in a way similar to the way he did

21    the first time, and he fought me tooth and nail on

22    everything that I did.

23         So what I'm going to do is come in with Dr.

24    Endless and say -- a brief little background on the

25    history on how we got to the politics of ethnicity and

1  what that means in Rwanda now and what that has

2  produced by way of both a political dynamic and a

3  cultural dynamic for them.

4         He is going to testify largely based on the

5  writings of Dr. Longman, and in particular the recent

6  writings of Dr. Longman, who has been highly critical

7  of the Rwandan government's forcing of the official

8  narrative.

9         Sure, he's done some research on the ground

10 that might suggest that some Rwandans are not quite as

11 susceptible to it as they used to be and they're

12 starting to break away from it.  It's creating a lot

13 of problems, according to Dr. Longman, but that's what

14 has happened.

15        There are certain tools that the Rwandan

16 government has used.  We've cited some already.  The

17 Gacaca courts.  The reeducation camps.  Those are the

18 two that come to mind right offhand.  The reward

19 system for prisoners and so forth.

20        Those are the kinds of things that Dr.

21 Endless is going to reinforce.  And he's going to talk

22 extensively even what Dr. Longman has written and

23 concluded about what has gone on there.

24        I'm not going to -- just like Dr. Longman

25 can't do it, and I didn't even try.  I'm not going to

1   say to Dr. Endless you know that the Rwandan

2   government has done something particular to a witness

3   in this case.  I'm not going to do that.  Nor am I

4   going to say what did they do to witnesses in the ICTR

5   cases.  I don't intend to do that either.  I think I

6   might be able to do that, but I'm not going to try,

7   because I can even tell that you're even somewhat

8   suspect.

9           THE COURT:  I am suspect of that.

10          MR. HOWARD:  So I'm not going to try.  I'm

11  going to keep it to the very same framework that Dr.

12  Longman created but then tried very hard to back away

13  from in his cross.

14          So I'm coming back in with now I've got my

15  expert to say the things that even their expert has

16  written about but refused to acknowledge.  That's what

17  I'm doing.

18          MR. CHAKRAVARTY:  Then it's impeachment of

19  Dr. Longman, which is also --

20          THE COURT:  No.  It's just a different

21  opinion based on his, I suppose.

22          MR. CHAKRAVARTY:  Based on his opinion of

23  what Dr. Longman meant?

24          THE COURT:  Well, that happens all the time.

25  I assume he treats Dr. Longman's writings as learned

1  treatises and quotes from them.  That's usually what

2  people do.

3          MR. CHAKRAVARTY:  Right.  But that's his

4  basis of knowledge on this issue.

5          THE COURT:  He's his own expert.  He's got

6  his own expertise.

7          MR. CHAKRAVARTY:  But even then -- even given

8  this kind of modified problem, the reeducation camps,

9  the Gacaca courts, where's the evidence that that has

10  anything to do with this case?  Not one witness went

11  to some reeducation camp.  Not one Gacaca proceeding.

12          THE COURT:  No.  I think one did, I think.

13          MR. CHAKRAVARTY:  No, your Honor.  There was

14  a question from counsel as to a reeducation camp.

15          THE COURT:  I thought a soldier had to go

16  through --

17          MR. CHAKRAVARTY:  No, he was not asked

18  whether he had to go to a reeducation camp.  The only

19  thing that was asked was, when you came back did you

20  have to do anything, and the answer was no.

21          MR. HOWARD:  No, I asked him.  I asked the

22  XFAR soldier if he went through a reeducation camp,

23  and he said that he did.

24          THE COURT:  I thought he said he did in order

25  to be assimilated, and when he came back from the

1    refugee status I think he had to go through the --

2           MR. CHAKRAVARTY:   Your Honor, my

3    understanding is that was Dr. Longman's testimony.

4    That's my memory.  I mean, it's fallible but --

5           THE COURT:  We all have notes.  We should

6    look it up.  We should look it up.

7           But anyway, yes, he can testify obviously to

8    the extent he's giving general, cultural expert

9    opinions to help the jury understand the nature of the

10   culture, as Dr. Longman did.

11          MR. HOWARD:  Right.  And that's how I'm going

12   to focus it, Judge.

13          THE COURT:  But he's not going to comment on

14   the credibility of individual witnesses, obviously, or

15   Rwandans in general as not credible witnesses.

16          MR. HOWARD:  Yeah.  That's right.  I do think

17   that there's -- and I don't want to overstep, so I'm

18   going to clarify right now.

19          Dr. Longman in his testimony last year -- he

20   didn't quite buy into it this year.  He has given a

21   speech before where he said, at least initially,

22   Rwandans do not have -- and the quote is -- a habit of

23   being truthful at first.

24          Then there's obviously an explanation that

25   comes along with that that gets into, because of the

1  stock answers and the story of the genocide they tend

2  to tell things in a certain way so you have to dig a

3  little deeper.  That's not the same thing as saying

4  they all lie, but it is saying you have to be

5  suspicious of what they say until you've really vetted

6  it.

7        So I did intend to have Dr. Endless use that

8  as a piece of what he's talking about, what informs

9  his opinion.

10        THE COURT:  Use Dr. Longman's testimony.

11        MR. HOWARD:  Yes.

12        MR. CHAKRAVARTY:  Your Honor, the fear there

13  -- it seems to be that that will be extrinsic evidence

14  used to impeach Dr. Longman with his own statements

15  that they --

16        THE COURT:  No.  I disagree there completely.

17  He's an expert witness.  He's entitled to give opinion

18  evidence, and he's entitled to explain the basis of

19  his opinion.

20        MR. CHAKRAVARTY:  But not necessarily read

21  that hearsay testimony into the record.

22        MR. HOWARD:  I wasn't going to do that.

23        THE COURT:  Okay.  He is allowed in general

24  to discuss the basis of his opinion, what he relied on

25  in forming the opinions.

1          MR. CHAKRAVARTY:  Identifying that stuff, but

2    not necessarily rehashing.

3          THE COURT:  Well, no.  An expert is allowed

4    to say I relied on this, I relied on that, and this is

5    what I relied on.  They're allowed to do that.

6          Let me see you at sidebar just for an

7    administrative matter.

8          (SIDEBAR)

9          THE COURT:  Juror 10.  Remember, we talked

10   about her at the beginning?  Her grandmother passed

11   away.  Number 10, the younger woman in the back row

12   middle.

13         MR. CAPIN:  The third from the left?

14         THE COURT:  Yeah.  Her grandmother did pass

15   away and the funeral is Tuesday now.  She, I assume,

16   wants to be excused.

17         THE CLERK:  She wants to go to the funeral.

18         THE COURT:  Any objection to excusing her?

19         MR. HOWARD:  No.  And then we just replace

20   her with alternate number --

21         THE COURT:  The alternate will take her seat.

22         MR. HOWARD:  Would that be seat number 7

23   or -- don't they go 1 through 6 and then 7 and 8, and

24   13 and 14 are the alternates?

25         THE CLERK:  Yes.

1          MR. HOWARD:  So 7 becomes --

2          THE COURT:  No.

3          MR. HOWARD:  You go to the back row?

4          THE CLERK:  No.  Number 13 becomes seat 7.

5          MR. HOWARD:  Oh, yeah.  That's what I meant.

6   That's what I meant.

7          MR. CHAKRAVARTY:  No objections.

8          MR. CAPIN:  No objections.

9          MR. HOWARD:  No objections.

10          (CONCLUSION OF SIDEBAR)

11          THE COURT:  All right.  See you Tuesday.

12          (CONCLUSION OF HEARING AT 3:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate

6     transcription of the within proceedings, to the best of

7     my knowledge, skill, ability and belief.

8

9

10    Submitted: 10-1-13          *Susan M. Bateman*
                                  **SUSAN M. BATEMAN, LCR, RPR, CRR**
11                                LICENSED COURT REPORTER, NO. 34
                                  STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/15/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-cr-85-01-SM
          v.                    *  February 19, 2013
                                *  9:20 a.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 10 - MORNING SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. McAULIFFE
AND A JURY

Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH)
                      53 Pleasant Street, 4th Floor
                      Concord, NH 03301

For the Defendant:    David W. Ruoff, Esq.
                      Mark E. Howard, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH  03104

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

2

1                      I N D E X

2

3    Voir dire of Brian Endless by Mr. Chakravarty, page 28

4    Voir dire of Brian Endless by Mr. Howard, page 34

5

6

7    Witness              Direct   Cross   Redirect   Recross

8    BRIAN ENDLESS

9    By Mr. Howard         22                129
     By Mr. Chakravarty            82                   131
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       BEFORE THE COURT

 2             THE COURT:  Somebody want to bring something

 3   up?

 4             MR. CAPIN:  Two issues, your Honor.  May I?

 5             THE COURT:  Sure.

 6             MR. CAPIN:  First of all, we understand the

 7   defense is resting today.  It was our understanding as

 8   of last night that the two witnesses today would be the

 9   final Rwandan witness, Ms. Anastasia Mukamwiza, and then

10   Dr. Endless who's the expert.  We learned a couple hours

11   ago the defendant is not calling Ms. Mukamwiza.  She's

12   present in the courtroom, I believe.  Ms. Mukamwiza,

13   your Honor, has evidence that the government believes is

14   probative of a key fact in this case.  And in fact, it

15   directly reflects everything we've heard -- well, much

16   of what we heard from the Rwandan witnesses called in

17   the case of the defense on Friday.  The government would

18   therefore seek to call her in rebuttal.  We have at most

19   two minutes of examination of her.

20             THE COURT:  What's the rebuttal?

21             MR. CAPIN:  I'm not sure if it should be done

22   in the presence of the witness.  I think the witness

23   should be instructed to leave the room and make herself

24   available and then just call.

25             THE COURT:  Why don't you come to sidebar.
```

4

```
 1                         AT SIDEBAR

 2              MR. CAPIN:  Your Honor, Ms. Mukamwiza

 3    testified last year I remember that she was at the

 4    Ihuriro the entire time and that there was a two-week

 5    period when the defendant traveled with her sister to a

 6    town called Cyangugu late in May.  This directly

 7    contradicts every witness who says she was at my side or

 8    in my sight every day during my period there.  It is one

 9    question.

10              THE COURT:  Are you going to rest?  You're not

11    going to call her?

12              MR. HOWARD:  We can stipulate to the fact that

13    there was a brief period of time --

14              THE COURT:  It's a minor point, I mean, it's a

15    minor point.

16              MR. ROUFF:  It's also contained in the

17    defendant's ICTR testimony.

18              MR. CAPIN:  I can keep the direct exam to one

19    minute.

20              THE COURT:  Again, we've got translation

21    issues.  Everybody understands that --

22              MR. CAPIN:  She speaks English, your Honor.

23              THE COURT:  No, no, no, no.  I'm talking about

24    the setup testimony.  I don't think anybody in the jury

25    literally thinks somebody was welded to the hip of this
```

5

```
 1   defendant 24/7 for three months.

 2           MR. CAPIN:  But the jury was led to believe

 3   that at least there was not a day when she was absent --

 4   well, gone for two weeks --

 5           THE COURT:  Like I said, these are rational

 6   people just like you and I.  They have common sense.

 7   They don't think that everyone was welded to her 24/7.

 8   They don't think that she couldn't have gone out and

 9   come back.

10           MR. CAPIN:  We will be permitted to call her

11   for that limited purpose?

12           THE COURT:  Yes, you may.

13           MR. CAPIN:  There's another issue I'd like to

14   raise that doesn't have to be at sidebar.

15                       IN OPEN COURT

16           THE COURT:  Ma'am, you will testify today,

17   but, you will testify today.

18           MS. MUKAMWIZA:  Okay, no problem.

19           THE COURT:  I know that's not a problem, but I

20   just wanted to make sure you need to stick around.

21           MS. MUKAMWIZA:  Okay.

22           MR. CAPIN:  The second issue, your Honor, and

23   I raise this now because before Dr. Endless takes the

24   stand I want to make sure that the record is not

25   confused or distorted by anything currently before the
```

6

1    court because I want to make sure that the ground rules

2    are clear.

3         The defense filed late last night the motion

4    for mistrial which says a number of things.  Among them

5    it says that the prosecution did not proffer any

6    evidence in its case in chief about the head of the,

7    quote, secret police or whether any such organization

8    even existed in Rwanda at the time.

9         Your Honor, I'm flabbergasted by the lack of

10   candor the defendant is showing this court.  Doctor --

11   the testimony that Ms. Mukamwiza last year, she was

12   asked specifically, do you know Prudence Kantengwa's

13   husband was the head of the intelligence service.  She

14   said yes, she was aware of that.

15        THE COURT:  I don't think -- I haven't studied

16   it yet, so --

17        MR. CAPIN:  If I could just make a record

18   because there's much more.

19        THE COURT:  Well, I don't want to argue the

20   motion now.

21        MR. CAPIN:  No, no, but I want to make a

22   record for current purposes.

23        Then, at the Prudence Kantengwa trial, your

24   Honor, one of the questions was, was he head of the

25   secret police.  Dr. Timothy Longman, who was noticed as

1    a witness in this case by the defendants was asked, and

2    this is U.S. v. Prudence Kantengwa, Criminal Action

3    08-10385, District of Massachusetts, jury trial,

4    April 24, 2012, are you familiar with the service de

5    senda mon (ph).  Yes.  Can you say what it is in English

6    and we will use the English phrase?  Sure.  It's the

7    secret service with secret information.  What function

8    did it have in Rwanda?  They function like a secret

9    police basically.

10           THE COURT:  I don't think he's questioning

11   your good faith basis.  I think he's raising the same

12   issue that I guess I was raising with you which is there

13   is a line out there.  Even though you have a good faith

14   basis to ask a question that goes to impeaching the

15   witness and you're stuck with the answer, when it starts

16   to look like you're really not trying to impeach the

17   witness at all, although technically it falls within the

18   impeachment rule, and you do have a good faith basis for

19   asking the question, if the purpose for asking the

20   question is not actually impeachment but rather to put

21   before the jury a prejudicial fact that you haven't or

22   can't prove otherwise, that's a problem, that's improper

23   impeachment.  Now, we discussed this I think during the

24   trial.

25           MR. CAPIN:  You did.

1          THE COURT:  There's a line out there.  Now,

2     where is that line?  It's not really fixed.  It's more

3     of a judgment call.  It's a discretionary thing.  And I

4     kept warning you that in my judgment you were doing

5     that, hence the emphatic instruction that I gave to the

6     jury about the plumber.

7          MR. CAPIN:  I understood.  If I may, if I

8     could have one minute to make a record --

9          THE COURT:  So I think the gist of the motion,

10    again, I haven't studied it, but I gather the gist of

11    the motion is, yes, you crossed that line.  That line is

12    out there.  And one of the ways was not that you didn't

13    have a good faith basis for saying the guy was the head

14    of the secret police, but rather you're putting that in

15    front of the jury.

16         MR. CAPIN:  Well, I would make two points.  My

17    read of the papers is that there's a suggestion when you

18    say there was no information that the entity even

19    existed, that it may not, and defense counsel --

20         MR. HOWARD:  No, no, no, that's not -- there's

21    no evidence of it in this case.

22         MR. CAPIN:  I just want to make a record

23    because obviously this is important.

24         THE COURT:  What are you making a record of,

25    that you have a good faith basis the organization --

```
 1            MR. CAPIN:  That --

 2            THE COURT:  Now you're interrupting me.

 3   You're really not allowed to do that.

 4            MR. CAPIN:  And that --

 5            THE COURT:  It's one thing to talk over Mr.

 6   Howard.  You can't talk over me.

 7            MR. CAPIN:  Sorry.

 8            THE COURT:  You're talking over me, and you

 9   know that.

10            MR. CAPIN:  Of course I do.

11            THE COURT:  Okay.  What is it that you're

12   trying to --

13            MR. CAPIN:  Two things.  Sorry.  I thought you

14   were done.

15            THE COURT:  No, I'm not.  I'll signal.  What

16   are you trying to make a record of?  Is it that you had

17   a good faith basis to think and therefore ask about his

18   status as head of the state police and the existence of

19   a state police organization?  Is that what you want to

20   put the record about?

21            MR. CAPIN:  That's one of two things.

22            THE COURT:  Okay, what's the second thing?

23            MR. CAPIN:  The second thing is that witness

24   when questioned in 2008, based on both notes and the

25   memory of the agents, identified Prudence Kantengwa's
```

1    husband in the photograph.

2            THE COURT:  The witness you were talking

3    about?

4            MR. CAPIN:  Correct.

5            THE COURT:  Okay.

6            MR. CAPIN:  Identified -- said she had seen

7    the roadblock and said she had seen MRND meetings at the

8    house.  She called that by saying I only saw Munyemana,

9    Pauline, and Kambanda, the prime minister.  So I had a

10   good faith reason to believe that if her memory is

11   refreshed, she will remember that.  In fact, your Honor

12   will recall, she did remember --

13           THE COURT:  You know, we could probably cut

14   this short.  I don't think they're challenging your good

15   faith basis for asking the question.  I think they're

16   challenging the fact that you're asking it not for a

17   legitimate impeachment purpose but to get the fact

18   before the jury, which allows you then to rely on,

19   argue, because you completely, you said in your opening

20   far be it from us to try to obtain a conviction on guilt

21   by association theory.  That's not why we're here.  And

22   yet the question lends itself to the appearance that

23   maybe you are.

24           MR. CAPIN:  Well, may I respond?

25           THE COURT:  Ah-hum.

1           MR. CAPIN:  First of all, just to finish the

2   point on the record I was trying to make, and I

3   appreciate the court, I don't know if you read the

4   papers --

5           THE COURT:  I haven't.  I keep telling you, I

6   haven't studied it.  I zipped through it just to see

7   what the gist of it was.

8           MR. CAPIN:  And frankly, I looked at it right

9   before I came in, so, I appreciate the court --

10          THE COURT:  Me too.  I was looking at it

11  coming down the stairs.

12          MR. CAPIN:  But what most struck me was that

13  Ms. Howard, Mr. Howard's associate, was at the entire

14  trial.  She's heard --

15          THE COURT:  Stop.  Are you suggesting he has

16  no good faith basis to ask the question?  In other

17  words, there was no factual predicate for the question?

18          MR. HOWARD:  No.

19          THE COURT:  Okay.

20          MR. HOWARD:  I'm not.

21          THE COURT:  I didn't think so.

22          MR. CAPIN:  Okay.  Then with regard to the

23  purpose of the question, the perspective, my perspective

24  listening to the witnesses we heard from on Friday is

25  that the defense is attempting to paint a picture of

1    people seeking refuge in the Ihuriro and are afraid to

2    go out.  It is probative of the absurdity of that

3    proposition that the head of the secret police, the head

4    of what Dr. Longman called the agency that served as the

5    secret police was living in the house at the time,

6    coming and going from work back to the hotel from the

7    genocidal government's headquarters 50 miles or 30 miles

8    or 20 miles down the road, that Pauline Nyiramasuhuko

9    was coming and going and lived there, and that there

10   were guards protecting them coming and going at all

11   times.  It's probative of that point.  And moreover, the

12   defendant in her ICTR testimony described taking a walk

13   with this very man, with Mr. Munyemana.  So if the image

14   is, well, not the image, the claims and implication like

15   every witness that this defendant never left the hotel

16   is clearly called into question both by her ICTR

17   testimony and if this witness can remember that in fact

18   they took a walk together, that's probative of what the

19   witness -- what this defendant --

20            THE COURT:  It would be probative if you had

21   evidence of that.  But again, we come back to basics.

22   That you ask the question and assume in the question

23   that he's there and he's a member of the secret or head

24   of the secret police and there is a secret police,

25   there's no evidence of that from the witness that says

1    nope.  What's the evidence?  Has there been any evidence

2    presented to the jury that this guy is there and he's

3    head of the secret police and there is a secret police?

4    No.  There isn't any evidence of that.  The only

5    suggestion that those things are true are in your

6    question.  Your question is asked strictly as an

7    impeachment question.  When you get no for an answer,

8    there is no evidence.

9              MR. CAPIN:  And your Honor --

10             THE COURT:  So you're standing there saying

11   it's very probative that the witness said no.  No, it

12   isn't probative the witness said no.  It may be

13   probative if you had some evidence that he was there and

14   he was the head of the secret police, but you haven't

15   presented any evidence, hence their motion.

16             MR. CAPIN:  Your Honor, may I?

17             THE COURT:  Sure.

18             MR. CAPIN:  I think the same can be said with

19   regard to the witness's denial of ever seeing the

20   roadblock.

21             THE COURT:  Of course.

22             MR. CAPIN:  If she said I don't remember

23   seeing it, then I stop there.  But in this case she saw

24   Agent Andersen standing in the audience, her memory is

25   refreshed, and she said and oh, and you might recall the

1   nod, oh, now I remember, I did see --

2          THE COURT:  But we can have this academic

3   discussion forever.  But yes, as long as you have a good

4   faith basis, you can ask the question.  When it gets to

5   the point where it strikes me that you're asking the

6   question not for impeachment but to get before the jury

7   facts that you otherwise have no evidentiary basis to

8   argue, then we start getting, hence I kept saying you're

9   getting uncomfortably close to improper impeachment.

10         MR. CAPIN:  Your Honor, one last point.

11         THE COURT:  You're taking your chances.  We'll

12  see what happens.

13         MR. CAPIN:  One last point.  I don't know if

14  the court is suggesting that the government cannot, any

15  party cannot establish an affirmative fact through

16  cross-examination.

17         THE COURT:  Of course you can.

18         MR. CAPIN:  Well, in this case, for example,

19  we established affirmatively that witness saw the

20  roadblock, ergo the roadblock was there when she left

21  the hotel.

22         THE COURT:  I'm not talking about the

23  roadblock.

24         MR. CAPIN:  Well, if she had testified

25  consistently with what she told Agent Andersen, she also

1    would have said yes, the defendant was MRND.

2            THE COURT:  Then you would have had some

3    evidence.  But in fact I don't think that's the gist of

4    their claim.  The gist of their claim is, you've got no

5    for an answer.  We're not saying you didn't have a good

6    faith basis for asking the question.  What we're saying

7    is you're asking these questions not for the purpose of

8    legitimate impeachment but rather to put before the jury

9    the facts assumed in the question.

10           MR. CAPIN:  I'm asking the question -- and

11   that's why --

12           THE COURT:  I hear your defense.  I understand

13   what you're saying.

14           MR. CAPIN:  The roadblock example, I'm asking

15   the question because I have every reason to believe that

16   the witness, if her memory is refreshed, will remember I

17   said I saw the roadblock.  She remembered that.

18           THE COURT:  Well, you switched to roadblock.

19   Why don't we stick with the secret police chief.

20           MR. CAPIN:  Well, I said MRND.  She didn't

21   remember that.  I left it alone.  She identified

22   Munyemana in a photograph.  She remembered that.  That's

23   all she remembered.  I left it -- but I certainly had a

24   good faith basis to ask her more than once when she was

25   showing that her memory was emerging as we spoke --

 1             THE COURT:  Again, I think you're arguing the

 2    motion.  I don't really want to argue it now because I

 3    really haven't studied it.

 4             MR. CAPIN:  I simply want to make a record.

 5             THE COURT:  And you need to be given an

 6    opportunity to respond to, so.  Are you going to respond

 7    to it in writing or do you just want to argue it?

 8             MR. CAPIN:  I suppose we will, but not before

 9    closing, your Honor.

10             THE COURT:  Oh no, we've got to resolve it

11    right away.

12             MR. CAPIN:  Well --

13             THE COURT:  Why don't we take it up after --

14             MR. CAPIN:  I don't feel the need to respond

15    in writing.

16             THE COURT:  Okay.  You're going to call Dr.

17    Endless and then you're going to rest?

18             MR. HOWARD:  That's correct.

19             THE COURT:  All right.  And then you're going

20    to call --

21             MR. CHAKRAVARTY:  Yes.

22             THE COURT:  We can take it up after that.  It

23    shouldn't be too long.

24             Oh, I'll just put on the record when the jury

25    comes in about counsel screaming at my decision to let

17

1    jurors go.

2              MR. CAPIN:  May I inquire on one further

3    issue?

4              THE COURT:  Sure.

5              MR. CAPIN:  I'll have to look at the

6    transcript, but I believe the witness who we're calling

7    in rebuttal also addresses this issue.  She's aware that

8    the head of the intelligence agency is Kantengwa's

9    husband and was residing the entire time at the hotel.

10             THE COURT:  Well, that's why I asked you at

11   the sidebar, what is it you're rebutting?  What evidence

12   is it that you're rebutting?

13             MR. CAPIN:  Well --

14             THE COURT:  Rebuttal isn't a second chance --

15             MR. CAPIN:  No, it isn't.  There's two issues.

16   One is the claim that she never left the hotel.  And the

17   other is that the claim that the hotel, that the people

18   in the hotel felt unsafe.

19             THE COURT:  Okay, got it.

20             MR. CAPIN:  So I can ask both those issues?

21             THE COURT:  Yes.

22             MR. HOWARD:  Well, judge, if I may, that means

23   he's going to be allowed to ask is there a secret police

24   organization, was this person the head of the secret

25   police as far as you know, because that's not rebuttal.

1              THE COURT:  No, it is rebuttal.  To the extent

2    you --

3              MR. HOWARD:  He's rebutting an issue he

4    raised.  I apologize, your Honor.

5              THE COURT:  No, no, he, no.  He's rebutting

6    the issue that you presented to the jury which is

7    everybody in that compound was basically locked down

8    with few exceptions to get food and so forth because of

9    beer and so forth, and they were all being protected

10   there, and his rebuttal is that's not so.  There are

11   people in the MRND there coming and going and so forth,

12   and leaders coming and going.  I mean, I'm not sure

13   you're limited to Tutsis.  It didn't sound like you were

14   limiting it to Tutsis.  Maybe I'm misunderstanding your

15   theme, but that's what I drew from the evidence, was

16   these people weren't engaged in any type of atrocity

17   because these people were hunkered down trying to

18   protect themselves and staying within the walls so as

19   not to be injured.

20             MR. HOWARD:  The Rwandan witnesses who

21   testified Friday said they stayed there because they

22   were told to, and that they did not witness violence

23   around them, and one of them kept saying all I know is I

24   wasn't hurt.

25             THE COURT:  And they also testified the

19

1    defendant never left.  Was there.

2              MR. HOWARD:  Right.

3              THE COURT:  Sick, frail, pregnant, and never

4    left because of what was going on outside.

5              MR. HOWARD:  That's right.  But the point that

6    there is some guy named, who's the head of some secret

7    police, doesn't rebut any of that.  It's -- all they are

8    trying to do now since we caught them at what they were

9    doing before which is to put in proper evidence before

10   the jury is take a second bite of the apple.  That

11   doesn't rebut any issue we raised.  He's trying to

12   establish something he raised.  We didn't do that.

13             THE COURT:  All right.  I hear you, but yes,

14   you may rebut on those two points.

15             MR. CAPIN:  Thank you, your Honor.

16             THE COURT:  And the point you're making, Mr.

17   Capin, is there was movement, free movement in and out.

18             MR. CAPIN:  There was free movement in and out

19   and --

20             THE COURT:  By leaders.

21             MR. CAPIN:  By leaders.

22             MR. ROUFF:  Your Honor, if we could just have

23   two minutes, then, before we bring the jury in.  We

24   might as well just call the witness in our case, we will

25   call her now if they are going to be allowed to bring

1   that evidence in.

2          THE COURT:  Well, they're going to be allowed

3   to call the witness in rebuttal.

4          MR. ROUFF:  Well, we may call her --

5          THE COURT:  It's entirely up to you who you

6   call.  Entirely up to you.

7          MR. CAPIN:  I assume that the scope of my

8   cross expands if the scope of the direct expands as

9   well.

10          THE COURT:  That's an odd question for you to

11  be asking.  Your cross is in theory and by rule limited

12  to the scope of direct.  That's not a rule that's been

13  honored very much, but, so we start with that, right?

14          MR. CAPIN:  And if the defense --

15          THE COURT:  I wouldn't put it as it expands.

16  I'll say whatever she testifies on direct, your cross is

17  limited to that scope.

18          MR. CAPIN:  So I guess the issue is --

19          THE COURT:  Yes, you don't have to recall her

20  in rebuttal.  You can take up the two points in cross so

21  as to avoid recalling her.

22          MR. CAPIN:  That was my question.  Thank you.

23          THE COURT:  Thank you.

24                     BEFORE THE JURY

25          THE CLERK:  Court is in session and has for

1   consideration jury trial day ten in the matter of United

2   States of America versus Beatrice Munyenyezi, Case

3   Number 10-cr-85-01-SM.

4          THE COURT:  All right, good morning, ladies

5   and gentlemen.

6          Just before we begin, you're all aware that

7   Ms. Doherty had a family issue.  Her grandmother passed

8   away and the funeral is today, so by an agreement of

9   counsel we've excused her.

10          So we're all sitting in the right spot?  Good.

11          Secondly, I apologize for the delay in

12   starting, but again, it was one of those mornings we had

13   issues we needed to take up, but we will definitely

14   finish today in terms of presenting the evidence.

15   Probably won't argue until tomorrow.  So closing

16   arguments will probably be tomorrow morning.  But we

17   should have a very short day today, meaning less than

18   1 o'clock, all right, or around 1.

19          All right, we're continuing with the

20   presentation of defense witnesses.  And Mr. Howard, you

21   may call your next witness.

22          MR. HOWARD:  All right, thank you, your Honor.

23   Good morning, ladies and gentlemen.  Defense will call

24   Dr. Brian Endless.

25          THE CLERK:  Please raise your right hand.

1                        BRIAN ENDLESS

2          having been duly sworn, testified as follows:

3               THE CLERK:  Thank you.  Please be seated.  For

4     the record, please state your full name and spell your

5     last name.

6               THE WITNESS:  My name is Brian Endless.

7     E-N-D-L-E-S-S.

8                        DIRECT EXAMINATION

9     BY MR. HOWARD:

10         Q.   Good morning, Professor Endless.

11         A.   Good morning.

12         Q.   Welcome to New Hampshire.

13         A.   Thank you.

14         Q.   You've already stated your name and spelled

15    it, and we appreciate that.  Could you explain to the

16    jury what your occupation is, please?

17         A.   Sure.  I am a faculty member in the Department

18    of Political Science at Loyola University in Chicago

19    teaching political science international relation

20    classes.

21         Q.   Can you give the jury a sort of itinerary of

22    the types of courses you teach?

23         A.   Certainly.  It's a pretty broad range of

24    things on the international side, from introductory

25    courses to international political economy, the United

23

1   Nations, international law, international health, and

2   also conflict and politics of genocide.

3       Q.   And recently Loyola University started a

4   department of African studies?

5       A.   Yes.  Actually we're in the process of

6   formation right now and it was just made official last

7   week and I'm going to be the chair of that African

8   studies program.

9       Q.   Dr. Endless, could you give the jury a summary

10  of your educational background and the degrees that you

11  hold?

12      A.   Certainly.  I hold a bachelor's of arts from

13  the University of Illinois at Urbana-Champaign.  That

14  was in political science with minors in history and

15  philosophy.

16           I also hold a master's and Ph.D. from Loyola

17  University in Chicago.  My focus was on international

18  peace and security and the United Nations, and my Ph.D.

19  was in 2003.

20      Q.   And could you describe for the jury in

21  somewhat more detail what your Ph.D. was in?

22      A.   Yes.  My Ph.D. covered the United Nations

23  Security Council and International Legitimacy.  I was

24  looking at several case studies where the Security

25  Council was involved in trying to solve problems in the

1    world.  My initial research covered Libya, Rwanda --

2    excuse me, Iraq and Somalia.  And my final dissertation

3    ended up being written about Iraq and Somalia.

4         Q.   Was there -- strike that.  At some point in

5    your professional career did you take an interest in

6    politics in Rwanda stemming from the 1994 genocide?

7         A.   I did, absolutely.  It was actually before I

8    went back to graduate school that I started studying

9    Rwanda.  I was running a model United Nations

10   educational organization, and I focused a lot on

11   security issues there.  Rwanda was an up and coming

12   topic during the civil war in the early 1990s.  I was

13   then just starting graduate school as the genocide broke

14   out in Rwanda, and the post-genocide was a regular piece

15   of what I studied in my economic work.

16        Q.   And since that time have you taken a renewed

17   interest in the politics in Rwanda?

18        A.   I have.  My earlier studies were more of the

19   international situation, and I understood the genocide

20   from kind of a big international picture.  In 2007,

21   though, I started working with Paul Rusesabagina, the

22   movie Hotel Rwanda was made about him, and his

23   foundation is based in Chicago.  I started working with

24   Paul and his foundation on issues inside of Rwanda and

25   in the region, and I've been very actively engaged in

1    Rwandan issues since 2007.

2         Q.   And since -- strike that.  Since your interest

3    in Rwanda both at the time of the genocide, during your

4    graduate studies and 2007, have you written about that

5    topic?

6         A.   I have, yes.  I've written a number of

7    different articles, usually from humanitarian

8    perspectives and focusing on policy issues and advocacy

9    issues, looking at human rights in Rwanda, looking at

10   freedom of press, looking at development in Rwanda and

11   the overall political situation and political

12   oppression.

13        Q.   And do you generally -- strike that.  Have you

14   had speaking engagements and other public appearances

15   concerning conditions in Rwanda and the history of

16   Rwanda?

17        A.   Certainly.  I've had quite a few speaking

18   engagements at universities around the Chicago area.

19   That includes Northwestern and University of Chicago.

20   I've spoken at University of Miami Law School.  I have

21   an upcoming engagement at University of Notre Dame's Law

22   School.  And then I've been a fairly frequent speaker on

23   the subject on National Public Radio in Chicago among

24   other places.

25        Q.   Dr. Endless, in terms of your writing and your

1    speaking about issues in Rwanda concerning the genocide,

2    is it important to understand the history of Rwanda that

3    led to the 1994 events?

4        A.    Absolutely.  I think that most of us, myself

5    included, really up until 2007, kind of saw the genocide

6    as something that came up very quickly and lasted

7    90 days and then went away.  And what I've come to

8    realize since I started doing a truly in-depth look at

9    Rwanda is that the genocide was simply a piece of

10   violence based on an enormous amount of history and

11   conflict between elites inside of that country, and I

12   believe if you don't understand that conflict, you can't

13   really understand what happened in 1994 or what's

14   happened since that point in time.

15       Q.    And is it important to your opinions about

16   what happened in Rwanda and the conditions since then

17   that you understand not only the politics and history

18   but also certain cultural phenomenon that existed?

19       A.    Absolutely.  Its politics, its history.  It is

20   the importance of ethnicity to Rwanda.  Where what we

21   would call ethnicity, we can perhaps talk a little bit

22   about that because it's not really ethnicity the way

23   Americans would look at it.  And then it is also the

24   culture that authoritarian leadership has driven inside

25   of that country and it's created a very specific culture

1   with the Rwandan people.

2            MR. HOWARD:  Your Honor, at this time, before

3   we move on to the history of Rwanda, I'd ask the court

4   to qualify Dr. Endless as an expert in history, politics

5   and cultural phenomenon as it relates to the genocide.

6            THE COURT:  Any objection to his credentials

7   as an expert?

8            MR. CHAKRAVARTY:  No objection to his

9   credentials, but we do object to the court saying that

10  he is a, you know, somehow an expert in something.

11           THE COURT:  I have to if he's going to give

12  expert opinion testimony.

13           MR. CHAKRAVARTY:  I think that's a legal

14  finding, not some kind of --

15           THE COURT:  I'm about to make it unless you

16  object.

17           MR. CHAKRAVARTY:  I object, your Honor.

18           THE COURT:  What's your basis for objection?

19           MR. CHAKRAVARTY:  He has absolutely no basis

20  or experience in the Rwanda genocide or, you know, in

21  Rwanda during witness interviews, no qualifications

22  about the history or the culture.

23           THE COURT:  Do you want to voir dire at all?

24           MR. CHAKRAVARTY:  I would be happy.  May have

25  I proceed?

 1              THE COURT:  Yes.  I'm going to allow him to

 2    voir dire on the issue of his expertise.

 3                         VOIR DIRE

 4         Q.   BY MR. CHAKRAVARTY:  Doctor, have you been to

 5    Rwanda?

 6         A.   I have not, no.  I actually don't believe it

 7    would be safe for me to go there.

 8         Q.   All right, so, when I ask you a question that

 9    you can answer with a yes or no, if you'd be so kind to

10    answer with a yes or no.  If you can't, just let me know

11    and I will ask a new question, okay?

12              Have you, in your studies to become a Ph.D.,

13    did you do academic research on the history of Rwanda?

14         A.   Yes, I did.

15         Q.   And you did that in context with the UN

16    Security Council actions in Somalia, Iraq and -- those

17    were the two places that were in your dissertation;

18    right?

19         A.   Plus I mentioned Rwanda and Libya.

20         Q.   Okay.  But you didn't actually include those

21    in your dissertation?

22         A.   Correct.

23         Q.   You've never done any on-the-ground research

24    in Rwanda.  Have you collaborated with scholars who have

25    done research on the ground?

```
 1        A.    Yes, I have.

 2        Q.    Who were those scholars?

 3        A.    It was Emmanuel Hakizimana.  I wrote an

 4   article with him on healthcare in Rwanda, and he's a

 5   native Rwandan.

 6        Q.    All right, so he's a native Rwandan.  He's not

 7   a scholar who went over to Rwanda and conducted

 8   research; right?

 9        A.    He has conducted research in that way.  For

10   this article, he did not.

11        Q.    And most of the information you that received

12   about Rwanda is from dissidents, Rwanda dissidents like

13   Paul Rusesabagina?

14        A.    That would actually be incorrect.

15        Q.    So Paul Rusesabagina is an outspoken critique

16   of the Rwandan government; correct?

17        A.    Correct.

18        Q.    And his organization, the Hotel Rwanda

19   Rusesabagina Foundation is one of the organizations

20   you're on the board; right?

21        A.    I'm not actually on the board.  I'm the senior

22   advisor.

23        Q.    And that is an advocacy organization; correct?

24        A.    Correct.

25        Q.    And you've never actually engaged in peer
```

1    review writing about Rwanda; isn't that correct?

2         A.   I have not.

3         Q.   So, no scholar like a Dr. Timothy Longman

4    would have sat and reviewed something you wrote and

5    said, yeah, this sounds about right.  That you haven't

6    done?

7         A.   I have not engaged in that, no.

8         Q.   So, the information that you have about

9    Rwandan culture is based on the Rwandans that you've

10   talked to here in the United States?

11        A.   Only partially correct.

12        Q.   Have you traveled to other countries to

13   interview Rwandans?

14        A.   I have been to Belgium.

15        Q.   You've been to Belgium which is the formal

16   colonial power of Rwanda; right?

17        A.   And actually it's a significant Rwandan

18   community, so.

19        Q.   You would agree with me that a lot of Rwanda

20   dissidents live in Belgium as well?

21        A.   Correct.

22        Q.   And those are the people that you spoke with?

23        A.   Yes.

24        Q.   Paul Rusesabagina is one of them?

25        A.   Correct.

1          Q.    And he told you about all the problems with

2    the current Rwandan regime; right?

3          A.    In addition I've done a thorough review of the

4    scholarly research on the topic.

5          Q.    But you've never actually talked to an average

6    Rwandan about what they're experiencing every day?

7          A.    That's not correct.

8          Q.    You've never been to Rwanda but you've talked

9    to a Rwandan who hasn't come to the west?

10         A.    No, I have not talked.  By definition I could

11   not have.

12         Q.    So what you can testify to is about the

13   cultural influence on the dissidents who left Rwanda and

14   are residing in Belgium and the United States; is that

15   correct?

16         A.    That is only half correct.

17         Q.    So, in addition to your lack of a peer review

18   journal, peer review work, in addition to the lack of

19   your personal interviews, would you agree with me that

20   Dr. Longman and Alison Des Forges' work, human rights

21   book, Leave None to Tell the Story, is one of the

22   defining documents related to the Rwanda genocide?

23         A.    I've read it several times.  It is an early

24   defining document but there's been a significant amount

25   of work done since then, too.

1        Q.    But you haven't done any of that work, have

2    you?

3        A.    I have contributed to the literature on Rwanda

4    but not in peer review form.

5        Q.    And you haven't done any of the work

6    researching the history of the genocide; right?

7        A.    No, I have researched the genocide.

8        Q.    And you published that and contributed to the

9    scholarly work on that?

10       A.    I have not published it because my job does

11   not require me to publish unlike some faculty members.

12       Q.    You said that -- let's talk about your

13   faculty.  You were careful not to say that you were a

14   professor at Loyola University.  You're not a professor;

15   isn't that right?

16       A.    At the moment I'm not, no.  My title has

17   changed several times due to changes administratively

18   inside the university.

19       Q.    Right.  And not being a professor means that

20   you don't have tenure track, you don't have to publish

21   and you don't have to be peer reviewed; right?

22       A.    That's correct.

23       Q.    You can say whatever you want; right?

24       A.    That is incorrect.

25             MR. HOWARD:  Objection.

```
 1              THE COURT:  Overruled.

 2         Q.   You recently testified in Canada as an expert

 3    witness; correct?

 4         A.   Correct.

 5         Q.   And in fact, you only testified for defendants

 6    in criminal cases.  Isn't that a fact?

 7         A.   That is correct.

 8         Q.   And in Canada you testified about the

 9    conditions in Rwanda as relates to witnesses; right?

10         A.   Correct.

11         Q.   And in Canada the court said that they could

12    not place value on your opinion.  Isn't that right?

13         A.   That is incorrect.

14         Q.   In fact, the court there said that you were

15    not objective in your analysis, you were an advocate?

16         A.   That is incorrect.

17         Q.   Did you read the court's opinion?

18         A.   I didn't know there was a final opinion.  As

19    of a week ago, there was not.

20         Q.   Actually there was.  You're not aware of it?

21         A.   I have not seen the final opinion of the

22    court.

23         Q.   And finally, you wrote an expert report in

24    this case; correct?

25         A.   Correct.
```

1      Q.   And we've actually talked before through video

2   link; right?

3      A.   Ah-hum.

4      Q.   And you didn't review any of the evidence with

5   regards to this case; correct?

6      A.   No.

7      Q.   So what you're going to testify about is the

8   cultural phenomenon of Rwanda, that's what you're about

9   to --

10     A.   As stated in my report, I have no personal

11  knowledge of this case, and yes, I will testify about

12  background and cultural phenomena currently in Rwanda.

13          MR. CHAKRAVARTY:  That would be all, your

14  Honor.  The government would renew its objection to his

15  qualification.

16          THE COURT:  You want to voir dire?

17          MR. HOWARD:  Just quickly.

18                    VOIR DIRE

19     Q.   BY MR. HOWARD:  Dr. Endless, did you testify

20  in the case of United States versus Kobagaya in the

21  District of Kansas?

22     A.   Yes, I did.

23     Q.   Were you qualified as an expert in the history

24  of Rwanda and country conditions at the time of the

25  genocide by the U.S. District Court judge in Kansas?

1     A.   Yes, I was.

2     Q.   And you've testified as an expert in the

3   Canadian court?

4     A.   Correct.

5     MR. HOWARD:  With that, your Honor, I move

6   that he be recognized as an expert on the topics

7   previously disclosed.

8     THE COURT:  All right, I find the witness is

9   qualified to provide expert opinion evidence with

10  respect to the history and culture of Rwanda.

11     Now, just so we don't get all distorted on

12  what that means.  Most witnesses, almost all witnesses,

13  ladies and gentlemen, have to testify about what they

14  know from personal experience, what they've seen, what

15  they actually heard.  That's the limit.  Experts are a

16  little different.  If someone by virtue of their

17  education or training or experience have knowledge about

18  a particular subject matter that may be useful to a jury

19  in the jury deciding the issues that are before them,

20  that witness is allowed to give that opinion evidence.

21  It's not what he's seen, it's not what he's heard, it's

22  not what he knows by personal experience arguably.  It's

23  really just relating what was within his expertise to

24  the extent you may find it useful, that information

25  useful in deciding the issues that are before you.

1              Dr. Longman testified on the same basis.  He

2     was an expert professor, knowledgeable about Rwanda, the

3     genocide, the history, both political and cultural

4     history of the country, so he was allowed to give his

5     opinions as well to the extent you find them useful, and

6     I'll instruct you in more detail on that later.  But

7     basically this witness, like Dr. Longman, has an

8     expertise.  He's going to share that with you to the

9     extent you find that useful in deciding the issues that

10    you're deciding.

11             MR. HOWARD:  All right, thank you, your Honor.

12        Q.   BY MR. HOHWARD:  Dr. Endless, before we begin

13    with a brief preview of the history of Rwanda, have you

14    studied the works of Timothy Longman?

15        A.   I have, yes.  I don't know that I've read

16    everything he's written, but quite a bit of it.

17        Q.   And Dr. Susan Thompson of Colgate University,

18    you've read her works as well,

19        A.   Yes, yes, I have.

20        Q.   Professor Strauss?

21        A.   Yes.

22        Q.   Now, what I'd like to do at this point with a

23    particular focus on the role of ethnicity and the

24    history of Rwanda is to have you take us back to the

25    colonial period in the late 1800s and discuss from the

1    point where Rwanda became, I hope I'm not wrong about

2    this, a German colony, if you would, please.

3         A.   Thank you.  Starting just a little bit before

4    that, if I could, Rwanda was a Tutsi Kingdom from the

5    1600s until the late 1800s.  By that I mean that there

6    were Hutu and Tutsis as the two main groups in the

7    country.  Traditionally what scholars have said is about

8    85 percent Hutu, about 14 percent Tutsi, and about one

9    percent Twa.  The Twa are the indigenous people.  We

10   don't talk about them very much frankly because they've

11   never been politically active.  Really this is the story

12   of how Hutu and Tutsi leaders have interacted.

13        For several hundred years the Tutsis had

14   centralized control inside of Rwanda, and by the 1600s

15   we would call it a Tutsi Kingdom with a king overseeing

16   everything.

17        It was really much more a class system and an

18   ethnic system when we look at it at that point in time

19   in that there was an upper class of Tutsis.  They were

20   typically the warriors.  And a lower class of Hutus.

21   They were typically the farmers.

22        This was also fluid, though, in that you could

23   be made a Tutsi or made not a Tutsi by the king or by

24   your actions.  There's a story that Rwandans use --

25   Tutsiness was derived from how many cows you had.  And

1  the histories are conflicting.  It was somewhere between

2  four and ten cows.  So if you got to that four cow level

3  you were suddenly a Tutsi.  What really typically

4  happened was the king gave you cows as a sign of favor

5  and showed that you were a Tutsi based on that.

6          So, people could become Tutsis or the king

7  could take your cows away to withdraw his favor.

8          This lasted until the late 1800s.  And in 1884

9  there was a conference on Berlin where the European

10 powers split up Africa based on their own maps and

11 Germany was given the right to control what is now the

12 Rwanda region.  It was called German East Africa.  And

13 it was Rwanda Burundis, some other territory in that

14 area.

15         In the case of Germany being given control,

16 they didn't actually take control until 1890.  So in

17 between they didn't put any troops on the ground, and

18 when they did take control they did it in a way that

19 Europeans did in many African colonies.  They used the

20 minority that happened to be in power at the time, the

21 Tutsis, and they teamed up, worked with the Tutsis to

22 control the Hutus and to assist in their colonial

23 control.  So, effectively the Germans took Tutsis who

24 were already in power and put them even more firmly in

25 power at that point in time such that those Tutsis kept

1   control through the end of World War II and into the

2   1950s.

3       Q.   And if you could then take us through the

4   point where Germany cedes its colonial rule over Rwanda

5   to the Belgians?

6       A.   Certainly.  Germany keeps control, we have

7   indirect control and a lot of colonists, a lot of troops

8   on the grounds, mostly administrators, they keep

9   indirect control through the end of World War I when

10  Germany loses its colonies and then Belgium takes

11  control as part of the League of Nations mandate.  After

12  World War I German colonies were split up and were given

13  to other European powers, technically this was to help

14  them gain independence, but in a practical sense they

15  were really still colonies.

16      Q.   And with respect to the Tutsi/Hutu

17  distinction, what did the Belgians do to enhance the

18  distinction?

19      A.   The Belgian colonizers were really the group

20  that made this what we now see as an ethnicity.  They

21  took the existing split between the Tutsis and the Hutus

22  and they formalized it.  And they did it with what was

23  really the best science of the time.  There was a

24  sociologist named Speke, I believe it's John Hanning

25  Speke, British sociologist, who was going to different

1    African countries and used Rwanda as one of his

2    examples, and trying to determine where people came

3    from.  And the way that he did this was by measuring

4    parts of the body.  Measuring faces.  Looking at whether

5    someone had a thinner face or fuller face.  Whether

6    someone had a longer nose, a longer forehead, taller,

7    thinner, stockier.  And what Speke found and what the

8    Belgians picked up was that the Tutsi people were

9    obviously descendents of the biblical Ham, I believe is

10   Noah's son who, ignore Abraham, I apologize for my lack

11   of bible scholarship here, but it's called the Hamitic

12   hypothesis, it was the son who was pushed out and moved

13   to Africa, and there are a number of Africa tribes who

14   are believed to descendents of Ham.  What Speke said is

15   the Tutsis, because they are taller, thinner, look a

16   little bit more like Europeans, are obviously the group

17   that should be entitled to rule because they're the

18   group that are descended from more civilized Europeans.

19   And we might see that as kind of horrific now, but at

20   the time it was actually the best science that Europe

21   had.  The big problem with it was that this was then

22   institutionalized, and more to the point for the future

23   the Belgians took these measurements, decided who was

24   Tutsi and who was Hutu, and assigned everyone an ID

25   card, and on your ID card was stamped Tutsi or Hutu, and

1   these ID cards became one of the terrible tools that was

2   used to identify people during the genocide many years

3   later.

4        Q.   Can you take us up to the point of the

5   independence in the late 1950s?

6        A.   Certainly.  The Belgians like the Germans

7   continued to support the Tutsi minority until around the

8   1950s, and it became clear at that point in time that

9   the Hutu majority was starting to really chafe against

10  the Tutsis, was feeling very oppressed and was starting

11  to move to the point that they wanted and were going to

12  push for majority rule, and in the 1950s what we see is

13  the Belgians slowly pulling back from their support of

14  Tutsis as the country was obviously moving toward

15  independence, moving toward support of the majority

16  Hutus.  By 1957 or in 1958, this was pretty much

17  complete and the Belgians were largely and pretty openly

18  supporting the Hutu by that point in time.  And then

19  from 1959 to 1962 unfortunately we see this move into

20  what has often been called the first genocide in Rwanda.

21  In that three-year period about 150,000 mostly Tutsis

22  were killed by Hutus as the Hutus started to move into

23  power.  So we had a shift in power from Tutsis to Hutus,

24  and it was a very violent shift with the Hutu having

25  many spates of killings, rounds of killings against

1    Tutsis at that time and many, many more Tutsis fleeing

2    the country.

3         Q.   And what happened in Rwanda in 1962?

4         A.   1962 is independence and we see the first

5    Rwandan president who is a Hutu, post-independence

6    president who's a Hutu, he's actually a southern Hutu,

7    and this is something that is another important piece,

8    complicating piece in the Rwandan puzzle.  There aren't

9    simply Hutus and Tutsis.  There are different groups of

10   Hutus and Tutsis.  From 1962 to 1973 we see southern

11   Hutus dominating the country with only a few northern

12   Hutus sharing the power.

13        The dominance pushes back against the old

14   Tutsi rule.  And what we see is Tutsis heavily

15   discriminated against.  Hutus were and felt they were

16   discriminated against under the Tutsi king and under

17   colonialism, and the Hutus when what is now traditional

18   in Rwanda turned the tables on the Tutsis, they begin

19   discriminating heavily against them in legal ways,

20   almost impossible for a Tutsi to get even an elementary

21   school education, and those few who do find that they

22   can't get jobs once they get out of school.

23        There's also some discrimination against

24   northern Hutus, though, because there was a pretty clear

25   split.  Northern Hutus are likely to be educated,

43

 1   they're likely to get lower level jobs, they are

 2   unlikely to get the best positions in the government,

 3   though.  So it was dominance against multiple groups at

 4   the time.

 5        Q.   And what occurred in 1973?

 6        A.   1973 we see a bloodless coup by the northern

 7   Hutu defense minister.  He's one of the few northern

 8   Hutus who worked his way into power by moving up through

 9   the military.  This is Habyarimana who becomes president

10   in 1973 and remains the president through the civil war

11   in 1990, and the genocide in 1994 begins with his death.

12        Habyarimana is a northern Hutu.  He pushes the

13   southern Hutus out of power.  He brings northern Hutus

14   into the positions of power.  He definitely still

15   discriminates against Tutsi.  There is some distinction

16   in the literature, was he worse or was he not as bad as

17   the previous regime.  It's very hard to say which it

18   was.  There was clearly discriminatory policies against

19   Tutsis and also discrimination against southern Hutus.

20   One of the things we see with Habyarimana, though, is he

21   had more difficulty consolidating his power, and by the

22   late 1980s and as we head into 1990 it was becoming

23   pretty clear that he really was an authoritarian leader,

24   but not a dictator.  He wanted to be the center of power

25   but there were a lot of people who were working against

1  him, many within his own northern Hutu group and within

2  his own party.

3       Q.   Did Habyarimana represent a single party

4  system in Rwanda?

5       A.   It was a single party system until just after

6  the cold war ended, it changed in 1991.  The MRND was

7  the primary party and Habyarimana had laws put into

8  place to make that a single party system.  One of the

9  things that we see starting with independence, and

10  Habyarimana is the first to do this, and then this

11  happens again after the civil war and genocide, is

12  Rwandans typically institutionalize new rule by writing

13  a new constitution and that new constitution benefits

14  typically the ruling party, the new ruling party and

15  pushes out the old groups.

16       Q.   We will come back to the period of roughly

17  1991 in just a moment.  Going back to 1962 when the

18  Hutus took over independence, what happened with, we

19  know that there was what's commonly referred to as the

20  first genocide, what happened with the Tutsi population

21  at that point?

22       A.   Tutsi population was in three groups.  There

23  was the group that was killed in the genocide.  There

24  was a group that stayed inside the country, and these

25  were primarily poor people who were not in the halls of

1    power.  There were many Tutsis who were not part of the

2    elites, perhaps one to two percent of people at any

3    given point in time were really elites who controlled

4    the society.  The rest of the Tutsis had some benefits

5    under the kingdom, but they weren't in power, and many

6    of them simply stayed in place.  Those are the people

7    who were discriminated against in the sixties, the

8    seventies and the eighties.  Most of the leading Tutsis

9    went into exile, and the exile went primarily in two

10   directions, but they were scattered in many others.

11   Many southern Tutsis in particular fled into Burundi,

12   across the border into Burundi, and most of the ruling

13   group that were able to flee, fled into Uganda to the

14   north at the time and -- excuse me, this included a very

15   young Paul Kagame who is now the Tutsis president of

16   Rwanda since the end of the genocide, Paul Kagame fled

17   at the age of two in 1960 with his parents.  His parents

18   were extremely well-connected.  In the old regime his

19   father was an advisor to the king and his mother was a

20   cousin of the queen.  It was that type of group that

21   fled into Uganda and that grew up in Uganda in the

22   sixties, seventies and eighties.

23        Q.   And can you briefly describe over the years

24   Paul Kagame's connection to what we would later know as

25   the Rwandan Patriotic Front?

1       A.    Certainly.  Kagame grew up with these refugees

2   and exiles in Uganda, and historian, this is according

3   to a gentleman Stephen Kinser who's effectively his

4   official biographer, Kagame was very resentful as a

5   youth of the fact that he was pushed out of the country.

6   He and friends certainly wanted to get back into Rwanda

7   at some future point in time.  At one point they talked

8   about equality for Tutsis.  Later on after 1973 they

9   started talking about the fact that there would never be

10  equality and that they would simply need to take over

11  the country.  Kagame was a person like a number of

12  others who worked his way into the Ugandan military.  He

13  actually first started with rebel groups.  The current

14  president of Uganda is gentleman named Museveni and at

15  that point in time he was a rebel fighting against Idi

16  Amin who you may remember as one of the worst dictators

17  ever certainly in African history but probably in world

18  history.  Kagame was with the group fighting against Idi

19  Amin in Uganda.  He gained military training there.  He

20  moved up through the ranks fairly quickly to the point

21  in the 1980s he become the intelligence chief of the

22  rebel movement, and then in 1986 when that rebel

23  movement finally formally took over the country, he

24  became the acting intelligence chief of the Ugandan

25  military.

1            Another Rwandan who was with him, Fred, and I

2   apologize, I always mess up his name, it is difficult to

3   pronounce, it's Rwigema, Fred was the acting head of the

4   military, the chief of staff of the military.  The two

5   of them were exiled Rwandans who'd come up together and

6   worked their way up to the top of the Ugandan military

7   and trained there, and they had a core cadre of Rwandans

8   who worked with them in the late 1980s.  In the late

9   1980s they formed the Rwandan Patriotic Front and they

10   began a plan to move back and fight a civil war inside

11   of Rwanda.

12       Q.    Did there come a point in time where this

13   Rwandan Patriotic Front made an incursion into Rwanda?

14       A.    They did.  That started in 1990 and it's what

15   we typically refer to as the civil war that lasted from

16   1990 up until 1994.  Kagame was actually studying in the

17   United States at Fort Leavenworth.  He was on an

18   exchange program with the U.S. military.  When the civil

19   war started, he had to fly back almost immediately,

20   though, because Fred, who was the leader of the

21   movement, was killed in the first attack.  He was the

22   person leading the first attack.  Kagame flew back, took

23   a circuitous route through Europe, through Uganda and

24   into Rwanda and took over as the head of the RPF from

25   that point forward.

1       Q.    After the incursion by the RPF was there also

2    a change within Rwanda from the single party to a

3    multiparty system?

4       A.    There was.  And there were a number of factors

5    that were involved.  The RPF attacking from Uganda into

6    Rwanda put a lot of fear into Rwandans.  And this was at

7    an every day level.  There was a war going on and they

8    were being invaded.  It was also very fearful for the

9    leadership, though, because they realized it's a very

10   tenuous hold on power.  And what happened at that time

11   was a lot of people who had been falling out with

12   Habyarimana, the president of Rwanda, started to blame

13   him for the problems of the RPF coming in and for the

14   fact that the Rwandan military couldn't quickly stop the

15   RPF.  What the Rwandan military realized was they were a

16   pretty good military at stopping internal dissent, but

17   they were not equipped to fight a war, and especially

18   not a war against people coming in who've been rebels in

19   the bush for a number of years and who had significant

20   military training at that point in time.

21          The second factor that comes in here is like

22   most African countries, Rwanda had been supported by one

23   or the other of the super power groups during the cold

24   war.  In Rwanda's case their primary patron was France

25   and to a lesser extent Belgium was still a patron there.

49

1    And after the end of the cold war we saw the major

2    powers pulling back their support.  Where France would

3    have been an uncritical supporter and Habyarimana could

4    have done whatever he wanted to during the cold war as

5    long as Rwanda didn't go to the communist side, now

6    France was saying, all right, you're kind of not a

7    democracy and we want to see you move toward

8    democratization and the fact that you have a one party

9    state is problematic.  We'd like to see that move toward

10   more open elections.  And by 1991 what ended up

11   happening was changes in the election laws that allowed

12   for a multiparty system that was pushed both by the

13   external struggle by the civil war and by the patrons in

14   the west who provided a lot of funding.

15        Q.   And did there come a point in time during the

16   civil war and after the move to multipartyism that an

17   agreement was reached to share power?

18        A.   There did, yes.  The civil war continued in

19   1990, '91.  By the beginning of 1992 it was pretty clear

20   that the RPF left unchecked was going to win the civil

21   war and that there was very little question that they

22   would march across the country, French troops actually

23   had to become actively involved as opposed to just

24   helping out the Rwandan military, French troops became

25   actively involved in supporting the Rwandan military at

1    that point in time and most historians look at it and

2    suggest that without French support the Rwandan

3    government would have fallen much, much sooner.

4           What ends up happening is a push for a peace

5    agreement, and that peace agreement is what we now all

6    call the Arusha Accords signed in Arusha, Tanzania, and

7    it was an agreement that was between the Rwandan

8    government, the RPF, and also the other political

9    parties inside Rwanda and the neighboring states.  And

10   the realization was this couldn't just be an agreement

11   between the government and the RPF because the

12   government didn't really control the country at that

13   point in time.  And it was necessary to have the other

14   internal political parties become involved in that peace

15   agreement to have some chance of the agreement actually

16   working because most people realized Habyarimana wasn't

17   speaking for the other parties.

18   Q.    What happened after the Arusha Accords with

19   this ongoing civil war?

20   A.    Several things.  There was a lull in the

21   fighting after the Arusha Accords pretty much up until

22   the genocide begins in April 1994.  The lull in

23   fighting, though, allowed a number of things to go on.

24   The first is the Accords had said that the RPF would be

25   power sharing, would have a share of the power in the

1    new government.   They were given some shadow ministers

2    inside the government and the RPF was allowed to house

3    troops inside of Kigali, the Rwandan capital, to help

4    guarantee the agreement.

5            The more important thing internally inside

6    Rwanda was Habyarimana's enemies, mostly people inside

7    of his own party, realized that he had effectively sold

8    them out from their perspective.   That he cut a deal

9    that they weren't willing to live with.   And this was

10   the beginning of what we call the Hutu power movement

11   with a Hutu power party coming out of the MRND, the Hutu

12   power wing, that focused on the idea that Hutus are

13   superior to Tutsis.   Tutsis are invading our country.

14   They're going to take all of your things.   All Tutsis

15   have to be stopped.   And it started linking all Tutsis

16   together such that it wasn't just invaders but all

17   Tutsis across the country were demonized.   They had a

18   number of tools to do this.   One of the most terrible

19   was RTLM radio, which is often called Radio Mille

20   Colline, Radio of a Thousand Hills.   Rwanda is the

21   country of a thousand hills.   Radio was the primary

22   means of communication with the population, and RTLM

23   radio moved from a popular populist radio station to a

24   radio station that was largely controlled by the Hutu

25   power party, and that started to completely demonize the

1    Tutsi people, all of them, not just the soldiers but any

2    Tutsis.

3         Q.    And if you could then take us up, this jury

4    has heard many times about the date of April 6, 1994, if

5    you can describe one more time for them what happened

6    that day and the consequences of that event?

7         A.    Very briefly, April 6, 1994, the president,

8    Habyarimana of Rwanda, along with the president of

9    Burundi are flying back from some discussions on the

10   peace accords and their plane is shot down as they come

11   into Kigali airport.  We don't know to this day, and I'm

12   not sure we ever will know who shot it down.  There are

13   allegations that the Belgians did it, that the Hutus did

14   it, that the Tutsis did it, and there is simply not an

15   enormous amount of proof any one way or another.  What

16   we do know is the plane being shot down was the trigger

17   for the terrible genocide that began at that point in

18   time.  The Hutu power groups had formed something that

19   had come to be called the Interahamwe militias.  They

20   were effectively primarily youth militias of extremist

21   Hutus who had bought in completely to the extreme anti-

22   Tutsi message, and they had been waiting for a trigger.

23   They arguably didn't know what it was, but they were

24   looking for it and they had a signal that was going to

25   go out over RTLM radio.  When the trigger came, the

53

1    signal was to cut the tall trees.  And when RTLM

2    announced that it was time to cut the tall trees, the

3    Interahamwe and the military allies with them,

4    significant parts of the military were working with

5    them, knew that it was time to begin killing Tutsis, and

6    that was the code to start the genocide.

7         Q.    We will evolve in our discussion into what

8    happens in that period between April and July.  First,

9    you've used the term genocide several times now in your

10   discussion.  Was the events in Rwanda in 1994 a

11   genocide?

12        A.    Absolutely.  I have no personal doubt in my

13   experience, in my reading of the literature, in my study

14   both as it was going on and since that a genocide

15   occurred.  I think it was a very complex genocide.  It

16   was certainly not a genocide in which only Tutsis were

17   killed.  There were both Hutus and Tutsis killed at that

18   point in time.

19            There are a few scholars who question whether

20   it was a genocide.  There were some Rwandan dissidents

21   who question whether it was formally a genocide.  If

22   they do they typically question it on very legalistic

23   grounds.  It's hard to prove intent to commit genocide

24   on a large level honestly because a lot of the people

25   who might be witnesses are dead and that makes it

1    difficult to prove that intent.  Personally, though, I

2    see no reason why that we should not describe this

3    accurately as a genocide.

4        Q.    You mentioned a moment ago that during this

5    period there were also significant number of Hutus who

6    were killed.  Have you heard a description of the

7    concept called the dual genocide?

8        A.    I have, yes.  There is something called a dual

9    or actually usually double genocide theory.  This is

10   something the Rwandan government will frequently accuse

11   people of.  It comes down to the way the Rwandan

12   government currently defines the genocide.  It's a

13   question of control of information inside the country

14   which begins with control of information about the

15   genocide.

16          According to the Rwandan government and

17   official interpretation, only Tutsis were killed in the

18   genocide.  Hutus were the only perpetrators.  Tutsis

19   were the only people who died.  In fact, what we know is

20   that Hutus, militia, military and others killed both

21   Tutsi and Hutu during the genocide.  Many, many Hutus

22   were swept up in the genocide.

23          At the same time during that period, the RPF

24   restarted the civil war the day after the genocide began

25   and killed many people, primarily Hutus and a few

1    Tutsis, as they were coming into the country.

2            To have the double genocide theory I believe

3    you would really have to say in an objective sense that

4    the Tutsi RPF was also committing a genocide.  I don't

5    see that out of everything that I have read or seen on

6    the subject.  The Tutsis absolutely committed war crimes

7    and crimes against humanity.  The RPF militia that were

8    coming into the country were extreme, they were violent,

9    they were horrific, but I don't believe from everything

10   that I've read that they were trying to wipe out the

11   Hutus.  They were simply coming in as a part of war.

12   There was clearly, though, a genocide that happened, but

13   it was a genocide in which Tutsis and Hutus were killed

14   almost in equal numbers.

15       Q.   If you could expound upon that.  We've heard

16   figures ranging approximately 800,000 people were killed

17   in those horrible days.  What's your understanding of

18   the scholarly literature on the actual statistics?

19       A.   Sure.  I believe that 800,000 is an excellent

20   scholarly consensus.  The fact is, no one knows.  There

21   is no firm number out there.  The numbers killed range

22   any place from 500,000, which is the official Rwandan

23   government number which only includes Tutsis, up to

24   about 1.2 million.  To get to the 1.2 million killed you

25   probably have to go to the end of 1994 and not stop when

1    the genocide ends in July.

2            Eight hundred thousand is, I believe, an

3    excellent consensus number that most scholars would

4    agree with, and that number is fairly evenly split.  In

5    terms of the number of Tutsis killed, estimates are any

6    place from 300,000 to 600,000 Tutsis were killed during

7    the genocide.  That's of about 800,000 living in the

8    country at the time.  Probably the best consensus there

9    that most people use is that 400,000 Tutsis were killed

10   during the genocide.  Four hundred thousand out of

11   800,000 leaves another 400,000 Hutus who were also

12   killed during the genocide.  And again, they were killed

13   by military, by Interahamwe militias, and by RPF coming

14   into the country.

15       Q.   You mentioned a moment ago that there's a

16   distinction between what constitutes a genocide versus

17   war crimes and crimes against humanity.  If you could

18   elaborate briefly for the jury just what that

19   distinction is?

20           MR. CHAKRAVARTY:  Objection, your Honor,

21   irrelevant.

22           THE COURT:  Objection?

23           MR. CHAKRAVARTY:  Objection to what the

24   difference is between war crimes and genocide.  It has

25   nothing to do with this case.

1          MR. HOWARD:  I think the definitions do have

2    something to do with this case, your Honor.

3          THE COURT:  Well, but there's no, neither side

4    contests that there was a genocide in Rwanda, correct?

5          MR. HOWARD:  Let me -- allow me to, that's

6    correct, but how that is defined is actually an issue in

7    the case.  So what I'd ask the professor to do is to

8    define what a genocide is, what the term means.

9          THE COURT:  Well, there are statutory

10   definitions.

11         MR. HOWARD:  That's true, yes.

12         THE COURT:  But it's not an issue in this

13   case, right?

14         MR. HOWARD:  But, you know what, judge, I

15   thought it was, but I'll move on, that's fine.

16         THE COURT:  Well, if you think it is, but I'm

17   not following you.

18         MR. HOWARD:  All right.  I will tell you what,

19   judge, I'll just move on.

20      Q.   And what I'd like you to do at this point, we

21   have talked some about the statistics, and you mentioned

22   a moment ago coming out --

23         THE COURT:  Well, you know, you're right, I

24   suppose it is.  Why don't you come to sidebar.

25                         AT SIDEBAR

1          MR. HOWARD:  I thought they have to prove, if

2     they are going to prove that she participated in the

3     genocide, is that genocide has a definition to it and

4     one of the things, part of the definition is the intent,

5     and there's a difference in intent between what's

6     genocide and what's a war crime or crime against

7     humanity.  That's what I was attempting to show so that

8     I can then later focus on just what this actually means

9     and what it meant to my client.

10         THE COURT:  Maybe I'm over-thinking it but, I

11    mean, you're not opposing a defense that says look,

12    she's did a lot of bad things but it wasn't with the

13    intent to eliminate Tutsis, so therefore it's not

14    genocide.  Is that what you're thinking?

15         MR. HOWARD:  That is not the theme of our

16    defense because we absolutely deny, but the jury still

17    has to make that conclusion, don't they?  Because what

18    if they say, well, she did these things but she didn't

19    have the intent, therefore not guilty.

20         THE COURT:  Well, not guilty of that

21    particular theory.

22         MR. HOWARD:  Right, right, which is part of

23    the indictment.

24         THE COURT:  All right, but if that's the case

25    then why would we stray from the definition that I would

1   assume I would instruct the jury on the statutory

2   definition of what genocide is?  When the United States

3   government says did you participate in genocide, they

4   necessarily mean genocide as defined in the statute.

5          MR. CHAKRAVARTY:  The witness, my memory is

6   the witness -- my memory of the witness's testimony

7   already is the only thing scholars quibble about is

8   whether they had the intent, so he's already elicited

9   the testimony.  To go back now it seems both redundant

10  as well as distracting.  The issue about other war

11  crimes, crimes against humanity, that seems completely

12  irrelevant and that's what prompted me to stand up.

13         THE COURT:  Okay, I agree.

14         MR. HOWARD:  I'm happy to move on, judge.

15         THE COURT:  All right, great, I tend to agree.

16  Thank you, Mr. Chakravarty.

17                  BEFORE THE JURY

18     Q.   BY MR. HOWARD:  Dr. Endless, if you could, at

19  this point we've talked about the numbers, we've talked

20  about the issue of ethnicity as it informed the

21  genocide, I want to talk now and start to move past

22  1994.  Can you first describe in your opinion some of

23  the activities of the RPF following July of 1994?

24     A.   Certainly.  When the RPF came in pretty much

25  everybody in the international community and many

60

```
1    Rwandans who I've spoken to personally thought they were
2    the knight on the white horse.  That they were the group
3    that was coming in to stop the genocide.  And what
4    pretty quickly became clear was that that wasn't going
5    to be the case, and that it was going to be more of the
6    same type of governance but from the other side.  So, to
7    begin, they went with the coalition government.  They
8    actually had a Hutu as president and as prime minister
9    assuming positions.  Paul Kagame was in charge of the
10   military but did not take the title of president or
11   prime minister for six or seven years until much later.
12   This government looked like it might actually try to
13   bridge the gap between Hutus and Tutsis.  Unfortunately
14   what we saw very quickly through RPF military actions
15   and then shortly after that political actions was a
16   government that was interested in its own dominance and
17   in making sure that the Tutsis who came in from Uganda,
18   and that's a separate group from all the other Tutsis
19   that were in the country at the time, the Tutsis who
20   came in from Uganda were the ones who were in power and
21   the ones who controlled everything.  We saw a number of
22   retributive killings over the course of the six months
23   after the genocide.  Scholars suggest that was any place
24   from 200,000 to 400,000 Hutus who were killed inside of
25   Rwanda.
```

61

1          There are a couple very famous incidents in

2     1994 and 1995.  In 1994 the UN High Commissioner for

3     Refugees had sent in investigators to look into the

4     refugee camps, the displaced person camps that had been

5     set up inside of Rwanda and across the border, and the

6     representative of that commissioner filed something

7     that's called the Gersony Report.  That report suggested

8     that the Rwandan military had gone in to several

9     different villages and had killed tens of thousands of

10    people.  This report was actually squashed and never

11    came out officially in public, it still hasn't, it has

12    been leaked and it's now freely available on the

13    internet, but the official report was never published to

14    cover up what the Rwandan government was doing at the

15    time.

16          Then in 1995 we have the now infamous Kibeho

17    Massacre.  The Kibeho Massacre involved the Rwandan

18    government, the Rwandan troops rather, going into a

19    refugee camp and slaughtering refugees in front of

20    Australian peacekeepers and NGO workers who were there

21    with Doctors Without Borders, Medecins Sans Frontieres

22    is the official name of the group, had witnesses who

23    watched these people be slaughtered.  Men, women,

24    children were killed, pregnant women who were killed

25    with knifings, men who were pushed into latrines and

62

1  shot but not killed and allowed to die in latrines.  The

2  estimates in that one killing are that anywhere from 25

3  hundred to 4,000 people were killed, and people, the

4  representatives there think it may have been more than

5  that but they weren't sure enough to say.

6          These were some of the types of things that we

7  saw happening in terms of oppression.  By the time of

8  the Kibeho Massacre in 1995 it had actually become clear

9  enough to the Hutu politicians who were part of this new

10 coalition government that the Tutsis were not interested

11 in sharing power, that they were just there as what the

12 Rwandans call stuffed suits, that they were just filling

13 the chair, that the Hutu politicians actually began to

14 resign, and in 1995 we saw several very high level Hutu

15 politicians resign their posts.

16     Q.   You were talking about the massacres, was that

17 done by the RPF?

18     A.   It was done by the RPF military called the RPA

19 at that time, the Rwandan Patriotic Army, they had

20 changed their name when they officially took over the

21 country.

22     Q.   And does the historical scholarship also

23 address incursions into nearby Congo refugee camps?

24     A.   It does.  The biggest incursions in the Congo

25 started in 1996.  There were a number of smaller ones

1    before that time, but we have substantial evidence.  The

2    refugees, Hutu refugees in large part fled over the

3    border into neighboring Zaire, what is now Congo to the

4    west.  And by the time that 1994 and 1995 ended,

5    estimates are that there were as many as 2,000,000

6    refugees, primarily Rwandan Hutu refugees who were

7    living across the border.

8            Unfortunately the Interahamwe militia and

9    elements of the government had been able to flee with

10   them.  To put this in perspective, though, we're talking

11   about estimates of somewhere between a hundred to

12   200,000 people actively participated in the genocide.

13   Two million people fled across the border for fear of

14   their lives as the RPF advanced during the civil war.

15           In 1996 what we start seeing is the beginning

16   of incursions that still have been going on as of last

17   year of the Rwandan military going in to the Congo, and

18   they pretty much always claim that they are chasing

19   after Hutu militants or they are chasing after

20   Interahamwe.  The problem is, nongovernmental

21   organizations and international organization workers

22   working in those camps have filed regular reports since

23   that point in time that while they might be going after

24   rebels, enormous numbers of civilians are being killed,

25   and actually in many cases civilians are being targeted.

1          Two years ago the United Nations put out

2     something called the Mapping Report that talks about the

3     Congo just in the 1990s and over that period of time

4     about two million people were killed from 1996 until the

5     end of the 1990s and the UN Mapping Report suggests that

6     the Rwandan military were specifically targeting Hutu

7     civilians, and they were targeting them for death.  They

8     declared that war crimes and crimes against humanity had

9     been committed and that there may even be enough

10    evidence that another genocide is going on across the

11    border right now.

12         Q.   In addition to those activities was there also

13    with the new government and the RPA, you had mentioned

14    that there were a number of retributive actions taken,

15    retribution.

16         A.   Right.

17         Q.   Were there imprisonments of people who didn't

18    leave the country?

19         A.   Yes.  The retributive killings, first the

20    imprisonments were of Hutus not Tutsis.  There were a

21    number of retributive killings.  We can actually point

22    to a couple of cases in which someone in the military

23    was actually charged with a crime in these killings.  In

24    general there is agreement these are people who had

25    fallen out with the military.  The RPF did not accuse

1   their own, did not try their own.  They did, however,

2   begin imprisoning Hutus, especially either prominent

3   Hutus or in particular in the 1990s Hutus who dissented

4   from what the RPF Tutsis wanted to do.  And this was the

5   beginning of a point in time where dissent became

6   dangerous.  It became clear in 1995, '96.  Early charges

7   were typically corruption.  If you were a politician who

8   did something that the ruling party was opposed to, you

9   would be accused of corruption and charged and find

10  yourself in jail.  And the trials, according to all

11  western sources including U.S. State Department, were

12  not even vaguely legal or fair.

13      Q.    Apart from ruling people being imprisoned,

14  were there also sort of the ordinary local folks who

15  were Hutus who were being imprisoned without being

16  charged?

17      A.    There were.  We see more of that as we get

18  into the last ten years, and that really started to pick

19  up in 2003 after a new constitution was formed.  Before

20  that point in time the focus was more on high profile

21  people.  But even in the late 1990s, what we saw were

22  the use of local defense forces.  These are groups that

23  are stationed, often just one or two people, in a

24  village that are often seen as the real power behind the

25  throne.  So there might be a mayor or burgomaster who is

66

1    in a village, but there is also typically someone who is

2    a member of the RPF and a member of the local defense

3    forces.  They are allowed to carry a weapon with them.

4    And they are known as the person who really makes the

5    decisions.  So if the local politicians make the wrong

6    decision, the local defense forces person might overrule

7    them.  And the job of these individuals is to keep

8    control at the local level and to make sure that no one

9    is actively speaking out against the government.

10   Control of dissenters is incredibly important to the

11   RPF.

12        Q.   I think you mentioned a few moments ago that

13   new governments in Rwanda tend to write their own

14   constitutions.  Did the Kagame led government become the

15   official government at some point?

16        A.   They did, yes.  I mentioned 1995 we saw a

17   number of resignations among prominent Hutus.  In 2000,

18   any pretense of a coalition government completely fell

19   apart.  We saw the last resignations of major Hutu

20   politicians and Paul Kagame actually took the title of

21   president in 2000.  They began working toward a new

22   constitution that was formalized in 2003, and that

23   constitution very, very clearly in a very legalistic

24   sense embedded the RPF as the sole source of power

25   inside of Rwanda and set up a wide variety of laws.

1  There's a scholar named Filip Reyntjens, who is a

2  European scholar, probably be a preeminent name in

3  Rwanda, when he talks about this constitution he calls

4  it a document that was set up with the purposeful intent

5  of stopping all dissent and setting up a legal system

6  such that the government can use laws to control people.

7  We see the beginning of what are called genocide

8  ideology laws, genocide negationism laws, double

9  genocide theory laws, and divisionism is also formalized

10  under the law at that point in time.

11          MR. HOWARD:  Your Honor, before I go into --

12          THE COURT:  This would be a good time, thank

13  you, appreciate it.

14          Ladies and gentlemen, we'll take our

15  midmorning break now.

16          (Recess taken.)

17          THE COURT:  Mr. Howard.

18          MR. HOWARD:  Thank you, judge.

19     Q.   BY MR. HOWARD:  Dr. Endless, before we took

20  the break you were beginning to describe this concept of

21  genocide ideology and how it is embedded in the

22  constitution of Rwanda.  Can you just remind the jury

23  what is the concept of genocide ideology?

24     A.   Certainly.  Genocide ideology and it's often

25  confused both inside and outside of Rwanda with a number

1    of other terms, genocide negationism, double genocide

2    theory, divisionism, it's hard to tell which of these

3    terms will apply, so I'll kind of describe them

4    together.

5              The idea of genocide ideology is encoded in

6    the 2003 constitution and then in the federal laws of

7    Rwanda.  What it effectively says is you may not take a

8    position on the genocide that disagrees with the

9    official position of the Rwandan government.  So, if I

10   were sitting in Rwanda right now, I would be a genocide

11   ideologist probably 10 or 12 times over so far today,

12   much less than anything I have done before.  And as

13   examples, the official position is only Tutsis were

14   killed.  I state, as does almost every academician I

15   know, as do all nine governmental organizations, as does

16   the international community, that Hutus and Tutsis were

17   killed.  It's illegal to say that inside of Rwanda.

18   It's illegal to say that the RPF committed war crimes

19   and crimes against humanity during the genocide or since

20   that point in time.  It's illegal to say that they are

21   engaging in any type of activity especially potentially

22   genocidal activity next door in the Congo.  All of those

23   things, speaking all of those things publicly are

24   against the law.

25             So, there are some people who will try to say

1   that the genocide didn't exist.  It was just war crimes

2   and crimes against humanity.  They might be a genocide

3   negationist.

4           If you suggest that there might have been two

5   genocides going on you're a double genocide theorist.

6           Divisionism is a charge that started a little

7   before 2003 but that again was included in the legal

8   codes after that point in time.  Divisionism is a

9   slightly broader category of anything else that might

10  suggest to people that the ruling party is not doing the

11  right thing.  So if you were discussing the genocide of

12  Hutu and Tutsis in any way, you could be accused of

13  being a genocide ideologist.  If you are disagreeing

14  with any official government doctrine, you can't

15  criticize the president without the possibility of being

16  arrested, would be an example of that, you were a

17  divisionist.

18      Q.   Earlier in this trial we had heard the

19  comparison of these types of laws to say laws in Germany

20  that proscribe against denying the holocaust.  Is there

21  a difference?  Are you familiar with those --

22      A.   I am, yeah, and certainly with all the popular

23  lore I know you can't talk about the Holocaust or talk

24  about any positives of Nazism and Nazi Germany.  There

25  is a significant difference here though.  The Rwandan

1  government would like us to believe they are the same

2  and they regularly say, this is just like German laws

3  against the Holocaust.  The difference, though, is both

4  in the current and in the historical context of what

5  happened.  Currently we have a German government that's

6  widely recognized as democratic that has changes in

7  parties on a regular basis and it doesn't use

8  discussions of the Holocaust as an element of rule.

9  Right now we have a Rwandan party in charge that uses

10  the genocide.

11          Second point is looking back on history the

12  analogy is just wrong.  In the case of Rwanda we had a

13  civil war in which the RPF Tutsis came into the country,

14  fought a four-year long war, started terrible genocides,

15  started and mostly perpetrated by the Hutus.  The Tutsis

16  won, the Tutsis took power, and then the Tutsis kicked

17  the Hutus out, marginalized them, made them refugees,

18  passed laws against them.  This would be as if the

19  holocaust was a case of a civil war between Jews and

20  Germans that went on for four years and then at the end

21  of the civil war the Jews won the civil war, ended the

22  Holocaust, took power, and kicked the Germans out of the

23  country.  That would be a comparable analogy and we

24  could talk about at that point in time.  That's not at

25  all what's happening here.

1      Q.   You mentioned a moment ago about the

2    government through its genocide idealogy laws forcing an

3    official narrative.  First of all, is there an official

4    narrative of the genocide in Rwanda?

5      A.   There is.  The official narrative of the

6    genocide, and to a further short version, I can expound

7    if you like more, Hutus are bad, Tutsis are good, and

8    Tutsis are victims.  All killing during the genocide was

9    done by Hutus.  Only Tutsis died during the genocide.

10   You're not allowed to talk about the civil war as part

11   of the official narrative.  The RPF were the saviors of

12   the country and the RPF came in and ended the genocide

13   and then since that point in time the RPF have done

14   nothing but work toward reconciliation to the point that

15   many officials inside the RPF regularly declare that

16   Hutus and Tutsis no longer exist, that these are no

17   longer important distinctions inside of Rwanda, that the

18   people have all reconciled.

19     Q.   Earlier you talked about in addition to

20   genocide idealogy the violence perpetrated by the RPF.

21   Was that -- is that a forum that the RPF had used

22   historically to force the official narrative?

23     A.   To some extent.  It is much more occasional

24   violence combined to back up a known threat of violence.

25   The official narrative is something that people in

1    Rwanda understand and scholars have talked about this,

2    and Tim Longman actually is one of the people who's

3    talked about this, I was just reviewing his work

4    recently.  Filip Reyntjens, Human Rights Watch talk

5    about this.  Rwandans are people who have a very -- are

6    used to authoritarianism is probably the best way to put

7    it, and they tend to do what people in authority want

8    them to do, and they tend to say what they believe

9    people in authority want them to say.  This is

10   occasionally sometimes in very harsh ways backed up by

11   violence, and the Rwanda regime is typical of many other

12   authoritarian regimes I've read about and studied, they

13   don't use violence constantly.  It would be wrong to

14   suggest that someone is always threatened before they

15   say something.  We think about it in American terms and

16   we think there would have to be a direct threat to stop

17   us from telling the truth about something.  In the case

18   of Rwanda the threats don't have to be direct.  There is

19   what Longman and what Reyntjens and others have called a

20   societal knowledge that the government is in control and

21   that you should not say anything that is opposed to the

22   government.  This is both a positive and a negative by

23   the way.  You don't say things the government wouldn't

24   want you to say.  At the same time you do say things

25   that the government does want you to say, and that

1   might, not in all cases, but that might lead to

2   benefits.  Basically if you play ball and if you say the

3   right things, you have a better chance of being

4   included.  The basic Rwandan, though, really just wants

5   the government to pay no attention to them at all.  When

6   the government does pay attention, they do what they

7   think the government wants them to do in most cases.

8       Q.   We'll come back to that concept in just a

9   moment.  What are some of the other devices in your

10  opinion that the Rwandan government has installed to

11  enforce the narrative?

12      A.   Sure --

13           MR. CHAKRAVARTY:  Objection, your Honor,

14  enforcement of an official narrative by the Rwanda

15  government doesn't seem relevant.

16           THE COURT:  It doesn't, does it?

17      Q.   All right.  What are -- I will withdraw the

18  question.  You have described the official narrative.

19  Are there other devices in Rwandan society that tend to

20  promote the official narrative?

21      A.   Absolutely.  I had already mentioned the local

22  defense forces.  People in local communities down to the

23  village level who are known supporters of the

24  government, and you need to be careful what you say in

25  front of them, and most Rwandans perceive that their job

1   is to basically rat you out if you do the wrong thing,

2   to tell if you do the wrong thing, or possibly to help

3   you if you do the right thing.

4            It's been very clear in the press, there is no

5   freedom of press in Rwanda.  It's less than 150, I want

6   to say it's number 156 out of 190 countries in the world

7   according to Reporters Without Borders in terms of lack

8   of press freedom.  The official press, the new times,

9   and the Rwanda news agency are effectively government

10  run press even though they are technically independent.

11  They tell and they reenforce the government's story over

12  and over again and there is effectively no other press

13  that people get, thus that reinforcement of the story is

14  very effective.

15           This goes from the top levels, from the

16  speeches and the press, down to the bottom levels, and

17  what you'll read in a lot of literature, hear in a lot

18  of literature, is the idea that this is a communal based

19  issue.  That communities know that you need to do the

20  right thing, and that if you're someone who doesn't

21  choose to do the right thing, it's not just that the

22  government might do something to you, it's that your

23  community might ostracize you and your community would

24  not want you as part of that community if you're

25  effectively not a loyal Rwandan the way it is described.

1    But it really is top to bottom mostly in direct control

2    with some examples of arrests.

3              This, by the way, goes from homeless people up

4    to party leaders.  There were party leaders during the

5    last election, people who were trying to form opposition

6    parties who were jailed, who were exiled, and in one

7    terrible case the vice president of one of the potential

8    opposition parties was beheaded and killed.  To be fair

9    there is no direct proof that this was done by the

10   Rwandan government, but it was part of a number of

11   different activities that very clearly in the minds of

12   most international observers point to the Rwandan

13   government doing it.  On the other end of the spectrum,

14   even homeless people on the streets might be swept up.

15   There are re-education camps in Rwanda, and elementary

16   school students, homeless people and dissident party

17   leaders, refugees returning from other countries, have

18   all been sent to these re-education camps to learn the

19   official story so that they can better be a part of

20   society.

21        Q.   Have you also in addition to the re-education

22   camps that you just described, have you also studied the

23   gacaca court system?

24        A.   I have, yes.

25        Q.   And does that play a part in your view of how

1   the Rwandan government reinforces the official

2   narrative?

3        A.   It absolutely does.  The gacaca system is a

4   local system that was setup to try perpetrators of the

5   genocide.  We had international and local efforts after

6   1994, the UN formed the International Criminal Tribunal

7   for Rwanda, but it could only try very limited numbers

8   of the highest end suspects.  The rest were supposed to

9   be tried in Rwandan courts.  The Rwandan court system

10  very quickly realized their normal court system would be

11  horribly overburdened.  It was something like, and I

12  don't remember the exact numbers, in the range of 20,000

13  prison cell seats inside of Rwanda and about 300,000

14  prisoners right after the genocide occurred, and there

15  was just no way to work them all through the system.

16       What the Rwandan government came up with in

17  the late 1990s, 1997, 1998, and it really wasn't put

18  into effect 2005, 2006, was a system called gacaca or

19  local courts.  There are a couple different translations

20  of gacaca.  I think the most common one is justice on

21  the grass.  These are courts of village elders, leaders

22  in the communities who in the past would get together to

23  decide on property disputes or whose goat is it or did

24  that cow come over my property and eat something on my

25  property.  Those were the types of decisions that they

1    made.

2           These courts were turned into local level

3    courts to try people who were accused of genocide.

4    Perpetrators were encouraged to come forward and to

5    confess.  That's extremely important in Rwandan society

6    if you want reconciliation, to have a confession and

7    have the person admit to it.  And if they confessed,

8    they were supposed to get lighter sentences, but many

9    people were accused over time.

10          These courts started off with great

11   intentions.  There were always questions about whether

12   the courts would work because we were talking about

13   village elders trying genocide cases and they simply

14   didn't have the training, they didn't have the legal

15   system setup to do it.  That was one of the problems

16   that we certainly saw in gacaca.

17          The other side, though, is gacaca was very

18   quickly politicized, and there was a realization that

19   the government at both the federal and the local level,

20   was driving the people who would be brought to trial,

21   was encouraging judges to make the right decisions from

22   the government's perspective.  The government was

23   clearly preventing any Tutsis from being brought to

24   trial, and the government was supporting groups, and

25   Longman has written about this fairly significantly,

78

1    that encouraged witnesses to not tell the truth at

2    gacaca in order to get someone convicted.

3        Q.   You have talked about now several institutions

4    within Rwanda that are used to enforce the official

5    narrative.  In your expert opinion, having reviewed and

6    been an expert in this area, and having spoken to many

7    Rwandans outside of Rwanda, how do these institutions

8    translate into a cultural phenomenon to those who may be

9    questioned as a witness?

10       A.   Sure.  There are a couple of Rwandan cultural

11   things that are I believe important from a witness

12   perspective.  The first is one that I've already

13   mentioned, which is with absolutely no preparation

14   whatsoever, no pressure put on them, the average Rwandan

15   is likely to do what they believe the government wants

16   them to do.  If they understand the official narrative,

17   they understand what the government would want in a

18   particular case.  The average Rwandan is likely to focus

19   on that as an important piece of their answer.

20            Something else we see in Rwanda that is

21   particularly important, and this goes to people who have

22   testified at gacaca and a lot of the survivors groups

23   that Reyntjens and Longman, Des Forges, Human Right

24   Watch and others have written about is a concept that I

25   like to think of as second person truth.  And I notice

1    this with Rwandans personally.  I deal with a lot of

2    Rwandans in exile on a regular basis, and one of the

3    first things I've realized when talking to them is they

4    will often tell you a story that from a first person

5    prospective is a truth to them.  I saw this happen.  I

6    know that this happened.  And what actually happened was

7    their sister saw something happen or their brother saw

8    something happen or their neighbor saw something happen,

9    and the neighbor told them a story.  And when they tell

10   it to you, they tell it as if they saw it.  This is

11   something that is particularly strange to us sitting in

12   the U.S., sitting in the west, because when we talk

13   about telling the truth it's supposed to be things that

14   we've seen.  To a Rwandan there is not necessarily going

15   to be that distinction.  If you ask them if they saw it,

16   they are likely to say yes, even if it was someone else

17   who saw it, and you often have to probe deeper.  I find

18   myself doing that a lot with the people that I work

19   with.  They will make some type of claim and I'll have

20   to say did you really see that or where did you get that

21   information from, and I'll have to double-check the

22   claim and look for other sources to be sure that that

23   claim is accurate.  It's not that it's inaccurate all

24   the time, it's simply that even with friends I often

25   can't trust the exact things they say and I spend a lot

1    of time confirming those things.  At trials, the gacaca

2    trials there's a lot of records that show this and the

3    U.S. Department of State even had a report on it, I

4    think it was 2008, 2009.  One of the problems at gacaca

5    has been that there are a number of survivors groups.

6    Ibuka is the largest most well-known survivors group.

7    These are groups of people who have gotten together to

8    seek justice for the genocide, average ordinary

9    Rwandans.  They are groups that are often supported

10   financially by the Rwandan government to help them

11   exist.  That's not unusual in other countries certainly.

12   But in this particular case there are well vetted

13   allegations that Ibuka members have simply made things

14   up about things that happened at genocide.  There were

15   three or four women in particular who were talked about

16   in this report --

17           MR. CHAKRAVARTY:  Objection, your Honor.

18           THE COURT:  Sustained.

19      Q.   Dr. Endless, we have talked about the two

20   cultural phenomena that you experienced and have

21   studied.  Do those cultural phenomena make the people of

22   Rwanda susceptible to the official narrative as imposed

23   by their government?

24      A.   They do absolutely.

25           MR. CHAKRAVARTY:  Objection, your Honor, to

81

```
 1   form as well as the --

 2              THE COURT:  Sustained.

 3        Q.   Dr. Endless, I only have one other question

 4   for you.  When Attorney Chakravarty was asking you

 5   questions, one of the things you stated was you hadn't

 6   been to Rwanda, probably wouldn't be safe for you to do

 7   that.  Are you familiar with a, I'll call it an

 8   institution, I'm not sure that's what it is, known as

 9   the Friends of Evil?

10        A.   Yes, I am.

11        Q.   What is that?

12        A.   The Friends of --

13              MR. CHAKRAVARTY:  Objection, your Honor.

14              MR. HOWARD:  I questioned Dr. Longman about

15   this and he didn't know what it was.

16              THE COURT:  I'm not sure it's relevant.

17              MR. CHAKRAVARTY:  I don't see what the

18   relevance is.

19              THE COURT:  I don't either.  Sustained.

20              MR. HOWARD:  Dr. Endless, I am sure the

21   government has questions for you.  I'm going to defer to

22   them at this time.  Thank you very much.

23              THE WITNESS:  Thank you.

24              THE COURT:  Mr. Chakravarty.

25              MR. CHAKRAVARTY:  Thank you, your Honor.
```

```
 1                    CROSS-EXAMINATION

 2   BY MR. CHAKRVARTY:

 3        Q.   Dr. Endless, let me go back a little bit about

 4   your qualifications.

 5        A.   Sure.

 6        Q.   You teach a number of subjects I know you

 7   testified to?

 8        A.   I do.

 9        Q.   And in fact your personal passion is something

10   called the Model United Nations?

11        A.   Yes.

12        Q.   And that's where college kids pretend they are

13   in the United Nations and they try to deal with the

14   issues of the day?

15        A.   Correct.

16        Q.   And this is a program that you've been very

17   active in for over a decade?

18        A.   Correct.

19        Q.   And it's in that context that you first

20   started teaching after you got your Ph.D.?

21        A.   That's correct.

22        Q.   And consistently coached teams to talk about

23   the issues of the day in Model United Nations?

24        A.   That is one of the academic things I do, yes.

25        Q.   And the rest of your kind of teaching
```

1    experience is based on dealing with international

2    negotiations, international perceptions of different

3    issues that are arising around the world.  Is that fair

4    to say?

5         A.    That's accurate.

6         Q.    Any issue anywhere in the world that the

7    international community is dealing with you should know

8    something about?

9         A.    Something about.  I've got specialty areas,

10   but I do have some broad bases too.

11        Q.    In fact the only class that you've taught on

12   the genocide in Rwanda involves one portion of one class

13   that you taught I think last year about the politics of

14   the genocide well after the genocide; is that fair to

15   say?

16        A.    Actually I created the politics of genocide

17   class three years ago.  Taught it twice now.  I also

18   regularly teach an international law class that deals

19   with genocide war crimes, crimes against humanity, and

20   Rwanda is a constant example there.

21        Q.    Okay, so you're saying the international law

22   class, you're not a law professor; right?

23        A.    I teach international law.  I do not have a

24   law degree.

25        Q.    So in terms of the description of how much

84

1  your academic time is spent on Rwanda, it's actually not

2  that much; is that fair to say?

3      A.   My teaching time is not that much, that's fair

4  to say.

5      Q.   And most of your time spent focused on Rwanda

6  is related to your work with Hotel Rwanda foundation?

7      A.   Correct.

8      Q.   That is something that you donate your time

9  to?

10     A.   Correct.

11     Q.   And you agree with the mission of that

12 organization?

13     A.   I do.

14     Q.   And that's an advocacy organization with a lot

15 of the concerns about the current Rwanda government?

16     A.   Yes.

17     Q.   And that's, you actually try to lobby

18 different politicians and different governments to

19 recognize the facts that you are seeing?

20     A.   That's one of several things the foundation

21 does, yes.

22     Q.   And so the basis of your understanding of what

23 is the happening in Rwanda now, this description of this

24 narrative, that is based on what other people are

25 telling you about what they perceive the dynamic in

1    Rwanda to be; is that fair?

2         A.   If you include other people to be the

3    scholarly community, the press community, the

4    nongovernmental and intergovernmental organizations,

5    then yes, that's fair.

6         Q.   And the press community, things you read in

7    the paper?

8         A.   Yes.

9         Q.   You rely on that as well?

10        A.   That is certainly one source, yes.

11        Q.   And I asked you earlier whether you've done

12   peer-reviewed writing about Rwanda, and that's, you

13   haven't done any peer-reviewed writing either for

14   something relating to the genocide or about this

15   cultural phenomenon that you just discussed?

16        A.   No, that's correct.

17        Q.   You just mentioned before I stood up the fact

18   that when you talk to Rwandans, some of whom you're very

19   good friends, you're not sure you can trust what they're

20   telling you; is that fair to say?

21        A.   Exactly, yes, I always have to double-check to

22   make sure with other sources.

23        Q.   So it's fair to say you presume that Rwandans

24   are lying to you?

25        A.   No, that's incorrect.

86

1     Q.   You have to probe deeper in order to figure

2  out whether what they are telling you is the truth?

3     A.   I trust but verify in cases where it's

4  something that does not jive with other things that I

5  know from previous research, previous understanding.

6     Q.   And the people you're talking to from Rwanda

7  are not in Rwanda now.  They are here or in Belgium or

8  someplace else?

9     A.   Correct.

10     Q.   And despite that you still don't believe

11  anything that they tell you without verifying?

12     A.   That's an incorrect statement.  I never said I

13  don't believe anything they tell me.  I believe most of

14  what they tell me, but there are certainly times where

15  they say something that seems like it may be outside the

16  norm and I believe verification is important.

17     Q.   And you agree with me that if they told you

18  something that was not consistent with what you call the

19  official narrative in Rwanda, that that would be more

20  credible to you because it's consistent with what you

21  found in your own research?

22     A.   I'm not sure I understand the question.  Could

23  you restate it, please.

24     Q.   If the Rwandans that you've spoken with told

25  you something that was not part of the official

1    narrative, then that would not raise any red flags as to

2    whether they are telling you the truth?

3        A.    Since pretty much everything that a

4    non-Rwandan government or person in the country is

5    telling you is going to be outside the official

6    narrative, yes, that's an accurate statement.  It's

7    pretty broad, though.  That can cover almost anything.

8        Q.    So the only insider access to information that

9    you have about what's going on in Rwanda now is from

10   what these people are telling you who have left Rwanda

11   and don't want to go back?

12       A.    And also from scholars, some of whom have

13   still studied inside of Rwanda, but many of whom also

14   cannot travel there.

15       Q.    We will talk about scholars in a moment.  The

16   foundation that you're involved with, you agree with

17   with me that that's an advocacy organization?

18       A.    To some extent, yes, policy and advocacy.

19       Q.    Do you agree with me that you're an advocate?

20       A.    Yes, that is one of the roles I play.

21       Q.    And in fact you've actively tried to influence

22   different governmental leaders, including the U.S.

23   governmental leaders, in order to change their position

24   with regards to dealing with Rwanda?

25       A.    Correct.

1       Q.    For example, the Clinton administration, the

2  Clinton Foundation is very close to the government of

3  Paul Kagame, the current government over there?

4       A.    Yes.  I've never spoken to anyone inside the

5  Clinton Foundation, though.

6       Q.    But you have actually gone on the Clinton

7  Foundation website to tell former President Clinton that

8  you should think twice before you deal with Rwanda?

9       A.    Absolutely.

10       Q.    So you're trying to influence how the world

11  perceives the government of Rwanda?

12       A.    Trying to promote the truth, yes.

13       Q.    In addition to the classes that you teach,

14  international law, international health I think you

15  said, United Nations, the Model United Nations, you've

16  also been a computer consultant; is that right?

17       A.    Before I went back to grad school, yes.

18       Q.    I think from 1994 to 2004 is what you say in

19  your resume?

20       A.    That was one of the things that I did to make

21  money while I was in grad school.

22       Q.    So for ten years you were a computer software

23  consultant and you would like design websites?

24       A.    Some website designs, some database design.

25       Q.    In fact you did the twitter account for

1    Rusesabagina?

2         A.   No, I didn't actually.

3         Q.   Was it Facebook?

4         A.   I do have the Facebook account, yes.

5         Q.   Now, I asked earlier whether you testified

6    before in cases and you indicated that you had; is that

7    right?

8         A.   Correct.

9         Q.   When you testify in criminal cases, either in

10   the United States or Canada, you testify on behalf of

11   the defendant?

12        A.   Correct.

13        Q.   And in this case in fact you were hired by the

14   defendant?

15        A.   Correct.

16        Q.   If you don't mind me asking, how much are you

17   getting paid for this work?

18        A.   I believe it's $200 an hour.

19             MR. HOWARD:  Your Honor, could we just

20   approach on that point real quickly?

21             THE COURT:  Sure.

22                       AT SIDEBAR

23             MR. HOWARD:  I don't want the misimpression

24   created that my client is paying this person to come

25   testify for her because she's not, the court is, and the

1    government well knows that.

2              THE COURT:  The court's not, the government

3    is.

4              MR. HOWARD:  But that's the rate set by the

5    government.  He didn't dictate that rate.

6              THE COURT:  You should be happy that it's so

7    low.

8              MR. HOWARD:  No, I agree, but I didn't --

9    well, I just don't think --

10             THE COURT:  It's standard cross-examination.

11             MR. HOWARD:  But to lead -- well, it's

12   standard cross-examination because --

13             THE COURT:  You can clear it up on cross if

14   you'd like.

15             MR. CHAKRAVARTY:  The caution is --

16             THE COURT:  The point is it's a bias, it's a

17   bias challenge and he's being paid for his testimony.

18   Fairly common.  His answer is no, I'm being paid for my

19   time.  You can cover that.

20             MR. HOWARD:  Okay.

21                      BEFORE THE JURY

22       Q.   BY MR. CHAKRAVARTY:  Doctor, that $200 an hour

23   rate, approximately how many hours have you worked on

24   this case?

25       A.   I honestly have not put it together, counsel,

91

1    I was thinking about doing that this morning.  From

2    previous things to the current, my guess would be in the

3    80 to a hundred range, but I'm not sure.

4         Q.   Eighty to a hundred hours thus far?

5         A.   Correct.

6         Q.   And this is not the first proceeding in which

7    you testified?

8         A.   It is not, no.

9         Q.   And you actually did an expert report;

10   correct?

11        A.   Correct.

12        Q.   And some 30 pages long?

13        A.   Correct.

14        Q.   In an expert report you don't talk about the

15   particular facts as you illustrated in the trial in this

16   case; is that fair?

17        A.   Restate, please.  I just want to make sure I

18   understand your question.

19        Q.   In the expert report that you did for this

20   case, you didn't talk about the facts that came out at

21   trial in this case?

22        A.   No, I didn't.  I believe I even stated in the

23   report that I don't have any particular expert knowledge

24   of this specific case other than a few things that I've

25   read about relatives of the accused.

1        Q.    So it's fair to say that testifying as an

2   expert is not so dissimilar from your consulting as a

3   software consultant?

4        A.    I have no idea what that means.

5        Q.    You're doing it for the money?

6        A.    No, really not.

7        Q.    You don't have any particular vested interest

8   in what happens at the end of this case; do you?

9        A.    I do not, no.

10       Q.    So you're testifying for your time, you're

11   getting paid for your time?

12       A.    Getting paid for my time happens to be a

13   benefit, monetary benefit that comes out of it.  I'm

14   testifying because I think there are important points

15   here that the Rwandan government is trying to push

16   forward that are simply not true.

17       Q.    Let's talk about that.  The Rwandan government

18   is trying to put certain facts forward.  That's why

19   you're here today?

20       A.    This would fit part of the Rwandan narrative,

21   yes.

22       Q.    So, it would affect your conclusion if you

23   recognized that the U.S. government is actually bringing

24   this immigration case?

25       A.    I understand the U.S. government is bringing

93

1    the immigration case.

2         Q.   That does affect your conclusion about what

3    the Rwandan government is doing, doesn't it?

4         A.   Once again, I'm not sure what you mean by that

5    question.

6         Q.   The fact that this is a U.S. immigration case,

7    does that bear on your expert opinion as to whether this

8    case has nothing to do with the Rwandan government?

9         A.   Not particularly in and of itself, but all the

10   circumstances put together do.

11        Q.   Doesn't affect your conclusion at all?

12        A.   I apologize, counsel, I'm still not sure what

13   the question means.

14        Q.   Do you think this case is somehow a proxy for

15   the Rwandan government?

16        A.   I think the Rwandan government sees it as a

17   proxy.

18        Q.   My question to you is do you have any fact to

19   suggest that this case, an immigration case in the

20   United States, is somehow being controlled by the

21   puppeteers in the Rwandan government?

22        A.   This case fits the modus operandi of the

23   Rwandan government.  I do not have any fact directly

24   linking this particular case to the Rwandan government.

25        Q.   So, absent any fact connecting this case to

94

1    the Rwandan government, you're here to testify about

2    what the Rwandan government has done since 1994; is that

3    fair to say?

4         A.   Correct.  And previous history before that as

5    it informs that, yes.

6         Q.   And are you asking this jury to conclude that

7    because of what they've done after 1994, that they must

8    be doing something in the case?

9         A.   Must would be too strong.

10         Q.   Would it affect your expert conclusion if

11    every Rwandan witness who came in here said that they

12    weren't influenced at all by the Rwandan government?

13         A.   No, not particularly, that would actually fit

14    the mold pretty well.

15         Q.   Because the facts shouldn't interfere with

16    your opinion about the Rwandan government?

17         A.   No, that's not true.

18         Q.   Now most of what you know about the genocide

19    as it occurred in Butare prefecture you know from the

20    Human Rights Watch report called Leave None to Tell the

21    Story principally authored by Alison Des Forges;

22    correct?

23         A.   Correct, as with pretty much anyone, that is

24    the primary source for that region for anyone studying

25    the region.

1       Q.   And you recognize that Dr. Longman, who you

2   mentioned several times today, he was one of the authors

3   of that?

4       A.   Yes, I believe he worked with Dr. Des Forges

5   on that report.

6       Q.   And the two of them are perhaps the most

7   authoritative historians about what happened during the

8   genocide in Butare?

9       A.   Des Forges is certainly one of the most

10  authoritative.  There are also clearly other people who

11  are at least at or above Dr. Longman's level, but he's

12  certainly important on, I think he's probably a little

13  bit more authoritative on gacaca now than he was on the

14  early history.

15      Q.   And you cited him several times.  You've

16  relied on his authority?

17      A.   I have reread a number of his things recently,

18  yes.

19      Q.   And so you agree, I won't belabor this, but

20  you agree there was a genocide of Tutsis?

21      A.   Tutsis and Hutus, yes.

22      Q.   Clarify.  Are you saying there was a genocide

23  of Hutus?  There was some attempt to eradicate Hutus

24  between April and July?

25      A.   I believe that Hutus were caught up in the

1    genocide that was originally directed against Tutsis and

2    that the genocidal violence perpetrated by the Hutu

3    Interahamwe militia and government killed both Tutsis

4    and Hutus who were either sympathetic or who got caught

5    up in the violence in a variety of different ways.  But

6    a significant number of Hutus were killed during the

7    genocidal violence.

8         Q.   And if that has actually been exactly the

9    testimony in this case, then that would undercut your

10   notion that the Rwandan government or anybody else is

11   trying to instill some kind of narrative because that's

12   a fact; right?

13        A.   No, if I said that.

14        Q.   That wasn't my question.

15        A.   Okay.  I'm not sure what the question was.

16   Please rephrase it.

17        Q.   The question was, if the witnesses that

18   testified in this court in America testified that in

19   fact moderate Hutus were also killed along with Tutsis

20   during the genocide, then that would not be consistent

21   with your version of what the official narrative is?

22        A.   Well, I would certainly expect Professor

23   Longman would state that.  I don't think we have any

24   disagreement about that at all.

25        Q.   And if Rwandans came in and said that very

1   same thing, then that would affect your opinion,

2   wouldn't it?

3       A.   If Rwandans came in and said that very same

4   thing and were going back to Rwanda, I would consider

5   them very brave people and they would be taking a risk

6   in saying that.

7       Q.   So, you'd also agree with me that one of the

8   dynamics that led up to the genocide was that the

9   political elite, the Hutu and the Tutsi side, were

10  riling up the masses in order to motivate them to take

11  action?

12      A.   Absolutely.

13      Q.   And this is basically an ethnic scapegoat,

14  each one is blaming the other side.  When you say elite,

15  what we're talking about is the people who have

16  political privilege and financial privilege so that they

17  were actually, their fates were tied up in who remained

18  in power?

19      A.   Correct.

20      Q.   And you agree with me that Interahamwe was

21  largely responsible for the retail killing, the killing

22  on street corners and on the roadblocks throughout?

23      A.   Interahamwe supported the military.  It's hard

24  to distinguish the two.  But, you know, to say it was

25  51 percent or 60 percent maybe, I don't know that anyone

1   has done those numbers.

2        Q.   Okay, so let's distinguish the two a little

3   bit.  The Interahamwe was the youth wing of the MRND

4   party?

5        A.   Correct.

6        Q.   Incidentally, the MRND, do you know what that

7   is?

8        A.   It's a French name and I cannot remember the

9   French, I apologize.

10        Q.   But it was the political party of President

11   Habyarimana?

12        A.   Correct.

13        Q.   The president came in 1975?

14        A.   Correct.

15        Q.   And you describe his rule as an authoritarian

16   rule?

17        A.   Correct.

18        Q.   And it was after the Arusha Accord process

19   began until 1991 that more than MRND were allowed, more

20   parties than just the MRND were allowed as political

21   parties?

22        A.   Correct, it was forced to be more open and

23   allow more parties in.

24        Q.   And then the MRND actually moved to the right

25   and became much more Hutu power because they were

1   scapegoating the Tutsis?

2       A.   It was actually split in the MRND and there

3   were still some MRND who were more in the position that

4   they were at and then the Hutu power group moved very,

5   very far to the extreme side.

6       Q.   So another distinction between the military

7   and the Interahamwe is the Interahamwe were not

8   military, they were civilians; right?

9       A.   Correct.

10      Q.   Are you familiar with clothes like these?

11      A.   I have seen them in pictures, yes.

12      Q.   And you recognize these to be Interahamwe

13  clothes; right?

14      A.   Those would have at the time been clothes that

15  were worn by the Interahamwe, but many other people in

16  Rwanda may have put them on for what were effectively

17  patriotic reasons and forced patriotism arguably in some

18  cases.

19      Q.   And to show support for the then party in

20  power, the MRND?

21      A.   Could be to show support, but frankly in as

22  many cases it could easily just be fear of being outside

23  at a rally and not being in those clothes.

24      Q.   So if you attended a rally or MRND in that

25  multiparty period, it would be customary to see somebody

100

1    wearing those clothes?

2         A.    Absolutely.

3         Q.    You'd agree with me based on your research of

4    the genocide that these roadblocks that went up

5    throughout the country were instrumental for a large

6    number of the killing?

7         A.    They were.

8         Q.    And the roadblocks I think you said before

9    that if you were a Tutsi then and you were found out to

10   be or suspected to be a Tutsi, then you likely were

11   going to be killed?

12        A.    I don't believe I said that in testimony but

13   that was in my written testimony certainly.  You could

14   be killed, you could be treated harshly in other ways,

15   but killing is kind of --

16        Q.    And that's because the Hutu extremists were

17   running those roadblocks?

18        A.    Correct.

19        Q.    And the roadblocks permeated the entire

20   country?

21        A.    Correct, especially in populated areas.

22        Q.    And there were large numbers of Interahamwe,

23   sometimes military, sometimes just civilians were

24   conscripted to work for those roadblocks?

25        A.    Yes, civilians would probably never be doing

1   the roadblocks themselves.  They might have been

2   conscripted by the Interahamwe or the military to be

3   there, and if you didn't agree you would often be

4   treated as if you were a Tutsis if you refused to help.

5        Q.   Because there was this drive to rid the

6   country of anyone who was helping the RPF who were

7   essentially the Tutsis?

8        A.   That was the public drive, yes.  It was to

9   take control and rid the country of Tutsis.  Publically

10  the Hutu power party was saying it was to rid the

11  country of people helping the RPF.  There's probably

12  very little linkage in the case in most of Tutsis who

13  had died to their supporting RPF.

14       Q.   So what we just talked about in the last

15  couple minutes, that is all fact; right?

16       A.   I don't believe I have any significant

17  disagreement with anyone of the scholarly community on

18  it.

19       Q.   And so the fact that those facts coincide with

20  what the Rwandan narrative that you're saying exists,

21  that doesn't play any role into whether in fact the

22  Rwandan government or anyone else is influencing people

23  to say it?

24       A.   Actually the Rwandan narrative wouldn't agree

25  with several of the things we just talked about.  For

1    example, the idea that people that were Hutus were

2    conscripted, Hutu civilians were conscripted and might

3    have been killed -- I'm sorry, I apologize, I'm going on

4    the opposite side, yes.

5        Q.   The reason I asked you the MRND question, are

6    you familiar with, you testified in another case and you

7    actually called it the MNRD; right?

8        A.   I did and it was a mistake on my part at the

9    time.  It's one of those acronyms that I not uncommonly

10   get backwards.

11       Q.   Okay, and it's because it's in French?

12       A.   Combination of the French translation and just

13   remembering the acronym.

14       Q.   It's not because you don't know very much

15   about the political party?

16       A.   It has nothing to do with it.

17       Q.   So you're familiar also with the MDR?

18       A.   I believe it's MRD, yes.

19       Q.   Okay.  In fact, if I told you that it was in

20   fact MDR and not MRD, would that refresh your memory?

21       A.   Possibility.  Once again, I have to apologize,

22   acronyms are not something I'm very good with.

23       Q.   So that was also something that you remembered

24   is MRD in that other case; right?

25       A.   That's a possibility.

1      Q.    So let's talk about the numbers that you were

2    asked about.   There are about a hundred to 200,000

3    perpetrators of the genocide; right?

4      A.    Sure, that's the general consensus number.

5      Q.    Right.   There's no way to possibly know how

6    many people were involved in the actual hacking and

7    killing?

8      A.    No, the number is based on Des Forges' early

9    research and confirmations that have been done since

10   that point in time.   She started with a slightly higher

11   number and many experts think it's probably lower, but a

12   hundred to 200,000 is a good estimate.

13     Q.    And in the ICTR they only prosecuted about 80

14   or so?

15     A.    Yeah.

16     Q.    And I think you said earlier that they are

17   going for the leaders and organizers of the genocide?

18     A.    Correct.

19     Q.    And that was the same for Leave None to Tell

20   the Story, the Human Rights Watch report, they weren't

21   trying to catalog all the people who participated in the

22   genocide?

23     A.    Actually Des Forges in the three or four

24   regions that they talk about were pretty categorical in

25   what they were saying on the region.   They really seemed

1    very specific.

2         Q.    Okay.  So that's the basis of your knowledge

3    is this book about what happened in Butare?

4         A.    Yes.

5         Q.    So in Butare you would agree with me that they

6    mention, in their research they mention Pauline

7    Nyiramasuhuko, they mention Shalom Ntahobali, they

8    mention a handful of other individuals?

9         A.    Because I had reviewed it now, it's probably

10   been eight months ago for this case, I very clearly

11   remember that those two were mentioned, yes.

12        Q.    And there were approximately a hundred

13   thousand people who were killed in Butare; right?

14        A.    I do not know that number off the top my head,

15   so I wouldn't want to confirm or deny.

16        Q.    Would you confirm that there were thousands of

17   people?

18        A.    Thousands clearly, yes.

19        Q.    And is it your suggestion that those handful

20   of people killed those thousands of people with their

21   own hands?

22        A.    No, not at all, simply that they were the ring

23   leaders.  An individual killer might not be mentioned in

24   that particular case.  Someone who was at the center,

25   someone who was giving orders, directing, I would expect

1    to be mentioned.

2         Q.    And you wouldn't expect somebody who was

3    checking identification cards to be in that book either,

4    would you?

5         A.    Not likely but possible.

6         Q.    There were dozens of roadblocks throughout

7    Butare, weren't there?

8         A.    Hum.

9         Q.    And there were dozens of people who were

10   manning each of those roadblocks?

11        A.    I don't know for a fact, but I'm sure that's

12   accurate.

13        Q.    There were different shifts.  They weren't all

14   working 24 hours a day at these roadblocks; right?

15        A.    Sure.

16        Q.    So it's fair to say that there were hundreds

17   of people who were Interahamwe, military and civilians

18   who participated in each of those genocides?

19        A.    That is right.

20        Q.    Now, the genocide actually arrived in Butare a

21   couple weeks after President Habyarimana's plane was

22   shot down; right?

23        A.    Correct.

24        Q.    And that's because Butare was a pocket of

25   resistance to the MRND Hutu power influence; right?

106

 1       A.   That's correct.  It was one of the places

 2   where opposition parties had taken hold after the split

 3   and it was a more moderate Hutu party that was in charge

 4   there.

 5       Q.   And there was actually a Tutsi governor at the

 6   time of the genocide?

 7       A.   Yes, the question was how important was he,

 8   but yes.

 9       Q.   And so it was about two weeks later when the

10   genocide began and it was triggered by the interim

11   president, the one who replaced Habyarimana,

12   Sindikubwabo, he gave a speech saying it's time for the

13   people in Butare to get to work?

14       A.   My understanding is that was one of a number

15   of triggers and it was building up over time with Hutu

16   power people in the region working behind the scenes to

17   try to take power and try to do things, and then a

18   national push from the top.  There have been reports

19   that have been confirmed and denied of troops being sent

20   in to help trigger it, but that was one of the things of

21   my understanding that started it.

22       Q.   And it was very shortly after that speech that

23   the genocide actually began?

24       A.   That's my understanding.

25       Q.   And the roadblocks popped up?

1        A.    Yes, that's my understanding.

2        Q.    And at that time there were a few MRND leaders

3    who were based out of Butare?

4        A.    I frankly don't know the numbers.  I believe a

5    few would be an accurate description, but I don't know

6    for a fact.

7        Q.    Well, there was Sindikubwabo; right?  There

8    was the prime minister, the newly appointed prime

9    minister, Jean Kambanda; right?  In fact, the prior

10   prime minister was killed, the woman Agathe, she was

11   killed right at the beginning of the genocide.

12       A.    Correct.  That was one of the first actions

13   was to kill what were the moderate Hutu politicians and

14   she was one of the first killed.

15       Q.    And to this day in Rwanda she is considered a

16   hero in Rwanda even though she's a Hutu?

17       A.    I don't know that for a fact.  I don't confirm

18   or deny that.

19       Q.    You agree with me that Pauline Nyiramasuhuko,

20   a member of the cabinet, was also a prominent MRND

21   member?

22       A.    Correct.

23       Q.    Did you know that her husband, Maurice

24   Ntahobali, was a former MRND member?

25       A.    I didn't realize that, no.

1      Q.    Did you realize he was the presidentially

2   appointed president of the university?

3      A.    I did not realize that.

4      Q.    You didn't realize he was president of the

5   university?

6      A.    No.  It's possible I read that someplace.

7   That's not something that's off the top of my head.

8      Q.    Incidentally, Maurice Ntahobali, are you aware

9   of any prosecution against Maurice Ntahobali for what he

10  did during the genocide?

11     A.    Not particularly.  I did some basic research

12  on Pauline and Shalom, but didn't go into any depth on

13  that person or any of the other relatives.

14     Q.    So if that person was never prosecuted,

15  wouldn't that work counter to your idea of this Rwandan

16  government narrative?

17     A.    Oh not at all.  The Rwandan government

18  absolutely doesn't prosecute everyone.  It's a question

19  of making enough examples that people realize that you

20  could be next.  You could be the next example.

21     Q.    So, you would agree with me that the roadblock

22  outside Shalom Ntabobali's house was one of the most

23  notorious?

24     A.    That's the way Des Forges describes it, yes.

25     Q.    And you have no reason to question that?

1        A.    No, no.

2        Q.    You have no reason to question the fact that

3   Shalom was the Interahamwe militia leader in Butare, he

4   traveled around?

5        A.    That's my understanding from everything that

6   I've read.

7        Q.    I think you said earlier that local if leaders

8   did not participate in the genocide, then they were

9   frequently replaced by the MRND government or by someone

10  else in power?

11       A.    I'm not sure if I said that or wrote that but

12  that's accurate.

13       Q.    Now, you relied a lot on the Des Forges Leave

14  None to Tell the Story report.  Do you agree with the

15  methodology that they used?

16       A.    Basically.  There are some questions of

17  whether eyewitness, how reliable eyewitness accounts

18  fairly shortly after that level of tragedy can be, but

19  overall I think it was the best possible practice at the

20  time.

21       Q.    In fact, you've written that it is the best

22  history of what happened in --

23       A.    As there is pretty much no other, and yes, it

24  is, on top of that a good history.

25       Q.    And so you would agree that asking Rwandans

1   who were present during the genocide would be useful to

2   figure out what happened during the genocide?

3        A.   It can be, but as I was saying, one of the

4   criticisms of Des Forges, as with any eyewitness

5   account, and particularly an eyewitness account after

6   tragedy, you need to confirm that in as many ways as

7   possible.  Sometimes there are other ways to confirm it.

8   Sometimes it's difficult to confirm.  But it's certainly

9   one of the sources.  This has been one of the problems

10  at the gacaca and international tribunals, is how

11  reliable are the eyewitness accounts after the fact.

12       Q.   Would you agree with me that cross-examination

13  is the single best tool to establish whether there are

14  deficiencies in somebody's story?

15       A.   Oh not at all.  I'd much prefer outside

16  information and outside research as opposed to

17  cross-examination.  I think you'd probably get similar

18  problems as you're going through on cross-examination

19  with the one person.  I think corroboration from as many

20  sources as possible is the best way.  Cross-examination

21  can certainly contribute.

22       Q.   So, you agree that cross-examination is a good

23  thing to do?

24       A.   Sure.

25       Q.   Corroborating with other people who see

1    similar things?

2         A.    Not just who see similar things because that's

3    more eyewitnesses, but with as many people as possible

4    who've done more in-depth research, scholarly research,

5    nongovernmental organizations on the ground, groups who

6    aren't intimately linked to the crisis may have

7    perspective to the important testimony of people who are

8    intimately linked to the crisis.

9         Q.    Okay, I'll ask you about each of those, but

10   I've asked you a few questions that we're asking for a

11   yes or no.  If you wouldn't mind just trying to answer

12   them yes or no.  If you can't, just let me know.

13        A.    Okay.  Many of them have been more complex,

14   but I'll try.

15        Q.    So, you agree with me that if the entity

16   conducting the research is not affiliated with the

17   Rwandan government, then that would add to the

18   reliability?

19        A.    Yes.

20        Q.    You would agree with me that if you talked to

21   individuals who naturally would live around the crime

22   scene, then they would be better situated to say what

23   they saw?

24        A.    Better situated than who?

25        Q.    Better situated than someone who wasn't from

1    there?

2         A.    Yes, but.

3         Q.    Okay.  You would agree with me that if there

4    was independent non-Rwandan corroboration for things

5    that the Rwandan witnesses were saying, then that would

6    be very probative of whether that's correct?

7         A.    Certainly.

8         Q.    That includes if there were representatives of

9    nongovernmental organizations that didn't have a dog in

10   that fight to tell you what they saw was consistent with

11   what witnesses saw?

12        A.    That would be an important piece.

13        Q.    You mentioned earlier that there was an

14   organization called Medecins Sans Frontieres; right?

15        A.    Ah-hum.

16        Q.    Doctors Without Borders?

17        A.    Correct.

18        Q.    And this is a humanitarian organization, they

19   go around the world helping people who are in crisis?

20        A.    Correct.

21        Q.    And if somebody from Doctors Without Borders

22   saw something that corroborated a Rwandan witness, then

23   this would be very persuasive, wouldn't it?

24        A.    I think that would certainly help the case.

25        Q.    Would it also be probative for you to learn of

1    forensics evidence that was not provided by the Rwanda

2    government but rather provided by a third government

3    altogether that corroborated facts that a Rwanda witness

4    said?

5         A.    Certainly.

6         Q.    So, if there was a roadblock outside the

7    Ihuriro Hotel, then if there was some independent

8    corroboration of the roadblock, then that would be

9    persuasive to you that that roadblock existed?

10        A.    I don't think there's much question that that

11   roadblock existed, but certainly.

12        Q.    Just as you would, you expressed some

13   skepticism with some of your friends when they tell you

14   about Rwanda.  If somebody tells you something that you

15   know to be contradicted by objective evidence, that

16   would suggest to you that that person may not be fully

17   being candid about their experience during the genocide?

18        A.    Yes.  And either not candid or that they have

19   a different way of understanding it.  When we talk about

20   candid, we often suggest that someone is actively lying,

21   and from a Rwandan perspective that may or may not --

22             THE COURT:  I think we're getting awfully

23   close to this witness's commenting on credibility of

24   witnesses.  That's entirely your job, ladies and

25   gentlemen, and nobody can come in and tell you how to do

 1   that.  I'll give you instructions on the things you

 2   should consider, but we're not going to have witnesses

 3   commenting -- we're getting close to that.

 4            MR. CHAKRAVARTY:  Your Honor, by all means, I

 5   want to make it very clear that this witness should not

 6   be commenting on --

 7            THE COURT:  Well, you're asking questions that

 8   seem to be eliciting that.

 9            MR. CHAKRAVARTY:  Well, perhaps I can tie it

10   up a little more explicitly.

11        Q.   BY MR. CHAKRAVARTY:  If the defendant were

12   asked what she saw during the course of the genocide and

13   made statements that were objectively contradicted by

14   evidence, non-testimonial evidence, wouldn't that lead

15   you to question whether what she was telling you was the

16   whole truth?

17            MR. HOWARD:  Objection.

18            THE COURT:  Sustained.  That's what I'm

19   talking about.  The witness isn't qualified to comment

20   on credibility of any witnesses based upon anything like

21   that.

22            MR. CHAKRAVARTY:  Thank you, your Honor, I'll

23   move on.

24        Q.   Now, you would agree with me that most

25   everyone who was living in Rwanda during the genocide

1    was personally affected by the genocide?

2         A.    Yes.

3         Q.    And that could extend to people being

4    internally displaced or externally displaced as well as

5    if they were victims of the genocide?

6         A.    Correct.

7         Q.    Now, in this case you didn't review any of the

8    evidence; is that right?

9         A.    Only what was in the news effectively.

10        Q.    So you relied on the news reports to figure

11   out what this case was about?

12        A.    Yeah, news reports and then some of the

13   readings as I mentioned from the ICTR and from Des

14   Forges.

15        Q.    Did you read the defendant's testimony at the

16   ICTR?

17        A.    The defense testimony?

18        Q.    Did you read the defendant's testimony?

19        A.    Yes, I did.

20        Q.    And in fact, when you first wrote and spoke

21   about this case, your entire basis of knowledge was

22   based on what you had read in the newspaper?

23        A.    If you mean there was a brief blurb in I think

24   the Kobagaya written report, yes, that's accurate.

25        Q.    And you made a number of inaccurate statements

116

1    about this case; right?

2         A.    Actually I believe I reported on it as the

3    news was reporting on it at the time and later realized

4    that those weren't accurate.

5         Q.    And one of those things is that you claimed

6    that this was brought because the defendant testified

7    before the ICTR?

8         A.    I don't recall.

9         Q.    Another thing is you said that the case was

10   brought by the Rwandan government, they actually

11   instituted it?

12        A.    I believe I knew that they didn't, but I might

13   have said something about the Rwandan government pushing

14   it, but I don't recall the specific words.

15        Q.    You said that the defendant's mother and

16   father were charged before the ICTR?

17        A.    I believe that was one of the mistakes I made

18   based on the press.

19        Q.    Now, the fact that you knew that the

20   investigation was started by the United States

21   completely independent of the Rwandan government, would

22   that bear on your expert opinion about what the Rwandan

23   cultural narrative is?

24        A.    Actually as an expert I have difficulty

25   believing that it could be done independent, completely

117

1   independently of the Rwandan government.

2       Q.   So, the fact that you have no understanding of

3   any of the evidence in this case, still leads you to be

4   skeptical about whether the case was investigated in

5   Rwanda?

6       A.   Correct, based on the fact that to go into

7   Rwanda and investigate something would require the

8   consent of the Rwandan government.

9       Q.   So if American agents testified to how they

10  learned about the defendant --

11          THE COURT:  Well, again, that's getting

12  awfully close.

13          MR. CHAKRAVARTY:  Fair enough.

14      Q.   Now, you're aware of other cases that have

15  been prosecuted in the United States involving Rwanda?

16      A.   I'm very aware of the Kobagaya case that I

17  worked on.  I'm aware of the case, just peripherally,

18  the college professor.

19      Q.   Are you familiar with the Kantengwa case?

20      A.   Kantengwa case, which one is that?  I'm not

21  sure that I am.  I might be and just not remembering it.

22          MR. HOWARD:  I'll object to relevance.

23          THE COURT:  Sustained.

24      Q.   You're aware that when the U.S. government has

25  brought charges against individuals in Rwanda for which

1  activities during the genocide were at issue, that

2  people from Rwanda were flown over here to testify?

3      A.   I am.

4      Q.   And you're aware that they testified for both

5  the government as well as for the defense?

6      A.   Correct.

7      Q.   And you're aware that they sometimes testified

8  inconsistently with the official narrative that you

9  described?

10     A.   Yes.

11     Q.   Now, you haven't actually talked to any of

12  those witnesses; right?

13     A.   Other than a brief hello at the Kobagaya case,

14  not in-depth, no.

15     Q.   So you didn't talk to them about what

16  government influence they were -- they had --

17     A.   I did not.

18     Q.   Yet your entire thesis is that there is some

19  such government influence?

20     A.   Based on the scholarly literature on the

21  subject, that is correct.

22     Q.   So, would you agree that it would be good

23  scholarly methodology to talk to people who may be

24  susceptible to that phenomenon when you have a chance?

25     A.   Certainly.  I personally didn't have an

1  opportunity.

2      Q.   So, you didn't have an opportunity to talk to

3  the witnesses, but you were able to say hi?

4      A.   No, literally I was in as I am for this trial,

5  in and out for the day of the trial and I only saw the

6  witnesses for a moment or two before I went on the

7  stand.

8      Q.   So, some hundred hours of time that you spent

9  on this case you couldn't just ask to speak with any of

10 the witnesses?

11     A.   Didn't think it was important because I wasn't

12 speaking to the facts of the case, I was speaking in the

13 case of Kobagaya to the history of the genocide.

14     Q.   And so in the Kobagaya case you didn't talk to

15 any of the witnesses?

16     A.   No, I was speaking on the general history of

17 the genocide there, not on the facts of the case.

18     Q.   So you know that in many cases witnesses come

19 from Rwanda to the United States, have testified in U.S.

20 court, and have gone back without any reprisals?

21     A.   I do not know that there have not been any

22 reprisals, but I have not heard of any reprisals.

23     Q.   You have no evidence and no scholarly research

24 that suggests that there have been?

25     A.   I do not, correct.

1          Q.    Now, one of the things you looked for in

2    determining whether somebody is sticking to the official

3    government narrative is whether witnesses seem to be

4    speaking from script.  Is that fair to say?

5          A.    Yeah, from either a well-defined script or a

6    general script that's kind of the lore of the genocide.

7          Q.    You would agree with me that scholarly

8    research demonstrates that for a lot of people who

9    participated in the genocide, that when they were

10   interviewed about what they saw, they said I didn't see

11   anything?

12         A.    There was certainly some cases of that.  I

13   don't know if I describe it as a lot or not, but

14   scholarly research certainly talks about that.

15         Q.    It was a common story in Rwanda that many

16   people said that they saw nothing?

17         A.    I have not read things that would suggest it

18   as common.  Doesn't mean people have written about it.

19         Q.    So, I'm trying to narrow down the -- your

20   version of the Rwandan narrative is basically one that

21   insulates the current governmental regime from being

22   responsible for any of the atrocities; is that fair?

23         A.    Correct.

24         Q.    So basically they don't want to take

25   responsibility for anything that they did?

121

```
1        A.    Correct.

2        Q.    But it doesn't change the fact of there was a

3   genocide and how it kind of played out, that it was

4   brutal and that there was the attempted extermination of

5   the entire Tutsi population?

6        A.    They do not talk about any killings of Hutus,

7   but it certainly plays up the fact that Hutus were

8   killed.

9        Q.    So, as related to this case, the issue of

10  criticizing the Rwandan government is the fact that the

11  Rwandan government would take issue with it, they don't

12  want people to criticize them?

13       A.    That's correct.  They very actively and

14  passively try to control it.

15       Q.    So you recognize this is an immigration case

16  about false statements made to the U.S. government?

17       A.    The Rwandan government regularly works outside

18  of the country of Rwanda to influence both Rwandans and

19  non-Rwandans in what they say.

20       Q.    Thank you for that.  That wasn't my question.

21  My question was, do you understand that this is a U.S.

22  case involving immigration fraud to the United States

23  government?

24       A.    Yes.

25       Q.    And in that context you recognize what the
```

1   Rwandan government did has nothing to do with this case?

2        A.   I don't believe that's true.

3        Q.   You believe that what the Rwandan government

4   did after the genocide has something to do with what the

5   defendant said to the U.S. government when she came

6   here?

7        A.   Not necessarily with what the defendant said.

8        Q.   Now, you would agree with me that -- one

9   moment.  You talked at length about the different

10  manifestations I think you said of the official

11  narrative?

12       A.   Ah-hum.

13       Q.   And one of them you said was in the press?

14       A.   Ah-hum.

15       Q.   That was one of the ways to further what

16  people in Rwanda should be thinking and saying about the

17  genocide?

18       A.   Correct.

19       Q.   And are you aware that there was no evidence

20  of any such press related to this case?

21       A.   I have not seen anything specific.  That

22  doesn't mean that it doesn't exist.

23       Q.   Another mechanism you mention was that there

24  was these justice on the lawn sessions called gacaca

25  that was one of the ways in which the Rwandan government

1   would tell its narrative; right?

2        A.   The narrative came in there, but that wasn't

3   directly the Rwandan government telling the narrative,

4   that would be incorrect there.

5        Q.   Okay, so, to help individuals who would say

6   things that are consistent with the --

7        A.   That did happen during gacaca, yes.

8        Q.   And gacaca has nothing to do with this case;

9   right?

10       A.   Except in so far as it revolves with the

11  potential for what witnesses might or might do, no.

12       Q.   Well, this isn't a gacaca court, this is a

13  U.S. district court; right?

14       A.   Correct.  We can find similarities from

15  gacaca, though, to other cases.

16       Q.   You said that another manifestation was in the

17  use of re-education for people who were like homeless or

18  that needed to understand what the story was; right?

19       A.   Correct.

20       Q.   And again, if there was no such evidence in

21  this case, then that would affect your opinion as to

22  whether evidence in this case was somehow tainted by

23  this official narrative; right?

24       A.   No, that's incorrect.

25       Q.   So, if there's no evidence of re-education

1   camps or anybody being influenced by re-education, then

2   you're still saying that it, your opinion about the use

3   of re-education is just as relevant?

4        A.   Sure, re-education is something that is held

5   over people's heads as a potential that could be done to

6   them at a future point in time.  If I'm the Rwandan

7   government I wouldn't actively threaten someone before

8   they came to a case like this, but there's a cultural

9   understanding that the threat could be there.

10       Q.   You said that the official narrative doesn't

11  recognize that Hutus and Tutsis alike would be

12  vulnerable to this; right?

13       A.   I did not say that Hutus and Tutsis would see

14  the official narrative differently actually.

15       Q.   So, would it make a difference to you whether

16  it was a Hutu or Tutsi who testified?

17       A.   To some extent in that a Tutsi would be more

18  likely if they were connected to the elites to have a

19  vested interest in the official narrative and a Hutu

20  might be doing it more out of potential for benefit,

21  potential for repercussion if that was an issue for

22  them.

23       Q.   And so if a Tutsi were not one of the elite

24  exiles that you described like Paul Kagame who lived out

25  in Uganda, you're saying that they still would have a

1    vested interest in re-articulating the official

2    narrative?

3         A.   No, it depends on their frankly status in

4    society.  They could be very similar to Hutus where they

5    might have an equal chance of benefit if they said the

6    right thing or punishment if they said the wrong thing

7    or some type of detrimental effect.  If they were

8    connected in some way to the elites at a local or at a

9    federal level they might see more direct benefits out of

10   it and they might more realize that.  There would be

11   similarities, though, for people at the lowest levels

12   certainly.

13        Q.   So if both Hutus and Tutsis, Tutsis who were

14   from Rwanda and born and bred in Rwanda, all testified

15   to the same essential facts from different

16   perspectives --

17             MR. HOWARD:  Objection, your Honor.

18             THE COURT:  Sustained.

19        Q.   You cited Dr. Longman on several occasions.

20        A.   Ah-hum.

21        Q.   Right?  Both about the genocide as well as

22   about the gacaca and the current atmosphere in Rwanda?

23        A.   Correct.

24        Q.   And you recognize that he's an expert who's

25   actually been to Rwanda during the RPF regime and

126

1    conducted numerous interviews?

2         A.    Yes.

3         Q.    He's done statistical studies as well as

4    qualitative studies?

5         A.    Yes, correct.

6         Q.    And it's largely that scholarship and other of

7    that ilk that you used to try to suggest that there's

8    this official narrative; right?

9         A.    Many others, but he's certainly one of the

10   sources.

11        Q.    So you would agree with him, then, there are

12   many ways where, there are many ways in which Rwandans

13   depart from the official narrative?

14        A.    There are certainly circumstances where

15   individual Rwandans depart from it.

16        Q.    And in fact that's a growing trend that's

17   changing over time because so many people have been

18   talking about the genocide?

19        A.    Actually my understanding inside of Rwanda is

20   the opposite of that, that it's becoming more difficult

21   to speak inside, but it's a growing trend outside of

22   Rwanda.

23        Q.    So, you're saying that Dr. Longman's research

24   is deficient in that?

25        A.    I'm not actually certain Dr. Longman said

1   that, I don't know if I read him saying that.

2        Q.   So, are you a better judge of what Dr. Longman

3   meant by what he said than he is?

4        A.   I do not know what Dr. Longman said, sir.

5        Q.   Well, you don't know what he said here?

6        A.   Correct.

7        Q.   But you know what he said in scholarly

8   research?

9        A.   I've got a good view of his research, yes.

10       Q.   And if he said that in fact as a function of

11  time and as a function of people talking about the

12  genocide, that it actually is more prevalent that people

13  will vary from what the official government narrative

14  is?

15       A.   I actually haven't read him saying that and

16  more recently he's been more critical.  He had a couple

17  of recent articles in the press that were cited where

18  he's become more critical of the Rwandan government

19  controlling dissent.  So I don't deny that he has said

20  that, but I haven't read him say it and I certainly read

21  him saying the opposite.

22       Q.   And you recognize he testified here even after

23  those articles?

24       A.   Sure.

25       Q.   So if anyone is going to feel it's unsafe for

128

1    them to go to Rwanda, it would be Dr. Timothy Longman?

2        A.    Dr. Longman is in an interesting position

3    because of his Human Rights Watch affiliation.  I've

4    talked to people at the Human Rights Watch office in New

5    York and they have been very critical of the Rwandan

6    government and at times they've still been allowed to

7    work inside the country, and when talking to them

8    they're frankly not sure why Dr. Longman is certainly

9    someone who is regularly criticized by people working

10   with the Rwandan government in the press.

11           MR. CHAKRAVARTY:  Can I have one moment, your

12   Honor?

13           THE COURT:  Certainly.

14           (Pause.)

15       Q.    Dr. Endless, you have not reviewed any of the

16   evidence in this case; right?

17       A.    Not direct evidence, no.

18       Q.    You haven't spoken to any of the witnesses?

19       A.    No.

20       Q.    And you recognize that it's not your role to

21   comment on the credibility of other witnesses?

22       A.    Not on specific witnesses, no.

23           MR. CHAKRAVARTY:  That's all I have.

24           THE COURT:  Any redirect?

25           MR. HOWARD:  Very briefly, judge.

1                    REDIRECT EXAMINATION

2    BY MR. HOWARD:

3        Q.   Dr. Endless, taking you back to the beginning

4    of the government's cross-examination.  With respect to

5    your views on the cultural phenomena that exists in

6    Rwanda, do you find that your views are consistent with

7    that of Dr. Longman?

8        A.   Yes, definitely.

9        Q.   And his articulation of the official narrative

10   and those forces that enforce the official narrative are

11   consistent with Dr. Longman, aren't they?

12       A.   Yes, he's one of the number of people that I

13   agree with on that.

14       Q.   And by the way, do you anticipate or expect

15   that Dr. Longman came here and testified for free?

16       A.   No.  My understanding is that experts

17   typically receive very similar compensation.

18       Q.   And you were asked a number of questions about

19   your understanding of the facts of the case and a number

20   of questions about your review of Leave None to Tell the

21   Story.  In your review of this case, in that book you

22   found that Shalom Ntabobali's name was mentioned;

23   correct?

24       A.   Correct.

25       Q.   And Pauline Nyiramasuhuko?

130

```
 1        A.    Correct.

 2        Q.    And Shalom's wife and Pauline's daughter-in-

 3   law was not mentioned at all, was it?

 4              MR. CHAKRAVARTY:  Objection, your Honor.

 5              MR. HOWARD:  Judge, he opened the door to that

 6   question.

 7              THE COURT:  Overruled.

 8        Q.    Beatrice Munyenyezi wasn't mentioned once in

 9   that book, was she?

10        A.    No.  That was actually one of the first things

11   that I looked at when I was approached about working on

12   this case.  I'll always do research to see whether it's

13   someone that I think might have been wrongly accused,

14   whether it's something that I should act in the defense

15   role, and one of the most interesting things to me was

16   with some of the early accusations against her she

17   should have --

18              THE COURT:  I'm sorry, but I think the

19   question was did her name show up in the book.

20        A.    And it did not show up in the book, no.

21        Q.    And neither in any of your other research --

22        A.    No, she did not show up in any of my research

23   except for her testimony at the ICTR.

24        Q.    All right.  And it was shortly after her

25   testimony that she was prosecuted; correct?
```

1      A.   Correct.

2           MR. HOWARD:  Thank you.

3           MR. CHAKRAVARTY:  Very brief, your Honor,

4    along those lines.

5           THE COURT:  Sure.

6                     RECROSS-EXAMINATION

7    BY MR. CHAKRAVARTY:

8      Q.   I thought you testified on cross that you

9    would not expect people who were checking identity cards

10   at road roadblocks to be mentioned in that book?

11     A.   It's entirely possible they would not be.

12     Q.   And there were many Interahamwe who were not

13   mentioned in that book; right?

14     A.   Correct.

15     Q.   Dsir Munyaneza,, he wasn't mentioned in that

16   book; right?

17     A.   I have to look.  I don't know.

18     Q.   Kazungu, Lambert, Pascal --

19     A.   Once again, I did not search for those names,

20   so I cannot comment on that.

21     Q.   So you don't know anyone else who was working

22   that roadblock in front of the Ihuriro who was mentioned

23   in that book; right?

24     A.   I only searched for some very specific names

25   that were affiliated with this case.

132

1     Q.   There's no list in that book about people who

2  participated in the genocide?

3         MR. HOWARD:  Asked and answered, judge.

4         THE COURT:  If you know.

5     A.   Excuse me?

6         THE COURT:  If you know.

7     A.   Oh.  There are people listed.  There is not a

8  single comprehensive list, no.

9     Q.   Mr. Howard just asked you whether the

10  defendant was prosecuted shortly after her ICTR

11  testimony.  Do you know when she testified before the

12  ICTR?

13     A.   I do not recall the date.

14     Q.   Do you know that it was four years later after

15  U.S. investigation before she was charged in this

16  country?

17     A.   I know it was some short amount of time

18  afterwards.  I do not recall the date.

19         MR. CHAKRAVARTY:  Thank you.

20         MR. HOWARD:  Thank you, judge.

21         THE COURT:  All right, sir, you may step down

22  and you're excused.  You may call your next witness, Mr.

23  Howard.

24         MR. HOWARD:  Your Honor, we will not be

25  calling another witness, but before we rest we do have

1    to take care of some administrative matters.

2            THE COURT:  All right.  All right, ladies and

3    gentlemen, I'm going to excuse you for lunch now.  Why

4    don't we resume again at ten after one or so.

5            (Jury exited the courtroom.)

6            MR. HOWARD:  I didn't want to rest before

7    making sure that, I think Mr. Ruoff is going to be

8    providing digital copies of our exhibits, I wanted to

9    make sure that everything was all set in that respect

10   because I didn't want the record to close without doing

11   that.

12           THE COURT:  Well, I appreciate that, but I'll

13   always give counsel an opportunity at the end, if you've

14   overlooked something you can certainly reopen.

15           MR. HOWARD:  So we are going to rest and we

16   will make our motions obviously whenever you want to

17   hear them.

18           THE COURT:  Why don't we, if you're going to

19   rest why don't we do it now.  You have to rest in front

20   of the jury, obviously, but I'll take your argument now.

21           MR. HOWARD:  Well, your Honor, first I would

22   renew the Rule 29 motion made at the close of the

23   government's case for the same reasons that I

24   articulated there.  The other issue --

25           THE COURT:  All right, those motions are

134

1    denied.

2            MR. HOWARD:  What I, this may be an issue

3    that's more for jury instructions than it is for a Rule

4    29, and I got into that confusion on my last motion, and

5    I don't know what the court intends to provide for

6    instructions, I'm going off of what the instructions

7    were after the end of first trial.

8            The instructions, at least, and the indictment

9    alleges that my client participated in directly in

10   murder, rapes, kidnapping and theft.  As I understand

11   the testimony in this case there's been no evidence of

12   any direct involvement in any of those potential

13   offenses.

14           There has also been no testimony of any

15   involvement as an aider and abettor, which is how it was

16   instructed last time, to homicide, to rape, or to theft.

17   The only potential is to that of kidnapping.  I believe

18   there has been testimony that she directed, upon

19   checking an ID, some witnesses have said that she would

20   then direct a Tutsi to go stand off to the side or go

21   sit off to the side.  That could be construed as aiding

22   and abetting a kidnapping.  There's been no testimony

23   that any Tutsi was either killed or raped as a result of

24   that, only that she checked IDs and had some stand off

25   to the side.

1            So to the extent that what I'm asking for here

2    is a Rule 29 on those specific allegations in the

3    indictment, I'd ask the court to rule in that respect.

4    If it's going to be handled in instructions, then we'll

5    handle it in instructions.

6            THE COURT:  Well, it's an interesting point

7    given the way the indictment reads, but I really think

8    it's better handled as an instruction.

9            MR. HOWARD:  I think that might be right,

10   judge, but I didn't want to waive the argument as one

11   that the jury simply can't consider because there's been

12   no evidence of those charges in the indictment.

13           THE COURT:  I follow you.  I thought about

14   theft, but I'm not sure there's evidence of theft.  But

15   anyway, who's -- Mr. Chakravarty, what's your response?

16           MR. CHAKRAVARTY:  Off the top of my head I

17   don't recall the evidence of theft.  That being said, I

18   think that this -- a couple things.  The defendant in

19   her own ICTR testimony mentions theft, that she sees

20   theft.  The fact that --

21           THE COURT:  No, no, that she committed.

22           MR. CHAKRAVARTY:  Right.  She committed theft

23   is a separate issue which the government would argue

24   that the jury has enough to infer that several types of

25   crimes were occurring at roadblocks generally.  There's

1    the separate testimony about specifically what people

2    saw --

3            THE COURT:  Not Dr. Longman.

4            MR. CHAKRAVARTY:  Partially.  Partially.

5            THE COURT:  No.  He was talking about women

6    participating in the genocide primarily being looters.

7    But I think the defense point is yes, of course, there

8    were people not charged here in this courtroom that were

9    engaged in theft, but what's the evidence that this

10   defendant charged in this case engaged in theft?

11           MR. CHAKRAVARTY:  Well, there's a distinction

12   between all of the other crimes listed and theft in the

13   sense that all of the other witnesses described those

14   crimes did occur at or from that roadblock.  With

15   regards to theft --

16           THE COURT:  Yes, but there's no connection

17   between because those crimes occurred, because she was

18   at the roadblock, ergo she committed those crimes.  It

19   doesn't work that way.

20           MR. CHAKRAVARTY:  Well, there is evidence that

21   she knew what she was doing when she was participating

22   in this machinery of the genocide.  She was voluntarily

23   and willfully saying okay --

24           THE COURT:  No, I'm sorry, I'm sorry, maybe I

25   confused you.  Put aiding and abetting aside.  Is there

1   direct evidence that this defendant engaged in the crime

2   of theft?

3            MR. CHAKRAVARTY:  My recollection is no, your

4   Honor, based --

5            THE COURT:  Tends to be my recollection as

6   well.

7            MR. CHAKRAVARTY:  It's based, I think --

8            THE COURT:  Then that raises the next

9   question.  Better to handle that by just changing the

10  instructions and eliminating that reference or is it a

11  Rule 29 acquittal with respect to theft.  I don't think

12  so.

13           MR. CHAKRAVARTY:  It's definitely not a Rule

14  29 because the law she's charged with is not based on a

15  theft.

16           THE COURT:  Not theft.

17           MR. CHAKRAVARTY:  It's an instruction issue

18  and we could probably -- I don't want to concede that

19  yet without engaging on each one, but if that's where

20  we're going, that's not a Rule 29.

21           THE COURT:  And then I suppose the same issue

22  arises with respect to murder, rape, et cetera.

23           MR. CHAKRAVARTY:  We think there is evidence

24  of aiding and abetting murder, rape.  There is a

25  description of the rapes, hearing the screams from

1    people who were taken down to a basement, right from the

2    roadblock.  Where that basement was I don't think the

3    witness was clear, but it was while the defendant was

4    manning the roadblock.

5            THE COURT:  I guess I'm making the same

6    distinction.  Direct evidence of primary guilt as a

7    principle or aiding and abetting?

8            MR. CHAKRAVARTY:  Aiding and abetting, your

9    Honor.

10           THE COURT:  So I think same answer,

11   instruction.

12           MR. CHAKRAVARTY:  It's an instruction.

13           THE COURT:  All right, anything else, Mr.

14   Howard?

15           MR. HOWARD:  No, your Honor.

16           THE COURT:  All right, and when we come back

17   you're going to both call a rebuttal witness and I'm

18   going to allow you to reopen I suppose technically with

19   respect to the other evidence.

20           MR. CAPIN:  I'm sorry, your Honor?

21           THE COURT:  Well, I guess technically you're

22   reopening with respect to putting on evidence of who was

23   in the Ihuriro, right?

24           MR. CAPIN:  I'm not sure I understand what you

25   mean by reopening.  Reopening the government's case in

139

1   chief?

2            THE COURT:  Yes.

3            MR. CAPIN:  Yes, your Honor.

4            THE COURT:  Because the scope of the -- I

5   mean, you're calling a witness as a rebuttal witness.

6            MR. CAPIN:  Correct.

7            THE COURT:  And I'm not sure it's entirely

8   rebuttal, I suppose, but to the extent you need to

9   reopen to put on evidence of participation of who is

10  there, comings and goings --

11           MR. CAPIN:  Thank you, your Honor, and I will

12  keep it modest.

13           THE COURT:  Thank you.

14           MR. HOWARD:  Please note my objection to the

15  court reopening the government's case in chief.  I

16  understand you have the power to do it, judge, just note

17  my objection.

18           THE COURT:  Well, it's hard to serve you both

19  ways, I mean, if you're objecting strenuously on the

20  grounds that there's no evidentiary basis for the

21  examination, how can you object when the government says

22  all right, I'll put on the evidence?

23           MR. HOWARD:  Well, because they closed their

24  case in chief and now they're going into rebuttal.

25           THE COURT:  That's reasonable.  It's

140

1    reasonable to allow them to reopen for that purpose

2    given the issue.

3           MR. HOWARD:  Well, if I may, judge, then this

4    is why I don't believe that --

5           THE COURT:  Let me put it this way.  I think

6    it comes within the scope of cross -- I mean rebuttal,

7    comes within the scope of rebuttal, but to the extent it

8    doesn't I certainly will exercise my discretion to allow

9    the government to reopen and put that evidence on

10   particularly given the defense position in the case.

11          All right, what else do we have?  Oh, do you

12   want to take up that motion?  Too early?  Motion for a

13   mistrial.  I take that as meaning fine.

14          MR. HOWARD:  Well, judge, we have done a

15   written submission, we did it yesterday.  Frankly I

16   think it might be premature to take up the motion

17   because you're about to allow --

18          THE COURT:  The second part of the motion, I

19   mean, is there agreement between counsel that in fact

20   the witness, I can't pronounce the name, Ahishakiye,

21   that she did in fact not go to Boston in April and May

22   and did not testify in the Kantengwa case and was not on

23   the witness list?

24          MR. CAPIN:  There is agreement, not agreement

25   with characterization by the defense about what was said

141

1    between counsel, how that played out or with what if any

2    prejudice stems from that, we say there was no

3    prejudice.

4             THE COURT:  Why do you say that?

5             MR. CAPIN:  Well, for two reasons.  First of

6    all, I mean, just to lay it out, it was my --

7             THE COURT:  It was pretty dramatic.

8             MR. CAPIN:  What's that?

9             THE COURT:  It was pretty dramatic, your

10   questioning was pretty dramatic and the implication was

11   very clear, you're here telling us that you didn't come

12   here when you darn well know you were in Boston just

13   last year to testify?

14            MR. CAPIN:  And I think she said no, I just

15   came for this case, so --

16            THE COURT:  No, I think she said -- you said

17   your view is you've only come to the United States to

18   testify for the defendant Munyenyezi or maybe she said

19   something to that effect, but you were very assertive

20   about that can't be right.  Surely you know you came to

21   testify when you testified in a trial in Boston, and

22   Boston is different from New Hampshire which we all

23   concede.

24            MR. CAPIN:  Right.  Although in terms of

25   basically impeaching her for bias, as I don't think it

1    makes a difference whether she's here to testify for

2    Prudent's case --

3            THE COURT:  It was lack of credibility, lack

4    of memory.

5            MR. CAPIN:  Well, there's a number of things

6    going on here.  First of all, with regard to that I do

7    confess error, and in reviewing the file the only thing

8    I had on this witness was what I had been told by the

9    agent who interviewed her, certain notes, and then each

10   of these witnesses filled out a parole document which

11   both parties have showing basically when they are

12   coming.  I saw that she came I think in April or March,

13   and in my mind I thought that was Kantengwa.  I know for

14   a fact that both at this trial last year the defense

15   brought a number of witnesses who never testified.  All

16   of the -- at least four of the witnesses brought over

17   this time by Mr. Howard and Rouff came over for

18   Kantengwa, none of them testified.  So in my mind it

19   wasn't clear whether this was a woman in that category.

20   I believed it was.  There's a suggestion that I told

21   counsel for the defense that I had been informed of the

22   same by a case agent.  That is simply not -- well, it's

23   simply a misunderstanding I would assume.  What I said

24   was I thought they all came over, I'll get the witness

25   list.  On the break I got the witness list, I shared it

1   with counsel and said yes, you're right, I certainly

2   won't do it again.

3          With regard to the prejudice, she was

4   confronted with the question did you come over here

5   previously.  I specifically didn't say which proceeding.

6   She said yes.  And I said was it to Boston, Prudence

7   Kantengwa.  I think she pushed back and said no, it was

8   for Beatrice Munyenyezi.  The import of that was simply

9   you came over basically at the invitation of the defense

10  to testify on behalf of somebody who was in that hotel

11  during the genocide and during the time that you were

12  there and you say you saw nothing.  I don't think it

13  really makes a difference with regard to prejudice

14  whether her bias stems from trying to concoct a story to

15  protect one sister or the other.  The line of questions

16  as regards what she knew about Kantengwa's husband, what

17  she knew about the defendant's MRND affiliation, what

18  she knew about the existence of the roadblock, and what

19  she knew about whether the prime minister for the

20  genocidal government came to a meeting at the hotel

21  during the genocide, those were all questions that I

22  asked to establish the truth of each of those matters,

23  to establish that with the full expectation that the

24  witness would say to this court and to this jury what

25  she had said to agents in Rwanda five years ago.

1  Defendant was MRND.  I did see the roadblock, it did

2  come in this case, and yes, that man in that photograph

3  which I am now identifying was Kantengwa's husband.  All

4  of those were offered not for impeachment, your Honor,

5  they were offered, those questions were asked for

6  impeachment, were asked in order to establish the truth

7  of the fact asserted in the question.  As we've been

8  over now and I understand the distinctions that --

9          THE COURT:  Well, obviously, people have

10  different perceptions.  Mr. Chakravarty as a

11  disinterested observer apparently thinks you were right,

12  but I can tell you my perception as a thirteenth juror

13  was quite different.  Whatever.  That's not the issue.

14  The issue here is I thought that cross-examination was

15  rather compelling.  That if you were to accept the

16  assumption in your question that she in fact came to

17  testify in another proceeding in Boston not a year ago

18  and yet was resolutely denying that she came to Boston,

19  that she testified, how can somebody possibly deny that

20  they testified.  How can they possibly deny that they

21  did not come to United States and testify in Boston as

22  opposed to here in a different case involving a

23  different defendant.  That's pretty compelling.  And now

24  if you find out that, well, there was no basis for that

25  question, that would affect I think a jury's assessment

1    of her credibility quite a lot.

2            MR. CAPIN:  But your Honor, she agreed she

3    came.  The question was did you come more than once.

4            THE COURT:  I'm not sure she did.  He's

5    shaking his head no.  Well, tell you what, why don't we

6    do this.  Let's assume it's wrong, completely utterly

7    wrong and your cross was absolutely focused on her

8    seeming denial of an obvious truth.  How are you going

9    to correct it?

10           MR. CAPIN:  Well, your Honor, I'm having

11   trouble with the counter factual because I have a

12   statement, we could look at the record.

13           THE COURT:  I was going to suggest that.  We

14   can't get the official transcript, but you certainly --

15           MR. CAPIN:  When asked, she said I did come

16   before.  I did testify previously.  I never suggested

17   that she testified more than once because I didn't --

18   well, no, I never suggested that she traveled more than

19   once.  I suggested that she traveled once.  I thought it

20   was for Kantengwa.

21           THE COURT:  The gist, though, for me, again,

22   just hearing it for the first time, like the jurors, was

23   you came here last spring.  You came here for the

24   Kantengwa case in Boston?  You were a witness?  You

25   testified?  And you're denying that?

146

1           MR. CAPIN:  No, your Honor --

2           THE COURT:  That's the impression I have.

3           MR. CAPIN:  I never asked her if she

4    testified.  I asked her if she came to this country for

5    the purpose of testifying, because I knew she didn't

6    testify.

7           THE COURT:  Well, in that case --

8           MR. CAPIN:  Right, but the thrust of it was

9    you came to this country in 2012 for the purpose of

10   testifying.  It wasn't, you know, it wasn't --

11          THE COURT:  Well, you're doing the best with

12   what you've got I guess.  Why don't we do that.  Why

13   don't we, Sandy, maybe you can find that transcript and

14   maybe counsel should look at the transcript as it

15   exists, understanding it's not a certified transcript,

16   and get a better gist of what was actually said.

17          MR. HOWARD:  Yes, I would like to do that,

18   judge.  I would also like to add, if I may just for

19   purposes of the record, that it was my understanding of

20   that cross, it wasn't just you came here to testify for

21   a family member that's bias.  That cross came in the

22   context of I think the witness at first said she didn't

23   remember who Prudence was, didn't remember the husband,

24   and that was followed up with, well, wait a minute, you

25   traveled to Boston just last year, to show that she had

1  to be lying about who she knew.

2          THE COURT:  I mean, the way I'm looking at it,

3  I guess for your guidance I suppose, is it was pretty,

4  in my view it was pretty effective and pretty dramatic

5  cross-examination with respect to credibility.  Maybe

6  bias as well, but credibility certainly, based upon

7  questioning not for which you didn't have a factual

8  basis.  Now, if that turns out to be the case, we have

9  to correct it.

10          MR. CAPIN:  You can correct by recalling the

11  witness.

12          THE COURT:  That's one way to correct it.

13          MR. CAPIN:  But again, with regard to my good

14  faith basis to ask do you know Prudence Kantengwa, she

15  told the agent in 2008 she knew Prudence Kantengwa.

16          THE COURT:  That's not the issue.  That's not

17  the issue.

18          MR. CAPIN:  Well, if she denies knowledge of

19  Prudence Kantengwa then can I --

20          THE COURT:  No, it's the whole you certainly

21  can't be trusted because you are denying that you came

22  to Boston to testify in this case, which is the way I

23  remember it, maybe that's not quite right, but you went

24  to Boston to testify on behalf of the defendant's sister

25  and you're denying that you came to Boston, how can you

148

1    possibly do that, you're not credible.  If that turns

2    out to be not right, then it's got to be fixed.  We

3    can't let this jury go off thinking that --

4              MR. CAPIN:  I would prefer recalling the

5    witness.

6              THE COURT:  Well, that's one way.  The other

7    way is for me to take judicial notice of the records and

8    say she didn't come to Boston to testify and she didn't

9    testify.  The other way is for you to stand up in front

10   of the jury and say mea culpa.  When I asked all those

11   questions about that witness, I was wrong, she didn't

12   come to Boston.  She was right.  I was wrong.  She

13   didn't testify --

14             MR. CAPIN:  Well, actually --

15             THE COURT:  That's another way.

16             MR. CAPIN:  I think she was confused.  I'm not

17   sure what --

18             THE COURT:  I don't think she was confused.

19   If the record is she didn't go to Boston and testify, I

20   think you were confused.

21             MR. CAPIN:  If the court is going to take

22   judicial notice of something, I would ask that it take

23   judicial notice of the fact that she did travel here for

24   a separate case and that --

25             MR. HOWARD:  She said I came here for

1  Beatrice, which is true.

2          MR. CAPIN:  Well, then, what's the harm, your

3  Honor?

4          THE COURT:  The harm is the jury is left with

5  the impression that the prosecutor has superior

6  knowledge of the truth, and that superior knowledge is,

7  in fact you came to testify in a proceeding in Boston

8  involving the defendant's sister and yet you are here

9  looking me right in the eye and this jury and denying

10  that.  That's the problem.  And the jury might accept

11  that assumption in your question and say, you know, I

12  don't find her very credible because how could she

13  possibly deny coming to Boston and testifying in a case

14  against the defendant's sister when she did, and there's

15  no evidence that she did and in fact she didn't.  That's

16  the problem.

17          MR. CAPIN:  But the gist of the inconsistency

18  was I don't know Prudence Kantengwa.

19          THE COURT:  Well, that's your view of it.  I'm

20  telling you that as the thirteenth juror sitting here,

21  my view of it was, you know, that's a pretty good cross

22  because that goes directly to credibility, and anybody

23  who would get on the witness stand and look a jury in

24  the eye and deny coming to Boston to testify in a

25  separate case, who could do that?  That's not mistake.

1    That's intentional.  And that undermines your

2    credibility significantly.  And if it turns out that's

3    not the case, because your question assumed facts that

4    simply weren't true, we ought to correct that.  We ought

5    to figure out how to correct that.  But again, you've

6    got to look at the transcript and see exactly what it

7    was.

8             MR. CAPIN:  Fair enough, your Honor, I

9    appreciate the opportunity.  And I would ask if given a

10   chance to correct it, can we correct it in a way that

11   doesn't leave the impression that she never traveled for

12   any purpose because --

13            THE COURT:  We've got to correct it in a clear

14   and understandable way that that effective

15   cross-examination is based on a misunderstanding by you,

16   so that it's very clear that they should not discount

17   her credibility based on those answers, because she

18   didn't come to Boston to testify in that case, if in

19   fact that's the case, which I think you're saying is the

20   case.

21            MR. CAPIN:  It certainly is the case.  I

22   realized as soon as Mr. Ruoff pointed it out to me.

23            THE COURT:  Now the issue is, well, what were

24   the questions and what were the specific answers and so

25   on.  I agree with you, I think she said yes, I came for

1    the defendant.

2              MR. HOWARD:  And she said she came here for

3    Beatrice.

4              THE COURT:  Not to testify in any other case.

5    To me that's a big difference because somebody, if they

6    came to Boston from Rwanda to testify in a different

7    case in a different courthouse, a much grander place, a

8    big city as opposed to a small town, they would remember

9    that.  If they deny that, that reflects on their --

10             MR. CAPIN:  Except, your Honor, that there was

11   no suggestion in the question that she testified.  It

12   was did you travel to America?  Did you stay in a hotel

13   in Boston?  There was no suggestion she came -- knew for

14   a fact she didn't come to testify.  She came for the

15   purpose of providing testimony.  She traveled to

16   America.  I believe --

17             THE COURT:  When did she testify?  In April or

18   May this case was over.

19             MR. CAPIN:  I'm sorry?

20             THE COURT:  This case was over April or May.

21             MR. CAPIN:  Correct.

22             THE COURT:  So she couldn't have been here

23   testifying for the defendant.

24             MR. CAPIN:  And when she traveled -- well, she

25   traveled here certainly.  Did not testify.

1           THE COURT:  Well, I don't know if she did or

2     she didn't.  Did she?   Did you bring her over in April

3     or May?

4           MR. HOWARD:  For Beatrice's case, last March,

5     yes.

6           MR. ROUFF:  And she flew into Boston to come

7     here.  They all did.

8           MR. HOWARD:  They landed in Boston and were

9     driven up in I think it was somewhere March 5th to March

10    --

11          THE COURT:  Is she here today?  Is she

12    available today?

13          MR. HOWARD:  I think they're all back at the

14    hotel, but I can't swear to that.

15          MR. CAPIN:  Shall we arrange her presence just

16    in case --

17          THE COURT:  You might want to bring her over.

18          MR. ROUFF:  But part of the problem that the

19    defense has with recalling the witness, I mean, I can

20    talk to her, but the problem is the government created

21    the misimpression.  If the jury's already fixed in their

22    mind an assessment of her credibility, the appropriate

23    way in our belief to remedy that is a statement from the

24    government saying that she actually did not travel here

25    to testify for Prudence Kantengwa.  As a matter of fact,

1    I think it's undisputed that she did not travel here.

2              THE COURT:  I tend to agree with you, but, in

3    principle I tend to agree with you, but you really need

4    to look at the transcript and see exactly what the

5    comments were, because if Mr. Capin is right, that it's

6    less, less dramatic than that, then I think we can

7    probably cure it with instructions I suppose.  I mean,

8    I'm hesitant to do that because I don't want to

9    interject myself into it, you know, tell the jury Capin

10   made an error here.  I'm not sure, I mean, I think it

11   was important but I don't think -- it's not mistrial

12   material obviously, but it needs to be corrected just

13   because if that's not the case, once again, it's about

14   assuming facts in the questions that are not evidence of

15   the fact.  I don't want the jury -- I'm satisfied, based

16   upon my interjections so far, they understand the

17   concept now, but if that's the case, that this was based

18   on an erroneous assumption of fact, that needs to be

19   corrected so that they don't take that into account in

20   determining her credibility.  And I think we can do that

21   in many different ways, but I think it needs to be done,

22   it needs to be done.

23             MR. ROUFF:  I agree.

24             THE COURT:  All right.

25             (Recess at 12:45 p.m.)

154

1

2                        C E R T I F I C A T E

3

4           I, Sandra L. Bailey, do hereby certify that

5      the foregoing transcript is a true and accurate

6      transcription of the within proceedings, to the best of

7      my knowledge, skill, ability and belief.

8

9

10     Submitted: 10/17/13

11                               **SANDRA L. BAILEY, LCR, CM, CRR**

12                               LICENSED COURT REPORTER, NO. 15

13                               STATE OF NEW HAMPSHIRE

14

15

16

17

18

19

20

21

22

23

24

25

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2-3-
2014

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                     \*
UNITED STATES OF AMERICA             \*
                                     \*  10-CR-85-01-SM
            v.                       \*  February 19, 2013
                                     \*  1:20 p.m.
   BEATRICE MUNYENYEZI               \*
                                     \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF JURY TRIAL
DAY TEN - AFTERNOON SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE


APPEARANCES:


For the Government:      John A. Capin, AUSA
                        Aloke S. Chakravarty, AUSA
                        U.S. Attorney's Office (MA and NH)


For the Defendant:      Mark E. Howard, Esq.
                        David W. Ruoff, Esq.
                        Howard & Ruoff, Esq.



Interpreters:           Jacqueline Adam
                        Joseph Rubagumya



Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

I N D E X

WITNESS:          Direct   Cross   Redirect   Recross

ANASTASIA MUKAMWIZA

By Mr. Capin       15



EXHIBITS                              FOR ID   IN EVD

GOVERNMENT'S:

30.                                      44

1                  P R O C E E D I N G S

2              (IN COURT - NO JURY PRESENT)

3              MR. CAPIN:  Your Honor, may I, before the

4    jury comes out?

5              THE COURT:  Yes.  You want to obtain more of

6    the transcript, I hear.

7              MR. CAPIN:  My memory is that there was a --

8    the Court gave a further, and certainly from where I'm

9    standing, more of a stern curative instruction after I

10   went down that path again.

11             So I would argue -- that said, if it

12   satisfies the issue I would actually -- I appreciate

13   the Court's offer to let the government do a mea

14   culpa, but tell the jury --

15             THE COURT:  Well, I don't think it was an

16   offer quite, but it was a possibility, an alternative.

17             MR. CAPIN:  Oh, I'm sorry.  I mean, if I

18   could do a mea culpa and basically say that you're

19   permitting me to clarify the record with regard to

20   that and that I was incorrect in including in my

21   question my belief that she had come for the Kantengwa

22   trial when in fact she came through Boston to Concord

23   for this case in the prior proceeding, I think that

24   would clear the record up.  I think this would be the

25   time to do it.

1          THE COURT:  All right.  Let's get a good

2    handle on what it is -- where the divergence is.

3          So she did not come to Boston to testify in

4    the case -- in an unrelated case -- I'll give you a

5    chance, Mr. Ruoff and Mr. Howard, to comment

6    obviously -- in an unrelated case involving her

7    sister -- involving the defendant's sister.  She did

8    not go to the courthouse in Boston.  Well, did not

9    testify.  Did not go to the courthouse.

10          MR. CAPIN:  There was no question, your

11    Honor, about going to the courthouse.

12          THE COURT:  I thought there was.

13          MR. CAPIN:  I'm sorry.  You're right.  You're

14    right.

15          MR. RUOFF:  Page 49.

16          THE COURT:  Page 49, question 14, "And you

17    went to a courthouse in Boston?"

18          MR. CAPIN:  Answer:  Yes.

19          THE COURT:  Okay.  And you asked for the

20    rest, Mr. Capin, additional transcripts?

21          MR. CAPIN:  I did simply because I do

22    believe -- my memory again -- the Court interjected

23    here at page 48 about --

24          THE COURT:  Yes.  About whether she knew

25    that --

1       MR. CAPIN:  The picture.  My recollection,

2  and it was singular recollection, was that the Court

3  after this line then admonished -- pointed out to the

4  jury during my cross that questions that lawyers ask

5  that assume facts that are not in evidence do not put

6  those facts in evidence.  So the witnesses --

7       THE COURT:  Yes.

8       MR. CAPIN:  And you said it in no uncertain

9  terms, and I think it was after this.  So I think

10  actually it has been cured.

11       THE COURT:  No.  I would disagree because

12  that presupposes -- that's the normative rule, but

13  that presupposes a good faith basis for asking the

14  question and it assumes the fact.  That's a minimal

15  requirement that there be a good faith basis for

16  asking a question that assumes the fact.  You know, a

17  good faith basis to think that the fact is in fact

18  true.

19       Here I have no doubt that you thought it was

20  true, but it turns out it's not true and I think it

21  needs to be cured.  So I would think an appropriate

22  cure would be for you to tell the jury, look, when I

23  cross-examined that woman and implied that she had

24  come to Boston to testify in an unrelated proceeding

25  in Boston, that's not so.  I verified that that's not

1   so.  When I implied that she testified in that

2   courthouse in Boston, that's not so.  She didn't.  And

3   when I implied that she went to the courthouse in

4   Boston and testified, that's also not so.  She didn't.

5            MR. CAPIN:  Well, may I say that in fact I

6   was wrong because she traveled through Boston to this

7   courthouse to testify in this -- for the purposes of

8   testifying in a prior proceeding involving this

9   defendant, because that's also true?

10           THE COURT:  I don't have a difficulty with

11   your giving a full explanation that in fact what

12   happened was she came to this country in March, not

13   April and May.  I didn't see it in the transcript, but

14   that's my memory.  That's when the Kantengwa case was,

15   right?

16           MR. CAPIN:  It was in May, your Honor.

17           THE COURT:  So she did not come in April or

18   May.  We all agree, right?  So that's another one.  To

19   the extent I implied she came to this country in April

20   or May of last year, she didn't, but she had

21   previously come in 2012 to testify in a prior

22   proceeding here in this court.

23           MR. CAPIN:  In March.

24           THE COURT:  In March.  Does that bother you

25   "in this court"?  No, because you want all that in,

1  right?

2            MR. CAPIN:  Correct.

3            THE COURT:  Well, okay.  Is that satisfactory

4  to you, Mr. Howard or Mr. Ruoff?

5            MR. HOWARD:  What you just said is, so I hope

6  that that's what gets repeated to the jury.

7            Could I ask that the Court give it?  Would

8  you be willing to do it?

9            THE COURT:  Well, I'm not really because -- I

10  mean, I would prefer not to just because I think

11  unfortunately the black robe carries a lot of

12  authority with the jurors and I don't want to be -- I

13  don't want to overdo it in terms of -- I don't think

14  it's government misconduct here.  It's an error.

15  Unfortunately, it's an error that means something and

16  it has consequences so I think it needs to be cured,

17  but I don't want to be in the business of appearing to

18  be sanctioning counsel because I don't think it

19  warrants a sanction.  That's the risk I'm considering,

20  and that's fine with me.

21            You know, I may follow up, Mr. Capin, with

22  just a reminder that that's a good illustration that

23  facts assumed in questions are not evidence of the

24  facts.

25            MR. CAPIN:  Fair enough.  I wasn't writing

1  down what I'm to say.

2          THE COURT:  Okay.  Well, put it in your own

3  words, but the elements are when you implied in your

4  cross-examination of the witness -- how do you

5  pronounce it?

6          MR. CAPIN:  Ahishakiye.

7          THE COURT:  Okay.  And then remind them who

8  that was.

9          MR. CAPIN:  I will.

10          THE COURT:  When you were cross-examining her

11  and you were asking questions that assumed facts, such

12  as she came to Boston to testify in an unrelated

13  proceeding involving the defendant's sister, she in

14  fact did not come to Boston to testify in that

15  proceeding and she didn't testify in that proceeding.

16          MR. CAPIN:  There's no suggestion -- again,

17  I'm sorry to nit-pick, but in the record there's no

18  suggestion that she came to testify.  It's that she

19  came to Boston to testify.  She went to the courthouse

20  to testify, but she never testified.  I knew for a

21  fact she didn't, and I didn't ask her that question.

22          THE COURT:  Let's see.

23          MR. CAPIN:  It's on page 49, your Honor, line

24  7.  "You believe it involved Beatrice in Boston last

25  year?"

 1          THE COURT:  All right.  "And you went to the

 2   courthouse."

 3          So make it that when I implied that she went

 4   to the courthouse in Boston, she in fact did not go to

 5   the courthouse in Boston.

 6          MR. CAPIN:  Implied she went to the

 7   courthouse in Boston.  Implied she traveled for the

 8   purpose of Kantengwa.

 9          THE COURT:  And that she did not come to

10   Boston April or May, but she was here earlier than

11   that in March -- February, March.

12          MR. CAPIN:  She was here in March.  The

13   record of that is clear.

14          THE COURT:  All right.  Here in March for a

15   proceeding in this court.  All right?

16          MR. CAPIN:  Is the word "implied" required or

17   may I say suggested?

18          THE COURT:  Well, that's what you implied.

19          MR. CAPIN:  It's also what I suggested.  I

20   think suggest is certainly more consummate with my --

21          THE COURT:  I'll tell you what.  You use

22   suggested and I'll use implied.  Okay?

23          MR. CAPIN:  Fair enough.

24          MR. HOWARD:  I may be going back to the well

25   at my own peril here, but I was going to ask again

1   that you do it because it's just -- I know that you

2   said the black robe carries this persona that you

3   don't want to be suggesting to the jury that you're

4   punishing a party, or what have you, or that you are

5   injecting a credibility assessment about the witness,

6   but the flip side to that is allowing the prosecutor

7   to do it.  He gets to stand up and essentially enhance

8   his own credibility with the jury.  Look at me.  I

9   made a mistake.  I'm the honest one in this courtroom.

10  I'm here to tell you that I made a mistake, and I'm

11  going to confess that mistake so here I am.

12          I think that gives a credibility to the

13  prosecution that they shouldn't have also, and I think

14  it should come from the neutral arbiter and not from

15  the party.

16          THE COURT:  All right.  I appreciate it, but

17  I don't think anybody reasonably could consider what

18  Mr. Capin is going to have to do here is bolster his

19  own credibility.  I think it's a walk back.

20          MR. HOWARD:  All right.

21          MR. CAPIN:  Thank you, your Honor.

22          THE COURT:  And I'll also instruct them on --

23  once again, remind them about this notion that facts

24  are not evidence.

25          MR. RUOFF:  That actually raises a point.  I

1  mean, this is a stipulated fact, essentially, so they

2  can pay attention to what he does say with respect to

3  this stipulation, because later on you're going to

4  tell them things that lawyers say are not evidence,

5  but actually this is evidence.

6          MR. CAPIN:  This is not evidence.  This is

7  the Court explaining the evidentiary value of my

8  questions.

9          MR. RUOFF:  But when he says she was not here

10  for Prudence Kantengwa's trial, that's a fact.

11          THE COURT:  Yes.  But it's only important to

12  the extent that it relates to her credibility.

13  Otherwise, it's irrelevant.  It doesn't matter whether

14  she was here or not here.  It only relates to the

15  cross-examination.  The cross-examination only relates

16  to an attack on her credibility, and that only relates

17  to, are you sure you're telling the truth here, and

18  that's going to be cured.

19          MR. CAPIN:  Shall we have the witness take

20  the stand?

21          THE COURT:  Oh, are you going to call a

22  witness as well?

23          MR. CAPIN:  No, no.  The next witness, your

24  Honor.  The rebuttal witness.

25          THE COURT:  Oh, no.  Why don't we do that.

1   Why don't we call her after we do this.

2           MR. CAPIN:  Okay.

3           MR. HOWARD:  Does he do his speech first and

4   then we'll rest?  I just want to know if I should

5   stand up.

6           THE COURT:  Yes.

7           MR. HOWARD:  Okay.  Good.  Thank you.

8           THE COURT:  Mr. Capin, I'm just going to tell

9   them that the matter has come to the attention of the

10  parties and the Court and you're going to address it.

11          MR. CAPIN:  Thank you, your Honor.

12          (IN COURT - JURY PRESENT)

13          THE COURT:  Once again, ladies and gentlemen,

14  let me apologize for the delay.  We had to take up

15  some matters with counsel.

16          A matter has come to the attention of the

17  parties and the Court that needs to be addressed, and

18  Mr. Capin is about to address the issue and clarify

19  some information for you.  Mr. Capin.

20          MR. CAPIN:  Thank you, your Honor.

21          Good afternoon.  The Court has permitted me

22  an opportunity to clarify the record with regard to

23  the testimony of a woman named Alice Ahishakiye,

24  A-H-I-S-H-A-K-I-Y-E.  She is one of the two cooks who

25  testified.  She was a little hard of hearing.  She

1   testified on Friday.

2        In my cross-examination of her I asked her if

3   she traveled to Boston last year for the purpose of

4   testifying on behalf of the defendant's sister,

5   Prudence Kantengwa.  I asked her if she went to the

6   courthouse in Boston, and I asked her if she went in

7   April and May of last year.

8        I was incorrect in assuming in my question

9   that that was when she traveled and the purpose.  In

10  fact, she traveled through Boston to testify in

11  Concord not in April or May but in March of last year

12  in a prior proceeding involving this defendant.

13       Is that satisfactory, your Honor, on that

14  issue?

15       THE COURT:  Well, in fact, the witness did

16  not come to Boston to testify in an unrelated

17  proceeding involving the defendant's sister.  That

18  didn't happen.  That's not so.  She did not go to a

19  courthouse in Boston, and she did not come to the

20  United States in April or May.

21       She did, however, come to the United States

22  in March to testify in a proceeding in this

23  courthouse.  So you should understand that -- now, let

24  me take the opportunity -- again, this is a good

25  illustration of the principle that I've been talking

1  about a couple of times before, which is facts assumed

2  in questions by counsel are not -- the question is not

3  evidence of that fact.

4          So, for example, when you said, isn't it true

5  that you came to Boston in April and May last year,

6  went to the Boston courthouse to testify in a

7  proceeding involving the defendant's sister, isn't

8  that so, you might think that is so and look for the

9  answer.  If the answer is no, you might think, hmm.

10  Don't think hmm, because there's no evidence that the

11  witness did.

12          What the prosecutor has just clarified for

13  you is that when he asked those questions one might

14  think that there's an implication that she did do

15  those things, and the prosecutor had a good faith

16  basis for thinking that was so, but he has since

17  learned -- all the parties have learned that's not the

18  case so they're clarifying that for you so you don't

19  take that into account in determining the issues that

20  are before you.  Does that do it?

21          MR. CAPIN:  I appreciate it.  Thank you.

22          MR. HOWARD:  Your Honor, thank you.

23          With that, ladies and gentlemen, the defense

24  rests.

25          THE COURT:  All right.  The defense has now

1  rested.  That means they've completed presenting the

2  evidence that they wish to present.

3          The government now has an opportunity to call

4  witnesses in rebuttal, and I understand the government

5  is going to call one witness in brief rebuttal.

6          MR. CAPIN:  One very brief witness.  The

7  government calls Anastasia Mukamwiza.

8                      ANASTASIA MUKAMWIZA

9          having been duly sworn, testified as follows:

10          THE CLERK:  For the record, please state your

11  name and spell your last name.

12          THE WITNESS:  My name is Anastasia

13  Munyandekwe Mukamwiza.  My last name is

14  M-U-N-Y-A-N-D-E-K-W-E and Mukamwiza is

15  M-U-K-A-M-W-I-Z-A.

16                      DIRECT EXAMINATION

17  BY MR. CAPIN:

18      Q.  Good afternoon, Ms. Mukamwiza.

19      A.  Good afternoon, sir.

20      Q.  Please tell the jury where you live.

21      A.  Sorry?

22      Q.  Please tell the jury where you live.

23      A.  I live in UK, United Kingdom, in England.

24      Q.  Do you live in London?

25      A.  I live in Norwich.  Two hours from London.

 1      Q.  Do you know the defendant, Beatrice

 2  Munyenyezi?

 3      A.  Yes, sir.

 4      Q.  Are you a friend of hers?

 5      A.  Sorry.

 6      Q.  Are you a friend of hers?

 7      A.  No.  She is my family member.

 8      Q.  She's your family member?

 9      A.  Yes.

10      Q.  And you have known her since before she

11  married Shalom Ntahobali?

12      A.  I know her when -- the first time I saw her

13  is when I attend my cousin Shalom's graduation.

14      Q.  And that was before he married her?

15      A.  Yes.

16      Q.  And did you go to their wedding?

17      A.  Yeah, I did.

18      Q.  And that was in 19 -- what year was that?

19      A.  Sometime 1993.  I can't remember exactly.

20      Q.  And did you live in Butare in the I'Huriro

21  Hotel at any point in time?

22      A.  Yes, sir.

23      Q.  In fact, did you travel here to testify about

24  your experience in Butare?

25      A.  Sorry?

```
 1        Q.  Did you travel to this courtroom in Concord,
 2   New Hampshire, to testify about your experience in
 3   Butare during the genocide?
 4        A.  Last year, yes.
 5        Q.  Yes.  In fact you were called by Beatrice
 6   Munyenyezi's attorneys to testify in this case,
 7   correct?
 8        A.  Yes.
 9        Q.  And you spent almost -- is it correct that
10   you spent almost the entire genocide living in the
11   I'Huriro Hotel in Butare?
12        A.  Yes, sir.
13        Q.  And while you were living there Maurice
14   Ntahobali was there, correct?
15        A.  Yeah.
16        Q.  And he came and -- he went and -- let me
17   start that sentence again.
18            He was able to leave the hotel and come and
19   go as he pleased, right?
20        A.  Uncle Maurice?
21        Q.  Yes.
22        A.  What do you mean come and -- I don't remember
23   him going anywhere or coming in.  I can't recall.  I
24   don't remember.
25        Q.  Are you saying Uncle Maurice stayed in the
```

1  hotel the whole genocide?

2      A.  Yeah, he was at the hotel, as far as I

3  remember.

4      Q.  How about Aunt Pauline?  She came and went as

5  she pleased, didn't she?

6      A.  When you say as you please, I don't

7  understand what you mean, sir.

8      Q.  Well, I mean she got up in the morning -- if

9  she was at the hotel, she got up in the morning and

10  drove to work in Gitarama, right?

11      A.  No.  She used to come once in a while.  She

12  wasn't really in Butare.  As I say, she used to come

13  to visit once in a while, like maybe say once, twice,

14  something like that, but not every day.

15      Q.  She would just come visit for a few hours, or

16  overnight, and then go back to where her government

17  office was in Gitarama, right?

18      A.  Yes, sir.

19      Q.  And nothing prevented her from coming back to

20  the hotel and returning to Gitarama, right?

21      A.  No.  I don't remember.

22      Q.  And you were living there with the defendant,

23  Beatrice, correct?

24      A.  Yes, sir.

25      Q.  And you were living there with the

1  defendant's husband, Shalom?

2      A.  Yes.

3      Q.  And Shalom was able to leave and come back as

4  he pleased, correct?

5      A.  What do you mean leaving?  Going away?

6      Q.  Did you ever see Shalom leave the hotel

7  during the entire genocide?

8      A.  I can't say I've seen him leave, because I

9  was not there to control his move.

10     Q.  I'm not asking you --

11     A.  I saw him.  Yeah, he was there.  But I

12  couldn't tell you how many times he left because I was

13  not there to control his move.

14     Q.  Okay.  And you saw the defendant's sister

15  Prudence.  Prudence Kantengwa.  Was she living at the

16  hotel while you were there?

17     A.  She came at some point, or I see at some

18  point, but she live there at some point, yes.

19     Q.  Okay.  And she was brought by her husband to

20  the hotel, right?

21     A.  She came, yeah.  I saw her husband at some

22  point, but I don't remember if she came with her

23  husband or not.

24     Q.  Are you saying that you don't remember if

25  Prudence's husband was also present at the hotel?

1       A.  He was there.  I saw him at some point.  But

2    all I'm saying is that I don't remember -- I didn't

3    see them coming.  I saw them, though.  I remember they

4    were there, but I can't tell you when they came or how

5    they came.

6       Q.  But you do remember that he was there and

7    that he was the head of the Rwandan intelligence

8    service?

9       A.  I'm not sure about -- I want to say -- what

10   do you mean about the head?

11      Q.  Well, I'll ask it different.  Was he

12   employed -- did he work for the intelligence service

13   of Rwanda?

14      A.  What I remember is that he was called maneko.

15   In Kinyarwanda language called maneko, and the name

16   can be translated as intelligence in Rwanda, but I

17   don't remember if he was the head or no.

18      Q.  No.  My question is, do you remember if he

19   was working as an intelligence officer?

20      A.  Intelligence officer?

21      Q.  Yes.  Do you remember one way or the other?

22      A.  What do you mean?

23      Q.  Do you remember if he was working as an

24   intelligence officer for the Rwandan government?

25      A.  I knew he was working out of president's

 1  office, yeah.

 2       Q.  Working for the president's office.  Do you

 3  know if he was working for the president's office as

 4  an intelligence officer?

 5       A.  Yeah, but I can't tell you that I was sure of

 6  his title.

 7       Q.  I'm not asking his title.  I'm asking you was

 8  he working as an intelligence officer for the

 9  president of Rwanda?

10       A.  I can't -- I don't -- can you repeat that?

11       Q.  Was he working for the Rwandan government as

12  an intelligence officer?

13       A.  I don't assume that.

14       Q.  I'm sorry.

15       A.  I don't -- I don't like -- how can I say?  I

16  don't really assume -- I don't -- I don't know how to

17  say.

18       Q.  Well, I'm not asking you to assume anything.

19  Did you testify in a prior proceeding in this case

20  about what Prudence Kantengwa's husband did for a

21  living?

22       A.  You mean last year?

23       Q.  Yes.

24       A.  Yes, I remember they were asking about him.

25       Q.  Do you remember being asked what he was doing

1    and saying, "Yeah, he was working as an intelligence

2    officer"?

3              MR. RUOFF:   What page, counsel?

4              THE COURT:   Give him the cite.

5              MR. CAPIN:   61, line 25.

6       A.   I think there's a language barrier or a

7    language something missing here.

8       Q.   Let me ask you a question just so there's no

9    language issue.   Take a look at this and tell me if

10   you've ever seen that before.

11      A.   Yeah, I saw it before.

12      Q.   What is it?

13      A.   Yeah, it's me when -- yeah, it's my

14   testimony.

15      Q.   It's a transcript of your testimony in a

16   prior proceeding in this courtroom sitting in that

17   chair, correct?

18      A.   Sorry?

19      Q.   It's a transcript of your testimony in a

20   prior proceeding in this case and you were sitting in

21   that very chair?

22      A.   Yes.

23      Q.   When was the last time you read this

24   transcript?

25      A.   Yeah, I was reading the past few -- yeah, the

1  past few days or last night.

2       Q.  You read it over the weekend?

3       A.  Uh-huh.

4       Q.  Now, take a look at page 61 to 62, please.

5       A.  61, 62.  Yeah, I'm there.

6       Q.  Do you see at the bottom of page 61, line 23?

7       A.  Yeah.

8       Q.  Do you see where it says, "Okay, so

9  Prudence's husband was head of the intelligence

10  service in Rwanda, wasn't he?"  And you answered,

11  "Yeah, he was working as intelligence officer, I don't

12  know, something like that, yeah."  Did I read that

13  correctly?

14       A.  Yeah.  Can I clarify?

15       Q.  Mr. Ruoff or Mr. Howard will clarify.  I just

16  want to make sure you answer my questions so we can

17  get done here.

18            In fact, Prudence and Beatrice were allowed

19  to come and go as they pleased, weren't they?

20       A.  To say that they were allowed to go and come

21  as pleased, I didn't testify that because I didn't see

22  them coming many times or going back as they pleased.

23  The time I remember is the time they went to Cyangugu.

24       Q.  I'm sorry.  Where did they go?

25       A.  To Cyangugu.

1       Q.   They took a trip to another city called

2    Cyangugu; is that correct?

3       A.   Yeah.   They chose like to go as they pleased.

4       Q.   So did they go to Cyangugu at the end of May?

5       A.   I can't remember when they left, sir.

6       Q.   Take a look at page 27 of that transcript,

7    please.   Look at line 18, please.   Do you see that?

8       A.   Yeah.

9       Q.   Do you see the question was, "Do you recall

10   when the roadblock was put there?"   And you answered,

11   "I remember it was put there around the end of May.

12   The reason why I remember is because it was put there

13   after Beatrice and Prudence, they went to Cyangugu."

14   Did I read that correctly?

15      A.   Yes.

16      Q.   So they went there sometime in May, correct?

17      A.   They went sometime before, yes.   I can't say

18   exactly May.   Yes, I say May here, but remember it was

19   20 years ago, so I don't really say exactly that it

20   was in May.

21      Q.   But certainly your memory about when they

22   went isn't better now than it was a year ago, is it?

23      A.   Sorry?

24      Q.   Your memory about when they went is not

25   better now than it was a year ago?

1       A.  What do you mean?

2       Q.  And it's true that they went for about two or

3  three weeks, right?

4       A.  Yeah.  They went sometime -- yeah, sometime.

5  To say more than that, I can't say exactly how long

6  they went.

7       Q.  But you're confident that they went for a few

8  weeks, maybe two or three weeks?

9       A.  I said maybe.

10      Q.  But they went for at least a few weeks,

11 right?

12      A.  Yeah.  Maybe, yeah.

13      Q.  And you didn't go with them?

14      A.  No, I didn't.

15      Q.  So in order to be by Beatrice's side for the

16 entire genocide you would have had to go to Cyangungu,

17 correct?

18      A.  Sorry?

19      Q.  If you were going to be by Beatrice's side --

20 with her in her presence during the entire genocide,

21 you would have had to go to Cyangungu with her for a

22 few weeks; isn't that true?

23      A.  Why do I have to go with her?

24      Q.  If a person were going to be by Beatrice's

25 side for the entire genocide, that person would have

1  had to go to Cyangungu with her for a few weeks,

2  right?

3       A.  No, no -- so sorry -- because you are living

4  there as a family member of almost six or seven people

5  who are seeing each other, but I don't think it was

6  necessary to say that I would have gone with her to

7  Cyangungu.

8       Q.  I'm not suggesting you went to Cyangungu.  Do

9  you know if anybody else went to Cyangungu?

10      A.  Yeah.

11      Q.  With Beatrice?

12      A.  Yes.

13      Q.  Who else went?

14      A.  Her family.  Her sister and her sister's

15  family.

16      Q.  Did anybody from the kitchen go, either of

17  the two cooks?

18      A.  I can't remember.  I can't recall.

19      Q.  Did a man named Gilbert go?

20      A.  I don't remember.

21      Q.  But you would agree that if a person living

22  at the hotel didn't go with Beatrice to Cyangungu for

23  a few weeks during the genocide, that person couldn't

24  have been with her for the whole genocide?

25      A.  I don't -- can you repeat again the question?

1  It's very wrong sentence.  Sorry.

2          MR. CAPIN:  I think nothing further.  Thank

3  you, ma'am.

4          THE COURT:  All right.  Any cross?

5          MR. RUOFF:  Judge, I have no questions.

6  Thank you.

7          THE COURT:  All right.  Thank you, ma'am.

8  You may step down.  You're excused.  Any other --

9          MR. CAPIN:  Nothing further from the

10  government, your Honor.  Thank you.

11          THE COURT:  All right.  Ladies and gentlemen,

12  that completes the presentation of evidence in the

13  case, so we've reached that point where counsel will

14  have an opportunity to stand before you once again and

15  make what's known as a closing argument.  You've heard

16  all of the evidence.  Closing arguments will be based

17  on the evidence as it has been presented in the

18  courtroom, and then I'll instruct you on the law that

19  you are to apply in returning a verdict in the case.

20          I need to take up some matters with counsel

21  and then we need to have a charging conference which

22  basically goes over the instructions and makes sure

23  they're all complete and in good order, so that's

24  going to take a little bit of time.

25          We'll resume again tomorrow morning at 9:00

1  o'clock.  At that time you can expect to hear closing

2  arguments.  You know, why don't we make it 9:30

3  tomorrow just in case.  Sometimes administrative

4  issues come up and so forth, so I don't want to hold

5  you up.  So 9:30 tomorrow morning we'll begin closing

6  arguments, after which I'll instruct you on the law

7  and then you will have the case for deliberation and

8  decision.

9        Once again, for the last time, please don't

10  discuss the case amongst yourselves or with anybody

11  else during the course of the break.

12        (IN COURT - NO JURY PRESENT)

13        THE COURT:  Mr. Howard, I think -- you've

14  rested.  I think I did rule on your Rule 29 motion

15  before you rested.

16        MR. HOWARD:  You did.

17        THE COURT:  So I'll consider it to be renewed

18  and deny your motion.

19        The motion for mistrial is denied.  With

20  respect to the first part of the motion, I find that

21  the government did have a good faith basis for asking

22  the question based upon the prior proceeding, and it's

23  relevant to the government's theory of the case.

24  Certainly this witness at least has added evidence of

25  his presence in the I'Huriro during the relevant time.

1          With regard to the second part of the motion,

2    I find that the government's concession and my

3    instruction to the jury adequately cured any prejudice

4    that might have arisen from the cross-examination of

5    Ms. Ahishakiye.

6          The court reporter did give me the other

7    pages that you asked for, Mr. Capin.  It's probably

8    after the fact now, but if you want to look at it.

9          MR. CAPIN:  Your Honor, I have it here and

10   it's burned into my memory.

11         THE COURT:  Okay.  Well, honestly I don't

12   think it makes a difference one way or the other.  It

13   simply illustrates the point that questions aren't

14   evidence and there's no evidence of the fact assumed

15   in the question.

16         All right.  So a charging conference maybe --

17   do you want to take fifteen minutes?

18         MR. CAPIN:  Yes.

19         MR. HOWARD:  I was wondering if I could

20   indulge the Court just to supplement the record on our

21   mistrial motion because I do think that -- first of

22   all, may I?

23         THE COURT:  Of course.

24         MR. HOWARD:  Thank you, Judge.

25         THE COURT:  Well, supplement -- you mean --

1  all right.  Add grounds?

2          MR. HOWARD:  Well, I think it's based on --

3  the government was allowed reopen their case -- maybe

4  it was reopening, maybe it was rebuttal -- to attempt

5  to elicit evidence to support the question that was

6  asked of the cook.

7          The question that -- if I may, Judge, the

8  question that was asked was, "Didn't you know that he

9  was the head of the secret police of Rwanda?"

10  Everybody in this courtroom has to acknowledge that's

11  a very charged question.  That's different than being

12  an intelligence officer.  They're two very different

13  things.  There's no evidence in this case that there

14  is such an entity as the secret police in Rwanda.

15  There's no evidence in this case that he was the head.

16          What the government has asserted as a good

17  faith basis for the question was this witness's

18  testimony.  And what they knew was this witness said

19  in response to the question, "So Prudence's husband

20  was head of the intelligence service in Rwanda, wasn't

21  he?  Yeah, he was working as intelligence officer, I

22  don't remember, something like that."  That's it.

23          From there we go to the very prejudicial

24  implication -- suggestion that there's a secret police

25  of which he is the head.

1          Of course that's all tied to trying to

2    impeach both Alice and Gilbert with how could they not

3    know that he was a man of such prominence with such an

4    insidious organization as the secret police.

5          It's highly prejudicial.  They elicited it

6    both on credibility and to support their guilt by

7    association theory that they clearly pursued here that

8    this hotel was crawling with MRNDs so Beatrice must be

9    one.

10          I don't believe that the record that they

11   have now just elicited supports their question.  It

12   was an improper question.  It highly prejudices the

13   jury and deprives my client of a fair trial under the

14   due process clause.

15          It is the ultimate in bolstering, as the

16   First Circuit has cautioned against as recently as

17   last June, so we would renew our motion for a

18   mistrial.

19          THE COURT:  I don't think it's bolstering.

20   It's not bolstering any testimony to that effect.

21   Your whole point is there is no evidence to that

22   effect.

23          MR. HOWARD:  Bolstering can come in two

24   forms.  One is bolstering the credibility of a

25   witness, as the First Circuit pointed out in a case

1   called Valdevia.

2          THE COURT:  I've seen your memo.

3          MR. HOWARD:  It is in the memorandum.  And

4   other circuits have recognized that there is a

5   bolstering of the theory of the government's case, not

6   necessarily witness credibility, but suggesting to the

7   jury that the government is in possession of evidence

8   that supports its case that it has not shared with the

9   jury but bolsters the strength of its case simply by

10  suggesting it to the jury.  That is just as improper

11  as trying to bolster the credibility of an individual

12  witness.

13         That's what they've done here.  And I can't

14  stress enough the insidious nature of characterizing

15  this as the secret police of Rwanda.  It makes it

16  sound like she hobnobs with the Gestapo and then we've

17  got Hermann Goring at the hotel as well, and it's

18  simply not true and they had no evidence to base it

19  upon.

20         So I believe that in -- especially in

21  combination, I recognize that the Court sees that we

22  rectified the other problem of traveling to Boston for

23  Prudence's case.  Those two things in combination

24  support a mistrial.

25         It's our view that the secret police

1    testimony from Mr. Capin -- the secret police question

2    infects this trial to the point where it can't be

3    resurrected, it's improper bolstering, and the Court

4    should declare a mistrial.

5         THE COURT:  Thank you.  Mr. Capin.

6         MR. CAPIN:  Just to make a factual record,

7    your Honor, I continue to be flabbergasted by the

8    disingenuousness of this argument given that defense

9    counsel and his associate sat through I believe the

10   entire Kantengwa trial.

11        Mr. Chakravarty opened calling it secret

12   police.  Professor Longman called it secret police.  I

13   closed calling it secret police.  Defense witnesses

14   called by the defendant called it the secret police.

15   Its actual name was Service de Renseignement.  I

16   believe that's R-E-N-S-E-I-G-N-E-M-E-N-T.  But

17   Professor Longman said, and I quote, "It in essence

18   functioned as a secret police."

19        I will offer as an exhibit in this proceeding

20   Exhibit 13(A) -- and I would like to have this marked,

21   if I may -- to the Kantengwa trial, which was Mr.

22   Munyemana's personnel file provided by the Rwandan

23   Ministry of Labor which shows -- there was a dispute

24   at the Kantengwa trial, but it showed was certainly

25   more than a good faith basis to believe that he in

1   fact was the head of the secret police.

2          The suggestion that a witness who was not

3   even in Rwanda at the relevant time would be expected

4   to know that Mr. Munyemana was the head of the secret

5   police, especially when the witness resided in the

6   I'Huriro with him, is not bolstering.  It's simply

7   asking the question they expect the witness to answer

8   honestly, which I would submit there's abundant

9   evidence with this particular witness and others did

10  not, but in terms of bolstering I think it's a

11  meritless argument, your Honor.

12         THE COURT:  Is there something -- an agency

13  in Rwanda at the time that was known as the secret

14  police?

15         MR. CAPIN:  There was an agency called the

16  Service Central de Renseignements.  I read it into the

17  record this morning.  Professor Longman testified --

18         MR. HOWARD:  It had been an unrelated case he

19  testified.  He didn't testify that --

20         MR. CAPIN:  No, but I know that -- Professor

21  Longman was asked by Mr. Chakravarty, what is that,

22  and he said, "It in essence functioned as a secret

23  police."

24         During that entire trial the parties without

25  objection referred to it as the secret police.  In

1   fact, the defendant herself, Kantengwa, called a man

2   who had been arrested by the secret police, and in a

3   long colloquy -- and I stand to be corrected.  I don't

4   have the transcript, but my memory of this -- Mr.

5   Chakravarty cross-examined him, and there were

6   repeated references to Munyemana as the head of the

7   secret police.  It's what they were.

8           Now, as you've seen in this case --

9           THE COURT:  That takes care of your good

10  faith basis for asking the question, but it doesn't

11  address his argument about secret police being

12  different from intelligence.

13          MR. CAPIN:  Well, I think my good faith basis

14  is --

15          THE COURT:  No, no, no.  We're by that.  Good

16  faith basis.

17          MR. CAPIN:  Good to know.  To believe that

18  it's the secret police -- I mean, Professor Longman

19  called it the secret police.  If I can't rely on the

20  preeminent scholar in the field for what I call this

21  thing, because Service de Renseignement means nothing

22  to the jury.

23          THE COURT:  I have all of that.  I do.

24          Now, point number two.  There's no evidence

25  in this case that -- I'm just reiterating Mr. Howard's

1   point.  If I do it injustice, let me know, Mr. Howard,

2   but he's saying, look, in this case -- there's no

3   evidence in this case that there's such a thing as the

4   Rwandan secret police, or there was, and there's no

5   evidence that this fellow was its head.  And your

6   question, he says, assuming those facts, tends to

7   bolster the theory of your prosecution when there's no

8   evidence for it.  That's I think what he's saying, not

9   you don't have a good faith basis for asking it.

10          MR. CAPIN:  And I understand that, but I

11  think -- and maybe I didn't round out my point.  My

12  point is that not only do I have a good faith reason

13  to believe that the witness will know that he's the

14  head, but I have a good faith reason to believe that

15  the witness will honestly answer that, yes, he was the

16  head.

17          First of all, this was my witness.  I had no

18  reason to disbelieve that she would know his title,

19  especially when she was asked about it last year.  I

20  presume she knows about the Kantengwa trial and may

21  have read the transcripts for all I know.

22          And with regards to the government -- the

23  government -- the point is --

24          THE COURT:  His point is there's a big

25  difference between using the term secret police and

1  what that conjures in somebody's mind and intelligence

2  officer and what that conjures.

3      MR. CAPIN:  If I know that several Rwandan

4  witnesses who have testified about their experience in

5  the genocide have previously referred to them as the

6  secret police, then there's no reason I shouldn't

7  expect this witness to agree with me that that's what

8  it was.

9      If she had said that, that would be evidence.

10  I admit she didn't say that, but certainly there's

11  nothing untoward about my asking her the question.

12      It would be the same as if there were no

13  evidence in this case that there were a party called

14  the MDR and I said to her, isn't it true there were

15  other parties like the MDR.  She might say I don't

16  know, and I'm stuck with that answer.  She might say,

17  oh, yeah, there was.  That's evidence.

18      THE COURT:  Mr. Howard, I'm going to deny

19  your motion for a mistrial.  I take your point that

20  there's probably a difference and words matter

21  certainly, but if you would like I can certainly give

22  a curative instruction which I think would be more

23  than adequate.

24      If you want me to highlight the issue again,

25  I will, but what I'll tell them is, you know, there

1    were questions assuming that this fellow was a member

2    of the secret police and there was a secret police

3    agency when in reality the testimony was he was an

4    intelligence officer, and the jury can draw their own

5    distinction.

6            MR. CAPIN:  But with respect, your Honor, I

7    mean, I didn't do what I was criticized for doing last

8    week.  I didn't ask incredulously, you're saying you

9    don't know.  I asked an honest question to which she

10   should have given me an honest answer.  She said no,

11   and I backed away.

12           THE COURT:  That's this witness.  But the

13   other witness --

14           MR. CAPIN:  Which other witness, your Honor?

15           THE COURT:  Ahishakiye -- I can't say it.

16           MR. HOWARD:  Just call her Alice.  Everybody

17   does.

18           MR. CAPIN:  It's the same point, your Honor.

19   It's the same point.

20           THE COURT:  No.  That was a little more

21   dramatic.  Again, in my perception, a little more

22   dramatic.  You're just a dramatic person, Mr. Capin.

23   You can't avoid it.

24           So the answer is no.  It doesn't warrant a

25   mistrial certainly.  I don't think that deviation, to

1    the extent that it exists, is -- I'm going to take a

2    look at that case, but I think the answer is I'm happy

3    to give another curative instruction with respect to

4    reminding them that facts assumed in questions are not

5    evidence of those facts.

6              MR. CAPIN:  May I suggest that we at least

7    look at the transcript before any further instruction

8    is given?

9              THE COURT:  Sure.  I would be happy to.

10             Do you want a curative instruction, Mr.

11   Howard?

12             MR. HOWARD:  Well, I think, Judge, since we

13   only have until tomorrow morning, if Attorney Ruoff

14   and I can confer on what that might look like and have

15   a discussion either later today or tomorrow about

16   that.

17             THE COURT:  I'm not sure how it helps you.  I

18   mean, it's your call.  I mean, honestly I think

19   telling the jury, listen, one of you might have

20   implied that there's a secret police organization

21   so-called and so on and this fellow was the head of

22   it, that was assumed in the question but the answer

23   was he was an intelligence officer, and the other

24   person didn't know.  I think Alice didn't know, right?

25             MR. CAPIN:  Didn't know.  And if I may, I

1   thought the whole point of the exercise of having the

2   Court rehearse with the parties what this jury would

3   be told about what was improperly assumed in my

4   questions was to make sure that the parties agreed

5   that that was the universe.  The defense sat on its

6   hands and now it's saying, oh, it occurs to us that

7   there's another curative instruction that Capin

8   shouldn't have said ten minutes ago.  Your Honor, it

9   seems to me they waived this.

10          MR. HOWARD:  They are two different issues.

11   You know that.

12          THE COURT:  They are two different issues

13   certainly, but the ruling is the same.  It does not

14   warrant a mistrial, in my judgment, certainly.

15          At most it warrants a curative instruction,

16   but the curative instruction is going to be pretty

17   much the same, which is facts assumed in questions --

18   questions are not evidence of the facts assumed in the

19   question.  To the extent there's a divergence between

20   secret police and intelligence officer, ladies and

21   gentlemen, you heard the testimony.  Don't take the

22   question as any evidence of the fact that it's secret

23   police or whatever it is.  I'm not sure how that helps

24   you, frankly, but that's up to you.

25          MR. HOWARD:  But you understand, Judge,

1  that's the box that the government put us in by the

2  improper question.

3          THE COURT:  Yes, but the solution sometimes

4  is more painful than the problem, and that's why we

5  have lawyers and that's why they exercise their

6  judgment and make calls.  Your call.

7          MR. HOWARD:  I understand that the government

8  can impose a due process violation on us.

9          THE COURT:  No, it's not a due process

10 violation.

11         MR. HOWARD:  And I have the burden to fix it.

12         THE COURT:  It's not a due process violation.

13 It certainly doesn't rise to that level at all.  An

14 evidentiary problem perhaps, but that's it.

15         MR. HOWARD:  It is interesting to me that Mr.

16 Capin's only response to this is his supposed good

17 faith basis for the question, and when he marshals all

18 this evidence that was introduced at an unrelated

19 proceeding in Boston about some secret police

20 organization in Rwanda, he marks as an exhibit for ID

21 the guy's profile.

22         THE COURT:  Well, he wants it to be crystal

23 clear that he had a good faith basis for asking the

24 question so that later on there's no doubt about that.

25         MR. HOWARD:  I understand that.

1          THE COURT:  And he does have a good faith

2    basis for asking the questioning.

3          MR. HOWARD:  And I understand that, Judge,

4    and I concede that he had a good faith basis for the

5    question, but it proves my point that what they're

6    trying to imply to the jury is we've got a whole bunch

7    more evidence that we're not going to tell you

8    about except what I suggest in a question about the

9    secret police.

10         THE COURT:  You know, honestly, you know,

11   reading the jury and watching their reaction to my

12   questions, if they understand one thing very, very

13   well, they understand that questions of counsel are

14   not evidence of the facts assumed in the questions.  I

15   am absolutely convinced that they understand that

16   completely.

17         MR. HOWARD:  And I don't know how many times,

18   Judge, you've had to give that instruction --

19         THE COURT:  Several times.

20         MR. HOWARD:  -- over the government's cross,

21   and they did it again.  That's my point.

22         THE COURT:  Well, all right.  I take your

23   point.  Motion is denied.  If you want a curative

24   instruction along the lines I've outlined, I'll

25   certainly be open to giving that, but I think Mr.

1   Capin's point is well taken.  But I'll look at the

2   transcript and make sure we're clear about what

3   exactly you think the transgression is.

4           As I understand, it's just a distinction

5   between a secret police and an intelligence

6   organization so described.

7           MR. CAPIN:  One last point, because I think

8   it's actually germane to this.

9           This was not the first witness who was asked

10  about the secret police.  The first question drew no

11  objection whatsoever.

12          So if we were put on notice that the

13  nomenclature which we adopted from the preeminent

14  expert was unacceptable to the defense because of due

15  process, there should have been an objection.

16          An earlier witness was asked about the secret

17  police.  No objection.  They waited until -- I don't

18  know why they waited.  I think they waited because

19  it's an act in desperation, but I think they waived it

20  after not arguing, after not objecting to the first

21  reference to the secret police, and I would ask the

22  Court to consider that.

23          THE COURT:  Well, they might have waived

24  getting a curative instruction at that point, but they

25  certainly objected the second time.

1          MR. CAPIN:  They did.  But if the point is

2     that the government should have put them on notice

3     that this choice of words -- again, adopted from the

4     preeminent expert on Rwanda -- was appropriate, an

5     objection should have been made at the time of first

6     reference.  Instead they waited in the weeds and

7     waited for the second reference, and now they're --

8          THE COURT:  I'm not sure you're forever bound

9     to not object in the future because you didn't object

10    in the past.

11         MR. CAPIN:  But it does take a little of the

12    sting or shock to find them referring to the secret

13    police.

14         THE CLERK:  Just for the record, the

15    government's transcript has been marked as

16    Government's Exhibit 30 for identification.

17         (Government's Exhibit 30 marked for ID)

18         THE COURT:  All right.  Why don't you take

19    twenty minutes and then come up and we'll do a

20    charging conference.  I don't think this is going to

21    take too long, the charging conference.  Do you have

22    copies of the instructions?

23         MR. HOWARD:  From last year we do.

24         THE COURT:  All right.  I'll give you copies

25    of a draft now.  There aren't that many differences.

1          MR. CAPIN:  Your Honor, I have a personal

2    matter that I need to deal with telephonically.  Would

3    the Court be offended if I showed up a little late to

4    the charging conference?

5          THE COURT:  No.  It's up to you.  Mr.

6    Chakravarty can certainly cover that.

7          Okay.  I'll see you in twenty minutes.

8          (Conclusion of hearing at 2:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4          I, Susan M. Bateman, do hereby certify that the

 5     foregoing transcript is a true and accurate

 6     transcription of the within proceedings, to the best of

 7     my knowledge, skill, ability and belief.

 8

 9
        Submitted: 11-4-13              Susan M. Bateman
10                                 SUSAN M. BATEMAN, LCR, RPR, CRR
                                   LICENSED COURT REPORTER, NO. 34
11                                 STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 2/17/14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-85-SM
              v.                *  February 20, 2013
                                *  9:30 a.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

Day 11
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE STEVEN J. MCAULIFFE
and a jury

Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                     John A. Capin, SAUSA
                     U.S. Attorney's Office (NH and MA)

For the Defendant:   Mark E. Howard, Esq.
                     David W. Ruoff, Esq.
                     Howard & Ruoff, PLLC
                     831 Union Street
                     Manchester, NH 03104

Court Reporter:      Diane M. Churas, CSR, CRR
                     Official Court Reporter
                     U.S. District Court
                     55 Pleasant Street
                     Concord, NH   03301
                     (603) 225-1442

1                          I N D E X

2

3
     Closing argument by Mr. Capin, page 8
4

5    Closing argument by Mr. Howard, page 61

6    Closing argument by Mr. Chakravarty, page 102

7    Judge's charge, page 125

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        BEFORE THE COURT

 2              THE COURT:  Before we get started just a

 3    couple things on the instructions.  It occurred to me

 4    last night after you left that there's been no issue

 5    about redacting the indictment, and last time we did

 6    redact it.  My view is that's sort of law in the case,

 7    but it may not be.  What do you think about that?

 8              MR. RUOFF:  We just assumed that it would go

 9    to the jury redacted.

10              THE COURT:  As it was previously.

11              MR. RUOFF:  Yes.

12              THE COURT:  Second issue, have you given any

13    thought to whether you want me to repeat the curative

14    instruction with respect to secret police versus

15    intelligence officer?

16              MR. RUOFF:  At this point, no, Judge, but we'd

17    ask --

18              THE COURT:  As you know, it's in the

19    instructions as well.  It's highlighted in the

20    instructions.

21              MR. RUOFF:  The reference to the secret

22    police?

23              THE COURT:  No, no, not directly, but the

24    notion, the concept is emphasized yet again in the

25    instructions.
```

 1              MR. RUOFF:  Right.  Certainly we reserve the

 2    right to object if the prosecutor refers to that fact as

 3    true in his closing statement.

 4              THE COURT:  Well, you probably ought not to

 5    use the term "secret police."

 6              MR. CAPIN:  I intend not to, your Honor.  If I

 7    could just supplement the record with one more, since we

 8    are making a record on this issue.  After Ms. Mukamwiza

 9    testified yesterday and was asked about the secret

10    police, she used the word maneko to describe where

11    Athanase Munyemana worked.  She said -- what she said

12    was meneko -- I don't know how to say it.

13              Later the interpreter hired by the defense,

14    both interpreters I believe, approached the court

15    reporter and explained that maneko means secret service

16    agent.

17              So the record is clear, it corroborates what

18    Dr. Longman said previously at another proceeding about

19    what the Servista Renseignment was.  I just wanted to

20    make sure that was in the record, your Honor.

21              MR. RUOFF:  That's not a fact that he can

22    argue it.  That was a conversation he had with the

23    interpreter.

24              MR. CAPIN:  I don't intend to argue it, your

25    Honor.  Simply making the argument.

1          THE COURT:  He's just bolstering his good

2     faith argument.

3          MR. RUOFF:  We don't contest that.

4          THE COURT:  The instructions, did you find any

5     authority with respect to brute fact exceptions, I

6     suppose would be the question.

7          MR. RUOFF:  No, I was not able to locate any

8     cases that addressed the specific issue in Richardson,

9     discussion about brute facts, means versus elements, and

10    whether the jury has to be unanimous.  It's our belief

11    that Richardson's distinguishable from this case.  First

12    of all, the issue in Richardson was whether or not the

13    violations of the Controlled Drug Act, the three

14    predicate offenses for a CCE were statutory elements,

15    because the statute didn't cullG them out.  Now they're

16    common law elements.

17          So that was the issue of the case.  The

18    discussion about armed robbery and means elements was

19    kind of a preamble to the discussion on what the

20    government had to prove unanimously.  I think that's

21    different from a materiality issue where there is a

22    material false statement case.  Our belief, Judge --

23          THE COURT:  Well, on the material false

24    statements, the jury's going to be required obviously to

25    have unanimity on which statement was false, but it's

1    more the other issue of you knew you committed a crime,

2    the crime was making a false statement.  You were

3    ineligible because you previously committed a crime.

4    The crime was false statement.  Do they have to find the

5    means.

6              MR. RUOFF:  Yes, I understand that, but they

7    have to be unanimous.  The problem comes in when --

8    materiality is kind of the filter that they're assessing

9    prior false statements through, and if they're not all

10   unanimous on which statements are false, I'm not sure

11   they can be unanimous on whether or not the underlying

12   statements were also material.  I think they have to be

13   unanimous on the materiality issue, which by necessity I

14   would say means they have to be unanimous on --

15             THE COURT:  I didn't really want to distract

16   you too much, but we'll take it up before obviously the

17   instructions.  But I just wanted to know if you found

18   any authority that we could look at.

19             MR. RUOFF:  No.  As long as we can make the

20   record later, that's fine.

21             THE COURT:  Thank you.  All right.  As you

22   know, Mr. Capin, you opened.  Who's closing?  Mr. Ruoff?

23   Mr. Howard is going to close, and then brief rebuttal by

24   Mr. Chakravarty.  If you go 40 or 45 minutes or so I

25   will give you a break to get a chance to prepare.

1                    BEFORE THE JURY

2              THE CLERK:  Court is in session and has for

3    consideration Jury Trial Day 11 in the matter of United

4    States of America versus Beatrice Munyenyezi, Case No.

5    10-cr-85-01-SM.

6              THE COURT:  Good morning, ladies and

7    gentlemen.  You've now heard all the evidence that's to

8    be presented in the case, and counsel once again have an

9    opportunity to stand before you and speak directly to

10   you and make what's known as a closing argument.  Let me

11   remind you that closing arguments, like opening

12   statements, are not themselves evidence.  They're

13   designed to assist you in weighing and judging the

14   evidence, and counsel will -- opening statements as I

15   mentioned at the outset, counsel will tell you what they

16   anticipate or expect the evidence will be, but now in

17   closing arguments, the evidence already having been

18   presented, you know what the evidence is and counsel now

19   will be discussing the evidence as it was actually

20   presented in the context of their theories of the case.

21              Because the government bears the burden of

22   proof and that burden of proof never shifts to a

23   defendant, the government argues first, the defendant

24   argues second, and then the government is given an

25   opportunity for a brief rebuttal.  I told counsel that

8

 1   if the arguments in chief go about 45 minutes or if the

 2   government's argument in chief goes about 40 to

 3   45 minutes, we'll take a break between arguments.

 4          Mr. Capin, are you prepared?

 5          MR. CAPIN:  I am, your Honor.  Thank you.

 6          Good morning.  We've come a long way in two

 7   weeks.  When Mr. Chakravarty stood here two weeks ago,

 8   he told you that the U.S. is the envy of the world, and

 9   he told you that was so in part because our immigration

10   system makes us strong.  Our borders are open.  We are

11   welcoming all kinds of immigrants, including refugees,

12   refugees who came from war-torn areas such as post-

13   genocide Rwanda.

14          You heard evidence in this case that of the

15   one million or so of refugees who are trying to get into

16   this country, in 1995 when this defendant first

17   presented herself to Immigration authorities, of the one

18   million who tried, 4,500 got into this country.

19          The facts and the grounds in places like

20   post-genocide Rwanda are complicated.  It's not always

21   obvious which applicant is meritorious, which applicant

22   is eligible to come in.  It's not always obvious what

23   the applicant did or knew or saw in her home country,

24   and that is why the Immigration system is designed to

25   ask questions specifically tailored to the applicant's

1    circumstances.   Things like you were in Rwanda during

2    the genocide.   What did you see?   Did you witness it?

3    Did you belong to a political party?   Did you do

4    anything?

5              These are the questions that the system relies

6    on in order to work.   The Immigration system relies on

7    candor and honesty by the applicants.   The questions are

8    designed to provide the person adjudicating the

9    applications for refugee status -- or later in this case

10   you will hear for a green card or ultimately for

11   citizenship, which is what this case is about.

12   Questions designed to open up new areas of inquiry to

13   give the person adjudicating the application a true

14   picture of what the person's background is in order to

15   do his or her job in making the determination is this

16   person eligible to come here?   Is this person being

17   forthcoming with us?   Is the person providing truthful

18   and not misleading information about his or her

19   background.

20             And that's because Mr. Chakravarty told you

21   there are two ways of coming to this country and two

22   ways of getting citizenship.   One is legally and one is

23   illegal.   An applicant who provides false and misleading

24   information at any stage of the process makes it

25   difficult, if not impossible, for the people

1   adjudicating, people at the Department of State, U.S.

2   Citizenship and Immigration Services, the Immigration

3   officials you heard from in this case, first one you met

4   is Don Monica, who actually met with this defendant back

5   in 1995 in Nairobi, Kenya, and makes it impossible for

6   them to do their job.  Makes it impossible for Maurice

7   Viola who you heard from in Manchester, New Hampshire,

8   reviewed the A-File, reviewed the application for

9   citizenship, met with the defendant, asked her probing

10  questions about her background.

11          If the applicant isn't forthcoming, if the

12  applicant conceals or misrepresents or lies about facts

13  that matter, material facts, makes it impossible for the

14  system to work.  And that's what this case is about.

15  This case is about the defendant lying and lying and

16  lying again.  And the three stages that I will be

17  discussing of the Immigration process, at every juncture

18  she provided material false statements about who she was

19  affiliated with, who she was associated with, what party

20  she belonged to, what she saw during the genocide, what

21  she did during the genocide.

22          The judge will explain if you find that at any

23  step in the process she told a material lie, made a

24  material false statement, false statement about

25  something that matters to the Immigration authorities at

1   any stage, if she's made a material lie, she's guilty.

2   And that's because it's a crime to conceal who you are

3   and what you know and what you did.  That's what this

4   case is about.  And that's exactly what this defendant

5   did.

6           Now, if I know Mr. Howard, and I know him

7   well, he is going to stand up in a few minutes and he's

8   going to advocate zealously for his client and he's

9   going to try to direct your attention to certain things

10   that he discussed in evaluating the witnesses in this

11   case.  I ask you, ladies and gentlemen, don't be

12   distracted.  This case is not about whether Immigration

13   authorities should have figured out the fraud 15 or 20

14   years ago.  It's not about whether the ICTR should have

15   or did investigate her, and certainly it's not about

16   what's going on in Rwanda right now, what the political

17   situation is, whether that's an oppressive government or

18   not.

19           This is not a war crimes tribunal.  This is

20   not a political science class.  This is an American

21   criminal court and the specific crime with which this

22   defendant is charged, and that crime is procuring U.S.

23   citizenship through fraud.  That's the question.  That's

24   the question you'll be asking yourselves.  And I ask you

25   to recall a question I asked you during jury selection.

1  Two weeks ago we met in the bigger courtroom down the

2  hall and I asked you can you listen to heart-wrenching

3  difficult testimony about what happened during the

4  Rwanda genocide, listen to that and still only focus on

5  the fact that the question in this case is about did she

6  lie.  You all said that you could do that and I'm

7  confident that you can.

8            Now, the past two weeks you received a crash

9  course on two things:  The American immigration system

10 and the Rwandan genocide.  I venture to say that the

11 people sitting among you know more than the vast

12 majority of American citizens about what happened during

13 the Rwandan genocide.  What you learned about the

14 genocide is important because it gives you a context to

15 understand why what this defendant lied about mattered,

16 why it was material to processing the refugee

17 application, the processing of the green card, and the

18 processing ultimately to deciding whether she should

19 become a U.S. citizen.

20           I will spend a few minutes talking about what

21 you learned about the Rwandan genocide, key points.  You

22 heard from Professor Longman, one of the preeminent

23 scholars on the Rwandan genocide, the preeminent scholar

24 on what happened in Butare.  He lived in Butare before

25 the genocide.  He lived in Butare after the genocide.

1    He interviewed numerous witnesses who lived through the

2    genocide.  He reviewed the documents.  He described to

3    you the history of Rwanda.  He talked about the history

4    of ethnic tension, how the colonial system exacerbated

5    that, what happened during the 20th century.  He

6    explained it was a single party system.  The MRND was

7    the only party until about 1991 and then it opened up to

8    allow for the formation of other parties.

9           You heard that during those years people

10   joined other parties.  Certain hard-core people remained

11   with the MRND.  You learned that in the lead-up to the

12   genocide there had been a civil war which resulted in

13   the peace accords, the Arusha accords you heard about in

14   1993.  But in the lead-up to the genocide the MRND

15   fanned this hatred of the Tutsis, fanned this fear that

16   there's this rebel army out there and all the Tutsis

17   among you are allied with that army.  You should fear

18   them.

19          You learned that contrary to popular notions

20   you may have seen in American culture and the media,

21   this was not a spontaneous outburst of racial violence.

22   It was a carefully orchestrated, planned attempt to

23   eliminate the Tutsis.

24          You heard this from Dr. Longman, and even

25   though I suggested to you that Dr. Endless, who you

1   heard from yesterday, wasn't terribly helpful for

2   anything you need to consider, with regard to what he

3   said about the genocide he basically echoed Longman, and

4   he told you among other things that that's what MRND

5   youth, leaders of MRND youth, wore during the genocide,

6   that it wasn't uncommon -- it was common for people

7   going to MRND rallies wearing this.  He told you that

8   they did it to show the people off -- to show that they

9   were part of the group, to show that they shared the

10  goals.

11          The judge will explain to you that it is your

12  job to assess the credibility of every witness that came

13  in here.  No expert can come in here and tell you how to

14  assess the credibility, how to assess whether you should

15  believe what the witnesses have told you.  You make

16  credibility assessments, we all do, every day.  We talk

17  to people, we look at them, look at their demeanor.  We

18  ask ourselves are they telling the truth.

19          What tools do we use.  We say is what they're

20  saying make sense?  Do they have a basis to know what

21  they're saying?  Were they there?  Is it consistent with

22  information they learned from other sources?  Is it

23  consistent altogether?  You do this all the time.  No

24  expert can come in here and tell you whether to believe

25  a witness from Rwanda.

1          Let's talk about -- just as an example let's

2  talk about how you go about assessing credibility with

3  regard to the very first witness from Rwanda that you

4  heard.  You remember the gentleman, striking big guy

5  named Thierry Sebaganwa.  He was the engineer who lives

6  in Kigali, works in marketing for the petroleum company.

7  We learned in the course of his testimony he actually

8  speaks French, speaks quite a lot of English, and

9  naturally speaks Kinyarwanda.  You will learn that when

10  he went to meet with Agent Anderson in Rwanda he didn't

11  know what that was about.  He talked about it.  Agent

12  Anderson explained over the course of discussion turns

13  out he knew people in Rwanda, in Butare, grew up in

14  Butare.  He came back to a subsequent meeting and he

15  brought this photograph.  And you know that this here is

16  in fact Mr. Sebaganwa, that's our witness, and this here

17  in fact is Shalom Ntahobali.

18          So you ask yourself in testing his credibility

19  does he know Shalom?  Damn straight.  He has a photo of

20  Shalom and him at a picnic in high school.

21          You look at the A-File and you will see -- and

22  Agent Anderson prepared it and told you that it was

23  Shalom, but you'll see that there is a picture of

24  Shalom.  And there he is.  So you can rely on that as

25  well, not that there is any question.  You recall -- in

1    fact I showed the photograph to a young man named Jean

2    Paul.  He's the orphan who hid at the I'Huriro for a

3    while.  He recognized a couple of people.  He recognized

4    this man, who was Shalom, and then he recognized this

5    man who he said was called Eugene.  I think he called

6    him Eugene.  And I believe it was Mr. Ruoff who showed

7    the same photograph to the man Richard Kamanzi.  This is

8    the man who lived across the valley right next to the

9    mosque.  And he said do you recognize anybody?  And he

10   looked at it.  No, first he said have you seen this

11   photograph.  And of course he hadn't because it's

12   Thierry's photograph.  How could he have seen it.  He

13   said, no, I haven't.  Do you recognize anyone?  There's

14   four people, and he identified several of them telling

15   me he identified Shalom, and he identified Eugene.  You

16   can use that information in assessing the credibility of

17   Thierry, of Jean Paul, and of Richard Kamanzi.

18           What else did Terry tell you?  Did he

19   embellish?  Did he tell you I saw the defendant do

20   terrible things?  No.  He said I know Shalom.  I knew

21   Shalom got married, I saw this defendant wearing MRND

22   clothing.  He was asked to describe it.  He described

23   it.  Oh, do you remember that testimony?  Because he

24   said -- he described a colorful garment.  He said it had

25   the words MRND displayed in a circle.  I showed him the

1    garment.  You may remember I struggled -- because I
2    didn't have a hanger with me I struggled with showing it
3    to him.  And he said the letters MRND were displayed in
4    a circle.  And if you look at that, it doesn't jump out
5    at you.  But was he credible?  There they are.  It's
6    hard to see until you see it, but M-R-N-D.  He knew it
7    because he saw it during the genocide.
8            Dr. Longman told you that this garment was not
9    just MRND.  This was associated with what we call Hutu
10   power, the most enthusiastic supporters of MRND,
11   Interahamwe, the people who were most committed to the
12   mission of the genocide.
13           Recall the testimony of other witnesses who
14   saw MRND guards.  Remember the young man -- I think it's
15   Vincent Sibomana.  I think he was the last Rwandan
16   witness here.  He's a young man -- he was a young man,
17   still looks like a young man.  He's in his forties now
18   and he farms, grows rice and beans in Butare, and he
19   said he saw her in MRND garb.  And he described it.  He
20   said she was wearing a shirt that had Habyarimana's
21   photo in the circle.  And Mr. Howard asked him a
22   question.  He said he saw her once.  He saw her once in
23   the shirt.  Mr. Howard asked him is this what it was?
24   And he said yeah.  Dr. Longman also said this was
25   typical of MRND garb during the genocide.

1           There is the picture of the president whose

2    plane was shot down and that's the event that triggered

3    the genocide.  Mr. Howard said, was this it, too?  Does

4    this look like it?  He said yeah.  Ladies and gentlemen,

5    he saw it once.  This is what he described.  Very clever

6    to ask him if they look alike, because in fact they do

7    look alike.  But this is the one in the picture.  This

8    is the one he saw.

9           Consistent with what you learned from other

10   witnesses, consistent with what Dr. Longman explained to

11   you about how people indicated party membership during

12   the genocide.  You learned that party membership was big

13   and would lead up to the genocide, during the multiparty

14   period where people were out doing rallies and going to

15   meetings.  And in fact defense counsel asked -- I

16   believe it was Vincent.  He was asked -- no, it was Jean

17   Paul.  Do you remember the other MRND colors?  And he

18   rattled them off.  How about MDR?  MDR is another party.

19   He rattled off the colors.  How about the PSD?  He

20   rattled off the colors.  If you were a Rwandan in the

21   lead-up to the genocide you saw this stuff because it

22   was the air you breathe.  It was the political life of

23   the day.  It was what was going on.

24           Dr. Longman explained to you that the trigger

25   for the genocide, which had been in the work of --

1   planning had been in the works.  The trigger was on

2   April 6, 1994, when Habyarimana's, then MRND's

3   president's plane was shot down, and that's when the

4   genocide was immediately that night launched in Butare.

5   Tutsi and moderate Hutu also were killed.  The heads of

6   government, the moderate prime minister of the

7   government, was killed.

8           You heard from both Dr. Longman and Dr.

9   Zachariah that the genocide didn't arrive in Butare

10  immediately.  Butare was a quiet town, a college town.

11  It was far enough from Kigali, it took a couple weeks to

12  get there.  You learned that when it got there,

13  roadblocks went up everywhere, everywhere.  I think Mr.

14  Endless yesterday said dozens of roadblocks in the state

15  of Butare.  You heard from other witnesses, at least 10

16  or 12, in the town of Butare.  You learned that over the

17  course of a hundred days seven to 800,000 people were

18  killed, overwhelmingly Tutsis, moderate Hutus as well.

19  Mostly women, children, elderly.

20          You heard that 100,000 to 200,000 people

21  participated directly in the genocide, and this is

22  consistent with all of what you heard from both experts,

23  because this was not airplanes dropping bombs on

24  villages.  It wasn't people with machine guns.  There

25  were firearms.  But you heard most of the violence was

1    hand to hand, it was hard work, it was done with clubs,

2    it was done with machetes.  So it should come as no

3    surprise that there were as many as 200,000 perpetrators

4    of that genocide.

5            You heard from Dr. Longman the focus of his

6    research -- he went back after the genocide.  The focus

7    of his research was Butare.  He went through the Human

8    Rights Watch.  Let me step back for a moment and remind

9    you why what Dr. Longman told you is important.  It's

10   important because it gives you a context to understand

11   why the false statements by this defendant mattered.  He

12   told you about Butare, that it was a college town.

13   College director, president, was a man named Maurice

14   Ntahobali, defendant's father-in-law.

15           He told you that it wasn't a big MRND town.

16   It was a moderate town, and that in order to advance the

17   genocide mission the MRND relied on certain key players

18   in town, Pauline Nyiramasuhuko, a minister in the

19   government, Sindikubwabo, this is the man who became

20   interim president, a man named Kambanda who became the

21   genocidal government's prime minister.  He told you the

22   genocide was triggered in part by Sindikubwabo's speech

23   April 19th, and the speech was basically get to work,

24   get to work.  The rest of the country is at work.  Get

25   to work.  And work you heard was code for chop down the

1    big trees, kill the Tutsi.

2            You heard that Shalom Ntahobali ran the most

3    vicious roadblock in town, that it was right in front of

4    the I'Huriro, and you heard everybody in town knew the

5    family and everybody in town knew when Shalom married

6    the defendant in this case.

7            Now, Dr. Longman said that this roadblock --

8    can you all see this, sir?  This roadblock went in on

9    the 19th of April.  Dr. Zachariah who was there on the

10   ground treating victims of the genocide, treating

11   soldiers, treating other people.  So ladies and

12   gentlemen, even before you consider the testimony of a

13   single Rwandan witness, I submit to you, you know the

14   roadblock was there.  There it is.

15           You heard from Mr. Benn, Mr. Benn who's been

16   working analyzing imagery from the Cold War to the

17   take-down of Osama Bin Laden.  He explained exactly how

18   imagery worked.  He focused in and we saw the individual

19   elements of the burial.  I submit that's helpful, but

20   you can see the roadblock.  This is a human traffic jam

21   and it ends right there.  Remember, you will have the

22   exhibits.  You can zoom in and you can see exactly what

23   they describe.  This zigzagging pattern slowing people

24   down when they came to here which is where IDs were

25   being checked.

1          And you consider that testimony, what Dr.

2    Zachariah told you, what Dr. Longman told you, what Mr.

3    Benn told you, what your eyes show you when you consider

4    the testimony of the Rwandan witnesses.

5          I will just give you a few examples.  Remember

6    Vestine, the housekeeper who would walk from her home

7    south of the roadblock, south of the I'Huriro roadblock,

8    to a neighborhood called Itabu, walked back and forth

9    every day with her sister six days a week, go up at

10   seven in the morning or so and come back at five or so.

11   She remembers on April 20th she went to work and there

12   was nothing unusual at that hotel.  That evening she

13   came back and there was a roadblock, exactly when Dr.

14   Zachariah and Dr. Longman told you it was there.  And

15   ask yourself, is it credible that Vestine would remember

16   after all these years that April 20th that roadblock

17   appeared.  Ladies and gentlemen, how many of you

18   remember where you were on 9/11.  We all remember.

19          April 20th for Vestine was Butare's 9/11.  She

20   remembers that day.  She remembers having her ID taken,

21   being told by this defendant to sit down.  She remembers

22   being led off with her sister into the IRST woods.

23   Remember those woods where -- I'm not going to dwell on

24   this, I'm not showing the photograph, but the woods were

25   up this road and up this way, where Dr. Zachariah said

```
 1   they were and where Dr. Longman told you there was a lot

 2   of killing in the woods.  IRST is a research institute

 3   by the hospital.  A lot of killing in those woods.

 4   That's where Vestine's sister was killed.  Vestine told

 5   you what happened.  She described her sister's killing,

 6   she described her own escape, she described going back

 7   to her hometown to hope she could find shelter.  On

 8   cross-examination I think Mr. Howard asked her how did

 9   you survive the roadblock in your own town?  Remember

10   the question I asked on redirect?  Tell him how you

11   survived.  Tell the jury how you survived.  She survived

12   because she was taken in by a Hutu who basically kept

13   her as a slave and assaulted her.

14             This is consistent with what Dr. Longman

15   explained to you was common.  Women were often spared

16   immediate death.  Often they were sexually violated,

17   were taken as concubines.

18             Consider the testimony of Vincent Sibomana.

19   This is the young man who worked at a place called

20   Relais de la Soif.  It was the beer joint up the road.

21   Sold beer and Fanta.  He knew the defendant because the

22   defendant had come in to buy beer and soda pop for the

23   hotel.

24             Is that consistent with what you know?  Did

25   she have any involvement running the bar at the hotel?
```

1    Ladies and gentlemen, look at her own words.  This is

2    her resume.  July '92 to July '94, manager of I'Huriro

3    Restaurant and Boutique.

4         Perfectly consistent.  Now, Mr. Sibomana

5    hadn't seen that resume.  He knew she worked at the bar

6    because she came in and bought beer to sell at the bar.

7    And so did Shalom and so did other employees of the

8    I'Huriro.

9         And remember the questions I asked Mr.

10   Sibomana about the roadblock.  He wasn't shown that

11   aerial photograph.  He testified -- he described what

12   his work was.  And I showed him pictures of what he

13   showed Special Agent Anderson when Anderson went to

14   Butare.  And remember the photographs, because I think I

15   made a record of them, but may the record reflect that

16   he's standing with his right arm up.  He showed Anderson

17   where the shop was.  He showed Anderson where the

18   roadblock began.  He showed Anderson where the roadblock

19   ended and where this defendant and other Interahamwe

20   were checking IDs.  What did he show Anderson?  He

21   showed -- Special Agent Anderson then was shown the same

22   photographs and asked to tell you, to show you where

23   Vincent Sibomana indicated the roadblock existed.  And

24   he said Relais de la Soif was in this vicinity.  That

25   the roadblock here began here and it ended there and

1   that's where IDs were being checked.

2           Vincent Sibomana did not testify about this

3   photograph.  He testified about his memory.  His memory

4   was perfectly consistent with the forensic evidence you

5   have about what was happening at that roadblock.  And

6   ask yourselves when this defendant filled out that

7   Rwanda questionnaire -- which is here somewhere.  When

8   she filled out this Rwanda questionnaire and she's asked

9   have you been in Rwanda?  She said, yes, of course,

10  because that's why she's a refugee.  According to her,

11  she's fleeing because she happens to be one of those

12  people who is in danger.  If so -- a number of

13  questions.  Were you a witness.

14          Now, imagine the questions that Don Monica had

15  asked her if she said, yeah, I was a witness.  I had a

16  front row seat to the most vicious roadblock in Butare.

17  Imagine the questions he would have asked.  That's

18  materiality if her false statement about what she saw

19  blocked from Don Monica, shut down that line of inquiry,

20  prevented him from asking the natural follow-up

21  questions.  What did you see?  Who was there?  Did you

22  participate?  Did you invite Interahamwe into the bar?

23  Did you give them beer?  Did you check IDs?

24          By saying "family members disappeared," that

25  is false and it's misleading, and you will see that

1   false and misleading are key concepts, naturally they

2   are key concepts.  Somebody's coming into this country

3   seeking the privilege of becoming a U.S. citizen.

4   Whether they are being candid with adjudicating that

5   process, that's key.

6          You recall the testimony of Consolee.

7   Consolee is the woman who was Shalom's -- she was the

8   nurse.  Remember the nurse, and she said that the

9   genocide came to the health clinic she worked at.  She

10  sought shelter with her sister.  Her sister was married

11  to Maurice Ntahobali's nephew.  Remember her description

12  of the defendant's activities.  Remember her description

13  of being taken to the roadblock by her sister's husband.

14  And this is consistent with what you've heard from Dr.

15  Longman.  Some family members were protected.  Others

16  were not.  In this case she was sheltered for a while.

17         At some point according to Consolee his nephew

18  tried to take her to the border to get her out of the

19  country, but she was rebuffed at the roadblock.  She was

20  told she's not coming by here.  In her presence, in

21  Consolee's presence, this defendant was checking IDs.

22  This defendant was telling Tutsi to sit down.  In

23  Consolee's presence three men were clubbed to death.

24  Remember three men fought back?  And they were clubbed

25  to death, in her presence.

1          What would Mr. Monica have said if the

2    defendant had said, oh, yeah, during the genocide I was

3    a few feet away from three men who were clubbed to

4    death.  Do you know who did it?  Can you tell me about

5    it?  Did you participate?  Did you in any way aid and

6    abet them.

7          Aiding and abetting is a concept his Honor

8    will explain to you.  Aiding and abetting is a concept

9    in the law that basically says if I aid and abet

10   somebody it's encouraging or helping somebody to do

11   something.

12         So if I'm checking somebody's ID with the

13   knowledge -- and having that person sit down with the

14   knowledge that person is going to be taken into the

15   woods and hacked to death, I am as responsible for that

16   act as if I wielded the machete myself.

17         Call upon the testimony of Richard Kamanzi.

18   This is again a guy who lived by the mosque across the

19   valley.  He saw the roadblock and the logs would be

20   pushed off to the side.  And you heard that these logs

21   were removed, you heard it from Zachariah, you heard it

22   from Mr. Benn who said, yeah, clearly you can see how

23   big they are.  They're about the size of a human trunk.

24   A couple of big guys can move it.  I will get to this in

25   a moment.  You heard it from a defense witness who saw

1    it with her own eyes.

2           And actually that may be just a good

3    opportunity to remind you of something that the judge

4    has told us repeatedly, had told you repeatedly, and I

5    expect he will tell you again.  Questions that I ask or

6    Mr. Chakravarty asks or either defense counsel ask of

7    the witnesses, that's not evidence.  The evidence is the

8    words that come out of the witness's mouth, it's the

9    documents and the items that you have in front of you in

10   the jury room.

11          So let's think about that concept in the

12   context of what Alice, the cook, said.  Remember the

13   hard-of-hearing cook who saw nothing during the

14   genocide?  I asked her, do you remember telling Agent

15   Anderson that the defendant was MRND.  She said no.

16          So my question is not evidence.  You cannot

17   rely on Alice's words to determine that she was MRND or

18   affiliated with the MRND.  I would submit to you based

19   on all the other evidence there can be no reasonable

20   doubt that she in fact was a member of the MRND or at a

21   minimum closely associated and affiliated with the MRND.

22          But that's not what Alice gives us.  Recall

23   what I asked Alice about the roadblock.  She testified

24   exactly consistently with what Mr. Benn and Mr.

25   Sibomana, the guy by the mosque, told you.  She said I

1   saw the roadblock.  She didn't remember it.  But then I
2   pointed out Brian Anderson in the courtroom.  She
3   nodded, oh, yeah, now it's coming back to me.  She
4   remembered as they were leaving town to get out of the
5   country at the end of the genocide, somebody moved the
6   logs out of the way so they could leave.  That's
7   evidence.  That is evidence.  It's not my question.
8   It's her saying, yep, I saw that roadblock.
9           Once she remembered seeing Prime Minister
10  Kambanda come to dinner, come to a meeting.  That's
11  evidence.  It's evidence because she said yeah, I saw
12  him.  I knew who he was.  It was Kambanda.
13          And the testimony of Kambanda is important
14  because it corroborates other information about MRNDs
15  coming and going, MRND members, including the defendant,
16  coming and going from the I'Huriro Hotel before and
17  during the genocide.
18          So another example of this concept of
19  questions not being evidence.  Mr. Howard asked Mr.
20  Benn, the satellite expert, the imagery, is it possible
21  there are other images?  I think Mr. Benn said,  well, I
22  could speculate there might be, it's conceivable there
23  might be.  Mr. Howard suggested that there were other
24  photographs.  That's not evidence.  The evidence and
25  speculation is not evidence.  The only evidence of

1    photographs of the imagery you have is what's going to

2    be with you in the jury room.

3         So I ask you please when you listen to Mr.

4    Howard's closing, listen carefully to what he's talking

5    about, what the witness said or about a question he

6    asked to which the witness either didn't know the answer

7    or said no, because the question is not evidence.

8         Two more witnesses I will describe briefly,

9    Bruno, a Hutu soldier, Nyiraburiri, a Hutu soldier,

10   worked at Butare during the genocide, went back and

11   forth by that roadblock, knew the difference between a

12   real soldier like himself wearing a real uniform and the

13   sort of irregulars, the MRND and the Interahamwe who

14   worked at the roadblock.  He described from his

15   perspective that roadblock in a manner exactly

16   consistent with all these other folks who there's no

17   evidence he ever met.

18        He also said one thing that was different from

19   the others.  He said there were road poppers.  What are

20   the road poppers?  I ask you does that make sense?  Use

21   your common sense.  Of course he made sense.  This is

22   the only guy who was driving a vehicle.  All the other

23   people were pedestrians who didn't even make it through

24   the roadblock.  They got sat down or deviated or saw it

25   from the EER.  This guy is going through with his bike.

1    Of course it makes sense that he remembers the

2    roadblocks because if you are on a bicycle you don't

3    want to hit the roadblock.

4           Remember the testimony of Jean Paul.  Again,

5    this is the orphan who sought shelter at the EER, and I

6    showed him this picture and he said that he sought

7    shelter, that he slept inside one of these buildings,

8    and I asked him did you move around?  He said for three

9    days he moved around all over the place.  He was here,

10   he was here, and he was here.  And from here, ladies and

11   gentlemen, you knew -- remember Mr. Benn said the

12   distance between this building and this building was as

13   if you stepped out in that hallway and looked down, it's

14   the length of this building.

15          So when he was in this vicinity here, he had,

16   if this is where IDs were being checked, a hundred feet,

17   80 feet, 150 feet.  He saw the defendant checking IDs,

18   he saw the defendant with a notebook.

19          Again, Dr. Longman gives you the tools to

20   understand why that makes sense.  What was the typical

21   female role during the genocide?  There was some looting

22   and at roadblocks it was checking IDs, and if you were

23   illiterate -- because remember, this is not a highly

24   educated society.  Very few people had more than two

25   years in primary school.  We had an engineer.  Some

1    people had six years, four years, some people had high
2    school.  The defendant was educated, so that she would
3    have a notebook, as Dr. Longman stated, that would be
4    the person who would be keeping a list of the Tutsi,
5    keeping track of who would be killed.
6            These are the facts the Rwandan genocide
7    government has proven to you beyond a reasonable doubt.
8    The defendant was affiliated with the MRND.  She was a
9    member of the MRND.  She supported the goals of the
10   MRND.  She went to MRND rallies.  She wore MRND garb.
11   She saw the roadblock in front of the I'Huriro.  She was
12   at the roadblock in front of the I'Huriro.  She checked
13   IDs at the roadblock in front of the I'Huriro.  She
14   helped separate Tutsi from Hutu at the roadblock in
15   front of the I'Huriro, and regardless of how deeply she
16   was wrong, she did have a front row seat.  You saw on
17   that Rwandan questionnaire when she said I saw nothing,
18   I saw nothing, which was the theme of the defendant's
19   case, I saw nothing, I know nothing, I hear nothing.
20   When she said that, those are material
21   misrepresentations.
22           Now, the defense called witnesses as well.
23   You heard most of them last Friday.  And I ask you was
24   that helpful to you.  And I suggested in fact it was
25   helpful.  It was helpful because it was a study in

1    contrast.

2              Consider each of the Rwandan witnesses you

3    heard from when the government presented its case.  Each

4    one had a unique perspective, each one had an individual

5    experience.  Some saw the roadblock.  Thierry didn't

6    even see the roadblock.  Once the stuff hit the fan, he

7    skedaddled out of town.  He got out of town.  Each had a

8    different perspective and they complement each other in

9    an overlapping jigsaw puzzle that gives you a clear

10   image of what was happening.

11             The defense witnesses in contrast, that is

12   what the script looks like.  That is what the family

13   script looks like.  Family script looks like she never

14   left the hotel.  I never left the hotel.  For a hundred

15   days the cook didn't know where she got the food to feed

16   the 50 or 70 people the last witness said were there.

17   Remember Anastasia, the witness I called, the defense

18   flew over.  The cook didn't know where the food came

19   from.  Does that make sense to you?  They saw nothing.

20   All they knew was the fact that the defendant had a

21   baby, quote, too old to be nursed.  After the third

22   witness said the baby's name, it was too old to be

23   nursed.  The defendant was so pregnant she could hardly

24   move.

25             Ladies and gentlemen, you will see her A-File.

```
 1    The twins she was carrying were born in November.  When
 2    the genocide started she was at most six weeks pregnant.
 3    When the roadblock began she was at most two months,
 4    maybe ten weeks pregnant.  Ladies and gentlemen, is it
 5    credible that she could barely move?  Is it credible
 6    that she was within the eyesight of all these witnesses
 7    all the time?  She was never out of my sight.  That's
 8    what she told you.  Never out of my eyesight.  But it
 9    shows you the limit, how hard it is to script something.
10    Because they couldn't get it straight.  Was she
11    upstairs?  Was she downstairs?  Did she have a maid help
12    her with the baby or was she struggling because she had
13    no help whatsoever?
14           And most important, contrary to what each of
15    the witnesses the defense called said, which is she
16    never left.  The last witness you heard from said, oh,
17    yeah, she left.  She left in late May for three weeks
18    with her sister.  They went to a town called Cyangugu.
19    If she was out of town for three weeks during the
20    genocide, then to be credible each of the defense
21    witnesses by necessity went with her.  But they said
22    they never left.
23           That was your crash course on the genocide.
24    Mr. Chakravarty pointed out something I meant to show
25    you.  Because when I say that's the family script, the
```

35

1    defendant knows the script.  This is Exhibit 18.  You

2    will have this in front of you.  I will give you the

3    specific cite before I finish.  When she went to the

4    ICTR she was asked the following question and gave the

5    following answer:  Madam, you say that you did not

6    believe that those things happened to your knowledge.

7    Would it have been possible that Shalom confined and

8    raped the young women at the I'Huriro Hotel around the

9    20th or 21st of April, 1994?  Answer, the defendant's

10   answer, where was I?  I was at home.  Shalom never left

11   me.  Shalom did not leave the house after the curfew.

12   He was always there.  I was living at the hotel with

13   everyone else.  And when did those things happen?  I

14   didn't leave the hotel without Shalom.  When did he do

15   that?  That's the script.  You see it in her words and

16   you heard it on Friday.

17           Refugee process, Immigration process.  That's

18   the genocide.  That gives you the context for what this

19   defendant, what material false statements she made at

20   every stage of the process.

21           Now, the judge is going to tell you -- will

22   define materiality for you, and I expect he's going to

23   tell you that a statement is material if it has an

24   actual tendency to influence the decision maker.  What

25   that means in practice is, what that means is if a false

1   statement hinders me, prevents me, from opening up a new

2   line of questions, if a false statement is Don Monica,

3   the guy in Nairobi in 1995, prevented him or made it

4   less likely that he would open a line of questions,

5   that's material, that's what matters.

6         Again, if she told a single lie at any step of

7   the process, she's guilty.

8         Let's start with the defendant's application

9   to be classified as a refugee.

10         Before I do that I want to take a moment and

11   talk a little bit about the refugee process.  This is

12   something, as I said, we should be proud.  We bring in

13   refugees from all over the world.  I don't mean to make

14   this sound like a cheerleader, but it is something that,

15   if you look around the world, what people do to get

16   here.  They get on rickety boats, cross dangerous

17   deserts, something we should be proud of.

18         As I suggested, this is not a do-over of the

19   defendant's refugee application.  You're not sitting in

20   the Don Monica's seat and asking should she come in as a

21   refugee or not.  That's not the question for you.  Your

22   question is much simpler.  Did any of the statements she

23   gave Mr. Monica, were any of them misleading and false

24   in a material way.  Were they material false statements.

25   And we all agree -- I think you heard it from me, you've

1    heard it from Judge McAuliffe, you've heard it from

2    defense counsel.  In this country we don't do guilt by

3    association.  We have a long historical tradition of

4    being skeptical of guilt by association.  But for

5    Immigration authorities association matters, and that's

6    why on every form she's asked what were your

7    associations, what were your memberships, who did you

8    affiliate with?  Because it matters.  It matters to

9    somebody adjudicating an application for a refugee back

10   in 1995 to know who did you associate with in Rwanda?

11   Associations don't matter because they suggest that

12   she's a killer or that she aided and abetted killers.  I

13   suggest to you the government has proven beyond a

14   reasonable doubt in fact she did aid and abet the

15   killers.  The defendant suggests it doesn't matter.  It

16   matters because by blocking that it blocks a whole lot

17   of inquiry with Don Monica, Maurice Violo, the person

18   adjudicating green card applications, questions that

19   shut down lines of inquiry, block the adjudicators from

20   the truth.

21            So let's just spend a minute and review

22   quickly each of the applications.  I will start with --

23            I'm running a little longer, your Honor.

24            THE COURT:  That's all right.

25            MR. CAPIN:  Thank you.  I will start with

1    this.  This is sort of the golden ticket here.  Can you

2    see that, sir?  This is what Maurice Violo looked at.

3    Remember Maurice Violo, the man who testified from

4    Nashua, who viewed the A-File she filled out.  This is

5    not the actual application.  It's a collage.  You will

6    have the application in the file, and I will point to

7    you where you can find things in the file.  The

8    application is Exhibit 6, it's her entire A-File.  So if

9    you look at Exhibit 6 each page has a number on it.  The

10   N-400, the actual form this is, is at page 5 through 14.

11   That's where you want to look in the A-File to find this

12   form, pages 5 through 14.

13            So this asks the defendant -- there's that

14   question.  Have you ever been a member or associated

15   with any organization, association, fund, foundation,

16   party, etc.  And she answered no.

17            Ladies and gentlemen, the evidence has been

18   abundant that at a minimum she associated with the MRND.

19   She went to their meetings, she went to their rallies,

20   she wore their garb, she showed her allegiance for the

21   nation.  She said no.  That's a lie that matters.

22   That's a false statement that matters.  She's guilty --

23   if this answer is false she's guilty.  If it isn't, she

24   isn't.

25            Have you ever persecuted anybody based on

1    race, religion, or political opinion.  She said no.

2    That's a lie that matters.  Are you a person of good

3    moral character?  It defines it.  Have you ever

4    committed a crime or offense for which you were not

5    arrested?

6         Ladies and gentlemen, you don't have to have a

7    law degree to know that helping people kidnap others,

8    helping people take people into the woods to be hacked

9    to death, you don't have to have a law degree to know

10   that is a crime.  She said no.  That's a material false

11   statement.  That's a lie that matters.

12        These two questions are important, 23 and 24.

13   23 says:  Have you ever given false or misleading

14   information to any U.S. Government official while

15   applying for any immigration status, etc.  Have you ever

16   given false or misleading information to any U.S.

17   Government official?  She said no.  If at any stage

18   prior to this she lied, then that "no" is also a lie.

19   It's also a false statement.  It's one that matters.

20   It's on the form because it matters.  You heard from Mr.

21   Violo.  You heard from Ms. Salidzik, the young lady who

22   came in to talk about the big picture of the process.

23   You know it matters.  The question is on the form

24   because it matters.  Use your common sense.  Of course

25   it matters.  Somebody applying for citizenship, it

1    matters whether she has lied to Immigration authorities

2    in the past.  Did she conceal the things that mattered?

3    And as if it won't clear it up, the very next question

4    says:  Have you ever lied to any government official?

5    And she said no.  And that's a material falsehood.

6           That's the end of the road.  So to understand

7    those two questions, 23 and 24, and why these two are in

8    fact lies, you need to understand the earlier stages of

9    the process.

10          This is the refugee application.  This is her

11   first step on the road to citizenship.  You will see

12   again she's asked about political, professional, or

13   social organizations of which she's a member.  She says

14   none.  She was an MRND member as has been shown you.

15   That's a lie.

16          This is also interesting that this form tells

17   the defendant, puts her on notice, the very first

18   page -- remember she fills this out not with Don Monica,

19   but at that joint voluntary agency, the advocacy group.

20   She fills it out before she even sees Don Monica.  But

21   this document puts her on notice, it let's her know what

22   matters.  It let's her know, for example, this question.

23   Have you ever persecuted?  So she knows that that's an

24   issue by the question that she actually denied.  It

25   specifically says -- she's asked the question does this

1   apply to you?  If yes, explain.  She of course says --

2   she does not indicate that it does.

3          Aliens who have committed or to have been

4   convicted of a crime involving moral turpitude are not

5   admissible.  So she knew that if at any stage she

6   admitted that she had committed a crime or aided and

7   abetting in committing a crime, that she was not

8   admissible.  That makes her guilty.

9          Remember the testimony about that process, and

10  it was a form she filled out in Mr. Monica's -- with the

11  JVA's assistance.  Mr. Monica then reviewed the form.

12  This is the form that she presented, and I will not read

13  the entire thing.  But this is the form in which she

14  says -- it's illegible on this.  But this is the form

15  when she described in this section here -- I'm sure you

16  remember it because we went over it with several

17  witnesses.  She admittedly said there was turmoil in

18  Rwanda.  I happen to be one of the people who was

19  displaced.

20         Notable about that is that the exact same

21  language was on Shalom Ntahobali's form, the exact same

22  language.  They both sat in Don Monica's office.  Don

23  Monica directed his attention to her because she was the

24  primary applicant.  Shalom was riding the coattails, but

25  that's the exact same language.

1          Why is that important?  It's important because
2    Mr. Howard asked repeated questions about how could it
3    be that she identified her husband?  Everybody knew
4    Shalom Ntahobali.  How could it be that she identified
5    her mother-in-law, Pauline Nyiramasuhuko, or her
6    father-in-law.  And if the answer is she had to identify
7    Shalom because they were applying together.  Shalom was
8    the derivative applicant.  She was the primary.  He was
9    the derivative.  So it should come as no surprise that
10   she identified him because it's in his A-File which is
11   in evidence.  You will see it.  Because he was applying
12   as well, he identified his own parents.  So no surprise
13   that they were identified.
14          Moreover, and this is the real point here, in
15   1995, in February 1995 when they sit down with Don
16   Monica, this defendant has no reason to believe that the
17   genocide that just ended seven months ago is going to
18   come back to haunt her.  The ICTR didn't exist.  You
19   heard the ICTR didn't get set up until years later.
20   Professor Longman's book, "The Human Rights Encounter:
21   What Happened in Butare," that was published in 1999,
22   four years later.  So this defendant had no reason to
23   believe that I should conceal this.  She basically
24   dotted all the i's.  At a glance she looked normal.  In
25   case they check a database and find out who I'm married

1    to.  Actually, her husband is there.  In case they check

2    the database and find out relationships, it's all

3    kosher, nothing unusual here.  She had no reason to

4    believe that identifying Shalom, Pauline, Maurice would

5    have caused a problem.

6              So, again, what would have been a red flag for

7    Mr. Monica during his interview?  She didn't just fill

8    out the form.  She also gave an interview; right?  This

9    is the notes.  And you remember Mr. Monica explained

10   this is part of the process.  He was the supervisor.  He

11   actually supervised other people doing this.  The

12   process was review the application and then have a

13   conversation.  It's not an adversarial process.  It's a

14   friendly process.  Have a conversation to see whether

15   what she tells you is consistent with what you believe,

16   what you know, is it internally consistent, and you go

17   through here and it says -- she in fact does identify

18   primary applicant's family.  It says, "we're farmers."

19   That's her.  Spouse's family, civil service.  That's

20   Shalom.  She then says:  Prior to 4/94 neither PA, --

21   that's principal applicant -- spouse or family were

22   politically active or had any problem with the

23   government.

24             Ladies and gentlemen, you know that's not

25   true.  Nobody was more politically active than Pauline

1   Nyiramasuhuko.  Maurice Ntahobali had been the head of

2   the parliament before he became the presidentially

3   appointed head of the university.  Why lie if it doesn't

4   matter?  She lied because she knew it mattered.  Imagine

5   if in fact she had said in answer to the question I was

6   politically active, what might Mr. Monica have asked

7   her?  Did you see roadblocks in Butare?  Did you see any

8   violence?  Did you see any Tutsi harmed?  Did you

9   participate?  Did you help?  Did you aid?  Did you abet?

10          Several witnesses you heard from from

11   Immigration Services, Mr. Violo, Mr. Monica, Ms.

12   Salidzik, they all told you why these things matter.

13          So that was the refugee application stages.

14   She gets in.  Later -- this is important because if she

15   lied on any form, any part of the N-400, any part of

16   this, she's guilty of Count 1.  Count 1 is did you lie

17   to get citizenship.  Any single lie, including did you

18   lie about lying, any single lie, she's guilty.  Count 2

19   is did you lie about lying and were you otherwise

20   inadmissible.  Were you inadmissible because you don't

21   have good moral character?  Were you inadmissible

22   because you were a persecutor?  Were you inadmissible

23   because you lied at an earlier stage of the process.

24          Two weeks ago Mr. Chakravarty told you what he

25   expected -- before I move on to that I'm going to talk

1    to you for about 60 seconds --

2              THE COURT:  Take your time, Mr. Capin.

3              MR. CAPIN:  Step one of course is the refugee

4    process.  She comes in as a refugee.  You will see Count

5    2 on the elements of the crime, we have to prove certain

6    elements.  We have to prove that she became a citizen.

7    In Count 1 we have to prove that she lied to do it.

8    That's Count 1.

9              The first step of the process we talked about.

10   That was the refugee application.  The final step is the

11   N-400, this one.  That gets her what she wanted, the

12   golden ticket, U.S. citizenship.  The second step was

13   this one.  At this one she's now entered the country, I

14   would submit to you unlawfully.  She wasn't admissible.

15   She was ineligible for refugee status.  But she entered

16   the country, and again she's asked that question.  If

17   there's any question, ladies and gentlemen, that

18   associations matter, this should put it to rest because

19   every form asks that question, a variation of the same

20   question on every form.  List your present and past

21   membership or affiliation with any political

22   organization, etc.  What does she say?  She says no.

23   Have you ever engaged in genocide?  She says no.

24             That's the three steps of the Immigration

25   process, refugee application, Don Monica, green card

1    here in the U.S., application for citizenship with Mr.

2    Violo.

3             Again, you heard from Mr. Violo.  It wasn't

4    just a form.  He sat down with her and asked her, he

5    said I always do.  He asked every question.  Remember,

6    he was confronted by defense counsel.  Are you sure she

7    didn't say MRND?  And he got visibly animated.  I'd

8    remember that, I'd remember that.  And if she said I was

9    a member of the MRND, I'd remember that and I would have

10   done something.  I would have stopped.  I would have put

11   it on hold and I would have looked into what is this.

12            Now, when Mr. Chakravarty talked to you two

13   weeks ago today he told you that we would prove beyond a

14   reasonable doubt that the defendant lied about what she

15   saw, what she did, what she knew, who she associated

16   with during the genocide, and I submit to you that we

17   have proven beyond a reasonable doubt everything Mr.

18   Chakravarty promised.  The judge is of course correct,

19   that nothing I say to you is evidence.  The evidence is

20   that stuff, what came out of the witnesses' mouths who

21   sat in that chair.  What Mr. Chakravarty said wasn't

22   evidence, but it was a promise of what the evidence

23   would be.  I submit to you the evidence has been

24   exactly, exactly what Mr. Chakravarty promised.

25            Now, let's spend a few minutes talking about

1   the promises that Mr. Ruoff made during his opening.  I

2   will review them quickly.  You will have to speculate

3   who was translating documents for this defendant in

4   Kenya.  You don't have to speculate.  Don Monica said

5   there is an organization called the JVA.  They have a

6   contract with the State Department.  They have

7   Kinyarwanda interpreters.  I use them all the time.  I

8   had no question to doubt them.  If I had any questions,

9   I would have stopped.

10          Now, ladies and gentlemen, his notes aren't

11   consistent with that.  Look at the notes.  The notes

12   here say -- they follow -- you will have this in

13   evidence.  You will see at the very bottom of the

14   A-File, it has a number.  See the number?  DM A-File

15   00121. That's the page number where you will find Mr.

16   Monica's notes in Exhibit 6.

17          So what do they say?  It goes through the

18   normal chronological discussion, sort of logical

19   progression where the discussion goes.  He asks her

20   about the family.  He asks about political activity.  He

21   asks about what happened in Rwanda.  When he asked about

22   political activity, she says:  Not politically active.

23   She didn't say I like ponies, she didn't say my favorite

24   color is red.  She answered the question exactly because

25   she understood the question, because she either spoke

1    enough English -- she'd lived in Kenya.  She was

2    educated.  Kenya is largely English speaking.  Or more

3    likely because she had, as we had in this courtroom, as

4    you have, a well-trained Kinyarwanda interpreter who

5    made it very easy for Mr. Monica, who had years of

6    experience traveling all over the continent, to refugee

7    camps interviewing people, including Rwandans.  You

8    don't have to speculate about her language skills.

9            Moreover, when she does this, you don't have

10   any speculation.  She took an English test, and Mr.

11   Violo said if she didn't understand, if she didn't speak

12   the language, she wouldn't know.  There is an exception

13   -- I forget what the exception is for.  Really old folks

14   for the English language requirement.  She wouldn't have

15   gotten past Violo if she hadn't spoken English.  You

16   don't have to speculate about her English skills.

17           Look at her journal entries, Exhibit 14A.

18   It's written in 1999.  It appears as part of an English

19   class, that she writes things like I like to write

20   English, and her grammar is impeccable.  It's as good as

21   any of us in this room.  You don't have to speculate

22   about her language skills.

23           Machine guns on every corner, that's what he

24   said.  What did Thierry say?  Phone carts on every

25   corner.  Did anybody say machine guns on every corner?

1    Absolutely not.

2              Organizations try to train witnesses how to

3    testify.  Now, Dr. Endless speculated about

4    organizations that are aligned with the government, but

5    that had nothing to do with this case.  You heard from

6    Agent Anderson and none of these witnesses were told

7    what the interview was about.  You heard from the

8    witnesses.  They didn't know what it was about.  Nobody

9    trained them to testify.  And you've seen from defense

10   witnesses that even if witnesses try to come up with a

11   script, that's what cross-examination is about.  It's

12   not about being mean to the witnesses.  It's about

13   testing the veracity, testing the truthfulness.  And

14   these witnesses by very able counsel were tested and

15   their stories make sense.

16             Agents flew to Rwanda and were handed a list.

17   That's what Mr. Ruoff said.  You heard from Agent

18   Anderson.  They weren't handed any lists.  This is good

19   investigative work, found people of the type Agent

20   Anderson told you he thought would be useful to you,

21   people who lived in the neighborhood, people who went to

22   school with Shalom, people who knew when they got

23   married, people who sold them beer, people who lived

24   across the valley in the mosque, people who could hear

25   the screaming coming across that killing field, the

1    screams that nobody -- nobody in that hotel heard a

2    thing.  But you heard from Dr. Longman.  There was a

3    killing field in the woods behind the EER.  And you

4    heard from the witnesses, and what you heard made sense.

5    And imagine dozens, scores, hundreds of people being

6    hacked to death over days and days and days.  It must

7    have been thunderous.

8           Mr. Ruoff said that the witnesses you heard

9    from may or may not have known what American

10   investigators were there to talk about.  It wasn't that.

11   They didn't know.  They told you they didn't know.

12   Agent Anderson told you he took meticulous care.  He

13   hired a driver so he could communicate with them.

14   Didn't tell the driver what the investigation was about,

15   and specifically said if you're asked, at most tell them

16   the Americans want to talk to you.

17          He said the prosecution has been vague about

18   how the agents learned about the defendant's testimony

19   at the ICTR.  He said we still don't know the answer,

20   they won't tell us, and they probably won't tell you.

21          Well, ladies and gentlemen, Agent Anderson not

22   only told you, he showed you.  And you will have the

23   exhibits in evidence.  He showed you what she said at

24   the ICTR.

25          And I've noted here, ladies and gentlemen,

1   right here, for your convenience, that's the exhibit

2   number, if you want to look at the specific pages of the

3   transcript in evidence.  Madam, as far as you know, was

4   Shalom ever a member of -- a youth wing of any political

5   party?  No.  You know that's false.  The question you

6   have to ask yourself is does it matter?  And if it

7   doesn't matter, why lie about it?

8              Madam, prior to the 6th of April, 1994, had

9   you with your own eyes seen people called the

10  Interahamwe?  No, not to my knowledge.

11             Did you know, however, madam, if those

12  notorious Interahamwe had a specific manner, a

13  particular manner in which they dressed themselves in

14  order to distinguish themselves?  Answer, but in Butare

15  I didn't see any Interahamwe in those kind of uniforms.

16             Completely inconsistent with everything you

17  heard from Dr. Longman, from Dr. Zachariah, from every

18  Rwandan witness, from Mr. Endless, who said this is what

19  they wore.

20             Madam, can you tell us how things were at the

21  Hotel I'Huriro?  How was life there?  Life was boring.

22             Front row seat to the genocide, to the most

23  vicious roadblock in town, life is boring.  If it

24  doesn't matter, why lie about it.

25             Did you see any roadblocks on those two trips

1    outside the I'Huriro?  Other than the barracks near the

2    ESO -- remember the ESO was the non-commissioned

3    officers at the I'Huriro.  Other than the barracks near

4    the ESO, that was it and I didn't go through it.  That's

5    Exhibit 18B, page 74.

6            Exhibit 18B, page 75.  So apart from the

7    violence that's related to looting, you've never seen

8    any dead bodies?  No, I never saw dead bodies.

9            Remember, even defense witnesses have her

10   upstairs in the balcony looking out toward the back.

11   How can she not see dead bodies?  The area behind the

12   EER was at most a few hundred feet away.  You heard

13   witnesses -- remember Consolee, when she was taken by

14   Maurice's nephew, the way they left was via that path

15   behind the EER.  She saw the dead bodies.

16           You heard the man by the mosque.  He could

17   see -- from that distance he could see people being led

18   down.  He didn't embellish, he didn't say I saw what

19   happened.  He just said I saw them go down and I heard

20   screaming.

21           She saw nothing.  If it isn't lying, if it

22   doesn't matter, why lie about it.

23           The EER school is close to the I'Huriro,

24   isn't it?  No.

25           It was the closest thing there was.  If it

 1   doesn't matter why lie about it?

 2          Finally, and yet, madam, you probably are

 3   aware that people that have come here state that Shalom

 4   allegedly erected a roadblock in front of the I'Huriro

 5   Hotel, and that he was allegedly seen carrying weapons,

 6   particularly firearms and grenades, and that he

 7   allegedly killed hundreds of people as early as the 20th

 8   of April.  What would your position in respect of such

 9   evidence -- of such witnesses matter?  Answer, I want to

10   make this clear that these things are nothing other than

11   naked lies.  I will explain.  First of all, Shalom's

12   father owned a hotel.  He did not own a road in Butare,

13   he did not own a street in Butare.  Who was Shalom and

14   what kind of power did Shalom possess to install or

15   establish a roadblock in the street?  There was no

16   roadblock in front of the hotel except the roadblock

17   that I saw when I came from Cyangugu and that was after

18   April.  And back to the killings, Shalom had been

19   accused of killing people, Tutsi people.  Shalom has

20   done nothing to these people and nothing other than

21   giving them love, opening his gate of life to these

22   people, and he protected them over a long period of time

23   in our house.  He never killed anybody.  Exhibit 18B,

24   page nine.

25          This is spoken by somebody -- I will start

```
 1    that again.  Anybody living in Butare during the
 2    genocide knows that you don't have to own the road to
 3    set up a roadblock.  Even Dr. Endless said dozens of
 4    roadblocks.  He didn't say set up by the owners of the
 5    road.  It wasn't like this is a private way.  This is
 6    the main road to Kigali.  This is the main highway.  And
 7    you heard from every witness that there were several
 8    roadblocks along this road alone, this one, the one
 9    maybe north and another one maybe to the south.  If it
10    doesn't matter, why lie about it.
11            Mr. Ruoff said ICTR never investigated the
12    defendant.  She is not mentioned in the book, Dr.
13    Longman's book.  All you know about that book is it
14    mentions Pauline and Shalom and maybe a few other key
15    organizers of the genocide.  There were 100 to 200,000
16    people who participated in the genocide in different
17    ways.  Some wielded machetes, some checked IDs, some had
18    grenades, some looted.  Is it any surprise that Dr.
19    Longman didn't include her in the book, that he never
20    heard of her?  He never heard of Kzungu, Gilbert, Bosco,
21    all of the Interahamwe that nobody ever asked about
22    before, because there were up to 200,000 killers.  It
23    should come as no surprise that she's not in any kind of
24    book.
25            And finally -- and I will end with this --
```

1   there's this notion that Dr. Endless wants you to buy

2   concerning the dominant narrative.  That's a term he

3   kept using.  Dominant narrative.  The Rwanda

4   government's response is the dominant narrative.  That's

5   the government's culture.  Culturally Rwandans tell a

6   certain story.  Ask yourself if any of that was helpful

7   to you.  I suggest it wasn't.

8          It wasn't for three reasons.  First let me

9   show you what we know from our witnesses, when you're

10  assessing whether there's a dominant narrative.  Ask

11  yourself, first of all, if the dominant narrative is

12  simply lots of Tutsis died and roadblocks were used to

13  kill people, is that helpful?  We all know that.  Dr.

14  Longman knows that.  That's not a dominant narrative.

15  That's historical fact.  700 to 800,000 Tutsi were

16  murdered.  Is that a narrative?  No, that's historical

17  fact.

18          So if that's all Mr. Endless is saying, fair

19  enough.  But if he's saying that people called upon to

20  testify in American courts testify a certain way, then

21  you have to ask yourself what did each of these

22  witnesses say?  And does the notion that there's a

23  dominant narrative make any sense whatsoever?

24          These are the witnesses in the order you saw

25  them.  This isn't the whole thing.  This is just a few

1    high points to illustrate there ain't no narrative.  Who

2    rode with Shalom?  Thierry.  You know that's true.  You

3    saw the photograph.  You saw the defendant wearing an

4    Interahamwe uniform while at an MRND rally, you saw the

5    defendant working at the I'Huriro desk.  You know that.

6    You saw her resume.  Nothing about the roadblock.  He

7    says nothing about the roadblock.  If you're going to

8    tell a dominant narrative, you're going to tell a big

9    story, why not do it up big?  Why not say, oh, yeah, she

10   was out there, I saw her with a machete.  He doesn't

11   even see the roadblock.  That's not the dominant

12   narrative.  That's what he saw.

13          That's from a Hutu soldier, a Hutu soldier.

14   He recognized people at the roadblock wearing military

15   jackets.  He also explained to you that he knew -- some

16   of the witnesses thought they were soldiers.  He knew

17   they were soldiers.  They were folks wearing fatigues.

18   He said a soldier was me.  I had boots on, I had pants

19   on, I had a matching uniform.  I was a soldier.  He saw

20   someone who answered the name Beatrice wearing an MRND

21   uniform checking IDs.  He saw the roadblock zigzagged.

22          One thing -- another thing Mr. Ruoff said is

23   there's no forensic evidence.  Well, that aerial

24   photograph that Mr. Benn showed you  with the zigzag?

25   That is called forensic evidence.  He knew that because

1    he was there.  But telling you, he says I didn't know

2    Beatrice.  This is a quote.  I didn't know Beatrice.  I

3    don't know her.

4             If there's a dominant narrative, shouldn't the

5    narrative be I know her?  I know she is the wife of

6    Shalom.  I know she is Pauline's daughter-in-law.

7    Shouldn't it be her wielding a machete, taking IDs from

8    people?  Shouldn't it be something more dramatic than

9    she was standing there doing nothing but checking IDs?

10            Vestine, she knows exactly when the roadblock

11   went in.  We discussed that.  She was taken to where the

12   IRST was.  We discussed that.  Mr. Ruoff said they don't

13   even know the family had another home.  Well, you heard

14   several witnesses knew that they had at least two other

15   homes, the one in this place called Cyarwa and another

16   one was a home in Mbaza.  I think it was Consolee.  In

17   fact she visited them there.

18            So if the dominant narrative is supposed to be

19   the I'Huriro Hotel is where they lived, clearly these

20   witnesses are not explaining these matters limited to

21   some sort of narrative.

22            She said nothing about Interahamwe or military

23   or MRND uniform.  If there is a dominant narrative about

24   a Hutu Interahamwe during the genocide, wouldn't it

25   include that?

 1          Next you heard from Consolee.  Family member.
 2   Family is defined loosely in Rwanda.  Maybe distant
 3   cousins, this cousin's wife of my husband, married to --
 4   my sister is married to Maurice's nephew.  She knew
 5   Maurice had homes in both places.  She visited family
 6   there with her sister.  She was taken to the I'Huriro
 7   roadblock and went by the EER and saw the killing
 8   fields.  Her ID card was not checked by the defendants.
 9   That's not the dominant narrative.  The dominant
10   narrative is she should have said the defendant asked me
11   for my ID.  But she didn't because she was with her
12   nephew.  Beatrice knew exactly who she was.  That's why
13   she didn't check her ID.
14          This man Vincent.  He's a kid who worked down
15   the road at Ruhalo's (ph.) farm.  He saw her working at
16   the roadblock checking IDs.  He described the roadblock
17   precisely.  He knew when the defendant got married, and
18   he sold beer to her.  The dominant narrative, how could
19   there be a dominant narrative that didn't include one
20   major detail as I worked at a beer shop and she came in.
21   Do you know that's not a narrative?  Of course you know
22   because you know that she worked at a bar.  It's on her
23   resume.
24          Finally, the last two witnesses are Jean Paul
25   Rutaganda -- this is the orphan who saw the defendant

1   wearing the uniform holding the notebook, saw the

2   killings in the EER.  Doesn't implicate the defendant.

3   If there's a dominant narrative, how come he didn't say,

4   yeah, I saw people being hacked to death and she was

5   right there.  He doesn't implicate her.

6          Doesn't know Maurice's party affiliation.

7   Never saw her daughters.  He identifies the photo with

8   Thierry and Shalom.  He knows Eugene.  He didn't even

9   recognize Thierry.  Why would he?  They don't know each

10  other.

11          Finally, Richard Kamanzi, saw the defendant

12  with the defendant's family wearing MRND clothes, saw

13  the family taking people into the woods below the EER.

14  He heard screams, identified four of the people in the

15  photograph, which he had never seen before.  Went

16  through the roadblock with the log being off to the

17  side.  The log being off to the side isn't the dominant

18  narrative.  You heard it from two witnesses.  You heard

19  it from the defendant's cook and you heard it from

20  Sibomana.

21          Another thing I would ask you to consider is

22  if the notion about a dominant narrative makes any

23  sense, is why her?  Why if Agent Anderson comes over and

24  says tell me about Butare, why falsely implicate her?

25          Maurice Ntahobali was the former head of

1    parliament.  He was the presidentially appointed

2    minister, president of the university.  Not a single

3    witness said a bad word about him.  He's as pure as the

4    driven snow.  If there is a dominant narrative that said

5    when asked by investigators about the genocide, you

6    finger people who were Hutu, then isn't the obvious

7    candidate Maurice?

8           There is no dominant narrative.  And if the

9    dominant narrative, ladies and gentlemen, were so

10   powerful, if there was some fear of testifying, how can

11   it be that Maurice's sister and other members of the

12   family come not once but in some cases twice to testify

13   in this case and in other cases on behalf of people in

14   the American court system.  And they go back without any

15   fear of reprisal.  We asked every single one of them do

16   you have any fear of reprisal from the Rwandan

17   government?  Do you have any fear of going back?  Not a

18   one, not even Maurice's sister.  With all due respect to

19   Mr. Endless, this whole dominant narrative issue is

20   hogwash.  And even if it weren't hogwash, it has nothing

21   to do with this case.

22          This case is not about Rwandan politics.  It's

23   not about political science.  It's about did this

24   defendant lie on her path to citizenship.

25          And Mr. Chakravarty showed you this.  This is

1   her path to citizenship.  1995, there's the refugee

2   application.  '99, there's her green card.  '03, there's

3   her N-400 application for citizenship.

4          She lied, she concealed her past at every

5   stage, and at the end of the day this is what she got.

6   She got the golden ticket.  She got U.S. citizenship.

7   She got it by making material misrepresentations and

8   false statements that mattered to the Immigration

9   authorities at every stage of the process.  Find her

10  guilty.

11         THE COURT:  Thank you, Mr. Capin.  Ladies and

12  gentlemen, given the hour, we'll take a brief recess

13  before the defense makes its closing argument.

14         (Recess taken.)

15         THE COURT:  Mr. Howard, whenever you're ready.

16         MR. HOWARD:  Thank you.  Ladies and gentlemen,

17  the United States is the envy of the world.  We enjoy

18  greater freedoms and greater opportunities than any

19  other nation on this planet.

20         Ten years ago Beatrice came into this

21  courthouse and you will see on the screen her

22  citizenship certificate, and you will see became a

23  citizen of the United States.  The United States

24  Attorney General approved her citizenship.

25         Ten years ago she walked out of this

1    courthouse with her three young daughters, Charlene

2    Simbi, and Saro.  The twins, Simbi and Saro, are sitting

3    right here in the front.  Hers has been an amazing

4    journey and we're going to talk about that journey for

5    the next hour or so.

6            The United States of America is the envy of

7    the world because we have greater freedoms than anyone

8    else and one of those most important freedoms that we

9    enjoy is also one of the most important civic

10   responsibilities that you have, and that is to sit as a

11   jury of her peers.  Yes, you are her peers.  She is your

12   equal.  She deserves every privilege and every right of

13   an American citizen as I do, as you do, as anyone in

14   this courtroom does, because she has earned it.  She's

15   earned it legitimately, by putting herself through a

16   process that nobody in this jury could ever understand.

17   You could never understand where she came from, the kind

18   of struggle that she had to endure, the kind of violence

19   that she's seen.  Her country, her native country, war

20   torn, ripped apart from the genocide, a genocide in

21   which she had absolutely no part.

22           Your role as jurors is not to protect the

23   borders of the United States.  As Mr. Capin said, your

24   role as jurors is not to serve the function of

25   determining whether she should be a United States

1   citizen or not.

2              As Judge McAuliffe told you at the beginning,

3   you've been drafted, and you were drafted to serve a

4   very important function, and that function is to serve

5   as her guardian.

6              The jury system in the United States was

7   established for a very important reason, because unlike

8   in Rwanda where the authoritarian government oppresses

9   people through so many different devices, not the least

10  of which is their court system, the Gacaca courts, --

11  I'm surprised it doesn't mean kangaroo -- where the

12  government defines who's guilty, you have no shot in the

13  Gacaca court if you are a Hutu charged with genocide.

14             That doesn't happen here.  Here you get a fair

15  trial that is based on the evidence and only the

16  evidence.  And your job as jurors is to stand between

17  the government, who I'm sure believes is here with the

18  purest and most noble of objectives, but they're wrong.

19  They're dead wrong.  Your job is to stand between them,

20  to say we appreciate what you were trying to do, we

21  appreciate that you brought all these folks over here

22  from Rwanda, but it's not just that it isn't believable,

23  and it's not, it's because it's wrong.

24             So let's start the journey.  And let me just

25  tell you, I will give you a road map as to where I'm

1    going to go so you can have some expectation of what's

2    coming next.  We're going to talk about Beatrice's

3    journey.  We're going to talk about the two experts that

4    came into this courtroom and what they had to offer.

5    And it is helpful.  In fact, it's determinative for you.

6    We're going to talk about the witnesses that the

7    government brought here, the circumstances under which

8    they were found, the circumstances under which they were

9    here, and what they actually had to say.

10        Let me just interject something right here

11    about that point, about those witnesses.  The judge told

12    you at the beginning and may tell you again, the

13    witness's testimony is not just what they say on direct

14    examination when the government is asking them

15    questions.  Every bit as important is cross-examination

16    and what they say there.

17        As the government established with Dr. Endless

18    yesterday, cross-examination is probably the most

19    important truth-seeking function we have in our system.

20    We don't have to take a witness on face value.  We get

21    to question them.  And when we question them and what

22    they say doesn't make sense, because they've been

23    inconsistent or it simply is absurd or they come from a

24    culture where, as Dr. Longman said to you and Dr.

25    Endless affirmed, they say what they are supposed to

1  say.  They don't always tell you the truth.  When it

2  comes to the genocide they say what they think authority

3  wants to hear.  When it comes to the genocide they say

4  what's in their own interests, whether to promote

5  themselves or to protect themselves.  They tell the

6  story that their oppressive authoritarian government

7  wants them to say.

8          We are then going to talk about the family and

9  the friends and the cooks who stayed at the hotel, and

10 we're going to talk about all these Immigration

11 documents and the Immigration officers who handled this

12 process from start to finish.

13         In the end you're going to see that my job

14 here wasn't, as the government wants you to believe, to

15 create distractions for you.  I will make that promise

16 to you right now.  I am not going to create distractions

17 for you.  My job isn't just to be a zealous advocate for

18 Beatrice on the hope that I can get her off.  My job

19 here is to show you the truth, and we've done that.

20         Back in those horrible months in 1994 -- we

21 don't need to relive what happened there.  There's no

22 question, Rwanda had been in a civil war for four years,

23 tension that had been festering for years before that.

24 The RPF led by this guy Paul Kagame who's now the

25 president of Rwanda encouraged them invading Rwanda to

1    try to reestablish Tutsi power, the fomenting of ethnic

2    division that happened by the Hutu led government.  We

3    know all of that.

4           What did that mean for Beatrice?  She wasn't

5    involved in it.  She's not involved in the politics.

6    She's not involved in the party.  In fact, in the late

7    part of 1993 as tensions are continuing to escalate,

8    she's got a young baby, Charlene.  By February of 1994

9    she's pregnant again with the twins.  She's at the hotel

10   owned by her husband's parents, and she is there to keep

11   her children safe, to keep herself safe, to offer refuge

12   to her other family members.  Was life boring at the

13   hotel?  As she said at the ICTR, well, I suppose if what

14   you do every day is sit to keep yourself safe, yeah,

15   maybe that's boring.

16          Maybe the way she articulates things as her

17   native language of Kinyarwandan isn't quite the kind of

18   language we would expect to hear, just like every

19   Kinyarwandan speaking with us up here, how many times

20   did you hear these nonresponsive, awkward phrases that

21   meant nothing to us?  To them it meant something.

22          As the war escalated, the genocide had reached

23   Butare, yes, a lot of people were killed.  When it got

24   to be toward the end of June and the first part of July,

25   the RPF is coming into Butare.  Unless you served in the

1   military in a war zone, and I haven't, you don't know

2   what that feels like.  You don't know what's going to

3   happen to you.  The tanks are coming down the street,

4   the guerrillas are going through the woods with machine

5   guns, you don't know what's about to happen to you, your

6   two unborn children, and your baby.  So you load your

7   family and you flee the country.  Was that an unusual

8   event then?  Was that something -- was she fleeing from

9   all of her life, all of her misdeeds?  No, she was doing

10  what over a million, over a million, other people were

11  doing at exactly the same time.  Getting out of Rwanda.

12  Between a hundred and 200,000 people are involved in the

13  genocide, over a million are fleeing.  Almost all of

14  them are completely innocent.  They're just getting out

15  so they don't get hurt.  And that's Beatrice.

16          What do we know subsequent to her fleeing that

17  we will talk about in a little more detail at the end?

18  That the RPF is coming behind, and as they come through

19  the country, the retributive killings are going on.  Dr.

20  Endless described those.  The Hutus who are now behind

21  enemy lines are getting slaughtered.  The Hutus who have

22  fled into the Congo for refuge, the RPF chases them into

23  another country and slaughters them.  Hutus that are

24  left behind in the country, the Kibeho massacres, tens

25  of thousands of Hutus slaughtered.  Why?  Because

1    they're Hutu.  Not because they did anything, but

2    because they're Hutu.

3            So when Beatrice has on her initial refugee

4    application that the killings that went on in Rwanda

5    she's talking about the Tutsis being killed.  She's

6    talking about the Hutus being killed.  She is afraid to

7    go back.  She can't go back.  She is among those people

8    who will be killed if she goes back.  Those aren't lies.

9    That is exactly what Dr. Endless said happened, and

10   whether the government likes it or not, it's exactly

11   what Dr. Longman said happened.  There is a well-founded

12   fear of being persecuted or killed if she goes back, if

13   anyone goes back.

14           After fleeing into the Congo with a lot of her

15   family members -- she is fortunate.  The government

16   wanted to ridicule her as if it's somehow criminal.  She

17   is fortunate to have some means.  Her husband's family

18   has some money, so she is able to escape.  And here's a

19   bit of a news flash.  That's one of the reasons that she

20   was considered a good candidate to come to this country,

21   because she had some means to be here so she wouldn't

22   become a ward of the state, so she wouldn't become a

23   drag on the welfare system.  Government can't have it

24   both ways.  They can't criticize her for having means to

25   come here.  Right?

1          She is able to get out of the refugee camps.

2     You will see on the applications this wasn't an airplane

3     ride to Kenya.  They made their way into Tanzania, then

4     they made their way through Zambia and up into Kenya.

5     It took like two months to get there.  It took a long

6     time.  It's right on the applications.  She lays out

7     exactly what the trip was.

8          Once she makes it to Kenya, this is where we

9     start the process of applying for refugee status to come

10    to the United States.  One of the things that Mr.

11    Chakravarty said in his opening, and that's when she

12    became her aggressive, dogged pursuit of United States

13    citizenship.  Really.

14         This is what happened.  She fills out the

15    refugee application.  I think it's called the I-59.  She

16    fills that out in December 1994.  She files it through

17    this JVA, the Joint Volunteer Association, in January of

18    1995.  She has her first interview in February of 1995.

19    That's with Mr. Monica.  We'll talk in some detail about

20    him in a little while.

21         At that point, I believe it was February 16th

22    that she had that interview, what do we know happens

23    next?  The United States Government through the

24    Immigration Service approves her refugee application.

25    She was considered eligible to come into the United

1    States.

2            So what happened?  They couldn't even find

3    her.  That's how aggressive she was about her pursuit to

4    come into the United States.  For ten months she didn't

5    even go back to the office to see what her status was,

6    to see what had happened.  And the folks at the JVA were

7    looking for her.  She had actually gone back to Kenya,

8    and you will see that in the later papers, to help her

9    family and -- not to Kenya, I'm sorry, back to the Congo

10   to the refugee camps to help her family.  That's how

11   dogged her pursuit was.  That's what a manipulative,

12   deceitful liar she was.

13           When she then came back to Kenya, what she

14   found out was in October of 1995 the JVA had written to

15   the United States to the organization over here who was

16   sponsoring her and said could you find her anchor for

17   us?  Her anchor being her brother Higiro.  Remember that

18   discussion?  We can't find Beatrice.  We want to let her

19   know that she can go to the United States.  She made it,

20   she's eligible.

21           Even in November of 1995 she went into the

22   office, and that's when they had her fill out the

23   Rwandan questionnaire.  Even then they didn't tell her,

24   by the way, you're eligible.  She doesn't even find that

25   out until January 1996.  Almost a full year later does

1    she find out that she was eligible the year before.

2    That's how dogged her manipulative and deceitful pursuit

3    was.

4              So she fills out the Rwandan questionnaire.

5    They do the visa donkey to the State Department.  Within

6    six days, six days -- I haven't known the federal

7    government to react in six days to anything.  But in six

8    days they write a Visa 6 back to her and say you're good

9    to go.

10             At that point we run into a bit of a problem.

11   She has to go through -- she went through a medical

12   screening once before.  Had to go through another one,

13   and an issue came up and she was deemed excludable for

14   health reasons.

15             Now, this is in 1996.  That issue goes on for

16   another year and a half.  What does she do in that year

17   and a half?  Nothing.  She does nothing but wait.

18   That's how dogged and deceitful and manipulative her

19   efforts were.

20             It's not until March of 1998, over three

21   years, before she first walked into that JVA office and

22   talked to Mr. Monica.  Three years before she was

23   allowed to come.

24             And I think now might be a good time to talk

25   about some of those documents that she filled out to

1  show you that they're not lies, to show you that she was

2  being open, honest, and accurate about her applications.

3       The first, the government makes its big point

4  of she said on that application she was not a member of

5  the MRND.

6       She wasn't a member of the MRND.  Did you hear

7  any evidence whatsoever in this courtroom that she was a

8  member of the MRND?  Not one.  You had some people say,

9  oh, I saw Beatrice in the MRND clothing.

10       Okay.  So what does that mean?  First of all,

11  they're just wrong.  They're not telling the truth, and

12  I will show you why in a few minutes.

13       Beatrice herself said, because she's so

14  deceitful and manipulative, she goes to the ICTR and she

15  herself says, yeah, I've been to an MRND rally.  I know

16  what those things are.

17       Does that mean she's a member or associated or

18  affiliated?  No, it means that she's been to a rally.

19  They're big parties.

20       If I wear a Patriots T-shirt on Sunday, does

21  that mean I'm a member of the Patriots?  No.  Does it

22  mean I'm affiliated with the Patriots?  No.  Does it

23  mean I'm associated with the Patriots?  No, it does not.

24  It means that I'm a Patriots fan.  Maybe my daughter is

25  a Patriots fan and I support her, so I wear a Patriots

1   T-shirt.  Just going to these things doesn't make a lick

2   of difference.  They know that.

3           All right.  What I really want to drive at, as

4   Mr. Capin made a significant point that when she does

5   her interview with Mr. Monica -- this is in February of

6   1995.  It was interesting listening very carefully to

7   how he described in this document to you, did it occur

8   to you the major hole he left out in the points he was

9   trying to make?

10          Here's what they are.  In the interview, Mr.

11  Monica is sitting right across the table.  He's the one

12  assessing her credibility.  Shalom is sitting right

13  there.  He's the one asking the questions, the

14  interpreter's apparently interpreting the questions and

15  the answers that come back, and this is what we learned.

16  She says right off, PA's family were farmers, spouse's

17  family, civil servants.

18          There's that sentence.  Stop there.  The next

19  full sentence that's written in the main part is:  Prior

20  to 4/94 neither PA, spouse, or family were politically

21  active or had problems with the government.

22          Mr. Capin says, oh, my gosh, how could she

23  possibly deny that they were not politically active?

24          First of all, Mr. Monica is the one sitting

25  right there.  If he thought that that answer of

1   politically active was inconsistent with the family

2   being civil servants, he would have asked her.  Right?

3   He's right there.  And so what happens next?  It's

4   obvious on the document itself that Mr. Monica said

5   explain that to me.  And what does she tell him, written

6   in the margins over here, Shalom's father is the

7   president of the National University.  His mother is an

8   appointed cabinet minister.  She discloses that right

9   then and there to Donald Monica.

10          The government wants you to believe that

11   that's hiding something, that this document itself is

12   inconsistent.  She's lying right in the interview.  But

13   yet she says exactly what it is.

14          And what do we know about Shalom's parents?

15   Shalom filed his own refugee application and he put his

16   family members in his application.  So Donald Monica

17   knows in that interview that the father is Maurice

18   Ntahobali and he is the president of the National

19   University, and Donald Monica knows in that interview

20   that Shalom's mother is a cabinet minister, appointed

21   cabinet minister, and her name is Pauline Nyiramasuhuko.

22   Nothing was hidden from the U.S. Government whatsoever.

23          Now, Mr. Capin wants you to say, well, the

24   defense's whole point here is, well, gee, if she had

25   disclosed all of these things, then I guess the

1    government should have done a better job of discovering

2    her fraud.  Right?  That's how he characterizes our

3    point here.  That's not our point at all.  Our point is

4    she's telling the government everything.  She's not

5    hiding a fraud.  She's disclosing exactly who she is,

6    who she's related to, where she's been, where she's

7    coming from.  That her mother-in-law is a cabinet

8    minister.

9              Now let's flash forward.  Mr. Heflin, do you

10   remember him from the State Department?  He was the

11   white-haired gentleman sitting up there.  He's the guy

12   who described the visa donkey and the Visa 6, going back

13   and forth.  Do you remember his reaction when we were

14   cross-examining him and we showed him this interview.

15   Right?  We showed him this interview.  We said would it

16   make a difference to you if she told you that her mother

17   was a cabinet minister?  And he would go, yep, that's a

18   red flag.  We would want a lot more questions asked

19   then.  Showed him this interview, ahem, ahem, ahem, she

20   told us that?

21             Even he said that's the red flag.  They didn't

22   do anything about that.  And that's Beatrice's fault.

23   Now the federal government comes in and says you're a

24   liar.

25             When the federal government sits in this chair

1    and we say, well, she told you and you guys didn't do

2    anything about it, that's her fault?  And he stammered

3    on -- I'll never forget this moment.  He stammers on

4    about some babbling about her brother, and remember, Mr.

5    Ruoff standing here, what's your point.  Because he had

6    no point.  It's because he knew in that moment that she

7    had told the truth, that she had told everything, and

8    that they didn't do anything about it.

9            We're going to get away from these documents

10   now and I want to talk to you about the Rwandan

11   witnesses.  They come here from a very different culture

12   than what you and I know.  The government doesn't want

13   you to pay any attention to that issue.  They want you

14   to say there's no such thing as an official narrative.

15   That's all a bunch of malarkey what Dr. Endless was here

16   to talk about.  I know they don't like Dr. Endless.

17   That's pretty clear.

18           I know they think he's a quack.  But here's

19   the problem.  Everything that Dr. Endless told you about

20   the official narrative, the oppression put on by the

21   Kagame regime on its people, the devices it uses to

22   force the official narrative, the compliance that it

23   requires to the genocide narrative, to the genocide

24   idealogy, all of those things that Dr. Endless said, Dr.

25   Longman agrees with him.  Dr. Longman sat in that chair,

1    the expert paid by the government to come here to

2    testify on their behalf that, oh, yeah, there's an

3    official narrative, and yes, indeed, the government

4    enforces it.  And he has given lecture after lecture

5    about every device that they use.

6            And do you remember at the end of his

7    testimony, Dr. Longman, he, upon questioning by the

8    prosecutor, said now did you listen to the defendant's

9    opening?  Yes, I sat right there and listened to it.  Do

10   you remember the defense calling every Rwandan a liar?

11   First of all, that never happened.  Do you remember

12   calling the defense a liar?  And he sits up there and

13   goes, yes, I do.  And I've got to tell you, I'm kind of

14   offended by that.

15           Guess what?  The first thing out of his mouth

16   on cross-examination, isn't it true that it is your

17   opinion that when Rwandans are spoken to about the

18   genocide, that they have a tendency to tell you what you

19   want to hear, especially if you're in a position of

20   authority.  I don't know what you'd call that.  I'd call

21   that lying.  If you say what you think the person wants

22   to hear, that means you're saying it regardless of the

23   truth.  So he sat up there pretending to be offended by

24   the very notion that we are trying to establish and he

25   actually agrees with us, that Rwandans do not tell the

1  truth about the genocide.  That they do say what

2  authority wants them to say.

3          For example, when big, bulky, white U.S.

4  American agents come into your town and want to talk

5  about Beatrice Munyenyezi, you better believe we're

6  talking about Beatrice Munyenyezi.  You better believe

7  we're going to talk about the wife of Shalom.  Of course

8  we know the wife of Shalom.  Of course she worked at a

9  roadblock.

10          Mr. Capin wants you to say, no, no, no, no,

11  no, those agents didn't tell those people what they

12  wanted to talk about.  That was Agent Anderson's

13  testimony, that, no, we kept it pure as the driven snow.

14  Those people had no idea what it was we were going to

15  talk about when we got there.

16          Just picture that for a moment.  It borders on

17  the complete ridiculous.  These agents went to Rwanda,

18  what did he say, eight times, five of them about this

19  case alone.  They talked to scores of people.  They put

20  all of those resources, all of that money, all of that

21  agent time going to investigate this case, and no one on

22  the ground in Rwanda knows why they're there.  Baloney.

23  Everybody on the ground in Rwanda knows why they're

24  there.  The Rwandan government knows they're there.  The

25  Rwandan officials know they're there.  The folks in

1    Butare, those police and prosecutors, you think they

2    don't know that that six-foot something agent from the

3    U.S. who looks absolutely nothing like nobody else in

4    town, they don't know why he's there?  Of course they

5    do.  And they know he's there about Shalom, about

6    Pauline, and about Beatrice.  Everybody in Butare knows

7    the story of Shalom and Pauline by now.

8             Let's not forget, this didn't happen last

9    year.  This didn't happen two years ago.  These events

10   were 19 years ago.  If you don't think that everybody in

11   Butare Town by now knows the story, if you don't think

12   that everybody has been trained fully to give the stock

13   answers that Dr. Longman told you about -- that's what

14   they do when they talk about the genocide, they give the

15   stock answers.  Yes, there were roadblocks.  Yes, Tutsi

16   IDs were being checked.  No one disputes that.  Yes,

17   Tutsis were set aside.  Yes, Tutsis were killed.

18   Horrible things happened.  There were mass graves.

19   There were killing of kids.  Everybody knows where those

20   mass graves were in Butare.  One of them was down behind

21   the EER.  Everybody knows that.  So all that those

22   witnesses have to do is just tell the story that

23   everybody already knows and then for the first time in

24   19 years put Beatrice at the roadblock.  Every witness

25   who came here, every one of them, hadn't even been

1  spoken to about this case until just last June, seven,

2  eight months ago.

3          We heard from Agent Anderson that her house

4  was searched.  She was charged in this case in 2010.

5  Hum, but every witness who you hear wasn't even spoken

6  to until June of 2012?  How does that work?  You know

7  what that means?  That this story -- this investigation

8  has been going on for four or five years and the story

9  couldn't be more well-known in Butare that Beatrice is

10  being investigated and charged in the United States.

11  Even Thierry, that one Rwandan witness, said, yeah, I

12  read an article about her or saw an article about her,

13  about Beatrice.

14          Those agents had been there multiple times

15  before they showed up in June of 2012.  Everybody in

16  that community knows what they're up to when they come.

17  And so they know what to say.  And then I ask you, how

18  is it that the agents -- remember we said in our opening

19  statement -- still turned out to be true -- they're not

20  going to tell you how they actually found those people.

21  They wouldn't tell us and they probably wouldn't tell

22  you and they haven't.

23          Agent Anderson could not explain, Agent Fox

24  could not explain how it was that he got Consolee

25  Mukeshimana's name, how it was that he got Vincent

1   Sibomana's name, Bruno's name, Jean Paul's name.   How

2   did you get their phone numbers?   I don't know.   How'd

3   you get their name?   Don't remember.

4          It's because each and every one of those

5   witnesses was fed to them, and they won't want to tell

6   you that, because if they tell you that, that means it's

7   all corrupted.

8          And so let's take it from the witnesses'

9   perspective.   They're just sitting at home in their farm

10  one afternoon and some complete stranger named Jean

11  Pierre calls them on their cellphone.   Okay.   None of

12  the witnesses had any idea who Jean Pierre was.   They

13  had no idea, complete stranger to them, how he got their

14  phone number, no idea.   What did he want to talk about?

15  I don't know.   Well, what did he do?   He asked me if I

16  would come meet with some people at the Hotel Faucon.

17         A complete stranger who you have no idea who

18  he is and how he got your phone number asks you to come

19  talk to some complete strangers about a topic he will

20  not tell you at the Hotel Faucon.   And they go.   They're

21  either incredibly susceptible to authoritarian pressure

22  or they're stupid because you just don't go with anybody

23  under those circumstances.   Would you?   A complete

24  stranger calls you and says I'm not going to tell you

25  who I am, I'm not going to tell you how I got your

1    number, but I want you to come in a ride with me to talk

2    to some completely strange people about a topic I'm not

3    going to tell you about.  And by the way, when you get

4    there, they're not going to tell you what they want to

5    talk about either.

6           That's just completely absurd.  Those agents

7    know it.  Why they just won't be honest about it I don't

8    know.  But they know it's absurd.

9           And when each and every witness got into that

10   room?  What happened then?  The agent sat on that stand

11   and said we did not tell them what we wanted to talk

12   about.  We just said, please, tell us your experiences

13   about the genocide.  And, wow, the first thing they said

14   was Beatrice was at a roadblock.  Are you serious?  No.

15          I will give at least Vestine, and I'm going to

16   say it was Jean Paul, although it might have been

17   Vincent, at least they were honest enough to say this

18   much.  And, Vestine, when you were in that room with the

19   agents they told you they wanted to talk about Beatrice

20   Munyenyezi, wife of Shalom, didn't they?  And she said

21   yes.  And I think it was Jean Paul.  And, Jean Paul,

22   when you were in that room they told you they wanted to

23   talk about Beatrice, didn't they?  Yes, they did.  Why

24   is that important?  Because all they have to do at that

25   point is tell the stock story of a roadblock and give

1    the name that the agents want to hear.  That's all

2    they've got to do, and that's all they did in this case.

3    So let's talk specifically about each and every one of

4    those witnesses.

5            I made a promise to you at the beginning that

6    I wouldn't create any distractions for you.  Now that

7    I'm about halfway or a little more than halfway into

8    this, I'm going to make you another promise.  If I don't

9    have you out of here by 12:30, you can give me the look.

10   I'm sure you're uncomfortable, I'm sure you're tired,

11   I'm sure you're sick of it already.  But please bear

12   with me.  This case was investigated for five years by

13   these agents.  I'm asking you to only give me 30 more

14   minutes for Beatrice.  So please.

15           The first witness we heard from was not a

16   Rwandan, and the government brought that witness here

17   for two very specific reasons.  Remember Dr. Zachariah,

18   the Doctors Without Borders guy.  Dr. Zachariah has told

19   this story in many different courtrooms throughout the

20   world.  He has a very compelling story to tell about his

21   personal experience in the genocide and that's exactly

22   why they brought him here, to inject into this case an

23   emotion that you won't be able to avoid on the hope that

24   you will punish her for the bad things that happened

25   there.  That's the only reason he took that stand.

1          The second reason -- and the reason I say that

2     is because he didn't have one relevant thing to say

3     about Beatrice, not one.  He told a lot of stories about

4     a lot of people being hurt, but he had nothing to say

5     about Beatrice, with the possible exception of this.

6     They also asked him, now, Dr. Zachariah, you were

7     familiar with this area, the hotel -- well, I'll put

8     this up, but this is not the best photo.  We know that

9     the hotel is here.  Remember from that big blowup, we

10    know that the University Hospital is down this way;

11    right?  That's where Dr. Zachariah was working.  What

12    they wanted to elicit from him was, and after April 19th

13    a horrible roadblock went up in front of the hotel,

14    didn't it?  Yes, it did, and it was the most difficult

15    and most notorious roadblock in all of Butare for the

16    next four days that I was there.

17         They want him to say that so that they can

18    corroborate what the Rwandan witnesses say, that there

19    was a roadblock in front of the hotel.  That way you

20    don't have to believe just the Rwandans.  You can

21    believe the Doctors Without Borders guy.

22         Here's the problem.  Dr. Zachariah testified

23    in Canada just a few years back and he was asked that

24    very same question.  Was there a roadblock in front of

25    Pauline Nyiramasuhuko's house, and he did this in Canada

1    under oath just a few years ago and I read it to him.

2    He put a roadblock further up by the Hotel Faucon and by

3    the Hotel Ibis that's further up the road, and he came

4    down and he put a roadblock by the ESO, which is over on

5    a different street, and then he put a roadblock down by

6    the other entrance of the University Hospital, further

7    south, much further south than the hotel.  And he said

8    to the court in Canada, how that relates to Pauline's

9    house?  I don't know.  We went from he had no clue under

10   oath in Canada just a few years ago whether there was

11   even a roadblock near that hotel to the time he comes

12   here and he tells you at the behest of the prosecutors

13   it's the most notorious, most difficult roadblock in all

14   of Butare.

15           Do you think maybe Dr. Zachariah has got a

16   personal axe to grind?  I'm very sorry for him.  He lost

17   personal friends in the genocide.  It was terrible.  But

18   don't come in here just to help.  Come in here to tell

19   the truth.  Come in here to contribute what you know.

20   Don't lie to us.  So what he has to say doesn't

21   corroborate any of this.

22           Consolee Mukeshimana.  Consolee, if you can

23   try to get an image in your mind, she was the woman who

24   came in in the full African garb and had the African

25   headdress on.  Consolee is also -- her sister was

1   married to a man name Enoch who was some relative of

2   Maurice Ntahobali.  Remember that connection?  Consolee

3   told you the story about how she, after about three or

4   four weeks into the genocide, was brought by her

5   brother-in-law Enoch down to Pauline's hotel with the

6   purpose that Pauline helped her escape, and that's when

7   she said Beatrice was there checking IDs.

8          It is a complete fiction and this is how you

9   know that.  One of the biggest problems that a person

10  has when they want to tell a story like this is the

11  stories that they have told before.  Consolee

12  Mukeshimana gave an interview quoted in detail about her

13  experience in the genocide to a book that was printed in

14  1995.  Remember when I asked her those questions?  What

15  she said then was she was involved at a massacre at the

16  Sovu Health Center which is up to the northwest of

17  Butare Town.  She escaped that.  She went to her

18  sister's house where her brother-in-law Enoch wanted to

19  kill her, where her brother-in-law Enoch killed her

20  husband, and after killing her husband came back home in

21  her husband's clothes with a club in his hand.  She was

22  deathly afraid of Enoch.  And the interview she gave in

23  1995 was my sister then hid me from place to place

24  within Sovu, not in Butare Town without her husband's

25  knowledge so that he wouldn't kill me.  And then I was

1     freed when the RPF came.

2             That was her story of her experience in the

3     genocide until the U.S. agents show up and want to talk

4     about Beatrice and then she's got a new story.

5             That's what we talked about.  That's what Dr.

6     Longman means when he says when authority shows up to

7     talk about somebody specific in the genocide, you tell

8     them what they want to hear, regardless of the truth,

9     regardless of what you said of what really happened to

10    you.

11            Even when she testified, she couldn't even

12    keep the stories straight of what she had told the

13    agents just six months before.  Remember I asked her

14    have you ever -- this person who you are almost related

15    to, Beatrice Munyenyezi, is daughter-in-law of Maurice

16    who is uncle to your brother-in-law.  Have you ever

17    talked about Beatrice before in your life?  No, not

18    once.  June of 2012.  And even then she says when she

19    comes into court the purpose of the trip to the hotel

20    was to get Pauline to Sovu, and Pauline said I will take

21    you to Burundi and I'll drown you in the river.  She

22    never said that to the agents last year.  She gets here

23    and she wants to embellish and embellish and embellish,

24    and that puts the lie to the whole thing.

25            And then for lawyers like me who make a living

1   out of cross-examining people, this is what we call a

2   coop de grace.  She tells a story of how her sister lost

3   a child in around June of 1994 and how Maurice's family

4   came out to mourn the loss of the child and she said in

5   excruciating detail Pauline was there, Beatrice was

6   there, Shalom was there, Maurice was there, and their

7   three daughters were there, Clarisse, Denise, and

8   Brigette.  It probably occurred to you when I started

9   asking her let's talk about Brigette.  Why don't you

10  tell me what Brigette was wearing that day.  What does

11  Brigette look like?  Did she talk to the other sisters?

12  Yes, she did.  What were some of the things you heard

13  them say?  Brigette, Brigette, Brigette.  And guess

14  what?  Brigette is not even in Rwanda.  Brigette is in

15  Germany.  Every witness who knows Brigette said she had

16  left well before the genocide.  If you look at Shalom's

17  A-File, he says right in there my sister Brigette is in

18  Germany.  She wants to tell a story and it's just a

19  fiction.  Brigette wasn't even there.

20          Bruno is the former army soldier, called

21  himself an expat; right?  Here's what Bruno has to say.

22  He's going back and forth from the military camp in

23  Ngoma.  He goes home, and he says that when he's coming

24  back one day -- doesn't say when it was, doesn't give

25  any other detail, it's just I'm going back to the camp

1    and I'm traveling north with my friend Pasquale.

2    Pasquale and I live in the same community.  We are

3    traveling north.  And then he makes a mistake, a fatal

4    mistake.  He says Pasquale works at the university and

5    we are going to work that morning.  So when we get to

6    the hotel, Pasquale sees a woman who he refers to as

7    Beatrice.  Can you describe that woman, Bruno?  No, I

8    can't.  Can you tell us anything about her?  No, I

9    can't.  I just know that Pasquale said hi to a woman

10   named Beatrice and Beatrice said hello back to him.

11          Here's the problem.  They are traveling north

12   from their village down south of the university.

13   Pasquale works at the university.  The university

14   entrance is a half a kilometer before the hotel.  When

15   Pasquale is going to work he doesn't walk all the way up

16   to the hotel.  He goes to the university, which is what

17   Bruno said he was doing.  So you know that story is just

18   fiction.

19          Another thing about Bruno that you probably

20   ought to keep in mind -- and it's true for every one of

21   these.  Even on your 9/11 -- as Mr. Capin said,

22   April 19th was 9/11 for the Rwandans in Butare.  But

23   9/11 was 12 years ago.  Do you have any recollection of

24   about a week after 9/11 walking down the street and

25   hearing somebody say some other person's name and you

1    remember that?  This is 18, 19 years ago, and the only

2    thing that Bruno has ever said about the genocide in his

3    life is when American agents come in June of 2012 and he

4    comes out with the name Beatrice?  It just makes

5    absolutely no sense.  He tells that story because they

6    told him we want to hear if you know wife of Shalom, if

7    you know Beatrice, did you ever see a woman named

8    Beatrice?  Uh-huh, I saw her.  This is how I know

9    Beatrice.  It's complete fiction.

10          All right.  Thierry, this is the fellow who's

11   in marketing for an oil company in Kigali and he's the

12   fellow who says he knows Shalom.  Here are a few

13   problems with Thierry, who is now claiming to be a

14   really close childhood friend of Shalom and knows

15   Beatrice.

16          First of all, when you ask Thierry to describe

17   Beatrice, right around the time of their wedding, and he

18   says I met her in July of 1993.  What did she look like?

19   And he described her as, oh, kind of medium build.  Said

20   she was dark-skinned.  She's not.  She's a light-skinned

21   African.  But we'll forgive him for that one even though

22   it's completely wrong.  He describes her as just a

23   medium build.

24          Charlene was born in September.  At the time

25   of their wedding Beatrice was seven months pregnant.

1   Seven months pregnant.  Not one witness who claimed to

2   know her in June and July of 1993 noticed that she was

3   seven months pregnant.  In fact the other kid -- I think

4   it was the kid who worked at the drink stand.  He didn't

5   even know she had children.  Said he knew her at the end

6   of 1993, 1994, knew nothing about her pregnancy, knew

7   nothing about having children.  That's how close he was

8   to her.

9            The other thing that Thierry did, remember

10  when he's on the stand and they're asking him -- the

11  prosecutor's asking him about MRND clothing and about

12  whether she's a member of the MRND party, and this is

13  his answer.  He doesn't just say yes.  He says yes, and

14  she knows it.  Well, how do you know, Thierry, that she

15  was ever denying that?  How do you know that that's even

16  an issue?  Why are you so eager to tell us that, dammit,

17  she even knows it.  It's because he's been educated

18  about this case.  He knows what it's about.  And so he

19  comes out with his story.

20           The other thing about Thierry, like a few

21  others he gave statements to Canadian investigators back

22  in I think it was 2001 to 2005.  Those interviews were

23  about Shalom.  They were about this other guy named

24  Desire Munyaneza.  They were about the activities in

25  Butare.  And he claims to know all about Shalom and all

1    about Desire and never once mentions Beatrice, the wife

2    of Shalom that he knows so well, and he's never

3    mentioned this before.

4            And finally, because it was through Thierry

5    that we started to learn about the MRND clothing -- I'm

6    going to make it.  You just sit tight.  I promise you.

7            The other thing about that clothing, it's

8    being presented to you as authentic MRND clothing from

9    the period of the genocide.  First of all, two of those

10   shirts appear to be commemorative shirts, one of them

11   for the 1985 10-year anniversary and one for the 1990

12   15-year anniversary of the party, the MRND.

13           Secondly, where did they come from?  Were they

14   produced by somebody who actually had them in the

15   genocide?  No.  Did they have any relationship to

16   Beatrice whatsoever?  No, none whatsoever.  What we

17   learned is Agent Anderson, the big white mzungu, going

18   into a souvenir shop in Kigali in one of, as Dr. Longman

19   said, the poorest nations in the world and here comes an

20   American with a fistful of dollars.  He says, hey, you

21   got any MRND clothing?  Oh, yeah, authentic, MRND

22   clothing, here you go.  How many American dollars do you

23   have for me?  And he buys it.  And he comes in here and

24   he says, see, this is evidence that she wore MRND

25   clothing in the genocide.  It's just silly.

1           Richard Kamanzi is the fellow who said he

2    lives near the mosque down the road, quite a ways down

3    the road across the valley.  First of all, remember, the

4    prosecutor tried five or six times to get him just to

5    find his house in the photograph and he couldn't do it.

6    He put his house right next to the hotel, the very

7    building right next to the hotel.  Over and over again

8    he put it there.  It wasn't until the prosecutors

9    finally just said, hey, isn't your house down the road

10   over here?  Oh, yeah, yeah, it's down the road over

11   there.

12           After his house you can look at the

13   photographs of the mosque that's down the road.  It goes

14   down into a valley.  He is claiming from some three,

15   400 meters away with buildings in the way, with brush in

16   the way, with foliage in the way, and even into the

17   front of the building, that he can see Beatrice at a

18   roadblock.  He can see people being stopped.  He can see

19   all of those things never having been there himself, but

20   he can see all of those things happening.

21           It's just not credible.  He's just making it

22   up.  And here's his larger problem.  What he told you

23   was I saw people being stopped in front of that hotel

24   checking for ID cards two days before and two days after

25   April 19th.

1             Got some bad news for you, Richard.  Guess

2       you're not remembering quite the history as well as the

3       Rwandan government would like you to because the

4       genocide didn't even hit Butare until April 19th, and no

5       witness, none, not even Dr. Zachariah, puts a roadblock

6       there two days before the 19th, but he still has people

7       being stopped there then.  That's how you know he's

8       lying.

9             He's also the person who said he saw this huge

10      group of people in front of the hotel dancing in the

11      streets with their MRND clothing, 45 of them he said,

12      but he distinctly remembers, never having told this

13      story before, 18, 19 years later he distinctly remembers

14      that Beatrice in this group of 45 people with her MRND

15      clothing on was standing off to the side.  On its face

16      it is not credible.

17            Jean Paul Rutaganda, the second I believe of

18      the boys who were -- that's the other thing about

19      Richard, too.  Richard, Vincent, and Jean Paul, they

20      were all, what, 13, 14 years old at the time and we're

21      going to rely on what they have to say 19 years later as

22      accurate and true?  No, you're not.  You would never do

23      that in your daily life and you're not going to do it

24      here.

25            Jean Paul is the one who talked about seeing

1    Beatrice at the roadblock with a notebook in her hand
2    and writing down names of the Tutsis who are being set
3    aside and killed, keeping the register.  He says she's
4    doing the accounting of the Tutsis being killed.  Well,
5    Jean Paul, please tell us where were you when you saw
6    all this?  I was down -- remember the EER buildings.
7    Jean Paul says I went from across the street into the
8    EER, and that's where I sought refuge for three days.  I
9    hid in the EER for three days and I was up in here, up
10   in this northwest corner of the EER.
11       That's why we put these photographs in.
12   Because if you look at the intersection, this is right
13   in front of the hotel, all you see when you look toward
14   the EER are the roofs of the buildings.  Why is that?
15   Because that slope goes way down like this.  So he is
16   up -- way up in this corner.  Down the slope behind the
17   buildings for three days, he's way up in here, yet he
18   can see not just people standing on the road, which he'd
19   never be able to see, but he can identify a woman named
20   Beatrice with a notebook in her hand and writing things
21   down.  Nobody can do that.  Those things never happened.
22   It wasn't possible for him even to see.
23       Another shot of the EER roof.  He is way down
24   the hill over here.  This photograph shows you how steep
25   that slope is.  Here's the very corner of the EER.

1    There's the hotel with the trucks and the construction

2    truck.  It shows you how steep it is.  There's no way he

3    can see what he says he saw.

4            Oh, and just for fun, when we told you there

5    were machine guns on every corner in Rwanda and

6    everybody up there said no, there isn't, no, there

7    isn't, it's a wonderful place, check out that dude right

8    there.  In sleepy little Butare Town they're not doing

9    anything, and there's a blue uniformed soldier with an

10   AK just standing right there.

11           Vestine, very quickly on Vestine, she said

12   that she went to work one morning, there was no

13   roadblock anywhere, and on the way back she encountered

14   the roadblock at the hotel.  The first problem with that

15   story is other witnesses had said there were roadblocks

16   up by the Ibis and the Faucon.  Dr. Zachariah said that.

17   She would have had to walk through those roadblocks on

18   the way back to get to the hotel.  She said she didn't

19   go through any.  Already trying to embellish.  For the

20   first time, in June 2012, once again in 18 years, she's

21   telling the story of a woman named Beatrice, checking

22   her ID and setting her aside.  Where was that story in

23   1994?  Where was it in 1995?  Where was that story

24   anytime in the last 18 years before American agents

25   showed up?

1          I'm sure bad things happened to Vestine, but

2     they didn't happen at that roadblock.  When she talked

3     here about her sister being with her, she had never said

4     that before.

5          And then finally Vincent, another one of the

6     young men.  He apparently is also across the street or

7     up the street.  He's the one that's standing in the road

8     pointing to the roadblock.  Well, everybody in Butare

9     knows that at some point in the genocide there was a

10    roadblock there.  So that's not very difficult to do,

11    not difficult at all.

12         Vincent says that for the few days that he hid

13    out at the EER he hid behind a bush, and he says without

14    even being asked a question there was killing day and

15    night.  But then when I asked him questions -- because

16    remember Consolee had said, look, that roadblock?  It

17    wasn't just logs and stuff in the road.  That roadblock

18    was made out of dead bodies.  The dead bodies were

19    arranged on the road to keep people from going back and

20    forth.  And I said to Vincent did you see even one dead

21    body anywhere near that roadblock, and he said no, not

22    one.

23         Just to finish about these witnesses and Agent

24    Anderson.  Did you notice that in this trial not one of

25    those Rwandans, even Thierry who claims to know her

1   personally, even the kid who sold her drinks at the

2   stand according to him, not one of those witnesses was

3   asked if they could identify Beatrice in this courtroom.

4   Wouldn't you think that they'd be able to do that if

5   they had such a horrific story to tell.  They weren't

6   even asked.

7           Here's another thing.  Wouldn't you have

8   expected Agent Anderson at least in some way to try to

9   corroborate or verify their story, show them a

10  photograph of her.  Is this her?  Or better yet, how

11  about we do a photo array.  You know what those are.

12  Put a collection of photographs together of women who

13  look fairly similar to one another.  Maybe they look

14  completely different.  Who knows?  But put six or eight

15  of them in a row and have these people sit down and say,

16  look, you claim to know this woman, you claim to be

17  almost related to her for crying out loud.

18          We've got -- from all of the investigation

19  that was done in this case from the Immigration file,

20  we've got a picture there from 1995 of Beatrice, we've

21  got a picture there of Beatrice with her three young

22  children, we have a picture there of Beatrice, and the

23  United States Government had in its possession the

24  entire time yet another photograph of Beatrice.  And how

25  come, how come we can't have an apparently experienced

1    United States agent investigating a genocide case do a

2    simple photo array just to see if these people have any

3    idea who they're talking about.

4              You know why he didn't do that?  Because he

5    knows they can't.  He doesn't want to take the chance

6    that they'd get it wrong.  Because if they get it wrong,

7    guys like me are going to stand up and say they can't

8    even identify her.  That would be extremely important

9    for you to know.  Can they even identify the woman that

10   they have come here to talk about and none of them can.

11             All right, ladies and gentlemen, I promised

12   you 12:30 and I'm going to make that promise.  I am

13   going to simply -- about the rest of those Immigration

14   agents the only one I want to talk about is Mr. Violo.

15   He and I had it really going there for a while.  But

16   here's the thing.  By 2003 he had available to him, as

17   did every agent along the way, all of the information

18   that she had provided, Shalom, his relatives, where she

19   was, where she had been.  Just like Mr. Monica, Mr.

20   Violo made a credibility assessment.  He didn't see any

21   problem.  And one of the pieces of information he had

22   available to him was she told him in 2003 I've been to

23   Tanzania in the last year to see my husband who's in

24   Arusha.  That's what I confronted him with, and didn't

25   she tell you and didn't you ask why is he in Arusha?

1   Didn't she tell you he's at the ICTR?  He denied it and

2   you can decide whether you think that denial is credible

3   or not.

4          But you know that discussion happened.  And

5   they approved her citizenship anyway.  That's not her

6   fault.  She didn't lie about anything.

7          All right.  I ask you, ladies and gentlemen,

8   to consider this one last thing.  Look at the full

9   totality of all of her actions from 1994 right through

10  when she went to the ICTR to testify in her husband's

11  case.  Are those actions the actions of a woman who lied

12  and committed crimes to get herself into the United

13  States?  We already know that it took her three years.

14  We already know that she didn't even know she had been

15  declared eligible for close to a year.  But when she

16  leaves Kenya for the United States, she learns English,

17  and you will see in the A-File that when she first

18  applied she didn't know English at all.  She learns

19  English, she works very hard.  You will see some of the

20  journals that she wrote, and as much as Mr. Capin wants

21  to say it's perfect English, no offense, Beatrice, the

22  syntax is terrible, the grammar is awful.  But she's

23  working very hard.

24          You will see from her resume that she becomes

25  a translator and a caseworker with charitable

1    organizations in Manchester.  She does an NPR, National

2    Public Radio, interview here in Concord and you can

3    listen to that.

4              And then she goes to the ICTR.  Why would a

5    woman who has lied to get here, who the government says

6    committed all these crimes, expose herself to such

7    public scrutiny?  Why would she take the risk knowing

8    that the Rwandan government has got their eye on her

9    when she goes to the ICTR?  They can't wait to hear what

10   she has to say so that they can call those guys over

11   there in the back of the room to investigate her.

12             How do we know that?  She testified in the

13   ICTR in 2006, February of 2006.  Agent Anderson said

14   that he opened this case in 2008, probably got the

15   A-File shortly before that.  Uh-uh.  The very cover

16   sheet of the A-File, if you take a look at it, within

17   less than three months of her going to the ICTR, someone

18   in the federal government requested the A-File from

19   archives.  May of 2006.  That means somebody was

20   watching.  Somebody couldn't wait to hang her.  Who do

21   you think that was?  The U.S. Government?  Nope.  The

22   Rwandan government.  They're the ones who had a stake in

23   the ICTR.  Shalom Ntahobali's wife shows up and the next

24   thing you know they're beating down the doors of the

25   U.S. agents who fall right into their hands and here we

1    are today.

2              Ladies and gentlemen, there's a lot more I

3    could talk to you about, believe me.  I'm not even

4    turning the page on the next five notes.  I'm going to

5    spare you that.

6              Beatrice has been here now for almost

7    15 years.  She's been a U.S. citizen for ten years.

8    She's raised her daughters, Charlene, who can't be here,

9    she's off to college.  Her twins are sitting right

10   there.  She's educated herself.  You will see as of 2008

11   she had her associate's degree.  She has done exactly

12   what we want immigrants to do, learn our language,

13   contribute to our society, take care of yourself, take

14   care of your family.  She's done all of that.  Ten years

15   ago she came to this courthouse and walked out an

16   American citizen.  Today she's going to walk out an

17   innocent American citizen.  Thank you.

18             THE COURT:  Thank you, Mr. Howard.  And now

19   ladies and gentlemen, as I mentioned, the government

20   always bears the burden of proof in the case and because

21   of that the government has an opportunity for brief

22   rebuttal.  Mr. Chakravarty will give a brief rebuttal.

23             MR. CHAKRAVARTY:  Thank you, your Honor.

24   Ladies and gentlemen, thank you for your time, your

25   service, your attention, which we all saw you giving the

1    evidence in this case.  Not what it was that Mr. Howard

2    just told you for the last hour.  It's your memories of

3    what those witnesses said that controls, not his

4    characterization, which most often were his questions to

5    these witnesses.

6            For example, he asked Consolee about what she

7    said to some people who are writing a book, and then he

8    went and told you this is what she said to the people

9    who were writing the book, when you remember that

10   Consolee said I never saw what people wrote about what I

11   said.  I have no idea.

12           How many times has the judge told you that the

13   questions, the statements that I or Mr. Howard or anyone

14   else, any of the attorneys said, that's not evidence.

15   Speculating about some conspiracy or some boogeyman that

16   is controlling what witnesses say, that's not evidence.

17   That's the thread for everything that Mr. Howard just

18   said.  Don't believe anyone.  Don't believe Agent

19   Anderson.  Don't believe Tim Longman.  Don't believe the

20   doctor from the Medicins Sans Frontieres because they're

21   all lying.  They are all in on some conspiracy.

22           The only one who's not lying was this lady

23   when she said there was no roadblock.  It was that lady

24   when she said that there was nothing going on outside of

25   the I'Huriro.

1            We know, ladies and gentlemen, over two weeks

2    that's a documented fact.  You don't have to rely on

3    somebody in Rwanda to tell you that.  Dr. Longman, Dr.

4    Endless, their own witness, admitted the same thing.

5            The foundation of Mr. Howard's very apt

6    presentation is that there's some puppeteer that you

7    should speculate about controlling witnesses.

8            They're very good lawyers.  They

9    cross-examined witnesses.  They could have asked every

10   single one of those witnesses, including Brian Anderson

11   or Jason Fox or Jeff Howes or any of the other agents

12   who investigated this case, what led you to this

13   witness?  They never asked.  They could have asked every

14   one of the Rwandan witnesses did you know anything about

15   the case?  Had you seen anything in the media?  And

16   either they didn't ask or the witnesses had already said

17   no.

18           That's evidence, ladies and gentlemen.  And

19   for them to ask you to suspect that because they're

20   Rwandan, because Brian Endless gets up there and says I

21   don't trust my Rwandan friends so you shouldn't either,

22   that's not evidence.  That's speculation.  It's what

23   happens in this courtroom that you all sat through that

24   matters, it's your memories.  Their reactions, were

25   those sincere reactions when they are talking about

1    their family members dying?  Were those sincere

2    reactions when they said this is why I know Shalom's

3    wife, not because some agent showed me a picture and

4    said 19 years later is this somebody who looks the same

5    as the person I knew in high school.  It's because they

6    remember Shalom's wife from when they were in Butare

7    together.  Those witnesses didn't want to come here.

8    They put their lives on hold for two plus weeks.

9    Because we asked them to tell you what they saw, what

10   they heard, not to make stories up, not to concoct

11   things about some genocidal maniac.  It was just saying

12   I saw her wearing MRND clothes.  That's not illegal.

13   It's not against the law here or there.  But it's a fact

14   that mattered to Immigration.  That's why we brought

15   them over to tell you that.

16           If there was this narrative, if they were all

17   concocting things, if they were all being suggested

18   either by those agents -- who I submit to you there is

19   no evidence that they did anything like that in this

20   case.  Or about the Rwandan government who has had no

21   involvement at all in this case, that is the evidence,

22   if there was any such suggestions, why wouldn't they be

23   making it big?  Why wouldn't they be saying that

24   Beatrice was at Shalom's side every step of the way,

25   just like she said she was.  Was the Rwandan government

106

1    telling her what to say?

2              Ladies and gentlemen, that's the premise that

3    the defense relies on in order to discount two weeks of

4    witnesses who you should ask yourself what is their

5    motive, what is their incentive to concoct some story?

6    And if they're going to concoct a story and they get

7    certain facts wrong -- and I'm not suggesting they did.

8    But the biggest gotcha moment that Mr. Howard presented

9    to you was the notion that one of Shalom's sisters may

10   not have been in this country.

11             First, we don't know that.  The only evidence

12   we have is that two of the witnesses that were at the

13   I'Huriro, one said she was gone in Germany, one said she

14   was gone in Belgium, and in Shalom's A-File it says that

15   in 1995 after they had all evacuated to a refugee camp,

16   at that time Rashid, his third sister, goes to Germany,

17   but in that two minutes talking about it?  It reminds

18   you all, ladies and gentlemen, does that make a lick of

19   difference as to what this defendant was doing with the

20   MRND before the genocide, whether she was checking IDs

21   at the roadblock that was right in front of her house

22   that is uncontroverted during the genocide?  No, ladies

23   and gentlemen.  The types of impeachment that they did

24   of the witnesses had nothing to do with whether they saw

25   Beatrice, the defendant, Shalom's wife, wearing MRND

1   hanging out with the family.

2           Mr. Howard mischaracterized some of the

3   testimony.  Richard Kamanzi, this is the guy that lives

4   down by the mosque, suggesting somehow I was trying to

5   tell him this is where he lived.  He was confused.  He

6   was looking at an overhead image.  He didn't know which

7   one was his house.  He knew it was close.  There's no

8   suggestion he's concocting that in order to appease

9   authority.  Once he realized, oh, yeah, that's the

10  mosque, that's where my house was, the mosque was a

11  building between my house and the I'Huriro.  He said,

12  yeah, that's where I could see.

13          That's not where he saw Beatrice.  He saw

14  Beatrice when he was walking by the I'Huriro and he sees

15  his own uncle, Joseph Kanyabashi, who happened to be the

16  mayor, his own uncle getting out of cars with Beatrice,

17  Shalom, all of the rest of the family was getting out of

18  the cars.  Isn't that preposterous?  It isn't like he

19  remembers that.  He knows the people.  45 people coming

20  back from an MRND rally wearing MRND clothes, that's

21  something you remember whether he's 13, 14 or something

22  else.  Because what happened there, as you now know, is

23  something that stays in your mind.  This isn't randomly

24  what happened the week after 9/11.  This is 9/11 happens

25  and you're being hunted.  Your family is being killed.

1    This is etched on those people's minds for the rest of

2    their lives.  Those tears were sincere.  Those reactions

3    were genuine.  You can't script that.  They saw what

4    happened.

5           What they told you were their firsthand

6    realtime observations about what happened during the

7    genocide, and the reason we did bring in Dr. Zachariah

8    and Dr. Longman and Eric Benn, and even Dr. Endless

9    corroborated this, those objective facts about what

10   happened at that genocide, during the genocide, what

11   happened in Butare outside of the I'Huriro, those facts

12   corroborate what those witnesses say.  So there is no

13   doubt that what they saw is true.

14          But ladies and gentlemen, your job is not to

15   find the defendant innocent of the genocide.  It's not

16   to determine, as Mr. Howard suggests, that the RPF, this

17   Rwandan government is somehow some oppressive regime

18   that's pulling strings.  That's not at play here.

19          The evidence that you've seen and the facts

20   that you will have to decide is modest.  It's did she

21   lie?  Did she provide false or misleading information?

22   And I submit to you, even under the most generous

23   reading of what the facts were that Mr. Howard is

24   suggesting that actually undercut what witnesses saw,

25   that even under the most generous reading, she was a

```
 1   member of the MRND.  She saw the roadblock outside of
 2   her house for three months.  Hundreds of people died.
 3   There were killing fields right behind the residence
 4   where she stayed for the whole time, that she was the
 5   wife of the most influential -- the Interahamwe leader
 6   in Butare at the time.  You shouldn't find her guilty
 7   because she picked a bad spouse.  You should find her
 8   guilty because she was with him and doing things at his
 9   roadblock for the genocide.  And what were those things?
10   Those are the exact same things as Dr. Longman said that
11   women were doing, checking IDs, managing the roadblock,
12   getting beer.  That's what she said in her resume when
13   she's looking for a job here.  That's what qualifies.
14          Look at her own statements and you will see
15   that the witnesses that testified, the stories that they
16   said ring true.  And most importantly, there's no
17   evidence of some Machiavelli or svengali or whatever
18   phrase you want to use, some puppet master who's
19   controlling this.  That's speculation.  That's asking
20   you to think of a boogeyman that's some reason why she
21   should get off.
22          This isn't about punishing her.  What it's
23   about is having her accountable for violating our system
24   of laws which requires a simple thing of impending
25   immigrants, and that is, you have to be open so that we
```

1    can do our job.  It's not whether 15 years ago they

2    should have caught this.  That's not at issue here.

3    It's whether you decide based on this evidence that she

4    misled.  She misled the U.S. government so they couldn't

5    actually do the process that they were sworn to do,

6    which is weigh whether she should become, first, a

7    refugee, then a permanent resident, and then a citizen.

8          Whether she had a real, well-founded fear of

9    persecution, that's not an issue.  That's something for

10   Immigration officials.  Your job is to find the simple

11   facts.  Did she lie, and if so, about what.  And I

12   submit to you she lied about her party affiliation.  I

13   submit to you, evidence beyond a reasonable doubt, she

14   lied about seeing a roadblock, she lied about

15   participating in checking identity cards, she lied about

16   what happened during the genocide.  That's a crime.

17   That's what got her the citizenship.

18          And the reason she kept lying about it after

19   that is because it worked.  She made it 15 years without

20   anyone catching on until those agents finally got over

21   to Rwanda.  They interviewed witnesses and they brought

22   them here to present to you.  And the defense was able

23   to do the same thing.  Assess those witnesses'

24   credibility in determining whether she lied.  Assess

25   those witnesses' credibility in determining whether the

1    objective evidence that isn't tainted by the Rwandan

2    politics that Mr. Howard wants you to speculate about

3    isn't tainted, and in that analysis there is only one

4    just verdict.  The evidence is overwhelming.  We've

5    proven it beyond a reasonable doubt.  She no longer is

6    innocent.  She no longer is a citizen like everyone

7    else.  You should find her guilty.

8         Count 1 charges that she lied in the

9    Immigration process, and Count 2 says that she was

10   ineligible to become a citizen.  We ask you to return

11   those verdicts.

12        THE COURT:  Thank you, Mr. Chakravarty.

13   Ladies and gentlemen, let me just remind you again, as

14   you've heard, argument of counsel is not evidence

15   itself.  It's simply designed to help you understand the

16   evidence and put it in context.

17        Given the hour I understand your lunches are

18   ready, and I need to take up some matters with counsel

19   with respect to the instructions.  So why don't we break

20   for lunch and we'll resume again at 1:30 and I will

21   instruct you on the law that you are to apply in

22   returning a verdict in this case.

23        (Jury left courtroom.)

24                    BEFORE THE COURT

25        THE COURT:  I'm going to give you a clean

1    draft of the instructions after our discussion last

2    night.  You might want to take a minute and take a look

3    at -- beginning at page 27, I added a unanimity -- you

4    don't see it there.  Or do you have it?

5                    MR. RUOFF:  Count 2?

6                    MR. CHAKRAVARTY:  We're looking at the draft,

7    your Honor.

8                    THE COURT:  I've added a unanimity.  You know,

9    I wanted to go over some other things.  I just cleaned

10   some grammatical things up, but now I've forgotten where

11   they are.  So I will have to read through and figure out

12   where they are.  They're not substantive.

13                   I guess it's not fair to ask you what your

14   objections are.  Tell you what, why don't we do this

15   then.  Why don't we -- when Kate brings them back down,

16   she will have them distributed to you and you can go

17   over them during the lunch period.  The major change

18   though is 26 is adding the unanimity provision.  I don't

19   think there's anything else that really involves any

20   substantive change at all.  Everything else I think is

21   pretty much as we discussed with perhaps some stylistic

22   changes.

23                   But your job is to read through them and

24   identify them and then we'll go over them.  Twenty

25   after?  Will that be enough time do you think?

```
 1              ALL:  Thank you, your Honor.

 2              (Luncheon recess taken.)

 3                        BEFORE THE COURT

 4              THE COURT:  All right.  Have you had an

 5    opportunity to review I guess we'll call it the final

 6    draft?

 7              MR. CAPIN:  Yes, your Honor.

 8              MR. RUOFF:  Yes, your Honor.

 9              THE COURT:  I'm sorry, I understand you're not

10    feeling well.

11              MR. RUOFF:  I am not feeling well at all.

12              THE COURT:  Any objections?

13              MR. RUOFF:  I object to not feeling well,

14    certainly.  I have one typographical issue I picked up

15    on, really just to prove that I read the instructions.

16    On page 28, second line, the reference is to A through G

17    under Section B on pages -- that should be 24 and 25.

18    It's just a pagination issue.  Maybe when they printed

19    it out it changed the pages.

20              THE COURT:  Yes.  Thank you.  Actually I think

21    we caught that last night and probably changed it to the

22    wrong thing.  24 and 25?

23              MR. RUOFF:  Yes.

24              THE COURT:  All right.  Did you look at the

25    second unanimity instruction?
```

```
 1              MR. RUOFF:  Yes, I looked at both of them.
 2     The first one I believe is on page 19 of the
 3     instructions.  The second is contained after that which
 4     I just referenced on page 28.  We discussed this before.
 5     I will just note our objection to the lack of inclusion
 6     of language requiring the jury to find unanimously that
 7     the underlying lie that makes the material false
 8     statement false, that the Court should instruct the jury
 9     that they have to all unanimously agree about, for
10     example, any of the lies in the A-File or in the I-400
11     form and that that's the only way they could find a
12     material false statement or 1001 violation, which is the
13     basis for Section 5, if they lied to any government
14     official, which is on page 19 of the instruction.  It's
15     a narrow exception, but I believe the materiality
16     assessment, which is actually not present in the
17     Richardson case, requires the jury to actually assess
18     and agree on the underlying lie in this case, not the
19     lie or alleged false statement that's contained on the
20     form, but the alleged either conduct or alleged false
21     statement that makes the statement false.
22              THE COURT:  I understand.
23              MR. RUOFF:  And we make that under the Fifth
24     and Sixth Amendments to the Constitution and my client's
25     right to a fair trial and unanimous verdict on all the
```

1    elements of the offense.

2            THE COURT:  No other objections?

3            MR. RUOFF:  No, just to the unanimity.

4            THE COURT:  And do you want to respond to

5    that, Mr. Chakravarty?

6            MR. CHAKRAVARTY:  I think we've responded.

7            THE COURT:  Do you want me to do that?  I'm

8    happy to do it if you agree.

9            MR. CHAKRAVARTY:  Do we want you to give it?

10   No, we don't want you to give it.  We think that, as we

11   discussed earlier, if I'm clear on what you're asking --

12           THE COURT:  That's what I'm asking.

13           MR. CHAKRAVARTY:  To give the underlying group

14   facts --

15           THE COURT:  Defendant is suggesting with

16   respect to number five on page 19 that I should instruct

17   the jury not only are they required to unanimously find

18   beyond a reasonable doubt that she lied in saying I

19   guess that she didn't lie, but they also should

20   unanimously find -- they must also unanimously find what

21   lie is the predicate lie that makes saying I didn't lie

22   a lie.

23           MR. CHAKRAVARTY:  And the government -- that

24   is consistent with Richardson.  Those are brute facts.

25   Those are not elements of the case to show how she lied.

1    Those are the factual predicates for what makes the lie

2    material.

3              THE COURT:  You're saying the lie described in

4    paragraph numbered five on page 19 is the principal lie

5    for which she's being charged and how she accomplished

6    that lie is a brute fact or a means.  I think -- yes, I

7    think you're probably correct.

8              MR. RUOFF:  One more thing, if I may, just to

9    supplement my argument.  I think we mentioned this in

10   chambers last night, but just to put it on the record.

11   My argument also is directed towards the specific

12   allegation for the misstatement on those forms,

13   specifically at page 5 and 6 of the indictment where

14   they put in factual allegations about specific

15   misstatements in the I-590 form that they say are false.

16   So they actually took the liberty of alleging specific

17   false statements that are not the basis for the

18   indictment.

19             THE COURT:  Well, in a sense they're

20   illustrative of the type of lies that they say at this

21   predicate I suppose.  You're saying where it says like

22   including she said X, she wasn't associated with the

23   MRND, that sort of thing?

24             MR. RUOFF:  Exactly, your Honor.

25             THE COURT:  Any objections by the government

1    to the instructions?

2              MR. CHAKRAVARTY:  Just one request.  On page

3    12, the identification instruction, the second full

4    paragraph, second sentence reads:  Its value depends on

5    the opportunity the witness had to observe the person at

6    the time and later to make a reliable identification,

7    whether directly, through a photograph, or by some other

8    means.

9              The government requests that that sentence end

10   at "to make a reliable identification."  There's no

11   evidence that identification was made through photograph

12   or by some other means, which is only relative to the

13   photograph reference.  There's just no evidence of that

14   in this case.

15             THE COURT:  I think that's correct.  There's

16   no -- nobody identified the defendant by means of a

17   photograph; right?  How about if we put a period after

18   "identification."  Strike "whether directly, through a

19   photograph, or by some other means."

20             MR. RUOFF:  That's fine with the defense.

21             THE COURT:  All right.  Strike "whether

22   directly, through a photograph, or by some other means."

23   Because they did make a later identification here from

24   the witness stand.  All right.  Any other?

25             MR. RUOFF:  One last point with respect to

1    unanimity and I will be very brief.  As currently

2    structured, I believe the jury instructions would allow

3    the individual jurors, with respect to number five on

4    page 19, to conclude that a false statement in the

5    A-File was made regardless of whether or not it's

6    material and still use that as a basis for finding

7    violation of a false statement with respect to the

8    question, have you ever lied to any U.S. Government

9    official to gain entry or admission into the United

10   States.

11            THE COURT:  But I think -- I'm not sure that's

12   required to be material, because -- what's required to

13   be material is the question asked as set out in section

14   five.  That question has to be material.  The question

15   is have you, emphasis, ever lied.  I don't think that

16   conveys have you ever lied in a material way.  It's have

17   you ever lied.  And this has to be --

18            MR. RUOFF:  So if the jury finds that there

19   are two dates of birth that are off, they can use that

20   as a basis for convicting her for procuring citizenship

21   unlawfully.

22            THE COURT:  You raise an interesting point.  I

23   think it comes back to this has to be material, this

24   question, have you ever lied.  If you've lied, answering

25   no, I've never lied, that has to be material.  You

1    didn't really argue this in front of the jury of course.

2           MR. RUOFF:  No, no, we didn't.

3           THE COURT:  So if you're saying my defense

4    is -- I didn't argue this, but my defense is she might

5    have lied, but it wasn't of a material matter or related

6    to a material matter, I'm not sure the jury's even going

7    to consider that.

8           Well, what do you say, Mr. Chakravarty?

9           MR. CHAKRAVARTY:  I tend to agree with your

10   articulation, your Honor.  The materiality of the lie is

11   by falsely answering the question on the I-400 form.

12          THE COURT:  What do you say to Mr. Ruoff's

13   argument that -- he's positing the jury could say, you

14   know, she lied about a couple of immaterial matters,

15   dates she moved from one residence to another, say.

16   That's not material, but then is this material if it

17   relates to that kind of lie.

18          MR. CHAKRAVARTY:  So the jury is still making

19   the determination that she intentionally lied on this

20   question, which is material.  So that's what they're

21   finding.  Again, it goes back to the means by which

22   she's doing it is maybe something that might be

23   immaterial, but that's not the element.  The element is

24   was it a material false statement on this form.

25          THE COURT:  You're willing to give him that

1    error is what you're saying.

2              MR. CHAKRAVARTY:  What is the proposal?  I

3    want to make sure to protect the verdict.  What is the

4    proposal in terms of how this would read?

5              THE COURT:  Well, I suppose you would add a

6    sentence that says not only must you be unanimous with

7    respect to number five, for example, but you must also

8    be unanimous with respect to the means by which -- the

9    means by which the question number five was rendered a

10   lie.  In other words --

11             MR. CHAKRAVARTY:  That's a slightly different

12   question as to agreeing on the means versus agreeing

13   that the underlying lies were material.

14             THE COURT:  Well, that would be a means.  Have

15   you ever lied?  No.  That's a lie.  Why is that a lie?

16   Because you previously lied.

17             Does the jury have to find just beyond a

18   reasonable doubt that you lied when you said you'd never

19   lied?  Or does it have to find beyond a reasonable doubt

20   you lied when you said you never lied because we all

21   unanimously agree on a lie you told previously, as

22   opposed to 12 of us all agree that you lied, but we have

23   12 different reasons to think you lied previously, 12

24   different lies.

25             MR. CHAKRAVARTY:  Right.  Well, the difference

1   of the lie, the means lie --

2           THE COURT:  You're saying does not need to be

3   proven.

4           MR. CHAKRAVARTY:  It doesn't need to be

5   proven.  To the extent that we want to ensure that

6   whatever that lie is is material, we can just add the

7   word the way in which she lied was material.  I was

8   trying to find out where the appropriate place --

9           MR. RUOFF:  As long as the answer knowing and

10  material with respect to the underlying lie, I think

11  we're fine with that.

12          THE COURT:  It doesn't apply just to number

13  five?

14          MR. RUOFF:  I believe so.  I think that's the

15  only catch-all.

16          MR. CHAKRAVARTY:  My proposal would be -- this

17  is the middle of the second full paragraph on page 19.

18  And before you may find the government has carried its

19  burden of proof with regard to that element, you must

20  unanimously agree that the defendant made at least one

21  particular material false statement.

22          THE COURT:  I'm sorry, where were you?

23          MR. CHAKRAVARTY:  Second full sentence, second

24  full paragraph.

25          THE COURT:  Page 19.

1               MR. CHAKRAVARTY:  Yes.  And before you may

2  find the government has carried its burden of proof with

3  regard to that element, you must unanimously agree that

4  the defendant made at least one particular -- and I

5  would propose inserting "material false statement."

6               THE COURT:  And add "one particular false

7  statement?"

8               MR. CHAKRAVARTY:  Where it says currently:

9  Made at least one particular material false statement.

10              THE COURT:  I'm not following you here.  And

11 before you may find that the government has carried its

12 burden of proof with regard to that element -- is that

13 where you are?

14              MR. CHAKRAVARTY:  Yep.

15              THE COURT:  You must unanimously agree that

16 the defendant made at least one particular false

17 statement?

18              MR. CHAKRAVARTY:  Right.  And say "material

19 false statement."

20              THE COURT:  Does that do it for you, Mr.

21 Ruoff?

22              MR. RUOFF:  I think that can be interpreted

23 two different ways.  One is applying to the main

24 question, have you ever lied.

25              THE COURT:  I will add that because I think

1    that helps.  Why don't we add this.  At the end of the

2    paragraph, why don't we add something like "with

3    respect" -- I'm thinking as I'm writing, so it's going

4    to be clumsy.  With respect to the -- what do we call

5    these?  Assertions?  Allegations?  Number five.

6            MR. HOWARD:  I think it's 4 and 5 that

7    captures it.

8            THE COURT:  Okay.

9            MR. HOWARD:  Four is false or misleading.

10   Five is the lie.

11           THE COURT:  All right.  With respect to the

12   allegations, is that okay with you, Mr. Ruoff?

13           MR. CHAKRAVARTY:  Yes.

14           MR. RUOFF:  Yes.

15           THE COURT:  Allegations set out in

16   subparagraphs 4 and 5 above must all agree that -- you

17   must all agree as to the -- as to at least one I guess.

18   Right?

19           MR. RUOFF:  Um-hum.

20           THE COURT:  At least one prior material

21   misstatement.  How's that?

22           MR. RUOFF:  I think that's fine.

23           THE COURT:  It's basically where we started,

24   Mr. Chakravarty.  We're basically saying, look, before

25   you can find guilt on five, you have to find five, but

1    you also have to find unanimously what the predicate is.

2              You know, that makes sense to me, honestly.

3    It really does.  It's a quasi 1001 kind of claim, and

4    under 1001 you really do need to have that.  You know

5    what I think it is?  I think it's unnecessary legally

6    but prudent.

7              MR. CHAKRAVARTY:  That's our take, your Honor.

8              THE COURT:  All right.  Any other changes?

9    Any other questions?

10             MR. RUOFF:  No, your Honor.  Thank you.

11             THE COURT:  All right.  This is going to take

12   about 10 or 15 more minutes to get these copied, so why

13   don't you plan on -- why don't you tell the jury 2.

14             Oh, one other thing.  You've all had a chance

15   to look at the jury verdict, and I just want to put on

16   the record that both sides prefer a general verdict

17   form?

18             MR. CAPIN:  Correct.

19             MR. HOWARD:  Yes.

20             THE COURT:  Okay.  And I just want the record

21   to show I tried to talk you out of it, and my own view

22   is probably a special verdict form, but both parties

23   want a general verdict form; right?

24             MR. HOWARD:  Yes.

25             MR. CAPIN:  Yes.

1          THE COURT:  Okay.

2          (Brief recess taken.)

3                    BEFORE THE JURY

4          THE COURT:  Ladies and gentlemen, you've heard

5    all the evidence in the case and you've heard closing

6    arguments by counsel.  It's now my obligation to

7    instruct you on the law that you're to apply in

8    returning a verdict in the case.

9          I am required to instruct you orally.  You've

10   all obviously picked up the written instructions that

11   each of you have been provided that was on your seat.

12   Some people do better listening.  Some people do better

13   following along with the written word.  Whatever is best

14   for you as an individual is fine with me.  So either

15   read along or just listen, but please don't read ahead.

16         And let me also say, despite our best efforts,

17   often there will be a typographical error because we

18   have to produce these on sort of a short notice basis.

19   But I think this is pretty clean.  But if it turns out

20   there's a mistake of some kind, a typographical error or

21   something that's wrong for some reason, what I will

22   probably do is just stop, ask one of you, perhaps the

23   lady sitting in the first chair to just make a pen note

24   of the change and all of you can make a pen note of the

25   change, and then we'll try to correct it that way.

1            All right.  I will now instruct the jury.

2            At this stage of the trial it is my duty to

3    instruct you on the principles of law that you must

4    apply in deciding this case.  It is your duty to follow

5    these instructions during your deliberations.  You

6    should not single out any one instruction but instead

7    apply these instructions as a whole to the evidence in

8    this case.

9            Each of my instructions has a caption or

10   heading.  The captions are present solely for the

11   purposes of convenience, to assist you in locating

12   different instructions, but I will not read them.

13           You are the sole and exclusive judges of the

14   facts.  You must weigh the evidence that has been

15   presented impartially, without bias, without prejudice,

16   and without sympathy.  You must determine what the facts

17   are, what the truth is, based upon the evidence

18   presented in the case.  You will decide the case by

19   applying the law as I give it to you in these

20   instructions to the facts as you find them to be from

21   the evidence.

22           In determining what the facts are, what the

23   truth is, you must necessarily assess the credibility of

24   each witness and determine what weight you will give to

25   each witness's testimony.  By credibility I mean the

1    believability or the truthfulness of a witness.

2           You should carefully scrutinize all the

3    testimony given, the circumstances under which each

4    witness has testified, and every matter in evidence

5    which tends to show whether a witness is worthy of

6    belief or not worthy of belief.  You should also

7    consider the extent, if any, to which the testimony of

8    each witness is either supported or contradicted by

9    other evidence in the case.

10          After assessing the credibility of each

11   witness, you will assign to the testimony of each

12   witness, both under direct and cross-examination, such

13   weight as you deem proper.  You are not required to

14   believe the testimony of a witness simply because that

15   witness was under oath.  You may believe or disbelieve

16   all or part of the testimony of any witness.  It is

17   within your province to determine what testimony is

18   worthy of belief and what testimony may not be worthy of

19   belief.

20          You should consider the testimony of a

21   government agent in the same way as the testimony of any

22   other witness in the case.  In evaluating the

23   credibility of a government agent, you should use the

24   same tests that you apply to the testimony of any other

25   witness.  In no event should you give the testimony of

1    any government agent any more credibility or any less

2    credibility simply because that witness is a government

3    agent.

4           The testimony of a witness may be discredited

5    or, as we sometimes say, impeached by showing that the

6    witness previously made statements that are different

7    than or inconsistent with his or her testimony here in

8    court.  Some of the prior statements introduced in this

9    case were made by witnesses who were under oath during

10   another proceeding when the statements were made.  You

11   may consider such statements as if they were made at

12   this trial.  You must decide what weight, if any, should

13   be given to the testimony of a witness who has made

14   prior inconsistent or contradictory statements.  In

15   making that determination, you may consider whether the

16   witness purposely made a false statement or whether it

17   was an innocent mistake, whether the inconsistency

18   concerns an important fact or whether it had to do with

19   a small detail, whether the witness had an explanation

20   for the inconsistency and whether that explanation

21   appealed to your common sense.

22          If a person is shown to have knowingly

23   testified falsely about any important matter, you

24   obviously have a right to distrust the testimony of that

25   person concerning other matters.  You may reject all of

129

1   the testimony of that witness or give it such weight or

2   credibility as you may think it deserves.

3           You have heard testimony from witnesses who

4   were permitted to testify as experts.  An expert is

5   allowed to express an opinion on those matters about

6   which he or she has special knowledge and training.

7   Expert testimony is presented to you based on the belief

8   that someone who is experienced in a particular field

9   can assist you in understanding the evidence or in

10  reaching an independent decision on the facts.

11          In weighing an expert's testimony, you may

12  consider the expert's qualifications, experience,

13  training, the reasons for testifying, as well as all of

14  the other considerations that ordinarily apply when you

15  are deciding whether or not to believe a witness's

16  testimony.  You may give the expert testimony such

17  weight, if any, as you find it deserves in light of all

18  the evidence in the case.  You should not, however,

19  accept the testimony of an expert witness merely because

20  the witness is an expert, nor should you substitute the

21  opinions of an expert for your own reason, judgment, and

22  common sense.  In the end the determination of the facts

23  in this case rests solely with you.

24          You will recall that neither expert was

25  permitted to give opinions about the credibility of

1   witnesses appearing before you.  No expert's opinion on

2   that subject is superior to your own, and it is solely

3   your responsibility to judge the credibility of

4   witnesses.  The expert's testimony about the history and

5   culture of Rwanda may be considered by you to the extent

6   you may find it useful.

7        The weight of the evidence is not necessarily

8   determined by the number of witnesses testifying on

9   either side.  You will consider all the facts and

10  circumstances in evidence to determine which of the

11  witnesses are worthy of belief.  You may find that the

12  testimony of a small number of witnesses on a particular

13  issue is more credible than the testimony of a greater

14  number of witnesses on the other side of the same issue.

15  It is not the number of witnesses or the quantity of

16  testimony that is important, but the quality of the

17  evidence that has been produced that is important.

18       The fact that the prosecution is brought in

19  the name of the United States of America entitles the

20  government to no greater consideration than that given

21  to any other party in litigation.  By the same token,

22  the government is entitled to no less consideration.

23  All parties, whether the government or individuals,

24  stand as equals before the bar of justice.

25       There are two types of evidence that you may

1    properly use in deciding whether the defendant is guilty

2    or not guilty of the crimes charged in the indictment.

3          Direct evidence is the testimony given by a

4    witness about what that witness has seen, heard, or

5    observed, or what that witness knows based on personal

6    knowledge.  Direct evidence also includes any exhibits

7    that have been marked and any stipulations that have

8    been agreed to by the lawyers.  During the course of the

9    trial you were told that the government and defendant

10   agreed or stipulated to certain facts.  This simply

11   means that both sides accept those facts to be true.

12   Because there is no disagreement regarding those facts,

13   there was no need for either side to introduce evidence

14   relating to them.  You must accept as true the facts to

15   which the government and the defendant have stipulated.

16         Evidence may also be used to prove a fact by

17   implication, and this is referred to as circumstantial

18   evidence.  In other words, from examining direct

19   evidence you may be able to draw certain inferences that

20   are reasonable and justified in light of your daily

21   experience and common sense.  Such reasonable inferences

22   constitute circumstantial evidence.

23         The law makes no distinction between the

24   weight to be given to either direct or circumstantial

25   evidence.  It is up to you to decide how to weigh the

1   evidence in this case.

2           The evidence in this case consists of the

3   sworn testimony of the witnesses, both on direct and

4   cross-examination, regardless of who may have called

5   those witnesses, the exhibits that have been received

6   into evidence, regardless of who may have produced them,

7   and any facts to which the lawyers have agreed or

8   stipulated.

9           Certain things are not evidence and you cannot

10  consider them as evidence.

11          Arguments, statements, and questions by the

12  lawyers are not evidence.  Questions asked by the

13  lawyers and statements the lawyers have made in their

14  opening statements, closing arguments, and at other

15  times during the trial are intended to help you

16  interpret the evidence, but they are not evidence.  You

17  will recall that I previously instructed you that

18  questions by lawyers are not evidence of any facts

19  assumed in the questions.  If the facts as you remember

20  them differ from the way the lawyers have stated them,

21  your memory controls.

22          Objections by the lawyers are not evidence.

23  Lawyers have a duty to object when they believe that a

24  question is improper under the Rules of Evidence.  I

25  must rule on objections, and I have not intended to

133

1    indicate in any way by my rulings or by what I have said

2    what the verdict should be in this case.  You should not

3    be influenced by the lawyers' objections or by my

4    rulings on those objections.

5         Testimony that has been excluded or stricken

6    or that I have instructed you to disregard is not

7    evidence and must not be considered in any way in your

8    deliberations.

9         The indictment is not evidence.  This case,

10   like most criminal cases, began with an indictment.  You

11   will have that indictment before you during the course

12   of your deliberations.  That indictment was returned by

13   a grand jury which heard only the government's side of

14   the case.  The fact that this defendant has been

15   indicted by a grand jury is not evidence of her guilt.

16   The indictment is simply an accusation.  It is the means

17   by which the government's allegations and charges are

18   brought before this Court.  It is you who will determine

19   whether the defendant is guilty or not guilty of the

20   offense charged in the indictment based on a

21   consideration of all the evidence presented during trial

22   and the law applicable to the case, and the indictment

23   is not evidence.

24        Anything you may have seen or heard when the

25   court was not in session is not evidence.  You must

134

1    decide the case solely on the evidence received at

2    trial.

3         During the course of the trial I've instructed

4    you that certain evidence was being admitted for a

5    limited purpose.  It is your duty to follow those

6    instructions during your deliberations.

7         Let me remind you that the fact an indictment

8    has been returned against a defendant is not evidence of

9    her guilt.  A defendant, although accused, begins a

10   trial with a clean slate with no evidence against her.

11   The law permits nothing but the admissible evidence

12   presented before you to be considered in support of the

13   charges against her.

14        The law presumes every defendant to be

15   innocent until proven guilty beyond a reasonable doubt.

16   The burden of proof rests entirely on the government.  A

17   defendant does not have to prove her innocence.  A

18   defendant enters the courtroom and is presumed to be

19   innocent until the government convinces you beyond a

20   reasonable doubt that she is guilty of every essential

21   element of one or more of the offenses charged in the

22   indictment.  That presumption means that you are to

23   regard the defendant in this case as innocent unless the

24   government proves beyond a reasonable doubt that she is

25   guilty.

1          The presumption of innocence alone is

2    sufficient to acquit the defendant unless you are

3    satisfied beyond a reasonable doubt, after a careful and

4    impartial consideration of all of the evidence in the

5    case, that she is guilty of one or more of the crimes

6    charged in the indictment.

7          The fact that the defendant did not testify

8    must not be considered by you in any way or even

9    discussed in your deliberations.  She has an absolute

10   right not to take the witness stand, and you must not

11   draw any inferences from the fact that she exercised

12   that right.

13         The burden is always on the government to

14   prove guilt beyond a reasonable doubt.  The burden of

15   proof never shifts to the defendant to demonstrate her

16   innocence.  The law does not impose upon a defendant in

17   a criminal case the obligation to call any witnesses or

18   produce any evidence.

19         If, after careful and impartial consideration

20   of all the evidence in this case, you have a reasonable

21   doubt as to whether the defendant is guilty of any

22   charge, you must find her not guilty on that charge.

23         The defendant has pleaded not guilty to each

24   of the charges in the indictment.  That plea puts in

25   issue all of the essential elements of the offenses that

136

1    I will describe to you in a moment and imposes on the

2    government the burden of establishing each of those

3    elements by proof beyond a reasonable doubt.

4         The jury must never find a defendant guilty

5    based on mere suspicion, conjecture, or guess.

6    Likewise, the jury must never find a defendant guilty

7    because it thinks she might be guilty or that she is

8    probably guilty.  Before you may return a verdict of

9    guilty as to a crime charged in the indictment, you must

10   unanimously conclude, beyond a reasonable doubt, that

11   the defendant committed each of the essential elements

12   of that offense.

13        The indictment charges two separate crimes

14   against the defendant.  Each offense charged in the

15   indictment and the evidence pertaining to it should be

16   considered separately.  The fact that you may find the

17   defendant guilty or not guilty of one of the offenses

18   charged should not control your verdict as to the other

19   offense charged against the defendant.

20        One of the important issues in this case is

21   the identification of the defendant.  The government has

22   the burden of proving identity beyond a reasonable

23   doubt.

24        Identification testimony is an expression of

25   an opinion or belief on the part of a witness.  Its

137

1    value depends on the opportunity the witness had to

2    observe the person at the time and later to make a

3    reliable identification.  In considering the testimony

4    of an identification witness, you should consider the

5    following matters:  Did the witness have the ability to

6    see the person at the time?

7            Was the witness's identification of the

8    defendant influenced by circumstances under which the

9    identification was made?

10           Has the witness's identification been unfairly

11   suggested by events that occurred since the time of

12   observation?  Is the witness's recollection accurate?

13           You may also consider whether the witness gave

14   descriptions of the person he or she observed that were

15   inconsistent with characteristics of the defendant at

16   the time the person was observed.  In addition, you

17   should consider the credibility of the identification

18   witness just as you would any other witness.

19           It is not essential that an identification

20   witness be free from doubt as to the correctness of his

21   or her identification of a defendant.  However, you, the

22   jury, must be satisfied beyond a reasonable doubt that

23   it was the defendant who committed each of the essential

24   elements of the charged crime before you may convict her

25   of that crime.

138

1          Let me repeat, the burden is on the

2   prosecution to prove every element of a crime charged,

3   including the identity of the defendant as the person

4   who committed that crime.  Therefore, if after examining

5   all of the evidence you find that a crime was committed

6   but you have a reasonable doubt about whether it was the

7   defendant who committed the crime, you must find her not

8   guilty of that charge.

9          You will see that the indictment charges that

10  the offenses at issue were committed on or about certain

11  dates.  When the phrase "on or about" is used, the

12  evidence need not establish with certainty the exact

13  date of an alleged offense.  It is sufficient if the

14  evidence establishes beyond a reasonable doubt that the

15  offense charged was committed on a date reasonably near

16  the date alleged, that is, a date reasonably close in

17  time to the date on which the offense is alleged to have

18  occurred.

19          The law provides that when an indictment

20  charges several means of violating a statute in the

21  conjunctive, that is, by listing several of those means

22  and joining them with the word "and," a conviction may

23  be obtained on proof of only one of those means.

24          In other words, where a statute sets forth

25  several different means by which an offense may be

139

1    committed, it is permissible for a count in an

2    indictment to charge that a defendant committed several

3    or even all of those means in the conjunctive.

4    Nevertheless, to satisfy its burden of proof, the

5    government need only convince you beyond a reasonable

6    doubt that the defendant committed or engaged in one of

7    those means by which to commit the charged offense.

8    Proof beyond a reasonable doubt of any one of the acts

9    conjunctively charged in the indictment is sufficient.

10          The indictment charges the defendant with two

11   separate crimes, each of which you must consider

12   separately.  In Count 1 the government alleges that the

13   defendant knowingly procured her citizenship, quote,

14   contrary to law, closed quote.  In Count 2 it alleges

15   that she knowingly procured citizenship to which she

16   was, quote, not entitled, closed quote.

17          In Count 1 of the indictment, the government

18   charges that the defendant knowingly procured her

19   citizenship, also known as naturalization, quote,

20   contrary to law, closed quote.  Specifically the

21   indictment alleges that the defendant provided multiple

22   material false statements on her Application for

23   Naturalization, Form N-400.  Some of those alleged false

24   statements concern her activities in Rwanda during the

25   genocide in 1994, including crimes she allegedly

1    committed and crimes she allegedly aided and abetted.

2    Some of those alleged false statements concerned

3    associations with or memberships in certain groups in

4    Rwanda, including the MRND political party and the

5    Interahamwe.  Some of those alleged false statements

6    concern whether the defendant lawfully gained entry into

7    the United States or lawfully gained status as a

8    permanent resident prior to seeking naturalization, and

9    some of those alleged false statements concern whether

10   she ever violated United States criminal laws or

11   previously made material false statements in order to

12   gain any Immigration benefits.

13           Count 1 of the indictment charges that, quote,

14   from on or about December 16, 2002, and continuing

15   thereafter through on or about July 18, 2003, in the

16   District of New Hampshire and elsewhere, the defendant,

17   Beatrice Munyenyezi, did knowingly procure and attempt

18   to procure her own naturalization contrary to law, that

19   is, in violation of Title 18, United States Code,

20   Sections 1001(a)(2) and (3), by knowingly providing

21   false and fraudulent information as to material facts in

22   her Application for Naturalization, Form N-400, and in

23   violation of the Immigration and Nationality Act, all in

24   violation of Title 18, United States Code, Section

25   1425(a).

141

1             Title 18, United States Code, Section 1425(a)

2    provides that, quote, whoever knowingly procures or

3    attempts to procure, contrary to law, the naturalization

4    of any person, closed quote, shall be guilty of a crime.

5             Title 18, United States Code, Section 1001(a)

6    provides that, quote, whoever in any matter within the

7    jurisdiction of the executive, legislative, or judicial

8    branch of the government of the United States knowingly

9    and willfully makes any materially false, fictitious, or

10   fraudulent statement or representation, or makes or uses

11   any false writing or document knowing the same to

12   contain any materially false, fictitious, or fraudulent

13   statement, closed quote, shall be guilty of a crime.

14             To carry its burden of proof with regard to

15   the crime charged in Count 1 of the indictment, the

16   government must prove each of the following essential

17   elements beyond a reasonable doubt:

18             First, that the defendant procured or

19   attempted to procure United States citizenship.  And

20   second, that it was contrary to the law for the

21   defendant to procure such citizenship.  And third, that

22   the defendant knowingly and intentionally provided

23   materially false statements on her Application for

24   Naturalization, Form N-400.

25             Contrary to law.  The government alleges that

1  the defendant procured United States citizenship, quote,

2  contrary to law because it claims she violated federal

3  law which makes it unlawful to give false material

4  statements in connection with procuring or attempting to

5  procure immigration and naturalization benefits.

6  Specifically, the government alleges that the defendant

7  made the following false material statements when she

8  completed and submitted an Application for

9  Naturalization, Form N-400:

10        One, in response to a question on her Form

11  N-400 that asks, quote, have you ever, emphasis in the

12  original, been a member of or associated with any

13  organization, association, fund, foundation, party,

14  club, society, or similar group in the United States or

15  in any other place, closed quote, emphasis in the

16  original, the defendant did not disclose her membership

17  in and association with the MRND and Interahamwe, and

18  she responded by putting an "X" in the box marked,

19  quote, no, closed quote.

20        Two, in response to a question on her N-400

21  that asked, quote, have you ever persecuted, either

22  directly or indirectly, any person because of race,

23  religion, national origin, membership in a particular

24  social group or political opinion, closed quote,

25  emphasis in original.  The defendant responded by

1    putting an "X" in the box marked "no" and failed to

2    disclose her direct and indirect persecution of Tutsis

3    during the Rwandan genocide.

4            Three, in response to a question on her N-400

5    that asked, quote, have you ever committed a crime or

6    offense for which you were not arrested, question,

7    closed quote, emphasis in the original.  The defendant

8    failed to disclose her participation in genocide,

9    murder, rape, kidnapping, and theft, and responded by

10   putting an "X" in the box marked "no."  The government

11   also alleges that the defendant failed to disclose that

12   she had previously violated United States criminal laws

13   by providing false information in immigration interviews

14   and documents, that is, the Form I-590, Form G-646, the

15   Rwandan questionnaire, and Form I-485.

16           Four, in response to a question on her Form

17   N-400 that asked, quote, have you ever given false or

18   misleading information to any U.S. official while

19   applying for any immigration benefit or to prevent

20   deportation, exclusion, or removal, question mark,

21   emphasis in the original.  The defendant responded by

22   putting an "X" in the box marked "no" and failed to

23   disclose false information she provided in previous

24   Immigration documents, that is, the Form I-590, Form

25   G-646, the Rwandan questionnaire, and Form I-485.

144

1            Five, in response to a question on her N-400

2     that asked, quote, have you ever lied to any U.S.

3     Government official to gain entry or admission into the

4     United States, question mark, closed quote, emphasis in

5     the original, the defendant responded by putting an "X"

6     in the box marked "no" and failed to disclose the false

7     information she provided on the Form I-590, Form G-646,

8     and the Rwandan questionnaire.

9            In order to satisfy its burden with regard to

10    that element, the government must prove beyond a

11    reasonable doubt that the defendant made one or more of

12    the statements set forth above, and it must also prove

13    that the statement was false and material.

14            You must give separate consideration to each

15    of the alleged false statements the government has

16    identified, and before you may find that the government

17    has carried its burden of proof with regard to that

18    element, you must unanimously agree that the defendant

19    made at least one particular material false statement.

20    By that I mean the following:  It is not sufficient if

21    you all agree that the defendant made some false

22    statement but cannot agree on which one.  Instead,

23    before you may convict the defendant of the crime

24    charged in Count 1, you must all agree with regard to

25    which specific false statement or statements the

145

1   government has proved beyond a reasonable doubt.  With

2   respect to the allegations set out in subparagraphs 4

3   and 5 above, you must all agree as to at least one prior

4   material false statement.

5          "Knowingly" means to act voluntarily and

6   deliberately rather than mistakenly or inadvertently.

7   In other words, an act is done knowingly if the

8   defendant was aware of the act and did not proceed

9   through ignorance, mistake, or accident.

10          "Intentionally," a person acts intentionally

11   if it was her conscious objective or desire to act in

12   the manner that she did.

13          "Material," a statement is material if it has

14   a natural tendency to influence or to be capable of

15   influencing the decision of the decision maker to which

16   it was addressed.  So in this case a statement is

17   material if the statement had a natural tendency to

18   influence or was capable of influencing the decision of

19   a government agency in making a determination required

20   to be made.  The government need not show that the

21   agency was actually influenced by the statement

22   involved.  If a statement could have provoked

23   governmental action, it is material regardless of

24   whether the agency actually relied on it.

25          "Persecute," the term "persecute" means to

1    inflict suffering or harm upon those who differ in race,

2    religion, national origin, political opinion, or

3    membership in a particular social group in a manner that

4    is regarded as offensive and that is condemned by

5    civilized governments.

6              "Murder," murder is the unlawful killing of a

7    human being committed with the intent to kill.

8              "Rape," rape is sexual intercourse by force or

9    threat of force, and without the victim's consent.

10             "Kidnap," kidnapping is the seizure of a

11   victim by force against his or her will for the purpose

12   of securing some benefit to the actor.

13             "Theft," theft is the unlawful taking or

14   exercise of unlawful control over the property of

15   another with the intent to deprive the other of that

16   property.

17             "Genocide," the term genocide includes any of

18   the following acts, whether in a time of peace or in a

19   time of war, that are committed with the specific intent

20   to destroy, in whole or in substantial part, a national,

21   ethnic, racial, or religious group:  One, killing

22   members of that group, or two, causing serious bodily

23   injury to members of that group, or three, causing the

24   permanent impairment of the mental faculties of members

25   of that group through drugs, torture, or similar

1    techniques, or four, subjecting that group to conditions

2    of life that are intended to cause the physical

3    destruction of the group in whole or in part, or five,

4    imposing measures intended to prevent births within that

5    group, or six, transfers by force children of that group

6    to another group.

7            One who aids, abets, counsels, induces, or

8    procures the commission of a crime is considered a

9    principal.  That is, he or she is considered to have

10   committed the crime.  The government alleges that the

11   defendant provided false material statements that

12   concealed her participation, either directly or as an

13   aider and abettor, in murder, rape, kidnapping, false

14   imprisonment, receiving stolen property, and genocide,

15   all in connection with the Rwandan genocide in 1994.

16           To "aid and abet" means intentionally to help

17   someone else commit a crime.  To establish aiding and

18   abetting of an underlying crime, the government must

19   prove beyond a reasonable doubt that, one, someone else

20   committed the crime, and two, the defendant willfully

21   associated herself in some way with the crime and

22   willfully participated in it as she would in something

23   she wished to bring about.  The central requirement of

24   this second element is a showing that the defendant

25   consciously shared the other person's knowledge of the

1    underlying criminal act and intended to help him.

2           The defendant need not perform the substantive

3    offense or be present when it is performed or be aware

4    of the details of its execution to be guilty of aiding

5    and abetting, but a general suspicion that an unlawful

6    act may occur or that some criminal purpose is afoot is

7    not enough.  Mere presence at the scene of a crime and

8    knowledge that a crime is being committed are also not

9    sufficient to establish aiding and abetting.

10          Count 2.  In Count 2 of the indictment, the

11   government charges the defendant with knowingly

12   procuring United States citizenship to which she was not

13   entitled.  It says she was not entitled to United States

14   citizenship because:  She provided false information on

15   her Application for Naturalization, Form N-400; she was

16   not lawfully admitted to the United States because she

17   gained entry to the United States by providing false and

18   fraudulent information as to material facts in a series

19   of documents she submitted to the United States

20   Government; she was an inadmissible alien who had

21   engaged in genocide; and she was ineligible for

22   naturalization because she was not a person of good

23   moral character; and she was ineligible because she did

24   not satisfy the requirements for naturalization set

25   forth in United States law.

1          Count 2 of the indictment charges that, quote,

2    from on or about December 16, 2002, and continuing

3    thereafter, through on or about July 18, 2003, in the

4    District of New Hampshire and elsewhere, the defendant,

5    Beatrice Munyenyezi, did knowingly procure, obtain, and

6    apply for, and did attempt to procure and obtain

7    naturalization and citizenship for herself to which she

8    was not entitled, in that:

9          A, the defendant did provide false and

10   fraudulent information as to material facts in her

11   Application for Naturalization, Form N-400;

12         B, at the time of her Application for

13   Naturalization, the defendant was not lawfully admitted

14   to the United States for permanent residence pursuant to

15   Title 8, United States Code, Section 1427, and Title 8,

16   United States Code, Section 1182, in that the defendant

17   did gain entry to and asylum in the United States by

18   providing false and fraudulent information as to

19   material facts in a Registration for Classification as a

20   Refugee, Form I-590, sworn statement of refugee applying

21   for entry into the United States, Form G-646, and

22   Questions for Rwandan Visa Applicants questionnaire;

23         C, at the time of her Application for

24   Naturalization the defendant was not lawfully admitted

25   to the United States for permanent residence pursuant to

1   Title 8, United States Code, Section 1427, and Title 8,

2   United States Code, Section 1182, in that the defendant

3   did apply for and receive status as a lawful permanent

4   resident of the United States by providing false and

5   fraudulent information as to material facts in an

6   Application to Register Permanent Residence or Adjust

7   Status, Form I-485;

8           D, at the time of her Application for

9   Naturalization, the defendant was not lawfully admitted

10  to the United States for permanent residence pursuant to

11  Title 8, United States Code, Section 1427, and Title 8,

12  United States Code, Section 1182, in that the defendant

13  was an inadmissible alien who had engaged in conduct

14  that is defined as genocide for the purposes of the

15  International Convention for the Prevention and

16  Punishment of Genocide;

17          E, at the time of her Application for

18  Naturalization, the defendant could not satisfy the

19  requirements for naturalization pursuant to Title 8,

20  United States Code, Section 1427, in that the defendant

21  provided false testimony for the purpose of obtaining

22  immigration benefits;.

23          F, at the time of her Application for

24  Naturalization, the defendant could not satisfy the

25  requirements for naturalization pursuant to Title 8,

1    United States Code, Section 1427, in that she was not a

2    person of, quote, good moral character, closed quote, in

3    that the defendant had participated in genocide and in

4    so doing committed numerous acts of violence, including

5    murder, rape, persecution, and theft;

6            And G, at the time of her application for

7    naturalization, the defendant did not satisfy the

8    requirements for naturalization that are set forth in

9    Title 8, United States Code, Section 1427.

10           All in violation of Title 18, United States

11   Code, Section 1425(b).

12           Title 18, United States Code, Section 1425(b)

13   provides that, quote, whoever, whether for himself or

14   another person, not entitled thereto, knowingly procures

15   or obtains or applies for naturalization or citizenship

16   shall be guilty of a crime.

17           To carry its burden of proof with regard to

18   the crime charged in Count 2 of the indictment, the

19   government must prove each of the following essential

20   elements beyond a reasonable doubt:

21           First, that the defendant obtained citizenship

22   of the United States; and

23           Second, that the defendant was not entitled to

24   United States citizenship; and

25           Third, that the defendant knew that she was

1    not entitled to United States citizenship.

2              Knowingly.  As I instructed you earlier,

3    "knowingly" means to act voluntarily and deliberately,

4    rather than mistakenly or inadvertently.  An act is done

5    knowingly if the defendant was aware of the act and did

6    not proceed through ignorance, mistake, or accident.

7              So to sustain its burden with regard to the

8    third element of Count 2, the government must prove

9    beyond a reasonable doubt that when the defendant

10   applied for or obtained citizenship, she knew she was

11   not entitled to become a naturalized citizen of the

12   United States.

13             A person's knowledge of some particular fact

14   is difficult to prove directly because there is no way

15   to fathom or scrutinize the operations of the human

16   mind.  But you may infer the defendant's knowledge from

17   the surrounding circumstances.  You may consider any

18   statements she made or any actions she undertook or

19   omitted as well as all other facts and circumstances in

20   evidence that might reveal her state of mind.  So, for

21   example, if you find that the government has proved that

22   the defendant made material false statements in

23   connection with her application to become a citizen, you

24   may, but are certainly not required to, infer that she

25   knew she was not entitled to become a citizen of the

1    United States.

2            Good moral character.  A person is ineligible

3    for naturalization if he or she is not of good moral

4    character.  There are of course many ways that a person

5    can be considered to be not of good moral character.

6    For purposes of this case, it is sufficient to say that

7    a person is not of good moral character if she ordered,

8    incited, assisted, or otherwise participated in

9    genocide, or if she committed, aided, or abetted the

10   commission of murder, rape, kidnapping, or theft, or if

11   she made material false statements for the purpose of

12   obtaining immigration or naturalization benefits.

13           With respect to the second element, that the

14   defendant was not entitled to United States citizenship,

15   the government has set forth several reasons,

16   Subsections A through G under Section B on pages 24 and

17   25, that it claims disqualified the defendant from

18   obtaining United States citizenship.  In order to

19   satisfy its burden with regard to the second element,

20   the government must prove beyond a reasonable doubt that

21   the defendant was in fact not entitled to United States

22   citizenship.  You must give separate consideration to

23   each of the grounds allegedly disqualifying the

24   defendant from obtaining United States citizenship that

25   the government has identified.  Before you may find that

154

1   the government has carried its burden of proof with

2   regard to the second element, you must unanimously agree

3   as to which specific disqualifying ground or grounds the

4   government has proved beyond a reasonable doubt.

5           The principles of law set forth in these

6   instructions are intended to guide you in reaching a

7   fair and just result in this case, which is important to

8   all of the parties.  You are to exercise your judgment

9   and common sense without prejudice and without sympathy,

10  but with honesty and understanding.  You should be

11  conscientious in your determination of a just result in

12  this case because that is your highest duty as officers

13  of this court.  Remember also that the question before

14  you can never be will the government win or loss the

15  case.  The government always wins when justice is done,

16  regardless of whether the jury's verdict is guilty or

17  not guilty.  Your duty is to see that justice is done.

18          When you have considered and weighed all of

19  the evidence you must make one of the following findings

20  with respect to each crime charged in the indictment:

21          If you have a reasonable doubt as to whether

22  the government has proved any one or more of the

23  essential elements of the crime charged, you must find

24  the defendant not guilty with regard to that crime.

25          If you find that the government has proved all

1   of the essential elements of the crime charged beyond a

2   reasonable doubt, then you may find the defendant guilty

3   with regard to that crime.

4           In reaching an impartial verdict in this case,

5   you must not speculate as to what punishment the law

6   provides for the crimes with which the defendant is

7   charged.  The punishment provided by law for the

8   offenses charged in the indictment is exclusively my

9   responsibility.  You should not consider it, nor should

10  it affect or color your deliberations in any way.

11          When you retire, you should elect one member

12  of the jury as your foreperson.  That individual will

13  act very much like the chairperson of a committee,

14  seeing to it that the deliberations are conducted in an

15  orderly fashion and that each juror has a full and fair

16  opportunity to express his or her views, positions, and

17  arguments on the evidence and on the law.

18          The verdict with regard to each offense

19  charged in the indictment must represent the considered

20  judgment of each juror.  In order to return a verdict,

21  it is necessary that each juror agree to it.  Your

22  verdict as to each count in the indictment, regardless

23  of whether it is guilty or not guilty, must be

24  unanimous.

25          It is your duty as jurors to consult with one

1    another and to deliberate with a view toward reaching an

2    agreement if you can do so without violence to

3    individual judgment.  Each of you must decide the case

4    for yourself, but do so only after an impartial

5    consideration of the evidence in the case with your

6    fellow jurors.  In the course of your deliberations, do

7    not hesitate to reexamine your own views and to change

8    your opinion if you become convinced it is erroneous,

9    but do not surrender your honest conviction as to the

10   weight or effect of the evidence solely based upon the

11   opinion of your fellow jurors or merely for the purpose

12   of returning a verdict.  Remember at all times that you

13   are not partisans.  You are judges, judges of the facts.

14   Your sole interest is to seek the truth from the

15   evidence in the case.

16           If during your deliberations it becomes

17   necessary to communicate with me, you may do so only in

18   writing signed by the foreperson or by one or more

19   members of the jury.  Give that note to the court

20   security officer and he or she will bring it to my

21   attention.  No member of the jury should ever attempt to

22   communicate with me except by a signed writing, and I

23   will communicate with you on anything concerning the

24   case either in writing or orally in the courtroom.

25           Remember that you are not to tell anyone,

1    including me, how the jury stands numerically or

2    otherwise on the matters you are deciding until after

3    you have reached a unanimous verdict or have been

4    discharged.  In other words, if the jury is split, say,

5    8 to 4 on some issue, the existence of that split or the

6    number on one side or the other must not be disclosed to

7    anyone, including me.

8            If we recess during your deliberations, follow

9    all of the instructions that I've given you concerning

10   your conduct during the trial.  In particular, refrain

11   from discussing the case with anyone other than your

12   fellow jurors in the jury room with everyone present.

13           At the risk of being repetitive, let me again

14   say that nothing said in these instructions is intended

15   to suggest in any way what your verdict should be.  The

16   verdict is exclusively your duty and responsibility.

17           After you have reached a verdict, your

18   foreperson will fill in the verdict form that has been

19   given to you, or will be given to you, sign and date it

20   and notify the court security officer.  You will then be

21   returned to the courtroom.

22           THE COURT:  I will see counsel at side bar.

23                      AT SIDEBAR

24           THE COURT:  Objections to the instructions?

25   Defendant?

1          MR. HOWARD:  Not that we've already raised or

2     noted.

3          THE COURT:  You should reiterate your

4     objections.

5          MR. HOWARD:  I think that we got the

6     instruction we asked for.  It was somewhat watered down,

7     but we were looking for the unanimity instruction on the

8     underlying lies.  I think we got a version of that.

9          THE COURT:  Any objection by the government?

10          MR. CAPIN:  We hadn't noticed, there's no

11     admonishment with regards to the media now that they are

12     deliberating.  It wouldn't hurt to remind them of that.

13          THE COURT:  I will do it informally when I

14     give them my administrative instructions.  Anything

15     else?

16          MR. CAPIN:  Okay.  Thank you.

17                    IN OPEN COURT

18          THE COURT:  All right, ladies and gentlemen,

19     we'll swear the court security officer in just a second,

20     but before you are released to the court security

21     officer, it's my practice to allow the jury to determine

22     your own schedule.  Basically and obviously we expect a

23     full day if you can do it, but your timing in terms of

24     how long you wish to deliberate today, what your

25     schedule will be tomorrow and so forth, once you select

1  your foreperson, it's fine with me that you all just

2  agree to your schedule.  But under our local rules

3  counsel are required to remain in the courthouse while

4  the jury is deliberating.  So please let the court

5  security officer know what your schedule is, if you

6  would, or what you anticipate the schedule to be so that

7  counsel can be available and so can I.

8         Just again, this case has generated some

9  publicity, so while you are deliberating I won't have

10 the opportunity to communicate with you.  So let me

11 again remind you, please, take all the steps and

12 precautions you can to make sure you are not exposed to

13 any media coverage with respect to the case.  You have

14 to decide the case based on the evidence presented in

15 the court.

16         And the alternates, I'm now going to excuse

17 you, but again, with a caveat, if you could please not

18 discuss the case amongst yourselves or anyone else until

19 you hear a verdict is returned, because in the event

20 that, God forbid, somebody becomes disabled for some

21 reason and is excused, we will call you back in the

22 order and the jury will begin deliberations again from

23 the beginning.  So it's important that you preserve your

24 capacity, your ability to serve as an impartial juror,

25 and with that I will excuse the three alternates.  We've

160

1    had some issues in the past.  That means you have to

2    gather your belongings and you have to leave.  We've had

3    some jurors stay in the past and thinking it was okay to

4    stay and watch the deliberations.  It's not.  So when

5    you're excused, you're excused.

6           All right.  Swear in the court security

7    officer.

8           (Court security officer duly sworn.)

9           (Jury exited courtroom.)

10                    BEFORE THE COURT

11          THE COURT:  With respect to local rule --

12          MR. CHAKRAVARTY:  We've been at the U.S.

13   Attorney's Office.

14          THE COURT:  Mark, locally, do you have a local

15   office?

16          MR. RUOFF:  We have an office in the building.

17          THE COURT:  Great, thank you.  You know, if

18   you want -- notwithstanding the strictness of the local

19   rule, if you do want to leave that's fine with me.  Just

20   make sure you are not gone for no more than 15 or

21   20 minutes, half hour, lunch excepted, but let Judy have

22   a cellphone number where she can call you in case

23   there's a question or something like that.  Any other

24   issues?

25          THE CLERK:  What version of the indictment is

1    going in?

2              THE COURT:  Yes, the redacted indictment;

3    right?

4              MR. HOWARD:  Yes, the one from last year.

5              MR. RUOFF:  I believe both sides still have to

6    strike the ID on exhibits.

7              THE COURT:  Right now you should go through

8    the exhibits and make sure everything is marked

9    correctly, and if there isn't and you can stipulate,

10   that's fine, but make sure you let Judy know.

11             And finally, really, this was a lot more rocky

12   and contentious probably, but well tried on both sides.

13   Nobody has any reason to hang their heads in the way the

14   case was tried.  I really think the jury has all the

15   evidence they possibly could have that's meaningful.  So

16   I think the decision, whatever way it goes, is certainly

17   not the result of any failure on the part of counsel to

18   do anything they should have done.  So congratulations,

19   well tried.

20             (Jury deliberations began at 2:55 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Diane M. Churas, do hereby certify that the

4    foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9                                  _Diane M. Churas_
     Submitted: 11/19/13
10                                 **DIANE M. CHURAS, LCR, RPR, CRR**
                                   LICENSED COURT REPORTER, NO. 16
11                                 STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**U.S. DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**FEB 20 2013**

**FILED**

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

v.                                        Criminal Case No. 10-cr-085-SM

<u>Beatrice Munyenyezi</u>

## JURY INSTRUCTIONS

### INTRODUCTION

At this stage of the trial it is my duty to instruct you on the principles of law that you must apply in deciding this case. It is your duty to follow these instructions during your deliberations. You should not single out any one instruction but instead apply these instructions as a whole to the evidence in this case.

Each of my instructions has a caption or heading. The captions are present solely for purposes of convenience, to assist you in locating different instructions, but I will not read them.

### JURY SOLE JUDGES OF FACT

You are the sole and exclusive judges of the facts. You must weigh the evidence that has been presented impartially, without bias, without prejudice, and without sympathy. You must

determine what the facts are, what the truth is, based upon the evidence presented in the case. You will decide the case by applying the law as I give it to you in these instructions to the facts as you find them to be from the evidence.

## CREDIBILITY OF WITNESSES

In determining what the facts are and what the truth is, you must necessarily assess the credibility of each witness and determine what weight you will give to each witness's testimony. By "credibility" I mean the believability or the truthfulness of a witness.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief or not worthy of belief. You should also consider the extent, if any, to which the testimony of each witness is either supported or contradicted by other evidence in the case.

After assessing the credibility of each witness, you will assign to the testimony of each witness, both under direct and cross-examination, such weight as you deem proper. You are not required to believe the testimony of a witness simply because that witness was under oath. You may believe or disbelieve all or part of the testimony of any witness. It is within your

2

province to determine what testimony is worthy of belief and what testimony may not be worthy of belief.

## A.   CREDIBILITY OF GOVERNMENT AGENTS

You should consider the testimony of a government agent in the same way as the testimony of any other witness in the case. In evaluating the credibility of a government agent, you should use the same tests that you applied to the testimony of any other witness.   In no event should you give the testimony of a government agent any more credibility, or any less credibility, simply because that witness is a government agent.

## B.   PRIOR INCONSISTENT STATEMENTS

The testimony of a witness may be discredited or, as we sometimes say, "impeached" by showing that the witness previously made statements that are different than, or inconsistent with, his or her testimony here in court.   Some of the prior statements introduced in this case were made by witnesses who were under oath during another proceeding when the statements were made. You may consider such statements as if they were made at this trial.   You must decide what weight, if any, should be given to the testimony of a witness who has made prior inconsistent or contradictory statements.   In making that determination you may consider whether the witness purposely made a false statement or

3

whether it was an innocent mistake; whether the inconsistency concerns an important fact or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency and whether that explanation appealed to your common sense.

If a person is shown to have knowingly testified falsely about any important matter, you obviously have a right to distrust the testimony of that person concerning other matters. You may reject all of the testimony of that witness or give it such weight or credibility as you may think it deserves.

### C.  TESTIMONY OF EXPERT WITNESSES

You have heard testimony from witnesses who were permitted to testify as experts. An expert is allowed to express an opinion on those matters about which he or she has special knowledge and training. Expert testimony is presented to you based on the belief that someone who is experienced in a particular field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing an expert's testimony, you may consider the expert's qualifications, experience, training, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony. You may give the expert testimony such

4

weight, if any, as you find it deserves in light of all of the evidence in this case. You should not, however, accept the testimony of an expert witness merely because that witness is an expert. Nor should you substitute the opinions of an expert for your own reason, judgment, and common sense. In the end, the determination of the facts in this case rests solely with you.

You will recall that neither expert was permitted to give opinions about the credibility of witnesses appearing before you. No expert's opinion on that subject is superior to your own, and it is solely your responsibility to judge the credibility of witnesses. The experts' testimony about the history and culture of Rwanda may be considered by you to the extent you may find it useful.

## WEIGHT OF THE EVIDENCE

The weight of the evidence is not necessarily determined by the number of witnesses testifying on either side. You will consider all the facts and circumstances in evidence to determine which of the witnesses are worthy of belief. You may find that the testimony of a small number of witnesses on a particular issue is more credible than the testimony of a greater number of witnesses on the other side of the same issue. It is not the number of witnesses or the quantity of testimony that is important, but the quality of the evidence that has been produced that is important.

5

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that given to any other party in litigation. By the same token, the government is entitled to no less consideration. All parties, whether the government or individuals, stand as equals at the bar of justice.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two types of evidence that you may properly use in deciding whether the defendant is guilty or not guilty of the crimes charged in the indictment.

Direct evidence is the testimony given by a witness about what that witness has seen, heard, or observed, or what that witness knows based on personal knowledge. Direct evidence also includes any exhibits that have been marked and any stipulations that have been agreed to by the lawyers. During the course of the trial, you were told that the government and the defendant agreed, or "stipulated," to certain facts. This simply means that both sides accept those facts to be true. Because there is no disagreement regarding those facts, there was no need for either side to introduce evidence relating to them. You must accept as true the facts to which the government and the defendant have stipulated.

6

Evidence may also be used to prove a fact by implication, and this is referred to as circumstantial evidence. In other words, from examining direct evidence you may be able to draw certain inferences that are reasonable and justified in light of your daily experience and common sense. Such reasonable inferences constitute circumstantial evidence.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is up to you to decide how to weigh the evidence in this case.

## WHAT IS EVIDENCE

The evidence in this case consists of: (1) the sworn testimony of the witnesses, both on direct and cross-examination, regardless of who may have called those witnesses; (2) the exhibits that have been received into evidence, regardless of who may have produced them; and (3) any facts to which the lawyers have agreed or stipulated.

## WHAT IS NOT EVIDENCE

Certain things are not evidence and you cannot consider them as evidence:

1. Arguments, statements, and questions by the lawyers are not evidence. Questions asked by the lawyers and statements the lawyers have made in their opening statements, closing arguments,

7

and at other times during the trial are intended to help you interpret the evidence, but they are not evidence. You will recall that I previously instructed you that questions by lawyers are not evidence of any facts assumed in the questions. If the facts as you remember them differ from the way the lawyers have stated them, your memory controls.

2. Objections by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper under the rules of evidence. I must rule on objections and I have not intended to indicate in any way by my rulings or by what I have said what the verdict should be in this case. You should not be influenced by the lawyers' objections or by my rulings on those objections.

3. Testimony that has been excluded or stricken, or that I have instructed you to disregard, is not evidence and must not be considered in any way in your deliberations.

4. The indictment is not evidence. This case, like most criminal cases, began with an indictment. You will have that indictment before you during the course of your deliberations. That indictment was returned by a grand jury, which heard only the government's side of the case. The fact that this defendant has been indicted by a grand jury is not evidence of her guilt. The indictment is simply an accusation. It is the means by which the government's allegations and charges are brought before this

8

court. It is you who will determine whether the defendant is guilty or not guilty of the offenses charged in the indictment, based on a consideration of all the evidence presented during trial and the law applicable to the case. And, the indictment is not evidence.

5. Anything you may have seen or heard when the court was not in session is not evidence. You must decide the case solely on the evidence received at trial.

## EVIDENCE ADMITTED FOR A LIMITED PURPOSE

During the course of the trial, I have instructed you that certain evidence was being admitted for a limited purpose. It is your duty to follow those instructions during your deliberations.

## PRESUMPTION OF INNOCENCE

Let me remind you that the fact that an indictment has been returned against the defendant is not evidence of her guilt. A defendant, although accused, begins a trial with a clean slate – with no evidence against her. The law permits nothing but the admissible evidence presented before you to be considered in support of the charges against her.

The law presumes every defendant to be innocent until proven guilty beyond a reasonable doubt. The burden of proof rests entirely on the government. A defendant does not have to prove

9

her innocence. A defendant enters the courtroom and is presumed to be innocent until the government convinces you, beyond a reasonable doubt, that she is guilty of every essential element of one or more of the offenses charged in the indictment. That presumption means that you are to regard the defendant in this case as innocent unless the government proves, beyond a reasonable doubt, that she is guilty.

The presumption of innocence alone is sufficient to acquit the defendant unless you are satisfied beyond a reasonable doubt, after a careful and impartial consideration of all of the evidence in the case, that she is guilty of one or more of the crimes charged in the indictment.

## **DEFENDANT'S DECISION NOT TO TESTIFY**

The fact that the defendant did not testify must not be considered by you in any way or even discussed in your deliberations. She has an absolute right not to take the witness stand and you must not draw any inferences from the fact that she exercised that right.

## **GOVERNMENT'S BURDEN OF PROOF - BEYOND A REASONABLE DOUBT**

The burden is always on the government to prove guilt beyond a reasonable doubt. The burden of proof never shifts to the defendant to demonstrate her innocence. The law does not impose

10

upon a defendant in a criminal case the obligation to call any witnesses or produce any evidence.

If, after careful and impartial consideration of all of the evidence in this case, you have a reasonable doubt as to whether the defendant is guilty of any charge, you must find her not guilty on that charge.

The defendant has pleaded not guilty to each of the charges in the indictment. That plea puts in issue all of the essential elements of the offenses that I will describe to you in a moment, and imposes on the government the burden of establishing each of those elements by proof beyond a reasonable doubt.

The jury must never find a defendant guilty based on mere suspicion, conjecture, or guess. Likewise, the jury must never find a defendant guilty because it thinks she "might" be guilty or that she is "probably" guilty. Before you may return a verdict of guilty as to a crime charged in the indictment, you must unanimously conclude, beyond a reasonable doubt, that the defendant committed each of the essential elements of that offense.

## CONSIDER EACH COUNT SEPARATELY

The indictment charges two separate crimes against the defendant. Each offense charged in the indictment and the evidence pertaining to it should be considered separately. The

11

fact that you may find the defendant guilty or not guilty of one of the offenses charged should not control your verdict as to the other offense charged against the defendant.

## IDENTIFICATION

One of the important issues in this case is the identification of the defendant. The government has the burden of proving identity, beyond a reasonable doubt.

Identification testimony is an expression of an opinion or belief on the part of a witness. Its value depends on the opportunity the witness had to observe the person at the time and, later, to make a reliable identification. In considering the testimony of an "identification witness," you should consider the following matters:

- Did the witness have the ability to see the person at the time?

- Was the witness's identification of the defendant influenced by circumstances under which the identification was made?

- Has the witness's identification been unfairly suggested by events that occurred since the time of observation?

- Is the witness's recollection accurate?

You may also consider whether the witness gave descriptions of the person he or she observed that were inconsistent with characteristics of the defendant at the time the person was

12

observed.  In addition, you should consider the credibility of
the identification witness just as you would any other witness.

It is not essential that an identification witness be free
from doubt as to the correctness of his or her identification of
a defendant.  However, you, the jury, must be satisfied beyond a
reasonable doubt that it was the defendant who committed each of
the essential elements of a charged crime before you may convict
her of that crime.

Let me repeat, the burden is on the prosecution to prove
every element of a crime charged, including the identity of the
defendant as the person who committed that crime.  Therefore, if
after examining all of the evidence, you find that a crime was
committed, but you have a reasonable doubt about whether it was
the defendant who committed the crime, you must find her not
guilty of that charge.

### DATE OF OFFENSE - ON OR ABOUT

You will see that the indictment charges that the offenses
at issue were committed "on or about" certain dates.  When the
phrase "on or about" is used, the evidence need not establish
with certainty the exact date of an alleged offense.  It is
sufficient if the evidence establishes, beyond a reasonable
doubt, that the offense charged was committed on a date
reasonably near the date alleged; that is, a date reasonably

13

close in time to the date on which the offense is alleged to have occurred.

### INDICTMENT CHARGING IN THE CONJUNCTIVE

The law provides that when an indictment charges several means of violating a statute in the conjunctive (that is, by listing several of those means and joining them with the word "and"), a conviction may be obtained on proof of only one of those means.

In other words, where a statute sets forth several different means by which an offense may be committed, it is permissible for a count in an indictment to charge that the defendant committed several or even all of those means in the conjunctive. Nevertheless, to satisfy its burden of proof, the government need only convince you, beyond a reasonable doubt, that the defendant committed or engaged in one of those means by which to commit the charged offense; proof beyond a reasonable doubt of any one of the acts conjunctively charged in the indictment is sufficient.

### THE NATURE OF THE OFFENSES CHARGED

The indictment charges the defendant with two separate crimes, each of which you must consider separately. In Count One, the government alleges that the defendant knowingly procured her citizenship "contrary to law." In Count Two, it alleges that

14

she knowingly procured citizenship to which she was "not entitled."

## I.  COUNT ONE - UNLAWFUL PROCUREMENT OF CITIZENSHIP OR NATURALIZATION

### A.  THE GOVERNMENT'S ALLEGATIONS

In Count One of the indictment, the government charges that the defendant knowingly procured her citizenship (also known as "naturalization") "contrary to law." Specifically, the indictment alleges that the defendant provided multiple material false statements on her Application for Naturalization, Form N-400. Some of those alleged false statements concern her activities in Rwanda during the genocide in 1994, including crimes she allegedly committed and crimes she allegedly aided and abetted. Some of those alleged false statements concern associations with, or memberships in, certain groups in Rwanda, including the MRND political party and the Interahamwe. Some of those alleged false statements concern whether the defendant lawfully gained entry into the United States or lawfully gained status as a permanent resident, prior to seeking naturalization. And, some of those alleged false statements concern whether she ever violated United States criminal laws or previously made material false statements in order to gain any immigration benefits.

15

**B.   THE INDICTMENT**

Count One of the indictment charges that "from on or about December 16, 2002, and continuing thereafter through on or about July 18, 2003, in the District of New Hampshire and elsewhere, the Defendant, Beatrice Munyenyezi, did knowingly procure and attempt to procure her own naturalization contrary to law, that is, in violation of Title 18, United States Code, Sections 1001(a)(2) and (3), by knowingly providing false and fraudulent information as to material facts in her Application for Naturalization, Form N-400, and in violation of the Immigration and Nationality Act.  All in violation of Title 18, United States Code, Section 1425(a)."

**C.   THE RELEVANT CRIMINAL STATUTES**

Title 18, United States Code, Section 1425(a) provides that, "Whoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person" shall be guilty of a crime.

Title 18, United States Code, Section 1001(a) provides that, "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation or makes or

16

uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement" shall be guilty of a crime.

### D.   ESSENTIAL ELEMENTS OF THE CRIME

To carry its burden of proof with regard to the crime charged in Count One of the indictment, the government must prove each of the following essential elements beyond a reasonable doubt:

> First:    That the defendant procured, or attempted to procure, United States citizenship; and
>
> Second:   That it was contrary to the law for the defendant to procure such citizenship; and
>
> Third:    That the defendant knowingly and intentionally provided materially false statements on her Application for Naturalization, Form N-400.

### E.   DEFINITIONS

"Contrary to Law."  The government alleges that the defendant procured United States citizenship "contrary to law" because it claims she violated federal law which makes it unlawful to give false material statements in connection with procuring or attempting to procure immigration and naturalization benefits.  Specifically, the government alleges that the defendant made the following false material statements when she

17

completed and submitted an "Application for Naturalization, Form

N-400."

1.   In response to a question on her Form N-400 that asked,
     "Have you **EVER** been a member of, or associated with,
     any organization, association, fund, foundation, party,
     club, society, or similar group in the United States or
     in any other place?" (emphasis in original), the
     defendant did not disclose her membership in, and
     association with, the MRND and Interahamwe and she
     responded by putting an "X" in the box marked "No."

2.   In response to a question on her N-400 that asked,
     "Have you **EVER** persecuted (either directly or
     indirectly) any person because of race, religion,
     national origin, membership in a particular social
     group, or political opinion?" (emphasis in original),
     the defendant responded by putting an "X" in the box
     marked "No" and failed to disclose her direct and
     indirect persecution of Tutsis during the Rwandan
     genocide.

3.   In response to a question on her N-400 that asked,
     "Have you **EVER** committed a crime or offense for which
     you were **NOT** arrested?" (emphasis in original), the
     defendant failed to disclose her participation in
     genocide, murder, rape, kidnapping, and theft, and
     responded by putting an "X" in the box marked "No."
     The government also alleges that the defendant failed
     to disclose that she had previously violated United
     States criminal laws by providing false information in
     immigration interviews and documents - that is, the
     Form I-590, Form G-646, the Rwandan Questionnaire, and
     Form I-485.

4.   In response to a question on her Form N-400 that asked,
     "Have you **EVER** given false or misleading information to
     any U.S. official while applying for any immigration
     benefit or to prevent deportation, exclusion or
     removal?" (emphasis in original), the defendant
     responded by putting an "X" in the box marked "No" and
     failed to disclose false information she provided in
     previous immigration documents - that is, the Form I-
     590, Form G-646, the Rwandan Questionnaire, and Form I-
     485.

18

5.   In response to a question on her N-400 that asked,
     "Have you **EVER** lied to any U.S. government official to
     gain entry or admission into the United States?"
     (emphasis in original), the defendant responded by
     putting an "X" in the box marked "No" and failed to
     disclose the false information she provided on the Form
     I-590, Form G-646, and the Rwandan Questionnaire.

In order to satisfy its burden with regard to that element,
the government must prove, beyond a reasonable doubt, that the
defendant made one or more of the statements set forth above and
it must also prove that the statement was false and material.

You must give separate consideration to each of the alleged
false statements the government has identified.  And, before you
may find that the government has carried its burden of proof with
regard to that element, you must unanimously agree that the
defendant made at least one particular material false statement.
By that I mean the following: it is not sufficient if you all
agree that the defendant made some false statement, but cannot
agree on which one.  Instead, before you may convict the
defendant of the crime charged in count one, you must all agree
with regard to which specific false statement or statements the
government has proved beyond a reasonable doubt.  With respect to
the allegations set out in subparagraphs 4 and 5 above, you must
all agree as to at least one prior material false statement.

"Knowingly" means to act voluntarily and deliberately,
rather than mistakenly or inadvertently.  In other words, an act

19

is done knowingly if the defendant was aware of the act and did not proceed through ignorance, mistake, or accident.

"Intentionally"  A person acts intentionally if it was her conscious objective or desire to act in the manner that she did.

"Material"  A statement is "material" if it has a natural tendency to influence or to be capable of influencing the decision of the decisionmaker to which it was addressed.  So, in this case, a statement is "material" if the statement had a natural tendency to influence, or was capable of influencing, the decision of a government agency in making a determination required to be made.  The government need not show that the agency was actually influenced by the statement involved.  If a statement could have provoked governmental action, it is material regardless of whether the agency actually relied upon it.

"Persecute"  The term "persecute" means to inflict suffering or harm upon those who differ (in race, religion, national origin, political opinion, or membership in a particular social group) in a manner that is regarded as offensive and that is condemned by civilized governments.

20

"<u>Murder</u>"   Murder is the unlawful killing of a human being, committed with the intent to kill.

"<u>Rape</u>"   Rape is sexual intercourse by force or threat of force and without the victim's consent.

"<u>Kidnap</u>"   Kidnapping is the seizure of a victim by force, against his or her will, for the purpose of securing some benefit to the actor.

"<u>Theft</u>"   Theft is the unlawful taking, or exercise of unlawful control over, the property of another, with the intent to deprive the other of that property.

"<u>Genocide</u>"   The term "genocide" includes any of the following acts, whether in a time of peace or in a time of war, that are committed with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group:

    (1)   killing members of that group; or

    (2)   causing serious bodily injury to members of that group; or

    (3)   causing the permanent impairment of the mental faculties of members of that group through drugs, torture, or similar techniques; or

21

(4)   subjecting that group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; or

(5)   imposing measures intended to prevent births within that group; or

(6)   transfers by force children of that group to another group.

## AIDING AND ABETTING A CRIME

One who aids, abets, counsels, induces, or procures the commission of a crime is considered a principal - that is, he or she is considered to have committed the crime.  The government alleges that the defendant provided material false statements that concealed her participation, either directly or as an aider and abettor, in murder, rape, kidnapping, false imprisonment, receiving stolen property, and genocide - all in connection with the Rwandan genocide in 1994.

To "aid and abet" means intentionally to help someone else commit a crime.  To establish aiding and abetting of an underlying crime, the government must prove beyond a reasonable doubt that (1) someone else committed the crime and (2) the defendant willfully associated herself in some way with the crime and willfully participated in it as she would in something she wished to bring about.  The central requirement of this second element is a showing that the defendant consciously shared the other person's knowledge of the underlying criminal act and

22

intended to help him. The defendant need not perform the substantive offense, or be present when it is performed, or be aware of the details of its execution to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that some criminal purpose is afoot is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

## II. COUNT TWO - PROCUREMENT OF CITIZENSHIP TO WHICH A PERSON IS NOT ENTITLED

### A. THE GOVERNMENT'S ALLEGATIONS

In Count Two of the indictment, the government charges the defendant with knowingly procuring United States citizenship to which she was not entitled. It says she was not entitled to United States citizenship because: she provided false information on her Application for Naturalization, Form N-400; she was not lawfully admitted to the United States because she gained entry to the United States by providing false and fraudulent information as to material facts in a series of documents she submitted to the United States government; she was an inadmissible alien who had engaged in genocide; and she was ineligible for naturalization because she was not a person of "good moral character;" and she was ineligible because she did

23

Appendix Page 1845

not satisfy the requirements for naturalization set forth in
United States law.

**B.    THE INDICTMENT**

Count Two of the indictment charges that, "from on or about
December 16, 2002, and continuing thereafter through on or about
July 18, 2003, in the District of New Hampshire and elsewhere,
the Defendant, Beatrice Munyenyezi, did knowingly procure, obtain
and apply for, and did attempt to procure and obtain
naturalization and citizenship, for herself, to which she was not
entitled, in that:

   a.    the Defendant did provide false and fraudulent
         information as to material facts in her Application
         for Naturalization, Form N-400;

   b.    at the time of her application for naturalization, the
         Defendant was not lawfully admitted to the United
         States for permanent residence, pursuant to Title 8,
         United States Code, Section 1427, and Title 8, United
         States Code, Section 1182, in that the Defendant did
         gain entry to and asylum in the United States by
         providing false and fraudulent information as to
         material facts in a Registration for Classification as
         a Refugee, Form I-590, Sworn Statement of Refugee
         Applying for Entry into the United States, Form G-646,
         and "Questions for Rwandan Visa Applicants"
         questionnaire;

   c.    at the time of her application for naturalization, the
         Defendant was not lawfully admitted to the United
         States for permanent residence, pursuant to Title 8,
         United States Code, Section 1427, and Title 8, United
         States Code, Section 1182, in that the Defendant did
         apply for and receive status as a Lawful Permanent
         Resident of the United States, by providing false and
         fraudulent information as to material facts in an

24

Application to Register Permanent Residence or Adjust Status, Form I-485;

d.  at the time of her application for naturalization, the Defendant was not lawfully admitted to the United States for permanent residence, pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that the Defendant was an inadmissible alien who had engaged in conduct that is defined as "genocide" for the purposes of the International Convention for the Prevention and Punishment of Genocide;

e.  at the time of her application for naturalization, the Defendant could not satisfy the requirements for naturalization, pursuant to Title 8, United States Code, Section 1427, in that she was not a person of "good moral character," in that the Defendant provided false testimony for the purpose of obtaining immigration benefits;

f.  at the time of her application for naturalization, the Defendant could not satisfy the requirements for naturalization, pursuant to Title 8, United States Code, Section 1427, in that she was not a person of "good moral character," in that the Defendant had participated in genocide, and in so doing committed numerous acts of violence, including murder, rape, persecution, and theft; and

g.  at the time of her application for naturalization, the Defendant did not satisfy the requirements for naturalization that are set forth in Title 8, United States Code, Section 1427.

All in violation of Title 18, United States Code, Section 1425(b)."

## C.   THE RELEVANT CRIMINAL STATUTE - 18 U.S.C. § 1425(b)

Title 18, United States Code, Section 1425(b) provides that, "Whoever, whether for himself or another person not

25

entitled thereto, knowingly . . . procures or obtains or applies for . . . naturalization or citizenship," shall be guilty of a crime.

## D. ESSENTIAL ELEMENTS OF THE CRIME

To carry its burden of proof with regard to the crime charged in Count Two of the indictment, the government must prove each of the following essential elements beyond a reasonable doubt:

First: That the defendant obtained citizenship of the United States; and

Second: That the defendant was not entitled to United States citizenship; and

Third: That the defendant knew that she was not entitled to United States citizenship.

## E. DEFINITIONS

"Knowingly" As I instructed you earlier, "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently. An act is done knowingly if the defendant was aware of the act and did not proceed through ignorance, mistake, or accident.

So, to sustain its burden with regard to the third element of Count Two, the government must prove, beyond a reasonable doubt, that when the defendant applied for or obtained

26

citizenship, she knew she was not entitled to become a naturalized citizen of the United States.

A person's knowledge of some particular fact is difficult to prove directly because there is no way to fathom or scrutinize the operations of the human mind. But, you may infer the defendant's knowledge from the surrounding circumstances. You may consider any statement she made or any action she undertook (or omitted), as well as all other facts and circumstances in evidence that might reveal her state of mind. So, for example, if you find that the government has proved that the defendant made material false statements in connection with her application to become a citizen, you may, but are certainly not required to, infer that she knew she was not entitled to become a citizen of the United States.

"Good Moral Character" A person is ineligible for naturalization if he or she is not of good moral character. There are, of course, many ways that a person can be considered to be not of good moral character. For purposes of this case, it is sufficient to say that a person is not of good moral character if she ordered, incited, assisted, or otherwise participated in genocide; or if she committed, aided, or abetted the commission of murder, rape, kidnapping, or theft;

27

or if she made material false statements for the purpose of obtaining immigration or naturalization benefits.

## G. UNANIMITY

With respect to the second element - that the defendant was not entitled to United States citizenship - the government has set forth several reasons (subsections a through g, under Section B on pages 24 and 25 ) that it claims disqualified the defendant from obtaining United States citizenship. In order to satisfy its burden with regard to the second element, the government must prove, beyond a reasonable doubt, that the defendant was in fact not entitled to United States citizenship. You must give separate consideration to each of the grounds allegedly disqualifying the defendant from obtaining United States citizenship that the government has identified. Before you may find that the government has carried its burden of proof with regard to the second element, you must unanimously agree as to which specific disqualifying ground or grounds the government has proved beyond a reasonable doubt.

## CONCLUSION

The principles of law set forth in these instructions are intended to guide you in reaching a fair and just result in

28

this case, which is important to all of the parties. You are to exercise your judgment and common sense, without prejudice and without sympathy, but with honesty and understanding. You should be conscientious in your determination of a just result in this case because that is your highest duty as officers of this court. Remember also that the question before you can never be: "Will the government win or lose the case?" The government always wins when justice is done, regardless of whether the jury's verdict is guilty or not guilty. Your duty is to see that justice is done.

When you have considered and weighed all of the evidence, you must make one of the following findings with respect to each crime charged in the indictment:

1. If you have a reasonable doubt as to whether the government has proved any one or more of the essential elements of the crime charged, you must find the defendant not guilty with regard to that crime.

2. If you find that the government has proved all of the essential elements of the crime charged beyond a reasonable doubt, then you may find the defendant guilty with regard to that crime.

29

## A. PUNISHMENT - IRRELEVANT

In reaching an impartial verdict in this case, you must not speculate as to what punishment the law provides for the crimes with which the defendant is charged. The punishment provided by law for the offenses charged in the indictment is exclusively my responsibility; you should not consider it nor should it affect or color your deliberations in any way.

## B. SELECTION OF FOREPERSON

When you retire, you should elect one member of the jury as your foreperson. That individual will act very much like the chairperson of a committee, seeing to it that the deliberations are conducted in an orderly fashion and that each juror has a full and fair opportunity to express his or her views, positions, and arguments on the evidence and on the law.

## C. VERDICT MUST BE UNANIMOUS

The verdict with regard to each offense charged in the indictment must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict as to each count in the indictment, regardless of whether it is guilty or not guilty, must be unanimous.

30

**D. DELIBERATIONS**

It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and to change your opinion if you become convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely based upon the opinion of your fellow jurors or merely for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges - judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

If, during your deliberations, it becomes necessary to communicate with me, you may do so only in writing, signed by the foreperson or by one or more members of the jury. Give that note to the court security officer and he or she will bring it to my attention. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will communicate with you on anything concerning the case either in writing or orally in the courtroom.

31

Remember that you are not to tell anyone, including me, how the jury stands, numerically or otherwise, on the matters you are deciding, until after you have reached a unanimous verdict or have been discharged.  In other words, if the jury is split, say 8 to 4 on some issue, the existence of that split or the number on one side or the other must not be disclosed to anyone, including me.

If we recess during your deliberations, follow all of the instructions that I have given you concerning your conduct during the trial.  In particular, refrain from discussing the case with anyone other than your fellow jurors in the jury room, with everyone present.

At the risk of being repetitive, let me again say that nothing said in these instructions is intended to suggest in any way what your verdict should be.  The verdict is exclusively your duty and responsibility.

After you have reached a verdict, your foreperson will fill in the verdict form that has been given to you, sign and date it, and notify the court security officer.  You will then be returned to the courtroom.

32

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

     v.                          Criminal Case No. 10-cr-085-SM

<u>Beatrice Munyenyezi</u>

**JURY INSTRUCTIONS**

**<u>INTRODUCTION</u>**

At this stage of the trial it is my duty to instruct you on
the principles of law that you must apply in deciding this case.
It is your duty to follow these instructions during your
deliberations.  You should not single out any one instruction but
instead apply these instructions as a whole to the evidence in
this case.

Each of my instructions has a caption or heading.  The
captions are not part of my instructions.  They are present
solely for purposes of convenience, to assist you in locating
different instructions.

**<u>JURY SOLE JUDGES OF FACT</u>**

You are the sole and exclusive judges of the facts.  You
must weigh the evidence that has been presented impartially,
without bias, without prejudice, and without sympathy.  You must

determine what the facts are, what the truth is, based upon the evidence presented in the case.  You will decide the case by applying the law as I give it to you in these instructions to the facts as you find them to be from the evidence.

### CREDIBILITY OF WITNESSES

In determining what the facts are and what the truth is, you must necessarily assess the credibility of each witness and determine what weight you will give to each witness's testimony. By credibility I mean the believability or the truthfulness of a witness.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief or not worthy of belief.  You should also consider the extent, if any, to which the testimony of each witness is either supported or contradicted by other evidence in the case.

After assessing the credibility of each witness, you will assign to the testimony of each witness, both under direct and cross-examination, such weight as you deem proper.  You are not required to believe the testimony of a witness simply because that witness was under oath.  You may believe or disbelieve all or part of the testimony of any witness.  It is within your

2

province to determine what testimony is worthy of belief and what testimony may not be worthy of belief.

### A.   CREDIBILITY OF GOVERNMENT AGENTS

You should consider the testimony of a government agent in the same way as the testimony of any other witness in the case. In evaluating the credibility of a government agent, you should use the same tests that you applied to the testimony of any other witness.   In no event should you give the testimony of a government agent any more credibility, or any less credibility, simply because that witness is a government agent.

### B.   CREDIBILITY OF ACCOMPLICES

You have heard witnesses who testified that they were involved in the planning and execution of crimes underlying the charges in the indictment.   Such persons are commonly referred to as accomplices.

The testimony of a witness who says that he or she is an accomplice may be received in evidence and considered by you even though it is not corroborated by other evidence, and you may give such testimony the weight you deem appropriate under the circumstances.   However, you should keep in mind that such testimony is always to be received with caution and considered with great care.

3

In scrutinizing the manner and circumstances of the
testimony given by an alleged accomplice, you may consider
whether an alleged accomplice believed that he or she would
benefit more by lying or by telling the truth.  In short, you may
consider how an alleged accomplice's hope of future benefits may
have affected that witness's testimony.

### C.   PRIOR INCONSISTENT STATEMENTS

The testimony of a witness may be discredited or, as we
sometimes say, "impeached" by showing that the witness previously
made statements that are different than, or inconsistent with,
his or her testimony here in court.  Some of the prior statements
introduced in this case were made by witnesses who were under
oath during another proceeding when the statements were made.
You may consider such statements as if they were made at this
trial.  You must decide what weight, if any, should be given to
the testimony of a witness who has made prior inconsistent or
contradictory statements.  In making that determination you may
consider whether the witness purposely made a false statement or
whether it was an innocent mistake; whether the inconsistency
concerns an important fact or whether it had to do with a small
detail; whether the witness had an explanation for the
inconsistency and whether that explanation appealed to your
common sense.

4

If a person is shown to have knowingly testified falsely about any important matter, you obviously have a right to distrust the testimony of that person concerning other matters. You may reject all of the testimony of that witness or give it such weight or credibility as you may think it deserves.

**D.   WITNESS'S USE OF INTOXICANTS**

The testimony of a witness who is shown to have used intoxicants, such as alcohol or drugs, during the period of time about which that witness testified must always be examined and weighed by you with greater care and caution than the testimony of ordinary witnesses.

You should not convict the defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

**E.   TESTIMONY OF EXPERT WITNESSES**

You have heard testimony from witnesses who were permitted to testify as experts.  An expert is allowed to express an opinion on those matters about which he or she has special knowledge and training.  Expert testimony is presented to you based on the belief that someone who is experienced in a particular field can assist you in understanding the evidence or in reaching an independent decision on the facts.

5

In weighing an expert's testimony, you may consider the expert's qualifications, experience, training, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony.  You may give the expert testimony such weight, if any, as you find it deserves in light of all of the evidence in this case.  You should not, however, accept the testimony of an expert witness merely because that witness is an expert.  Nor should you substitute the opinions of an expert for your own reason, judgment, and common sense.  In the end, the determination of the facts in this case rests solely with you.

### WEIGHT OF THE EVIDENCE

The weight of the evidence is not necessarily determined by the number of witnesses testifying on either side.  You will consider all the facts and circumstances in evidence to determine which of the witnesses are worthy of belief.  You may find that the testimony of a small number of witnesses on a particular issue is more credible than the testimony of a greater number of witnesses on the other side of the same issue.  It is not the number of witnesses or the quantity of testimony that is important, but the quality of the evidence that has been produced that is important.

6

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that given to any other party in litigation. By the same token, the government is entitled to no less consideration. All parties, whether the government or individuals, stand as equals at the bar of justice.

### DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two types of evidence that you may properly use in deciding whether the defendant is guilty or not guilty.

Direct evidence is the testimony given by a witness about what that witness has seen, heard, or observed, or what that witness knows based on personal knowledge. Direct evidence also includes any exhibits that have been marked and any stipulations that have been agreed to by the lawyers. During the course of the trial, you were told that the government and the defendant agreed, or "stipulated," to certain facts. This simply means that both sides accept those facts to be true. Because there is no disagreement regarding those facts, there was no need for either side to introduce evidence relating to them. You must accept as true the facts to which the government and the defendant have stipulated.

Evidence may also be used to prove a fact by implication, and this is referred to as circumstantial evidence. In other

7

words, from examining direct evidence you may be able to draw certain inferences that are reasonable and justified in light of your daily experience and common sense. Such reasonable inferences constitute circumstantial evidence.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is up to you to decide how to weigh the evidence in this case.

## WHAT IS EVIDENCE

The evidence in this case consists of: (1) the sworn testimony of the witnesses, both on direct and cross-examination, regardless of who may have called those witnesses; (2) the exhibits that have been received into evidence, regardless of who may have produced them; and (3) any facts to which the lawyers have agreed or stipulated.

## WHAT IS NOT EVIDENCE

Certain things are not evidence and you cannot consider them as evidence:

1. Arguments, statements, and questions by the lawyers are not evidence. Questions asked by the lawyers and statements the lawyers have made in their opening statements, closing arguments, and at other times during the trial are intended to help you interpret the evidence, but they are not evidence. If the facts

8

as you remember them differ from the way the lawyers have stated them, your memory controls.

2. Objections by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper under the rules of evidence. I must rule on objections and I have not intended to indicate in any way by my rulings or by what I have said what the verdict should be in this case. You should not be influenced by the lawyers' objections or by my rulings on those objections.

3. Testimony that has been excluded or stricken, or that I have instructed you to disregard, is not evidence and must not be considered in any way in your deliberations.

4. The indictment is not evidence. This case, like most criminal cases, began with an indictment. You will have that indictment before you during the course of your deliberations. That indictment was returned by a grand jury, which heard only the government's side of the case. The fact that this defendant has been indicted by a grand jury is not evidence of her guilt. The indictment is simply an accusation. It is the means by which the government's allegations and charges are brought before this court. You must decide whether the defendant is guilty or not guilty of those charges, and the indictment is not evidence.

9

5.   Anything you may have seen or heard when the court was not in session is not evidence.  You must decide the case solely on the evidence received at trial.

## EVIDENCE ADMITTED FOR A LIMITED PURPOSE

During the course of the trial, I have instructed you that certain evidence was being admitted for a limited purpose.  It is your duty to follow those instructions during your deliberations.

## PRESUMPTION OF INNOCENCE

Let me remind you that the fact that an indictment has been returned against the defendant is not evidence of her guilt.  An indictment is merely a formal method of accusing an individual of a crime in order to bring that person to trial.  It is you who will determine whether the defendant is guilty or not guilty of the offenses charged in the indictment, based on a consideration of all the evidence presented during trial and the law applicable to the case.  Therefore, you must not consider the indictment in this case as any evidence of the guilt of this defendant, nor should you draw any inference from the fact that an indictment has been returned against her.

A defendant, although accused, begins a trial with a clean slate - with no evidence against her.  The law permits nothing

10

but the admissible evidence presented before you to be considered in support of the charges against her.

The law presumes every defendant to be innocent until proven guilty beyond a reasonable doubt.  The burden of proof rests entirely on the government.  A defendant does not have to prove her innocence.  A defendant enters the courtroom and is presumed to be innocent until the government convinces you, beyond a reasonable doubt, that she is guilty of every essential element of one or more of the offenses charged in the indictment.  That presumption means that you are to regard the defendant in this case as innocent unless the government proves, beyond a reasonable doubt, that she is guilty.

The presumption of innocence alone is sufficient to acquit the defendant unless you are satisfied beyond a reasonable doubt, after a careful and impartial consideration of all of the evidence in the case, that she is guilty of one or more of the crimes charged in the indictment.

## DEFENDANT'S DECISION NOT TO TESTIFY

The fact that the defendant did not testify must not be considered by you in any way or even discussed in your deliberations.  She has an absolute right not to take the witness stand and you must not draw any inferences from the fact that she exercised that right.

11

## GOVERNMENT'S BURDEN OF PROOF - BEYOND A REASONABLE DOUBT

The burden is always on the government to prove guilt beyond a reasonable doubt.  The burden of proof never shifts to the defendant to demonstrate her innocence.  The law does not impose upon a defendant in a criminal case the obligation to call any witnesses or produce any evidence.

If, after careful and impartial consideration of all of the evidence in this case, you have a reasonable doubt as to whether the defendant is guilty of any charge, you must find her not guilty on that charge.

The defendant has pleaded not guilty to each of the charges in the indictment.  That plea puts in issue all of the essential elements of the offenses as described in these instructions, and imposes on the government the burden of establishing each of those elements by proof beyond a reasonable doubt.

The jury must never find a defendant guilty based on mere suspicion, conjecture, or guess.  Likewise, the jury must never find a defendant guilty because it thinks she "might" be guilty or that she is "probably" guilty.  Before you may return a verdict of guilty as to a crime charged in the indictment, you must unanimously conclude, beyond a reasonable doubt, that the defendant committed each of the essential elements of that offense.

12

## CONSIDER EACH COUNT SEPARATELY

The indictment charges two separate crimes against the defendant. Each offense charged in the indictment and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty of one of the offenses charged should not control your verdict as to the other offense charged against the defendant.

## IDENTIFICATION

One of the important issues in this case is the identification of the defendant. The government has the burden of proving identity, beyond a reasonable doubt.

Identification testimony is an expression of an opinion or belief on the part of a witness. Its value depends on the opportunity the witness had to observe the person at the time and, later, to make a reliable identification, whether directly, through a photograph, or by some other means. In considering the testimony of an "identification witness," you should consider the following matters:

- Did the witness have the ability to see the person at the time?

- Was the witness's identification of the defendant influenced by circumstances under which the identification was made?

13

—   Has the witness's identification been
    unfairly suggested by events that occurred
    since the time of observation?

—   Is the witness's recollection accurate?

You may also consider whether the witness gave descriptions of
the person he or she observed that were inconsistent with
characteristics of the defendant at the time the person was
observed.  In addition, you should consider the credibility of
the identification witness just as you would any other witness.

It is not essential that an identification witness be free
from doubt as to the correctness of his or her identification of
a defendant.  However, you, the jury, must be satisfied beyond a
reasonable doubt that it was the defendant who committed each of
the essential elements of a charged crime before you may convict
her of that crime.

Let me repeat, the burden is on the prosecution to prove
every element of a crime charged, including the identity of the
defendant as the person who committed that crime.  Therefore, if
after examining all of the evidence, you find that a crime was
committed, but you have a reasonable doubt about whether it was
the defendant who committed the crime, you must find her not
guilty of that charge.

14

## DATE OF OFFENSE - ON OR ABOUT

You will see that the indictment charges that the offenses at issue were committed "on or about" certain dates. When the phrase "on or about" is used, the evidence need not establish with certainty the exact date of an alleged offense. It is sufficient if the evidence establishes, beyond a reasonable doubt, that the offense charged was committed on a date reasonably near the date alleged; that is, a date reasonably close in time to the date on which the offense is alleged to have occurred.

## INDICTMENT CHARGING IN THE CONJUNCTIVE

The law provides that when an indictment charges several means of violating a statute in the conjunctive (that is, by listing several of those means and joining them with the word "and"), a conviction may be obtained on proof of only one of those means.

In other words, where a statute sets forth several different means by which an offense may be committed, it is permissible for a count in an indictment to charge that the defendant committed several or even all of those means in the conjunctive. Nevertheless, to satisfy its burden of proof, the government need only convince you, beyond a reasonable doubt, that the defendant committed or engaged in one of those means by which to commit the

15

charged offense; proof beyond a reasonable doubt of any one of the acts conjunctively charged in the indictment is sufficient.

## THE NATURE OF THE OFFENSES CHARGED

The indictment charges the defendant with two separate crimes, each of which you must consider separately. In Count One, the government alleges that the defendant knowingly procured her citizenship "contrary to law." In Count Two, it alleges that she knowingly procured citizenship to which she was "not entitled."

## I. COUNT ONE - UNLAWFUL PROCUREMENT OF CITIZENSHIP OR NATURALIZATION

### A. THE GOVERNMENT'S ALLEGATIONS

In Count One of the indictment, the government charges that the defendant knowingly procured her citizenship (also known as "naturalization") "contrary to law." Specifically, it alleges that defendant made several false statements on her Application for Naturalization, Form N-400. The government alleges that the defendant provided the false statements at issue to conceal her participation, both directly and as an aider and abettor, in murder, rape, kidnapping, false imprisonment, receiving stolen property, and genocide - all in connection with the Rwandan genocide in 1994.

16

**B.    THE INDICTMENT**

Count One of the indictment charges that "from on or about December 16, 2002, and continuing thereafter through on or about July 18, 2003, in the District of New Hampshire and elsewhere, the Defendant, Beatrice Munyenyezi, did knowingly procure and attempt to procure her own naturalization contrary to law, that is, in violation of Title 18, United States Code, Sections 1001(a)(2) and (3), by knowingly providing false and fraudulent information as to material facts in her Application for Naturalization, Form N-400, and in violation of the Immigration and Nationality Act.  All in violation of Title 18, United States Code, Section 1425(a)."

**C.    THE RELEVANT CRIMINAL STATUTES**

Title 18, United States Code, Section 1425(a) provides that, "Whoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person" shall be guilty of a crime.

Title 18, United States Code, Section 1001(a) provides that, "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation or makes or

17

uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement" shall be guilty of a crime.

### D.   ESSENTIAL ELEMENTS OF THE CRIME

To carry its burden of proof with regard to the crime charged in Count One of the indictment, the government must prove each of the following essential elements beyond a reasonable doubt:

First:    That the defendant procured, or attempted to procure, United States citizenship; and

Second:   That it was contrary to the law for the defendant to procure such citizenship; and

Third:    That the defendant knowingly and intentionally provided materially false statements on her Application for Naturalization, Form N-400.

### E.   DEFINITIONS

"Contrary to Law."  The government alleges that the defendant procured United States citizenship "contrary to law" because it claims she violated federal law which makes it unlawful to give false statements relating to immigration and naturalization.  Specifically, the government alleges that the defendant made the following false material statements when she completed and submitted an "Application for Naturalization, Form N-400."

18

1.   In response to a question on her Form N-400 that asked, "Have you **EVER** been a member of, or associated with, any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?" (emphasis in original), the defendant did not disclose her membership in, and association with, the MRND and Interahamwe and she responded by putting an "X" in the box marked "No."

2.   In response to a question on her N-400 that asked, "Have you **EVER** persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion?" (emphasis in original), the defendant responded by putting an "X" in the box marked "No" and failed to disclose her direct and indirect persecution of Tutsis during the Rwandan genocide.

3.   In response to a question on her N-400 that asked, "Have you **EVER** committed a crime or offense for which you were **NOT** arrested?" (emphasis in original), the defendant failed to disclose her participation in genocide, murder, rape, kidnapping, and theft, and responded by putting an "X" in the box marked "No." The government also alleges that the defendant failed to disclose that she had previously violated United States criminal laws by providing false information in immigration interviews and documents – that is, the Form I-590, Form G-646, the Rwandan Questionnaire, and Form I-485.

4.   In response to a question on her Form N-400 that asked, "Have you **EVER** given false or misleading information to any U.S. official while applying for any immigration benefit or to prevent deportation, exclusion or removal?" (emphasis in original), the defendant responded by putting an "X" in the box marked "No" and failed to disclose false information she provided in previous immigration documents – that is, the Form I-590, Form G-646, the Rwandan Questionnaire, and Form I-485.

5.   In response to a question on her N-400 that asked, "Have you **EVER** lied to any U.S. government official to gain entry or admission into the United States?" (emphasis in original), the defendant responded by

19

putting an "X" in the box marked "No" and failed to disclose the false information she provided on the Form I-590, Form G-646, and the Rwandan Questionnaire.

In order to satisfy its burden with regard to the first element, the government must prove, beyond a reasonable doubt, that the defendant made one or more of the statements set forth above and it must also prove that the statement was false and material.

You must give separate consideration to each of the alleged false statements the government has identified. And, before you may find that the government has carried its burden of proof with regard to the first element, you must unanimously agree that the defendant made at least one particular false statement. By that I mean the following: it is not sufficient if you all agree that the defendant made some false statement, but cannot agree on which one. Instead, before you may convict the defendant of the crime charged in count one, you must all agree with regard to which specific false statement(s) the government has proved beyond a reasonable doubt.

If you cannot unanimously agree that the defendant made a false statement as alleged in count one, or if you cannot unanimously agree which specific false statement she made, you must return a verdict of not guilty with regard to count one.

20

"<u>Knowingly</u>" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.  In other words, an act is done knowingly if the defendant was aware of the act and did not proceed through ignorance, mistake, or accident.

"<u>Intentionally</u>"  A person acts intentionally if it was her conscious objective or desire to act in the manner that she did.

"<u>Material</u>"  A statement is "material" if it has a natural tendency to influence or to be capable of influencing the decision of the decisionmaker to which it was addressed.  So, in this case, a false statement is "material" if the statement would have warranted a denial of citizenship, or, the statement had a natural tendency to influence, or was capable of influencing the decision of a government agency in making a determination required to be made.  The government need not show that the agency was actually influenced by the statement involved.  If a statement could have provoked governmental action, it is material regardless of whether the agency actually relied upon it.

"<u>Persecute</u>"  The term "persecute" means to inflict suffering or harm upon those who differ (in race, religion, national origin, political opinion, or membership in a particular social

group) in a manner that is regarded as offensive and that is condemned by civilized governments.

"<u>Murder</u>"  Murder is the unlawful killing of a human being, committed with the intent to kill.

"<u>Rape</u>"  Rape is sexual intercourse by force or threat of force and without the victim's consent.

"<u>Kidnap</u>"  Kidnapping is the seizure of a victim by force, against his or her will, for the purpose of securing some benefit to the actor.

"<u>Theft</u>"  A person commits "theft" is he or she unlawfully takes, or exercises unlawful control over, the property of another, with the intent to deprive the other of that property.

"<u>Genocide</u>"  The term "genocide" includes any of the following acts, whether in a time of peace or in a time of war, that are committed with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group:

(1)  killing members of that group; or

22

(2)  causing serious bodily injury to members of that
     group; or

(3)  causing the permanent impairment of the mental
     faculties of members of the group through drugs,
     torture, or similar techniques; or

(4)  subjecting the group to conditions of life that
     are intended to cause the physical destruction of
     the group in whole or in part; or

(5)  imposing measures intended to prevent births
     within the group; or

(6)  transfers by force children of the group to
     another group.

## AIDING AND ABETTING A CRIME

One who aids, abets, counsels, induces, or procures the commission of a crime is punishable as a principal – that is, he or she is considered to have committed the crime.

To "aid and abet" means intentionally to help someone else commit a crime.  To establish aiding and abetting of an underlying crime, the government must prove beyond a reasonable doubt that (1) someone else committed the crime and (2) the defendant willfully associated herself in some way with the crime and willfully participated in it as she would in something she wished to bring about.  The central requirement of this second element is a showing that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.  The defendant need not perform the substantive offense, be present when it is performed, or be aware

23

of the details of its execution to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that some criminal purpose is afoot is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

## II. COUNT TWO - PROCUREMENT OF CITIZENSHIP TO WHICH A PERSON IS NOT ENTITLED

### A. THE GOVERNMENT'S ALLEGATIONS

In Count Two of the indictment, the government charges the defendant with knowingly procuring United States citizenship to which she was not entitled. It says she was not entitled to United States citizenship because: she provided false information on her Application for Naturalization, Form N-400; she was not lawfully admitted to the United States because she gained entry to the United States by providing false and fraudulent information as to material facts in a series of documents she submitted to the United States government; she was an inadmissible alien who had engaged in genocide; and she was ineligible for naturalization because she was not a person of "good moral character."

**B.    THE INDICTMENT**

Count Two of the indictment charges that, "from on or about December 16, 2002, and continuing thereafter through on or about July 18, 2003, in the District of New Hampshire and elsewhere, the Defendant, Beatrice Munyenyezi, did knowingly procure, obtain and apply for, and did attempt to procure and obtain naturalization and citizenship, for herself, to which she was not entitled, in that:

a.    the Defendant did provide false and fraudulent information as to material facts in her Application for Naturalization, Form N-400;

b.    at the time of her application for naturalization, the Defendant was not lawfully admitted to the United States for permanent residence, pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that the Defendant did gain entry to and asylum in the United States by providing false and fraudulent information as to material facts in a Registration for Classification as a Refugee, Form I-590, Sworn Statement of Refugee Applying for Entry into the United States, Form G-646, and "Questions for Rwandan Visa Applicants" questionnaire;

c.    at the time of her application for naturalization, the Defendant was not lawfully admitted to the United States for permanent residence, pursuant to Title 8, United States Code, Section 1427, and Title 8, United States Code, Section 1182, in that the Defendant did apply for and receive status as a Lawful Permanent Resident of the United States, by providing false and fraudulent information as to material facts in an Application to Register Permanent Residence or Adjust Status, Form I-485;

d.    at the time of her application for naturalization, the Defendant was not lawfully admitted to the United States for permanent residence, pursuant to Title 8,

25

United States Code, Section 1427, and Title 8, United
States Code, Section 1182, in that the Defendant was an
inadmissible alien who had engaged in conduct that is
defined as "genocide" for the purposes of the
International Convention for the Prevention and
Punishment of Genocide;

e.   at the time of her application for naturalization, the
Defendant could not satisfy the requirements for
naturalization, pursuant to Title 8, United States
Code, Section 1427, in that she was not a person of
"good moral character," in that the Defendant provided
false testimony for the purpose of obtaining
immigration benefits;

f.   at the time of her application for naturalization, the
Defendant could not satisfy the requirements for
naturalization, pursuant to Title 8, United States
Code, Section 1427, in that she was not a person of
"good moral character," in that the Defendant had
participated in genocide, and in so doing committed
numerous acts of violence, including murder, rape,
persecution, and theft; and

g.   at the time of her application for naturalization, the
Defendant did not satisfy the requirements for
naturalization that are set forth in Title 8, United
States Code, Section 1427.

All in violation of Title 18, United States Code, Section
1425(b)."

## C.   THE RELEVANT CRIMINAL STATUTE - 18 U.S.C. § 1425(b)

Title 18, United States Code, Section 1425(b) provides
that, "Whoever, whether for himself or another person not
entitled thereto, knowingly . . . procures or obtains or
applies for . . . naturalization or citizenship," shall be
guilty of a crime.

### D. ESSENTIAL ELEMENTS OF THE CRIME

To carry its burden of proof with regard to the crime charged in Count Two of the indictment, the government must prove each of the following essential elements beyond a reasonable doubt:

First: That the defendant obtained citizenship of the United States; and

Second: That the defendant was not entitled to United States citizenship; and

Third: That the defendant knew that she was not entitled to United States citizenship.

### E. DEFINITIONS

"Knowingly" As I instructed you earlier, "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently. An act is done knowingly if the defendant was aware of the act and did not proceed through ignorance, mistake, or accident.

So, to sustain its burden with regard to the third element of Count Two, the government must prove, beyond a reasonable doubt, that when the defendant applied for or obtained citizenship, she knew she was not entitled to become a naturalized citizen of the United States.

A person's knowledge of some particular fact is difficult to prove directly because there is no way to fathom or

27

scrutinize the operations of the human mind. But you may infer the defendant's knowledge from the surrounding circumstances. You may consider any statement made or any action undertaken (or omitted) by the defendant, as well as all other facts and circumstances in evidence that might reveal her state of mind. So, for example, if you find that the government has proved that the defendant made material false statements in connection with her application to become a citizen, you may, but are certainly not required to, infer that she knew she was not entitled to become a citizen of the United States.

"Good Moral Character" A person is ineligible for naturalization if he or she is not of good moral character. There are, of course, many ways that a person can be considered to be not of good moral character. For purposes of this case, it is sufficient to say that a person is not of good moral character if she ordered, incited, assisted, or otherwise participated in genocide, or committed, aided, or abetted the commission of murder, rape, kidnapping, or theft. Also, a person is not of good moral character if she has made false statements for the purpose of obtaining immigration or naturalization benefits.

28

## CONCLUSION

The principles of law set forth in these instructions are intended to guide you in reaching a fair and just result in this case, which is important to all of the parties.  You are to exercise your judgment and common sense, without prejudice and without sympathy, but with honesty and understanding.  You should be conscientious in your determination of a just result in this case because that is your highest duty as officers of this court.  Remember also that the question before you can never be: "Will the government win or lose the case?"  The government always wins when justice is done, regardless of whether the jury's verdict is guilty or not guilty.  Your duty is to see that justice is done.

When you have considered and weighed all of the evidence, you must make one of the following findings with respect to each crime charged in the indictment:

1.  If you have a reasonable doubt as to whether the government has proved any one or more of the essential elements of the crime charged, you must find the defendant not guilty with regard to that crime.

2.  If you find that the government has proved all of the essential elements of the crime charged beyond a reasonable doubt, then you may find the defendant guilty with regard to that crime.

29

## A. PUNISHMENT - IRRELEVANT

In reaching an impartial verdict in this case, you must not speculate as to what punishment the law provides for the crimes with which the defendant is charged. The punishment provided by law for the offenses charged in the indictment is exclusively my responsibility; you should not consider it nor should it affect or color your deliberations in any way.

## B. SELECTION OF FOREPERSON

When you retire, you should elect one member of the jury as your foreperson. That individual will act very much like the chairperson of a committee, seeing to it that the deliberations are conducted in an orderly fashion and that each juror has a full and fair opportunity to express his or her views, positions, and arguments on the evidence and on the law.

## C. VERDICT MUST BE UNANIMOUS

The verdict with regard to each offense charged in the indictment must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict as to each count in the indictment, regardless of whether it is guilty or not guilty, must be unanimous.

30

### D.  DELIBERATIONS

It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views and to change your opinion if you become convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of the evidence solely based upon the opinion of your fellow jurors or merely for the purpose of returning a verdict. Remember at all times that you are not partisans.  You are judges - judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

If, during your deliberations, it becomes necessary to communicate with me, you may do so only in writing, signed by the foreperson or by one or more members of the jury.  Give that note to the court security officer and he or she will bring it to my attention.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will communicate with you on anything concerning the case either in writing or orally in the courtroom.

31

Remember that you are not to tell anyone, including me, how the jury stands, numerically or otherwise, on the matters you are deciding, until after you have reached a unanimous verdict or have been discharged. In other words, if the jury is split, say 8 to 4 on some issue, the existence of that split or the number on one side or the other must not be disclosed to anyone, including me.

If we recess during your deliberations, follow all of the instructions that I have given you concerning your conduct during the trial. In particular, refrain from discussing the case with anyone other than your fellow jurors in the jury room, with everyone present.

At the risk of being repetitive, let me again say that nothing said in these instructions is intended to suggest in any way what your verdict should be. The verdict is exclusively your duty and responsibility.

After you have reached a verdict, your foreperson will fill in the verdict form that has been given to you, sign and date it, and notify the court security officer. You will then be returned to the courtroom.

32

Appendix Page 1886

⟍    UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE

United States of America

v.                                    Criminal Case No. 10-cr-085-SM

Beatrice Munyenyezi

**JURY VERDICT**

As to the charges alleged in the indictment against the
defendant, we, the jury, find as follows:

I.    Count One - Procurement of Naturalization Contrary to Law
      (18 U.S.C. § 1425(a))

      ___ Not Guilty
      ✓ Guilty

II.   Count Two - Procurement of Naturalization by a Person not
      Entitled Thereto (18 U.S.C. § 1425(b))

      ___ Not Guilty
      ✓ Guilty

Signed:_____
                    Foreperson

Dated:  February 21, 2013

Appendix Page 1887

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO
2/11/2014

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-CR-85-SM
            v.                  *  February 21, 2013
                                *  1:40 p.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY VERDICT
BEFORE THE HONORABLE STEVEN J. MCAULIFFE
and a jury

Appearances:

For the Government:    Aloke S. Chakravarty, SAUSA
                       John A. Capin, SAUSA
                       U.S. Attorney's Office (NH and MA)

For the Defendant:     Mark E. Howard, Esq.
                       David W. Ruoff, Esq.
                       Howard & Ruoff, PLLC
                       831 Union Street
                       Manchester, NH 03104

Court Reporter:        Diane M. Churas, CSR, CRR
                       Official Court Reporter
                       U.S. District Court
                       55 Pleasant Street
                       Concord, NH   03301
                       (603) 225-1442

1                    BEFORE THE COURT

2          THE CLERK:  Will the court security officer

3    please bring in the jury.

4                    BEFORE THE JURY

5          THE CLERK:  Madam foreperson, the Court

6    understands the jury has reached a verdict.

7          THE JUROR:  We have.

8          THE CLERK:  Will the court security officer

9    please hand the verdict to me.

10         (Pause.)

11         THE COURT:  Madam foreperson, is the jury's

12   verdict unanimous?

13         THE JUROR:  Yes, it is.

14         THE CLERK:  In the matter of United States

15   versus Beatrice Munyenyezi, Criminal Case No.

16   10-cr-85-01-SM, the jury verdict reads as follows:

17         As to the charges alleged in the indictment

18   against the defendant, we, the jury, find as follows:

19         As to Count 1, guilty.

20         As to Count 2, guilty.

21         It is signed by the foreperson, Traci Booth,

22   and dated February 21st, 2013.

23         THE COURT:  Would either counsel like the jury

24   polled?

25         MR. HOWARD:  Yes, please.

```
 1                    THE COURT:  All right.  I'd ask the deputy
 2   clerk to please poll the jury.
 3                    THE CLERK:  Madam foreperson and members of
 4   the jury, you have heard the verdict as the Court has
 5   recorded it.  Juror No. 1, is that your verdict?
 6                    THE JUROR:  Yes.
 7                    THE CLERK:  Juror No. 2, is that your verdict?
 8                    THE JUROR:  Yes.
 9                    THE CLERK:  Juror No. 3, is that your verdict?
10                    THE JUROR:  Yes.
11                    THE CLERK:  Juror No. 4, is that your verdict?
12                    THE JUROR:  Yes.
13                    THE CLERK:  Juror No. 5, is that your verdict?
14                    THE JUROR:  Yes.
15                    THE CLERK:  Juror No. 6, is that your verdict?
16                    THE JUROR:  Yes.
17                    THE CLERK:  Juror No. 7, is that your verdict?
18                    THE JUROR:  Yes.
19                    THE CLERK:  Juror No. 8, is that your verdict?
20                    THE JUROR:  Yes.
21                    THE CLERK:  Juror No. 9, is that your verdict?
22                    THE JUROR:  Yes.
23                    THE CLERK:  Juror No. 10, is that your
24   verdict?
25                    THE JUROR:  Yes.
```

```
 1              THE CLERK:  Juror No. 11, is that your

 2    verdict?

 3              THE JUROR:  Yes.

 4              THE CLERK:  Juror No. 12, is that your

 5    verdict?

 6              THE JUROR:  Yes.

 7              THE COURT:  All right.  Ladies and gentlemen,

 8    on behalf of the Court I want to thank you for your

 9    service.  Obviously it's a very difficult job and you've

10    done a very good job of listening carefully to the

11    evidence and I'm sure considering the evidence and the

12    issues you're deciding and I want to thank you for that

13    service to your country.  And with that thanks, I'm now

14    going to excuse you from jury service in the case.

15              (Jury left courtroom.)

16                    BEFORE THE COURT

17              THE COURT:  Based upon the jury's verdict,

18    judgment will be entered in accordance with the verdict.

19    I now determine that the final order admitting the

20    defendant, Beatrice Munyenyezi, to United States

21    citizenship is hereby set aside, revoked, and declared

22    void.  Defendant's certificate of naturalization is

23    hereby declared cancelled.  A written order to that

24    effect will be entered on the docket.

25              Defendant shall be detained pending
```

1    sentencing.  A date has been set for sentencing.  It's

2    June 3rd, 2013, at 9:30 a.m., June 3rd, 2013, at

3    9:30 a.m.  Yes, Mr. Howard?

4            MR. HOWARD:  Your Honor, would the Court

5    entertain release pending sentencing?

6            THE COURT:  Well, you know, I will certainly

7    give you an opportunity to file a motion.  You probably

8    want to think about it for a little bit.  She will be

9    detained certainly from this point.

10           All right.  Defendant's remanded to the

11   custody of the Marshal.  Court's adjourned.  Thank you

12   very much.

13           (Adjourned at 1:45 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3           I, Diane M. Churas, do hereby certify that the

 4   foregoing transcript is a true and accurate

 5   transcription of the within proceedings, to the best of

 6   my knowledge, skill, ability and belief.

 7

 8

 9   Submitted: 11/13/2013      DIANE M. CHURAS, LCR, RPR, CRR
                                LICENSED COURT REPORTER, NO. 16
10                              STATE OF NEW HAMPSHIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                           Case No. 10-cr-85-1-SM

Beatrice Munyenyezi

## O R D E R

The defendant, Beatrice Munyenyezi, having been convicted in this court, by a jury, of knowingly procuring naturalization contrary to law in violation of the provisions of 18 U.S.C. § 1425(a), and of obtaining naturalization or citizenship knowing that she was not entitled thereto in violation of the provisions of 18 U.S.C. § 1425(b), the final order admitting Beatrice Munyenyezi to citizenship is hereby revoked, set aside and declared void.  The certificate of citizenship, issued to Beatrice Munyenyezi on July 18, 2003, No. 27028925, (I.N.S. Registration No. A071669672), is hereby declared cancelled.  See 18 U.S.C. § 1451(e).

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 25, 2013

cc:  Aloke S. Chakravarty, AUSA
     John A. Capin, AUSA
     Mark E. Howard, Esq.
     David W. Ruoff, Esq.
     U.S. Probation
     U.S. Marshal

2

Appendix Page 1895

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 10/30/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *  10-cr-85-01-SM
            v.                  *  July 15, 2013
                                *  1:35 p.m.
BEATRICE MUNYENYEZI             *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE STEVEN J. McAULIFFE

Appearances:

For the Government:   Aloke S. Chakravarty, SAUSA
                      John A. Capin, SAUSA
                      U.S. Attorney's Office (NH)
                      53 Pleasant Street, 4th Floor
                      Concord, NH 03301


For the Defendant:    David W. Ruoff, Esq.
                      Mark E. Howard, Esq.
                      Howard & Ruoff, PLLC
                      831 Union Street
                      Manchester, NH  03104


Probation Officer:    Jodi Gauvin

Court Reporter:       Sandra L. Bailey, LCR, CM, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH  03301
                      (603)225-1454

```
 1                    BEFORE THE COURT

 2            THE CLERK:  The court is in session and has

 3  for consideration a sentencing in the matter of United

 4  States of America versus Beatrice Munyenyezi, Case

 5  Number 10-cr-85-01-SM.

 6            THE COURT:  All right, before we move to that,

 7  Mr. Ruoff and Mr. Howard, would you like to be heard on

 8  your motion for judgment of acquittal?

 9            MR. RUOFF:  No.  We will rest on our

10  pleadings, judge

11            THE COURT:  All right.  Does the government

12  wish to be heard?

13            MR. CAPIN:  Likewise, your Honor.

14            THE COURT:  I'm sorry?

15            MR. CAPIN:  Likewise we will rest on our

16  papers.

17            THE COURT:  All right, the motion for judgment

18  of acquittal is denied.  The evidence plainly supports

19  the jury's verdict beyond a reasonable doubt when you

20  take the evidence in a light most favorable to the

21  verdict.

22            All right, Mr. Ruoff, have you reviewed the

23  Presentence Investigation Report with your client?

24            MR. RUOFF:  Yes, I have, your Honor.

25            THE COURT:  All right, the report will be
```

1    placed in the record under seal.  If an appeal is taken,

2    both parties will have access to the report.

3            Are there any objections you'd like to raise

4    to the report, Mr. Ruoff?

5            MR. RUOFF:  No legal objections to the one

6    provided by the probation department.  Obviously this

7    was a trial and we still contest the facts.

8            THE COURT:  Any objection by the government to

9    the report?

10           MR. CHAKRAVARTY:  No, your Honor, whatever we

11   had we'd incorporate it.

12           THE COURT:  No, are there any objections?

13           MR. CHAKRAVARTY:  Your Honor, there was the

14   objections that we noted in our papers which --

15           THE COURT:  If you have an objection, you have

16   to raise it now orally on the record.

17           MR. CHAKRAVARTY:  Then, if you don't mind,

18   your Honor, I will raise just for purposes of the record

19   --

20           THE COURT:  Well, no, it's not for purposes of

21   the record.  It's because you actually have an

22   objection.

23           MR. CHAKRAVARTY:  The objection, we have made

24   an objection --

25           THE COURT:  The First Circuit has said over

1   and over, if you say for the record, it doesn't count.

2          MR. CHAKRAVARTY:  Fair enough, your Honor.

3   Very briefly, your Honor.  The government objected to

4   incorporation of certain facts which did not appear

5   originally in the report, which are in the final revised

6   report, I believe they do appear again.  Because I'm not

7   sure how an appeals court will review the record, I want

8   to make sure that is actually imparted on the record.

9          The other is there was an additional --

10          THE COURT:  Do you have an objection to the

11   incorporation of facts in the report?

12          MR. CHAKRAVARTY:  Not the legal analysis, but

13   I wanted to make sure that the state of relevant conduct

14   was included in the report.  And the original iteration

15   of the initial presentence report did not have those in

16   there.

17          THE COURT:  Right, but then you proposed a

18   different or supplemental.

19          MR. CHAKRAVARTY:  Supplemental, right, which I

20   believe are incorporated, your Honor.  If that is the

21   case, then there is not an objection.  I just want to

22   make sure that that is in fact, the court has accepted

23   those as opposed to it simply being --

24          THE COURT:  Is it in the report?

25          MR. CHAKRAVARTY:  It is, your Honor.

5

```
 1              THE COURT:  What's your objection?
 2              MR. CHAKRAVARTY:  That the bases for upward
 3    departure and variance, actually upward departure in the
 4    case, that 5K2.0, 5K2.8 and 4A1.3 should all be
 5    considered as appropriate bases for upward departure.
 6              THE COURT:  Which is in the report.
 7              MR. CHAKRAVARTY:  My understanding --
 8              THE COURT:  Page 12, paragraph 69.
 9              MR. CHAKRAVARTY:  Thank you, your Honor.  My
10    objection is withdrawn.
11              THE COURT:  Withdrawn?
12              MR. CHAKRAVARTY:  Yes, your Honor.
13              THE COURT:  Okay.  No other objections?
14              MR. CHAKRAVARTY:  No, your Honor.
15              THE COURT:  All right, there being no
16    objections I adopt the findings and recommendations set
17    forth in the report, and based upon those findings I
18    conclude that the total offense level properly
19    calculated under the sentencing guidelines is level
20    eight and the Criminal History Category is Category I.
21              Would you like to be heard on sentencing, Mr.
22    Ruoff?
23              MR. RUOFF:  Certainly, your Honor.  I suppose
24    there are -- there's a motion before the court for an
25    upward departure.  Would you like me to just state my --
```

1          THE COURT:  Well, do you want to take that up

2   first?  I'm happy to take that up first if you'd rather.

3          MR. RUOFF:  That would be my preference.  I

4   could just respond and then make my sentencing argument

5   and objection all in one.

6          THE COURT:  That's fine.  All right, Mr.

7   Chakravarty, are you doing it?

8          MR. CHAKRAVARTY:  Yes, your Honor, for

9   sentencing argument.

10          THE COURT:  We will take up your motion for

11   upward departure.  If you include your sentencing

12   argument, that would be great, and then Mr. Ruoff will

13   just respond.

14          MR. CHAKRAVARTY:  The issues do overlap, your

15   Honor.

16          THE COURT:  All right.

17          MR. CHAKRAVARTY:  Your Honor, we understand

18   it's largely academic whether your Honor adopts the

19   departure analysis the government offers under the

20   guidelines that, as your Honor correctly pointed out,

21   5K2.0, 5K2.8 and 4A1.3, are all mechanisms under the

22   sentencing guidelines to capture what the government is

23   otherwise arguing is appropriate for an upward variance;

24   specifically the conduct for which the defendant is

25   being sentenced both because of the serious nature of

1   the conduct as well as what it says about the nature and

2   characteristics of the defendant herself in addition to

3   the fact that it demonstrates that she has a seriously

4   underrepresented criminal history, all factors under

5   both the departure analysis as well as under the

6   variance analysis, for a much higher sentence than the

7   guidelines call for as a strict total offense level for

8   the offense of conviction.

9           I say that, your Honor, because Congress in

10  enacting a statute that has a 10-year penalty, maximum

11  penalty for unlawfully obtaining citizenship, clearly

12  indicate that the most extreme versions of gathering one

13  of the most sacred privileges of U.S. citizenship, one

14  of the most extreme penalties should comport to the

15  outrageous nature of the conduct.  The outrageous nature

16  of conduct in obtaining unlawful citizenship includes

17  the activity which someone concealed in order to obtain

18  that sacred privilege.  In this case, your Honor, the

19  jury was presented evidence and credited numerous

20  witnesses who saw the defendant manning a roadblock.

21  Who saw the defendant both before the genocide as well

22  as during the genocide embracing the MRND, the political

23  party in power that was largely responsible for inciting

24  the genocide.  That she was further observed both acting

25  as an Interahamwe member of the youth wing that was one

8

1   of the predominant actors in perpetrating the genocide.

2   That she wore the garb of the MRND.  And most notably,

3   at least five witnesses saw her staffing the roadblock,

4   saw her checking the identification cards, which as your

5   Honor well knows, was basically being the gatekeeper of

6   who was allowed to live and who suffered a fate of

7   sometimes death, sometimes worse.

8          It is that role, your Honor, that highlights

9   what the defendant lied about and what she concealed

10  from the U.S. government who was trying to perform its

11  own gatekeeping function to prevent persecutors, to

12  prevent people who are concealing human rights

13  violations and atrocities, from being the people who are

14  able to obtain U.S. citizenship.

15         That characterizes why this defendant deserves

16  the maximum penalty under the statute because she

17  ultimately, your Honor, under any theory of liability,

18  if you credit that testimony, both under the beyond a

19  reasonable doubt standard which the government submits

20  we submitted to the jury, it was not sandbagging, not

21  asking for some higher sentence based on evidence that

22  we didn't show.  The jury clearly credited those

23  witnesses.  And all of those witnesses were impeached on

24  one basic theory.  That their testimony was contrived

25  and it was orchestrated somehow by the Rwandan

1    government, your Honor.  The fact that the jury rejected

2    that, I submit, your Honor, suggests that certainly by a

3    preponderance of the evidence standard, which is a

4    controlling standard, that this court should also credit

5    that, which means two things.  One, that she

6    participated in the genocide.  And two, that she's

7    essentially a mass murderer.  She was aiding and

8    abetting mass murder by identifying individuals who were

9    then going to be killed; by Consolee Mukeshimana's

10   observations that people were killed in front of her at

11   the roadblock that she manned that her husband was in

12   charge of right in front of the home where she spent

13   almost 70 days, if not more, during the genocide.

14          This was a period of time where she

15   participated in atrocities, not a singular event.  It

16   was a period of time where she knowingly participated in

17   the machinery of the genocide by checking identification

18   cards.

19          Vestine Nyiraminani further testified that

20   once the defendant selected her, her sister and about 20

21   or 18 others to be culled out of that roadblock, and

22   then they were escorted down to the killing fields, not

23   the ones right behind her home, but rather a little bit

24   further down the street by the IRSP forest, there they

25   began slaughtering and she escaped.  So she was a

1    survivor of the defendant's very acts which under a

2    joint venture and an aiding and abetting theory clearly

3    make her responsible for murder, your Honor.  It's that

4    person that Congress must have intended receive the

5    maximum penalty.

6            When you lie about those activities and you

7    pull a shroud of lies over yourself, when you're trying

8    to get one of the sacred benefits of United States

9    citizenship, when you've defrauded every stage starting

10   in 1995 to 1998, 2001, 2003, and then again to the ITCR

11   where she perjured herself to testify for her own

12   husband who, if there is any doubt as to what his role

13   was, then Professor Longman's credible testimony about

14   his role at that most notorious roadblock must be

15   credited, your Honor.  It is all of those activities

16   that she was lying.  And it's not surprising that she

17   would conceal all of that in order to reinvent herself

18   and project herself to the American people as something

19   quite different.  As someone who is a victim of the

20   persecution.  Someone who is a victim of a war as

21   opposed to the orchestrated genocide that occurred over

22   the hundred-day period in the summer of 1994.  And she

23   has maintained that fiction throughout, based on not

24   only the testimony of the witnesses that you heard from

25   in the trial earlier this year, but even those witnesses

1   who were impeached primarily on that Rwandan

2   orchestration argument.  And I submit to you, I'm not

3   talking about the fellow genocidaires and some of the

4   others who were impeached on multiple different levels,

5   but there were those whose only meaningful impeachment

6   was, you are testifying here because the Rwandan

7   government put you up to it.

8          I submit to you, your Honor, the jury rejected

9   that theory.  And that means that the testimony of

10  Emmaunel Niyitigeka, certainly at a preponderance of the

11  evidence standard, further shows that not only did she

12  check identification cards and watch people get killed,

13  not only did she hear the screams and see the sights and

14  hear the sounds of other Interahamwe killing people

15  behind her home, but Emmaunel Niyitigeka says that while

16  she was there she even asked him, ordered him to engage

17  in killing.

18          So your Honor, I submit, should accept that

19  testimony also when considering who is this person under

20  the 3553 analysis and under 4A1.3 under the guidelines

21  in terms of the criminal conduct that hasn't been

22  reported as well as the egregiousness and the outrageous

23  nature of her conduct, who is this person that the court

24  is going to sentence?  And it's someone, your Honor, who

25  I submit to you the evidence has shown, beyond a

1    reasonable doubt and certainly by a preponderance of the

2    evidence, somebody who participated in the Rwanda

3    genocide.  She was a part of the machinery.  She was an

4    integral element of these roadblocks which were the

5    principal machinery, checking the identification and

6    knowing the fate that was going to befall these people,

7    that she should reap the rewards of not providing

8    sympathy to the people who were going through her

9    roadblock just as Congress had intended that the 10-year

10   felony be reserved for those who exhibit the most

11   extreme conduct.  She did not exhibit sympathy, empathy.

12   She did not give time for due process when she was

13   making these assessments as a gatekeeper of the Ihuriro

14   roadblock, your Honor.

15          And to the contrary, under our system of

16   justice, she has had every aspect of due process.  She

17   has had a fastidious counsel.  She has had a right to

18   trial by jury.  She has had vigorous cross-examination.

19   She has had the ability to investigate herself in

20   Rwanda.  She has had the ability to present testimony on

21   her own behalf, which I submit to you didn't help her

22   cause.  The incredible testimony that she had presented

23   at trial further corroborates the government's case even

24   to the fact that the cook, one of the people who said

25   that they were in the basement all the time, when she

1  comes up she also sees the roadblock that the defendant

2  had denied even existed in front of her.

3          I submit to you that entire panoply of

4  evidence.  And I know your Honor knows this from living

5  through the trial, both trials, and living through

6  litigation of this case, but when you boil it down to

7  the credible testimony that demonstrates both under the

8  guidelines as well as under the 3553 analysis, then the

9  need for serious deterrence for other people who will

10  commit human rights violations and try to defraud our

11  immigration system in order to be able to come to the

12  states here and to obtain U.S. citizenship must be

13  deterred.  The fact that she personally must be held

14  accountable for the egregiousness of her lies to the

15  U.S. government.

16          As we briefed in our papers, we are not asking

17  her to be punished for the substantive crimes of

18  genocide here.  We have not alleged that that's what

19  this trial is about.  But we cannot ignore and we should

20  not ignore, the court should not ignore the nature of

21  what she lied about, and that is the distinction.  There

22  will be a time and place possibly for her to face

23  justice for the substantive offense, but when you lie

24  about the most egregious things that you can lie about

25  to get in this country, there must be a just and extreme

14

1    punishment, your Honor, and under our due process, a

2    10-year felony is what Congress has deemed appropriate.

3    The seriousness of the offense, the nature and

4    characteristics of the defendant, the need to promote

5    deterrence, all of those factors suggest that the

6    government's recommendation of ten years is the

7    appropriate sentence in this case, and we ask you to

8    levy that either under the guidelines analysis or under

9    the variance under Section 3553.

10          THE COURT:  In arguing for your departure I

11   noticed, and I can surmise why, but I noticed that

12   neither you nor the defense have mentioned the

13   Commission's modification of the applicable guideline.

14          MR. CHAKRAVARTY:  Your Honor, I believe we

15   mentioned it in a footnote.  Are you talking about the

16   2012 amendments?  The 2012 amendments, your Honor,

17   capture --

18          THE COURT:  I understand that they don't

19   apply.

20          MR. CHAKRAVARTY:  They don't technically

21   apply.

22          THE COURT:  They don't apply, but aren't they

23   some guidance as to a, say, guided departure under 5K2.0

24   at least?

25          MR. CHAKRAVARTY:  They are, your Honor.

1    That's the whole point of those guidelines.  However, a

2    careful reading of those amendments demonstrates two

3    classes of sentencing enhancements when someone has

4    concealed their own personal involvement in human rights

5    violations.

6            One it says is for incitement to genocide.

7    It's a very clear distinction from actual participation

8    in mass murder.  And I suggest to you the reasons for

9    that is because pre-homicidal activity could suggest

10   some mitigation because it's based on, you know, speech

11   or other activities which may not have materialized into

12   actual action.

13           But the second does not describe genocide at

14   all.  In fact, I don't have it in front of me, but it

15   describes a wide array of human rights offenses in

16   various generalities, none of which suggest murder,

17   suggest rape, suggest torture, or suggest --

18           THE COURT:  I think you might be mistaken, or

19   I'm not following you.  It's 2L2.2.

20           MR. CHAKRAVARTY:  Yes, that is the correct

21   provision, your Honor.  What I'm suggesting is --

22           THE COURT:  Do you have a copy?

23           MR. CHAKRAVARTY:  I do not have a copy, your

24   Honor --

25           THE COURT:  Jodi, do you --

16

1          MR. CHAKRAVARTY:  -- of the applicable

2    guideline.

3          THE COURT:  I mean, I guess I read it

4    differently.  If you look at 2L2.2(B)(4), capital B, and

5    then subsection 2 under B, capital B, it does talk about

6    genocide and murder.  It just phrases it as other

7    serious human rights offenses.  But if you go down to

8    the definitions you'll see that serious human rights

9    offense is defined as genocide, torture, war crimes, et

10   cetera, using child soldiers.

11         MR. CHAKRAVARTY:  Your Honor, the government

12   concedes that the application note does refer to the

13   genocide statute.  I suppose what I'd say to that, your

14   Honor, is genocide can take many forms.

15         THE COURT:  Well, you, I guess -- maybe I'm

16   being obtuse.  Here is my question.  You're asking for a

17   5K2.0 departure.  Generally that would be an unguided

18   departure.  Does this provide some guidance with respect

19   to some degree of departure?  If it does, doesn't it

20   limit it to less than ten years?  If it does, what's the

21   argument for ten years even though the Commission has

22   provided expert advice with respect to this particular

23   statutory violation and the particular circumstances

24   that would appear?

25         MR. CHAKRAVARTY:  So, let me address that

1   first where I left off.  First, there are many different

2   types of serious human rights offenses.  The application

3   note suggests that genocide, torture and some of the

4   other ones which are now substantive crimes under U.S.

5   law are consistent, but there are many ways to commit

6   those offenses.  So what I would suggest to you in the

7   first instance is what the guideline talks about is a

8   floor.  It's a floor to, if someone has committed

9   genocide, then the guidelines suggest, then, this is the

10   minimum under the advisory guideline system under which

11   you should start, as you point out, provide some

12   guidance as to how far of a departure is appropriate.

13          THE COURT:  Assuming this applied, assuming

14   this guideline applied, what would your argument be for

15   a sentence?

16          MR. CHAKRAVARTY:  5K2.0 still applies, and

17   that the appropriate sentence is still ten years because

18   this is -- as your Honor hinted at, this was an

19   amendment that was enacted last year, not based on the

20   traditional strength of the Sentencing Commission which

21   relies on empirical evidence, which relies on expert

22   testimony, this is the first case of a court sentencing

23   someone for participating in genocide.  This is the

24   first case of the application, if this were an

25   applicable guideline, this would be the first case.  And

1  I suggest to you that the reason that's important is

2  because the traditional strength where you're actually

3  gathering evidence, this was not quite spit-balling,

4  your Honor, I'm not going to impeach the people who

5  participate in the process, but I'm suggesting to you

6  that the character of the conduct, the actual killing,

7  the use of a machete, the actual -- the sustained nature

8  of committing conduct over a period of some 70 days of

9  multiple people being killed at the hands of someone,

10  all of those factors were not envisioned in --

11          THE COURT:  No, I think they are all

12  incorporated in the term genocide.

13          MR. CHAKRAVARTY:  I think they are

14  incorporated, but I suggest to you that's why there are

15  many ways to commit genocide.  One way is to encourage

16  somebody as a member of the MRND --

17          THE COURT:  No, no, no, no.  That's a separate

18  section.  That's a separate section.  That gets you a,

19  under the current guideline, that would get you a six

20  level increase; right?

21          MR. CHAKRAVARTY:  If it was just incitement,

22  yes, your Honor.

23          THE COURT:  Yes.  So that's quite different.

24          MR. CHAKRAVARTY:  I know.  We're not

25  suggesting your Honor --

1            THE COURT:  The second section is

2    participation, and that's an increase to level 25.

3            MR. CHAKRAVARTY:  Right, but there are many

4    different ways to participate.  And my point is, if you

5    are participating under duress, if you're participating

6    in some dramatic mitigating factor, then you still are

7    susceptible to this guideline, but that would be, I

8    would submit to you, the lowest common denominator.

9    That would be the floor of which you cannot go.  I

10   should say of course you can go, but you should not go

11   because the Sentencing Commission has found that the

12   minimum that is appropriate if you've committed a

13   serious human rights offense, is what is delegated under

14   2L --

15           THE COURT:  I guess I'm not following you.

16   You're familiar with the guideline structure obviously.

17   The guideline structure is what's the total offense

18   level, what's the Criminal History Category, what range

19   results.  Here, here, this guideline applied to be what,

20   25-I.  And if memory serves, it's 57 to 71 months or

21   something.  57 to 71 months.  So I'm not sure what you

22   mean by a floor.  The floor would be 57 under a

23   guideline sentence, the ceiling would be 71, Criminal

24   History Category I.

25           MR. CHAKRAVARTY:  No, my point is this.  That

1   that range, that 57-71, suggests that anybody who

2   commits any serious human rights offense, no matter the

3   scale, no matter the gravity, no matter the personal

4   involvement, and no matter how sustained that activity

5   was, that everybody in that category who commits any

6   serious human rights offense should be within that

7   range, 57 to 71 months.  And what I'm suggesting is, if

8   what someone has done, what they've concealed as a

9   serious human rights offense, if they've committed

10  murder, if they've committed torture and these other

11  things, then the court ought to look at the factual

12  basis for what they did in order to engage in those

13  acts.

14          THE COURT:  It goes without saying that

15  genocide is the mass murder of people based upon

16  ethnicity or some other characteristic in an effort to

17  eradicate that group.  So, that's all incorporated.

18  That's all part of it already.  So in other words, I

19  guess I -- I've thought long and hard about this and I

20  guess I don't accept the distinction among genocidaires

21  that some are worse than others, because it's one of

22  those things that it's all terrible.  There are no

23  gradations of terrible in that circumstance.

24          MR. CHAKRAVARTY:  Your Honor, I'm not going to

25  quibble with you on that.

1            THE COURT:  So then have this guideline where

2    the Commission has apparently made distinctions based on

3    what, Criminal History Category.  That's the only

4    distinction.

5            MR. CHAKRAVARTY:  Well, and that's one of the

6    issues with the guideline, your Honor, as I led with,

7    that it's not based on empirical evidence, and the

8    Sentencing Commission ought not to be able to supersede

9    what Congress has clearly decided.

10           THE COURT:  No, they haven't.  They haven't.

11   They provided for the statutory maximum, but the

12   statutory maximum is provided for at level 25, Criminal

13   History Category VI.

14           MR. CHAKRAVARTY:  Right.

15           THE COURT:  Hence it appears to me that the

16   only distinction in the guideline with respect to

17   sentencing a 1425 violation involving someone who lied

18   about their participation in genocide, the only

19   distinction in the current guideline is current Criminal

20   History Category it seems to me.

21           MR. CHAKRAVARTY:  So, through that lens, your

22   Honor, that even under 2L2.2, under the 5K that we're

23   operating under, were the only sentencing guidelines

24   enhancement, then perhaps I wouldn't be able to say much

25   more except what I have, which is the guidelines are

1    insufficient to capture the conduct.  But 4A1.3 is

2    equally complimentary and an important factor here

3    because it gets to the types of aggravating factors

4    which I was suggesting; that this wasn't a one-time

5    incident that the defendant engaged in one additional

6    crime that was underrepresented.  In this case, she

7    engaged in crimes throughout that 70-day period which I

8    suggest, your Honor, bumps her up under 4A1.3 to the

9    Criminal History Category VI.

10          So, if your Honor were to credit the

11   guidelines, the advisory, the current 2013 version of

12   the 2L2.2 enhancement, then you should do so with a

13   horizontal move on the guideline chart.

14          THE COURT:  Well, I wouldn't -- I don't want

15   to be confusing here -- I wouldn't credit it or apply

16   it.  It's simply not applicable.  We all understand

17   that.  The only issue is, does it provide some guidance

18   with respect to a degree of departure argument under

19   5K2.0.  Under the guidelines it does apply.  And your

20   argument is, well, I don't think so because it's not

21   high enough.

22          MR. CHAKRAVARTY:  Well, I think that's part of

23   it, your Honor.  Plus my reading of the legislative

24   history of the new amendment does not specifically talk

25   about the fact that this is the approximation for a

1    5K2.0.  It talks about that there needs to be --

2              THE COURT:  Oh, no, it wouldn't, it wouldn't,

3    because it's applicable currently forward.

4              MR. CHAKRAVARTY:  Right, so, my point on that

5    is the open-ended 5K2.0 and 5K2.8 enhancement can be

6    guided by what the Sentencing Commission has thought

7    might be --

8              THE COURT:  We can probably eliminate that off

9    the bat.  I reject any motion for an upward departure

10   based on 5K2.8, the extreme conduct, it simply doesn't

11   apply here.  That's extreme conduct in my view in the

12   conduct of the offense of conviction.  It's not extreme

13   conduct in predicate offenses that support the element

14   of the offense.  There was no extreme conduct in the

15   lies.  The lies are lies are lies, but there's no

16   extreme conduct.

17             MR. CHAKRAVARTY:  Okay, fair enough.  But what

18   you lie about matters, your Honor.

19             THE COURT:  Well, sure, sure, I agree

20   completely.

21             MR. CHAKRAVARTY:  Wherever your Honor

22   considers that.

23             THE COURT:  But I think 5K2.8 is not a

24   legitimate legal basis to grant a departure.  So, to the

25   extent your motion is based on 5K2.8, that's denied.

1           MR. CHAKRAVARTY:  Fair enough.  So, under a

2    5K2.0 theory where your Honor wants to look at what the

3    Sentencing Commission thinks is appropriate, the

4    government is suggesting that that should be the floor

5    under which you consider that's the Criminal History

6    Category I range.  Here, because of the nature of the

7    conduct and because it was sustained over a period of

8    time, that you should consider that same, if your Honor

9    is inclined to credit the Sentencing Commission's

10   approximation, then you should consider that under

11   Criminal History Category VI, which would be, and the

12   government similarly, your Honor, thought of how can we

13   have a principal way to argue aside from the just the

14   need, the desire to have a maximum sentence here, the

15   desire to follow through with what we had indicated both

16   at the detention phase of this case as well as

17   throughout, that the government would be seeking based

18   on this conduct and the nature of the lies, the maximum

19   sentence here.

20           The Criminal History Category VI, even under

21   the GSR 25, 57 to 71 months, brings it up to 110 to

22   137 months, which is perfectly nested around what

23   Congress has felt is the punishment that we want to send

24   a message to other people who might want to come and

25   seek safe haven on our shores when they are lying about

1    some of the most egregious crimes that humanity can

2    envision.

3              THE COURT:  Thank you, Mr. Chakravarty.

4    Appreciate it.  Mr. Ruoff.

5              MR. RUOFF:  Thank you, your Honor.  I think

6    one of the most beguiling points in issuing a sentence

7    in this case is for the court to determine what was the

8    lie.

9              As Attorney Chakravarty just pointed out in

10   his sentencing memo, all lies are not created equal when

11   it comes to lying on immigration forms.  And in this

12   case there is great ambiguity about what the verdict

13   represents was the material misstatement.

14             Traditionally in criminal trials the trial

15   process is about a search for the truth.  One of the

16   things that several observers to this trial process in

17   this case have observed is that with two very different

18   trials, there is some question about what the truth is

19   about the verdict.

20             This court sat through two very different jury

21   trials.  The prosecutor referenced the testimony of

22   Emmaunel Niyitigeka, Manny as he was affectionately

23   known.  He testified in the first trial.  He did not

24   testify in the second trial.  So, it's unclear what

25   corpus of information the government is asking the court

1   to draw from in trying to determine what Beatrice may or

2   may not have done in Rwanda in 1994.

3           As I put in my pleading, we can't take this

4   ambiguity about what the verdict means lightly because

5   the thesis for the second trial was more focused on MRND

6   party affiliation and membership.  That's why we had

7   uniforms.  That's why we had pictures of what the MRND

8   looked like.  And we had less of genocidaires who

9   accused her of shooting nuns in the forehead and accused

10  me of bribing them.

11          So, as the court has picked out already in

12  looking at the existing guidelines, you know, there are

13  nuances to what the misrepresentation is, and they are

14  important nuances.  They would be important today if she

15  were being sentenced under the current guideline;

16  whether she incites or participates, whether she just

17  made a representation to conceal her membership in an

18  organization that promoted it, okay, that makes a vast

19  difference in the sentencing guideline calculation here.

20          Obviously this court asked both sides

21  repeatedly whether or not we wanted special verdict

22  forms.  For different reasons neither of us requested a

23  special verdict form, but the jury instructions in this

24  case clearly said they only had to agree on one

25  misrepresentation, that's it, out of the seven to nine

1    that were alleged in both counts.

2            So, we are left here to wonder whether or not

3    the jury all unanimously agreed, you know, we believe

4    she was not forthright with Donald Monica when she

5    interviewed with him in Nairobi about her family and her

6    husband's involvement, okay, and that's enough for us.

7    According to the jury instructions, we're done.  We can

8    convict her of these offenses for lying to an

9    immigration official, and then not admitting to that lie

10   when she applied for citizenship.

11           So, that's where we're left.  The nature and

12   circumstance of the offense.  It is tied to the

13   underlying predicate offense that puts the lie to the

14   lie.  So, all lies are not created equal, and I don't

15   envy you, your Honor, for trying to figure out, you

16   know, which misstatements were based on murderous

17   conduct or rather just conduct that would get her a much

18   more lenient sentence under the current guideline

19   scheme.  There's no way to tell.

20           You know, special verdict forms, you know,

21   usually are required, or not required, but recommended

22   in a case where there are 924(c) charges, multiple

23   firearms, so there's no ambiguity about the specific

24   jury finding.  Throughout the government's pleadings

25   they repeat this mantra that she is now convicted of

1    committing rape, committing murder or acting as an

2    accomplice to those types of offenses.  And that's a

3    clear departure from the tenor of the second trial, it

4    really is, and that should be something the court should

5    take into consideration in trying to determine what type

6    of punishment should be imposed.

7         Let me discuss a little bit about the

8    government's argument that, well, there are certain

9    offenses that Congress intended the maximum sentence

10   should be applied.  That's why they set a 10-year

11   maximum.  That's not really true.  There are several

12   criminal offenses where Congress never imposed a maximum

13   and the courts just said, well, where there's no

14   maximum, well, it's just life.  We see it often in many

15   of these 922, 924(c) gun cases.

16        So, I'm not sure of the fact they classify

17   this offense with a 10-year max means that Congress was

18   telling this court that there are certain offenses, that

19   that's where you go.  It says no, there are certain

20   offenses where you just can't go beyond that because

21   we're not going to give you discretion to punish any

22   harsher.  They're setting the maximum.  And I would

23   submit to the court that normally the maximum is for

24   recidivist offenders, people that have been through the

25   system, tried to rehabilitate them, tried to

1    rehabilitate them time and time again and at some point

2    it just becomes a matter of protecting the public from

3    this individual and they get a statutory maximum

4    sentence.  And that's not this case.

5              There is ambiguity in the verdict.  And in

6    other areas of the law where there's ambiguity, your

7    Honor, within statutory construction, where there are

8    different sentencing provisions that may apply, the

9    First Circuit has said that you can apply the rule of

10   lenity.  That if there's uncertainty about what this

11   verdict means and what lies she was actually convicted

12   of, you're well within your rights to go towards the

13   lesser end of the lies.  The rule of lenity would allow

14   that in this case.  It would allow if there were

15   statutes that were ambiguous, provisions within the

16   sentencing guidelines that were ambiguous.  It should

17   also apply when there is ambiguity about what material

18   misstatements were in fact made and what the underlying

19   predicate offenses were.

20             Now, the government has forwarded a few

21   analogs for this court to look to in support of their

22   request for a statutorily maximum sentence.  I pulled

23   the files on them.  But I can tell you, your Honor, and

24   I agree with the government, this is a very unique case.

25   There are no other cases like this one.  The four that

1   they cite are very, very different.  Different

2   sentences.  The U.S. versus Belfast case.  That was the

3   case that they cite wherein furtherance of their request

4   for an upward departure, he was the son-in-law of the

5   Liberian president and kind of ran sort of a house of

6   horrors.  And he was actually convicted of multiple

7   counts of substantive torture and sentenced on those

8   multiple counts.  So there was no ambiguity when that

9   sentencing court sentenced that defendant about what the

10  jury actually found that defendant did.  No ambiguity.

11          And the same thing was true in Boskic, which I

12  believe was Attorney Auerhaun's case.  Mr. Boskic was

13  convicted after a trial of lying on his refugee

14  application.  But he admitted to his participation in a

15  sabotage unit and his participation in a very notorious

16  massacre in the Bosnian conflict.  And he admitted to

17  that and he's since admitted to it in Bosnia and has

18  been sentenced in Bosnia.  So, the court sentencing that

19  defendant really had to face no ambiguity about what the

20  defendant did in that case and received that 63-month

21  sentence, not like the case here where there is some

22  ambiguity.

23          The government also cites to Jordan, U.S.

24  versus Jordan.  I believe this is out of Florida.  That

25  case involved a plea bargain where there was an agreed

1  to set of facts where Mr. Jordan admitted to being part

2  of a guerilla attack squad that wiped out, surrounded an

3  entire town, and he agreed to doing that.  He told the

4  court.  And he agreed to the fact that he took a baby

5  and dropped it down the dry well.  And those were the

6  facts that were concrete, were solid, were known to that

7  defendant in that court sentencing that defendant.

8          Lastly, one of Attorney Chakravarty's cases,

9  Carlos Lopes.  Again, a plea bargain with an agreed to

10  set of facts where he agreed that he fled Cape Verde

11  after he was indicted for kind of running a house of

12  horrors prison that he was in charge of or he was in the

13  management structure and torturing prisoners while he

14  was there.  So again, no ambiguity.  And the judge

15  didn't have to worry about, hum, what does a guilty

16  finding really mean in this case.  And I think that's

17  something this court should give very careful

18  consideration to.

19          Now, in Chakravarty's argument he kind of

20  criticizes the defense and our theme that all of these

21  Rwandan witnesses were fabricating the evidence.  That

22  they were kind of put up to it by the current Rwandan

23  regime.  That's a common theme in many of these for the

24  Rwandan genocide prosecutions for the defense, and it's

25  been accepted.  Recently there was a verdict that came

1   down in the Mungwarere case up in Canada last week,

2   after almost a year of trial and 44 witnesses.  Same

3   types of allegations.  Same themes of defense.  The

4   trial judge up there acquitted the defendant who had

5   been incarcerated since his arrest in 2009.

6          So, there is merit to our argument and to our

7   defense that these cases are tough to find because,

8   either like in Kobagaya, wind up in acquittal and then

9   later dismissal, or an acquittal in the case in Canada.

10  There's only one other, which is the Desire Munyaneza

11  case in Canada which resulted in a guilty finding.  So,

12  looking to analogs, I suggest, isn't really going to

13  help, especially ones that the government looks to.

14          The defense has submitted a number of letters

15  for the court.  I don't think there's any really serious

16  contention that recidivist conduct is an issue in this

17  case.  Really what the government is trying to sentence

18  Beatrice for is what they consider the best part of

19  their evidence, the high watermark of their evidence for

20  something that she did in the worst two months, the

21  worst portion of her life.

22          Before you stands a woman who by all accounts

23  when she got to the United States did everything that we

24  expect our citizens to do.  She did everything that she

25  could to better herself.  She educated herself.  She

1    learned our language.  Learned our culture.  She

2    invested herself in the local community.  She was a good

3    mother to her children.  And that should account for

4    something.

5              Are those the acts of a murderer?  Are those

6    the acts of someone like Mr. Boskic who the government

7    holds out as an example who actually got here and

8    committed a number of acts of violence in the few years

9    that he was here?  He had a criminal record.  She is

10   squeaky clean.  The letters that I've submitted come

11   from a variety of different people.  Academicians,

12   people that just know her, people that she helped out.

13             There's one other issue, judge, and if I may

14   approach.  I would just like the court to read this

15   letter.  I don't want to submit it into evidence because

16   it contains confidential medical information, but I

17   think it's something the court should consider in

18   assessing sentence.  May I approach?

19             THE COURT:  Certainly.  Are you familiar with

20   this?

21             MR. CHAKRAVARTY:  We are, judge.

22             THE COURT:  Any objection to my considering

23   it?

24             MR. CHAKRAVARTY:  No.

25             (Pause while judge reads letter.)

1             THE COURT:  Thank you, Mr. Ruoff.  Anything

2    else?

3             MR. RUOFF:  No, your Honor.  My client does

4    not wish to allocute.  Thank you, your Honor.

5             THE COURT:  All right, Ms. Munyenyezi, you do

6    have a right of allocution which means you have the

7    right to address the court on any subject you choose

8    prior to imposition of sentence.  You're not required to

9    exercise that right.  But if you'd care to, I'd be happy

10   to hear from you now.  It means you're entitled to say

11   anything you'd like to say before sentence is imposed.

12            THE DEFENDANT:  No thank you, your Honor.

13            THE COURT:  Okay.  All right, well, obviously

14   I've given a great deal of thought to this case and it

15   certainly is on many levels a difficult case.

16            As Mr. Chakravarty has pointed out, however,

17   imposition of sentence, in imposing sentence, first of

18   all, is the exclusive responsibility of the court.  It's

19   not the responsibility of the jury.  The jury plays no

20   role in determining the appropriate sentence.  And in

21   fashioning an appropriate sentence it's necessary for me

22   to determine what the pertinent facts are by a

23   preponderance of the evidence, and certainly the facts

24   matter.

25            I think, obviously, I think we all understand

1   that it's difficult for those of us who did not witness

2   the atrocities in Rwanda to image what it must have been

3   like to be a Tutsi in the spring of 1994.  To be singled

4   out in the village of one's birth.  Ordered to sit and

5   wait at a roadblock run by a mob realizing death by

6   machete or club or gun is imminent.  What it was like to

7   be taken to a killing field under the orders of people

8   that you knew, grew up with, prominent citizens, family

9   members; people who, by accident of birth, were called

10  Hutu.  It's impossible probably for us to imagine what

11  it was like to know that churches and priests and

12  ministers were encouraging and participating in that

13  slaughter and were willingly complicit in carrying out

14  the genocide.  It must have been unimaginable.  And for

15  what?  For what?  The accident of birth, the accident of

16  ignorance, social classifications imposed by European

17  colonials.

18          I suppose it's natural, certainly for me it's

19  natural to recoil from the prospect that such repulsive

20  atrocities are actually committed, and we all very

21  naturally want to deny that we can lurch out of control

22  and engage in such utterly cruel and ignorant and

23  widespread slaughter of our fellow humans.  That we can

24  indiscriminantly slaughter innocent children, and young

25  and old civilians, and know ones fear.

1          In this case it's natural for me to strain to

2     find some plausible way to deny, you know, for my own

3     peace of mind, and I suppose other people who will look

4     at it the same way, for my own peace of mind to deny

5     that this particular defendant, a very young normal

6     appearing, seemingly ordinary person, not so threatening

7     looking, not so scary looking, that she managed such

8     vicious and unfeeling infliction of death and misery.

9          I certainly have come to the evidence in this

10    case with skepticism and a natural bias in favor of

11    disbelieving that this person or any person, except the

12    rare psychopath, could willingly do such a thing.  I've

13    strived to reconcile the overwhelming and, as the

14    government points out in their papers, largely

15    uncontradicted evidence of the defendant's guilt with

16    some theory of if not innocence, at least mitigation,

17    and I strived mightily to believe that she might not

18    have done what she's accused of doing.  As you've

19    suggested, Mr. Ruoff, perhaps the witnesses were all

20    mistaken.  Perhaps they mistook the defendant for a

21    different Beatrice manning the roadblock.  Perhaps a

22    different Beatrice condemned passersby to death.

23    Perhaps the intervening years have rendered their

24    memories weakened and unreliable.  Maybe the witnesses

25    are all corrupted by a corrupt Rwandan government.

1   Maybe they were afraid to return home if they didn't

2   persuasively accuse this Hutu defendant and so maybe

3   they made up their stories.  But I think, in fact I

4   know, to the government's consternation certainly as

5   this trial proceeded, I bent over backwards to give you

6   every opportunity to prove that circumstance, if it

7   could be proven, and the evidence simply did not

8   establish any such corruption.

9            So, I cannot so easily dismiss the evidence,

10  and I cannot so easily dismiss the victims and the

11  witnesses who appeared in court, and I can't ignore the

12  fact that the government's case was compellingly

13  presented and was largely unshaken.  In my view there

14  was no credible evidence of witness corruption

15  presented, no credible evidence of the current Rwandan

16  government's control or manipulation of the

17  prosecution's investigation, or of the Rwandan

18  witnesses, no credible or evidence of contrived

19  testimony or unreliably weak memories or distorted

20  translations.  I think the facts are unavoidable, I

21  think the truth is unavoidable, much as we may wish to

22  avoid it.  The evidence in my view commands only one

23  conclusion, and that's well beyond a preponderance of

24  the evidence.  It does not mitigate the defendant's

25  innocence.  There's no compelling mitigating

1   circumstances.  This clearly was not civil war.  It was

2   not a revolution.  It was not an armed conflict.  It was

3   not self-defense in which the defendant participated.

4   It was deliberate hateful mass murder of hundreds of

5   thousands of innocents, perpetrated not by a few but by

6   thousands of persecutors orchestrated by a truly evil

7   government to evil people.

8            I find that this defendant was not unaware of

9   the genocide.  I find that she was not a mere spectator.

10  Not a simple young woman who unfortunately married into

11  a brutal political family.  I find that this defendant

12  was actively involved.  She personally participated in

13  the mass killing of innocent women, men and children

14  merely because they were called Tutsi.  She did so

15  knowingly.  She manned the infamous roadblock in Butare

16  outside her family's hotel.  She checked identification

17  cards, she kept records, she sorted those who would die

18  from those who would live.  She directed their murder.

19  She facilitated murder.  She aided and abetted the

20  genocidal efforts of the MRND and the Interahamwe.  And,

21  critically for this case, she lied repeatedly about her

22  involvement and her conduct.  She lied about her

23  experiences and her associations.  And she did so in

24  order to obtain refuge in this country and to obtain

25  citizenship in this country that she knew she was not

1    qualified for and did not deserve.

2              I have considered the fact that this defendant

3    has lived a different life here in the United States,

4    but she's lived that life under false pretenses all the

5    while.  She has stolen the highly prized privilege of

6    United States citizenship, and probably stole it from

7    someone who perhaps also had daughters, and someone who

8    perhaps was also a real victim of the MRND and

9    Interahamwe, a genuine refugee of the Rwandan genocide,

10   someone we'll never know, and she's lived that life here

11   in an effort to avoid accountability for her conduct.

12             She's also used that illegally procured

13   citizenship to travel freely to the ITCR where she

14   falsely denied awareness of the genocide in Butare, and

15   where she falsely denied her husband's involvement in

16   it.

17             This is a case, in my view, in which the

18   predicate fact, the facts that gave rise to the lie are

19   so disproportionately repulsive when compared to the

20   crime actually charged that obviously care must be taken

21   to avoid a sentence and avoid imposing a sentence for

22   the predicate acts rather than for the crime, and that's

23   a difficult line to draw obviously.

24             This defendant is not accountable in this

25   court or in this country for her acts of genocide.  She

1    is accountable for lying to obtain refuge and

2    citizenship for which she was not qualified.

3          Congress has provided a maximum punishment for

4    the offense of conviction under 18, U.S. Code, Section

5    1425 of ten years in prison on each of the counts; but

6    each of the counts of conviction, although punishable by

7    up to ten years, it's clear to me that the criminal

8    conduct underlying each is essentially the same, so

9    concurrent sentences are warranted.  And I note that the

10   government does not challenge that conclusion -- or I

11   should say does not argue otherwise.

12         Given the court's findings with respect to the

13   defendant's acts about which she lied, the maximum

14   sentence allowed by law for the offense of conviction in

15   my judgment is a just and appropriate sentence; in fact,

16   is the only appropriate sentence under these

17   circumstances.

18         The maximum sentence prescribed by Congress, I

19   stress, is not imposed as a surrogate punishment for

20   genocidal conduct, for murder or for aiding and abetting

21   kidnap or rape, or for the persecution of innocents, but

22   it is imposed for committing the most serious of

23   violations of Section 1425 that one can describe.  Lying

24   about participation in genocide when specifically asked,

25   knowing that such conduct is automatically disqualifying

41

1   with respect to immigration and citizenship seriously

2   undermines the integrity of this country's immigration

3   standards in the most offensive way possible and

4   obviously puts this country at risk; particularly, we

5   cannot abide this country being a haven for

6   genocidaires.  If any lies in the immigration and

7   naturalization process warrant a position of the

8   statutory maximum punishment contemplated by Congress,

9   it's surely this one.  The nature of the defendant's

10  underlying conduct and her lies about that conduct take

11  this case, in my judgment, well out of the heartland of

12  Section 1425 prosecutions.  Obviously this is hardly a

13  run-of-the-mill immigration or citizenship fraud case.

14          Under Section 5K2.1 it is clear to me that

15  there are aggravating circumstances here of a kind and

16  to a degree that were not adequately taken into account

17  by the Sentencing Commission in formulating the

18  applicable guideline, and I'm referring to the

19  applicable guideline in this case, and obviously that's

20  not demonstrated by subsequent acts, should be

21  demonstrated by the Commission's amendment in 2012.

22          While the degree of departure upward under the

23  guidelines that's necessary to account for the unique

24  aggravating circumstance of this case and achieve a just

25  sentence produces as large a departure as is possible up

1   to the maximum, statutory maximum sentence, I think the

2   facts warrant that great a departure.

3          Moreover, in addition to an upward departure

4   under Section 5K2.0 under the guidelines, to the extent

5   necessary to impose a guidelines sentence equivalent to

6   the statutory maximum, the court also, independently of

7   the applicable guideline, would impose and does impose

8   the statutory maximum sentence as a variance from the

9   guidelines recommended sentence for the same reasons

10  given.  Such a variance is warranted, in my judgment,

11  after considering the factors set out in U.S. Code,

12  Section 3553(a); particularly the need to impose a just

13  punishment, the need to provide for general deterrence,

14  to encourage respect for the law, to reflect the

15  seriousness of the defendant's criminal conduct.  Other

16  would be refugees, immigrants and applications for

17  United States citizenship, applicants for citizenship

18  must know in my view that if they are murderers, if they

19  participated in unspeakable acts of genocide, if they

20  participated in serious human rights violations, if they

21  persecuted others, they are simply not welcome here.

22  And if they lie about such conduct to obtain immigration

23  benefits or refuge or citizenship, the punishment for

24  that fraud will not be lenient.

25          I have carefully considered and diligently

43

1    considered all of defense counsels' argument in

2    mitigation made in their papers, and Mr. Ruoff, as you

3    presented here today, and while I ardently wish that I

4    could ignore the evidence and deny the facts and deny

5    the truth and suspend belief that this defendant

6    knowingly participated in the Rwandan genocide, I would

7    do so, but I can't.  She did aid and abet in the deaths

8    of others in connection with the Rwandan genocide.

9    Many, many innocent people died, and so I cannot do so.

10          Accordingly I find that the arguments in

11   mitigation are wanting and insufficient to support a

12   sentence below the maximum available in this case.  That

13   good character and good behavior, law-abiding conduct

14   since immigrating is certainly a factor to be

15   considered, as is the defendant's relative youth at the

16   time of the genocide, possible family and social

17   influences or pressures at the time of her acts, I've

18   certainly taken into account her efforts to assimilate,

19   her family responsibilities, the fact that she's helped

20   other immigrants to adjust to their new lives here, and

21   I've certainly taken into account her health issues as

22   she renewed that argument today.  Certainly her health

23   issues are better treated here than elsewhere.  And as I

24   say, all of those factors are entitled to serious

25   consideration.  I've given here serious consideration,

44

 1   but those factors, in my view, cannot begin to move the

 2   scales toward leniency in this case.  They can't begin

 3   to offset the need to recognize her lies for what they

 4   are.  They cannot deter imposition of a just punishment,

 5   one that reflects the gravity, the fraud, and one that

 6   also may serve to deter similar applicants from seeking

 7   refuge and citizenship here in the future.

 8          Obviously, I hope it's obvious, if I were to

 9   impose a sentence for this defendant's participation in

10   the Rwandan genocide would not be a sentence of ten

11   years to be served concurrently on each count, it would

12   be a sentence of, at minimum, obviously life in prison.

13   The sentence imposed here is far too lenient and

14   entirely inadequate to sanction acts of genocide.  It

15   is, however, within the range of punishments

16   contemplated by Congress for and is adequate to sanction

17   the most egregious violations of Section 1425 that one

18   can imagine.

19          I brought up the issue with the government

20   about the current guidelines as perhaps a guide with

21   respect to a departure under 5K2.0, and I suppose by

22   analogy, perhaps with respect to a variance, an upward

23   variance independent of the guideline structure.  I'm

24   aware of that current guideline and its provisions.  I'm

25   aware of the rationale that the Commission apparently

1   had in formulating the guideline.  I've considered it.

2   I understand the Commission's expertise.  However, after

3   carefully thinking about that guideline as a reference

4   point or an anchor with respect to an upward departure

5   or variance, I am not persuaded that that guideline

6   provides, the current guideline provides reliable

7   guidance or reliable advice, and for the following basic

8   reason.  Not because I think genocidaires can be

9   distinguished based upon the level or -- level of their

10  participation as Mr. Chakravarty has argued, but rather

11  for a completely different reason, which is, as I said

12  earlier, the facts underlying the lie that make the

13  statements lies are so disproportionately disturbing as

14  to dwarf and overwhelm the conviction, the crime of

15  conviction.

16          Similarly, it seems to me, that I'm not sure

17  what the Commission had in mind, but to me it looks like

18  the Commission provided for a very severe punishment up

19  to the maximum allowed by statute for people who

20  actually participated in genocide and then later lied

21  about it in order to gain immigration benefits.  And

22  then it appears that the Commission perhaps routinely

23  reduced the proportional punishment down according to

24  just Criminal History Category because the maximum

25  punishment is provided for at level 25, Criminal History

46

 1    Category VI, but it seems to me a false distinction to

 2    distinguish among genocidaires who have lied about their

 3    participation in genocide in order to obtain immigration

 4    benefits and then later impose a sentence based upon

 5    whether they have drug convictions or robbery

 6    convictions or something like that, it seems to me it

 7    demeans the serious, serious nature of genocidal

 8    participation.

 9              So, one, that guideline is not applicable in

10    this case.  I'm aware of that.  Secondly, to the extent

11    it provides perhaps helpful advice with respect to a

12    guided departure, I would reject it, because it does not

13    make proper or persuasive distinctions, it seems to me,

14    like resorting to Criminal History Category

15    distinctions.  It's a false distinction in my judgment.

16    And for the reason that, as well, the circumstances for

17    this case are such that the maximum sentence imposed

18    under the statute is warranted.

19              Those are based on the facts as I find them to

20    be by a preponderance of the evidence having listened to

21    all the evidence presented in the case.

22              Accordingly I will announce the sentence I

23    intend to impose but I won't actually impose it until

24    I've given counsel an opportunity to raise any legal or

25    factual issues they may care to raise.  The government's

1   motion for an upward departure under Section 5K2.0 is

2   granted and the government's separate independent motion

3   for an upward departure -- I'm sorry, for an upward

4   variance independent of the guidelines structure is also

5   granted for the reasons articulated.  The court intends

6   to impose sentence as follows:

7           Pursuant to the Sentencing Reform Act of 1984

8   it is the judgment of this court that the defendant,

9   Beatrice Munyenyezi, is hereby committed to the custody

10  of the Bureau of Prisons to be in prison for a term of

11  120 months on Counts One and Two, both terms to be

12  served concurrently.

13          Upon release from imprisonment the defendant

14  shall be placed on supervised release for a term of

15  three years on each of Counts One and Two, both such

16  terms to run concurrently.

17          Within 72 hours of release from the custody of

18  the Bureau of Prisons the defendant shall report in

19  person to the probation office in the district to which

20  the defendant is released.

21          While on supervised release the defendant

22  shall not commit another federal, state or local crime,

23  shall comply with the standard conditions that have been

24  adopted by the court, and shall comply with the

25  following additional conditions:

1          The defendant shall not illegally possess a

2     controlled substance.

3          The defendant shall not possess a firearm,

4     destructive device or any other dangerous weapon.

5          Pursuant to 42, U.S. Code, Section 14135a, the

6     defendant shall submit to DNA collection while

7     incarcerated in the Bureau of Prisons or at the

8     direction of the U.S. Probation Office.

9          The drug testing condition required by 18,

10    U.S. Code, Section 3563(a)(5) is hereby suspended based

11    upon the court's determination that this defendant poses

12    a low risk of future substance abuse.

13         The defendant shall pay any financial penalty

14    that is imposed by this judgment and that remains unpaid

15    at the commencement of the term of supervision.

16         In addition, the defendant shall comply with

17    the following special conditions:

18         The defendant shall provide the probation

19    officer with access to any requested financial

20    information.

21         The defendant is barred from the use of the

22    Internet and all media devices with interactive computer

23    service as defined in 42, U.S. Code, Section 230(f)

24    without the prior approval of the probation officer.

25         The defendant shall consent to and cooperate

1   with unannounced examinations of any computer owned or

2   controlled by the defendant, which may result in

3   retrieval and copying of all data from the computers and

4   any internal or external peripherals and may involve

5   removal of such equipment for the purpose of conducting

6   a more thorough inspection.

7          The defendant shall consent to the

8   installation of systems that will enable the probation

9   officer or its designee to monitor computer use on any

10  computer owned or controlled by the defendant, and the

11  defendant shall pay for the cost of installation of such

12  systems to the extent she is able as determined by the

13  probation officer.

14         The defendant shall submit her person,

15  residence, office or vehicle to a search conducted by a

16  U.S. probation officer at a reasonable time and in a

17  reasonable manner based upon reasonable suspicion that

18  contraband or evidence of a violation of a condition of

19  release may exist.  Failure to submit to a search may be

20  grounds for revocation.  The defendant shall warn any

21  other residents that the premises may be subject to

22  searches pursuant to this condition.

23         The defendant shall, if deported, remain

24  outside the United States of America unless granted

25  permission to reenter by the Secretary of the Department

1   of Homeland Security.

2             It is further ordered the defendant shall pay

3   the United States a non-waivable special assessment of

4   $200 which amount shall be due in full immediately.

5             The court finds that this defendant does not

6   have the ability to pay a fine and accordingly will

7   waive imposition of the fine in this case.

8             The defendant shall be remanded to the custody

9   of the U.S. Marshal.

10            Would either counsel like to raise any legal

11  or factual issues with regard to the sentence.  Mr.

12  Ruoff?

13            MR. RUOFF:  None that we haven't already

14  argued, your Honor.  Just one ministerial question.

15            THE COURT:  Well, let me take care of this

16  first.  Mr. Chakravarty?

17            MR. CHAKRAVARTY:  No, your Honor.

18            THE COURT:  All right, does either counsel --

19  does either side feel that there is some issue with

20  respect to an argument in mitigation or aggravation that

21  I have not ruled on or resolved that you wish to have

22  ruled on or be resolved?

23            MR. RUOFF:  No, your Honor.

24            MR. CHAKRAVARTY:  No, your Honor.

25            THE COURT:  Okay.  Ministerial?

1          MR. RUOFF:  I suppose it will be in the

2     judgment that you enter.  I just lost track of how you

3     were getting to the sentence imposed, whether the

4     Criminal History Category or you granted certain level

5     vertically.

6          THE COURT:  No.  I've departed upward under

7     the applicable guideline, the applicable guideline

8     scheme.  I've departed upward under Section 5K2.0 based

9     upon the presence of aggravating circumstances not

10    appropriately taken into account by the Sentencing

11    Commission, number one.

12         Number two, I've independently, without regard

13    to the guideline structure, I've independently varied

14    upward to the maximum possible sentence essentially for

15    the same reasons I've given having considered the

16    factors set out in 18, U.S. Code, Section 3553(a).  And

17    I think I've articulated that, but obviously there will

18    be a written justification explanation of the reasons

19    for the sentence appended to the judgment, so you will

20    have it in writing as well.

21         MR. RUOFF:  Okay, did you specifically rule on

22    the government's request under 4A?

23         THE COURT:  Yes, I -- oh, no, I didn't, thank

24    you.  That's denied.  I am not in to departing upward or

25    granting a variance based upon the claim that the

52

1    defendant's actual criminal history or calculated

2    criminal history substantially underrepresents her

3    actual criminal history.  Her Criminal History Category

4    is properly calculated in my view as I, okay?  Any other

5    issues?

6            MR. CHAKRAVARTY:  None, your Honor.

7            THE COURT:  All right.  The court then hereby

8    imposes the sentence as announced.  And Ms. Munyenyezi,

9    it's my obligation now to advise you that you do have

10   14 days after the entry of judgment within which to file

11   an appeal with the United States Court of Appeals for

12   the First Circuit located in Boston, Massachusetts.  I

13   expect judgment will be entered either today or

14   tomorrow.  But in any event, you will have 14 days from

15   the entry of judgment to file any appeal.

16           The defendant is remanded to the custody of

17   the United States Marshal, and court's adjourned.

18           (Hearing concluded at 2:40 p.m.)

19

20

21

22

23

24

25

53

1

2                          C E R T I F I C A T E

3

4              I, Sandra L. Bailey, do hereby certify that

5    the foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 8/1/13

**SANDRA L. BAILEY, LCR, CM, CRR**

11                                LICENSED COURT REPORTER, NO. 15

12                                STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JUL 17 2013

FILED

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.

Beatrice Munyenyezi

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: 10-cr-85-01-SM

**Mark Howard, Esq. and David Ruoff, Esq.**
Defendant's Attorneys

**THE DEFENDANT:**

☐    pleaded guilty to count(s): __.
☐    pleaded nolo contendere to count(s) __ which was accepted by the court.
☒    was found guilty on Counts _1 and 2_ after a plea of not guilty.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1425(a) | Procurement of Citizenship or Naturalization Unlawfully | July 18, 2003 | 1 |
| 18 U.S.C. § 1425(b) | Procurement of Citizenship or Naturalization Unlawfully | July 18, 2003 | 2 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐    The defendant has been found not guilty on count(s) __ and is discharged as to such count(s).

☐    Count(s) dismissed on motion of the United States: __.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

July 15, 2013
Date of Imposition of Judgment

Signature of Judicial Officer

Steven J. McAuliffe
United States District Judge
Name & Title of Judicial Officer

July 17, 2013
Date

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 120 months.

Said term of 120 months is on each of Counts One and Two, both terms to be served concurrently.

☐ The court makes the following recommendations to the Bureau of Prisons:

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district.
☐ on __ at __.
☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
☐ before __ on ___.
☐ as notified by the United States Marshal.
☐ as notified by the Probation or Pretrial Services Officer.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By: _____
Deputy U.S. Marshall

CASE NUMBER:    10-cr-85-01-SM                                                           Judgment - Page 3 of   6
DEFENDANT:      Beatrice Munyenyezi

# SUPERVISED RELEASE

**Upon release from imprisonment, the defendant shall be on supervised release for a term of Three (3) Years .**

**This term of three years is on each of Counts One and Two, both such terms to run concurrently.**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*Pursuant to 42 U.S.C. § 14135a, the defendant shall submit to DNA collection while incarcerated in the Bureau of Prisons, or at the direction of the U.S. Probation Office.*

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance.    The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed 72 drug tests per year of supervision.

☒   The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.    (Check if applicable)

☒   The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).    The defendant shall also comply with the additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    The defendant shall not leave the judicial district without permission of the court or probation officer;
2)    The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3)    The defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;
4)    The defendant shall support his or her dependents and meet other family responsibilities;
5)    The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6)    The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)    The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8)    The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)    The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)   The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)   The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)   The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)   As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

CASE NUMBER: 10-cr-85-01-SM
DEFENDANT: Beatrice Munyenyezi

# SPECIAL CONDITIONS OF SUPERVISION

In addition, the defendant shall comply with the following special conditions:

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall, if deported, remain outside the United States, unless granted permission to re-enter by the Secretary of the Department of Homeland Security.

The defendant shall submit her person, residence, office, or vehicle to a search conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion that contraband or evidence of a violation of a condition of release may exist; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

The defendant is barred from the use of the internet and all media devices with interactive computer service, as defined in U.S.C. § 230(f), without prior approval of the probation officer.

The defendant shall consent to the installation of systems that will enable the probation office or its designee to monitor computer use on any computer owned or controlled by the defendant.   The defendant shall pay for the cost of the installation of such systems to the extent she is able as determined by the probation officer.

The defendant shall consent to and cooperate with unannounced examinations of any computer owned or controlled by the defendant, which may result in retrieval and copying of all data from the computer(s) and any internal or external peripherals, and may involve removal of such equipment for the purpose of conducting a more thorough inspection.


**Upon a finding of a violation of probation or supervised release, I understand that the court may:   (1) revoke supervision; (2) extend the term of supervision; and/or (3) modify the conditions of supervision.**

**These conditions have been read to me.   I fully understand the conditions and have been provided a copy of them.**

(Signed)

_____     _____
Defendant                                                                Date


_____     _____
U.S. Probation Officer/ Designated Witness                       Date

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $200.00 | | |

☐  The determination of restitution is deferred until .   An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant shall make restitution (including community restitution) to the following payees in the amount listed.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.   However, pursuant to 18 U.S.C. § 3664(i), all non-federal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | **Total Amount of Loss | Amount of Restitution Ordered | Priority Order or % of Pymnt |
|---|---|---|---|
| | | | |
| TOTALS: | $    0.00 | $    0.00 | |

☐  If applicable, restitution amount ordered pursuant to plea agreement.

☐  The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. §3612(f).   All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. §3612(g).

☐  The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐  The interest requirement is waived for the     ☐ fine     ☐ restitution.

☐  The interest requirement for the     ☐ fine and/or     ☐ restitution is modified as follows:

Appendix Page 1953

** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994 but before April 23, 1996.

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**   ☒   Lump sum payment of $200.00 due immediately.

        ☐ not later than _, or
        ☐ in accordance with   ☐ **C**,   ☐ **D**, or ☐ **E**  below;  or

**B**   ☐   Payment to begin immediately (may be combined with  ☐ **C**,  ☐ **D**,  or ☐ **E**  below); or

**C**   ☐   Payment in  installments of $ over a period of  , to commence  days after release from imprisonment to a term of
        supervision; or

**D**   ☐   Within thirty days of the commencement of supervision, payments shall be made in equal monthly installments of
        $ during the period of supervised release, and thereafter.

**E**   ☐   Special instructions regarding the payment of criminal monetary penalties:


Criminal monetary payments are to be made to Clerk, U.S. District Court, 55 Pleasant Street, Room 110, Concord, NH 03301.   Payments shall be in cash or in a bank check or money order made payable to Clerk, U.S. District Court.   Personal checks are not accepted.

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment.   All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are to be made payable to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    **Defendant Name**        **Case Number**        **Joint and Several Amount**


☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3 )restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# United States v. Munyenyezi

United States Court of Appeals for the First Circuit

March 25, 2015, Decided

No. 13-1950

**Reporter**

781 F.3d 532 *; 2015 U.S. App. LEXIS 4866 **; 96 Fed. R. Evid. Serv. (Callaghan) 1471

UNITED STATES OF AMERICA, Appellee, v. BEATRICE MUNYENYEZI, Defendant, Appellant.

**Subsequent History:** US Supreme Court certiorari denied by Munyenyezi v. United States, 136 S. Ct. 214, 193 L. Ed. 2d 164, 2015 U.S. LEXIS 5473 (U.S., Oct. 5, 2015)

Post-conviction relief denied at, Certificate of appealability denied Munyenyezi v. United States, 2017 U.S. Dist. LEXIS 140431 (D.N.H., Aug. 30, 2017)

**Prior History:** [**1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE. Hon. Steven J. McAuliffe, U.S. District Judge.

United States v. Kantengwa, 2010 U.S. Dist. LEXIS 88133 (D. Mass., July 29, 2010)

United States v. Munyenyezi, 2010 U.S. Dist. LEXIS 75832 (D.N.H., June 25, 2010)

## Case Summary

### Overview

HOLDINGS: [1]-Defendant was properly convicted of procuring citizenship illegally by making false statements to the government in violation of 18 U.S.C.S. § 1425(a) and (b) because from the evidence, a rational jury could conclude that defendant lied on her naturalization form, using no answers to hide her membership in a Rwanda Hutu militia, her role in persecuting Tutsis, and her penchant for peddling untruths to get into America; [2]-The district court did not err in admitting International Criminal Tribunal for Rwanda evidence under Fed. R. Evid. 404(b) and 403 because the evidence went to non-character issues and showed that she consistently presented a set of false facts concerning the genocide in Rwanda, and if there was any error, it was harmless given the vast and damning array of evidence against her.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Sufficiency of Evidence

*HN1*[⬇] **De Novo Review, Sufficiency of Evidence**

Richard Guerriero

A challenge to the sufficiency of the evidence to convict an uphill fight. Reviewing the record de novo, where the defendant preserved the argument below, and taking the evidence and reasonable inferences in the light most helpful to the prosecution, the appellate court sees whether the defendant has shown (as she must) that no rational jury could have convicted her.

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

*HN2*[⬇] **Appeals, Standards of Review**

The appellate court cannot reweigh the evidence, second guess the jury on credibility issues (actually, the appellate court must assume the district court resolved credibility disputes consistent with the verdict), or consider the relative merits of the defendant's theories of innocence (because what matters is not whether a jury reasonably could have acquitted but whether it could have found guilt beyond a reasonable doubt).

Immigration Law > Naturalization > Administrative Proceedings > General Overview

*HN3*[⬇] **Naturalization, Administrative Proceedings**

8 U.S.C.S. § 1425(a) makes it a crime for a person to knowingly procure or attempt to procure citizenship illegally. One way to do that is to make false statements in a naturalization application. 18 U.S.C.S. § 1001(a). There are four independent requirements for a § 1425(a) crime: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment. Section 1425(a)'s next-door neighbor, § 1425(b), makes it a crime for a person to knowingly procure naturalization or citizenship that she is not entitled to. One must have good moral character to be eligible for citizenship, of course. 8 U.S.C.S. § 1427(a). Two of the many things that negate good character are helping commit genocide, 8 U.S.C.S. § 1101(f)(9), and making materially false statements to score immigration or naturalization benefits, § 1101(f)(6).

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Weight of Evidence

*HN4*[⬇] **Province of Court & Jury, Credibility of Witnesses**

Credibility choices and evidence-weighing are for juries, not for reviewing courts.

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > General Overview

*HN5*[⬇] **Juries & Jurors, Province of Court & Jury**

Sifting through conflicting testimony and determining where the truth lies is the sort of work that falls squarely within the jury's province.

Evidence > Admissibility > Conduct Evidence > Prior Acts, Crimes & Wrongs

***HN6***[⬇]  **Conduct Evidence, Prior Acts, Crimes & Wrongs**

Fed. R. Evid. 404(b) bans other-acts evidence offered to prove a person's character. Rule 404(b)(1). But it allows such evidence for non-character purposes, like proving knowledge or lack of mistake or accident, Rule 404(b)(2), provided of course the evidence's probativeness is not substantially outbalanced by any unfair prejudice, Fed. R. Evid. 403.

Evidence > Relevance > Exclusion of Relevant Evidence > Confusion, Prejudice & Waste of Time

***HN7***[⬇]  **Exclusion of Relevant Evidence, Confusion, Prejudice & Waste of Time**

Evidence that may have cast a defendant in an unflattering light does not make them excludable under Fed. R. Evid. 403. Only unfair prejudice that substantially outweighs the evidence's probative value is forbidden.

Evidence > Relevance > Exclusion of Relevant Evidence > Confusion, Prejudice & Waste of Time

***HN8***[⬇]  **Exclusion of Relevant Evidence, Confusion, Prejudice & Waste of Time**

The appellate court normally reverses a judge's Fed. R. Evid. 403 ruling only where his judgment is egregiously wrong.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Mistrial

Criminal Law & Procedure > Trials > Motions for Mistrial

***HN9***[⬇]  **Abuse of Discretion, Mistrial**

The appellate court inspects the district court's denial of a mistrial only for abuse of discretion, which means his decision stands unless no reasonable person could have ruled as he did. The reason for this is that a district judge is much closer to the trial action than the appellate court can ever be and so is better positioned to see if prejudicial matter presented there could likely affect the case's outcome. Granting a mistrial is strong medicine, of course, prescribed only as a last resort if the alleged harm cannot be overcome with less-drastic remedies, like curative instructions.

Criminal Law & Procedure > Trials > Jury Instructions > General Overview

***HN10***[⬇]  **Trials, Jury Instructions**

Courts normally assume that juries follow instructions.


Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Mistrial

*HN11*[⬇] **Abuse of Discretion, Mistrial**

The appellate court reverses mistrial denials only under extremely compelling circumstances.


Criminal Law & Procedure > ... > Reviewability > Preservation for Review > Abandonment

*HN12*[⬇] **Preservation for Review, Abandonment**

Where an appellant cites no authority for an argument (or offer any convincing explanation of what the law should be, assuming she found no authority), she has waived it.


Criminal Law & Procedure > ... > Appeals > Standards of Review > Abuse of Discretion

*HN13*[⬇] **Standards of Review, Abuse of Discretion**

There is no perfect sentence, but, instead, a wide universe of supportable sentencing outcomes. The appellate court looks only for abuse of discretion. And as long as it sees a plausible sentencing rationale that reaches a defensible result, the sentence stands.


Criminal Law & Procedure > ... > Departures From Guidelines > Upward Departures > Extreme Conduct

*HN14*[⬇] **Upward Departures, Extreme Conduct**

U.S. Sentencing Guidelines Manual § 5K2.8 (2002) lets a judge depart upward if he finds the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim.


Criminal Law & Procedure > ... > Sentencing Guidelines > Departures From Guidelines > Downward Departures

*HN15*[⬇] **Departures From Guidelines, Downward Departures**

U.S. Sentencing Guidelines Manual § 5K2.0 (2002) lets a judge depart upward if he finds aggravating circumstances of a kind or degree not adequately taken into account by the guidelines.


Criminal Law & Procedure > Sentencing > Imposition of Sentence > Factors

*HN16*[⬇]  **Imposition of Sentence, Factors**

18 U.S.C.S. § 3553(a) lets a judge vary upward based on factors listed there, like the defendant's background (including her criminal history), the circumstances of the offense, the seriousness of the offense, the need to protect and deter others, the need to promote respect for the law and to provide a just punishment, and the need to eliminate unjustified sentencing disparities.

Criminal Law & Procedure > ... > Sentencing Guidelines > Departures From Guidelines > Downward Departures

*HN17*[⬇]  **Departures From Guidelines, Downward Departures**

A judge can depart downward in certain situations. U.S. Sentencing Guidelines Manual § 5K2.0 (2002).

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Factors

*HN18*[⬇]  **Imposition of Sentence, Factors**

Under certain circumstances a judge can vary downward using 18 U.S.C.S. § 3553(a).

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

*HN19*[⬇]  **Sentencing Guidelines, Adjustments & Enhancements**

U.S. Sentencing Guidelines Manual § 2L2.2 (2012) specifically discusses sentencing enhancements for genocide-related acts.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

*HN20*[⬇]  **Sentencing Guidelines, Adjustments & Enhancements**

A judge using U.S. Sentencing Guidelines Manual § 2L2.2 can set the upper end of a defendant's sentencing range at the statutory maximum if the defendant committed a serious human rights offense and has a criminal history category of VI.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

*HN21*[⬇]  **Sentencing Guidelines, Adjustments & Enhancements**

See U.S. Sentencing Guidelines Manual § 2L2.2 (2012).

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Factors

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Statutory Maximums

*HN22*[⬇]  **Imposition of Sentence, Factors**

A judge can find facts for sentencing purposes by a preponderance of the evidence, so long as those facts do not affect either the statutory minimum, or the statutory maximum.

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Factors

*HN23*[⬇]  **Imposition of Sentence, Factors**

18 U.S.C.S. § 3553(a)(6) requires judges to consider the need to avoid unwarranted sentence disparities. But that section primarily refers to national disparities among similarly situated defendants.

**Counsel:** Mark E. Howard, with whom David W. Ruoff and Howard & Ruoff, PLLC, were on brief, for appellant.

Mark T. Quinlivan, Special Assistant United States Attorney, with whom Donald Feith, Acting United States Attorney, District of New Hampshire, and Carmen M. Ortiz, United States Attorney, District of Massachusetts, were on brief, for appellee.

**Judges:** Before Lynch, Chief Judge, Thompson and Barron, Circuit Judges.

**Opinion by:** THOMPSON

## Opinion

 [*534]  **THOMPSON, <u>Circuit Judge</u>**.

### Overview[1]

Man's inhumanity to man is limitless. Any doubt, just recall the 1994 genocide in  [*535]  Rwanda. Over the course of 100 days, roving bands of Hutus (Rwanda's majority ethnic group) slaughtered hundreds of thousands of their countrymen, most of them Tutsis (a minority group long-dominant in Rwanda). Some of the crazed killers belonged to the Interahamwe, the dreaded militia of a Hutu political party known by the initials, MRND.[2] About 7,000 Rwandans died each [**2]  day, often butchered by machete-wielding

---

[1] We present the facts below in the light most favorable to the government, because (as you will see) our defendant challenges the sufficiency of the evidence against her. <u>See, e.g., United States v. Polanco</u>, 634 F.3d 39, 45 (1st Cir. 2011).

[2] MRND stands for the National Republican Movement for Democracy and Development.

Richard Guerriero

Interahamwes at roadblocks set up to catch fleeing Tutsis. And these killers didn't just kill — they raped, tortured, and disfigured too.

Now meet Beatrice Munyenyezi, a Hutu from Rwanda. She spent the genocide months (pregnant with twin girls) living at the Hotel Ihuriro in Butare, Rwanda — a hotel managed by her husband, Shalom Ntahobali, and owned by her mother-in-law, Pauline Nyiramasuhuko. Ntahobali and Nyiramasuhuko were no ordinary hoteliers, however. He was an Interahamwe leader who manned a notorious roadblock in front of the hotel. She was a high-powered minister in Rwanda's MRND government who kicked-off the killing frenzy there by telling the party's devotees that all Tutsi "cockroaches" must die. And Hutu thugs ultimately massacred more than 100,000 Tutsis in and around Butare.

Munyenyezi fled to Kenya in the genocide's waning days. Hoping to come to the United States as a refugee, she filled out immigration form I-590 in 1995, writing "none" when asked to list "political, professional or social organizations" that she had been a member of or affiliated [**3] with since her "16th birthday."[3] She also affirmed there that she had neither committed a crime of moral turpitude nor persecuted people on grounds of race, religion, or politics. Asked on another form whether she was personally affected by the "atrocities" in Rwanda — "Were you a victim? A witness? Were you otherwise involved?" — she simply wrote "family members disappeared." And she answered "no" to the question whether she either had a hand in killing or injuring persons during the genocide or had encouraged others to do so. The government approved her papers in 1996, and she moved to the United States in 1998.

About a year later Munyenyezi applied to change her status to lawful permanent resident. One question on her application asked her to jot down her "present and past membership in or affiliation with every political organization, association, . . . party, club, society or similar group" since turning 16. She wrote "none." She also checked "no" in answer to the questions whether she had ever committed a crime of moral turpitude and whether she had anything to do with genocide or with killing or injuring persons because of their race, ethnicity, religion, [**4] or politics. The government approved her application in 2001.

In 2003 Munyenyezi applied for naturalization as an American citizen, declaring that the answers in her form N-400 — a naturalization form — were truthful. Answers on that form included that she had (a) never been associated with any organization, party, club, or the like; (b) never done a crime leading to her arrest or conviction; and (c) never lied to or misled federal officials to get immigration benefits. [*536] She became a naturalized citizen later that year.

In 2006 Munyenyezi testified at an international criminal court — commonly called the ICTR — as a witness for her husband (he was being prosecuted for his role in the Rwandan genocide).[4] There she said that she saw no roadblock near her family's hotel or dead bodies in Butare, and she also said that her husband was no génocidaire. Just a few short months after she testified, the federal government pulled her immigration file to check for any illegalities.

Convinced that she had concealed her role in the Rwandan genocide — her part in the killings and rapes at the roadblock next to the Hotel Ihuriro, and her [**5] ties to the MRND and the Interahamwe — federal prosecutors later indicted Munyenyezi in 2010 on two counts of procuring citizenship illegally by

---

[3] She turned 16 in 1986.

[4] ICTR is short for the International Criminal Tribunal for Rwanda.

making false statements to the government. See 18 U.S.C. §§ 1425(a) and (b). Her first trial ended in a hung jury. A second trial resulted in convictions. Using the 2002 edition of the federal sentencing guidelines, the judge then sentenced her to two concurrent 120-month prison terms.

On appeal Munyenyezi challenges the sufficiency of the proof against her, contests an evidentiary ruling, alleges prosecutorial misconduct, and questions the reasonableness of her sentence. We address each issue in turn, presenting only those facts needed to put matters into perspective. And at the end of it all, we find no reason to reverse.


## Sufficiency of the Evidence

As promised, we lead off with Munyenyezi's claim that the evidence is insufficient for a sensible jury to believe beyond a reasonable doubt that she infracted sections 1425(a) and (b). *HN1*[⬆] Hers is an uphill fight, however. See, e.g., Polanco, 634 F.3d at 45. Reviewing the record de novo — because (as the government concedes) she preserved the argument below — and taking the evidence and reasonable inferences in the light most helpful to the prosecution, we see whether [**6] she has shown (as she must) that no rational jury could have convicted her. See id. And so doing, we take special care to remember our long list of "cannots": *HN2*[⬆] we cannot reweigh the evidence, secondguess the jury on credibility issues (actually, we must assume it resolved credibility disputes consistent with the verdict), or consider the relative merits of her theories of innocence (because what matters is not whether a jury reasonably could have acquitted but whether it could have found guilt beyond a reasonable doubt). See id.; see also United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013).

*HN3*[⬆] Section 1425(a) makes it a crime for a person to "knowingly procure[] or attempt[] to procure . . . citizenship" illegally. One way to do that is to make false statements in a naturalization application. See 18 U.S.C. § 1001(a). And — according to our judicial superiors — there are "four independent requirements" for a section 1425(a) crime: "the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." Kungys v. United States, 485 U.S. 759, 767, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (1988); see also United States v. Mensah, 737 F.3d 789, 808-09 (1st Cir. 2013) (discussing Kungys in exquisite detail). Section 1425(a)'s next-door neighbor, [*537] section 1425(b), [**7] makes it a crime for a person to "knowingly . . . procure . . . naturalization . . . or citizenship" that she is not entitled to. One must have good moral character to be eligible for citizenship, of course. See 8 U.S.C. § 1427(a). And two of the many things that negate good character are (unsurprisingly) helping commit genocide, see 8 U.S.C. § 1101(f)(9), and making materially false statements to score immigration or naturalization benefits, see id. § 1101(f)(6).

Viewed from a prosecution-friendly perspective, the record in Munyenyezi's case is a bone-chilling read. Consider the following examples, taken from the testimony of government witnesses:

Richard Kamanzi told the jury that in March 1994 (about a month before the genocide, when he was 15 years old) he saw Munyenyezi (he had seen her before) decked out in MRND clothing, hanging out with 45 other MRNDers near the Hotel Ihuriro. He did not see her during the genocide, though.

But Vestine Nyiraminani did. She testified that in April 1994 she and her sister got stopped at the roadblock near the Hotel Ihuriro. An "Interahamwe named Beatrice" — a person Nyiraminani knew was

married to Shalom Ntahobali — asked for IDs.[5] Seeing that their cards identified them as Tutsis, Munyenyezi ordered [**8] them to sit at the side of the road with other Tutsis. A half hour later, soldiers marched them into the woods. One of the thugs then plunged a knife into Nyiraminani's sister's head. Nyiraminani escaped. But she never saw her sister again.

Jean Paul Rutaganda testified about a time in April 1994 when (as a 15 year old) he and some other Tutsis hid at an Episcopal school near the Hotel Ihuriro. Rutaganda spotted Munyenyezi (he knew her by name) at the roadblock with Interahamwes, wearing an MRND uniform, asking for identity cards, and writing in a notebook. "She was counting," Rutaganda said, "registering dead Tutsis and others who were not yet dead." Tutsis, he added, "were killed day and night" in the nearby forest — something he knew from the "screaming" and the "crying."

Tutsi Consolee Mukeshimana also saw Munyenyezi around this time. Mukeshimana had seen her before (at Mukeshimana's sister's house). And at the roadblock Mukeshimana watched a fatigues-wearing Munyenyezi check IDs and lead Tutsis to other "Interahamwe so they could get killed."

Desperate to leave Butare because of the killing, Tutsi [**9] Vincent Sibomana tried to run but got detained at the roadblock. Munyenyezi asked for an ID. He knew who she was because he had seen her buy beer at a store where he had worked. And he had also seen an MRND-shirt-wearing Munyenyezi walking around Butare. Anyhow, Sibomana was too young to have an ID card, apparently (he was only 14). An irate Interahamwe hit his head with a rifle butt. And he fell into a ditch. More Tutsis were there. "Beatrice" — to quote Sibomana's testimony — then told the other Interahamwes to "kill[]" them all. Sibomana bolted. But he saw and heard Tutsis "being killed," hacked by "machetes" and bludgeoned with "clubs."

From this evidence a rational jury could conclude that Munyenyezi lied on her form N-400 — using "no" answers to hide her Interahamwe membership, her role in persecuting Tutsis, and her penchant for peddling [*538] untruths to get into America. She sees two ways around this. Neither way works.

One is her theory that the witnesses had zero credibility.[6] They just made stuff up, she says, thinking they would be hailed as "heros" in Rwanda for putting a Hutu behind bars. Some witnesses were only in their teens when the killing started, she stresses — the apparent [**10] intended inference being that they were too young to remember important details about what had happened. And culturally, she writes, the witnesses are inclined to saying whatever authority figures — like "jurors" — want to hear. Plus, she adds, in pushing their "stock" storyline, none of them identified her in court and some of them did not know details like whether she had children or what part of Rwanda she came from. Her theory fails, though, and for a simple reason. Munyenyezi's lawyer hit the credibility theme hard below — during his powerful opening statement, his spirited cross-examination of witnesses, his energetic evidence presentation (involving testimony from a counter-expert about pressures Rwandans feel to testify a certain way), and his hard-charging summation. But the jury did not buy it. And (again) **HN4**[⬆] credibility choices and evidence-weighing are for juries, not for reviewing courts. See Polanco, 634 F.3d at 45; see generally United States v. Nascimento, 491 F.3d 25, 46 (1st Cir. 2007) (stressing that **HN5**[⬆] "[s]ifting

---

[5] Remember that Munyenyezi's first name is Beatrice and her husband is Shalom Ntahobali.

[6] She, tellingly, does not claim that their testimony — if believed — is inadequate to help convict. And, just as importantly, [**11] she does not argue that the government failed to prove other elements of the crimes charged, like that the statements were knowingly made and material.

Richard Guerriero

through conflicting testimony and determining where the truth lies is the sort of work that falls squarely within the jury's province").

Munyenyezi's other way is her claim that the evidence showed only her "mere presence" at the roadblock, which, she reminds us, is not enough to convict. But reading the record as required — afresh, and in the light most agreeable to the government — we think a levelheaded jury could find that she wasn't simply in the wrong place at the wrong time. Far from it — dressed as an Interahamwe, she personally inspected IDs at the checkpoint, separated those who would live from those who would die (and die gruesomely), and kept records of the ghastly going-ons. And that sinks her "mere presence" claim. See generally United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) (noting that a "'mere presence' argument will fail in situations where the 'mere' is lacking").

Enough said about the sufficiency issue.

**Evidentiary Ruling**

During opening statements defense counsel claimed that Munyenyezi "couldn't read or write English" when she came to America. And then he said — most importantly for our purposes — that "we'll have to speculate who was translating [the immigration] documents for her in Kenya when [**12] they were filling out those forms all in English."

Days later the prosecutor told the judge that he wanted to admit excerpts of Munyenyezi's testimony before the ICTR — appearing there on her husband's behalf, she denied seeing a roadblock near the Hotel Ihuriro or dead bodies in Butare, and she disclaimed knowing her husband was a génocidaire. The defense responded with a motion in limine, arguing that the ICTR evidence should be kept out as other bad acts to prove character (her propensity to lie about genocide), and even if not, that the danger of unfair prejudice substantially outweighed its probative worth. [*539] See Fed. R. Evid. 404(b) and 403; see also United States v. Landrau-López, 444 F.3d 19, 23 (1st Cir. 2006). The government disagreed, naturally, suggesting that the excerpts showed that she consistently presented a set of false facts concerning what had happened in Rwanda.

Refereeing this dispute, the judge sided with the government, ruling the ICTR evidence relevant because it countered the suggestion that someone had translated the key immigration/naturalization papers for her and had "misconstrued what she said and put it down on the form[s]." "She's consistently said the same things," in the pertinent forms and at the ICTR, the judge added. So, he concluded, the [**13] ICTR evidence goes to "her knowledge," as well as "lack of accident, mistake" — legitimate nonpropensity purposes, one and all. And the excerpts ultimately came in through the testimony of Dr. Timothy Longman, the government's Rwanda-genocide expert.

Munyenyezi still thinks the judge got the ICTR-excerpts ruling all wrong. Reviewing the matter for abuse of discretion, see United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013), we think otherwise.[7]

*HN6*[⬆] Rule 404(b) bans other-acts evidence offered to prove a person's character. See Fed. R. Evid. 404(b)(1). But it allows such evidence for noncharacter purposes, like proving knowledge or lack of

---

[7] Neither side questions whether the judge's in limine decision was definitive enough to preserve the issue without need for further objection, see Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 35 (1st Cir. 2011), so we let it pass.

mistake or accident, see Fed. R. Evid. 404(b)(2) — provided of course the evidence's probativeness is not substantially outbalanced by any unfair prejudice, see Fed. R. Evid. 403. The problem for Munyenyezi is that her lawyer's opening remarks — that she could not read or write English when she lived in Kenya, so one must "speculate" about who translated and filled out the immigration papers — put knowledge or absence of mistake or accident in play. And the ICTR excerpts went to those noncharacter issues, helping [**14] to show that her answers did not result from some translation gaffe, because (as the judge said) the evidence suggests that she told essentially the same story about the Rwanda genocide at every turn. That the *HN7*[⬆] excerpts may have cast her in an unflattering light does not make them excludable under Rule 403 either. Only "unfair" prejudice that "substantially" outweighs the evidence's probative value is forbidden. See United States v. Rodríguez-Soler, 773 F.3d 289, 296 (1st Cir. 2014). And we see nothing unfair about letting the jury consider this evidence for the limited purpose of dealing with an issue that came to the fore in the defense's opening. *HN8*[⬆] We normally reverse a judge's Rule 403 ruling "only where [his] judgment is egregiously wrong." United States v. Adams, 375 F.3d 108, 111 (1st Cir. 2004). And nothing egregious screams off the pages of the record here.[8]

Munyenyezi's counter-arguments are not difference-makers. First she accuses the judge of not performing a Rule 404(b) analysis. As already shown, the judge [**15] did do one in denying her in limine motion. He just did not redo it when Dr. Longman took the stand, probably because she did not ask him to reconsider his earlier ruling. [*540] Next she accuses the government of misleading the judge, an accusation that goes something like this: the prosecutor said that he would not use the ICTR excerpts to paint her as a persistent liar but then did precisely that, like when he said during closing arguments that her ICTR testimony was part of a family "script." She does not raise an issue of prosecutorial misconduct with the closing, however. She just uses the comments to highlight why the judge abused his discretion by admitting the evidence in the first place. We need not take a position on this point, though, because any error (if error there was) was harmless given the vast and damning array of evidence against her. See United States v. Dunbar, 553 F.3d 48, 59-60 (1st Cir. 2009) (discussing the harmless-error standard when it comes to admitting evidence).

Two issues down, two to go.


## Prosecutorial Misconduct

Munyenyezi next claims the judge should have granted a mistrial based on the prosecutor's suggestive questioning. Here is what you need to know.

Kicking off the trial, the judge cautioned the jury that a lawyer's [**16] "questions are not evidence. So if a counsel asks a question of a witness that assumes a fact, there's no evidence of that fact unless the witness accepts the fact." And the judge's antenna shot up — and he took corrective action — when either side's counsel asked questions that assumed facts not in evidence.[9]

---

[8] The government argues that the ICTR excerpts are intrinsic — not extrinsic — evidence and so not subject to Rule 404(b). See United States v. Souza, 749 F.3d 74, 84 (1st Cir. 2014) (discussing intrinsic and extrinsic evidence). But because we find no abuse of discretion even if the excerpts constitute extrinsic evidence, we need not grapple with this issue. See United States v. Jimenez, 507 F.3d 13, 18 (1st Cir. 2007) (taking that same tack).

[9] During the defense's cross-examination of Dr. Longman, for example, the judge sustained the government's objection to this line of questioning:

Munyenyezi's claim centers on the prosecutor's crossexamination of defense witness Marie Alice Ahishakiye, a cook at the Hotel Ihuriro during the genocide. "Did you travel to Boston last year?" the prosecutor asked. "Yes," Ahishakiye replied. "And," the [**17] prosecutor said, "you were there for a proceeding involving Prudence Kantengwa; were you not?" Kantengwa is Munyenyezi's sister, by the way, and earlier the government introduced evidence showing Kantengwa faced "perjury" charges in Boston. "I don't think I know of Kantengwa," Ahishakiye answered.

The prosecutor then asked Ahishakiye about Kantengwa's husband, Athanase Munyemana. Ahishakiye admitted that she had picked Munyemana out of a photo before. "[Y]ou knew that he was the director of the secret police for the MRND government," the prosecutor said next, which drew a sustained objection from defense counsel. And before breaking for lunch the judge reminded the jury that facts assumed in questions are not evidence.

Munyenyezi's lawyer moved for a mistrial, claiming prosecutorial misconduct. The defense's theory was straightforward enough. The prosecutor, the defense argued, botched the Ahishakiye cross by assuming two facts in his questions — that Ahishakiye had testified at Kantengwa's perjury trial (even though the prosecutor knew that she had not) and that Munyemana [*541] once headed the MRND secret police (even though the prosecutor had no basis for that claim).

On the first issue — concerning [**18] the question about testifying at Kantengwa's trial — the prosecutor fessed up to a mistake, saying he had a document showing Ahishakiye had come to America the year before and wrongly thought she had done so to testify for Kantengwa. Calling the travel question "pretty dramatic," the judge said the prosecutor should correct the record for the jury. And the prosecutor did just that, explaining in open court that he wrongly assumed in his question that Ahishakiye had gone to Boston to testify for Kantengwa — "in fact," he stressed, she had actually traveled to New Hampshire to testify "in a prior proceeding involving" Munyenyezi. The judge jumped in, telling the jury that

[w]hat the prosecutor has just clarified for you is that when he asked those questions one might think that there's an implication that she did do those things, and the prosecutor had a good faith basis for thinking that was so, but . . . the parties have learned that's not the case so they're clarifying that for you so you don't take that into account in determining the issues that are before you.

"Does that do it?" the judge asked. Both sides agreed that it did.

On the second issue — concerning the secret-police question — [**19] the prosecutor argued (and Munyenyezi does not contest) that he had a good-faith basis for touching on that topic, given that testimony at Kantengwa's trial suggested Rwanda had a secretpolice agency. And, the prosecutor said, he believed that Ahishakiye would name Munyemana as its head (though the record is not exactly clear why he thought she would finger Munyemana as the head). "Are you suggesting he has no good faith basis to ask the question?" the judge asked defense counsel. "No," counsel said.

---

Q. Are you aware that you are on the Friends of Evil list that is propagated by the state-run media out of Rwanda?

A. I don't think I knew that, no.

Q. And they are extremely critical of your views — [PROSECUTOR]: Objection.

THE COURT: Sustained.

And then the judge said:

You're not testifying . . . . Questions can be asked, but the questions are not themselves evidence. And facts assumed in the question [are] not evidence. So there's no evidence of such a thing. The witness hasn't heard of it.

The judge later denied the mistrial motion. The prosecutor's "concession and my instruction to the jury," the judge said, effectively "cured any prejudice" that may have arisen because of the travel question. And, he added, the prosecutor had a good-faith basis for asking the secret-police question. The judge offered to give a curative instruction regarding the secret-police question, which, he said, would tell the jury (again) that facts assumed in questions are not evidence. But the defense declined. "You know," the judge went on to say, "watching [the jurors'] reaction[s]" to what had happened, "if they understand one thing very, very well, they understand that questions of counsel are not evidence [**20] of the facts assumed in the questions." Still, the judge told the jury in his final charge that "[a]rguments, statements, and questions by lawyers are not evidence," and that "questions by lawyers are not evidence of any facts assumed in the questions."

Unshaken in her belief that the prosecutor's questioning required a mistrial, Munyenyezi blasts away at the judge's ruling. As she tells it, the prosecutor's actions — posing questions with "no evidentiary foundation" — rendered the trial fundamentally unfair by creating the misimpression that Ahishakiye was either lying or had a very bad memory. But what hurts her is the standard of review — *HN9*[⬆] we inspect the judge's ruling only for abuse of discretion, see Dunbar, 553 F.3d at 58, which means his decision stands unless no reasonable person could have ruled as he did, see United States v. Maldonado, 708 F.3d 38, 42 (1st Cir. 2013). The reason for this is that a district judge is much closer to the trial action than we can ever be and so is better positioned to see if prejudicial matter presented there could likely affect the [*542] case's outcome. See United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994). Granting a mistrial is strong medicine, of course — prescribed only as a last resort if the alleged harm cannot be overcome with less-drastic remedies, like curative instructions. See [**21] United States v. De Jesus Mateo, 373 F.3d 70, 73 (1st Cir. 2004).

With all this in mind, we think the judge handled the suggestive-questioning issue with sufficient sensitivity to Munyenyezi's fair-trial rights, taking timely action to minimize the risk of undue prejudice. He had the prosecutor face the jury, for example, and confess error on the subject of Ahishakiye's travels. And he followed that up with an instruction telling the jury not to take the prosecutor's questions on that point into account. The defense rejected the judge's offer of a curative instruction regarding the secret-police question. No matter, though. At every other turn (including during his final charge), the judge carefully instructed the jury that questions that assume facts are not evidence. *HN10*[⬆] We normally assume that juries follow instructions. See Acosta-Colón, 741 F.3d at 202 n.13. And we see no reason to stray from that practice here: remember, having watched the jurors closely, the judge said that he was "absolutely convinced" that they "completely" understood "that questions of counsel are not evidence of the facts assumed in the questions," and Munyenyezi gives us nothing to contradict his ring-side take on the case. Also hurting her is the fact that the abundance of evidence against her "dwarf[s]" the complained-about [**22] prejudice arising from these few questions.[10] See United States v. Butterworth, 511 F.3d 71, 76 (1st Cir. 2007).

---

[10] Munyenyezi says in a footnote that the prosecutor asked a rebuttal witness whether she knew Munyemana was an MRND "intelligence officer," suggesting that this question crossed the line too. But she floats this idea only in passing, which means any argument lurking there is waived. See, e.g., Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999) (explaining "that arguments raised only in a footnote or in a perfunctory manner are waived").

The bottom line is this. *HN11*[⬆] We reverse mistrial denials only under "extremely compelling circumstances." <u>Pierro</u>, 32 F.3d at 617. And the circumstances here do not come within a country mile of satisfying that standard.[11]


## Sentence Length

That brings us to Munyenyezi's complaints about her 120-month [**23] sentence — the maximum term permitted by statute but well above the 0-6 month advisory guideline range (a range recommended by probation, which the judge adopted, without objection). Simply put, she thinks the sentence is too long — that it is (in legalese) substantively unreasonable. Such an argument is usually a tough sell. After all, *HN13*[⬆] there is no "perfect sentence," but, instead, "a wide universe of supportable sentencing outcomes." <u>United States v. Del Valle-Rodríguez</u>, 761 F.3d 171, 177 (1st Cir. 2014). We look only for abuse of discretion. <u>See, e.g., United States v. Medina-Villegas</u>, 700 F.3d 580, 583 (1st Cir. 2012). And as long as we see "a plausible sentencing rationale" that reaches "a [*543] defensible result," the sentence stands. <u>United States v. Martin</u>, 520 F.3d 87, 96 (1st Cir. 2008). So it is here, as we now explain.

Munyenyezi first faults the judge for departing upward from that range under section 5K2.8 of the federal sentencing guidelines. *HN14*[⬆] That section lets a judge depart upward if he finds "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." <u>See</u> USSG § 5K2.8 (2002 edition). But in fact the judge <u>denied</u> the prosecutor's request for a section-5K2.8 departure. Which pours cold water on this argument.[12]

The judge did rule that the case called for either an upward departure under section 5K2.0 or, alternatively, an upward variance under 18 U.S.C. § 3553(a). *HN15*[⬆] Section 5K2.0 lets a judge depart upward if he finds aggravating circumstances of a kind or degree not adequately taken into account by the guidelines. <u>See</u> USSG § 5K2.0 (2002 edition).[13] *HN16*[⬆] Section 3553(a) lets a judge vary upward based on factors listed there, like the defendant's background (including her criminal history), the circumstances of the offense, the seriousness of the offense, the need to protect and deter others, the need to promote respect for the law and to provide a just punishment, and the need to eliminate unjustified sentencing disparities.[14] And the judge made clear that she would receive the same sentence either way.

Munyenyezi attacks the judge's ruling on several fronts. None carries the day.

For starters, Munyenyezi criticizes the judge for not considering recently-amended guideline section 2L2.2 in his departure analysis — *HN19*[⬆] a section that specifically discusses sentencing

---

[11] As a fallback, Munyenyezi also thinks that the prosecutor's conduct violated her Sixth Amendment right to confront witnesses who say they had "personal knowledge of a 'secret police' organization in Rwanda at the time of the genocide" or who say they had "personal knowledge" that Munyemana ran the secret police. But *HN12*[⬆] because she cites no authority for this argument (nor does she offer any convincing explanation of what the law should be, assuming she found no authority), she has waived it. <u>See, e.g., Medina-Rivera v. MVM, Inc.</u>, 713 F.3d 132, 140-41 (1st Cir. 2013); <u>Town of Norwood v. Fed. Energy Regulatory Comm'n</u>, 202 F.3d 392, 405 (1st Cir. 2000).

[12] The judge could not have been any clearer. "I think 5K2.8 is not a legitimate legal basis to grant a departure," the judge said to the prosecutor, "[s]o, to the extent your [**24] motion is based on 5K2.8, that's denied."

[13] *HN17*[⬆] A judge can depart downward in certain situations too. <u>See</u> USSG § 5K2.0 (2002 edition) (discussing "mitigating circumstances").

[14] *HN18*[⬆] Under certain circumstances a judge can also vary downward using section 3553(a).

enhancements [**25] for genocide-related acts. See USSG § 2L2.2 (2012 edition).[15] If the judge had applied section 2L2.2, she argues, her "genocidal conduct" would have been "taken into account," making her ineligible for a 5K2.0 enhancement — and her guideline range would have been 57-71 months, a range well below the 10-year statutory maximum. That is because *HN20*[⬆] a judge using section 2L2.2 can set the upper end of a defendant's sentencing range at the statutory maximum if the defendant committed a "serious human rights offense" and has a criminal history category of VI. Munyenyezi has a criminal history category of I, which as we just said would have yielded a guideline range of 57-71 months if section 2L2.2 held sway.

[*544] A couple of things pull the rug out from under Munyenyezi's theory, however. One, section 2L2.2 — the judge found and the parties agree — does not apply here because of ex post facto concerns. And two, the judge actually did consider that section, checking solely to see if it offered any guidance on the departure issue. He just found that it did not, concluding that regardless of her criminal history category, the "facts" that made her immigration/naturalization "statements lies" — i.e., the facts that showed her to be a génocidaire — are so "disturbing" that they deserved the maximum sentence permitted by statute. Munyenyezi never pinpoints any error in the judge's conclusion, which means she has waived any argument she might have had. See, e.g., Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

Turning to section 3553(a), Munyenyezi protests that the judge punished her without knowing whether the jury found that she had lied about being a génocidaire or about being a member of a political party — he did not know, the argument goes, because the jury used a general-verdict form. But *HN22*[⬆] a [**27] judge can find facts for sentencing purposes by a preponderance of the evidence, so long as those facts do not affect either the statutory minimum, see Alleyne v. United States, 133 S. Ct. 2151, 2155, 186 L. Ed. 2d 314 (2013), or the statutory maximum, see Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) — exceptions not implicated here. And the judge did exactly that, finding a preponderance of proof that she had lied to hide her genocidal past.[16]

Which takes us to Munyenyezi's next section 3553(a) argument — that the judge sentenced her as a génocidaire even though he said he would not. Despite what she thinks, the judge kept his word, explicitly

---

[15] *HN21*[⬆] Section 2L2.2 (2012 version) reads, in relevant part:

Fraudulently Acquiring Documents Relating to Naturalization, Citizenship, or Legal Resident Status for Own Use; False Personation or Fraudulent Marriage by Alien to Evade Immigration Law; Fraudulently Acquiring or Improperly Using a United States Passport

(a) Base Offense Level: **8**

(b) Specific Offense Characteristics

. . .

(4) (Apply the Greater):

. . .

(B) If the defendant committed any part of the instant offense to conceal the defendant's participation in (i) the offense of incitement to genocide, increase [**26] by **6** levels; or (ii) any other serious human rights offense, increase by **10** levels. If clause (ii) applies and the resulting offense level is less than **25**, increase to level **25**.

[16] She "personally participated in the mass killing" of innocents "merely because they were called Tutsi," the judge found — "mann[ing] the infamous roadblock in Butare" near the Hotel Ihuriro; checking IDs, keeping records, and "sort[ing] out who would die from those who would live"; and "direct[ing]" and "facilitat[ing] murder."

hitting her with the statutory maximum not as "punishment for genocidal conduct" but because her lies were the "most serious" infractions "of section 1425 that one can describe." She "is not accountable in this court" for her genocidal acts, the judge stressed. But "she is accountable for lying to obtain refuge and citizenship for which she was not qualified." And "lying about participation in genocide when [**28] specifically asked," the judge explained, knowing full well "that such conduct is automatically disqualifying with respect to immigration and citizenship seriously undermines the integrity of this country's immigration standards in the most offensive way" imaginable. The judge drove home these points a little later in the hearing, saying that if he "were to impose a sentence" for her "participation in the Rwandan genocide," it

> would not be a sentence of ten years to be served concurrently on each count[;] it would be a sentence of, at minimum, obviously life in prison. The sentence imposed here is far too lenient and entirely inadequate to sanction acts of genocide. It is, however, within the range of punishments contemplated by Congress . . . and is adequate to sanction the most egregious violations of section 1425 that one can imagine.

And in exercising his judgment, the judge expressly tied the sentence to the relevant section 3553(a) factors, like protecting the community and deterring criminal wrongdoing, promoting respect for the [*545] law, and providing a just punishment. "We cannot abide this country being a haven for génocidaires," the judge emphasized. Citizenship applicants must know, he added, that if they [**29] "lie" about taking part in genocide, "the punishment for that fraud will not be lenient." By our lights, the judge's analysis is plausible and defensible.

As a last-ditch effort, Munyenyezi complains that her sentence is at "odds" with much-less severe sentences imposed by two other district judges in this circuit in two (supposedly) similar cases. And she suggests that the judge's failure to give her a sentence like the ones in the other two cases slighted **HN23**[⬆] section 3553(a)(6), which requires judges to consider "the need to avoid unwarranted sentence disparities." But that section primarily refers to <u>national</u> disparities among <u>similarly situated</u> defendants. <u>See United States v. Ayala-Vazquez</u>, 751 F.3d 1, 32 (1st Cir. 2014). Unfortunately for her, she never explains how her situation fits that bill. So any argument in this direction is waived. <u>See United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

### Final Words

Wrapping up, we <u>affirm</u> Munyenyezi's convictions and sentence.

---

End of Document

Appendix Page 1970

Richard Guerriero

1:16-CV-402-SM

AO 243 (Rev. 01/15)                                                                                           Page 2

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District: NEW HAMPSHIRE | |
|---|---|---|
| Name *(under which you were convicted)*:<br>BEATRICE MUNYENYEZI | 2016 SEP -6 P 2:34 | Docket or Case No.:<br>1:10-CR-000-85-SM |
| Place of Confinement:<br>FCI-ALICEVILLE ALICEVILLE, ALABAMA | Prisoner No.:<br>11805-049 | |
| UNITED STATES OF AMERICA | Movant *(include name under which convicted)* | |
| V.    BEATRICE MUNYENYEZI | | |

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

## MOTION

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:

    U.S. DISTRICT COURT - DISTRICT OF NEW HAMPSHIRE

    (b) Criminal docket or case number (if you know):  1:10-Cr-00085-SM

2.  (a) Date of the judgment of conviction (if you know):  February 21, 2013

    (b) Date of sentencing:  July 15, 2013

3.  Length of sentence:  120 months

4.  Nature of crime (all counts):  Title 18 U.S.C. 1425 (a) & (b) Procurement of
    Citizenship or naturalization unlawfully

5.  (a) What was your plea?  (Check one)
    (1) Not guilty [X]        (2) Guilty [ ]        (3) Nolo contendere (no contest) [ ]

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or
    what did you plead guilty to and what did you plead not guilty to?

                      NONE

6.  If you went to trial, what kind of trial did you have?  (Check one)        Jury [x]        Judge only [ ]

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?        Yes [ ]        No [X]

8.  Did you appeal from the judgment of conviction?        Yes [X]        No [ ]

AO 243 (Rev. 01/15)                                                                                    Page 3

9.  If you did appeal, answer the following:
    (a) Name of court:  __United States Court of Appeals - First Circuit__
    (b) Docket or case number (if you know):  __13-1950__
    (c) Result:  __Sentence and Conviction Affirmed__
    (d) Date of result (if you know):  __March 25, 2015__
    (e) Citation to the case (if you know):  __unknown__
    (f) Grounds raised: (1) Whether the trial court erred in admittin 404b evidence of the defendant's alleged false statements to the ICTR in 2006 in order to prove she lied about her involvement in the genocide in 1994.(2)Whether the trial court erred in not granting a mistrial due to prosecurital misconduct, where the prosecutor impermissibly injected inadmissible, highly prejudicial facts through his questioning.(3) Whether the trial court erred in denying the motion for judgment of aquittal(4) Whether the trial court's sentence was substantively unreasonable.

    (g) Did you file a petition for certiorari in the United States Supreme Court?   Yes [X]   No [ ]
        If "Yes," answer the following:
        (1) Docket or case number (if you know):  __15-5264__
        (2) Result:  __Petition denied__

        (3) Date of result (if you know):  __October 5, 2015__
        (4) Citation to the case (if you know):  __unknown__
        (5) Grounds raised:  (1) Whether Beatrice Munyenyezi's constitutional right to due process was violated due to prosecutorial misconduct, where the prosecutor, after warnings from the court, impermissibly injected inadmissible, highly prejudicial facts before the jury through his questioning (2) Whether the Court erred in admitting so called 404(b) evidence of prior alleged false statements to the International Criminal Tribunal for Rwanda in 2006 made by Beatrice Munyenyezi in order to prove she lied about her involvement in the Rwandan genocide in 1994.

10.  Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
     Yes [ ]   No [X]

11.  If your answer to Question 10 was "Yes," give the following information:
     (a) (1) Name of court:  _____
         (2) Docket or case number (if you know):  _____
         (3) Date of filing (if you know):  __N/A__
     (4) Nature of the proceeding:  _____
     (5) Grounds raised:  __N/A__

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐          No ☒

(7)  Result: _____ N/A _____

(8)  Date of result (if you know): _____

(b)  If you filed any second motion, petition, or application, give the same information:

(1)  Name of court: _____

(2)  Docket of case number (if you know): _____

(3)  Date of filing (if you know): _____ N/A _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

NONE

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐          No ☒

(7)  Result: _____

(8)  Date of result (if you know): _____ N/A _____

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:          Yes ☐          No ☒

(2)  Second petition:     Yes ☐          No ☒

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

N/A

12.  For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

AO 243 (Rev. 01/15)

**GROUND ONE:**   INEFFECTIVE ASSISTANCE OF COUNSEL

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

DEFENSE COUNSEL FAILED TO REQUEST A CHANGE OF VENUE

(SEE MEMORANDUM OF LAW IN SUPPORT OF)

(b) **Direct Appeal of Ground One:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐      No ☒

(2)  If you did not raise this issue in your direct appeal, explain why:

Defense counsel failed to raise this issue. I am not versed in federal law. I relied upon my attorney to raise this issue

(c) **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☒

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

n/a

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

n/a

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐      No ☒

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐      No ☒

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐      No ☒

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

<u>                              n/a                                                              </u>

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

<u>                              n/a                                                              </u>

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
issue:                              n/a

---

**GROUND TWO:**  <u>VIOLATION OF CONSTITUTIONAL RIGHT - AMENDMENT V - DUE PROCESS</u>

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

THE UNITED STATES SUPREME COURT HAS DEEMED THE RESIDUAL CLAUSE
UNCONSTITUTIONALLY VAGUE FOR CRIMES OF VIOLENCE
( SEE MEMORANDUM OF LAW IN SUPPORT OF)

(b)  **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐      No ☒

(2)   If you did not raise this issue in your direct appeal, explain why:

The Supreme Court decision in "JOHNSON v. U.S. (2015) had not
been decided at the time of sentencing

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☒

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____ n/a _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

n/a

_____

(3)   Did you receive a hearing on your motion, petition, or application?
        Yes ☐        No ☒

(4)   Did you appeal from the denial of your motion, petition, or application?
        Yes ☐        No ☒

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
        Yes ☐        No ☒

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____ n/a _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

n/a

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this
        issue:        n/a

**GROUND THREE:**   _INEFFECTIVE ASSISTANCE OF COUNSEL_

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

DEFENSE COUNEL FAILED TO CONDUCT AN INDEPENDANT PRE-TRIAL INVESTI-
GATION, INCLUDING FAILURE TO INTERVIEW WITNESSES AND FAILURE TO PRE-
PARE FOR TRIAL

( SEE MEMORANDUM OF LAW IN SUPPORT OF)

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

        I AM NOT VERSED IN FEDERAL LAW AND I RELIED UPON MY ATTORNEY TO PRESENT THESE ISSUES

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    n/a

    Docket or case number (if you know):

    Date of the court's decision:

    Result (attach a copy of the court's opinion or order, if available):

    n/a

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☒

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☒

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☒

    (6)  If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed:

    Docket or case number (if you know):

    Date of the court's decision:    n/a

    Result (attach a copy of the court's opinion or order, if available):

    n/a

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

n/a

---

**GROUND FOUR:**   INEFFECTIVE ASSISTANCE OF COUNSEL

---

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

DEFENSE COUNSEL FAILED TO OBJECT TO FALSIFIED EVIDENCE AND PROSECU-
TORIAL MISCONDUCT

( SEE MEMORANDUM OF LAW IN SUPPORT OF)

(b)  **Direct Appeal of Ground Four:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐        No ☒

(2)  If you did not raise this issue in your direct appeal, explain why:

DEFENSE COUNSEL FAILED TO RAISE THIS ISSUE WHEN I RELIED UPON HIM
TO RAISE ALL ISSUES. I AM NOT VERSED IN FEDERAL LAW.

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐        No ☒

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:          n/a

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

n/a

Appendix Page 1978

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☒

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☒

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐        No ☒

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know): _____

Date of the court's decision: _____ n/a _____

Result (attach a copy of the court's opinion or order, if available):

n/a

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:        n/a

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

1.  FAILURE TO REQUEST A CHANGE OF VENUE
2.  VIOLATION OF CONSTITUTIONAL RIGHT - AMENDMENT V - DUE PROCESS
3.  FAILURE TO CONDUCT AN INDEPENDANT PRE-TRIAL INVESTIGATION, INCLUDING FAILURE TO INTERVIEW WITNESSES AND FAILURE TO PREPARE FOR TRIAL
4.  FAILURE TO OBJECT TO FALSIFIED EVIDENCE: OBJECT TO PROSECUTORIAL MISCONDUCT
5.  FAILURE TO ARGUE MITIGATION OF PUNISHMENT FACTORS AND ROLE, AT SEN-TENCING
6.  PROSECUTORIAL MISCONDUCT BY FAILING TO DISCLOSE EXCULPATORY EVIDENCE

14.   Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?        Yes ☐      No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

N/A

15.   Give the name and address, if known, of each attorney who represented you in the following stages of the
you are challenging:

(a)  At the preliminary hearing:

DAVID RUOFF

(b)  At the arraignment and plea:

DAVID RUOFF

(c)  At the trial:

DAVID RUOFF AND MARK HOWARD

(d)  At sentencing:

DAVID RUOFF AND MARK HOWARD

(e)  On appeal:

DAVID RUOFF AND MARK HOWARD

(f)  In any post-conviction proceeding:

DAVID RUOFF AND MARK HOWARD

(g)  On appeal from any ruling against you in a post-conviction proceeding:

NONE

16.   Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court
and at the same time?              Yes ☐         No ☒

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are
challenging?              Yes ☐         No ☒

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

NONE

(b)  Give the date the other sentence was imposed:

(c)  Give the length of the other sentence:              NONE

(d)  Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or
sentence to be served in the future?              Yes ☐         No ☒

18.   TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain
why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

THIS MOTION IS TIMELY FILED

AO 243 (Rev. 01/15)                                                                                 Page 13

Therefore, movant asks that the Court grant the following relief:

_____REMAND FOR RESENTENCING_____
or any other relief to which movant may be entitled.


NONE
_____
Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion
under 28 U.S.C. § 2255 was placed in the prison mailing system on _Sept 01, 2016_____
                                                                        (month, date, year)


Executed (signed) on _Sept 01, 2016_____ (date)


_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

2016 SEP -6 P 2:34

BEATRICE MUNYENYEZI,                    )
                    DEFENDANT            )
          vs.                           ) Case No. 1:10-CR-000-85-SM
UNITED STATES OF AMERICA,               )
                    PLAINTIFF            )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MEMORANDUM  OF LAW IN SUPPORT OF TITLE 28 U.S.C. 2255 MOTION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMES NOW, DEFENDANT PRO SE, BEATRICE MUNYENYEZI, providing this Honora-
ble Court with her memorandum in support of her grounds for relief pursuant
to Title 28 U.S.C. 2255 motion to Vacate, Set Aside, or Correct Sentence By
A Person in Federal Custody. The Grounds for relief are as follows:

Ground One - INEFFECTIVE ASSISTANCE OF COUNSEL
Supporting Facts- Defense Counsel failed to request a change of venue

Defendant MUNYENYEZI requested that her defense counsel Ruoff file a
motion with the court for a change of venue given the extensive media cover-
age that the case was receiving. MUNYENYEZI's concerns stemmed from her
first trial ending in a deadlock jury. This resulted in a mistrial, which
persuaded the court to release MUNYENYEZI pending her reitrial(she had been
detained for 22 months)  The Rwandan media reaction to this result was swift
pervasive and highly critical of a United States Court System.

The media was so extensive that during this trial the Government sought
to remind the court to admonish the jury regarding the media coverage:
          The Govèrnment: "There's no admonishment with regards
                          to the media now that they are deliberating
                          it wouldn't hurt to remind them of that"
                    [Doc.309 Pgld:158,Ln:10-12]

A few minutes later the court informally instructs the jury just before de-
liberations:
          The Court:   "Just again, this case has generated some publicity
                       so while you are deliberating, I won't have the oppor-
                       tunity to communicate with you, so let me again re-
                       mind you. Please take all the steps and precautions
                       you can to make sure you are not exposed to the media
                       coverage with respect to this case. You have to de-
                       cide the case based on the evidence presented to the
                       Court"[Doc.309:Pgld:159 Ln:8-15]

Yet the damage was already done, even in the second trial, with the
heavy media presence, the public became enamored with details. The jury pool
was well aware of the events in the first trial. It was the talk of the town.

Appendix Page 1982

For example, prior to the trial, Ms Deborah Scraton was going about New Hampshire showing a documentary titled: "Earth Made of Glass" on the Holocaust and Genocide. On or about September 18, 2012, students from the "Bishop Brady School" and "Saint Paul's School, as well as the general public attended the event at the Red River Theater in Concord, New Hampshire. Ms. Scraton blatantly told the audience that there was a trial about the Rwanda Genocide set to begin again, here in Concord, New Hampshire about BEATRICE MUNYENYEZI, stating: " In fact her daughter is sitting right there" and then points to my then 18 year old daughter. That begs the question as to how Ms. Scraton knew who MUNYENYEZI'S daughter was or even the timing of her lecture specifically in Concord, New Hampshire just prior to the second trial commencing.

Between the local gossip, seminars, TV and radio stations, newspapers and internet coverage, not to mention the propaganda as mentioned above and since her first trial had become a household topic, MUNYENYEZI'S belief that the new jury would be so tainted by the coverage that a change of venue was required. It was inevitable. The damage was done. MUNYENYEZI'S chances of a favorable result in trial was non-existant.

Ruoff was ineffective because he had failed to request a change of venue at MUNYENYEZI'S request. She asserts that if the venue had been changed to a location where potential jurors were not exposed to unfair media accounts as well as a new Judge and Prosecutor, MUNYENYEZI would have evaded such great prejudice aginst her. Thus there would have been a greater probability of a fair and impartial trial.

MUNYENYEZI was subject to countless television news segments and front page news articles in the New Hampshire Union leader and the Concord Monitor as well as the National Public radio, all painting a picture of her being a Genocidaire. MUNYENYEZI concedes that whether or not such a motion would have succeeded may be debatable. Ruoff still should have filed the motion nonetheless, because when considering all of MUNYENYEZI'S claims cumulatively, counsel was constitutionally deficient.

Ground Two - Violation of Constitutional Right - Amendment V - Due Process
Supporting Facts - The United States Supreme Court has deemed the "residual clause" unconstitutionally vague for "crimes of violence"

At the sentencing hearing, the court(judge) varied upward from 0-6 months to 120 months because he finds that I had participated in the murder of women, men and children directly, even though there was no evidence or witnesses who testified to having seen me engaging in those violent crimes.

Under the "residual clause", that has now been deemed unconstitutionally vague for "crimes of violence"., defendant MUNYENYEZI should be considered for resentencing. This violation of her Fifth Amendment right to Due Process has been violated. The "clause states that any crime that purports the risk of physical, forceful injury constitutes a "crime of violence". MUNYENYEZI has been found guilty by a jury and convicted for a crime that outlined violence. MUNYENYEZI was sentenced to 120 months imprisonment because of the violence surrounding her criminal act. This establishes her eligibility under the now deemed unconstitutional "residual clause".

Ground Three - Ineffective Assistance of Counsel
Supporting Facts - Defense counsel failed to conduct an independant pre-
                   trial investigation, including failure to interview wit-
                   nesses and failure to prepare for trial

In this case MUNYENYEZI'S trial attorney David Ruoff failed to conduct any kind of reasonable, independant pre-trial investigation of her case. Despite fertile grounds for investigation by defense counsel, very little was done. At trial, counsel called no new witnesses, nor no new evidence.

Specifically, counsel failed to research the case law, interview new witnesses, or investigate the facts of MUNYENYEZI'S case. To MUNYENYEZI'S knowledge, there was not any kind of independent pre-trial investigation conducted.

Not only did defense counsel fail to explore the possibility of a defense, he also intercepted his own client's effort to present the defense to the court during pre-trial and trial. In this case, had counsel conducted a reasonable investigation, he would have discovered that most of the government's information and case stemmed from the Rwandan government's hearsay evidence and witnesses that were being recruited and who were not forthright and contradictory. Counsel also failed to investigate compelling evidence in the form of an e-mail[ exhibit 1] that defense counsel was in receipt of from the individual that was recruited by a Rwandan survivor's organization called "IBUKA". The largest and most well-known group of people who seek justice for the genocide survivors and who are supported by the Rwandan government to help them exist.

Defense counsel did not investigate or pursue the witness(recipient of the e-mail) or enter the e-mail as evidence into trial. Ironically, this recruitment is a replica of the first group of witnesses that appeared in MUNYENYEZI'S first trial, when the defense exposed that most of the witnesses knew one another and had in fact colluded with one another to lie in their statements in past trials in Rwanda and at the ICTA(International Criminal Tribunal for Rwanda), thus the witnesses were extensively impeached with radically inconsistant under-oath statements from other proceedings which in turn prompted the trial court, in a subsequent order to state:

The Court: " During the first trial, many of the government's
            principal witnesses were effectively impeached
            based upon extensive and preparatoryeffort by
            defense counsel" [Doc. 176 at 2]

Furthermore, MUNYENYEZI submitted a list of six new witnesses, again, Ruoff chose not to pursue MUNYENYEZI'S request. The new witnesses were never contacted. If counsel would have contacted them, as well as conducted an investigation, they could have been called to refute the government's witnesses testimony. For example, government witness, Thierry Sebaganwa testified that he was in Rwanda at the specific time period, and claimed he saw MUNYENYEZI engage in political rallies. If counsel had contacted MUNYENYEZI'S list of witnesses, he could have called them to impeach Thierry Sebaganwa's testimony. Mr. Sebaganwa wasn't even in Rwanda during the specific period that he claimed to have seen MUNYENYEZI.

Defense counsel should have vetted the government's cast of witnesses. He should have investigated the histories of these people and if they were indeed part of "recruited group" that were sent to countries to testify at different trials of people accused of similar allegations. Furthermore, upon testimony of witnesses, Mr. Eric Benn, who is employed by the federal government, at the Department of Defense, as a imagery analyst, testified that the

satellite images that he analized from as early as March and April of 1994 showed no type of trafficking or road blocks at all.[Doc. 248 Pg 10:43Ln 16-33]. Yet, upon discovering that the government had introduced images only from May 23rd of 1994 and after, did he recant his testimony. He also testified that April 1994 images exist. Ironically, all witnesses testified that they saw MUNYENYEZI at a road block outside the Lihuriro Hotel in April 1994. This begs the question, as to why the government did not in troduce the April 1994 images into evidence if in fact MUNYENYEZI can be seen manning the road block. All of the government's witnesses testified they saw her there, specifically in the month of April. The month that the government chose not to introduce any images.

MUNYENYEZI invites the court's attention to the fact that a road block or MUNYENYEZI was never seen in any images the government produced, and if she was in any images in April of 1994, as the government's witnesses testified, then why weren't they entered into evidence, since the images do exist? Defense counsel did not conduct an investigation of all of the government's witnesses, because if he had, all their witnesses would have, once again been impeached. The April images would have proven that there was never a road block and MUNYENYEZI was never seen there, quite simply, because she wasn't there.

In a jury trial, the jury relies on evidence, testimony of government witnesses, testimony of defense counsel's witnesses and sometimes the defendant. The jury was not privy to the admonishing given by the judge in the first trial, about the questioning of conflicting testimonies made by the government's witnesses. The jury was not aware of the fact that a different set of hired, coached witnesses were sent over to say what was necessary.

In Cronic v. U.S.; 466 US 648, 80 L.ed. 2d 657, 104 S.ct. 2039(1/10/84) The court held that Cronic's constitutional right guaranteed by the sixth amendment was violated due to the following reasons:

(1) time afforded for investigation and preparation;(2) the experirnce of counsel;(3) the gravity of the charge;(4)the complexity of possi ble defense, and(5) the accessibility of witnesses to counsel. When we review reason (3-5) the court must consider defense counsel's access to potential witnesses most located in or out of Rwanda and if counsel made an attempt to contact said witnesses, or, if counsel believing any effort was futile, gave in to discouragement. The petitioner believes that latter. MUNYENYEZI gave counsel the information, but the evidence was not promulgated. The lack of effort severly prejudiced the outcome of this case. The evidence would have shown the fraudulent means to which the government would stoop to, just to receive justice for the atrocities that took place in the country. Regardless to whether the defendant was involved directly or indirectly. In this case, other than the questionable statements, there were no proving statements or evidence presented by the government. The defense did not use proper trial preparation. If defense counsel would have compounded properly, the evidence for trial, there is a reasonable probability that MUNYENYEZI'S trial would have resulted in a different outcome.

Ground Four - INEFFECTIVE ASSISTANCE OF COUNSEL
Supporting Facts -   Defense counsel failed to object to falsified evidence
                     and prosecutorial misconduct

(1) Failure to object to falsified evidence

     During the search and seizure, the government took the defendant's na-
tional ID card from her residence. The ID was used in both trials[ exhibit 11]
Defendant obtained her ID on August 26, 1997 in a place where she was born
(Mukarange,Byumba,Rwanda). During the pre-trial, both defense counsel and
defendant realized that the ID's year of issuance has been tampered with, then
entered into trial (from 1991 to 1994). Defendant asked counsel to bring the
matter before the court, but to no avail.
     However, by August 26,1994, Rwanda was under RPF(Rwandan Patriotic Front)
control. There were no ID's being issued by the RPF. Moreoever, defendant
with more than 2,000,000 refugees left the country on July 18, 1994 to exile
(congo) as indicated in the indictment.
     If counsel would have investigated his own (findings) discovery, he
would have proved that during the period of the time the governemnt asserts
MUNYENYEZI was issued that identification, it was impossible, due to the
fact that the municipality that issues the identifications was under seize
during that period of time, therefore no national identifications were issu-
ed, particularly in that municipality.

(2) Failure to object to prosecutorial misconduct

     During cross examination of defense witness, Gilbert Hitimana, the go-
vernment improperly badgered the witness. By way of asking questions in a
testimonial manner, in order to inflict an emotional reaction to the jury.
For example, without any evidentiary basis, the government asserted the fol-
lowing:

          The Government: "and her husband was actually head of the
                          secret police of the MRND government, right?"
                             [ Doc. 308 Pg 24 Ln: 23-25]
Defense counsel did not object. Later, during another defense witness, Marie
Ahishakiye,

          The Government: "and you know that he was the director of
                          the secret police for the MRND government?"

Defense cousnel objected during side bar. The court instructed the govern-
ment the following:

          The Court:".....It's way far a field. It's beyond the scope.
                    Do not mention him again."
                       [ Doc. 308 Pg. 63 Ln. 6-8]
Then on the next witness Anastasia Mukamwiza, the government again brought
him up(Munyemana ), but with a twist, stating:

          The Government: "ubutodo you remember that he was there and
                          he was head of the Rwandan Intelligence
                          Service?" [ Doc. 308 Pg 20 Ln. 6-8]
                                      (trial 2 day 10 2/19/13)
Defense counsel, nor the court objected or intervened. The government was
putting words  in the witnesses' mouth, clearly misleading the jury. The
government asked these questions in such a way to make the jury believe that

they were facts, and those facts were neither supported by the evidence, re-
cord, or corroborated by any witness. It was without any regard of what the
answer would be, yet accomplished its goal of reflecting an emotional reac-
tion by the jury. Defense counsel failed to object to the improper remarks
and questioning, thus prejudicially affecting substantial rights of MUNYEN-
YEZI'S fifth amendment. Severe errors such as these worked in MUNYENYEZI'S
substantial disadvantage infecting her entire trial with error of constitu-
tional dimensions. With the absence of these errors, there is a reasonable
probability the result of the trial would have been different.

Ground Five - Ineffective Assistance of Counsel
Supporting Facts - Defense counsel failed to argue mitigation of punish
                  ment factors and role at sentencing

     During sentencing, defense counsel failed to argue mitigating factors
and the role of MUNYENYEZI "alleged" involvement in the genocide. MUNYENYEZI
married into a prominent political family, this does not make her a part of
an organization. MUNYENYEZI'S mother-n-law held a position as a cabinet mem-
ber of the MRND government.(the record will reflect that MUNYENYEZI disclos-
ed this fact on all immigration forms). That fact alone does not automatical-
ly make her a part of it. There was no first hand testimony at trial placing
MUNYENYEZI at the scene of a massacre. No satellite images were produced
that showed MUNYENYEZI anywhere in any photos, let alone road blocks. No evi-
dence at trial of MUNYENYEZI committing any atrocities. She was never seen
committing an inhumane crime. The testimonies, however contradictory, claim-
ed she was wearing a dress of MRND'S uniform and was present at a road block.
Words, just words, from a cast of witnesses plucked from the very same pool
of people from the "IBUKA" organization, as was the first "cast' of witnesses.
These people were all impeached in the first trial.
     Defense counsel should have argued all of those factors and more notibly
when the court stated during sentencing.
          The Court: "there is no extreme conduct in the lies. The lies,
               are lies, but there is no extreme conduct"
                    [ Doc. 274, Pg. 23. Ln 14-16]

Again, during deliberation, the court agreed with the defense counsel that
the indictment alleged that MUNYENYEZI participated directly in murder, rape,
kidnapping and theft, and that there has been no testimony to any of that be-
havior, and the court went on to state:
          The Court: " well it's an interesting point given the way the
               indictment reads" [ Doc. 308 Pg. 135 Ln. 6-8]

Yet, in sentencing, the court contradicts itself and states:

          The Court: "I find that the defendant was actively involved in
               the mass killing of innocent women, men and children
               because they were called "tutsi". She did so knowingly
               she manned the infamous road block in Butare
                    [ Doc. 274, Pg. 38 Ln. 11-15]

The Court went on to impose the maximum mandatory sentence of 120 months imprisonment, affer it adopted the PSR. The Pre-sentence investigation recommended a sentence of 0-6 months. Defense counsel argued nothing , he just summarily put on record the gist of the sentencing memorandum and objection to the government's citings of various other cases. Defense counsel should have challenged an overruling of her objections, including the contradiction by the court. The relevant conduct used in determining her sentence, as well as argue that givenm the facts and circumstances of the case, her sentence was substantively unreasonable.

Even though the court stated that she was being sentenced only for lying onuppaperwork, itís obvious that the court took into consideration the genocide account in iбs mandatory sentencing of 120 months. Therefore, a mitigating role should have been argued especially when one is sentenced to such a severe punishment for "lying" on documentation.

When we look at the gravity of the charges, this case eminates a person who was put on trial, not because she was alleged securement of INS standing, but for the actual charge of genocide. The case wasn't about that, but that's all the jury heard. How could she have received a fair trial? This case became complex because the governemnt made it so. She didn't stand a chance. Counsel was hired to defend a person accused of lying on paperwork in order to receive asylum. What counsel received was a case where he had to defend a person basically accused of genocide. Counsel was not prepared in the second trial to defend his client.

Unpreparedness, due to lack of funds, or just discouragement, due to onslaught of "witnesses", he did not properly prepare for the case on the second go round. it wasn't deliberate, it wasn't malicious. It was inevitable.

Ground Six - Prosecutorial Misconduct by Failing to Disclose Exculpatory Evidence

The instant ground presents a perfect storm of factors that could result in a wrongful conviction, thus warranting special scrutiny. By this the court in reviewing this specific argument on the subject of these infamous satellíte images taken by the department of defense during the period of the 100 days, 1994 genocide that took place between April 6 - July 18, 1994. Out of all the images, the government entered in evidence, none of the government witnesses' testimonies were corroborated by the photographs, because every single witness testified they saw MUNYENYEZI man a road block, checking ID's during the month of April 1994.

In trial, government witness Eric Benn testified that he reviewed the prepared April images and that they do exist. Then, when Mr. Benn was shown all of the images and the government educated him and the jury that there were no April images introduced into evidence, Mr. Benn was very swift to recant his testimony. The government badgered the witnesses to conform to what they wanted said, as well as what they wanted to convey to the jury. The government never disclosed pertinent evidence that would dipute MUNYENYEZI'S involvement with the genocide. The "Brady Violations" that the government performed are numerous. This alone would constitute a new trial for the defendant, with different court personnel.

## CONCLUSION

This case is not about the work ethic of defense counsel. As a whole, one's record generally speaks for itself. However, there comes a time, and a case, once in a while, where counsel makes some critical errors. It's not intentional, it's simple human error. It doesn't take away from counsel and his abilities to do his job. It shows that as humans, we tend to err. We realize the mistake, acknowledge it and move forward in the correct manner. What happened in this case can not be fixed, but the outcome can be corrected. Ineffective assistance of counsel, a sixth amendment violation occured here. What are we to do? The resounding answer would be to vacate and remand for further consideration.

Respectfully Submitted,

BEATRICE MUNYENYEZI

## CERTIFICATE OF SERVICE

I BEATRICE MUNYENYEZI, hereby declare under penalty of perjury, that the foregoing "Memorandum of Law In Support of Title 28 U.S.C. 2255 Motion" is true and correct. This Memorandum is to be delievered to the Clerk of the Court, for the District of New Hampshire, by the United States Postal Service.

Date: Sept 01, 2016

BEATRICE MUNYENYEZI #11805-049
FCI-ALICEVILLE P.O. BOX 4000
ALICEVILLE, ALABAMA 35442

TRULINCS 11805049 - MUNYENYEZI, BEATRICE - Unit: ALI-C-B          EXHIBIT 1

--------------------------------------------------------------------------------

FROM: David, Ruoff
TO: 11805049
SUBJECT: RE: upate
DATE: 10/15/2015 06:06:02 PM

ok the email that went on the IBUKA listserve?
This one:??


--- On Thu, 5/31/12, Yvette Rugasaguhunga <rugasy@yahoo.fr> wrote:

From: Yvette Rugasaguhunga <rugasy@yahoo.fr>
Subject: [ibuka-l] Munyenyezi trial
To:
Date: Thursday, May 31, 2012, 1:36 PM


Dear all,

An American friend of mine and a loyal friend of Rwanda, angered that his country is giving high level perpetrators safe haven is trying to help the office of prosecutor to gather more evidence to convict Munyenyezi.

As you might know, the US government botched the NH trial of Beatrice Munyenyezi primarily because the jury could not follow the long drawn out translations of Kinyarwanda in the courtroom. Additionally, so many cultural issues came into play and the witnesses were discredited for shifting their own narratives based on nuances in the question. Sometimes these were survivors, other times they were perpetrators.

The prosecutor forwarded him the following list (what he is looking for):

Please email me in private and let me know if you might have any information that can help.

Here is his list:

5.      Witnesses:
a.      Bystanders
                        i.      people who did not commit genocide but saw it happen, likely those who are of the Hutu
ethnicity
                        ii.     neighbors
b.      Survivors
                        i.      Women who tried to pass through the roadblock
                        ii.     Women who were kidnapped
                        iii.    Women who were raped in the hotel or the nearby areas
                        iv.     Women who hid as refugees in or around the EER school buildings
c.      Men who survived (specifically from that area)
d.      Soldiers who served at the ESO during that time (04/1994 through 07/1994)
e.      Perpetrators
                        i.      Confessed killers who have been released into the community
                        ii.     Killers who have confessed (accepted responsibility) but have not been released because
they engaged in rape and genocide
f.      People in the US who can speak English and meet any of the criteria of the above witnesses
6.      Contemporaries of Beatrice MUNYENYEZI who may have gone to school with her
a.      Knew Beatrice and her associations from school
b.      Knew Beatrice from the National University
c.      Knew her from the bar at the Ihuliro Hotel
d.      Knew her from her political activities (if any)
7.      Records or photos of Interahamwe membership and training events in the Butare area
8.      Evidence of mass graves in the area of the Appendix Page 1990
a.      Photos
b.      Witness testimony

TRULINCS  11805049 - MUNYENYEZI, BEATRICE - Unit: ALI-C-B

--------------------------------------------------------------------------------

c.      Reports
d.      Government records
e.      NUR records

Thank you in advance and

Have a*‴)

,. ´,. *‴) ,. *‴)

(,. ´ (,. ´ * Wonderful One! *

--------------------

Yvette Nyombayire Rugasaguhunga
Founder & Director
YR Survivors' Education Fund
New York City,USA
 : 347-768-0494 (C)
 : 347-813-4341 (H)
Visit us at www.yrsef.com









Beatrice Munyenyezi
11805-049
Federal Correctional Institution
PO Box 4000
Aliceville, AL 35442
United States

Birmingham, AL P&DC 352
FRI 02 SEP 2016   PM

⇔11805-049⇔
U S District Court *of New Hampshire*
55 Pleasant ST
Concord, NH 03301
United States

Appendix Page 1994

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **BEATRICE MUNYENYEZI,** ) | |
| **Petitioner** ) | |
| **v.** ) | **Criminal No.  16-cv-402-SM** |
| ) | |
| **UNITED STATES OF AMERICA,**) | |
| **Respondent** ) | |

## MOTION TO DISMISS 28 U.S.C. § 2255 PETITION

### I.    INTRODUCTION

On February 21, 2013, a jury found Beatrice Munyenyezi ("Munyenyezi" or "petitioner") guilty of unlawful procurement of citizenship or naturalization, in violation of 18 U.S.C. §§1425(a) and (b).  [D.1, 229]. [1]  Evidence at trial established that Munyenyezi was actively involved and personally participated in the 1994 Rwandan genocide as a member of the Mouvement Républicain National pour la Démocratie et le Dévelopement ("MRND").  [Sent. Tr.: at 37-38], and that Munyenyezi had deliberately concealed her involvement in the genocide and her affiliation with the MRND in order to obtain U.S. citizenship.  [*See* Tr.:10, a.m., at 35-36].

On May 14, 2014, Munyenyezi filed an appeal challenging the sufficiency of the proof against her and her sentence and claiming, *inter alia*, prosecutorial misconduct for questions assuming facts not in evidence.  *See United States v. Munyenyezi*, 781 F.3d 532, 536 (1st Cir. 2015).  On March 25, 2015, the First Circuit affirmed Munyenyezi's convictions and sentence.  *Id*. at 545.  On October 5,

---

[1] Docket entries are cited as "D_."  Citations to the trial transcript are to the trial date and morning or afternoon session.  Thus, for example, "Tr.:1, a.m., at 12" refers to the morning session of trial day 1 at page 12.

2015, the U.S. Supreme Court denied Munyenyezi's petition for writ of certiorari.  *Munyenyezi v. United States*, 136 S. Ct. 214 (2015).

Munyenyezi now collaterally attacks her conviction and sentence under 28 U.S.C. § 2255.  The Petition asserts six grounds for relief, including four claims of ineffective assistance of counsel:

1. Ineffective assistance of counsel for failure to request a change of venue based on extensive media coverage of the prosecution.  Pet. at 4; Memo at 1-2.

2. Violation of Due Process on the basis that *Johnson v. United States*, 135 S.Ct. 2551 (2015) (holding the residual clause of the Armed Criminal Career Act ("ACCA"), to be void for vagueness).  *See* Pet. at 5.

3. Ineffective assistance of counsel for alleged failure to conduct an independent pre-trial investigation, interview witnesses, and prepare for trial.  Pet. at 6.

4. Ineffective assistance of counsel for failure to object to allegedly falsified evidence and alleged prosecutorial misconduct.  Pet. at 8.

5. Ineffective assistance of counsel for failure to argue mitigating factors at sentencing.  Pet. at 9.

6. Prosecutorial misconduct based on alleged failure to disclose exculpatory evidence.  *Id.*

For ease of presentation, the government groups its response to the ineffective assistance of counsel arguments together and then separately addresses the petitioner's Due Process and prosecutorial misconduct claims.

As explained below, the § 2255 Petition is devoid of merit, both factually and legally. Munyenyezi's ineffective assistance of counsel claims are baseless because (1) there was no basis to seek change of venue because the manner in which the Court conducted voir dire ensured that the jury empaneled was able impartially to determine the petitioner's guilt or innocence; (2) the record belies the claim that defense counsel failed to conduct an independent investigation or prepare for trial; to the contrary, as the First Circuit noted, defense counsel engaged in zealous representation "during his

powerful opening statement, his spirted cross-examination of witnesses, his energetic evidence presentation (involving testimony from a counter-expert about pressures Rwandans feel to testify a certain way), and his hard-charging summation."; and (3) similarly, the record makes clear that defense counsel did in fact argue vigorously for leniency at sentencing, arguments counsel preserved and renewed on appeal.  Second, the petitioner's *Johnson* claim is baseless because § 1425 is not a crime of violence and her conviction in no way implicates the ACCA, much less its residual clause.  Finally, Munyenyezi waived her claim of prosecutorial misconduct -- which is, in any event, factually baseless – because she failed to raise it on direct appeal.

## II.    FACTS

### A.  Background:

As the Court is aware, Munyenyezi was charged with procurement of citizenship or naturalization unlawfully by concealing, in her applications for naturalization and other immigration benefits, involvement in the persecution, kidnapping, rape, and murder of numerous individuals at a roadblock in front of the Hotel Ihuriro in Butare, Rwanda, during the Rwandan genocide in 1994, and also concealed her membership in and affiliation with the MRND political party and the MRND's youth militia, known as the Interahamwe.  [*Id.*].  Trial commenced on February 22, 2012 and lasted thirteen days.  Jury deliberations began on March 9, 2012.  On March 15, 2012, this Court declared a mistrial after the jury reported that it was hopelessly deadlocked.  [D.132].

Re-trial commenced on February 5, 2013, and closed on February 19, 2013.  [Docket Entry dated 02/05/2013].  On February 21, 2013, the jury convicted Munyenyezi of both counts of the indictment.  [D.229].  The Court sentenced Munyenyezi to concurrent terms of imprisonment of 120

months on each count of conviction, to be followed by three years of supervised release. [Sent. Tr.: at 34-52].

On May 14, 2014, Munyenyezi filed an appeal challenging the sufficiency of the proof against her, contesting an evidentiary ruling, alleging prosecutorial misconduct for improper questions assuming facts not in evidence, and questioning the reasonableness of her sentence. *See United States v. Munyenyezi*, 781 F.3d 532, 536 (1st Cir. 2015). On March 25, 2015 the First Circuit affirmed Munyenyezi's convictions and sentence. *Id.* at 545.

B. The Government's Evidence at Trial

The government's evidence at trial consisted of expert testimony regarding the Rwandan genocide and the events that led up to it; the testimony of eyewitnesses who encountered Munyenyezi manning a roadblock in front of the Hotel Ihuriro, checking identity cards, and helping separate Tutsis from Hutus; the testimony of eyewitnesses who saw Munyenyezi wearing clothing indicating she was a member of or associated with the MRND political party or its youth militia, known as the Interahamwe, satellite images showing that an obstruction consistent with a roadblock existed in front of the Hotel Ihuriro in June and July 1994; and Munyenyezi's applications for naturalization and other immigration benefit, as well as the testimony of United States immigration officials.

1. The Petitioner's Role in the Genocide

The government will not rehearse the background of the Rwandan genocide, the history of which the Court is aware. The trial evidence focused on the Butare roadblock in front of the Hotel Ihuriro. [*See, e.g.,* Tr.:2, a.m., at 98-99, Tr.:5, a.m., at 106-108]. Munyenyezi lived at the hotel with Shalom Ntahobali, who managed the hotel, and their young child. [Tr.:5, a.m., at 107-108]. The

roadblock was set up by an Interahamwe militia led by Ntahobali, and it quickly became notorious, as being a frightening and "particularly brutal" roadblock.  [Tr.:5, a.m., at 105-106].

Numerous witnesses at trial testified about their experiences at the roadblock, including (1) seeing Munyenyezi personally check identity cards at the roadblock to identify Tutsis.    [Tr.:4, a.m., at 105-106]; (2) knowledge of Munyenyezi as an Interahamwe [Tr.:4, a.m., at 106-109].; (3) observing acts of violence at the roadblock and committed against victims detained at the roadblock [*See e.g.,* Tr.:4, a.m., at 108-113; Tr.:6, a.m., at 16-28; Tr.:7, p.m., at 3-32; Tr.:8, a.m., at 14-26.]  Other witnesses testified to seeing the Munyenyezi wearing MRND garb [*See, e.g.*, Tr.:3, p.m., at 16-19]. Satellite images taken in June and July 1994 also showed obstructions in the road in front of the Hotel Ihuriro that an expert witness testified were consistent with a roadblock.  [Gov. Ex. 5 A-H, Tr.:6, a.m., at 45-79].

2.  The Petitioner's False Statements in Her Applications for Naturalization and Other Immigration Benefits

In her 1995 application for refugee status, the petitioner was asked to list "[p]olitical, professional or social organizations of which I am now or have been a member or with which I am now or have been affiliated since my 16th birthday."  [Gov. Ex. 6].[2]  The application further instructed that "[i]f you have never been a member of any organization, state '"None.'"  [*Id.*].  Munyenyezi answered, "None."  [*Id.*].  Munyenyezi also specifically affirmed that she was not an alien who had committed or had been convicted of any crime involving moral turpitude, and further affirmed that she had never "ordered, assisted or otherwise participated in the persecution of any person because of race, religion or political opinion."  [*Id.*].

---

[2] Munyenyezi was born in 1970, and would have been 24 or 25 when she applied for refugee status.

The petitioner similarly lied during an interview with the INS official adjudicating her application, stating in response to questions designed to ferret out individuals involved in the genocide, merely that "[f]amily members disappeared," and that she had no involvement in the killing or injury to other persons, or in any way encouraged others to participate in such killings or injury.  [*Id.*].

Subsequently, in her application for lawful permanent residence, Munyenyezi denied "present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society or similar group in the United States or in any other place since your 16th birthday."  [*Id.*].  She also denied that she had ever knowingly committed any crime of moral turpitude for which she had not been arrested or, specifically, that she had ever "engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion."  [*Id.*].

Finally, in her application for naturalization as a United States citizen, Munyenyezi denied ever (1) being "a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place" ; (2) persecuting "(either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion"; and (3) "committing a crime or offense for which she was not arrested."  [*Id.*].  She also answered, "No" to the questions whether she had ever given false or misleading information to any U.S. government official while applying for any immigration benefit, and whether she had ever lied to any U.S. government official to gain entry or admission into the United States.  [*Id.*].  Her application for naturalization was approved on July 2, 2003, and she was naturalized as a United States citizen on July 18, 2003.  [*Id.*].

C.  The Defense at Trial

In preparation for the first trial, defense counsel retained an expert witness and traveled to Rwanda to interview lay witnesses and seek documentary evidence.  *See, e.g.* Trial One: Tr.8:, a.m. at 43-45 (testimony of Jean-Damascene Nshimiyimana, discussing meeting with defense counsel in Rwanda and providing documentation).  Indeed, well before the initial trial date, counsel sought and the Court granted a continuance to permit the defense to travel to Rwanda, obtain records from the International Criminal Tribunal on Rwanda and from similar trials in Canada.  *See* D.34.  As one of the bases for the continuance, defense counsel indicated their sensitivity to the challenging "logistics involved in investigating a potential defense half a world away from the alleged witnesses and crime scene [as well as the importance] of obtaining discovery from [the ICTR].  *Id.*

Numerous of the witnesses the defense sought out in Rwanda travelled the United States to testify at both trials during the case-in-defense.  *See* Defense Witness Lists, Trial 1, D.89 (listing nine witnesses); Re-trial, D.232 (listing 20 witnesses).  In fact the lists of witnesses at the two trials was significantly different, reflecting strategic considerations by defense counsel.  In addition to interviewing and calling lay witnesses, the defense's "energetic evidence presentation," as the First Circuit described the case-in-defense, also involved testimony from a counter-expert about pressures Rwandans feel to testify a certain way.

The substance of Munyenyezi's defense at trial was that she had rarely left the Hotel Ihuriro during the genocide, that she had no involvement whatsoever in the roadblock in front of the hotel, and that she was not a member or associated with the MRND or Interahamwe militia. To advance this defense, Munyenyezi presented five lay Rwandan witnesses – Gilbert Hitimana, Mary Alice

Ahishakiye, Venerance Uwiteyakazana, Venuste Habinshuti, and Venatie Nyriramamariro – who testified that they were at the Hotel Ihuriro in April or May 1994 and never saw Munyenyezi leave the hotel, participate in the roadblock in front of the hotel, or wear MRND or Interahamwe garb.  [Tr.:9, a.m., at 10-31 (Hitamana); at 38-44 (Ahishakiye); at 75-78; Tr.:9, p.m. at 3 (Uwiteyakazana); at 17-23 (Habinshuti); at 32-37 (Nyriramamariro)].  Munyenyezi also argued that the Rwandan witnesses presented by the government were unreliable because they were corrupted by the prevailing "genocide ideology" of the current government of Rwanda.  To support that theory, Munyenyezi called Professor Brian Endless of Loyola University in Chicago, who provided expert testimony that the current government of Rwanda enforces compliance to a "genocide ideology" – that only Tutsis were killed during the genocide, not Hutus.  [Tr.:10, a.m., at 22-82].

    D.  <u>Sentencing</u>

    On July 15, 2013, this Court sentenced Munyenyezi to concurrent terms of imprisonment of 120 months followed by three years of supervised release.  [Sent. Tr.: at 34-52].  The court sentenced Munyenyezi to a term of imprisonment of 120 months, explaining its sentencing rationale at length. [Sent. Tr.: at 34-47, 52].

    This Court began by noting that sentencing was the exclusive responsibility of the Court and that, in fashioning an appropriate sentence, the Court was obligated to determine what the pertinent facts were by a preponderance of the evidence.  [Sent. Tr.: at 34].  Although noting that it had "come to the evidence in this case with skepticism and a natural bias in favor of disbelieving that this person or any person, except the rare psychopath, could willingly" engage in acts of genocide, this Court found that Munyenyezi was "actively involved" and "personally participated" in the Rwandan genocide:

> I find that this defendant was not unaware of the genocide. I find that she was not a mere spectator. Not a simple young woman who unfortunately married into a brutal political

> family. I find that this defendant was actively involved. She personally participated in the mass killing of innocent women, men and children merely because they were called Tutsi. She did so knowingly. She manned the infamous roadblock in Butare outside her family's hotel. She checked identification cards, she kept records, she sorted those who would die from those who would live. She directed their murder. She facilitated murder. She aided and abetted the genocidal efforts of the MRND and the Interahamwe. And, critically for this case, she lied repeatedly about her involvement and her conduct. She lied about her experiences and her associations. And she did so in order to obtain refuge in this country and to obtain citizenship in this country that she knew she was not qualified for and did not deserve.

[Sent. Tr.: at 37-38]. Hence, given its findings with respect to the acts about which Munyenyezi lied, this Court determined that "the maximum sentence allowed by law for the offense of conviction in my judgment is a just and appropriate sentence; in fact, is the only appropriate sentence under these circumstances." [Sent. Tr.: at 40].

This Court also explained that a sentence at the statutory maximum was warranted because the offenses of conviction were the "most serious of violations of Section 1425 that one can describe," not because Munyenyezi participated in genocide:

> The maximum sentence prescribed by Congress, I stress, is not imposed as a surrogate punishment for genocidal conduct, for murder or aiding and abetting kidnap or rape, or for the persecution of innocents, but it is imposed for committing the most serious of violations of Section 1425 that one can describe. Lying about participation in genocide when specifically asked, knowing that such conduct is automatically disqualifying with respect to immigration and citizenship seriously undermines the integrity of this country's immigration standards in the most offensive way possible and obviously puts this country at risk; particularly we cannot abide this country being a haven for genocidaires. If any lies in the immigration and naturalization process warrant a position of the statutory maximum punishment contemplated by Congress, it's surely this one.

[Sent. Tr.: at 40-41]. This Court therefore stated that it was upwardly departing under U.S. Sentencing Guidelines (USSG) §5K2.0 and independently varying under §3553(a), and further stated that "the arguments in mitigation are wanting and insufficient to support a sentence below the maximum available in this case." [Sent. Tr.: at 41-43].

E.  Direct Appeal

Munyenyezi's argument on appeal was that (1) the government's introduction of Munyenyezi's ICTR testimony was propensity evidence that should have been excluded; (2) the Court's admonishment of the prosecutor's improper questioning assuming two unproven facts should have resulted in a mistrial; (3) the evidence was not sufficient to sustain a guilty verdict; and (4) the District Court's sentence was "substantively unreasonable because it presumed the jury's verdict represented a finding that the defendant participated in the genocide." *See United States v. Munyenyezi*, 781 F.3d at 536.

On March 25, 2015, the First Circuit affirmed Munyenyezi's conviction and sentence. *United States v. Munyenyezi*, 781 F.3d at 545.  The Supreme Court denied certiorari on October 5, 2015. *Munyenyezi v. United States*, 136 S. Ct. 214 (2015).  Munyenyezi filed the instant § 2255 Petition on September 9, 2016, within the one-year limitation period.  *See* 28 U.S.C. § 2255(f)(1).

III.   **ARGUMENT**

A.  The Petitioner's Ineffective Assistance Claims Are Without Merit

To establish ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient and "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 667 (1984).   Under the two-part test established in *Strickland*, Munyenyezi must demonstrate (1) that her counsel's performance was so deficient that they were not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that but for her counsel's alleged errors, the result of the trial would have been different.  *Id.* at 684-85; *Knight v. United States, 447 F.3d 6*, 15 (1st Cir. 2006).  Judicial scrutiny of attorney performance is "highly deferential," and there is a strong presumption that counsel's conduct fell "within the wide range of reasonable

professional assistance." *Strickland*, 466 U.S. at 689; *see also United States v. Rodriguez*, 675 F.3d 48, 56 (1st Cir. 2012).

"Under the first prong of *Strickland*, there is a 'strong presumption' that counsel's strategy and tactics fall 'within the range of reasonable professional assistance,' and courts should avoid second-guessing counsels' performance with the use of hindsight." *Knight v. Spencer*, 448 F.3d at 15 (quoting *Strickland*, 466 U.S. at 689); *see also United States v. Thomann*, 609 F.2d 560, 566 (1st Cir. 1979) (refusing to "open the door to Monday morning quarterbacking tactics."). "This court has held that a lawyer's performance is deficient under *Strickland* only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." *United States v. Rodriguez*, 675 F.3d at 56 (internal citation and quotation marks omitted). Therefore, Munyenyezi must overcome the presumption that the challenged conduct "might be considered sound trial strategy." *Id.* (quoting *Strickland*, 466 U.S. at 689).

### 1. Petitioner Was Not Prejudiced by Defense Counsel's Alleged Errors

Even if there were any basis for the petitioner's claim that her representation was deficient in a constitutionally cognizable sense – a proposition that, as discussed below, is bootless – Munyenyezi's claim would nonetheless be fatally flawed because she cannot show prejudice. That is, the petitioner cannot possibly show that, but for errors she alleges, she probably would have been acquitted. Put simply, Munyenyezi cannot satisfy *Strickland*'s high standard for prejudice because the evidence of her guilt was overwhelming. As this Court explained at sentencing, [Sent. Tr.: 36] (discussing "the overwhelming and . . . largely uncontradicted evidence of the defendant's guilt") and as the First Circuit observed in the context of one of Munyenyezi's arguments on direct appeal, the abundance of evidence against

[Munyenyezi] dwarfs the complained-about prejudice arising from the [claimed error]." *United States v. Munyenyezi*, 781 F.3d at 542.  As the First Circuit concluded,

> [R]eading the record as required — afresh, and in the light most agreeable to the government — we think a levelheaded jury could find that she wasn't simply in the wrong place at the wrong time. Far from it — dressed as an Interahamwe, she personally inspected IDs at the checkpoint, separated those who would live from those who would die (and die gruesomely), and kept records of the ghastly going-ons.

*Munyenyezi*, 781 F.3d at 539-40.

### 2.   Defense Counsel's Performance Was Not Constitutionally Deficient

Nor can the petitioner satisfy *Strickland*'s performance prong; indeed the quality of defense was, as evidenced by the hung jury after the first trial, beyond reproach.  The government will address each of the individual claims of ineffectiveness in turn.

### a.   The Decision Not to Request a Venue Change Did Not Constituted Ineffective Assistance (Petition, Ground 1)

In her first ineffective assistance claim, Munyenyezi faults counsel for "failing to request a change of venue."  Pet. at 13.  Petitioner bases this claim on "extensive media coverage" stemming from her first trial, citing coverage by the New Hampshire Union Leader, the Concord Monitor, National Public Radio, as well as a showing of a documentary about the genocide at a theater in Concord, New Hampshire.  *Id.*

### Facts Relevant to Change of Venue

As part of voir dire, the Court specifically asked each member of the venire about media exposure.  "Have you heard anything on the radio or have you seen anything on television about this case?"  [Tr.:1, a.m., at 17].  The record shows that only eight members of the venire

considered as members of the jury had been exposed to any media about the case.[3]  Of those, the

Court struck three for cause; an additional four were struck peremptorily.[4]

Moreover, the sole member of the venire seated on the jury who had been in any way

exposed to media about the case know nothing about the facts, as reflected in his colloquy with

the Court:

Juror:      I've seen the TV things on the defendant here. I actually thought
            she was from Somalia, not Rwanda. So that's how much I know about it.

Court:      Do you remember what you saw or what you heard about the case, if anything?

Juror:      Nothing that -- that she might be deported or lose her citizenship or something like
            that.

Juror:      You don't know anything about the facts of the case?

Juror:      No.

Court:      Can you be fair and impartial?

Juror:      Oh, yes.

Court:      Can you listen to the evidence presented in this courtroom, determine what the
            facts are, what the truth is, based only on that evidence?

[3]  Tr.:1, a.m., at 20 (juror No. 296 read an article about the case in the Boston Globe); *Id.* at 48
(juror No. 284 saw something on the TV about the case); *Id.* at 53-54 (juror No. 230 followed the
case in the newspaper); *Id.* at 57-58 (juror No. 77 started following the case during the first trial);
*Id.* at 58-59 (juror No. 180 followed some coverage on the first trial); *Id.* at 67-68 (juror No. 170
saw on television that the case was up for retrial); *Id.* at 71-72 (juror No. 187 saw on TV that
defendant was from Rwanda); and *Id.* at 74 (juror No. 133 was able to recall what they saw on
the news about the case).

[4]  Tr.:1, a.m., at 54 (defense counsel's motion to strike Juror No. 284 for cause was granted); *Id.*
at 58 (defense counsel's motion so strike Juror No. 77 for cause was granted); and *Id.* at 61
(government's motion to strike Juror No. 180 for cause was granted). *See* Tr.:1, a.m., at 115 (only
Juror No. 284 was called back after peremptory challenges); *and see* Tr.:1, a.m., at 115 (only
Juror No. 284 was called back after peremptory challenges).

Juror:          Yes.

Court:          Will you follow my instructions on the law in returning a verdict?

Juror:          Yes.

[Tr.:1, a.m., at 115]

<u>Argument</u>

It is axiomatic that "[T]he Sixth Amendment secures to a criminal defendant the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010).  Normally, screening questionnaires and voir dire are sufficient to "detect and defuse juror bias" and ensure a fair trial.  *See Id.* at 381, 385.  Accordingly, most courts agree that

> [w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity. . . Indeed, we have ruled that a trial court's method of holding its decision . . . in abeyance until the conclusion of the voir dire is clearly the preferable procedure.

*United States v. Campa*, 459 F.3d 1121, 1145, 1146-47 (11th Cir. 2006) (citation and internal quotation marks omitted).  The Supreme Court has explained that "[t]he theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Id.* (*quoting* P*atterson v. Colorado ex rel. Attorney General of Colo*., 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.)).  "[A] change of venue may be granted if the court determines that there exists in the district 'so great a prejudice against the defendant that he cannot obtain a fair and impartial trial.'"  *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir.1984) (*quoting United States v. Gullion*, 575 F.2d 26, 28 (1st Cir.1978)).  The First Circuit has

explained that, in determining whether sufficient prejudice exists to require a change of venue, the two relevant inquiries are (1) whether jury prejudice should be presumed given the facts presented; and (2) if prejudice should not be presumed, whether the jury was actually prejudiced. *United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990).

The doctrine of presumed prejudice is practically moribund and, in any event, the facts of this case, as described above, completely undercut a claim based on presumed prejudice.  "[In] rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law."  *United States v. Abello-Silva*, 948 F.2d 1168, 1176-77 (10th Cir. 1991).  Notably, the Supreme Court has presumed jury prejudice on the basis of negative community sentiment and pretrial publicity in only three cases, all of which were decided nearly 50 years ago: *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The facts of those cases are instructive.  For example, Rideau was tried in a Louisiana parish of 150,000 people and convicted of robbery, kidnaping, and murder. *Rideau*, 373 U.S. at 724. Police interrogated him in jail following his arrest and filmed his confession.  *Id*.  On three separate occasions shortly before trial, which took place less than two months after his arrest, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Id. In reversing *Rideau's* conviction, the Supreme Court wrote:

> What the people saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder. . . . this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial -- at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Id*. at 726.

The record in this case does not support any suggestion of media exposure that would permit a presumption of prejudice.

The same is true with regard to any possible showing of actual prejudice, which "typically requires direct evidence of bias, such as voir dire responses or survey data." *United States v. Houlihan*, 926 F. Supp. 14 (D. Mass 1996) (Gertner, J.) (citing *Irvin v. Dowd*, 366 U.S. 717, 728 (1961)). Petitioner's assertion that media exposure deprived her of an impartial jury is manifestly without basis. In this case, few venire members were aware of media coverage of this case and, of those, only one sat on the jury. That juror had no knowledge of the facts of the case. Thus, this Court correctly exercised its discretion in its conduct of the voir dire and the record of that proceeding provides no basis for a claim of media taint.

Because there is no evidence of actual or presumed prejudice in the jury pool or selected jurors based on petitioner's claim of prior exposure to the media, Munyenyezi's claim of ineffective assistance of counsel for failing to request a change of venue fails.

b. Petitioner's Claim that Counsel Failed Adequately to Prepare for Trial is Baseless (Ground Three)

Petitioner next claims that her counsel failed to "research the case-law, interview new witnesses, or investigate the facts of Munyenyezi's case." Pet. at 14. This claim warrants short shrift because the record contradicts it completely. Defense counsel thoroughly litigated pretrial issues [*see, e.g*. D. 182-198] and mounted a defense at trial that was lauded by the First Circuit. Indeed, the defense successfully fended off the government's attempt to preclude or limit the testimony of defense expert Brian Endless. [*See* D. 80; and entry dated February 21, 2012 (*Daubert* hearing)]. The decision to call or not call trial witnesses is a quintessentially strategic decision and, thus, unlikely to satisfy *Strickland*'s performance prong. Even more so here.

Defense counsel identified 20 witnesses who were available to testify at trial.  At trial, the

defense called certain of those witnesses and chose not to call others.  The witnesses called to

testify in the case-in-defense supported the defense that Munyenyezi's statements to immigration

authorities were not false because she in fact was not a member of the MRND and knew nothing about

a roadblock outside her residence.   Counsel made mighty efforts to discredit the case-in-chief, both

through vigorous cross-examination and also through the argument that the Rwandan witnesses

presented by the government were unreliable because they were corrupted by the prevailing "genocide

ideology" of the current government of Rwanda.  Indeed, the defense presented expert testimony that

the government of Rwanda enforces a particular script about the genocide that witnesses were

presumed to follow.   As the First Circuit described in discussing the attack on the credibility of

the government's witnesses.

> Munyenyezi's lawyer hit the credibility theme hard below — during his powerful
> opening statement, his spirited cross-examination of witnesses, his energetic
> evidence presentation (involving testimony from a counter-expert about pressures
> Rwandans feel to testify a certain way), and his hard-charging summation.

*Munyenyezi*, 781 F.3d at 538.  Simply put, the record shows that Munyenyezi's counsel

thoroughly prepared for trial.

### c.   Petitioner's Claim of Ineffective Assistance based on Alleged Failures to Make Trial Objections Are Without Merit (Ground Four Part 1)

The Petitioner next complains that that counsel failed to object to (1) to admission in

evidence of what she now claims is a "tampered with" Rwandan national identity card and (2

prosecutorial misconduct involving facts not in evidence. In support of the former assertion, the

petitioner asserts that Munyenyizi's Rwandan identity card, which she concedes was taken from

her residence during a search, was "tampered with."  Aside from the petitioner's current

assertion, the record reflects not basis for this claim.  Failure to make a futile objection does not amount to ineffective assistance of counsel.  *See Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).  Moreover, the only relevance of the national identity card was to (1) show the jury an exemplar of what both experts acknowledged was the common form of Rwandan identification; and (2) show that the petitioner's card indicated she is Hutu, a fact that was not in dispute at trial and that the petitioner does not now dispute.   Thus, even if the document had been "tampered with," as she asserts, it would be immaterial.

With regard to the claim involving the prosecutor's confrontation of several defense witnesses with the assertion that that the petitioner's sister (another resident of the Hotel Ihuriro) was married to the head of the secret police of the MRND government, Munyenyezi concedes that her counsel did in fact object to that line of cross-examination.  [Pet. at 16].  The decision not to renew the objection and the appreciation for the affect of a renewed objection may have on the jury, is squarely within the realm of trial strategy.  In addition, as the First Circuit noted in addressing this issue, this Court, at "every . . . turn (including during his final charge) . . . carefully instructed the jury that questions that assume facts are not evidence. We normally assume that juries follow instructions.  . . .  And we see no reason to stray from that practice here: remember, having watched the jurors closely, the judge said that he was "absolutely convinced" that they completely understood that questions of counsel are not evidence of the facts assumed in the questions," and Munyenyezi gives us nothing to contradict his ring-side take on the case." *Munyenyezi*, 781 F.3d at 542 (citation and internal quotation marks omitted).  Thus, even one were to quibble with defense counsel's decision not to renew the objection to the prosecutor's questions, the petitioner cannot show prejudice.

d. <u>Petitioner's Claim that Defense Counsel Failed to Argue Mitigation of Punishment Factors and Her Role at Sentencing is False (Ground 5)</u>

Munyenyezi's next ineffective assistance claim asserts "defense counsel failed to argue mitigating factors and the role of Munyenyezi 'alleged' involvement in the genocide." Pet. at 17. However, that is simply not true. Munyenyezi simply does not approve of her counsel's strategy for arguing against the prosecution sentence and enhancements.

Specifically, with regard to her role in the MRND, Munyenyezi argues that marrying "into a prominent political family . . . does not make her a part of an organization." *Id.* She argues that "there was no first hand testimony" or any satellite images that placed Munyenyezi at the scene of the massacre, nor any evidence that she committed any atrocities. *Id.* The witnesses who testified about her presence at a road block were "plucked from the very same pool of people" in the first trial who were sent from Rwanda to testify, but who were impeached. *Id.* Munyenyezi argues that "defense counsel should have argued all of those factors" at sentencing. *Id.* Basically, Munyenyezi is asking this Court to second-guess the method with which her defense counsel approached the sentencing hearing and asking the Court to engage in the type of Monday morning quarterbacking disapproved of by this Court. *See United States v. Thomann*, 609 F.2d at 566.

Additionally, Munyenyezi notes that "the court agreed with defense counsel that the indictment alleged that Munyenyezi participated directly in murder, rape, kidnapping and theft, and that there has been no testimony to any of that behavior." Pet. at 17. Munyenyezi further claims that this Court "contradict[ed] itself" in finding that the she was "actively involved in the mass killing of innocent women, men and children because they were called 'tutsi'." *Id.* "Defense counsel argued nothing when the court imposed the maximum mandatory sentence of

120 months' imprisonment."  *Id*.  Munyenyezi argues she was "put on trial, not because she was alleged securement of INS standing, but for the actual charge of genocide," making her sentence "substantively unreasonable."  *Id*.  However, these claims, which were already litigated on appeal, are patently false.

First, it is simply not true that Munyenyezi's defense counsel did not argue against the government's proposed sentence enhancement. Munyenyezi's counsel vigorously challenged the requested sentencing enhancements.  [Sent. Tr.: at 25-33].  Despite defense counsel's tremendous efforts, this Court decided to sentence Munyenyezi with the statutory maximum, not as punishment for genocide, but for lying about her genocidal acts to obtain citizenship, knowing full well that "that such conduct is automatically disqualifying with respect to immigration and citizenship seriously undermines the integrity of this country's immigration standards in the most offensive way" imaginable.  *United States v. Munyenyezi*, 781 F.3d at 544.

Second, this Court made it perfectly clear that if the Court were to impose a sentence for Munyenyezi's participation in the Rwandan genocide, it would be a sentence of, at a minimum, life in prison.  *Id*.  The First Circuit analyzed this Court's rationale for the sentence, looking at section 3553(a) factors, like protecting the community and deterring criminal wrongdoing, promoting respect for the law, and providing a just punishment, and found this Court's analysis "plausible and defensible."  *Id*. at 544-45.

### 3.   Petitioner's Due Process Claim Is Without Merit (Ground 2)

The petitioner seeks to base a Due Process claim on *Johnson v. United States*, 135 S. Ct. 2551 (2015), in which the Court held that imposition of an increased sentence under the residual clause of the Armed Career Criminal Act ["ACCA"] violates the Constitution's guarantee of Due

Process.  *Id*. at 2563.  The definition of "violent felony" for purposes of the ACCA provides, in pertinent part, that a "violent felony" is:

> [A]ny crime punishable by imprisonment for a term exceeding one year . . . that –
>
> (i)   has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)  is burglary, arson, extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).  The first clause has come to be known as the "force" clause; the second as the "residual clause."

Munyenyezi's Due Process claim has no merit for two primary reasons.  First, naturalization fraud, the crime of conviction here, is not a violent felony and the ACCA's definition of that term is therefore inapposite. Indeed, this Court made clear when imposing sentence that it was not punishing the petitioner for violent conduct, but because her lies were "the most serious infractions of section 1425 that one can describe."  [Sent. Tr.: at 40].  Driving the point home, this Court explained that the basis for the sentence imposed is to hold Munyenyezi "accountable for lying to obtain refuge and citizenship for which she was not qualified."  *Id*.  at 40. Second, if the ACCA's definition of violent felony had any bearing on the defendant's sentence, the applicable provision to cover her involvement in murder, rape, and kidnapping would be the force clause, application of which was unaffected by *Johnson*.

3. <u>Petitioner Waived Claim of Failure to Disclose Exculpatroy Evidence Which, In Any Event, Is Baseless (Ground Six)</u>

Munyenyezi asserts with no basis that government withheld satellite images showing the Ihuriro roadblock.  [Pet. at 18.].  The petitioner provides no support for this assertion, which the Court thoroughly addressed during the testimony of government expert Eric Benn.  [*See* Tr.:6, a.m., at 109 *et seq*.].  "Under the long-standing 'procedural default' rule, a non-constitutional claim that could have been, but was not, raised on appeal, may not be asserted by collateral attack under § 2255 absent exceptional circumstances."  *Damon v. United States*, 732 F.3d 1, 4 (1st Cir. 2013) (citing *Knight v. United States*, 37 F.3d at 772); *see also United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal.").  Munyenyezi's recently-minted claim that the government withheld evidence is thus waived, as well as baseless.

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss the § 2255 Petition.

Respectfully submitted,

**EMILY GRAY RICE**
**United States Attorney**

By:      <u>/s/ *John A. Capin*</u>
JOHN A. CAPIN
ALOKE S. CHAKRAVARTY
Special Assistant U.S. Attorneys
(617)748-3100

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that the above document was filed through the ECF system and was aslso, on the this date, served by first-class mail on the petitioner at the following address:

     Beatrice Munyenyezi
     11805-049
     FCI, Aliceville
     P.O. Box 4000
     Aliceville, AL  35442

         /s/ *John A. Capin*

         _____

         John A. Capin
         Special Assistant U.S. Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

U. ~ ~ COURT      ~ COURT
~ ~ NH        ~ NH
FILED        FILED

2017 APR 14 P 3:28

Beatrice Munyenyezi,                    Criminal No P 12-CR-00085-SM
Petitioner/Affiant
in her Personal                    )    WRIT OF HABEAS CORPUS TITLE
Capacity for                       )    28 U.S.C Section 2255 &
BEATRICE MUNYENYEZI®,              )    ARTICLE 1; SECTION 9, CLAUSE 17
Ens legis                          )    ARTICLE 1, SECTION 8, CLAUSE 17
                                   )    OF THE UNITED STATES OF AMERICA,
        v.                         )    1789;
                                   )
Emily Gray Rice;                   )    REPLY TO GOVERNMENT MOTION TO
United States Attorney             )    DISMISS Affiant's 28 U.S.C §2255
John A. Capin;                     )              &
Special Assistant U.S. Attorney    )    CONDITIONAL ACCEPTANCE OF MOTION
Aloke S. Chakravarty,             )    TO DISMISS VIA PROOF OF CLAIMS:
Special Assistant U.S. Attorney    )    AND WRIT OF CONSTITUTIONAL CHAL-
in their Personal Capacity for     )    LENGE PURSUANT TO ARTICLE 1,
UNITED STATES OF AMERICA,          )    SECTION 8, CLAUSE 17
Respondents                        )

---

"TRUTH IS EXPRESSED IN THE FORM OF AFFIDADIT."
"AN UNREBUTTED AFFIDAVIT BECOMES JUDGMENT IN COMMERCE."
"A MATTER MUST EXPRESS TO BE RESOLVED" Heb. 4:16

AFFIDAVIT

CONDITIONAL ACCEPTANCE OF MOTION TO DISMISS AFFIANT'S MOTION FOR RELIEF UNDER 28
U.S.C §2255  VIA PROOF OF CLAIMS WITH EXHIBITS "1, A AND  B " ATTACHED:

COMES NOW, Beatrice Munyenyezi, hereinafter Affiant, in her personal
capacity, a Living Woman and non-fiction, a foreigner to the corp-
orate United States/UNITED STATES, or any other derivatives of same,
hereinafter reffered to as "the Federal Government" a private corpo-
ration. Affiant is a Third Party Intervenor for debtor, BEATRICE
MUNYENYEZI®, Ens legis.  Affiant is making a Special Appearance,
Accepting the above Respondents, Emily Gray Rice, United States Attor-
ney ans John A. Capin Special Assistant U.S. Attorney, opposing Affi-
ant's motion for relief via a Motion to Dismiss received on 3/14/2017,
wherein the Respondents, alleging Affiant's Ineffective Claims Are
Without Merit; Affiant Was not Prejudiced by Defense Counsel's Alleged
Errors; Defense Counsel's Performance Was Not Constitutionally Defic-
ient and that The Decision Not to Request a Venue Change Did Not
Constituted Ineffective Assistance; Affiant's Claim that Counsel Fail-
ed Adequately to Prepare for Trialis Baseless; Petitioner's Claim of

Iffective Assistance based on Alleged Failures to Make Trial Objections Are without Merit."

Affiant accepts the Respondents' Motion to Dismiss and agree to perform to it however, she reserves her right to exhaust her private Administrative Remedy to this matter, as required by Administrative Procedures Act. 5U.S.C Section 556(d) Therein she is seeking a 'PROOF(s) OF CLAIM' from the above named Respondents and their offices in the nature of Exhausting her Private Administrative Remedy. Affiant is therefore Challenging the Respondents herein named to come forward with any PROOF OF CLAIM they have to answer the below claims, point by point with evidence to prove their Authority, their Federal Legislative Criminal Jurisdiction in the first place on the Affiant for the Indictment and any other Claims presented, to the court and Affiant.

Affiant has discovered new evidence that, if proven and viewed in light of the evidence as a whole that no reasonable factfinder would vote against her, at the time of her trial. The respondents never disclosed who the REAL PARTY IN INTEREST was; nor did they produce any legal contract between the two parties herein. Affiant had no clue who the beneficiary of the Indictment was.

AFFIANT DEMANDS THIS COURT AND THE RESPONDENTS TO TAKE JUDICIAL NOTICE OF THE BELOW:

FRAUD: "A knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his/her detrument"
EXTRINSIC FRAUD: "Deception that prevents a person from knowing about or asserting certain rights"
CRIMINAL FRAUD: "Fraud that has been made illegal by statute that subjects the offender to criminal penalties such as fines and imprisonment"

UNCONSCIONABLE FRAUD:  "The unfair use of the power arising out of the
parties' relative positions and resulting in an unconcionable bargain/
dealing"

FRAUD ON THE COURT:  "In a judicial proceeding, a lawyer's or other
parties' misconduct so serious that it undermines or is intended to
undermine the integrity of the proceedings, fabricated evidence"
(See Blacks Law Dictionary 4th edition, An Act for the prevention of
Frauds and Perjuries, 29 Car. 2, ch 3, based on the English Statute
of Frauds).

Affiant's Habeas Corpus presented to the court, is requesting to be
dismiss by the Respondents on procedural grounds rather than adjudica-
ted on the actual Habeas Corpus Writ Issues. It is quite evident that
the Respondents' main goal is to ignore or dismiss the Writ Issues that
have been raised in the motion.

Affiant calls the court's attention to the above proven statements, due
to the fact that they all apply to the Respondents in their zealous
attempt to secure a conviction. For eaxample, the Federal Government
does not dispute the fact that Affiant's Identification Card was
tampered with before admitting it into evidence.

Affiant is requesting PROOF OF CLAIM that her Identification Card's
Year of Issuance Was Not Changed from 1991 to 1994 while in their
possession.

Affiant is requesting PROOF OF CLAIM of the Respondents response on
page 18 of their motion to dismiss. If the role of the Identification
card in evidence was so insignificant and minimal why the Federal
Government  went to such trouble of recreating it? Why they did not

present it to the jury in it oroginal condition? Why they changed the
year from 1991 to 1994? PROOF OF CLAIM that it was not for the Purpose
of tainting the Jury's mind?

The respondents also ignore the issue of the e-mail (Exhibit 1) as if
it does not exist. Affiant is requesting PROOF OF CLAIM that the e-mail
does not show the Respondents soliciting and/or using third party to
recruit witnesses and that is how these witnesses came about.

PROOF OF CLAIM that the Respondents does not agree that the IBUKA's
members were the ones who went at work for the Federal Government to
recruit these witnesses.

Affiant  claims that the United States District Court is in violation
of the Constitutions and laws of the United Nations, as the United
States Court has no Federal Legislative Criminal Jurisdiction over
Affiant from the start as there is no PROOF that Affiant Committed
any of the alleged crimes on Federal Territory.

Affiant is requesting that Respondents respond point by point, addres-
sing the above and below PROOF OF CLAIMS and the issue of Federal Legis-
lative Criminal Jurisdiction, and she is challenging the jurisdiction
be proved upon the Proof of Claim submitted.

Chief Justice John Marshall of the Supreme Court, stated in People v.
Godfrey, 17 Johns 225 (NY 1819)... to bring criminal offenses within the
jurisdiction of the Federal Courts of the union, it must have been first
committed out of the jurisdiction of the (Sovereign) State. In U.S. v.
Benson, 495 f.2d 475 (5th Cir. 1974) the court stated: "It's axiomatic
that the prosecution must always prove territorial jurisdiction over
crime in order to sustain a conviction therefore."

PROOF OF CLAIM CONTINUED

1. Does the Constitution of the United States of America, mention any more than the Three areas of Jurisdiction in which the Courts may operate, other than?

   <u>Common Law:</u>  Natural or Constitutional Law is based on our Creator's Laws as anytime someone is charged under the common law, <u>there MUST be a damaged party.</u> Common Law cannot compel performance.  Any violation of Common Law is a criminal act that is punishable.

   <u>Equity Law:</u>  Equity Law is Law which compels performance.  It compels you to perform to the <u>exact letter of any contract</u> that you are under.  In Equity jurisdiction you cannot be tried Criminally, for it is a Civil Action only that depends solely on compelled performance, of a valid Contract.

   <u>Admiralty or Maritime Law:</u>  Admiralty is a Civil jurisdiction of compelled performance, which has Criminal penalties for not adhering to the letter of the Contract, but this <u>ONLY</u> applies to <u>International Contracts.</u>

2. Affiant states, that when a Federal Court is without jurisdiction, the judgment of the conviction of the court and/or the jury is void ab initio, on its face, (see Bauman v. U.S. 156 F.2d 534, 5th Cir. 1946).

3. Affiant state that, Federal Criminal Jurisdiction is NEVER presumed; it MUST always be proven; and it can NEVER be WAIVED, (see U.S. v. Rogers, 23 Fed 658 (DC ARK. 1885).

4. Affiant states that, pursuant to Article I, §8, Cl 17, of the Constitution of the United States, there is but one means of Federal acquisition of legislative jurisdiction - that is by State Consent, and if this mode of transfer is not pursued, no transfer of jurisdiction can take place, (see Interdepartmental Committee for the Study of Jurisdiction over Federal Areas within the States, Part II, June 1957).

5. Affiant states that, all 50 States in America have adopted in whole or substantially the Uniform Commercial Code, (UCC), including the District of Columbia, (see Blacks Law, 6th Edition).

6. PROOF OF CLAIM that the State of Massachuss/STATE OF MASSACHUSSETS and the UNITED STATES/United States <u>does not</u> operate under the U.S. Bankruptcy confirmed on June 5, 1933, (see Senate Report No. 93-549, codified at 12 USCA 95 a), also known as the National Emergency, (see Executive Proclamation No. 2972).

7. PROOF OF CLAIM that the U.S. Bankruptcy/National Emergency has been terminated and does not operate within 'The' or 'This' State/STATE or the United States.

8. PROOF OF CLAIM that within the State of Massachuss/STATE OF MASSACHUSSETS all State Banks <u>are not</u> under the direction and control of the corporate "Governor" of the International Monetary Fund, (see Public Law 94-564).

9.  PROOF OF CLAIM that the Plaintiff in the original case, "The United States of America, Incorporated, was not Bankrupted in 1933 and that President Roosevelt did not quit claim all the assets and liabilities of "the United States of America, Incorporated, to the International Monetary Fund, (IMF) an agency of the "UNITED NATIONS".

10. PROOF OF CLAIM that the Constitution of the United States operates against Affiant, a Private Citizen in her Private Capacity.

11. PROOF OF CLAIM that the name appearing on the charging instrument, in all capital letters, BEATRICE MUNYENYEZI is not a corporate fiction, but is the name of the Private woman, Beatrice Munyenyezi, in her private capacity.

12. PROOF OF CLAIM that in relation to any monetary penalty the use of a "Federal Reserve Note" is not only a promise to pay, (see Fidelity savings v. Grimes, 131 P2d 894).

13. PROOF OF CLAIM that Legal Tender (federal reserve) Notes are good and lawful money of the United States, in relation to any monetary penalty, (see Rains v. State, 226 S.W. 189).

14. PROOF OF CLAIM that Affiant had a 'meeting of the minds' with the United States officials pursuant to the Contract/Agreement in respect to full disclosure and that said Contract contained no elements of fraud by the United States government.

15. PROOF OF CLAIM that the United States did not, in respect to their Contract Agreement was not made beyond the scope of its corporate powers and the Contract is not unlawful and void, (see McCormick v. Market Natl. Bank, 165 US 538).

16. PROOF OF CLAIM that there are clauses in the United States Constitution that subject Private Citizen in United States Statutory Jurisdiction.

17. PROOF OF CLAIM that on March 27, 1861, Eleven Congressional Delegates from the Southern States did not walk out, leaving Congress adjourned without an agreed upon date to meet again.

18. PROOF OF CLAIM that Congress did not cease to operate, as required by contract, after the walk out of March 27, 1861, lawfully and legally.

19. PROOF OF CLAIM that the "Federal Government" has not functioned ever since 1861 as a Corporate Commercial Entity.

20.   PROOF OF CLAIM that as a for-profit commercial corporation, the federal government like any other commercial for-profit commercial corporation has NO special status, NO immunity from prosecution, and hasn't functioned as a governing body under the Constitution for the United States of America since 1865.

21.   PROOF OF CLAIM that in 1861 Abraham Lincoln did not organize a Delaware Corporation and appoint the remaining members as Board of Directors of the "US Congress".

22.   PROOF OF CLAIM that in 1862 this Corporate Congress Board of Directors did not change the meaning of the word "PERSON" to mean internally "Corporation" for all federal government purposes, (see 37th Congress, Second Session, Chapter 49, Section 68.)

23.   PROOF OF CLAIM that the same acting Congress did not pass an Act changing the meaning of "state, States and United States" in 1864, to mean "the territories and District of Columbia," (see 13 Stat. 223, 306, Ch 173, Sec 182, June 30, 1864.)

24.   PROOF OF CLAIM that all reference to "state, States and United States," in the Federal Code that was used to prosecute Affiant, did not mean only the territories and District of Columbia.

25.   PROOF OF CLAIM that all the United States Courts today are not operating under "Statutory law", which is "Uniform Commercial Law" or Admiralty Law.

26.   PROOF OF CLAIM that "Statutory law" does not apply uniquely to Statutory Entities, - legal fictions created by statute.

27.   PROOF OF CLAIM that there is NO DIFFERENCE between the "Constitution of the United States of America" and the "Constitution for the united States of America, (see The Constitution of the United States of America, 1871 Act).

28.   PROOF OF CLAIM that either of the two above Constitutions DO NOT pertain or have any jurisdiction over Affiant.

29.   PROOF OF CLAIM that the United States Government has authority as a Corporate body politic to pass laws effecting people out of their territory, District or Insular possessions.

30.   PROOF OF CLAIM that Affiant is subject to any laws of the Corporate United States of America.

31. PROOF OF CLAIM that the United States of America, in any of its derivatives was not released from Bankruptcy July 1, 2013.

32. PROOF OF CLAIM that the Real Party of Interest is the dejure "United States of America" and not the "International Monetary Fund" or "The Federal Reserve", in Affiant's case.

33. PROOF OF CLAIM that All federal crimes Are Not Statutory, and "all" criminal prosecutions in the federal courts Are Not based on Acts of Congress, which jurisdiction of such acts Are Not contained in the District of Columbia, Puerto Rico, Territories or Insular possessions thereof.

34. PROOF OF CLAIM that Affiant is a Corporate Entity of any kind, and that the Corporate federal government in any of its Corporate derivatives, has jurisdiction over a private Person/ Citizen.

35. PROOF OF CLAIM that the Supreme Court in Penhallow v. Doan's Administrations (3 US 54, 1 L.Ed 57, 3 Dall, 54, SCR 1795) DID NOT CONFIRM: "Insomuch as every government is an Artificial Person, an abstraction, and a creature of the mind only, a government can interface only with other Artificial Persons. The imaginary, having neither actuality nor substance is foreclosed from creating and attaining parity with the tangible. The legal manifestation of this is that NO government, as well as any law, agency, aspect, court, etc., can concern itself with anything other than Corporate, Artificial Persons and the Contracts between them."

36. PROOF OF CLAIM that NO United States District Courts have "Federal Legislative Criminal Jurisdiction" in the 50 Sovereign States over anyone, unless the crime has occured on Federal Territory ceded and owned by the "Federal Government".

37. PROOF OF CLAIM that Affiant committed a crime on Federal Territory, Insular Possessions, or the District of Columbia.

General acquiescence, or non-response by you as the respondents to provide the above "PROOFS OF CLAIM" will constitute your agreement and formal acceptance. You will have by your non-response to state a claim upon which relief can be granted otherwise shall operate as general acquiescence relative to this presentment. You will have admitted there is no valid Claim of Action arising via contract and/ or compelling the undersigned into an unconscionable contract and that there was no meeting of the minds in respect to the alleged charge and contract.

You will have formally accepted each and every fact herein as they operate in favor of the Affiant herein, due to your silence and estoppels is in effect. AFFIANT HEREIN DEMANDS THIS COURT TO IMMEDIATELY RELEASE HER TO HER FREEDOM.

The Indictment, Trial, Sentence and Judgment are all ouside the Law and Constitutionally invalid. They all happened outside the Federal Territory (ten Miles square) which Federal Legislative Criminal Jurisdiction is confined to the plan in Article 1, Section 8, Clause 17 of the Federal Constitution. Therefore, the Federal Government lacked lawful Legislative Jurisdiction to secure a Warrant, arrest, indict, or sentence. This rendered them all invalid and void.

Affiant requesting that Ms. Emily Gray Rice; Mr. John A. Capin; and Mr. Aloke S. Chakravarty adjudicate these issues as Respondents in their Personal Capacity, through this Administrative Process - Article 1 Redress of Grievance under the Ninth Amendment Reservations for Resolution and equitable, in the Nature of PROOF OF CLAIM.

Failure to respond to each PROOF OF CLAIM, ALL POINTS, AND AUTHORITIES, will place Respondents in Default, and the presumption will be taken upon private and public record that they fully agree to the point of Authorities/Proof of Claim to be True. Correct and Certain.

NOTE: Non- Response is agreement. Partial Response without Rebuttal is agreement. Any points left unrebutted are points in agreement. Therefore, the Constitution places the burden of proof back upon the Respondents, as required by the Administrative Procedures Acts, 5 U.S.C §556(d).

Affiant affirms the above is true and complete to the best of her knowledge. She is over the age of maturity. Dated this 10th day of April 2017.

Attached:
EXHIBIT 1
POINT & AUTHORITIES
DUNN No OF U.S CORP.

Beatrice Munyenyezi, Affiant/Petitioner in her Personal Capacity, for BEATRICE MUNYENYEZI®, Ens legis

## A C K N O W L E D G E M E N T

The below signed Witnesses do acknowledge that Beatrice Munyenyezi did personally appear and known to me, to be the woman whose name subscribed on this Affidavit of Conditional Acceptance of Motion to Dismiss on the 10th day of April, 2017.

Maria Vera Reg. No. 23005-075

Toni Demara Reg. No: 29408-058

Laurie Francois Reg. No 69100-019

## PROOF OF SERVICE

I, Beatrice Munyenyezi,      a living woman and non-fiction, hereby certify
under penalty of pejury, under laws of the United States of America, that
I am at least 18 years of age, and that I personally serve the following
document(s):

REPLY TO GOVERNMENT MOTION TO DISMISS AFFIANT'S 28 U.S.C §2255

AND

CONDITIONAL ACCEPTANCE OF MOTION TO DISMISS VIA PROOF OF CLAIMS

By placing one true correct copy of said document(s) in first class
united States Mail Office, at FCI Aliceville, with postage prepaid and
properly addressed to the following:

UNITED STATES ATTORNEY'S OFFICE
District of Massachussets
John J. Moakley Courthouse
Suite 9200
1 Courthouse Way
Boston, Massachussets [02210]
ATTN: Emily Gray rice, United States Attorney
      John A. Capin, Special Assistant U.S. Attorney

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE
55 Pleasant Street
Concord, NH 03301

## UNSWORN DECLARATION OF PERJURY

I, Beatrice Munyenyezi, a living woman and non-fiction, under penalty of
perjury, certify that the aforementioned is true to the best of my
knowledge, and executed on this date:  10th day of April, 2017

So Served,

Authorized Representative, Secured Party Credi-
tor for Beatrice Munyenyezi®, Ens legis. Affiant. reserving all Rights.

IN THE UNITED STATES DISTRICT COURT
FOR THE FEDERAL DISTRICT OF
NEW HAMPSHIRE
CASE NO: 10-cr00085-sm

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

2011 JUL 17 A 11: 39

BEATRICE MUNYENYEZI
                    PETITIONER
VS.

UNITED STATES OF AMERICA
                    RESPONDENT

---

MOTION PURSUANT TO RULE 15, Part 2(d), AMENDED AND
SUPPLEMENTAL PLEADINGS:

---

COMES NOW, the petitioner in this matter, Ms. Munyenyezi, proceeding pro se at this juncture, respectfully moves this Honorable Court, to allow the hereto supplement, to be filed on the docket, in support of the grounds raised in the submitted motion pursuant to 28 USC §2255, pursuant to Rule 15, which reads in part:

> On motion and reasonable notice, the Court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The Court may permit supplementation even though the original pleading is defective in stating a claim or defense. The Court may order the opposing party plead to the supplemental pleading within a specified time. See Duddles v U.S. 399 A.2d 59, 62 (D.C. 1979), where Court allowed counsel to file a motion to supplement as additional information comes to light.

Prior to disposition, the Supreme Court holds: [a]ny party may file a short supplemental brief, "calling attention to new cases, new legislation, or other

intervening matter not available at the time of the party's last filing. See <u>Brown, Gov. of CA v Plata, no. 09-1233</u>, where leave to file a supplemental brief after argument was granted. See also <u>U.S. v Ramirez-Flores, 743 F.3d 816 820 (2014)</u> and <u>U.S. v Estrella, 758, F.3d 1239 (2014)</u>, where rule 28(j) letter was accepted after all briefs were filed. See also <u>U.S. v Levy, 379, F.3d 1241, 1244-1245(04)</u> where Court considered new issue in a supplemental brief.

The petitioner in this matter, seeks review on the matter, involving the stripping of her U.S. citizenship. She questions the legality of said stripping. In a recent case, not available to her person, during the preparation and filing of her motion, our Esteemed Supreme Court, held that the interpretation of statute 18 USC §1425, was troublesome, where it would give the federal government nearly 'unlimited power' to denaturalize any naturilized citizen.

There was skepticism amongst the Justices in <u>Maslenjak v U.S., no. 16-309, 4/26/2017</u>. In brief, the case questioned whether or not, the defendant lied to influence the government's decision to naturlize her. Maslenjak allegedly lied to cover up her husband's possible involvement in the 1995 genocide of some 8000 Bosnian Muslim civilians during the civil war. The Court since said filing, vacated the case on 6/22/2017, held: " The most natural understanding is that the illegal act must have somehow contributed to the obtaining of citizenship." Unless the government can prove, that if it were not for the information given in the lie, citizenship would not have been granted, then the denaturalization is unconstitutional.

In the hereto case, citizenship was stripped due to the guilty verdict announced in the case. There was no other valid reason given to justify the

stripping. The government felt that a guilty plea alone, sufficed. As we know now, the reasoning is flawed, and based on the Court's standing on the issue, further investigation was required. The government did not meet its two-part burden.(1) proof that the misrepresentation was 'sufficiently relevant' to a requirement for naturalization that it would have prompted further investigation. Then, (2), the government needs to establish that the investigation 'would predictably have discolosed' some legal disqualification.
Becaue they havent, this sanction needs to be vacated for further proceedings.

Finally, defense counsel raised the constitutionality of the jury instructions, as it relates to the petitioner actually participating in a direct capacity, in murder, rapes, kidnapping and theft. Ms. Munyenyezi wishes to raise this ground once again, to preserve on record, the challenge to the instruction, as it violated due process rights. The petitioner was never placed or participated in any such acts, as there was no testimony to support said allegation. . To give instruction to a jury inclusive of such wording, was not only prejudicial, it was unfair, and unconstitutional. Further review is warranted.

Ms. Munyenyezi understands that it is within the sole discretion of the Court to allow or disallow the filing of this supplemental brief. She prays that this Court is moved to allow the filing, as it raises valid constitutional claims, where our Highest Court has expressed an opinion on one of the grounds, as being unconstituional, where the government had unfetted power to strip a defendant of citizenship, without investigation or hearing, to ascertain whether

4.

or not, her actual conviction, as it related to the 'lie', was grounds to denaturalize.

Wherefore, she asks for relief on the grounds mentioned herein, and seeks further review.

Thank you.

Respectfully,

Beatrice Munyenyezi

CERTIFICATE OF SERVICE:

I, Beatrice Munyenyezi, hereby state under the penalty of perjury, that
the hereto motion was placed in the prison mailbox on 7/10/2017, and mailed to the
clerk of Court, and a copy was mailed to the AUSA office.

Signed: _Beatrice Munyenyezi_ dated: _7/10/2017_

Beatrice Munyenyezi
FCI Aliceville
PO Box 4000
Aliceville, AL  35442

11805 049

Beatrice Munyenyezi
11805-049
Federal Correctional Institution Aliceville
PO Box 4000
Aliceville, AL 35442
United States

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
**CERTIFIED MAIL®**

7016 2070 0000 2373 1786

FCI Aliceville Mail Room
Date Rec'd 07.10.17
Time: 112∞ way

ALICEVILLE AL
JUL 11 20

11805-049
U S District Court NH
55 Pleasant ST
Attn: Office of the Clerk
Concord, NH 03301
United States

Appendix Page 2033

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Beatrice Munyenyezi,
    Petitioner

v.                                          Case No. 16-cv-402-SM
                                            Opinion No. 2017 DNH 171

United States of America,
    Respondent

## O R D E R

Petitioner, Beatrice Munyenyezi, seeks relief from her
conviction and sentence under the provisions of 28 U.S.C.
§ 2255.  Petitioner was convicted by a jury of unlawfully
procuring citizenship or naturalization (18 U.S.C. §§ (a) and
(b)).

Petitioner says her appointed defense counsel provided
constitutionally deficient representation; that prosecutorial
misconduct occurred in that the government failed to disclose
exculpatory evidence prior to trial and that she is entitled to
sentence relief under Johnson v. United States, 135 S. Ct. 2551
(2015).  None of her claims have merit.

1

Ineffective Assistance

Defense counsel, as noted by the court of Appeals on direct appeal, provided a thorough, zealous and informed defense.  See United States v. Munyenyezi, 781 F.3d 532 (1st Cir. 2015).  They poured over records; reviewed the history of Rwanda's genocide; researched the aftermath and current posture of the Rwandan government toward those who perpetrated atrocities during the months of genocide; traveled to Rwanda twice to identify and interview potential defense witnesses and arranged their travel to testify in the United States; retained an academic expert to support a defense of Rwandan governmental manipulation of the prosecution's witnesses; and presented witnesses and vigorous argument in support of defenses ranging from complete innocence to mistakes in translation with respect to the pertinent documents.

Nevertheless, says petitioner, counsel should have moved for a change of venue.  But venue was proper in this district, and such motion would not have been granted.  While petitioner thinks that pretrial publicity counseled in favor of a change in venue, the jury panel voir dire and individual juror voir dire at side bar disclosed no basis to conclude that the empaneled

2

jury was influenced by any negative publicity.  Certainly petitioner has not shown that prejudice existed against her that was so great that she could not obtain a fair trial.  United States v. Dougar, 748 F.2d 8, 29 (1st Cir. 1984).  United States v. Gullion, 575, F.2d 26, 28 (1st Cir. 1978).  What publicity occurred before and during the trial was generally factual, non-hysterical, not overblown, nor so pervasive and biased as to raise any concerns regarding the ability to empanel a fair and impartial jury, and the jury was fair and impartial.  It was well within defense counsel's discretion not to seek a change in venue.  It was hardly error not to do so.  And, failure to seek a venue change did not prejudice respondent in any way.

Next petitioner claims that counsel did not adequately prepare for trial.  The record completely belies the claim.  Counsel went well beyond the call of duty in providing an exceptional defense effort in this case.  Petitioner points to nothing left undone that would have made any material difference in the outcome, and nothing that would remotely qualify as deficient performance, or that might have been materially prejudicial.  There are no perfect trials of course; to obtain relief on grounds of ineffective assistance petitioner must do

3

more than second guess counsel's performance, she must show that their performance was so deficient that they were not functioning as the counsel guaranteed by the Sixth Amendment <u>and</u> that the deficient performance prejudiced her defense. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Petitioner cannot begin to make such a showing on this record.

Petitioner asserts that counsel should have renewed objections previously made to questions related to petitioner's sister's relationship with the alleged head of the Rwandan secret police.  Again, petitioner can show no prejudice — counsel did object, and the jury understood the point (facts assumed in questions are not in evidence and the question itself is not evidence of the assumed fact).  The jury was repeatedly instructed on the point and fully understood it.  Even if additional objections were called for, there was no prejudicial effect given those instructions and the jury's clear comprehension, as well as the fact that the evidence of petitioner's guilt was overwhelming — the outcome would hardly have been different had counsel interposed an additional identical objection to the government's questions.

4

Finally, petitioner criticizes counsels' handling of the sentencing phase of trial.  There can be no legitimate complaint.  Counsel argued vigorously and as effectively as the record evidence and prevailing circumstances would permit. Counsel challenged the proposed departure from the facially applicable Guideline Sentencing Range, argued for leniency in light of respondent's new life and family responsibilities, reiterated defense themes related to mitigation, including argument about the lack of certainty in the verdict as to the nature of the misrepresentations underlying the counts of conviction.

Counsel's representation was not only not deficient, it was commendable.  See Munyenyezi, supra.

The sentence was not unreasonable for the reasons fully discussed on the record at sentencing.  Id.

The Johnson Claim

The holding in Johnson v. United States, 135 S. Ct. 2551 (2015) does not apply to this case.  Petitioner was not

5

sentenced under the Armed Career Criminal Act, and her crimes of conviction do not qualify as violent felonies.

Failure to Disclose Exculpatory Evidence

This claim, too, is without merit.  While it is not entirely clear what petitioner is asserting, she seems to say that Defense Department satellite photographs exist that would have clearly shown the roadblock over which petitioner was alleged to have presided in April of 1994.  Those photographs, she says, would establish that she was not present.  But there is no evidence that such photographs exist.  To the contrary, the government's satellite photograph expert testified that all relevant photographs had been located and had been provided to the defense.  The government's expert denied that any other photographs existed beyond what was disclosed, and the prosecution says they do not exist and so were not withheld from the defense.  Petitioner refers to a possible Brady violation, Brady v. Maryland, 373 U.S. 83 (1963), but there is no evidence presented showing that at any time prior to or during trial the government was aware of any such photographs, or had custody or control of such evidence, yet failed to disclose it.

6

Accordingly, the <u>Brady</u> rule is not triggered here.  <u>See</u> <u>United States v. Maldonado-Rivera</u>, 489 F.3d 60, 67 (1st Cir. 2007).

## Conclusion

As the files and records of this case conclusively show that the petitioner is entitled to no relief, the motion is denied.

Petitioner has not made a substantial showing of the denial of a constitutional right.  The court, therefore, declines to issue a certificate of appealability.  28 U.S.C. § 2253(c)(2)(1); Rule 11, Rules Governing Section 2255 Proceedings.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

August 30, 2017

cc:  Beatrice Munyenyezi, pro se
     John A. Capin, AUSA

7

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Beatrice Munyenyezi

v.                                                   Case No. 16-cv-402-SM

United States of America


**J U D G M E N T**


In accordance with the Orders by United States District Judge Steven J. McAuliffe dated

August 30, 2017, judgment is hereby entered.


By the Court,

*/s/ Daniel J. Lynch*

_____

Daniel J. Lynch
Clerk of Court

Date: August 31, 2017

cc:      Beatrice Munyenyezi, pro se
         John A. Capin, AUSA
         Seth R. Aframe, AUSA

BEATRICE MUNYENYEZI / Petitioner

V

UNITED STATES

2017 NOV-6 P 2:37
ENTERED IN CLERKS OFFICE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

MOTION TO ENSURE AN effective
RIGHT OF APPEAL REVIEW
FOR A HABEAS CORPUS
PURSUANT TO ARTICLE 1
SECTION 9, CLAUSE 17 KNOWN
AS 28 U.S.C § 2255

Petitioner's habeas corpus was denied
including the Certificate of appealabi-
Lity by the lower Court.

In the Court Summary, the court
did not even mention' petitioner's
Supplemental pleading. In that matter,
petitioner sought a review involving
the stripping of her citizenship,
for in recent case "MASLENJAK V US
Case : 16-309 ; 4/26/2017 the
esteemed Supreme Court held that
the interpretation of statute 18 U.S.C

Section 1425 was troublesome, where it would give federal government nearly unlimited power to denaturalize any naturalized citizen.

Furthermore, the court also ignored proof of government soliciting witnesses from IBUKA organization and the fact that the US government perjured themselves by changing the year of issuance of petitioner's ID (identification) before admitting it into evidence.

Petitioner therefore requests this Honorable court to adjudicate her habeas corpus.

Beatrice Munyenyezi, Petitioner

Beatrice Munyenyezi          10/27/17

CERTIFICATE OF SERVICE

I, __Beatrice Munyenyezi, Petitioner__, certify that the hereto

Appeal , was placed in the prison mailbox, in FCI Aliceville
Alabama _____, on the 27th , day of October _____, year
2017.

It was mailed to the following address listed below:

UNITED STATES COURT OF APPEALS

John Joseph Moakley United States Courthouse

One Courthouse Way, Suite 2500

Boston, MA 02210-3002

## UNSWORN DECLARATION OF PERJURY

I, __Beatrice Munyenyezi__ _____ under penalty of perjury, that
the aforementioned is true, and executed on this date: 10/27/2017

So Served,

Beatrice Munyenyezi



Beatrice Munyenyezi
11805-049
Federal Correction Institution Aliceville
PO Box 4000
Aliceville, AL 35442
United States

Legal
Mail

FCI Aliceville Mail Room

Date Rec'd _10/27/17_

Time: _1/5_

UNITED STATES COURT OF APPEALS
JOHN JOSEPH MOAKLEY UNITED
STATES COURTHOUSE
ONE COURTHOUSE WAY, SUITE 2500
BOSTON, MA 02210-3002

# United States Court of Appeals
## For the First Circuit

No. 18-1023

BEATRICE MUNYENYEZI,

Petitioner, Appellant,

v.

UNITED STATES,

Respondent, Appellee.

Before

Torruella, Kayatta and Barron,
<u>Circuit Judges</u>.

**JUDGMENT**

Entered: February 7, 2019

Beatrice Munyenyezi was convicted by a federal jury of making false statements to obtain a grant of United States citizenship.  <u>See</u> 18 U.S.C. § 1425(a) & (b).  She has petitioned under 28 U.S.C. § 2255, and this court has certified one claim for appeal:  the claim that the jury was given inaccurate instructions on her criminal liability, in support of which Munyenyezi cites the United States Supreme Court's decision in <u>Maslenjak</u> v. <u>United States</u>, 137 S. Ct. 1918 (2017).

The government submits that Munyenyezi's claim was procedurally defaulted because her defense counsel did not preserve an argument anticipating the substance of <u>Maslenjak</u> at her trial or on direct appeal.  Munyenyezi asserts that <u>Maslenjak</u> presents a novel development that was not reasonably available to her defense counsel in light of "[i]ts relative newness and unique intricate setup . . .." *Brief of Pro Se Petitioner at 2*.  Petitioner's <u>Maslenjak</u> claim was first raised in a supplemental § 2255 filing in the district court and was denied without a substantive discussion of reasons.  As an alternative to affirmance, the government has raised the possibility of remand to allow the district court to address the claim in the first instance.  We conclude that the district court indeed should be given an opportunity to address petitioner's <u>Maslenjak</u> claim in the first instance, including the issue of procedural default and any other defense that properly might be asserted.

The judgment of the district court is vacated, only insofar as it denied the <u>Maslenjak</u> claim, and the case is remanded to the district court for further proceedings consistent with this judgment. **<u>So ordered</u>**.

By the Court:

Maria R. Hamilton, Clerk

cc:    Hon. Steven J. McAuliffe
       Daniel Lynch, Clerk, United States District Court for the District of New Hampshire
       Beatrice Munyenyezi
       Mark T. Quinlivan
       John A. Capin
       Cynthia A. Young
       Seth R. Aframe

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| _____ )<br>BEATRICE MUNYENYEZI, )<br>Petitioner, )<br> )<br> v. )<br> )<br>UNITED STATES OF AMERICA, )<br>Respondent. )<br>_____ ) | Civil Action No. 16-402-SM |

**GOVERNMENT'S RESPONSE TO PETITIONER'S CLAIM**
**BASED ON *MASLENJAK V. UNITED STATES*, 137 S. Ct. 1918 (2017)**

The petitioner, Beatrice Munyenyezi, has moved for relief under 28 U.S.C. §2255 based on the Supreme Court's decision in *Maslenjak v. United States*, 137 S. Ct. 1918 (2017), in which the Supreme Court held that in a prosecution under 18 U.S.C. §1425(a)—which makes it unlawful for any person to "knowingly procure[] or attempt[] to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship"—the government "must establish that an illegal act by the defendant played some role in her acquisition of citizenship."  137 S. Ct. at 1923.  For three reasons, that claim should be denied.

First, Munyenyezi was charged and convicted of two counts—Count One, which charged her with violating 18 U.S.C. §1425(a), and Count Two, which charged her with violating 18 U.S.C. §1425(b)—but the Supreme Court's decision in *Maslenjak* only implicates her conviction for violating §1425(a).  She also was sentenced to concurrent terms of imprisonment of 120 months on both counts of conviction.  Hence, under the concurrent sentence doctrine, Munyenyezi is not entitled to §2255 relief because vacating her relief on Count One would not require that she be released or resentenced.

Second, Munyenyezi procedurally defaulted the claim that the government must prove a causal relation between her false statement(s) and the conferral of citizenship by failing to raise it at trial and in her direct appeal, and she has not shown, and cannot show, "cause" and "prejudice" to excuse her procedural default, or "actual innocence."

Third, for the same reason that Munyenyezi has not shown, and cannot show, "prejudice" to excuse her procedural default, any error in the Court's instructions was harmless.

## STATEMENT OF THE CASE

### A.    Proceedings in Munyenyezi's Criminal Case

On June 23, 2010, a federal grand jury returned an indictment charging Munyenyezi with one count of knowingly procuring and attempting to procure her own naturalization contrary to law by knowingly providing false and fraudulent information as to material facts in her Application for Naturalization, Form N-400, in violation of 18 U.S.C. §1425(a) (Count One), and one count of knowingly procuring and obtaining naturalization and citizenship to which she was not entitled, in violation of 18 U.S.C. §1425(b) (Count Two).  [Crim.D.1, at 13-17].[1]  The indictment also alleged that upon conviction, Munyenyezi's citizenship should be revoked under 8 U.S.C. §1451(e). [Crim.D.1, at 17].

Trial commenced on February 22, 2012.  On March 15, 2012, the Court declared a mistrial after the jury reported that it was hopelessly deadlocked.  [Crim.D.132, at 9].

A retrial commenced on February 5, 2013.  With respect to Count One, the Court instructed the jury that the government had to prove beyond a reasonable doubt that Munyenyezi procured or attempted to procure United States citizenship, that it was contrary to law for her to procure

---

[1] The docket in the underlying criminal case, *United States v. Beatrice Munyenyezi*, Criminal Case No. 10-cr-085-SM, is cited as "[Crim.D.__]."  The docket in this proceeding, *Beatrice Munyenyezi v. United States*, Civil Action No. 16-cv-402-SM, is cited as "[Civ.D.__]."

such citizenship, and that Munyenyezi knowingly and intentionally provided materially false statements on her Form N-400.  [Crim.D.309, at 140-142].  The Court further instructed the jury that the government had to prove beyond a reasonable doubt that Munyenyezi made one or more of the statements set forth in the indictment, that any such statement(s) was false and material, and that the jury must unanimously agree that she made at least one particular material false statement.  [Crim.D.309, at 142-145].  In this regard, the Court instructed the jury that the term "material" means the following:

> "Material," a statement is material if it has a natural tendency to influence or to be capable of influencing the decision of the decision maker to which it was addressed. So in this case a statement is material if the statement had a natural tendency to influence or was capable of influencing the decision of a government agency in making a determination required to be made.  The government need not show that the agency was actually influenced by the statement involved.  If a statement could have provoked governmental action, it is material regardless of whether the agency actually relied on it.

[Crim.D.309, at 145].

With respect to Count Two, the Court instructed the jury that the government had to prove beyond a reasonable doubt that Munyenyezi obtained citizenship of the United States, that she was not entitled to United States citizenship, and that she knew at the time that she was not entitled to United States citizenship.  [Crim.D.309, at 148-154].  Munyenyezi did not object to the Court's instructions on the ground that 18 U.S.C. §1425(a) required the government to prove that the false statement played some role in her acquisition of citizenship.  [Crim.D.309, at 157-158].

On February 21, 2013, the jury convicted Munyenyezi on both counts.  [Crim.D.229]. Following the return of the jury's verdict, the Court revoked Munyenyezi's citizenship pursuant to 8 U.S.C. §1451(e).  [Crim.D.236].  On July 15, 2013, the Court sentenced Munyenyezi to concurrent terms of imprisonment of 120 months.  [Crim.D.270].

**B.**     **Munyenyezi's Direct Appeal**

In her direct appeal, Munyenyezi challenged her convictions and sentence on four grounds: (1) insufficiency of the evidence; (2) the admission of her testimony before the International Criminal Tribunal for Rwanda was error; (3) her motion for a mistrial should have been granted based on prosecutorial misconduct; and (4) her sentence was substantively unreasonable.  *See United States v. Munyenyezi*, 781 F.3d 532, 536-45 (1st Cir. 2015).  Munyenyezi did not argue in her direct appeal that this Court had erred in instructing the jury regarding the elements of §1425(a).

On March 25, 2015, the First Circuit affirmed Munyenyezi's conviction and sentence.  781 F.3d at 536-45.  On October 25, 2015, the Supreme Court denied Munyenyezi's petition for a writ of certiorari.  *Munyenyezi v. United States*, 136 S. Ct. 214 (2015).

**C.**     **Proceedings on Munyenyezi's §2255 Motion**

**1.**     **Munyenyezi's initial §2255 motion**

On September 6, 2016, Munyenyezi filed a timely *pro se* motion under 28 U.S.C. §2255 in which she claimed that her trial counsel provided ineffective assistance of counsel by (1) failing to request a change of venue, (2) failing to conduct an independent pre-trial investigation, (3) failing to object to what she asserted was falsified evidence at trial, and (4) failing to argue mitigating factors at sentencing.  [Civ.D.1].  She also alleged that the government had engaged in prosecutorial misconduct by failing to disclose exculpatory evidence prior to trial, and that she was entitled to relief from her sentence under *Johnson v. United States*, 135 S. Ct. 2551 (2015). [Civ.D.1, at 1-9].  The government moved to dismiss Munyenyezi's §2255 motion.  [Civ.D.9].

### 2.      Munyenyezi's amended/supplemental §2255 motion

On July 17, 2017, Munyenyezi moved to amend and supplement her §2255 motion under Fed. R. Civ. P. 15(d) to include two additional claims.  [Civ.D.11].  First, Munyenyezi asserted that her naturalization should not have been revoked because the revocation was based on her convictions, and, under *Maslenjak*, the government failed to prove that any misrepresentation was sufficiently relevant to a requirement for naturalization that it would have prompted further investigation and that the further investigation would "predictably have disclosed" some legal disqualification.  [Civ.D.11, at 2-3].  Munyenyezi also asserted that the Court erred in instructing the jury about her actual participation in murder, rape, kidnapping, and theft because there was no evidence or testimony that supported this allegation.   [Civ.D.11, at 3].

On August 9, 2017, the Court granted the motion to amend and supplement in an endorsed order.

### 3.      The order denying Munyenyezi's §2255 motion

On August 30, 2017, this Court entered an order denying Munyenyezi's §2255 motion, finding no merit to any of the claims raised in her initial §2255 motion.  [Civ.D.12].  The Court did not address Munyenyezi's claim based on *Maslenjak* in its decision.

### 4.      Proceedings on appeal

After filing a timely notice of appeal, Munyenyezi moved to issue a certificate of appealability.  On March 5, 2018, the First Circuit granted the motion in part as to her claim that she was entitled to relief in light of *Maslenjak*, and otherwise denied her request for a certificate of appealability.

On February 7, 2019, the First Circuit vacated and remanded with respect to Munyenyezi's *Maslenjak* claim.  In doing so, First Circuit noted that the government, in its brief on appeal, had

raised the possibility of remand to allow this Court to address the claim in the first instance as an alternative to affirmance, and concluded that this Court "indeed should be given an opportunity to address petitioner's *Maslenjak* claim in the first instance, including the issue of procedural default and any other defense that properly might be asserted."

## ARGUMENT

I. **BECAUSE *MASLENJAK* ONLY IMPLICATES MUNYENYEZI'S CONVICTION ON COUNT ONE AND SHE RECEIVED CONCURRENT SENTENCES, SHE IS NOT ENTITLED TO RELIEF UNDER THE CONCURRENT SENTENCE DOCTRINE.**

Liberally construed, Munyenyezi contends that her conviction on Count One should be overturned because the Court did not instruct the jury that the government must prove that any false statements(s) played a role in the government's conferral of United States citizenship, as required by *Maslenjak*.  That claim should be denied because *Maslenjak* does not call into question Munyenyezi's conviction on Count Two.  She therefore is not entitled to relief under the concurrent sentence doctrine because she received concurrent sentences on both counts of conviction.

1. Munyenyezi was convicted on Count One of violating 18 U.S.C. §1425(a), which makes it unlawful for any person to "knowingly procure[] or attempt[] to procure[], contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship * * *."  She was convicted on Count Two of violating 18 U.S.C. §1425(b), which makes it unlawful for any person to "knowingly issue[], procure[] or obtain[] or appl[y] for or otherwise attempt[] to procure or obtain naturalization, or citizenship, or a declaration of intention to become a citizen, or a certificate of arrival or any certificate or evidence of nationalization or citizenship, documentary or otherwise, or duplicates or copies of any of the foregoing * * *."

In *Maslenjak*, the Supreme Court held that in a prosecution under §1425(a), the government "must establish that an illegal act by the defendant played some role in her acquisition of

citizenship," and, when the illegal act is a false statement, "that means demonstrating that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result." 137 S. Ct. at 1923. In other words, §1425(a) "demands a means-end connection between a legal violation and naturalization." *Id.* at 1926.

The Supreme Court also provided "operational" guidance about how §1425(a)'s requirement of causal influence would apply in practice. 137 S. Ct. at 1927-30. If the facts a defendant misrepresented are themselves disqualifying, "there is an obvious causal link between the defendant's lie and her procurement of citizenship" because "when the defendant misrepresents facts that the law deems incompatible with citizenship, her lie must have played a role in her naturalization." *Id.* at 1928-29. A defendant whose lies "throw investigators off a trail leading to disqualifying facts" also procures "citizenship by means of those lies," and the government thus may alternatively prove a §1425(a) violation by demonstrating: (a) that the misrepresented fact "was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials" to undertake further investigation; and (b) that the "investigation 'would predictably have disclosed' some legal disqualification." *Id.* at 1929 (quoting *Kungys v. United States*, 485 U.S. 759, 774 (1988)). If that showing is made, "the defendant's misrepresentation contributed to the citizenship award in the way we think §1425(a) requires." *Id.*

2.      In this case, the Court did not instruct the jury that it needed to find a causal connection between Munyenyezi's false statement(s) and the conferral of citizenship. The Court did instruct the jury that Munyenyezi's false statements had to be material, and that a "statement is material if it has a natural tendency to influence or to be capable of influencing the decision of the decision maker to which it was addressed." [Crim.D.309, at 145]. That instruction was

consistent with the position taken by Justice Alito in his opinion concurring in the judgment in *Maslenjak*, in which he argued that the unlawful procurement element of §1425(a) "imposes the familiar materiality requirement that applies in other contexts" and "does not require proof that a false statement actually had some effect on the naturalization decision." 137 S. Ct. at 1932 (Alito, J., concurring in the judgment).  But the Court did not instruct the jury that it needed to find a causal connection between Munyenyezi's false statement(s) and the conferral of citizenship to convict her on Count One, as *Maslenjak* now requires.  The government therefore assumes that the failure to instruct the jury that the unlawful procurement under §1425(a) requires the government to prove causation between Munyenyezi's false statements(s) and the conferral of citizenship constituted an error.

    **3.**    The Supreme Court's decision in *Maslenjak* only addressed the elements for a conviction on §1425(a), as the Court made clear in its opening paragraph:

> A federal statute, 18 U.S.C. §1425(a), makes it a crime to "knowingly procure[ ], contrary to law, the naturalization of any person." And when someone is convicted under §1425(a) of unlawfully procuring her own naturalization, her citizenship is automatically revoked. See 8 U.S.C. §1451(e).  In this case, we consider what the Government must prove to obtain such a conviction.  We hold that the Government must establish that an illegal act by the defendant played some role in her acquisition of citizenship. When the illegal act is a false statement, that means demonstrating that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result.

137 S. Ct. at 1922-23.  The Supreme Court also expressly distinguished between §1425(a) and §1425(b), stating that the former "covers illegal means of procurement" while the latter "covers simple lack of qualifications."  137 S. Ct. at 1925 n.2.

*Maslenjak* thus does not call into question Munyenyezi's conviction on Count Two, which charged her with violating §1425(b), and she consequently is not entitled to relief under the concurrent sentence doctrine. Under that doctrine, the existence of one valid conviction "make[s] unnecessary the review of other convictions when concurrent sentences have been given, provided there is no adverse collateral consequence to not reviewing the concurrent sentence." *United States v. McHatton*, 16 F.3d 401, at *1 (1st Cir. 1994) (unpublished) (quoting *United States v. Hudacek*, 7 F.3d 203, 204 n.1 (11th Cir. 1993)) (per curiam)). In this case, the Court sentenced Munyenyezi to concurrent terms of imprisonment of 120 months on each count. Consequently, even if the Court were to conclude that *Maslenjak* calls into question her conviction on Count One, she is not entitled to relief under §2255 because vacating her conviction on Count One would not require that she be released or resentenced.

Munyenyezi also would not suffer any adverse collateral consequences if her conviction on Count One were not reviewed. Under 8 U.S.C. §1451(e),[2] the revocation of her naturalization was automatic upon her convictions for violating §1425(a) and (b). *See, e.g., United States v. Allouche*, 703 F. App'x 241, 244 (11th Cir. 2017) (unpublished) ("The penalties for violating either subsection [§1425(a) and (b)] include both imprisonment and mandatory denaturalization, *see* 8 U.S.C. §1451(e)."). Hence, even if her conviction on Count One were vacated, the revocation of Munyenyezi's citizenship would remain undisturbed by virtue of her conviction on Count Two.

---

[2] This subsection provides:

> When a person shall be convicted under section 1425 of Title 18 of knowingly procuring naturalization in violation of law, the court in which such conviction is had shall thereupon revoke, set aside, and declare void the final order admitting such person to citizenship, and shall declare the certificate of naturalization of such person to be canceled. Jurisdiction is conferred on the courts having jurisdiction of the trial of such offense to make such adjudication.

Nor does the fact that Munyenyezi was assessed a special assessment on Count Two alter this conclusion.  To be sure, the Supreme Court has held that the concurrent sentence doctrine cannot be applied where a special assessment was applied to each count of conviction.  *See Ray v. United States*, 481 U.S. 736, 737 (1987).  Because special assessments have been imposed under 18 U.S.C. §3013 since 1984, and are mandatory on any person convicted of an offense against the United States, whether a felony or misdemeanor, *see* 18 U.S.C. §3013(a), courts have recognized that "[a]s a practical matter, the concurrent-sentence doctrine was abrogated for direct appeal when Congress imposed a special assessment * * * for each separate felony conviction."  *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012).

The concurrent sentence doctrine continues to apply in the collateral context, however, as even if a special assessment for a count of conviction is vacated, the prisoner would not be entitled to be "released" from "custody," as required by §2255.  *See, e.g., Eason v. United States*, 912 F.3d 1122, 1123 (8th Cir. 2019) ("However, where a §2255 motion challenges only the validity of a concurrent sentence, as in this case, the concurrent sentence doctrine will apply unless a ruling in Eason's favor would reduce the time he is required to serve or otherwise prejudice him in any way."); *United States v. Ross*, 801 F.3d 374, 382 (3d Cir. 2015) ("Because we believe the burden of a special assessment—even one imposed in conjunction with a wrongful conviction—does not amount to 'custody,' Ross is not 'claiming the right to be released' from 'custody' and his special assessment cannot serve as the basis for a claim under section 2255."); *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012) ("As a practical matter, the concurrent-sentence doctrine was abrogated for direct appeal when Congress imposed a special assessment of $50 (now $100) for each separate felony conviction.  A collateral attack under §2241, §2254, or §2255 contests only custody, however, and not fines or special assessments.") (internal citation omitted); *but see Cazy*

*v. United States*, 717 F. App'x 954, 956 (11th Cir. 2017) (unpublished) (holding that district court lacked authority under §2255 to waive special assessment imposed at sentencing and, as a result, that "[b]ecause Cazy's $100 special assessment must stand, the concurrent sentence doctrine is inapplicable").[3]  The Supreme Court also has stated that "[a] stronger case" for abolishing the concurrent sentence doctrine may well be made "in cases on direct appeal, as compared to convictions attacked collaterally by suits for postconviction relief."  *Benton v. Maryland*, 395 U.S. 784, 793 n.11 (1969).

Munyenyezi's challenge to her conviction on Count One therefore is barred by the concurrent sentence doctrine because she would not be entitled to release or resentencing if that conviction were vacated, nor would she suffer any adverse collateral consequences if her conviction on Count One were not reviewed.  The government acknowledges, however, that the Court has indicated that it is preferable in some circumstances to resolve a pending claim brought under §2255 rather than invoke the convenience of the concurrent sentence rule.  *Burke v. United States*, 2018 WL 3653157, at *1 (D.N.H. Aug. 1, 2018) (unpublished).  If the Court determines that it is preferable to take a similar approach in this case, Munyenyezi's challenge to her conviction on Count One should be denied for the reasons set forth below in Parts II and III.

---

[3] The Second Circuit has recently held that a prisoner has Article III standing to bring a motion under 28 U.S.C. §2241 notwithstanding an unchallenged concurrent sentence, but, in doing so, the court declined to decide whether the Supreme Court's decision in *Ray* precludes application of the concurrent sentence doctrine in the habeas context.  *See Dhinsa v. Krueger*, 917 F.3d 70, 77-80 & n.4 (2d Cir. 2019).  The Tenth Circuit similarly has stated, in the course of affirming the denial of a §2241 motion, that a prisoner's release from custody did not moot an appeal from the denial of a §2241 petition even where the prisoner's term of supervised release would not change because of an unchallenged conviction based, in part, on the fact that the prisoner might seek recovery of a special assessment.  *See Prost v. Anderson*, 636 F.3d 578, 582 n.3 (10th Cir. 2011) (Gorsuch, J.).  As in *Dhinsa*, however, the Tenth Circuit did not consider in that appeal whether the concurrent sentence doctrine would preclude relief to the prisoner on the merits.

II.   **MUNYENYEZI PROCEDURALLY DEFAULTED HER *MASLENJAK* CLAIM AND SHE CANNOT SHOW CAUSE AND PREJUDICE TO EXCUSE HER PROCEDURAL DEFAULT, OR ACTUAL INNOCENCE.**

A prisoner seeking relief under §2255 procedurally defaults a claim if he or she failed to raise the asserted error during his or her criminal trial and on direct appeal.  *See United States v. Frady*, 456 U.S. 152, 167-68 (1982); *Bucci v. United States*, 662 F.3d 18, 27-29 (1st Cir. 2011). In this case, Munyenyezi did not argue at trial or in her direct appeal that the Court erred by failing to instruct the jury that to convict her on Count One, which charged her with violating §1425(a), it had to find that her false statement(s) would have justified denying naturalization or would predictably have led to other facts warranting that result.  As a result, she procedurally defaulted this claim.

Thus, to overcome her procedural default, Munyenyezi must establish either (1) "cause" and a resulting "actual prejudice," or (2) that she is "actually innocent."  *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 622 (1998).  She has not made, and cannot make, those showings.

1.     A prisoner can establish "cause" by showing that his or her claim is "so novel that its legal basis is not reasonably available to counsel."  *Reed v. Ross*, 468 U.S. 1, 16 (1984).  The Supreme Court has cautioned, however, that "[w]here the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default."  *Engle v. Isaac*, 456 U.S. 107, 134 (1982).  The question of whether a claim's "novelty" amounts to cause for failing to raise it on direct review is not "whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all."  *Smith v. Murray*, 477 U.S. 527, 537 (1986).

Here, for more than a decade before Munyenyezi's trial and/or her direct appeal, defendants had been arguing that the unlawful procurement element of §1425(a) requires the government to prove causation between a false statement and the conferral of citizenship.  *See United States v. Mensah*, 737 F.3d 789, 807 (1st Cir. 2013); *United States v. Latchin*, 554 F.3d 709, 712-13 (7th Cir. 2009); *United States v. Puerta*, 982 F.2d 1297, 1302 (9th Cir. 1992).  This argument had its roots in the Supreme Court's fractured opinion in *Kungys*, a civil denaturalization case under 8 U.S.C. §1451(a), in which the Court agreed that the materiality element of §1451(a) differed from the procurement element, and also agreed that, at a minimum, the procure requirement demanded that citizenship was obtained as a result of the application process in which the misrepresentations or concealments were made.  485 U.S. at 767-76.  The Court split, however, as to what else procurement means.  *See Mensah*, 737 F.3d at 808 (quoting *Latchin*'s description of the various positions in *Kungys*).  Justice Stevens, joined by Justices Marshall and Blackmun, advocated what amounts to a "but for" test—that the government has to establish that citizenship would not have been conferred but for the misrepresentation.  485 U.S. at 784-801 (Stevens, J., concurring in the judgment).  Justice Scalia, joined by Chief Justice Rehnquist and Justice Brennan, rejected this construction and concluded that proof of a material misrepresentation created a rebuttable presumption that citizenship was procured on that basis.  *Id.* at 776-79.  Justice Brennan wrote a separate concurrence in which he said that this rebuttable presumption does not arise unless the government produces evidence sufficient to show that truthful information would have given rise to a "fair inference of ineligibility.'"  *Id.* at 783-84 (Brennan, J., concurring).

Following the Supreme Court's decision in *Kungys*, the Seventh and Ninth Circuits held that the unlawful procurement element of §1425(a) only requires the government to show that the false statement or misrepresentation concealed facts that give rise to a "fair inference" that the

13

defendant was ineligible for naturalization, a standard consistent with Justice Brennan's concurring opinion in *Kungys*. *See Latchin*, 554 F.3d at 713-14; *Puerta*, 982 F.2d at 1302-05. Thereafter, in *Mensah*—which was decided on December 16, 2013, after Munyenyezi's trial and conviction but before her direct appeal was briefed and decided—the First Circuit agreed with the Seventh and Ninth Circuits that the unlawful procurement element of §1425(a) only requires the government to show that the false statement or misrepresentation concealed facts that give rise to a "fair inference" that the defendant was ineligible for naturalization. *See Mensah*, 737 F.3d at 807-09.

Hence, because "various forms of the claim" that the unlawful procurement element of §1425(a) requires a causal connection between the false statement and the conferral of citizenship "had been percolating in the lower courts for years," *Smith v. Murray*, 477 U.S. at 537, that claim was available to Munyenyezi at the time of her trial and direct appeal. Indeed, the Sixth Circuit has concluded that that a jury instruction setting forth the "fair inference" standard—that the government needed to prove that a false statement "played some role in [his] acquisition of citizenship" by proving "facts that raise a fair inference that the material false statement, if disclosed, would have made the person ineligible"—is consistent with *Maslenjak*. *See United States v. Haroon*, 874 F.3d 479, 482 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1576 (2018).

Moreover, the defendant in *Mensah* argued for a *more* demanding standard than the "fair inference" standard ultimately adopted by the First Circuit, as he urged that the government needed to prove a "but for" link between the false statement and the conferral of citizenship. *See Mensah*, 737 F.3d at 807 ("Mensah argues that the court's instruction was flawed because the jurors should have been told that they needed to find a 'but for' connection between any misrepresentations and the grant of citizenship—and not merely that it would be 'fair to infer' such a connection."). The

defendants in *Latchin* and *Puerta*, too, had made similar arguments.  *See Latchin*, 554 F.3d at 712-13 (7th Cir. 2009) ("Latchin would increase the government's burden so that a false statement is only material if a true statement would have precluded citizenship.  Since no one testified that Latchin's application would have been outright denied had he disclosed his affiliation with the IIS—Reyes only said she would have asked more questions and flagged the case for a supervisor—Latchin submits that the government failed to prove its case."); *Puerta*, 982 F.2d at 1302 (9th Cir. 1992) ("Puerta claims that his false statements were not material because they were not shown to conceal actual ineligibility for naturalization.").  In *Maslenjak*, the Supreme Court rejected a "but for" causation requirement, stating that "[a] yet-stricter causal requirement, demanding proof positive that a disqualifying fact would have been found, sets the bar so high that 'we cannot conceive that Congress intended' that result."  137 S. Ct. at 1930 (quoting *Kungys*, 485 U.S. at 777 (opinion of Scalia, J.).  But the fact that defendants had been arguing for a *more* demanding standard than that ultimately adopted by the Supreme Court—both in this circuit and others—only underscores the conclusion that the argument that the unlawful procurement element of §1425(a) requires a causal connection between the false statement and conferral of citizenship was available to Munyenyezi at the time of her trial and direct appeal.

For these reasons, Munyenyezi has not shown, and cannot show, "cause" for her procedural default.

2.    Munyenyezi also has not shown, and cannot show, "prejudice" for her procedural default because any error in failing to instruct the jury that the unlawful procurement element of Count One required causation between the false statement(s) and the conferral of citizenship was harmless.  *See Lassend v. United States*, 898 F.3d 115, 123 (1st Cir. 2018) (stating that "the prejudice inquiry dovetails with the merits inquiry"), *cert. denied* 2019 WL 416251 (U.S. March

4, 2019); *Glass v. Williams*, 325 F. App'x 752, 754 (11th Cir. 2009) (unpublished) ("Because we conclude from the record that the evidence of Glass's guilt was overwhelming, any error the state made at trial in eliciting that he had invoked his right to counsel was harmless.  Therefore, Glass failed to establish prejudice under the cause-and-prejudice test for us to review his procedurally defaulted claim.").

As discussed above, in *Maslenjak*, the Supreme Court held that the unlawful procurement element "means demonstrating that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result."  137 S. Ct. at 1923.  In this case, the Court did not instruct the jury that it needed to find a causal connection between Munyenyezi's false statement(s) and the conferral of citizenship.  Therefore, and as noted above, the government assumes that the failure to instruct the jury that the unlawful procurement under §1425(a) requires the government to prove causation between Munyenyezi's false statements(s) and the conferral of citizenship constituted an error.  Any error, however, was harmless beyond a reasonable doubt because Munyenyezi's false statements either misrepresented facts that were themselves disqualifying, or would have prompted reasonable officials to undertake further investigation that predictably have disclosed some legal disqualification.  *See Neder v. United States*, 527 U.S. 1, 9-10 (1999) (applying harmless-error review to a defendant's claim that a jury instruction omitted an element of the charged offense).

Count One of the indictment, which charged her with violating §1425(a), alleged that in her Form N-400, Munyenyezi made the following false, misleading, and fraudulent statements:

a.      In response to a question on her Form N-400 that asked, "Have you
        **EVER** been a member of or associated with any organization,
        association, fund, foundation, party, club, society, or similar group
        in the United States or in any other place?" (emphasis in the
        original), the Defendant MUNYENYEZI did not disclose her
        membership in, and association with, the MRND and Interahamwe
        and responded by putting an "X" in the box marked "No."

b.      In response to a question on her N-400 that asked, "Have you **EVER**
        persecuted (either directly or indirectly) any person because of race,
        religion, national origin, membership in a particular social group, or
        political opinion?" (emphasis in the original), the Defendant
        MUNYENYEZI responded by putting an "X" in the box marked
        "No" and failed to disclose her direct and indirect persecution of
        Tutsis during the Rwandan genocide.

c.      In response to a question on her N-400 that asked, "Have you **EVER**
        committed a crime or offense for which you were **NOT** arrested?"
        (emphasis in the original), the Defendant MUNYENYEZI failed to
        disclose her participation in genocide, murder, rape, kidnapping, and
        theft, and responded by putting an "X" in the box marked "No." In
        addition, MUNYENYEZI failed to disclose that she had previously
        violated U.S. criminal laws by providing false information and
        responses in immigration documents and interviews, including the
        Form I-590, Form G-646, the Rwandan Questionnaire and Form I-
        485.

d.      In response to a question on her Form N-400 that asked, "Have you
        **EVER** given false or misleading information to any U.S. official
        while applying for any immigration benefit or to prevent
        deportation, exclusion or removal?" (emphasis in the original), the
        Defendant MUNYENYEZI responded by putting an "X" in the box
        marked "No," thus failing to disclose all the false information she
        provided in previous immigration documents submitted to receive
        immigration benefits and to remain in the United States, that is, the
        Form I-590, Form G-646, Rwandan Questionnaire, and Form I-485.

e.      In response to a question on her N-400 that asked, "Have you **EVER**
        lied to any U.S. government official to gain entry or admission into
        the United States?" (emphasis in the original), the Defendant
        MUNYENYEZI responded by putting an "X" in the box marked
        "No," thus failing to disclose the false information she provided on
        the Form I-590, Form G-646 and Rwandan Questionnaire.

[Crim.D.1, at 10-12].  The indictment further alleged that on April 29, 2003, Munyenyezi appeared before an officer of the federal government in New Hampshire and certified, under the penalty of perjury, the truthfulness of the Form N-400 that contained these false, misleading, and fraudulent statements.  [Crim.D.1, at 12].

The Court instructed the jury that the government had to prove beyond a reasonable doubt that Munyenyezi made one or more of the statements set forth in the indictment, that the statement(s) was false and material, and that the jury must unanimously agree that she made at least one particular material false statement.  [Crim.D.309, at 142-145].  The Court also instructed the jury that with respect to the fourth and fifth false statements alleged in the indictment, the jury must unanimously agree to at least one prior material false statement (*i.e.*, that Munyenyezi made one or more of the first three false statements alleged in the indictment).  [Crim.D.309, at 145].

Hence, because the jury returned a general verdict on Count One, any instructional error would be harmless beyond a reasonable doubt if each of the first three false statements alleged in the indictment either misrepresented facts that were themselves disqualifying, or would have prompted reasonable officials to undertake further investigation that predictably have disclosed some legal disqualification.  They did.

Munyenyezi's false statement that she had never been a member of or associated with any organization or party in the United States or in any other place—subparagraph (a) above—hid her membership in, and association with, the MRND and Interahamwe, and a truthful answer would have prompted reasonable officials to undertake further investigation that predictably would have led to the discovery of disqualifying facts, including her role in persecuting Tutsis.  *See Munyenyezi*, 781 F.3d at 537-38 (stating that "the record in Munyenyezi's case is a bone-chilling read," and a rational jury could conclude from the testimony at trial that "Munyenyezi lied on her

form N-400—using 'no' answers to hide her Interahamwe membership, her role in persecuting Tutsis, and her penchant for peddling untruths to get into America"); *id.* at 538 ("[W]e think a level-headed jury could find she wasn't simply in the wrong place at the wrong time.  Far from it—dressed as an Interahamwe, she personally inspected IDs at the checkpoint, separated those who would live from those who would die (and die gruesomely), kept records of the ghastly goings-on.").

Munyenyezi's false statement that she had never persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion—subparagraph (b) above—hid her direct and indirect persecution of Tutsis during the Rwandan genocide.  A truthful answer would have disqualified Munyenyezi from citizenship for lack of good moral character.  *See* 8 U.S.C. §1427(a) (person must have good moral character to be eligible for citizenship); 8 U.S.C. §1101(f)(9) (person lacks good moral character "who at any time has engaged in conduct described in section 1182(a)(3)(E) of this title (relating to assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings) or 1182(a)(2)(G) of this title (relating to severe violations of religious freedom).").

Finally, Munyenyezi's false statement that she had never committed a crime or offense for which she was not arrested—subparagraph (c) above—hid her participation in genocide, murder, rape, kidnapping, and theft.  A truthful answer would have disqualified her from citizenship for lack of good moral character, *see* 8 U.S.C. §1101(f)(9) (genocide), and for having committed one or more aggravated felonies, *see* 8 U.S.C. §1101(a)(43)(A) (murder and rape are aggravated felonies); *id.* at §1101(a)(43)(G) (theft for which term of imprisonment is at least one year is an

aggravated felony).[4]   Munyenyezi therefore has not shown, and cannot show, "prejudice" to excuse her procedural default.

**3.**     Munyenyezi also has not shown, and cannot show, "actual innocence."  The Supreme Court has noted that "'actual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 624 (1998).  Munyenyezi's claim of instructional error under *Maslenjak* does not satisfy this standard.

## III.     ANY ERROR WAS HARMLESS.

Finally, for the same reason that Munyenyezi has not shown, and cannot show, "prejudice," any error has harmless.  *See Lassend*, 898 F.3d at 123.

As shown above, each of the first three false statements alleged in the indictment either misrepresented facts that were themselves disqualifying, or would have prompted reasonable officials to undertake further investigation that predictably have disclosed some legal disqualification.   For example, Donald Monica, the officer in charge of the Nairobi office of the then-Immigration and Naturalization Service who interviewed and conditionally approved Munyenyezi's application for refugee status in March 1995, testified at trial that he would have asked additional questions if Munyenyezi had disclosed that he had been a member of the MRND in that application, and that he had denied the applications of persons he learned or believed had engaged in the persecution of others.   [Crim.D.301, at 13-15, 18-20].  From that testimony, the jury could have concluded that a similar inquiry would have resulted had Munyenyezi given a truthful answer to the same question in her Form N-400, which predictably would have led to the

---

[4] The least serious form of theft criminalized under Rwandan law is punishable by imprisonment of six months to two years.  *See* Organic Law Instituting the Penal Code, Article 300 (available at https://www.unodc.org/res/cld/document/rwa/1999/penal-code-of-rwanda_html/Penal_Code_of_Rwanda.pdf).

discovery of disqualifying facts, including Munyenyezi's persecution of Tutsis at the roadblock at the Hotel Ihuriro.  Indeed, Munyenyezi's conviction on Count Two—which required the jury to find that she in fact was ineligible for citizenship—underscores the conclusion that a truthful answer to this question would predictably have led to the discovery of disqualifying facts.

Munyenyezi also did not argue in her defense at trial that the government had not proven beyond a reasonable doubt causation between her false statements(s) and the conferral of citizenship.  Rather, she argued in her closing, *inter alia*, that her statements were truthful and the government's witnesses were not credible.  [Crim.D.309, at 61-102].  Similarly, in her direct appeal, Munyenyezi argued that the evidence was insufficient to convict her because the government's witnesses were not credible and because, at most, the evidence only showed her mere presence at the roadblock in front of the Hotel Ihuriro.  781 F.3d at 538 (discussing Munyenyezi's sufficiency challenge).  Munyenyezi, in other words, did not contest causation at trial or in her direct appeal.

For these reasons, any error in failing to instruct the jury that the unlawful procurement element of §1425(a) requires causation between Munyenyezi's false statements(s) and the conferral of citizenship was harmless, as the omitted element was uncontested and supported by overwhelming evidence.  *See United States v. Pizarro*, 772 F.3d 284, 297-99 (1st Cir. 2014) (stating that because the omitted element of drug quantity was both uncontested and supported by overwhelming evidence, the Court did not need to decide whether the absence of a contest is required to find harmless error).

## CONCLUSION

For the foregoing reasons, Munyenyezi's challenge to her conviction on Count One based on *Maslenjak* should be denied.

Respectfully submitted,

SCOTT W. MURRAY
United States Attorney

By:     */s/ Mark T. Quinlivan*
MARK T. QUINLIVAN
Special Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3606
mark.quinlivan@usdoj.gov

Dated:  March 29, 2019

## CERTIFICATE OF SERVICE

I, Mark T. Quinlivan, hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the petitioner, Richard Guerriero, Esq., and will be sent by first-class mail, postage prepaid, to the petitioner, at the following address: Beatrice Munyenyezi, Reg. No. 11805-049, FCI Aliceville, Federal Correctional Institution, P.O. Box 4000, Aliceville, AL 35442.

By:     */s/ Mark T. Quinlivan*
MARK T. QUINLIVAN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

BEATRICE MUNYENYEZI, Petitioner

v.                                                          No. 1:16-cv-00402-SM

UNITED STATES OF AMERICA, Respondent

Petitioner's Memorandum in Support of Motion Pursuant to 28 U.S.C. 2255

Petitioner, through counsel and as directed by this Court's order, submits this

memorandum in further support of her motion pursuant to 28 U.S.C. 2255 and *United*

*States v. Maslenjak*, 137 U.S. 1918 (2017), and in response to the Government's

objections to her motion. As set forth below, the Court should vacate Petitioner's

convictions and sentences, and order a new trial.

Summary of Argument

Petitioner was convicted on an indictment which charged two counts of procuring

citizenship unlawfully. In Count One, under 18 U.S.C. 1425(a), she was charged with

procuring citizenship "contrary to law." In Count Two, under 18 U.S.C. 1425(b), she was

charged with procuring citizenship when she was "not entitled thereto." To prove both

that Petitioner acted "contrary to law" and that she was "not entitled" to citizenship, the

Government presented a case focused on false statements allegedly made by Petitioner.

The alleged false statements made up the bulk of the factual allegations in the indictment,

most of the Government's evidence at trial, and the predominant part of the

Government's closing arguments. Although a theory of guilt not involving false

statements might have been available regarding Count Two under 1425(b), the

Government did not present a case on Count Two which focused on alternative theories of guilt. More importantly, when the Court offered the Government the chance for a special verdict form which might have revealed whether the conviction of Count Two was based on false statements or on a lack of entitlement to citizenship without regard to false statements, the Government rejected that offer.

Years after Petitioner's trial, the Supreme Court decided *United States v. Maslenjak*, 137 U.S. 1918 (2017). Addressing 18 U.S.C. 1425(a), the Court held that to convict a person of "procuring" citizenship by means of a false statement, the Government must prove a causal link by showing that the alleged false statement "played some role" in the granting of citizenship. Petitioner is entitled to relief as a result of *Maslenjak* because her convictions are not supported by a jury finding of such a causal link. To the contrary, in Petitioner's trial, the Court instructed the jury that "the government need **not** show that the [government] agency was actually influenced by the statement involved." (Emphasis added.) *Maslenjak* applies with equal force to Petitioner's 1425(a) conviction and her 1425(b) conviction because the Government chose to present the same proof for both counts. That is, the Government's case was that Petitioner's alleged false statements showed both that she acted "contrary to law" and that she was "not entitled" to citizenship.

The Government concedes, at least as to Count One, under 18 U.S.C. 1425(a), that Petitioner was convicted in error because the jury was not instructed to find the causal link required by *Maslenjak*. Nonetheless, the Government argues against a new trial and proposes a series of alternative procedural bypasses in the form of the concurrent

sentence doctrine, procedural bar, and harmless error. Yet, largely because of choices made by the Government in trying its case, each of those paths leads to a dead end.

The bottom line is that the Government attempted to prove both charges by presenting a case that Petitioner lied to procure citizenship. *Maslenjak* requires that, having chosen that theory, the Government must prove a causal link between the alleged lies and the granting of citizenship. Petitioner's jury was not instructed to make that finding before returning verdicts of guilty. Therefore, both of Petitioner's convictions must be set aside and a new trial ordered.

<u>The Indictments, the Evidence, the Government's Arguments, and the Jury Instructions Centered on Petitioner's Alleged False Statements.</u>

The procedural history of this case is well-known to the Court and is summarized in the Government response. Therefore, Petitioner does not review the history of the case comprehensively. Rather, Petitioner focuses on the parts of the record relevant to her argument.[1]

*The Indictment: The Government Alleged False Statements Made to Procure Citizenship as the Primary Factual Basis for Both Counts in the Indictment.*

Petitioner was charged in a two-count indictment with violating 18 U.S.C. 1425(a) and 1425(b). Crim.D. 1 at 1. Paragraphs 6 – 10 of the indictment stated that Petitioner was a Hutu affiliated with the MRND political party in Rwanda in 1994 and that she participated in killings, rapes, kidnappings, and many other crimes against Tutsis. *Id*. at 3-5. Paragraphs 11 – 17 detailed how Petitioner allegedly lied about or failed to disclose her background and crimes during the immigration process. *Id*. at 5-11. The

---

[1] For ease of reference Petitioner follows the same citation convention as the Government with regard to the two relevant dockets and cites the docket in *United States v. Beatrice Munyenyezi*, No. 10-cr-00085-SM as "Crim.D." and the docket in this matter, *Beatrice Munyenyezi v. United States*, No. 16-cv-00402-SM as "Civ.D."

Government alleged that Petitioner made false statements about her background and prior conduct throughout the process, from her application for refugee status, to her application for permanent residence, to her application to become a naturalized citizen. Against that factual background, the indictment then charged the two counts.

Count One charged that Petitioner procured her naturalization as a citizen "contrary to law" "by knowingly providing false and fraudulent information as to material facts in her Application for Naturalization, Form N-400." *Id*. at 13. Count Two charged that Petitioner procured naturalization and citizenship "to which she was not entitled." *Id*. at 14. Count Two further specified how Petitioner was "not entitled" to citizenship. In subparts a, b, and c, of Count Two, the indictment alleged that Petitioner was not entitled to naturalization because she provided "false and fraudulent information as to material facts" on her applications for naturalization, for refugee status, and for permanent residence. *Id*. at 14-15. In subparts d, f, and g, of Count Two, the indictment alleged that Petitioner was not entitled to become a citizen under 8 U.S.C. 1427 because she had participated in genocide, she was not of good moral character, and because she was not otherwise entitled to naturalization according to the requirements of the statute. *Id*. at 15-16. Subpart e of Count Two combined the "false statements" and the "not entitled to" concepts by alleging that Petitioner falsely claimed that she was a person of good moral character. *Id*. at 15.

Thus, the indictment drafted by the Government alleged false statements by Petitioner as the primary basis for both the "contrary to law" theory of Count One, under 18 U.S.C. 1425(a), and the "not entitled thereto" theory of Count Two, under 18 U.S.C. 1425(b).

4

*Testimony at Trial: The Government's Witnesses Did Not Testify that an Admission of Affiliation with MRND Would Have Resulted in Petitioner's Exclusion or in the Discovery of Evidence Which Would Have Inevitably Led to Her Exclusion.*

The Government presented witnesses at trial to testify that Petitioner was affiliated with MRND, a political party of the Hutus, and that she participated in the killing of Tutsis as well as other crimes. The Government also presented evidence that during Petitioner's immigration to the United States she did not reveal that she had been affiliated with MRND, that she has participated in genocide and other criminal conduct, or that she had lied at during the immigration process.

With regard to the specific claims that Petitioner was affiliated with MRND and that she lied about that affiliation, the Government's witnesses from immigration agencies testified that MRND affiliation alone would not have resulted in Petitioner's exclusion from the United States. Furthermore, the witnesses did not say that such an admission would have inevitably led to the discovery of evidence which would resulted in Petitioner's exclusion.

Donald Monica testified that he was associate director at the United States Citizenship and Immigration Service. Crim. D. 290 at 36. He worked for that agency, or its predecessor for over 30 years, and worked all around the world. *Id*. at 36-39. In 1995, while working in Nairobi, he adjudicated Petitioner's application for refugee status. *Id*. at 47; Crim.D. 301 at 13. Monica testified that Petitioner's Hutu status would not have automatically raised suspicions for him. Crim.D. 301 at 45. Regarding Petitioner's response that she was not affiliated with any political, professional, or social organizations, he said that if she had written "MRND" he would have asked more questions, but he did not say that such an answer would have been an automatic

disqualification. *Id*. at 13-14, 45-46.  He explained that an answer of "MRND" could have related to either the risk of an applicant being persecuted or grounds to exclude an applicant involved in persecuting others. *Id*. at 14. He was not asked and did not say that if Petitioner had written "MRND" on her application that would have predictably disclosed some disqualification and led to Petitioner's exclusion.

Donald Heflin testified for the Government that he was the managing director of the State Department's Visa Office and that he had previously served as the desk officer for Rwanda in the Bureau of African Affairs. Crim.D. 285 at 4. He testified that an applicant who stated they had been a member of MRND would have been asked more questions. *Id*. at 28. However, he also said that "the MRND had some people in it that never participated in the genocide." *Id*. at 30.

Lastly, Maurice Violo testified that he was an immigration services officer in 2003 who adjudicated Petitioner's application for naturalization. Crim.D. 292 at 44-49. Regarding questions during that process about political affiliations, he noted that Petitioner did not list any. *Id*. at 57. He said that if Petitioner had described being affiliated with MRND, he would have investigated further. *Id*. at 58-59. When asked directly, "had she written MRND, she would have been excluded?" he said "no . . . We would investigate . . . . No final decision would have been made at that time." Id. at 90.

Thus, even if Petitioner's jury believed she had been affiliated with MRND and that she lied about it, the Government did not establish that false statements about MRND played a role in the granting of citizenship. This is significant because, as explained below, the Court has no way to know which false statement or statements formed the basis of the jury verdicts.

*Closing Argument: The Government's Closing Argument Focused on Evidence of False Statements.*

The Government's closing argument focused on Petitioner's alleged false

statements, especially the denial of affiliation with MRND. Government counsel stated:

> If the applicant isn't forthcoming, if the applicant conceals or misrepresents or lies about facts that matter, material facts, makes it impossible for the system to work. And that's what this case is about. This case is about the defendant lying and lying and lying again. Crim.D. 309 at 10.

> I would submit to you based on all the other evidence there can be no reasonable doubt that she in fact was a member of the MRND or at a minimum closely associated and affiliated with the MRND." Crim.D. 309 at 28.

> The defendant was affiliated with the MRND. She was a member of the MRND. She supported the goals of the MRND. She went to MRND rallies. She wore MRND garb. Crim.D. 309 at 32.

> [I]f she told a single lie at any step of the process, she's guilty. Crim.D. 309 at 36.

> Ladies and gentlemen, the evidence has been abundant that at a minimum she associated with the MRND. She went to their meetings, she went to their rallies, she wore their garb, she showed her allegiance for the nation. She said no. That's a lie that matters. That's a false statement that matters. She's guilty -- if this answer is false she's guilty. Crim.D. 309 at 38.

> Count 1 is did you lie to get citizenship. Any single lie, including did you lie about lying, any single lie, she's guilty. Count 2 is did you lie about lying and were you otherwise inadmissible. Were you inadmissible because you don't have good moral character? Were you inadmissible because you were a persecutor? Were you inadmissible because you lied at an earlier stage of the process. Crim.D. 309 at 44.

> She lied, she concealed her past at every stage, and at the end of the day this is what she got. She got the golden ticket. She got U.S. citizenship. She got it by making material misrepresentations and false statements that mattered to the immigration authorities at every stage of the process. Find her guilty. Crim.D. 309 at 61

Considering the force and repetition of these arguments, it is reasonable to conclude that

the jury believed lying about affiliation with MRND was both clearly proven and was,

standing alone, sufficient evidence to convict Petitioner.

*Jury Instructions: The Court Did Not Require the Jury to Find a Causal Link Between the Alleged False Statements and the Granting of Citizenship.*

Regarding Count One, the Court instructed the jury that in order to convict it had to find that Petitioner's false statements were "material." Crim.D. 309 at 145. However, the Court told the jury that it need only find that the false statements had "a natural tendency to influence or be capable of influencing the decision maker" and that "the government need not show that the agency was actually influenced by the statement involved." *Id*. In other words, the Court did not instruct the jury that it was required to find that the false statements played some role in the decision to grant Petitioner citizenship. The Court also told the jury that it had to be unanimous as to which statement or statements it found to be false, *Id*. at 144-45, but did not instruct the jury to identify those statements in a special verdict form, as discussed below.

Regarding Count Two, the Court told the jurors they had to be unanimous regarding the specific disqualifying ground which caused them to find that Petitioner was not entitled to become a citizen, but the Court did not require the jurors to identify that ground or grounds. Crim.D. 309 at 154. In addition, the Court told the jury it had two alternative routes to find that Petitioner was not entitled to become a citizen because she lacked good moral character. The Court said that either participating in genocide or making "material false statements for the purpose of obtaining immigration" would qualify as failing to be of good moral character. *Id*. at 153. Similar to the instruction on Count One, the Court said the jurors had to be unanimous as to the specific ground, but here again did not require jurors to identify that ground *Id*. at 154. Although the Court referred to a "material false statement," the Court did not specifically refer back to the definition offered with regard to Count One or reinstruct the jury on materiality. Lastly,

when telling the jurors that a verdict on 1425(b) could be based on a material false

statement, the Court did not require the jurors to find that the false statement played some

role in granting Petitioner citizenship.

*Verdict: The Jury Did Not Make a Specific Finding Regarding the Factual Basis for
Either Conviction.*

Although the Court instructed the jury that it must be unanimous as the specific

false statements it found regarding 1425(a) and as to the specific grounds it found

regarding 1425(b), a special verdict form was not used. This was a conscious decision on

the part of the Government. The Court suggested the use of a special verdict form:

> THE COURT: . . . Oh, one other thing. You've all had a chance to look at the jury verdict, and I just want to put on the record that both sides prefer a general verdict form?
>
> MR. CAPIN: Correct.
>
> MR. HOWARD: Yes.
>
> THE COURT: Okay. And I just want the record to show I tried to talk you out of it, and my own view is probably a special verdict form, but both parties want a general verdict form; right?
>
> MR. HOWARD: Yes.
>
> MR. CAPIN: Yes.
>
> THE COURT: Okay

Crim.D. 309 at 124-25.

The jury returned a general verdict of guilty on both counts. Crim.D. 229 at 1;

Crim.D. 303 at 1-6. As a result, there is no way to know which alleged false statement or

statements formed the basis of the jury verdicts. Likewise, it is unknown whether the

1425(b) verdict was based on the allegations of false statements or on Petitioner

procuring citizenship when she did not meet the requirements of 8 U.S.C. 1427.

*Sentencing Hearing: The Court Recognized that the Evidence in Support of Each Conviction Was the Same.*

While sentencing is not an issue raised in Petitioner's motion, the Court did reach a conclusion in the sentencing hearing which is relevant here. Specifically, the Court found that, as to "each of the counts of conviction . . . it's clear to me that the criminal conduct underlying each is essentially the same." Crim.D. 274 at 40. As explained further below, Petitioner notes this finding in support of her position that the *Maslenjak* decision requires reversal of both convictions in this case.

<u>*Maslenjak* Requires Reversal of Both of Petitioner's Convictions.</u>

In *Maslenjak*, the defendant, a Serb, immigrated from Bosnia to the United States. In the process, she lied about the reasons she feared persecution, about her husband's service in the Bosnian Army, and about his role in the slaughter of thousands of Bosnian Muslim civilians. When she was charged with violating 18 U.S.C. 1425(a), she sought a jury instruction requiring the government to prove that her lies had influenced the decision to grant her citizenship. The trial court declined to give such an instruction, but the Supreme Court ultimately reversed that decision. The Supreme Court held that when a defendant is charged with procuring citizenship contrary to law, as provided in 18 U.S.C. 1425(a):

> [T]he Government must establish that an illegal act by the defendant played some role in her acquisition of citizenship. When the illegal act is a false statement, that means demonstrating that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result.

*Id*. 137 S. Ct. at 1923.

The Court based this holding on the wording of the 18 U.S.C 1425(a) which makes it a crime to knowingly "procure, contrary to law, the naturalization" of oneself or

another. *Id*. at 1924. Since the "adverbial phrase 'contrary to law,' [is] wedged between 'procure' and 'naturalizing,'" the "most natural understanding is that the illegal act must have somehow contributed to the obtaining of citizenship." *Id*. at 1924-25. Thus, the "statute strips a person of citizenship, not when she committed any illegal act during the naturalization process, but only when that act played some role in her naturalization." *Id*. at 1927.

The Court further elaborated on the practical operation of this required causal link between the illegal act and obtaining citizenship. The "issue a jury must decide in a case like this one is whether a false statement sufficiently altered those [immigration] processes as to have influenced an award of citizenship." *Id*. at 1928. When the Government's case is based on claims that the defendant lied about facts which would have led to the discovery of disqualifying information, the Government must make a two-part showing. First, "the Government has to prove that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials . . . to undertake further investigation." *Id*. at 1929. That showing alone is not enough, however. The Government must then also show that "the investigation 'would predictably have disclosed' some legal disqualification." *Id*.

As conceded by the Government, there was error as to Petitioner's 1425(a) conviction because the jury was not instructed that a conviction must be supported by proof of the *Maslenjak* causal link. Petitioner, of course, agrees with the Government on that point, but further submits that *Maslenjak* also requires reversal of her 1425(b) conviction because the Government's primary case regarding both counts was that Petitioner lied during the immigration process. To be sure, 1425(b) provides another

theory of criminal liability – that the defendant knowing procured citizenship when she did not possess the required qualifications. *Maslenjack,* 137 U.S. at 1925, n. 4. But the Government did not make a record that would support that theory as an independent basis for the conviction. As the Court stated when explaining why it imposed concurrent sentences, "the criminal conduct underlying each [count] is essentially the same." Crim.D. 274 at 40. To preserve the possibility of an independent theory of liability under 1425(b), the Government could have accepted the Court's suggestion of a special jury verdict form.  Without that record, the Court has no way to know at this point whether the jury's 1425(b) verdict was based on a finding that Petitioner lied to procure citizenship or whether the jury found that 1425(b) was violated simply because she did not meet the requirements of citizenship, regardless of whether she told lies which influenced the process. Since Government cannot show that the 1425(b) verdict was not based on a theory of false statements, and since the required *Maslenjak* instruction was not given as to either counts, the Court must vacate both of Petitioner's convictions.

The Concurrent Sentence Doctrine Does Not Apply in this Case.

The Government's first objection is that the concurrent sentence doctrine bars relief . In summary, the Government's argument is that *Maslenjak* only addressed 18 U.S.C. 1425(a) and "does not call into question Munyenyezi's conviction on Count Two." Civ. D. 22 at 6. Therefore, the argument goes, since Petitioner received equal and concurrent sentences on the two counts, granting her relief on Count One would not result in her being released or resentenced since she would still be serving the same sentence on Count Two. Civ. D. 22 at 9.

The Government's argument fails in the first instance because it assumes that *Maslenjak* requires no relief on Count Two. As explained above, that assumption is wrong. The case could have been tried, the jury could have been instructed, and the verdict could have been returned in a fashion which would allow parsing out the basis of the 1425(b) verdict. However, that is not what happened. Having had the opportunity to use a special verdict form and having been encouraged by the Court to proceed in that manner, the Government must now live with the consequences of having rejected that suggestion. The Government's case was that Petitioner's false statements justified both both the "contrary to law" charge under 1425(a) and the "not entitled to" charge under 1425(b). As to both counts, the Government is required by *Maslenjak* to show a causal connection between the false statements and the "procuring" of citizenship. For this reason alone, the Court should reject the Government's argument that the concurrent sentence doctrine precludes relief.

Second, the Government wrongly asserts that Petitioner will not suffer any adverse collateral consequences if her convictions and sentences are not vacated. That assertion ignores the fact that the Government's revocation of Petitioner's citizenship has led the United States Citizenship and Immigration Service to issue a Notice of Intent to Cancel Certificate of Citizenship to each of Petitioner's daughters. *See* Exhibit A (Letter from counsel for Charlene Ntahobari, Simbi Ntahobari, and Saro Ntahobari). That notice states that the USCIS intends to revoke the citizenship of Petitioner's daughters based on the revocation of Petitioner's own citizenship after her 2013 convictions. Petitioner's daughters came to the United States at a very young age and have grown up here. Their lives will be destroyed if their citizenship is revoked and they are removed from the

13

United States. They know no other home. To say the least, revocation of their citizenship is a significant collateral consequence.

Lastly, as recognized by this Court, the concurrent sentence doctrine is of questionable validity and now survives primarily as a rule of judicial convenience. *See Burke v. United States*, 2018 DNH 155, 2018 U.S. Dist. LEXIS 128687; *see also Benton v. Maryland*, 395 U.S. 784, 793 (1969); *Vanetzian v. Hall*, 562 F.2d 88, 90 (1st Cir. 1977). In a different case in which there were concurrent sentences arising out of two entirely separate charges, there may be judicial convenience in following the concurrent sentence doctrine. However, in this case where the charges are extensively intertwined to the point of being nearly coextensive, the Court should not treat the outcome regarding one charge as unrelated to the other charge. Following the concurrent sentence doctrine here would serve neither convenience nor justice.

<u>Petitioner Is Not Procedurally Defaulted from Raising a *Maslenjak* Claim.</u>

The Government also tries to avoid correction of the *Maslenjak* error by asserting the defense that Petitioner procedurally defaulted on the claim by not raising the it during her original trial or appeal. By way of context, it must first be noted that Petitioner was found guilty on February 21, 2013, she was sentenced on July 15, 2013, her conviction and sentence were affirmed by the First Circuit on March 25, 2015, and her petition for certiorari was denied on October 5, 2015. The petition for certiorari in *Maslenjak* was filed a year and a half later, on October 11, 2016. *Maslenjak* was not decided until June 22, 2017. Thus, the Government would fault Petitioner for not raising her *Maslenjak* claim four years before Maslenjak was decided.

A petitioner who seeks to obtain collateral relief based on trial errors to which no contemporaneous objection was made, must show (1) "cause" excusing his procedural default, and (2) "actual prejudice" resulting from the errors of which he complains. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *United States v. Frady*, 456 U.S. 152, 167-68 (1982); *Lassend v. United States*, 898 F.3d 115, 123 (1st Cir. 2018). Petitioner meets both requirements in this case.

*Petitioner Should Not Be Faulted for Failing to Raise the Maslenjak Claim Because It Was Not Reasonably Available at the Time of Her Trial and Appeal .*

Since *Maslenjak* was decided long after Petitioner's case was over, Petitioner could not have argued for the jury instruction required by *Maslenjak* and cited *Maslenjak* as authority. The Government recognizes that the novelty of a claim may constitute cause and therefore excuse a failure to raise the claim.  *See Reed v. Ross*, 468 U.S. 1, 16 (1984). Nonetheless, the Government argues that Petitioner should have anticipated the *Maslenjak* issue because similar issues had been raised in some other cases. The Government's contention that some version of the *Maslenjak* issue had been raised in other cases before Petitioner's conviction was final is correct, as far as that assertion goes. Nevertheless, the Government is wrong for several reasons.

First, the argument made in *Maslenjak* had been repeatedly rejected. The Government relies heavily on *United States v. Mensah*, 737 F.3d 789 (1st Cir. 2013) and correctly points out that the defendant in that case argued that a 1425(a) conviction must be supported by proof of a "but for" causal link between the illegal conduct and the grant of citizenship. *Id*. at 807. The Government should not have stopped there.

The rest of the story of *Mensah* is that the First Circuit rejected the argument for a *Maslenjak*-like causal link between false statements and the granting of citizenship.

Moreover, the Court pointed to other circuits which had rejected the same argument. The Court quoted at length from *United States v. Lachin*, 554 F.3d 709, 713-14 (7th Cir. 2009), noting that *Lachin* relied on the United States Supreme Court's analysis of a related statute in *Kungys v. United States*, 485 U.S. 759 (1988). In addition, the *Mensah* court quoted *Lachin* to the effect that its holding was consistent with "every federal appellate decision applying *Kungys* to a prosecution under 18 U.S.C. 1425(a)." *Mensah*, 737 F.3d at 808.

Seen in this light, the Government's argument is that Petitioner should have foreseen that a viable *Maslenjak* claim would be available four years after her trial, even though that claim had been rejected by Courts of Appeal relying on United States Supreme Court case law, including the First Circuit Court of Appeal. While it is true that the Supreme Court has said that futility alone is not justification for failing to bring a claim, *see Engle v. Isaac*, 456 U.S. 107, 130, n. 35 (1982), it is also the law that a defendant does not default on a claim when it is not <u>reasonably</u> available. *See Reed*, 468 U.S. at 16. The Supreme Court's comments in *Reed* about what claims are "reasonably available" are pertinent here.

> Counsel's failure to raise a claim for which there was no reasonable basis in existing law does not seriously implicate any of the concerns that might otherwise require deference to a State's procedural bar. Just as it is reasonable to assume that a competent lawyer will fail to perceive the possibility of raising such a claim, it is also reasonable to assume that a court will similarly fail to appreciate the claim. It is in the nature of our legal system that legal concepts, including constitutional concepts, develop slowly, finding partial acceptance in some courts while meeting rejection in others. . . . when the concept is in its embryonic stage, it will, by hypothesis, be rejected by most courts. Consequently, a rule requiring a defendant to raise a truly novel issue is not likely to serve any functional purpose.

*Reed,* 468 U.S. at 15.

The situation posited in *Reed* is exactly what happened here. At the time of Petitioner's trial, some lawyers in other cases had the idea to make the claim which was ultimately accepted years later in *Maslenjak*. But that idea was in its embryonic stage and had been rejected by appellate courts, including emphatically the First Circuit. In these circumstances, Petitioner (and her trial counsel) cannot be faulted for not raising the claim during her trial or appeal.

*If the Court Finds that the Maslenjak Claim Was Reasonably Available and Should Have Been Raised, then the Failure to Raise the Issue was Ineffective Assistance of Counsel.*

Attached to this memorandum as Exhibits B and C are affidavits from Petitioner's trial attorneys. Both are very experienced and skilled attorneys, so much so that both now sit on the New Hampshire Superior Court as trial judges. Nonetheless, if Petitioner is faulted for her trial attorneys' failure to anticipate and assert a *Maslenjak* claim, then this Court should excuse that default on the grounds of ineffective assistance of counsel. The Supreme Court has recognized that ineffective assistance of counsel may constitute cause sufficient to excuse a procedural default if the representation was "constitutionally ineffective under the standard established in *Strickland*." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Bucci v. United States*, 662 F.3d 18, 29 (1st Cir. 2011).

As set forth in the attached affidavits, Exhibits B and C, both former counsel have agreed to the following statement:

> I was not aware of the issue raised in *Maslenjak* or of other cases in which that issue had been discussed. If I had been aware of the issue, I would have raised it. The failure to raise the *Maslenjak* issue was not a considered or strategic decision. We tried the case several years before *Maslenjak* was decided and, despite having researched the materiality issues governing false-statement and immigration cases, I did not know that other lawyers had raised the issue in other trial courts and courts of appeal.

If, as the Government argues, "various forms of the claim" had been "percolating in the lower courts for years," Civ.D. 22 at 14, such that the *Maslenjak* argument was reasonably available to defense counsel, then Petitioner's trial lawyers should have raised it.

Under *Strickland v. Washington*, 466 U.S. 668(1984), defense counsel's performance will be found constitutionally ineffective if the defendant can show (a) that his counsel's performance was deficient; and (b) that the defendant was prejudiced as a result of the deficient performance. 466 U.S. at 687. Regarding the performance prong, the test is whether "whether counsel's assistance was reasonable considering all of the circumstances," *id*. at 688, evaluating the attorney's conduct "from counsel's perspective at the time" and in light of "prevailing professional norms," *id.* at 688-89. *See Rivera v. Thompson*, 879 F.3d 7, 12 (1st Cir. 2018).

Although Petitioner disagrees, according to the Government any reasonable lawyer would have seen that the *Maslenjak* issue was had been raised "in various forms" and had been "percolating for years." If that was the case, then there can be no good excuse for trial counsel's failure to become aware of the issue, despite performing legal research, or for failing to raise the issue. In short, if the Government is correct that the issue was "reasonably available," then surely competent trial counsel would have raised it.

Prejudice and Harmless Error

To complete her argument on procedural default, her argument on ineffective assistance of counsel, and her argument against the Government's additional defense of harmless error, Petitioner must discuss how she was prejudiced by the absence of a

*Maslenjak* instruction to her jury. Rather than repeat her prejudice argument three times over, Petitioner instead sets out a single argument.

There is a reasonable possibility that the jury based its verdicts primarily, if not exclusively, on a finding that Petitioner was affiliated with MRND and that she lied about that affiliation during the immigration process. That would have been the easiest basis on which the jury could reach consensus. The allegation that Petitioner lied about an affiliation with MRND was the least extreme of the Government allegations and those would be been the easiest for the jury to accept. Moreover, the Government heavily emphasized this basis for guilty verdicts in its closing. If the jury had accepted the Government's arguments for convictions based on this finding, the jury could have followed all of the Court's instructions and returned a verdict of guilty on both counts without making a finding on any of the other allegations.

If MRND affiliation alone was the basis for both verdicts, the *Maslenjak* error becomes especially important. The Government's witnesses testified that some MRND members did not participate in genocide and that MRND affiliation alone would not automatically exclude a person from the immigration process. Yet, since the jury was not given the jury instruction required by *Maslenjak*, they were not required to find that lying about affiliation with MRND impacted the decision to grant Petitioner citizenship. Petitioner's jurors were instructed that the Government did not have to prove that her alleged lies about MRND affiliation actually influenced the decision to grant her citizenship, whereas if the *Malenjak* instruction had been given, the jury would not have been able to convict unless it made a finding that the lies about MRND affiliation played some role in the decision to grant citizenship.

Proving that lies about MRND affiliation played a role in the granting of Petitioner's citizenship would have been difficult for the Government in light of the testimony of its witnesses. Moreover, had the *Maslenjak* instruction been required, trial counsel for Petitioner would have presented their case differently by asking questions and presenting arguments with regard to the absence of a causal link between MRND affiliation and the denial of citizenship. *See* Exhibits B and C.

Considering these circumstances, it is clear that Petitioner was prejudiced by the failure of the Court to give the instruction required by *Maslenjak*. Therefore, the government's arguments regarding procedural default and harmless error must be rejected.

Conclusion.

For all of the foregoing reasons, the Court should grant Petitioner's motion, vacate her convictions and sentences, and order a new trial.

No additional memorandum is filed with this motion because no further recitation of authority is necessary.

WHEREFORE, Petitioner respectfully requests that the Court schedule a hearing on her motion, grant the motion, set aside the convictions and sentences in 10-cr-00085-SM, and order a new trial.

Date: July 30, 2019.                                    Respectfully submitted,

                                                       */s/ Richard Guerriero*
                                                       Richard Guerriero, Esq.
                                                       N.H. Bar ID. 10530
                                                       Lothstein Guerriero, PLLC
                                                       Chamberlain Block Building
                                                       39 Central Square, Suite 202
                                                       Keene, NH 03431
                                                       Telephone: (603) 352-5000

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered Participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on the date the document was signed by me.

*/s/ Richard Guerriero*

1440 NEW YORK AVENUE, N.W.
WASHINGTON, D.C.  20005-2111

TEL: (202) 371-7000
FAX: (202) 393-5760

DIRECT DIAL
(202) 371-7983
DIRECT FAX
(202) 661-9063
EMAIL ADDRESS
SALZMAN@PROBONOLAW.COM

July 26, 2019

Richard Guerriero, Esq.
Lothstein Guerriero, PLLC
39 Central Sq., Ste. 202
Keene, New Hampshire 03431

Dear Mr. Guerriero:

We are pro bono counsel for Charlene Ntahobari, Simbi Ntahobari, and Saro Ntahobari, citizens of the United States and the daughters of Beatrice Munyenyezi. We write to inform you that our clients could be directly affected by the resolution of Ms. Munyenyezi's Motion to Vacate pending before the United States District Court for the District of New Hampshire (Concord).

On July 26, 2018, the United States Citizenship and Immigration Services (USCIS) sent each of our clients a Notice of Intent to Cancel Certificate of Citizenship, which stated that USCIS would cancel their Certificate of Citizenship if they did not respond within 60 days. Understandably, this letter surprised and alarmed our clients, who were brought to the United States by their mother when they were very young children, were raised here, and have no memory of living outside the United States. Until they received these letters in the mail more than five years after Ms. Munyenyezi's conviction, the sisters had no reason to believe their citizenship could be called into question.

The notice states that the basis for USCIS's actions relate to Ms. Munyenyezi's case: "You obtained Certificate of Citizenship No. [ ] on July 8, 2004, based upon Munyenyezi's naturalization which was revoked, set aside, and declared void in 2013. Therefore, in the absence of evidence to the contrary that you have at least one U.S. citizen parent, you are not a U.S. citizen and are not entitled to a Certificate of Citizenship."

In our view, USCIS's attempt to cancel their Certificates of Citizenship is unjust, and it is clear that Ms. Munyenyezi's proceedings are the underlying reason for the notices. Thus, if Munyenyezi's conviction is upheld, our clients could be placed into legal jeopardy with respect to their citizenship. In this way, the pending Motion to Vacate relates to the citizenship of four individuals, although it is undisputed that three of them—our clients—had absolutely nothing to do with the conduct alleged in Ms. Munyenyezi's case. (Charlene was an infant and Saro and Simbi were not yet born.)

Richard Guerriero, Esq.
July 26, 2019
Page 2

Our clients grew up in the United States, coming to this country at ages five (Charlene) and four (Saro and Simbi—twins). Each of the sisters attended primary school in New Hampshire. While in high school, our clients grappled with the hardship of their single parent mother's significant legal peril—including two jury trials. Nevertheless, each of our clients persevered in the midst of this personal challenge, graduated from high school, and went on to attend college. Charlene graduated from high school in New Hampshire in 2011 and from Syracuse University in 2015. After obtaining a degree in public health from Syracuse, Charlene worked in the health services industry. More recently, Charlene has become an entrepreneur and has established her own business in the health and wellness services industry. Saro graduated from high school in 2013, matriculated to Howard University in Washington, D.C., and is currently assessing opportunities to further her higher education. Simbi also graduated high school in 2013, attended American University, and currently works as a program coordinator at a national nonprofit organization for American civil rights.

Charlene, Saro and Simbi deserve the opportunity to pursue their educational, professional, and personal aspirations with the full benefits of citizenship to which they are entitled.

When we learned that the United States Court of Appeals for the First Circuit had remanded Ms. Munyenyezi's case to the District Court to reconsider her Motion to Vacate in light of the United State Supreme Court's decision in *Maslenjak v. United States*, we asked USCIS to either dismiss or stay its proceedings against our clients until the courts had fully and finally resolved Ms. Munyenyezi's claims with respect to her Motion. We made those requests because the sole basis for USCIS's Notices was the revocation of Ms. Munyenyezi's citizenship as a result of her convictions in this case. USCIS subsequently granted our request to stay the proceedings against our clients pending the outcome of Ms. Munyenyezi's case.

As we are not aware of any filing which would have provided notice of these collateral matters to the Court, we wanted to make sure that the Court is aware of the proceedings against our clients. We would appreciate your calling attention to the serious collateral effects of the disposition of Ms. Munyenyezi's case by attaching this letter to any filing that you make in that matter or informing the Court in some other manner.

If any additional information would be helpful to you or the Court, we are happy to provide it at your request or at the request of the Court.

Sincerely,

Donald P. Salzman

cc:   Theodore M. Kneller
      Jason N. Kestecher
      Joshua G. Rabon

Beatrice Munyenyezi
Petitioner Exhibit B
1:16-cv-00402-SM
1:10-cr-00085-SM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

BEATRICE MUNYENYEZI, Petitioner

v.                                                  No. 1:16-cv-00402-SM

UNITED STATES OF AMERICA, Respondent

### AFFIDAVIT OF THE HONORABLE DAVID W. RUOFF

I, David W. Ruoff, hereby state, under the pains and penalties of perjury, that:

1. I am currently a Superior Court Judge for the State of New Hampshire, having been appointed in 2016. Prior to being appointed to the bench, after admitted to the Bar in 1996, I had a 20-year career as a trial lawyer focusing on criminal cases.  I served as an Assistant Rockingham County Attorney, Assistant Attorney General and staff attorney for the NH Public Defender.  I also served on the NH Supreme Court's Professional Conduct Committee and the NH Bar Association Board of Governors.  For 8 years immediately prior to my appointment I worked as a private defense lawyer in state and federal criminal cases.

2. I was court-appointed counsel for Beatrice Munyenyezi when she was arrested in 2010.  Soon thereafter, my law partner Hon. Mark E. Howard was appointed as co-counsel. In that role I performed all of the functions of defense counsel, including reviewing discovery, conducting an investigation, meeting with the defendant, filing motions, preparing a trial strategy, and providing representation at all hearings and two jury trials in federal court.  I also travelled to Rwanda twice to prepare her defense.

3. I am aware of the post-conviction claim for relief filed by the defendant based on the case of *Maslenjak v. United States*, 137 S.Ct. 1918 (2017).

4. While representing the defendant, I was not aware of the issue raised in *Maslenjak* or of other cases in which that issue had been discussed. If I had been aware of the issue, I would have raised it. The failure to raise the *Maslenjak* issue was not a considered or strategic decision. We tried the case several years before *Maslenjak* was decided and, despite having researched the "materiality" issues governing false-statement and immigration cases, I did not know that other lawyers had raised the issue in other trial courts and courts of appeal. I believed that the standard jury instructions on the materiality of false statements – given in both jury trials – reflected settled law.

5. If *Maslenjak* had been the law at the time of the trial, particularly during the second trial (which saw a significant shift in the nature of the evidence when compared to the first trial), such that the government had to prove that any unlawful activities by the defendant played a role in the decisions of U.S. immigration officials, we would have presented our case differently. We would have changed our presentation of the evidence, witness examination, and arguments to show that the government could not prove that the alleged false statements by the defendant actually played role in the immigration and citizenship decisions. Certain witnesses, including Donald Monica and Donald Heflin, provided testimony which would have supported such an argument. I would have questioned them further about that issue and we would have made a specific argument to the jury under the *Maslenjak* standard. In addition, we would have sought a jury instruction consistent with *Maslenjak.*

6. Based on my knowledge of the entire case, I believe that if the jury had been

instructed consistent with the holding of *Maslenjak*, the verdict may have been different.

7. I am willing to testify at a hearing regarding the foregoing, upon presentation

of a subpoena, service of which I authorize General Counsel for the New Hampshire

Judicial Branch to accept on my behalf.

8. I swear these foregoing statements are true to the best of my knowledge.

July 23, 2019, at Keene, New Hampshire.

_____
David W. Ruoff

On July 23, 2019 personally appeared before me the above-named David W.

Ruoff, known to me, or proven to be the same, who affirmed under penalty of perjury

that the foregoing statements are true, to the best of his knowledge and belief.

_____
Justice of the Peace/Notary Public
My Comm. Expires: 12/2...

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

BEATRICE MUNYENYEZI, Petitioner

v.                                                      No. 1:16-cv-00402-SM

UNITED STATES OF AMERICA, Respondent

### AFFIDAVIT OF THE HONORABLE MARK E. HOWARD

I, Mark E. Howard, hereby state, under the pains and penalties of perjury, that:

1. I am currently a Superior Court Judge for the State of New Hampshire, having joined the bench in December 2015. I was admitted to the New Hampshire Bar in 1987, and practiced law as a trial attorney for over 28 years. I served as a State and federal prosecutor in New Hampshire for a total of 12 years. Prior to being appointed to the bench, I was an attorney in private practice where my focus was primarily criminal defense and general civil litigation.

2. In or around 2010, my then law partner, the Honorable David W. Ruoff, and I were court-appointed trial co-counsel for Beatrice Munyenyezi. In that role I performed all of the functions of defense counsel, including reviewing discovery, conducting an investigation, meeting with the defendant, filing motions, preparing a trial strategy, and providing representation at all hearings and two jury trials in federal court (the first trial in 2012 resulted in a hung jury).

3. I am aware of the post-conviction claim for relief filed by the defendant based on the case of *Maslenjak v. United States*, 137 S.Ct. 1918 (2017).

1

4.  While representing the defendant, I was not aware of the issue raised in *Maslenjak* or of other cases in which that issue had been discussed.  If I had been aware of the issue, I would have raised it. The failure to raise the *Maslenjak* issue was not a considered or strategic decision. We tried the case several years before *Maslenjak* was decided and, despite performing legal research on the issue of materiality in federal false statement cases, I did not know that other lawyers had raised the issue in other trial courts and courts of appeal.

5.  If *Maslenjak* had been the law at the time of the trial, particularly the second trial in 2013, such that the government had to prove that any unlawful activities by the defendant played a role in the decisions of U.S. immigration officials, we would have presented our case differently. We would have changed our presentation of the evidence, witness examination, and arguments in order to show that the government could not prove that the alleged false statements by the defendant actually played role in the immigration and citizenship decisions.  Certain witnesses, including Donald Monica and Donald Heflin, provided testimony which would have supported such an argument. Judge Ruoff or I would have questioned them further about that issue and we would have made a specific argument to the jury under the *Maslenjak* standard.  In addition, we would have sought a jury instruction consistent with *Maslenjak* with regard to the elements of the offense under 18 U.S.C. § 1425(a).

6.  Based on my knowledge of the entire case, I believe that if the jury had been instructed consistent with the holding of *Maslenjak*, the verdict may have been different.

7.  I swear the foregoing statements are true to the best of my knowledge.

2

8. I am willing to testify at a hearing regarding the foregoing upon presentation of a subpoena, service of which I authorize General Counsel for the New Hampshire Judicial Branch to accept on my behalf.

July 19, 2019, at Dover, County of Strafford, New Hampshire.

_Mark E. Howard_
Mark E. Howard

On July 19, 2019 personally appeared before me the above-named Mark E. Howard, known to me, or proven to be the same, who affirmed under penalty of perjury that the foregoing statements are true, to the best of his knowledge and belief.

_Mary B. Billert_
Justice of the Peace/Notary Public
My Comm. Expires: _10/03/2023_

MARY B. BILLERT, Notary Public
State of New Hampshire
My Commission Expires October 3, 2023

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

BEATRICE MUNYENYEZI, Petitioner

v.                                                        No. 1:16-cv-00402-SM

UNITED STATES OF AMERICA, Respondent

NOTICE OF APPEAL

Petitioner, Beatrice Munyenyezi, through counsel, hereby appeals to the United

States Court of Appeals for the First Circuit from this Court's judgment and order on

October 10, 2019 denying her motion pursuant to 18 U.S.C. §2255

Petitioner notes that a Rule 11 certificate of appealability was issued.

Submitted October 12, 2019 by counsel for Petitioner.

Respectfully submitted,

*/s/ Richard Guerriero*
Richard Guerriero, Esq.
N.H. Bar ID. 10530
Lothstein Guerriero, PLLC
Chamberlain Block Building
39 Central Square, Suite 202
Keene, NH 03431
Telephone: (603) 352-5000

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent
electronically to the registered Participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as nonregistered participants on
the date the document was signed by me.

*/s/ Richard Guerriero*